JACOBS & BARBONE, P.A.
A Professional Corporation
Attorneys at Law
1125 Pacific Avenue
Atlantic City, N.J. 08401
(609) 348-1125
jacobsbarbone@comcast.net
Attorneys for Plaintiffs

| | |
|---|---|
| VERNON W. HILL, II, SHIRLEY HILL AND INTERARCH, INC., | UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY |
| Plaintiffs, | Civil Action No. 1:09-cv-03685(RBK-JS) |
| v. | Civil Action |
| COMMERCE BANCORP., LLC AND TD BANK, N.A., | **AMENDED COMPLAINT AND JURY DEMAND** |
| Defendants. | |

Plaintiffs Vernon W. Hill, II ("Mr. Hill"), Shirley Hill ("Mrs. Hill"), and

InterArch, Inc. ("InterArch"), by way of their Amended Complaint against the Defendants,[1] say:

## NATURE OF THE ACTION

1.      This is an action by Plaintiffs for: (1) payment of damages arising from

the breach of an employment contract and a services contract by Defendants and for other

injuries the Defendants inflicted upon Plaintiffs' contractual, economic, and other interests; (2)

for indemnification and reimbursement of expenses against Commerce, pursuant to its

contractual obligations; and (3) an injunction and damages arising out of violation of the federal

---

[1]      Plaintiffs' original complaint included claims against individual Commerce directors and against Scott Hite. In this Amended Complaint, Plaintiffs dismiss their claims against the individual directors and against Mr. Hite.

copyright laws. Because of the wrongful conduct by Defendants, Plaintiff Vernon Hill has suffered damages in excess of $50,000,000, and Plaintiffs Shirley Hill and InterArch have suffered damages in excess of $7,500,000.

2.       Mr. Hill founded Commerce Bancorp, Inc. ("the Holding Company" or "Commerce Bancorp") in 1973 with a single branch in Marlton, New Jersey. Over the past 34 years, Mr. Hill built the Holding Company into one of the largest and most successful regional headquartered in New Jersey. As of mid-2007, Commerce Bank, N.A. ("CB" or "the Bank"), a wholly-owned subsidiary of the Holding Company, operated more than 425 branches throughout the East Coast, served more than 2.4 million customers, and employed approximately 15,000 persons.

3.       During the 34 years Mr. Hill led the Bank and the Holding Company (collectively "Commerce"), the Bank expanded its network of branches exponentially. On a small number of new branch transactions, the Bank worked in partnership with real estate developers, including development firms in which Mr. Hill had a financial interest. Mr. Hill's financial interests in those affiliated-party transactions were the subject of disclosure to the Board of Directors of the Holding Company and the Holding Company's shareholders, as well as to the principal regulators of CB and the Holding Company—the Office of the Comptroller of the Currency ("OCC") and the Board of Governors of the Federal Reserve (the "Fed").

4.       Mrs. Hill founded InterArch, a full-service architectural and design firm, in 1973. Over the past 35 years, InterArch has provided extensive services to Commerce including, but not limited to, interior design, exterior design, space planning, move coordination,

2

and landscape design.  During that time, InterArch has become nationally and internationally renowned for its design and brand developments for Commerce.  The role of InterArch and Mrs. Hill in Bank transactions was the subject of disclosure to the Board of Directors of the Holding Company, as well as to the OCC and the Fed.

5.     Indeed, Commerce and the banking regulators have been monitoring the affiliated-party transactions and relationships at Commerce since 1975.  Notably, OCC regulations and guidelines expressly permit affiliated-party transactions.  As stated in the Insider Activities Comptroller's Handbook published by the OCC, "Transactions between a bank and its insiders can address legitimate banking needs and serve the interests of both parties."

6.     At no time during this period have the banking regulators issued any finding that the above-described activities of Mr. Hill, Mrs. Hill, or InterArch violated any laws or regulations.  Indeed, upon information and belief, from 2002 to 2006, the OCC and the Fed examined these affiliated-party transactions and found that they complied with prevailing regulations and guidance, did not disclose any cost disadvantage to Commerce and in some cases resulted in cost advantages, were made at predominantly market rates, and were consistent with arms-length guidelines.

7.     In addition, Commerce itself has never asserted that the affiliated-party transactions in which Mr. Hill or Mrs. Hill were involved harmed Commerce.  In fact, the opposite is true—in its public filings Commerce has asserted that the affiliated-party transactions in which Mr. Hill or Mrs. Hill were involved were completed at prices comparable or more favorable than those services that could have been obtained or received from non-affiliated

3

parties.  For example, at the urging of the OCC and the Fed, Commerce retained an independent

third party—Smart and Associates LLP—to analyze the services provided by InterArch, the

architectural and design firm wholly-owned by Shirley Hill.  In a report dated August 24, 2004,

Smart and Associates determined that InterArch's "hourly rates are well below those of the

competitors identified by Smart and equal to or lower than those that would be contracted in an

arm's length transaction."  The report also stated that "[t]otal project fees paid to InterArch are

significantly below industry averages" and that "if Commerce procured similar design services

from other vendors . . . the additional cost to Commerce in 2003 would have exceeded $3.3

million."  Commerce Bancorp confirmed this in a subsequent filing with the SEC:

> The Company obtained architectural design and facilities management services
> from InterArch, Inc., a business owned by the wife of Mr. Hill, the former
> Chairman of the Company.  The Company spent $7.8 million in 2007 for such
> services and related costs.  Management believes these disbursements were
> substantially equivalent to those that would have been paid to unaffiliated
> companies for similar services.

Commerce Bancorp 2007 10-K, at 86.

8.     Nevertheless, Commerce improperly excluded Mr. Hill from important

meetings, forced him to resign from the Bank, and terminated his employment contract.  Further,

Commerce has refused to pay Mr. Hill monies owed to him under his employment agreement,

despite acknowledging in public filings that such payments are owed to Mr. Hill.  Commerce

representatives have stated that Commerce would make the payments due to Mr. Hill but for its

fear that making such payments would antagonize its federal bank regulators.  The OCC has

never issued any finding that Mr. Hill acted improperly, nor has any other regulator.  To the

extent the OCC had concerns about Mr. Hill, the OCC and Mr. Hill have since resolved any such

concerns and have entered into a settlement agreement that expressly contemplates Commerce's

payments to Mr. Hill of the amounts owed.  *See* Stipulation and Consent Order, at 5 (attached hereto as Exhibit A).

9.      Defendants have also taken actions directed at Mrs. Hill.  Specifically, Commerce has refused to pay monies owed to Mrs. Hill and/or InterArch, despite its contractual obligations.  Moreover, Commerce continued to accept services from InterArch after having determined that it would breach its contract with InterArch and would not pay monies owed to InterArch for services rendered.

10.     Specifically, Commerce, without the consent of InterArch (i) instituted a 10 percent holdback; (ii) wrongfully terminated the contractual relationship with InterArch effective October 31, 2007 (two months prior to the contractual expiration date of December 31, 2007); and (iii) failed to pay any outstanding invoices.  As a result of these decisions, Commerce has wrongfully and maliciously failed to pay approximately $2.9 million, exclusive of interest, to InterArch, without providing any justification for its failure to pay for InterArch's valuable services.

11.     Commerce has infringed InterArch's copyrights by unauthorized use of InterArch's architectural plans, which were used for the construction of Commerce branches, and other copyrighted documents.

12.     As a consequence of this wrongful conduct by Commerce, Mr. Hill, Mrs. Hill, and InterArch have been compelled to commence this action.

## THE PARTIES

13.     Plaintiff Vernon W. Hill, II, is a New Jersey resident, residing in the Township of Moorestown, Burlington County.  Until June and July 2007, respectively, Mr. Hill was the President and Chief Executive Officer of Commerce Bank and Commerce Bancorp.

14.     Plaintiff Shirley Hill is the wife of Plaintiff Vernon W. Hill, II and is also a New Jersey resident, residing in the Township of Moorestown, Burlington County, New Jersey. Mrs. Hill is the founder, President, and owner of InterArch.

15.     Plaintiff InterArch, Inc., is an architectural and design firm incorporated in New Jersey, having its principal place of business in the Township of Mount Laurel, Burlington County, New Jersey.

16.     Defendant Commerce Bancorp, Inc., was, at the time of the events described herein, a bank holding company incorporated in New Jersey and the parent company of Commerce Bank, N.A.[2]

---

[2]     Mr. Hill's Employment Agreement was executed by Commerce Bancorp, Inc. -- the parent of Commerce Bank, N.A.  In connection with the acquisition of Commerce by The Toronto-Dominion Bank, Commerce Bancorp, Inc., was restructured as Commerce Bancorp, LLC.  Also, Commerce Bank, N.A. and one other entity merged into TD Bank, N.A.  Pursuant to the January 8, 2009 Order of the United States District Court for the District of Columbia, Commerce Bancorp, LLC was substituted as the defendant on the claims in the Complaint against Commerce Bancorp, Inc., and TD Bank, N.A. was substituted as the defendant on claims against Commerce Bank, N.A.  Because the events that give rise to these claims occurred prior to the acquisition of Commerce, this Amended Complaint continues to refer herein to Commerce Bancorp and Commerce Bank, N.A. for clarity.  Nevertheless, pursuant to the January 8, 2009 Order, Commerce Bancorp, LLC and TD Bank, N.A. are substituted in as defendants in claims brought against Commerce Bancorp, Inc. and Commerce Bank, N.A., respectively.

17.     Defendant Commerce Bank, N.A., was, at the time of the events described herein, a Pennsylvania corporation, a national banking association, and a wholly-owned subsidiary of Commerce Bancorp, Inc.

## JURISDICTION

18.     This Court has subject matter jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1338.

19.     This Court has subject matter jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367.

20.     Upon information and belief, the Defendants have had substantial contacts with this District in connection with the allegations herein.

## VENUE

21.     This District is the appropriate venue under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## FACTUAL ALLEGATIONS

### Mr. Hill Builds and Transforms Commerce Bancorp Into One of America's Leading Banks

22.     Mr. Hill founded Commerce in 1973 with the opening of a single branch in Marlton, New Jersey. Between 1973 and 2007, Mr. Hill built Commerce into one of the

largest and most successful banks in the mid-Atlantic region and the largest Bank based in New Jersey by growing its branches to more than 425 from just one, with virtually all of that growth being organic. Under Mr. Hill's stewardship, Commerce revolutionized the banking industry by implementing Mr. Hill's ideas that included providing ultra-modern, distinctive and convenient branch locations, free checking, seven-day banking and extended and weekend hours, and free coin-counting machines. While Mr. Hill pioneered these ideas, they are now also standard practice at many leading banking institutions around the country.

23.     Under the leadership of Mr. Hill, Commerce's first 34 years were marked by rapid but prudent growth, sound profitability, and excellent financial returns to its shareholders. The company's earnings per share rose at an average annual rate of 23 percent for the past 20 years. Over that same period, the holding company's stock generated a return roughly five times that of the S&P index. As of mid-2007, its annual revenues had exponentially increased to $1.6 billion and it had a market capitalization of $7.6 billion, which ranked it third among 146 regional U.S. banks.

24.     Commerce created rapid growth by aggressively building new branches in prime market areas. As of mid-2007, the Bank operated branches in the District of Columbia, Virginia, Maryland, Pennsylvania, New Jersey, New York, Connecticut, Delaware, and Florida. Commerce had assets of more than $48 billion and deposits of $44 billion.

25.     Mr. Hill served as the Chairman, President, and CEO of the Bank until June 2007 and the Holding Company until July 2007, when he was forced out of his positions at both institutions by the Holding Company.

26.     On October 2, 2007, after Mr. Hill was forced out of his positions at both institutions, TD Bank Financial Group ("TD") announced that it had reached a definitive agreement to acquire Commerce in a 75 percent stock and 25 percent cash transaction valued at $8.5 billion.  Under the agreement, Commerce Bancorp shareholders would receive 0.4142 shares of TD common stock and $10.50 in cash in exchange for each common share of Commerce Bancorp.  This transaction closed on March 31, 2008.

27.     After Mr. Hill's departure resulted in the forced sale of Commerce to a foreign bank, class action lawsuits were brought challenging the sale.  In addition, in its public filings, Commerce has stated that Commerce Chairman Dennis DiFlorio would earn a total of $7.6 million, CEO Robert Falese would earn $7.3 million, chief financial officer Douglas Pauls would earn $4 million and insurance division chairman George Norcross III would earn $7.6 million, if they remain with TD Bank after the acquisition.  The only Commerce executive not benefiting from the TD Bank acquisition is Commerce's founder and leader for 34 years, Mr. Hill, who was driven out of Commerce based on unsubstantiated allegations prior to the proposed acquisition.

### Mr. Hill's Employment Agreement

28.     On January 1, 1992, Mr. Hill entered into an Employment Agreement with the Holding Company.  This agreement provided that Mr. Hill would be employed as the Chairman, President, and CEO of the Holding Company for a term of five years beginning on January 1, 1992, renewing automatically on each anniversary date for a new five-year term.  The agreement was approved by the Commerce Bancorp Board of Directors and publicly disclosed.

29.     On March 14, 2006, Mr. Hill entered into an Amended and Restated Employment Agreement ("Employment Agreement") with the Holding Company.  A copy of the Employment Agreement is attached hereto as Exhibit B.  The OCC did not indicate any objection to the Employment Agreement.  The Employment Agreement was approved by the Holding Company Board of Directors and publicly disclosed.

30.     The Employment Agreement provides that Mr. Hill is to be employed as the Chairman, President, and CEO of Commerce Bancorp for a term of five years beginning on January 1, 2006, renewing automatically on January 1, 2007, and ending on December 31, 2011.

31.     Pursuant to the Employment Agreement, Mr. Hill's base salary is to be at a rate of not less than $1,000,000 per year.  Mr. Hill's base salary at the time of his termination was $1,000,000 per year and his bonus paid in 2007 with respect to his services during 2006 was $1,500,000.

32.     The Employment Agreement also entitled Mr. Hill to participate in all fringe benefits including, without limitation, medical and hospitalization coverage, life insurance coverage, and disability coverage.

33.     The Employment Agreement allows for Commerce Bancorp to terminate Mr. Hill's employment "For Cause" or "Without Cause" as provided therein.

34.     Under section 7.1 of the Employment Agreement, Commerce Bancorp has the right to terminate Mr. Hill's employment "Without Cause" by giving him not less than thirty days' prior written notice of its intention to terminate his employment.

10

35.     Section 7.2 defines "Without Cause" as "any reason other than by either Termination 'For Cause' [], or Termination at Anniversary…."

36.     Upon termination Without Cause, pursuant to section 7.3 of the Employment Agreement, Commerce Bancorp is required to pay Mr. Hill the following:

(a)     ***Compensation through Termination Date.***  Any pro-rated portion of his full Compensation through the date of termination; and

(b)     ***"Without Cause Severance Payment"***.  A lump sum severance payment (the ***"Without Cause Severance Payment"***) in lieu of any further Compensation payments to Hill after the date of termination.

(i)     ***"Without Cause Severance Payment"*** means the sum of Hill's full Compensation that would still be remaining until the end of the then Term had Hill continued to be employed by Commerce to the end of the then Term.

Section 3.1 of the employment agreement defines "Compensation" as "the sum of the highest annual rate of base salary … and highest cash bonus … paid to Hill during the most recent twenty-four (24) months of the Term."

37.     In addition, upon termination Without Cause, pursuant to section 11 of the Employment Agreement, the Holding Company is required to permit Mr. Hill to participate in the Holding Company's medical, disability, hospitalization, and life insurance benefits for three years.

38.     Further, any outstanding options held by Mr. Hill to purchase Commerce Bancorp stock shall vest as of the date of termination of Mr. Hill's employment.

39.     Under section 12.2 of the Employment Agreement, following termination Without Cause, all payments due and owing Mr. Hill are required to be paid within thirty days from the date of his termination of employment.

**Commerce Bancorp Breaches the Terms of the Employment Agreement with Mr. Hill**

40.     On June 28, 2007, Commerce, through its Board of Directors, ratified a resolution terminating Mr. Hill's employment Without Cause, effective July 31, 2007.

41.     By its letter of July 3, 2007, Commerce Bancorp acknowledged that under the Employment Agreement the following contractual obligations were triggered by Mr. Hill's termination Without Cause:

(a)     "Separation Payment in the amount of $11,250,000.00 that would have been paid to Mr. Hill had he continued to be employed by Commerce Bancorp, Inc. until December 31, 2011."

(b)     "Participation in all Commerce Bancorp, Inc. medical, disability, hospitalization and life insurance benefits for a period of three (3) years from the date of the termination of Mr. Hill's employment."

(c)     "Immediate vesting of any outstanding options to purchase Commerce Bancorp, Inc.'s stock as of the date of termination of employment."

(d)     "Release from any restrictive covenants on the termination date."

A copy of this letter is attached as Exhibit C.

42.     Commerce Bancorp acknowledged the contractual obligations owed to Mr. Hill in a subsequent SEC filings.  In its 2007 10-K filing, Commerce Bancorp acknowledged: "Vernon W. Hill, II. was Chairman, President and Chief Executive Officer of the Company

through July 31, 2007. Per the terms of his Amended and Restated Employment Agreement, Mr. Hill was entitled to a lump sum severance payment of $11.0 million." 2007 10-K, at 51. A copy of Commerce Bancorp's 2007 10-K is attached as Exhibit D. Similarly, in its June 30, 2007 10-Q filing, Commerce Bancorp acknowledged: "Under the terms of Hill's Amended and Restated Employment Agreement (Agreement), Hill is to receive a lump sum severance payment of $11.0 million." A copy of Commerce Bancorp's June 30, 2007 10-Q is attached as Exhibit E.

43.     On July 13, 2007, Mr. Hill served Commerce Bancorp with a written demand that it comply with the Employment Agreement by providing him with (i) his Without Cause severance payment in the amount of $11,250,000 under section 7.3(b) of the Employment Agreement, plus annual bonus, estimated at approximately $750,000; (ii) three years' participation in Commerce's medical, disability, hospitalization, and life insurance benefits under section 11.1(a) of the Employment Agreement; (iii) vesting of his outstanding options under section 11.1(b) of the Employment Agreement; and (iv) Commerce Bancorp stock allocated to his accounts under the Commerce 401(k)/ESOP.

44.     Despite this written demand, and the fact that all payments due and owing Mr. Hill were required to be paid by August 31, 2007, Commerce Bancorp has failed to provide Mr. Hill with all the payments and benefits due and owing him under the terms of the Employment Agreement.

45.     According to section 14 of the Employment Agreement, Mr. Hill is entitled to full reimbursement from Commerce Bancorp for all costs and expenses, including reasonable attorneys' fees, costs, and interest, incurred in enforcing his rights under the

Employment Agreement ("Enforcement Expenses") based upon Commerce Bancorp's failure to pay and provide Mr. Hill with the benefits due under the Employment Agreement.

46.     The Employment Agreement also provided Mr. Hill the right to participate in the Commerce stock-option plan.  On October 11, 2007, Mr. Hill attempted to exercise 500,000 stock options expiring in 2016 and 200,000 options expiring in 2017.  At the current market price on that date, the pre-tax proceeds from the exercise of those options would have been approximately $3.5 million.  Commerce Bancorp has not yet executed Mr. Hill's exercise of those options.

47.     Under section 14.3 of the Employment Agreement, Mr. Hill is entitled to such payment and reimbursement for Enforcement Expenses provided that: (i) Commerce Bancorp does not cure its failure to pay or provide Mr. Hill any amounts or benefits owed him within 30 days after receiving Mr. Hill's written notice of such failure; and (ii) Mr. Hill's action in enforcing his rights is not frivolous (hereinafter "Enforcement Provisions").

48.     On September 10, 2007, Mr. Hill provided written notice to the Holding Company detailing its failure to provide him with the payments and benefits under the Employment Agreement.

49.     Commerce Bancorp has failed to cure its refusal to provide Mr. Hill with the payments and benefits due and owing him under the Employment Agreement.  Accordingly, the Holding Company is obligated to pay Mr. Hill's Enforcement Expenses, including but not limited to fees and costs for prosecuting this action.

**Mr. Hill's Reputation Was Damaged As a Result of Commerce's Actions**

50.     By publicly forcing Mr. Hill out of Commerce under an unfounded cloud of suspicion, Commerce has severely damaged Mr. Hill's reputation in the banking industry.

**Mrs. Hill Builds InterArch Into a Leading Design Firm**

51.     Mrs. Hill is a graduate of the Pratt Institute of New York.  In 1973, Mrs. Hill founded InterArch, an architecture and design firm that has undertaken various commercial design projects in locations from Boston to Florida.  Since its founding, Mrs. Hill has at all times served as President of InterArch.  InterArch employed over 60 employees who had experience in architecture and design, landscape architecture, and industrial, product, furniture, lighting, and graphic design.

52.     For 35 years, InterArch has been engaged to provide interior design, exterior design, administration and management, construction procurement, bidding and negotiation, contract negotiation, space planning, move coordination, fixtures, furniture, and artwork procurement, project administration, and landscape design services to Commerce. InterArch has been instrumental in creating the unique and distinctive design, look, and feel of Commerce's branches.  InterArch has designed Commerce branches from Boston to Florida.

53.     Over the past 35 years, InterArch has foregone numerous other contracts and projects and devoted almost all of its time, effort, and energy to serving Commerce's needs.

54.     During 2007, InterArch designed Commerce branch locations in, among other locations, New Canaan, Connecticut, Shelton, Connecticut, Carl Springs, Florida, Derwood,

Florida, Juno Isles, Florida, Riviera Beach, Florida; Essex, Maryland, Germantown, Maryland, East Rutherford, New Jersey, Jamesburg, New Jersey, Morristown, New Jersey, New York, New York, Lower Moreland, Pennsylvania, Philadelphia, Pennsylvania, Richboro, Pennsylvania, Arlington, Virginia, and Leesburg, Virginia.  InterArch also designed and collaborated in the creation of operational facilities for Commerce in, among other locations, Calverton, Maryland and Cyprus Creek, Florida.

### InterArch's and Commerce's Contractual Agreements

55.     In recent years, it was Commerce and InterArch's practice for InterArch to submit a proposal of services ("Proposal of Services") to Commerce for the upcoming year.  The Proposal of Services included both a list of services that InterArch intended to perform for Commerce and a rate schedule for that work.

56.     In recent years, it was Commerce's practice to accept the Proposal of Services and to notify InterArch that it had accepted the Proposal of Services.

57.     In each instance, Commerce's Board of Directors approved InterArch's Proposal of Services, and its approval was disclosed to the Fed, the OCC, and Commerce's shareholders.

58.     In recent years, Commerce and InterArch agreed that InterArch was to be Commerce's sole provider of interior design, exterior design, space planning, move coordination, and landscape design services.

59.     Pursuant to its agreements with InterArch, Commerce compensated InterArch for the work it performed on Commerce's behalf based on a flat fee or based on the number of hours InterArch spent on a particular project.

## The Master Agreement Between InterArch and Commerce

60.     Consistent with Commerce's and InterArch's practice, on December 5, 2005, InterArch submitted a Proposal of Services to Commerce for the 2006 calendar year.

61.     Commerce accepted InterArch's 2006 Proposal of Services. That proposal included an agreement by Mrs. Hill to provide her professional services free of charge. This saved Commerce approximately $300,000 in 2006.

62.     Upon information and belief, this acceptance was approved by Commerce's Board of Directors.

63.     On February 27, 2006, InterArch and Commerce executed a Master Agreement for Architectural/Engineering/Consultant Services ("Master Agreement"). The term of the agreement is January 1, 2006, until December 31, 2006. A copy of the Master Agreement is attached hereto as Exhibit F.

64.     Upon information and belief, the Master Agreement was approved by Commerce's Board of Directors.

65.     Throughout 2006, Commerce and InterArch acted consistent with the Master Agreement.

**The 2007 Agreement Between InterArch and Commerce**

66.     Consistent with Commerce's and InterArch's pattern and practice, on December 13, 2006, InterArch submitted its 2007 Proposal of Services to Commerce. That proposal included a list of services that InterArch offered to perform for Commerce during the upcoming year and a rate schedule for that work. Like the 2006 Proposal of Services, the 2007 Proposal of Services provided that Mrs. Hill would provide her professional services free of charge.

67.     Commerce's Board of Directors accepted and approved InterArch's 2007 Proposal of Services on or about February 20, 2007.

68.     Commerce notified InterArch that it had accepted InterArch's 2007 Proposal of Services.

69.     Commerce also delivered a copy of InterArch's 2007 Proposal of Services to InterArch with a handwritten note indicating that Commerce's Board of Directors had accepted InterArch's 2007 Proposal of Services.

70.     Upon information and belief, Commerce accepted InterArch's 2007 Proposal of Services upon the same terms and conditions as the Master Agreement; therefore, all of the terms and conditions of the Master Agreement remained in effect through December 31, 2007. Consistent with prior contractual dealings, InterArch provided Commerce with a 5 percent fees reduction, which reduction Commerce accepted.

71.     Pursuant to Commerce's agreements with InterArch, including, but not limited to the Master Agreement, Commerce was prohibited from terminating its contractual relationship with InterArch before December 31, 2007, unless: (i) InterArch has failed to materially perform in accordance with the terms of the Master Agreement; (ii) Commerce has notified InterArch of such a breach; and (iii) Commerce has provided InterArch with sixty days to cure the breach.

72.     Accordingly, Commerce is legally obligated to adhere to Commerce's agreements with InterArch, including, but not limited to the Master Agreement, through December 31, 2007.

73.     To meet Commerce's requests, InterArch declined to seek and to accept other business for the 2007 calendar year.

74.     Pursuant to Commerce's agreements with InterArch, including, but not limited to the Master Agreement, Commerce is obliged to pay each invoice in full within thirty days of receiving it.  To date, Commerce owes InterArch approximately $2.9 million, exclusive of interest.  This amount includes the full amount Commerce owes on unpaid InterArch invoices from prior to June 2007 through October 2007 as well as amounts that Commerce has failed to pay on other invoices as a unilateral 10 percent holdback on invoices which it has otherwise paid in part.  InterArch did not consent to this holdback.

75.     Article 13 of the Master Agreement provides Mrs. Hill and InterArch the right to indemnification from Commerce.  It incorporates by reference Paragraph 5 of the

January 15, 2002 Agency Agreement ("Agency Agreement") between InterArch and Commerce, which is attached hereto as Exhibit G, and provides in relevant part that, "Commerce shall fully indemnify InterArch against, and defend and hold it, its officers, directors, employees, agents and other representatives harmless from any and all liability and related expenses (including without limitation reasonable fees and expenses of its counsel) incurred by InterArch and its officers, directors, employees, agents and other representatives, which may arise out of acts performed or omitted in connection with Projects and this Agreement."

76.     Pursuant to the Master Agreement and the Agency Agreement, Commerce is obligated to indemnify Mrs. Hill and InterArch for the costs that they have incurred as a result of investigations of Commerce by the OCC and other federal agencies.  In addition, Commerce is obligated to reimburse InterArch for any legal fees it expends to enforce its agreements with Commerce.

### Commerce Terminates Its Agreements with InterArch

77.     Despite InterArch providing valuable services to Commerce and without any warning or proper notice and in violation of its agreements with InterArch, Commerce unilaterally and without justification terminated its agreements with InterArch, including, but not limited to the Master Agreement, effective October 31, 2007, even though the Agreement by its terms ran through December 31, 2007.

78.     Upon information and belief, Commerce continued to accept the services of InterArch even after it had decided – without informing InterArch – that it would unilaterally terminate InterArch's services prior to the end of the contractual term and that it would not pay

for InterArch's services that were provided to Commerce (or it that it would withhold 10 percent of each invoice for such services).

79.     Since at least June 2007, without the consent of InterArch and in violation of its agreements with InterArch, Commerce arbitrarily and capriciously instituted a 10 percent holdback on invoices submitted by InterArch.

80.     Despite written demands to Commerce that it comply with its agreements with InterArch, including, but not limited to the Master Agreement, Commerce has refused to do so.

### Commerce Contemplates Acquiring InterArch and Requests Permission to Hire InterArch's Employees

81.     In February 2007, the Commerce Governance Committee recommended that Commerce acquire InterArch and hire all InterArch employees—including Mrs. Hill. *See* Commerce Bancorp June 11, 2007 8-Q, at 2 (attached as Exhibit H). However, the full Board of Directors never voted on the proposal. Upon information and belief, this is because the OCC objected to the acquisition of InterArch.

82.     In July 2007, Dennis DiFlorio, the Chairman of Commerce, met with Mrs. Hill and asked her to permit Commerce to hire InterArch's employees. Mrs. Hill informed Commerce that she would not permit Commerce to hire InterArch's employees.

83.     In August 2007, Fred Graziano, President of Commerce's Retail Banking division, met with Mrs. Hill and asked her to permit Commerce to hire InterArch's employees.

Again, Mrs. Hill informed Commerce that she will not permit Commerce to hire InterArch's employees.

## Commerce Steals InterArch's Employees

84.     Upon information and belief, in or about July 2007, Commerce contacted Scott Hite with the malicious intent to induce Mr. Hite to resign from InterArch and take a job with Commerce, which Mr. Hite agreed to do.

85.     Upon information and belief, in or about July 2007, Commerce and Mr. Hite maliciously and intentionally conspired to induce other key employees of InterArch to resign from InterArch and take a job with Commerce.

86.     Upon information and belief, Mr. Hite and Commerce entered into this conspiracy with the malicious intent to destroy InterArch's business and steal InterArch's business.

87.     In furtherance of this conspiracy, prior to October 31, 2007, Mr. Hite contacted certain InterArch employees with the malicious intent to induce them to resign from InterArch and take a job with Commerce.

88.     Upon information and belief, in furtherance of this conspiracy, Commerce contacted certain InterArch employees with the malicious intent to induce them to resign from InterArch and take a job with Commerce.

89.     Beginning prior to October 31, 2007, Commerce and Mr. Hite maliciously and intentionally concealed this conspiracy from InterArch and Mrs. Hill.

90.     Without prior notice, on November 1, 2007, Mr. Hite and other InterArch employees resigned from their positions at InterArch effective immediately.

91.     Upon information and belief, some or all of the employees who resigned from their positions at InterArch on November 1, 2007, were among the employees contacted by Mr. Hite and Commerce.

92.     Upon information and belief, the employees who resigned from their positions at InterArch on November 1, 2007, would not have resigned from their positions at InterArch absent Commerce's and Mr. Hite's actions.

93.     The employees who resigned from their positions at InterArch on November 1, 2007, have accepted positions with Commerce.

94.     The employees who resigned are critical to InterArch's business. Commerce and Mr. Hite believed that luring these employees away from InterArch would have the effect of destroying InterArch.

### Commerce Infringes InterArch's Copyrights

95.     InterArch owns valid copyrights in architectural designs, plans, drawings, and specifications, prepared by InterArch ("InterArch's IP") relating to the construction of Commerce buildings.

96.     InterArch's IP is incorporated both in technical designs and in "architectural works" as that term is defined within the copyright laws of the United States.

97.     InterArch's IP was created at substantial expense and effort.

98.     In December 2007, InterArch applied for copyright registrations with the United States Copyright Office for certain of InterArch's IP.  InterArch also claims valid copyrights in other aspects of InterArch's IP that are expected to be the subject of additional forthcoming applications to the United States Copyright Office.

99.     InterArch's IP was not created by anyone who was, at the time of creation, an employee of any of the Defendants, and InterArch's IP was not created within the scope of any employment by any of the Defendants.

100.    The Master Agreement does not provide that Commerce owns any copyrights in InterArch's IP that was produced pursuant to the Master Agreement.  To the contrary, the Master Agreement explicitly provides that InterArch's designs, plans, drawings, and specifications "may not be used by [Commerce] for any other project unless [Commerce] provides prior notice to [InterArch] and agrees to pay a reasonable fee for such use."

101.    InterArch's IP is not work made for hire.

102.    None of InterArch's IP is a contribution to a collective work, part of a motion picture or other audiovisual work, a translation, supplementary work, a compilation, an instructional text, a test, answer material for a test, or an atlas.

103.   At no time did InterArch or Mrs. Hill ever give Commerce or any of the other Defendants permission, express, or implied, to utilize any aspect of InterArch's IP after Commerce terminated its agreements with InterArch, except as expressly set forth in the Master Services Agreement.

104.   Upon information and belief, despite refusing to pay monies due to InterArch, Commerce has copied and continues to use and/or exploit InterArch's IP in the construction of one or more of Commerce's buildings.

105.   Upon information and belief, Commerce or other architectural firms working under the direction of Commerce have made other uses of InterArch's IP that are as yet unknown to Plaintiffs in order to complete buildings that were unfinished at the time of InterArch's termination and/or on other building designs that are derivative of and/or employ original features of InterArch's IP, including but not limited to the works that are the subject of InterArch's copyright registration applications.

106.   Commerce's copying and employment of InterArch's IP without InterArch's express consent violates InterArch's exclusive rights to reproduce its copyrighted works and to prepare derivative works.

### FIRST CLAIM FOR RELIEF
### (Breach of Contract)
### (Mr. Hill Against Commerce Bancorp)

107.   Plaintiff Mr. Hill repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

108.     Mr. Hill has done all things that have been required to be done by him under the Employment Agreement and he is not in breach of that agreement.

109.     The Holding Company terminated Mr. Hill's employment Without Cause effective July 31, 2007.

110.     Upon Mr. Hill's termination Without Cause, section 7.3(b) of the Employment Agreement required Commerce Bancorp to pay Mr. Hill $11,250,000 representing the compensation due and owing to him for the remaining term of the Employment Agreement, and a pro-rata portion of his annual bonus.

111.     Upon Mr. Hill's termination Without Cause, section 11 of the Employment Agreement required that Commerce Bancorp: (i) allow Mr. Hill to participate in Commerce Bancorp's medical, disability, hospitalization, and life insurance benefits for three years; and (ii) immediately vest all outstanding shares held by Mr. Hill to purchase Commerce Bancorp stock.

112.     The Holding Company has willfully and wrongfully breached the terms and conditions of the Employment Agreement by failing:

(a)     to pay Mr. Hill the compensation due and owing him for the remaining term of the Employment Agreement;

(b)     to allow Mr. Hill to participate in Commerce's medical, disability, hospitalization, and life insurance benefits for three years following his termination; and

(c)     to vest all outstanding shares held by Mr. Hill to purchase Commerce Bancorp stock.

113.    As a direct and proximate result of Commerce Bancorp's breach of the Employment Agreement, Mr. Hill has been damaged and his damages include lost compensation, lost medical coverage, and lost vesting rights to purchase Commerce Bancorp stock.

114.    The Enforcement Provisions of the Employment Agreement provide that Mr. Hill is entitled to full reimbursement from the Holding Company for all costs and expenses, including reasonable attorneys' fees, costs, and interest, incurred in enforcing his rights under the Employment Agreement based on the Holding Company's failure to provide Mr. Hill with the payments and benefits due and owing him under the Employment Agreement.

115.    Mr. Hill has fully complied with the Enforcement Provisions.  Despite doing so, Commerce Bancorp has willfully and wrongfully breached the Employment Agreement by failing to cure its refusal to provide Mr. Hill the payments and benefits due and owing him under the Employment Agreement.

116.    As a result of the Holding Company's conduct, Mr. Hill has incurred and will incur substantial attorneys' fees and costs, which he is entitled to full reimbursement for under section 14 of the Employment Agreement.

## SECOND CLAIM FOR RELIEF
### (Breach of Implied Covenant of Good Faith and Fair Dealing)
### (Mr. Hill Against Commerce Bancorp)

117.    Plaintiff Mr. Hill repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

118.    The Holding Company is obligated under an implied covenant of good faith and fair dealing to act in good faith and deal fairly with respect to the Employment Agreement and the obligations it assumed thereunder.

119.    Commerce Bancorp breached its obligation of good faith and fair dealing through its termination of Mr. Hill's employment with Commerce Bancorp and its willful and wrongful failure to pay Mr. Hill the compensation and benefits due and owing him under the Employment Agreement.  Commerce Bancorp acted in a manner that damaged Mr. Hill's reputation in the banking industry and unfairly called into question Mr. Hill's business ethics.

120.    The breach by Commerce Bancorp of its obligations of good faith and fair dealing caused Mr. Hill damages in addition to those caused by Commerce Bancorp's breach of the Employment Agreement.  Specifically, Commerce Bancorp's breach of its obligation of good faith and fair dealing has caused and will continue to cause Mr. Hill damages in the form of harm to his reputation.

121.    As a result of the Holding Company's bad faith breach, Mr. Hill has incurred and will incur substantial attorneys' fees and costs.

### THIRD CLAIM FOR RELIEF
### (Contractual Indemnification)
### (Mr. Hill Against Commerce Bancorp)

122.    Plaintiff Mr. Hill repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

28

123.    Section 4.4 of the Employment Agreement provides that Mr. Hill is entitled to "[i]ndemnification by Commerce to the fullest extent permitted by governing law and in accord with Commerce's bylaws and policies, against all claims concerning Hill's status as an officer, director, employee, or agent of Commerce."

124.    Mr. Hill has incurred various costs and expenses for which the Holding Company is obligated to provide indemnification including those relating to shareholder actions and investigations by the OCC and other federal agencies, along with the instant employment dispute.

125.    Despite Mr. Hill's numerous requests for indemnification and the advance payment of defense costs, the Holding Company has steadfastly refused to indemnify and advance defense costs to Mr. Hill.

126.    Commerce Bancorp has willfully and wrongfully breached the Employment Agreement by refusing to indemnify and advance defense costs to Mr. Hill.

127.    As a result of Commerce Bancorp's breach, Mr. Hill has incurred and will incur substantial attorneys' fees and costs.

## FOURTH CLAIM FOR RELIEF
### (Breach of Contract)
### (InterArch Against Commerce Bancorp and CB)

128.    Plaintiff InterArch repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

129.    InterArch has done all things that have been required to be done by its agreements with Commerce, including, but not limited to the Master Agreement, and it is not in breach of those agreements.

130.    Commerce has terminated its agreements with InterArch, including, but not limited to the Master Agreement, effective October 31, 2007.

131.    Commerce has willfully and wrongfully breached the terms and conditions of its agreements with InterArch, including, but not limited to the Master Agreement, by failing to pay and honor the obligations imposed by those agreements.

132.    As a direct and proximate result of Commerce's breach of its agreements with InterArch, including, but not limited to the Master Agreement, InterArch has been damaged. Commerce has failed to pay InterArch approximately $2.9 million, exclusive of interest.  This sum includes the amount that Commerce failed to pay as a result of the 10 percent holdback on invoices which have been paid in part.  InterArch did not consent to this holdback.

133.    In addition, in reliance upon a course of conduct by Commerce over three decades, InterArch built up a work-force and infrastructure designed to serve Commerce's ongoing needs and declined to seek other opportunities.

134.    Indeed, had Commerce not led InterArch to believe that InterArch would be asked to continue to provide services throughout, at a minimum, 2008, InterArch would have pursued other opportunities.

135.    In addition, InterArch retains certain property interests in and contractual rights to the architectural plans it designed for Commerce.  Commerce has failed to pay InterArch for its rights in these plans despite being requested to do so.

### FIFTH CLAIM FOR RELIEF
### (Quantum Meruit \ Unjust Enrichment)
### (InterArch Against Commerce Bancorp and CB)

136.    InterArch repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

137.    InterArch has provided interior design, exterior design, administration and management, construction procurement, bidding and negotiation, contract negotiation, space planning, move coordination, fixtures, furniture, and artwork procurement, project administration, and landscape design services for Commerce since December 31, 2006.

138.    InterArch performed such services in a good faith belief that it would be compensated for such services.

139.    Commerce has accepted such services.

140.    InterArch is entitled to the reasonable value of such services.

141.    If InterArch is not compensated for its services, Commerce will be unjustly enriched.

### SIXTH CLAIM FOR RELIEF
### (Promissory Estoppel)
### (InterArch Against Commerce Bancorp and CB)

142.    InterArch repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

143.    Commerce made a clear and definite promise that it would compensate InterArch for the services that it performed at Commerce's request.

144.    Commerce also made a clear and definite promise that InterArch would be its sole provider of various interior design, exterior design, administration and management, construction procurement, bidding and negotiation, contract negotiation, space planning, move coordination, fixtures, furniture, and artwork procurement, project administration, and landscape design services for the calendar year 2007, up to and including December 31, 2007.

145.    Commerce made those promises with the expectation and intention that InterArch would rely on those promises.

146.    InterArch relied upon Commerce's promises when it performed various interior design, exterior design, administration and management, construction procurement, bidding and negotiation, contract negotiation, space planning, move coordination, fixtures, furniture, and artwork procurement, project administration, and landscape design services at Commerce's request.

147.    InterArch also relied on those promises when it declined to seek other work.

148.   If InterArch is not compensated for the work it performed and the work it declined to seek at Commerce's behest, it will incur a substantial financial loss.

## SEVENTH CLAIM FOR RELIEF
### (Breach of Implied Covenant of Good Faith and Fair Dealing)
### (InterArch Against Commerce Bancorp and CB)

149.   Plaintiff InterArch repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

150.   Commerce is obligated under an implied covenant of good faith and fair dealing to act in good faith and deal fairly with respect to its agreements with InterArch, including, but not limited to the Master Agreement and the obligations it assumed thereunder.

151.   Commerce breached its obligation of good faith and fair dealing through their termination of their agreements with InterArch, including, but not limited to the Master Agreement, its willful and wrongful imposition of a 10 percent holdback, and their failure to pay InterArch the compensation and benefits due and owing it under its agreements with Commerce, including, but not limited to the Master Agreement.  Commerce acted in a manner that damaged InterArch's reputation in the design industry and unfairly called into question InterArch's business ethics.

152.   The breach by Commerce of its obligations of good faith and fair dealing caused InterArch damages in addition to those caused to InterArch by Commerce's breach of its agreements with InterArch, including, but not limited to the Master Agreement.  Specifically,

Commerce's breach of its obligation of good faith and fair dealing has caused and will continue to cause InterArch damages in the form of harm to its reputation.

153.   As a result of Commerce's bad faith breach, InterArch has incurred and will incur substantial attorneys' fees and costs.

## EIGHTH CLAIM FOR RELIEF
### (Tortious Interference)
### (InterArch Against Commerce Bancorp)

154.   Plaintiff InterArch repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

155.   InterArch had a reasonable expectation of economic advantage stemming from its employment of its employees who were pirated by Commerce Bancorp.

156.   Commerce Bancorp intentionally and wrongfully interfered with InterArch's economic advantage by maliciously and unjustifiably inducing these employees to resign, en masse, from their positions at InterArch.

157.   Absent Commerce Bancorp's intentional and wrongful conduct, InterArch possessed a reasonable likelihood of economic benefit from its employment of the pirated employees.

158.   As a result of Commerce Bancorp's tortious interference, InterArch has incurred and will continue to incur damages in the form of lost revenue, the monetary value of the training of the pirated employees, the cost of recruiting and training new employees to replace the pirated individuals, and attorney's fees.

## NINTH CLAIM FOR RELIEF
### (Contractual Indemnification)
### (InterArch and Mrs. Hill Against Commerce Bancorp and CB)

159.    Plaintiffs InterArch and Mrs. Hill repeat and reallege each and every allegation in the foregoing paragraphs as if fully set forth herein.

160.    Pursuant to the Master Agreement and Agency Agreement, Commerce shall indemnify InterArch and Mrs. Hill for the costs that they have incurred as a result of the investigation of Commerce by the OCC and other federal agencies.

161.    Commerce shall also reimburse InterArch for any legal fees it expends to enforce its agreements with Commerce.

162.    InterArch and Mrs. Hill have incurred various costs and expenses for which Commerce is obligated to provide indemnification including those relating to investigations by the OCC and other federal agencies, along with the instant contractual dispute.

163.    Despite Mrs. Hill's and InterArch's numerous requests for indemnification and the advance payment of defense costs, Commerce has steadfastly refused to indemnify and advance defense costs to Mrs. Hill and InterArch.

164.    Commerce has willfully and wrongfully breached its agreements with InterArch, including, but not limited to the Master Agreement, by refusing to indemnify and advance defense costs to InterArch and Mrs. Hill.

165.    As a result of Commerce's breach, InterArch and Mrs. Hill have incurred and will incur substantial attorneys' fees and costs.

### TENTH CLAIM FOR RELIEF
### (COPYRIGHT INFRINGEMENT)
### (InterArch Against Commerce Bancorp and CB)

166.    Plaintiff InterArch repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

167.    InterArch owns valid copyrights in InterArch's IP that it prepared in connection with its work for Commerce.

168.    InterArch has filed registration applications with the United States Copyright Office seeking to register certain of its copyrights for InterArch's IP.

169.    Commerce's conduct, including copying InterArch's IP and employing InterArch's IP in new and ongoing projects without InterArch's express consent, violates InterArch's exclusive rights in its copyrights.

170.    Commerce's conduct constitutes copyright infringement under the federal Copyright Act, 17 U.S.C. §§ 101 *et seq.*

171.    Commerce's infringement has damaged InterArch in an amount to be determined at trial.  For example and without limitation, Commerce has been unjustly enriched through their unlawful use of InterArch's IP.

172.    Commerce's infringement has caused and, unless restrained by this Court, will continue to cause InterArch irreparable injury.

173.    InterArch has no adequate remedy at law for Commerce's infringement.

174.    Commerce should be permanently enjoined and restrained from copying, preparing derivative works based upon, or otherwise infringing, directly or indirectly, InterArch's IP.

175.    InterArch is entitled to recover all damages suffered as a result of Commerce's wrongful acts, including but not limited to the amount of Commerce's unjust enrichment.  In the alternative, InterArch is entitled to statutory damages in an amount to be determined by the Court for its infringement of InterArch's IP that is subject to InterArch's pending and anticipated copyright registration applications.  InterArch is also entitled to recover all reasonable attorneys' fees, court costs, and interest on its damages from the date of Defendants' infringement.

### ELEVENTH CLAIM FOR RELIEF
#### (Intentional Infliction of Emotional Distress)
#### (Mr. and Mrs. Hill Against Commerce Bancorp and CB)

176.    Plaintiffs Mr. and Mrs. Hill repeat and reallege each and every allegation in the foregoing paragraphs as if fully set forth herein.

177.    The conduct, actions, and statements of Commerce Bancorp and the Bank, as alleged herein, were intentional, reckless, outrageous, and done with the intent to cause Mr. and Mrs. Hill to suffer severe emotional distress.

178.    The conduct, actions, and statements of Commerce Bancorp and the Bank were done in willful and wanton disregard for the rights of Mr. and Mrs. Hill.

179.    Commerce Bancorp's and the Bank's conduct, actions, and statements directly and proximately caused Plaintiffs Mr. and Mrs. Hill severe emotional distress.

## DEMAND FOR JURY

Pursuant to F.R.C.P. 38(b) and 48, Plaintiffs demand trial by jury on all issues so triable herein.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against the defendants for the following:

(a)    Compensatory damages;

(b)    Consequential damages;

(c)    Punitive damages;

(d)    Statutory damages;

(e)    Advance payment of defense costs;

(f)    Indemnification;

(g)    A permanent injunction prohibiting Commerce, its agents, servants, officers, employees, attorneys, and all other persons in active concert or participation with Commerce from infringing, or causing any other person or entity to infringe, InterArch's copyrights;

(h)    Prejudgment and postjudgment interest;

(i)    Reasonable attorneys fees and cost of suit; and

38

(j)      Such other relief as is equitable.

<u>DESIGNATION OF TRIAL COUNSEL</u>

Plaintiffs hereby designate Edwin J. Jacobs, Jr., Esquire as trial counsel.

Respectfully submitted,

JACOBS & BARBONE, P.A.

By:_____
        EDWIN J. JACOBS, JR., ESQUIRE


Andrew L. Sandler (*pro hac vice* application
        pending)
Kirk D. Jensen (*pro hac vice* application pending)
BUCKLEYSANDLER LLP
1250 24th Street, N.W. Suite 700
Washington, D.C. 20037
Tel.:  (202) 349-8000

*Attorneys for Plaintiffs Vernon W. Hill, II, Shirley*
*Hill and InterArch, Inc.*


Dated: August 19, 2009