NOT FOR PUBLICATION                                                         (Document Nos. 85, 94, 121)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

_____
                                    :
VERNON W. HILL, II, SHIRLEY HILL,   :
and INTERARCH, INC.,                :
                                    :
            Plaintiffs,             :    Civil No. 09-3685 (RBK/JS)
                                    :
      v.                            :    **OPINION**
                                    :
COMMERCE BANCORP, INC.,             :
COMMERCE BANK, N.A., and            :
TD BANK, NA                         :
                                    :
            Defendants.             :
_____:

**KUGLER**, United States District Judge:

This matter arises out of the tempestuous business divorce between Plaintiffs Vernon W. Hill, II, Shirley Hill, and InterArch Inc. and Defendants Commerce Bancorp, Inc., Commerce Bank N.A., and TD Bank NA (collectively "Commerce"). Presently before the Court are a number of motions: 1) the Motion to Dismiss Plaintiff InterArch's Copyright Infringement Claim in Count Ten of the Amended Complaint (Doc. No. 85); 2) the Motion for Partial Summary Judgment as to Counts One through Three by Plaintiff Vernon Hill (Doc. No. 94); and 3) the Second Motion for Partial Summary Judgment as to Counts One through Three by Mr. Hill (Doc. No. 121). For the reasons discussed below, the Motion to Dismiss as to Count Ten is granted, and the Motion for Partial Summary Judgment as to Counts One through Three is denied. The

Second Motion for Partial Summary judgment is dismissed.

## I.     BACKGROUND[1]

### A.     Facts relevant to the Motion to Dismiss

Plaintiff Vernon Hill founded Commerce Bancorp, Inc. in 1973 in Marlton, New Jersey. Over the past 30 plus years, he built the company into one of the largest and most successful regional institutions. As of mid-2007, Commerce Bank, N.A., a wholly-owned subsidiary of Commerce Bancorp, operated more than 425 branches throughout the east coast. During Hill's 34 years with Commerce Bank and Commerce Bancorp, the Bank worked with real estate developers, including development firms in which Mr. Hill had a financial interest. One entity with which the Bank did business was InterArch, Inc., a full-service architectural and design firm, founded by Shirley Hill, Vernon's wife. InterArch provided extensive services to Commerce, including interior design, exterior design, space planning, move coordination, and landscape design.

Mr. Hill served as chairman, president, and CEO of Commerce Bank and Commerce Bancorp. His employment with Commerce Bancorp was pursuant to a written agreement, which provided for a five year term, beginning in 1992, and which renewed automatically on each anniversary date for a new five-year term. On March 14, 2006, Mr. Hill entered into the Amended and Restated Employment Agreement (the "Employment Agreement"), which continued his employment for a five year period from January 1, 2006 through December 31, 2011. Pursuant to the Employment Agreement, Mr. Hill's base salary was $1 million per year

---

[1] While the facts and claims underlying the dispute are many, the Court limits the recitation here to those facts necessary for the disposition of the present motions.

plus bonuses, which for services rendered in 2006 was $1,500,000.  The Employment Agreement permitted Commerce Bancorp to terminate Mr. Hill's employment for cause or without.  A termination without cause entitled Mr. Hill to certain benefits, including a lump sum severance payment for the full compensation for the remaining portion of the agreement, the right to participate in Commerce Bancorp's medical, disability, hospitalization, and life insurance benefits for three years, and the immediate vesting of Mr. Hill's options to purchase Commerce Bancorp stock.  Under the Employment Agreement, the payments due to Mr. Hill for a without cause termination were required to be paid within thirty days of the termination.

On June 28, 2007, the Board of Directors of Commerce terminated Mr. Hill without cause, effective July 31, 2007.  Per the Employment Agreement, the termination at that time entitled Mr. Hill to a lump sum payment in excess of $11 million.  After the termination, Mr. Hill demanded payment and also exercised his vested stock options.  Despite these actions, Commerce Bancorp never paid the demand and never executed the exercise of the stock options.

Mrs. Hill's company InterArch also had a contractual relationship with Commerce during this same period.  It was the parties' practice for InterArch to submit to Commerce for approval a proposal of services for the upcoming year, which included a list of services that InterArch intended to perform for Commerce and included a rate schedule for that work.  Commerce's Board of Directors typically approved the proposal and notified InterArch of its acceptance.

On February 27, 2006, InterArch and Commerce executed a Master Agreement for Architectural/Engineering/Consultant Services (the "Master Agreement"), which ran from January 1, 2006 to December 31, 2006.  Throughout 2006, Commerce and InterArch acted consistent with the Master Agreement.  In December 2006, InterArch submitted its 2007

proposal of services to Commerce. The Board of Directors accepted and approved the proposal on February 20, 2007. InterArch interpreted that acceptance as being upon the same terms and conditions as the Master Agreement, which expired December 31, 2006, thus extending is term until December 31, 2007. Notwithstanding this arrangement, Commerce terminated its relationship with InterArch effective October 31, 2007.

In December 2007, Commerce applied for copyright registrations with the United States Copyright Office for certain of InterArch's intellectual property ("IP"). InterArch maintains that it owns valid copyrights in architectural designs, plans, drawings, and specifications related to the construction of Commerce buildings. InterArch insists that pursuant to the Master Agreement, it did not unconditionally convey copyrights to Commerce. InterArch alleges that despite its ownership of the IP, Commerce continues to use it without consent and without compensation.

On the basis of these allegations, Plaintiffs commenced a civil action on January 14, 2008 in the United States District Court for the District of Columbia. The action was later transferred to this Court, see Doc. No. 69, whereupon Plaintiffs filed the Amended Complaint. See Doc. No. 79. The Amended Complaint alleges eleven causes of action: 1) breach of contract (by Mr. Hill against Commerce Bancorp); 2) breach of the implied covenant of good faith and fair dealing (by Mr. Hill against Commerce Bancorp); 3) contractual indemnification (by Mr. Hill against Commerce Bancorp); 4) breach of contract (by InterArch against Commerce Bancorp and Commerce Bank); 5) quantum meruit/unjust enrichment (by InterArch against Commerce Bancorp and Commerce Bank); 6) promissory estoppel (against InterArch against Commerce Bancorp and Commerce Bank); 7) breach of implied covenant of good faith and fair dealing (by InterArch against Commerce Bancorp and Commerce Bank); 8) tortious interference (by

4

InterArch against Commerce Bancorp); 9) contractual indemnification (by InterArch and Mrs. Hill against Commerce Bancorp and Commerce Bank); 10) copyright infringement (by InterArch against Commerce Bancorp and Commerce Bank); and 11) intentional infliction of emotional distress (by Mr. and Mrs. Hill against Commerce Bancorp and Commerce Bank).[2]

Commerce filed the Motion to Dismiss InterArch's copyright infringement claim on September 24, 2009. See Doc. No. 85. Vernon Hill filed the Motion for Partial Summary Judgment as to Counts One through Three on November 24, 2009. See Doc. No. 94. Mr. Hill filed the Second Motion for Partial Summary Judgment as to Counts One through Three on May 5, 2010. See Doc. No. 121.

**B.     Facts relevant to the First and Second Motions for Summary Judgment**

On or about June 28, 2007, Commerce was the subject of a Consent Order issued by the Office of the Comptroller of the Currency ("OCC"). Pursuant to the Consent Order, Commerce was designated an institution in "troubled condition." Later, on November 17, 2009, Mr. Hill entered into a Stipulation and Consent Order with the OCC wherein the Comptroller found that Mr. Hill "engaged in unsafe and unsound practices and breaches of fiduciary duties by failing to comply with sound corporate governance principles in connection with real estate purchases, leases and joint real estate development transactions involving [Commerce] which resulted in financial gain to [Mr. Hill] . . . ." Leming decl., Ex. C at 1.

---

[2] During the pendency of this dispute, Toronto-Dominion Bank acquired Commerce. Thereafter, Commerce Bancorp, Inc. was restructured as Commerce Bancorp, LLC. Toronto-Dominion Bank merged Commerce Bank, N.A. with TD Banknorth, N.A. to form TD Bank, N.A. See Pl. br. (94) at 1 n.1.

## II. STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a court may dismiss an action for failure to state a claim upon which relief can be granted. With a motion to dismiss, "'courts accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.'" Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009) (quoting Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008)). In other words, a complaint survives a motion to dismiss if it contains sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007).

In making this determination, a court must engage in a two part analysis. Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949-50 (2009); Fowler, 578 F.3d at 210-11. First, the court must separate factual allegations from legal conclusions. Iqbal, 129 S. Ct. at 1949. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. Second, the court must determine whether the factual allegations are sufficient to show that the plaintiff has a "plausible claim for relief." Id. at 1950. Determining plausibility is a "context-specific task" that requires the court to "draw on its judicial experience and common sense." Id. A complaint cannot survive where a court can only infer that a claim is merely possible rather than plausible. See id.

Alternatively, summary judgment is appropriate where the court is satisfied that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 248 (1986).  "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'"  Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (quoting Anderson, 477 U.S. at 255).

"[T]he party moving for summary judgment under Fed.R.Civ.P. 56(c) bears the burden of demonstrating the absence of any genuine issues of material fact."  Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1080 (3d Cir. 1996).  The moving party may satisfy its burden either by "produc[ing] evidence showing the absence of a genuine issue of material fact" or by "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case."  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  If the moving party satisfies its burden, the nonmoving party must respond by "set[ting] out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).  "If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party."  Id.

### III.  DISCUSSION

####  A.  Motion to Dismiss Count Ten (Doc. No. 85)

Commerce moves to dismiss Count Ten by InterArch (which alleges a cause of action for copyright infringement under the Copyright Act, 17 U.S.C. § 101 et seq.) based on Commerce's use of InterArch's IP in new and ongoing projects without consent or compensation.  Commerce argues that pursuant to the terms of the Master Agreement between Commerce and InterArch,

Commerce was the owner of the IP and therefore cannot have infringed.[3]  Commerce br. (85) at 6.  InterArch responds that Commerce's ownership was subject to a condition that it first notify and pay InterArch before use of the IP on "other projects," and a failure of such notice and payment is grounds for divestiture.  Pl. br. (89) at 4-6.  The Court disagrees.

The elements of a copyright infringement claim are 1) ownership of a valid copyright and 2) copying by the alleged infringer.  <u>Masquerade Novelty, Inc. v. Unique Indus., Inc.</u>, 912 F.2d 663, 667 (3d Cir. 1990).  Ownership of a copyright may be transferred by "any means of conveyance or by operation of law[.]"  17 U.S.C. § 201(d)(1).  A transfer of copyright ownership outside of the operation of law requires that the instrument of conveyance, note, or memorandum of the transfer be in writing and signed by the owner of the rights.  17 U.S.C. § 204(a).  The parties do not dispute that the Master Agreement was a written transfer of copyright ownership.

Instead, the parties dispute whether pursuant to the terms of that transfer Commerce later lost its ownership rights.  That dispute focuses squarely on the language of Master Agreement at Article 8(D), which provides:

> All Instruments of Service shall be the sole property of [Commerce], and [Commerce] is vested with all rights therein, whether created by law or in equity; provided that [InterArch's] designs, drawings, or specifications many not by used by [Commerce] for any other project unless [Commerce] provides prior notice to [InterArch] and agrees to pay a reasonable fee for such use.  [Commerce] hereby waives any claim against [InterArch] and agrees to Indemnify and hold [InterArch] harmless from any claim or liability for injury or loss arising from [Commerce's] unauthorized reuse of [InterArch's]

---

[3] The parties seemingly do not dispute that the Court can consider the Master Agreement without converting the Motion to Dismiss to one for summary judgment since the Master Agreement is attached as an exhibit to the Amended Complaint.  See <u>In re Burlington Coat Factory Sec. Litig.</u>, 114 F.3d 1410, 1426 (3d Cir. 1997) (holding a court may consider a "'document *integral to or expressly relied* upon in the complaint'" without converting the motion to dismiss to a summary judgment motion (quoting <u>Shaw v. Digital Equip. Corp.</u>, 82 F.3d 1194, 1220 (1st Cir. 1996))).

designs, drawings or specifications.[4]

Amd. Compl., Ex. F at Art. 8(D).

Resolution of this dispute requires contract interpretation. It is well-established law that the intent of the parties controls when interpreting a contract. See Great Atlantic & Pacific Tea Co. v. Checchio, 762 A.2d 1057, 1060-61 (N.J. Super. Ct. App. Div. 2000). When the meaning of a contract is in dispute, a reviewing court's role is to initially determine if a contract is clear or ambiguous. Schor v. FMS Fin. Corp., 814 A.2d 1108, 1112 (N.J. Super. Ct. App. Div. 2002); see also Mellon Bank, N.A. v. Aetna Bus. Credit, Inc., 619 F.2d 1001, 1011 (3d Cir. 1980). If an agreement is clear, the court can interpret it as a matter of law. See Great Atlantic, 762 A.2d at 1061. If it is ambiguous, contract interpretation is a question of fact for a jury. Id. Terms of a contract are ambiguous if they are susceptible to at least two reasonable interpretations. Schor, 814 A.2d at 1112; see also Mellon Bank, 619 F.2d at 1011.

Certain contracts contain conditions precedent. A condition is "an act or event which 'must occur before a duty of performance under an existing contract becomes absolute.'" Castle v. Cohen, 840 F.2d 173, 177 (3d Cir. 1988) (quoting J. Calamari & M. Perillo, The Law of Contracts § 11-3 (2d ed. 1977)). A condition precedent in turn is "an act of a party that must be performed or a certain event that must happen before a contractual right accrues or contractual duty arises." 13 Richard A. Lord, Williston on Contracts § 38:9 (4th ed.); see also Mellon Bank, 619 F.2d at 1008 n.4. Conditions precedent are disfavored because a "'failure to comply with a condition precedent works a forfeiture.'" Liberty Mutual Ins. Co. v. President Container, Inc.,

---

[4] "Instruments of Service" is defined under the Master Agreement as all "plans, designs, drawings, specifications, studies and other instruments of service produced for the Project by or on behalf of [InterArch] pursuant to this Agreement[.]" Amd. Compl., Ex. F at Art. 8(A).

687 A.2d 760, 766 (N.J. Super. Ct. App. Div. 1997) (quoting Castle, 840 F.2d at 177).  Thus, unless a condition precedent is expressed in clear language, the court must construe it as a promise.  See id.; Marsa v. Metrobank for Sav., F.S.B., 825 F. Supp. 658, 664 (D.N.J. 1993), aff'd, 26 F.3d 122 (3d Cir. 1994).  While particular language is not required, certain terms such as "on condition that," " provided that" and "if" are frequently used to express a condition. Restatement (Second) of Contracts § 226 cmt. a (1981); see also Suburban Transfer Serv. v. Beech Holdings, Inc., 716 F.2d 220, 224-25 (3d Cir. 1983) (noting the words "provided, however" establish a conditional clause)

      The Court is not convinced that Article 8(D) reflects a clear condition.  While use of the words "provided that" is certainly indicia of conditional intent, it does not control the result. Reading the provision as a whole, the Court is persuaded that the provision merely conveys a promise by Commerce to pay for subsequent other uses of the IP, and does not convey some reversionary interest.  A clear condition would have unequivocally stated that Commerce's failure to give notice and payment resulted in a divestiture of ownership, but that is not what appears.  Instead, unfettered ownership is conveyed in the first half of the first sentence of Article 8(D), and then the remainder expresses a promissory right to notice and payment for use on "other project[s]."  At best, the language is unclear, and the Court must thus construe it as stating a promise and not a condition.[5]

      In sum, InterArch has not plausibly stated a claim for relief since Article 8(D) does not

---

[5] The Court is not persuaded that use of the words "unauthorized reuse" in the closing sentence of Article 8(D) further supports finding a condition, as suggested by InterArch.  See InterArch br. (89) at 6.  That language is consistent with finding unconditional ownership and a promise to notify and pay for certain subsequent uses.  A failure of the notice and payment rights would be an "unauthorized reuse."

reflect clear conditional ownership. Commerce owns the IP and as such it cannot have infringed its own rights. Therefore, Commerce's Motion to Dismiss Count Ten is granted.

> **B. First and Second Motion for Partial Summary Judgment as to Counts One Through Three (Doc. Nos. 94, 121)**

Mr. Hill individually moves for partial summary judgment as to Counts One through Three of the Amended Complaint, which allege breach of contract, breach of the implied covenant of good faith and fair dealing, and contractual indemnification respectively. Mr. Hill maintains that Commerce itself acknowledges that it owes him compensation and benefits pursuant to the terms of the Employment Agreement, and thus its failure to pay is a clear breach. Pl. br. (94) at 11. Commerce chiefly responds by arguing that it cannot pay its acknowledged debt because the payment would be a "golden parachute" under the Federal Deposit Insurance Act ("FDIA"), 12 U.S.C. § 1828, and thus its performance is excused under the doctrine of impossibility.[6] Commerce br. (106) at 7-12. The Court concurs and denies the Motion.

Before turning to the merits of the present dispute, the Court must dispose of an initial

---

[6] Commerce also argues that since no discovery has been completed, summary judgment is premature and should be denied under Rule 56(f). Commerce br. (106) at 4-6. The Court cannot deny the Motion on that ground. Rule 56(f) serves as a safety valve to relieve a non-moving party from the potentially draconian effects of incomplete discovery in appropriate cases. See Rivera-Torres v. Rey-Hernandez, 502 F.3d 7, 10 (1st Cir. 2007). It authorizes the district court to deny a motion, order a continuance, or fashion other just relief where "a party opposing the motion shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(f). The Third Circuit requires that a Rule 56(f) motion identify with specificity (1) the information sought; (2) how it would preclude summary judgment; and (3) why it has not been obtained previously. Lunderstadt v. Colafella, 885 F.2d 66, 71 (3d Cir. 1989) (quoting Dowling v. City of Philadelphia, 855 F.2d 136, 140 (3d Cir. 1988)). While Commerce has supplied a Rule 56(f) affidavit, see Doc. No. 106-2, the affidavit does not specifically describe how the information sought would preclude summary judgment. Thus the Court cannot deny the Motion for lack of discovery.

procedural matter. During the pendency of the Motion for Summary Judgment as to Counts One through Three (Doc. No. 94), Mr. Hill again filed for summary judgment as to the same three counts. See Doc. No. 121. Mr. Hill's Second Motion for Partial Summary Judgment is not based on an intervening change in law, on evidence previously unavailable, or evidence discovered during the pendency of the first motion. Thus, as best as the Court can tell, Mr. Hill's new "motion" is really just a sur-reply to his original motion. Under Local Civil Rule 7.1(d)(6) sur-replies are not permitted without leave of the Court. Since Mr. Hill requested no such leave, the Court will dismiss the "motion" at Document Number 121 as an improper sur-reply.[7]

To state a claim for breach of contract, a party must allege 1) the parties entered into an agreement, 2) the plaintiff satisfied the terms of the agreement, 3) the defendant failed to satisfy at least one term of the agreement, and 4) the breach caused the plaintiff to suffer a loss. Cargill Global Trading v. Applied Development Co., No. 03-5920, - - - F. Supp. 2d - - - -, 2010 WL 1568457, at *14 (D.N.J. Apr. 21, 2010); Coyle v. Englander's, 488 A.2d 1083, 1088 (N.J. Super. Ct. App. Div. 1985) (holding prima facie elements for breach of contract are a valid contract, defective performance, and resulting damages). The elements of a basic contract are offer, acceptance, and consideration. See Smith v. SBC Commc'ns, Inc., 839 A.2d 850, 861 (N.J. 2004).

New Jersey law implies a duty of good faith and fair dealing into every contractual relationship. Wilson v. Amerada Hess Corp., 773 A.2d 1121, 1126 (N.J. 2001). Good faith has not been precisely defined, but it at least includes "conduct that does not violate community

---

[7] Moreover, nothing in the Second Motion for Summary Judgment compels a result on the merits different from the conclusion below.

standards of decency, fairness or reasonableness." Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs., 864 A.2d 387, 395 (N.J. 2005) (quotations removed). The covenant of good faith and fair dealing requires that parties to a contract must refrain from doing "'anything which will have the effect of destroying or injuring the right of the other party to receive' the benefits of the contract." Id. (quoting Palisades Props. Inc. v. Brunetti, 207 A.2d 522, 531 (N.J. 1965)). An action for breach of the covenant requires proof of "'bad motive or intention.'" Id. at 396 (quoting Wilson, 773 A.2d at 1130); see also Seidenberg v. Summit Bank, 791 A.2d 1068, 1077 (N.J. Super. Ct. App. Div. 2002) ("To determine what is considered a good faith performance, the court must consider the expectations of the parties and the purposes for which the contract was made."). "The party claiming a breach of the covenant of good faith and fair dealing 'must provide evidence sufficient to support a conclusion that the party alleged to have acted in bad faith has engaged in some conduct that denied the benefit of the bargain originally intended by the parties.'" Brunswick, 864 A.2d at 396 (quoting 23 Williston on Contracts § 63:22, at 513-14 (Lord ed. 2002)).

      Here the parties do not dispute that Mr. Hill and Commerce had a valid and enforceable agreement (the Employment Agreement). They further do not dispute that under that agreement, Mr. Hill was entitled to certain compensation, and that he has not been paid that compensation. Compare Pl. 56.1 stmt. (94) at ¶ 23, with Commerce responsive 56.1 stmt. (106) at ¶ 23. What the dispute centers on is whether Commerce is otherwise permitted to pay Mr. Hill without running afoul of the FDIA. This is an impossibility dispute.

      Impossibility or impracticability is a complete defense to a breach of contract claim where "a fact essential to performance is assumed by the parties but does not exist at the time of


performance." Connell v. Parlavecchio, 604 A.2d 625, 627 (N.J. Super. Ct. App. Div. 1992). New Jersey has adopted the Restatement (Second) on Contracts § 261 (1981). See M.J. Paquet, Inc. v. New Jersey Dep't of Transp., 794 A.2d 141, 148-49 (N.J. 2002); Connell, 604 A.2d at 627. Section 261 provides:

> Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary.

One particular example of impossibility excusing performance is an intervening governmental regulation or order. See Directions, Inc. v. New Prince Concrete Constr. Co., 491 A.2d 1347, 1349 (N.J. Super. Ct. App. Div. 1985) (citing Restatement (Second) of Contracts §§ 261, 264).

In this dispute, Commerce's impossibility defense is based on the FDIA. Under the FDIA and applicable regulations, the Federal Deposit Insurance Corporation ("FDIC") is permitted to prohibit "golden parachute" payments. 12 U.S.C. § 1828(k); 12 C.F.R. § 359.0 et seq. As is relevant here, a golden parachute is

> [1] any payment (or any agreement to make any payment) in the nature of compensation [2] by any insured depository institution or covered company [3] for the benefit of any institution-affiliated party [4] pursuant to an obligation of such institution or covered company that . . . [5] is received on or after the date on which . . . [6] the institution's appropriate Federal banking agency determines that the insured depository institution is in a troubled condition[.]

§ 1828(k)(4)(A)(ii)(III); 12 C.F.R. § 359.1(f). An "institution-affiliated party" ("IAP") includes "[a]ny director, officer, employee, or controlling stockholder . . . of . . . an insured depository institution or depository institution holding company[.]" 12 C.F.R. § 359.1(h)(1). By regulation, no insured depository institution or depository institution holding company may make or agree to make a golden parachute payment, except as provided by the express regulatory process. 12

C.F.R. § 359.2. For purposes of the present Motion, Mr. Hill does not meaningfully argue that the severance payment under the Employment Agreement is not a golden parachute. Instead he primarily argues that Commerce cannot rely on the impossibility defense because it alone has the power to initiate government approval for the payment, and it has failed to do so. Pl. reply (108) at 7-9.[8]

The FDIC regulations do indeed provide a mechanism for a depository institution or depository institution holding company to make a golden parachute payment. As is relevant, such payments can be made only when "[t]he appropriate federal banking agency, with the written concurrence of the [FDIC], determines that such a payment or agreement is permissible," and the institution, holding company, or the IAP making the request for approval "demonstrate[s] that it does not possess and is not aware of any information, evidence, documents or other materials which would indicate that there is a reasonable basis to believe, at the time such payment is proposed to be made, that" the IAP has engaged in certain prohibited conduct or caused certain results (which are irrelevant for purposes of disposition of this Motion). 12 C.F.R.

---

[8] Mr. Hill also argues that the golden parachute regulations were not a surprise or an intervening event, and thus they cannot be the basis for an impossibility defense. Pl. reply (108) at 8. This argument is without merit. Mr. Hill has not shown how at the time of contracting the parties had any indication that Commerce would become a troubled institution and would thereafter be subject to government prohibitions on severance payments.
   Moreover, while Mr. Hill frequently insists that Commerce alone has the ability to request approval for the golden parachute payment, see Pl. reply (108) at 4-5, that position is flatly wrong. The relevant regulations specifically permit an IAP (i.e. Mr. Hill) to request approval. See 12 C.F.R. § 359.4 ("An insured depository institution, depository institution holding company *or IAP* making a request pursuant to paragraphs (a)(1) through (3) of this section shall demonstrate. . ." (emphasis added)); see also McCarron v. FDIC, 111 F.3d 1089, 1096 (3d Cir. 1997) (noting that bank executive not entitled to severance payment under 12 C.F.R. § 359.4 where *he* never obtained the requisite consent from the FDIC).

§ 359.4(a)(1), (4).[9]

With these parameters in mind, the Court is compelled to deny the Motion for Summary Judgment. First, it appears that Commerce has in fact applied for approval to make the severance payments, and that approval is seemingly pending. See Pl. reply (108) at ¶ 15 (answers to interrogatories stating that the date of the last inquiry to the Federal Reserve Board regarding payment to Mr. Hill was December 18, 2009). Commerce has no ability to make the severance payment until it receives the requisite assent. Second, Mr. Hill's challenge to the impossibility defense seems premised on the idea that application for approval alone would eliminate the impossibility. Even if Commerce had not applied, nothing in the record reflects that the approval is certain in this case. In fact, the requisite regulations reflect that the appropriate federal banking agency must look at a number of considerations before it will approve the golden parachute payment. See 12 C.F.R. § 359.4(a)(4). Based on these considerations, a change in law since the making of the Employment Agreement (Commerce's status as a troubled institution) has rendered impossible Commerce's duty to perform.

Therefore, the Court must deny the Motion for Partial Summary Judgment as to Counts One through Three.[10]

## IV.   CONCLUSION

---

[9] The specific manner in which such requests must be submitted is codified in 12 C.F.R. § 359.6

[10] In its brief in opposition, Commerce styled part of its response as a "cross-motion" for summary judgment for a $4 million offset to any award to Mr. Hill. See Commerce br. (106) at 12. Commerce's motion, to the extent it really is one, is really just an alternative relief request dependant upon the Court first granting Mr. Hill's Motion. Since the Court has not done so, Commerce's alternative "motion" is dismissed as moot.

For the foregoing reasons, the Motion to Dismiss as to Count Ten is **GRANTED**. The Motion for Partial Summary Judgment as to Counts One through Three is **DENIED**. The Second Motion for Partial Summary judgment is **DISMISSED**. An appropriate Order shall follow.

Date:  6-17-10                                                           /s/ Robert B. Kugler
                                                                              ROBERT B. KUGLER
                                                                              United States District Judge