NOT FOR PUBLICATION                                      (Doc. Nos. 201,
                                                              202, 203)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**CAMDEN VICINAGE**

_____
                                          :
VERNON W. HILL, II, SHIRLEY HILL,         :
and INTERARCH, INC.,                      :
                                          :
            Plaintiffs,                   :     Civil No. 09-3685 (RBK/JS)
                                          :
            v.                            :     **OPINION**
                                          :
COMMERCE BANCORP, INC.,                   :
COMMERCE BANK, N.A., and                  :
TD BANK, N.A.,                            :
                                          :
            Defendants.                   :
_____   :

**KUGLER**, United States District Judge:

        This matter comes before the Court on the motion of Commerce Bancorp, Inc.,

Commerce Bank, N.A., and TD Bank, N.A. ("Defendants") for summary judgment of Counts

One, Two, and Three of the Amended Complaint of Vernon Hill (Doc. No. 201), and Counts

Four, Six, Seven, and Eight of the Amended Complaint of Shirley Hill and InterArch, Inc. (Doc.

No. 202), and the cross-motions for summary judgment of Vernon Hill, Shirley Hill, and

InterArch, Inc. (collectively, "Plaintiffs"), as well as Defendants' unopposed motion to seal

documents related to motions for summary judgment (Doc. No. 203).

        For the reasons laid out below, the Court denies Defendants' motions for summary

judgment as to Counts One, Two, Three, Four, Seven, and Eight, and grants Defendants' motion

as to Count Six.  The Court grants Plaintiffs' cross-motion for partial summary judgment as to

Count Four.  The Court grants in part and denies in part Defendants' unopposed motion to seal.

## I.     BACKGROUND

Plaintiff Vernon Hill is the former chairman, president, and CEO of Commerce Bank and Commerce Bancorp.[1]  After his termination without cause, which was effective July 31, 2007, Vernon Hill initiated this lawsuit against Defendants in order to obtain the severance payment of over $11 million that was provided for in his Employment Agreement.[2]  Plaintiff InterArch, the full-service architectural and design firm founded by Shirley Hill, Vernon Hill's wife, had contracted annually with the Commerce Defendants to provide architectural, engineering, and consultant services.  On October 31, 2007, the Commerce Defendants terminated their decades-long relationship with InterArch, and hired a group of InterArch employees to work for their new in-house architecture and design team.  InterArch alleges that it had an agreement with Commerce that lasted through the end of 2007, and that Defendants therefore breached that agreement.  InterArch also brings claims of promissory estoppel, breach of the covenant of good faith and fair dealing, and tortious interference for Defendants' poaching of InterArch employees.

The Amended Complaint alleged eleven causes of action.  On June 17, 2010, this Court dismissed Count Ten, and on June 8, 2011, this Court granted summary judgment for Defendants with respect to Counts Nine and Eleven.  The remaining Counts are as follows: Count One—breach of contract (by Mr. Hill against Commerce Bancorp); Count Two—breach of the implied covenant of good faith and fair dealing (by Mr. Hill against Commerce Bancorp); Count Three—contractual indemnification (by Mr. Hill against Commerce Bancorp); Count Four—breach of contract (by InterArch against Commerce Bancorp and Commerce Bank); Count Five—quantum

---

[1] After this lawsuit was filed, Commerce Bank, Inc. was restructured as Commerce Bancorp, LLC.  Toronto-Dominion Bank merged Commerce Bank, N.A. with TD Banknorth, N.A. to form TD Bank, N.A.
[2] The parties do not dispute that Mr. Hill and the Commerce Defendants had a valid and enforceable agreement ("Employment Agreement" or "Agreement").  The parties also agree that, under the Agreement, Mr. Hill was entitled to compensation upon severance, which Mr. Hill has not yet been paid.

meruit/unjust enrichment (by InterArch against Commerce Bancorp and Commerce Bank);
Count Six—promissory estoppel (by InterArch against Commerce Bancorp and Commerce
Bank); Count Seven—breach of implied covenant of good faith and fair dealing (by InterArch
against Commerce Bancorp and Commerce Bank); and Count Eight—tortious interference (by
InterArch against Commerce Bancorp).

Defendants have now moved for summary judgment with respect to Plaintiff Vernon Hill
as to Counts One, Two, and Three of the Amended Complaint.  They argue that they cannot pay
Mr. Hill's severance package because such payment would constitute a "golden parachute"
prohibited under the Federal Deposit Insurance Act ("FDIA"), 12 U.S.C. § 1828.  Moreover,
they contend that the severance package does not fall under any of the enumerated exceptions to
the golden parachute regulations.  Mr. Hill has opposed Defendants' summary judgment motion
and has filed a cross-motion for summary judgment on Counts One, Two, and Three.

Defendants have also moved for summary judgment as to Counts Four, Six, Seven, and
Eight of the Amended Complaint.  Defendants argue that InterArch's breach of contract claim
fails because Commerce and InterArch had not executed an agreement in 2007, the year when
the alleged breach took place.  Moreover, Defendants contend, even if an agreement had been
executed, it did not bind Defendants to exclusively use InterArch's services—or even to engage
InterArch's services at all.  Furthermore, Defendants argue, they were obligated by federal
banking regulators to terminate their relationship with InterArch, and therefore cannot be liable
under InterArch's claims of breach of good faith and fair dealing or tortious interference.
InterArch[3] has filed a cross-motion for summary judgment as to Count Four.

---

[3] The cross-motion for summary judgment as to Count Four was filed by InterArch as well as Shirley Hill.
However, the Amended Complaint indicates that Count Four was brought by InterArch alone (not Shirley Hill).

Finally, Defendants have moved to seal portions of these summary judgment motions and their appended exhibits, arguing that federal regulatory agencies require that certain information remain confidential.

## II.     STANDARD

### A. Summary Judgment

Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986). A genuine issue of material fact exists only if the evidence is such that a reasonable jury could find for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). When the Court weighs the evidence presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Id. at 255.

The burden of establishing the nonexistence of a "genuine issue" is on the party moving for summary judgment. Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1080 (3d Cir. 1996). The moving party may satisfy its burden either by "produc[ing] evidence showing the absence of a genuine issue of material fact" or by "'showing'— that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325.

Once the moving party satisfies this initial burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e). To do so, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Rather, to survive summary judgment, the nonmoving party must "make a showing sufficient to establish

the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex</u>, 477 U.S. at 322.  Furthermore, "[w]hen opposing summary judgment, the nonmovant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'" <u>Corliss v. Varner</u>, 247 F. App'x 353, 354 (3d Cir. 2007) (quoting <u>Port Auth. of N.Y. & N.J. v. Affiliated FM Ins. Co.</u>, 311 F.3d 226, 233 (3d Cir. 2002)).

In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial.  <u>Anderson</u>, 477 U.S. at 249.  Credibility determinations are the province of the factfinder, not the district court.  <u>BMW, Inc. v. BMW of N. Am., Inc.</u>, 974 F.2d 1358, 1363 (3d Cir. 1992).

## B. Motion to Seal

Local Civil Rule 5.3 governs requests to seal documents filed with the Court.  Under Rule 5.3(c)(2), a party seeking to seal documents must show: (1) the nature of the materials at issue; (2) the legitimate private or public interests which warrant the relief sought; (3) the injury that would result if the relief sought is not granted; and (4) why a less restrictive alternative to relief sought is not available.  In turn, any order or opinion on a motion to seal must make findings as to those factors. L. Civ. R. 5.3(c)(5).  Additionally, where a party moves to seal pretrial motions of a "nondiscovery nature, the moving party must make a showing sufficient to overcome a 'presumptive right of public access.'"  <u>Leucadia v. Applied Extrusion Tech., Inc.</u>, 998 F.2d 157, 164 (3d Cir. 1993). To overcome that presumption, a party must demonstrate that "good cause" exists for the protection of the material at issue.

Good cause exists when a party makes a particularized showing that disclosure will cause a "clearly defined and serious injury to the party seeking closure." Pansy v. Borough of Stroudsburg, 23 F.3d 772, 786 (3d Cir. 1994) (citations omitted); see Glenmede Trust Co. v. Thompson, 56 F.3d 476, 483 (3d Cir. 1995). A party does not establish good cause by merely providing "'broad allegations of harm, unsubstantiated by specific examples of articulated reasoning.'" Pansy, 23 F.3d at 786 (quoting Cipollone v. Liggett Grp., 785 F.2d 1108, 1121 (3d Cir. 1986)). To prevail, the parties must make this good cause showing with respect to each document sought to be sealed. Id. at 786-87.

## III.   DISCUSSION

### A. Counts One, Two, and Three

Defendants argue that they are not permitted to tender Mr. Hill's severance benefit because such payment constitutes a "golden parachute" that the FDIA prohibits. Defendants contend that Mr. Hill has failed to exhaust administrative processes that may exempt him from the prohibition on golden parachute payments. Defendants further argue that the doctrine of conflict preemption bars enforcement of Mr. Hill's contract because such enforcement would conflict with federal law governing golden parachute payments. Moreover, Defendants argue that it is contractually impossible for them to perform the provision of the Employment Agreement that provides for Mr. Hill's severance payment, because such performance would require Defendants to certify to the appropriate regulating agency that they are not aware of any evidence affording a reasonable basis to believe that Mr. Hill engaged in conduct prohibited by the regulation—and, Defendants maintain, they cannot make such a certification.

In opposition, and in support of his cross-motion for summary judgment, Mr. Hill contends that the golden parachute provisions do not apply to his severance package because

Commerce Bancorp ("Bancorp"), the party with whom Mr. Hill signed his Employment Agreement, did not at any time receive the "troubled" designation that triggers the golden parachute regulations.  Rather, he argues, it was Commerce Bank that the Office of Comptroller of the Currency ("OCC") allegedly designated as troubled, and Mr. Hill had no contractual agreement with that entity.  Moreover, Mr. Hill contends, even Commerce Bank was never formally designated as "troubled."  Finally, even if Commerce Bank had been designated a "troubled" institution, it was not troubled when Mr. Hill entered into his Employment Agreement, nor was it troubled at the time that Mr. Hill was terminated and Defendants became obligated to tender his severance package.

In an Opinion dated June 17, 2010, this Court found that the golden parachute provisions of the FDIA were, indeed, implicated in this matter, and, moreover, barred Defendants' payment of Mr. Hill's severance package.  The Court further found that these facts substantiated Defendants' use of the impossibility defense in this contract action, since "a change in law"— namely, "Commerce's status as a troubled institution"—triggered the golden parachute regulations and therefore made it impossible for Commerce to perform the severance-related provisions of the Employment Agreement.  Opinion, Doc. No. 131, 16.  However, because Mr. Hill has raised new arguments in support of his contention that the golden parachute regulations do not apply, the Court now revisits its June 17, 2010 findings in light of Defendants' arguments that the regulations do apply, that Mr. Hill has failed to exhaust his administrative remedies, that it would be impossible for Defendants to make the contractually agreed-upon payment to Mr. Hill, and that federal regulations preempt Defendants' state-law obligation to do so.

The Court also notes that, while Defendants move to dismiss Counts One, Two, and Three of Mr. Hill's Complaint, neither party has addressed Count Three (claiming

7

indemnification by Mr. Hill against Commerce Bancorp) in its briefing and supplemental

exhibits.  Mr. Hill's indemnification is regulated by 12 C.F.R. § 359.0(c), and the exceptions to

that regulation's limitations are contained in that provision.  Both parties have extensively

briefed the issue of whether the prohibition of golden parachute payments applies to Mr. Hill,

and whether there is a relevant application exception to that rule.  However, although both

golden parachute payments and indemnification payments are governed by 12 C.F.R. § 359.0,

subsection (b) clearly governs golden parachute payments, and (c) concerns indemnification

payments.  Thus indemnification payments are statutorily distinguished from golden parachute

payments; they are not subsumed within the general category of "golden parachute payments."

See 12 C.F.R. § 359.1(f) (defining "golden parachute payment").  Given the lack of legal or

factual argument on this issue, the Court simply cannot conclude that Defendants have shown an

absence of a genuine issue of material fact as to Mr. Hill's claim for indemnification (Count

Three).  Accordingly, summary judgment on Count Three is denied, and the discussion to follow

concerns the motion for summary judgment on Counts One and Two, specifically with regard to

Defendants' purported obligation to pay Mr. Hill's severance package.

        1. <u>Application of Golden Parachute Regulations</u>

12 C.F.R. 359.0(a) "limits and/or prohibits, in certain circumstances, the ability of

insured depository institutions, their subsidiaries and affiliated depository institution holding

companies to enter into contracts to pay and to make golden parachute and indemnification

payments to institution-affiliated parties (IAPs)."  An IAP is "[a]ny director, officer, employee,

or controlling stockholder (other than a depository institution holding company) of, or agent for,

an insured depository institution or depository institution holding company . . . ." 12 C.F.R. §

359.1(h)(1).  As former chairman, president, and CEO of Commerce Bank and Commerce

Bancorp, Mr. Hill qualifies as an IAP of both entities.  Moreover, "[a] 'golden parachute payment' is generally considered to be any payment to an IAP which is contingent on the termination of that person's employment and is received when the insured depository institution making the payment is troubled . . . ."  12 C.F.R. § 359.0(b).  Mr. Hill's severance package qualifies as the kind of payment to an IAP that constitutes a golden parachute, if the Commerce entity obligated to make the payment is designated as "troubled."

Mr. Hill draws a distinction between Commerce Bank and Commerce Bancorp, arguing that his Employment Agreement was a contract between him and Commerce Bancorp—not between him and Commerce Bank.  He suggests that this distinction is important because Commerce Bank was the entity for which a "troubled" designation had been contemplated by the OCC.  Therefore, he argues, because Commerce Bancorp was the entity that signed the Agreement that provided for payment of his severance, and because Bancorp was not troubled, the golden parachute regulation does not apply in this case.  This argument is misguided, as the relevant regulations define a golden parachute payment as payment to an IAP on termination of employment not only "when the insured depository institution making the payment is troubled," but also, "if the payment is being made by an affiliated holding company, [when] either the holding company itself or the insured depository institution employing the IAP[] is troubled."  12 C.F.R. § 359.0(b) (emphasis added).  Thus the golden parachute restrictions are said to "apply to depository institution holding companies which are troubled . . . as well as healthy holding companies which seek to enter into contracts to pay or to make golden parachute payments to IAPs of a troubled insured depository institution subsidiary."  12 C.F.R. 359.0(b).  Accordingly, although Mr. Hill's Agreement may have been with Commerce Bancorp and not Commerce Bank, Mr. Hill's status as an IAP of the troubled subsidiary Commerce Bank means that the

regulations apply to Commerce Bancorp as well, if Bancorp attempts to make the contracted-for severance payment to Mr. Hill.

Mr. Hill also argues that, because Commerce Bancorp was acquired by TD Bank, and ceased to function after that acquisition, Bancorp's "troubled" status became "irrelevant."  See Pl. Vernon Hill's Br. in Opposition to Summ. J. ("Pl. Vernon Hill's Br. Opp."), 7.  The Court finds such an interpretation untenable.  An interpretation according to which an entity's "troubled" status is destroyed by its acquisition would eviscerate the FDIA's restrictions by providing a safe harbor to officers and directors seeking to activate their golden parachutes through acquisition by another institution.

Mr. Hill further argues that Commerce Bank was never actually designated as "troubled" by the OCC.  As explained above, the golden parachute limitations are triggered when a payment conditioned on an IAP's termination is received on or after "[a] determination by the insured depository institution's or depository institution holding company's appropriate federal banking agency . . . that the insured depository institution or depository institution holding company is in a troubled condition, as defined in the applicable regulations of the appropriate federal banking agency (§ 303.101(c) of this chapter) . . . ."  12 C.F.R. § 359.1(f)(ii)(C).  A bank may assume "troubled" status in one of four ways.  12 C.F.R. § 303.101(c).  This case appears to invoke Section 303.101(c)(3):

> Troubled condition means any insured state nonmember bank that . . . [i]s subject to a cease-and-desist order or written agreement issued by either the FDIC or the appropriate state banking authority that requires action to improve the financial condition of the bank or is subject to a proceeding initiated by the FDIC or state authority which contemplates the issuance of an order that requires action to improve the financial condition of the bank, unless otherwise informed in writing by the FDIC . . . .

The parties do not dispute that the OCC would be the appropriate authority to issue a cease-and-desist order to Commerce Bank.  Moreover, the parties agree that the June 28, 2007 Consent

Order entered into by Commerce Bank and the OCC does qualify as a cease-and-desist order by the OCC.  Pl. Vernon Hill's Br. Opp., 6 ("[U]nder FDIC regulations, such an Order is considered a 'cease and desist' Order . . . ."); Defs.' Reply Br. in Support of Summ. J. ("Defs.' Reply Br."), 7 (referring to the Consent Order as a cease-and-desist order).

However, Mr. Hill raises a question as to whether the cease-and desist order, which he claims "does not relate to financial condition," is able to "trigger FDIC controlled golden parachute provisions."  Pl. Vernon Hill's Br. Opp., 6.  Indeed, Section 303.101(c)(3) indicates that a "troubled condition" arises when a bank receives a "cease-and-desist order or written agreement . . . that requires action to improve the financial condition of the bank," 12 C.F.R.§ 303.101(c)(3), and Defendants do not contend that the Order relates to the Bank's financial condition.[4]

Nevertheless, the Court finds that the OCC's cease-and-desist Order does concern the bank's financial condition.  The Consent Order was entered pursuant to the OCC's authority under 12 U.S.C. § 1818.  See June 28, 2007 Consent Order, Defs.s' Br. in Support of Summ. J. ("Defs.' Br."), Ex. H ("Pursuant to the authority vested in him by the Federal Deposit Insurance Act, as amended, 12 U.S.C. § 1818, the Comptroller hereby orders . . . .").  That section provides that a cease-and-desist proceeding may be initiated if "the appropriate Federal banking agency" reasonably believes that an "insured depository institution, depository institution which has insured deposits, or any institution-affiliated party is engaging or has engaged. . . in an unsafe or unsound practice in conducting the business of such depository institution . . . ."  12 U.S.C. § 1818(b).  The Court finds that "an unsafe or unsound" banking practice would necessarily have

---

[4] Instead, Defendants point to another banking regulation that defines "troubled condition" more broadly, without reference to a bank's finances, describing simply a "national bank that . . . is subject to a cease and desist order, a consent order, or a formal written agreement, unless otherwise informed in writing by the OCC . . . ."  12 C.F.R. 5.51(c)(6)(ii).

some effect on a bank's financial condition.  In fact, as the Third Circuit has explained, "[a]n

unsafe or unsound practice has two components: (1) an imprudent act (2) that places an abnormal

risk of financial loss or damage on a banking institution."  <u>Seidman v. Office of Thrift</u>

<u>Supervision, Dep't of the Treasury</u> (<u>In re Seidman</u>), 37 F.3d 911, 932 (3d Cir. 1994).  Thus the

OCC's cease-and-desist Order in this case necessarily concerns Commerce Bank's financial

condition.[5]  As a result, the Order was sufficient to classify Commerce Bank (and therefore

Commerce Bancorp as well) as being in "troubled condition," properly triggering the golden

parachute regulations.

Mr. Hill's final challenge to the applicability of the golden parachute limitation is that,

because neither Commerce Bank nor Bancorp was "troubled" when the Agreement—and the

relevant severance provision—was entered into, and because neither entity was "troubled" when

Mr. Hill's severance payment became due (that is, on Mr. Hill's termination), the golden

parachute rules should not regulate his severance payment.  In response to comment letters in

response to its Second Proposal to implement the FDIA, 12 U.S.C. § 1828(k), the FDIC

explained, "any payment which is contingent on the termination of an IAP's employment and is

received on or after an institution or holding company becomes troubled is a prohibited golden

parachute.  If this payment is prohibited under the prescribed circumstances, it is prohibited

forever."  Comments, Final Rule, 61 Fed. Reg. 5926, 5928 (Feb. 15, 1996).  In light of these

Comments by the FDIC itself, the Court finds unavailing Mr. Hill's argument that the golden

parachute provisions do not apply to him because the Bank was no longer "troubled" when he

---

[5] The Court has reviewed the Affidavit of Paul Allan Schott, former Chief Counsel of the OCC, who avers that
Commerce Bank and Bancorp "were in extraordinarily good financial condition," and did not "show[] any sign of
financial difficulty."  Affidavit of Paul Allan Schott, Pl. Vernon Hill's Br. Opp., Ex. 11 at ¶ 9.  Although the Court
has no doubt of Mr. Schott's experience in the field of banking regulation, the Court agrees with Defendants that, for
the purposes of the instant motions, many of Mr. Schott's statements are legal conclusions that are the province of
the Court to make, rather than proper opinion testimony.  <u>See, e.g.</u>, <u>id.</u> at ¶ 13 ("Modifying or confirming a bank's
internal systems and procedures simply has nothing to do with 'the financial condition of the institution.'").

was terminated.  In the absence of any applicable exception to the relevant regulations, the

golden parachute restrictions apply.

2. <u>Exceptions to the Golden Parachute Regulations</u>

12 C.F.R. 359.4(a) lists three circumstances under which "[a]n insured depository

institution or depository institution holding company . . . may make a golden parachute

payment . . . ."  Defendants argue that only one of these circumstances may be said to apply in

this case, and Plaintiff does not contest this.  Specifically, Defendants contend that the Bank

could only make a golden parachute payment if "[t]he appropriate federal banking agency, with

the written concurrence of the Corporation, determines that such a payment or agreement is

permissible . . . ."  12 C.F.R. § 359.4(a)(1).  In order to petition the appropriate banking agency

for permission to make a golden parachute payment, the party requesting permission to make

such a payment to the relevant federal agency must also

> demonstrate that it does not possess and is not aware of any information, evidence, documents or other materials which would indicate that there is a reasonable basis to believe, at the time such payment is proposed to be made, that . . . [t]he IAP has committed any fraudulent act or omission, breach of trust or fiduciary duty, or insider abuse with regard to the depository institution or depository institution holding company that has had or is likely to have a material adverse effect on the institution or holding company . . . .

§ 359.4(a)(4)(i).  As this Court has previously held, Defendants and Plaintiff are all equally

eligible to apply for the exception to the golden parachute restrictions, as long as they are able to

certify to the above (and can make other, similar certifications about the IAP).  Opinion, June 17,

2010 ("June 17, 2010 Op."), Doc. No. 131, 16; <u>see also</u> 12 C.F.R. § 359.4(a)(4).

In its June 17, 2010 Opinion, this Court observed, "it appears that Commerce has in fact

applied for approval to make the severance payments, and that approval is seemingly pending."

June 17, 2010 Op., 16.  However, it now appears that this is not the case.  <u>See</u> Pl.'s Br. Opp. 13-

13

14 ("[D]efendants have misinformed the Court about having filed the golden parachute application.  Last year they said they did and it was pending and the court accepted that.  They never corrected that misrepresentation."); see also Defs.' Reply Br., 19 ("Defendants cannot make the requisite certification for approval for the golden parachute payment . . . .").  Thus, although either Mr. Hill or Defendants may make the requisite application to the appropriate federal agency, and although this application is at the very heart of the dispute between Mr. Hill and Defendants, neither party has made the application.

Mr. Hill contends that, in order to perform the provisions of the Employment Agreement they entered into with him, Defendants must make the applications themselves.  See Dep. Vernon Hill, Defs.' Br., Ex. N, 103-05 ("[T]he bank has to certify it.").  Therefore, the logic appears to go, Mr. Hill need not make that application himself.  Although the Court concurs that "Mr. Hill's refusal to even consider filing the application himself is," to say the least, "perplexing," Defs.' Br., 8, nevertheless the Court agrees with Mr. Hill that, if Defendants are able to make the application themselves, they are contractually bound by the Agreement to do so—regardless of whether or not Mr. Hill may do so himself.

Defendants, however, argue that they are unable apply for permission to make the golden parachute payment, because they are unable to make the necessary certification that they are not aware of materials creating a reasonable basis to believe that Mr. Hill did not commit a fraudulent act or omission, breach, or insider abuse with regard to the Commerce entities.  Defs.' Br., 12 ("Commerce cannot itself make the requisite certification for approval for the golden parachute payment because it cannot certify that it is not aware of any information, documents or evidence indicating that there is a reasonable basis to believe Mr. Hill engaged in any of the conduct prohibited by the applicable regulation.").  They consider the fact that Mr. Hill has not

14

applied for the Section 359.4(a)(4) exception to mean that he has failed to exhaust his administrative remedies.  They further contend that their state law contract duties conflict with their federal duties to abide by golden parachute regulations.  Finally, they argue that the federal golden parachute regulations make it impossible for them to perform their contract.  We will address each of these in turn.

a. Requirement to Exhaust Administrative Remedies

Defendants argue that, because Mr. Hill did not himself apply to the appropriate agency to seek permission for payment of his severance package, Mr. Hill failed to exhaust his administrative remedies and thus cannot pursue his claims before this Court.  However, Defendants have pointed the Court to no explicit exhaustion requirement in the FDIA relating to the golden parachute restrictions, nor has the Court been able to locate one.  Moreover, in the limited context in which the Third Circuit has addressed the issue of exceptions to the golden parachute regulations, it has not located a requirement that a plaintiff exhaust administrative remedies.  In McCarron v. FDIC, the Third Circuit considered the exception provided for in Section 359.4(a)(2)—known as the "white knight" exception—to the golden parachute rule.  111 F.3d 1089 (3d Cir. 1997).  The Court of Appeals found in that case that the plaintiff was not entitled to the regulated payment based on his "white knight" status because he "failed to meet the requirement that the appropriate federal banking agency and the FDIC consent in writing to the amount and terms of the golden parachute payment."  Id. at 1096 (internal quotation omitted).  However, the McCarron Court did not characterize this as a failure to exhaust an administrative requirement; rather, the Third Circuit explained, the plaintiff failed to meet a necessary precondition of payment, giving the court "no factual or legal basis to permit payment of [his] severance claims."  Id.

Thus Defendants' argument concerning Mr. Hill's failure to exhaust administrative remedies is unavailing. Furthermore, in this case Mr. Hill has brought suit not against the FDIC, as was the case in McCarron, but rather against the bank—an entity that, putting the certification issue aside momentarily, has the ability to apply for permission to make the golden parachute payment. Therefore, if this lawsuit were to be resolved in favor of Mr. Hill, and if Defendants were able to make the necessary certification, Defendants themselves would be able to apply for agency and FDIC approval, and potentially obtain permission to make the golden parachute payment. To satisfy the Employment Agreement, Defendants must perform the Agreement's provisions—including the severance provision. However, the Court notes that the obligation to perform is necessarily conditioned upon compliance with federal banking regulations; therefore, the question of whether Defendants are able to make the requisite certification for the Section 359.4(a)(4) exception is central to the question of whether or not Defendants can be said to have breached the Agreement by withholding Mr. Hill's severance payment. However, the fact that Defendants' obligation to perform the Agreement is conditioned upon regulatory compliance does not mean that Defendants are excused from performance because Mr. Hill has the ability to apply for the Section 359.4(a)(4) exception himself.

The Court finds a genuine issue of material fact as to whether or not Defendants are able to demonstrate that they "do[] not possess and [are] not aware of any . . . materials which would indicate that there is a reasonable basis to believe" that Mr. Hill committed "any fraudulent act or omission, breach of trust or fiduciary duty, or insider abuse with regard to" the Commerce entities "that has had or is likely to have a material adverse effect" on Defendants. 12 C.F.R. 359.4(a)(4)(i). Defendants argue that the Stipulation and Consent Order entered into between Mr. Hill and the OCC on November 17, 2008 provides such a "reasonable basis," as the Order

indicates that "the Comptroller finds . . . that Respondent engaged in unsafe and unsound practices and breaches of fiduciary duties . . . ." November 17, 2008 Stipulation and Consent Order, Defs.' Br., Ex. U.[6]  The Court finds that, even if the Stipulation and Consent Order are said to provide a reasonable basis for Defendants to believe that that Mr. Hill committed a fraudulent act or omission, breach of trust or fiduciary duty, or insider abuse, a question remains as to whether that act "has had or is likely to have a material adverse effect" on Defendants.  12 C.F.R. 359.4(a)(4)(i).  No evidence of such material adverse effect has been presented by Defendants.

Defendants also indicate that "[t]he self-dealings that Mr. Hill engaged in when he was CEO and COB of Commerce can easily be construed as breach of fiduciary duty, or unsafe or unsound banking practices." Defs.' Br., 16.  While Defendants are correct that, because Section 359.4(a)(4) requires only "a reasonable basis to believe" that Mr. Hill has engaged in acts that would disqualify him from the exception to the golden parachute limitation, Defendants need not "offer 'proof' of any actual violation or misfeasance" by Mr. Hill.  Id.  Nevertheless, Defendants must present a showing of a reasonable basis that Mr. Hill engaged in a disqualifying act that "has had or is likely to have a material adverse effect" on Defendants, and they have not done so. 12 C.F.R. § 359.4(a)(4)(i).

b. Contractual Impossibility

Because there remains a genuine question of material fact as to whether or not Defendants are able to make the Section 359.4(a)(4) certification on Mr. Hill's behalf, Defendants cannot be afforded summary judgment on their contractual impossibility defense. They claim that, because "Commerce cannot itself make the requisite certification for approval

---

[6] Mr. Hill has filed an in limine motion to exclude the November 17, 2008 Order.

for the golden parachute payment," "it is contractually impossible for Commerce to make the golden parachute payment called for in Mr. Hill's Agreement." Defs.' Br., 12.[7]  Certainly, "[o]bjective impossibility is ordinarily a complete defense, unless the risk is assumed by the promisor rather than the promisee and the thing to be done is not illegal." Duff v. Trenton Beverage Co., 4 N.J. 595, 606 (1950).  In this case, as Defendants point out, the "thing to be done"—that is, the severance payment to Mr. Hill—is indeed regulated by the FDIA and may be prohibited if the parties are ineligible for the Section 359.4(a) exception.  However, there is a question of fact as to whether or not Defendants are, as they claim, unable to perform their contract by seeking agency approval for the golden parachute payment, including tendering the necessary Section 359.4(a)(4) certification.  Accordingly, summary judgment cannot yet be granted on the grounds of Defendants' contractual impossibility defense.

### c. Conflict Preemption

The same is true for Defendants' conflict preemption argument.  Defendants argue that Mr. Hill's "common law claims for breach of contract and breach of the covenant of good faith and fair dealing require the Court to enter a judgment ordering Commerce to make the severance payment." Defs.' Br., 11.  According to Defendants, in this case, "[s]tate law and the federal regulatory provisions governing golden parachute payments . . . irreconcilably conflict with one another." Id. at 11-12.  First, the Court does not conclude that an irreconcilable conflict exists between New Jersey's common law and the federal regulations invoked in this case.  Because the factual question remains as to whether or not Defendants are able to petition the relevant federal agency for permission to make the payment to Mr. Hill, and because the outcome of such a

---

[7] Defendants also argue that the fact that "Mr. Hill refuses to submit a request for approval even though he declares that he can" factors into their impossibility analysis. Defs.' Br., 12.  The Court disagrees.  The fact that Mr. Hill is able to apply for the exception to the golden parachute regulation does not exempt Defendants from their obligation to attempt to fulfill their contract, if indeed they are able to do so.

petition is necessarily unknown, a question also remains as to whether or not Mr. Hill's state claims conflict with the federal golden parachute regulations.

Second, and more importantly, the doctrine of conflict preemption is simply inapplicable to the matter currently before the Court. Conflict preemption is generally brought into play when a federal statute and a state statute attempt to regulate the same activity; indeed, this is the case in the examples Defendants cite in support of their preemption argument. For example, in Florida Lime and Avocado Growers, Inc. v. Paul, the Supreme Court considered a conflict between "federal regulation of a field of commerce" and the competing regulations of a single state. 373 U.S. 132, 142 (1963). As the Third Circuit has found, "[c]onflict preemption exists where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." NE Hub Partners, L.P. v. CNG Transmission Corp., 239 F.3d 333, 348 (3d Cir. 2001).

In this case, it is certainly possible that the FDIC or other appropriate agency might not approve the payment to Mr. Hill. However, the fact that federal regulations might make it impossible for Defendants to perform their contractual obligations does not mean that the New Jersey common law of contracts generally stands in the way of the FDIA's regulations. As Defendants have argued in the alternative, the relevant doctrine is contractual impossibility—not conflict preemption. If the Court were to accept Defendants' preemption theory, then the enforcement of any contract containing a provision granting a severance payment to an IAP would be preempted by the golden parachute regulations, because circumstances might arise that would trigger the regulations and put state contract law into conflict with federal regulation. That cannot be an intended result of the federal regulations, particularly because, as explained above, the regulations themselves contain explicit exceptions to golden parachute restrictions.

19

**B. Counts Four, Six, Seven, and Eight**

Therefore, the Court finds that genuine issues of material fact remain as to Counts One, Two, and Three of the Amended Complaint, and accordingly denies Defendants' motion for summary judgment and Mr. Hill's cross-motion for summary judgment on those Counts. The Court now moves to consideration of Defendants' motion for summary judgment of the claims of Plaintiffs InterArch and Shirley Hill.

1. <u>InterArch's Breach of Contract Claim</u>

Defendants first argue that they cannot be liable for breach of contract with InterArch, because no such contract existed between the parties in 2007. Defendants further argue that, even if a contract did exist in 2007, Defendants are not liable for damages because the agreement would not have required them to use InterArch's services exclusively. To elucidate the status of the relationship between InterArch and Defendants at the time of InterArch and Shirley Hill's termination on October 31, 2007, it is necessary to review briefly the historical course of dealing between the parties, as InterArch and Defendants have described it.

For over thirty years, InterArch provided design and architectural service to Commerce Bancorp. Although the parties appear to agree that Commerce Bancorp was never contractually bound to exclusively use InterArch's services for its design and architectural needs, InterArch contends, and Defendants do not seem to dispute, that no company other than InterArch ever provided those services. <u>See</u> Dep. Shirley Hill, Defs.' Br. in Support of Summary Judgment Against InterArch ("Defs.' Br. InterArch"), Ex. 1, 15-17. In 2002, InterArch and Bancorp signed an "Agency Agreement," whereby the two parties "memorialize[d] certain terms and conditions by which their relationship ha[d] been governed and by which they desire[d] their relationship to continue to be governed." Agency Agreement, Defs.' Br. InterArch, Ex. 9.

Though the Agency Agreement reflected a clear intention for the parties' relationship to continue according to its prior course of dealing, the Agency Agreement also made clear that it was "subject to the annual approval of the Commerce Board(s) . . . ." Id. at ¶ 11.  It appears that, for at least several years prior to 2006, the Commerce Board's annual approval was manifest in the form of a letter proposal.[8]  Dep. Shirley Hill, Defs.' Br. InterArch, Ex. 1, 26-27.  That proposal was signed by Ms. Hill, and generally contained formulaic language such as the following: "I am pleased to enclose our Proposal for architectural and interior design services, landscape design, construction management and facilities procurement and consulting to Commerce Bancorp, Inc. to commence January 1, 2005 through December 31, 2005."  2005 Letter Proposal (Nov. 23, 2004), Defs.' Br. InterArch, Ex. 12; see also 2003-04 Letter Proposal (Dec. 12, 2003), Defs.' Br. InterArch, Ex. 11.

For the 2006 term, however, the practice by which Bancorp contracted for InterArch's services changed somewhat.  See Dep. Shirley Hill, Defs.' Br. InterArch, Ex. 1, 27 ("Q: And you would agree with me that in 2006, that practice changed . . .; correct?  A: It appears that in 2006 it did.").  Specifically, in 2006, the parties signed a Master Agreement for Architectural/ Engineering/ Consultant Services ("Master Agreement").  Defs.' Br. InterArch, Ex. 14.  The Master Agreement specified a term of January 1, 2006 to December 31, 2006, and was signed by the parties on February 27, 2006 and March 2, 2006.  Id.  The Master Agreement also made explicit reference to the 2002 Agency Agreement.  See, e.g., id. at ¶¶ 13, 14.  The Master Agreement was preceded by a Letter Proposal dated December 9, 2005.  2006 Letter Proposal (Dec. 9, 2005), Defs.' Br. InterArch, Ex. 14, Addendum B ("It is an honor to be asked to present our upcoming contract. . . . Enclosed is our proposed 2006 Rate Schedule.").

---

[8] Moreover, even before the signing of the Agency Agreement in 2002, it appears that the letter proposal form governed the agreement between the parties.  See, e.g., 1998-99 and 2001-02 Letter Proposals, Defs.' Br. InterArch, Exs. 6, 7.

For the 2007 contract term—the period at issue in this case—a Letter Proposal was drafted by Ms. Hill and presented to Bancorp for approval.  2007 Letter Proposal (Dec. 13, 2006), Defs.' Br. InterArch, Ex. 15.  A handwritten notation on the Letter Proposal, which, Defendants concede, was written by Jon Sandeen, Commerce Bank's Senior Vice President and Director of Development, indicates that the proposal was "Approved by Board 2/20/07," and "effective Jan[.] 1, 2007."  Id., see also, Defs.' Br. Interarch, 6 (referencing a "handwritten note by Commerce's senior vice president, Jon Sandeen").  Moreover, the Minutes of a February 20, 2007 meeting of the Commerce Board of Directors confirms this.  See Minutes of Board of Directors Meeting (Feb. 20, 2007), Defs.' Br. InterArch, Ex. 19 at ¶ 8(B) ("[T]he Committee has requested and received a proposal from InterArch to continue its services.  The proposal was presented to the Board and discussed in detail.  The Board approved the InterArch proposal to continue services.").  However, it appears that no Master Agreement for the 2007 term exists or, at least, has been discovered in preparation of this litigation.  See Dep. Joseph Vasta, Defs.' Br. InterArch, Ex. 5, 119-20.

Defendants argue that the 2006 Master Agreement "incorporated by reference" the termination provision of the 2002 Agency Agreement, which stipulated that the Agency Agreement (and, therefore, the Master Agreement) would be "subject to the annual approval of the Commerce Board(s)."  Defs.' Br. InterArch, 4 (quoting Agency Agreement, Defs.' Br. InterArch, Ex. 9 at ¶ 11).  Therefore, Defendants claim, "[t]he Master Agreement had an express term of only one year."  Defs.' Br. InterArch, 4.  The Court concurs that the Master Agreement terminated at the close of 2006 and was not renewed in 2007.

Nevertheless, the Court finds that a contract for services was formed between InterArch and Bancorp for the 2007 term.[9]  Although a Master Agreement had been executed for the previous contract term, Defendants point to no documentation specifying that a Master Agreement was necessary for a relationship between the parties to exist in another year.  Thus the Court finds that the Master Agreement was an additional agreement entered into by the parties in 2006, which had not been and did not need to be executed in order for a legal relationship to bind the parties in 2007.  This is so because the 2002 Agency Agreement was never terminated, and the 2002 Agency Agreement stipulates that it is renewable by annual Board approval.  Board approval of the annual Letter Proposal had always sufficed to form a binding contract.[10]  Accordingly, because the February 20, 2007 Board Minutes confirm that Board approval was obtained for the 2007 Letter Proposal, the terms of that Letter Proposal and the Agency Agreement bound the parties "effective January 1, 2007"—as Senior Vice President Jon Sandeen's note makes clear.  Because, as New Jersey courts have made clear, the evidence of Defendants' intent to be bound by InterArch's 2007 Letter Proposal demonstrates that a contract between the parties was indeed formed for the 2007 year.  And, as the 2007 Letter Proposal provides, the contract ran from "January 1, 2007 through December 31, 2007."  2007 Letter Proposal (Dec. 13, 2006), Defs.' Br. InterArch, Ex. 15.  Not only does the plain language of the existing Agency Agreement between the parties compel the conclusion that a contract was formed, but general common law contract principles require it as well.  See, e.g., Comerata v. Chaumont, Inc., 52 N.J. Super. 299, 305 (App. Div. 1958) ("The ultimate question is one of intent.") (citing Williston on Contracts (ed. 1936), §§ 28, 28A, pp. 59 et seq.).

---

[9] The Amended Complaint alleges that "Commerce has willfully and wrongfully breached the terms and conditions of its agreements with InterArch, including, but not limited to the Master Agreement . . . ."  Am. Compl. at ¶ 131.

[10] Even in 2006, when the additional Master Agreement was also executed, there is no indication that Board approval of the annual Letter Proposal would not have bound the parties in the absence of the new Master Agreement.

Defendants go on to argue that, even if the Court finds that a valid contract existed between InterArch and Defendants in 2007, that contract did not require that Defendants exclusively use InterArch's services.  Therefore, the logic goes, the fact that Defendants did not assign InterArch any projects between October 31, 2007 and the end of that year does not leave Defendants vulnerable to liability.  InterArch counters that, "[n]otwithstanding the defendants' arguments that InterArch was never promised exclusivity, exclusivity was the historical fact between the two parties."  Pl. InterArch's Br. in Opposition to Summary Judgment Motion ("Pl. InterArch's Br. Opp."), 18.

Defendants' argument that "[t]he 2007 [Letter] Proposal is devoid of any provision that would have prevented Commerce from terminating InterArch's services at any time" is misguided.  Defs.' Reply Br. InterArch, 6.  The 2002 Agency Agreement, which still governed the two parties in 2007, explained that "this Agreement may be terminated by either party upon not less than sixty days' written notice (the 'Notice Period') should the other party fail to materially perform in accordance with the terms of this Agreement and fails to cure such failure to perform within the Notice Period."  Agency Agreement, Defs.' Br. InterArch, Ex. 9 at ¶ 11.  Given this Termination Clause, Defendants' affirmative termination of the agreement with InterArch on October 31, 2007, without notice and without indication that InterArch had failed to materially perform its contractual obligation, constituted a breach of contract.  Defendants' argument that this breach does not make it liable to InterArch for the sum of money InterArch has demanded is not a legal question for the Court to decide; rather, it is a jury question as to whether or not any damages flow from the breach.  See New Jersey State Model Civil Jury Charges, 8.45 ("A plaintiff who is awarded a verdict for breach of contract is entitled to compensatory damages for such losses as may fairly be considered to have arisen naturally from the

defendant's breach of contract.  Alternatively, plaintiff may be entitled to such damages as may

reasonably be supposed to have been contemplated by both parties, at the time they made the

contract, as the probable result of the breach of such contract.").

Finally, Defendants indicate that, in late 2006, they were informed by the OCC and the

Federal Reserve Board that an investigation of Commerce had been undertaken.  Defs.' Br.

InterArch, 9.  Specifically, the OCC "was investigating potential conflicts of interest involving

the relationship of Mr. Hill as CEO and COB of Commerce, and Mrs. Hill, who was the

President of InterArch."  Id.  Defendants argue that, because of a Consent Order entered into

with the OCC, Commerce was "required . . . to terminate its business relationship with InterArch

by December 31, 2006."  Id.  However, the OCC Consent Agreement, which was signed by

Commerce representatives on June 28, 2007 and by the Senior Deputy Comptroller on July 28,

2007, actually required that any InterArch agreements be terminated by December 31, 2007.  See

Consent Order, Defs.' Br. InterArch, Ex. 25, Article II ¶ (1) ("Only until December 31, 2007, the

Bank may continue existing contracts and agreements with Insiders and Insider-Related Parties

(including, but not limited to InterArch, Inc. . . ) . . . .").  As a result, the provisions of the OCC

Consent Order are irrelevant.

Accordingly, the Court denies Defendants' motion for summary judgment as to Count

Four, and grants Plaintiff InterArch's cross-motion for summary judgment as to Count Four.

### 2. Promissory Estoppel

Because the Court finds that a valid contract was entered into between InterArch and

Bancorp for the duration of 2007, the Court does not reach the merits of the issue of promissory

estoppel raised by InterArch's Count Six.  InterArch cannot prevail on both a breach of contract

and promissory estoppel theory for the same conduct, since promissory estoppel by its definition

assumes that a contract supported by consideration has not been formed.  See, e.g., Friedman v. Tappan Development Corp., 22 N.J. 523, 536 (1956) (defining promissory estoppel as "a departure from the classic doctrine of consideration that the promise and the consideration must purport to be the motive each for the other").  Accordingly, Defendants' motion for summary judgment on Count Six is granted.

### 3.  Breach of Implied Covenant of Good Faith and Fair Dealing

Defendants also move for summary judgment on InterArch's Seventh Claim—that Defendants breached the implied covenant of good faith and fair dealing.  The New Jersey Supreme Court has held that "[e]very party to a contract . . . is bound by a duty of good faith and fair dealing in both the performance and enforcement of the contract."  Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs., 182 N.J. 210, 224 (2005).  Although that court has found that "[g]ood faith is a concept that defies precise definition," it firmly requires that "[p]roof of 'bad motive or intention is vital to an action for breach of the covenant."  Id. at 224, 225 (internal quotation omitted).  Accordingly, "[t]he party claiming a breach of the covenant of good faith and fair dealing 'must provide evidence sufficient to support a conclusion that the party alleged to have acted in bad faith has engaged in some conduct that denied the benefit of the bargain originally intended by the parties.'"  Id. at 225 (quoting 23 Williston on Contracts § 63:22 at 513-14 (Lord ed. 2002)).

Although the Court doubts InterArch's characterization of Defendants' behavior as a "scheme" of "calculated depravity," the Court cannot find, in light of the New Jersey Supreme Court's above definition of the covenant of good faith and fair dealing, that there is no factual dispute as to whether or not Defendants have breached it.  Indeed, the New Jersey Supreme Court has found a breach of the covenant of good faith and fair dealing in a case where a

defendant terminated a contract so as to deny plaintiff's "reasonable expectations and right to

receive the fruits of the contract."  <u>Sons of Thunder v. Borden, Inc.</u>, 148 N.J. 396, 425 (1997).

There does exist ample evidence in the record to indicate that, in late 2006, Defendants were

under pressure from federal regulators for alleged insider relationships; however, the Court

concludes that the question of whether Defendants' actions in response to that pressure were

taken in good faith is a factual one for a jury to decide.  <u>See</u> Letter from Kevin L. Lee, Senior

Counsel, Comptroller of the Currency, to Board of Directors of Commerce Bank, N.A. (Dec. 5,

2006), Defs.' Br. InterArch, Ex. 20 ("Please be advised that the Office of the Comptroller of the

Currency ('OCC'), in conjunction with the Board of Governors of the Federal Reserve System

('Board'), is currently conducting an investigation into the affairs of Commerce Bank, N.A.

('Bank').").  Therefore, although the Court finds that InterArch brashly overstates its claim for

breach of the covenant when it argues that "[t]he termination of Vernon Hill from Commerce

Bancorp, Inc., ushered in an unprecedented campaign of purposeful destruction and corporate

espionage fit for TV consumption," nevertheless the Court cannot find an absence of genuine

issue of material fact as to Defendants' good faith in their breach of the agreement with

InterArch.  Pl. InterArch's Br., 19.

        4. <u>Tortious Interference</u>

Defendants have also moved for summary judgment on InterArch's claim of tortious

interference.  Count Eight of InterArch's Amended Complaint alleges that "Commerce Bancorp

intentionally and wrongfully interfered with InterArch's economic advantage by maliciously and

unjustifiably inducing these employees to resign, en masse, from their positions at InterArch."

Am. Compl. at ¶ 156.

New Jersey law requires that a tortious interference claim "must demonstrate that plaintiff was in 'pursuit' of business" such that plaintiff has "some reasonable expectation of economic advantage," "must allege facts claiming that the interference was done intentionally and with malice," "must allege facts leading to the conclusion that the interference caused the loss of the prospective gain," and must show that in the absence of the interference the plaintiff "would have received the anticipate economic benefit." Printing Mart-Morristown v. Sharp Electronics Corp., 116 N.J. 739, 751 (1989) (quotation marks omitted).

Defendants' principal argument is that, because InterArch's employees were all employed at will, InterArch must—but cannot—show that Defendants acted with malice in hiring them. "The general rule appears to be that the mere inducement of an employee to move to a competitor is not in itself actionable where the employment is terminable at will, but that such inducement is actionable if the party offering the inducement either has an unlawful or improper purpose or uses unlawful or improper means." Avtec Indus. v. Sony Corp. of Am., 500 A.2d 712, 715 (N.J. App. Div. 1985) (citing 24 A.L.R. 3d 821, §2[a] at 823 (1969)). Acknowledging the "hazy" nature of the term "improper means," the Appellate Division explained that "[i]t clearly includes such conduct as fraud, misrepresentation, intimidation, obstruction and molestation," and also "includes conduct which fails to accord with generally accepted standards of morality." Id.

The New Jersey Appellate Division found the malice necessary to sustain a tortious interference claim in a situation where one highly ranked employee recruited coworkers from his current company to move with him to a rival employer. Wear-Ever Aluminum, Inc. v. Townecraft Indus., Inc., 75 N.J. Super. 135 (Ch. Div. 1962). InterArch alleges that Defendants engaged in identical activity through Scott Hite, a former InterArch employee whose only direct

superior was Shirley Hill, InterArch's President.  Dep. Scott Hite, Defs. Br. InterArch, Ex. 3, 11-12.  InterArch claims that Mr. Hite "convened . . . surreptitious meetings away from the InterArch workplace" where he attempted to persuade InterArch employees to leave the firm for the new in-house architecture and design department at Commerce.  Pl. InterArch Statement of Undisputed Material Facts at ¶ 87.  Timothy Hogan, an employee who stayed at InterArch but who allegedly was also wooed by the Commerce in-house department, testified in his deposition that Scott Hite informed him that Mr. Hite "had been asked by Commerce to extract out of Interarch the stars, the top performers, the managers, to build a new team at Commerce."  Dep. Timothy Hogan, Pl. InterArch's Br. Opp., Ex 2, 80.  Joseph Vasta, another employee who remained at InterArch, also testified that he "[knew] there was a number of people [Scott Hite] approached within the office.  And they were pretty much like the management level people."  Dep. Joseph Vasta, Defs.' Br. InterArch, Ex. 5, 54.  Mr. Vasta also explained that Mr. Hite "called a meeting of all the other people he had talked to, everyone, in September, at lunch, at the Macaroni Grill around the corner here."  Id. at 55.

Defendants have presented facts to support its argument that former InterArch employees "applied to Commerce for vacancies listed on its website of their own volition."  Defs.' Reply Br. InterArch, 16.  However, given the similarities between the Wear-Ever Aluminum case, and the facts presented by InterArch, the Court cannot find that InterArch has not presented a genuine issue of material fact as to its tortious interference claim.  The "malice" standard enforced by New Jersey courts for a showing of tortious interference is not an overwhelmingly rigorous one: "Merely to persuade a person to break his contract, may not be wrongful in law or fact.  But if the persuasion be used for the indirect purpose of injuring the plaintiff, or of benefiting the defendant, at the expense of the plaintiff, it is a malicious act, which is in law and

in fact a wrong act, . . . and an actionable act if injury ensues from it."  Wear-Ever Aluminum, 75

N.J. Super. at 141-42 (quoting Louis Kamm, Inc. v. Flink, 113 N.J.L. 582, 587-89 (E. & A.

1934) (emphases omitted).

Given this standard and the evidence InterArch has presented, the Court finds that

InterArch has raised a genuine issue of material fact as to its tortious interference claim, and the

Court accordingly denies Defendants' motion for summary judgment as to Count Eight.

**C. Motion to Seal**

Defendants have also moved to seal documents in connection with the motions for

summary judgment addressed herein, pursuant to District of New Jersey Local Civil Rule 5.3.

Defendants argue that 12 C.F.R. § 4.37, which regulates the dissemination or disclosure of OCC

information, designates information of the kind contained in their summary judgment motions

and appended exhibits as "non-public," and accordingly necessitates OCC approval before

disclosure.  Plaintiffs have not opposed this motion.

In the instant motion to seal, Defendants do not enumerate the documents that, in their

view, must be sealed.  Defendants have previously moved to seal a list of OCC-related

documents submitted to the Court in connection with other motions.  Doc. Nos. 183, 192.  On

December 9, 2011, Magistrate Judge Joel Schneider expressed some "skepticism about whether

the materials at issue are covered by § 4.37(b)," and issued an Order granting in part and denying

in part Defendants' motions to seal.  Doc. No. 240, 6.   Specifically, Judge Schneider determined

that, because "[t]he bank examination privilege belongs to the OCC," "the Court will defer its

decision on defendants' request until the OCC weights in on the issue."  Id.  By letter dated

February 14, 2012, Defendants informed the Court that "even though the materials at issue are in

the OCC's opinion privileged under the bank examination privilege, the OCC has authorized

public use of the materials identified in . . . the Court's Order." Letter from William M. Tambussi, Counsel for Defendants, to the Hon. Joel Schneider, U.S.M.J. (Feb. 14, 2012). The letter went on to express the OCC's only request for redaction: "the OCC has requested that the names of four persons identified in the third paragraph in Exhibit O be redacted." Id. The letter indicated that the OCC "does not object to retaining the name of Shirley Hill" in that paragraph. Id. Accordingly, the Court issued an Order on February 16, 2012, redacting those four names.

The Exhibit O referred to above has been filed in this case as Exhibit D accompanying Defendants' motion for summary judgment against Mr. Hill, and Exhibit 22 accompanying Defendants' motion for summary judgment against InterArch. Based on Judge Schneider's February 16, 2012 Order, the Court orders that the same four names contained in the third paragraph of Exhibits D and 22 of Defendants' motions for summary judgment against Mr. Hill and InterArch, respectively, be redacted.

Moreover, as Judge Schneider previously ordered, this Court will allow Defendants to write to the OCC within one week of the date of this Order, with a copy to Plaintiffs, to advise that Office that this Court is deciding whether to seal or redact "Confidential" materials. Defendants will advise the OCC that if it does not unequivocally object in writing to granting public access to the relevant materials by April 28, 2012, the Court will deny Defendants' motion to seal and the materials will become part of the public record. Defendants will inform the Court of any objection by the OCC.

## IV.  CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment on Counts One, Two, and Three is **DENIED**. Plaintiff Vernon Hill's cross-motion for summary judgment on Counts One, Two, and Three is **DENIED**. Defendants' motion for summary judgment on Count

Four is **DENIED**.  Plaintiff InterArch's cross-motion for partial summary judgment on Count

Four is **GRANTED**.  Defendants' motion for summary judgment on Count Six is **GRANTED**.

Defendants' motions for summary judgment on Count Seven and Count Eight are **DENIED**.

Finally, Defendants' motion to seal is **GRANTED IN PART** and **DENIED IN PART**.


Dated: 3/1/2012                                    /s/ Robert B. Kugler
                                                   ROBERT B. KUGLER
                                                   United States District Judge