**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

1

2

3 _____

VERNON W. HILL, II,

4

        Plaintiff,           CIVIL ACTION NUMBER:

5

        -vs-                 09-3685

6

COMMERCE BANCORP, LLC,

7

        Defendant.

8 _____

      Mitchell H. Cohen United States Courthouse
9       One John F. Gerry Plaza
      Camden, New Jersey 08101
10       May 8, 2013

11 <u>B E F O R E</u>:      THE HONORABLE ROBERT B. KUGLER
                   UNITED STATES DISTRICT JUDGE

12

13 <u>A P P E A R A N C E S</u>:

14 JACOBS AND BARBONE
BY:  EDWIN J. JACOBS, JR., ESQUIRE
15      LOUIS M. BARBONE, ESQUIRE
ATTORNEYS FOR PLAINTIFF
16

BROWN & CONNERY, LLP
17 BY:  WILLIAM M. TAMBUSSI, ESQUIRE
     SUSAN LEMING, ESQUIRE
18 ATTORNEYS FOR DEFENDANT

19

20

21

22

23

24 Certified as true and correct as required by Title 28,
U.S.C., Section 753.
25                /S/ <u>Carl J. Nami</u>

```
 1

 2   JOHN CHRISTIAN FISHER           1        92        21

 3   DIRECT EXAMINATION OF JOHN      1        92        23

 4   CHRISTIAN FISHER BY MR.

 5   JACOBS

 6   CROSS EXAMINATION OF JOHN C.    1        145       10

 7   FISHER BY MR. TAMBUSSI:

 8   REDIRECT EXAMINATION OF JOHN    1        177       15

 9   C. FISHER BY MR. JACOBS:

10   RECROSS-EXAMINATION OF JOHN     1        202       21

11   CHRISTIAN FISHER BY MR.

12   TAMBUSSI

13   rEDIRECT EXAMINATION OF JOHN    1        204       19

14   CHRISTIAN FISHER BY MR.

15   JACOBS

16

17

18   PLAINTIFF EXHIBIT P-70 WAS      1        100       9

19   RECEIVED IN EVIDENCE

20   defendant Exhibit D-2 was       1        149       1

21   received in evidence

22   defendant Exhibit D-3 was       1        149       22

23   received in evidence

24   defendant Exhibit D-4 was       1        150       15

25   received in evidence
```

| | | | | |
|---|---|---|---|---|
| 1 | defendant Exhibit D-5 was | 1 | 151 | 16 |
| 2 | received in evidence | | | |
| 3 | defendant Exhibit D-6 was | 1 | 152 | 14 |
| 4 | received in evidence | | | |
| 5 | defendant Exhibit D-7 was | 1 | 153 | 9 |
| 6 | received in evidence | | | |
| 7 | defendant Exhibit D-8 was | 1 | 154 | 6 |
| 8 | received in evidence | | | |
| 9 | government Exhibit D-9 was | 1 | 154 | 22 |
| 10 | received in evidence | | | |
| 11 | defendant Exhibit D-10 was | 1 | 155 | 8 |
| 12 | received in evidence | | | |
| 13 | defendant Exhibit D-11 was | 1 | 155 | 20 |
| 14 | received in evidence | | | |
| 15 | defendant Exhibit D-12 was | 1 | 156 | 8 |
| 16 | received in evidence | | | |
| 17 | defendant Exhibit D-13 was | 1 | 159 | 24 |
| 18 | received in evidence | | | |
| 19 | joint Exhibit P-9 was | 1 | 160 | 12 |
| 20 | received in evidence | | | |
| 21 | Joint Exhibit P-58 was | 1 | 161 | 1 |
| 22 | received in evidence | | | |
| 23 | Joint Exhibit P-59 was | 1 | 161 | 10 |
| 24 | received in evidence | | | |
| 25 | defendant Exhibit D-19 was | 1 | 161 | 24 |

```
1    received in evidence

2    defendant Exhibit D-20 was      1        162      22

3    received in evidence

4    government Exhibit D-52 was     1        163      16

5    received in evidence

6    Joint Exhibit P-60 was          1        164      6

7    received in evidence

8    joint Exhibit P-19 was          1        164      24

9    received in evidence

10   joint Exhibit P-23 was          1        165      13

11   received in evidence

12   joint Exhibit P-24 was          1        166      2

13   received in evidence

14   joint Exhibit D-51 was          1        166      13

15   received in evidence

16   joint Exhibit P-26 was          1        167      9

17   received in evidence

18   joint Exhibit P-27 was          1        167      22

19   received in evidence

20   joint Exhibit P-35 was          1        168      12

21   received in evidence

22   joint Exhibit P-38 was          1        169      14

23   received in evidence

24   joint Exhibit P-36 was          1        169      24

25   received in evidence
```

```
 1   Joint Exhibit P-53 was        1        170      13
 2   received in evidence
 3   joint Exhibit P-46 was        1        171      13
 4   received in evidence
 5   joint Exhibit P-48 was        1        171      24
 6   received in evidence
 7   joint Exhibit P-47 was        1        172      17
 8   received in evidence
 9   joint Exhibit P-70 was        1        173      11
10   received in evidence
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1          DEPUTY CLERK:  All rise.

2          THE COURT:  Good morning, everybody.  Have a seat,

3    please.

4      Do we need to talk about any transcripts?

00:00   5          MR. JACOBS:  I don't think so, Judge.  We made the

6    necessary or the agreed supplements to the Norcross read-in,

7    which is first, the video of Vassalluzzo is second, and we're

8    going to pause at a point to read-in a supplement requested by

9    Mr. Tambussi, and then that takes us, I believe, to the Fisher

00:00   10   read-ins and I think we're done.  We've made requested

11   supplements on the Fisher read-ins also.

12          THE COURT:  Anything else you want to talk about?

13          MR. TAMBUSSI:  Judge, obviously there's this

14   newspaper article this morning that wasn't accurate to say the

00:00   15   least.  I don't really intend to ask you to highlight

16   anything, but just in the normal course you remind the jury

17   they're not to look at or read --

18          THE COURT:  Do you want me to find out if any of the

19   jurors have read it?

00:01   20          MR. TAMBUSSI:  Well, if any juror read it, they're

21   talking about a case vastly different than what's here.

22          MR. JACOBS:  Judge, I concur, I think it would be --

23   the article is completely wrong and I think you ought to tell

24   the jurors that this is a good example of why they shouldn't

00:01   25   read the newspapers.  The original article in the Courier

 1   Post, if you happened to have seen it, hope you didn't read

 2   it, it's totally wrong.  And it is, both counsel agree.

 3        MR. TAMBUSSI:  That's inviting them to read it.

 4        MR. JACOBS:  Well, I don't think so.  You've told

00:01    5   them not to and probably they didn't, but it's up to you,

 6   Judge.  I think you should say something.

 7        THE COURT:  It's not up to me, it's up to you.

 8        MR. JACOBS:  I think you should say something.

 9        MR. TAMBUSSI:  I think you should give your general

00:01   10   instruction and remind them not to read anything in the paper

11   because things in the paper might not be accurate, something

12   like that, Judge.

13        THE COURT:  So you don't want me to inquire whether

14   they read this article.

00:02   15        You do?

16        MR. JACOBS:  I do, Judge.

17        THE COURT:  I'm going to.

18        DEPUTY CLERK:  All rise.

19             (Jury Enters the Courtroom.)

00:03   20        THE COURT:  Thanks, ladies and gentlemen.  Have a

21   seat.

22        Before we get started, there is a rather lengthy

23   newspaper story about this case this morning in the print

24   edition and online in the Courier Post.  Anybody read it?

00:03   25   Good, nobody read it.  Don't read it.  I don't want you

1    reading any stories about the case.  And the reason I ask you

2    not to read it is because the writer is writing for a

3    different audience, obviously, they're writing for a general

4    audience.  They put a lot of information in these stories that

00:04    5    have nothing to do with this case.  It's information that

6    you're not going to hear about.  I'm afraid it's going to

7    influence, might tend to influence certain facts in the case.

8    You can read it when it's over.  Don't read any stories online

9    or print edition about this case.  All right?

00:04    10        You're on.  Next witness, please.

11            MR. JACOBS:  Thank you, Judge.

12        Your Honor, the next witness will testify through the

13    read-in of sworn testimony taken on April 17th, 2009, it is

14    George Norcross, a former Commerce Bank Director.

00:04    15            THE COURT:  Just assume this is Mr. Norcross here

16    testifying, please.

17            MR. JACOBS:  Ready?

18            MR. LUBIN:  I am.

19    BY MR. JACOBS:

00:04    20    Q.   So then would it be fair to say that Vernon never

21    admitted to you personally or to the Board any wrongdoing?

22    A.   Correct.

23    Q.   He defended himself?

24    A.   He defended on certain of the topics for certain.

00:05    25    Q.   And on those topics he did not defend, he did not

1    address?

2    A.   To the best of my recollection at this point.

3    Q.   Did the Board ever find Vernon guilty of any of the

4    topics -- any of these topics raised by the OCC?

00:05    5    A.   I would say it was a virtue unanimous consensus of the

6    Board that activities involving him were in some cases

7    inappropriate, not proper conduct.  I wouldn't describe it as

8    guilty versus not guilty, but it was clear from Mr. Lloyd and

9    Mr. Vassalluzzo, who were the principal Board members

00:05    10   investigating much of this, and perhaps Mr. Giordano and the

11   other members of the Board, that there were -- there were

12   activities going on here that -- that they did not feel were

13   appropriate.

14   Q.   And what did the Board do about that?  Did they ever pass

00:06    15   a resolution saying that Vernon Hill had done something

16   inappropriate?

17   A.   Well, the Board obviously acted to terminate his

18   employment.

19   Q.   Was he terminated with or without cause?

00:06    20   A.   Without cause, that was a negotiated discussion which was

21   unanimous, I believe.

22   Q.   Unanimous that he be terminated without cause?

23   A.   Correct.

24   Q.   And at the moment he was terminated without cause, all of

00:06    25   these discussions among the Board members and the OCC and

1   outside counsel had already occurred?

2   A.   I don't understand your question.   Sorry.

3   Q.   All the things you've been telling us about, the

4   discussions about what the OCC claimed Vernon had done and

00:06   5   Vernon's defense of that --

6   A.   Right.

7   Q.   -- that had all occurred when he was terminated without

8   cause?

9   A.   You mean all the allegations they had made?

00:06   10   Q.   Yes.

11   A.   Oh, sure.

12   Q.   All the allegations on the table let me say.

13   A.   Yes, sir.

14   Q.   And although they were all on the table, the Board

00:07   15   unanimously terminated Vernon without cause?

16   A.   The Board negotiated a -- I don't know whether you call

17   it a dismissal or termination, there was a negotiated

18   departure and part of that structured departure was a without

19   cause provision versus otherwise.

00:07   20   Q.   And that was unanimous.

21   A.   Yes, sir.

22   Q.   There was at least a consensus and apparent unanimity

23   that Vernon should be discharged without cause as opposed to

24   with cause.

00:07   25   A.   Yes, sir.

1   Q.   Now, you said there was a need for change.  Do you say

2   that because of the pendency of the OCC investigation?

3   A.   Absolutely.

4   Q.   And was it your perception, perhaps the Board's

00:07   5   perception, that if there were a change, namely, Vernon

6   leaving, that would defuse or at least shorten the OCC

7   investigation?

8   A.   It would definitely not end the investigation but

9   Commerce Bank and its shareholders in all likelihood, assuming

00:08   10   the Consent Order requirements were met properly,

11   perspectively would be able to return itself to normalcy

12   versus what had been going on for six months, I guess, seven

13   months at the time.

14   Q.   Okay.  Will you turn to Tab 2 in the exhibit book you

00:08   15   have in front of you.  And when you do, you will be looking at

16   Commerce Bancorp, Inc., Board of Directors meeting minutes

17   June 28, 2007, and they reflect your presence in the first

18   paragraph, do you see that?

19   A.   Yes, sir.

00:08   20   Q.   If you will go down to Paragraph 2, which says

21   Termination of Hill, without me reading it into the record, do

22   you see there the Board unanimously approved Vernon's

23   termination without cause?

24   A.   Yes, sir.

00:08   25   Q.   And do you see there that unanimously the Board stated it

1    was their intent to fully honor the terms and conditions of

2    his Employment Agreement subject to all applicable laws and

3    regulations and so on?

4    A.   Yes.

5    Q.   Does that square with your recollection?

6    A.   Yes, we approved his termination without cause subject to

7    any rules, regulatory approval or otherwise, it was our

8    intention to act accordingly.

9    Q.   And if you turn the page to Exhibit B, you will see that

10   very resolution, will you not?

11   A.   Yes, sir.

12   Q.   If you turn the page one more time, you will see Vernon's

13   June 29th resignation letter from Commerce Bank, N.A.

14   A.   Yes, sir.

15   Q.   Okay.  So there is the date that we've been using,

16   June 28, 2007, is it fair to say that by that date there had

17   been about six months of discussions about these various

18   allegations being made by the OCC in part involving Vernon?

19   A.   Yes, sir.

20   Q.   Would it be fair to say that during six months, the same

21   six months, there had been a number of reports by lawyers to

22   the Board of Directors about these same allegations being made

23   by the OCC about Vernon?

24   A.   Yes, sir.

25   Q.   There is no secret about any of this stuff.

1   A.   Not at that point.

2   Q.   The next tab, number three, is a July 3, 2007, letter by

3   Mr. Tambussi to this Mr. Bennett you referred to earlier,

4   two-page letter, have you seen it before?

00:10   5   A.   I have no idea.  Possible, I guess.  I have no idea.

6   Q.   All right.  You will see that in the second paragraph,

7   first page it again states that Mr. Hill's termination is

8   without cause.

9   A.   Yes, sir.

00:10   10   Q.   And on the second page next to last paragraph you will

11   see that Mr. Tambussi claims to have received an opinion from

12   the Federal Reserve Board that the payment would be covered by

13   the golden parachute regulation, do you see that?

14   A.   I do.

00:11   15   Q.   What was known to you -- was that known to you, as a

16   Board member, if you know, to other Board members as of

17   July 2003 that the golden parachute regulation would be

18   involved in paying Vernon?

19   A.   It was known absolutely, including the day that the

00:11   20   resolution was acted on.

21   Q.   Okay.  Thank you.

22   A.   We received a report from Cohen for sure.  I am not

23   certain whether Alexander was there.

24   Q.   Got you.  Tab 4 are part of July 8, 2007, Board of

00:11   25   Director meeting minutes and it is stated everyone was there

1  except Mr. Kerr, so that would mean you.  If you look at the

2  second page, Paragraph 5, do you see claims that Mr. Tambussi

3  updated the Board on issues regarding Mr. Hill's compensation?

4  A.  Yes, sir.

5  Q.  Now, does that square with your recollection that the

6  Board on several occasions discussed payments to Vernon?

7  A.  I assume it is accurate.

8  Q.  If you turn to Tab 5, you will be looking at

9  September 12, 2007, Board of Directors meeting minutes, and in

10  the first paragraph it is stated you were there, is that

11  right?

12  A.  I think it says telephone Board meeting, I was on call, I

13  presume.

14  Q.  I will accept the amendment that you were participating.

15  A.  Right.

16  Q.  And topic heading 2 claims:  "The Board was also briefed

17  by William Tambussi and Rodgin Cohen on the status of Vernon

18  Hill's demand for separation payments."

19      Did I read that correctly?

20  A.  Yes, sir.

21  Q.  So is that a third example or fourth example of the Board

22  discussing paying Vernon?

23  A.  I don't know what was discussed other than what is stated

24  here.

25  Q.  All right.  September 12th is almost three months after

1    that June 28, 2007, Board meeting where Vernon was discharged

2    without cause, right?

3    A.   About two-and-a-half months, right.

4    Q.   If you turn to Tab 6, you should be looking at Board of

00:13    5    Directors meeting minutes for October 16, 2007, and it is said

6    in the first paragraph that you joined that meeting in

7    progress, do you remember that?

8    A.   No.

9    Q.   If you will turn to the third page top, you will see yet

00:13    10   another couple sentences pertaining to the negotiations to pay

11   Vernon Hill his separation money, right?

12   A.   Yes, sir.

13   Q.   So now, October, now we're about almost four months down

14   the road from June, the June 28th meeting.  Right?

00:13    15   A.   Yes, sir.

16   Q.   The next tab number seven is photocopy of a 10Q for the

17   period ending June 30, 2007.  Do you see that?

18   A.   Yes, sir.

19   Q.   If you would turn to the second excerpt, excerpted page,

00:14    20   you will see that on the bottom paragraph H a statement that

21   on June 29, 2007, the company announced Vernon's resignation

22   and it goes on to discuss payment to Vernon under his

23   employment agreement subject to regulatory approval.

24   A.   Yes, sir.

00:14    25   Q.   Now, as of the date of this, as of the date of this

1   document was filed, which was August 8, 2007, had the Board

2   taken any action to apply for regulatory approval?

3   A.   I wouldn't know.  The Board directed whom ever to do

4   whatever they had decided to do at its Board meeting in late

00:14   5   June.

6   Q.   Who would that whom ever be?  Would it be counsel?

7   A.   Could have been.  I am not certain.

8   Q.   If it weren't counsel, who would it be?

9   A.   We had a compliance officer.

00:14   10   Q.   You mentioned Felice and DiFlorio.  Am I to understand

11   from you're having brought them up that you as a Board member

12   thought it would be their responsibility to pursue this

13   regulatory approval?

14   A.   No.  I didn't say that at all.  First of all, I would not

00:15   15   have known and I'm not sure any Board member would have known

16   what regulatory matters would have been involved here.  The

17   presumption of the Board is you asked me the question who

18   would have been directed to do this.  It would have been among

19   others our compliance officers, our new executive leadership

00:15   20   or counsels inside and outside.

21   Q.   Did any of them do it?

22   A.   I have no idea.

23   Q.   The next document is tab, in tab eight, is a 10K for the

24   fiscal year ended December 31, 2007.  I'm going to ask you to

00:15   25   look at the second page, top page 53.  And do you see there

1   this statement.  Vernon W. Hill the Second was chairman,

2   president and chief executive officer of the company to July

3   31, 2007 for the terms of his amended and restated employment

4   agreement Mr. Hill was entitled to a lump sum severance

00:16   5   payment of 11 million dollars.  Payment of this amount is

6   subject as to regulatory approval.  And as a result, no

7   amounts had been recorded as such and approval has not been

8   granted.  Did I read that correctly?

9   A.   Yes.

00:16   10   Q.   So that is stated a publicly filed document for the

11   year-end 2007.  Right?

12   A.   Yes, sir.

13   Q.   Now if you turn to the last page, page 95, you will see

14   the filing date is March 13, 2008?

00:16   15   A.   Yes, sir.

16   Q.   As of that date, had anybody taken the necessary step of

17   requesting regulatory approval to pay Vernon?

18   A.   No idea.

19   Q.   If you turn to, we'll skip nine.  We'll come back to

00:17   20   that.  Go to tab 10, please.  You will be looking at

21   November 20, 2007 Board of Directors meeting minutes and

22   according to the first paragraph, you once again joined the

23   meeting in progress.  Is that correct?

24   A.   Yes.

00:17   25   Q.   If you will turn to the third page.  It is topic heading

1   five.  It is in the top half of page 3.  I'm going to read

2   this into the record for clarity in the event we have a need

3   to repeat this in a trial.  Do you see the first sentence

4   reading:

00:17   5          The Board was also briefed by legal counsel on the

6   status of the negotiations with the attorneys for Vernon Hill

7   and InterArch on the issues of Vernon Hill's separation

8   payment claims and InterArch's transition.  Did I read that

9   correctly?

00:17   10  A.   Yes, sir.

11  Q.   Was the Board, in fact, briefed on those topics?

12  A.   I assume they were.

13  Q.   Next.  The Board it was advised of the meeting had with

14  the attorneys for Vernon Hill and InterArch, October 26, 2007

00:18   15  in Washington, D.C.  did I read that right?

16  A.   Yes, sir.

17  Q.   Were you at that meeting in Washington?

18  A.   I assume I was not.

19  Q.   Third.  Or next I should say.  The Board was advised that

00:18   20  the OCC directed Commerce to deal directly with the Federal

21  Reserve Board and the FDIC on the issues of Vernon Hill's

22  separation payment claims.  Did I read that correctly?

23  A.   Yes, sir.

24  Q.   Is that your recollection?

00:18   25  A.   I assume it is accurate from the minutes.

1  Q.   Next.   The Board approved a motion authorizing a request

2  to be made to the Federal Reserve Board FDIC for authorization

3  of any separation payments to Vernon Hill.  Did I read that

4  correctly?

00:18  5  A.   Yes, sir.

6  Q.   Did the Board do that?

7  A.   I assume so.

8  Q.   Was it unanimous?

9  A.   I have no idea.

00:19  10  Q.   And last.  Director Giordano also requested that Sullivan

11  and Cromwell provide legal opinion to the Board prior to any

12  payments being made to Vernon Hill.  Did I read that

13  correctly?

14  A.   Yes.

00:19  15  Q.   Now this date, November 20, 2007 is approximately

16  11 months after December of 2006 and approximately ten months

17  after January of 2007.  Right?

18  A.   Yes, sir.

19  Q.   And we had discussion at the very beginning of this

00:19  20  deposition about your interaction.  First with Lex Bono and

21  then with Vernon Hill about the written notifications by the

22  OCC of an investigation.  Back in that time frame, December,

23  January, 06, 07.  Right?

24  A.   Yes, sir.

00:19  25  Q.   And it is approximately seven months after April of 2007,

1    isn't it?

2    A.    Is this October you are talking about?

3    Q.    Yes.

4    A.    I don't think it would be seven months.

5    Q.    You tell me.

6    A.    Well, six months.

7    Q.    Okay.  Let's do this again.  Let's start April 23rd to

8    May to June to July to August, to September, to October, to

9    November.

10   A.    You said October.

11   Q.    I'm sorry.

12   A.    You said October.  Six months.  You may have meant

13   November.

14   Q.    If I said October, I meant November.  It was a trick

15   question from April to November we have seven months?

16   A.    Correct.

17   Q.    Now did Sullivan and Cromwell ever provide Director

18   Giordano with that opinion I requested?

19   A.    I have no idea.

20   Q.    Now at this point, and here we are in November, not

21   October, November of 2007.  All of the things that you and I

22   have discussed up to this point in this deposition, all of the

23   claims made by the OCC about things they thought Vernon did

24   that may have been inappropriate.  They had been on the table

25   out in the open for discussion for many months.  Hadn't they?

1    A.    Sure.

2    Q.    What do you mean when you say regulatory resistance?

3    A.    It was clear to the Board that parts of the employment

4    agreement in terms of its payments because there were

00:21    5    retirement benefits, there were, I don't know, 401K benefits.

6    There may have been some other benefits.  I can't recall what

7    was in the, in the contract.  Some were subject to regulatory

8    approval, some were not.

9    Q.    Where did the resistance come in?

00:21    10    A.    I will get to that in a moment.  It was reported to us by

11    counsel that the regulators were not prepared to authorize

12    whatever it was they were empowered to authorize to affect our

13    Board resolution that we had passed and intended to comply

14    with.  So, for many months, we were briefed on what was

00:21    15    occurring through that period.

16    Q.    What was occurring?

17    A.    Our counsels were communicating, contacting, discussing

18    the implementation of the employment contract and the action

19    the Board took.  I can't recall six years later but

00:22    20    undoubtedly whatever regulatory approval was required was not

21    forthcoming.

22    Q.    Well, was it applied for?

23    A.    I don't know that it required to have an application per

24    se.  There is no document that our counsel spoke to the

00:22    25    appropriate parties about affecting this.

1   Q.   Okay.  So does that mean that your counsel made an oral

2   application for approval to make payment to Vernon under his

3   employment contract?

4   A.   I know that our counsels communicated because they were

00:22   5   reported to us.  They communicated with the regulators on a

6   regular basis about a host of things, including the

7   implementation of the employment agreement that we had

8   authorized and settled.

9   Q.   Did the Board ever have a discussion where they

00:22   10   determined as a Board that the request to make payment to

11   Vernon under his contract should be deferred for five years?

12   A.   No, I am not aware of any discussion.

13   Q.   Did they ever have a discussion that the request for

14   regulatory approval to make payment to Vernon should be

00:23   15   deferred for any period of time?

16   A.   Not that I am aware of.  It was the intent of the Board

17   to comply with the agreement that we had made with Vernon.

18   Q.   And to comply with your own resolution of November 20th,

19   to request regulatory approval?

00:23   20   A.   Well, I think we did that in June by the resolution that

21   it was to be done.  And I know we were briefed by our attorney

22   shortly thereafter as to the discussions that we're having,

23   that they were having with the OCC and Fed about implementing

24   the terms of that Settlement Agreement.

00:23   25   Q.   But I believe you said earlier don't know if anybody ever

1   filed an application for regulatory approval to pay Vernon

2   under his contract?

3   A.   No.  You asked me did anybody file an application.  I

4   said I am not aware that there is a requirement for a formal

5   filing document.  I now that our attorneys virtually

6   immediately pursued permission to pay under the terms of the

7   agreement because it was clear that the Board intended to have

8   him receive his money.  That is without question.

9   Q.   Can I safely take your answer as a no?  You have not seen

10  any letter authored by a lawyer on behalf of Commerce Bancorp,

11  Inc. and its Board of Directors to the Federal Reserve and/or

12  FDIC saying in substance we would like your approval to pay

13  Vernon Hill what is due him under his employment contract?

14  A.   I don't recall any letter.

15  Q.   As far as you know, did the Board of Directors ever

16  revoke the resolutions that they made on November 20 and

17  December 18, 2007 to pay Vernon Hill under his contract and to

18  seek regulatory approval to do that?

19  A.   I am not sure I understand your question, but I will try

20  to answer it.  We intended as part of the settlement to honor

21  his contract subject to regulatory approval.  And that is the

22  case in my opinion as of today.  That was our agreement with

23  him for him to be terminated without cause and for him to

24  receive whatever benefits were applicable under that contract

25  subject to whatever approvals were necessary.  Number two.  I

1  believe based on the representations that were made to us from

2  the date of that meeting through our final Board meeting,

3  whenever that was, I think in February or March of 2008, that

4  our counsel, our management, our compliance officers and

00:25  5  others attempted to implement the terms of that agreement.

6  Q.   Including attempting to secure regulatory approval?

7  A.   Absolutely.

8  Q.   And which counsel was that charged primarily with

9  attempting to secure regulatory approval?

00:26  10  A.   I, I couldn't tell you which one, but it would be

11  including Arnold and Porter, Sullivan and Cromwell.  I think

12  Mr. Critchley may have been involved in assisting that effort,

13  not directly with the regulators but perhaps with Sullivan and

14  Cromwell, Arnold and Porter who were both acting our

00:26  15  regulatory counsel.

16  Q.   Do you know whether they had, those lawyers had access to

17  the February 2008 report of the special litigation committee

18  composed of Mr. Vazzalusso, Mr. Lloyd and Mr. Giordano?

19  A.   Did who have possession?

00:26  20  Q.   The lawyers you just mentioned who may have been

21  responsible for securing regulatory approval.

22  A.   I can only make an assumption they did.

23  Q.   Once Commerce Bancorp, Inc. was acquired by merger by TD

24  did it not become TD's responsibility to pay Vernon under his

00:26  25  contract and to secure the necessary regulatory approval?

A.    As a successor in interest, I presume the answer is yes.

It has always been our intention, it has always been our

intention until in moment, in my opinion, that we wanted, we

desired as part of the settlement, the global settlement with

00:27    him leaving the Bank for him to receive his money.

Q.    Why do you think he hasn't?

A.    Based on what your counsel has told us, the regulatory

approval has not been forthcoming.

Q.    Has your counsel told you that they've asked for it?

00:27    A.    I believe they have.

Q.    In writing?

A.    Can't recall whether in writing or otherwise.  Every

month, well, we were meeting very frequently back them.  It

could have been every week, ten days or otherwise.  This

00:27    subject undoubtedly and the regulatory outstanding issues

because there were some outside of him and those activities

and there was some other discussions that were taking place.

This was a regular topic of resolution in part because he

wanted to have his employment contract affected, which I don't

00:28    blame him.  I would, too.  And I was one who would make

inquiries as to where that status spoke, and every meeting we

would receive a report as to what was occurring and it was

occurring.  And the best recollection I have five and a half

years later is that there are requirements that include the

00:28    beneficiary making as part of this regulatory approval.  What

1    they may be I am not certain.  I remember reading a couple

2    years ago that he settled with some regulatory body by

3    agreeing to pay 4 or five whatever million dollars to them.

4    And I would have assumed at that time that that resolution

00:28    5    would have resolved all the matters involving the

6    circumstances but obviously it hasn't because we're sitting

7    here today.

8    Q.   So the most you know is that as a Director, you have been

9    advised periodically that under direction of the Board of

00:29   10    Directors, outside counsel has made multiple oral requests of

11    the regulators to pay Vernon?

12    A.   No, I didn't say that.  I said that we, we were advised

13    on a regular basis as to the progress that was being made to

14    implement our resolution which was to comply with the terms of

00:29   15    his without cause provision of his contract.  I am not

16    familiar with the application process.  I am not familiar with

17    what is specifically required in order to affect that.  I --

18    we do know as members of the Board that approval has not been

19    forthcoming by the regulators.

00:29   20    Q.   But didn't you say earlier it had been requested?

21    A.   Well, they certainly had discussions and wanted that to

22    be affected and wanted the government to approve it.  Now,

23    what that involves and what requirements there are is not

24    something I can tell you I knew.  I probably knew back then

00:29   25    what was required.  And I recall that there were certain

1    representations that he would have to make to the Government.

2    There were representations that the Board or members of senior

3    management had to make to the government, some of which

4    weren't made, couldn't be made, refused to be made.  I am not

00:30        5    certain, but obviously that has caused a bureaucratic dilemma.

6                MR. JACOBS:  Judge, that concludes the testimony of

7    Mr. Norcross.  Should we proceed with the next witness?

8                THE COURT:  Please, yes.

9                MR. JACOBS:  All right.  The next witness, Judge, is

00:30        10   Joseph Vassalluzzo.  Mr. Vassalluzzo is a former member of the

11   Board of Directors and a member of the special litigation

12   committee.  His testimony was taken on April 12th, this year,

13   and we would like to present it by video.  There will be that

14   single instance where we will read a short passage from the

00:30        15   printed transcript.

16               THE COURT:  Okay.  This is going to be a video now?

17               MR. JACOBS:  Yes.

18               THE COURT:  Okay.  Good.

19               (Videotape deposition of Mr. Vassalluzzo was then

00:31        20   played to the jury)

21               MR. JACOBS:  We need volume.  Can we back up?

22               THE COURT:  Back it up, please.

23               (Tape stopped)

24             (Taped played)

00:31        25             (Tape continued to be played)

1          (The following was then read in by Mr. Jacobs of Mr.

2    Vazzalusso)

3          MR. JACOBS:  Judge, this is the point where we need

4    to make the single read in.  Now the last sentence in this

5    first paragraph reads:

6          Director Giordano also requested that Sullivan and

7    Cromwell provide a legal opinion as to the Board prior to any

8    payments being made to Vernon Hill.

9          Did I read that correctly?

10         Answer:  Yes.

11         And were Sullivan and Cromwell a law firm?

12         Answer:  Yes.

13         Do you know whether they ever complied with Mr.

14    Giordano's request and provided this legal opinion?

15         Answer:  I do not recall.

16          THE COURT:  Okay.

17          (Tape continued to be played)

18          MR. JACOBS:  No.  We stop there.  We're recycling.

19    We're recycling.

20          (Brief Pause)

21          MR. JACOBS:  Judge, that concludes this video.  Can I

22    have a moment to point something out to counsel?

23          THE COURT:  Sure.

24          (Counsel conferring)

25          MR. JACOBS:  Judge, with agreement of counsel, there

1   was a single answer which was cut off in the video somewhere

2   in the first few minutes.  So I'm just going to read that

3   question and that answer for completeness.

4           THE COURT:  Sure.

5           MR. JACOBS:  So I'm just going to read that question

6   and that answer.

7           Question:  The words unanimously agree suggest to me

8   that there was a vote.  Do they suggest that to you.

9           The answer which was cut off is:

10          They do suggest it.

11          And that completes the video testimony of Mr.

12  Vassalluzzo.

13          THE COURT:  All right.  What's next?

14          MR. JACOBS:  We are back to read-in testimony.

15          THE COURT:  Okay.

16          MR. JACOBS:  Judge?

17          THE COURT:  Okay.

18          MR. JACOBS:  And the witness is John Fisher.  Right?

19          MR. BARONE:  Yes.

20          MR. JACOBS:  The witness is John Fisher who was

21  designated as a corporate representative of the defendant

22  Bank.

23          THE COURT:  Ladies and gentlemen, when counsel take

24  depositions and there's a organization of corporations, a

25  party, you can ask that that corporation or organization

01:01
01:02
01:02
01:02
01:02

1   appoint someone as their designated spokesperson for the

2   purpose of answering questions on behalf of the corporation or

3   the organization.  That's what they did in this case and

4   that's who Mr. Fisher is.  He was the person appointed by the

01:02   5   Bank to answer questions on behalf of the Bank itself.

6           MR. TAMBUSSI:  Judge, are we going to take a break?

7   This is lengthy.

8           THE COURT:  Going to take a break at 11:00 o'clock.

9           MR. TAMBUSSI:  Okay.  Thank you.

01:03   10          MR. JACOBS:  Can we get some lights you think, Judge?

11  So I can read this a little better?

12          THE COURT:  Sure.

13                  (Brief pause)

14          THE COURT:  This will take that few minutes to warm

01:03   15  up.  But go ahead.

16          MR. JACOBS:  Well, I do, too.  Judge, this testimony

17  was taken from Mr. Fisher on March 24, 2011.  Prepared?

18          THE WITNESS:  I am.

19          MR JACOBS:  Good.

01:03   20  Q.  And for whom do you work?

21  A.  I work for TD Bank.

22  Q.  What is your position?

23  A.  I am the head of corporate insurance for the U. S.

24  Q.  Head of corporate insurance.  What does that mean?

01:03   25  A.  Corporate insurance involves the insurance related to the

1  Bank itself and the Bank entities.  Probably easiest to show

2  it as a comparison.  We also own an insurance company and own

3  an insurance brokerage.  Those would be insurance company and

4  brokerage and work that they do.  Corporate insurance works

01:04  5  for the insurance that covers TD itself, such as automobiles

6  have to have automobile insurance, property needs to have

7  property insurance.  Things like that.

8  Q.  How long have you worked for TD Bank?

9  A.  Thirteen years.

01:04  10  Q.  So this is 2011.  That takes us back to 1998?

11  A.  1997.  September of 1997.

12  Q.  1997.  And did you go to work in 1977 for what was then

13  Commerce Bank or for TD Bank?

14  A.  At the time I came to work for Commerce National

01:04  15  Insurance Services which was owned by Commerce Bank.

16  Q.  How long did you work for Commerce National Insurance

17  Services?

18  A.  I worked for them approximately ten years.  Although they

19  changed their name a couple of times until TD Bank purchased

01:05  20  Commerce Bank.

21  Q.  Sounds like your entire career as you've described it so

22  far has been in the insurance field?

23  A.  In the insurance related field, yes.  My career prior to

24  the Bank was in the insurance field directly.  With the Bank

01:05  25  it has been more of an insurance risk and insurance brokerage

1   field.

2   Q.   Okay.  Well, let's get right to it then.  I want you to

3   start telling me if you want to look at Roman Numeral one.  I

4   want you to start telling me what information the Bank

01:05   5   possesses regarding a reasonable basis to believe that Vernon

6   Hill committed any fraudulent act or omission, breach of trust

7   or fiduciary duty or insider abuses during his tenure with

8   Commerce.  I'm talking about bank information now as

9   distinguished from your interviews with Directors which we

01:06   10   will get to.

11   A.   Can I have the documents?  In reviewing the information

12   for the Bank, based on this section of the subpoena, I

13   reviewed a number of items that showed allegations or

14   questions or issues that appear to be related to the language

01:06   15   of the quotation read reasonable basis to believe Vernon Hill

16   committed any fraudulent act or omission, breach of trust or

17   fiduciary duty or insider abuses during his tenure with

18   Commerce close quote.

19   Q.   Well let's be specific.  Tell me each piece of

01:06   20   information and as Mr. Tambussi points out, it may be a

21   document other, may be in some other form, for example an oral

22   report to you.  Tell me each piece of information you are

23   going to rely on as a corporate representative that the Bank

24   has reasonable basis to believe Vernon Hill committed any

01:07   25   fraudulent act or omission, breach of trust or fiduciary duty

1   or insider abuses during his tenure with Commerce?

2   A.   The documents I reviewed and I'm going to go through as

3   you requested, show allegations or findings that I felt in my

4   review as the corporate representative lent themselves to that

01:07   5   language there.  They do not necessarily show that he

6   committed fraud or breach of trust or fiduciary duty or

7   insider abuses during his tenure with Commerce Bank, during

8   his tenure with Commerce based on the Bank itself, with

9   possibly the exception of a finding by the regulator.  So, the

01:07   10   first document is a stipulation and Consent Order from the

11   OCC.

12   Q.   Do you want to identify it a little bit more for us?

13   A.   Certainly.  It is dated November 14th of 2008.

14   Q.   Okay.  As you and I discuss that, the record will make

01:08   15   clear that we are talking about our today's exhibit 41.  Okay?

16       Does the Bank rely on this as a reasonable basis to

17   believe that Vernon Hill committed any fraudulent act or

18   omission, breach of trust or fiduciary duty or insider abuses

19   during his tenure with Commerce?  Yes or no.  Quote you are

01:08   20   pausing.  Do you understand the question?

21   A.   I am thinking so that I can best answer it for you.

22   Q.   Fine.  We encourage deponents to do that.  That is fine.

23   A.   In reviewing the documents, I went through and I had

24   identified anything that was as allegation.  Anything that

01:08   25   appeared to lend itself to the language of the subpoena.

1  Based on my understanding, again I am not an attorney.  It was

2  some, it was somewhat difficult because you are reading.  You

3  are being specific to a reasonable basis to believe Vernon

4  Hill committed any fraudulent act or omission, breach of trust

01:08  5  or fiduciary duty or insider abuses during his tenure with

6  Commerce.  Based on my reading of the documents and

7  interviewing with the Board members, it did not appear that

8  the Bank meant to or did come to a conclusion that he

9  committed any fraudulent act or omission, breach of trust or

01:09  10  fiduciary duty or insider abuses, but rather there was a

11  number of items that lent to that language.  There was a

12  finding by the regulator, which was the chief regulator for

13  the Bank and other items that are appropriate to that

14  language, but not necessarily as a Bank would say proof that

01:09  15  we're relying on that he committed a fraudulent act or

16  omission or the rest.  So, you asked me to go through those

17  documents.  Is that how you wish me to proceed?

18  Q.   Yes.  Starting with this one, which we're referring to as

19  Number 41.  I want you to tell me as a Bank representative to

01:09  20  tell me, to tell me firstly whether the Bank is relying on

21  this as part of a reasonable basis to believe Mr. Hill

22  committed any fraud and so on.  And, secondly, why.

23  A.   I don't know that the Bank is making a basis that or

24  making a statement that he committed fraud or omission or

01:10  25  breach of trust or fiduciary duty or insider abuses during his

1    tenure with Commerce.

2    Q.   As a corporate representative, does the Bank believe that

3    Vernon Hill committed any fraudulent act or omission, breach

4    of trust or fiduciary duty or insider abuses during his tenure

01:10    5    with Commerce.  Does the Bank believe that?

6    A.   The Bank is not an individual.  So, I can't -- there is

7    not an answer to that question.  There is not Mr. Bank that I

8    talk to that said I believe this or don't believe this.

9    Q.   Are you saying as a Bank representative, that the Bank

01:10    10   has a reasonable basis to believe Vernon Hill committed any

11   fraudulent act or omission, breach of trust or fiduciary duty

12   or insider abuses during his tenure with Commerce.  Yes or no.

13   Or are you saying the Bank doesn't know?

14   A.   Based on my interviews and my reviews of the documents, I

01:11    15   don't believe the Bank has made a definitive decision that he

16   has committed any fraudulent act or omission, breach of trust

17   or fiduciary duty or insider abuses.

18   Q.   Okay.  I appreciate that.  But the language upon which I

19   am trying to get you to focus is, whether the Bank feels it

01:11    20   has a reasonable basis to believe that Mr. Hill did any of

21   those things?

22   A.   Based on my reviews and my interviews?

23   Q.   Yes.

24   A.   I believe the Bank has documents and perceptions and

01:11    25   findings that give it a basis to say they can't say it didn't

1    happen.

2    Q.   Okay.  Are you, as a corporate representative, aware that

3    the Federal regulators, such as the OCC, the Federal Reserve

4    or FDIC have the power to file formal complaints?

5    A.   It is my understanding that they can, yes.

6    Q.   Did you find any against Vernon Hill?

7    A.   In the documents I reviewed, I do not recall seeing any,

8    no.

9    Q.   Do you have any knowledge of any of the Federal

10   regulators ever filing a formal complaint against Vernon Hill?

11   A.   Not that I reviewed or recall being aware of, no.

12   Q.   Now, the bulk of your experience, as you've told us, is

13   in insurance.  Right?

14   A.   Insurance and insurance risk management, yes.

15   Q.   So you must be familiar with the concept of settling

16   claims, aren't you?

17   A.   Yes, sir.

18   Q.   You know that many claims -- you know that many are

19   settled.  Right?

20   A.   Majority, yes.

21   Q.   Okay.  Pretty big majority, isn't it?

22   A.   Yes.

23   Q.   Right.  And they are commonly settled without their

24   having been any adjudication on the merits, aren't they?

25   A.   Yes, many claims are.

1  Q.   And from that insurance experience, you understand that

2  in a, a settlement with no adjudication on the merits is a

3  settlement without any finding or admission of wrongdoing.

4  Right?

01:13   5  A.   It usually is because the adjustor will usually require a

6  release in which both parties state basically that language.

7  Q.   Now, I am wondering why you are unable to apply that fund

8  of knowledge you gained in the insurance industry to the same

9  language appearing twice in this exhibit on page one and page

01:13  10  ten, that this is a stipulation and consent order entered

11  without an adjudication on the merits.

12  A.   I'm not sure what you are asking.

13  Q.   Don't you understand that this document which you've

14  drawn to our attention, number 41 is a settlement document

01:13  15  signed by the parties without either admitting it is wrong?

16  A.   Well, as you noted, it is a stipulation and Consent

17  Order.  It doesn't appear to be a release.  But based on the

18  reading, it does appear that Mr. Hill is not admitting or

19  denying, but they are reaching an agreement.

01:14  20  Q.   They're reaching an agreement without there having been

21  an adjudication on the merits and the agreement says it is not

22  to be construed as an adjudication on the merits.  Right?

23  A.   Yes.

24  Q.   All right.  Sir, you wanted to say something else.  Go

01:14  25  ahead.

1    A.   You had asked what it was about in reference or you were

2    comparing that to a settlement of an insurance claim because I

3    assumed, because I am more familiar with that and I was

4    reading that again.  It is quote:  The comptroller finds there

01:14    5    is no admission or denial on behalf of the respondent close

6    quote.  Part of the reason that it does look like -- start

7    that over.

8         Part of the reason that it does look somewhat like a

9    settlement document goes back to the, the paragraph three

01:15    10   under Article five.  We had just looked at four and it

11   referred to three and three did use the word settlement.  And

12   it says:  It is hereby agreed that the provisions of this

13   order constitute that settlement of the actions completed by

14   the comptroller described above.  And the comptroller agrees

01:15    15   not to institute proceedings for the specific acts, omissions

16   violations described above.  So, in that it does sound like a

17   Settlement Agreement.  If that answers your question.

18   Q.   Isn't the subject matter of this stipulation and Consent

19   Order quote:  Real estate purchases, leases, joint real estate

01:15    20   development, transactions with the Bank close quote.  Yes or

21   no.

22   A.   That is the subject matter of open quote:  The

23   comptroller finds close quote.

24   Q.   Okay.  As a corporate representative, are you aware or

01:16    25   unaware that six years before this Consent Order that we just

1  reviewed, Number 41, Mr. Hill had advised the Board that he

2  was relinquishing his positions in real estate companies doing

3  business with the Bank.  Were you aware of that?

4  A.   I recall from my review of the documents and discussions

01:16  5  with the Board members that there was references to Mr. Hill

6  separating himself from certain real estate transactions or

7  ownership.  I know there was one item in particular where may

8  have been an e-mail where the regulators were noting that he

9  had separated at some point.  Don't recall what that was, but

01:16  10  so that is about the limit of my knowledge there that I can

11  recall.

12          MR. JACOBS:  Judge, what do you want me to do, stop

13  or keep going?

14          THE COURT:  Great time to stop.  Thank you.

01:17  15          MR. JACOBS:  Okay.

16          THE COURT:  Ladies and gentlemen, take a break for

17  15 minutes.  Please don't discuss this case or do any research

18  on this case and we'll see you back.

19          THE DEPUTY COURT CLERK:  All rise.

01:17  20      (Jury leaves the courtroom)

21              (Recess)

22              (Open court)

23          THE DEPUTY COURT CLERK:  All rise.

24          THE COURT:  Ready?

01:39  25          MR. TAMBUSSI:  Yes.

1          THE COURT:  Okay.  Get the jury in.

2               (Brief pause)

3          THE DEPUTY COURT CLERK:  All rise.

4                    (Jury present)

01:39  5          THE COURT:  All right.  Have a seat, everyone, and

6     we'll continue, please.

7          MR. JACOBS:  Judge, where we resume starts with an

8     answer on page 70.

9     A.   I'm looking at a document, it is called the Galati

01:40 10    complaint.   _-G-a-l-a-t-i.

11    Q.   This is a civil lawsuit?

12    A.   Yes.

13    Q.   Tell me when it was identified.  Was it July 2, 2004?

14    A.   Yes.

01:41 15    Q.   And what is it about the Galati lawsuit that you as a

16    corporate representative claims gives the Bank a reasonable

17    basis to believe that the things recited in Roman Numeral one

18    on page four?

19    A.   I noted when answering earlier as we started the list of

01:41 20    documents that based on my review and discussions it wasn't my

21    perception that the Bank had taken a position that he had

22    committed any fraudulent act, omission, breach of trust or

23    fiduciary duty or insider abuses.  But that I was going to

24    give you the documents that I have reviewed that seem to be

01:41 25    related to Roman Numeral one.

1  Q.   Well, if you want to revisit that, I guess we can.  Roman

2  Numeral one requires you to give testimony on a topic.  The

3  topic is whether the Bank has a reasonable basis to believe

4  any of the things recited in Roman Numeral one.  You

01:41   5  understand that, don't you?

6  A.   Yes.

7  Q.   Why don't you try to give me a simple yes or no answer.

8  Does the Bank claim it does or doesn't have a reasonable

9  basis?

01:42   10  A.   The Bank hasn't determined whether it has a reasonable

11  basis or not.

12  Q.   Okay.  So the Bank doesn't know.  Right?

13  A.   The Bank has not made a determination based on my review.

14  Q.   Okay.  Fine.  Now let's get back to Galati.

01:42   15       Tell me why in the Bank's view you as the corporate

16  representative say it's got anything to do with Roman Numeral

17  one?

18  A.   I pulled that document out of the reviews because it

19  specifically noted allegations regarding the chief executive

01:42   20  officer.

21  Q.   Where?

22  A.   One place is on page one and the introduction.

23  Q.   Now, this is a complaint you are looking at.  Right?

24  A.   Correct.

01:42   25  Q.   Tell me what in this complaint you think has a bearing on

1   Roman Numeral one?

2   A.   I pulled it out because Roman Numeral one asks for

3   anything related to fraudulent act.  And the allegation in the

4   complaint regards honest services, fraud, wire fraud, mail

01:43   5   fraud.  And so I pulled the document out as being related.

6   Q.   Okay.  Well, I understand that.  What happened to this

7   complaint?  Did the plaintiff win?  Let me help you.

8        Wasn't this complaint dismissed for failure to state a

9   cause caution of action -- for failure to state a claim?

01:43   10   A.   I believe it was dismissed, if I recall.

11   Q.   It was dismissed.  All right.  What is the next piece of

12   information or document you want to talk to us about in this

13   discussion about Roman Numeral One?

14   A.   It was the indictment of Ronald White, Cory Kemp and Glen

01:43   15   Hulk.

16   Q.   Was Mr. Hill indicted?

17   A.   I do not believe so.  No.

18   Q.   Was Mr. Hill named as an unindicted coconspirator in this

19   indictment?

01:43   20   A.   I am not sure what that means from a legal term.

21   Q.   Have you read the indictment?

22   A.   Yes, I have.

23   Q.   Does it say Mr. Hill is an unindicted coconspirator?

24   A.   It is a large complaint.  I recall I pulled it out

01:44   25   because again it had to do with allegations of fraud and the

1   position of chief executive officer was mentioned I believe

2   numerous times.

3   Q.   All right.  Now tell me as a corporate representative,

4   has the Bank, based on this indictment, is the Bank claiming a

01:44   5   reasonable basis to believe Vernon Hill committed any

6   fraudulent act or omission, breach of trust or fiduciary duty

7   or insider abuses based on that indictment?

8   A.   Based on my review, they did not come to a conclusion.

9   Q.   So they are not claiming a reasonable basis to believe

01:44   10   any of those things based on that indictment.  Correct?

11   A.   Correct.

12   Q.   All right.  Are you at tab two?

13   A.   Yes, sir.

14   Q.   What is it?

01:44   15   A.   It says amended and restated employment agreement between

16   Commerce Bancorp and Vernon W. Hill the second.

17   Q.   Have you ever seen it before?

18   A.   Yes, I have.

19   Q.   Is it dated?

01:45   20   A.   It's dated January 1st, 2006.

21   Q.   January 1st, 2006.  After the return of the indictment

22   you produced today, which was November 2, 2004.

23   A.   Yes.

24   Q.   And it is also after the return of the jury verdict on

01:45   25   May 10, 2005?

*United States District Court*
*Camden, New Jersey*

*44*

```
      1   A.   Yes.
      2   Q.   And also after the sentencing of Hulk and Umbrell
      3   October 6, 2005?
      4   A.   Yes.  I don't recall that date, but it sounds right.
)1:45 5   Q.   Turn to the last page of this document which is Page 22.
      6   Look at the signature lines center right.  Do you see that?
      7   A.   I have Page 28.  But I think it is that signature.  So I
      8   think it is the same one you want.
      9   Q.   Well, if you look at the bottom, you will see it's on
)1:45 10  this Document 22 of 22.
     11   A.   Oh, yes.
     12   Q.   So we're talking about the same thing.  Do you see that
     13   this contract although it is effective January 1, 2006, was
     14   executed by both parties on March 14, 2006?
)1:46 15  A.   Yes.
     16   Q.   And again that date March 16 or March 14, 2006 is
     17   considerably after November 2, 2004, May 10, 2005 or
     18   October 6, 2005?
     19   A.   Correct.
)1:46 20  Q.   All right.  Now the Bank through its Board of Directors
     21   voted to indemnify --
     22         MR. TAMBUSSI:  Objection.  Objection.  This has been
     23   withdrawn.  86, 16 to 21 has been withdrawn and --
     24         MR. JACOBS:  Let us check.  Let us check.  All right.
)1:46 25  We apologize.  They were withdrawn.
```

1          THE COURT:  Okay.

2    Q.   What else have you brought here today which, as a

3    corporate representative, you feel creates a reasonable basis

4    to believe Vernon Hill committed any fraudulent act or

01:47    5    omission, breach of trust or fiduciary duty or insider abuses?

6    A.   Again, I don't believe the Bank came to that conclusion.

7    Q.   Okay.

8    A.   But in reviewing documents as per the subpoena, I am

9    going through the list of documents I pulled that appear to be

01:47    10   related to that language.

11   Q.   What is next?

12   A.   Next is the special litigation committee dated February

13   2008.

14   Q.   Okay.  We call that Exhibit 42.  Now that was February

01:47    15   what 2008?

16   A.   It's dated on the face February 12, 2008.

17   Q.   Now -- okay.  Now what was the special litigation

18   committee?

19   A.   The litigation we just had mentioned, litigation that

01:48    20   arose after the announcement of the OCC were after the

21   announcement of the investigations, the Board of Directors

22   formed a special litigation committee to look into the terms

23   within those complaints and then report back to the Bank.

24   Q.   All right.  Within which complaints?  You are talking

01:48    25   about the Galati, Lucas and sheet metal complaints?

1   A.   Yes.  At least the Lucas and sheet metal was Galati I

2   believe was from earlier.  Galati was from 2004.

3   Q.   Okay.  Was there any other reason the SLC we will call it

4   was formed?

01:48   5   A.   Yes.  They also were looking into an indemnification

6   issue with InterArch on a case called DiMaria.  They also

7   looked into issues with Galloway National Golf Club.

8   Q.   The first page of the report tells us what it is.

9   Investigative report of the special litigation committee of

01:48   10   the Board of Directors of Commerce Bancorp, Inc.  Right?

11   A.   Yes.

12   Q.   And I see three Board members on the committee.

13   Giordano, Lloyd and Vazzalusso?

14   A.   Yes.

01:49   15   Q.   And I see two lawyers at counsel to the committee.

16   Right?

17   A.   Yes.

18   Q.   Now if you go to page 2 of the report.  Doesn't it tell

19   us that they made findings upon after their investigation

01:49   20   number one, the Bank's decision to indemnify InterArch.

21   Number two, whether Vernon Hill used company contractors at

22   his house.  Number three, the fair market value of rents and

23   lease agreements.  Number four, factors that caused the OCC to

24   question completeness of branch applications?

01:49   25   A.   Yes.

1    Q.   That is what they made findings on?

2    A.   Yes.

3    Q.   Now after the investigation, they did not make findings

4    on, one, the relationship between the Bank and InterArch.

5    Two, fees paid and/or reimbursed by the Bank relating to

6    Galloway National Golf Club.  Right?

7    A.   Correct.

8    Q.   So, we have four sets of findings and two sets of

9    non-findings?

10   A.   Yes, sir.

11   Q.   With me?  Okay.  Now you have read this report?

12   A.   Yes.

13   Q.   Do you understand it?

14   A.   I believe so. It is a large report.

15   Q.   Yes.  If you turn to Page 19, topic heading three

16   purports to be an analysis of propriety of the InterArch

17   indemnification which you referred to earlier.  Right?

18   A.   Yes, sir.

19   Q.   And if you read through, if you read that through to its

20   conclusion on Page 22, according to the Bank's special

21   litigation committee in their view, the indemnification

22   payment by Commerce to InterArch was ill advised.  Right?

23   A.   Yeah.  That is a good way to summarize it.

24   Q.   And then in the next sentence, the observation is made

25   that the Bank has filed suit to try to recover that money.

1   A.   Yes.

2   Q.   Right?  Do you know the status of that suit?

3   A.   In general, yes.

4   Q.   What is it you know?

5   A.   It is in appeals.

6   Q.   Do you know if the New Jersey Superior Court Appellate

7   Division has ruled that the indemnification was proper and

8   could not be reversed?

9   A.   I know that they overturned the lower Court ruling.  I

10   have not read the rulings on it.  So I am not exactly sure why

11   it was overturned.

12   Q.   Okay.  That is okay.  Go on to page 23 which deals with

13   allegation of somebody claiming that Vernon Hill had

14   contractors work at his house for free or reduced rights.  Do

15   you see that?

16   A.   Yes.

17   Q.   And the conclusion of the LS -- I'm sorry, the SLC.

18   After interviewing the contractors and doing whatever other

19   investigative work they saw fit, is that the work was paid

20   for.  There were no improprieties and Mr. Hill got charged

21   with whatever everybody else pays.  Quote:  The SLC did not

22   discover any evidence of wrongdoing close quote.  Page 25.

23   A.   Correct.

24   Q.   If we go to page 26 topic heading C, dealing with the

25   fair market value of rents due under certain insider related

1  party lease agreements and the allocation of property taxes

2  and CAM charges under those lease agreements.

3       Did you read all that stuff?

4  A.   I do recall that I read it, yes.

01:52  5  Q.   Okay.  There is a reference on page 26, Article 2, Roman

6  Numeral 2 4B of a Consent Order.  Do you understand that to be

7  the June 28, 2007 OCC Consent Order?

8  A.   I believe so, yes.

9  Q.   Now, according to the SLC report, the Consent Order

01:52  10  requires the Bank to include in its transition plan a cost

11  benefit analysis evaluating these leases.  As a Bank

12  representative can you tell us if that was done?

13  A.   I believe it was, yes.

14  Q.   Okay.  It had to be done.  The Consent Order said it had

01:53  15  to be done.  Right?

16  A.   Correct.

17  Q.   Okay.  If you look just a few lines down one, two, three,

18  four, five, six, seven sentences from the top.  There is a

19  reference to James L. Gertie's November 1, 2007 e-mail and

01:53  20  letter to the OCC confirming that the Bank did, in fact, do a

21  cost benefit analysis.  Right?

22  A.   Yes.

23  Q.   Now as a corporate representative, I'd like you to

24  confirm for me that the Bank also had, also had a real estate

01:53  25  review committee analyze these leases.

1    A.    Yes, there was a real estate committee.

2    Q.    And the result of all this, basically, was that the real

3    estate committee found the leases to be propitious.  I only

4    use that word because it is in the SLC report.  Ordinarily I

01:54    5    would not attempt that word.  I would said favorable.  But

6    these rents were propitious to the Bank because they were at

7    about 65 percent of fair market value.  Am I right in all

8    this?  You can look at page 27 if you want to check anything I

9    said.  I am summarizing it right out of the Bank's own report.

01:54    10    A.    Yeah, I am reading it now.  The first paragraph

11    references assessments of 65 percent of market rates.  Market

12    rents.

13    Q.    The point, the point is simply that there was a cost

14    benefit analysis done according to Mr. Gertie and there was a

01:54    15    real estate review committee analysis and the result is the

16    SLC finding that the leases are propitious and that 65 percent

17    of fair market value.  Right?

18    A.    That was part of their review, yes.  But it goes on.

19    Q.    I know it goes on.  Now there were a couple of leases

01:55    20    examined where, and again we're on page 27, where the real

21    estate review committee found there might be a hundred dollar

22    a year or $400 a year differential in tax allocations.  Right?

23    A.    That is what it says, yes.

24    Q.    And there were some negotiations to resolve issues such

01:55    25    as that, right?

1   A.   It said that there would be, yes.

2   Q.   Let me ask you this.  Has the Bank tried to walk away

3   from or cancel or break any of these leases that were

4   examined?

01:55    5   A.   I don't have direct knowledge of that, but in issuing

6   certificates of insurance for properties, I don't recall

7   cancelling any leases.

8   Q.   The negotiations that you are referring to were on six

9   leases where the Bank felt the tax and CAM charges were not

01:56   10   fairly allocated.  Is that right?  You can confirm that?

11   A.   Yes.  That is what it says on page 27, yes.

12   Q.   Okay.  Now, next topic is the branch application process.

13   Have you read that over, and do you understand what the SLC is

14   saying?

01:56   15   A.   I have read it over.  I believe I understand.  Seems a

16   little confusing.

17   Q.   Well, it is a lot confusing.  Will you agree that

18   according to the SLC, there were three versions of a branch

19   application.  Right?

01:56   20   A.   Yes.

21   Q.   The first --

22   A.   Discussed in the report, yes.

23   Q.   The first '88 to '98, the second April 1998 and the third

24   July 2002.

01:56   25   A.   That sounds right.  But if you tell me what page you're

1  on, I can get there.

2  Q.   32.

3  A.   Yes.

4  Q.   And according to the SLC report, will you agree that the

01:57   5  first of these three applications, the '88 to '98 application

6  was more exacting in the questions it posed about potential

7  conflicting interests?

8  A.   Yes, that was the report of the committee.

9  Q.   And the SLC committee states that the '98 and '02

01:57   10  applications were less exacting.  They say they were

11  streamlined.

12  A.   I'm not finding exactly where that was.  But that sounds

13  correct from my reading.

14  Q.   Okay.  Now the whole problem identified here as reported

01:57   15  by the SLC, is that the 1998 application was used past the

16  2002 revision and, in fact, right up to 2006.  Right?

17  A.   Well, they noted that the problem was the discussions on

18  disclosing insider related party transactions.  But in

19  discussing the applications, yes, they discussed that there

01:58   20  were issues in using the incorrect form.

21  Q.   And although form number three was published in July of

22  2002, the regulators accepted the 1998 application right up to

23  2006 when they finally wrote, a letter in December saying you

24  are using the old application.  The regulators missed it for

01:58   25  four years, didn't they?

```
 1   A.   I have to reread it to get to that level, but it sounds
 2   like what I read.
 3   Q.   Okay.  All right.  The bottom line on this is that no
 4   regulator, OCC, Federal Reserve, FDIC filed any complaint
 5   against anybody as a result of these or as a result of using
 6   the wrong application.  Is that right?
 7   A.   Filed a complaint?
 8   Q.   Yes.
 9   A.   Not to my knowledge.
10   Q.   All right.  Well I'd like to go to page 40, first full
11   paragraph.  Just answer the question if you can.  If you
12   can't, we'll go on.  The way I read it, the SLC decided it was
13   unnecessary to redo the application to try to reach a
14   conclusion.  Everything has been fully disclosed.
15   A.   Yes, that is what they say regarding those eleven
16   branches.
17   Q.   The next issue dealt with by the SLC is the relationship
18   between the Bank and InterArch.  Is that right?
19   A.   Section E on the same page, yes.
20   Q.   Okay.  We don't need to discuss this with you in any
21   detail because we have a Bank InterArch representative
22   tomorrow.  But in your capacity as corporate representative on
23   the Vernon Hill claims.  Let me ask you to confirm that what
24   the SLC said is true.  I'm looking at Page 40, the second and
25   last full sentence.  Quote:  The company has made no secret of
```

1    its decades-long relationship with InterArch or Mrs. Hill's

2    sole ownership of InterArch close quote.  That is true, isn't

3    it?

4    A.   That is in the report, yes.

02:00    5    Q.   Okay.  Now, you know that somebody had expressed some

6    gripe or experienced some concern about Bank fees paid to

7    Galloway National Golf Club.

8    A.   I read that in this report, yes.

9    Q.   Okay.  And while no specific findings were made, did the

02:00   10    SLC state that everything they investigated pointed toward a

11    systematic business entertainment plan and the Bank, the

12    business generated for the Bank as a result of golf outings at

13    Galloway was substantial and it's neither an uncommon nor

14    improper business practice for a company to cover the costs of

02:00   15    an executive membership at a golf club close quote.  All true?

16    A.   I can't answer all true to that whole.  One sentence says

17    at this point, however, the SLC does not have any basis for

18    evaluating whether the expenses paid in connection with

19    Galloway were proportionate to the Bank business generated by

02:01   20    use of Galloway.  I.

21    Q.   Fine.  The rest of what I said was true?

22    A.   Could you repeat what you said, please?

23    Q.   Yes.  Their investigation pointed toward a systematic

24    business entertainment plan.  Fourth sentence from the bottom,

02:01   25    the first paragraph.  And the business generated for the Bank

1   as a result of the golf outings at Galloway what was

2   substantial and it's neither an uncommon nor improper business

3   practice for a company to cover the cost of an executive's

4   membership at a golf club close quote.  Center, first full

5   paragraph.

6   A.   Yes, that is in the report.

7   Q.   All right.  What is your next document?

8   A.   We're getting there.  I'm looking at a December 5th, 2006

9   letter from the comptroller of currency to the Board of

10  Directors.

11  Q.   All right.  We call that exhibit 39.  Now, it is dated

12  December 5, 2006 to the Board of Directors of Commerce?

13  A.   Correct.

14  Q.   Okay.  And look at the first paragraph.  Without me

15  having to read the whole thing.  Does it say that the OCC is

16  conducting an investigation and, number one, about

17  transactions related to Bank officers and Directors and their

18  relatives and business associates and, two, related to Bank

19  premises?

20  A.   On those two items, but it is not limited to that, is

21  what they state.

22  Q.   Okay.  Now --

23  A.   And it's -- I'm sorry.  One other clarification.  It is

24  also the Fed.

25  Q.   What was appended to that letter?

```
 1    A.    The request letter.

 2    Q.    For documents?

 3    A.    For lots of documents, yes.

 4    Q.    Lots meaning how many?  The Bank records reflect how many

 5    documents were turned over pursuant to this request letter.

 6    A.    I believe it was millions of --

 7    Q.    Millions of documents?

 8    A.    Well, not documents.  Millions of pages.

 9    Q.    But well --

10    A.    Yes.

11    Q.    Fair enough.  Millions of pages were turned over.  Right?

12    A.    To the best of my knowledge, yes.

13    Q.    Okay.  And this is an investigation that ultimately ended

14    without an adjudication on the merits.  Is that right?

15    A.    Well, no.  I don't know that it ended.  But one of the

16    results was the Consent Order from which you are quoting.  The

17    other is a December 5th, 2006 letter from the Federal Reserve

18    to Vernon Hill the Second and states him as chairman and CEO.

19    Q.    All right.  We call that number 40.  And does this also

20    say there is an investigation about one transactions related

21    to Commerce, its officers, relatives and business associates?

22    And, two, transactions related to premises occupied or

23    intended to be occupied by the Bank?

24    A.    It reflects the same language where it says, including

25    but not limited to.
```

02:02 (line 5)
02:03 (line 10)
02:03 (line 15)
02:03 (line 20)
02:04 (line 25)

1    Q.    Is it accompanied by a document demand?

2    A.    Yes, it is.

3    Q.    And how many pages were provided in response to this?

4    A.    I believe it was all the same response.

02:04    5    Q.    Let's proceed to Roman Numeral two.  Have you any

6    documentation you want to provide which you as a corporate

7    representative feel supports all reasonable belief by the Bank

8    that Vernon Hill committed any fraudulent act, omission,

9    breach of trust, breach of fiduciary duty or insider abuse

02:04    10    that had a material effect on Commerce during his tenure or is

11    the same documents?

12    A.    It would again be the same condition we talked about

13    where based on my review and discussing with people.  The Bank

14    did not make a definitive decision on saying that he did

02:05    15    commit a fraudulent act, omission, et cetera.  But as for the

16    documents I pulled that appear related to that language, it

17    would be the same documents.

18    Q.    Okay.  What are you referring to?

19    A.    Okay.  I'm looking at the Consent Order, the end of

02:05    20    June 2007.

21    Q.    June 28, 2007?

22    A.    Yes.

23    Q.    To us that is Exhibit 4.  Now, that is what you're

24    referring to the June 28, 2007 Consent Order.

02:05    25    A.    Correct.

*United States District Court*
*Camden, New Jersey*

1  Q.   All right.   And what do you understand that Consent Order

2  to be about?   What is its subject matter?

3  A.   It is a notice from the OCC advising the Bank and the

4  Bank consenting to the order over a number of items consenting

02:05  5  that the OCC is conducting an investigation of Commerce Bank.

6  All go back to the concept order.

7  Q.   Okay.   The Consent Order, center paragraph, carries the

8  language I just read.   About ensuring that actual or apparent

9  conflicts of interest are unsafe or unsound practices

02:06  10  involving the construction or acquisition of branch offices do

11  not occur in the future.   Is that correct?

12  A.   That is what it says, yes.

13  Q.   So is that what this order is about, future conduct.

14  A.   Yes, it does stipulate for a number of future items that

02:06  15  must occur.

16  Q.   Okay.   Now I am looking again at your deposition notice.

17  And my specific question is:   As a corporate representative

18  are you saying that the Bank has a reasonable basis to believe

19  that Vernon Hill was substantially responsible for any

02:06  20  insolvency or troubled condition of Commerce?

21  A.   Yes.   I would say it is my understanding based on

22  interviewing the parties and reading the documents, that the

23  OCC's perception here in that their need to investigate arose

24  out of their perception of issues that involved Mr. Hill and

02:07  25  related parties.   And it was that issuance of a cease and

1    desist and that agreement to a Consent Order that put us into

2    a troubled condition.

3    Q.    Okay.

4    A.    Again, I am not a lawyer, but that is my understanding.

02:07    5    Q.    Okay.  Now this order which again we have marked as

6    Number four, as I think you've agreed and its language is

7    agreed upon quote:  To ensure that actual or apparent

8    conflicts of interest were unsafe or unsound practices

9    involving the construction or acquisition of branches, branch

02:07    10   offices do not occur in the future close quote.  Is that

11   right?

12   A.    Yes.  It says it is also arising from certain issues

13   arising from investigation having been communicated to the

14   Bank.  So it is also referencing evidently their past

02:07    15   investigation.

16   Q.    Well, is the subject matter anything other than ensuring

17   that the actual or apparent conflicts of interest --

18         MR. TAMBUSSI:  Hold on.  Hold on.  That's beyond what

19   we said we were going to read here.

02:08    20         MR. JACOBS:  Well, let me check it.  Is it?

21         MR. TAMBUSSI:  Objection.

22         MR. JACOBS:  We'll check it, Judge.

23            (Brief pause)

24            (Counsel conferring)

02:08    25         MR. JACOBS:  All right.  We'll delete, Judge.  All

*United States District Court*
*Camden, New Jersey*

| | |
|---|---|
| 1 | right so we pick up at 115. |
| 2 | MR. TAMBUSSI:  135. |
| 3 | MR. JACOBS:  I'm sorry.  135. |
| 4 | MR. TAMBUSSI:  Yes. |
| 5 | MR. JACOBS:  Okay. |
| 6 | Q.  Go back to page six of Exhibit 4 which is this same |
| 7 | Consent Order.  Aside from directing that the transition plan |
| 8 | identify and do a cost benefit analysis for all such leases, |
| 9 | it goes on to say in sub-paragraph C and D that the Bank must |
| 10 | detail steps it plans to take to terminate or modify any such |
| 11 | leases.  Do you see all that? |
| 12 | A.  Yes.  Under C and D. |
| 13 | Q.  Did the Bank take steps to terminate any such leases? |
| 14 | A.  Based on those, the SLC, that is where they advised us |
| 15 | they were going into negotiations. |
| 16 | Q.  Let's deal with terminations first. |
| 17 | A.  Okay. |
| 18 | Q.  Did the Bank take steps to terminate any such leases? |
| 19 | A.  Not that I am aware of. |
| 20 | Q.  The testimony would be the same, the cost benefit |
| 21 | analysis was done.  Right? |
| 22 | A.  Yes. |
| 23 | Q.  It showed the leases were at 65 percent of fair market |
| 24 | value.  Right? |
| 25 | A.  Yes.  That first paragraph showed that of the SLC report. |

Timestamps in left margin: 02:08 (line 5), 02:09 (line 10), 02:09 (line 15), 02:09 (line 20), 02:10 (line 25)

1    Q.    Making the leases propitious to the Bank?

2    A.    That was the word from the report.

3    Q.    Yes.  And none of those leases were terminated?

4    A.    Not to my knowledge.

02:10   5    Q.    But there were a small number of leases where

6    negotiations were undertaken regarding the allocation of real

7    estate taxes and CAM charges.

8    A.    That is what the report says, yes.

9    Q.    The two examples in the report were, one, lease where

02:10   10   there might be a 400 dollar discrepancy annually and another

11   lease where there might be a $100 discrepancy annually?

12   A.    I thought it was more than two, but yes.  I remember

13   those two numbers.

14   Q.    And you are not able to tell us today from your review as

02:10   15   a corporate representative how many dollars were involved in

16   these negotiations on real estate tax and CAM allocation?

17   A.    No, I am sorry I am not.

18   Q.    Okay.  Now, so, what you are telling us, I think or are

19   you telling us, that based on this order which we just

02:11   20   reviewed, this June 28, 2007 order, the Bank has a reasonable

21   belief that Vernon Hill was substantially responsible for the

22   troubled condition of Commerce?

23   A.    I am trying to be careful how I answer that because I

24   believe the troubled condition arose from the regulator's

02:11   25   action which was according to them, based on their questions

1    and their investigation, not Mr. Hill and interrelated

2    parties.  So I don't know that you can say it was Mr. Hill's

3    direct fault.  But it was all arising from the regulators and

4    their investigation of Hill, yes.

02:11   5    Q.   Now I'd like to try to pull this all together.  If

6    overall -- and by the way, how many leases were there?  What

7    is the universe of leases that were looked at?

8    A.   For Commerce at that time?

9    Q.   Yeah.  By its investigative committee in 2008, 2007,

02:12  10    2008?

11    A.   It is a guess, but because I handled the insurance with

12    certificates, I would guess probably 60 or 70.

13    Q.   Okay.  So, out of 60 or 70, the overall conclusion is

14    that the rents, not the real estate taxes or CAM charges, but

02:12  15    the rents were at 65 percent of market value.  Right?

16    A.   That is what the report says.

17    Q.   Okay.  Meaning the Bank is paying about 35 percent less

18    than fair market value on those 60 or 70 leases.

19    A.   I am not a real estate professional but that sounds like

02:12  20    it makes sense.

21    Q.   Now let's move over to the eight leases where there is a

22    question.  Two of the eight, the relatively insignificant ones

23    in the words of the SLC raise questions not exceeding the $400

24    a year or a hundred dollars a year.  Right?

02:12  25    A.   Correct.

```
 1   Q.   And on the other six there had to be some work done to

 2   figure out what would be a more proper allocation of taxes and

 3   CAM charges.

 4   A.   Correct.

 5   Q.   Okay.  When you put all this together that we've been

 6   discussing the last couple minutes, if Commerce is

 7   representing 60 or 70 banks at 35 percent below fair market

 8   value, that could amount to a fairly significant annual

 9   figure.  Right?

10   A.   Again, I am not a real estate professional, but that

11   makes sense.

12   Q.   Now you said earlier that this Consent Order led to the

13   troubled status for the Bank.  Right?

14   A.   That is my understanding, yes.

15   Q.   And this Consent Order came about because the OCC began

16   an investigation.  Right?

17   A.   And the Federal and the Fed, yes.

18   Q.   And the Federal Reserve began an investigation.

19   A.   Right.

20   Q.   Okay.  Now, once the investigation -- neither the Bank

21   nor Vernon Hill could stop the OCC or the Fed from pursuing an

22   investigation.  Could they?

23   A.   Not a lawyer, but that is not my understanding.  I'm not

24   a lawyer.

25   Q.   Neither the Bank nor Vernon Hill could stop the OCC or
```

02:13 (line 5)
02:13 (line 10)
02:13 (line 15)
02:13 (line 20)
02:14 (line 25)

1  the Fed from continuing an investigation.  Could they?

2  A.    Again, I am not a lawyer, but that is my understanding.

3  Q.    All right.  The point I am making is there is nothing in

4  this Consent Order that says Vernon Hill did anything wrong.

02:14    5  And as a matter of fact, when the investigative committee got

6  done with its report, if he were involved in these leases,

7  then he was giving the Bank a 35 percent break on rent.

8  Right?

9  A.    Regard --

02:14   10  Q.    Both things are right.  Right?

11  A.    Regarding, regarding the real estate section we read,

12  yes.  The SLC report was quite longer than that, but yes.

13  Q.    Let's cut to the chase.  This Consent Order requires that

14  there be an investigation into whether leases which may

02:15   15  involve insiders gives the Bank a fair shake or did not.

16  Right?

17  A.    It requires that as well as restrictions.

18  Q.    Okay.

19  A.    On insider and --

02:15   20  Q.    Okay.  But let's take them one at a time.  Okay?

21  A.    Okay.

22  Q.    Isn't there an obligation imposed on the Bank to do an

23  investigation?  Yes or no.  This is a yes.

24  A.    One of the requirements of it is to create the real

02:15   25  estate review committee which would do certain investigations

1    regarding the leases and real estate transactions, yes.

2    Q.   Okay.  Go to the page numbered D-1879.  Look at paragraph

3    six and tell me as you told me an hour ago, doesn't this order

4    require an investigative service be engaged?

02:15    5    A.   Yes, it does.

6    Q.   And if you go to paragraph -- I'm sorry.  Article 2,

7    paragraph four.  Doesn't this order require as you said an

8    hour ago, a cost benefit analysis be done?

9    A.   Yes.  It does.

02:16   10    Q.   And article three on the next page requires a real estate

11    committee to be formed.  Right?

12    A.   That is correct.

13    Q.   And the Bank did everything it was supposed to do.

14    Right?

02:16   15    A.   To the best of my knowledge, yes.

16    Q.   That the bank did everything it was supposed to do,

17    right?

18    A.   To the best of my knowledge, yes.

19    Q.   Okay.  Now, will you add that all up.  I'm just asking

02:16   20    you to do a little bit inductive reasoning here, that is all

21    I'm asking you to do.  When you add that all up, didn't this

22    Order say to the bank take a hard look at all these leases,

23    which may be insiders or insider related parties and make a

24    determination whether the bank did or did not get a fair

02:16   25    shake, isn't that what this all adds up to?

1    A.    Among other things within it, yes.

2    Q.    And the bank concluded it was getting a fair deal,

3    35 percent below market on the rents, right?

4    A.    Again, I'm not a real estate professional but that sounds

5    what it says from the first paragraph.

6    Q.    And that there were six -- there were two leases where

7    there may be $100 or $400 issue and six others that had to be

8    studied on real estate tax and CAM allocations, right?

9    A.    Not studied but determined unfairly allocated tax and CAM

10   charges and they would be negotiated.

11   Q.    So you have correctly pointed out that the OCC and/or the

12   Fed started the investigation, right?

13   A.    Yes, to the best of my knowledge.

14   Q.    You have correctly pointed out that either the bank or

15   Vernon Hill could tell them not to start or continue an

16   investigation, right?

17   A.    To the best of my understanding, yes.

18   Q.    And you have correctly pointed out that it was the OCC

19   and/or Fed on the one side and the bank on the other side that

20   made this Consent Order, right?

21   A.    To the best of my knowledge, yes.

22   Q.    And not Vernon Hill?

23   A.    His signature was not on there.

24   Q.    And you have correctly pointed out that after a thorough

25   investigation, the insider leases were found to be good deals

1  for the bank, right?

2  A.   Again, we went through that a couple times and we read

3  the paragraph and it is what it says.

4  Q.   Okay.  So then if we go back to the question that started

02:18  5  all this, does the bank have a reasonable basis to believe

6  that Vernon Hill was substantially responsible for the

7  troubled condition, how is that when leases turn out to be

8  good deals, when the Consent Order he doesn't sign, when he

9  can't control whether the OCC or the Federal Reserve starts an

02:18  10  investigation, how does the bank, through you as a corporate

11  representative, conclude that he is responsible for the

12  troubled condition arising from this Consent Order?

13  A.   Similar to the others, not making a statement that the

14  bank has made a judgment that he committed those, but stating

02:19  15  that we do have any reasonable cause to believe based on the

16  documents reviewed and the people interviewed, it was clear

17  that the perception was the OCC and the Fed were specifically

18  investigating Mr. Hill and his insider related activities,

19  their words.

02:19  20  Q.   Okay.  So the bank then, speaking through you as a

21  corporate representative, is not claiming a reasonable basis

22  to believe that Vernon Hill was responsible for the troubled

23  condition arising from this Consent Order, right?

24  A.   The bank is saying that we have not made a decision one

02:19  25  way or the other that he was the cause, but in producing

1    documents that answer that or that are related to that is why

2    I pulled this document.

3    Q.   Does the bank have or not have a reasonable basis to

4    believe that Vernon Hill was responsible for the troubled

02:19    5    condition arising from this Consent Order that he did not

6    sign?

7    A.   The bank has not stated that Vernon Hill was

8    substantially responsible for insolvency.

9    Q.   Or troubled condition.

02:20    10    A.   Or troubled condition.  I'm -- my apologies.

11    Q.   Now --

12    A.   The bank has stated there were not an issue with

13    insolvency.

14    Q.   All right.  I want to read into the record the precise

02:20    15    language of the federal regulation we refer to as 359.4:  "An

16    insured depository institution, the depository institution

17    holding company or IAP, making a request pursuant to

18    Paragraphs A1 through 3 of this section, shall demonstrate

19    that it does not possess and is not aware of any information,

02:20    20    evidence, documents, or other materials which would indicate

21    that there is a reasonable basis to believe at the time such

22    payment is proposed to be made that," and then there appear

23    the topics you and I have been discussing.

24         Now, you have it in front of you, you heard me read it,

02:21    25    you are reading along, you understand it all?

1   A.   Yes.

2   Q.   Okay.  Now, when I say to you, as I have been since this

3   morning, whether the bank believes it has a reasonable basis

4   to believe that Vernon Hill has committed a fraudulent act or

02:21   5   omission or breach of trust or fiduciary duty or insider abuse

6   likely to have a material adverse effect on the holding

7   company, you understand all that right?

8   A.   I understand what you are saying, yes.

9   Q.   Now, seeing this in front of you, does this change any of

02:21   10   the answers that you've been giving me all day?

11   A.   No, but it supports my response back to you in that the

12   bank on those items, from what I've learned by interviewing

13   people and reading documents, has not determined that he

14   committed any of those.  However, because there are documents,

02:21   15   allegations, and a finding by the OCC and other items, we

16   can't say that it was not.  We can't answer in the negative,

17   which is what this language asks for.  It says "shall

18   demonstrate that it does not possess and is not aware of any

19   information, evidence, documents or other materials, which

02:22   20   would indicate that there is a reasonable basis to believe,"

21   and we can't answer in the negative to fulfill that.  Although

22   you are correct, we have not found that he did not do --

23   although you are correct, we have not found that he did do

24   those things.

02:22   25   Q.   I think you've said multiple times that the bank has not

1  concluded there is a reasonable basis to believe he did any

2  one of these things wrong, haven't you said that multiple

3  times?

4  A.  We have not come to the conclusion that he has done any

02:22   5  of those things wrong, correct.

6  Q.  Okay.  Well, my question was a little bit different.  You

7  have not come to the conclusion that there is a reasonable

8  basis to believe that he has done any of those things wrong?

9  A.  I have not said that.  I've continued to say that the

02:23  10  bank has not decided or made a judgment that he has done any

11  of those things wrong.

12  Q.  But what you cannot answer is this question, having

13  reviewed those documents and spoken to people, does the bank

14  have or not have a reasonable basis to believe that Vernon

02:23  15  Hill did any of those things wrong?

16  A.  The bank has not determined if they have a reasonable

17  basis, they've determined whether they can answer this

18  question, and we cannot say that we are not aware of any

19  information, evidence, documents.

02:23  20  Q.  Fine.  So the bank has not determined whether it has a

21  reasonable basis to believe that Vernon has done any of those

22  things wrong, you just said that, didn't you?

23  A.  Yes.

24  Q.  The bank has simply determined that they have documents,

02:24  25  which you piled on this table, right?

1    A.   Yes, that we have documents relative to this.  Yes.

2    Q.   But, as of this moment, which is 24 minutes to 3:00 on

3    March 24, 2011, the bank has not determined that it, the bank,

4    has a reasonable basis to believe that Vernon Hill did any of

5    these things wrong, right?

6    A.   Again, in discussing what they -- what the different bank

7    representatives have come to a conclusion of is that they

8    are -- they cannot say that they are not aware of any

9    information, evidence, documents, et cetera.

10   Q.   Next question.  Based on those documents and all the

11   interviews you've done, has the bank, as of 23 minutes to 3:00

12   on March 24, 2011, made a determination that there is a

13   reasonable basis to believe that Vernon Hill did any of these

14   things wrong in the regulation?

15   A.   The bank has not made that determination.

16   Q.   So you've got documents which bear on the issue, you have

17   brought them here, but the bank has not, as of 22 minutes to

18   3:00 on March 24, 2011, made a determination that there is a

19   reasonable basis to believe that Vernon has done any of the

20   things wrong in this regulation, right?

21   A.   Again, the way you are saying it is very broad.  In my

22   discussions with the people and review of the documents, the

23   bank has determined that they cannot say they were not aware

24   of any information, documents, et cetera, that is the

25   determination that was made.

02:24
02:24
02:25
02:25
02:25

1   Q.   But you are aware of them and you brought them here and

2   that is a simple thing.  These are the documents that the bank

3   is aware of that may have something to do with this issue,

4   right?

02:26   5   A.   Correct.

6   Q.   But that is not what I'm asking you as a corporate

7   representative.  We all know that.  We know it because you

8   brought them here and you identified them.  I am asking you

9   repeatedly, and I think you have answered, I think, I'm asking

02:26   10   you repeatedly isn't it simply true that as of 21 minutes to

11   3:00, March 24, 2011, the bank has not made a determination

12   that it, the bank, has concluded there is a reasonable basis

13   to believe that Vernon has done anything wrong?

14   A.   The bank has not made a determination in either way

02:26   15   except to say that we cannot say that we are not aware of any

16   information, evidence, documents.

17   Q.   So the bank has not made a determination either way

18   whether there is a reasonable basis to say that he did any of

19   this stuff wrong, isn't that what you are saying?

02:26   20   A.   I am trying to be clear, and the way you keep coming back

21   is almost in the negative of what we're reading in front of

22   us.  So it is easier to go back with what is in front of us

23   and that is that the bank has determined that we can't say

24   that we are not aware of any information, evidence, documents

02:27   25   based on what we've produced and is on this table today.

1    Q.    Do you think that Vernon Hill violated any of these

2    things right in the front of you in the regulation 359.4?  Do

3    you think you have a reasonable basis to believe he violated

4    any of the stuff here, do you?  Do you think you have a

02:27    5    reasonable basis?

6    A.    I would go with the same way as this that --

7    Q.    Same way as what?

8    A.    The same way as we've been discussing, that I couldn't

9    say that I am not aware of any information, evidence,

02:27    10    documents, or others.

11    Q.    But now that you've studied the information, the

12    documents and interviewed people, now that you've done all

13    that, speaking as a representative of the bank, does the bank

14    think it has a reasonable basis to conclude that Vernon did

02:28    15    any of these bad things, yes or no?

16    A.    The bank is not a person.  There is a lot of opinions and

17    other things out there.  Based on interviewing the Board

18    members and reading the documents, the determination that was

19    made is that we could not say that we are not aware of any

02:28    20    information, evidence, documents, or other materials.

21    Q.    Okay.  I'd like you to turn to Exhibit 30, Exhibit 30 are

22    November 20, 2007, Board of Directors meeting minutes, and

23    much of it is redacted, but on the third page number DO 465

24    you will see in the first paragraph, third sentence:  "The

02:28    25    Board was advised that OCC directed Commerce to deal directly

1   with the Federal Reserve Board and the FDIC on the issues of

2   Vernon Hill's separation payment claims."

3          Did I read that right?

4   A.   Yes, sir.

02:29    5   Q.   Okay.  And it continues:  "The Board approved the motion

6   authorizing a request to be made to the Federal Reserve Board

7   and FDIC for authorization of any separation payments to

8   Vernon Hill."

9   A.   Yes, sir.

02:29   10   Q.   Did you ask any of the Board members why they voted to

11   pay Vernon Hill and to have the bank do whatever is necessary

12   with the OCC and the Federal Reserve and the FDIC to get him

13   paid?

14   A.    I don't recall that I had to ask, it was forthcoming from

02:29   15   all of them and I was told that was a unanimous vote that they

16   did want him paid.

17   Q.   They did want him paid.  And did they all tell you that?

18   Did you ask them, if they thought he did anything wrong, why

19   they wanted him paid?

02:29   20   A.   Not in my format, no.

21   Q.   Well, it is not in your list of questions that I see.  So

22   you didn't say to any of them, well, you voted that he be

23   paid.  If you thought he did something wrong, why did you vote

24   that he be paid?  Did you ask anybody anything like that?

02:30   25   A.   I don't believe any of them told me that they

1  specifically thought he did something wrong, they mentioned

2  that there were poor judgments, that there were questionable

3  items, an issue regarding commissions came up from someone on

4  the Real Estate Commission or Group, but in their opinion he

02:30  5  had done a good job for the bank and they wanted to see him

6  paid.

7  Q.  None of them told you that they thought he did anything

8  wrong, right?  Is that correct?

9  A.  As I just noted, they mentioned that there were -- it

02:30  10  depends on your definition of wrong.  None of them said I

11  don't think he did anything wrong.

12  Q.  Did any of them accuse Vernon Hill of wrongdoing?

13  A.  Again, it's wrongdoing.  Several of them noted that there

14  were -- there was poor judgment was one of the statements,

02:31  15  that there were questions because of the investigation, they

16  noted it was ongoing at the time.  But in general, no, they

17  felt that he had done a good job for the bank, that his

18  stepping down was for the bank and they wanted to see him

19  paid.

02:31  20  Q.  Those interviews were conducted recently, weren't they?

21  A.  In the last week or two, yes.

22  Q.  During March of 2011?

23  A.  Yes.

24  Q.  Now, you were talking to these directors and they were --

02:31  25  apparently none of them told you that they thought he

1  committed any crime, did they?

2  A.   That is correct.

3  Q.   None of them told you that they thought Vernon Hill

4  committed any fraudulent act, correct?

02:31    5  A.   Just double-checking my notes.

6        No, none of them said that he did a fraudulent act.

7  Q.   None of them told you that he committed a breach of trust

8  or fiduciary duty, right?

9  A.   No, no one said that.

02:31    10  Q.   None of them told you that he was guilty of insider abuse

11  with regard to the depository institution or holding company,

12  right?

13  A.   I didn't ask that question and I didn't get a response to

14  that, no.

02:32    15  Q.   And nobody told you that he did any of those things and

16  therefore those things not done could not have had a material

17  adverse effect on the bank, right?

18       Yeah.  Do you have the regulation in front of you?

19       MR. TAMBUSSI:  You skipped an answer, it says:

02:32    20  WITNESS:  Can you say that again, please?

21       MR. JACOBS:  Here?

22       MR. TAMBUSSI:  No.

23       MR. JACOBS:  Let me borrow yours.

24       MR. TAMBUSSI:  Sure.

02:32    25       MR. JACOBS:  My copy of the transcript is missing two

1    lines.

2           MR. TAMBUSSI:  Start this with this question and pick

3    up with this answer.  Actually I should give it to Eric.

4           MR. JACOBS:  Judge, we have a photocopy problem.  Can

02:32   5    I check and make sure that Mr. Lubin has Lines 18, 19, 20, and

6    21.

7           MR. LUBIN:  I do not.

8           MR. TAMBUSSI:  I need it back to follow along.  We

9    can just read the question and Mr. Jacobs can read the answer,

02:33  10    that would be fine, too.

11           MR. JACOBS:  That's fine.  Do you want to just to do

12    that?

13           THE COURT:  Go ahead, read the question.

14           MR. JACOBS:  Mr. Tambussi can read the answer.

02:33  15    Q.   Yeah.  And nobody told you that he did any of those

16    things and therefore those things not done could not have had

17    a material adverse effect on the bank, right?

18    A.   Can you say that again, please?

19           MR. JACOBS:  Do I have another line?

02:33  20           MR. TAMBUSSI:  Your next line is "yeah."

21           MR. JACOBS:  Yeah.

22           MR. TAMBUSSI:  Do you have the regulation.

23           MR. JACOBS:  Do you have the regulation.

24           MR. TAMBUSSI:  Okay.

02:33  25           MR. JACOBS:  Now we're up to date.

**1**       We should now be up to 210, Line 1.

**2**           MR. TAMBUSSI:  Okay.

**3**           MR. JACOBS:  Right?

**4**           MR. TAMBUSSI:  Yes.

02:33   **5**   Q.   Nobody told you he committed a fraudulent act or

**6**   omissions, breach of trust or fiduciary duty or insider abuse,

**7**   you've already --

**8**   A.   But --

**9**   Q.   You've already said that.

02:34   **10**   A.   I think.

**11**   Q.   Now, looking at the regulation, if those things had been

**12**   done, it would have been necessary for them to have a material

**13**   adverse effect on the bank, right?

**14**   A.   Yes, sir.

02:34   **15**   Q.   But we never get to that issue, material adverse effect

**16**   on the bank, because none of these directors told you that

**17**   Vernon did any of those things.

**18**   A.   Again, I did not ask them if they knew that he did those

**19**   things.

02:34   **20**   Q.   You did not.

**21**   A.   I read --

**22**   Q.   Is there a reason you did not?

**23**   A.   I read the Act.  I asked if they could certify that he

**24**   did not commit any of those things and the answer was that at

02:34   **25**   the time they could not.

1  Q.  Did you say to any of these interviewees in the language

2  of the regulation, do you possess and/or are you aware of

3  information, evidence, documents or other materials which to

4  you indicate there is a reasonable basis to believe that

5  Vernon did any of those things, did you say that to any of

6  them?

7  A.  In that manner, no.  Again, you are reading to the

8  positive.  What I asked them was in the negative, which

9  reflected the Act, I asked if they could certify that he did

10 not do any of those things.

11 Q.  So you were asking these individuals to provide a

12 certification, which to most people is an affidavit, provide a

13 certification that Vernon did not do any of those things?

14 A.  I was asking if at the time they were on the Board they

15 felt they could have made that certification and the answer

16 was that they could not.

17 Q.  Did you say to any of those interviewees based on what

18 you know, based on what you know starting the day the earth

19 cooled and up to the moment you picked up the receiver to talk

20 to me, can you tell me whether you have a reasonable basis to

21 believe Vernon did any of those things?

22 A.  One, I didn't ask it like that and, two, I never asked

23 them if they had a reasonable basis to believe he did

24 something, I asked if they could certify that he did not do

25 anything.

1   Q.   I'm sorry.  Stop there.  So the interviewees, the Board

2   of Director members, all you told -- all told you that they

3   told their lawyers to seek regulatory approval, is that what

4   you're saying?

02:36   5   A.   They didn't say it in that way.  They said they all

6   agreed and it was unanimous that they wanted him paid.

7   Q.   Right.

8   A.   And they instructed the two law firms to work to do what

9   needed to be done to get him paid.

02:36   10   Q.   What two law firms?

11   A.   It was Arnold & Porter and Sullivan & Cromwell.

12   Q.   Did the bank ever prepare a golden parachute payment

13   application?

14   A.   Not that I'm aware of.

02:36   15   Q.   Did anybody ever explain to you why?

16   A.   In reviewing the emails there was a lot of back and forth

17   that there needed to be a settlement to be brought to the

18   regulators to approve or not.  There is a lot of back and

19   forth regarding that certification, we've already discussed

02:37   20   that in depth.  There were emails that appeared that there was

21   close to a settlement and there was back and forth on that but

22   it went away so...

23   Q.   Who told you that there had to be a settlement before the

24   regulators would consider approving a payment, who told you

02:37   25   that?

1    A.   I wasn't told, that was in one of the emails, I think, to

2    Mr. Hill's attorney.  Let me see if I noted it in my notes.  I

3    noted it but I didn't say where.

4    Q.   Rather than search for that, rather than search for that,

02:37    5    did you discuss with anybody simply submitting Vernon Hill's

6    contract to the regulators with a request to pay according to

7    its terms?

8    A.   Can you say that again, please?

9    Q.   Did you discuss with anyone simply submitting Mr. Hill's

02:38    10   Employment Contract to the regulators with a request to pay

11   according to its terms?

12   A.   Are you asking if I made the recommendation to do that?

13   Q.   I asked did you discuss that with anyone.

14   A.   Not in that manner.  I discussed -- I reviewed documents

02:38    15   and discussed what those documents meant.

16   Q.   Why can the bank not photocopy Mr. Hill's employment

17   contract and send it to the regulators with all of the

18   information you have produced today, which in your view bears

19   on the issues in Section 359.4, and tell the regulators here

02:38    20   is the contract, here is all the information that we have and

21   we've not made a determination of whether there is a

22   reasonable basis to believe he did anything wrong, so please

23   consider this, is there a reason the bank can't do that?

24   A.   I don't know that they can.  I don't know the reason they

02:38    25   couldn't do that.

1    Q.   There is no special form for a golden parachute payment

2    request is there?

3    A.   I could read through the rule here, but I am not an

4    attorney, I don't know the answer to that.

02:39    5    Q.   Okay.  So you can't think of a reason the bank can't

6    simply duplicate the employment contract, duplicate all the

7    documents you brought here and send a couple pages of your

8    transcript where, or, as a bank representative, say the bank's

9    not made a decision on whether there is a reasonable basis to

02:39   10    believe that he did or didn't do any of these things?

11    A.   To be clear, you are asking if we can do that?

12    Q.   Yeah.

13    A.   I don't see a reason why we couldn't do that.  I don't

14    know that it has anything to do with regulation, but I don't

02:39   15    see why we couldn't do that.

16    Q.   Has anybody in the bank, yourself or anybody else, sat

17    down and studied the documents you produced today and made an

18    objective assessment of whether those documents and any other

19    information you have amount to a reasonable basis to believe

02:40   20    that Vernon did anything wrong recited within the regulation,

21    has anybody done that?

22    A.   I know that -- I'm not sure how to answer that question.

23    I was reviewing it based on the subpoena.  I know that our

24    legal department is overseeing this, I know we have counsel on

02:40   25    this, and I would make the assumption that people are looking

1   at this.  However, you asked the question in the positive and

2   the question is actually in the negative, can we attest based

3   on all this that he did not.  And from what I've seen so far

4   and people I've asked, the answer is we can't certify that he

02:40   5   did not because there was an OCC finding that he did and the

6   OCC is the bank's regulator.

7   Q.   Let me particularize this to you as the corporate

8   representative.  Have you sat down and read all the documents

9   you produced today, which you say may potentially bear on this

02:41   10   issue, and made an objective assessment as to whether those

11   documents and any other information you have gathered generate

12   a reasonable basis to believe that Vernon did any of these

13   things recited in the regulation?

14   A.   I did review all the documents that I brought here today

02:41   15   and read them all and I, from my determination, read the rule

16   and could not certified that he did not do any of those items.

17   Q.   And you think that is what the rule requires?

18   A.   That is what I understand from reading the rule and --

19   Q.   Okay.

02:41   20   A.   -- that is what Richard Alexander said.

21   Q.   Okay.  Mr. Fisher, in this book are some emails back and

22   forth among the OCC and attorneys as to who is responsible for

23   payment of Vernon Hill's contractual entitlement under his

24   Employment Agreement.  Who is?

02:41   25   A.   It's my understanding, based on this review and asking

1    questions, and I did reach out to some in finance as well, I

2    found out we do have a reserve set and it is under the holding

3    company.  It was transferred from the Bancorp, Inc., holding

4    company when that accounting system was shut down to the Bank

02:42   5    North, Inc., which was the holding company, but that then

6    changed its name to the TD Bank U.S. holding company.

7    Q.   So?

8    A.   So, yes, there is a reserve for the holding company.

9    Q.   So as a corporate representative, you are telling us that

02:42   10   TD Bank U.S. holding company is the entity responsible for

11   paying whatever are Vernon Hill's contractual entitlements?

12   A.   That is my understanding based on my review --

13   Q.   Okay.

14   A.   -- and discussions.

02:42   15   Q.   All right.  Tell me what the bank's position is on

16   Vernon's contract, how much does the bank say Vernon is

17   entitled to?  Don't tell me the reserve yet but tell me what

18   the bank says he's entitled to under his contract?

19   A.   There was -- based on what I read, and there are

02:42   20   documents in there including letters back and forth, but what

21   I saw was $11,250,000 in salary.

22   Q.   Right.

23   A.   Approximately 729,000 in pro rata bonus.

24   Q.   Right.

02:43   25   A.   Approximately 2.6 million in options, those were the

1    options that --

2    Q.   They're the part that --

3    A.   -- which vested was accelerated because -- and that is

4    why it fell in, minus the $4 million related to the Consent

02:43    5    Order and I believe that is what we have.

6    Q.   Have you made any allowance for interest or counsel fees

7    in the bank's calculation what is due Vernon Hill?

8    A.   I did not in what I reviewed, no.

9         MR. JACOBS:   Judge, that concludes the testimony of

02:43    10   Mr. Fisher.

11        THE COURT:   Okay.  Good timing.

12        We'll break for lunch, ladies and gentlemen.  Please

13   don't discuss the case or do any research.  See you back in an

14   hour.  I hope you enjoy your lunch.

02:44    15        DEPUTY CLERK:  All rise.

16            (Jury Leaves the Courtroom.)

17        MR. JACOBS:  Just one minute before you leave,

18   please.

19        THE COURT:  Sure.

02:44    20        MR. JACOBS:  We have -- Mr. Barbone has a conflict

21   with a state court judge who has been pursuing him for a

22   couple days and he's now requiring his appearance for him to

23   request an adjournment at 8 a.m. tomorrow.  And if he makes

24   that -- inevitably, if he make that appearance, it's going to

02:44    25   hold us up and he and I are working in tandem.  Can you just

1    ask the judge if it can be the next day, it's only an

2    adjournment request.

3              THE COURT:  Why can't ask him?

4              MR. JACOBS:  What if he says no and then we have to

02:45    5    come back to you?

6              THE COURT:  What if he says no to me, what am I going

7    to do?

8              MR. JACOBS:  Well, saying no to us is one thing,

9    saying no to you another.  If he says no to us, then we're

02:45    10   going to have to ask you to step in, that's the problem.

11             THE COURT:  If he's going to be there at 8:00 to

12   request an adjournment --

13             MR. JACOBS:  Well, you would hope he'd be out by

14   8:30, you would hope he'd be here at 9:30, that's what you

02:45    15   hope.  You know how it is.  You have no guarantee that the

16   judge is going to be there, the prosecutor is going to be

17   there.

18             THE COURT:  Do the best you can, Mr. Jacobs, that's

19   all I can tell you.  If he can't be here on time, you have to

02:45    20   make a choice, you have to ask if I can postponement the start

21   or you can start without him.  I don't know what you plan on

22   doing tomorrow morning that you need Mr. Barbone here at 9:30

23   to do.  My observation is he hasn't done any of the

24   questioning or anything else in this case yet.

02:46    25             MR. JACOBS:  He hasn't done the questioning, he's

1    done all the preparatory work for me.  We work together in the

2    mornings and we work together in the evenings, both, to get

3    this done.

4              THE COURT:  I'm sure 15 minutes later isn't going to

02:46    5    effect your presentation of evidence tomorrow if all you're

6    doing is reading more deposition transcript.  I don't know

7    what you plan on doing tomorrow.

8              MR. JACOBS:  Well, to give you a specific example,

9    we're going to be up to another read-in where there are an

02:46   10    awful lot of objections, and thus far Mr. Barbone has been

11    handling all of those supplements and objections.  So he's

12    going to be working on that tonight and tomorrow morning if

13    there are unresolved things, he would be dealing with them.

14    So we may be asking you to wait for him if he has to make that

02:47   15    appearance.

16              THE COURT:  Well, you can request of the judge to

17    postpone till Friday and let me know how you make out.

18              MR. JACOBS:  All right.

19              (Luncheon recess.)

03:49   20              DEPUTY CLERK:  All rise.

21              (Jury Enters the Courtroom.)

22              DEPUTY CLERK:  All rise.

23              THE COURT:  Are we ready?  What's next?

24              MR. JACOBS:  Judge, the next witness is Mr. Fisher.

03:56   25              THE COURT:  Live and in person?

1          MR. JACOBS:  Yes.

2          THE COURT:  Oh.

3          MR. JACOBS:  For a break.  And there are two exhibits

4    I will show him that I'm informed that one of the two --

03:56   5          THE COURT:  Sit down, everybody.

6          MR. JACOBS:  -- P-70 and 71, I'm told by Mr. Barbone

7    71 is an exhibit previously sealed and ordered by you or Judge

8    Schneider.

9          THE COURT:  This is a certification dated April 15,

03:56   10   2013?

11         MR. JACOBS:  Is it March 15th?

12         THE COURT:  I have April.

13         MR. JACOBS:  April.  Okay.  April 15th.

14         THE COURT:  Okay.  It's going to be unsealed today,

03:56   15   now.

16         MS. LEMING:  Your Honor, the FDIC had requested that

17   if the parties try to move to seal these few documents that we

18   had requested an authorization to be used at the time of trial

19   in this case, they submitted letters back to us in response to

03:57   20   our request stating that some of these documents that have

21   been produced in this case are subject to a confidentiality

22   Order are exempt records and not permitted to be disclosed

23   except as authorized by the FDIC.  The FDIC has asked that in

24   order for these to be used at trial, that we move to file

03:57   25   these documents under seal and notify them if such request has

1    been denied.

2         THE COURT:  May I see the document so I know what

3    we're talking about?

4         MR. JACOBS:  Yes.  Do you want the whole book or do

03:57    5    you want me to take it out?

6         THE COURT:  The whole thing.

7         MR. JACOBS:  Tab 71.

8         THE COURT:  Thank you.

9         What is this?  What was the purpose of this

03:58    10   certification?

11        MS. LEMING:  Your Honor, if I may, P-71 was submitted

12   with a cover letter by Mr. Pollock to the FDIC, so this was an

13   enclosure to the letter.  The letter and its enclosure was

14   designated by the FDIC as confidential docs under the

03:58    15   regulation.

16        THE COURT:  Do you have any idea why the FDIC labeled

17   this as confidential when it was not prepared by them?

18        MS. LEMING:  Your Honor, the best I can understand is

19   that it's their position that documents that are submitted

03:58    20   directly to and from them, particularly with respect to the

21   golden parachute regulations, are designated as confidential

22   under the regulations and not permitted to be used absent

23   their authorization.  So we did -- we were authorized to

24   disclose them during the course of discovery subject to a

03:59    25   confidentiality Order that was executed by counsel and Judge

1  Schneider in this case.

2       THE COURT:  Well, okay.  And you're supposed to

3  notify them?

4       MS. LEMING:  If my request to seal the documents have

5  been denied, yes, we're supposed to immediately notified them

6  of that.

7       THE COURT:  Well, no one made a request.  Are you

8  making a request to seal the document?

9       MS. LEMING:  I believe it's a joint request, your

10  Honor, that Mr. Jacobs was trying to present before, yes.

11       THE COURT:  This is a little bit different, I don't

12  like sealing documents at trial absent national security

13  reasons.  You can tell them that it's my intention to unseal

14  this document and I'll give them till the end of business on

15  Friday to make an application to seal.

16       MS. LEMING:  Very well, your Honor.

17       THE COURT:  It will be sealed until that time.  As of

18  5:00 on Friday, it becomes unsealed unless I hear from them

19  and make a ruling to the contrary.

20       How do you intend to use this?

21       MR. JACOBS:  70 is a February 1, 2013, certification

22  filed by Mr. Fisher.  On March 14, 2013, the bank was notified

23  by someone at the Federal Reserve that they considered it

24  overbroad.  P-71, which we're now talking about, is dated

25  April 15, 2013, and it is considerably different than what was

1   originally submitted and it changes Mr. Fisher's view as to

2   what the bank feels it has a reasonable basis about and what

3   it doesn't, that's how I intend to use it.

4           THE COURT:  I understand the relevance.  But what I

04:00   5   want to know is what is the jury going to hear about it?

6           MR. JACOBS:  I plan to use both exhibits in the

7   direct examination of Mr. Fisher.

8           THE COURT:  By reading them into the record or how

9   exactly are you going to do it?  What's the jury going to hear

04:01  10   about the substance what's on these papers?

11           MR. JACOBS:  I'm going to ask him did you file a

12   certification.

13           THE COURT:  Right.

14           MR. JACOBS:  In this paragraph what did you say.

04:01  15           THE COURT:  Okay.

16           MR. JACOBS:  Then when I get to the second one, is

17   that the same or different from what you said a few weeks

18   earlier.

19           THE COURT:  Is it your intention ultimately to have

04:01  20   the jury see these documents when they deliberate the case?

21           MR. JACOBS:  Eventually, but that will be well after

22   Friday.

23           THE COURT:  Fine.  I think we're fine.

24           MR. JACOBS:  So I can use them?

04:01  25           THE COURT:  Sure.

FISHER - DIRECT - JACOBS

1          MR. JACOBS:  All right.

2          THE COURT:  Did you want to be heard on that?

3          MS. LEMING:  No, your Honor.  Thank you.

4          THE COURT:  Is he here in the courtroom?

04:01    5          MR. JACOBS:  I believe he is, Judge.

6          THE COURT:  Okay.  Let's get the jury out.

7          MR. JACOBS:  Judge, let me ask one more question.

8  Does that mean I should not put 71 on the screen?

9          THE COURT:  It does mean that, yeah, for now.

04:02   10          DEPUTY CLERK:  All rise.

11              (Jury Enters the Courtroom.)

12          THE COURT:  Have a seat, everyone.

13      I just want to explain and apologize for these little

14  delays, but we are working out here and actually streamlining

04:03   15  things to make it easier once we get going.

16      Your next witness, please.

17          MR. JACOBS:  Your Honor, the next witness is John

18  Fisher.

19          THE COURT:  Mr. Fisher, come on up here, please.

04:03   20      Good afternoon.  Would you raise your right hand.

21  (**JOHN CHRISTIAN FISHER**, HAVING BEEN DULY SWORN AS A WITNESS,

22  TESTIFIED AS FOLLOWS:)

23  (DIRECT EXAMINATION OF JOHN CHRISTIAN FISHER BY MR. JACOBS)

24          THE COURT:  State your full name.

25          THE WITNESS:  John Christian Fisher.

*United States District Court*
*Camden, New Jersey*

FISHER - DIRECT - JACOBS

1          THE COURT:  Spell your last name.

2          THE WITNESS:  F-I-S-H-E-R.

3          THE COURT:  Mr. Fisher, if you'll please have a seat.

4   And try to speak into that microphone so we can all hear you.

04:03   5          THE WITNESS:  Yes, sir.

6          THE COURT:  Thank you.

7          MR. JACOBS:  All right, Judge?

8          THE COURT:  You may go.

9   BY MR. JACOBS:

04:04   10  Q.  Good afternoon, Mr. Fisher.

11  A.  Good afternoon.

12  Q.  Mr. Fisher, by whom are you employed?

13  A.  TD Bank.

14  Q.  And you've been with TD Bank how long?

04:04   15  A.  I've been with TD Bank 16 years this year.

16  Q.  Mr. Fisher, were you in the courtroom today?

17  A.  Earlier today?

18  Q.  Yes.

19  A.  Yes, sir.

04:04   20  Q.  Are you the same John Fisher whose testimony I took more

21  than two years ago, namely, on March 24, 2011?

22  A.  Yes, sir.

23  Q.  That was you?

24  A.  Yes, sir.

04:04   25  Q.  Okay.  Did you hear the questions and answers?

*United States District Court*
*Camden, New Jersey*

—————— FISHER - DIRECT - JACOBS ——————

1   A.  Yes, sir.

2   Q.  Now, Mr. Fisher, first, what is your position with TD

3   Bank today?

4   A.  I head up corporate insurance for the U.S. so I work in

5   conjunction with our corporate insurance group that does

6   global.

7   Q.  Are you still in insurance?

8   A.  Yes, sir.

9   Q.  All right.  And have you been since March 24, 2011?

10   A.  Yes.

11   Q.  Mr. Fisher, I want to ask you whether sometime before

12   today you answered questions in this case, written questions

13   under oath called interrogatories.

14   A.  Interrogatories in this case?

15   Q.  Yes.

16   A.  Yes, sir.

17   Q.  All right.  I want to show you one in particular, this is

18   Plaintiff's Exhibit 39, Interrogatory 24?

19         MR. JACOBS:  Can we get that on the screen, Judge?

20         THE COURT:  Sure.

21         MR. JACOBS:  Can we see the signature page before we

22   look at the interrogatory itself?  Okay.  Can you make that go

23   down just a little bit?  Down is the other way.

24   BY MR. JACOBS:

25   Q.  You see the certification?

04:04 (line 5)
04:04 (line 10)
04:05 (line 15)
04:05 (line 20)
04:05 (line 25)

FISHER - DIRECT - JACOBS

1   A.   Yes, sir.

2   Q.   Did you sign that certification on February 12th, 2010?

3   A.   Yes, that's my signature.

4   Q.   Okay.  And you signed -- did you sign the signature after

5   answering these questions that we served upon you?

6   A.   The interrogatories?

7   Q.   The interrogatories.

8   A.   Yes, sir.

9   Q.   And did you compose the answers to the interrogatories?

10  A.   I reviewed and asked questions on them, I think they were

11  composed by legal and counsel.

12  Q.   Not by you?

13  A.   Most likely not, I don't recall doing that.

14         MR. JACOBS:  Can we go to number 24, please?

15  Interrogatory number 24.  Can we make that bigger, is that

16  possible?  Can we center it now?  Can you make it -- can you

17  make it just a little bit bigger so we don't lose any of it?

18  Okay.

19  BY MR. JACOBS:

20  Q.   I want to direct your attention to this particular

21  question:  "What did Commerce Bancorp, LLC, do to cure its

22  refusal to pay Mr. Hill all of his contractual entitlements

23  within 30 days of his termination pursuant to Paragraph 14 of

24  his Amended and Restated Employment Agreement."

25         Did I read that right?

FISHER - DIRECT - JACOBS

**1**  A.   Yes, sir.

**2**  Q.   Okay.  What was your answer?

**3**  A.   Objection as the phrase contractual entitlement is vague,

**4**  undefined and calls for an improper legal conclusion.  Without

04:07  **5**  waiving the objection, and by way of further response, as Mr.

**6**  Hill is aware, defendants offered to place certain moneys in

**7**  escrow back in 2007, Mr. Hill adamantly refused to consent to

**8**  the use of an escrow account.  In addition, Commerce has

**9**  sought necessary approvals from the appropriate regulatory

04:07  **10**  authorities."

**11**  Q.   "In addition, Commerce has sought necessary approvals

**12**  from the appropriate regulatory authorities."  Is that what

**13**  you said?

**14**  A.   Yes, sir.

04:07  **15**  Q.   Did you see any of those, any document seeking regulatory

**16**  approval before you answered this?

**17**  A.   Yes, sir.

**18**  Q.   What was the nature of the document you saw in 2010

**19**  seeking regulatory approval?

04:08  **20**  A.   There were a number of emails.  There were -- I believe I

**21**  saw the Board notes, which had counsel, I believe Richard

**22**  Alexander, coming back and stating updates to the Board.

**23**  There were -- I know there were a lot of emails, I looked at

**24**  some from the regulators back to the bank, some from the bank

04:08  **25**  to the regulators, there were emails with Mr. Hill's attorneys

FISHER - DIRECT - JACOBS

1    back to the regulators, there were documents of multiple

2    meetings in Washington, D.C., that included both the counsel

3    and regulators and also sometimes the Board of Directors

4    members there were a lot occurring over that time period.

04:08    5    Q.   From whom do you say Commerce sought the necessary

6    approvals, what regulatory agencies?

7    A.   It looked predominately that they were working with the

8    Federal Deposit Insurance Corporation and the Office of the

9    Comptroller of the Currency.  And there was also the Fed, the

04:08   10    Fed, Federal Board of Governors, it's always called the Fed,

11    those are the three primary regulators that were involved.

12    Q.   Do you have and can you show me a writing, a document

13    from Commerce Bank directed to the Federal Reserve or the FDIC

14    which says we want your approval to pay Vernon Hill?

04:09   15    A.   There were definitely emails to that effect.  The one I'm

16    thinking of was regarding what they did get successful

17    permission from the regulators to pay and that were what they

18    determined were the non-golden parachute benefits.  So

19    anything that was part of the contract that this Part 359 that

04:09   20    we've talk about didn't deem to be the golden parachute

21    payment, an additional payment, they did get permission.  So I

22    saw -- I remember emails back and forth on that and they came

23    back and the regulators did give permission to have that paid

24    and it was paid.

04:09   25    Q.   Are you talking about things that are simply not covered

FISHER - DIRECT - JACOBS

1  by the golden parachute regulation?

2  A.   Yes, that's what was paid.  That's what they did get

3  permission on.  They were seeking permission on everything

4  through all those emails, that's what they did get permission

5  on, yes.

6  Q.   All right.  What I'm asking you to produce, if you have

7  it, is a writing where Commerce Bank or its lawyer says we

8  want approval from you, Federal Reserve or FDIC, to pay Vernon

9  Hill on his contract, the parts covered by golden parachute,

10  does that exist?

11  A.   Specifically on the parts covered by golden contract?

12  Q.   Golden parachute.

13  A.   Back from this time period?

14  Q.   Yes.

15  A.   I don't believe so.

16  Q.   Okay.  Now, it was more than two years after you gave

17  this answer that you gave your sworn testimony to me, right?

18  A.   The date of this was 2010?

19  Q.   The date of this is February of 2010.

20  A.   So it was about a year later, yes.

21  Q.   A year later.  And it's been about two years since you

22  gave your sworn testimony.

23  A.   That sounds right, yes.

24  Q.   Okay.  Now, Mr. Fisher, I'd like you to tell me whether

25  approximately 22 months, 22 months after you gave your sworn

04:10
04:10
04:10
04:11
04:11

FISHER - DIRECT - JACOBS

1   testimony, specifically on February 1, 2013, just a couple of

2   months ago, you filed something with the Federal Reserve

3   and/or FDIC.

4   A.   That sounds about the right date, yes.

04:11   5   Q.   And was that something a certification or an affidavit?

6   A.   That was a certification under that Part 359, yes, or an

7   attempt to do -- we couldn't do a clean one but it was the

8   best we thought we could do, yes.

9   Q.   Now --

04:12   10          MR. JACOBS:   Judge, on this one we can display it,

11   right, number 70?

12          THE COURT:   70, does this objection apply to 70?

13          MS. LEMING:   No, your Honor, it does not.

14          THE COURT:   Okay.  You can display that.

04:12   15          MR. JACOBS:   Okay.  Can we put on the screen the

16   first page of this certification?

17          THE COURT:   I assume this is in evidence.  This is in

18   evidence no objection?

19          MR. JACOBS:   I don't believe there's an objection in

04:12   20   the Pretrial Order.

21          THE COURT:   Okay.  70 is in evidence.

22          MR. JACOBS:   According to my record, there's no

23   objection.

24          MS. LEMING:   Your Honor, there's no objection in the

04:12   25   Pretrial Order because they were late amendments, so we

*United States District Court*
*Camden, New Jersey*

———— FISHER - DIRECT - JACOBS ————

1    weren't provided an opportunity to fully amend and submit

2    objections on all of the --

3           THE COURT:  There's no objection now?

4           MR. TAMBUSSI:  No objection now.

5           MS. LEMING:  No, your Honor.

6           THE COURT:  70 in is in evidence and you may display

7    it to the jury.

8           MR. JACOBS:  Thank you.

9       (PLAINTIFF EXHIBIT P-70 WAS RECEIVED IN EVIDENCE)

10   BY MR. JACOBS:

11   Q.   Now, Mr. Fisher, maybe we can focus in a little bit more

12   on the second paragraph, did you compose that second

13   paragraph?

14   A.   I didn't compose the document.  I believe between legal

15   and counsel they composed and then they asked me for my

16   reading of what I agreed with and there was some back and

17   forth until it was finish, yes.

18   Q.   What does that mean, that lawyers prepared it?

19   A.   Yes, lawyers, it's a legal document so lawyers prepared

20   it.  But before I would sign it, I needed to read it and make

21   sure I was in agreement what was in it.

22   Q.   Now, the second photograph says:  "I have knowledge of

23   the facts stated in this certification based upon my review of

24   business records of TD Bank maintained in the regular course

25   of business and my knowledge of other facts gathered on behalf

101

FISHER - DIRECT - JACOBS

1    of the corporation."

2         Is that right?

3    A.   Yes, sir.

4    Q.   Now, this next sentence:  "I make this certification in

04:14    5    connection with the request for approval to pay Vernon W.

6    Hill, II, (Mr. Hill) certain severance payments pursuant to

7    12 C.F.R. 359.4(a)(4)."

8         Is that what it says?

9    A.   That's what it says, sir, right.

04:14    10   Q.   Now, that sentence, which says:  "Request for approval to

11   pay Vernon Hill," right, that sentence.

12   A.   Yes, sir.

13   Q.   Are you talking in that sentence about requesting

14   approval for the salary and bonus and options in his

04:14    15   employment contract which require golden parachute approval,

16   is that what you're talking about?

17   A.   In this, yes.  The others had already been given

18   permission by the regulators and paid.

19   Q.   You mean the things that were not subject to golden

04:14    20   parachute.

21   A.   Right.

22   Q.   So we're now focusing on things that are subject to

23   golden parachute.

24   A.   Yes.

04:14    25   Q.   The salary, the bonus, the option exercises, whatever

FISHER - DIRECT - JACOBS

1   interest he's entitled to, is that what you're talking about?

2   A.   Yes, sir, sounds right.

3   Q.   What is the date of this document, February 1, 2013?

4   A.   Yes, sir.

04:15   5   Q.   This year?

6   A.   Yes, sir.

7   Q.   This sentence here saying "I'm making this certification

8   in connection with the request for approval to pay Mr. Hill,"

9   to pay Mr. Hill the golden parachute regulated payments?

04:15   10   A.   Yes, sir.

11   Q.   Before February 1, 2013, did you ever sign any other

12   document directed to the Federal Reserve or FDIC requesting

13   approval to pay Mr. Hill the golden parachute payments?

14   A.   Not that I'm aware of, no, sir.

04:15   15   Q.   So the first time you ever put in writing to the Federal

16   Reserve or the FDIC a request, a written request to pay Mr.

17   Hill his golden parachute payments was about ten weeks ago.

18   A.   That I did?

19   Q.   Yes.

04:16   20   A.   Yes.  Not the emails back and forth with counsel and Mr.

21   Hill's counsel and the regulators and Board?

22   Q.   Let's start with you.

23   A.   Okay.

24   Q.   The first time you did it.

04:16   25   A.   Yes, sir.

———— FISHER - DIRECT - JACOBS ————

**1**  Q.   All right.  Are you telling me in your reference to

**2**  emails that there is an email somewhere on the planet issued

**3**  by Commerce or any of its lawyers requesting approval to pay

**4**  Mr. Hill his golden parachute contract entitlements?

04:16  **5**  A.   I reviewed a host of documents, probably about a foot

**6**  tall, I remember there were a number of emails back and forth

**7**  to the regulators and I know they were all about trying to get

**8**  Mr. Hill -- getting approval from the regulators to pay Mr.

**9**  Hill.  But I know many of those emails were in general, they

04:16  **10**  weren't focused just on those golden parachute.

**11**  Q.   All right.  I apologize.  I guess I'm not making the

**12**  question clear.

**13**      Is there a piece of paper on which it is written by

**14**  Commerce Bank or any of its lawyers, we want your approval to

04:17  **15**  pay Mr. Hill his golden parachute contract entitlements which

**16**  predates February 1, 2013?

**17**  A.   Said in that manner?

**18**  Q.   Yes.

**19**  A.   I don't think so that I remember.

04:17  **20**  Q.   Okay.  Now, in the third paragraph of your certification

**21**  do you recite the existence of Mr. Hill's employment contract

**22**  and the termination without cause provisions?

**23**  A.   Yes, sir.

**24**  Q.   And in the fourth paragraph do you -- why don't you just

04:18  **25**  read the fourth paragraph for completeness.

—— FISHER - DIRECT - JACOBS ——

**1**   A.   Pursuant to his Employment Agreement, Mr. Hill's without

**2**   cause severance payment has an estimated value of blank

**3**   million dollars.  In addition, Mr. Hill is contractually

**4**   entitled to payment for unexercised stock options with an

**5**   estimated of blank million dollars.  Mr. Hill also has a

**6**   contractual entitlement to attorney's fees and interest with

**7**   an estimated value of million dollars.

**8**   Q.   Now, let's deal with the first blank without cause

**9**   severance payment, which you estimate to have a value of blank

**10**  million dollars.  Are the components of that salary and bonus?

**11**  A.   To the best of my review of those documents, yes.

**12**  Q.   And let's move onto your second blank, Mr. Hill is

**13**  contractually entitled to payment for unexercised stock

**14**  options.  When you say unexercised stock options, did he try

**15**  to exercise them and not get paid, is that what happened?

**16**  A.   I believe there were emails where I saw that he was

**17**  asking to exercise them but the regulators did not give him

**18**  permission to do so.

**19**  Q.   Well, did anybody request in writing that regulators do

**20**  give him permission to do so?

**21**  A.   I remember seeing emails back and forth asking what they

**22**  should do with that, yes.

**23**  Q.   Again, I'm not making my question clear.  I apologize.

**24**       Did Commerce Bank or any of their lawyers send a letter

**25**  or an email to the regulators saying please approve the

FISHER - DIRECT - JACOBS

1    exercise of Mr. Hill's options?

2    A.   Again, you're being very specific.  And what was

3    occurring during the summer of 2007 was a lot of back and

4    forth, a lot of meetings, phone calls, emails, which I know,

04:19    5    based on my review of all those documents later when asked by

6    you in the subpoena, and there clearly was a lot of discussion

7    back and forth.  I know I remember seeing specific emails on

8    the options, I don't remember who all they were between.

9    Q.   Do you recall seeing one authored by the bank or its

04:20   10   lawyers saying please approve the exercise of Mr. Hill's

11   options so he can be paid, does that exist?

12   A.   Specific just to options?

13   Q.   Yes.

14   A.   Not that I recall that specifically, no.

04:20   15   Q.   You go on to say that Mr. Hill's entitled to blank

16   million dollars for interest and attorney's fees, right?

17   A.   That's what it says, yes.

18   Q.   Now, I realize we're dealing with blanks there so let's

19   just focus on the topics.  Did you say these things in

04:20   20   Paragraph 4 because you had read the contract and you

21   understood it?

22   A.   The first two blanks, yes, but I had read the contract.

23   The third blank the contract does speak about that but I had

24   actually asked back on that because it's a legal opinion and

04:21   25   I'm not an attorney.

FISHER - DIRECT - JACOBS

**1**   Q.   Well, it's your certification, do you stand by it?

**2**   A.   Yes, sir.

**3**   Q.   Is he entitled under this contract to salary, bonuses,

**4**   interest, option exercise, and attorney's fees?

**5**   A.   I really -- from reading the contract again it was two

**6**   years ago or more, that there was something about that if he

**7**   wasn't paid within 30 days, he had the right to that, but

**8**   there was a question back and forth because if they couldn't

**9**   pay because the regulators wouldn't allow it, whether that was

**10**   owed or not.  But again, that was a legal opinion so I asked

**11**   counsel if that was correct and I relied on counsel.

**12**   Q.   Let's look at your Paragraph 5.  In your Paragraph 5 you

**13**   state:  "Pursuant to a Stipulation and Consent Order between

**14**   the OCC and Mr. Hill, dated November 17, 2008, Mr. Hill is

**15**   obligated to $4 million to TD Bank," and you append a copy, is

**16**   that right?

**17**   A.   Yes, sir.

**18**   Q.   Have you read that document?

**19**   A.   Yes, sir.

**20**   Q.   And is that what it says, that Mr. Hill is obligated to

**21**   pay $4 million to TD Bank?

**22**   A.   I think the way it actually said it was based on any

**23**   settlement, he was to credit back or credit off $4 million to

**24**   the final amount, it was something of that nature.  But, yeah,

**25**   I remember reading the document and it referenced that amount.

*107*

FISHER - DIRECT - JACOBS

1           MR. JACOBS:  Can we see P-53, Page 5.  I guess you

2   ought to start with Page 1, I take it back.

3   BY MR. JACOBS:

4   Q.   Is this the document?

04:22   5   A.   Yes.  It appears to be it, yes.

6   Q.   Okay.  Now, does it say "Stipulation and Consent Order?"

7   A.   Yes, sir.

8   Q.   All right.  Now, we know it's the document.  We'll come

9   back to this first page but now let's go to Page 5 and let's

04:23  10   look at Article VI.

11           MR. JACOBS:  Can we make that bigger?  We want Page 5

12   -- right there, Article IV.  Can we make that a bit bigger

13   maybe?  Okay.

14   BY MR. JACOBS:

04:23  15   Q.   This says Monetary Payments.  Now does it read:

16   "Respondent shall pay to TD Bank the sum of $4 million."  You

17   said that part in your certification, right?

18   A.   Yes, sir.

19   Q.   Okay.  But it goes on, doesn't it:  "In the form of an

04:24  20   offset."  Do you know what an offset is?

21   A.   That means it's subtracted from.

22   Q.   Subtracted from what?

23   A.   If there's an agreement, an amount, a final payment, just

24   what I just said about a couple minutes ago.

04:24  25   Q.   Subtracted from what, though?  Can you subtract it from a

─────── FISHER - DIRECT - JACOBS ───────

1   smaller amount?

2   A.   To an agreed-upon sum to be paid by TD Bank to the

3   respondent, yes.

4   Q.   All right.  "$4 million in the form of an offset to an

04:24   5   agreed-upon sum to be paid by TD Bank to respondent," right?

6   A.   Yes, sir.

7   Q.   Now, is it clear to you that that agreed-upon sum would

8   have to be more than $4 million for this to make any sense?

9   A.   In order for it to be an offset, that would make sense.

04:24   10   Q.   Right.  And they use the word "offset," right?

11   A.   Yes, sir.

12   Q.   So it's not just an Order that Mr. Hill write a check for

13   $4 million, what this actually says is that when TD pays him

14   more money, they're going to get a deduction of $4 million,

04:25   15   right?

16   A.   That sounds correct.

17   Q.   And this is an Order prepared by a federal bank

18   regulatory agency, isn't it?

19   A.   Yes, sir.

04:25   20   Q.   The OCC.

21   A.   I believe so, yes.

22   Q.   "In the form of an offset to an agreed-upon sum to be

23   paid by TD Bank to respondent resolving all litigation between

24   them," right?

04:25   25   A.   Yes.

*United States District Court*
*Camden, New Jersey*

───── FISHER - DIRECT - JACOBS ─────

1   Q.   The day it was signed, was there in fact litigation

2   pending between Mr. Hill and his wife and TD Bank?

3   A.   This was 2008?

4   Q.   Yes.

5   A.   I believe there was already litigation, yes.

6   Q.   And is that what the reference was to?

7   A.   I would assume so.  Again, the OCC wrote it.

8   Q.   Let's go back to the first page.  Okay.  Now, have you

9   read this first page before today?

10  A.   Yes, sir.

11  Q.   Okay.  And you're familiar with its contents?

12  A.   Yes, sir.

13        MR. JACOBS:  Okay.  Can we make that second whereas

14  paragraph bigger?

15  BY MR. JACOBS:

16  Q.   In the fifth line do you see the phrase "solely for the

17  purposes of this settlement?"

18  A.   "Solely for the purposes of this settlement," yes, sir.

19  Q.   So you were aware -- were you aware of all this when you

20  composed your February 1, 2013, or when you reviewed this

21  February 1, 2013, certification composed for you?

22  A.   Yes, sir.

23        MR. JACOBS:  Now, can we go to the second page of

24  this certification?

25  BY MR. JACOBS:

FISHER - DIRECT - JACOBS

1  Q.   And in Paragraph 6 we see another blank where you say:

2  "The amount of the golden parachute payment to Mr. Hill would

3  be blank million dollars," right?

4  A.   Correct.

04:27  5  Q.   And the seventh paragraph who do you say is obligated to

6  pay this blank million dollars?

7  A.   TD Bank U.S. holding company is the entity that would be

8  making the severance payment.

9  Q.   What does Paragraph 8 say?

04:28  10  A.   "The cost of the proposed settlement will not have a

11  material impact on the bank's capital or earnings."

12  Q.   What does that mean?

13  A.   Under the regulation, I believe it was required that we

14  have to show that payment of golden parachute payments would

04:28  15  not materially damage the bank, and they would not.

16  Q.   Is this the same TD Bank that bought Commerce for

17  $8.5 billion?

18       MR. TAMBUSSI:  Objection, your Honor.

19       THE COURT:  Sustained.

04:28  20       MR. TAMBUSSI:  Thank you.

21       MR. JACOBS:  Judge, that's in evidence already.

22       MR. TAMBUSSI:  It's not.

23       MR. JACOBS:  Yes, it is.  It is in evidence through

24  the testimony of Mr. DiFlorio, Mr. DiFlorio for one, which we

04:28  25  just played yesterday and I think through --

*United States District Court*
*Camden, New Jersey*

         1          THE COURT:  If it's in evidence, why do you have to

         2   ask it again?

         3          MR. JACOBS:  Well, because of the context of

         4   Paragraph 8, Judge.

04:28    5          THE COURT:  He just said it would not effect this

         6   bank's --

         7          MR. JACOBS:  Okay.

         8          THE COURT:  -- materially effect this bank's

         9   earnings.

04:29   10          MR. JACOBS:  All right.  But it is in evidence,

        11   Judge.

        12          THE COURT:  Fine.  I accept your representation.  If

        13   it's in evidence, we don't need to do it again.  Trust me, the

        14   jury gets it the first time.

04:29   15          MR. JACOBS:  I know.

        16   BY MR. JACOBS:

        17   Q.  Now, Paragraph 9 is a big long paragraph.

        18   A.  Yes, sir.

        19   Q.  And can I safely assume that you have both read it and

04:29   20   understand it?

        21   A.  Yes, sir.

        22   Q.  Does it start out with the reference to the golden

        23   parachute regulation, 12 C.F.R. 359.4?

        24   A.  Yeah, I keeping referring to it as Part 359, that's why.

04:29   25   Q.  Fair enough.

─────────── FISHER - DIRECT - JACOBS ───────────

1    Now, in this lengthy paragraph, which goes onto the

2    next page, do you or don't you say that the bank cannot

3    certify that it doesn't possess and didn't know of information

4    and documents which would indicate there's a reasonable basis

04:30    5    to believe that Mr. Hill has committed a fraudulent act or

6    omission, breach of trust, substantially responsible for

7    insolvency or troubled conditions, materially violated

8    applicable federal and state banking regulations, and so on,

9    did you say all that?

04:30    10   A.    Yeah.

11   Q.    Did you miss anything in the regulation or did you cover

12   every blessed thing that's recited in the regulation?

13   A.    If I recall, this is when they listed the entire

14   regulation.

04:30    15   Q.    The entire regulation.

16   A.    At least this part that is referenced here.

17   Q.    You filed a certification, which you recognize is a form

18   of swearing under oath?

19   A.    Yes, sir.

04:30    20   Q.    You filed a certification saying that the bank cannot

21   tell you that it doesn't have information giving it a

22   reasonable basis to believe that Mr. Hill did all this stuff.

23   A.    I'm sorry, were you asking a question?

24   Q.    Yeah.

04:31    25   A.    Could you repeat the question, please?

———— FISHER - DIRECT - JACOBS ————

1   Q.   You filed a certification to the regulators saying the

2   bank can't tell you that it does not have information giving

3   it a reasonable basis to believe that Mr. Hill did, and then

4   you listed every single thing in the regulation, right?

5   A.   Yes, sir.  Although I think you added a word there,

6   didn't you?  Go back up a little bit, please.  This is what

7   you and I went back and forth on in that deposition, which the

8   jury got to hear, where you kept asking if the bank had come

9   to a conclusion if Mr. Hill committed any of these issues, he

10  committed a breach of fiduciary duty or trust, insider abuse,

11  and that's not what the regulation says.  And the bank was

12  pretty careful not to come to a conclusion that they are being

13  a regulator and determine if he did or did not.  They were

14  following the regulation to determine if they could do this

15  certification, do they have any documents, evidence, or any

16  other information which gives a reasonable basis to believe he

17  may have done them.

18  Q.   And you're saying you do.

19  A.   Yes, sir.

20  Q.   Okay.  What information do you have that he violated

21  Section 215?  That's in your certification, isn't it?  Isn't

22  it?

23  A.   Yes, sir, the entire regulation was listed, that's

24  correct.

25  Q.   Look at Roman numeral number four:  "Has violated or

*United States District Court*
*Camden, New Jersey*

────── FISHER - DIRECT - JACOBS ──────

1    conspired to violate Section 215," do you see that?

2    A.   Yes.

3    Q.   "Receipt of commissions or gifts for procuring loans."

4    Tell me the information in the possession of the bank to give

04:33    5    you a reasonable basis to believe that Mr. Hill violated

6    Section 215, "receipt of commissions or gifts for securing

7    loans."

8    A.   I don't believe there is any.  We basically stated in --

9    what I was stating here, we could not certify to that entire

04:33    10   Section 359 and the regulators even came back and asked ask us

11   to clarify and we did.

12   Q.   The next thing you recite is Section 656, you're saying

13   you can't tell the regulators you don't have a reasonable

14   basis to believe -- you're telling the regulators that you

04:33    15   have documents or information which give a reasonable basis to

16   believe he violated Section 656, "theft, embezzlement,

17   misapplication by bank officer or employee."  What document or

18   information is that?

19   A.   Well again, that's why this is all one paragraph, we were

04:33    20   answering that we cannot provide the certification required

21   under Part 359 and so we listed the entire item.  The actual

22   regulators came back and said that's a big paragraph, can you

23   please clarify and we did provide clarification.

24   Q.   You even told the regulators in this paragraph that you

04:34    25   couldn't say that you lacked information or evidence giving

1  you a reasonable basis to believe that Mr. Hill violated

2  Section 1014, "loan and credit applications, renewals,

3  discounts, and crop insurance," you even put that in, didn't

4  you?

04:34  5  A.   We quoted the entire regulation, yes, sir.

6  Q.   According to the entire regulation, did you realize you

7  were telling the regulators that you were unable to say,

8  Federal Reserve and FDIC, we don't have any information giving

9  us a reasonable basis to believe that Mr. Hill violated, for

04:35  10  example, crop insurance, theft, embezzlement, commissions or

11  gifts for procuring loans, do you realize what you were doing?

12  A.   No, sir, I disagree with that.  What we were doing was

13  stating we did not have documents, information, or evidence

14  which gave a reasonable basis to believe that we could file

04:35  15  this certification and then we quoted the regulators own

16  language back to the regulators.  And again, that's why they

17  came back and said can you be more clear and we gave them a

18  supplement to this getting more clear.

19  Q.   When you gave them a supplement to this, you eliminated

04:35  20  about two thirds of the claims that you claimed you couldn't

21  certify, didn't you?

22  A.   Yes.  Picture having 359, I don't know if you had it up

23  there before, but you have a list of all these different items

24  and it's been the bank's goal from the beginning is to find a

04:36  25  way that we could get permission to issue these payments and

FISHER - DIRECT - JACOBS

1    resolve this.  So what we did the first time was we said,

2    look, we can't make this certification, here's the rule.

3    However, we can have Mr. Hill's testimony, give it, will you

4    accept that.  They came back with -- because the response of

04:36    5    the regulators is always either yes, no, or give us more

6    information, can you change things, the regulators can

7    basically ask whatever they want.

8         In this case they asked us for two items and one item

9    was that the regulation also requires that we actually give

04:36    10    them a copy of the settlement agreement, which we didn't have,

11    the other item was can you clarify that you really mean the

12    entire regulation or are you really focusing on just a certain

13    part you can't certify to.  And so we did an addendum, we did

14    an excerpt of the certification, gave them that supplement

04:36    15    that said, well, no, we can rule out all these things that

16    don't apply, such as -- we didn't find anything, there's no

17    documents that I'm aware of that would say anything that he

18    embezzled any money, there was nothing to say the bank was

19    being liquidated, because it wasn't.  So pretty much have to

04:37    20    take the two together.  The first is what was done.  The

21    second, the regulators came back and said, hey, please

22    clarify, and we clarified.

23    Q.  So if you're admitting now that there's no document and

24    no information saying he embezzled money, why did you put it

04:37    25    in Paragraph 9?

─── FISHER - DIRECT - JACOBS ───

**1**   A.   Again, we quoted the entire regulation.  It was the

**2**   regulator's rule, we quoted it for them.  We weren't going to

**3**   change the regulator's language.

**4**   Q.   Let's see if we can get your Paragraph 10 on the screen.

04:37  **5**   See your Paragraph 190?

**6**   A.   Yes, sir.

**7**   Q.   Does it start out:  "In light of the investigation

**8**   conducted by the OCC, in conjunction with the Federal Reserve,

**9**   and in consideration of related facts, the bank's Board of

04:38  **10**  Directors could not, and can't, in good faith, provide the

**11**  certification required under 12 C.F.R. 359.4(a)(4)," is that

**12**  what it says?

**13**  A.   Yes, sir.

**14**  Q.   Will you tell me the date the Board of Directors of the

04:38  **15**  bank considered this?

**16**  A.   Again, in my review of the documents, my review of the

**17**  Board meetings, my interview with the Board's counsel that was

**18**  giving them direction on ways to get Mr. Hill paid, on

**19**  discussions with the regulators was that there was ongoing

04:38  **20**  discussion with them.  There were updates at every Board

**21**  meeting.  I know there was at one point a vote which said,

**22**  look, we want you to do what you can to get him paid and the

**23**  attorneys were working on that.  That was really what

**24**  initiated all those emails and meetings and conferences and

04:38  **25**  Board members going to Washington, et cetera, in searching how

————— FISHER - DIRECT - JACOBS —————

1    they could get this paid.

2    Q.   The date?

3    A.   Sorry?

4    Q.   Do you remember my question?

04:39    5    A.   I believe you asked the date -- can you ask the question

6    again, please?

7    Q.   Sure.  In your first sentence you make the claim:  "The

8    Board of Directors could not, and cannot, in good faith,

9    provide the certification."  All I asked you is tell us the

04:39    10   date that the Board of Directors met and decided that?

11   A.   I interviewed most of the Board of Directors and asked

12   them those questions and they said they could not provide that

13   certification.

14   Q.   What year did you do that?

04:39    15   A.   It was the same year in the deposition with you, so that

16   would have been two years ago.

17   Q.   You're talking about 2011?

18   A.   Yes, sir.

19   Q.   So you're talking about Board of Directors of the former

04:39    20   Commerce Bank?

21   A.   Yes, sir.

22   Q.   Okay.  Was there ever -- should we understand this to be

23   a reference to the Board of Directors of TD Bank?

24   A.   I think it would probably apply to both.

04:40    25   Q.   Well, you wrote it and you don't say which, that's why

─────── FISHER - DIRECT - JACOBS ───────

1   I'm asking the question.  When you say Board of Directors,

2   tell us who you're talking about.

3   A.   I would say that it actually would apply to both.   It

4   would apply to what occurred before but if this date is now

04:40   5   2013, now it would be referring to the current Board that

6   would have responsibility over was Commerce Bancorp.

7   Q.   Thank you.

8        The jury has heard from directors of Commerce Bank so

9   now I want to focus in on TD Bank.  Tell me the date the Board

04:40   10   of Directors of TD Bank discussed this and determined they

11   could not provide the necessary certification?

12   A.   I've not reviewed Board meetings from the current Board,

13   but I have discussed and interviewed counsel that's providing

14   information on this.

04:41   15   Q.   You talked to lawyers?

16   A.   Yes, sir.

17   Q.   Lawyers for the bank?

18   A.   Yes, sir.

19   Q.   Lawyers for the bank obligated to pay over $17 million,

04:41   20   that's the lawyers you talked to?

21   A.   Yes, sir.

22   Q.   Okay.  I want to get back to Board of Directors meetings,

23   and what I want to know specifically, if you can help me with

24   it, did the Board of Directors of TD Bank, they're obligated

04:41   25   to pay, right?

FISHER - DIRECT - JACOBS

**1**  A.   On behalf of the Commerce Bancorp, yes.

**2**  Q.   Yeah.  Did the Board of Directors of TD Bank, N.A., as

**3**  far as you know, did they ever a Board of Directors meeting

**4**  and did they review this and decide what they could and what

04:41  **5**  they could not say about Mr. Hill to get him paid?

**6**  A.   It would be the holding company not TD Bank, N.A.

**7**  Q.   Did they?

**8**  A.   I'm not aware.  I was not made privy to the Board

**9**  meetings.  So I have not looked into that.

04:41  **10**  Q.   So it sounds like you don't know whether the Board of

**11**  Directors of TD Bank ever even considered this matter.  Do

**12**  you?

**13**  A.   I don't have direct proof of that, no.  But I again been

**14**  working with their counsel.  I know there's been discussions.

04:42  **15**  I know counsel has given opinions.

**16**  Q.   You go on in this paragraph number ten to say the Board

**17**  reasonably believes that it cannot make the requisite

**18**  certification at a minimum.  Now those are your words.  Right?

**19**  A.   I cannot in good faith provide the certification required

04:42  **20**  under part 359.

**21**  Q.   Okay.  Have you read that regulation 359?

**22**  A.   Yes.

**23**  Q.   Does it use the word certification anywhere?

**24**  A.   No, sir.  At least that I recall.

04:42  **25**  Q.   Did you get that from a lawyer?

*United States District Court*
*Camden, New Jersey*

FISHER - DIRECT - JACOBS

1  A.  No, sir.  That -- there's a publication by the Federal

2  Deposit Insurance Company that actually gives a, it's called a

3  letter and they have letters that help you understand these

4  regulations because the regulations are very complex.  And

04:42  5  there's a letter 66 that describes in a little more plain

6  English how to apply this part 359 and certification I believe

7  came from there.

8  Q.  And the regulation itself says you got to demonstrate --

9  A.  Correct.

04:43  10  Q.  You got to demonstrate that you don't have information

11  giving you a reasonable belief, a reasonable basis to believe

12  that the person to receive the payment did any of these

13  things.  Right?

14  A.  Yeah.  You keep putting in you in there.  The actual

04:43  15  regulation says and what the Bank has to certify in the

16  negative to basically like a double negative.  The Bank has to

17  certify that it does not have information, documents other

18  material that gives a reasonable basis to believe.  That

19  doesn't require the Bank to come to a decision whether it is

04:43  20  or whether it didn't and the Bank didn't want to take the

21  place of a regulator.  The Bank just had to certify that it

22  did not have documents, evidence, information or other

23  material which gives a reasonable basis.  Unfortunately, given

24  that OCC document that you showed us just prior, the OCC

04:44  25  itself found that there was a breach of fiduciary duty by Mr.

FISHER - DIRECT - JACOBS

1  Hill.  The Board couldn't ignore that.  So we can't complete

2  that certification.

3  Q.  So you're basing it all on that November 2008 agreement

4  that Mr. Hill reached settling his differences with the OCC?

04:44    5  A.  No, sir.  You and I went through must have been over a

6  foot high of documents.

7  Q.  In your paragraph ten you go on to explain reasons that

8  the Board cannot make this certification is necessary.  And

9  you say at a minimum as a result of an investigation which

04:44   10  triggered the entry of the cease and desist order between

11  Commerce and OCC.  What do you mean by that?

12  A.  Can you tell me where you are?  How far down.

13  Q.  Paragraph ten, the very next sentence.

14  A.  Yes, sir.  What's the question again, please?

04:45   15  Q.  The question is:  Why did you say this?  The Board

16  reasonably believes it cannot make the requisite certification

17  at a minimum as a result of the investigation which triggered

18  the entry of the cease and desist order between Commerce Bank

19  and the OCC in June of 2007.  Why do you say that?

04:45   20  A.  Based on my review of the documents, based on my review

21  and interviews with the Board members, based on my review with

22  counsel that was responding giving counsel both to that Board

23  and now to the TD's Board, it was abundantly clear based on

24  all those documents, including the OCC finding that there was

04:45   25  a breach of fiduciary duty that they could not complete that

———— FISHER - DIRECT - JACOBS ————

1   certification.

2   Q.   You're talking about counsel for Commerce and counsel for

3   TD?

4   A.   Yes, I'm thinking particularly of Richard Alexander who I

)4:46   5   interviewed.

6   Q.   So you're taking lawyers' opinions.

7   A.   Yes.

8   Q.   Okay.  Now, what is there about this cease and desist

9   order in June of 2007 which in your mind prevents you from

)4:46   10  saying you don't have a reasonable basis to believe Vernon did

11  anything wrong?

12  A.   I have to think back to all the different documents.  I

13  believe the cease and desist order was relative to insider

14  transactions, real estate transactions, both conditions of

)4:46   15  what the Bank would have to do to avoid either the perception

16  of the actual abuses and what it needed to do in the future to

17  make sure they didn't exist.  So, that document and that

18  language, the document itself gives a reasonable basis to

19  believe that it happened.

)4:46   20  Q.   To believe what?

21  A.   That there -- Mr. Hill could have breached his fiduciary

22  duty, committed insider abuse.

23  Q.   How?

24  A.   Through insider real estate transactions.

)4:47   25  Q.   The one that the SLC examined?

———— FISHER - DIRECT - JACOBS ————

**1**  A.   Yes.

**2**  Q.   The ones that the SLC found were favorable deals for the

**3**  Bank right down the line, those real estate transactions?

**4**  A.   The SLC did find that the cost on them was certainly, I

04:47  **5**  think I the word was propitious to the Bank, but they also

**6**  found questions on I think 8 of the leases, two of which were

**7**  very minor but six needed further work or negotiation, yes.

**8**  Q.   So is that -- but the SLC report, you remember it, don't

**9**  you?

04:47  **10**  A.   It was a very long report, but I read it a couple of

**11**  times.

**12**  Q.   Do you remember the part which said specifically we'll

**13**  try to negotiate these things, but we're not going to push it

**14**  too hard because we don't want to lose these good leases.

04:47  **15**  Remember that part?

**16**  A.   I don't recall it saying it that way but I know the

**17**  intent if I recall from reading it was that they didn't want

**18**  to lose that propitious price in fixing what they knew had to

**19**  be fixed in order to fill the regulators' requirement.

04:48  **20**  Q.   They didn't want to jeopardize the lease.

**21**  A.   They wanted to have the best of everything they could, of

**22**  course.

**23**  Q.   Have their cake and eat it, too?

**24**  A.   Sure.

04:48  **25**  Q.   That was the Bank's viewpoint on those leases?

─────── FISHER - DIRECT - JACOBS ───────

1    A.   If possible.   The primary was make sure they fulfilled

2    the Regulators' requirement because they were under very close

3    scrutiny.

4    Q.   All right.   Let's go on to the next thing you say.   The

04:48    5    OCC and Federal Reserves lent the investigations were directed

6    primarily at the potential conflicts of interest arising from

7    Hill's relationship with relatives and close business

8    associates and in connection with real estate development

9    projects for new branch offices.   That's the next thing you

04:48   10    said.   Right?

11    A.   Yes.

12    Q.   Did you say anything about Mr. Hill, this is 2013.   Did

13    you say anything about Mr. Hill having withdrawn from those

14    companies 11 years earlier?

04:48   15    A.   Not in this document, no.

16    Q.   But you know that's accurate, don't you?

17    A.   I recall in my review of documents that there was

18    information regarding his separating himself from certain real

19    estate transactions.

04:49   20         MR. JACOBS:   Can we see number 50.

21    Q.   And tell me in the document that you recall, July 9, 2002

22    to avoid any appearance of a conflict, Mr. Hill separating

23    himself from these landlord real estate companies.   Is this

24    the document you're talking about?

04:49   25    A.   I don't recall if I read that specifically.   I remember

*United States District Court*
*Camden, New Jersey*

*126*

FISHER - DIRECT - JACOBS

1    references to this and I may have reviewed it.  Again there

2    were a lot of documents.

3    Q.   Let's go to the second page?  Look at the top of page

4    two.  To avoid any perception issue, I, therefore, propose to

04:49    5    sever my relationship with that portion of the site

6    development group that does business with Commerce as of

7    July 30, 2002 as follows.  You see this document?

8    A.   I do see the document, yes.

9    Q.   Okay.  You didn't say anything about this document Mr.

04:50    10    Hill having pulled out of those real estate transactions

11    11 years earlier.  You didn't say anything like that in this

12    certification?

13    A.   The certification?

14    Q.   Yeah.

04:50    15    A.   No.  The regulators were already aware of that.  In fact,

16    I recall it was either an e-mails or no discussion back and

17    forth back in 2007 when they were issuing the Consent Order

18    where it was questioned the Bank's attorneys questioned back

19    to say well, what about your prior findings.  What about these

04:50    20    other items.  And the regulator's opinion was well --

21         MR. JACOBS:  Judge, I object to the response.  He's

22    making an opinion which is hearsay.

23         MR. TAMBUSSI:  Judge, number, it's not being offered

24    for the truth.

04:50    25         THE COURT:  It's not being offered for the truth.  So

*United States District Court*
*Camden, New Jersey*

─── FISHER - DIRECT - JACOBS ───

**1**  it's not hearsay.  And you should let him finish his answer

**2**  before you interrupt.

**3**          MR. JACOBS:  Judge --

**4**          THE COURT:  If it's not responsive, then you can seek

04:51  **5**  the assistance of the court.

**6**          MR. JACOBS:  All right, Judge.  Ordinarily,

**7**  responsiveness objection we're told to make it before not

**8**  after.

**9**          THE COURT:  How can you make it before you hear the

04:51  **10**  answer?

**11**          MR. JACOBS:  Well, when you hear the prelude before

**12**  it's coming.

**13**          THE COURT:  I'm not in a position to make a ruling

**14**  until I hear an answer.

04:51  **15**          MR. JACOBS:  All right.

**16**          THE COURT:  Do you want to continue your answer?  Do

**17**  you remember where you were?

**18**          THE WITNESS:  I believe so.

**19**          THE COURT:  Continue

04:51  **20**   your answer, please.

**21**  A.   Sure.  The Bank had questioned back to the regulators

**22**  regarding that Mr. Hill had separated himself and the

**23**  regulator's answer was that the time thing was not favorable

**24**  to what they were reviewing and that the damage had already

04:51  **25**  been done is I believe the language from the special

*United States District Court*
*Camden, New Jersey*

─── FISHER - DIRECT - JACOBS ───

1   litigation committee report.

2   Q.   From the special litigation committee report?

A.   Or it could have been an interview.  It could have been
an interview with one of the bank attorneys or it could have
been the memorandum back to the Board regarding the 2007 when
the I initial report came out from the Fed and the OCC.  Again
there were a lot of documents.  I'm trying to remember
everything I heard and saw and put that together to answer
your questions.

Q.   In the documents you reviewed, did you see that the OCC
regularly examined these type of insider transactions?  Did
you see that?

A.   I didn't see those examinations, but I saw reference to
it.  In fact, in the time I was just telling about, that was
one of their questions back was, well, you were aware of many
of these issues before and the OCC responded that they had had
other interviews and other information from outside parties
and that their prior findings were not relevant to today.

Q.   All right.  Tell me if you saw this document among those
that you reviewed, number 51 which is a memo by general
counsel to Commerce.  Mr. Bono December 14, 2006.  Have you
ever read this over?

            (Brief pause)

A.   I don't recall seeing that specifically, no.

Q.   Take a look at the second page which is where my interest

FISHER - DIRECT - JACOBS

is.  You see the topic heading Prior Examinations?

A.   Yes, sir.

Q.   Is it true or not that the Federal Reserve or the OCC in the years 2002, 2003, 2004 and 2006 examined Commerce Bank insider transactions and gave them a clean bill of health?

A.   Again, I'm not aware of reviewing anything directly on that point, but again I saw the reference to the Bank's counsel questioning the Regulators about prior examines.  This certainly could be what they were referring to.

Q.   The third thing rely on is Bank branches being constructed with the design and architectural services of InterArch, Inc.

        MR. TAMBUSSI:  Judge, going back to the certification?

        MR. JACOBS:  Yes.

        THE COURT:  Okay.

        MR. JACOBS:  You can take that down.

Q.   Owned by Mr. Hill's wife.  Is that the third thing you referred to?

A.   I'll take a look at the document, sir.

Q.   Paragraph ten.  If we can get that back up for you.  Is that what you said bank branches?

A.   Yes, sir.

Q.   Okay.  When you did this on February 1st of this year, did you know that the SLC had, had investigated the InterArch

FISHER - DIRECT - JACOBS

Commerce relationship and reported on it?  You know that?

A.   I know that was part of what they reviewed, including the DiMaria matter.  I don't remember if they reviewed the overall but I think they did.  I remember seeing multiple employment agreements and discussions on -- between the Regulators and the Bank and the Bank's attorneys regarding InterArch and I know there was one question whether InterArch would be brought in house.  There was another one, whether there was a contract with InterArch.  So I saw a lot of e-mails related to InterArch, yes.

Q.   I'm asking you about the special litigation committee report.  You've read it?

A.   Yes, sir.

Q.   You know what's it in?

A.   A very large document, but I've read it a couple of times, yes, sir.

Q.   When you prepared this or when you signed this certification on February 1st of this year, did you know that almost five years earlier the special litigation committee had reported on InterArch and its dealings with Commerce?  You know that?

A.   I remember that InterArch was in the special litigation committee report.  I don't remember the details offhand.

Q.   Do you remember that the special litigation committee report said every single executive and employee of Commerce

FISHER - DIRECT - JACOBS

that was interviewed said InterArch did a good job and gave

them a good value for their money?

A.  I remember there were positives statements.  I remember

their questions regarding money that may have been paid back,

)4:56   but I know that there was overall.  In fact I think I saw some

things that said it would have been difficult to find someone

to provide all the services they provide.  So, yes.

Q.  Did you know when you signed this that the special

litigation committee report made absolutely no finding of

)4:57   wrongdoing regarding InterArch?

A.  I don't recall if it was the special litigation committee

or not.  I remember there were issues with InterArch where

they owed money back to the Bank.  And I know there was

litigation actually that went regarding the DiMaria matter

)4:57   which eventually got shut down and I know there were questions

regarding whether there was a contract in place or not with

them.  In fact, there was litigation between the Bank and

them.  So there was a lot of questions.  I don't recall

specifically what were the answers in the special litigation

)4:57   committee report.

Q.  Do you remember the special litigation committee report

finding that InterArch was uniquely suited to meet all of the

needs of Commerce?

A.  Again, I remember there were positive things such as that

)4:57   matter I don't remember if that's the exact language.

FISHER - DIRECT - JACOBS

Q.   Did you say any of those positive things in this February 1st certification that you did just a few weeks ago?

A.   The certification?

Q.   Yeah.

A.   No.  The certification wasn't asking for the positives. It was asking if we could certify based on part 359 which is why we quoted part 359.

Q.   When you signed this on February 1st, did you realize that InterArch was working with Commerce Bank for more than three decades and was responsible to developing the Commerce brand in the opinion of every Director?

A.   I don't believe I asked every Director their opinion.  I was very aware that InterArch was integrally involved with Bank and with the designs just from my work with the Bank.

Q.   Before you signed this on February 1st, in the weeks before, did you, by any chance, speak again to Mr. DiFlorio who testified here or Mr. Pauls who testified here or Mr. Buckelew who testified here, or Mr. Lloyd who testified here? Have you spoken to any of them in the weeks before you signed this?

A.   Did I speak to them again after?

Q.   Yeah.  The weeks before you signed.

A.   I don't believe so, no.

Q.   How about the last time you spoke to them was in back March of 2011, I'll bet?

FISHER - DIRECT - JACOBS

A.   Probably talked to Mr Norcross or Mr. Buckelew since then but it wouldn't have been related to this matter.

Q.   The next thing you say is Mr. Hill admitted that unsafe practices occurred during his tenure at Commerce in response to OCC assertions that the Bank, that the Bank application, the Bank engaged in unsafe practices by submitting material false branch application information.  And Mr. Hill wrote response that is true only in an extremely limited number of isolated cases.  Is that what you put in there?

A.   Yes.  That was a quote from the consent order issued by the OCC in 2007.  And then a memo from Mr. Hill.

Q.   Wait.  Wait.  Hold on.

A.   All right.

Q.   You stay it's a quote?

     MR. TAMBUSSI:  Judge, he's got to let him complete his answer.

     THE COURT:  Let him finish.

Q.   Okay.  Go ahead.

A.   That was put in in response, first language there was from the OCC's, issuance of a Consent Order in 2007.  And then that night into the following day evidently Mr. Hill I remember looking at a memo.  I don't remember if it was to Doug Pauls or back to counsel where Mr. Hill was responding and going through the entire Consent Order and giving his opinions on what was in there and what should be done.  And

FISHER - DIRECT - JACOBS

that was a quote from Mr. Hill, yes.

Q.   Thank you.  Now, are you talking about a quote from Mr. Hill regarding a draft of the June Consent Order, the June 2007 Consent Order?

A.   I think that sounds right, yes.

Q.   The actual Consent Order was executed June 28, 2007.  Is that right?

A.   That sounds right.

Q.   Have you read it?

A.   Yes, sir.

Q.   Does it have a peep in it, a peep about false branch application information?  Does it have a word in it about that footnote?  Anything?

A.   I would have to review it begin.  I recall the draft and I recall the issuance.  I read them both.  But in order to differentiate one from the other, I have, I have to look at it again.  That was two years ago.

Q.   So you don't recall right now whether the June 28, 2007 order has a single word in it about false branch applications?

A.   I don't recall specifically, no, sir.

Q.   Whose job was it to do branch applications?  Was that Mr. Hill's job as CEO of a 450 branch Bank to do application forms?

A.   I don't know specifically whose job was the final responsibility.  When I was interviewing people and reviewing

*135*

FISHER - DIRECT - JACOBS

documents, the answer was that Mr. Hill was involved in every

step of real estate.

Q.   Who is David Wochek?

A.   David Wochek I believe he works for the Bank or worked

05:02   for the Bank in the real estate department.

Q.   What was his job?

A.   I'm not sure what all his responsibilities were.

Q.   So you don't know whether he was in charge of branch

application completion?

05:02   A.   No, sir.

Q.   Do you remember in the special litigation committee

report their finding that Mr. Hill told Mr. Wochek to go check

on the revision of the branch application form regarding

disclosures of insider information?

05:02   A.   Don't remember specifically, but I remember there was

back and forth as to whether especially on those six items,

the six -- no, that was the real estate.  I'm sorry.

Q.   I think you want to say three?

A.   Yeah, there were, I think it was three.  Again it was a

05:03   big report.  But there were questions on three that were not

-- where the information on Mr. Hill's ownership or interest

in the landlord, that was part of the deal were disclosed and

there was question over whether things needed to be re-filed

or not.

05:03   Q.   Do you remember what the SLC said about all that?

─── FISHER - DIRECT - JACOBS ───

A.   I believe the final answer was that they didn't need to re-file.

Q.   Do you remember what else the SLC said about that, no way to tell whether this was just a good faith mistake or anything else?  Right?

05:03

A.   I don't recall that.  But it could be.

Q.   The last thing I get into was the Bank cannot disregard the November 17, 2008 stipulation and Consent Order between the OCC and Mr. Hill which we discussed earlier.  Right?

05:03

A.   Yes.

Q.   And you see now that on Page 5, it is contemplated that Mr. Hill will receive money from TD Bank and allow a $4 million deduction?

A.   From that section, yes, there was a 4 million, that there would be 4 million reduced from any settlement.  I think it said to settle all litigation between them.

05:04

Q.   Now, the next certification that you prepared, I'm not going to put on the screen, so I will give you a copy for your reference.

05:04

          THE COURT:  Put it on his screen.

          MR. JACOBS:  Are we able to do that?

          THE COURT:  I don't know if you're able to do it.

          MR. JACOBS:  I'm not.  Can we do that?  I'm asking a tech person.  No?

05:04

          MR. LUBIN:  I can put 71 up.

──────── FISHER - DIRECT - JACOBS ────────

        THE COURT:  On his screen and counsel's screen and my screen.  Just don't put it on the TV screens.  If you can't do it, just give him a written copy.

        MR. JACOBS:  I think that would probably be easier, Judge.  Where's the other booklet?

        THE COURT:  I have your binder here.

        MR. JACOBS:  Oh, I gave it to you, that's where it is.

        THE COURT:  How about if I give it to the witness.  You want him to look at 71?

        MR. JACOBS:  That will be a help.  Thanks, Judge.  I forget I gave it to you.

        THE COURT:  Always trying to help.

        MR. JACOBS:  Thank you.

        THE COURT:  That's what he wants you to look at.

        THE WITNESS:  Thank you.

BY MR. JACOBS:

Q.  Okay.  Are you there?

A.  Yes, sir.

Q.  All right.  Now, is this another certification that you signed, this one on April 15, 2013, which is just, what, three weeks ago?

A.  About that.  But it was not another certification.  It was supplemental to the certification.

Q.  Fine.  I'll accept the amendment.

————— FISHER - DIRECT - JACOBS —————

             Again, did you prepare this or was it prepared by

lawyers and given to you for execution?

A.   It would have been prepared by legal and defense counsel,

and I would have reviewed it and gone back and forth until we

05:05    were both happy with it.

Q.   Okay.  Now, is this the one, where, because the OCC --

I'm sorry, the federal reserve told you you were being over

broad, you took out about two-thirds of the things recited in

the golden parachute reg 359.4?

05:06    A.   Yes, we looked closely at that.  Again, if you look at --

and imagine regulation and there's all these numbers, and the

regulators asked us, was there anything you can knock out, and

we basically went through and, okay, there was embezzlement,

we could knock that out.  There was liquidation, we could

05:06    knock that out.

Q.   Crop insurance?

A.   Crop insurance.

Q.   Crop insurance.

A.   We tried to knock out everything we can, until we got to

05:06    the point where we ran into the 359 certification on --

Q.   So you knocked out embezzlement, misapplication, theft,

crop insurance, fraud by wire, radio or television.  You

knocked out, by my count, about two-thirds of the things that

you were claiming in the February 1 certification, right?

05:07    A.   Again, I don't know that we were claiming it in the

FISHER - DIRECT - JACOBS

February 1 certification.  We simply quoted the entire

regulation, and noted that based on the language of that

certification, based on the documents I reviewed, based on the

interviews I made with directors, based on the interviews with

05:07   counsel, based on the other information we had -- I had

reviewed, the bank could not make that certification.

Q.   So is it accurate to say that in both your

certifications, the one you filed February 1st and the one you

filed just a few weeks ago, in both your certifications, for

05:07   the first time, you said, A, we're requesting approval to pay

Vernon Hill.  Is that part correct?

A.   Well, again, there were not two certifications.  We

submitted a certification; regulators came back and asked for

a supplement.  We provided a supplement.

05:07   Q.   Okay.  Let me get over that hump.

A.   Okay.

Q.   I'll call them documents.

A.   Okay.

Q.   In the two documents you signed, dated February 1 of this

05:07   year and April 15 of this year, in those two documents, is it

correct that in each of those two, you started out, for the

first time, asking for approval to make the golden parachute

payment to Mr. Hill?

A.   No, sir.  If you go back to what I said about 2007, when

05:08   Mr. Hill stepped down, when he was terminated without cause,

FISHER - DIRECT - JACOBS

there was a wealth of back and forth with the regulators, with
Mr. Hill's attorneys, with the bank's attorneys, with the
Board of Directors, again, meetings in Washington, all trying
to find a way to get regulatory approval to issue payment.

05:08       What they ended up with was permission to issue the
non-golden parachute payments.  What was left was the golden
parachute payments.  It became very clear that the regulators
were stating -- in fact, it all got into an escrow agreement,
where the FDIC specifically said Section 359, Section 359.

05:08       And so it became clear that the only way to request the
regulators to give an answer, whether he could be paid these
golden parachute payments or not, was to follow Section 359,
and that gets back to what we have been discussing.

Q.   Do you remember the question I asked you?

05:09  A.   You asked if this was the first time that we requested
payment, and it wasn't.

Q.   Payment for the golden parachute portion of Mr. Hill's
contract.

A.   Yes, sir.  And back in 2007, we were not separating out

05:09  everything.  We were looking to find permission from the
regulators, if we could pay Mr. Hill based on the contract.

Q.   Okay.  So you're telling me that there is a 2007 document
somewhere on this planet, which is authored by Commerce or its
lawyers, which says, we want your approval, federal reserve or

05:09  FDIC, to make golden parachute --

─────FISHER - DIRECT - JACOBS─────

THE COURT:  Counsel, excuse me.  You've asked this question now at least four or five times, and the answer has always been the same.

MR. JACOBS:  Okay.

05:10

THE COURT:  The answer is, there is no document back in 2007, which specifies golden parachute payments.

MR. JACOBS:  I got the message, Judge.

THE COURT:  It was a general request to make all contractual payments.  Do you want me to tell you what else he

05:10

said?

MR. JACOBS:  Well --

THE COURT:  The jury's heard it the first, second, third, fourth, and probably fifth time.  They got it.

MR. JACOBS:  All right.

05:10

THE COURT:  Thank you.

MR. JACOBS:  I got the message, Your Honor.  I'll go on.

BY MR. JACOBS:

Q.   All right.  Now, you just made reference in that answer

05:10

to some escrow agreement, did you?

A.   Yes, sir.

Q.   Okay.

A.   I think that's the first thing I had seen about Section 359.

05:10

Q.   Hang on a second.  Can we get 61 on the screen.  I want

───── FISHER - DIRECT - JACOBS ─────

you to look at this and tell me if this is the escrow

agreement to which you're referring.

A.   This is part of the chain of e-mails that I saw, that

referenced where the FDIC did come back and say the bank had

permission to put moneys into escrow.

Q.   So was the answer to my question, yes, this is the escrow

agreement you're talking about?

A.   This is an e-mail.  I don't believe it's an agreement.

This was permission from the FDIC that the bank could seek to

put it into escrow, yes.

Q.   Okay.  Does it have six paragraphs?

A.   There's a header and footer, and it has six points in the

middle, yes, sir.

Q.   What does the sixth paragraph say?

A.   Do you want me to read it or just tell you in general?

Q.   Read it.  It's only a sentence.

A.   Oh.  No. 6?

Q.   Yeah.

A.   There will be no time limit on the escrow or the feds or

FDIC's approval process.

Q.   Do you understand that?

A.   Yes, sir.

Q.   There will be no time limit on how long the money would

sit there or on the federal reserve or the FDIC-approval

process.  No time limit.  Is that what it says?

─────── FISHER - DIRECT - JACOBS ───────

A.   That's what it says, yes, sir.

Q.   Did Mr. Hill ever agree to that, no time limit?

A.   I didn't talk to him about it, but it's my understanding from the documents I reviewed that he did not.

05:12             MR. JACOBS:  That's all I have for the witness, Judge.

             THE COURT:  We're going to take a break, 15 minutes. Fifteen minutes, ladies and gentlemen.  Please don't discuss the case, don't do any research.  We will see you back.

05:12             THE DEPUTY CLERK:  All rise.

             (JURY EXITS 2:52 p.m.)

             THE COURT:  Are you going to question the witness now or call him on your care?

             MR. TAMBUSSI:  I want to question him now, Judge.

05:13             THE COURT:  How long do you think you'll be?

             MR. TAMBUSSI:  It won't be that long.  Certainly before the end of the day.

             THE COURT:  Do you have another witness ready, then?

             MR. JACOBS:  Well, here's where we are, Judge.  The

05:13   next witness is a read-in, Mr. Pollock.  And Mr. Barbone can better address this than I.

             There are a lot of supplements, which we have been handling on our own, but there are a lot of objections, which are probably going to require rulings by you.  And that is

05:13   part of the dilemma that we have tomorrow morning.  I'll try

FISHER - DIRECT - JACOBS

to move this case along.  I'm trying to work with Mr. Hill as

a witness.  Mr. Barbone is handling these read-ins, and he's

got this issue with the state court, Judge.

　　　　　MR. TAMBUSSI:  Judge, if I may, Mr. Lubin was kind

enough to give this to me over the lunch break, their

read-ins.  I'm in the process of going through them.  I will

be withdrawing a number of objections.

　　　　　MR. JACOBS:  Well, good.

　　　　　MR. TAMBUSSI:  And they do appear to have added in a

number of the requests that I have made.

　　　　　MR. JACOBS:  All of them?

　　　　　MR. TAMBUSSI:  I didn't finish.  I wasn't accusing of

you of anything, I just haven't finished it.  So I think that

this could be cued up for either later this afternoon or first

thing tomorrow.

　　　　　THE COURT:  Well, I'd like to get to some of it

today, if we can.

　　　　　MR. TAMBUSSI:  If I can finish with Mr. Fisher, sure.

　　　　　THE COURT:  I thought you said you would.

　　　　　MR. TAMBUSSI:  Yeah, but, Judge, it's 3:00 o'clock,

we're going to start at 3:15.  If I take maybe more than five

minutes.

　　　　　THE COURT:  See you in 15 minutes.

　　　　　MR. JACOBS:  All right.  Thank you.

　　　　　(Brief recess.)

05:14

05:14

05:14

05:14

05:31

──────── FISHER - CROSS - TAMBUSSI ────────

                (OPEN COURT, May 8, 2013, 3:11 p.m.)

                     THE COURT:  Get the witness back up.  Ready to go?

        Let's get the jury, please.

                     THE DEPUTY CLERK:  All rise.

05:31                (JURY ENTERS 3:11 p.m.)

                     THE COURT:  Okay, thanks.  Have a seat everybody.

        We'll have the cross-examination, then.  Mr. Tambussi, you may

        proceed.

                     MR. TAMBUSSI:  Thank you, Your Honor.

05:32   (CROSS EXAMINATION OF JOHN C. FISHER BY MR. TAMBUSSI:)

        Q.  Mr. Fisher, the Court identified you as corporate

        representative for Commerce in this case, correct?

        A.  Yes, sir.

        Q.  And as the corporate representative, did you take certain

05:32   steps to become prepared to testify?

        A.  Yes, sir.

        Q.  Did you review certain documents?

        A.  I reviewed a host of documents, yes, sir.

        Q.  We will get to those in a minute.  Did you interview

05:33   anyone?

        A.  Yes, sir.  Board of directors --

        Q.  Who did you interview?

        A.  I interviewed most of the board of directors and counsel

        for the bank.

05:33   Q.  Okay.  Now, you mentioned Section 359.

—————— FISHER - CROSS - TAMBUSSI ——————

Chris, could we have the statute put up, please.

What I'm showing on these boards to the jury is identical to what's on the screen before you, in two pages. Is the the part 359 statute that you were referring to?

05:33   A.   Yes, sir.

Q.   Okay.  And this is the entirety of the statute, correct?

MR. JACOBS:  Objection.  This is the regulation. It's not the statute, at all.

MR. TAMBUSSI:  I stand corrected, Judge.  Let me

05:33   rephrase the question, if I may, Your Honor.

BY MR. TAMBUSSI:

Q.   Mr. Fisher, is this the part 359 regulation you are referring to?

A.   I only see the first page.  It looks like it there.

05:33   MR. TAMBUSSI:  Chris, can you pop up the second page.

A.   Yeah, it looks right.

BY MR. TAMBUSSI:

Q.   Now, I'm just going to show you a summary of part 359 that we worked with a little bit earlier.

05:34   MR. TAMBUSSI:  Chris, please, the summary.

THE COURT:  Let me interrupt you.  When I gave you that piece of paper about this section, remember I told you that it was only part of it.  This is the rest of it.  I told you counsel would be referring to the other parts.  So -- I

05:34   just wanted to make sure you remembered that I did tell you --

*United States District Court*
*Camden, New Jersey*

*147*

FISHER - CROSS - TAMBUSSI

I gave you only part of it and here is all the rest of it.

BY MR. TAMBUSSI:

Q.   Okay.  Now, Mr. Fisher, this is the regulation that you were working on when you were trying to determine whether or not the bank could provide the certification, correct?

A.   Yes, sir.

Q.   Okay.  It was whether or not the bank could demonstrate that it does not possess and is not aware of any information, evidence, documents or other materials, correct?

A.   Correct.

Q.   And that it referred to fraudulent act or omission, breach of trust or fiduciary duty, or insider abuse, correct?

A.   Correct.

Q.   And then it also, whether or not the institution affiliated party, in this case, Mr. Hill, was responsible for the troubled condition, correct?

A.   Yes, sir.

Q.   All right.  Now, that being said, you said you looked at documents, right?

A.   Yes, sir.

Q.   There were a lot of documents, weren't there?

A.   Yes, sir.

          MR. TAMBUSSI:  See if we can cover some of these documents.  Judge, may I approach the witness?

          THE COURT:  You may.

FISHER - CROSS - TAMBUSSI

BY MR. TAMBUSSI:

Q.   Mr. Fisher, I'm going to show you what's marked D-2 for identification.  Can you identify that -- can you identify that document?

05:35

A.   Yes, sir.  This was a lawsuit filed by Galati against Commerce Bancorp, Vernon Hill, Ron White, Glen Holk, Steve Umbrell, Doug Pauls.  Doesn't have a date on it, but I believe this is back in 2003 or 2004.

Q.   Yes.  And this is a document that you reviewed --

05:36

A.   Yes, sir.

Q.   -- as part of your -- part of your part 359 investigation, correct?

A.   Yes, sir.

Q.   You were here today when your deposition was read into

05:36

the record, correct?

A.   Yes, sir.

Q.   And you heard reference to the Galati case, correct?

A.   Yes, sir.

     MR. TAMBUSSI:  Judge, I'd like to move D-2 into

05:36

evidence.

     THE COURT:  Any objections?  Questions on the exhibit?

     MR. JACOBS:  No objections, Your Honor.

     THE COURT:  D-2 is received in evidence.  You may

05:36

show it to the jury, if you want.

*149*

FISHER - CROSS - TAMBUSSI

(Defendant Exhibit D-2 was received in evidence)

           MR. TAMBUSSI:  Pop that up, Chris.  First page of it.

       Thank you, Judge.

       Ma'am, if you could just look at it and pass it,

05:36  please.

           Judge, in the interest of moving this along, since we

have a lot of documents, perhaps I can show as the jury is

looking at this, with the Court's permission and the jury's

permission.

05:36          THE COURT:  Sure.

           MR. TAMBUSSI:  Thank you.  Mr. Fisher, I show you

what has been marked D-3 for identification.

           THE COURT:  Any objections?

           MR. JACOBS:  Can I see it first, Judge.  I will tell

05:37  you quickly.  No.

           THE COURT:  D-3 is received in evidence.  You may

show it to the jury.

           MR. TAMBUSSI:  Well, can I tell -- have Mr. Fisher

tell us what it is, first, Judge?

05:37          THE COURT:  If you like.

           MR. TAMBUSSI:  Thank you.

(Defendant Exhibit D-3 was received in evidence)

BY MR. TAMBUSSI:

Q.  Mr. Fisher, what is D-3

05:37  A.  It's another class action lawsuit that I reviewed.  This

FISHER - CROSS - TAMBUSSI

one from Elaine Langer versus Vernon Hill, Bob Falese and a

number of others.

Q.  Did you review this as part of your part 359

investigation?

A.  Yes, sir.

       MR. TAMBUSSI:  Judge, may I present it to the jury?

       THE COURT:  You may.

       MR. TAMBUSSI:  Thank you.

    Judge, may I approach the witness with D-4 for

identification?

       THE COURT:  Are there going to be objections to D-4?

       MR. JACOBS:  No objection, Judge.

       THE COURT:  Received in evidence.

       MR. TAMBUSSI:  Thank you.

(Defendant Exhibit D-4 was received in evidence)

BY MR. TAMBUSSI:

Q.  Mr. Fisher, can you identify D-4 for identification -- or

D-4 into evidence.  I'm sorry.

A.  Yes, sir.  This is the DePalma matter.  It was another

class action lawsuit.  I'm trying to determine which one this

was.  Oh, this is back in the 2004/2005 period again.  It was

another one that I reviewed, as part of this agreement, and

also as part of my job with the bank.

Q.  Does it have to do with the Philadelphia Pay and Play

case?

——— FISHER - CROSS - TAMBUSSI ———

A.   Yes, sir.

          MR. TAMBUSSI:  Judge, may I present this to the jury?

          THE COURT:  You may.

BY MR. TAMBUSSI:

05:38    Q.   Mr. Fisher, did you look at this document in conjunction

with your part 359 review?

A.   The DePalma matter?

Q.   Yes.

A.   Yes, sir.

05:38          MR. TAMBUSSI:  Judge, may I approach the witness with

D-5?

          THE COURT:  Any objections to D-5?

          MR. JACOBS:  No objection, Judge.

          THE COURT:  It's received in evidence.  You may show

05:39    it to the witness.

(Defendant Exhibit D-5 was received in evidence)

BY MR. TAMBUSSI:

Q.   Thank you.  Mr. Fisher, can you describe for the jury,

please, what D-5 is?

05:39    A.   Yeah, this is another class action lawsuit I reviewed.

This is Pearl Lucas versus Vernon Hill and Commerce Bancorp.

Q.   Okay.  Did you review this document as part of your part

359 investigation?

A.   Yes, sir.  I'd actually reviewed -- I don't know if it's

05:39    important, but I reviewed virtually all of these as part of my

FISHER - CROSS - TAMBUSSI

job with Commerce already.

Q.   Okay.  As part of your job and your regular job duties?

A.   Yes, sir.  And then I reviewed them specifically for my job here as the witness.

05:39            MR. TAMBUSSI:  Judge, may I publish this to the jury, please?

            THE COURT:  You may.

            MR. TAMBUSSI:  May I approach the witness, Judge?

            THE COURT:  You may.  Which one is it now?

05:39            MR. TAMBUSSI:  D-6, Your Honor

            THE COURT:  Will there be any objections to D-6?

            MR. JACOBS:  No, sir.

            THE COURT:  D-6 is received in evidence.

(Defendant Exhibit D-6 was received in evidence)

05:39            MR. TAMBUSSI:  Thank you, Judge.  Sorry to speak over you.

            THE COURT:  It's all right.

BY MR. TAMBUSSI:

Q.   Mr. Fisher, can you identify D-6 for identification -- in

05:40   evidence?  I'm sorry.

A.   Yes, sir.  This is a Sheetmetal Workers, another class action lawsuit, naming Vernon Hill, Jack Bershad, Joe Buckelew and others, that I reviewed.

            MR. TAMBUSSI:  May I publish this to the jury, Your

05:40   Honor?

──────── FISHER - CROSS - TAMBUSSI ────────

THE COURT:  You may.

MR. TAMBUSSI:  Approach the witness, Your Honor?

THE COURT:  You may.  7?  Is this D-7?

MR. TAMBUSSI:  D-7, Your Honor.

05:40          THE COURT:  Any objections?

MR. JACOBS:  No objection, Your Honor.

THE COURT:  D-7 may be received in evidence.  You may show it to the witness.

(Defendant Exhibit D-7 was received in evidence)

05:40     BY MR. TAMBUSSI:

Q.  Mr. Fisher, can you identify for the jury, please, what D-7 in evidence is, please?

A.  Yes, sir.  This is the Lerner case, another class action lawsuit naming Vernon Hill and others.

05:40          MR. TAMBUSSI:  May I publish it to the jury, Your Honor?

THE COURT:  You may.

MR. TAMBUSSI:  D-8, Your Honor, please.

THE COURT:  Any objections to 8?  Do you object to

05:41     D-8?

MR. JACOBS:  Judge, it appears to be a duplicate of D-6.

THE COURT:  Is it different than D-6?

MR. TAMBUSSI:  I think it's different.  I think it's

05:41     different years.

─────── FISHER - CROSS - TAMBUSSI ───────

MR. JACOBS:  Well, it's all 2007.  Well, in any event, I don't object anyway, duplicate or not.

THE COURT:  All right.  D-8 is received in evidence. You may show it to the witness and then publish it to the jury at your convenience.

(Defendant Exhibit D-8 was received in evidence)

MR. TAMBUSSI:  Thank you.

BY MR. TAMBUSSI:

Q.  Mr. Fisher, could you please identify for the jury what D-8 is?

A.  This is the Sheetmetal Workers Pension Fund, another class action lawsuit that I reviewed.

MR. TAMBUSSI:  D-9, Your Honor.

THE COURT:  Any objections to 9?

A.  This was an amended Complaint.

MR. TAMBUSSI:  D-8 was an amended Complaint?

A.  Yes.  So it was another Complaint.

MR. JACOBS:  No objection, Judge.

THE COURT:  D-9 is received in evidence.  You may show it to the witness and publish it at your convenience.

MR. TAMBUSSI:  Thank you, Your Honor.

(Government Exhibit D-9 was received in evidence)

BY MR. TAMBUSSI:

Q.  Mr. Fisher, D-9, I believe that's the Amended Complaint in the Pearl Lucas matter versus Vernon Hill, correct?

FISHER - CROSS - TAMBUSSI

A.   Correct.  Another class action lawsuit I reviewed naming Vernon Hill.

        MR. TAMBUSSI:  D-10, Your Honor.

        THE COURT:  Any objections to 10?

05:42        MR. JACOBS:  No objection, Judge.

        THE COURT:  That is received in evidence.  You may show it to the witness and publish it at your convenience.

(Defendant Exhibit D-10 was received in evidence)

        MR. TAMBUSSI:  Thank you, Your Honor.

05:42 BY MR. TAMBUSSI:

Q.   Mr. Fisher, D-10 in evidence.  The second amended Pearl Lucas complaint against Vernon Hill and others, correct?

A.   Yes, sir.  Another class action lawsuit naming Mr. Hill that I reviewed.

05:43        MR. TAMBUSSI:  D-11, Your Honor.

        THE COURT:  Any objection to 11?

        MR. JACOBS:  No objection, Judge.

        THE COURT:  11 is received in evidence.  You may show it to the witness and publish it at your convenience.

05:43 (Defendant Exhibit D-11 was received in evidence)

        MR. TAMBUSSI:  Thank you.

BY MR. TAMBUSSI:

Q.   Mr. Fisher, D-11, Mark Henzel versus Vernon Hill and others.

05:43 A.   Yes, this is another class action lawsuit, shareholder

─── FISHER - CROSS - TAMBUSSI ───

derivative action -- it's a class action lawsuit naming Mr.

Hill, as well as others, that I reviewed.

      MR. TAMBUSSI:  D-12, Your Honor?

      THE COURT:  Any objection to 12?

      MR. JACOBS:  No objection, Judge.

      THE COURT:  12 is received in evidence.  You may show

it to the witness and publish it at your convenience.

(Defendant Exhibit D-12 was received in evidence)

      MR. TAMBUSSI:  Thank you, Your Honor.

BY MR. TAMBUSSI:

Q.  Mr. Fisher, D-12, this is actually a state court action

filed by Mr. -- Ms. Goldgrab versus Commerce Bancorp and

Vernon Hill and others, correct?

A.  Correct.  It's the Goldgrab Complaint.  It's another

class action that I reviewed.

Q.  Now, Mr. Fisher, all of these complaints, going from the

first set, which were the 2004 complaints, and into the 2007

complaints, they were ultimately resolved, correct?

A.  Yes.  I believe the '04's were dismissed, and the '07's

and others were settled.

Q.  Resolved without adjudication on the merits?

A.  Yes, that makes sense.

Q.  But each of those complaints contained allegations

regarding Mr. Hill, correct?

A.  Yes, sir.  That's why I reviewed them.

FISHER - CROSS - TAMBUSSI

MR. TAMBUSSI:  D-13, Your Honor?

THE COURT:  D-13.  Any objections?

MR. JACOBS:  Judge, D-13, I do have an objection to.

THE COURT:  Okay.  Let's go to sidebar.

Excuse us, ladies and gentlemen.

(SIDEBAR AS FOLLOWS:)

THE COURT:  You have some familiarity with documents like this, I assume, don't you?

MR. JACOBS:  I'm sorry?

THE COURT:  You have some familiarity with documents like this?

MR. JACOBS:  First time out of the gate.

The witness, on the read-in part of his testimony, said that this indictment didn't play a role in whatever judgments the bank had made, so it shouldn't now be used for the same purpose.

THE COURT:  So you're objecting on relevance grounds?

MR. JACOBS:  It's not just relevance.  What he said.

THE COURT:  It's because he said -- he was saying it's not relevant.

MR. JACOBS:  It's the one -- yes.  This is the one where he took him through the timeline leading up to the execution of the amended and restated contract with Mr. Hill. All of this stuff, the indictment, the trial, the -- it all postdated his contract, let alone the resolutions.  And he

———— FISHER - CROSS - TAMBUSSI ————

said on the read-ins, this didn't play any part in their

evaluation.

          MR. TAMBUSSI:  Two things, Judge.  First of all, the

joint pretrial order has no objection to this document by the

plaintiffs.  Secondly, Judge, because this was read in, I

think the jury has the right to see in context what the

testimony was.  In fact, they said, did you review this

document, and he said yes.  Then he came to the second

question as to whether or not it played a role in his

certification.

          THE COURT:  But if it -- setting aside the first

objection, if it played no role in any decisions that the bank

is making as to whether or not they can make this

certification, then how is it relevant?

          MR. TAMBUSSI:  There's two parts.  No. 1 is the

adequacy of his investigation, what he did.  Mr. Fisher was

called to task for not doing anything.  The bank has been

called to task for not doing anything.  First part of it is,

here are all the things he reviewed.  The second part of it

is, it was read into evidence about this matter.  So I'm going

to show it to the jury for context.  Finally, there's no

objection to the pretrial order.

          THE COURT:  Why didn't you object in the pretrial

order?

          MR. JACOBS:  I don't know.  I do the pretrial order

FISHER - CROSS - TAMBUSSI

myself.  What I do know is I did the testimony myself and I --
there should have been an objection because I took pains in
the deposition of this witness to demonstrate and I think I
did demonstrate that it was completely out of play.  The
chronology was against him and he said it wasn't part of the
evaluation process.

MR. TAMBUSSI:  Well, why was it read in?

MR. JACOBS:  It was read in to take it out of play is
why it was read in.

THE COURT:  I understand that.  But first of all, you
didn't object and to amend it now could raise an objection as
to the necessary to prevent manifest injustice.  But you're
raising an issue as to the adequacy of investigation that the
bank did, arriving at the conclusion that they couldn't make
the certifications.  It's relevant to show that this is part
of what they looked at.  I think the jury remembers and you'll
certainly remind them that it was not part of the
decision-making process, but he did look at it.  So I'm going
to overrule the objection and move that into evidence.

MR. TAMBUSSI:  Thank you.

(END OF SIDEBAR)

THE COURT:  13 is admitted into evidence.  You may show
it to the witness and publish it at your convenience.

(Defendant Exhibit D-13 was received in evidence)

BY MR. TAMBUSSI:

FISHER - CROSS - TAMBUSSI

Q.  Mr. Fisher, I show you D-13 in evidence.  Can you

identify that document to the jury, please?

A.  Yes, this is the corruption case that was filed.  This is

a criminal action against Ron White, Corey Kemp, Glen Holk,

05:49     and Steven Umbrell, who are both of Commerce.

            MR. TAMBUSSI:  Thank you.  Judge, P-9.

            THE COURT:  P-9?

            MR. TAMBUSSI:  Yes.  This is actually a joint

Exhibit, Judge.

05:49     THE COURT:  So there's no objection to that cause

it's a joint exhibit.

(Joint Exhibit P-9 was received in evidence)

            THE COURT:  You can show it to the jury and the

witness.

05:49     MR. TAMBUSSI:  Thank you.

BY MR. TAMBUSSI:

Q.  Mr. Fisher, P-9 which is in evidence, can you tell us

what that document is?

A.  This is the special litigation committee report.

05:49     Q.  Just as heavy as everybody promised it to be?

A.  As I said, it's a big report.

            MR. TAMBUSSI:  P-58, Judge.  This is also a joint

exhibit.

            THE COURT:  I assume there's no objection, then.  You

05:49     may show it to the witness and the jury.

─────── FISHER - CROSS - TAMBUSSI ───────

(Joint Exhibit P-58 was received in evidence)

BY MR. TAMBUSSI:

Q.  Mr. Fisher, P-58 in evidence, can you tell us what that
is?

05:50    A.  Yes, this was the December 5th, 2006, notice of
investigation from the Fed, to Commerce and to Mr. Hill.

MR. TAMBUSSI:  P-59.  Also a joint exhibit, Judge.

THE COURT:  Show it to the jury and the witness.  And
it's in evidence.

05:50    (Joint Exhibit P-59 was received in evidence)

BY MR. TAMBUSSI:

Q.  P-59, Mr. Fisher, please.

A.  Yes, this was also December 5th, 2006.  This was a notice
of the investigation, but this was from the Office of
05:50    Comptroller of the Currency to the bank and the board of
directors of the bank.

MR. TAMBUSSI:  D-19, Your Honor?

THE COURT:  T- or D-19?

MR. TAMBUSSI:  D as in David.

05:51    THE COURT:  D-19, any objection to Defense Exhibit
19?

MR. JACOBS:  No, Judge.

THE COURT:  It's received in evidence.

(Defendant Exhibit D-19 was received in evidence)

05:51    BY MR. TAMBUSSI:

FISHER - CROSS - TAMBUSSI

Q.   D-19, Mr. Fisher, the jury has seen this before, but if you can tell them what it was, what it is.

A.   Yes.  This was an update letter from the Office of Comptroller of the Currency in April of 2007, basically advising the bank that there was still matters under investigation.  It's specifies some of the items and also advises that -- this is one where they said they would have to hold off on any decisions regarding branch applications.

Q.   This is the one where they said there will be no new branch approvals, pending investigation, correct?

A.   Correct.  Yeah, and then they referenced back to the investigation matters, including Mr. Hill, Mrs. Hill, InterArch, et cetera.

          MR. TAMBUSSI:  D-20, Your Honor?

          THE COURT:  Any objection to 20?

          MR. JACOBS:  Judge, I'd like to be heard on this.

          THE COURT:  Sure.  Sidebar.

          MR. JACOBS:  I'm sorry, no objection.

          THE COURT:  So Mr. Jacobs has withdrawn his objection.  It's in evidence.  You may show it to the witness and the jury.

(Defendant Exhibit D-20 was received in evidence)

          MR. TAMBUSSI:  Thank you.

BY MR. TAMBUSSI:

Q.   Mr. Fisher, D-20 for identification, the jury actually

*United States District Court*
*Camden, New Jersey*

FISHER - CROSS - TAMBUSSI

saw this in opening statements.  Is this the letter from the

OCC to Mr. Alexander, dated June 7th, 2007, where it states

that, as you undoubtedly know from your own review, the bank

has serious and extensive insider problems emanating from the

05:53   highest levels of the bank?

A.   Yes, sir.  This is that June 7th, '07 letter.

Q.   Thank you.

        MR. TAMBUSSI:  D-52, Your Honor?

        THE COURT:  5-2?

05:53           MR. TAMBUSSI:  Yes, sir.

        THE COURT:  Any objections?

        MR. JACOBS:  Judge, we already dealt with this one in

another hearing, so there is no objection.

        THE COURT:  52 is received in evidence.  You may show

05:53   it to the witness and the jury.

(Government Exhibit D-52 was received in evidence)

        MR. TAMBUSSI:  Thank you, Your Honor.

BY MR. TAMBUSSI:

Q.   Mr. Fisher, in evidence, D-52, is this the document that

05:53   you referred to in your certification, where Mr. Hill's

response that the bank engaged in unsafe practices by

submitting materially-false branch information, was that that

is true, only in an extremely limited number of isolated

cases?

05:54   A.   Yes, sir, this is that memo I referenced.

———— FISHER - CROSS - TAMBUSSI ————

Q.   Thank you.

     MR. TAMBUSSI:  P-60, Your Honor.  It's a joint
exhibit.

     THE COURT:  6-0.  It's received in evidence.  You may
show it to the witness and the jury.

(Joint Exhibit P-60 was received in evidence)

     MR. TAMBUSSI:  Thank you.

BY MR. TAMBUSSI:

Q.   Mr. Fisher, before you marked P-60 into evidence,
memorandum of understanding between the Federal Reserve Bank
and Commerce Bancorp, is this a document you reviewed as part
of your part 359 certification?

A.   Yes, it is, sir.

     MR. TAMBUSSI:  So Judge, these documents are piling
up for the jury.  Can I collect some of them as they finish
and put them on the table?

     THE COURT:  Sure.

     MR. TAMBUSSI:  Thank you.  P-19, Your Honor, is a
joint exhibit.

     THE COURT:  19.  It's the consent order?

     MR. TAMBUSSI:  Yes, sir.

     THE COURT:  It's in evidence.  You may show it to the
witness and the jury.

(Joint Exhibit P-19 was received in evidence)

BY MR. TAMBUSSI:

─── FISHER - CROSS - TAMBUSSI ───

Q.   Mr. Fisher, P-19 in evidence, the consent order of
June 28th, 2007, correct?

A.   Yes, this is the 2007 consent order from the Office of
Comptroller of the Currency.

05:56               MR. TAMBUSSI:  Joint Exhibit, Your Honor, P-23.

               THE COURT:  P-23.  It's already in evidence.

               MR. TAMBUSSI:  Okay.  May I approach the witness,
Your Honor?

               THE COURT:  You may.

05:56               MR. TAMBUSSI:  Thank you.  And publish it to the
jury?

               THE COURT:  You may.

(Joint Exhibit P-23 was received in evidence)

BY MR. TAMBUSSI:

05:56  Q.   Mr. Fisher, I show you P-23 in evidence, which are the
June 28th, 2007 meeting minutes, as they refer to Mr. Hill,
correct?

A.   Yes, sir.

Q.   Attached to that is, on the second page, is the
05:56  resolution accepting Mr. Hill's termination without cause,
correct?

A.   Yes, sir.

Q.   Thank you.

               MR. TAMBUSSI:  P-24, Your Honor, a joint exhibit?

05:57               THE COURT:  It will be received in evidence.  You may

—————— FISHER - CROSS - TAMBUSSI ——————

show it to the witness and the jury.

(Joint Exhibit P-24 was received in evidence)

BY MR. TAMBUSSI:

Q.   Mr. Fisher, before you, P-24 in evidence, this is Mr.

05:57   Hill's resignation letter and -- from the bank, correct?

A.   Yes, sir.

Q.   Thank you.

          MR. TAMBUSSI:  D-51, Judge, joint exhibit.

          THE COURT:  This is the Bono memo?

05:57          MR. TAMBUSSI:  This is the escrow memo, Judge, D-51.

          THE COURT:  Sorry.  It's in evidence.  You may show

it to the witness and the jury.

(Joint Exhibit D-51 was received in evidence)

          MR. TAMBUSSI:  Thank you, Your Honor.

05:57   BY MR. TAMBUSSI:

Q.   Mr. Fisher, this is the memo, D-51 -- the e-mail, I'm

sorry, D-51 e-mail, is the escrow reference that came from the

federal reserve board, Mr. Ashton, correct?

A.   Correct, this is what I referenced.

05:58   Q.   June 28th, 2007, at 4:21 p.m.?

A.   Yes, sir.

Q.   And does this not set forth the terms that the FRB, or

the Fed, imposed on the escrow agreement?

A.   Yes.  Actually both, the Fed and the FDIC.

05:58   Q.   They weren't Commerce's terms, correct?

─────── FISHER - CROSS - TAMBUSSI ───────

A.   No, sir.

Q.   So when it says there's no time limit on the escrow or the Feds or FDIC's approval process, that wasn't a term put in there by Commerce, correct?

05:58   A.   No, this e-mail is from actually Rich Ashton of the Fed.

Q.   Thank you.

        MR. TAMBUSSI:  P-26, Judge, a joint exhibit.

        THE COURT:  P-26.  Joint exhibit.  In evidence.

(Joint Exhibit P-26 was received in evidence)

05:58        THE COURT:  Therefore, you may show it to the witness and the jury.

BY MR. TAMBUSSI:

Q.   Mr. Fisher, P-26 is actually my letter to Mr. Bennett, then attorney for Mr. Hill, dated July 3rd, 2007, correct?

05:59   A.   Yes, sir.

Q.   The jury's heard a little bit about this, but now they actually have a chance to read it, the whole thing.  Thank you.

        MR. TAMBUSSI:  P-27, Judge, joint exhibit?

05:59        THE COURT:  It will be received in evidence.  You may show it to the witness and the jury.

(Joint Exhibit P-27 was received in evidence)

        MR. TAMBUSSI:  Thank you.  Mr. Fisher, P-27, July 13th, 2007, letter from Mr. Hill's attorney to me, in

05:00   response to my letter, correct?

FISHER - CROSS - TAMBUSSI

A.   Yes, sir.

Q.   Again, a document that you considered as part of your review in this process?

A.   Yes, sir.  I reviewed this.

Q.   Thank you.

          MR. TAMBUSSI:  P-35, Judge, joint exhibit.

          THE COURT:  3-5?

          MR. TAMBUSSI:  Yes, sir.

          THE COURT:  It will be received in evidence.  You may show it to the witness and the jury.

          MR. TAMBUSSI:  Thank you.

(Joint Exhibit P-35 was received in evidence)

BY MR. TAMBUSSI:

Q.   Mr. Fisher, P-35 in evidence, August 6th, 2007, letter from William Kroener of Sullivan & Cromwell, the Federal Deposit Insurance Corporation and Board of Governors of the Federal Reserve System, correct?

A.   Yes, sir.

Q.   This, in fact, dealt with those payments that the bank was able to pay Mr. Hill, correct?

A.   Yes, sir.

Q.   And, in fact, did pay Mr. Hill, correct?

A.   Yes, sir.

Q.   And this showed a request by the bank to those regulators, correct?

──────── FISHER - CROSS - TAMBUSSI ────────

A.   Yes, sir.

Q.   Thank you.

        MR. TAMBUSSI:  Joint Exhibit P-38, Your Honor?

        THE COURT:  That's the board minutes of November

05:01   20th.

        MR. TAMBUSSI:  Yes, sir.

        THE COURT:  That's already in evidence.

        MR. TAMBUSSI:  Thank you.  May I show it to the

witness?

05:01           THE COURT:  You may.

        MR. TAMBUSSI:  Publish it to the jury, Judge?

        THE COURT:  Yes.

        MR. TAMBUSSI:  Thank you.

(Joint Exhibit P-38 was received in evidence)

05:01   BY MR. TAMBUSSI:

Q.   Mr. Fisher, before you, P-38 in evidence, board of

directors' meeting minutes of November 20th, 2007, as they

relate to Mr. Hill, correct?

A.   Yes, sir.

05:01   Q.   Thank you.

        MR. TAMBUSSI:  P-36, joint exhibit, Your Honor?

        THE COURT:  It will be received in evidence.  P-36.

You may show it to the witness and the jury.

(Joint Exhibit P-36 was received in evidence)

05:02           MR. TAMBUSSI:  Thank you.

─── FISHER - CROSS - TAMBUSSI ───

BY MR. TAMBUSSI:

Q.   Mr. Fisher, P-36, a December 6, 2007, letter from the
Board of Governors of the Federal Reserve System, to William
F. Kroener of Sullivan & Cromwell, granting permission to make
certain payments to Mr. Hill, correct?

A.   Yes, sir.

Q.   And those payments were made?

A.   Yes, sir.

          MR. TAMBUSSI:  P-53, joint exhibit, Your Honor?

          THE COURT:  5-3.  It will be received in evidence.
You may show it to the witness and the jury.

          MR. TAMBUSSI:  Thank you.

(Joint Exhibit P-53 was received in evidence)

BY MR. TAMBUSSI:

Q.   Mr. Fisher, P-53 for identification -- in evidence, I'm
sorry.  The stipulation and consent order signed by Vernon
Hill, November 17th, 2008, correct?

A.   That is correct, sir.

Q.   And this is the document says that the comptroller finds,
and it responds it neither admits nor denies, that respondent
engaged in unsafe and unsound practices, and breaches of
fiduciary duty, by failing to comply with sound corporate
government principles, in connection with real estate
purchases, leases and joint real estate development
transactions, involving the bank, which resulted in financial

FISHER - CROSS - TAMBUSSI

gain to the respondent.  Does it say that, in part?

A.   Yes, sir.

Q.   Is the respondent Mr. Hill?

A.   Yes, sir.

05:03   Q.   Is there anywhere in this document where Mr. Hill denies

the findings of the -- of the comptroller?

A.   No, sir.

Q.   Two more.

MR. TAMBUSSI:  P-46, Judge, joint exhibit.

05:03   THE COURT:  46 has been received in evidence.  You

may show it to the witness and the jury.

MR. TAMBUSSI:  Thank you.

(Joint Exhibit P-46 was received in evidence)

BY MR. TAMBUSSI:

05:04   Q.   Mr. Fisher, this is actually something that we can

actually put in the jury's hands, we have shown them a lot.

This is the actual part 359.4 golden parachute regulation, in

it's entirety, correct?

A.   Yes, sir.

05:04   Q.   Thank you.

MR. TAMBUSSI:  P-48, Judge.  Please, joint exhibit.

THE COURT:  It will be received in evidence.  You may

show it to the witness and the jury.

(Joint Exhibit P-48 was received in evidence)

05:04   BY MR. TAMBUSSI:

—— FISHER - CROSS - TAMBUSSI ——

Q.   Mr. Fisher, P-48, a supervisory letter, SRO3-6.  Guidance regarding the restrictions on institutions in troubled condition.  Did you review this document?

A.   Yes, sir.

05:04   Q.   Does this talk about the payment of separation payments to people who were employed by banks in troubled condition?

A.   Yes, sir.

Q.   Is this a precursor to the financial institution letter you reviewed and referred to on your direct testimony?

05:05   A.   Yes, sir.

Q.   Thank you.

        MR. TAMBUSSI:  Last document for this witness, sir -- I'm sorry, next to the last document for this witness.  P-47, a joint exhibit.

05:05        THE COURT:  It's received in evidence.  You may show it to the witness and the jury.

(Joint Exhibit P-47 was received in evidence)

        MR. TAMBUSSI:  Thank you.

BY MR. TAMBUSSI:

05:05   Q.   Now, Mr. Fisher, before you is a financial institution letter, FIL66-2010, October 14th, 2010.  Can you tell me what this document is?

A.   Yes, sir.  The FDIC, on their website and then through these letters, publishes greater detail or more plain English
05:05   language on how to work with their rules and regulations, and

─────────────── FISHER - CROSS - TAMBUSSI ───────────────

that's what this is.  In fact, I referred to it in my

testimony in answering Mr. Jacob's questions.

Q.  Thank you.

        MR. TAMBUSSI:  P-70, Judge.  Joint exhibit.

        THE COURT:  7-0?

        MR. TAMBUSSI:  7-0, Judge.

        THE COURT:  These are already -- that's already in

evidence, but you may show that to the jury.

        MR. JACOBS:  I moved that, Judge.

        MR. TAMBUSSI:  Fair enough.  Thank you.

(Joint Exhibit P-70 was received in evidence)

BY MR. TAMBUSSI:

Q.  Now, Mr. Fisher, P-70.  That's your initial certification

to the regulators, correct?

A.  Yes, sir.

Q.  And Mr. Jacobs questioned you about some of the things

that you certified to the regulators in that document,

correct?

A.  Yes, sir.

Q.  But he didn't cover all of the things you said to the

regulators, correct?

A.  No, sir.

Q.  Could you refer to paragraph 11 of your certification?

        MR. TAMBUSSI:  Chris, can you blow that up, please.

A.  Do you want me to read that, sir?

——————— FISHER - CROSS - TAMBUSSI ———————

BY MR. TAMBUSSI:

Q.   Please.

A.   The requisite regulations do permit an institution affiliated party, such as Mr. Hill, to satisfy the criteria of 12CFR359.4.

     That's part of 359 we have been talking about.

Q.   Thank you.  And this is further certified to the regulators in paragraph 12.

A.   In the matter of Vernon W. Hill versus Commerce Bancorp, civil action -- it goes on to describe it.

Q.   This case, right?

A.   Yes, this case.

Q.   Okay.

A.   Mr. Hill, an institution affiliated party, an IFP, as defined in 12CFR359, has testified under oath as follows:

     And then we quoted his testimony from his deposition.

Q.   What did you quote?  Let's read it.

A.   Let's break this down.  Can you certify to any regulatory agency that you have not committed any fraudulent act that has had a material adverse effect on Commerce?

     He answered:  Yes.

     The question was:  You can?

     He answered:  Absolutely.

     The next question:  Can you certify to a regulatory agency that you have not committed any fraudulent omission?

05:07

05:07

05:07

05:07

05:08

FISHER - CROSS - TAMBUSSI

The answer was:  Yes.

The question was:  Let me finish my question.  That has had a material adverse effect on Commerce?

The answer again was yes.

05:08      The question was:  Can you certify that you have not committed any breach of trust that has had a material adverse effect on Commerce?

Mr. Hill's answer again was yes.

Next question was:  Can you certify that you have not

05:08      committed any breach of fiduciary duty that has had a material adverse effect on Commerce?

Mr. Hill answered yes.

The next question:  Can you certify that you have not committed any insider abuse that has had a material adverse

05:08      effect on Commerce?

Mr. Hill's answer was yes.

Next question:  Mr. Hill, can you certify that you have not violated any federal or state banking law that has had or is likely to have a material effect on Commerce?

05:08      Mr. Hill's answer was yes.

Q.   Can we give a citation to that testimony?

A.   Yes.  That was Vernon Hill's deposition on March 11, 2011.

Q.   Now, did the bank further certify on paragraph 13 as to

05:09      that testimony?

FISHER - CROSS - TAMBUSSI

A.   "The bank cannot certify that the foregoing sworn testimony of Mr. Hill is true, but rather, the sworn testimony is offered for consideration by the respective regulatory agencies, in conjunction with this submission."

05:09   Q.   Do you know whether or not Mr. Hill ever submitted this certification to the regulators?

A.   He did not, as far as I'm aware.

Q.   Paragraph 14, what was our -- your final paragraph to the regulators, paragraph 14?

05:09   A.   Well, the bank engaged in protracted settlement discussions to resolve the litigation subject to regulatory approval.  The parties were unable to reach an amicable resolution, and as a result, the litigation will proceed to trial.

05:09           The litigation, which has been pending since January 14th of 2008, will begin a costly and lengthy trial as of April 29th, 2013.  It is anticipated that the trial will serve as a distraction to management of potentially two dozen past and present individuals affiliated with the bank will be

05:09   involved with trial.  Trial is expected to last approximately two to three weeks.

Q.   Is this certification submitted in good faith by the bank in order to get approval for Mr. Hill's payments?

A.   Yes, sir.

05:10   Q.   Now, you were asked some questions about this $4 million

───────── FISHER - REDIRECT - JACOBS ─────────

offset.  Do you recall that?

A.   Yes, sir.

Q.   You would agree with me, would you not, that in order for Mr. Hill to get paid anything, he needs regulatory approval, correct?

A.   Yes, sir.  It was very clear in my reviews, both with the board and with e-mails back and forth that I saw from both the bank's counsel and Mr. Hill's counsel.

Q.   And to date, there has been no regulatory approval, correct?

A.   There has not, no, sir.

            MR. TAMBUSSI:  Nothing further, Your Honor.

            THE COURT:  Any redirect?

            MR. JACOBS:  Thank you, Judge.

(REDIRECT EXAMINATION OF JOHN C. FISHER BY MR. JACOBS:)

BY MR. JACOBS:

Q.   Mr. Fisher, I want you to take a look at some of these documents with me, if you don't mind doing that.  And perhaps we can get by with the first pages of some of these.

            D-4, if we can get that on the screen.

            MR. TAMBUSSI:  While that's coming up, can I get some of the documents out of the jury's box?

            THE COURT:  Sure, they're done with them.

            MR. TAMBUSSI:  Thank you.

A.   Sorry.  Yes, sir.

———— FISHER - REDIRECT - JACOBS ————

BY MR. JACOBS:

Q.   Are you looking at D-4?

A.   Yes, sir.

Q.   And is this a civil Complaint in the Federal Court, some kind of class action?

A.   Yes, sir.

Q.   And I see a filing date of January 24, 2005.  Do you see that?

A.   Yes, sir.  It's on the top of the document.

Q.   Okay.  Now, who all got sued here?  Do you know?

A.   I'm looking at that page that's here.  Hold on a second. I don't see that page, what I see on here is Commerce Bancorp Security Litigations.

Q.   Okay.  Well, let's pass that for a moment.  On the face page I see a filing date of January 24, 2005, but when I turn to page 56, I see January 24th, 2004.  Which was it?

A.   Oh, I believe this was the consolidated action.  So it took a number of cases that arose relative to class actions from -- that arose out of the Pay to Play that occurred, the criminal indictments that occurred, the other issues with Philadelphia, and then there were about a dozen lawsuits, class action lawsuits that were filed, and then this would have combined them.

        So if this was combined, a number of those did name various directors.  They named Vernon Hill.  They named

———— FISHER - REDIRECT - JACOBS ————

Mr. Holk, Mr. Umbrell, others.

Q.   And you say --

A.   And most of those are here, I think.

Q.   And you say these arose out of the -- what you just
called the Pay to Play indictment in Philadelphia, is that
right?

A.   Yes.

Q.   All right.  Can we put the first page of D-13 on the
screen, so we know what you're talking about.

       When it gets up here, it's going to say the U.S.
attorney announces a superseding indictment in a Philadelphia
corruption case.  Is that it?

A.   Yes, sir.

Q.   This involved the city treasurer in Philadelphia?

A.   Yes, I believe his name was Corey Kemp.

Q.   Corey Kemp, and Ron White.  And a couple of people who
worked at Commerce Bank and a couple of people who worked at
other banks got indicted, right?

A.   Yes, sir.

Q.   I think I asked you about this.  Vernon Hill never got
indicted, and he never got named as an unindicted
coconspirator, did he?

A.   No, he -- there were references to the chairman of the
bank, but I don't believe Vernon Hill's name was used
specifically in the criminal.  He was named specifically in

—— FISHER - REDIRECT - JACOBS ——

the civil actions.

Q.   But right now I'm talking about the indictment.  I want
to get it crystal clear.  He wasn't charged with or convicted
of a crime.  Can we agree on that?

A.   Mr. Hill?

Q.   Yes.

A.   No, he was not.

Q.   All right.  And this big, long indictment here and press
release, as I understood it from your testimony, which we read
in today, played no part in your evaluation of whether he had
a reasonable basis to believe Mr. Hill did anything wrong.
Did I get that correct?

A.   No, sir.  I did review these as part of looking at any
documents or information that the bank was either aware of or
possessed, that gave a reasonable basis to believe --

Q.   I'm sorry, go ahead.

A.   In fact, I remember -- again, it's been awhile since I
read through all of this, but I remember their -- a lot of the
references -- and I don't think it listed Mr. Hill
specifically, it kept listing the chairman.  It referenced
phone tapping.

         In fact, I remember one that stuck out to me, there was
a tap that was Mr. Hill with, I believe, director Ron White,
talking about to connive the plan.  That's the only reason it
sticks out because the language is kind of weird.  But, no,

—— FISHER - REDIRECT - JACOBS ——

there wasn't specific to Mr. Hill, other than that he was

chairman of the bank.

Q.   Okay.  Now, this all happened in 2004 and 2005, didn't

it?

A.   I think it may have started in 2003, but it was that time

frame, yes.

Q.   It was all over before Mr. Hill's March 16, 2006 contract

was signed, wasn't it?

A.   I believe it was all done by that time, yes.

Q.   And it was all certainly over before the Board voted to

pay Mr. Hill on his contract and get regulatory approval on

June 28, 2007 and November 20, 2007 and December 18, 2007.

Right?

A.   Yes, those cases would have been complete by then, yes.

Q.   Let's go back to those cases.  The first one -- well,

tell me now, are you saying that this, this case, this

criminal case from 2004, 2005 give you a reasonable basis to

believe that Mr. Hill violated any section of that Golden

Parachute statute?

A.   Again, we talked about that before.  The Bank was not

taking a position that Mr. Hill did or did not.

Q.   The Bank wasn't taking a position.

A.   I was reviewing documents based on the language of part

359 to determine if the Bank had any documents, information,

evidence and that those documents created a reasonable basis

FISHER - REDIRECT - JACOBS

to believe Mr. Hill committed a breach of duty, fiduciary

duty, fiduciary trust inside abuse, et cetera that was part of

359.

Q.  Does this document recite such a reasonable basis?

A.  There are certainly allegations in it, yes.

Q.  So you're saying does this document which predates his

current employment contract, creates a reasonable basis to

believe he violated one of the things in the Golden Parachute

statute?

A.  In conjunction with everything we reviewed, that includes

more than a dozen Class Actions with allegations against Mr.

Hill, specifically in the criminal indictment where there were

phone conversations tapped, et cetera, do all those documents

and the documents lead to a reasonable belief that Vernon Hill

committed any of those items in 359?  It certainly could have.

We certainly couldn't say it could not, which is what we had

to do for the certification.

Q.  Well, did it?  Did it lead to a reasonable belief that he

did any of those things?

A.  You asking me personally or as a representative of the

Bank.

Q.  Both.

A.  As a representative of the Bank, the Bank did not take a

position whether they felt Mr. Hill committed and/or did

commit.  That was not required of them, other than the

———— FISHER - REDIRECT - JACOBS ————

certification and they didn't want to become a Regulator.
They had to look at all the documents.  Sorry.  Go ahead.

Q.   Thank you.  Let's try to deal with these 2004 complaints
which arose from this indictment.  Right?

A.   From the activities of the indictment that it focused on,
yes.

Q.   D-two, D-3 and D-4.  Right?

A.   Yes, sir.

Q.   Okay.  Do you know what I'm talking about or do you need
to see them on the screen.

A.   I think you're talking about the Class Action lawsuits.

Q.   As a result of this pay to play case in Philadelphia.

A.   They were lawsuits, Class Action lawsuits that arose
after that.  It was my perception from an insurance side that
they resulted from that and that it was the basis for those
plaintiff attorneys Class Action, plaintiff attorneys to file
lawsuits against the Bank Class Action lawsuits.  There was a
lot more in them than just the pay to play.  But, yes.

Q.   And they all got dismissed for failure to state a claim,
didn't they?

A.   I believe they were combined first and then they were
dismissed, yes.

Q.   All dismissed.  Now do the dismissed complaints -- I mean
you reviewed them.  Do these complaints which were dismissed
for failure to state a claim, are they part of your reasoning

––––––– FISHER - REDIRECT - JACOBS –––––––

as to why you can't apply, what the Bank can't apply for

regulatory approval to pay Mr. Hill?

A.   They were a number of documents that under 359 that asked

if we had any documents, information or evidence that gave

06:18    rise to a reasonable belief that he committed a breach of

fiduciary duty or insider abuse and there was specific

allegations to both of those, yes.

Q.   So even though they were dismissed for failure to state a

claim, you're still relying on them as what?

06:19    A.   Under Part 359 it asked the Bank if it can certify that

it does not have any evidence, information, document or other

material.  And we have all this.  Not only had that because I

reviewed it for your subpoena, I had all this because they

were involved in insurance claims.  And so I had seen all

06:19    those.  The Bank does have all these documents.  They included

allegations that were specifically listed in part 359.  So

yes.

Q.   Let's take a look at D-7 which is another one of these

civil complaints, the Lerner complaint.

06:20    A.   Yes, sir.

        MR. JACOBS:  Can we get it on the screen, please?

Q.   And we can blow up the caption a little bit?  Who got

sued here?  Mr. Hill, Mr. Bershad, Mr. Buckelew, Mr. DiFlorio,

Mr. DiFrancesco, Mr. Kerr, Mr. Lewis, Mr. Lloyd, Mr. Norcross,

06:20    Mr. Ragone, Mr. Schwartz, Mr. Tarquiny Mr. Vazzalusso.  What

──── FISHER - REDIRECT - JACOBS ────

do they all have in common?

A.   They were Directors of the Bank.

Q.   Oh.  D-9.

MR. JACOBS:  Blow up the caption, please.

06:20    Q.   Let's see who got sued.  Mr. Hill, Mr. Bershad, Mr. Buckelew, Mr. DiFrancesco, Mr. Kerr, Mr. Lewis, Mr. Lloyd, Mr. Norcross, Mr. Ragone, Mr. Schwartz, Mr. Tarquiny, Mr. Vassalluzzo and Mr. Giordano.  What do they all have in common?

06:20    A.   I do know that Mr. Hill was specific to certain counts and the rest were to specific counts but what they had in common, they were all Directors of the Bank.

Q.   And as to some there were specific counts, as to others were weren't.  But they're all Directors.

06:21    A.   Yes, sir.

Q.   D-10.  Let's go up to caption a little bit.  A little more?  Who all got sued?  Mr. Hill, Mr. Bershad, Mr. Buckelew Mr. DiFrancesco, Mr. Kerr, Mr. Lewis, Mr. Lloyd, Mr. Norcross, Mr. Ragone, Mr. Schwartz, Mr. Tarquiny, Mr. Vassalluzzo, Mr.

06:21    Giordano and Toronto Dominion Bank.  Right?

A.   Yes, sir.

Q.   So what do they all have in common except for Toronto Dominion Bank.

A.   Well again, I note there were separate counts for Mr.

06:21    Hill.  As to the rest and the Directors, what Toronto Dominion

──── FISHER - REDIRECT - JACOBS ────

Bank would have had in common was its relation to Commerce.

Q.   So other than Toronto Dominion Bank, they're all Directors in Commerce.

A.   Yes.

Q.   Now, these suits that were filed in 2007 in part, these suits challenged the merger, didn't they?

A.   Not the ones we discussed earlier.  But, yes, the Lucas and the related cases, yes.

Q.   They challenged the merger.  One of their chief gripes was that Toronto Dominion shouldn't have such a small payment at the end.  They wanted to change the end payment, for example.  Remember that?

A.   I believe one of the, one of the complaints in it, yes. Again it's been a while since I read all of them.

Q.   Yes.  Okay.  The next -- now, these suits were filed in 2007, right?

A.   First group you asked about I believe 2004, 2005.  The second group was 2007, 2008.

Q.   Okay.  And most of, if not all of these, were filed before November 20th and December 18, 2007.  Is that right?

A.   I'd have to look at each one.  I don't remember, sir.

Q.   Let me ask you about some of the letters that were shown to you.  Let's start with Number 26.  This is defense Exhibit 26.  If we get on to the screen, this is July 3, 2007, letter from Mr. Tambussi to a Mr. Bennett.  You identified

——— FISHER - REDIRECT - JACOBS ———

this letter.

A.   Yes, sir.

Q.   Excuse me.  26.  I'm sorry.  You were handed a Plaintiff's copy.  I'm sorry.  Okay.  P-26.  It's apparently a joint -- it's our exhibit, joint exhibit.  Now is one of the things you reviewed?

A.   Yes, sir.

Q.   Okay.  And this is, as counsel said, a letter by Mr. Tambussi dated July 3, 2007.  Right?

A.   Yes, sir.

Q.   Look at the bottom of the page.  That little paragraph labeled A?

A.   Yes, sir.

Q.   Is that right or wrong?

A.   Is it there?  Yes, it's there.

Q.   I know it's there.  I referred you to it.  I'm asking you is you, is it right or wrong?

A.   The amounts?

Q.   How about the date?  You see a date.

A.   The date December 31, 2011.

Q.   Yes.

A.   Yeah.  I don't think that's correct.

Q.   It's not.

A.   No.

Q.   Mr. Hill's contract ended a year before that December 31,

—— FISHER - REDIRECT - JACOBS ——

2010.  Right?

A.   Oh, this is asking not when he ended his, but when his
contract ran to?  I don't remember.  I'd have see the
contract.

06:25   Q.   Is it right or wrong that Mr. Hill would have been paid
if he had been employed by Commerce, until December 31, 2011?
Didn't his contract end in 2010?

A.   I, again, I don't remember for sure.  I remember it did
run through the end of the year and that amount looks right.

06:25   But I don't remember the exact date.

Q.   It's a five-year contract.  It starts January 1, 2006.
When does it end?

A.   Sound like 2011.

Q.   2011?  So 2006, 2007, 2008, and 2009 and 2010.  That

06:25   gives you a five year contract?

A.   Oh, again, I would have to see the contract, sir.

Q.   Okay.  The second page of this letter refers specifically
to the necessity for a Golden Parachute regulation approval.
Doesn't it?

06:26   A.   Yes.  It advises that the Federal Reserve Board had
advised that any Golden Parachute, any payments would come
under the Golden Parachute regulations.

Q.   Okay.  Now, P-27 is a letter authored ten days later.
Let's see if we can get on the screen.  That would be July 13,

06:26   2007.  And this is back to Mr. Tambussi.  First thanking him

──────── FISHER - REDIRECT - JACOBS ────────

for his letter of July 3rd which we just looked at.  Is that

right?

A.   Yes, sir.

Q.   And it's on the letterhead of this Skadden Arps law firm.

06:26   Right?

A.   Yes, that was Mr. Hill's attorney at the time as I

understand.

Q.   Okay.  And these lawyers, this a Washington, D.C. office

right?

06:27   A.   New York Avenue, Washington D.C., yes, sir.

Q.   All right.  Now, you say you reviewed this letter?

A.   Yes, sir.

Q.   Did you review the fourth page?  Can you get to the

fourth page, please?

06:27   A.   Yes, sir.

Q.   Did you review the topic heading employment agreement?

A.   Yes, sir.  I remember I read the entire letter.

Q.   Can we get to the third paragraph?  Can we blow that up a

bit?

06:27       Did you read the part that says based on the July 3rd

letter, it appears that the company's position is that the

lump sum severance payment of $11,250 --

        THE COURT:  Hold on.  Hold on.  We got the wrong

thing on the screen.

06:27       MR. JACOBS:  It's the third paragraph.

*United States District Court*
*Camden, New Jersey*

FISHER - REDIRECT - JACOBS

THE COURT:  The third paragraph.

MR. JACOBS:  Well, I was in the employment agreement section, third paragraph.

THE COURT:  So you want the final paragraph.

06:28    MR. JACOBS:  Yes.  That's it.  Thank you.

Q.  Does it say based on the July 3rd letter, it appears that the company's position is that the lump severance payment of $11,250 falls within the requirements of --

THE COURT:  Excuse me.  It's 11,250,000.

06:28    MR. JACOBS:  What did I say?

THE COURT:  Eleven thousand 250 dollars.

MR. TAMBUSSI:  Take the 11,000.

MR. JACOBS:  I was discounting it, Judge.

Q.  Based on the July 3rd letter it appears that the

06:28    company's position is that the lump sum severance payment of $11,250,000.00 falls within the requirement, requirements $11,250,000.00 part 359.  Did I read that right?

A.  Yes, sir.

Q.  Therefore, we request that the company promptly seek any

06:28    necessary approvals, including but not limited to approvals from the Federal Reserve and FDIC so the company can comply with its contractual obligations under section 7.3B and 12.12 of the employment agreement to make such payment to Mr. Hill within 30 days of the date of his termination of employment.

06:29    Is what it says?

─── FISHER - REDIRECT - JACOBS ───

A.   Other than you said 12.12 instead of 12.2, yes.

Q.   All right.  Is that what it says?

A.   Yes, sir.

Q.   So is that a letter from Mr. Hill's lawyer ten days after
Mr. Tambussi writes telling him that it's Mr. Hill's position
and his lawyer's position that to perform their contract, they
have to make the application?

A.   That's certainly Mr. Hill's attorney coming back and
requesting that they do so, yes.

Q.   Well is Mr. Hill and his lawyer, are they correct or
incorrect saying that the contract says the Bank has to pay
him pay in 30 days?

A.   I recall the contract, it did have that, yes.

Q.   How can they pay in 30 days if they don't apply?

A.   Well, again, get back to what we talked about what was
happening in and around this time.  There were multiple
meetings, multiple phones calls, multiple e-mails.  Again the
two meetings down the Washington D.C. with the attorneys,
including Mr. Hill's attorneys and the Directors all
attempting to find a way to get regulatory approval to pay.

Q.   P-35 is another lawyer letter.

          MR. JACOBS:  Can we get that on the screen?

Q.   Now, you see this one is dated August 6, 2007?

A.   Yes, sir.

Q.   And is it written to the FDIC and the Board of Governors

—————— FISHER - REDIRECT - JACOBS ——————

on the Federal Reserve?

A.    Yes, sir.

Q.    And is it written by this Washington law firm, Sullivan and Cromwell?

A.    Yes, sir.

Q.    And does it start out saying:  We are writing on behalf of our client Commerce Bancorp, Inc?

A.    Yes, sir.

Q.    Now, August 6, 2007, is 23 days after July 13, 2007 isn't it?

A.    That sounds about right.

Q.    It's bit more than three weeks.  Right?

A.    Yes, sir.

Q.    Now, look at -- can we blow up this second paragraph, first page a little bit?  Now, I want you to -- you read all this.  I want you to look at this second paragraph which refers to specifically to Mr. Hill's employment contract.  Doesn't it?

A.    Yes, sir.

Q.    And look at the second sentence starting with the words pursuant to.  Do you see that?

A.    Pursuant to the terms, yes, sir.

Q.    Pursuant to the terms of the employment agreement, Mr. Hill's entitled to certain benefits.  Right?

A.    Yes, sir.

─────────── FISHER - REDIRECT - JACOBS ───────────

Q.   Because, however, Commerce Bank National Association is a wholly owned subsidiary, a wholly subsidiary has been designated as an institution in trouble condition as a result of the Consent Order with the comptroller of the currency. Such benefits are subject to the so-called Golden Parachute regulation, 12 CFR 359 as applied to Commerce by supervisory letter SRO3 of the Board of Governors of the Federal Reserve System, the regulations.  Did I read all that right?

A.   Yes, sir.

Q.   Now this is a Commerce Bank lawyer.  Right?

A.   Yes, sir.

Q.   And when I read this, these couple of sentences, did you realize he's saying that we, Commerce Bank, know that Mr. Hill is entitled to certain payments but we also know they're subject to the Golden Parachute regulation before they can be paid.  Did you get that?

A.   Yes, sir.

Q.   Now you find me in this letter a sentence where they say we want approval.  We want approval to pay him.  You find me a sentence.

                    (Brief pause)

A.   The reference is asking for a review and confirmation of our understanding that's set forth above and they talk about the 401K.  They talk about the stock option plan.  For the vested stock options.  They talked about the --

───── FISHER - REDIRECT - JACOBS ─────

Q.   Excuse me.  Maybe I'm not being clear.  I'm just asking
you to find a sentence where this lawyer reacts to what Hill's
lawyer told him eight days earlier.  Find the sentence when he
writes to the Federal Reserve, the FDIC and says, we want your
approval to pay Mr. Hill what he's due.  Please find that
sentence.

A.   It appears most of this letter was seeking approval for
those non-Golden Parachute payments.

Q.   I know.  I'm not concerned about the non -- this case is
not about things that aren't governed by the Golden Parachute.
It's about things that are governed by the Golden Parachute.
Find the sentence written by this Washington lawyer which
says, we know the Golden Parachute applies.  He's
contractually entitled to payments.  We want your approval to
make them.  Where is that sentence?

A.   It's not a sentence of that type right in this letter.
There's not.

Q.   Is there any letter you can produce before this trial is
over which has such a sentence?

A.   No, sir.  Again it goes back to --

Q.   What was that?  No, sir?

A.   No, sir.

Q.   No, sir.

          MR. TAMBUSSI:  Let him finish his answer.

          MR. JACOBS:  Well, that's all I needed.

FISHER - REDIRECT - JACOBS

MR. TAMBUSSI:  I know, but still wasn't finished his answer.

THE COURT:  Go ahead.

Q.  You want to say something?

A.  Yes, sir.  It goes back to what we discussed of multiple meetings occurring with Washington, with Mr. Hill's attorneys with the Bank attorneys.  The multiple e-mails I saw.  There was correspondence.  They reference phone conversations.  So it was, it was a very fluid situation that was occurring where the Bank was seeking to find a way to get approval.

Q.  Who today and in 2012, 11,10, 9, 8 and the second half of 2007 had custody and control of all the documents and checks and writings that used to belong to Commerce Bank and now belong to TD Bank NA.  Who has them in all those years?

A.  I'm not sure I understand your question.  I'm sorry.

Q.  Does the Bank have documents, checks, computer records, and all sorts of stuff that used to belong to Commerce?

A.  That now are owned by TD.

Q.  Yes.

A.  Yes, sir.

Q.  So when TD bought Commerce, one of the things they got was all their documentary and computer information.

A.  That would make sense.

Q.  That would cover checks and ledgers and loans and payrolls and everything else.  Right?

FISHER - REDIRECT - JACOBS

A.   Yeah.  It's a very detailed and complex integration process and I remember leafing through that for two years as they brought all that in and TD put it in their procedures and their systems.  And, yeah.  But, yeah, everything would have come with Commerce.

Q.   Exactly.  So, since this regulation requires the person applying to make a payment to state that they have reviewed all the documents, and all the evidence, and all the information at their disposal, it's the Bank that has all that.  Isn't it?

A.   You're referring back to Section 359 where they ask that the Bank has any documents, evidence, information?

Q.   Yes.

A.   The Bank would certainly have documents, evidence and information, yes.

Q.   Does Mr Hill have 34 years of banking information from Commerce when it started in 1973 until he was discharged without cause in the middle of 2007?  Do you think that he kept all that?  And in the merger TD Bank NA didn't it get?  Do you think that?

          MR. TAMBUSSI:  Judge, it's at least three different questions there.

          THE COURT:  You want to break it down?

          MR. JACOBS:  Okay.

Q.   What you did as a corporate representative is reviewed

───────── FISHER - REDIRECT - JACOBS ─────────

information that TD Bank had which you thought was relevant to

to this regulation.  Right?

A.  Yes.  Depending how you want to say.  TD Bank had it.  I

had a lot of it myself.

Q.  Did that include the millions of pages of documents

turned over in 2006 and 2007 to the OCC, the millions of

pages?

A.  Did I have that or did the Bank?

Q.  Did the Bank have it?

A.  The Bank should have it, yes.

Q.  Did Mr. Hill have the millions of pages?

A.  I have no idea.

Q.  Are you aware that if you read through the publications

on these Golden Parachute applications, one of the things

that's got to be done is a performance evaluation?  How well,

or how poorly the IAP, the person receiving the payment did?

A.  I don't remember that specifically.  I remember there was

a lot of language around how detailed the regulators would

look at a person based on whether they were a middle level

manager or whether they were more senior manager or how much

control they had, et cetera.  That would probably come in that

section.

Q.  Well, do you or don't you remember the section that

requires a performance evaluation?  The responsibilities in

specific areas of the Bank that report to and are supervised

──────── FISHER - REDIRECT - JACOBS ────────

by the IAP?  Performance assessment to the areas that report

to the IAP?  You think those are things that Mr. Hill could

explain to the regulators himself?

A.   That was involved with his supervision I would assume so.

06:39  Q.   Let's take a look at D-52 which is a document shown to

you by Mr. Tambussi, but you referred to it in your direct

testimony.

A.   I'm sorry.  I have 53 but I -- and then 48.  I don't see

52.

06:39  Q.   D-52.  Well, it should be on your screen.

A.   Oh, okay.

Q.   Right?  You see what this is?  A June 8, 2007 memo by Mr.

Hill regarding an OCC proposal?

A.   Yes, sir.

06:40  Q.   Does it say proposal or order?

A.   It says OCC proposal.

Q.   And in the first sentence, does it talk about a proposed

agreement?

A.   Yes, I remember from reviewing the other documents.  It

06:40  was either this day, the day before when the Federal

regulators gave their draft Consent Order to the attorneys for

the Bank.

Q.   Okay.  And is it in this document where Mr. Hill makes

his comment that it was an extremely limited number of

06:40  incidents where the information may have been, here it is,

*United States District Court*
*Camden, New Jersey*

FISHER - REDIRECT - JACOBS

page two.  Let's go page two.  Sub, sub-paragraph Roman

Numeral eight.  If you can blow that up.

A.   Yes, sir.  Do you want me to read it?

Q.   We're going to blow it up first so everybody can read it.

A.   Okay.

Q.   Where the statement in the proposal apparently is the

Bank engaged in unsafe practices by submitting materially

false branch information.  Mr. Hill's response:  That is true

only in a extremely limited number of isolated cases.

A.   Yes, sir.

Q.   That's what we were talking about?

A.   Yes, sir.

Q.   All right.  Now this is June 8th.  This is 20 days before

the June 28th order.  Right?

A.   Yes, sir.

Q.   Right.  And having had a chance to think about this, can

you now agree that this whole false information in branch

application issue was dropped out of the June 28th order?

A.   Again, I would have to review the 28th order again but it

would still not change the fact that that is part of 359 that

I would have had to review because it's a document and the

document itself would give rise to a reasonable basis to

believe that Mr. Hill committed a breach of trust or fiduciary

duty or insider abuse.

Q.   Some of these other complaints.  Let's look at six, for

——— FISHER - REDIRECT - JACOBS ———

example.  The sheet metals workers' complaint.  Maybe we can

make that caption a little bigger.  Same thing here.  Who all

got sued?  Vernon Hill, Jack Bishard, Joe Buckelew, Donald

DiFrancesco, and on and on and on.  All the Directors got

06:42    sued, right?  We have it on the screen now.

A.  Yes, sir.

Q.  All the directors got sued.

A.  I know these are all directors.  I don't recall if those

were all of them but that would make sense.

06:42    Q.  Let's look at the next one I have in my hand, D-12, the

*Goldgarb* suit.  Let's blow up the caption and see all who got

sued.  Mr. Hill, Mr. Norcross, Mr. Bershad, Mr. Buckelew, Mr.

DiFrancesco, Mr. Giordano, Mr. Kerr, Mr. Lewis, Mr. Lloyd, Mr.

Ragone, on and on and on.

06:43         What do they all have in common?

A.  Directors of the bank, sir.

Q.  And one more, D-11, let's blow up the caption and see who

all got sued.  Mr. Hill, Mr. Bershad, Mr. Buckelew, Mr.

DiFrancesco, Mr. Giordano, Mr. Kerr, Mr. Lewis, Mr. Lloyd, the

06:43    directors, right?

A.  Yes, sir.

Q.  Now, will you confirm for the jury that the people who

filed these suits did not get one single dollar as a result of

these suits, do you know that?

06:43         MR. TAMBUSSI:  Judge, I'm not sure that's accurate.

FISHER - REDIRECT - JACOBS

THE WITNESS:  I know there were settlements.

MR. JACOBS:  He knows or he doesn't?

THE COURT:  You're asking him whether he knows the answer to that question?

06:44               MR. JACOBS:  Yes.

THE COURT:  Do you know the answer to that question? You're talking about any plaintiff in any lawsuit?

MR. JACOBS:  No, the three I just mentioned.

THE COURT:  Oh, just the ones you just mentioned.

06:44               MR. JACOBS:  I went through the ones that got dismissed.

THE COURT:  Well, there's a lot more than that.

BY MR. JACOBS:

Q.  The ones I'm talking about at the moment are D-11, D-6,

06:44      and D-12, do you know whether any of these plaintiffs got a single American dollar?

A.  Were those the cases from '04/'05 or were those the cases from '06/'07?

Q.  These cases are '07 cases.

06:44      A.  '07 I believe were settled, it would be my assumption they received something but, no, I didn't look into that so I don't know.

Q.  Putting aside your assumption, do you know as a matter of absolute historical fact they got any money?

06:44      A.  I wouldn't know that, no.

──────FISHER - RECROSS - TAMBUSSI──────

Q.   Did Mr. Hill have to pay a penny?

A.   Again, I wouldn't know that.  My assumption would be no.

Q.   Was any of this lawsuit activity, as far as you know, hidden from the Board of Directors of Commerce when they voted to pay Mr. Hill on June 28th and November 20 and December 18, 2007?

A.   I don't believe anything would be hidden, no, these were matters of public record.

Q.   Do you know of any efforts to keep directors such as Mr. Vassalluzzo, who has testified, Mr. Lloyd, who has testified, Mr. Buckelew, who has testified, Mr. Pauls, who has testified, do you know of any efforts to keep this information from them? It was commonly known within Commerce, wasn't it?

A.   Certainly, it was, again, public record, it was reported on by the press.

        MR. JACOBS:  That's all I have of the witness, Judge.

        MR. TAMBUSSI:  Just a couple, Judge.  I'm just going to grab a document, Judge, very quickly.

     Would you just pop up, Chris, if you would, D-52 in evidence on the screen?

(RECROSS-EXAMINATION OF JOHN CHRISTIAN FISHER BY MR. TAMBUSSI:)

Q.   You were asked some questions, Mr. Fisher, about whether or not the statements on Page 2 that the bank engaged in unsafe practices by submitting materially false branch

—— FISHER - RECROSS - TAMBUSSI ——

information made it into the June 28, 2007, Consent Order, do
you recall that?

A.  Yes, sir.

Q.  You're aware, are you not, that Mr. Hill was gone from
the bank by that point, correct?

A.  Yes, sir.

Q.  All right.  Now, these lawsuits where you were shown the
captions, Mr. Hill and a whole host of other people that you
identified as directors any of those other directors subject
to the OCC investigation, the Federal Reserve investigation
that was announced to December of '06 or did that
investigation solely focus on Mr. Hill?

A.  I don't believe so.  My focus, of course, was looking at
answering Section 359, which is related to Mr. Hill.  I
recall, in thinking about what was there, I think it was
focused on Mr. Hill and then his related business associates
and family members.

Q.  Okay.  So when you went through this process and you
looked at all these documents, you understood that certain
members of the Board of Directors signed certain documents
with regard to these investigations, correct?

A.  Yes, sir.

Q.  But when you were looking at it for the part 359
certification, did that part 359 certification focus on any
one of these directors besides Mr. Hill?

─────── FISHER - REDIRECT - JACOBS ───────

A.   No, sir.

          MR. TAMBUSSI:  Nothing further, Judge.

          THE COURT:  Any re-redirect?

          MR. JACOBS:  No, Judge.

06:48          THE COURT:  All right.  We're done for the day.

     Ladies and gentlemen, have a good evening.  We'll see

you tomorrow morning at 9:15.  Don't discuss the case, don't

do any research and have a great evening.

          MR. JACOBS:  Judge, I'm sorry.

06:48          THE COURT:  What?

          MR. JACOBS:  I'm sorry, I just found an exhibit I was

looking for.  One question.

          THE COURT:  Does it relate to something Mr. Tambussi

asked?

06:48          MR. JACOBS:  Yes.

          THE COURT:  Excuse me, ladies and gentlemen, have a

seat, please.

     Go ahead.

(REDIRECT EXAMINATION OF JOHN CHRISTIAN FISHER BY MR. JACOBS:)

06:48 Q.   We have Exhibit 51, third page.

          MR. TAMBUSSI:  D or P?

          MR. JACOBS:  P.

BY MR. JACOBS:

Q.   51, third page on the screen.

06:48          THE COURT:  That's not in evidence yet.

*United States District Court*
*Camden, New Jersey*

──────── FISHER - REDIRECT - JACOBS ────────

           MR. JACOBS:  Judge, I thought 51 was.

           THE COURT:  Are you moving it in the evidence?  Is it
plaintiff's 51 or defense 51?

           MR. JACOBS:  It's ours, Judge.

06:49      THE COURT:  Are you moving it in evidence?

           MR. JACOBS:  Yes.

           THE COURT:  Any objection?

           MR. TAMBUSSI:  Yes, Judge, I believe we did state an
objection.

06:49      MR. JACOBS:  It's already identified by this witness.

           MR. TAMBUSSI:  I know but we have an objection to it
coming into evidence.

           THE COURT:  There's testimony about it, it hasn't
been moved in evidence.

06:49      MR. JACOBS:  Let me ask the question.

BY MR. JACOBS:

Q.   Do you know whether the OCC and Federal Reserve requested
tolling agreements?  Do you know what they are?

           THE COURT:  You're asking what?

06:49      MR. JACOBS:  Tolling.

           THE COURT:  Oh, tolling.  T-O-L-L-I-N-G?

           MR. JACOBS:  Yes.

           THE COURT:  Thank you.

BY MR. JACOBS:

06:49
Q.   Do you know what tolling agreements are?

*United States District Court*
*Camden, New Jersey*

──────── FISHER - REDIRECT - JACOBS ────────

A.  I know what a tolling agreement is, yes, sir.

Q.  Do you know whether in December of 2006 the OCC and
Federal Reserve requested tolling agreements for Vernon Hill,
Shirley Hill, Jack Bershad, Joe Buckelew, Don DiFrancesco,
Edward Jordon, Morton Kerr, Steven Lewis, George Norcross,
Daniel Ragone, William Schwartz, Joe Tarquini, David Wojcik,
Dennis DiFlorio, Doug Pauls, Gerry Guidice, and Steve Talbot,
do you know whether they did?

A.  I don't recall that.  The only tolling agreement I recall
reviewing was something for InterArch.

Q.  I'm talking about individuals.  Do you know whether the
Federal Reserve and the OCC asked for tolling agreements on
the individuals I just named?

A.  I'm not aware of it, no.

          MR. JACOBS:  Nothing further, Judge.

          MR. TAMBUSSI:  Nothing further.

          THE COURT:  Okay.  Good night.

          DEPUTY CLERK:  All rise.

                    (Jury leaves the courtroom.)

          THE COURT:  Mr. Tambussi, I've got a motion to quash
a subpoena, are you going to respond to that or are you
abandoning the subpoena?

          MR. TAMBUSSI:  Can I tell you in the morning, Judge.

          THE COURT:  You want to say something?

          MR. JACOBS:  Yes, last Wednesday we gave our list of

——— FISHER - REDIRECT - JACOBS ———

read-ins to counsel and he gave us a response, objections,

additions, and so on Friday or Saturday and to this point

Wednesday we've been collaborating, we have accommodated most

if not at all of the additions and you've ruled on a handful

06:51    of objections.  The next read-in witness I believe has

generated the most objections.  I think we've accommodated all

of the supplements but there are a bunch of objections.  Now,

I think Mr. Tambussi was occupied with other matters and

therefore unable to do an additional review of where we are so

06:52    we'll be tackling that tomorrow morning.  But the problem as I

told you earlier?

           THE COURT:  Why can't we tackle it now?

           MR. TAMBUSSI:  I'm actually almost finished, Judge,

if I can have another 15 minutes.

06:52              MR. JACOBS:  Why don't we try to do it now?

           THE COURT:  It's my suggestion to do it now.

           MR. TAMBUSSI:  There's only a couple left, Judge,

that are in dispute.

           THE COURT:  I'll rule on them this afternoon.

06:52              MR. JACOBS:  That may solve the problem.

           THE COURT:  Anything else?

           MR. JACOBS:  Not from me.

           MR. TAMBUSSI:  We'll definitely need you but it's a

question of a couple of them.

06:52              THE COURT:  Fine.  I'll stick around.  Who is going

─────── FISHER - REDIRECT - JACOBS ───────

to testify tomorrow?  You have the read-ins.  What else are
you going to do tomorrow?

        MR. JACOBS:  Here's the agenda for tomorrow.  We're
going to do the read-ins.  Then we have a witness who's out of
the country, Mr. Lewis, I'm sorry, Mr. Schwartz.  I'm trying
to get some information on when we can expect him back.  I may
be asking to take him out of order after we rest because --

        THE COURT:  I don't have a problem with that.

        MR. JACOBS:  -- because my final witness, absent him,
would be Mr. Hill.

        THE COURT:  So you have two witnesses left, Mr. Hill
and Mr. Schwartz.

        MR. JACOBS:  Three.

        THE COURT:  And who is Mr. Schwartz?

        MR. JACOBS:  The read-in is Mr. Pollock.

        THE COURT:  Who is Schwartz?

        MR. JACOBS:  Mr. Schwartz is a former director.

        THE COURT:  Where is he now?

        MR. JACOBS:  He's out of the country.

        THE COURT:  You don't know when he's coming back?

        MR. JACOBS:  We tried to reach him by phone but we
don't have an answer to that question.  We served him with a
subpoena, he apparently understood it effective the week of
the 29th, which is how the problem arose.

        MR. TAMBUSSI:  Judge, can we have a proffer on this

witness, please?

          MR. JACOBS:  He's in the Pretrial Order.

          MR. TAMBUSSI:  We have an objection to this witness.

          THE COURT:  He's in the pretrial?

06:54          MR. JACOBS:  Yes.

          MR. TAMBUSSI:  Yes.

          THE COURT:  "Former Bancorp Director told by Bharat Masrani that TD's plan is to delay payment to Vernon Hill forever and cost him as much as possible in legal fees."

06:54          That's what he's going to say?

          MR. JACOBS:  Yes.

          MR. TAMBUSSI:  What's the relevance of that to a breach of contract, Judge?

          MR. JACOBS:  That it's intentional.  If that is their

06:54     intent to delay payment as long as possible, that's a relevant fact for the jury that bespeaks breach of contract.  That explains their motive, look at the delays in this case. Explain them any other way.

          MR. TAMBUSSI:  Judge, this is a straight up breach of

06:54     contract case.  This is tort testimony, it is not breach of contract testimony.

          MR. JACOBS:  Judge, we still have a punitive damage claim in this case and, if Mr. Schwartz is believed by the jury, then that gives me explanations why they did nothing

06:55     from March 13, 2008, forward.  Now, I have the corporate

FISHER - REDIRECT - JACOBS

representative saying they made no decision at all for a
period starting no later than March 13, 2008, and extending
through 2011, then they went silent for another year until
they filed the Pollock letter in 2012 and then went silent for
another year until the Fisher certifications.  I have a
foundation, an evidential foundation to support this.  If this
witness is believed by the jury, it fully explains what they
have done, they are just intentionally delaying the matter and
if that means breaching the contract, then they'll breach the
contract.

          MR. TAMBUSSI:  Judge, that's not what this case is
about.  And, frankly, this is clearly inflammatory evidence
that has no bearing on the basic elements of this case, which
is a breach of contract case.

          MR. JACOBS:  It deals directly with the good faith
and the bad faith.

          THE COURT:  The bank has an obligation, a contractual
obligation to pay him these benefits under his contract.  So
it is, I think the question of delay is relevant to the breach
issue in this case.

          MR. JACOBS:  To the good faith/bad faith issue also.

          THE COURT:  It's more than that, good faith/bad
faith, they have an obligation to pay under the contract.
They have an explanation of impossibility, I think the
plaintiff is entitled to proffer a different explanation.  I

—————FISHER - REDIRECT - JACOBS—————

will permit that testimony.

          MR. JACOBS:  Thank you, Judge.  You're going to wait

a while?

          THE COURT:  I'll be here.

          MR. TAMBUSSI:  Thank you, Judge.

          THE COURT:  Upstairs.

               (Proceedings Concluded)

## $

**$100** [2] - 61:11, 66:7
**$11,250** [2] - 189:22, 190:8
**$11,250,000** [1] - 84:21
**$11,250,000.00** [2] - 190:16, 190:17
**$17** [1] - 119:19
**$4** [1] - 108:4
**$400** [3] - 50:22, 62:23, 66:7

## '

**'02** [1] - 52:9
**'04/'05** [1] - 201:17
**'06** [1] - 203:11
**'06/'07** [1] - 201:18
**'07** [3] - 163:6, 201:19, 201:20
**'88** [2] - 51:23, 52:5
**'98** [3] - 51:23, 52:5, 52:9

## /

**/S** [1] - 1:25

## 0

**04's** [1] - 156:19
**06** [1] - 19:23
**07** [1] - 19:23
**07's** [1] - 156:19
**08101** [1] - 1:9
**09-3685** [1] - 1:5

## 1

**1** [58] - 2:2, 2:3, 2:6, 2:8, 2:10, 2:13, 2:18, 2:20, 2:22, 2:24, 3:1, 3:3, 3:5, 3:7, 3:9, 3:11, 3:13, 3:15, 3:17, 3:19, 3:21, 3:23, 3:25, 4:2, 4:4, 4:6, 4:8, 4:10, 4:12, 4:14, 4:16, 4:18, 4:20, 4:22, 4:24, 5:1, 5:3, 5:5, 5:7, 5:9, 44:13, 49:19, 78:1, 90:21, 99:1, 102:3, 102:11, 103:16, 107:2, 109:20, 109:21, 138:24, 139:1, 139:19,

**158**:15, 188:11
**10** [7] - 2:6, 3:23, 17:20, 43:25, 44:17, 117:4, 155:4
**100** [1] - 2:18
**1014** [1] - 115:2
**10K** [1] - 16:23
**10Q** [1] - 15:16
**11** [9] - 5:9, 17:5, 19:16, 125:14, 126:11, 155:16, 155:18, 173:23, 175:22
**11,000** [1] - 190:12
**11,10** [1] - 195:11
**11,250,000** [1] - 190:9
**115** [1] - 60:1
**11:00** [1] - 30:8
**12** [11] - 3:19, 4:20, 14:9, 45:16, 101:7, 111:23, 117:11, 156:4, 156:6, 174:8, 193:6
**12.12** [2] - 190:22, 191:1
**12.2** [1] - 191:1
**12CFR359** [1] - 174:15
**12CFR359.4** [1] - 174:5
**12th** [3] - 14:25, 27:12, 95:2
**13** [11] - 4:10, 4:14, 5:1, 5:3, 17:14, 159:22, 175:24, 188:24, 192:9, 209:25, 210:2
**135** [2] - 60:2, 60:3
**13th** [1] - 167:24
**14** [9] - 3:3, 4:22, 44:14, 44:16, 90:22, 95:23, 128:21, 176:8, 176:9
**145** [1] - 2:6
**149** [2] - 2:20, 2:22
**14th** [3] - 33:13, 172:21, 176:16
**15** [11] - 2:8, 2:24, 39:17, 87:4, 88:9, 90:25, 137:21, 139:20, 143:7, 144:23, 207:14
**150** [1] - 2:24
**151** [1] - 3:1
**152** [1] - 3:3
**153** [1] - 3:5
**154** [2] - 3:7, 3:9
**155** [2] - 3:11, 3:13
**156** [1] - 3:15

**159** [1] - 3:17
**15th** [2] - 88:11, 88:13
**16** [7] - 3:1, 4:4, 15:5, 44:16, 44:23, 93:15, 181:7
**160** [1] - 3:19
**161** [3] - 3:21, 3:23, 3:25
**162** [1] - 4:2
**163** [1] - 4:4
**164** [2] - 4:6, 4:8
**165** [1] - 4:10
**166** [2] - 4:12, 4:14
**167** [2] - 4:16, 4:18
**168** [1] - 4:20
**169** [2] - 4:22, 4:24
**17** [3] - 5:7, 106:14, 136:8
**170** [1] - 5:1
**171** [2] - 5:3, 5:5
**172** [1] - 5:7
**173** [1] - 5:9
**177** [1] - 2:8
**17th** [2] - 8:13, 170:17
**18** [5] - 23:17, 77:5, 181:12, 186:20, 202:5
**19** [5] - 2:13, 47:15, 77:5, 161:21, 164:20
**190** [1] - 117:5
**1973** [1] - 196:17
**1977** [1] - 31:12
**1997** [3] - 31:11, 31:12
**1998** [4] - 31:10, 51:23, 52:15, 52:22
**1st** [8] - 43:20, 43:21, 129:24, 130:18, 132:2, 132:8, 132:15, 139:8

## 2

**2** [12] - 4:12, 11:14, 11:20, 14:16, 40:13, 43:22, 44:17, 46:18, 49:5, 49:6, 65:6, 202:24
**2.6** [1] - 84:25
**20** [10] - 3:13, 17:21, 19:15, 23:16, 73:22, 77:5, 162:15, 181:12, 199:13, 202:5
**2002** [6] - 51:24, 52:16, 52:22, 125:21, 126:7, 129:4
**2003** [4] - 13:17, 129:4, 148:8, 181:5

**2004** [12] - 40:13, 43:22, 44:17, 46:2, 129:4, 148:8, 156:17, 178:16, 181:3, 181:17, 183:3, 186:17
**2004/2005** [1] - 150:21
**2005** [9] - 43:25, 44:3, 44:17, 44:18, 178:7, 178:15, 181:3, 181:17, 186:17
**2006** [20] - 19:16, 43:20, 43:21, 44:13, 44:14, 44:16, 52:16, 52:23, 55:8, 55:12, 56:17, 128:21, 129:4, 161:5, 161:13, 181:7, 188:11, 188:14, 197:6, 206:2
**2007** [76] - 11:17, 12:16, 13:2, 13:24, 14:9, 15:1, 15:5, 15:17, 15:21, 16:1, 16:24, 17:3, 17:11, 17:21, 18:14, 19:15, 19:17, 19:25, 20:21, 23:17, 49:7, 49:19, 57:20, 57:21, 57:24, 61:20, 62:9, 73:22, 96:7, 105:3, 122:19, 123:9, 126:17, 128:5, 133:11, 133:20, 134:4, 134:6, 134:18, 139:24, 140:19, 140:22, 141:6, 154:1, 156:17, 162:4, 163:2, 165:2, 165:3, 165:16, 166:20, 167:14, 167:24, 168:14, 169:17, 170:2, 181:12, 186:5, 186:16, 186:18, 186:20, 186:24, 187:9, 188:14, 188:25, 191:23, 192:9, 195:12, 196:18, 197:6, 198:12, 202:6, 203:1
**2008** [19] - 17:14, 24:3, 24:17, 33:13, 45:13, 45:15, 45:16, 62:9, 62:10, 106:14, 109:3, 122:3, 136:8, 170:17, 176:16, 186:18, 188:14, 209:25, 210:2
**2009** [2] - 8:13, 188:14
**2010** [8] - 95:2, 96:18, 98:18, 98:19,

**172**:21, 188:1, 188:7, 188:14
**2011** [17] - 30:17, 31:10, 71:3, 71:12, 71:18, 72:11, 75:22, 93:21, 94:9, 118:17, 132:25, 175:23, 187:20, 188:6, 188:13, 188:14, 210:3
**2012** [2] - 195:11, 210:4
**2013** [16] - 1:10, 88:10, 90:21, 90:22, 90:25, 99:1, 102:3, 102:11, 103:16, 109:20, 109:21, 119:5, 125:12, 137:21, 145:1, 176:17
**202** [1] - 2:10
**204** [1] - 2:13
**20th** [4] - 22:18, 169:5, 169:17, 186:20
**21** [5] - 2:2, 2:10, 44:23, 72:10, 77:6
**210** [1] - 78:1
**215** [3] - 113:21, 114:1, 114:6
**22** [11] - 2:22, 3:9, 4:2, 4:18, 44:5, 44:10, 47:20, 71:17, 98:25
**23** [4] - 2:3, 48:12, 71:11, 192:9
**23rd** [1] - 20:7
**24** [18] - 3:17, 3:25, 4:8, 4:24, 5:5, 30:17, 71:2, 71:3, 71:12, 71:18, 72:11, 93:21, 94:9, 94:18, 95:14, 95:15, 178:7, 178:15
**24th** [1] - 178:16
**25** [1] - 48:22
**250** [1] - 190:11
**26** [6] - 18:14, 48:24, 49:5, 186:23, 186:24, 187:3
**27** [3] - 50:8, 50:20, 51:11
**28** [13] - 1:24, 11:17, 12:16, 15:1, 44:7, 49:7, 57:21, 57:24, 61:20, 134:6, 134:18, 181:12, 203:1
**28th** [8] - 15:14, 165:2, 165:16, 166:20, 199:14, 199:18, 199:19, 202:5
**29** [1] - 15:21
**29th** [3] - 12:13, 176:17, 208:24
**2:52** [1] - 143:11

## 3

**3** [5] - 13:2, 18:1, 68:18, 186:24, 187:9
**3-5** [1] - 168:7
**30** [9] - 15:17, 73:21, 95:23, 106:7, 126:7, 190:24, 191:12, 191:14
**31** [5] - 16:24, 17:3, 187:20, 187:25, 188:6
**32** [1] - 52:2
**34** [1] - 196:16
**35** [4] - 62:17, 63:7, 64:7, 66:3
**359** [39] - 97:19, 99:6, 111:24, 114:10, 114:21, 115:22, 120:20, 120:21, 121:6, 132:6, 132:7, 138:20, 140:9, 140:12, 141:24, 145:25, 146:4, 146:12, 146:18, 148:11, 150:3, 151:6, 151:23, 164:12, 174:6, 181:24, 182:3, 182:15, 184:3, 184:10, 184:16, 190:17, 193:6, 196:11, 199:20, 203:14, 203:23, 203:24
**359.4** [6] - 68:15, 73:2, 81:19, 111:23, 138:9, 171:17
**359.4(a)(4** [1] - 117:11
**359.4(a)(4)** [1] - 101:7
**39** [2] - 55:11, 94:18
**3:00** [5] - 71:2, 71:11, 71:18, 72:11, 144:20
**3:11** [2] - 145:1, 145:5
**3:15** [1] - 144:21
**3rd** [5] - 167:14, 189:1, 189:20, 190:6, 190:14

## 4

**4** [17] - 13:24, 26:3, 57:23, 60:6, 85:4, 105:20, 106:15, 106:21, 106:23, 107:16, 108:8, 108:13, 108:14, 136:13, 136:14,

136:15, 176:25
**40** [3] - 53:10, 53:24, 56:19
**400** [1] - 61:10
**401K** [2] - 21:5, 193:24
**41** [4] - 33:15, 34:19, 37:14, 39:1
**42** [1] - 45:14
**450** [1] - 134:22
**46** [1] - 171:10
**465** [1] - 73:23
**48** [1] - 198:8
**4:21** [1] - 166:20
**4B** [1] - 49:6

## 5

**5** [9] - 14:2, 14:8, 55:12, 106:12, 107:1, 107:9, 107:11, 136:11
**5-2** [1] - 163:9
**5-3** [1] - 170:10
**50** [1] - 125:20
**51** [6] - 128:20, 204:20, 204:24, 205:1, 205:3
**52** [2] - 163:14, 198:9
**53** [2] - 16:25, 198:8
**56** [1] - 178:16
**5:00** [1] - 90:18
**5th** [4] - 55:8, 56:17, 161:5, 161:13

## 6

**6** [10] - 3:7, 4:6, 15:4, 44:3, 44:18, 110:1, 142:17, 170:2, 191:23, 192:9
**6-0** [1] - 164:4
**60** [4] - 62:12, 62:13, 62:18, 63:7
**61** [1] - 141:25
**65** [5] - 50:7, 50:11, 50:16, 60:23, 62:15
**656** [2] - 114:12, 114:16
**66** [1] - 121:5
**6th** [1] - 168:14

## 7

**7** [1] - 153:3
**7-0** [2] - 173:5, 173:6
**7.3B** [1] - 190:22
**70** [11] - 40:8, 62:12, 62:13, 62:18, 63:7,

90:21, 99:11, 99:12, 99:21, 100:6
**71** [6] - 88:6, 88:7, 89:7, 92:8, 136:25, 137:10
**729,000** [1] - 84:23
**753** [1] - 1:24
**7th** [2] - 163:2, 163:6

## 8

**8** [13] - 1:10, 3:11, 3:15, 13:24, 16:1, 85:23, 110:9, 111:4, 124:6, 145:1, 153:19, 195:11, 198:12
**8.5** [1] - 110:17
**86** [1] - 44:23
**8:00** [1] - 86:11
**8:30** [1] - 86:14
**8th** [1] - 199:13

## 9

**9** [8] - 2:18, 3:5, 4:16, 111:17, 116:25, 125:21, 154:14, 195:11
**92** [2] - 2:2, 2:3
**95** [1] - 17:13
**9:15** [1] - 204:7
**9:30** [2] - 86:14, 86:22

## A

**a.m** [1] - 85:23
**A1** [1] - 68:18
**abandoning** [1] - 206:22
**able** [5] - 11:11, 61:14, 136:21, 136:22, 168:20
**absent** [3] - 89:22, 90:12, 208:9
**absolute** [1] - 201:24
**absolutely** [5] - 11:3, 13:19, 24:7, 131:9, 174:23
**abundantly** [1] - 122:23
**abuse** [11] - 57:9, 69:5, 76:10, 78:6, 113:10, 123:22, 147:12, 175:14, 182:2, 184:6, 199:24
**abuses** [15] - 32:7, 32:17, 33:1, 33:7,

33:18, 34:5, 34:10, 34:25, 35:4, 35:12, 35:17, 40:23, 43:7, 45:5, 123:16
**accelerated** [1] - 85:3
**accept** [4] - 14:14, 111:12, 116:4, 137:25
**accepted** [1] - 52:22
**accepting** [1] - 165:20
**access** [1] - 24:16
**accommodated** [2] - 207:3, 207:6
**accompanied** [1] - 57:1
**according** [11] - 17:22, 47:20, 49:9, 50:14, 51:18, 52:4, 61:25, 81:6, 81:11, 99:22, 115:6
**accordingly** [1] - 12:8
**account** [1] - 96:8
**accounting** [1] - 84:4
**accurate** [7] - 6:14, 7:11, 14:7, 18:25, 125:16, 139:7, 200:25
**accuse** [1] - 75:12
**accusing** [1] - 144:12
**acquired** [1] - 24:23
**acquisition** [2] - 58:10, 59:9
**act** [24] - 12:8, 32:6, 32:16, 32:25, 33:17, 34:4, 34:9, 34:15, 35:3, 35:11, 35:16, 40:22, 42:3, 43:6, 45:4, 57:8, 57:15, 69:4, 76:4, 76:6, 78:5, 112:5, 147:11, 174:19
**Act** [2] - 78:23, 79:9
**acted** [2] - 9:17, 13:20
**acting** [1] - 24:14
**action** [22] - 16:2, 21:18, 42:9, 61:25, 149:25, 150:20, 151:20, 152:22, 153:13, 154:12, 155:1, 155:13, 155:25, 156:1, 156:11, 156:15, 160:4, 174:10, 178:5, 178:17, 178:22
**Action** [4] - 183:11, 183:13, 183:16, 183:17
**ACTION** [1] - 1:4

**actions** [3] - 38:13, 178:18, 180:1
**Actions** [1] - 182:11
**activities** [5] - 9:6, 9:12, 25:16, 67:18, 183:5
**activity** [1] - 202:3
**acts** [1] - 38:15
**actual** [8] - 58:8, 59:7, 59:17, 114:21, 121:14, 123:16, 134:6, 171:17
**adamantly** [1] - 96:7
**add** [2] - 65:19, 65:21
**added** [2] - 113:5, 144:9
**addendum** [1] - 116:13
**addition** [3] - 96:8, 96:11, 104:3
**additional** [2] - 97:21, 207:9
**additions** [2] - 207:2, 207:4
**address** [2] - 9:1, 143:21
**adds** [1] - 65:25
**adequacy** [2] - 158:16, 159:13
**adjournment** [3] - 85:23, 86:2, 86:12
**adjudication** [7] - 36:24, 37:2, 37:11, 37:21, 37:22, 56:14, 156:21
**adjustor** [1] - 37:5
**admission** [2] - 37:3, 38:5
**admits** [1] - 170:20
**admitted** [3] - 8:21, 133:3, 159:22
**admitting** [3] - 37:15, 37:18, 116:23
**adverse** [10] - 69:6, 76:17, 77:17, 78:13, 78:15, 174:20, 175:3, 175:6, 175:11, 175:14
**advised** [9] - 18:13, 18:19, 26:9, 26:12, 39:1, 47:22, 60:14, 73:25, 188:21
**advises** [2] - 162:7, 188:20
**advising** [2] - 58:3, 162:5
**affect** [2] - 21:12, 26:17
**affected** [2] - 25:19, 26:22

**affecting** [1] - 21:25
**affidavit** [2] - 79:12, 99:5
**affiliated** [4] - 147:15, 174:4, 174:14, 176:19
**afraid** [1] - 8:6
**afternoon** [5] - 92:20, 93:10, 93:11, 144:14, 207:19
**agencies** [2] - 97:6, 176:4
**agency** [2] - 108:18, 174:19, 174:25
**agenda** [1] - 208:3
**ago** [13] - 26:2, 65:3, 65:8, 93:21, 99:2, 102:17, 106:6, 107:24, 118:16, 132:2, 134:17, 137:22, 139:9
**agree** [8] - 7:2, 29:7, 51:17, 52:4, 143:2, 177:3, 180:4, 199:17
**agreed** [10] - 6:6, 38:12, 59:6, 59:7, 80:6, 100:16, 108:2, 108:5, 108:7, 108:22
**agreed-upon** [4] - 108:2, 108:5, 108:7, 108:22
**agreeing** [1] - 26:3
**Agreement** [6] - 12:2, 22:24, 38:17, 83:24, 95:24, 104:1
**agreement** [32] - 15:23, 17:4, 21:4, 22:7, 22:17, 23:7, 23:22, 24:5, 28:25, 37:19, 37:20, 37:21, 43:15, 59:1, 100:21, 107:23, 116:10, 122:3, 140:8, 141:20, 142:2, 142:7, 142:8, 150:22, 166:23, 189:16, 190:2, 190:23, 192:23, 198:18, 206:1, 206:9
**agreements** [8] - 46:23, 49:1, 49:2, 130:5, 205:18, 205:25, 206:3, 206:12
**agrees** [1] - 38:14
**ahead** [8] - 30:15, 37:25, 77:13, 133:18, 180:16, 183:2, 195:3, 204:18
**Alexander** [5] - 13:23, 83:20, 96:22, 123:4, 163:2

**allegation** [3] - 33:24, 42:3, 48:13
**allegations** [14] - 10:9, 10:12, 12:18, 12:22, 32:13, 33:3, 41:19, 42:25, 69:15, 156:23, 182:5, 182:11, 184:7, 184:16
**allocated** [2] - 51:10, 66:9
**allocation** [4] - 49:1, 61:6, 61:16, 63:2
**allocations** [2] - 50:22, 66:8
**allow** [2] - 106:9, 136:12
**allowance** [1] - 85:6
**almost** [5] - 14:25, 15:13, 72:21, 130:19, 207:13
**alone** [1] - 157:25
**amend** [2] - 100:1, 159:11
**amended** [6] - 17:3, 43:15, 154:15, 154:16, 155:11, 157:23
**Amended** [2] - 95:24, 154:24
**amendment** [2] - 14:14, 137:25
**amendments** [1] - 99:25
**American** [1] - 201:16
**amicable** [1] - 176:12
**amount** [9] - 17:5, 63:8, 82:19, 106:24, 106:25, 107:23, 108:1, 110:2, 188:9
**amounts** [2] - 17:7, 187:18
**analysis** [8] - 47:16, 49:11, 49:21, 50:14, 50:15, 60:8, 60:21, 65:8
**analyze** [1] - 49:25
**AND** [1] - 1:14
**announced** [2] - 15:21, 203:11
**announcement** [2] - 45:20, 45:21
**announces** [1] - 179:11
**annual** [1] - 63:8
**annually** [2] - 61:10, 61:11
**answer** [59] - 23:9, 23:20, 25:1, 28:10,

28:12, 28:15, 29:1, 29:3, 29:6, 29:9, 30:5, 33:21, 35:7, 40:8, 41:7, 53:11, 54:16, 61:23, 68:1, 69:16, 69:21, 70:12, 70:17, 76:19, 77:3, 77:9, 77:14, 78:24, 79:15, 82:4, 82:22, 83:4, 96:2, 98:17, 127:1, 127:10, 127:14, 127:16, 127:20, 127:23, 128:8, 133:16, 135:1, 136:1, 140:11, 141:2, 141:5, 141:19, 142:6, 175:1, 175:4, 175:8, 175:16, 175:20, 194:24, 195:2, 201:4, 201:6, 208:22
**answered** [6] - 72:9, 94:12, 96:16, 174:21, 174:23, 175:12
**answering** [6] - 30:2, 40:19, 95:5, 114:20, 173:2, 203:14
**answers** [5] - 38:17, 69:10, 93:25, 95:9, 131:19
**anticipated** [1] - 176:17
**anyway** [1] - 154:2
**apologies** [1] - 68:10
**apologize** [4] - 44:25, 92:13, 103:11, 104:23
**apparent** [4] - 10:22, 58:8, 59:7, 59:17
**appeals** [1] - 48:5
**appear** [8] - 32:14, 34:7, 37:17, 37:18, 45:9, 57:16, 68:22, 144:9
**appearance** [4] - 85:22, 85:24, 87:15, 125:22
**appeared** [2] - 33:25, 80:20
**appearing** [1] - 37:9
**Appellate** [1] - 48:6
**append** [1] - 106:15
**appended** [1] - 55:25
**applicable** [3] - 12:2, 23:24, 112:8
**application** [23] - 21:23, 22:2, 23:1, 23:3, 26:16, 51:12, 51:19, 52:5, 52:15, 52:22, 52:24, 53:6, 53:13, 80:13, 90:15,

133:5, 133:7, 134:12, 134:22, 135:9, 135:13, 191:7, 199:18
**applications** [9] - 46:24, 52:5, 52:10, 52:19, 115:2, 134:19, 134:21, 162:8, 197:14
**applied** [2] - 21:22, 193:6
**applies** [1] - 194:13
**apply** [11] - 16:2, 37:7, 99:12, 116:16, 118:24, 119:3, 119:4, 121:6, 184:1, 191:14
**applying** [1] - 196:7
**appoint** [1] - 30:1
**appointed** [1] - 30:4
**appreciate** [1] - 35:18
**approach** [6] - 147:24, 150:9, 151:10, 152:8, 153:2, 165:7
**appropriate** [5] - 9:13, 21:25, 34:13, 96:9, 96:12
**approval** [58] - 12:7, 15:23, 16:2, 16:13, 17:6, 17:7, 17:17, 21:8, 21:20, 22:2, 22:14, 22:19, 23:1, 23:12, 23:18, 23:21, 24:6, 24:9, 24:21, 24:25, 25:8, 25:25, 26:18, 80:3, 96:16, 96:19, 97:14, 98:8, 101:5, 101:10, 101:14, 101:15, 102:8, 102:13, 103:3, 103:8, 103:14, 139:10, 139:22, 140:4, 140:24, 142:20, 142:24, 167:3, 176:12, 176:23, 177:4, 177:9, 181:11, 184:2, 188:18, 191:20, 193:19, 194:5, 194:7, 194:14, 195:10
**approvals** [7] - 23:25, 96:9, 96:11, 97:6, 162:10, 190:20
**approve** [4] - 26:22, 80:18, 104:25, 105:10
**approved** [4] - 11:22, 12:6, 19:1, 74:5
**approving** [1] - 80:24
**April** [15] - 8:13, 19:25, 20:7, 20:15,

27:12, 51:23, 88:9, 88:12, 88:13, 90:25, 137:21, 139:20, 162:4, 176:17
**architectural** [1] - 129:11
**areas** [2] - 197:25, 198:1
**arising** [7] - 59:12, 59:13, 62:3, 67:12, 67:23, 68:5, 125:6, 65:10
**Arnold** [3] - 24:11, 24:14, 80:11
**arose** [9] - 45:20, 58:23, 61:24, 178:18, 178:19, 179:4, 183:4, 183:13, 208:24
**Arps** [1] - 189:4
**arriving** [1] - 159:14
**article** [6] - 6:14, 6:23, 6:25, 7:14, 65:6, 65:10
**Article** [4] - 38:10, 49:5, 107:10, 107:12
**AS** [3] - 92:21, 92:22, 157:6
**ashton** [1] - 166:18
**Ashton** [1] - 167:5
**aside** [3] - 60:7, 158:11, 201:23
**assertions** [1] - 133:5
**assessment** [3] - 82:18, 83:10, 198:1
**assessments** [1] - 50:11
**assistance** [1] - 127:5
**assisting** [1] - 24:12
**associates** [4] - 55:18, 56:21, 125:8, 203:16
**Association** [1] - 193:1
**assume** [12] - 8:15, 14:7, 18:12, 18:18, 18:25, 19:7, 99:17, 109:7, 111:19, 157:8, 160:24, 198:4
**assumed** [2] - 26:4, 38:3
**assuming** [1] - 11:9
**assumption** [5] - 24:22, 82:25, 201:20, 201:23, 202:2
**attached** [1] - 165:19
**attempt** [2] - 50:5, 99:7
**attempted** [1] - 24:5
**attempting** [3] -

24:6, 24:9, 191:20
**attention** [2] - 37:14, 95:20
**attest** [1] - 83:2
**attorney** [10] - 22:21, 34:1, 81:2, 82:4, 105:25, 167:14, 167:24, 179:11, 189:6, 191:8
**attorney's** [3] - 104:6, 105:16, 106:4
**attorneys** [18] - 18:6, 18:14, 23:5, 83:22, 96:25, 117:23, 126:18, 128:4, 130:6, 140:2, 183:16, 191:18, 191:19, 195:6, 195:7, 198:21
**ATTORNEYS** [2] - 1:15, 1:18
**audience** [2] - 8:3, 8:4
**August** [5] - 16:1, 20:8, 168:14, 191:23, 192:9
**authored** [4] - 23:10, 105:9, 140:23, 188:23
**authorities** [2] - 96:10, 96:12
**authorization** [4] - 19:2, 74:7, 88:18, 89:23
**authorize** [2] - 21:11, 21:12
**authorized** [3] - 22:8, 88:23, 89:23
**authorizing** [2] - 19:1, 74:6
**automobile** [1] - 31:6
**automobiles** [1] - 31:5
**Avenue** [1] - 189:10
**avoid** [3] - 123:15, 125:22, 126:4
**aware** [37] - 22:12, 22:16, 23:4, 36:2, 36:11, 38:24, 39:3, 60:19, 68:19, 69:18, 70:18, 71:8, 71:23, 72:1, 72:3, 72:15, 72:24, 73:9, 73:19, 79:2, 80:14, 96:6, 102:14, 109:19, 116:17, 120:8, 126:15, 128:15, 129:6, 132:13, 147:8, 176:7, 180:14, 197:13, 203:4, 206:14
**awful** [1] - 87:10
**awhile** [1] - 180:17

# B

**bad** [2] - 73:15, 210:16
**Bancorp** [17] - 11:16, 23:10, 24:23, 43:16, 46:10, 84:3, 95:21, 119:6, 120:1, 148:6, 151:21, 156:12, 164:11, 174:9, 178:12, 192:7, 209:7
**BANCORP** [1] - 1:6
**Bank** [190] - 8:14, 11:9, 12:13, 25:5, 29:22, 30:5, 30:21, 31:1, 31:8, 31:13, 31:15, 31:19, 31:20, 31:24, 32:4, 32:12, 32:23, 33:7, 33:8, 33:16, 34:8, 34:13, 34:14, 34:19, 34:20, 34:23, 35:2, 35:5, 35:6, 35:7, 35:9, 35:13, 35:15, 35:19, 35:24, 38:20, 39:3, 40:16, 40:21, 41:3, 41:8, 41:10, 41:12, 41:13, 43:4, 44:20, 45:6, 45:23, 47:4, 47:5, 47:25, 49:10, 49:11, 49:20, 49:24, 50:6, 51:2, 51:9, 53:18, 53:21, 54:6, 54:11, 54:12, 54:19, 54:25, 55:17, 55:18, 56:4, 56:23, 57:7, 57:13, 58:3, 58:4, 58:5, 58:18, 59:14, 60:9, 60:13, 60:18, 61:1, 61:20, 62:17, 63:13, 63:20, 63:25, 64:7, 64:15, 64:22, 65:13, 84:4, 84:6, 84:10, 93:13, 93:14, 93:15, 94:3, 97:13, 98:7, 100:24, 103:14, 104:24, 106:15, 106:21, 107:16, 108:2, 108:5, 108:23, 109:2, 110:7, 110:16, 118:20, 118:23, 119:8, 119:9, 119:10, 119:24, 120:2, 120:6, 120:11, 121:15, 121:16, 121:19, 121:20, 121:21, 122:18, 123:15, 124:3, 124:5, 127:21, 129:4, 129:10, 130:6, 131:13, 131:17,

132:9, 132:14, 133:5, 133:6, 134:22, 135:4, 135:5, 136:7, 136:12, 164:10, 179:17, 181:20, 181:22, 181:24, 182:21, 182:23, 183:17, 184:1, 184:10, 184:15, 185:2, 185:12, 185:20, 185:23, 186:1, 186:2, 191:11, 193:1, 193:10, 193:13, 195:7, 195:10, 195:13, 195:14, 195:16, 196:9, 196:12, 196:14, 196:19, 197:1, 197:3, 197:8, 197:9, 197:10, 197:25, 198:22, 199:7
**bank** [109] - 32:8, 65:16, 65:22, 65:24, 66:2, 66:14, 66:19, 67:1, 67:5, 67:10, 67:14, 67:20, 67:24, 68:3, 68:7, 68:12, 69:3, 69:12, 69:25, 70:10, 70:13, 70:16, 70:20, 70:24, 71:3, 71:6, 71:11, 71:15, 71:17, 71:23, 72:2, 72:11, 72:12, 72:14, 72:17, 72:23, 73:13, 73:16, 74:11, 75:5, 75:17, 75:18, 76:17, 77:17, 78:13, 78:16, 80:12, 81:16, 81:23, 82:5, 82:8, 82:16, 84:16, 84:18, 90:22, 91:2, 96:24, 105:9, 108:17, 110:15, 112:2, 112:20, 113:2, 113:8, 113:11, 114:4, 114:17, 116:18, 117:15, 119:17, 119:19, 128:4, 129:22, 139:6, 142:4, 142:9, 145:24, 147:5, 147:7, 150:23, 157:15, 158:12, 158:17, 159:14, 161:15, 161:16, 162:5, 163:3, 163:5, 163:21, 166:5, 168:19, 168:24, 170:25, 175:24, 176:1, 176:10, 176:19, 176:22, 179:24, 180:14, 181:2, 200:16, 202:24, 203:5, 210:17

**bank's** [11] - 82:8, 83:6, 84:15, 85:7, 110:11, 111:6, 111:8, 115:24, 117:9, 140:2, 177:8
**Bank's** [8] - 41:15, 46:20, 47:20, 50:9, 124:25, 126:18, 129:7, 130:6
**banking** [3] - 112:8, 175:18, 196:16
**banks** [3] - 63:7, 172:6, 179:18
**barbone** [2] - 143:20, 144:2
**Barbone** [4] - 85:20, 86:22, 87:10, 88:6
**BARBONE** [2] - 1:14, 1:15
**BARONE** [1] - 29:19
**based** [50] - 24:1, 25:7, 32:12, 33:8, 34:1, 34:6, 35:14, 35:22, 37:17, 40:20, 41:13, 43:4, 43:7, 43:8, 43:10, 57:13, 58:21, 60:14, 61:19, 61:25, 67:15, 71:10, 72:25, 73:17, 79:17, 79:18, 82:23, 83:2, 83:25, 84:12, 84:19, 100:23, 105:5, 106:22, 122:20, 122:21, 122:23, 132:6, 139:2, 139:3, 139:4, 139:5, 140:21, 181:23, 189:20, 190:6, 190:14, 197:19
**basic** [1] - 210:13
**basing** [1] - 122:3
**basis** [71] - 22:6, 26:13, 32:5, 32:15, 32:24, 33:16, 34:3, 34:21, 34:23, 35:10, 35:20, 35:25, 40:17, 41:3, 41:9, 41:11, 43:5, 43:9, 45:3, 54:17, 58:18, 67:5, 67:21, 68:3, 68:21, 69:3, 69:20, 70:1, 70:8, 70:14, 70:17, 70:21, 71:4, 71:13, 71:19, 72:12, 72:18, 73:3, 73:5, 73:14, 79:4, 79:20, 79:23, 81:22, 82:9, 82:19, 83:12, 91:2, 112:4, 112:22, 113:3, 113:16, 114:5, 114:14, 114:15,

115:1, 115:9, 115:14, 121:11, 121:18, 121:23, 123:10, 123:18, 180:11, 180:15, 181:17, 181:25, 182:4, 182:7, 183:15, 199:22
**bear** [2] - 71:16, 83:9
**bearing** [4] - 41:25, 210:13
**bears** [1] - 81:18
**became** [2] - 140:7, 140:10
**become** [3] - 24:24, 145:15, 183:1
**becomes** [1] - 90:18
**BEEN** [1] - 92:21
**began** [2] - 63:15, 63:18
**begin** [2] - 134:14, 176:16
**beginning** [2] - 19:19, 115:24
**behalf** [7] - 23:10, 30:2, 30:5, 38:5, 100:25, 120:1, 192:6
**belief** [6] - 57:7, 61:21, 121:11, 182:14, 182:18, 184:5
**believes** [3] - 69:3, 120:17, 122:16
**belong** [3] - 195:13, 195:14, 195:17
**below** [2] - 63:7, 66:3
**beneficiary** [1] - 25:25
**benefit** [6] - 49:11, 49:21, 50:14, 60:8, 60:20, 65:8
**benefits** [8] - 21:5, 21:6, 23:24, 97:18, 192:24, 193:5, 210:18
**Bennett** [3] - 13:3, 167:13, 186:25
**Bershad** [7] - 152:22, 184:23, 185:5, 185:17, 200:12, 200:18, 206:4
**bespeaks** [1] - 209:16
**best** [14] - 9:2, 25:23, 33:21, 56:12, 65:15, 65:18, 66:13, 66:17, 66:21, 86:18, 89:18, 99:8, 104:11, 124:21
**bet** [1] - 132:25
**better** [2] - 30:11, 143:21
**between** [15] - 43:15, 47:4, 53:18, 100:14,

105:8, 106:13, 108:23, 109:2, 122:10, 122:18, 130:5, 131:17, 136:8, 136:16, 164:10

**beyond** [1] - 59:18
**Bharat** [1] - 209:7
**big** [6] - 36:21, 111:17, 114:22, 135:20, 160:21, 180:8
**bigger** [6] - 95:15, 95:17, 107:11, 107:12, 109:14, 200:2
**bill** [1] - 129:5
**billion** [1] - 110:17
**binder** [1] - 137:6
**Bishard** [1] - 200:3
**bit** [16] - 33:12, 65:20, 70:6, 90:11, 94:23, 95:17, 100:11, 107:12, 113:6, 146:19, 167:16, 184:22, 185:16, 189:19, 192:12, 192:15
**blame** [1] - 25:20
**blank** [10] - 104:2, 104:5, 104:8, 104:9, 104:12, 105:15, 105:23, 110:1, 110:3, 110:6
**blanks** [2] - 105:18, 105:22
**blessed** [1] - 112:12
**blow** [9] - 173:24, 184:22, 185:4, 189:18, 192:14, 199:2, 199:4, 200:11, 200:17
**board** [7] - 145:21, 145:23, 161:15, 166:18, 169:4, 169:16, 177:7
**Board** [118] - 8:21, 9:3, 9:6, 9:9, 9:11, 9:14, 9:17, 9:25, 10:14, 10:16, 11:16, 11:22, 11:25, 12:22, 13:12, 13:16, 13:24, 14:3, 14:6, 14:9, 14:12, 14:16, 14:21, 15:1, 15:4, 16:1, 16:3, 16:4, 16:11, 16:15, 16:17, 17:21, 18:5, 18:11, 18:13, 18:19, 18:21, 19:1, 19:2, 19:6, 19:11, 21:3, 21:13, 21:19, 22:9, 22:10, 22:16, 23:7, 23:11, 23:15, 24:2,

26:9, 26:18, 27:2, 27:11, 28:7, 34:7, 39:1, 39:5, 44:20, 45:21, 46:10, 46:12, 55:9, 55:12, 73:17, 73:22, 73:25, 74:1, 74:5, 74:6, 74:10, 79:14, 80:1, 96:21, 96:22, 97:3, 97:10, 102:21, 117:9, 117:14, 117:17, 117:20, 117:25, 118:8, 118:10, 118:11, 118:19, 118:23, 119:1, 119:5, 119:12, 119:12, 119:22, 119:24, 120:2, 120:3, 120:8, 120:10, 120:16, 122:1, 122:8, 122:15, 122:21, 122:22, 122:23, 128:5, 140:3, 168:16, 170:3, 181:10, 188:20, 191:25, 193:7, 202:4, 203:20
**Board's** [2] - 11:4, 117:17
**boards** [1] - 146:2
**Bob** [1] - 150:1
**body** [1] - 26:2
**Bono** [3] - 19:20, 128:21, 166:9
**bonus** [4] - 84:23, 101:14, 101:25, 104:10
**bonuses** [1] - 106:3
**book** [3] - 11:14, 83:21, 89:4
**booklet** [1] - 137:5
**borrow** [1] - 76:23
**bottom** [5] - 15:20, 44:9, 53:3, 54:24, 187:11
**bought** [2] - 110:16, 195:21
**box** [1] - 177:22
**branch** [19] - 46:24, 51:12, 51:18, 58:10, 59:9, 125:9, 133:7, 134:11, 134:19, 134:21, 134:22, 135:8, 135:13, 162:8, 162:10, 163:22, 199:8, 199:17, 202:25
**branches** [4] - 53:16, 59:9, 129:10, 129:22
**brand** [1] - 132:11
**breach** [36] - 32:6, 32:16, 32:25, 33:6,

33:18, 34:4, 34:9, 34:25, 35:3, 35:11, 35:16, 40:22, 43:6, 45:5, 57:9, 69:5, 76:7, 78:6, 112:6, 113:10, 121:25, 122:25, 147:12, 175:6, 175:10, 182:1, 184:5, 199:23, 209:13, 209:16, 209:19, 209:20, 210:9, 210:14, 210:19
**breached** [1] - 123:21
**breaches** [1] - 170:21
**breaching** [1] - 210:9
**break** [11] - 30:6, 30:8, 39:16, 51:3, 64:7, 85:12, 88:3, 143:7, 144:5, 174:18, 196:23
**brief** [6] - 28:20, 30:13, 40:2, 59:23, 128:23, 193:21
**Brief** [1] - 144:25
**briefed** [5] - 14:16, 18:5, 18:11, 21:14, 22:21
**broad** [2] - 71:21, 138:8
**brokerage** [3] - 31:3, 31:4, 31:25
**brought** [10] - 16:11, 45:2, 71:17, 72:1, 72:8, 80:17, 82:7, 83:14, 130:7, 196:3
**BROWN** [1] - 1:16
**Buckelew** [11] - 132:18, 133:1, 152:22, 184:23, 185:6, 185:17, 200:3, 200:12, 200:18, 202:11, 206:4
**bulk** [1] - 36:12
**bunch** [1] - 207:7
**bureaucratic** [1] - 27:5
**business** [16] - 39:3, 54:11, 54:12, 54:14, 54:19, 54:24, 54:25, 55:2, 55:18, 56:21, 90:14, 100:24, 100:25, 125:7, 126:6, 203:16
**BY** [67] - 1:14, 1:17, 2:4, 2:7, 2:9, 2:11, 2:14, 8:19, 92:23, 93:9, 94:24, 95:19, 100:10, 107:3,

107:14, 109:15, 109:25, 111:16, 137:17, 141:18, 145:10, 146:11, 146:17, 147:2, 148:1, 149:23, 150:16, 151:4, 151:17, 152:18, 153:10, 154:8, 154:23, 155:10, 155:22, 156:10, 159:25, 160:16, 161:2, 161:11, 161:25, 162:24, 163:18, 164:8, 164:25, 165:14, 166:3, 166:15, 167:12, 168:13, 169:15, 170:1, 170:14, 171:14, 171:25, 172:19, 173:12, 174:1, 177:15, 177:16, 178:1, 201:13, 202:21, 204:19, 204:23, 205:16, 205:24

## C

**C.F.R** [3] - 101:7, 111:23, 117:11
**cake** [1] - 124:23
**calculation** [1] - 85:7
**CAM** [8] - 49:2, 51:9, 61:7, 61:16, 62:14, 63:3, 66:8, 66:9
**Camden** [1] - 1:9
**cancel** [1] - 51:3
**cancelling** [1] - 51:7
**cannot** [15] - 70:12, 70:18, 71:8, 71:23, 72:15, 112:2, 112:20, 114:20, 118:8, 120:17, 120:19, 122:8, 122:16, 136:7, 176:1
**capacity** [1] - 53:22
**capital** [1] - 110:11
**caption** [6] - 184:22, 185:4, 185:16, 200:2, 200:11, 200:17
**captions** [1] - 203:8
**care** [1] - 143:13
**career** [2] - 31:21, 31:23
**careful** [2] - 61:23, 113:12
**Carl** [1] - 1:25
**carries** [1] - 58:7

**case** [43] - 6:21, 7:23, 8:1, 8:5, 8:7, 8:9, 23:22, 30:3, 39:17, 39:18, 46:6, 85:13, 86:24, 88:19, 88:21, 90:1, 91:20, 94:12, 94:14, 116:8, 143:9, 144:1, 145:12, 147:15, 148:17, 150:25, 153:13, 160:3, 174:11, 174:12, 179:12, 181:16, 181:17, 183:12, 194:9, 204:7, 209:17, 209:20, 209:23, 210:11, 210:13, 210:14, 210:20
**cases** [12] - 9:6, 133:9, 163:24, 178:18, 181:14, 181:15, 186:8, 199:9, 201:17, 201:19
**caused** [2] - 27:5, 46:23
**caution** [1] - 42:9
**cease** [5] - 58:25, 122:10, 122:18, 123:8, 123:13
**center** [4] - 44:6, 55:4, 58:7, 95:16
**CEO** [2] - 56:18, 134:22
**certain** [24] - 8:7, 8:24, 13:23, 16:7, 26:1, 26:25, 27:5, 39:6, 48:25, 59:12, 64:25, 96:6, 101:6, 116:12, 125:18, 145:14, 145:17, 170:5, 185:10, 192:24, 193:14, 203:19, 203:20
**certainly** [13] - 26:21, 33:13, 124:4, 129:9, 143:16, 159:17, 181:10, 182:5, 182:15, 182:16, 191:8, 196:14, 202:14
**certificates** [2] - 51:6, 62:12
**certification** [72] - 79:12, 79:13, 79:15, 80:19, 88:9, 89:10, 90:21, 91:12, 94:25, 95:2, 99:5, 99:6, 99:16, 100:23, 101:4, 102:7, 103:20, 106:1, 107:17, 109:21, 109:24, 112:17,

112:20, 113:1,
113:15, 113:21,
114:20, 115:15,
116:2, 116:14,
117:11, 118:9,
118:13, 119:11,
120:18, 120:19,
120:23, 121:6, 122:2,
122:8, 122:16, 123:1,
126:12, 126:13,
129:14, 130:18,
132:2, 132:3, 132:5,
136:17, 137:20,
137:23, 137:24,
138:20, 138:24,
139:1, 139:3, 139:6,
139:13, 147:5,
158:10, 158:14,
163:20, 164:12,
173:13, 173:23,
176:6, 176:22,
182:17, 183:1, 203:24
  **certifications** [5] -
139:8, 139:9, 139:12,
159:15, 210:5
  **Certified** [1] - 1:24
  **certified** [3] - 83:16,
173:17, 174:7
  **certify** [21] - 78:23,
79:9, 79:24, 83:4,
112:3, 114:9, 115:21,
116:13, 121:15,
121:17, 121:21,
132:6, 174:18,
174:24, 175:5, 175:9,
175:13, 175:17,
175:24, 176:1, 184:10
  **cetera** [8] - 57:15,
71:9, 71:24, 117:25,
162:13, 182:2,
182:13, 197:21
  **CFR** [1] - 193:6
  **chain** [1] - 142:3
  **chairman** [5] - 17:1,
56:18, 179:23,
180:20, 181:2
  **challenged** [2] -
186:6, 186:9
  **chance** [3] - 132:16,
167:17, 199:16
  **change** [7] - 11:1,
11:5, 69:9, 116:6,
117:3, 186:11, 199:20
  **changed** [2] - 31:19,
84:6
  **changes** [1] - 91:1
  **charge** [1] - 135:8
  **charged** [3] - 24:8,
48:20, 180:3
  **charges** [6] - 49:2,

51:9, 61:7, 62:14,
63:3, 66:10
  **chase** [1] - 64:13
  **check** [8] - 44:24,
50:8, 59:20, 59:22,
77:5, 108:12, 135:12
  **checking** [1] - 76:5
  **checks** [3] - 195:12,
195:16, 195:24
  **chief** [5] - 17:2,
34:12, 41:19, 43:1,
186:9
  **choice** [1] - 86:20
  **Chris** [6] - 146:1,
146:15, 146:20,
149:2, 173:24, 202:19
  **Christian** [1] - 92:25
  **CHRISTIAN** [8] - 2:2,
2:4, 2:11, 2:14, 92:21,
92:23, 202:21, 204:19
  **chronology** [1] -
159:5
  **circumstances** [1] -
26:6
  **citation** [1] - 175:21
  **city** [1] - 179:14
  **CIVIL** [1] - 1:4
  **civil** [5] - 40:11,
174:10, 178:4, 180:1,
184:19
  **claim** [8] - 38:2, 41:8,
42:9, 118:7, 183:19,
183:25, 184:9, 209:23
  **claimed** [2] - 10:4,
115:20
  **claiming** [6] - 43:4,
43:9, 48:13, 67:21,
138:24, 138:25
  **claims** [14] - 13:11,
14:2, 14:16, 18:8,
18:22, 20:23, 36:16,
36:18, 36:25, 40:16,
53:23, 74:2, 115:20,
184:14
  **clarification** [2] -
55:23, 114:23
  **clarified** [1] - 116:22
  **clarify** [4] - 114:11,
114:23, 116:11,
116:22
  **clarity** [1] - 18:2
  **class** [14] - 149:25,
150:20, 151:20,
152:21, 153:13,
154:12, 155:1,
155:13, 155:25,
156:1, 156:15, 178:5,
178:18, 178:22
  **Class** [5] - 182:11,
183:11, 183:13,

183:16, 183:17
  **clean** [2] - 99:7,
129:5
  **clear** [18] - 9:8, 21:3,
23:7, 33:15, 67:16,
72:20, 82:11, 103:12,
104:23, 108:7,
115:17, 115:18,
122:23, 140:7,
140:10, 177:6, 180:3,
194:1
  **clearly** [2] - 105:6,
210:12
  **CLERK** [12] - 6:1,
7:18, 39:19, 39:23,
40:3, 85:15, 87:20,
87:22, 92:10, 143:10,
145:4, 206:18
  **client** [1] - 192:7
  **close** [12] - 32:18,
38:5, 38:20, 38:23,
48:22, 54:2, 54:15,
55:4, 59:10, 80:21,
125:2, 125:7
  **closely** [1] - 138:10
  **Club** [2] - 46:7, 47:6,
54:7
  **club** [2] - 54:15, 55:4
  **coconspirator** [3] -
42:18, 42:23, 179:22
  **Cohen** [3] - 1:8,
13:22, 14:17
  **collaborating** [1] -
207:3
  **collect** [1] - 164:15
  **combined** [3] -
178:23, 178:24,
183:21
  **coming** [7] - 72:20,
96:22, 127:12,
177:21, 191:8,
205:12, 208:20
  **comment** [1] -
198:24
  **COMMERCE** [1] -
1:6
  **Commerce** [95] -
8:14, 11:9, 11:16,
12:13, 18:20, 23:10,
24:23, 31:13, 31:14,
31:15, 31:16, 31:20,
32:8, 32:18, 33:1,
33:7, 33:8, 33:19,
34:6, 35:1, 35:5,
35:12, 43:16, 46:10,
47:22, 55:12, 56:21,
57:10, 58:5, 58:20,
61:22, 62:8, 63:6,
73:25, 95:21, 96:8,
96:11, 97:5, 97:13,

98:7, 103:3, 103:14,
104:24, 110:16,
118:20, 119:6, 119:8,
120:1, 122:11,
122:18, 123:2, 126:6,
128:21, 129:4, 130:1,
130:20, 130:25,
131:23, 132:9,
132:10, 133:4,
140:23, 145:12,
148:6, 151:21, 152:1,
156:12, 160:5, 161:6,
164:11, 167:4, 174:9,
174:20, 175:3, 175:7,
175:11, 175:15,
175:19, 178:12,
179:17, 186:1, 186:3,
188:6, 192:7, 193:1,
193:6, 193:10,
193:13, 195:13,
195:17, 195:21,
196:5, 196:17, 202:4,
202:13
  **Commerce's** [1] -
166:25
  **Commission** [1] -
75:4
  **commissions** [4] -
75:3, 114:3, 114:6,
115:10
  **commit** [3] - 57:15,
78:24, 182:25
  **committed** [38] -
32:6, 32:16, 32:24,
33:6, 33:17, 34:4,
34:9, 34:15, 34:22,
34:24, 35:3, 35:10,
35:16, 40:22, 43:5,
45:4, 57:8, 67:14,
69:4, 69:14, 76:1,
76:4, 76:7, 78:5,
112:5, 113:9, 113:10,
123:22, 174:19,
174:25, 175:6,
175:10, 175:14,
182:1, 182:15,
182:24, 184:5, 199:23
  **committee** [32] -
24:17, 27:12, 45:12,
45:18, 45:22, 46:9,
46:12, 46:15, 47:21,
49:25, 50:1, 50:3,
50:15, 50:21, 52:8,
52:9, 62:9, 64:5,
64:25, 65:11, 128:1,
128:2, 130:11,
130:19, 130:23,
130:24, 131:9,
131:11, 131:20,
131:21, 135:11,

160:19
  **common** [6] - 185:1,
185:9, 185:12,
185:22, 186:1, 200:15
  **commonly** [2] -
36:23, 202:13
  **communicated** [3] -
22:4, 22:5, 59:13
  **communicating** [1] -
21:17
  **companies** [3] -
39:2, 125:14, 125:23
  **Company** [1] - 121:2
  **company** [21] -
15:21, 17:2, 31:2,
31:3, 46:21, 53:25,
54:14, 55:3, 68:17,
69:7, 76:11, 84:3,
84:4, 84:5, 84:6, 84:8,
84:10, 110:7, 120:6,
190:19, 190:21
  **company's** [3] -
189:21, 190:7, 190:15
  **comparing** [1] - 38:2
  **comparison** [1] -
31:2
  **compensation** [1] -
14:3
  **complaint** [13] -
36:10, 40:10, 41:23,
41:25, 42:4, 42:7,
42:8, 42:24, 53:4,
53:7, 155:12, 184:19,
200:1
  **Complaint** [6] -
154:15, 154:16,
154:17, 154:24,
156:14, 178:4
  **complaints** [14] -
36:4, 45:23, 45:24,
45:25, 156:16,
156:17, 156:18,
156:23, 183:3,
183:23, 183:24,
184:19, 186:13,
199:25
  **complete** [4] - 122:1,
122:25, 133:15,
181:14
  **completed** [1] -
38:13
  **completely** [2] -
6:23, 159:4
  **completeness** [3] -
29:3, 46:24, 103:25
  **completes** [1] -
29:11
  **completion** [1] -
135:9
  **complex** [2] - 121:4,

196:1
**compliance** [3] -
16:9, 16:19, 24:4
**complied** [1] - 28:13
**comply** [6] - 21:13,
22:17, 22:18, 26:14,
170:22, 190:21
**components** [1] -
104:10
**compose** [3] - 95:9,
100:12, 100:14
**composed** [5] -
24:18, 95:11, 100:15,
109:20, 109:21
**comptroller** [8] -
38:4, 38:14, 38:23,
55:9, 170:19, 171:6,
193:4
**Comptroller** [4] -
97:9, 161:15, 162:4,
165:4
**computer** [2] -
195:16, 195:22
**concept** [2] - 36:15,
58:6
**concern** [1] - 54:6
**concerned** [1] -
194:9
**conclude** [2] - 67:11,
73:14
**Concluded** [1] -
211:7
**concluded** [3] - 66:2,
70:1, 72:12
**concludes** [3] - 27:6,
28:21, 85:9
**conclusion** [14] -
34:8, 43:8, 45:6,
47:20, 48:17, 53:14,
62:13, 70:4, 70:7,
71:7, 96:4, 113:9,
113:12, 159:14
**concur** [1] - 6:22
**condition** [15] -
57:12, 58:20, 59:2,
61:22, 61:24, 67:7,
67:12, 67:23, 68:5,
68:9, 68:10, 147:16,
172:3, 172:6, 193:3
**conditions** [3] - 12:1,
112:7, 123:14
**conduct** [2] - 9:7,
58:13
**conducted** [2] -
75:20, 117:8
**conducting** [2] -
55:16, 58:5
**conferences** [1] -
117:24
**conferring** [2] -

28:24, 59:24
**confidential** [3] -
89:14, 89:17, 89:21
**confidentiality** [2] -
88:21, 89:25
**confirm** [4] - 49:24,
51:10, 53:23, 200:22
**confirmation** [1] -
193:22
**confirming** [1] -
49:20
**conflict** [2] - 85:20,
125:22
**conflicting** [1] - 52:7
**conflicts** [4] - 58:9,
59:8, 59:17, 125:6
**confusing** [2] -
51:16, 51:17
**conjunction** [5] -
94:5, 117:8, 151:5,
176:4, 182:10
**connection** [5] -
54:18, 101:5, 102:8,
125:8, 170:23
**CONNERY** [1] - 1:16
**connive** [1] - 180:24
**consensus** [2] - 9:5,
10:22
**consent** [7] - 37:10,
96:7, 133:10, 164:20,
165:1, 165:3, 170:16
**Consent** [38] - 11:10,
33:10, 37:16, 38:18,
38:25, 49:6, 49:7,
49:9, 49:14, 56:16,
57:19, 57:24, 58:1,
58:7, 59:1, 60:7,
63:12, 63:15, 64:4,
64:13, 66:20, 67:8,
67:12, 67:23, 68:5,
85:4, 106:13, 107:6,
126:17, 133:20,
133:24, 134:3, 134:4,
134:6, 136:8, 193:4,
198:21, 203:1
**consenting** [2] - 58:4
**consider** [2] - 80:24,
81:23
**considerably** [2] -
44:17, 90:25
**consideration** [2] -
117:9, 176:3
**considered** [4] -
90:23, 117:15,
120:11, 168:2
**consolidated** [1] -
178:17
**conspired** [1] - 114:1
**constitute** [1] - 38:13
**constructed** [1] -

129:11
**construction** [2] -
58:10, 59:9
**construed** [1] -
37:22
**contacting** [1] -
21:17
**contained** [1] -
156:23
**contemplated** [1] -
136:11
**contents** [1] - 109:11
**context** [3] - 111:3,
158:6, 158:21
**continue** [4] - 40:6,
66:15, 127:16, 127:19
**continued** [3] -
27:25, 28:17, 70:9
**continues** [1] - 74:5
**continuing** [1] - 64:1
**contract** [60] - 21:7,
21:18, 22:3, 22:11,
23:2, 23:13, 23:17,
23:21, 23:24, 24:25,
25:19, 26:15, 44:13,
81:6, 81:17, 81:20,
82:6, 84:16, 84:18,
97:19, 98:9, 98:11,
101:15, 103:4,
103:15, 103:21,
105:20, 105:22,
105:23, 106:3, 106:5,
130:8, 131:16,
140:18, 140:21,
157:23, 157:25,
181:7, 181:11, 182:7,
187:25, 188:3, 188:4,
188:7, 188:11,
188:15, 188:16,
191:6, 191:11,
191:13, 192:17,
209:13, 209:16,
209:20, 209:21,
210:9, 210:10,
210:14, 210:18,
210:23
**Contract** [1] - 81:10
**contractors** [3] -
46:21, 48:14, 48:18
**contractual** [8] -
83:23, 84:11, 95:22,
96:3, 104:6, 141:9,
190:22, 210:17
**contractually** [3] -
104:3, 104:13, 194:14
**contrary** [1] - 90:19
**control** [3] - 67:9,
195:12, 197:21
**convenience** [6] -
154:5, 154:20, 155:7,

155:19, 156:7, 159:23
**conversations** [2] -
182:13, 195:8
**convicted** [1] - 180:3
**cooled** [1] - 79:19
**copy** [6] - 76:25,
106:15, 116:10,
136:18, 137:3, 187:4
**Corey** [3] - 160:4,
179:15, 179:16
**corporate** [31] -
29:21, 30:23, 30:24,
30:25, 31:4, 32:23,
33:4, 35:2, 36:2,
38:24, 40:16, 41:15,
43:3, 45:3, 49:23,
53:22, 57:6, 58:17,
61:15, 67:10, 67:21,
72:6, 83:7, 84:9, 94:4,
94:5, 145:11, 145:14,
170:22, 196:25,
209:25
**Corporation** [2] -
97:8, 168:16
**corporation** [3] -
29:25, 30:2, 101:1
**corporations** [1] -
29:24
**correct** [82] - 1:24,
8:22, 9:23, 17:23,
20:16, 41:24, 43:10,
43:11, 44:19, 47:7,
48:23, 49:16, 52:13,
55:13, 57:25, 58:11,
62:25, 63:4, 65:12,
69:22, 69:23, 70:5,
72:5, 75:8, 76:2, 76:4,
106:11, 108:16,
110:4, 113:24, 121:9,
139:11, 139:21,
145:12, 146:6, 147:5,
147:9, 147:10,
147:12, 147:13,
147:16, 148:12,
148:15, 148:17,
154:25, 155:1,
155:12, 156:13,
156:14, 156:18,
156:24, 162:10,
162:11, 165:2,
165:17, 165:21,
166:5, 166:18,
166:19, 166:25,
167:4, 167:14,
167:25, 168:17,
168:20, 168:22,
168:25, 169:18,
170:5, 170:17,
170:18, 171:18,
173:14, 173:18,

173:21, 177:5,
177:10, 180:12,
187:22, 191:10,
203:5, 203:21
**corrected** [1] - 146:9
**correctly** [11] -
14:19, 17:8, 18:9,
18:22, 19:4, 19:13,
28:9, 66:11, 66:14,
66:18, 66:24
**correspondence** [1]
- 195:8
**corruption** [2] -
160:3, 179:12
**Cory** [1] - 42:14
**cost** [10] - 49:10,
49:21, 50:13, 55:3,
60:8, 60:20, 65:8,
110:10, 124:4, 209:9
**costly** [1] - 176:16
**costs** [1] - 54:14
**counsel** [51] - 7:2,
10:1, 16:6, 16:8, 18:5,
21:11, 21:24, 22:1,
24:4, 24:8, 24:15,
25:7, 25:9, 26:10,
28:22, 28:24, 28:25,
29:23, 46:15, 59:24,
82:24, 85:6, 89:25,
95:11, 96:21, 97:2,
100:15, 102:20,
102:21, 106:11,
117:17, 119:13,
120:14, 120:15,
122:22, 123:2,
128:21, 129:8,
133:23, 138:3, 139:5,
141:1, 145:23,
146:24, 177:8, 187:8,
207:1
**counsel's** [1] - 137:1
**counsels** [3] - 16:20,
21:17, 22:4
**count** [1] - 138:23
**country** [2] - 208:5,
208:19
**counts** [4] - 185:10,
185:11, 185:13,
185:24
**couple** [15] - 15:10,
26:1, 31:19, 50:19,
63:6, 67:2, 82:7,
85:22, 99:1, 107:24,
124:10, 130:15,
179:16, 179:17,
193:12, 202:17,
207:17, 207:24
**Courier** [2] - 6:25,
7:24
**course** [5] - 6:16,

89:24, 100:24,
124:22, 203:13
**COURT** [247] - 1:1,
6:2, 6:12, 6:18, 7:7,
7:13, 7:17, 7:20, 8:15,
27:8, 27:16, 27:18,
27:22, 28:16, 28:23,
29:4, 29:13, 29:15,
29:17, 29:23, 30:8,
30:12, 30:14, 39:14,
39:16, 39:19, 39:23,
39:24, 40:1, 40:3,
40:5, 45:1, 77:13,
85:11, 85:19, 86:3,
86:6, 86:11, 86:18,
87:4, 87:16, 87:23,
87:25, 88:2, 88:5,
88:9, 88:12, 88:14,
89:2, 89:6, 89:8,
89:16, 90:2, 90:7,
90:11, 90:17, 91:4,
91:8, 91:13, 91:15,
91:19, 91:23, 91:25,
92:2, 92:4, 92:6, 92:9,
92:12, 92:19, 92:24,
93:1, 93:3, 93:6, 93:8,
94:20, 99:12, 99:14,
99:17, 99:21, 100:3,
100:6, 110:19, 111:1,
111:5, 111:8, 111:12,
126:25, 127:4, 127:9,
127:13, 127:16,
127:19, 129:16,
133:17, 136:20,
136:22, 137:1, 137:6,
137:9, 137:13,
137:15, 141:1, 141:5,
141:8, 141:12,
141:15, 143:7,
143:12, 143:15,
143:18, 144:16,
144:19, 144:23,
145:1, 145:2, 145:6,
146:21, 147:25,
148:21, 148:24,
149:10, 149:13,
149:16, 149:20,
150:7, 150:11,
150:13, 151:3,
151:12, 151:14,
152:7, 152:9, 152:11,
152:13, 152:17,
153:1, 153:3, 153:5,
153:7, 153:17,
153:19, 153:23,
154:3, 154:14,
154:19, 155:4, 155:6,
155:16, 155:18,
156:4, 156:6, 157:2,
157:4, 157:7, 157:10,
157:17, 157:19,

158:11, 158:23,
159:10, 159:22,
160:7, 160:10,
160:13, 160:24,
161:8, 161:18,
161:20, 161:23,
162:15, 162:17,
162:19, 163:9,
163:11, 163:14,
164:4, 164:17,
164:20, 164:22,
165:6, 165:9, 165:12,
165:25, 166:9,
166:11, 167:8,
167:10, 167:20,
168:7, 168:9, 169:4,
169:7, 169:10,
169:12, 169:22,
170:10, 171:10,
171:22, 172:15,
173:5, 173:7, 177:13,
177:23, 189:23,
190:1, 190:4, 190:9,
190:11, 195:3,
196:23, 201:3, 201:6,
201:9, 201:12, 204:3,
204:5, 204:10,
204:13, 204:16,
204:25, 205:2, 205:5,
205:7, 205:13,
205:19, 205:21,
205:23, 206:17,
206:20, 206:24,
207:12, 207:16,
207:19, 207:21,
207:25, 208:8,
208:11, 208:14,
208:16, 208:18,
208:20, 209:4, 209:7,
210:17, 210:22,
211:4, 211:6
**court** [5] - 39:22,
85:21, 127:5, 144:3,
156:11
**Court** [4] - 48:6,
48:9, 145:11, 178:4
**Court's** [1] - 149:8
**Courthouse** [1] - 1:8
**Courtroom** [4] -
7:19, 85:16, 87:21,
92:11
**courtroom** [4] -
39:20, 92:4, 93:16,
206:19
**cover** [7] - 54:14,
55:3, 89:12, 112:11,
147:23, 173:20,
195:24
**covered** [4] - 13:12,
97:25, 98:9, 98:11

**covers** [1] - 31:5
**create** [1] - 64:24
**created** [1] - 181:25
**creates** [2] - 45:3,
182:7
**credit** [3] - 106:23,
115:2
**crime** [2] - 76:1,
180:4
**criminal** [5] - 160:4,
178:20, 179:25,
181:17, 182:12
**Critchley** [1] - 24:12
**criteria** [1] - 174:4
**Cromwell** [10] -
19:11, 20:17, 24:11,
24:14, 28:7, 28:11,
80:11, 168:15, 170:4,
192:4
**crop** [6] - 115:3,
115:10, 138:16,
138:17, 138:18,
138:22
**CROSS** [2] - 2:6,
145:10
**cross** [1] - 145:7
**cross-examination**
[1] - 145:7
**crystal** [1] - 180:3
**cued** [1] - 144:14
**cure** [1] - 95:21
**Currency** [4] - 97:9,
161:15, 162:4, 165:4
**currency** [2] - 55:9,
193:4
**current** [3] - 119:5,
119:12, 182:7
**custody** [1] - 195:12
**cut** [3] - 29:1, 29:9,
64:13

# D

**D-10** [5] - 3:11,
155:3, 155:8, 155:11,
185:16
**D-11** [6] - 3:13,
155:15, 155:20,
155:23, 200:17,
201:14
**D-12** [6] - 3:15,
156:3, 156:8, 156:11,
200:10, 201:15
**D-13** [7] - 3:17,
157:1, 157:2, 157:3,
159:24, 160:1, 179:8
**D-1879** [1] - 65:2
**D-19** [6] - 3:25,
161:17, 161:18,

161:20, 161:24, 162:1
**D-2** [5] - 2:20, 148:2,
148:19, 148:24, 149:1
**D-20** [4] - 4:2,
162:14, 162:22,
162:25
**D-3** [6] - 2:22,
149:12, 149:16,
149:22, 149:24, 183:7
**D-4** [9] - 2:24, 150:9,
150:11, 150:15,
150:17, 150:18,
177:20, 178:2, 183:7
**D-5** [5] - 3:1, 151:11,
151:12, 151:16,
151:19
**D-51** [6] - 4:14,
166:8, 166:10,
166:13, 166:16,
166:17
**D-52** [7] - 4:4, 163:8,
163:16, 163:19,
198:5, 198:10, 202:19
**D-6** [9] - 3:3, 152:10,
152:11, 152:13,
152:14, 152:19,
153:22, 153:23,
201:14
**D-7** [7] - 3:5, 153:3,
153:4, 153:7, 153:9,
153:12, 184:18
**D-8** [7] - 3:7, 153:18,
153:20, 154:3, 154:6,
154:10, 154:16
**D-9** [6] - 3:9, 154:13,
154:19, 154:22,
154:24, 185:3
**D-two** [1] - 183:7
**D.C** [5] - 18:15, 97:2,
189:8, 189:10, 191:18
**damage** [3] - 110:15,
127:24, 209:22
**Daniel** [1] - 206:6
**date** [30] - 12:15,
12:16, 15:25, 17:14,
17:16, 19:15, 24:2,
44:4, 44:16, 77:25,
98:18, 98:19, 99:4,
102:3, 117:14, 118:2,
118:5, 118:10, 119:4,
119:9, 148:7, 177:9,
178:7, 178:15,
187:19, 187:20,
188:10, 190:24
**dated** [4] - 33:13,
43:19, 43:20, 45:12,
45:16, 55:11, 88:9,
90:24, 106:14,
139:19, 163:2,
167:14, 187:9, 191:23

**David** [4] - 135:3,
135:4, 161:19, 206:6
**days** [12] - 25:14,
85:22, 95:23, 106:7,
188:23, 190:24,
191:4, 191:12,
191:14, 192:9, 194:3,
199:13
**deal** [7] - 18:20,
60:16, 66:2, 73:25,
104:8, 135:22, 183:3
**dealing** [3] - 48:24,
87:13, 105:18
**dealings** [1] - 130:20
**deals** [5] - 48:12,
66:25, 67:8, 124:2,
210:15
**dealt** [3] - 53:17,
163:12, 168:19
**decades** [2] - 54:1,
132:10
**decades-long** [1] -
54:1
**December** [20] -
16:24, 19:16, 19:22,
23:17, 52:23, 55:8,
55:12, 56:17, 128:21,
161:5, 161:13, 170:2,
181:12, 186:20,
187:20, 187:25,
188:6, 202:5, 203:11,
206:2
**decide** [1] - 120:4
**decided** [4] - 16:4,
53:12, 70:10, 118:10
**decision** [8] - 35:15,
46:20, 57:14, 67:24,
82:9, 121:19, 159:18,
210:1
**decision-making** [1]
- 159:18
**decisions** [2] -
158:12, 162:8
**deduction** [2] -
108:14, 136:13
**deem** [1] - 97:20
**defend** [1] - 8:25
**Defendant** [1] - 1:7
**defendant** [27] -
2:20, 2:22, 2:24, 3:1,
3:3, 3:5, 3:7, 3:11,
3:13, 3:15, 3:17, 3:25,
4:2, 29:21, 149:1,
149:22, 150:15,
151:16, 152:14,
153:9, 154:6, 155:8,
155:20, 156:8,
159:24, 161:24,
162:22
**DEFENDANT** [1] -

1:18
**defendants** [1] - 96:6
**defended** [2] - 8:23, 8:24
**Defense** [1] - 161:20
**defense** [4] - 10:5, 138:3, 186:23, 205:3
**deferred** [2] - 22:11, 22:15
**defined** [1] - 174:15
**definitely** [3] - 11:8, 97:15, 207:23
**definition** [1] - 75:10
**definitive** [2] - 35:15, 57:14
**defuse** [1] - 11:6
**delay** [3] - 209:8, 209:15, 210:19
**delaying** [1] - 210:8
**delays** [2] - 92:14, 209:17
**delete** [1] - 59:25
**deliberate** [1] - 91:20
**demand** [2] - 14:18, 57:1
**demonstrate** [7] - 68:18, 69:18, 121:8, 121:10, 147:7, 159:3, 159:4
**denial** [1] - 38:5
**denied** [2] - 89:1, 90:5
**denies** [2] - 170:20, 171:5
**Dennis** [1] - 206:7
**denying** [1] - 37:19
**DePalma** [2] - 150:19, 151:7
**department** [2] - 82:24, 135:5
**departure** [2] - 10:18
**deponents** [1] - 33:22
**Deposit** [3] - 97:8, 121:2, 168:16
**deposition** [11] - 19:20, 20:22, 27:19, 58:16, 87:6, 113:7, 118:15, 148:14, 159:3, 174:16, 175:22
**depositions** [1] - 29:24
**depository** [3] - 68:16, 76:11
**depth** [1] - 80:20
**DEPUTY** [12] - 6:1, 7:18, 39:19, 39:23, 40:3, 85:15, 87:20, 87:22, 92:10, 143:10, 145:4, 206:18

**derivative** [1] - 156:1
**describe** [3] - 9:7, 151:18, 174:10
**described** [3] - 31:21, 38:14, 38:16
**describes** [1] - 121:5
**design** [1] - 129:11
**designated** [5] - 29:21, 30:1, 89:14, 89:21, 193:3
**designs** [1] - 132:14
**desired** [1] - 25:4
**desist** [5] - 59:1, 122:10, 122:18, 123:8, 123:13
**detail** [3] - 53:21, 60:10, 172:24
**detailed** [2] - 196:1, 197:18
**details** [1] - 130:23
**determination** [12] - 41:13, 65:24, 71:12, 71:15, 71:18, 71:25, 72:11, 72:14, 72:17, 73:18, 81:21, 83:15
**determine** [5] - 113:13, 113:14, 147:4, 150:20, 181:24
**determined** [13] - 22:10, 41:10, 66:9, 69:13, 70:16, 70:17, 70:20, 70:24, 71:3, 71:23, 72:23, 97:18, 119:10
**developing** [1] - 132:10
**development** [4] - 38:20, 125:8, 126:6, 170:24
**differences** [1] - 122:4
**different** [14] - 6:21, 8:3, 70:6, 71:6, 90:11, 90:25, 91:17, 115:23, 123:12, 153:23, 153:24, 153:25, 196:21, 210:25
**differential** [1] - 50:22
**differentiate** [1] - 134:16
**difficult** [2] - 34:2, 131:6
**DiFlorio** [6] - 16:10, 110:24, 132:16, 184:23, 206:7
**DiFrancesco** [7] - 184:24, 185:6, 185:18, 200:4, 200:13, 200:19, 206:4

**dilemma** [2] - 27:5, 143:25
**DiMaria** [3] - 46:6, 130:3, 131:14
**direct** [7] - 51:5, 62:3, 91:7, 95:20, 120:13, 172:9, 198:6
**DIRECT** [2] - 2:3, 92:23
**directed** [7] - 16:3, 16:18, 18:20, 73:25, 97:13, 102:12, 125:5
**directing** [1] - 60:7
**direction** [2] - 26:9, 117:18
**directly** [7] - 18:20, 24:13, 31:24, 73:25, 89:20, 129:6, 210:15
**director** [2] - 180:23, 208:17
**Director** [10] - 8:14, 13:25, 19:10, 20:17, 26:8, 28:6, 80:2, 132:11, 132:12, 209:7
**Directors** [42] - 4:16, 12:22, 14:9, 15:5, 17:21, 23:11, 23:15, 26:10, 27:11, 32:9, 44:20, 45:21, 46:10, 55:10, 55:12, 55:17, 73:22, 97:3, 117:10, 117:14, 118:8, 118:10, 118:11, 118:19, 118:23, 119:1, 119:10, 119:22, 119:24, 120:2, 120:3, 120:11, 140:3, 185:2, 185:12, 185:14, 185:25, 186:3, 191:19, 200:4, 202:4, 203:20
**directors** [16] - 75:24, 78:16, 119:8, 139:4, 145:21, 145:23, 161:16, 178:25, 200:7, 200:8, 200:16, 200:20, 202:9, 203:9, 203:25
**directors'** [1] - 169:17
**disagree** [1] - 115:12
**discharged** [3] - 10:23, 15:1, 196:17
**disclose** [1] - 89:24
**disclosed** [3] - 53:14, 88:22, 135:22
**disclosing** [1] - 52:18
**disclosures** [1] -

135:14
**discounting** [1] - 190:13
**discounts** [1] - 115:3
**discover** [1] - 48:22
**discovery** [1] - 89:24
**discrepancy** [2] - 61:10, 61:11
**discuss** [10] - 15:22, 33:14, 39:17, 53:20, 81:5, 81:9, 81:13, 85:13, 143:8, 204:7
**discussed** [13] - 14:6, 14:23, 20:22, 51:22, 52:19, 80:19, 81:14, 81:15, 119:10, 119:13, 136:9, 186:7, 195:5
**discussing** [9] - 14:22, 21:17, 52:19, 57:13, 63:6, 68:23, 71:6, 73:8, 140:13
**discussion** [10] - 9:20, 19:19, 20:25, 22:9, 22:12, 22:13, 42:13, 105:6, 117:20, 126:16
**discussions** [15] - 9:25, 10:4, 12:17, 22:22, 25:17, 26:21, 39:4, 40:20, 52:17, 71:22, 84:14, 117:19, 120:14, 130:5, 176:11
**dismissal** [1] - 10:17
**dismissed** [11] - 42:8, 42:10, 42:11, 156:19, 183:19, 183:22, 183:23, 183:24, 184:8, 201:11
**display** [3] - 99:10, 99:14, 100:6
**disposal** [1] - 196:9
**dispute** [1] - 207:18
**disregard** [1] - 136:7
**distinguished** [1] - 32:9
**distraction** [1] - 176:18
**DISTRICT** [3] - 1:1, 1:1, 1:11
**Division** [1] - 48:7
**DO** [1] - 73:23
**docs** [1] - 89:14
**Document** [1] - 44:10
**document** [75] - 16:1, 16:23, 17:10, 21:24, 23:5, 32:21, 33:10, 37:13, 37:14, 38:9, 40:9, 41:18,

42:5, 42:12, 44:5, 55:7, 57:1, 68:2, 89:2, 90:8, 90:14, 96:15, 96:18, 97:12, 100:14, 100:19, 102:3, 102:12, 106:18, 106:25, 107:4, 107:8, 114:17, 116:23, 121:24, 123:17, 123:18, 125:15, 125:21, 125:24, 126:7, 126:8, 126:9, 128:19, 129:20, 130:15, 140:22, 141:5, 148:4, 148:9, 151:5, 151:22, 158:4, 158:8, 160:2, 160:18, 163:19, 164:11, 168:2, 170:19, 171:5, 172:3, 172:12, 172:13, 172:22, 173:17, 178:9, 182:4, 182:6, 184:11, 198:5, 198:23, 199:21, 199:22, 202:18
**documentary** [1] - 195:22
**documentation** [1] - 57:6
**documents** [118] - 32:11, 33:2, 33:23, 34:6, 34:17, 35:14, 35:24, 36:7, 39:4, 40:20, 40:24, 45:8, 45:9, 56:2, 56:3, 56:5, 56:7, 56:8, 57:11, 57:16, 57:17, 58:22, 67:16, 68:1, 68:20, 69:13, 69:14, 69:19, 70:13, 70:19, 70:24, 71:1, 71:9, 71:10, 71:16, 71:22, 71:24, 72:2, 72:16, 72:24, 73:10, 73:12, 73:18, 73:20, 79:3, 81:14, 81:15, 82:7, 82:17, 82:18, 83:8, 83:11, 83:14, 84:20, 88:17, 88:20, 88:25, 89:19, 90:4, 90:12, 91:20, 97:1, 103:5, 104:11, 105:5, 112:4, 113:15, 114:15, 115:13, 116:17, 117:16, 121:17, 121:22, 122:6, 122:20, 122:24, 123:12, 125:17, 126:2, 128:7, 128:10, 135:1, 139:3, 139:17, 139:19, 139:20, 143:4,

145:17, 145:18,
147:9, 147:19,
147:21, 147:24,
149:7, 157:7, 157:10,
164:14, 177:18,
177:22, 180:14,
181:23, 181:24,
181:25, 182:13,
182:14, 183:2, 184:3,
184:4, 184:15,
195:12, 195:16,
196:8, 196:12,
196:14, 197:5,
198:19, 203:19,
203:20
  **dollar** [4] - 50:21,
61:10, 200:23, 201:16
  **dollars** [12] - 17:5,
26:3, 61:15, 62:24,
104:3, 104:5, 104:7,
104:10, 105:16,
110:3, 110:6, 190:11
  **Dominion** [5] -
185:20, 185:23,
185:25, 186:2, 186:10
  **Don** [1] - 206:4
  **Donald** [1] - 200:3
  **done** [40] - 6:10,
9:15, 10:4, 22:21,
49:12, 49:14, 49:15,
50:14, 60:21, 63:1,
64:6, 65:8, 70:4, 70:8,
70:10, 70:21, 71:11,
71:19, 72:13, 73:12,
75:5, 75:17, 76:16,
77:16, 78:12, 80:9,
82:21, 86:23, 86:25,
87:1, 87:3, 113:17,
116:20, 127:25,
133:25, 177:23,
181:9, 197:15, 204:5,
210:8
  **double** [2] - 76:5,
121:16
  **double-checking** [1]
- 76:5
  **Doug** [1] - 133:23,
148:7, 206:7
  **down** [18] - 11:20,
15:13, 49:17, 75:18,
82:17, 83:8, 84:4,
88:5, 94:23, 122:12,
124:3, 129:17,
131:15, 139:25,
174:18, 191:18,
196:23
  **dozen** [3] - 176:18,
178:21, 182:11
  **draft** [3] - 134:3,
134:14, 198:21

  **drawn** [1] - 37:14
  **dropped** [1] - 199:18
  **due** [4] - 23:13,
48:25, 85:7, 194:5
  **DULY** [1] - 92:21
  **duplicate** [4] - 82:6,
153:21, 154:2
  **during** [16] - 12:20,
32:7, 32:17, 33:1,
33:7, 33:19, 34:5,
34:25, 35:4, 35:12,
57:10, 75:22, 89:24,
105:3, 133:4
  **duties** [1] - 152:2
  **duty** [29] - 32:7,
32:17, 32:25, 33:6,
33:18, 34:5, 34:10,
34:25, 35:4, 35:11,
35:17, 40:23, 43:6,
45:5, 57:9, 69:5, 76:8,
78:6, 113:10, 121:25,
122:25, 123:22,
147:12, 170:22,
175:10, 182:1, 182:2,
184:6, 199:24

### E

  **e-mail** [6] - 39:8,
49:19, 142:8, 166:16,
166:17, 167:5
  **e-mails** [6] - 126:16,
130:9, 142:3, 177:7,
191:17, 195:7
  **earnings** [2] -
110:11, 111:9
  **earth** [1] - 79:18
  **easier** [3] - 72:22,
92:15, 137:4
  **easiest** [1] - 31:1
  **eat** [1] - 124:23
  **edition** [2] - 7:24, 8:9
  **Edward** [1] - 206:5
  **EDWIN** [1] - 1:14
  **effect** [16] - 57:10,
69:6, 76:17, 77:17,
78:13, 78:15, 87:5,
97:15, 111:5, 111:8,
174:20, 175:3, 175:7,
175:11, 175:15,
175:19
  **effective** [2] - 44:13,
208:23
  **effort** [1] - 24:12
  **efforts** [2] - 202:9,
202:12
  **eight** [5] - 16:23,
62:21, 62:22, 194:3,
199:2

  **either** [10] - 37:15,
66:14, 72:14, 72:17,
116:5, 123:15,
126:16, 144:14,
180:14, 198:20
  **Elaine** [1] - 150:1
  **elements** [1] -
210:13
  **eleven** [2] - 53:15,
190:11
  **eliminated** [1] -
115:19
  **email** [2] - 103:2,
104:25
  **emails** [19] - 80:16,
80:20, 81:1, 83:21,
96:20, 96:23, 96:25,
97:15, 97:22, 98:4,
102:20, 103:2, 103:6,
103:9, 104:16,
104:21, 105:4, 105:7,
117:24
  **emanating** [1] -
163:4
  **embezzled** [2] -
116:18, 116:24
  **embezzlement** [4] -
114:16, 115:10,
138:13, 138:21
  **employed** [3] -
93:12, 172:6, 188:6
  **employee** [2] -
114:17, 130:25
  **Employment** [5] -
12:2, 81:10, 83:24,
95:24, 104:1
  **employment** [22] -
9:18, 15:23, 17:3,
21:3, 21:18, 22:3,
22:7, 23:13, 25:19,
43:15, 81:16, 82:6,
101:15, 103:21,
130:4, 182:7, 189:16,
190:2, 190:23,
190:24, 192:17,
192:23
  **empowered** [1] -
21:12
  **enclosure** [2] - 89:13
  **encourage** [1] -
33:22
  **END** [1] - 159:21
  **end** [10] - 11:8,
17:11, 57:19, 90:14,
143:17, 186:11,
188:7, 188:9, 188:12
  **ended** [6] - 16:24,
56:13, 56:15, 140:5,
187:25, 188:2
  **ending** [1] - 15:17

  **engaged** [7] - 65:4,
133:6, 163:21,
170:21, 176:10,
199:7, 202:24
  **English** [2] - 121:6,
172:24
  **enjoy** [1] - 85:14
  **ensure** [1] - 59:7
  **ensuring** [2] - 58:8,
59:16
  **entered** [1] - 37:10
  **ENTERS** [1] - 145:5
  **Enters** [3] - 7:19,
87:21, 92:11
  **entertainment** [2] -
54:11, 54:24
  **entire** [13] - 31:21,
112:13, 112:15,
113:23, 114:9,
114:21, 115:5, 115:6,
116:12, 117:1,
133:24, 139:1, 189:17
  **entirety** [2] - 146:6,
171:18
  **entities** [1] - 31:1
  **entitled** [12] - 17:4,
84:17, 84:18, 102:1,
104:4, 104:13,
105:15, 106:3,
192:24, 193:14,
194:14, 210:25
  **entitlement** [3] -
83:23, 96:3, 104:6
  **entitlements** [4] -
84:11, 95:22, 103:4,
103:15
  **entity** [2] - 84:10,
110:7
  **entry** [2] - 122:10,
122:18
  **Eric** [1] - 77:3
  **escrow** [13] - 96:7,
96:8, 140:8, 141:20,
142:1, 142:5, 142:6,
142:10, 142:19,
166:10, 166:17,
166:23, 167:2
  **especially** [1] -
135:16
  **ESQUIRE** [4] - 1:14,
1:15, 1:17, 1:17
  **estate** [32] - 38:19,
39:2, 39:6, 49:24,
50:1, 50:3, 50:15,
50:21, 61:7, 61:16,
62:14, 62:19, 63:10,
64:11, 64:25, 65:1,
65:10, 66:4, 66:8,
123:14, 123:24,
124:3, 125:8, 125:19,

125:23, 126:10,
135:2, 135:5, 135:17,
170:23, 170:24
  **Estate** [1] - 75:4
  **estimate** [1] - 104:9
  **estimated** [3] -
104:2, 104:5, 104:7
  **et** [8] - 57:15, 71:9,
71:24, 117:25,
162:13, 182:2,
182:13, 197:21
  **evaluating** [2] -
49:11, 54:18
  **evaluation** [5] -
158:2, 159:6, 180:10,
197:15, 197:24
  **evening** [2] - 204:6,
204:8
  **evenings** [1] - 87:2
  **event** [2] - 18:2,
154:2
  **eventually** [2] -
91:21, 131:15
  **EVIDENCE** [2] -
2:19, 100:9
  **evidence** [153] -
2:21, 2:23, 2:25, 3:2,
3:4, 3:6, 3:8, 3:10,
3:12, 3:14, 3:16, 3:18,
3:20, 3:22, 3:24, 4:1,
4:3, 4:5, 4:7, 4:9,
4:11, 4:13, 4:15, 4:17,
4:19, 4:21, 4:23, 4:25,
5:2, 5:4, 5:6, 5:8,
5:10, 48:22, 68:20,
69:19, 70:19, 71:9,
72:16, 72:24, 73:9,
73:20, 79:3, 87:5,
99:17, 99:18, 99:21,
100:6, 110:21,
110:23, 111:1,
111:10, 111:13,
113:15, 114:25,
115:13, 121:22,
147:9, 148:20,
148:24, 149:1,
149:16, 149:22,
150:13, 150:15,
150:18, 151:14,
151:16, 152:13,
152:14, 152:20,
153:7, 153:9, 153:12,
154:3, 154:6, 154:19,
154:22, 155:6, 155:8,
155:11, 155:18,
155:20, 156:6, 156:8,
158:20, 159:19,
159:22, 159:24,
160:1, 160:12,
160:17, 161:1, 161:3,

161:9, 161:10,
161:23, 161:24,
162:20, 162:22,
163:14, 163:16,
163:19, 164:4, 164:6,
164:9, 164:22,
164:24, 165:1, 165:6,
165:13, 165:15,
165:25, 166:2, 166:4,
166:11, 166:13,
167:8, 167:9, 167:20,
167:22, 168:9,
168:12, 168:14,
169:7, 169:14,
169:16, 169:22,
169:24, 170:10,
170:13, 170:15,
171:10, 171:13,
171:22, 171:24,
172:15, 172:17,
173:8, 173:11,
181:25, 184:4,
184:11, 196:8,
196:12, 196:14,
202:20, 204:25,
205:2, 205:5, 205:12,
205:14, 210:12
**evidential** [1] - 210:6
**evidently** [2] - 59:14,
133:21
**exact** [2] - 131:25,
188:10
**exacting** [2] - 52:6,
52:10
**exactly** [4] - 48:10,
52:12, 91:9, 196:6
**EXAMINATION** [10] -
2:3, 2:6, 2:8, 2:10,
2:13, 92:23, 145:10,
177:15, 202:21,
204:19
**examination** [2] -
91:7, 145:7
**examinations** [1] -
128:13
**Examinations** [1] -
129:1
**examined** [5] -
50:20, 51:4, 123:25,
128:11, 129:4
**examines** [1] - 129:8
**example** [8] - 6:24,
14:21, 32:21, 87:8,
115:10, 186:12, 200:1
**examples** [1] - 61:9
**exceeding** [1] -
62:23
**except** [4] - 14:1,
72:15, 88:23, 185:22
**exception** [1] - 33:9

**excerpt** [2] - 15:19,
116:14
**excerpted** [1] - 15:19
**excuse** [6] - 141:1,
157:5, 187:3, 190:9,
194:1, 204:16
**executed** [3] - 44:14,
89:25, 134:6
**execution** [2] -
138:2, 157:23
**executive** [6] -
16:19, 17:2, 41:19,
43:1, 54:15, 130:25
**executive's** [1] - 55:3
**exempt** [1] - 88:22
**exercise** [5] -
104:15, 104:17,
105:1, 105:10, 106:4
**exercises** [1] -
101:25
**exhibit** [26] - 11:14,
33:15, 37:9, 55:11,
88:7, 148:22, 160:11,
160:23, 161:7, 164:3,
164:19, 165:24,
166:8, 167:7, 167:8,
167:19, 168:6,
169:21, 170:9, 171:9,
171:21, 172:14,
173:4, 187:5, 204:11
**EXHIBIT** [2] - 2:18,
100:9
**Exhibit** [79] - 2:20,
2:22, 2:24, 3:1, 3:3,
3:5, 3:7, 3:9, 3:11,
3:13, 3:15, 3:17, 3:19,
3:21, 3:23, 3:25, 4:2,
4:4, 4:6, 4:8, 4:10,
4:12, 4:14, 4:16, 4:18,
4:20, 4:22, 4:24, 5:1,
5:3, 5:5, 5:7, 5:9,
12:9, 45:14, 57:23,
60:6, 73:21, 94:18,
149:1, 149:22,
150:15, 151:16,
152:14, 153:9, 154:6,
154:22, 155:8,
155:20, 156:8,
159:24, 160:9,
160:12, 161:1,
161:10, 161:20,
161:24, 162:22,
163:16, 164:6,
164:24, 165:5,
165:13, 166:2,
166:13, 167:9,
167:22, 168:12,
169:3, 169:14,
169:24, 170:13,
171:13, 171:24,

172:17, 173:11,
186:24, 204:20
**exhibits** [2] - 88:3,
91:6
**exist** [3] - 98:10,
105:11, 123:17
**existence** [1] -
103:21
**EXITS** [1] - 143:11
**expect** [1] - 208:6
**expected** [1] -
176:20
**expenses** [1] - 54:18
**experience** [2] -
36:12, 37:1
**experienced** [1] -
54:6
**explain** [5] - 80:15,
92:13, 122:7, 198:3,
209:18
**explains** [2] -
209:17, 210:7
**explanation** [2] -
210:24, 210:25
**explanations** [1] -
209:24
**expressed** [1] - 54:5
**extending** [1] - 210:2
**extensive** [1] - 163:4
**extremely** [4] -
133:8, 163:23,
198:24, 199:9

## F

**F-I-S-H-E-R** [1] - 93:2
**face** [2] - 45:16,
178:14
**fact** [19] - 18:11,
49:20, 52:16, 64:5,
109:1, 126:15,
128:14, 131:5,
131:17, 140:8, 158:7,
168:19, 168:22,
173:1, 180:17,
180:22, 199:20,
201:24, 209:16
**factors** [1] - 46:23
**facts** [4] - 8:7,
100:23, 100:25, 117:9
**failing** [1] - 170:22
**failure** [5] - 42:8,
42:9, 183:19, 183:25,
184:8
**fair** [16] - 8:20, 12:16,
12:20, 46:22, 48:25,
50:7, 50:17, 56:11,
60:23, 62:18, 63:7,
64:15, 65:24, 66:2,

111:25, 173:10
**fairly** [2] - 51:10,
63:8
**faith** [9] - 117:10,
118:8, 120:19, 136:4,
176:22, 210:15,
210:16, 210:21,
210:23
**faith/bad** [2] -
210:21, 210:22
**Falese** [1] - 150:1
**falls** [2] - 190:8,
190:16
**false** [7] - 133:7,
134:11, 134:19,
163:22, 199:8,
199:17, 202:25
**familiar** [5] - 26:16,
36:15, 38:3, 109:11
**familiarity** [2] -
157:7, 157:10
**family** [1] - 203:17
**far** [8] - 23:15, 31:22,
83:3, 87:10, 120:3,
122:12, 176:7, 202:3
**fault** [1] - 62:3
**favorable** [3] - 50:5,
124:2, 127:23
**FDIC** [30] - 18:21,
19:2, 23:12, 36:4,
53:4, 74:1, 74:7,
74:12, 88:16, 88:23,
89:12, 89:14, 89:16,
97:13, 98:8, 99:3,
102:12, 102:16,
115:8, 140:9, 140:25,
142:4, 142:9, 142:24,
166:24, 172:23,
190:21, 191:25, 194:4
**FDIC's** [2] - 142:20,
167:3
**FDIC-approval** [1] -
142:24
**February** [23] - 24:3,
24:17, 45:12, 45:14,
45:16, 90:21, 95:2,
98:19, 99:1, 102:3,
102:11, 103:16,
109:20, 109:21,
129:24, 130:18,
132:2, 132:8, 132:15,
138:24, 139:1, 139:8,
139:19
**Fed** [16] - 22:23,
55:24, 63:17, 63:21,
64:1, 66:12, 66:19,
67:17, 97:9, 97:10,
128:6, 161:6, 166:23,
166:24, 167:5
**federal** [8] - 68:15,

108:17, 112:8, 138:7,
140:24, 142:24,
166:18, 175:18
**Federal** [43] - 13:12,
18:20, 19:2, 23:11,
36:3, 36:9, 53:4,
56:17, 63:17, 63:18,
67:9, 74:1, 74:6,
74:12, 90:23, 97:8,
97:10, 97:13, 98:8,
99:2, 102:12, 102:15,
115:8, 117:8, 121:1,
125:5, 129:3, 164:10,
168:15, 168:17,
170:3, 178:4, 188:20,
190:21, 192:1, 193:7,
194:4, 198:20,
203:10, 205:17,
206:3, 206:12
**Feds** [1] - 167:3
**feds** [1] - 142:19
**fees** [7] - 47:5, 54:6,
85:6, 104:6, 105:16,
106:4, 209:9
**Felice** [1] - 16:10
**fell** [1] - 85:4
**felt** [5] - 33:3, 51:9,
75:17, 79:15, 182:24
**few** [7] - 29:2, 30:14,
49:17, 88:17, 91:17,
132:2, 139:9
**fiduciary** [29] - 32:7,
32:17, 32:25, 33:6,
33:18, 34:5, 34:10,
34:25, 35:4, 35:11,
35:17, 40:23, 43:6,
45:5, 57:9, 69:5, 76:8,
78:6, 113:10, 121:25,
122:25, 123:21,
147:12, 170:22,
175:10, 182:1, 182:2,
184:6, 199:23
**field** [4] - 31:22,
31:23, 31:24, 32:1
**fifteen** [1] - 143:8
**fifth** [2] - 109:16,
141:13
**figure** [2] - 63:2, 63:9
**FIL66-2010** [1] -
172:21
**file** [7] - 23:3, 36:4,
88:24, 91:11, 115:14,
136:2, 183:16
**filed** [23] - 16:1,
17:10, 23:1, 47:25,
53:4, 53:7, 90:22,
99:2, 112:17, 112:20,
113:1, 135:23, 139:8,
139:9, 148:5, 156:12,
160:3, 178:22, 186:5,

186:15, 186:19, 200:23, 210:4

**filing** [5] - 17:14, 23:5, 36:10, 178:7, 178:15

**fill** [1] - 124:19

**final** [8] - 24:2, 106:24, 107:23, 134:24, 136:1, 176:8, 190:4, 208:9

**finally** [2] - 52:23, 158:21

**finance** [1] - 84:1

**financial** [3] - 170:25, 172:8, 172:20

**findings** [11] - 33:3, 35:25, 46:19, 47:1, 47:3, 47:8, 47:9, 54:9, 126:19, 128:18, 171:6

**fine** [12] - 33:22, 41:14, 54:21, 70:20, 77:10, 77:11, 91:23, 111:12, 137:25, 207:25

**finish** [8] - 100:17, 127:1, 133:17, 144:12, 144:18, 164:15, 175:2, 194:24

**finished** [3] - 144:13, 195:1, 207:13

**firm** [3] - 28:11, 189:4, 192:3

**firms** [2] - 80:8, 80:10

**first** [64] - 6:7, 11:17, 13:7, 14:10, 15:6, 16:14, 17:22, 18:3, 19:20, 28:5, 29:2, 33:10, 46:8, 50:10, 51:21, 51:23, 52:5, 53:10, 54:25, 55:4, 55:14, 60:16, 60:25, 66:5, 73:24, 94:2, 99:16, 102:15, 102:24, 104:8, 105:22, 107:9, 109:8, 109:9, 111:14, 116:1, 116:20, 118:7, 133:19, 139:10, 139:22, 140:15, 141:12, 141:23, 144:14, 146:14, 149:2, 149:14, 149:19, 156:17, 157:12, 158:3, 158:11, 158:18, 159:10, 177:19, 179:8, 181:15, 183:21, 186:17, 188:25, 192:15,

198:17, 199:4

**firstly** [1] - 34:20

**fiscal** [1] - 16:24

**Fisher** [68] - 6:9, 6:11, 29:18, 29:20, 30:4, 30:17, 83:21, 85:10, 87:24, 90:22, 91:7, 92:18, 92:19, 92:25, 93:3, 93:10, 93:12, 93:16, 93:20, 94:2, 94:11, 98:24, 100:11, 144:18, 145:11, 146:12, 147:3, 148:2, 149:11, 149:18, 149:24, 150:17, 151:5, 151:18, 152:19, 153:11, 154:9, 154:24, 155:11, 155:23, 156:11, 156:16, 158:16, 160:1, 160:17, 161:3, 161:12, 162:1, 162:25, 163:19, 164:9, 165:1, 165:15, 166:4, 166:16, 167:13, 167:23, 168:14, 169:16, 170:2, 170:15, 171:15, 172:1, 172:20, 173:13, 177:17, 202:23, 210:5

**FISHER** [12] - 2:2, 2:4, 2:7, 2:9, 2:11, 2:14, 92:21, 92:23, 145:10, 177:15, 202:21, 204:19

**Fisher's** [1] - 91:1

**fit** [1] - 48:19

**five** [11] - 18:1, 22:11, 25:23, 26:3, 38:10, 49:18, 130:19, 141:2, 144:21, 188:11, 188:15

**five-year** [2] - 188:11

**fixed** [1] - 124:19

**fixing** [1] - 124:18

**fluid** [1] - 195:9

**focus** [7] - 35:19, 100:11, 105:19, 119:9, 203:12, 203:13, 203:24

**focused** [3] - 103:10, 183:5, 203:16

**focusing** [2] - 101:22, 116:12

**follow** [2] - 77:8, 140:12

**following** [3] - 28:1, 113:14, 133:21

**FOLLOWS** [2] - 92:22, 157:6

**follows** [2] - 126:7, 174:15

**foot** [2] - 103:5, 122:6

**footer** [1] - 142:12

**footnote** [1] - 134:13

**FOR** [3] - 1:1, 1:15, 1:18

**foregoing** [1] - 176:1

**forever** [1] - 209:9

**forget** [1] - 137:12

**form** [9] - 32:21, 52:20, 52:21, 82:1, 107:19, 108:4, 108:22, 112:17, 135:13

**formal** [3] - 23:4, 36:4, 36:10

**format** [1] - 74:20

**formed** [3] - 45:22, 46:4, 65:11

**former** [5] - 8:14, 27:10, 118:19, 208:17, 209:7

**forms** [1] - 134:23

**forth** [21] - 80:16, 80:19, 80:21, 83:22, 84:20, 97:22, 100:17, 102:20, 103:6, 104:21, 105:4, 105:7, 106:8, 113:7, 126:17, 135:16, 138:4, 140:1, 166:22, 177:7, 193:23

**forthcoming** [4] - 21:21, 25:8, 26:19, 74:14

**forward** [1] - 209:25

**foundation** [2] - 210:6

**four** [11] - 15:13, 30:18, 40:18, 46:23, 47:8, 49:18, 52:25, 59:6, 65:7, 113:25, 141:2

**fourth** [7] - 14:21, 54:24, 103:24, 103:25, 141:13, 189:13, 189:14

**frame** [2] - 19:22, 181:6

**frankly** [1] - 210:12

**fraud** [8] - 33:6, 34:22, 34:24, 42:4, 42:5, 42:25, 138:22

**fraudulent** [24] - 32:6, 32:16, 32:25, 33:17, 34:4, 34:9, 34:15, 35:3, 35:11,

35:16, 40:22, 42:3, 43:6, 45:4, 57:8, 57:15, 69:4, 76:4, 76:6, 78:5, 112:5, 147:11, 174:19, 174:25

**FRB** [1] - 166:22

**free** [1] - 48:14

**frequently** [1] - 25:13

**Friday** [5] - 87:17, 90:15, 90:18, 91:22, 207:2

**front** [7] - 11:15, 68:24, 69:9, 72:21, 72:22, 73:2, 76:18

**fulfill** [1] - 69:21

**fulfilled** [1] - 125:1

**full** [4] - 53:10, 53:25, 55:4, 92:24

**fully** [4] - 12:1, 53:14, 100:1, 210:7

**Fund** [1] - 154:11

**fund** [1] - 37:7

**future** [5] - 58:11, 58:13, 58:14, 59:10, 123:16

---

**G**

**G-a-l-a-t-i** [1] - 40:10

**gain** [1] - 171:1

**gained** [1] - 37:8

**Galati** [8] - 40:9, 40:15, 41:14, 45:25, 46:1, 46:2, 148:5, 148:17

**Galloway** [7] - 46:7, 47:6, 54:7, 54:13, 54:19, 54:20, 55:1

**gate** [1] - 157:12

**gathered** [2] - 83:11, 100:25

**general** [8] - 7:9, 8:3, 48:3, 75:16, 103:9, 128:20, 141:8, 142:15

**generate** [1] - 83:11

**generated** [4] - 54:12, 54:19, 54:25, 207:6

**gentlemen** [8] - 7:20, 29:23, 39:16, 85:12, 143:8, 157:5, 204:6, 204:16

**George** [2] - 8:14, 206:5

**Gerry** [2] - 1:9, 206:7

**Gertie** [1] - 50:14

**Gertie's** [1] - 49:19

**gifts** [3] - 114:3, 114:6, 115:11

**Giordano** [10] - 9:10, 19:10, 20:18, 24:18, 28:6, 46:13, 185:8, 185:20, 200:13, 200:19

**Giordano's** [1] - 28:14

**given** [4] - 101:17, 120:15, 121:23, 138:2

**Glen** [3] - 42:14, 148:6, 160:4

**global** [2] - 25:4, 94:6

**goal** [1] - 115:24

**golden** [32] - 13:13, 13:17, 80:12, 82:1, 89:21, 97:18, 97:20, 98:1, 98:9, 98:11, 98:12, 101:15, 101:19, 101:23, 102:9, 102:13, 102:17, 103:4, 103:10, 103:15, 110:2, 110:14, 111:22, 138:9, 139:22, 140:6, 140:12, 140:17, 140:25, 141:6, 171:17

**Golden** [12] - 181:18, 182:8, 188:18, 188:21, 188:22, 193:5, 193:15, 194:8, 194:10, 194:11, 194:13, 197:14

**Goldgarb** [1] - 200:11

**Goldgrab** [2] - 156:12, 156:14

**Golf** [3] - 46:7, 47:6, 54:7

**golf** [4] - 54:12, 54:15, 55:1, 55:4

**governed** [2] - 194:10, 194:11

**Government** [1] - 27:1

**government** [7] - 3:9, 4:4, 26:22, 27:3, 154:22, 163:16, 170:23

**Governors** [5] - 97:10, 168:16, 170:3, 191:25, 193:7

**grab** [1] - 202:18

**granted** [1] - 17:8

**granting** [1] - 170:4

**great** [2] - 39:14, 204:8

**greater** [1] - 172:24
**gripe** [1] - 54:6
**gripes** [1] - 186:9
**grounds** [1] - 157:17
**group** [4] - 94:5, 126:6, 186:17, 186:18
**Group** [1] - 75:4
**guarantee** [1] - 86:15
**guess** [7] - 11:12, 13:5, 41:1, 62:11, 62:12, 103:11, 107:1
**guidance** [1] - 172:1
**Guidice** [1] - 206:7
**guilty** [4] - 9:3, 9:8, 76:10

## H

**half** [4] - 15:3, 18:1, 25:23, 195:11
**hand** [2] - 92:20, 200:10
**handed** [1] - 187:3
**handful** [1] - 207:4
**handled** [1] - 62:11
**handling** [3] - 87:11, 143:23, 144:2
**hands** [1] - 171:16
**hang** [1] - 141:25
**happy** [1] - 138:5
**hard** [2] - 65:22, 124:14
**HAVING** [1] - 92:21
**head** [3] - 30:23, 30:24, 94:4
**header** [1] - 142:12
**heading** [6] - 14:16, 17:25, 47:15, 48:24, 129:1, 189:16
**health** [1] - 129:5
**hear** [10] - 8:6, 90:18, 91:5, 91:9, 93:4, 93:25, 113:8, 127:9, 127:11, 127:14
**heard** [8] - 68:24, 92:2, 119:8, 128:8, 141:12, 148:17, 162:16, 167:16
**hearing** [1] - 163:13
**hearsay** [2] - 126:22, 127:1
**heavy** [1] - 160:20
**help** [5] - 42:7, 119:23, 121:3, 137:11, 137:13
**Henzel** [1] - 155:23
**hereby** [1] - 38:12
**hidden** [2] - 202:4, 202:7

**high** [1] - 122:6
**highest** [1] - 163:5
**highlight** [1] - 6:15
**HILL** [1] - 1:3
**Hill** [200] - 9:15, 11:21, 15:11, 17:1, 17:4, 18:6, 18:14, 19:3, 19:12, 19:21, 23:13, 23:17, 28:8, 32:6, 32:15, 32:24, 33:17, 34:4, 34:21, 35:3, 35:10, 35:20, 36:6, 36:10, 37:18, 39:1, 39:5, 42:16, 42:18, 42:23, 43:5, 43:16, 45:4, 46:21, 48:13, 48:20, 53:23, 56:18, 57:8, 58:19, 58:24, 61:21, 62:1, 62:4, 63:21, 63:25, 64:4, 66:15, 66:22, 67:6, 67:18, 67:22, 68:4, 68:7, 69:4, 70:15, 71:4, 71:13, 73:1, 74:8, 74:11, 75:12, 76:3, 85:7, 95:22, 96:6, 96:7, 97:14, 98:9, 101:6, 101:11, 102:8, 102:9, 102:13, 102:17, 103:4, 103:8, 103:9, 103:15, 104:3, 104:5, 104:12, 106:14, 106:20, 108:12, 109:2, 110:2, 112:5, 112:22, 113:3, 113:9, 114:5, 115:1, 115:9, 117:18, 120:5, 122:1, 122:4, 123:21, 125:12, 125:13, 125:22, 126:10, 127:22, 133:3, 133:7, 133:11, 133:21, 133:23, 134:1, 134:3, 135:1, 135:12, 136:9, 136:12, 139:11, 139:23, 139:25, 147:15, 148:6, 150:1, 151:21, 152:22, 153:14, 154:25, 155:2, 155:12, 155:13, 155:23, 156:2, 156:13, 156:24, 157:23, 161:6, 162:12, 165:16, 167:14, 168:20, 168:22, 169:18, 170:5, 170:17, 171:3, 171:5, 174:4, 174:9, 174:14,

175:17, 176:2, 176:5, 177:4, 178:25, 179:20, 180:15, 180:11, 180:19, 180:23, 181:1, 181:11, 181:18, 181:21, 182:1, 182:12, 182:14, 182:24, 184:2, 184:23, 185:5, 185:10, 185:17, 185:25, 188:5, 190:23, 191:10, 193:13, 194:5, 196:16, 197:11, 198:2, 198:13, 198:23, 199:23, 200:3, 200:12, 200:18, 202:1, 202:5, 203:4, 203:12, 203:14, 203:16, 203:25, 206:3, 206:4, 208:10, 208:11, 209:8
**hill** [5] - 140:21, 143:2, 144:1, 175:12, 203:8
**Hill's** [51] - 13:7, 14:3, 14:18, 18:7, 18:21, 54:1, 62:2, 74:2, 81:2, 81:5, 81:9, 81:16, 83:23, 84:11, 96:25, 102:21, 103:21, 104:1, 105:1, 105:10, 105:15, 116:3, 125:7, 129:18, 134:22, 135:21, 140:2, 140:17, 163:20, 165:20, 166:5, 167:24, 175:8, 175:16, 175:20, 175:22, 176:23, 177:8, 179:24, 181:7, 187:25, 189:6, 191:4, 191:5, 191:8, 191:19, 192:17, 192:24, 194:2, 195:6, 199:8
**himself** [6] - 8:23, 39:6, 125:18, 125:23, 127:22, 198:3
**historical** [1] - 201:24
**hold** [6] - 59:18, 85:25, 133:12, 162:8, 178:11, 189:23
**holding** [11] - 68:17, 69:6, 76:11, 84:2, 84:3, 84:5, 84:6, 84:8, 84:10, 110:7, 120:6
**Holk** [3] - 148:6, 160:4, 179:1

**honest** [1] - 42:4
**Honor** [45] - 8:12, 88:16, 89:11, 89:18, 90:10, 90:16, 92:3, 92:17, 99:13, 99:24, 100:5, 110:18, 141:16, 145:9, 146:10, 148:23, 152:10, 152:25, 153:2, 153:4, 153:6, 153:16, 153:18, 154:13, 154:21, 155:3, 155:9, 155:15, 156:3, 156:9, 157:1, 161:17, 162:14, 163:8, 163:17, 164:2, 164:18, 165:5, 165:8, 165:24, 166:14, 169:3, 169:21, 170:9, 177:12
**honor** [2] - 12:1, 23:20
**HONORABLE** [1] - 1:11
**hope** [5] - 7:1, 85:14, 86:13, 86:14, 86:15
**host** [2] - 22:6, 103:5, 145:18, 203:8
**hour** [2] - 65:3, 65:8, 85:14
**house** [2] - 46:22, 48:14, 130:8
**Hulk** [2] - 42:15, 44:2
**hump** [1] - 139:15
**hundred** [2] - 50:21, 62:24

## I

**IAP** [4] - 68:17, 197:16, 198:1, 198:2
**idea** [8] - 13:5, 16:22, 17:18, 19:9, 20:19, 89:16, 197:12
**identical** [1] - 146:3
**identification** [7] - 148:3, 149:12, 150:10, 150:17, 152:19, 162:25, 170:15
**identified** [8] - 33:24, 40:13, 52:14, 72:8, 145:11, 186:25, 203:9, 205:10
**identify** [9] - 33:12, 60:8, 148:3, 150:17, 152:19, 153:11, 154:9, 160:2
**IFP** [1] - 174:14

**ignore** [1] - 122:1
**II** [2] - 1:3, 101:6
**ill** [1] - 47:22
**imagine** [1] - 138:11
**immediately** [2] - 23:6, 90:5
**impact** [1] - 110:11
**implement** [2] - 24:5, 26:14
**implementation** [2] - 21:18, 22:7
**implementing** [1] - 22:23
**important** [1] - 151:25
**imposed** [2] - 64:22, 166:23
**impossibility** [1] - 210:24
**improper** [3] - 54:14, 55:2, 96:4
**improprieties** [1] - 48:20
**IN** [2] - 2:19, 100:9
**inappropriate** [3] - 9:7, 9:16, 20:24
**Inc** [8] - 11:16, 23:11, 24:23, 46:10, 84:3, 84:5, 129:12, 192:7
**incidents** [1] - 198:25
**include** [3] - 25:24, 49:10, 197:5
**included** [1] - 97:2, 184:15
**includes** [1] - 182:10
**including** [11] - 13:19, 22:6, 24:6, 24:11, 56:24, 84:20, 122:24, 130:2, 162:12, 190:20, 191:19
**incorrect** [2] - 52:20, 191:11
**indemnification** [4] - 46:5, 47:17, 47:21, 48:7
**indemnify** [2] - 44:21, 46:20
**indicate** [4] - 68:20, 69:20, 79:4, 112:4
**indicted** [3] - 42:16, 179:18, 179:21
**indictment** [16] - 42:14, 42:19, 42:21, 43:4, 43:7, 43:10, 43:21, 157:14, 157:24, 179:5, 179:11, 180:2, 180:8, 182:12, 183:4, 183:5

**indictments** [1] - 178:20
**individual** [1] - 35:6
**individuals** [4] - 79:11, 176:19, 206:11, 206:13
**inductive** [1] - 65:20
**industry** [1] - 37:8
**inevitably** [1] - 85:24
**inflammatory** [1] - 210:12
**influence** [2] - 8:7
**information** [65] - 8:4, 8:5, 32:4, 32:8, 32:11, 32:20, 32:22, 42:12, 68:19, 69:19, 70:19, 71:9, 71:24, 72:16, 72:24, 73:9, 73:11, 73:20, 79:3, 81:18, 81:20, 82:19, 83:11, 112:3, 112:21, 113:2, 113:16, 113:20, 114:4, 114:15, 114:18, 114:25, 115:8, 115:13, 116:6, 116:24, 119:14, 121:10, 121:17, 121:22, 125:18, 128:17, 133:7, 134:12, 135:14, 135:21, 139:5, 147:8, 163:22, 180:14, 181:24, 184:4, 184:11, 195:22, 196:9, 196:12, 196:15, 196:16, 197:1, 198:25, 199:8, 199:17, 202:12, 203:1, 208:6
**informed** [1] - 88:4
**initial** [2] - 128:6, 173:13
**initiated** [1] - 117:24
**injustice** [1] - 159:12
**inquire** [1] - 7:13
**inquiries** [1] - 25:21
**inside** [2] - 16:20, 182:2
**insider** [36] - 32:7, 32:17, 33:1, 33:7, 33:18, 34:5, 34:10, 34:25, 35:4, 35:12, 35:17, 40:23, 43:7, 45:5, 48:25, 52:18, 57:9, 64:19, 65:23, 66:25, 67:18, 69:5, 76:10, 78:6, 113:10, 123:13, 123:22, 123:24, 128:11,

**indictments** [1] - 129:5, 135:14, 147:12, 163:4, 175:14, 184:6, 199:24
**insiders** [2] - 64:15, 65:23
**insignificant** [1] - 62:22
**insolvency** [4] - 58:20, 68:8, 68:13, 112:7
**instance** [1] - 27:14
**instead** [1] - 191:1
**institute** [1] - 38:15
**institution** [9] - 68:16, 76:11, 147:14, 172:8, 172:20, 174:3, 174:14, 193:3
**institutions** [1] - 172:2
**instructed** [1] - 80:8
**instruction** [1] - 7:10
**insurance** [35] - 30:23, 30:24, 30:25, 31:2, 31:3, 31:4, 31:5, 31:6, 31:7, 31:22, 31:23, 31:24, 31:25, 36:13, 36:14, 37:1, 37:8, 38:2, 51:6, 62:11, 94:4, 94:5, 94:7, 115:3, 115:10, 138:16, 138:17, 138:18, 138:22, 183:14, 184:14
**Insurance** [5] - 31:15, 31:16, 97:8, 121:2, 168:16
**insured** [1] - 68:16
**integrally** [1] - 132:13
**integration** [1] - 196:1
**intend** [3] - 6:15, 90:20, 91:3
**intended** [4] - 21:13, 23:7, 23:20, 56:23
**intent** [4] - 12:1, 22:16, 124:17, 209:15
**intention** [1] - 12:8, 25:2, 25:3, 90:13, 91:19
**intentional** [1] - 209:14
**intentionally** [1] - 210:8
**interaction** [1] - 19:20
**InterArch** [27] - 18:7, 18:14, 46:6, 46:20, 47:4, 47:16, 47:22, 53:18, 53:21, 54:1,

54:2, 129:12, 129:25, 130:6, 130:7, 130:9, 130:10, 130:20, 130:22, 131:1, 131:10, 131:12, 131:22, 132:9, 132:13, 162:13, 206:10
**InterArch's** [1] - 18:8
**interest** [13] - 25:1, 58:9, 58:9, 59:17, 85:6, 102:1, 104:6, 105:16, 106:4, 125:6, 128:25, 135:21, 149:6
**interests** [1] - 52:7
**interrelated** [1] - 62:1
**interrogatories** [5] - 94:13, 94:14, 95:6, 95:7, 95:9
**Interrogatory** [1] - 94:18
**interrogatory** [2] - 94:22, 95:15
**interrupt** [2] - 127:2, 146:21
**interview** [5] - 117:17, 128:3, 128:4, 145:19, 145:22
**interviewed** [7] - 67:16, 73:12, 118:11, 119:13, 123:5, 131:1, 145:23
**interviewees** [3] - 79:1, 79:17, 80:1
**interviewing** [6] - 34:7, 48:18, 58:22, 69:12, 73:17, 134:25
**interviews** [9] - 32:9, 35:14, 35:22, 71:11, 75:20, 122:21, 128:17, 139:4
**introduction** [1] - 41:22
**investigate** [1] - 58:23
**investigated** [2] - 54:10, 129:25
**investigating** [2] - 9:10, 67:18
**investigation** [43] - 11:2, 11:7, 11:8, 19:22, 46:19, 47:3, 54:23, 55:16, 56:13, 56:20, 58:5, 59:13, 59:15, 62:1, 62:4, 63:16, 63:18, 63:20, 63:22, 64:1, 64:14, 64:23, 66:12, 66:16, 66:25, 67:10, 75:15,

117:7, 122:9, 122:17, 148:12, 150:4, 151:23, 158:16, 159:13, 161:6, 161:14, 162:6, 162:10, 162:12, 203:10, 203:12
**investigations** [4] - 45:21, 64:25, 125:5, 203:21
**investigative** [5] - 46:9, 48:19, 62:9, 64:5, 65:4
**inviting** [1] - 7:3
**involve** [1] - 64:15
**involved** [13] - 13:18, 16:16, 24:12, 58:24, 61:15, 64:6, 97:11, 132:13, 135:1, 176:20, 179:14, 184:14, 198:4
**involves** [2] - 26:23, 30:25
**involving** [6] - 9:6, 12:18, 26:5, 58:10, 59:9, 170:25
**isolated** [3] - 133:9, 163:23, 199:9
**issuance** [3] - 58:25, 133:20, 134:15
**issue** [18] - 46:6, 53:17, 66:7, 68:12, 71:16, 72:3, 75:3, 78:15, 83:10, 115:25, 126:4, 140:4, 140:5, 144:3, 159:13, 199:18, 210:20, 210:21
**issued** [2] - 103:2, 133:10
**issues** [16] - 14:3, 18:7, 18:21, 25:15, 32:14, 46:7, 50:24, 52:20, 58:24, 59:12, 74:1, 81:19, 113:9, 128:16, 131:12, 178:20
**issuing** [2] - 51:5, 126:17
**item** [4] - 39:7, 114:21, 116:8, 116:11
**items** [16] - 32:13, 34:11, 34:13, 55:20, 58:4, 58:14, 69:12, 69:15, 75:3, 83:16, 115:23, 116:8, 126:20, 135:16, 162:6, 182:15
**itself** [11] - 11:11, 30:5, 31:1, 31:5, 33:8,

33:25, 94:22, 121:8, 121:25, 123:18, 199:22
**IV** [1] - 107:12

# J

**Jack** [3] - 152:22, 200:3, 206:4
**Jacob's** [1] - 173:2
**JACOBS** [213] - 1:14, 1:14, 2:5, 2:9, 2:15, 6:5, 6:22, 7:4, 7:8, 7:16, 8:11, 8:17, 8:19, 27:6, 27:9, 27:17, 27:21, 28:3, 28:18, 28:21, 28:25, 29:5, 29:14, 29:16, 29:18, 29:20, 30:10, 30:16, 30:19, 39:12, 39:15, 40:7, 44:24, 59:20, 59:22, 59:25, 60:3, 60:5, 76:21, 76:23, 76:25, 77:4, 77:11, 77:14, 77:19, 77:21, 77:23, 77:25, 78:3, 85:9, 85:17, 85:20, 86:4, 86:8, 86:13, 86:25, 87:8, 87:18, 87:24, 88:1, 88:3, 88:6, 88:11, 88:13, 89:4, 89:7, 90:21, 91:6, 91:11, 91:14, 91:16, 91:21, 91:24, 92:1, 92:5, 92:7, 92:17, 92:23, 93:7, 93:9, 94:19, 94:21, 94:24, 95:14, 95:19, 99:10, 99:15, 99:19, 99:22, 100:8, 100:10, 107:1, 107:3, 107:11, 107:14, 109:13, 109:15, 109:23, 109:25, 110:21, 110:23, 111:3, 111:7, 111:10, 111:15, 111:16, 125:20, 126:21, 127:3, 127:6, 127:11, 127:15, 129:15, 129:17, 136:21, 136:23, 137:4, 137:7, 137:11, 137:14, 137:17, 141:4, 141:7, 141:11, 141:14, 141:16, 141:18, 143:5, 143:19, 144:8, 144:11, 144:24, 146:7, 148:23, 149:14, 150:12,

151:13, 152:12, 153:6, 153:21, 154:1, 154:18, 155:5, 155:17, 156:5, 157:3, 157:9, 157:12, 157:18, 157:21, 158:25, 159:8, 161:22, 162:16, 162:18, 163:12, 173:9, 177:14, 177:15, 177:16, 178:1, 184:21, 185:4, 189:25, 190:2, 190:5, 190:10, 190:13, 191:22, 194:25, 196:24, 201:2, 201:5, 201:8, 201:10, 201:13, 202:16, 204:4, 204:9, 204:11, 204:15, 204:19, 204:22, 204:23, 205:1, 205:4, 205:6, 205:10, 205:15, 205:16, 205:20, 205:22, 205:24, 206:15, 206:25, 207:15, 207:20, 207:22, 208:3, 208:9, 208:13, 208:15, 208:17, 208:19, 208:21, 209:2, 209:5, 209:11, 209:14, 209:22, 210:15, 210:21, 211:2

**Jacobs** [6] - 28:1, 77:9, 86:18, 90:10, 162:19, 173:16

**James** [1] - 49:19

**January** [10] - 19:17, 19:23, 43:20, 43:21, 44:13, 176:16, 178:7, 178:15, 178:16, 188:11

**jeopardize** [1] - 124:20

**JERSEY** [1] - 1:1

**Jersey** [2] - 1:9, 48:6

**job** [12] - 75:5, 75:17, 131:1, 134:21, 134:22, 134:24, 135:6, 150:23, 152:1, 152:2, 152:4

**Joe** [4] - 152:22, 200:3, 206:4, 206:6

**john** [1] - 92:25

**JOHN** [12] - 2:2, 2:3, 2:6, 2:8, 2:10, 2:13, 92:21, 92:23, 145:10, 177:15, 202:21, 204:19

**John** [5] - 1:9, 29:18, 29:20, 92:17, 93:20

**joined** [2] - 15:6, 17:22

**joint** [54] - 3:19, 4:8, 4:10, 4:12, 4:14, 4:16, 4:18, 4:20, 4:22, 4:24, 5:3, 5:5, 5:7, 5:9, 38:19, 90:9, 158:4, 160:8, 160:11, 160:12, 160:22, 161:7, 164:2, 164:19, 164:24, 165:5, 165:13, 165:24, 166:2, 166:8, 166:13, 167:7, 167:8, 167:9, 167:19, 167:22, 168:6, 168:12, 169:3, 169:14, 169:21, 169:24, 170:9, 170:24, 171:9, 171:13, 171:21, 171:24, 172:14, 172:17, 173:4, 173:11, 187:5

**Joint** [8] - 3:21, 3:23, 4:6, 5:1, 161:1, 161:10, 164:6, 170:13

**Jordon** [1] - 206:5

**Joseph** [1] - 27:10

**JR** [1] - 1:14

**Judge** [111] - 6:5, 6:13, 6:22, 7:6, 7:12, 7:16, 8:11, 27:6, 27:9, 28:3, 28:25, 29:16, 30:6, 30:10, 30:16, 39:12, 40:7, 59:22, 59:25, 77:4, 85:9, 87:24, 88:7, 89:25, 92:5, 92:7, 93:7, 94:19, 99:10, 110:21, 111:4, 111:11, 126:21, 127:6, 129:13, 133:15, 137:5, 137:11, 141:7, 143:6, 143:14, 143:19, 144:3, 144:4, 144:20, 146:9, 147:24, 148:19, 149:3, 149:6, 149:14, 149:19, 150:6, 150:9, 150:12, 151:2, 151:10, 151:13, 152:5, 152:8, 152:15, 153:21, 154:18, 155:5, 155:17, 156:5, 157:3, 158:3, 158:5, 160:6, 160:9, 160:22, 161:7, 161:22, 162:16, 163:12,

164:14, 166:8, 166:10, 167:7, 167:19, 168:6, 169:11, 171:9, 171:21, 173:4, 173:6, 173:9, 177:14, 190:13, 196:21, 200:25, 202:16, 202:17, 202:18, 204:2, 204:4, 204:9, 205:1, 205:4, 205:8, 206:15, 206:23, 207:13, 207:17, 209:13, 209:19, 209:22, 210:11, 211:2, 211:5

**JUDGE** [1] - 1:11

**judge** [8] - 28:21, 85:21, 86:1, 86:16, 87:16, 126:23, 127:3, 208:25

**judgment** [3] - 67:14, 70:10, 75:14

**judgments** [2] - 75:2, 157:14

**July** [20] - 13:2, 13:17, 13:24, 17:2, 20:8, 40:13, 51:24, 52:21, 125:21, 126:7, 167:14, 167:24, 186:24, 187:9, 188:24, 189:1, 189:20, 190:6, 190:14, 192:9

**June** [34] - 11:17, 12:13, 12:16, 15:1, 15:14, 15:17, 15:21, 16:5, 20:8, 22:20, 49:7, 57:20, 57:21, 57:24, 61:20, 122:19, 123:9, 134:3, 134:4, 134:6, 134:18, 163:2, 163:6, 165:2, 165:16, 166:20, 181:12, 198:12, 199:13, 199:14, 199:18, 202:5, 203:1

**juror** [1] - 6:20

**jurors** [2] - 6:19, 6:24

**JURY** [2] - 143:11, 145:5

**jury** [59] - 6:16, 27:20, 39:20, 40:1, 40:4, 43:24, 91:5, 91:9, 91:20, 92:6, 100:7, 111:14, 113:8, 119:8, 145:3, 146:2, 148:25, 149:7, 149:17, 150:6, 151:2, 151:18, 152:5,

152:24, 153:11, 153:15, 154:4, 154:9, 158:6, 158:21, 159:16, 160:2, 160:13, 160:25, 161:8, 162:1, 162:21, 162:25, 163:15, 164:5, 164:15, 164:23, 165:11, 166:1, 166:12, 167:11, 167:21, 168:10, 169:11, 169:23, 170:11, 171:11, 171:23, 172:16, 173:8, 200:22, 209:16, 209:24, 210:7

**Jury** [5] - 7:19, 85:16, 87:21, 92:11, 206:19

**jury's** [5] - 141:12, 149:8, 167:16, 171:16, 177:22

## K

**keep** [5] - 39:13, 72:20, 121:14, 202:9, 202:12

**keeping** [1] - 111:24

**Kemp** [4] - 42:14, 160:4, 179:15, 179:16

**kept** [3] - 113:8, 180:20, 196:19

**Kerr** [7] - 14:1, 184:24, 185:6, 185:18, 200:13, 200:19, 206:5

**kind** [3] - 144:4, 178:5, 180:25

**knock** [4] - 138:12, 138:14, 138:15, 138:19

**knocked** [2] - 138:21, 138:23

**knowledge** [13] - 36:9, 37:8, 39:10, 51:5, 53:9, 56:12, 61:4, 65:15, 65:18, 66:13, 66:21, 100:22, 100:25

**known** [6] - 13:15, 13:19, 16:15, 202:13

**knows** [2] - 201:2, 201:3

**Kroener** [2] - 168:15, 170:4

**KUGLER** [1] - 1:11

## L

**labeled** [2] - 89:16, 187:12

**lacked** [1] - 114:25

**ladies** [8] - 7:20, 29:23, 39:16, 85:12, 143:8, 157:5, 204:6, 204:16

**landlord** [2] - 125:23, 135:22

**Langer** [1] - 150:1

**language** [27] - 32:14, 33:5, 33:25, 34:11, 34:14, 35:18, 37:6, 37:9, 45:10, 56:24, 57:16, 58:8, 59:6, 68:15, 69:17, 79:1, 115:16, 117:3, 123:18, 127:25, 131:25, 133:19, 139:2, 172:25, 180:25, 181:23, 197:18

**large** [3] - 42:24, 47:14, 130:15

**last** [15] - 13:10, 17:13, 19:10, 28:4, 44:5, 53:25, 63:6, 75:21, 93:1, 132:24, 136:7, 172:12, 172:13, 176:20, 206:25

**late** [2] - 16:4, 99:25

**law** [6] - 28:11, 80:8, 80:10, 175:18, 189:4, 192:3

**laws** [1] - 12:2

**lawsuit** [15] - 40:11, 40:15, 148:5, 149:25, 150:20, 151:20, 152:22, 153:14, 154:12, 155:1, 155:13, 155:25, 156:1, 201:7, 202:3

**lawsuits** [8] - 178:21, 178:22, 183:11, 183:13, 183:17, 203:7

**lawyer** [14] - 23:10, 59:4, 63:23, 63:24, 64:2, 98:7, 120:25, 191:4, 191:10, 191:21, 193:10, 194:2, 194:3, 194:12

**lawyer's** [1] - 191:6

**lawyers** [19] - 12:21, 24:16, 24:20, 46:15, 80:3, 100:18, 100:19, 103:3, 103:14,

104:24, 105:10,
119:15, 119:17,
119:19, 119:20,
138:2, 140:24, 189:8
  **lawyers'** [1] - 123:6
  **lead** [2] - 182:14,
182:18
  **leadership** [1] -
16:19
  **leading** [1] - 157:22
  **leafing** [1] - 196:2
  **learned** [1] - 69:12
  **lease** [6] - 46:23,
49:1, 49:2, 61:9,
61:11, 124:20
  **leases** [32] - 38:19,
49:11, 49:25, 50:3,
50:16, 50:19, 51:3,
51:7, 51:9, 60:8,
60:11, 60:13, 60:18,
60:23, 61:1, 61:3,
61:5, 62:6, 62:7,
62:18, 62:21, 64:6,
64:14, 65:1, 65:22,
66:6, 66:25, 67:7,
124:6, 124:14,
124:25, 170:24
  **least** [8] - 6:15,
10:22, 11:6, 46:1,
112:16, 120:24,
141:2, 196:21
  **leave** [1] - 85:17
  **leaves** [2] - 39:20,
206:19
  **Leaves** [1] - 85:16
  **leaving** [2] - 11:6,
25:5
  **led** [1] - 63:12
  **ledgers** [1] - 195:24
  **left** [3] - 140:6,
207:17, 208:11
  **legal** [14] - 18:5,
19:11, 28:7, 28:14,
42:20, 82:24, 95:11,
96:4, 100:14, 100:19,
105:24, 106:10,
138:3, 209:9
  **LEMING** [11] - 1:17,
88:16, 89:11, 89:18,
90:4, 90:9, 90:16,
92:3, 99:13, 99:24,
100:5
  **lend** [1] - 33:25
  **lengthy** [4] - 7:22,
30:7, 112:1, 176:16
  **lent** [3] - 33:4, 34:11,
125:5
  **Lerner** [2] - 153:13,
184:19
  **less** [2] - 52:10,

62:17
  **letter** [49] - 12:13,
13:2, 13:4, 23:10,
23:14, 49:20, 52:23,
55:9, 55:25, 56:1,
56:5, 56:17, 89:12,
89:13, 104:24, 121:3,
121:5, 162:3, 163:1,
163:6, 166:5, 167:13,
167:24, 167:25,
168:14, 170:2, 172:1,
172:8, 172:21,
186:25, 187:1, 187:8,
188:17, 188:23,
189:1, 189:11,
189:17, 189:21,
190:6, 190:14, 191:4,
191:21, 193:7,
193:18, 194:7,
194:16, 194:18, 210:4
  **letterhead** [1] - 189:4
  **letters** [5] - 84:20,
88:19, 121:3, 172:24,
186:22
  **level** [2] - 53:1,
197:19
  **levels** [1] - 163:5
  **Lewis** [7] - 184:24,
185:6, 185:18,
200:13, 200:19,
206:5, 208:5
  **Lex** [1] - 19:20
  **light** [1] - 117:7
  **lights** [1] - 30:10
  **likelihood** [1] - 11:9
  **likely** [3] - 69:6,
95:13, 175:19
  **limit** [6] - 39:10,
142:19, 142:23,
142:25, 143:2, 167:2
  **limited** [7] - 55:20,
56:25, 133:8, 163:23,
190:20, 198:24, 199:9
  **Line** [1] - 78:1
  **line** [5] - 53:3, 77:19,
77:20, 109:16, 124:3
  **lines** [3] - 44:6,
49:17, 77:1
  **Lines** [1] - 77:5
  **liquidated** [1] -
116:19
  **liquidation** [1] -
138:14
  **list** [5] - 40:19, 45:9,
74:21, 115:23, 206:25
  **listed** [6] - 112:13,
113:4, 113:23,
114:21, 180:19,
184:16
  **listing** [1] - 180:20

**litigation** [30] -
24:17, 27:11, 45:12,
45:17, 45:19, 45:22,
46:9, 47:21, 108:23,
109:1, 109:5, 128:1,
128:2, 130:11,
130:19, 130:22,
130:24, 131:9,
131:11, 131:14,
131:17, 131:19,
131:21, 135:11,
136:16, 160:19,
176:11, 176:13,
176:15
  **Litigations** [1] -
178:13
  **live** [1] - 87:25
  **LLC** [2] - 1:6, 95:21
  **Lloyd** [10] - 9:8,
24:18, 46:13, 132:18,
184:24, 185:6,
185:18, 200:13,
200:19, 202:10
  **LLP** [1] - 1:16
  **loan** [1] - 115:2
  **loans** [4] - 114:3,
114:7, 115:11, 195:24
  **look** [45] - 6:17, 14:1,
16:25, 32:3, 38:6,
38:8, 44:6, 44:9,
45:22, 49:17, 50:8,
55:14, 65:2, 65:22,
94:22, 106:12,
107:10, 113:25,
116:2, 117:22, 126:3,
128:25, 129:20,
134:16, 137:10,
137:15, 138:10,
142:1, 149:4, 151:5,
159:18, 177:17,
183:2, 184:18,
186:21, 187:11,
192:14, 192:16,
192:20, 197:19,
198:5, 199:25,
200:10, 201:21,
209:17
  **looked** [11] - 38:10,
46:7, 62:7, 96:23,
97:7, 120:9, 138:10,
147:18, 159:16,
189:1, 203:19
  **looking** [22] - 11:15,
14:8, 15:4, 17:20,
40:9, 41:23, 46:5,
53:24, 55:8, 57:19,
58:16, 78:11, 82:25,
133:22, 140:20,
149:8, 178:2, 178:11,
180:13, 203:13,

203:23, 204:12
  **looks** [3] - 146:14,
146:16, 188:9
  **lose** [1] - 95:17,
124:14, 124:18
  **LOUIS** [1] - 1:15
  **lower** [1] - 48:9
  **LS** [1] - 48:17
  **LUBIN** [3] - 8:18,
77:7, 136:25
  **lubin** [1] - 77:5
  **Lubin** [1] - 144:4
  **Lucas** [6] - 45:25,
46:1, 151:21, 154:25,
155:12, 186:7
  **lump** [4] - 17:4,
189:22, 190:7, 190:15
  **lunch** [3] - 85:12,
85:14, 144:5
  **Luncheon** [1] - 87:19

## M

  **ma'am** [1] - 149:4
  **mail** [7] - 39:8, 42:4,
49:19, 142:8, 166:16,
166:17, 167:5
  **mails** [6] - 126:16,
130:9, 142:3, 177:7,
191:17, 195:7
  **maintained** [1] -
100:24
  **majority** [2] - 36:20,
36:21
  **management** [4] -
24:4, 27:3, 36:14,
176:18
  **manager** [2] - 197:20
  **manifest** [1] - 159:12
  **manner** [3] - 79:7,
81:14, 103:17
  **March** [20] - 17:14,
24:3, 30:17, 44:14,
44:16, 71:3, 71:12,
71:18, 72:11, 75:22,
88:11, 90:22, 93:21,
94:9, 132:25, 175:22,
181:7, 209:25, 210:2
  **Mark** [1] - 155:23
  **marked** [4] - 59:5,
148:2, 149:12, 164:9
  **market** [11] - 46:22,
48:25, 50:7, 50:11,
50:17, 60:23, 62:15,
62:18, 63:7, 66:3
  **Masrani** [1] - 209:8
  **material** [17] - 57:10,
69:6, 76:16, 77:17,
78:12, 78:15, 110:11,

121:18, 121:23,
133:6, 174:20, 175:3,
175:6, 175:10,
175:14, 175:19,
184:12
  **materially** [6] -
110:15, 111:8, 112:7,
163:22, 199:7, 202:25
  **materially-false** [1] -
163:22
  **materials** [5] - 68:20,
69:19, 73:20, 79:3,
147:9
  **matter** [17] - 38:18,
38:22, 58:2, 59:16,
64:5, 120:11, 130:3,
131:14, 131:25,
133:2, 150:19, 151:7,
154:25, 158:20,
174:9, 201:23, 210:8
  **matters** [6] - 16:16,
26:5, 162:5, 162:12,
202:8, 207:8
  **mean** [13] - 10:9,
14:1, 21:2, 22:1,
30:24, 92:8, 92:9,
100:18, 101:19,
110:12, 116:11,
122:11, 183:23
  **meaning** [2] - 56:4,
62:17
  **means** [3] - 42:20,
107:21, 210:9
  **meant** [4] - 20:12,
20:14, 34:8, 81:15
  **meet** [1] - 131:22
  **meeting** [22] - 11:16,
13:25, 14:9, 14:12,
15:1, 15:5, 15:6,
15:14, 16:4, 17:21,
17:23, 18:13, 18:17,
24:2, 25:13, 25:21,
73:22, 117:21, 120:3,
165:16, 169:17
  **meetings** [1] - 97:2,
105:4, 117:17,
117:24, 119:12,
119:22, 120:9, 140:3,
191:17, 191:18, 195:6
  **member** [5] - 13:16,
16:11, 16:15, 27:10,
27:11
  **members** [17] - 9:9,
9:11, 9:25, 13:16,
26:18, 27:2, 34:7,
39:5, 46:12, 73:18,
74:10, 80:2, 97:4,
117:25, 122:21,
203:17, 203:20
  **membership** [2] -

54:15, 55:4
**memo** [8] - 128:20,
133:11, 133:22,
163:25, 166:9,
166:10, 166:16,
198:12
**memorandum** [2] -
128:5, 164:10
**mentioned** [9] -
16:10, 24:20, 43:1,
45:19, 75:1, 75:9,
145:25, 201:8, 201:9
**merger** [4] - 24:23,
186:6, 186:9, 196:19
**merits** [7] - 36:24,
37:2, 37:11, 37:21,
37:22, 56:14, 156:21
**message** [2] - 141:7,
141:16
**met** [2] - 11:10,
118:10
**metal** [2] - 45:25,
46:1
**metals** [1] - 200:1
**microphone** [1] -
93:4
**middle** [3] - 142:13,
196:18, 197:19
**might** [5] - 7:11, 8:7,
50:21, 61:10, 61:11
**million** [24] - 17:5,
26:3, 84:25, 85:4,
104:3, 104:5, 104:7,
104:10, 105:16,
106:15, 106:21,
106:23, 107:16,
108:4, 108:8, 108:13,
108:14, 110:3, 110:6,
119:19, 136:13,
136:14, 136:15,
176:25
**millions** [7] - 56:6,
56:7, 56:8, 56:11,
197:5, 197:6, 197:11
**mind** [2] - 123:9,
177:18
**minimum** [3] -
120:18, 122:9, 122:17
**minor** [1] - 124:7
**minus** [1] - 85:4
**minute** [2] - 85:17,
145:19
**minutes** [25] - 11:16,
13:25, 14:9, 15:5,
17:21, 18:25, 29:2,
30:14, 39:17, 63:6,
71:2, 71:11, 71:17,
72:10, 73:22, 87:4,
107:24, 143:7, 143:8,
144:22, 144:23,

165:16, 169:4,
169:17, 207:14
**misapplication** [2] -
114:17, 138:21
**miss** [1] - 112:11
**missed** [1] - 52:24
**missing** [1] - 76:25
**mistake** [1] - 136:4
**Mitchell** [1] - 1:8
**modify** [1] - 60:10
**moment** [8] - 9:24,
21:10, 25:3, 28:22,
71:2, 79:19, 178:14,
201:14
**Monetary** [1] -
107:15
**money** [13] - 15:11,
23:8, 25:5, 47:25,
108:14, 116:18,
116:24, 131:2, 131:4,
131:13, 136:12,
142:23, 201:24
**moneys** [2] - 96:6,
142:5
**month** [1] - 25:13
**months** [20] - 11:12,
11:13, 12:17, 12:20,
12:21, 14:25, 15:3,
15:13, 19:16, 19:25,
20:4, 20:6, 20:12,
20:15, 20:25, 21:14,
98:25, 99:2
**morning** [10] - 6:2,
6:14, 7:23, 69:3,
86:22, 87:12, 143:25,
204:7, 206:23, 207:10
**mornings** [1] - 87:2
**Morton** [1] - 206:5
**most** [10] - 26:8,
79:12, 95:13, 118:11,
145:23, 179:3,
186:19, 194:7, 207:3,
207:6
**motion** [3] - 19:1,
74:5, 206:20
**motive** [1] - 209:17
**move** [7] - 62:21,
88:17, 88:24, 104:12,
144:1, 148:19, 159:19
**moved** [2] - 173:9,
205:14
**moving** [3] - 149:6,
205:2, 205:5
**MR** [405] - 2:4, 2:7,
2:9, 2:11, 2:14, 6:5,
6:13, 6:20, 6:22, 7:3,
7:4, 7:8, 7:9, 7:16,
8:11, 8:17, 8:18, 8:19,
27:6, 27:9, 27:17,
27:21, 28:3, 28:18,

28:21, 28:25, 29:5,
29:14, 29:16, 29:18,
29:19, 29:20, 30:6,
30:9, 30:10, 30:16,
30:19, 39:12, 39:15,
39:25, 40:7, 44:22,
44:24, 59:18, 59:20,
59:21, 59:22, 59:25,
60:2, 60:3, 60:4, 60:5,
76:19, 76:21, 76:22,
76:23, 76:24, 76:25,
77:2, 77:4, 77:7, 77:8,
77:11, 77:14, 77:19,
77:20, 77:21, 77:22,
77:23, 77:24, 77:25,
78:2, 78:3, 78:4, 85:9,
85:17, 85:20, 86:4,
86:8, 86:13, 86:25,
87:8, 87:18, 87:24,
88:1, 88:3, 88:6,
88:11, 88:13, 89:4,
89:7, 90:21, 91:6,
91:11, 91:14, 91:16,
91:21, 91:24, 92:1,
92:5, 92:7, 92:17,
92:23, 93:7, 93:9,
94:19, 94:21, 94:24,
95:14, 95:19, 99:10,
99:15, 99:19, 99:22,
100:4, 100:8, 100:10,
107:1, 107:3, 107:11,
107:14, 109:13,
109:15, 109:23,
109:25, 110:18,
110:20, 110:21,
110:22, 110:23,
111:3, 111:7, 111:10,
111:15, 111:16,
125:20, 126:21,
126:23, 127:3, 127:6,
127:11, 127:15,
129:13, 129:15,
129:17, 133:15,
136:21, 136:23,
136:25, 137:4, 137:7,
137:11, 137:14,
137:17, 141:4, 141:7,
141:11, 141:14,
141:16, 141:18,
143:5, 143:14,
143:16, 143:19,
144:4, 144:8, 144:9,
144:11, 144:12,
144:18, 144:20,
144:24, 145:9,
145:10, 146:7, 146:9,
146:11, 146:15,
146:17, 146:20,
147:2, 147:23, 148:1,
148:19, 148:23,
149:2, 149:11,

149:14, 149:18,
149:21, 149:23,
150:6, 150:8, 150:12,
150:14, 150:16,
151:2, 151:4, 151:10,
151:13, 151:17,
152:5, 152:8, 152:10,
152:12, 152:15,
152:18, 152:24,
153:2, 153:4, 153:6,
153:10, 153:15,
153:18, 153:21,
153:24, 154:1, 154:7,
154:8, 154:13,
154:16, 154:18,
154:21, 154:23,
155:3, 155:5, 155:9,
155:10, 155:15,
155:17, 155:21,
155:22, 156:3, 156:5,
156:9, 156:10, 157:1,
157:3, 157:9, 157:12,
157:18, 157:21,
158:3, 158:15,
158:25, 159:7, 159:8,
159:20, 159:25,
160:6, 160:8, 160:15,
160:16, 160:22,
161:2, 161:7, 161:11,
161:17, 161:19,
161:22, 161:25,
162:14, 162:16,
162:18, 162:23,
162:24, 163:8,
163:10, 163:12,
163:17, 163:18,
164:2, 164:7, 164:8,
164:14, 164:18,
164:21, 164:25,
165:5, 165:7, 165:10,
165:14, 165:24,
166:3, 166:8, 166:10,
166:14, 166:15,
167:7, 167:12,
167:19, 167:23,
168:6, 168:8, 168:11,
168:13, 169:3, 169:6,
169:8, 169:11,
169:13, 169:15,
169:21, 169:25,
170:1, 170:9, 170:12,
170:14, 171:9,
171:12, 171:14,
171:21, 171:25,
172:12, 172:18,
172:19, 173:4, 173:6,
173:9, 173:10,
173:12, 173:24,
174:1, 177:12,
177:14, 177:15,
177:16, 177:21,

177:24, 178:1,
184:21, 185:4,
189:25, 190:2, 190:5,
190:10, 190:12,
190:13, 191:22,
194:24, 194:25,
195:1, 196:21,
196:24, 200:25,
201:2, 201:5, 201:8,
201:10, 201:13,
202:16, 202:17,
202:21, 204:2, 204:4,
204:9, 204:11,
204:15, 204:19,
204:21, 204:22,
204:23, 205:1, 205:4,
205:6, 205:8, 205:10,
205:11, 205:15,
205:16, 205:20,
205:22, 205:24,
206:15, 206:16,
206:23, 206:25,
207:13, 207:15,
207:17, 207:20,
207:22, 207:23,
208:3, 208:9, 208:13,
208:15, 208:17,
208:19, 208:21,
208:25, 209:2, 209:3,
209:5, 209:6, 209:11,
209:12, 209:14,
209:19, 209:22,
210:11, 210:15,
210:21, 211:2, 211:5
**MS** [10] - 88:16,
89:11, 89:18, 90:4,
90:9, 90:16, 92:3,
99:13, 99:24, 100:5
**multiple** [10] - 26:10,
69:25, 70:2, 97:1,
130:4, 191:16,
191:17, 195:5, 195:7
**must** [4] - 36:15,
58:15, 60:9, 122:5

---

## N

**N.A** [3] - 12:13,
120:2, 120:6
**NA** [2] - 195:14,
196:19
**name** [7] - 31:19,
84:6, 92:24, 93:1,
178:24, 179:15,
179:24
**named** [6] - 42:18,
178:25, 179:21,
179:25, 206:13
**namely** [2] - 11:5,
93:21

**Nami** [1] - 1:25
**naming** [5] - 152:22, 153:14, 155:1, 155:13, 156:1
**national** [1] - 90:12
**National** [6] - 31:14, 31:16, 46:7, 47:6, 54:7, 193:1
**nature** [2] - 96:18, 106:24
**necessarily** [2] - 33:5, 34:14
**necessary** [13] - 6:6, 17:16, 23:25, 24:25, 74:11, 78:12, 96:9, 96:11, 97:5, 119:11, 122:8, 159:12, 190:20
**necessity** [1] - 188:18
**need** [13] - 6:4, 11:1, 18:2, 27:21, 28:3, 53:20, 58:23, 77:8, 86:22, 111:13, 136:1, 183:9, 207:23
**needed** [7] - 80:9, 80:17, 100:20, 123:16, 124:7, 135:23, 194:25
**needs** [3] - 31:6, 131:23, 177:4
**negative** [7] - 69:16, 69:21, 72:21, 79:8, 83:2, 121:16
**negotiate** [1] - 124:13
**negotiated** [4] - 9:20, 10:16, 10:17, 66:10
**negotiation** [1] - 124:7
**negotiations** [7] - 15:10, 18:6, 50:24, 51:8, 60:15, 61:6, 61:16
**never** [5] - 8:20, 78:15, 79:22, 179:20, 179:21
**NEW** [1] - 1:1
**new** [3] - 16:19, 125:9, 162:9
**New** [3] - 1:9, 48:6, 189:10
**newspaper** [2] - 6:14, 7:23
**newspapers** [1] - 6:25
**next** [44] - 8:10, 8:12, 13:2, 13:10, 15:16, 16:23, 18:13, 18:19, 19:1, 27:7, 27:9, 29:13, 42:11, 45:11,

45:12, 47:24, 51:12, 53:17, 55:7, 65:10, 71:10, 77:20, 86:1, 87:23, 87:24, 92:16, 92:17, 101:4, 112:2, 114:12, 122:13, 125:4, 125:9, 133:3, 136:17, 143:20, 172:13, 174:24, 175:9, 175:13, 175:17, 186:15, 200:10, 207:5
**night** [2] - 133:21, 206:17
**nine** [1] - 17:19
**nobody** [4] - 7:25, 76:15, 77:15, 78:5
**non** [5] - 47:9, 97:18, 140:6, 194:8, 194:9
**non-findings** [1] - 47:9
**non-golden** [3] - 97:18, 140:6, 194:8
**none** [9] - 61:3, 75:7, 75:10, 75:25, 76:3, 76:6, 76:7, 76:10, 78:16
**norcross** [1] - 200:12
**Norcross** [9] - 6:6, 8:14, 8:15, 27:7, 133:1, 184:24, 185:7, 185:18, 206:5
**normal** [1] - 6:16
**normalcy** [1] - 11:11
**North** [1] - 84:5
**note** [1] - 185:24
**noted** [10] - 37:16, 40:19, 41:19, 52:17, 75:9, 75:13, 75:16, 81:2, 81:3, 139:2
**notes** [3] - 76:5, 81:2, 96:21
**nothing** [8] - 8:5, 64:3, 116:18, 177:12, 204:2, 206:15, 206:16, 209:24
**notice** [4] - 58:3, 58:16, 161:5, 161:13
**notifications** [1] - 19:21
**notified** [2] - 90:5, 90:22
**notify** [2] - 88:25, 90:3
**noting** [1] - 39:8
**November** [24] - 17:21, 19:15, 20:9, 20:13, 20:14, 20:15, 20:20, 20:21, 22:18,

23:16, 33:13, 43:22, 44:17, 49:19, 73:22, 106:14, 122:3, 136:8, 169:4, 169:17, 170:17, 181:12, 186:20, 202:5
**Number** [5] - 34:19, 39:1, 46:23, 59:6, 186:23
**number** [37] - 12:21, 13:2, 15:16, 23:25, 32:13, 34:11, 37:14, 46:20, 46:21, 46:22, 52:21, 55:16, 56:19, 58:4, 58:14, 61:5, 73:23, 95:14, 95:15, 96:20, 99:11, 103:6, 113:25, 120:16, 125:20, 126:23, 128:20, 133:8, 144:7, 144:10, 150:2, 163:23, 178:18, 178:24, 184:3, 198:24, 199:9
**NUMBER** [1] - 1:4
**numbered** [1] - 65:2
**numbers** [2] - 61:13, 138:11
**Numeral** [12] - 32:3, 40:17, 40:25, 41:2, 41:4, 41:16, 42:1, 42:2, 42:13, 49:6, 57:5, 199:2
**numeral** [1] - 113:25
**numerous** [1] - 43:2

---

# O

**o'clock** [2] - 30:8, 144:20
**oath** [3] - 94:13, 112:18, 174:15
**object** [5] - 126:21, 153:19, 154:2, 158:23, 159:11
**objecting** [1] - 157:17
**objection** [42] - 44:22, 59:21, 96:3, 96:5, 99:12, 99:18, 99:19, 99:23, 99:24, 100:3, 100:4, 110:18, 127:7, 146:7, 150:12, 151:13, 153:6, 154:18, 155:5, 155:16, 155:17, 156:4, 156:5, 157:3, 158:4, 158:12, 158:22, 159:2, 159:11, 159:19,

160:10, 160:24, 161:20, 162:15, 162:18, 162:20, 163:13, 205:7, 205:9, 205:11, 209:3
**objections** [21] - 87:10, 87:11, 100:2, 143:23, 144:7, 148:21, 148:23, 149:13, 150:11, 151:12, 152:11, 153:5, 153:19, 154:14, 155:4, 157:2, 163:11, 207:1, 207:5, 207:6, 207:7
**objective** [2] - 82:18, 83:10
**obligated** [5] - 106:15, 106:20, 110:5, 119:19, 119:24
**obligation** [4] - 64:22, 210:17, 210:18, 210:23
**obligations** [1] - 190:22
**observation** [2] - 47:24, 86:23
**obviously** [5] - 6:13, 8:3, 9:17, 26:6, 27:5
**OCC** [61] - 9:4, 9:25, 10:4, 11:2, 11:6, 12:18, 12:23, 18:20, 19:22, 20:23, 22:23, 33:11, 36:3, 45:20, 46:23, 49:7, 49:20, 53:4, 55:15, 58:3, 58:5, 63:15, 63:21, 63:25, 66:11, 66:18, 67:9, 67:17, 69:15, 73:25, 74:12, 83:5, 83:6, 83:22, 106:14, 108:20, 109:7, 117:8, 121:24, 122:4, 122:11, 122:19, 122:24, 125:5, 128:6, 128:10, 128:16, 129:3, 133:5, 133:11, 136:9, 138:6, 163:2, 197:6, 198:13, 198:16, 203:10, 205:17, 206:2, 206:12
**OCC's** [2] - 58:23, 133:20
**occasions** [1] - 14:6
**occupied** [3] - 56:22, 56:23, 207:8
**occur** [3] - 58:11, 58:15, 59:10
**occurred** [6] - 10:1, 10:7, 119:4, 133:4,

178:19, 178:20
**occurring** [8] - 21:15, 21:16, 25:22, 25:23, 97:4, 105:3, 195:6, 195:9
**October** [12] - 15:5, 15:13, 18:14, 20:2, 20:8, 20:10, 20:12, 20:14, 20:21, 44:3, 44:18, 172:21
**OF** [12] - 1:1, 2:3, 2:6, 2:8, 2:10, 2:13, 92:23, 145:10, 159:21, 177:15, 202:21, 204:19
**offered** [4] - 96:6, 126:23, 126:25, 176:3
**offhand** [1] - 130:23
**office** [1] - 189:8
**Office** [4] - 97:8, 161:14, 162:3, 165:3
**officer** [5] - 16:9, 17:2, 41:20, 43:1, 114:17
**officers** [4] - 16:19, 24:4, 55:17, 56:17
**offices** [3] - 58:10, 59:10, 125:9
**offset** [7] - 107:20, 108:4, 108:9, 108:10, 108:22, 177:1
**old** [1] - 52:24
**omission** [20] - 32:6, 32:16, 32:25, 33:18, 34:4, 34:9, 34:16, 34:24, 35:3, 35:11, 35:16, 40:22, 43:6, 45:5, 57:8, 57:15, 69:5, 112:6, 147:11, 174:25
**omissions** [2] - 38:15, 78:6
**once** [4] - 17:22, 24:23, 63:20, 92:15
**one** [86] - 12:12, 24:10, 25:20, 32:3, 34:18, 37:9, 39:7, 40:17, 40:25, 41:2, 41:4, 41:17, 41:22, 42:1, 42:2, 44:8, 46:20, 47:4, 49:17, 54:16, 55:16, 55:23, 56:15, 56:20, 61:9, 64:20, 64:24, 66:19, 67:24, 70:2, 75:14, 76:9, 79:22, 81:1, 85:17, 86:8, 88:4, 90:7, 91:16, 92:7, 94:17, 97:15, 99:7, 99:10, 105:9, 110:24,

114:19, 116:8,
117:21, 123:25,
128:4, 128:15, 130:7,
130:8, 134:16,
137:21, 138:6, 139:8,
150:1, 150:20,
150:22, 152:9,
157:21, 162:7, 162:9,
163:12, 180:22,
181:15, 182:8,
184:18, 186:9,
186:13, 186:21,
187:5, 191:23,
195:21, 197:14,
200:10, 200:17,
200:23, 203:15,
204:12
  **One** [2] - 1:9, 42:13
  **ones** [6] - 62:22,
124:2, 186:7, 201:9,
201:10, 201:14
  **ongoing** [2] - 75:16,
117:19
  **online** [2] - 7:24, 8:8
  **OPEN** [1] - 145:1
  **open** [3] - 20:25,
38:22, 39:22
  **opening** [1] - 163:1
  **opinion** [14] - 13:11,
19:11, 20:18, 23:22,
25:3, 28:7, 28:14,
75:4, 105:24, 106:10,
126:20, 126:22,
132:11, 132:12
  **opinions** [4] - 73:16,
120:15, 123:6, 133:25
  **opportunity** [1] -
100:1
  **opposed** [1] - 10:23
  **option** [3] - 101:25,
106:4, 193:24
  **options** [11] - 84:25,
85:1, 101:14, 104:4,
104:14, 105:1, 105:8,
105:11, 105:12,
193:25
  **oral** [3] - 22:1, 26:10,
32:21
  **order** [36] - 26:17,
37:10, 38:13, 58:4,
58:6, 58:13, 59:5,
61:19, 61:20, 65:3,
65:7, 88:24, 108:9,
122:10, 122:18,
123:9, 123:13,
124:19, 133:10,
134:15, 134:19,
158:4, 158:22,
158:24, 158:25,
164:20, 165:1, 165:3,

170:16, 176:23,
177:3, 198:15,
199:14, 199:18,
199:19, 208:7
  **Order** [46] - 11:10,
33:10, 37:17, 38:19,
38:25, 49:6, 49:7,
49:9, 49:14, 56:16,
57:19, 57:24, 58:1,
58:7, 59:1, 60:7,
63:12, 63:15, 64:4,
64:13, 65:22, 66:20,
67:8, 67:12, 67:23,
68:5, 85:5, 88:22,
89:25, 99:20, 99:25,
106:13, 107:6,
108:12, 108:17,
126:17, 133:20,
133:24, 134:3, 134:4,
134:6, 136:8, 193:4,
198:21, 203:1, 209:2
  **ordered** [1] - 88:7
  **ordinarily** [2] - 50:4,
127:6
  **organization** [3] -
29:24, 29:25, 30:3
  **original** [1] - 6:25
  **originally** [1] - 91:1
  **otherwise** [4] -
10:19, 12:7, 25:12,
25:14
  **ought** [2] - 6:23,
107:2
  **outings** [2] - 54:12,
55:1
  **outside** [5] - 10:1,
16:20, 25:16, 26:10,
128:17
  **outstanding** [1] -
25:15
  **overall** [4] - 62:6,
62:13, 130:3, 131:5
  **overbroad** [1] -
90:24
  **overrule** [1] - 159:19
  **overseeing** [1] -
82:24
  **overturned** [2] -
48:9, 48:11
  **owed** [2] - 106:10,
131:13
  **own** [7] - 22:18, 31:2,
50:9, 115:15, 143:23,
163:3
  **owned** [4] - 31:15,
129:18, 193:2, 195:18
  **ownership** [3] - 39:7,
54:2, 135:21

**P**

  **P-19** [4] - 4:8,
164:18, 164:24, 165:1
  **P-23** [5] - 4:10,
165:5, 165:6, 165:13,
165:15
  **P-24** [4] - 4:12,
165:24, 166:2, 166:4
  **P-26** [6] - 4:16,
167:7, 167:8, 167:9,
167:13, 187:4
  **P-27** [5] - 4:18,
167:19, 167:22,
167:23, 188:23
  **P-35** [5] - 4:20,
168:6, 168:12,
168:14, 191:21
  **P-36** [5] - 4:24,
169:21, 169:22,
169:24, 170:2
  **P-38** [4] - 4:22,
169:3, 169:14, 169:16
  **P-46** [5] - 5:3, 171:9,
171:13
  **P-47** [3] - 5:7,
172:13, 172:17
  **P-48** [4] - 5:5,
171:21, 171:24, 172:1
  **P-53** [5] - 5:1, 107:1,
170:9, 170:13, 170:15
  **P-58** [4] - 3:21,
160:22, 161:1, 161:3
  **P-59** [4] - 3:23,
161:7, 161:10, 161:12
  **P-60** [4] - 4:6, 164:2,
164:6, 164:9
  **P-70** [7] - 2:18, 5:9,
88:6, 100:9, 173:4,
173:11, 173:13
  **P-71** [2] - 89:11,
90:24
  **P-9** [5] - 3:19, 160:6,
160:7, 160:12, 160:17
  **p.m** [4] - 143:11,
145:1, 145:5, 166:20
  **Page** [12] - 44:5,
44:7, 47:15, 47:20,
48:22, 53:24, 107:1,
107:2, 107:9, 107:11,
136:11, 202:24
  **page** [63] - 12:9,
12:12, 13:4, 13:7,
13:10, 14:2, 15:9,
15:19, 16:25, 17:13,
17:25, 18:1, 37:9,
40:8, 40:18, 41:22,
44:5, 46:8, 46:18,
48:12, 48:24, 49:5,

50:8, 50:20, 51:11,
51:25, 53:10, 53:19,
60:6, 65:2, 65:10,
73:23, 94:21, 99:16,
107:9, 109:8, 109:9,
109:23, 112:2, 126:3,
128:25, 146:14,
146:15, 149:2,
165:19, 178:11,
178:12, 178:15,
178:16, 179:8,
187:11, 188:17,
189:13, 189:14,
192:15, 199:1,
204:20, 204:24
  **pages** [9] - 56:8,
56:11, 57:3, 82:7,
146:3, 177:19, 197:5,
197:7, 197:11
  **paid** [33] - 47:5,
48:19, 54:6, 54:18,
74:13, 74:16, 74:17,
74:19, 74:23, 74:24,
75:6, 75:19, 80:6,
80:9, 97:23, 97:24,
98:2, 101:18, 104:15,
105:11, 106:7, 108:2,
108:5, 108:23,
117:18, 117:22,
118:1, 120:5, 131:4,
140:11, 177:4, 188:5,
193:16
  **pains** [1] - 159:2
  **paper** [4] - 7:10,
7:11, 103:13, 146:22
  **papers** [1] - 91:10
  **parachute** [31] -
13:13, 13:17, 80:12,
82:1, 89:21, 97:18,
97:20, 98:1, 98:9,
98:12, 101:15,
101:20, 101:23,
102:9, 102:13,
102:17, 103:4,
103:10, 103:15,
110:2, 110:14,
111:23, 138:9,
139:22, 140:6, 140:7,
140:12, 140:17,
140:25, 141:6, 171:17
  **Parachute** [12] -
181:19, 182:8,
188:18, 188:21,
188:22, 193:5,
193:15, 194:8,
194:10, 194:11,
194:13, 197:14
  **paragraph** [54] -
11:18, 13:6, 13:10,
14:10, 15:6, 15:20,

17:22, 28:5, 38:9,
50:10, 53:11, 54:25,
55:5, 55:14, 58:7,
60:9, 60:25, 65:2,
65:6, 65:7, 66:5, 67:3,
73:24, 91:14, 100:12,
100:13, 103:20,
103:24, 103:25,
109:14, 110:5,
111:17, 112:1,
114:19, 114:22,
114:24, 120:16,
122:7, 142:14,
173:23, 174:8,
175:24, 176:8, 176:9,
187:11, 189:18,
189:25, 190:1, 190:3,
190:4, 192:14,
192:16, 199:1
  **Paragraph** [15] -
11:20, 14:2, 95:23,
105:20, 106:12,
110:1, 110:9, 111:4,
111:17, 116:25,
117:4, 117:5, 122:13,
129:21
  **Paragraphs** [1] -
68:18
  **paragraphs** [1] -
142:11
  **part** [69] - 10:18,
12:18, 13:24, 23:20,
25:4, 25:18, 25:25,
34:21, 38:6, 38:8,
50:18, 85:2, 97:19,
107:17, 112:16,
116:13, 120:20,
121:6, 124:12,
124:15, 130:2, 132:6,
132:7, 135:22,
139:11, 142:3,
143:25, 146:4,
146:12, 146:18,
146:23, 147:1,
148:11, 150:3,
150:22, 150:23,
151:6, 151:22,
151:25, 152:2,
157:13, 158:1,
158:18, 158:19,
159:5, 159:15,
159:17, 164:11,
164:12, 168:2, 171:1,
171:17, 174:6,
180:10, 180:13,
181:23, 182:2,
183:25, 184:16,
186:5, 189:20,
190:17, 199:20,
203:23, 203:24

**Part** [5] - 97:19, 99:6, 111:24, 114:21, 184:10

**participating** [1] - 14:14

**particular** [3] - 39:7, 94:17, 95:20

**particularize** [1] - 83:7

**particularly** [2] - 89:20, 123:4

**parties** [11] - 21:25, 37:6, 37:15, 44:14, 58:22, 58:25, 62:2, 65:23, 88:17, 128:17, 176:12

**parts** [5] - 21:3, 98:9, 98:11, 146:24, 158:15

**party** [6] - 29:25, 49:1, 52:18, 147:15, 174:4, 174:14

**pass** [3] - 9:14, 149:4, 178:14

**passage** [1] - 27:14

**passed** [1] - 21:13

**past** [3] - 52:15, 59:14, 176:19

**Pauls** [5] - 132:17, 133:23, 148:7, 202:11, 206:7

**pause** [6] - 6:8, 30:13, 40:2, 59:23, 128:23, 193:21

**Pause** [1] - 28:20

**pausing** [1] - 33:20

**pay** [49] - 15:10, 17:17, 23:1, 23:6, 23:12, 23:17, 24:24, 26:3, 26:11, 74:11, 81:6, 81:10, 95:22, 97:14, 97:17, 98:8, 101:5, 101:11, 102:8, 102:9, 102:13, 102:16, 103:3, 103:8, 103:15, 106:9, 106:21, 107:16, 110:6, 119:19, 119:25, 139:10, 140:21, 168:20, 168:22, 181:11, 183:12, 183:18, 184:2, 191:11, 191:12, 191:14, 191:20, 193:19, 194:5, 202:1, 202:5, 210:18, 210:23

**Pay** [3] - 150:24, 178:19, 179:5

**paying** [4] - 13:18, 14:22, 62:17, 84:11

**payment** [42] - 13:12, 15:22, 17:5, 18:8, 18:22, 22:2, 22:10, 22:14, 47:22, 68:22, 74:2, 80:12, 80:24, 82:1, 83:23, 97:21, 104:2, 104:4, 104:9, 104:13, 107:23, 110:2, 110:8, 110:14, 121:12, 139:23, 140:4, 140:16, 140:17, 172:5, 186:10, 186:11, 189:22, 190:7, 190:15, 190:23, 196:7, 197:16, 209:8, 209:15

**Payments** [1] - 107:15

**payments** [27] - 14:6, 14:18, 19:3, 19:12, 21:4, 28:8, 74:7, 101:6, 102:9, 102:13, 102:17, 110:14, 115:25, 140:6, 140:7, 140:12, 141:6, 141:9, 168:19, 170:5, 170:7, 172:5, 176:23, 188:21, 193:14, 194:8, 194:14

**payrolls** [1] - 195:25

**pays** [2] - 48:21, 108:13

**Pearl** [3] - 151:21, 154:25, 155:11

**peep** [2] - 134:11

**pendency** [1] - 11:2

**pending** [3] - 109:2, 162:10, 176:15

**penny** [1] - 202:1

**Pension** [1] - 154:11

**people** [15] - 57:13, 67:16, 69:13, 70:13, 71:22, 73:12, 79:12, 82:25, 83:4, 134:25, 172:6, 179:16, 179:17, 200:22, 203:8

**per** [2] - 21:23, 45:8

**percent** [9] - 50:7, 50:11, 50:16, 60:23, 62:15, 62:17, 63:7, 64:7, 66:3

**perception** [9] - 11:4, 11:5, 40:21, 58:23, 58:24, 67:17, 123:15, 126:4, 183:14

**perceptions** [1] - 35:24

**perform** [1] - 191:6

**performance** [3] - 197:15, 197:24, 198:1

**perhaps** [5] - 9:10, 11:4, 24:13, 149:7, 177:18

**period** [7] - 15:17, 21:15, 22:15, 97:4, 98:13, 150:21, 210:2

**periodically** [1] - 26:9

**permission** [18] - 23:6, 97:17, 97:21, 97:23, 98:3, 98:4, 101:18, 104:18, 104:20, 115:25, 140:5, 140:20, 142:5, 142:9, 149:8, 149:9, 170:4

**permit** [2] - 174:3, 211:1

**permitted** [2] - 88:22, 89:22

**person** [8] - 30:4, 73:16, 87:25, 121:12, 136:24, 196:6, 197:16, 197:19

**personally** [2] - 8:21, 182:20

**perspectively** [1] - 11:11

**pertaining** [1] - 15:10

**Philadelphia** [6] - 150:24, 178:21, 179:5, 179:11, 179:14, 183:12

**phone** [5] - 105:4, 180:21, 182:13, 195:8, 208:21

**phones** [1] - 191:17

**photocopy** [3] - 15:16, 77:4, 81:16

**photograph** [1] - 100:22

**phrase** [2] - 96:3, 109:16

**pick** [2] - 60:1, 77:2

**picked** [1] - 79:19

**picture** [1] - 115:22

**piece** [5] - 32:19, 32:22, 42:11, 103:13, 146:22

**piled** [1] - 70:25

**piling** [1] - 164:14

**place** [5] - 25:17, 41:22, 96:6, 121:21, 131:16

**plain** [2] - 121:5, 172:24

**Plaintiff** [1] - 1:4

**plaintiff** [5] - 42:7, 183:16, 201:7, 210:25

**PLAINTIFF** [3] - 1:15, 2:18, 100:9

**plaintiff's** [1] - 205:3

**Plaintiff's** [2] - 94:18, 187:4

**plaintiffs** [2] - 158:5, 201:15

**plan** [10] - 49:10, 54:11, 54:24, 60:7, 86:21, 87:7, 91:6, 180:24, 193:24, 209:8

**planet** [2] - 103:2, 140:23

**plans** [1] - 60:10

**Play** [3] - 150:24, 178:19, 179:5

**play** [5] - 157:14, 158:1, 159:4, 159:8, 183:12, 183:18

**played** [8] - 27:20, 27:24, 27:25, 28:17, 110:25, 158:9, 158:12, 180:10

**Plaza** [1] - 1:9

**point** [17] - 6:8, 9:2, 13:1, 20:20, 20:22, 28:3, 28:22, 39:9, 50:13, 54:17, 64:3, 117:21, 129:7, 138:20, 203:5, 207:2

**pointed** [2] - 54:10, 54:23, 66:11, 66:14, 66:18, 66:24

**points** [2] - 32:20, 142:12

**Pollock** [4] - 89:12, 143:20, 208:15, 210:4

**poor** [2] - 75:2, 75:14

**poorly** [1] - 197:16

**pop** [3] - 146:15, 149:2, 202:19

**Porter** [3] - 24:11, 24:14, 80:11

**portion** [2] - 126:5, 140:17

**posed** [1] - 52:6

**position** [15] - 30:22, 40:21, 43:1, 84:15, 89:19, 94:2, 127:13, 181:21, 181:22, 182:24, 189:21, 190:7, 190:15, 191:5, 191:6

**positions** [1] - 39:2

**positive** [4] - 79:8, 83:1, 131:24, 132:1

**positives** [2] - 131:3, 132:5

**possess** [2] - 68:19, 69:18, 79:2, 112:3, 147:8

**possessed** [1] - 180:15

**possesses** [1] - 32:5

**possession** [2] - 24:19, 114:4

**possible** [3] - 13:5, 95:16, 125:1, 209:9, 209:15

**possibly** [1] - 33:9

**Post** [2] - 7:1, 7:24

**postdated** [1] - 157:25

**postpone** [1] - 87:17

**postponement** [1] - 86:20

**potential** [2] - 52:6, 125:6

**potentially** [2] - 83:9, 176:18

**power** [1] - 36:4

**practice** [2] - 54:14, 55:3

**practices** [8] - 58:9, 59:8, 133:4, 133:6, 163:21, 170:21, 199:7, 202:25

**precise** [1] - 68:14

**precursor** [1] - 172:8

**predates** [2] - 103:16, 182:6

**predominately** [1] - 97:7

**prelude** [1] - 127:11

**premises** [2] - 55:19, 56:22

**preparatory** [1] - 87:1

**prepare** [2] - 80:12, 138:1

**prepared** [11] - 21:11, 30:17, 89:17, 100:18, 100:19, 108:17, 130:17, 136:17, 138:1, 138:3, 145:15

**presence** [1] - 11:17

**present** [6] - 27:13, 40:4, 90:10, 150:6, 151:2, 176:19

**presentation** [1] - 87:5

**president** [1] - 17:2

**press** [2] - 180:8, 202:15

**presume** [2] - 14:13, 25:1

**presumption** [1] - 16:17

pretrial [5] - 158:4, 158:22, 158:23, 158:25, 209:4
Pretrial [3] - 99:20, 99:25, 209:2
pretty [3] - 36:21, 113:12, 116:19
prevent [1] - 159:12
prevents [1] - 123:9
previously [1] - 88:7
price [1] - 124:18
primarily [2] - 24:8, 125:6
primary [2] - 97:11, 125:1
principal [1] - 9:9
principles [1] - 170:23
print [2] - 7:23, 8:9
printed [1] - 27:15
privy [1] - 120:8
pro [1] - 84:23
problem [8] - 52:14, 52:17, 77:4, 86:10, 207:10, 207:20, 208:8, 208:24
problems [1] - 163:4
procedures [1] - 196:3
proceed [5] - 27:7, 34:17, 57:5, 145:8, 176:13
proceedings [1] - 38:15
Proceedings [1] - 211:7
process [11] - 26:16, 51:12, 142:20, 142:25, 144:6, 159:6, 159:18, 167:3, 168:3, 196:2, 203:18
procuring [2] - 114:3, 115:11
produce [2] - 98:6, 194:18
produced [6] - 43:22, 72:25, 81:18, 82:17, 83:9, 88:21
producing [1] - 67:25
professional [3] - 62:19, 63:10, 66:4
proffer [2] - 208:25, 210:25
progress [3] - 15:7, 17:23, 26:13
projects [1] - 125:9
promised [1] - 160:20
promptly [1] -

190:19
proof [2] - 34:14, 120:13
proper [3] - 9:7, 48:7, 63:2
properly [1] - 11:10
properties [1] - 51:6
property [3] - 31:6, 31:7, 49:1
propitious [6] - 50:3, 50:6, 50:16, 61:1, 124:5, 124:18
proportionate [1] - 54:19
proposal [4] - 198:13, 198:15, 198:16, 199:6
propose [1] - 126:4
proposed [3] - 68:22, 110:10, 198:17
propriety [1] - 47:16
prosecutor [1] - 86:16
protracted [1] - 176:10
provide [16] - 19:11, 20:17, 28:7, 57:6, 79:11, 79:12, 114:20, 114:23, 117:10, 118:9, 118:12, 119:11, 120:19, 131:7, 147:5
provided [4] - 28:14, 57:3, 100:1, 139:14
providing [1] - 119:13
provision [2] - 10:19, 26:15
provisions [2] - 38:12, 103:22
public [2] - 202:8, 202:14
publication [1] - 121:1
publications [1] - 197:13
publicly [1] - 17:10
publish [11] - 152:5, 152:24, 153:15, 154:4, 154:20, 155:7, 155:19, 156:7, 159:23, 165:10, 169:11
published [1] - 52:21
publishes [1] - 172:24
pull [1] - 62:5
pulled [8] - 41:18, 42:2, 42:5, 42:24, 45:9, 57:16, 68:2,

126:10
punitive [1] - 209:22
purchased [1] - 31:19
purchases [2] - 38:19, 170:24
purports [1] - 47:16
purpose [3] - 30:2, 89:9, 157:16
purposes [2] - 109:17, 109:18
pursuant [9] - 56:5, 68:17, 95:23, 101:6, 104:1, 106:13, 192:21, 192:22, 192:23
pursue [1] - 16:12
pursued [1] - 23:6
pursuing [2] - 63:21, 85:21
push [1] - 124:13
put [23] - 8:4, 59:1, 63:5, 92:8, 99:15, 102:15, 115:3, 116:24, 128:8, 133:9, 133:19, 136:18, 136:20, 136:25, 137:2, 142:5, 142:10, 146:1, 164:16, 167:3, 171:16, 179:8, 196:3
putting [2] - 121:14, 201:23

## Q

quash [1] - 206:20
questionable [1] - 75:2
questioned [4] - 126:18, 127:21, 173:16
questioning [3] - 86:24, 86:25, 129:8
questions [27] - 30:2, 30:5, 32:14, 52:6, 61:25, 62:23, 74:21, 75:15, 84:1, 93:25, 94:12, 95:5, 95:10, 118:12, 124:6, 128:9, 128:15, 131:4, 131:15, 131:18, 135:20, 148:21, 173:2, 176:25, 196:22, 202:23
quickly [2] - 149:15, 202:18
quite [1] - 64:12
quotation [1] - 32:15
quote [21] - 32:18,

33:19, 38:4, 38:6, 38:19, 38:20, 38:22, 38:23, 48:21, 48:22, 53:25, 54:2, 54:15, 55:4, 59:7, 59:10, 133:10, 133:14, 134:1, 134:2, 174:17
quoted [7] - 115:5, 115:15, 117:1, 117:2, 132:7, 139:1, 174:16
quoting [1] - 56:16

## R

radio [1] - 138:22
Ragone [5] - 184:25, 185:7, 185:19, 200:14, 206:6
raise [2] - 62:23, 92:20, 159:11
raised [1] - 9:4
raising [1] - 159:13
ran [2] - 138:20, 188:3
rata [1] - 84:23
rates [1] - 50:11
rather [5] - 7:22, 34:10, 81:4, 176:2
re [3] - 135:23, 136:2, 204:3
re-file [1] - 136:2
re-filed [1] - 135:23
re-redirect [1] - 204:3
reach [4] - 53:13, 84:1, 176:12, 208:21
reached [1] - 122:4
reaching [2] - 37:19, 37:20
reacts [1] - 194:2
read [118] - 6:6, 6:8, 6:10, 6:11, 6:17, 6:19, 6:20, 6:25, 7:1, 7:3, 7:10, 7:14, 7:24, 7:25, 8:2, 8:8, 8:13, 14:19, 17:8, 18:1, 18:8, 18:15, 18:22, 19:3, 19:12, 27:14, 28:1, 28:4, 28:9, 29:2, 29:5, 29:14, 30:11, 32:15, 42:21, 47:11, 47:19, 48:10, 49:3, 49:4, 51:13, 51:15, 53:2, 53:12, 54:8, 55:15, 58:8, 59:19, 64:11, 67:2, 68:14, 68:24, 74:3, 77:9, 77:13, 77:14, 78:21, 78:23, 82:3, 83:8, 83:15,

84:19, 87:9, 95:25, 100:20, 103:25, 105:20, 105:22, 106:18, 107:15, 109:9, 111:19, 120:21, 124:10, 125:25, 128:22, 130:12, 130:15, 134:9, 134:15, 142:15, 142:16, 143:20, 144:2, 144:6, 148:14, 157:13, 158:1, 158:5, 158:20, 159:7, 159:8, 159:9, 167:17, 173:25, 177:14, 180:9, 180:18, 186:14, 189:17, 189:20, 190:17, 192:15, 193:8, 193:12, 197:13, 199:3, 199:4, 207:1, 207:5, 208:1, 208:4, 208:15
read-in [9] - 6:6, 6:8, 8:13, 29:14, 87:9, 143:20, 157:13, 207:5, 208:15
read-ins [8] - 6:10, 6:11, 144:2, 144:6, 158:1, 207:1, 208:1, 208:4
reading [23] - 8:1, 11:21, 18:4, 26:1, 34:2, 34:6, 37:18, 38:4, 50:10, 52:13, 58:22, 68:25, 69:13, 72:21, 73:18, 79:7, 83:18, 87:6, 91:8, 100:16, 106:5, 106:25, 124:17
reads [1] - 28:5
ready [5] - 8:17, 39:24, 87:23, 143:18, 145:2
real [32] - 38:19, 39:2, 39:6, 49:24, 50:1, 50:2, 50:15, 50:20, 61:6, 61:16, 62:14, 62:19, 63:10, 64:11, 64:24, 64:5, 65:10, 66:4, 66:8, 123:14, 123:24, 124:3, 125:8, 125:18, 125:23, 126:10, 135:2, 135:5, 135:17, 170:23, 170:24
Real [1] - 75:4
realize [5] - 105:18, 115:6, 115:11, 132:8, 193:13

**really** [5] - 6:15, 106:5, 116:11, 116:12, 117:23

**reason** [10] - 8:1, 38:6, 38:8, 46:3, 78:22, 81:23, 81:24, 82:5, 82:13, 180:24

**reasonable** [72] - 32:5, 32:15, 32:24, 33:16, 34:3, 34:21, 35:10, 35:20, 40:16, 41:3, 41:8, 41:10, 43:5, 43:9, 45:3, 57:7, 58:18, 61:20, 67:5, 67:15, 67:21, 68:3, 68:21, 69:3, 69:20, 70:1, 70:7, 70:14, 70:16, 70:21, 71:4, 71:13, 71:19, 72:12, 72:18, 73:3, 73:5, 73:14, 79:4, 79:20, 79:23, 81:22, 82:9, 82:19, 83:12, 91:2, 112:4, 112:22, 113:3, 113:16, 114:5, 114:13, 114:15, 115:1, 115:9, 115:14, 121:11, 121:18, 121:23, 123:10, 123:18, 180:11, 180:15, 181:17, 181:25, 182:4, 182:7, 182:14, 182:18, 184:5, 199:22

**reasonably** [2] - 120:17, 122:16

**reasoning** [2] - 65:20, 183:25

**reasons** [2] - 90:13, 122:7

**receipt** [2] - 114:3, 114:6

**receive** [6] - 23:8, 23:24, 25:5, 25:22, 121:12, 136:12

**RECEIVED** [2] - 2:19, 100:9

**received** [91] - 2:21, 2:23, 2:25, 3:2, 3:4, 3:6, 3:8, 3:10, 3:12, 3:14, 3:16, 3:18, 3:20, 3:22, 3:24, 4:1, 4:3, 4:5, 4:7, 4:9, 4:11, 4:13, 4:15, 4:17, 4:19, 4:21, 4:23, 4:25, 5:2, 5:4, 5:6, 5:8, 5:10, 13:11, 13:22, 148:24, 149:1, 149:16, 149:22, 150:13, 150:15, 151:14,

151:16, 152:13, 152:14, 153:7, 153:9, 154:3, 154:6, 154:19, 154:22, 155:6, 155:8, 155:18, 155:20, 156:6, 156:8, 159:24, 160:12, 161:1, 161:10, 161:23, 161:24, 162:22, 163:14, 163:16, 164:4, 164:6, 164:24, 165:13, 165:25, 166:2, 166:13, 167:9, 167:20, 167:22, 168:9, 168:12, 169:14, 169:22, 169:24, 170:10, 170:13, 171:10, 171:13, 171:22, 171:24, 172:15, 172:17, 173:11, 201:21

**receiver** [1] - 79:19

**receiving** [1] - 197:16

**recently** [1] - 75:20

**recess** [3] - 39:21, 87:19, 144:25

**recite** [3] - 103:21, 114:12, 182:4

**recited** [6] - 40:17, 41:4, 82:20, 83:13, 112:12, 138:8

**recognize** [1] - 112:17

**recollection** [5] - 9:2, 12:5, 14:5, 18:24, 25:23

**recommendation** [1] - 81:12

**record** [9] - 11:21, 18:2, 33:14, 68:14, 91:8, 99:22, 148:15, 202:8, 202:14

**recorded** [1] - 17:7

**records** [4] - 56:4, 88:22, 100:24, 195:16

**recover** [1] - 47:25

**RECROSS** [2] - 2:10, 202:21

**RECROSS-
EXAMINATION** [2] - 2:10, 202:21

**recycling** [1] - 28:18, 28:19

**redacted** [1] - 73:23

**REDIRECT** [2] - 2:8, 177:15

**redirect** [4] - 2:13, 177:13, 204:3, 204:19

**redo** [1] - 53:13

**reduced** [2] - 48:14, 136:15

**refer** [3] - 68:15, 165:16, 173:23

**reference** [15] - 38:1, 49:5, 49:19, 103:1, 109:6, 111:22, 118:23, 128:13, 129:7, 136:19, 141:19, 148:17, 166:17, 193:22, 195:8

**referenced** [7] - 106:25, 112:16, 142:4, 162:11, 163:25, 166:19, 180:20

**references** [5] - 39:5, 50:11, 126:1, 179:23, 180:19

**referencing** [1] - 59:14

**referred** [10] - 13:3, 38:11, 47:17, 129:19, 147:11, 163:20, 172:9, 173:1, 187:16, 198:6

**referring** [12] - 34:18, 51:8, 57:18, 57:24, 111:24, 119:5, 129:9, 142:2, 146:4, 146:13, 146:24, 196:11

**refers** [2] - 188:17, 192:17

**reflect** [2] - 11:17, 56:4

**reflected** [1] - 79:9

**reflects** [1] - 56:24

**refusal** [1] - 95:22

**refused** [2] - 27:4, 96:7

**reg** [1] - 138:9

**regard** [3] - 64:9, 76:11, 203:21

**regarding** [25] - 14:3, 32:5, 41:19, 53:15, 61:6, 64:11, 65:1, 75:3, 80:19, 97:16, 125:18, 127:22, 128:5, 130:6, 131:4, 131:10, 131:14, 131:16, 134:3, 135:13, 156:24, 162:8, 172:2, 198:13

**regards** [1] - 42:4

**regular** [5] - 22:6, 25:18, 26:13, 100:24, 152:2

**regularly** [1] - 128:11

**regulated** [1] - 102:9

**regulation** [45] - 13:13, 13:17, 68:15, 71:14, 71:20, 73:2, 76:18, 77:22, 77:23, 78:11, 79:2, 82:14, 82:20, 83:13, 89:15, 98:1, 110:13, 111:23, 112:11, 112:12, 112:14, 112:15, 113:4, 113:11, 113:14, 113:23, 115:5, 115:6, 116:9, 116:12, 117:1, 120:21, 121:8, 121:15, 138:11, 139:2, 146:7, 146:12, 147:3, 171:17, 188:18, 193:6, 193:15, 196:6, 197:2

**regulations** [10] - 12:3, 89:21, 89:22, 112:8, 121:4, 172:25, 174:3, 188:22, 193:8

**Regulator** [1] - 183:1

**regulator** [7] - 33:9, 34:12, 53:4, 83:6, 113:13, 121:21

**regulator's** [5] - 61:24, 117:2, 117:3, 126:20, 127:23

**Regulators** [2] - 129:8, 130:5

**regulators** [63] - 21:11, 22:5, 24:13, 26:11, 26:19, 36:3, 36:10, 39:8, 52:22, 52:24, 62:3, 80:18, 80:24, 81:6, 81:10, 81:17, 81:19, 96:24, 96:25, 97:1, 97:3, 97:11, 97:17, 97:23, 101:18, 102:21, 103:7, 103:8, 104:17, 104:19, 104:25, 106:9, 113:1, 114:10, 114:13, 114:14, 114:22, 114:24, 115:7, 115:15, 115:16, 116:5, 116:6, 116:21, 117:19, 126:15, 127:21, 138:12, 139:13, 140:1, 140:7, 140:11, 140:21, 168:25, 173:14, 173:17, 173:21, 174:8, 176:6, 176:9, 197:18, 198:3, 198:21

**regulators'** [1] - 124:19

**Regulators'** [1] - 125:2

**regulatory** [41] - 12:7, 15:23, 16:2, 16:13, 16:16, 17:6, 17:17, 21:2, 21:7, 21:20, 22:14, 22:19, 23:1, 23:18, 23:21, 24:6, 24:9, 24:15, 24:21, 24:25, 25:7, 25:15, 25:25, 26:2, 80:3, 96:9, 96:12, 96:15, 96:19, 97:6, 108:18, 140:4, 174:18, 174:24, 176:3, 176:11, 177:4, 177:9, 181:11, 184:2, 191:20

**reimbursed** [1] - 47:5

**relate** [2] - 169:18, 204:13

**related** [25] - 30:25, 31:23, 32:14, 40:25, 42:3, 42:5, 45:10, 48:25, 52:18, 55:17, 55:18, 56:20, 56:22, 57:16, 58:25, 65:23, 67:18, 68:1, 85:4, 117:9, 130:9, 133:2, 186:8, 203:14, 203:16

**relating** [1] - 47:5

**relation** [1] - 186:1

**relationship** [6] - 47:4, 53:17, 54:1, 125:7, 126:5, 130:1

**relative** [3] - 71:1, 123:13, 178:18

**relatively** [1] - 62:22

**relatives** [3] - 55:18, 56:21, 125:7

**release** [3] - 37:6, 37:17, 180:9

**relevance** [4] - 91:4, 157:17, 157:18, 209:12

**relevant** [7] - 128:18, 157:20, 158:14, 159:15, 197:1, 209:15, 210:19

**relied** [1] - 106:11

**relinquishing** [1] - 39:2

**rely** [3] - 32:23, 33:16, 129:10

**relying** [3] - 34:15, 34:20, 184:9

**remember** [52] - 15:7, 26:1, 61:12, 97:22, 103:6, 103:19,

104:21, 105:7, 105:8, 106:25, 118:4, 124:8, 124:12, 124:15, 125:25, 127:17, 128:7, 130:3, 130:4, 130:22, 130:23, 130:24, 131:3, 131:12, 131:21, 131:24, 131:25, 133:22, 135:11, 135:15, 135:25, 136:3, 140:14, 146:22, 180:17, 180:18, 180:22, 186:12, 186:21, 188:3, 188:8, 188:10, 189:17, 196:2, 197:17, 197:23, 198:19

**remembered** [1] - 146:25

**remembers** [1] - 159:16

**remind** [3] - 6:16, 7:10, 159:17

**renewals** [1] - 115:2

**rent** [1] - 64:7

**rents** [7] - 46:22, 48:25, 50:6, 50:12, 62:14, 62:15, 66:3

**repeat** [3] - 18:3, 54:22, 112:25

**repeatedly** [2] - 72:9, 72:10

**rephrase** [1] - 146:10

**report** [43] - 13:22, 24:17, 25:22, 32:22, 45:23, 46:8, 46:9, 46:18, 47:11, 47:14, 49:9, 50:4, 50:9, 51:22, 52:4, 52:8, 54:4, 54:8, 55:6, 60:25, 61:2, 61:8, 61:9, 62:16, 64:6, 64:12, 124:8, 124:10, 128:1, 128:2, 128:6, 130:12, 130:23, 130:25, 131:9, 131:20, 131:21, 135:12, 135:20, 160:19, 160:21, 197:25, 198:1

**reported** [6] - 21:10, 22:5, 52:14, 130:1, 130:20, 202:14

**reports** [1] - 12:21

**representation** [1] - 111:12

**representations** [3] - 24:1, 27:1, 27:2

**representative** [32] - 29:21, 32:23, 33:4, 34:19, 35:2, 35:9, 36:2, 38:24, 40:16, 41:16, 43:3, 45:3, 49:12, 49:23, 53:21, 53:22, 57:7, 58:17, 61:15, 67:11, 67:21, 72:7, 73:13, 82:8, 83:8, 84:9, 145:12, 145:14, 182:20, 182:23, 196:25, 210:1

**representatives** [1] - 71:7

**representing** [1] - 63:7

**request** [32] - 19:1, 22:10, 22:13, 22:19, 28:14, 56:1, 56:5, 68:17, 74:6, 81:6, 81:10, 82:2, 85:23, 86:2, 86:12, 87:16, 88:20, 88:25, 90:4, 90:7, 90:8, 90:9, 101:5, 101:10, 102:8, 102:16, 104:19, 140:10, 141:8, 168:24, 190:19

**requested** [12] - 6:8, 6:10, 19:10, 20:18, 26:20, 28:6, 33:3, 88:16, 88:18, 140:15, 205:17, 206:3

**requesting** [6] - 17:17, 101:13, 102:12, 103:3, 139:10, 191:9

**requests** [2] - 26:10, 144:10

**require** [6] - 37:5, 65:4, 65:7, 101:15, 121:19, 143:24

**required** [10] - 1:24, 21:20, 21:23, 26:17, 26:25, 110:13, 114:20, 117:11, 120:19, 182:25

**requirement** [4] - 23:4, 124:19, 125:2, 190:16

**requirements** [6] - 11:10, 25:24, 26:23, 64:24, 190:8, 190:16

**requires** [9] - 41:2, 49:10, 64:13, 64:17, 65:10, 83:17, 116:9, 196:6, 197:24

**requiring** [1] - 85:22

**requisite** [3] - 120:17, 122:16, 174:3

**reread** [1] - 53:1

**research** [4] - 39:17, 85:13, 143:9, 204:8

**Reserve** [33] - 13:12, 18:21, 19:2, 23:11, 36:3, 53:4, 56:17, 63:18, 67:9, 74:1, 74:6, 74:12, 90:23, 97:13, 98:8, 99:2, 102:12, 102:16, 115:8, 117:8, 129:3, 164:10, 168:17, 170:3, 188:20, 190:21, 192:1, 193:7, 194:4, 203:10, 205:17, 206:3, 206:12

**reserve** [7] - 84:2, 84:8, 84:17, 138:7, 140:24, 142:24, 166:18

**Reserves** [1] - 125:5

**resignation** [3] - 12:13, 15:21, 166:5

**resistance** [2] - 21:2, 21:9

**resolution** [11] - 9:15, 12:10, 13:20, 21:13, 22:18, 22:20, 25:18, 26:4, 26:14, 165:20, 176:13

**resolutions** [2] - 23:16, 157:25

**resolve** [3] - 50:24, 116:1, 176:11

**resolved** [3] - 26:5, 156:18, 156:21

**resolving** [1] - 108:23

**respect** [1] - 89:20

**respective** [1] - 176:3

**respond** [1] - 206:21

**responded** [1] - 128:16

**respondent** [8] - 38:5, 107:16, 108:3, 108:5, 108:23, 170:20, 171:1, 171:3

**responding** [2] - 122:22, 133:23

**responds** [1] - 170:20

**response** [15] - 57:3, 57:4, 69:11, 76:13, 88:19, 96:5, 116:4, 126:21, 133:4, 133:8, 133:19, 163:21, 167:25, 199:8, 207:1

**responsibilities** [2] - 135:7, 197:24

**responsibility** [4] - 16:12, 24:24, 119:6, 134:25

**responsible** [13] - 24:21, 58:19, 61:21, 67:6, 67:11, 67:22, 68:4, 68:8, 83:22, 84:10, 112:6, 132:10, 147:15

**responsive** [1] - 127:4

**responsiveness** [1] - 127:7

**rest** [7] - 34:16, 54:21, 146:23, 147:1, 185:11, 185:25, 208:7

**Restated** [1] - 95:24

**restated** [3] - 17:3, 43:15, 157:23

**restrictions** [2] - 64:17, 172:2

**result** [13] - 17:6, 50:2, 50:15, 53:5, 54:12, 55:1, 122:9, 122:17, 176:13, 183:12, 193:3, 200:23

**resulted** [2] - 170:25, 183:15

**results** [1] - 56:16

**resume** [1] - 40:7

**retirement** [1] - 21:5

**return** [3] - 11:11, 43:21, 43:24

**reversed** [1] - 48:8

**review** [42] - 33:4, 39:4, 40:20, 41:13, 43:8, 49:25, 50:15, 50:18, 50:21, 57:13, 61:14, 64:25, 71:22, 83:14, 83:25, 84:12, 100:23, 104:11, 105:5, 117:16, 120:4, 122:20, 122:21, 125:17, 134:14, 145:17, 150:3, 151:6, 151:22, 158:7, 163:3, 168:3, 172:3, 180:13, 189:13, 189:16, 193:22, 199:19, 199:21, 207:9

**reviewed** [50] - 32:13, 33:2, 36:7, 36:11, 39:1, 40:24, 61:20, 67:16, 70:13, 81:14, 85:8, 95:10, 103:5, 109:20, 119:12, 126:1, 128:10, 128:20, 130:2, 130:3, 138:4, 139:3, 139:6, 143:4,

145:18, 148:9, 149:25, 150:22, 151:20, 151:24, 151:25, 152:3, 152:23, 154:12, 155:1, 155:14, 156:2, 156:15, 156:25, 158:19, 164:11, 168:4, 172:9, 182:10, 183:24, 184:13, 187:6, 189:11, 196:7, 196:25

**reviewing** [11] - 32:11, 33:23, 45:8, 80:16, 82:23, 127:24, 129:6, 134:25, 181:23, 198:19, 206:10

**reviews** [4] - 35:14, 35:22, 41:18, 177:6

**revision** [2] - 52:16, 135:13

**revisit** [1] - 41:1

**revoke** [1] - 23:16

**Rich** [1] - 167:5

**Richard** [3] - 83:20, 96:21, 123:4

**rights** [1] - 48:14

**rise** [14] - 6:1, 7:18, 39:19, 39:23, 40:3, 85:15, 87:20, 87:22, 92:10, 143:10, 145:4, 184:5, 199:22, 206:18

**risk** [2] - 31:25, 36:14

**road** [1] - 15:14

**ROBERT** [1] - 1:11

**Rodgin** [1] - 14:17

**role** [3] - 157:14, 158:9, 158:12

**Roman** [13] - 32:3, 40:17, 40:25, 41:1, 41:4, 41:16, 42:1, 42:2, 42:13, 49:5, 57:5, 113:25, 199:1

**Ron** [4] - 148:6, 160:4, 179:16, 180:23

**Ronald** [1] - 42:14

**rule** [8] - 82:3, 83:15, 83:17, 83:18, 116:2, 116:15, 117:2, 207:19

**ruled** [2] - 48:7, 207:4

**rules** [2] - 12:7, 172:25

**ruling** [3] - 48:9, 90:19, 127:13

**rulings** [2] - 48:10, 143:24

**run** [1] - 188:9

## S

**safely** [2] - 23:9, 111:19
**salary** [5] - 84:21, 101:14, 101:25, 104:10, 106:3
**sat** [2] - 82:16, 83:8
**satisfy** [1] - 174:4
**Saturday** [1] - 207:2
**saw** [16] - 48:19, 84:21, 96:18, 96:21, 97:22, 104:16, 128:8, 128:13, 128:19, 129:7, 130:9, 131:5, 142:3, 163:1, 177:7, 195:7
**Schneider** [2] - 88:8, 90:1
**Schwartz** [10] - 184:25, 185:7, 185:19, 206:6, 208:5, 208:12, 208:14, 208:16, 208:17, 209:23
**screen** [23] - 92:8, 94:19, 99:15, 117:4, 136:18, 136:20, 137:1, 137:2, 141:25, 146:3, 177:20, 179:9, 183:10, 184:21, 186:24, 188:24, 189:24, 191:22, 198:10, 200:5, 202:20, 204:24
**screens** [1] - 137:2
**scrutiny** [1] - 125:3
**se** [1] - 21:24
**seal** [5] - 88:17, 88:25, 90:4, 90:8, 90:15
**sealed** [2] - 88:7, 90:17
**sealing** [1] - 90:12
**search** [2] - 81:4
**searching** [1] - 117:25
**seat** [7] - 6:2, 7:21, 40:5, 92:12, 93:3, 145:6, 204:17
**Second** [2] - 17:1, 56:18
**second** [33] - 6:7, 13:6, 13:10, 14:2, 15:19, 16:25, 43:16, 51:23, 53:24, 91:16, 100:12, 100:22, 104:12, 109:13, 109:23, 116:21,

126:3, 128:25, 141:12, 141:25, 146:15, 155:11, 158:8, 158:19, 165:19, 178:11, 186:18, 188:17, 192:14, 192:16, 192:20, 195:11
**secondly** [2] - 34:22, 158:5
**secret** [2] - 12:25, 53:25
**section** [11] - 32:12, 53:19, 64:11, 68:18, 136:14, 146:22, 181:18, 190:3, 190:22, 197:22, 197:23
**Section** [16] - 1:24, 81:19, 113:21, 114:1, 114:6, 114:10, 114:12, 114:16, 115:2, 140:9, 140:12, 141:23, 145:25, 196:11, 203:14
**secure** [3] - 24:6, 24:9, 24:25
**securing** [2] - 24:21, 114:6
**Security** [1] - 178:13
**security** [1] - 90:12
**see** [75] - 11:18, 11:22, 11:25, 12:9, 12:12, 13:6, 13:11, 13:13, 14:2, 15:9, 15:17, 15:20, 16:25, 17:13, 18:3, 39:18, 44:6, 44:9, 44:12, 46:12, 46:15, 48:15, 60:11, 73:24, 74:21, 75:5, 75:18, 81:2, 82:13, 82:15, 85:13, 89:2, 91:20, 94:21, 94:25, 96:15, 107:1, 109:16, 110:1, 114:1, 117:4, 117:5, 125:20, 126:7, 126:8, 128:10, 128:12, 128:13, 129:1, 136:11, 143:9, 144:23, 146:14, 147:23, 149:14, 158:6, 178:7, 178:12, 178:15, 178:16, 183:10, 185:5, 187:19, 188:3, 188:16, 188:24, 191:23, 192:21, 198:8, 198:12, 200:11, 200:17, 204:6
**seeing** [7] - 36:7,

69:9, 104:21, 105:7, 105:9, 128:24, 130:4
**seek** [5] - 23:18, 80:3, 127:4, 142:9, 190:19
**seeking** [5] - 96:15, 96:19, 98:3, 194:7, 195:10
**seem** [1] - 40:24
**send** [3] - 81:17, 82:7, 104:24
**senior** [2] - 27:2, 197:20
**sense** [7] - 62:20, 63:11, 108:8, 108:9, 156:22, 195:23, 200:9
**sentence** [26] - 18:3, 28:4, 47:24, 53:25, 54:16, 54:24, 73:24, 101:4, 101:10, 101:11, 101:13, 102:7, 118:7, 122:13, 142:16, 192:20, 193:18, 193:20, 194:2, 194:3, 194:6, 194:12, 194:15, 194:16, 194:19, 198:17
**sentences** [3] - 15:10, 49:18, 193:12
**sentencing** [1] - 44:2
**separate** [1] - 185:24
**separated** [2] - 39:9, 127:22
**separating** [4] - 39:6, 125:18, 125:22, 140:19
**separation** [6] - 14:18, 15:11, 18:7, 18:22, 19:3, 74:2, 74:7, 172:5
**September** [4] - 14:9, 14:25, 20:8, 31:11
**serious** [1] - 163:4
**serve** [1] - 176:18
**served** [2] - 95:5, 208:22
**service** [1] - 65:4
**Services** [2] - 31:15, 31:17
**services** [3] - 42:4, 129:11, 131:7
**set** [4] - 84:2, 156:17, 166:22, 193:23
**sets** [2] - 47:8
**setting** [1] - 158:11
**settle** [1] - 136:16
**settled** [6] - 22:8, 26:2, 36:19, 36:23,

156:20, 201:20
**Settlement** [2] - 22:24, 38:17
**settlement** [20] - 23:20, 25:4, 37:2, 37:3, 37:14, 38:2, 38:9, 38:11, 38:13, 80:17, 80:21, 80:23, 106:23, 109:17, 109:18, 110:10, 116:10, 136:15, 176:10
**settlements** [1] - 201:1
**settling** [2] - 36:15, 122:4
**seven** [6] - 11:12, 15:16, 19:25, 20:4, 20:15, 49:18
**seventh** [1] - 110:5
**sever** [1] - 126:5
**several** [2] - 14:6, 75:13
**severance** [8] - 17:4, 101:6, 104:2, 104:9, 110:8, 189:22, 190:7, 190:15
**shake** [2] - 64:15, 65:25
**shall** [3] - 68:18, 69:17, 107:16
**shareholder** [1] - 155:25
**shareholders** [1] - 11:9
**sheet** [3] - 45:25, 46:1, 200:1
**Sheetmetal** [2] - 152:21, 154:11
**Shirley** [1] - 206:4
**short** [1] - 27:14
**shorten** [1] - 11:6
**shortly** [1] - 22:22
**show** [44] - 31:1, 33:3, 33:5, 88:4, 94:17, 97:12, 110:14, 146:18, 148:2, 148:25, 149:7, 149:11, 149:17, 151:14, 153:8, 154:4, 154:20, 155:7, 155:18, 156:6, 158:21, 159:15, 159:22, 160:1, 160:13, 160:25, 161:8, 162:20, 163:14, 164:5, 164:22, 165:15, 166:1, 166:11, 167:10, 167:21,

168:10, 169:8, 169:23, 170:11, 171:11, 171:23, 172:15, 173:8
**showed** [5] - 32:13, 60:23, 60:25, 121:24, 168:24
**showing** [1] - 146:2
**shown** [4] - 171:16, 186:22, 198:5, 203:7
**shut** [2] - 84:4, 131:15
**side** [3] - 66:19, 183:14
**Sidebar** [1] - 162:17
**sidebar** [1] - 157:4
**SIDEBAR** [2] - 157:6, 159:21
**sign** [6] - 67:8, 68:6, 95:2, 95:4, 100:20, 102:11
**signature** [6] - 44:6, 44:7, 66:23, 94:21, 95:3, 95:4
**signed** [14] - 37:15, 95:4, 109:1, 130:17, 131:8, 132:8, 132:15, 132:19, 132:22, 137:21, 139:19, 170:16, 181:8, 203:20
**significant** [1] - 63:8
**silent** [2] - 210:3, 210:4
**similar** [1] - 67:13
**simple** [2] - 41:7, 72:2
**simply** [8] - 50:13, 70:24, 72:10, 81:5, 81:9, 82:6, 97:25, 139:1
**single** [8] - 27:14, 28:4, 29:1, 113:4, 130:25, 134:19, 200:23, 201:16
**sit** [2] - 88:5, 142:24
**site** [1] - 126:5
**sitting** [1] - 26:6
**situation** [1] - 195:9
**six** [21] - 11:12, 12:17, 12:20, 12:21, 20:6, 20:12, 21:19, 38:25, 49:18, 51:8, 60:6, 63:1, 65:3, 66:6, 66:7, 124:7, 135:16, 135:17, 142:11, 142:12, 199:25
**sixth** [1] - 142:14
**Skadden** [1] - 189:4
**skip** [1] - 17:19
**skipped** [1] - 76:19

**SLC** [27] - 46:3, 48:17, 48:21, 49:9, 50:4, 50:16, 51:13, 51:18, 52:4, 52:9, 52:15, 53:12, 53:17, 53:24, 54:10, 54:17, 60:14, 60:25, 62:23, 64:12, 123:25, 124:2, 124:4, 124:8, 129:25, 135:25, 136:3

**small** [2] - 61:5, 186:10

**smaller** [1] - 108:1

**so-called** [1] - 193:5

**so..** [1] - 80:22

**sole** [1] - 54:2

**solely** [3] - 109:16, 109:18, 203:12

**solve** [1] - 207:20

**someone** [4] - 30:1, 75:3, 90:23, 131:6

**sometime** [1] - 94:11

**sometimes** [1] - 97:3

**somewhat** [2] - 34:2, 38:8

**somewhere** [3] - 29:1, 103:2, 140:23

**sorry** [30] - 10:2, 20:11, 48:17, 55:23, 60:3, 61:17, 65:6, 80:1, 112:23, 118:3, 135:17, 138:7, 150:18, 152:15, 152:20, 157:9, 162:18, 166:17, 170:16, 172:13, 177:25, 180:16, 183:2, 187:3, 187:4, 195:15, 198:8, 204:9, 204:11, 208:5

**Sorry** [1] - 166:11

**sorts** [1] - 195:17

**sought** [3] - 96:9, 96:11, 97:5

**sound** [3] - 38:16, 170:22, 188:13

**sounds** [15] - 31:21, 44:4, 51:25, 52:12, 53:1, 62:19, 66:4, 98:23, 99:4, 102:2, 108:16, 120:10, 134:5, 134:8, 192:11

**speaking** [2] - 67:20, 73:13

**special** [20] - 24:17, 27:11, 45:12, 45:17, 45:22, 46:9, 47:20, 82:1, 127:25, 128:2, 130:11, 130:19, 130:22, 130:24,

131:8, 131:11, 131:19, 131:21, 135:11, 160:19

**specific** [15] - 32:19, 34:3, 38:15, 54:9, 58:17, 87:8, 105:2, 105:7, 105:12, 181:1, 184:6, 185:10, 185:11, 185:13, 197:25

**specifically** [25] - 26:17, 41:19, 67:17, 75:1, 98:11, 99:1, 105:14, 119:23, 124:12, 125:25, 128:24, 131:19, 134:20, 134:24, 135:15, 140:9, 152:3, 179:25, 180:20, 182:12, 184:16, 188:17, 192:17, 197:17

**specifies** [2] - 141:6, 162:6

**spell** [1] - 93:1

**spoken** [2] - 70:13, 132:19

**spokesperson** [1] - 30:1

**square** [2] - 12:5, 14:5

**SRO3** [1] - 193:7

**SRO3-6** [1] - 172:1

**stand** [2] - 106:1, 146:9

**start** [15] - 20:7, 32:3, 32:4, 38:6, 66:15, 77:2, 86:20, 86:21, 102:22, 107:2, 111:22, 117:7, 144:21, 186:23, 192:6

**started** [7] - 7:22, 40:19, 66:12, 67:4, 139:21, 181:5, 196:17

**starting** [4] - 34:18, 79:18, 192:20, 210:2

**starts** [3] - 40:7, 67:9, 188:11

**State** [1] - 92:24

**state** [16] - 37:6, 42:8, 42:9, 54:10, 55:21, 85:21, 106:13, 112:8, 144:3, 156:11, 175:18, 183:19, 183:25, 184:8, 196:7, 205:8

**statement** [5] - 15:20, 17:1, 34:24, 67:13, 199:6

**statements** [4] -

75:14, 131:3, 163:1, 202:24

**states** [2] - 13:7, 52:9, 56:18, 163:2

**STATES** [2] - 1:1, 1:11

**States** [1] - 1:8

**stating** [6] - 67:14, 88:20, 96:22, 114:9, 115:13, 140:8

**status** [5] - 14:17, 18:6, 25:21, 48:2, 63:13

**statute** [6] - 146:1, 146:4, 146:6, 146:8, 181:19, 182:9

**stay** [1] - 133:14

**step** [3] - 17:16, 86:10, 135:2

**stepped** [1] - 139:25

**stepping** [1] - 75:18

**steps** [4] - 60:10, 60:13, 60:18, 145:15

**Steve** [2] - 148:6, 206:7

**Steven** [2] - 160:5, 206:5

**stick** [1] - 207:25

**sticks** [1] - 180:25

**still** [6] - 94:7, 162:5, 184:9, 195:1, 199:20, 209:22

**stipulate** [1] - 58:14

**Stipulation** [2] - 106:13, 107:6

**stipulation** [6] - 33:10, 37:10, 37:16, 38:18, 136:8, 170:16

**stock** [5] - 104:4, 104:13, 104:14, 193:24, 193:25

**stop** [6] - 28:18, 39:12, 39:14, 63:21, 63:25, 80:1

**stopped** [1] - 27:23

**stories** [3] - 8:1, 8:4, 8:8

**story** [1] - 7:23

**straight** [1] - 209:19

**streamlined** [1] - 52:11

**streamlining** [1] - 92:14

**structured** [1] - 10:18

**stuck** [1] - 180:22

**studied** [4] - 66:8, 66:9, 73:11, 82:17

**stuff** [7] - 12:25, 49:3, 72:19, 73:4,

112:22, 157:24, 195:17

**sub** [3] - 60:9, 199:1

**sub-paragraph** [2] - 60:9, 199:1

**subject** [20] - 12:2, 12:6, 15:23, 17:6, 21:7, 23:21, 23:25, 25:15, 38:18, 38:22, 58:2, 59:16, 88:21, 89:24, 101:19, 101:22, 176:11, 192:25, 193:15, 203:9

**submission** [1] - 176:4

**submit** [1] - 100:1

**submitted** [7] - 88:19, 89:11, 89:19, 91:1, 139:13, 176:5, 176:22

**submitting** [6] - 81:5, 81:9, 133:6, 163:22, 199:7, 202:25

**subpoena** [9] - 32:12, 33:25, 45:8, 82:23, 105:6, 184:13, 206:21, 206:22, 208:23

**subsidiary** [2] - 193:2

**substance** [2] - 23:12, 91:10

**substantial** [2] - 54:13, 55:2

**substantially** [5] - 58:19, 61:21, 67:6, 68:8, 112:6

**subtract** [1] - 107:25

**subtracted** [3] - 107:21, 107:22, 107:25

**successful** [1] - 97:16

**successor** [1] - 25:1

**sued** [9] - 178:10, 184:23, 185:5, 185:17, 200:3, 200:5, 200:7, 200:12, 200:18

**suggest** [3] - 29:7, 29:8, 29:10

**suggestion** [1] - 207:16

**suit** [3] - 47:25, 48:2, 200:11

**suited** [1] - 131:22

**suits** [5] - 186:5, 186:6, 186:15, 200:23, 200:24

**Sullivan** [10] - 19:10, 20:17, 24:11, 24:13,

28:6, 28:11, 80:11, 168:15, 170:4, 192:3

**sum** [8] - 17:4, 107:16, 108:2, 108:5, 108:7, 108:22, 189:22, 190:15

**summarize** [1] - 47:23

**summarizing** [1] - 50:9

**summary** [2] - 146:18, 146:20

**summer** [1] - 105:3

**Superior** [1] - 48:6

**superseding** [1] - 179:11

**supervised** [1] - 197:25

**supervision** [1] - 198:4

**supervisory** [2] - 172:1, 193:6

**supplement** [6] - 6:8, 115:18, 115:19, 116:14, 139:14

**supplemental** [1] - 137:24

**supplements** [5] - 6:6, 6:11, 87:11, 143:22, 207:7

**support** [1] - 210:6

**supports** [2] - 57:7, 69:11

**supposed** [4] - 65:13, 65:16, 90:2, 90:5

**SUSAN** [1] - 1:17

**sustained** [1] - 110:19

**swearing** [1] - 112:18

**sworn** [6] - 8:13, 98:17, 98:22, 98:25, 176:1, 176:2

**SWORN** [1] - 92:21

**system** [1] - 84:4

**System** [3] - 168:17, 170:3, 193:8

**systematic** [2] - 54:11, 54:23

**systems** [1] - 196:4

---

**T**

---

**Tab** [4] - 11:14, 13:24, 14:8, 15:4

**tab** [7] - 13:2, 15:16, 16:23, 17:20, 43:12, 89:7

ing

**table** [6] - 10:12, 10:14, 20:24, 70:25, 72:25, 164:16
**tackle** [1] - 207:12
**tackling** [1] - 207:10
**Talbot** [1] - 206:7
**tall** [1] - 103:6
**Tambussi** [16] - 6:9, 13:3, 13:11, 14:2, 14:17, 32:20, 77:14, 145:7, 186:25, 187:9, 188:25, 191:5, 198:6, 204:13, 206:20, 207:8
**TAMBUSSI** [191] - 1:17, 2:7, 2:12, 6:13, 6:20, 7:3, 7:9, 30:6, 30:9, 39:25, 44:22, 59:18, 59:21, 60:2, 60:4, 76:19, 76:22, 76:24, 77:2, 77:8, 77:20, 77:22, 77:24, 78:2, 78:4, 100:4, 110:18, 110:20, 110:22, 126:23, 129:13, 133:15, 143:14, 143:16, 144:4, 144:9, 144:12, 144:18, 144:20, 145:9, 145:10, 146:9, 146:11, 146:15, 146:17, 146:20, 147:2, 147:23, 148:1, 148:19, 149:2, 149:11, 149:18, 149:21, 149:23, 150:6, 150:8, 150:14, 150:16, 151:2, 151:4, 151:10, 151:17, 152:5, 152:8, 152:10, 152:15, 152:18, 152:24, 153:2, 153:4, 153:10, 153:15, 153:18, 153:24, 154:7, 154:8, 154:13, 154:16, 154:21, 154:23, 155:3, 155:9, 155:10, 155:15, 155:21, 155:22, 156:3, 156:9, 156:10, 157:1, 158:3, 158:15, 159:7, 159:20, 159:25, 160:6, 160:8, 160:15, 160:16, 160:22, 161:2, 161:7, 161:11, 161:17, 161:19, 161:25, 162:14, 162:23, 162:24, 163:8, 163:10, 163:17, 163:18, 164:2, 164:7,

164:8, 164:14, 164:18, 164:21, 164:25, 165:5, 165:7, 165:10, 165:14, 165:24, 166:3, 166:8, 166:10, 166:14, 166:15, 167:7, 167:12, 167:19, 167:23, 168:6, 168:8, 168:11, 168:13, 169:3, 169:6, 169:8, 169:11, 169:13, 169:15, 169:21, 169:25, 170:1, 170:9, 170:12, 170:14, 171:9, 171:12, 171:14, 171:21, 171:25, 172:12, 172:18, 172:19, 173:4, 173:6, 173:10, 173:12, 173:24, 174:1, 177:12, 177:21, 177:24, 190:12, 194:24, 195:1, 196:21, 200:25, 202:17, 202:22, 204:2, 204:21, 205:8, 205:11, 206:16, 206:23, 207:13, 207:17, 207:23, 208:25, 209:3, 209:6, 209:12, 209:19, 210:11, 211:5
**tandem** [1] - 85:25
**tap** [1] - 180:23
**tape** [2] - 27:23, 28:17
**Tape** [1] - 27:25
**taped** [1] - 27:24
**tapped** [1] - 182:13
**tapping** [1] - 180:21
**Tarquini** [1] - 206:6
**Tarquiny** [3] - 184:25, 185:7, 185:19
**task** [2] - 158:17, 158:18
**tax** [5] - 50:22, 51:9, 61:16, 66:8, 66:9
**taxes** [4] - 49:1, 61:7, 62:14, 63:2
**TD** [39] - 24:23, 30:21, 31:5, 31:8, 31:13, 31:19, 84:6, 84:10, 93:13, 93:14, 93:15, 94:2, 100:24, 106:15, 106:21, 107:16, 108:2, 108:5, 108:13, 108:23, 109:2, 110:7, 110:16,

118:23, 119:9, 119:10, 119:24, 120:2, 120:6, 120:11, 123:3, 136:12, 195:14, 195:18, 195:21, 196:3, 196:19, 197:1, 197:3
**TD's** [3] - 24:24, 122:23, 209:8
**tech** [1] - 136:24
**telephone** [1] - 14:12
**television** [1] - 138:22
**ten** [11] - 19:16, 25:14, 31:18, 37:10, 102:17, 120:16, 122:7, 122:13, 129:21, 188:23, 191:4
**tend** [1] - 8:7
**tenure** [12] - 32:7, 32:17, 33:1, 33:7, 33:8, 33:19, 34:5, 35:1, 35:4, 35:12, 57:10, 133:4
**term** [2] - 42:20, 167:3
**terminate** [4] - 9:17, 60:10, 60:13, 60:18
**terminated** [8] - 9:19, 9:22, 9:24, 10:7, 10:15, 23:23, 61:3, 139:25
**Termination** [1] - 11:21
**termination** [8] - 10:17, 11:23, 12:6, 13:7, 95:23, 103:22, 165:20, 190:24
**terminations** [1] - 60:16
**terms** [14] - 12:1, 17:3, 21:4, 22:24, 23:6, 24:5, 26:14, 45:22, 81:7, 81:11, 166:22, 166:25, 192:22, 192:23
**TESTIFIED** [1] - 92:22
**testified** [9] - 132:17, 132:18, 174:15, 202:10, 202:11
**testify** [3] - 8:12, 145:15, 208:1
**testifying** [1] - 8:16
**testimony** [31] - 8:13, 27:6, 27:12, 29:11, 29:14, 30:16, 41:2, 60:20, 85:9, 93:20, 98:17, 98:22, 99:1, 110:24, 116:3,

157:13, 158:7, 159:1, 172:9, 173:2, 174:16, 175:21, 175:25, 176:2, 180:9, 198:7, 205:13, 209:20, 209:21, 211:1
**thanking** [1] - 188:25
**THE** [256] - 1:1, 1:11, 6:2, 6:12, 6:18, 7:7, 7:13, 7:17, 7:20, 8:15, 27:8, 27:16, 27:18, 27:22, 28:16, 28:23, 29:4, 29:13, 29:15, 29:17, 29:23, 30:8, 30:12, 30:14, 30:18, 39:14, 39:16, 39:19, 39:23, 39:24, 40:1, 40:3, 40:5, 45:1, 77:13, 85:11, 85:19, 86:3, 86:6, 86:11, 86:18, 87:4, 87:16, 87:23, 87:25, 88:2, 88:5, 88:9, 88:12, 88:14, 89:2, 89:6, 89:8, 89:16, 90:2, 90:7, 90:11, 90:17, 91:4, 91:8, 91:13, 91:15, 91:19, 91:23, 91:25, 92:2, 92:4, 92:6, 92:9, 92:12, 92:19, 92:24, 92:25, 93:1, 93:2, 93:3, 93:5, 93:6, 93:8, 94:20, 99:12, 99:14, 99:17, 99:21, 100:3, 100:6, 110:19, 111:1, 111:5, 111:8, 111:12, 126:25, 127:4, 127:9, 127:13, 127:16, 127:18, 127:19, 129:16, 133:17, 136:20, 136:22, 137:1, 137:6, 137:9, 137:13, 137:15, 137:16, 141:1, 141:5, 141:8, 141:12, 141:15, 143:7, 143:10, 143:12, 143:15, 143:18, 144:16, 144:19, 144:23, 145:2, 145:4, 145:6, 146:21, 147:25, 148:21, 148:24, 149:10, 149:13, 149:16, 149:20, 150:7, 150:11, 150:13, 151:3, 151:12, 151:14, 152:7, 152:9, 152:11, 152:13, 152:17, 153:1, 153:3,

153:5, 153:7, 153:17, 153:19, 153:23, 154:3, 154:14, 154:19, 155:4, 155:6, 155:16, 155:18, 156:4, 156:6, 157:2, 157:4, 157:7, 157:10, 157:17, 157:19, 158:11, 158:23, 159:10, 159:22, 160:7, 160:10, 160:13, 160:24, 161:8, 161:18, 161:20, 161:23, 162:15, 162:17, 162:19, 163:9, 163:11, 163:14, 164:4, 164:17, 164:20, 164:22, 165:6, 165:9, 165:12, 165:25, 166:9, 166:11, 167:8, 167:10, 167:20, 168:7, 168:9, 169:4, 169:7, 169:10, 169:12, 169:22, 170:10, 171:10, 171:22, 172:15, 173:5, 173:7, 177:13, 177:23, 189:23, 190:1, 190:4, 190:9, 190:11, 195:3, 196:23, 201:1, 201:3, 201:6, 201:9, 201:12, 204:3, 204:5, 204:10, 204:13, 204:16, 204:25, 205:2, 205:5, 205:7, 205:13, 205:19, 205:21, 205:23, 206:17, 206:20, 206:24, 207:12, 207:16, 207:19, 207:21, 207:25, 208:8, 208:11, 208:14, 208:16, 208:18, 208:20, 209:4, 209:7, 210:17, 210:22, 211:4, 211:6
**theft** [3] - 114:16, 115:10, 138:21
**themselves** [1] - 33:4
**thereafter** [1] - 22:22
**therefore** [6] - 76:16, 77:16, 126:4, 167:10, 190:19, 207:9
**they've** [2] - 25:9, 70:17
**thinking** [4] - 33:21,

97:16, 123:4, 203:15
**third** [18] - 14:21, 15:9, 17:25, 18:19, 51:23, 73:23, 73:24, 103:20, 105:23, 129:10, 129:18, 141:13, 189:18, 189:25, 190:1, 190:3, 204:20, 204:24
**thirds** [3] - 115:20, 138:8, 138:23
**thirteen** [1] - 31:9
**thorough** [1] - 66:24
**thousand** [1] - 190:11
**three** [24] - 13:2, 14:25, 38:9, 38:11, 46:12, 46:22, 47:15, 49:17, 51:18, 52:5, 52:21, 65:10, 97:11, 132:10, 135:18, 135:19, 135:20, 137:21, 176:21, 192:12, 196:21, 201:8, 208:13
**timeline** [1] - 157:22
**timing** [1] - 85:11
**Title** [1] - 1:24
**today** [21] - 23:22, 26:7, 43:22, 45:2, 61:14, 72:25, 81:18, 82:17, 83:9, 83:14, 88:14, 93:16, 93:17, 94:3, 94:12, 109:9, 128:18, 144:17, 148:14, 180:10, 195:11
**today's** [1] - 33:15
**together** [6] - 62:5, 63:5, 87:1, 87:2, 116:20, 128:8
**tolling** [8] - 205:18, 205:20, 205:21, 205:25, 206:1, 206:3, 206:9, 206:12
**TOLLING** [1] - 205:21
**tomorrow** [13] - 53:22, 85:23, 86:22, 87:5, 87:7, 87:12, 143:25, 144:15, 204:7, 207:10, 208:1, 208:2, 208:3
**tonight** [1] - 87:12
**took** [6] - 21:19, 93:20, 138:8, 157:22, 159:2, 178:18
**top** [6] - 15:9, 16:25, 18:1, 49:18, 126:3, 178:9

**topic** [10] - 14:16, 17:25, 25:18, 41:2, 41:3, 47:15, 48:24, 51:12, 129:1, 189:16
**topics** [7] - 8:24, 8:25, 9:4, 18:11, 68:23, 105:19
**Toronto** [5] - 185:20, 185:22, 185:25, 186:2, 186:10
**tort** [1] - 209:20
**totally** [1] - 7:2
**toward** [2] - 54:10, 54:23
**transactions** [16] - 38:20, 39:6, 52:18, 55:17, 56:20, 56:22, 65:1, 123:14, 123:24, 124:3, 125:19, 126:10, 128:11, 129:5, 170:25
**transcript** [4] - 27:15, 76:25, 82:8, 87:6
**transcripts** [1] - 6:4
**transferred** [1] - 84:3
**transition** [3] - 18:8, 49:10, 60:7
**treasurer** [1] - 179:14
**trial** [11] - 18:3, 88:18, 88:24, 90:12, 157:24, 176:14, 176:16, 176:17, 176:20, 194:18
**trick** [1] - 20:14
**tried** [3] - 51:2, 138:19, 208:21
**triggered** [2] - 122:10, 122:17
**trouble** [1] - 193:3
**troubled** [15] - 58:20, 59:2, 61:22, 61:24, 63:13, 67:7, 67:12, 67:22, 68:4, 68:9, 68:10, 112:7, 147:16, 172:2, 172:6
**true** [12] - 1:24, 53:24, 54:2, 54:15, 54:16, 54:21, 72:10, 129:3, 133:8, 163:23, 176:2, 199:8
**trust** [25] - 32:6, 32:16, 32:25, 33:6, 33:18, 34:4, 34:9, 34:25, 35:4, 35:11, 35:16, 40:22, 43:6, 45:5, 57:9, 69:5, 76:7, 78:6, 111:13, 112:6, 113:10, 147:12,

175:6, 182:2, 199:23
**truth** [2] - 126:24, 126:25
**try** [12] - 23:19, 41:7, 47:25, 53:13, 62:5, 88:17, 93:4, 104:14, 124:13, 143:25, 183:3, 207:15
**trying** [12] - 35:19, 61:23, 72:20, 90:10, 103:7, 128:7, 137:13, 140:3, 144:1, 147:4, 150:20, 208:5
**turn** [15] - 11:14, 12:9, 12:12, 14:8, 15:4, 15:9, 15:19, 17:13, 17:19, 17:25, 44:5, 47:15, 67:7, 73:21, 178:15
**turned** [3] - 56:5, 56:11, 197:6
**TV** [1] - 137:2
**twice** [1] - 37:9
**two** [55] - 13:4, 15:3, 23:25, 43:12, 46:15, 46:21, 47:5, 47:8, 49:17, 55:18, 55:20, 56:22, 57:5, 61:9, 61:12, 61:13, 62:22, 66:6, 75:21, 76:25, 79:22, 80:8, 80:10, 88:3, 88:4, 93:21, 98:16, 98:21, 105:22, 106:5, 115:20, 116:8, 116:20, 118:16, 124:6, 126:4, 134:17, 138:8, 138:23, 139:12, 139:19, 139:20, 139:21, 146:3, 158:3, 158:15, 171:8, 176:18, 176:21, 183:7, 191:18, 196:2, 199:1, 208:11
**two-and-a-half** [1] - 15:3
**two-page** [1] - 13:4
**two-thirds** [2] - 138:8, 138:23
**type** [2] - 128:11, 194:16

## U

**U.S** [5] - 84:6, 84:10, 94:4, 110:7, 179:10
**U.S.C** [1] - 1:24
**ultimately** [3] - 56:13, 91:19, 156:18
**Umbrell** [4] - 44:2,

148:7, 160:5, 179:1
**unable** [4] - 37:7, 115:7, 176:12, 207:9
**unanimity** [1] - 10:22
**unanimous** [7] - 9:5, 9:21, 9:22, 10:20, 19:8, 74:15, 80:6
**unanimously** [4] - 10:15, 11:22, 11:25, 29:7
**unaware** [1] - 38:25
**uncommon** [2] - 54:13, 55:2
**undefined** [1] - 96:4
**under** [37] - 15:22, 22:2, 22:11, 23:2, 23:6, 23:13, 23:17, 23:24, 24:24, 26:9, 38:10, 48:25, 49:2, 60:12, 83:23, 84:2, 84:18, 88:25, 89:14, 89:22, 94:13, 99:6, 106:3, 110:13, 112:18, 114:21, 117:11, 120:20, 125:2, 162:5, 174:15, 184:3, 184:10, 188:22, 190:22, 210:18, 210:23
**understood** [4] - 105:21, 180:9, 203:19, 208:23
**undertaken** [1] - 61:6
**undoubtedly** [3] - 21:20, 25:15, 163:3
**unexercised** [3] - 104:4, 104:13, 104:14
**unfairly** [1] - 66:9
**unfortunately** [1] - 121:23
**unindicted** [3] - 42:18, 42:23, 179:21
**uniquely** [1] - 131:22
**UNITED** [2] - 1:1, 1:11
**United** [1] - 1:8
**universe** [1] - 62:7
**unless** [1] - 90:18
**unnecessary** [1] - 53:13
**unresolved** [1] - 87:13
**unsafe** [4] - 58:9, 59:8, 133:3, 133:6, 163:21, 170:21, 199:7, 202:25
**unseal** [1] - 90:13
**unsealed** [2] - 88:14, 90:18

**unsound** [3] - 58:9, 59:8, 170:21
**up** [50] - 7:5, 7:7, 16:11, 20:22, 27:21, 27:22, 30:15, 52:16, 52:22, 60:1, 65:19, 65:21, 65:25, 75:3, 77:3, 77:25, 78:1, 79:19, 85:25, 87:9, 92:19, 94:4, 113:6, 115:22, 129:21, 136:25, 140:5, 144:14, 145:2, 146:1, 146:15, 149:2, 157:22, 164:15, 173:24, 177:21, 179:10, 184:22, 185:4, 185:16, 189:18, 192:14, 199:2, 199:4, 200:11, 200:17, 202:19, 209:19
**update** [1] - 162:3
**updated** [1] - 14:3
**updates** [2] - 96:22, 117:20
**upstairs** [1] - 211:6

## V

**vague** [1] - 96:3
**value** [12] - 46:22, 48:25, 50:7, 50:17, 60:24, 62:15, 62:18, 63:8, 104:2, 104:7, 104:9, 131:2
**various** [2] - 12:17, 178:25
**Vassalluzzo** [9] - 6:7, 9:9, 27:10, 27:19, 29:12, 185:8, 185:19, 202:10
**vastly** [1] - 6:21
**Vazzalusso** [4] - 24:18, 28:2, 46:13, 184:25
**verdict** [1] - 43:24
**Vernon** [115] - 8:20, 9:3, 9:15, 10:4, 10:15, 10:23, 11:5, 12:18, 12:23, 13:18, 14:6, 14:17, 14:22, 15:1, 15:11, 15:22, 17:1, 17:17, 18:6, 18:7, 18:14, 18:21, 19:3, 19:12, 19:21, 20:23, 22:2, 22:11, 22:14, 22:17, 23:1, 23:13, 23:17, 24:24, 26:11, 28:8, 32:5, 32:15,

32:24, 33:17, 34:3, 35:3, 35:10, 36:6, 36:10, 43:5, 43:16, 45:4, 46:21, 48:13, 53:23, 56:18, 57:8, 58:19, 61:21, 63:21, 63:25, 64:4, 66:15, 66:22, 67:6, 67:22, 68:4, 68:7, 69:4, 70:14, 70:21, 71:4, 71:13, 71:19, 72:13, 73:1, 73:14, 74:2, 74:8, 74:11, 75:12, 76:3, 78:17, 79:5, 79:13, 79:21, 81:5, 82:20, 83:12, 83:23, 84:11, 84:16, 85:7, 97:14, 98:8, 101:5, 101:11, 123:10, 139:11, 148:6, 150:1, 151:21, 152:22, 153:14, 154:25, 155:2, 155:12, 155:23, 156:13, 170:16, 174:9, 175:22, 178:25, 179:20, 179:24, 182:14, 200:3, 206:3, 209:8

**VERNON** [1] - 1:3
**Vernon's** [5] - 10:5, 11:22, 12:12, 15:21, 84:16
**versions** [1] - 51:18
**versus** [9] - 9:8, 10:19, 11:12, 150:1, 151:21, 154:25, 155:23, 156:12, 174:9
**vested** [2] - 85:3, 193:25
**VI** [1] - 107:10
**video** [6] - 6:7, 27:13, 27:16, 28:21, 29:1, 29:11
**videotape** [1] - 27:19
**view** [4] - 41:15, 47:21, 81:18, 91:1
**viewpoint** [1] - 124:25
**violate** [1] - 114:1
**violated** [12] - 73:1, 73:3, 112:7, 113:20, 113:25, 114:5, 114:16, 115:1, 115:9, 175:18, 181:18, 182:8
**violations** [1] - 38:16
**virtually** [2] - 23:5, 151:25
**virtue** [1] - 9:5
**volume** [1] - 27:21

**vote** [4] - 29:8, 74:15, 74:23, 117:21
**voted** [5] - 44:21, 74:10, 74:22, 181:10, 202:4
**vs** [1] - 1:5

# W

**wait** [4] - 87:14, 133:12, 211:2
**waiving** [1] - 96:5
**walk** [1] - 51:2
**wants** [1] - 137:15
**warm** [1] - 30:14
**WAS** [2] - 2:18, 100:9
**Washington** [11] - 18:15, 18:17, 97:2, 117:25, 140:3, 189:8, 189:10, 191:18, 192:3, 194:12, 195:6
**ways** [1] - 117:18
**wealth** [1] - 140:1
**website** [1] - 172:23
**Wednesday** [2] - 206:25, 207:3
**week** [3] - 25:14, 75:21, 208:23
**weeks** [10] - 91:17, 102:17, 132:2, 132:15, 132:19, 132:22, 137:22, 139:9, 176:21, 192:12
**weird** [1] - 180:25
**whereas** [1] - 109:13
**White** [5] - 42:14, 148:6, 160:4, 179:16, 180:23
**whole** [8] - 52:14, 54:16, 55:15, 89:4, 89:6, 167:17, 199:17, 203:8
**wholly** [2] - 193:2
**wife** [2] - 109:2, 129:18
**WILLIAM** [1] - 1:17
**William** [4] - 14:17, 168:15, 170:3, 206:6
**win** [1] - 42:7
**wire** [2] - 42:4, 138:22
**wish** [1] - 34:17
**withdrawing** [1] - 144:7
**withdrawn** [5] - 44:23, 44:25, 125:13, 162:19
**witness** [61] - 8:10,

8:12, 27:7, 27:9, 29:18, 29:20, 87:24, 92:16, 92:17, 137:9, 143:5, 143:12, 143:18, 143:20, 144:2, 145:2, 147:24, 150:9, 151:10, 151:15, 152:4, 152:8, 153:2, 153:8, 154:4, 154:20, 155:7, 155:19, 156:7, 157:13, 159:3, 159:23, 160:14, 160:25, 161:8, 162:20, 163:15, 164:5, 164:23, 165:7, 166:1, 166:12, 167:10, 167:21, 168:10, 169:9, 169:23, 170:11, 171:11, 171:23, 172:12, 172:13, 172:16, 202:16, 205:10, 207:5, 208:4, 208:9, 209:1, 209:3, 210:7
**WITNESS** [9] - 30:18, 76:20, 92:21, 92:25, 93:2, 93:5, 127:18, 137:16, 201:1
**witnesses** [1] - 208:11
**Wochek** [3] - 135:3, 135:4, 135:12
**Wojcik** [1] - 206:6
**wondering** [1] - 37:7
**word** [10] - 38:11, 50:4, 50:5, 61:2, 108:10, 113:5, 120:23, 124:5, 134:12, 134:19
**words** [5] - 29:7, 62:23, 67:19, 120:18, 192:20
**Workers** [2] - 152:21, 154:11
**workers'** [1] - 200:1
**works** [2] - 31:4, 135:4
**write** [1] - 108:12
**writer** [1] - 8:2
**writes** [2] - 191:5, 194:4
**writing** [9] - 8:2, 8:3, 25:11, 25:12, 97:12, 98:7, 102:15, 104:19, 192:6
**writings** [1] - 195:13
**written** [8] - 19:21, 94:12, 102:16,

103:13, 137:3, 191:25, 192:3, 194:12
**wrongdoing** [6] - 8:21, 37:3, 48:22, 75:12, 75:13, 131:10
**wrote** [4] - 52:23, 109:7, 118:25, 133:7

# Y

**year** [23] - 16:24, 17:11, 27:12, 50:22, 62:24, 93:15, 98:20, 98:21, 102:5, 118:14, 118:15, 129:24, 130:18, 139:20, 187:25, 188:9, 188:11, 188:15, 210:3, 210:5
**year-end** [1] - 17:11
**years** [23] - 21:19, 22:11, 25:24, 26:2, 31:9, 31:18, 38:25, 52:25, 93:15, 93:21, 98:16, 98:21, 106:6, 118:16, 125:14, 126:11, 129:4, 130:19, 134:17, 153:25, 195:14, 196:2, 196:16
**yesterday** [1] - 110:25
**York** [1] - 189:10
**yourself** [1] - 82:16