**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

_____

VERNON W. HILL, II,

        Plaintiff,        CIVIL ACTION NUMBER:

        -vs-             09-3685

COMMERCE BANCORP, LLC,

        Defendant.
_____

      Mitchell H. Cohen United States Courthouse
      One John F. Gerry Plaza
      Camden, New Jersey 08101
      May 9, 2013

**B E F O R E:**       **THE HONORABLE ROBERT B. KUGLER**
               **UNITED STATES DISTRICT JUDGE**

**A P P E A R A N C E S:**

JACOBS AND BARBONE
BY:  EDWIN J. JACOBS, JR., ESQUIRE
     LOUIS M. BARBONE, ESQUIRE
ATTORNEYS FOR PLAINTIFF

BROWN & CONNERY, LLP
BY:  WILLIAM M. TAMBUSSI, ESQUIRE
     SUSAN LEMING, ESQUIRE
ATTORNEYS FOR DEFENDANT

Certified as true and correct as required by Title 28,
U.S.C., Section 753.
           /S/ Carl J. Nami
             Lisa Marcus  Karen Friedlander

```
 1
    VERNON W. HILL, II,              1      119      17
 2  DIRECT EXAMINATION OF VERNON     1      119      19
    W. HILL, II, BY MR. JACOBS
 3

 4  PLAINTIFF EXHIBIT 25 WAS         1      102      18
    RECEIVED IN EVIDENCE
 5  PLAINTIFF EXHIBIT 20 WAS         1      102      25
    RECEIVED IN EVIDENCE
 6  PLAINTIFF EXHIBIT 73 WAS         1      108      17
    RECEIVED IN EVIDENCE
 7  PLAINTIFF EXHIBIT 50 WAS         1      108      23
    RECEIVED IN EVIDENCE
 8  PLAINTIFF EXHIBITS 73 A, B C     1      109      10
    WERE RECEIVED IN EVIDENCE
 9  PLAINTIFF EXHIBIT 52 WAS         1      110      4
    RECEIVED IN EVIDENCE
10  PLAINTIFF EXHIBIT P-2 WAS        1      112      3
    RECEIVED IN EVIDENCE
11  PLAINTIFF EXHIBIT P-75 WAS       1      116      17
    RECEIVED IN EVIDENCE
12  PLAINTIFF EXHIBIT P-39 WAS       1      117      15
    RECEIVED IN EVIDENCE
13  PLAINTIFF EXHIBIT P-8 WAS        1      134      22
    RECEIVED IN EVIDENCE
14  PLAINTIFF EXHIBIT 22 WAS         1      159      8
    RECEIVED IN EVIDENCE
15

16

17

18

19

20

21

22

23

24

25
```

1        DEPUTY CLERK:  All rise.

2            THE COURT:  Good morning, everybody.

3        Are we ready to go?

4        Have you responded to the motion about the subpoena?

00:00    5            MR. TAMBUSSI:  Withdrawn.

6            THE COURT:  Withdrawing the subpoenas?

7            MR. TAMBUSSI:  Yes.

8            THE COURT:  I'll notify the government.

9        You're going to read deposition transcripts this

00:00   10   morning?

11            MR. JACOBS:  Yes, Judge.

12            THE COURT:  Okay.  Let's get started.

13            MR. JACOBS:  Judge, this is a lengthy one, what time

14   do you want to break?

00:00   15            THE COURT:  How long do you think this will be?

16            MR. JACOBS:  Just eyeballing it, an --

17            MR. TAMBUSSI:  At least an hour and a half.

18            MR. JACOBS:  At least an hour and a half.  Probably

19   between an hour and a half and two hours, that's probably

00:01   20   where it is.

21            DEPUTY CLERK:  All rise.

22            (Jury Enters the Courtroom.)

23            THE COURT:  Have a seat, folks.  Good morning.

24        I believe we're going to have some more deposition

00:04   25   testimony read in.

1       MR. JACOBS:  That's correct, Judge.

2       THE COURT:  Who is it?

3       MR. JACOBS:  Judge, the next witness is Edward

4  Pollock, Mr. Pollock is a TD Bank, N.A., regulatory person,

00:04   5  and his testimony was taken on March 8, 2013.

6       THE COURT:  Thank you.

7       MR. JACOBS:  May I?

8       THE COURT:  You may.

9  Q.   Okay.  Have you read any documents to prepare for this

00:05  10  deposition?

11  A.   Yes, I have.

12  Q.   Would you list them for me?

13  A.   I probably will not get them all by memory.  I read --

14  excuse me.  I read the Stipulation and Consent Order from the

00:05  15  OCC.

16  Q.   What date?

17  A.   The date of the Order?

18  Q.   June 28, 2007?

19  A.   I believe this was -- yeah, I think that was it.

00:05  20  Q.   Okay.

21  A.   And there was a Consent Order as well.

22  Q.   Well, there are -- there were a number of documents on

23  that date.  Are you referring to the Consent Order, the

24  Stipulation, and Agreement to Enter the Consent Order?

00:05  25  A.   I am referring to the -- yeah, I'm referring to the

1   Stipulation and Consent Order, to enter the Order.

2   Q.   Okay.  So you read both?

3   A.   I read both.

4   Q.   The Stipulation?

00:06   5   A.   Yes.

6   Q.   And the Consent Order?

7   A.   Yes.

8   Q.   How about the Memoranda of Understanding?

9   A.   I did not read that.

00:06   10   Q.   Okay.  What else?

11   A.   Yeah, I read the correspondence from the OCC, recent

12   correspondence from the OCC allowing us to present certain

13   information.

14   Q.   That document Mr. Tambussi just --

00:06   15   A.   Yes.

16   Q.   What else?

17   A.   Yeah, the March 5th letter.  Well, the letter that I

18   signed to the OCC dated --

19   Q.   April 12th?

00:06   20   A.   April 23rd.

21   Q.   Or 23rd, 2012?

22   A.   April 23rd, yes.

23   Q.   What else?

24   A.   Then I had a couple of letters to the OCC briefer than

00:06   25   that and I can't remember the dates.

1  Q.   A couple meaning two?

2  A.   Two or three, I am not sure.

3  Q.   Letters authored by whom?

4  A.   Authored -- well, written by my counsel, outside counsel

5  and signed by me.

6  Q.   Letters signed by you?

7  A.   Yes, sir.

8  Q.   Sent to the OCC?

9  A.   Yes.

10  Q.   When?

11  A.   I can't remember the exact dates, but sometime between,

12  let's say, March of 2012 and just recently.  Well, the

13  April 23rd document, then I think June.  And I don't think we

14  had any correspondence, official correspondence that I've

15  signed since then, I could be wrong.

16  Q.   So aside from the April 23, 2012, letter to the OCC, you

17  authored two or three others?

18  A.   As far as I can recall, yes.

19  Q.   And were they about the payment of Vernon Hill's contract

20  entitlements?

21  A.   Yes.

22  Q.   Okay.  Is there anything else you reviewed for this

23  deposition?

24  A.   I reviewed the 12 C.F.R. 359, which is the Part 359 that

25  governs banks ability to pay institution affiliated parties

```
 1   under employment contracts.
 2   Q.   When did you review that?
 3   A.   I reviewed it earlier this week.
 4   Q.   This week?
 5   A.   I reviewed it this week.  I reviewed it before this week,
 6   maybe last week.  I don't remember the exact date.
 7   Q.   This week and last week?
 8   A.   Yes.
 9   Q.   Before --
10   A.   I reviewed it a couple of times.
11   Q.   Before those two reviews, had you ever read it?
12   A.   I had never read the full Part 359.
13   Q.   So the first time you did was this week and last week?
14   A.   Yes.
15   Q.   Okay.  Anything else?
16   A.   The only thing -- it may have been -- well, when I say
17   this week or last week, it may have been two weeks ago, I am
18   not exactly sure of the date.
19   Q.   Okay.  So this week or last week or the week before for
20   the first time you read Section 359 --
21   A.   That is right.
22   Q.   -- governing golden parachute payments?
23   A.   Yes.
24   Q.   Okay.  Any other documents?
25   A.   Yeah, I'm just trying to think.  There was another
```

00:08
00:08
00:08
00:08
00:09

1  document that I read that was questions that were put to

2  Vernon Hill, and I can't remember the date, I think that was

3  June of 2007.

4  Q.   Can you be more specific when you say "questions that

00:09  5  were put to Vernon Hill?"

6  A.   I don't remember the title of the document, but there

7  were several questions that were asked of Vernon Hill in

8  writing and he was -- his response was in writing.

9  Q.   Okay.  Anything else?

00:09  10  A.   I also read a summary, some summaries by the court, I

11  think it was in this case, sort of recapping the issues and I

12  don't know what the title of that document was.

13  Q.   Do you mean decisions by Judge Kugler?

14  A.   Yes.

00:09  15  Q.   The document you referred to as questions put to Vernon

16  Hill, is that something that you appended to your April 23,

17  2012, letter to the OCC?

18  A.   Yes.

19  Q.   Okay.  Anything else?

00:10  20  A.   Yeah, there may have been, I just -- I can't recall.

21  Q.   Your employer is whom?

22  A.   TD Bank.

23  Q.   Okay.  Tell me when you got involved in this case as a

24  witness?

00:10  25  A.   As a witness?

1   Q.   Yeah.

2   A.   And when you say as a witness, can you define that for

3   me?

4   Q.   Sure.  You are here today as a witness.

00:10   5   A.   Yeah.

6   Q.   And you realize there is a lawsuit.

7   A.   Yes.

8   Q.   And lawyers are involved in the lawsuit.

9   A.   Yeah.

00:10   10   Q.   When did anybody first tell you that you were going to be

11   involved as a witness?

12   A.   As I recall, and I didn't know at the time, like, no one

13   used the term that I would "involved as a witness" so I didn't

14   know what you meant by that technically.

00:10   15   Q.   Uh-huh.

16   A.   I first became engaged in this to my recollection in

17   March of 2012.

18   Q.   Okay.  And was it a lawyer or a TD Bank nonlawyer

19   employee who advised you?

00:11   20   A.   It was a lawyer.

21   Q.   Okay.  That is March of 2012 you say?

22   A.   That is my recollection.

23   Q.   Okay.  How long have you been with TD Bank?

24   A.   Since October of 2010.

00:11   25   Q.   Two-and-a-half years?

1    A.    Yes.

2    Q.    What is your background?

3    A.    I worked for the Comptroller of the Currency prior to

4    coming to TD Bank, I was a bank examiner.

00:11    5    Q.    How long?

6    A.    30 -- almost 34 years.

7    Q.    What is your position?

8    A.    I am head of Regulatory Relations And Government Affairs.

9    Q.    Head of Regulatory Relations?

00:11    10    A.    Yes.

11    Q.    Well, what is the job description?

12    A.    I am TD's liaison with our U.S. regulators and --

13    Q.    Does that include the OCC?

14    A.    Yes, it does.

00:12    15    Q.    When you were at the OCC, did you have anything to do

16    with golden parachute responsibilities?

17    A.    When I was at the OCC, I was -- at one time when I was in

18    Washington, I participated in the committee that reviewed

19    problem bank cases and occasionally they would include golden

00:12    20    parachute.  I remember one or two instances where there was a

21    golden parachute case.

22    Q.    And what was your role?

23    A.    My role, you know, similar to others on the committee,

24    was to listen to the facts in the case and decide or make a

00:12    25    recommendation as to whether a golden parachute payment should

1   be made.

2   Q.   And that happened one or two times?

3   A.   Yes.

4   Q.   So in your, I believe, 33 years with the OCC, you had

00:12   5   those one or two encounters with the golden parachute law and

6   regulation?

7   A.   Yes, sir.

8   Q.   All right.  So you don't consider yourself to be an

9   expert in golden parachute applications, do you?

00:13   10   A.   I do not.

11   Q.   Okay.  Have you ever made one?

12   A.   Have I ever made one?

13   Q.   Yeah.

14   A.   Have I ever made a golden parachute payment?

00:13   15   Q.   Application.

16   A.   I have not.  Well, I did sign -- sorry.  So in the

17   report, in the April 23rd letter to the OCC we were clarifying

18   the circumstances around Vernon Hill and our ability to make

19   that payment, and we did apply or at least request the OCC to

00:13   20   respond as to whether in the event there was a decision in a

21   civil case to pay Vernon Hill, whether we could make the

22   payment so we refer to that as an application and I signed

23   that.

24   Q.   Is that your only one?

00:13   25   A.   Yes.

1    Q.   So your only, in the history of your professional life,

2    including 33 years at the OCC and two or three at TD Bank, the

3    only golden parachute application you've ever been involved in

4    is Vernon Hill's?

5    A.   Yes.  And I believe the golden parachute rule came into

6    effect in 1996 so I wouldn't have occasion prior to that.

7    Q.   Now, Mr. Pollock, I am looking at a Joint Pretrial Order

8    in this case, the document the lawyers are required to

9    prepare, you appear in it as witness number 24 and what it

10   says is "Edward D. Pollock, care of TD Bank, is expected to

11   testify as to communications with the respective regulatory

12   agencies on behalf of defendant," and that would be the bank.

13   Now you heard and understood that, right?

14   A.   Yes.

15   Q.   Okay.  Are the communications in that Pretrial Order the

16   April 23, 2012, letter and the two or three other letters we

17   discussed earlier?

18   A.   Yes.

19   Q.   All right.  So to refine my question a bit, it sounds

20   like you had one or two letters to the -- each to the OCC and

21   Fed and one or more phone calls each to the OCC and Fed about

22   Vernon Hill's payments, is that a fair summary?

23   A.   Yes, and the FDIC would have been copied at least on

24   those letters.

25   Q.   Okay.

1   A.   And we -- I had one or two conversations with the FDIC to

2   explain to them as well.

3   Q.   Now, let's focus in on the Fed and the FDIC.

4   A.   Okay.

00:15   5   Q.   In your communications with them did you request approval

6   to pay Vernon Hill?

7   A.   I don't think we requested approval to pay him on those

8   calls.  I mean, I did request approval to pay in that

9   April 23rd letter but we would -- we did not request approval.

00:15   10   I mean, I don't think that would be how you would do it on a

11   phone call, you would want to make that part of the record.

12   Q.   Well, I wasn't on the phone call so I need to ask.  So it

13   sounds like the answer is no?

14   A.   That is right.

00:16   15   Q.   Okay.  Now, however, you say you did request approval to

16   pay Mr. Hill in writing on April 23, 2012.

17   A.   Yes.

18   Q.   All right.

19   A.   Subject to the decision in the civil case.

00:16   20   Q.   Did somebody direct you to make that application for

21   payment to Vernon Hill to the Fed?

22   A.   No.

23   Q.   Nobody directed you to do it, right?

24   A.   That is right.

00:16   25   Q.   Okay.  Did someone ask you to do it?

1   A.   Yes.

2   Q.   Okay.  So you were asked by a female attorney to send the

3   April 23, 2012, letter?

4   A.   Yes.

00:16   5   Q.   Did you draft it yourself?

6   A.   I did not.

7   Q.   Was it drafted by that female attorney?

8   A.   I presume it was.

9   Q.   Why do you have to presume?

00:17   10   A.   I didn't see her actually work on it, but she provided it

11   to me.

12   Q.   Does that mean she handed it to you?

13   A.   She didn't hand it to me, she sent it to me, I think,

14   email.

00:17   15   Q.   Okay.  So you concluded from the fact that a female

16   attorney sent you this April 23, 2012, letter by email, you

17   concluded that you had not drafted it and she had.

18   A.   I didn't make that conclusion, she might have worked also

19   with our counsel at the bank.

00:17   20   Q.   All right.  So the long and the short of it is lawyers

21   prepared it not you.

22   A.   That is right.

23   Q.   All right.  You just affixed your signature.

24   A.   I signed it.

00:17   25   Q.   Okay.  Do you know why you were selected to sign it?

1    A.   Well, I am the -- I am the bank's representative with

2    regulatory agencies so I am the liaison with regulatory

3    agencies.

4    Q.   Now, did you read it before you signed it?

5    A.   Yes.

6    Q.   Did you make any changes?

7    A.   I did not.

8    Q.   You just executed it verbatim?

9    A.   That is right.

10   Q.   All right.

11   A.   I might have made one change to that letter.

12   Q.   Okay.  What was the change?

13   A.   A couple of times when my name was spelled A-C-K instead

14   of O-C-K.

15   Q.   So you corrected the spelling of your name?

16   A.   I corrected the spelling of my name, that is right.

17          MR. JACOBS:  Judge, at this point may we put the

18   letter itself on the screen?

19          THE COURT:  Is it in evidence?

20          MR. JACOBS:  It is a defense exhibit to which we have

21   no objection.

22          THE COURT:  Sure.

23          MR. JACOBS:  I want to catch the number.

24          MR. TAMBUSSI:  55.

25          MR. JACOBS:  55.  Is it possible to make that a bit

1    bigger?  Okay.  Maybe we can do it half at a time.  Well,

2    let's not do it half of the time.  Just leave it the way it

3    was, I think.

4    Q.  All right.  Now let's look at the letter itself.  If you

00:19   5    would be kind enough to open to this exhibit book Tab 33?

6            MR. NAMI:  Judge?

7            A JUROR:  We need the TV turned on.

8            THE COURT:  Oh, I'm sorry.  The one thing I have to

9    do.

00:19   10           MR. JACOBS:  Judge, do you think I can move this one

11   a little closer, also?

12           THE COURT:  Sure.

13           A JUROR:  That's good.

14   Q.  All right.  Now let's look at the letter itself.  If you

00:19   15   would be kind enough to open to this exhibit book, Tab 33

16   should be a copy of the letter we've been discussing.  So when

17   you get there, the first thing I would like you to do is to

18   confirm that is, indeed, the letter with the attachments.

19   A.  Yes.

00:20   20   Q.  Okay.  Did you look at the attachments, also?

21   A.  Yes, I've looked at the attachments.

22   Q.  Okay.  So is that the letter of April 23, 2012, that was

23   prepared by a female attorney, which you signed?

24   A.  Yes.

00:20   25   Q.  Okay.  Now, I'm going to read that sentence into the

1  record for completeness.  "Pursuant to a Stipulation and

2  Consent Order between the OCC and Mr. Hill dated November 17,

3  2008, Mr. Hill has an obligation to pay $4 million to the

4  bank."

5        Did I read that correctly?

6  A.   Yes.

7  Q.   All right.  Now, did you ever yourself read that

8  November 17, 2008, Consent Order?

9  A.   Yes.

10 Q.   And do you know whether that sentence is correct or

11 incorrect?

12 A.   I presume it is -- I presume it is correct.

13 Q.   You presume or you know?

14 A.   I presume.

15 Q.   Okay.  I'm going to ask you to turn to Tab 23 for a

16 moment.

17        MR. JACOBS:  Judge, can we switch to P-53?

18        THE COURT:  Is it in evidence?

19        MR. JACOBS:  Yes, it is.

20        THE COURT:  Sure.  You may show it to the jury.

21        MR. JACOBS:  And we need to get to Page 5 of P-53.

22 It would probably help to enlarge Article IV, if that's

23 possible.

24 Q.   My interest is on Page five.

25 A.   Yes.

1    Q.   Article four.  Are you looking at it?

2    A.   I am.

3    Q.   Okay.  Do you agree it says quote:  Respondent shall pay

4    to TD Bank the sum of four million dollars in the form of an

00:22   5    offset to an agreed upon sum to be paid by TD Bank to

6    respondent pursuant to an agreement between TD Bank and

7    respondent resolving all litigation between them.

8    A.   Yes, sir.

9    Q.   Did I read that correctly?

00:22   10   A.   Yes.

11   Q.   All right.  When you authored this letter to the Federal

12   Reserve, did you understand that this payment took the form of

13   an offset to a greater amount of money TD was to pay Mr. Hill.

14   A.   I understand that.  I don't recall if I thought about

00:22   15   that when I signed the letter.

16   Q.   But you certainly agree with me now, don't you?

17   A.   Yes.

18   Q.   That the four million dollars is not simply a requirement

19   that he write a four million dollar check.  It takes the form

00:23   20   of an offset.  Correct?

21   A.   Yes.

22   Q.   Offset to a greater amount of money TD is to pay Mr.

23   Hill?

24   A.   Yes.

00:23   25   Q.   Right?

1   A.   That is my understanding.

2   Q.   Now let's go back to where we were to number 33 which is

3   actually D-55 and turn to the second page of this letter.

4          MR. JACOBS:   So can we go back to D-55?   Thank you.

00:23   5   Q.   In the first full paragraph, first sentence your letter

6   states that TD Bank is submitting this application as a

7   consequence of the March 1, 2012 opinion of Judge Kugler.   Is

8   that basically what it says?

9   A.   Yes.

00:24   10   Q.   Okay.   And is that an opinion which you have read?

11   A.   I don't recall if I read it when I signed this.

12   Q.   Did you understand that first sentence when you signed

13   this letter?

14   A.   Yes.

00:24   15   Q.   Did you understand that Judge Kugler had written an

16   opinion and said something in it prompting the Bank to file an

17   application?

18   A.   Yes.

19   Q.   Now, the first sentence of this letter says --

00:24   20          MR. JACOBS:   And, Judge, may we -- I'm sorry.   I'm

21   sorry.   It is page two.   Can we enlarge the second full

22   paragraph a bit?   Okay.

23   Q.   Now the first sentence of this letter says quote:   In

24   light of the investigation conducted by the OCC, in

00:24   25   conjunction with the Federal Reserve, and in consideration of

1    related facts, the Bank's Board of Directors could not and

2    cannot in good faith provide the certification required by 12

3    CFR Section 359.4 A4 or otherwise support this application.

4    Did I read that correctly?

5    A.   Yes.

6            THE COURT:  May I see counsel at sidebar, please?

7    Carl.

8                        (Sidebar)

9            THE COURT:  Two days ago I actually asked your client

10   to turn off the signals he gets for incoming e-mails.  Now, I

11   don't care if he does his e-mails in front of the jury.

12   That's his problem.  I do care about the sound that his toys

13   make.  Now, if I hear one more sound, I'm going to go over and

14   confiscate his toys in front of the jury.  Now I don't let

15   lawyers do it.  I don't let jurors do it.  I don't want

16   spectators to do it.  He's not permitted to have sounds going

17   off in the courtroom.  Do you understand?

18           MR. JACOBS:  I understand, Judge.

19           THE COURT:  You can fix the problem or I'm going to

20   fix the problem.

21           MR. JACOBS:  Can we take a short recess?

22           THE COURT:  No.  I want you to go over now and take

23   it away from him if you have to.  Let's go.

24                      (Sidebar concluded)

25           MR. JACOBS:  Could I back up?

1          THE COURT:  Please.

2     Q.   Now the first sentence of this letter says quote:  In

3     light of the investigation conducted by the OCC in conjunction

4     with the Federal Reserve, and in consideration of related

5     facts, the Bank's Board of Directors could not and cannot in

6     good faith provide the certification required by 12 CFR

7     Section 359.4 A4 or otherwise support this application.  Did I

8     read that correctly?

9     A.   Yes.

10    Q.   Now that was prepared by a lawyer, not by you.

11    A.   That is right.

12    Q.   Do you know whether that sentence is factually accurate?

13    A.   I believe it is.

14    Q.   Okay.  Was there a Board of Directors meeting -- was --

15    let me rephrase the question.

16         Was there a Bank Board of Directors meeting when the

17    Directors discussed this and decided they were unable to

18    provide the 12 CFR 359.4A4 certification?

19    A.   Not that I'm aware of.

20    Q.   Not that you are aware of.  Let's see what that means.

21    Did you inquire whether there was a Board of Directors meeting

22    where the Board of Directors made that determination?

23    A.   I did not.

24    Q.   And did you understand what I mean inquire?  Did you ask

25    anybody?

1  A.   I understand what that means, yes.

2  Q.   Okay.  Did you review any minutes, any Board of Directors

3  meetings between mid 2007 and yesterday to see if there was

4  any such meeting?

00:28  5  A.   No.

6  Q.   What exactly was your source of information then that the

7  Board of Directors which you recognize as a collective group

8  of human beings, right?

9  A.   Yes.

00:28  10  Q.   What exactly was your source of information that the

11  Board of Directors as a collective entity could not make the

12  necessary certification?

13  A.   The Board would have to make the certification under Part

14  359, and Part 359 requires that whoever makes the

00:28  15  certification cannot be aware of any, and I'm paraphrasing,

16  any act by the institution affiliated party involving unsafe

17  or unsound activities or a breach of fiduciary trust, and in

18  the stipulation and Consent Order it specifically said that

19  the respondent had committed unsafe, unsound and again I am

00:28  20  paraphrasing, actions including breach of trust.

21  Q.   Which Consent Order?

22  A.   The stipulation and Consent Order.

23  Q.   Which date?

24  A.   I think that one was November of 2008.

00:29  25  Q.   That is the one you're referring to?

1   A.   And as I am aware, as I understand it as well the Board

2   before that was even instructed by their counsel that they

3   were subject to 359.  And given the investigation by the OCC,

4   would not be able to make that application.

5   Q.   And where did you get that information?

6   A.   In discussions with counsel.

7   Q.   Well did you ever review any Board minutes?

8   A.   No.

9   Q.   And as you sit here today, you cannot tell me under oath

10  that there are Board minutes reflecting that the Bank Board

11  has determined it cannot provide the necessary certification?

12  A.   That is right.  I cannot.

13  Q.   You cannot tell me that there is a set of Board minutes?

14  A.   I cannot.

15  Q.   Reflecting that the Board of Directors of the Bank has

16  discussed this and decided they are unable to provide the

17  necessary certification?

18  A.   That is right.

19  Q.   This sentence that we're now discussing clearly was

20  drafted by a Bank lawyer, right?  Not by you.

21  A.   It was not drafted by me.

22  Q.   And it was drafted by a Bank lawyer?

23  A.   Yes.

24  Q.   All right.  Bank lawyers who were advocates in this case.

25  A.   And I -- would you define advocates for me.

|   |   |
|---|---|
| **1** | Q.   Lawyers representing a client in a case? |
| **2** | A.   Yes. |
| **3** | MR. JACOBS:  Can we do the same thing again? |
| **4** | Q.   Direct your attention to the second sentence.  Quote: |
| **5** | The Board reasonably believes that it cannot make the |
| **6** | requisite certification at a minimum as a result of the |
| **7** | investigation which triggered the entry of the cease and |
| **8** | desist order between Commerce Bank and the OCC in June 2007. |
| **9** | Did I read that correctly? |
| **10** | A.   Yes. |
| **11** | Q.   All right.  Now same questions on this sentence.  Can you |
| **12** | direct me to a set of Board minutes which says that the Bank |
| **13** | Board considered the Vernon Hill application and the Bank |
| **14** | Board determined it could not make the necessary certification |
| **15** | in part because of the June 2007 OCC order? |
| **16** | A.   I am not aware of any minutes that say that. |
| **17** | Q.   Did you review any minutes to find that? |
| **18** | A.   No. |
| **19** | Q.   Anybody ever tell you there were any such minutes? |
| **20** | A.   No. |
| **21** | Q.   Did any Board member ever tell you that there had been a |
| **22** | meeting and this decision had been made? |
| **23** | A.   I don't, I don't believe that there are any Board minutes |
| **24** | at TD now that were Board members at that -- let me start |
| **25** | over. |

00:30 (line 5)
00:31 (line 10)
00:31 (line 15)
00:31 (line 20)
00:31 (line 25)

1          I don't believe that there are any Board members at TD

2     now that were Board members at the time.  I don't know any

3     Board members from Commerce.

4     Q.   Let's have a clarification here so we're both talking

00:32   5     about the same thing.  I you want to understand all of my

6     questions about minutes of the Board of Directors of the Bank.

7     A.   Yes.

8     Q.   As encompassing Commerce and TD.

9     A.   Okay.

00:32   10    Q.   With all of their various names.  TD.  Okay?  Now knowing

11    that, do you want to change any of your answers?

12    A.   I am sorry.  Would you ask the question again?

13    Q.   Knowing that, do you want to change any of your answers?

14    A.   No.

00:32   15    Q.   No?

16    A.   No.

17    Q.   Okay.  Now, so back where I was.  Did any human being

18    tell you that there had been a Board of Directors meeting

19    whether it is Commerce or TD or whatever, where there had been

00:32   20    a discussion about the payment to Vernon Hill's contractual

21    rights and a determination made that the Board could not make

22    the requisite certification?

23    A.   It is my understanding that counsel to Commerce Bank told

24    the Board that they could not make the certification.

00:33   25    Q.   So this all traces back to counsel.

1    A.    Yes.

2    Q.    All right.  And what is your source of information on

3    that?

4    A.    Discussions with TD counsel.

00:33   5    Q.    And you never heard anybody, any TD Bank employee, forget

6    counsel, excluding counsel, no TD Bank executive member of the

7    Board, CFO, CEO, COO, on one ever told you that the Bank

8    actually had a Board meeting and actually considered this

9    issue and actually decided whether they could make the

00:33   10   necessary certification.

11   A.    That is right, no one ever told me that.

12   Q.    So this is a lawyer decision, not a Bank decision.

13   Right?

14   A.    My information came from counsel.  My information about

00:33   15   what happened.

16   Q.    So to phrase it a different way.  You have no information

17   you can give us today or oral or written that the Board of

18   Directors of Commerce or TD or any of their other names, ever

19   had a meeting and discussed the payment of Vernon Hill's

00:34   20   contractual entitlements and determined that the company not

21   make the requisite regulatory certification.  Is that correct?

22   A.    Yeah, I, I don't know.  Again, I don't know if they had a

23   meeting and made that determination.  In my discussions with

24   counsel, they were advised that that was -- that they would

00:34   25   not be able to make the certification.

1   Q.   Well, that is what a lawyer told you?

2   A.   Yes.

3   Q.   I am asking you about what happened.  I'm asking about

4   historical facts.  You're a fact witness.  As a matter of

00:34  5   historical fact, do you think the Board of Directors of

6   Commerce or TD had a meeting had ever passed a resolution

7   saying we can't make the necessary certification to pay Vernon

8   Hill?

9   A.   Yeah, that was two years before I joined the Bank and I

00:34  10   am not aware that that occurred.

11   Q.   Nobody ever told you it did.  Right?

12   A.   In discussions with counsel, just what I relayed.

13   Q.   Nobody ever told you that happened?

14   A.   That is right.

00:35  15   Q.   And you never saw any documentary evidence that happened?

16   A.   I never did.

17   Q.   Mr. Pollock, while Mr. Barone is searching for these

18   exhibits, this sentence refers specifically to a cease and

19   desist order of June 27 -- of June 2007.  Is that right?

00:35  20   A.   I'm looking for the sentence.

21   Q.   Well, the same one we're on.  And we're still on the

22   second full paragraph, second sentence.

23   A.   Yes, that is what it says.

24   Q.   Now, I want to make sure we're talking about the same

00:35  25   order.  So I'm going to ask you to turn to three exhibits.

1    20, 21 and 22.  We'll start with 20.  Are you on 20?

2    A.   Yes.

3    Q.   Have you ever seen this document before?

4    A.   No.

00:36    5    Q.   It is captioned memoranda -- memorandum of understanding

6    and it is dated June 28, 2007.  Is that correct?

7    A.   Yes.

8    Q.   All right.  But you didn't review this anytime in the

9    couple years you've been with TD Bank.

00:36   10    A.   I never did.

11    Q.   All right.  Do you recognize -- you do recognize the

12    names, don't you, Federal Reserve Bank and Commerce?

13    A.   Yes, sir.

14    Q.   And you know what a memorandum of understanding is, don't

00:36   15    you?

16    A.   Yes, sir.

17    Q.   Now if you turn to the signature pages of the document of

18    which there are four or five.  If you look at the bottom

19    numbers, they start at 1953 and they go through 1958.  I guess

00:36   20    there is six.  Do you see all the signature pages?

21    A.   Yes.

22    Q.   You don't see a signature line for Vernon Hill there, do

23    you?

24    A.   I do not.

00:37   25    Q.   All right.  Now, let's turn to tab 21, keeping in mind

1    this date June 28, 2007.  And you see tab 21 is a stipulation

2    and consent to the issuance of a Consent Order.  And it's on

3    the letterhead of the OCC. You recognize that, right?

4    A.   Yes, sir.

00:37    5    Q.   Now, this -- is this a document you said you did review?

6    A.   Yes.

7    Q.   All right.  Now again, let's go to the signature pages

8    which start at 1873 and continue to through 1876 and just

9    confirm for me there is no signature by Vernon Hill?

00:37    10   A.   That is right, there is no signature by Vernon Hill.

11   Q.   Now let's look at the first page of this stipulation and

12   consent to the issuance of a Consent Order.  And by the way,

13   the signatures are all Commerce Bank personnel.  Right?

14   A.   I don't know any of these, these people.

00:38    15   Q.   Okay.  First page.  You say you have read this?

16   A.   I read a stipulation and Consent Order.

17   Q.   Is this it?  Have you read it?

18   A.   Yes.

19   Q.   Okay.  And what is it?  What does it do?

00:38    20   A.   It lays out facts and provides for a way of agreeing

21   between the regulator and the Bank what the Regulator's

22   conclusions are and --

23   Q.   You say it lays out the facts.  Where does it do that?

24   A.   I mean it lays out the facts as regards to the agreement.

00:38    25   Q.   Where?

1  A.   Well, it just describes that the OCC is conducting an

2  investigation and goes on to say the OCC is --

3  Q.   Well, where are you reading?

4  A.   First page.

00:38   5  Q.   Okay.  Which paragraph?

6  A.   First.

7  Q.   Okay.  Now the OCC is conducting an investigation.  You

8  were with the OCC for 33 years.  Right?

9  A.   Yes.

00:38  10  Q.   Part of their job is to conduct investigations.  Right?

11  A.   Sometimes.

12  Q.   Sometimes part of their job is to conduct investigations?

13  A.   Yes.

14  Q.   What are the sometimes?

00:39  15  A.   It is not typical that the OCC would conduct an

16  investigation.

17  Q.   Right.

18  A.   So it would be unusual.

19  Q.   It is unusual for the OCC to conduct an investigation.

00:39  20  A.   Yes.

21  Q.   Now when the OCC conducts an investigation, do they

22  sometimes make a finding that somebody did something wrong?

23  A.   Yes.

24  Q.   And when they make a fining that somebody did something

00:39  25  wrong, do they sometimes impose a penalty?

```
 1   A.    They can.

 2   Q.    Or they cannot?

 3   A.    That is right.

 4   Q.    They have the discretion to impose a penalty or not

 5   impose a penalty?

 6   A.    Yes.

 7   Q.    Okay.  Now, can you find something in this order that

 8   we're looking at, this is my tab 21, and this is the -- sorry.

 9   Can you find something in the stipulation and consent to the

10   issuance of an order which says somebody did something wrong?

11   A.    I'll have to read through it.

12   Q.    Okay.  Is there something in this stipulation and consent

13   to the issuance of a Consent Order which says that somebody

14   did something wrong?

15   A.    No.

16   Q.    Okay.  Now I'm looking at the first page, second

17   paragraph and I will read it into the record for completeness.

18   Quote:  Whereas information obtained in the investigation

19   indicates that it is necessary and appropriate for the

20   comptroller to issue a cease and desist order pursuant to 12

21   USC 1818 B to ensure the actual or apparent conflicts of

22   interest or unsafe or unsound practices involving the

23   construction or acquisition of branch offices do not occur in

24   the future.  Did I read that right?

25   A.    Yes.
```

1    Q.   It is an order entered in futuro, as we say.   Right?

2    A.   Yes.

3    Q.   And its focus seems to be conflicts for unsafe or unsound

4    practices regarding building and acquiring branch offices.

5    Right?

6    A.   Yes.

7    Q.   Does that appear to be the subject matter to you?

8    A.   It appears to be.

9    Q.   All right.   Now did you know that when you signed the

10   April 23, 2012 letter to the Fed?

11   A.   No.

12   Q.   Okay.   Now let's turn the page tab number 22 and you will

13   see that this is a Consent Order in the OCC.   It bears the

14   same date which we can confirm by looking at the final page

15   number 14 directly above the signature line.   Go to the last

16   page of 22.

17   A.   Okay.

18   Q.   And you see the date?

19   A.   Yes.

20   Q.   So now we have the same date, June 28, 2007 in the MOU

21   with the Fed, the stipulation with the Consent Order with the

22   OCC, and the order itself with the OCC.   June 28.   Right?

23   A.   Yes.

24   Q.   Now let's go back to the front of the order.   And again

25   the OCC, as you said earlier, can investigate and as a result

1    of the investigation, they can find somebody did something

2    wrong or not and they can impose some kind of punishment or

3    penalty or not.  Right?

4    A.   That is right.

00:42    5    Q.   All right.  Now in this order I would like you, this is

6    an order that you did review.  Right?

7    A.   I've read it.  I read it.

8    Q.   Okay.  Is there something in this order which either says

9    the OCC found somebody did something wrong or it punishes

00:42    10    somebody for doing something wrong, imposes a penalty?

11    A.   No.

12    Q.   All right.  Look at the first page, second full paragraph

13    which I'm going to read into the record for completeness.

14    Quote:  The Bank by and through its duly elected and acting

00:42    15    Board of Directors Board has executed a stipulation and

16    consent to the issuance of a Consent Order dated June 28,

17    2007.  Stipulation and consent.  That is acceptable by the

18    Comptroller.  By that stipulation and consent, which is

19    incorporated by reference herein, the Bank has consented to

00:43    20    the issuance of this Consent Order by the Comptroller to

21    ensure that actual or apparent conflicts of interest or unsafe

22    or unsound practices involving the construction or acquisition

23    of branch offices do not occur in the future.  Did I get it

24    right?

00:43    25    A.   Yes, sir.

1    Q.   Same questions as to the stipulation.  It speaks in

2    futuro, doesn't it?

3    A.   Yes.

4    Q.   And it focuses on unsafe or unsound practices regarding

5    construction or acquisition of branch offices.  Right?

6    A.   Yes.

7    Q.   Did you know any of that when you signed the lawyer

8    prepared April 23, 2012 letter?

9    A.   No.

10   Q.   Now before you signed that April 23, 2012 letter, had you

11   read this order?

12   A.   No.

13   Q.   Before you signed that April 23, 2012 letter, had anybody

14   explained this order to you?

15   A.   No.

16   Q.   Thirty-three is the April 23, 2012 order where on the

17   second page , second full paragraph.

18        MR. JACOBS:  Judge, this is D-55 again second page.

19   April 23, 2012 letter D-55, page two.  Second full paragraph.

20   Thanks.

21   Q.   And the second -- and the sentence which drew us to these

22   June 28, 2007 documents is the sentence which says quote:  The

23   Board reasonably believes that it cannot make the requisite

24   certification at a minimum as a result of the investigation

25   which triggered the entry of the cease and desist order

1    between Commerce Bank and the OCC in June of 2007.  That is

2    the sentence we were reviewing when I brought back to the June

3    28, 2007 order and related documents.  Right?

4    A.   Yes.

00:45    5    Q.   Okay.  Now, this is your letter you signed it although

6    you didn't author it, you signed.  What exactly does that

7    sentence mean?

8    A.   It means the Board cannot make the certification subject

9    to what is required in part 359 as a result of the

00:45    10   investigation which triggered the cease and desist order.

11   Q.   Well, we know the Board never had any such discussion.

12   At least one that you know about.  Right?

13   A.   Yeah.  I am not aware of a Board discussion.

14   Q.   And we know that because you already told us that you

00:45    15   never saw any Board minutes which say the Board discussed and

16   made that decision.  Right?

17   A.   That is right.

18   Q.   And we know that the order doesn't say anybody didn't --

19   and the order doesn't say anybody did anything wrong and

00:46    20   doesn't impose any kind of penalties.  Right?

21   A.   That is right.

22   Q.   Should your sentence be understood to mean that simply

23   the fact of an investigation prevents the Bank from applying

24   for regulatory approval to pay Mr. Hill?

00:46    25   A.   No.

1   Q.   Then how should it be understood you signed it?

2   A.   Well, as we discussed, yes, I did sign it.  And it was

3   prepared by counsel.  But I was aware when I signed it that

4   the OCC found unsafe, unsound practices and breach of

5   fiduciary duty and that the Board was aware of that.

6   Q.   Do the three documents that we just reviewed, numbers 20,

7   21 and 22, do they say what you just said that the OCC found

8   unsafe practices?

9   A.   I would have --

10  Q.   Or unsound practices?

11  A.   20, 21 and 22?

12  Q.   Yes.  You can look at them again.  We just reviewed them.

13  A.   I read that and I am not sure if they do.  I will look at

14  them again but in --

15  Q.   Why don't you look at them again.  Let's --

16  A.   In the stipulation and Consent Order that I read

17  previously, it says that.

18  Q.   That is number 22.  You take your time.  20 is the

19  memoranda, memorandum of understanding between the Bank and

20  the Fed.  21 is the stipulation and consent to the issuance of

21  a Consent Order between the Bank and the OCC. 22 is the

22  Consent Order between the Band and the OCC.  They all bear the

23  same date, June 28, 2007.  Do any of them say what you just

24  said that somebody is guilty of unsafe or unsound banking

25  practices?

1    A.    No.  I am referring to the document under tab 23.

2    Q.    You are referring to the November order?

3    A.    Yes.

4    Q.    Understood.  But you made a reference on page two,

5    paragraph two, sentence two to the June 28, 2007 order.  So

6    please stay with me on that and I promise you we'll get to the

7    other one?

8    A.    Okay.

9    Q.    All right.  I'm trying to get an under oath explanation

10   from you of the actual meaning of that sentence.  And it seems

11   to me you are saying the fact of the investigation leading to

12   the June 28, 2007 order prevents the bank from making the

13   necessary certification.  Is that right or wrong?

14   A.    The fact of the investigation that triggered the entry of

15   this cease and desist order.

16   Q.    Prevents us from making the certification?

17   A.    Yes.

18   Q.    To pay Mr. Hill?

19   A.    Yes.

20   Q.    Okay.  I think now we have an understanding.  So even

21   though the cease and desist order does not say Mr. Hill did

22   anything wrong and does not punish Mr. Hill, the fact that

23   there was an investigation and was an order, you say in this

24   letter prevents the Bank from making the certification to pay

25   Mr. Hill?

1    A.   Yes.

2    Q.   Okay.  All right.  Now, for the next few questions I want

3    to incorporate the following sentence of this letter that you

4    signed.  The following sentence says:  In addition as the

5    agency is fully aware of, the OCC and Federal Reserves lent

6    the investigations or directed primarily at potential

7    conflicts of interest arising from Mr. Hill's relationship

8    with relatives and close business associates in connection

9    with real estate development projects for new Bank branches.

10   Did I read that right?

11   A.   Yes.

12   Q.   Now you signed this letter.  What does that mean?

13   A.   It means it just describes what the investigation was

14   focused on, potential conflicts of interest arising from his

15   relationship with relatives and close business associates.

16   Q.   Well, what was your source of information on that?

17   A.   The -- counsel.

18   Q.   So you just signed the document that a lawyer prepared

19   for your signature?

20   A.   That is right.

21   Q.   Okay.  Now this document I put in front of you is number

22   37 in our exhibit book.  And you will see at the top of, at

23   the top it is on the letter head of TD Financial Group and it

24   purports to be a Tuesday October 2, 2007 conference call.

25   Have you ever read this transcript of this conference call

1   before?

2   A.   I have not.

3   Q.   So you certainly didn't read it before signing that you

4   prepared April 23, 2012 letter.  Right?

00:50   5   A.   That is right.

6   Q.   Do you recognize the names, do you recognize the names

7   Bob Falese and Bharat Masrani?

8   A.   Yes.

9   Q.   And who do you understand Bob Falese to be?

00:51   10   A.   His title here is president.  He's president CEO of

11   Commerce Bancorp.

12   Q.   And Bharat Masrani, of course, you've already told us

13   about?

14   A.   Yes.

00:51   15   Q.   I'm going to ask you to turn to page 9 of this document.

16   Are you familiar with these conference calls?

17   A.   Yes.

18   Q.   All right.  And my interest --

19           MR. JACOBS:  Judge, excuse me for one minute.

00:51   20   Q.   All right.  My interest is in the second paragraph of the

21   question he presented which reads.  Then my last question will

22   be for the Commerce people with regulatory restrictions in

23   place on new real estate business.  Can you maintain the

24   growth that you have had in the past and does TD help you

00:52   25   finally convert that great deposit base into a fairly large

1   loan base.  Do you see that language?

2   A.   Yes, I do.

3   Q.   Okay.  Now Bob Falese, just going to the center of the

4   page of this transcript responds.  This is Bob Falese.  If I

00:52   5   understood the question right, with respect to our capacity to

6   build branches, we received branch approvals recently from the

7   OCC and are continuing along to a tract of building out our

8   branch plan.  Then he goes on.  Did I ride that correctly?

9   A.   Yes.

00:52   10   Q.   Do you know that to be historically accurate what Mr.

11   Falese said?

12   A.   I don't.

13   Q.   Bharat Masrani, his report is saying quote:  This is

14   Bharat Andre with respect to, are there going to be any issues

00:52   15   in expanding the branches and continuing with the growth

16   story.  Obviously we've got a lot of due diligence here in our

17   view is that those issues going forward are manageable.  That

18   this does not have any meaningful impact on the operations

19   going forward.  Did I read that right?

00:53   20   A.   Yes.

21   Q.   So do you know that to be historically accurate, what Mr.

22   Masrani said?

23   A.   Yes.

24   Q.   Now the date I gave you from the front page of this

00:53   25   document is October 2, 2007.  Will you agree with me that that

1    is three months before -- I'm sorry.  Will you agree with me

2    that that is three months after the entry of the June 28,

3    2007, OCC cease and desist order?

4    A.   Yes.

00:53    5    Q.   Now will you turn to page 14?  Do you happen to recognize

6    the name Mario Mendonka, Annuity Capital Markets?

7    A.   No, I don't.

8    Q.   All right.  You will see the bottom third of the

9    transcript of this conference call attributed to him.  Quote:

00:54    10   If Mr. Hill, Mr. Hill's departure and anything on the

11   memoranda of understanding.  Well let me back up.  Okay.  I

12   screwed this up.  Go to the, right below the center of the

13   page.  Do you see attributed to Mr. Mario Mendonka quote:  And

14   then finally could someone shed some light on the departure of

00:54    15   Mr. Hill earlier this year and the memorandum of understanding

16   the various regulators and what limits.  And then he continues

17   on an inch below.  Mr. Hill's departure and anything on the

18   memorandum of understanding you can offer us.  Do you see all

19   that I just read?

00:54    20   A.   Yes.

21   Q.   Now Bob Falese whose name you at least recognize, I will

22   read you what you said and I'm going to ask you if you knew

23   about it.  Quote:  According to Mr. Falese quote:  Let me

24   describe it to you as we have described it over the past few

00:55    25   months.  First of all, if you read the Consent Order, you will

1    see that it was a very surgical document.  The document

2    focuses on insider activities and has really been limited to

3    that.  It has not at this point inhibited our ability to work

4    properly with our regulators to arrive at a plan to continue

5    doing what we've needed to do in terms of running the Bank and

6    building out our branches.  Have I read that right?

7    A.   Yes, you did.

8    Q.   Now what Mr. Falese said in this conference call three

9    months after the June 28, 2007 order, is it historically

10   accurate?

11   A.   Is his name statement historically accurate?

12   Q.   Yes.

13   A.   I suppose.  I don't know.  I was not there.  I don't know

14   what they -- how he worked with his regulators in continuing,

15   you know, to arrive at a plan.  I don't know.

16   Q.   I'm going to continue on the bottom of page 14 and then

17   I'm going to the top of page 15 quoting Mr. Falese whose

18   identified as Commerce Bancorp, Inc., president and CEO.  Is

19   that right?

20   A.   Yes.

21   Q.   Quote:  That document, that consent document is clear in

22   its direction.  It has no safety and soundness implication and

23   clearly no inhibitions to us related to growth and we are in

24   substantial compliance.  We've turned in documents that were

25   required and continue to work closely and will continue to

1    cooperate with the OCC in terms of the ongoing investigation.

2    Did read that right?

3    A.   Yes.

4    Q.   Okay.  And as far as you know, is it historically

5    accurate?

6    A.   I have no knowledge of whether at that time they were in

7    substantial compliance or whether they turned in documents

8    requested.  I don't know.

9    Q.   Whose Ed Clark?

10   A.   Ed Clark is CEO of TD DG.  The chair the Bank, the U.S.

11   Bank.

12   Q.   On page 15 of this transcript, of this conference call,

13   at the top he is quoted as saying quote:  It's Ed here.

14   Obviously before doing a transaction at this time there really

15   radio, there was really quite extensive due diligence and

16   obviously we talked to the appropriate the regulatory

17   authorities and wouldn't be the doing this transaction if we

18   weren't totally comfortable that this was a rather narrowly

19   defined issue centered on a single individual.  Did I read

20   that right?

21   A.   Yes, sir.

22   Q.   Okay.  And as far as you know, is what Mr. Clark said

23   there historically accurate?

24   A.   I would take him at his word.  If he said they wouldn't

25   do this if they weren't totally comfortable, that it was a

1    rather narrowly defined issue, yes.

2           MR. JACOBS:  Go back to D-5 page two again.

3           THE COURT:  Okay.

4           MR. JACOBS:  Judge, need to go to --

00:58    5    Q.   Okay.  Now I'm going to ask you to go back to tab 33

6    which is the letter prepared by a lawyer which you signed,

7    page two.  Now this sentence in the second full paragraph

8    which states:  The OCC and Federal Reserves lent the

9    investigations were directed primarily at potential conflicts

00:58   10    of interest arising from Mr. Hill's relationship with

11    relatives and close business associates in connection with

12    real estate development projects for new Bank branches.  That

13    sentence, did you do any independent investigation regarding

14    that sentence?

00:58   15    A.   No.

16    Q.   Do you know whether in the years 2007 and 2008 Commerce

17    Bank investigated that very claim?

18    A.   Whether Commerce Bank investigated it?

19    Q.   That very claim.

00:58   20    A.   Open quote:  OCC and Reserves close quote, no, I don't

21    know that Commerce Bank investigated that.

22    Q.   So the answer is you don't know?

23    A.   That is right.

24    Q.   Go to Tab 16 which on the face purports to be the

00:59   25    investigative report of the special litigation committee of

1    the Board of Directors of Commerce Bank and it is dated

2    February 28, 2008.

3            MR. JACOBS:  Judge, may we have up P-9 which is in

4    evidence as a joint exhibit.

00:59    5            THE COURT:  Sure.

6            MR. JACOBS:  Can you make it a little bigger?

7    Q.  Do you see that?

8    A.  Yes, I do.

9    Q.  Now, February 2008 would be approximately seven months

00:59    10   after the June 28, 2007 Consent Order.  Is that right?

11   A.  Yes.

12   Q.  Okay.  Have you ever see this document before?

13   A.  I have not.

14   Q.  And, therefore, you have never read this document before.

01:00    15   A.  That is right.

16   Q.  Has anybody ever summarized this document for you orally

17   or in writing?

18   A.  No.

19   Q.  Would you kindly turn to page 26 of the document.  Well,

01:00    20   I'm sorry.  Before you do that.  Before you do that.  Are you

21   even aware that there was a special litigation committee

22   appointed by Commerce Bank?

23   A.  I am not aware.

24   Q.  Have you ever heard the term?

01:00    25   A.  Not that I recall.

1    Q.   Do you know what disinterested Directors are?

2    Independent and disinterested Directors?

3    A.   I know what disinterested and independent means.

4    Q.   Okay.  Turn to page 26.

01:00    5        MR. JACOBS:  Can we get to 26?  That's 25.  Okay.

6    Q.   Do you see the topic heading bold face.  C fair market

7    value of the rents due under certain insider related party

8    lease agreements and the allocation of property taxes and CAM

9    charges under the same lease agreements?

01:01    10   A.   Yes.

11   Q.   Now, I don't know how much or how little actually you

12   know about the Vernon Hill's contract entitlements and the

13   history of regulatory approvals, but you do seem to know that

14   the crux of the issue in the June 28 documents is real estate

01:01    15   transactions with insiders.  Right?

16   A.   Yes.

17   Q.   Now if I can ask you to turn back to page two.  If I can

18   ask for a moment.  I'm just going to direct your attention to

19   the center paragraph.

01:02    20       MR. TAMBUSSI:  The cover page.  So you have to add a

21   number 2.  Every page you have.

22       MR. JACOBS:  All right.  This is the right page.

23   Q.   It's the second full paragraph which recites that the SLC

24   made findings in four areas.  Area three being the fair market

01:02    25   value of you rents under certain insider and real estate party

1    lease agreements ad property taxes and CAM charges and so on.

2    Do you see that?

3    A.   Yes.

4    Q.   Now, on page 26.

5            MR. JACOBS:  Go back do that.

6    Q.   We see the topic the heading referring to all that.  And

7    it goes on for four or five pages up to page 30.  Do you know

8    that the special litigation committee and the real estate

9    review committee mandated by the OCC concluded that the leases

10   in question were propitious to the Bank, and the special

11   litigation committee along with the real estate review

12   committee mandated by the OCC concluded that the leases in

13   question were at 65 percent of market value in favor of the

14   Bank.  You know that?

15   A.   No.

16   Q.   So you didn't know either of those things when you signed

17   the April 23, 2012 letter authored by a lawyer.

18   A.   That is right.

19   Q.   Okay.  Did you know that the special litigation committee

20   and the real estate review committee mandated by the OCC found

21   some minor, couple hundred dollar errors in real estate or CAM

22   charges but declined to pursue them beyond negotiation for

23   fear of jeopardizing the leases?  Did you know that?

24   A.   No.

25   Q.   Now I wanted to go back to tab 22 which we've already

1    looked at once but for a different purpose.  And I'm going to

2    ask you to turn to page six.  Again this is the June 28, 2007,

3    Consent Order with the OC and page six.  You've reviewed this,

4    right?  You've read this?

01:04    5    A.   Yes.

6    Q.   All right.

7         MR. JACOBS:  Judge, the number on this is P-19.

8    Could we get to P-19, page six?  Is it possible to make it

9    bigger without looking at the text?  Thank you.

01:05   10   Q.   Page six, paragraph four.  Well for completeness, it's

11   article two topic heading existing insider and insider related

12   party relationships.  Paragraph four, page six.  When you read

13   paragraph four, when you read paragraph four, did you

14   understand it?

01:05   15   A.   Yes.

16   Q.   Okay.  Since you understand it, I think we can agree that

17   this order required the Bank to do an examination of the

18   leases where there was a claim to have insider or insider

19   related party involvement.  Right?

01:06   20   A.   Yes, sir.

21   Q.   And the Bank was to identify the leases, provide a cost

22   Bennett evaluation and decide whether to continue the lease,

23   continue it through its effective term, terminate the lease by

24   December 31st, purchase the property.  There's a bunch of

01:06   25   alternatives, including termination of the leases.  Right?

1  A.   Yes, sir.

2  Q.   When you wrote -- when you signed -- withdraw that

3  fragment of the sentence.

4       When you signed the April 23, 2012 letter to the Fed,

01:06  5  did you know that after examining all these insider leases,

6  the Bank decided to keep them all and not terminate a single

7  one?  Did you know that?

8  A.   No.

9       MR. JACOBS:  D-55 again, please.  Okay.  D-55, page

01:07  10  two.  Thank you.  It's the second full paragraph.  Can you

11  made that bigger, please?

12  Q.   Okay.  Will you go down in this letter that you signed,

13  we're at tab 33, page two.  I'm looking at the very next

14  sentence which says:  Bank branches were constructed utilizing

01:07  15  the design and architectural services of InterArch, Inc, an

16  entity owned by his wife Mrs. Hill on real estate which was

17  leased through transactions which financially benefitted third

18  parties in which Mr. Hill, his relatives or close business

19  associates had an interest.  Did I read that right?

01:07  20  A.   Yes, sir.

21  Q.   And where did you get all that information?

22  A.   This was provided by counsel.

23  Q.   Okay.  Now InterArch, Inc., do you know what it is?

24  A.   I know that it is a company owned by Mrs. Hill.

01:08  25  Q.   Did you know what it did?

**1**  A.   Designed the branches, furnished branches.

**2**  Q.   Okay.  Now, do you know that, too, was investigated by

**3**  the Special Litigation Committee?

**4**  A.   I did not know that.

01:08   **5**  Q.   Did you know that -- well, therefore you did not know

**6**  that the Special Litigation Committee was unable to make a

**7**  finding either way on that relationship?

**8**  A.   I did not know that.

**9**  Q.   Nobody ever explained that to you?

01:08   **10**  A.   No.

**11**  Q.   As far as you know, did the OCC or the Federal Reserve or

**12**  the FDIC ever take any punitive action against Commerce Bank

**13**  or Mr. Hill based on his wife's firm InterArch doing business

**14**  with Commerce?

01:08   **15**  A.   I'm not aware that they did.

**16**  Q.   Okay.  Now, there's an attachment to your letter, which

**17**  is referenced in the next sentence.  Again, for completeness,

**18**  the next sentence of the letter, the lawyer prepared letter,

**19**  which you signed, says:  "Mr. Hill admitted that unsafe

01:09   **20**  practices occurred during his tenure at Commerce.  In response

**21**  to the OCC assertions that the bank engaged in unsafe

**22**  practices by submitting materially false bank application

**23**  information, Mr. Hill wrote Response:  That is true only in an

**24**  extremely number of isolated cases."

01:09   **25**        Did I read that right?

1    A.   Yes, sir.

2    Q.   Now explain to me exactly what that means.

3    A.   Well, when we -- the reference to "bank engaging in

4    unsafe practices," that is an assertion by the OCC, so the OCC

01:09   5    has said the bank engaged in unsafe practices.

6    Q.   So when you -- when you -- in this letter that you did

7    not write, that a lawyer wrote, where it says "in response to

8    the OCC's assertions that the bank engaged in unsafe practices

9    by submitting materially false branch application information,

01:10   10   Mr. Hill wrote Response:  That is true only in an extremely

11   limited number of isolated case," you are relying on this

12   attorney/client privileged memo?

13   A.   Yes, sir.

14   Q.   Now, first, who -- where did you get this attorney/client

01:10   15   privilege memo?

16   A.   From counsel.

17   Q.   From an attorney?

18   A.   Yeah.

19   Q.   All right.  You didn't get it from Mr. Hill?

01:10   20   A.   No.

21   Q.   Now, what is the date of this attorney/client privilege

22   memo?

23   A.   June 8, 2007.

24   Q.   That is 20 days before the entry of the OCC Cease and

01:10   25   Desist Order --

```
 1   A.   Yes.

 2   Q.   -- is that correct?

 3   A.   Yes.

 4   Q.   And do you see that the author of this memo is Vernon

 5   Hill?

 6   A.   Yes.

 7   Q.   And it's directed to two lawyers, Richard Alexander and

 8   Mike Critchley, and three other people, right?

 9   A.   Yes.

10   Q.   And the reference is OCC Proposal, right?

11   A.   Yes, sir.

12   Q.   The first sentence says:  "The following are my detailed

13   comments on their proposed agreement."  You've read this,

14   haven't you?

15   A.   Yes, sir.

16   Q.   Did you figure out that because this predates the OCC

17   Order by 20 days and because it says OCC Proposal, it is

18   talking about some prior draft of the OCC documents, did you

19   figure that out?

20   A.   Some prior draft or prior discussion.

21   Q.   Okay.  Do you see on the first page number 1A, reference

22   to Page 1, you see it, refers specifically to a Consent Order:

23   "Why are we signing a Consent Order if the matter is not

24   resolved?"

25   A.   Yes.
```

01:11
01:11
01:11
01:11
01:11
01:11

1   Q.   Now, you obviously read this and you referred or a lawyer

2   referred to it in the letter you signed and this obviously

3   predates the Consent Order by 20 days, so certainly it is

4   talking about a draft of the Consent Order, which was never

5   signed, right?

6   A.   I guess it is.

7   Q.   Let's go to the second page of this memo, and I am

8   looking at sub-subparagraph B8, which is what the lawyer who

9   wrote the April 23rd letter quoted, am I correct?

10  A.   Yes, sir.

11  Q.   And the letter written by the lawyer faithfully quoted

12  that "the bank engaged in unsafe practices by submitting

13  materially false branch application information.  Response:

14  That is true only in extremely limited number of isolated

15  cases."

16       Did I read that all right?

17  A.   Yes, sir.

18  Q.   That never appears in the OCC Order, does it?

19  A.   The statement from Mr. Hill?

20  Q.   Any of it, "this claim that the bank engaged in unsafe

21  practices by submitting materially false branch application."

22  A.   No, it is --

23  Q.   You don't see that in the OCC --

24  A.   No, it is not there.

25  Q.   OCC Cease and Desist Order doesn't even mention branch

1    applications, does it?

2    A.   I would have to go back and look.

3    Q.   Go back and look, that is what we're here for.

4    A.   Okay.  Which tab is that again?

01:13    5    Q.   That is 22.  Are you having any luck?

6    A.   Ask the question again.

7    Q.   I don't think there is any reference in this June 28th

8    Order to "the bank engaged in unsafe practices by submitting

9    materially false branch information," and I'm asking can you

01:13   10    find anything.

11    A.   No, I can't find anything.

12    Q.   Okay.  On the contrary, it refers specifically to insider

13    real estate transactions period, right?

14    A.   Yes.

01:14   15    Q.   Okay.  Now, as to the response -- so back up.  So

16    assuming for the moment the accuracy of the response by Mr.

17    Hill "that is true only in an extremely limited number of

18    isolated cases --

19    A.   Yes.

01:14   20    Q.   -- assuming the accuracy of that for a moment, it was

21    never incorporated into the Cease and Desist Order, was it?

22    A.   No.

23    Q.   And you don't know why, do you?

24    A.   No.

01:14   25    Q.   All right.  Do you know whether this response by Mr. Hill

1   is right or wrong?

2   A.   He said it.

3   Q.   I know he said it, it is his memo.

4   A.   Yes.

5   Q.   And it says "Response."

6   A.   Yes.

7   Q.   That is not the question.  You recognize a person's

8   response can be an error, don't you?

9   A.   Yeah.

10  Q.   People make mistakes?

11  A.   I don't know if it is right or wrong.

12  Q.   Okay.  That is the simple question, you don't know if it

13  is right or wrong?

14  A.   That is right.

15  Q.   That brings us back to Tab 16.  When you signed this

16  lawyer prepared letter on April 23rd, 2012, did you know in

17  February of 2008 the Special Litigation Committee issued its

18  report, including a report on this very topic?

19  A.   I did not know that.

20  Q.   Therefore, you didn't know that after a thorough

21  investigation the SLC concluded that no corrective action on

22  any branch application was warranted.

23  A.   I was not aware of that.

24  Q.   When you wrote this, did you know that from 1988 through

25  April of 1998, the OCC had a branch application form with

1  pinpoint specific questions about insider related parties?

2  A.   No.

3  Q.   After all the years you worked at the OCC, you didn't

4  know that?

01:15  5  A.   I was not -- that would be something people in licensing

6  looked at.

7  Q.   Did you know that in April of 1998 the form was changed

8  and made less specific on the topic of insider related real

9  estate transactions?

01:16  10  A.   I was not aware of that.

11  Q.   When you wrote the April -- when you signed the April 23,

12  2012, letter, you didn't know that either?

13  A.   That is right.

14  Q.   When you signed the April 23, 2012, letter, did you know

01:16  15  that in 2010 the branch application form was changed again and

16  as of the April 1998 application, there was no specificity

17  required on insider related real estate transactions?

18  A.   I was not aware of that.

19  Q.   When you wrote the April 23, 2012, letter, did you know

01:16  20  that Commerce Bank continued using the April 1998 application

21  form until 2006?

22  A.   No.

23  Q.   And that the OCC kept accepting it in 2002, 2003, 2004,

24  2005, and into 2006 until they realized it was the wrong form?

01:17  25  A.   I was not aware of that.

1   Q.   So you didn't know any of these things when you signed

2   this letter the lawyer prepared for you.

3   A.   That is right.

4   Q.   So you didn't know that the Special Litigation Committee

5   reviewed all of this and ultimately concluded that there was

6   full disclosure, there were 19 branches under discussion and

7   possibly seven more under discussion but nobody had to do

8   anything about the problem, you didn't know that when you

9   wrote this letter?

10  A.   I did not know that.

11  Q.   Do you have any evidence that the OCC or any regulatory

12  agency took any action against Mr. Hill based on branch

13  application forms?

14  A.   No.

15  Q.   Did you know that Mr. Hill wasn't even in charge of that,

16  it was an executive by the name of Wocjik?

17  A.   I did not know that.

18          MR. JACOBS:   Judge, this would be a midway stopping

19  point.

20          THE COURT:   Let's take a 15-minute break, ladies and

21  gentlemen.   Don't discuss the case, don't do any research, and

22  we'll see you back.

23          DEPUTY CLERK:   All rise.

24              (Jury Leaves the Courtroom.)

25          DEPUTY CLERK:   All rise.

1        THE COURT:  Are you ready?

2        MR. JACOBS:  Yes, Judge.  I'm a little more than

3   halfway through, so this will probably take me close to if not

4   to 12:30 and the next witness is Mr. Hill.

01:39   5        THE COURT:  If it's 12:15 and you want to break for

6   lunch, that's fine.

7        MR. JACOBS:  What if it's say 12:13.

8        THE COURT:  12:13?  We're going to negotiate, bargain

9   this?  What do I get giving up 15 of my minutes, what do I

01:39   10  get?

11       MR. JACOBS:  I'll read faster.

12       THE COURT:  Don't read faster.  This is not a sprint,

13  it's a marathon.

14       Get the jury out, please.

01:39   15       Did you get a hold of the overseas witness?

16       MR. JACOBS:  Not yet.

17       THE COURT:  You have to, Monday, Tuesday.

18       MR. JACOBS:  We are hoping he returns over the

19  weekend.

01:40   20       THE COURT:  Do we need to send somebody overseas to

21  find him?

22       MR. JACOBS:  I'll go.

23       THE COURT:  You have to be here to try to case.  But

24  maybe Mr. Barbone wants to go.

01:40   25       MR. BARBONE:  Certainly.

1          DEPUTY CLERK:  All rise.

2          THE COURT:  Okay.  We'll continue, please, with the

3     readings.

4          MR. JACOBS:  Thank you.

01:40   5   Q.   Okay.  Now, let's go back to Tab 33, and I'm looking at

6     the second full paragraph, the final sentence which says:

7     "The bank also cannot disregard the November 17, 2008,

8     Stipulation and Consent Order entered into between the OCC and

9     Vernon Hill, II, which sites the OCC's findings regarding the

01:40   10    unsafe and unsound practices engaged in by Mr. Hill and his

11    breaches of fiduciary duties, which Mr. Hill neither admitted

12    or denied."

13         Did I read that correctly or not?

14    A.   You did.

01:41   15   Q.   Okay.  Now, first, have you ever seen any minutes or

16    resolutions of the Board of Directors of Commerce or TD or any

17    of their names which say this November 17, 2008, Order was

18    discussed among them?

19    A.   No.

01:41   20   Q.   Have you ever seen any minutes or a resolution of

21    Commerce or TD which says based on this Order, they cannot

22    provide the necessary certification to get regulatory approval

23    to pay Mr. Hill?

24    A.   No.

01:41   25   Q.   This sentence was not drafted by you but by the lawyer.

1    A.   Yes.

2    Q.   A bank lawyer.

3    A.   Yes.

4    Q.   All right.  Now, let's -- Mr. Tambussi correctly pointed

01:41    5    out that this Order we're discussing is appended to the letter

6    you signed, so you can look at that or you can look at Tab 23,

7    I will leave it to you.  I want to look at Tab 23 because I

8    have it marked up.  So let me know when you are at either

9    place.

01:42    10   A.   I'm at Tab 23.

11        MR. JACOBS:  Judge, this is our P-53 in evidence.

12        THE COURT:  Okay.

13        MR. JACOBS:  P-53, please.

14   Q.   Okay.  So am I.  Now, this Order is on OCC letterhead,

01:42    15   right?

16   A.   Yes.

17   Q.   And it is captioned In The Matter Of Vernon Hill, former

18   Chief Executive Officer and Chairman, President, and CEO

19   Commerce Bank, N.A., right?

01:42    20   A.   Yes, sir.

21   Q.   Okay.  And it is called a Stipulation and Consent Order,

22   right?

23   A.   Yes, sir.

24   Q.   Now, in the first paragraph I see the language:  "Whereas

01:42    25   the Comptroller of the Currency of the United States

1    (Comptroller) intends to initiate a proceeding against Vernon

2    W. Hill, II, respondent."

3         Did I read that right?

4    A.   Yes.

01:43   5    Q.   No proceeding was initiated, was it?

6    A.   Not that I'm aware of.

7    Q.   All right.  In the second paragraph I see this language:

8    "Whereas the Comptroller finds and respondent neither admits

9    nor denies that respondent engaged in unsafe and unsound

01:43   10   practices and breaches of fiduciary duties by failing to

11   comply with sound corporate governance principles in

12   connection with real estate purchases, leases, and joint real

13   estate development transactions involving the bank which

14   resulted in financial gain to the respondent."

01:43   15        Did I read that right?

16   A.   Yes.

17   Q.   Now you obviously read this before today, right?

18   A.   Yes.

19   Q.   And the lawyer who prepared the letter and had you sign

01:43   20   it appended this and referred to this, right?

21   A.   Yes.

22   Q.   Okay.  But you are the signatory to the letter.  Do you

23   see that the focus of this is real estate purchases, leases,

24   and joint real estate development transactions?

01:43   25   A.   Yes.

1   Q.   When you signed the April 23, 2012, letter, you did not

2   know that the Special Litigation Committee had examined all of

3   these real estate transactions and reported on them in

4   February 2008, did you?

01:44   5   A.   I did not.

6   Q.   And the lawyer who prepared this letter made no reference

7   to the Special Litigation Committee report, did she?

8   A.   No.

9   Q.   More specifically, I pointed out to you, I believe on

01:44   10   Pages 26 or 27 of that report, that these very leases were

11   found to be propitious to the bank at 65 percent of market

12   value, remember that?

13   A.   Yeah.

14   Q.   Yet there is no mention of that either in this April 23,

01:44   15   2012, letter, is there?

16   A.   No.

17   Q.   By the way, I'm assuming you understand the word

18   propitious?

19   A.   Yes.

01:44   20   Q.   Okay.  What does it mean?

21   A.   Favorable.

22   Q.   Exactly.  Now, if we continue on in this paragraph, we

23   will see this language:  "And without an adjudication on the

24   merits."

01:45   25       You understand what that means, right?

1    A.   Without a hearing.

2    Q.   Well, doesn't it mean more than that?  Adjudication on

3    the merits, doesn't that mean a judgment on right and wrong?

4    A.   Yes.

01:45    5    Q.   So without a judgment on right and wrong and solely for

6    the purposes of settlement, you surely understand that?

7    A.   Yes.

8    Q.   Now, let's turn to the third page of this Order and I'm

9    going to direct your attention to subparagraphs --

01:45    10    A.   Can I go back to the beginning of this?

11    Q.   Sure.

12    A.   I mean, the key to me when I'm reading this as a bank --

13    as a former bank examiner, "the Comptroller finds and

14    respondent neither admits to or denies that respondent engaged

01:45    15    in unsafe and unsound practices and breaches of fiduciary

16    duties," so the Comptroller found that so that is the record

17    that I'm referring to, they found that.

18    Q.   Okay.

19    A.   And then to avoid litigation or whatever this means, the

01:46    20    Comptroller desired to enter into this Stipulation and Consent

21    Order and conclude it, won't litigate, will enter into this

22    Order, that is the way I understand that.

23    Q.   Do you also understand that the finding by the

24    Comptroller is a unilateral finding, that is, what the

01:46    25    Comptroller feels?

1    A.    Yes, I understand that.

2    Q.    And immediately following that is a statement by the

3    respondent Mr. Hill that he's not admitting it or denying it,

4    he's letting them feel whatever they want.

01:46    5    A.    That is right.

6    Q.    And you also understand that their feeling --

7    A.    It is their finding.  Doesn't say the Comptroller feels,

8    it said the Comptroller finds.

9    Q.    Okay.  And what are you -- you have agreed that is a

01:46    10    unilateral finding, that is what the Comptroller finds.

11    A.    Yes.

12    Q.    Doesn't say that Mr. Hill finds that.

13    A.    No.

14    Q.    All right.  And it doesn't say that any independent body

01:46    15    like a judge found that.

16    A.    That's right.

17    Q.    In fact it says the opposite, that there's been no

18    adjudication on the merits of their finding.

19    A.    That is right.

01:47    20    Q.    And all of this language, you will still agree, is about

21    real estate purchases, leases, and joint real estate

22    development transactions involving the bank, right?

23    A.    Yes.

24    Q.    Okay.  But the whole purpose my drawing your attention to

01:47    25    this is to have you concede, as you have, you did not know

1  that in February of the same year the SLC had investigated

2  this same thing and found no wrongdoing.

3  A.  I did not.

4  Q.  Okay.  As a former OCC employee, did you learn that

01:47  5  people sometimes settle things without hearings because it is

6  faster and cheaper?

7  A.  Yes, sir.

8  Q.  Okay.  Now, we were on Page 3, and this is for

9  completeness, so you wouldn't know whether in this very case

01:47  10  whether Mr. Hill settled this because it is faster and

11  cheaper?

12  A.  I wouldn't know his motivation.

13  Q.  All right.

14        MR. JACOBS:  May we have Page 3, please?  Can you

01:48  15  make the top half of it bigger, please?  2A Exception.  Page

16  3, the 2A Exception.  Okay.  You got Page 3.  There you go.

17  Thank you.

18  Q.  All right.  On Page 3, Article 2, sub-subparagraph 1A

19  reads:  "Neither respondent nor any respondent controlled

01:49  20  entity shall engage in that any future real estate related

21  activity with any member of such insured financial institution

22  group unless such transaction is," and then there are three

23  conditions, "reported, approved," and there's a time element,

24  right?

01:49  25  A.  Yes.

1    Q.   This, too, like the other Order, speaks *in futuro*?

2    A.   Yes.

3    Q.   Is there anything in this November Order which undoes

4    anything that Mr. Hill had done?

01:49    5    A.   Not that I've seen.

6    Q.   In his more than 30 years with Commerce Bank?

7    A.   No.

8    Q.   Is there anything in this Order which reverses any real

9    estate transaction in which Mr. Hill or one of his relatives

01:50    10    was involved with the bank?

11    A.   No.

12        MR. JACOBS:  Go to subparagraph B.  Can we just move

13    up?  Thank you.

14    Q.   Go to subparagraph B, which says:  "Respondent shall use

01:50    15    his best efforts to ensure that a respondent related party

16    does not engage in any future real estate related activity

17    with any member of such insured financial institution group

18    without satisfying the requirements above."

19        Is that what it says?

01:50    20    A.   Yes, sir.

21    Q.   Again it speaks *in futuro*.

22    A.   Yes, sir.

23    Q.   Now, it doesn't say -- this Order does not say that Mr.

24    Hill cannot engage in real estate transactions, it just says

01:50    25    they got to be reported and approved in a given timeframe,

1    right?

2    A.    That is right.

3    Q.    So it all speaks to the future, it doesn't undo a single

4    previous transaction, right?

01:51    5    A.    That is right.

6    Q.    And it does not prohibit him from doing anything, it

7    simply says he's got to report it, right?

8    A.    Yes, sir.

9    Q.    That is what this all boils down to?

01:51   10    A.    That is what it says.

11    Q.    All right.  Now we already discussed Article IV on Page 5

12    dealing with the offset, which you recognize is simply a

13    reduction in the amount of money that it is anticipated TD

14    will be paying Mr. Hill.

01:51   15    A.    Yes, sir.

16    Q.    Now -- sorry.  Turn back to Tab 33, please.  Are you

17    there?

18    A.    Yes.

19         MR. JACOBS:  This is 55, Page 2.  D-55, Page 2.  No,

01:51   20    sorry, it's the third, the final paragraph, the one at the

21    bottom.  If you can make that bigger.  Thank you.  On Page 2.

22    That is good.

23    Q.    The final paragraph on Page 2 reads in part:  "Based upon

24    the enumerated reasons in existence and known to the Board

01:52   25    since the entry of the 2007 Cease and Desist Order from which

1    it could be inferred that deficiencies in Mr. Hill's

2    management of Commerce Bank's business materially contributed

3    to Commerce's financial difficulties?"

4         Did I read that right so far?

01:52    5    A.   Yes.

6    Q.   Let me pause there.  What financial difficulties are you

7    referring to or is the lawyer who wrote this letter referring

8    to?

9    A.   The fact that Commerce was prohibited from opening new

01:52    10   branches, which brought Commerce new deposits, which was the

11   business model there.

12   Q.   Well, what are the financial difficulties?

13   A.   That's -- that was the -- that was the growth plan for

14   the bank so that would be the financial difficulty.

01:52    15   Q.   In dollars and cents what were the financial

16   difficulties?

17   A.   I don't know what they were in dollars and cents.

18   Q.   Were there any?

19   A.   I wasn't -- I didn't look at it at the time.  I wasn't

01:53    20   involved at the time but the fact that they would not be able

21   to follow the model of opening branches, which was the

22   business model, would be a financial difficulty.

23   Q.   Did it cost Commerce Bank any money?

24   A.   I don't know in dollars and cents what the impact was.

01:53    25   Q.   Well, do you know if in dollars and cents there was any

1  impact?

2  A.   I don't know.

3  Q.   TD Bank paid 8.5 billion dollars to acquire Commerce,

4  didn't it?

01:53    5  A.   Yeah.  I don't know what price they paid.

6  Q.   A multiple of and an unheard multiple of 22 and a half

7  times earnings.

8  A.   I don't know if that is unheard of.

9  Q.   Did you ever hear of it?

01:53   10  A.   I think Core States sold, they got five times book.

11  Q.   Well, how do you compare apples and oranges?

12  A.   Well, that -- I -- if you translate it, that's what a

13  multiple of --

14  Q.   That's a little different, no?

01:54   15  A.   It is different but I am sure that the multiple that you

16  referred to would have been extremely high in that case so

17  anyway it is.

18  Q.   High is a good word for it?

19  A.   It's certainly high on today's standards.

01:54   20  Q.   Now, if you are at 19 --

21       MR. JACOBS:  Just a moment.  I can't find this

22  quickly.

23  Q.   Now, if you are at 19, you should be looking at an

24  April 27, 2007, email from some operative in the OCC to the

01:55   25  Board of Directors of Commerce.  Is that what you're looking

1  at?

2  A.   Yes, sir.

3  Q.   Okay.  Now, on the first page of this letter in the

4  second full paragraph I see a claim that there is an

5  investigation, including but not limited to transactions

6  related the bank officers and directors and transactions

7  related to bank premises, do you see that?

8  A.   Yes, sir.

9  Q.   And in the next paragraph the writer of this letter kind

10  of redundantly says some of the specific matters are

11  potentially inaccurate and/or incomplete representations by

12  the bank to the OCC on branch applications, right?

13  A.   Yes, sir.

14  Q.   Potential conflicts of interest arising from the

15  involvement of Vernon Hill and relatives in branch

16  transactions, right?

17  A.   Yes, sir.

18  Q.   And potential violations of law, unsafe, unsound

19  practices, unjust enrichment with various bank branch

20  transactions, right?

21  A.   Yes.

22  Q.   On the second page final -- the penultimate paragraph

23  says:  "The OCC -- "because of this investigation the OCC will

24  not be able to act at this time with respect to pending branch

25  applications."  Right?

1    A.   Yes, sir.

2    Q.   That is what you're talking about.

3    A.   Yes.

4    Q.   So it was the OCC that said, A, we have an investigation,

01:56    5    B, here is the stuff we're looking at and, C we're not going

6    to approve any branch applications, right?

7    A.   Yes, sir.

8    Q.   Okay.  Now, so it is the OCC that did this?

9    A.   It's the OCC's letter.

01:56    10   Q.   Right.  Now, the OCC winds up 60 days later agreeing to a

11   Consent Order which does not say that Vernon Hill did a

12   blessed things wrong, right?

13   A.   That is right.

14   Q.   And addresses *in futuro* --

01:57    15   A.   Yeah.

16   Q.   -- a single issue, real estate transactions regarding

17   branches, right?

18   A.   Yes.

19   Q.   Does not penalize anybody for any real estate

01:57    20   transactions or branch application errors or anything else,

21   right?

22   A.   Yes.

23   Q.   Remember Exhibit 33 where I quoted Bharat Masrani and Bob

24   Falese and -- what is the other guy's name, Ed Clark?

01:57    25   A.   Yes.

```
 1   Q.   Talking about that Order --

 2   A.   Yes.

 3   Q.   -- saying it was no impediment, do you remember that?

 4   A.   Yes.

 5   Q.   Why would Bharat Masrani, Bob Falese and Ed Clark all say

 6   that the Order was no impediment to their continued growth,

 7   why would they lie about that?

 8   A.   The Order would not require TD to have that same sort of

 9   structure in place with regard to branch openings.

10   Q.   Do you remember we went through Pages 9, 14, and 15 of

11   what Bharat said and what Ed Clark said and what Falese said?

12   A.   Yes, sir.

13   Q.   You didn't know any of that when you signed this lawyer

14   prepared letter on April 23, 2012, did you?

15   A.   No.

16   Q.   You didn't know that on both sides the Commerce person

17   Bob Falese and the TD people Bharat Masrani and Ed Clark were

18   saying that in October 2007, they were all saying this Order

19   is no impediment at all, you didn't know that until I showed

20   it to you today?

21   A.   I did not.

22   Q.   And the lawyer who prepared that letter for you made no

23   mention of it, did she?

24   A.   No, she did not.

25   Q.   Okay.  Now, this goes on to say -- I'm going to pick up
```

01:57
01:57
01:58
01:58
01:58

1    at the comma, second word Line 4, that is where I left off.

2            MR. JACOBS:  55 again.  This is D-55 again, Judge.

3            THE COURT:  Okay.

4            MR. JACOBS:  It would be Page 2, that same last

01:59    5    paragraph.  Okay.  Fine.  Can we get to that last paragraph,

6    please?

7    Q.   "The bank in these circumstances is not able to certify

8    in good faith that it is not in possession or not aware of any

9    information, evidence, or documents which would indicate that

02:00   10    there is a reasonable basis to believe that Mr. Hill has not

11    engaged in the conduct set forth in 12 C.F.R. 359.4."

12            Did I read it right?

13    A.   Yes.

14    Q.   It doesn't make sense, does it?

02:01   15    A.   It does make sense.

16    Q.   It does?

17    A.   Yes.

18    Q.   Read it again.

19    A.   "The bank in these circumstances is not able to certify

02:01   20    in good faith that it is in possession or not aware of any

21    information, evidence, or documents which would indicate that

22    there is a reasonable basis to believe."

23            MR. TAMBUSSI:  You left a word out.

24            THE COURT:  There's a word missing in what you said,

02:01   25    which is not.

1          THE WITNESS:  I'll begin again.

2          THE COURT:  Okay.

3          THE WITNESS:  "The bank in these circumstances is not

4    able to certified in good faith that's it is not in possession

02:01   5    or not aware of any information, evidence, or documents which

6    would indicate that there is a reasonable basis to believe

7    that Mr. Hill is not engaged in the conduct set forth in 12

8    C.F.R. 359.4," et cetera.

9    Q.   Isn't it supposed to say -- aren't you supposed to --

02:01   10   under 359, aren't you supposed to certify that you got no

11   information that Mr. Hill did engage in this prohibited

12   conduct?

13   A.   Yes.

14   Q.   Your letter says that you have no information that he did

02:02   15   not engage in this prohibited conduct, you have a double

16   negative in there.

17   A.   Yeah.

18   Q.   Do you see the mistake?

19   A.   Well, the letter says there is no information that he did

02:02   20   not engage.

21   Q.   So you have no information that he did not engage?

22   A.   That is right.

23   Q.   He did not.

24   A.   That is right.

02:02   25   Q.   And the reg say that you got to certify that you have no

1    information that he did.

2    A.    I would have to look at the reg.

3    Q.    I thought you did that.

4    A.    I did.  I can't remember it precisely.

02:02   5    Q.    Take another look at it, I have it in this book as

6    Exhibit 11.

7    A.    But the OCC found that he engaged in unsafe, unsound

8    practices.

9    Q.    You're talking about the November 17, 2008, order?

02:02   10   A.    Yes.  And then in his responses he admitted to providing

11   materially false information.

12   Q.    I understand.  You don't need to argue your case with me,

13   I have all your testimony on those topics.

14   A.    Yeah.

02:03   15   Q.    Let's go to Exhibit 11, which is the regulation that you

16   have read a couple of times.  You should be looking at

17   subparagraph 4(a)(4) which describes the necessary statement

18   from the bank.  "It does not possess and is not aware of any

19   information, evidence, or documents or other materials which

02:03   20   would indicate that there is a reasonable basis to believe, 1

21   and 2, the IAP has committed any fraudulent act, omission,

22   breach of trust likely to have a material adverse effect."

23        Am I reading it right?

24   A.    Yes.

02:03   25   Q.    Your letter says the opposite, that you don't have any

1   information to indicate he did not do those things?

2   A.   Right.

3   Q.   You see the difference?

4   A.   I see the difference.

02:03   5   Q.   All right.  Now, let's go back to your letter -- I'm

6   sorry, back to the lawyer letter that you signed, Tab 33.

7   Now, does this letter, which you signed, contain 100 percent

8   of the reasons that you are telling the Federal Reserve that

9   the bank cannot provide the Rule 359.4 certification?

02:04   10   A.   I think it does.

11   Q.   All right.  Now, this letter tells the Federal Reserve

12   recipient that, according to the lawyer who wrote it, the bank

13   cannot make the necessary certification, is that right?

14   A.   Yes, sir.

02:04   15   Q.   Does it anywhere ask for approval to pay Mr. Hill?

16   A.   It asks whether the Fed can make a determination as to

17   whether the bank can lawfully pay, it is not asking for

18   approval to pay, can the bank lawfully pay.

19   Q.   And then it states a bunch of reasons the bank thinks it

02:04   20   cannot pay.

21   A.   That is right.

22   Q.   All right.  If we count forward from the date of Mr.

23   Tambussi's letter, July 3rd to November 17th of 2008, we will

24   get 18 months?

02:05   25   A.   Yes.

United States District Court
Camden, New Jersey

1    Q.   No, we won't.  17.

2    A.   17.

3    Q.   17 months.  Do you know if in those 17 months before that

4    November 17, 2008, Order, if the bank made any application to

5    the Federal Reserve or the FDIC or OCC for regulatory approval

6    to pay Mr. Hill?

7    A.   I don't know that, but there was a reference in this

8    letter that there is an opinion from the Federal Reserve that

9    any payment is subject to the golden parachute regulations.

10   Q.   That is exactly why I am asking the question.

11   A.   Yeah.

12   Q.   So the bank knew that at least as early as July 3rd.

13   A.   Yes.

14   Q.   That is why I asked you the question.  In the next 17

15   months knowing that they needed approval, regulatory approval,

16   in the next 17 months did anybody lift a finger to get

17   regulatory approval?

18   A.   The -- not that I am --

19   Q.   You don't --

20   A.   Not that I am aware of, but it would have to include that

21   certification.

22   Q.   So what I want to know is from July 3, 2007, Mr.

23   Tambussi's letter, which acknowledges that the bank needs to

24   get regulatory golden parachute approval --

25   A.   Yes.

1   Q.   -- for the next 17 months do you know whether the bank

2   did anything to get that approval?

3   A.   I don't know.

4   Q.   This is before the November 17, 2008, Consent Order came

02:06   5   into existence.

6   A.   Yes.

7   Q.   You don't know if anybody did anything?

8   A.   I don't know.

9   Q.   All right.   On the same topic turn to Tab 2, have you

02:06   10   ever seen this Commerce Bancorp, Inc., Board of Directors

11   meeting minutes?

12   A.   Nope.

13       MR. JACOBS:   Excuse me, Judge.   This is 23,

14   Plaintiff's Exhibit 23 in evidence, Judge.

02:07   15       Bigger, please.   Okay.   Thank you.

16   Q.   Do you see topic heading 2, it's June 28, 2007, the very

17   same date of the OCC Consent Order, right?

18   A.   Yes.

19   Q.   Do you see topic heading 2, the final sentence:   "The

02:07   20   Board of Directors unanimously agreed that it was their intent

21   to fully honor the terms and conditions of Mr. Hill's

22   Employment Agreement subject, however, to the requirements of

23   all applicable laws, rules, and regulations."

24       Do you see that?

02:07   25   A.   Yes.

1    Q.   Okay.  And do you understand that?

2    A.   Yes, sir.

3    Q.   All right.  If you go to Tab 4, you will see another

4    July 8, 2007, set of minutes a little bit after Mr. Tambussi's

02:07    5    letter, topic heading 5 on Page 2 discussing Mr. Hill's

6    compensation, do you see that?

7    A.   I am sorry, what tab was that?

8    Q.   2.  I'm sorry, 4.  4.  4.

9    A.   Yes.

02:08    10   Q.   Okay.  So there are two written documents, photocopies of

11   minutes of Board of Directors meetings of Commerce Bank, there

12   are two examples of the Board of Directors meeting and

13   discussing Mr. Hill's employment contract and how to pay him,

14   right?

02:08    15   A.   Yes.

16   Q.   Okay.  And here is a third example, Tab 5, September 12,

17   2007, Board of Directors, topic heading 2 reads:  "The Board

18   was also briefed by William Tambussi and Rodgin Cohen on the

19   status of Vernon Hill's demand for separation payments."  This

02:08    20   is a --

21   A.   I'm sorry, what are you reading?  Oh, I see it.  I see

22   it.

23   Q.   Okay.  That is a third example of tangible documentary

24   evidence that the Board of Directors was discussing Mr. Hill's

02:08    25   payment, regulatory approval, his contract, right?

1   A.   Yes, sir.

2   Q.   Right.  And another example is behind Tab 6, October 16,

3   2007, Board of Directors meeting, and topic heading 5 it looks

4   like on the third page:  "The Board of Director was also

5   briefed by legal counsel on the status of the negotiations

6   with the attorneys for Vernon Hill and InterArch on the issues

7   of Vernon Hill's separation payment claims."  Right?

8   A.   Yes.

9   Q.   These are all examples, aren't they, of Bank Board of

10  Directors meeting minutes and resolutions commemorating the

11  discussions of Vernon Hill's contractual entitlements and in

12  some instances the need for regulatory to approval.

13  A.   Yes, sir.

14  Q.   Tab seven is a June 30, 2007, 10Q.  You know what they

15  are.  Right?

16  A.   Yes.

17  Q.   It's something Commerce Bancorp would have to file with

18  the SEC?

19  A.   Yes.

20  Q.   I'm just giving you an extraction.  If you look right

21  behind the face page.  If you look at topic heading 8

22  subsequent event.  Do see a reference to Mr. Hill's employment

23  agreement, his entitlement to 11 million dollars subject to

24  regulatory approval?

25  A.   Yes.

02:09
02:09
02:09
02:10
02:10

1    Q.   And do you see quote:  No amounts related to the sum, the

2    lump sum severance payment have been reported as expenses in

3    the company's financial results, as regulatory approval has

4    been granted.

2:10    5    A.   I see that.

6    Q.   Turn to tab eight, a 10K for Commerce Bancorp fiscal year

7    ended December 31, 2007.  That is the year that Mr. Hill was

8    discharged without cause and resigned.  Right?

9    A.   Yes.

2:10    10    Q.   Right on its face page you will find page 53 which

11    contains notes to the financial statement saying right at the

12    top quote:  Vernon Hill was entitled to the lump sum severance

13    of 11 million dollars.  Payment of this amount is subject to

14    regulatory approval.  As a result, no amounts have been

2:11    15    reported as such approval has not by granted close quote.

16    Right?

17    A.   Yes, sir.

18    Q.   That is the end of December 2007, right?  It is for the

19    year ended December 31, 2007.  Right?

2:11    20    A.   I am just looking for the date.

21    Q.   The date is looking at the top two inches where it says:

22    The fiscal year ended December 31, 2007.  Look on.

23    A.   Yes, I see.  Yeah, I see.

24    Q.   Okay.  Now you know enough about these things to know

2:11    25    that it wasn't filed that day.  It was filed months later?

1    A.   That's right.

2    Q.   Right?

3    A.   Yes, sir.

4    Q.   And we just reviewed what it said.  Can you tell me as a

02:11   5    matter of absolute historical fact that say quote:  No amounts

6    have been reported as an approval has not been granted close

7    quote.  Anybody try to get approval as of this date?

8    A.   I am not aware that they did.

9    Q.   I want to skip number 9 for a moment and go to tab ten.

02:12   10   Then we'll go backwards to nine.  Are you looking at tab ten?

11   A.   Yes, sir.

12   Q.   This is yet another example of tangible documentary

13   evidence of what the Bank Board discussed.

14        MR. JACOBS:  38, Plaintiff's Exhibit 38.  Okay.

02:12   15   Fine.

16   Q.   November 20, 2007, Board of Directors meeting Commerce

17   Bancorp, Inc, November 20, 2007.  Look at topic heading five

18   on the third page.

19        MR. JACOBS:  Bigger, please?  Clear.

02:13   20   Q.   Which reads quote:  The Board was advised of the meeting

21   had with the attorneys for Vernon Hill and InterArch on

22   October 26, 2007 in Washington, D.C.  the Board was advised

23   that the OCC directed Commerce to deal directly with the

24   Federal Reserve Board and the FDIC on the issues of Vernon

02:13   25   Hill's separation claims.  Am I right so far?

1   A.   Yes.

2   Q.   Now I'm going to continue reading this quote.  Quote:

3   The Board approved the motion authorizing a request to be made

4   to the Federal Reserve Board and the FDIC for authorization of

02:13   5   any separation payments to Vernon Hill close quote.  Did I

6   read that right?

7   A.   Yes.

8   Q.   That is November 20, 2007.  Right?

9   A.   Yes.

02:13   10   Q.   Now I am showing you yet another example, tangible

11   documentary evidence of the Board of Directors of the Bank

12   passing a resolution to apply for regulatory approval to pay

13   for -- to pay Vernon.  Isn't that what it is?

14   A.   Yes.

02:14   15   Q.   Can you explain why they didn't do that, why the Board,

16   the Commerce Board of Directors resolution was not followed?

17   A.   I can't explain it.  I wasn't here.  It also says open

18   quote:  Director Giordano also requested that Solomon and

19   Cromwell provide a legal opinion to the Board prior to any

02:14   20   payments being made to Vernon Hill close quote.  So, I can

21   speculate that maybe he gave an opinion that suggested they

22   should not make that payment.

23   Q.   Do you have any evidence that is so?

24   A.   No.

02:14   25   Q.   Do you have any evidence that the legal opinions somehow

1    overrode this Board resolution to make the application?

2    A.   I -- well the Director requested the legal opinion.

3    Q.   Right.

4    A.   So I don't know myself.

02:15    5    Q.   Go back to tab 9 which is about a month later.

6    December 18, 2007.  This was -- this is another set of Board

7    of Directors minutes.  Meeting minutes.  In topic heading

8    seven quote:  The Board was also briefed by legal counsel on

9    the status of the negotiations with the attorneys for Vernon

02:15    10   Hill and InterArch on the issues of Vernon Hill's separation

11   payment claims and InterArch's transition.  The Board was

12   advised of the meeting with the Federal Reserve, FDIC in

13   Washington, D.C.  on the issues of Vernon Hill's separation

14   payment claims.  The Board approved a motion authorizing

02:15    15   settlement Cromwell to negotiate appropriate releases subject

16   to regulatory approvals with Vernon and InterArch close quote.

17       What does that do to your recently espoused theory that

18   these lawyers said you can't do it?

19   A.   I didn't say they said they can't do it.  I was -- I was

02:16    20   --

21   Q.   You were speculating?

22   A.   I was speculating.

23   Q.   Okay.  Well let's end the speculation.  When you see this

24   resolution a month later says quote:  Prepare releases close

02:16    25   quote.  Right?

1    A.    Subject to regulatory approvals.

2    Q.    Right.  Nothing in this one that says we changed our

3    mind.  Don't apply for regulatory approvals, is there?

4    A.    No.

02:16    5    Q.    Is there any Board of Directors meeting minutes that you

6    have seen or heard about which countermands what the Board

7    decided to do on November 20th and December 18, 2007, which is

8    to make regulatory approval application to pay Vernon Hill?

9    A.    No.

02:16    10    Q.    Tab 33.  Your April 23, 2012 letter.

11    A.    Yes.

12          MR. JACOBS:  That's D-55.

13    Q.    Prepared by a lawyer signed by you, that letter.  Once

14    you had that letter, did you present it to the Board of

02:17    15    Directors of the Bank?

16    A.    No.

17    Q.    Did anybody present it to the Board of Directors of the

18    Bank?

19    A.    I'm not aware that anyone did.

02:17    20    Q.    Did you ever discuss it Bharat Masrani?

21    A.    No.

22    Q.    All right.  Let's go back where we left off.  I was about

23    to start with Exhibit 12.  If you would be kind enough to look

24    at it, you will see it is a July 9, 2002 memo from Mr. Hill to

02:17    25    the Board of Directors of Commerce Bank.  Do you see that?

```
 1    A.   Yes.

 2              MR. JACOBS:  Judge, bear with me one moment.

 3              MR. TAMBUSSI:  It's not in evidence, Judge.

 4              MR. JACOBS:  That's what I'm checking.  All right.

 5    All right, it's not marked yet.  I will not put it on the

 6    screen.

 7              THE COURT:  Okay.

 8    Q.   If you would be kind enough to look at, you will see it's

 9    July 9, 2002 memo from Mr. Hill to the Board of Directors of

10    Commerce Bancorp.  Do you see that?

11    A.   Yes.

12    Q.   Now, have you ever seen this before?

13    A.   No.

14    Q.   If you would look at the top of the page, top of page

15    two, the first sentence you will see the words quote:  To

16    avoid any perception issue, I, therefore, propose to sever my

17    relationship with will portion of Site Development Group that

18    does business with Commerce as of July 30, 2002 close quote.

19    And then it goes on to address real estate development,

20    development approvals, real estate leases and so on.

21    A.   Yes.

22    Q.   Were you aware that approximately five years before the

23    June 28, 2007 Consent Order Mr. Hill had severed his

24    relationship with the real estate company doing business with

25    Commerce Bank.  You know that?
```

1   A.   I was not aware.

2   Q.   And this December 14, 2006 Bono memo which is tab 13.

3   Have you -- had you seen that before you signed the April 23,

4   2012 letter?

02:19   5   A.   No.

6   Q.   Now if you look at the second page of this memo, you will

7   see a statement under quote prior examinations close quote

8   which says quote:  Prior OCC and FRS examinations of insider

9   transactions in 2002, 2003, 2004, 2005.  I'm sorry.  2006

02:19   10   resulted in confidential non-public reports that find that the

11   insider transaction comply with governing regulations and

12   regulatory guidance.  And then it goes on referring to two

13   minor 2006 known credit violations.  You see all that?

14   A.   Yes.

02:20   15   Q.   And then he lists, he lists the examinations under that,

16   doesn't he?

17   A.   Yes.

18   Q.   All right.  Now before you signed the April 23, 2012,

19   letter prepared by the lawyer, did anyone make available to

02:20   20   you this document and documents like this indicating whether

21   the Bank had made disclosures whether the Bank had

22   investigated things?  Was any of this stuff we've been talking

23   about reviewed by you?  Was anything at all reviewed by you

24   before you signed that April 23, 2012 document?  Did anybody

02:20   25   provide you with a packet of historical Bank data, things like

|   | |
|---|---|
| 1 | the SLC report, things like this 10Q or the 10K we looked at? |
| 2 | Any of that stuff? |
| 3 | A.   No.  I did not look at any historical data. |
| 4 | Q.   None of the Bank resolutions? |
| 5 | A.   No. |
| 6 | Q.   Authorizing payment, an application for regulatory |
| 7 | approval?  None of that? |
| 8 | A.   No.  That is right. |
| 9 | Q.   All right.  We're going to at least temporarily skip tab |
| 10 | 14.  I'm going to ask you to turn to 15 which has an A, B and |
| 11 | C and we'll, of course, start with A which you will see as is |
| 12 | a proxy statement and it refers to a shareholders' meeting of |
| 13 | May 17, 2005.  Do you see that? |
| 14 | A.   Yes. |
| 15 | Q.   And you know what this is, right? |
| 16 | A.   Yes. |
| 17 | Q.   Okay.  It is Commerce Bancorp proxy statement, May 17, |
| 18 | 2005.  And if you will turn past the cover page, we've |
| 19 | excerpted page 27.  Are you there? |
| 20 | A.   On page 24? |
| 21 | Q.   No. It should be 27.  The shareholders -- |
| 22 | A.   Oh, your page 27, yeah. |
| 23 | Q.   Are you there? |
| 24 | A.   Yes. |
| 25 | Q.   Okay.  If you'll be kind enough to go one, two three, |

Timestamps in left margin: 02:20 (line 5), 02:21 (line 10), 02:21 (line 15), 02:21 (line 20), 02:21 (line 25)

1   four, five.  Paragraph five?

2   A.   Okay.

3   Q.   I see this language.  Quote:  Bancorp leases the land on

4   which it has constructed 17 branch offices from limited

02:22   5   partnerships in which Mr. Hill is a partner or in which a

6   corporation owned by Mr. Hill is a partner or from the Hill

7   family trust under separate operating lease agreements with

8   purchase options.  And then it goes on to -- then it states

9   the annual rents would be 1.3 million dollars.  Do you see

02:22   10   that?

11   A.   Yes, sir.

12   Q.   Okay.  And in the next paragraph you see this language.

13   Quote:  Management believes that the rental paid for each of

14   these foregoing leases is and was comparable to the rental

02:22   15   which would have been paid to non-affiliated parties in

16   similarly commercial transactions or similar locations.

17   Right?

18   A.   Yes, sir.

19   Q.   Right.  Now if you do some simple arithmetic, if there

02:22   20   are 17 branch offices and the total leases are 1.3 million

21   dollars, you can work out the annual rental for --

22   A.   Yes.

23   Q.   -- all of these?

24   A.   Yes.  Uh-huh.

02:23   25   Q.   So the numbers are all disclosed.  Right?

1    A.   Yes.

2    Q.   Now this is a 2005 document.  And you saw the 2002 memo

3    of Mr. Hill withdrawing from these companies.  Right?

4    A.   Yes.

02:23    5    Q.   So now you see that disclosures are a made even after he

6    has withdrawn.  Right?

7    A.   Yes.

8    Q.   So we know that we're talking about leases that were

9    entered into before mid 2002?

02:23   10    A.   Yes.

11    Q.   Before you signed the April 23, 2012 letter to the

12    Federal Reserve, did you study any of these SEC filings of

13    Commerce Bancorp to see what they had disclosed about real

14    estate transactions and what they had disclosed about

02:23   15    InterArch for how many years?

16    A.   No.

17    Q.   Within Tab 15 is another proxy statement for a meeting or

18    May 16, 2006.  If you look at page 34 right behind the cover

19    of--

02:23   20    A.   I'm sorry.  Where are you?

21    Q.   I am on Tab 15 which has an A, B, C.  We are on B.

22    A.   Sorry.  B. Okay.

23    Q.   We're on the B?

24    A.   Got you.

02:24   25    Q.   All right.  And if you turn past the cover, you will be

1  looking at on the top it says page 34, 45?

2  A.    Yes, sir.

3  Q.    And the fifth paragraph in reading quote:  Bancorp has

4  certain operating leases for land and Bank premises with the

02:24    5  related parties from 2002 and prior.

6  A.    Yes.

7  Q.    Right?  Now, remember what we are talking about, what we

8  were talking about earlier.  I showed you the 2002 memo where

9  Mr. Hill withdrew?

02:24   10  A.    Yes.

11  Q.    From the companies that leased or sold land to the Bank?

12  A.    Uh-huh, yes.

13  Q.    Right.  All but one of these leases are with limited

14  partnerships and in which Mr. Hill is a partner or in which a

02:24   15  corporation owned by Mr. Hill is a partner or from the Hill

16  family trust.  Then it goes on to represent the agreements are

17  at market rate and it gives the aggregate rental value of

18  1.9 million dollars.  Is that right?

19  A.    Yes, sir.

02:25   20  Q.    And following that is a statement.  Management believes

21  that the rental paid for each of them, of these foregoing

22  leases is and was comparable to the rental which would have

23  been paid to non-affiliated parties in similar commercial

24  transactions for similar locations.  Right?

02:25   25  A.    Yes.

1  Q.   All right.  You recognize this as another disclosure?

2  A.   Yes.

3  Q.   All right.  And this proxy statement for 2006 is almost

4  two years before the special litigation committee report in

02:25  5  February of 2008 which examined all these leases and found

6  them propitious to the bank.  Right?

7  A.   Yes.

8  Q.   And if we look at C, we'll see another proxy statement

9  May 15, 2007.  And if you turn two pages in, you will be at

02:25  10  page 49 of 57 where the fourth paragraph it is disclosed

11  quote:  Bancorp has 19 operating leases entered into during

12  2002 and prior for land and Bank premises with limited

13  partnerships in which Mr. Hill is a partner in which a

14  corporation owned by Mr. Hill is a partner or from the Hill

02:26  15  family trust.  And again it states the total of the leases of

16  1.9 million dollars annually.  So here the arithmetic is

17  simple.  Nineteen into that would be a hundred thousand

18  dollars a year, about.

19  A.   Yes.

02:26  20  Q.   8.3 or 8400 dollars per month per lease.  Right?

21  A.   Yes.

22  Q.   And it goes on to say in addition Bancorp has three

23  operating land leases entered into during 2004 and prior with

24  partnerships partially owned by family members and Mr. Hill

02:26  25  and there they put the figure at $372,000.00 annually?

```
 1   A.   Uh-huh.

 2   Q.   Right?

 3   A.   Yes.

 4   Q.   Now you will recall from tab 22 the Consent Order that

02:26   5   that the very focus of the OCC's concern was these related

 6   party real estate transactions.  Right?

 7   A.   Yes.  Yes.

 8   Q.   You see a series of documents I've shown you, the Bono

 9   memo, the 2002 withdrawal memo.  These proxy statements.  You

02:27   10   didn't have any of this when you signed the April 23, 2012,

 11   letter, did you?

 12   A.   No.

 13   Q.   So you didn't know that there was full disclosure of all

 14   this and that Mr. Hill had withdrawn years earlier, did you?

02:27   15   You didn't know any of these things, did you?

 16   A.   No.

 17   Q.   Did it ever occur to you before you signed that letter,

 18   that maybe since you were putting your signatures on

 19   something, you should do some independent review of the

02:27   20   documents and the facts?

 21   A.   No.

 22   Q.   Now I want to make sure we have absolutely no

 23   misunderstanding on one topic. And if we don't, we can

 24   conserve some time because there's lot of exhibits left.  I

02:27   25   asked you before the lunch break whether this letter that you
```

1   signed on April 23, 2012 contained all the information you

2   were relying upon to tell the Federal Reserve why you say the

3   Board could not file the necessary certification.  And an hour

4   two ago you said, I asked you, did it contain a hundred

02:28      5   percent.  An hour or two ago you said yes it did.  Is that

6   still your answer?

7   A.   Yes.

8   Q.   Okay.  Now, have you seen any application to the OCC for

9   permission to pay Vernon Hill which was filed on or before

02:28     10   February 5, 2010?

11   A.   No.

12   Q.   And although this sentence is not crystal clear, have you

13   seen any application to pay Vernon Hill filed with the Federal

14   Reserve or FDIC by or before February 5, 2010?

02:28     15   A.   No.

16   Q.   Have you ever heard this before I pointed it out to you

17   that there was an application to pay Mr. Hill before or by or

18   before February 5, 2010?

19   A.   No.

02:29     20   Q.   All right.  The point being and I have now shown you

21   three exhibits here.  When you wrote that -- I'm sorry.  When

22   you signed that April 23, 2012 letter.  What I'm trying to

23   establish here is that you had no information in front of you

24   regarding the historical financial performance or growth of

02:29     25   Commerce Bank.  Is that right?

```
 1   A.   That is right.

 2   Q.   So you had no idea how healthy Commerce Bank was or how

 3   rapidly its stock price or assets or earnings were increasing,

 4   did you?

 5   A.   No.

 6   Q.   Yet in this letter, which is tab, D-55 again, please.

 7   Last paragraph, please.  Yet this letter which is tab 33 on

 8   page two the final paragraph on page two, we will find the

 9   language prepared by a lawyer for the Bank that it could be

10   inferred that the deficiencies in Mr. Hill's management of

11   Commerce Bank's business materially contributed to Commerce's

12   financial difficulties.  Right?

13   A.   Yes.

14   Q.   And that was without benefit of any financial data in

15   front of you and you signed the letter.

16   A.   Yes.

17   Q.   Doesn't this letter say that the Board of Directors can't

18   provide the necessary certification?  Doesn't it say that?

19   A.   Yes.

20   Q.   Okay.  Now you recognize from having read the regulation

21   35.4, the certification is a necessary ingredient.  Right?

22   A.   Yes, sir.

23   Q.   And this letter plainly says that the Board cannot

24   provide the necessary certification.  And you know that means

25   that you can't apply for payment.  Right?
```

02:29 (line 5)
02:30 (line 10)
02:30 (line 15)
02:30 (line 20)
02:30 (line 25)

1    A.    Yes.

2    Q.    Your letter or the lawyer's letter which you signed

3    plainly says that the Board of Directors cannot in good faith

4    provide the certification necessary for regulatory approval.

02:31    5    Right?

6    A.    Yes.

7    Q.    And you signed that letter full well knowing that the

8    Board of Directors was never presented with the opportunity to

9    discuss and vote on this.  They never discussed and voted on

02:31   10    this letter, did they?

11    A.    No.

12    Q.    I'm glad you brought that up.  They also never discussed

13    and voted on whether they could provide the necessary

14    certification?

02:31   15    A.    Not that I'm aware of.

16    Q.    Okay.  The only time that the Board of Directors of the

17    Bank, and again Bank means Commerce or TD or any of their

18    names, did vote and discuss this was November 20, 2007 when

19    they passed a resolution saying to apply for regulatory

02:31   20    approval.  Right?

21    A.    And as I'm recalling, subject to regulations.

22    Q.    That's what I just said.

23    A.    You said --

24    Q.    To apply for regulatory --

02:31   25    A.    Okay.  Fine.

1   Q.   -- approval to make payment.

2   A.   Yeah.

3   Q.   November 20, 2007, you looked at the exhibit.

4   A.   Yes.

5   Q.   Right?  There is a Board resolution saying make the

6   application.  Right?

7   A.   Yes.

8   Q.   And there is no Board resolution you can produce taking

9   that back, reversing that, is there?

10   A.   No.

11   Q.   And this letter again was never approved by the Board of

12   Directors of Commerce or TD or anybody else, was it?

13   A.   No.

14   Q.   It was prepared by a lawyer and you signed it?

15   A.   That is right.

16   Q.   Who asked you to sign this letter?

17   A.   I discussed signing this letter with counsel from Brown

18   Connery and our TD counsel was also involved.

19   Q.   They both told you to sign it?

20   A.   Yes.

21   Q.   Are the words that are used in a document such as, the

22   one at tab 23, the stipulation and Consent Order ones that are

23   simply cut and pasted as boiler plate?

24   A.   I would say the form of this is boiler plate, but then,

25   of course, the facts and circumstances would be specific to

1  the Bank.

2  Q.   In the second whereas clause where it indicates the

3  comptroller finds and the respondent neither admits nor

4  denies.  Is there a particular significance attributed to the

)2:33    5  word find there?

6  A.   Open quote:  The comptroller finds close quote.  I would

7  say the comptroller, that indicates that the comptroller

8  finds, concludes, has decided.  That is what the word finds

9  means.

)2:33   10  Q.   You for hours have relied on this Exhibit 23 which is the

11  November 17, 2008 --

12  A.   Yes, sir.

13  Q.   -- Consent Order and particularly the word finds?

14  A.   Yes.

)2:33   15  Q.   Okay.

16  A.   Yes.

17  Q.   Now let me ask you a couple of questions on this.  First,

18  you are by no means an expert in Golden Parachute practice,

19  are you?

)2:33   20  A.   I am not.

21  Q.   Your only acquaintance with it seems to be you were at

22  one or two seminars where it came up?

23  A.   Meetings.

24  Q.   One or two meetings where it came up.  Right?

)2:33   25  A.   Yes.

1    Q.   Second, do you still agree as you did this morning that

2    the focus of this exhibit, 23, the November 17, 2008 Consent

3    Order is real estate purchases, leases and joint real estate

4    development transactions involving the Bank?

)2:34    5    A.   Yes.

6    Q.   You've never -- you acknowledgment the existence of the

7    special litigation report on that very topic?

8    A.   You have explained it to me.

9    Q.   Yes.

)2:34    10    A.   Yes.

11    Q.   Now the facts of this case are that when you were asked

12    to affix your signature to the April 23, 2012 letter, nobody

13    put on your desk a copy of the February 8, 2008 special

14    litigation committee report and said, read what the Bank's own

)2:34    15    committee had to say about these very same real estate and

16    lease transactions.  Nobody did that, did they?

17    A.   No.

18    Q.   Are you a fair minded person?

19    A.   Yes.

)2:34    20    Q.   If you had read the special litigation committee's report

21    and if you had said, if it said these leases, these

22    transactions were all favorable to the Bank, would you have

23    taken that into consideration when you -- before you signed

24    this letter?

)2:34    25    A.   I would have signed the letter.  Open quote:  The Bank's

1  regulator finds and Respondent neither admits to or denies

2  that Respondent engaged in unsafe and unsound practices close

3  quote.  That is a conclusion by the Bank's regulator.

4  Q.  If you had in front you the Bank's own one year special

5  litigation committee report saying the same real estate

6  transactions are fine for the Bank, they're favorable to the

7  Bank, what would you have done, just ignore it?

8  A.  I would have still signed the letter.

9  Q.  So you would have ignored it?

10  A.  Yes.

11  Q.  Okay.  All right.  So the part of the regulation which

12  deals with a good faith analysis of all the material at your

13  disposal, that wouldn't mean to you that have to look at the

14  whole picture, including the special litigation committee

15  report.  You would just ignore it?

16  A.  With a Consent Order that says this, I would still have

17  signed what I signed and I would have and I would still

18  represent that the Bank could not make an attestation under

19  part 359 given the findings of the OCC.

20  Q.  You would have -- you would still have signed the letter

21  relying on the November 17, 2008 Consent Order even in the

22  face of contradictory evidence generated by the Bank itself.

23  Right?

24  A.  Yes.

25  Q.  And I heard you say minutes ago that your experience, the

1   OCC would be flabbergasted by a Golden Parachute application.

2   Do you remember saying that?

3   A.   Yes.

4   Q.   Well you proved you are not an expert.  You don't make

5   Golden Parachute applications to the OCC, do you?

6   A.   No.

7   Q.   Well, do you actually think the CEO of a 450 branch Bank

8   would be filling out branch applications?

9   A.   Probably not.

10  Q.   Has it occurred to you that it might be a subordinate

11  lower on the food chain who thinks he may have done something

12  wrong?

13  A.   Could have been.

14       MR. JACOBS:  Judge, that concludes the reading of the

15  testimony of Mr. Pollock on March 8.

16       THE COURT:  Okay.  We're going to break now for lunch

17  for an hour.  We're going to hear some testimony when you get

18  back from lunch.  Please don't discuss the case or do any

19  research and we'll see you back.  Thank you.

20       THE DEPUTY COURT CLERK:  All rise.

21       (Jury leaves the courtroom)

22       MR. JACOBS:  Judge, I want to wait for the jurors to

23  leave.  Can we remove some exhibits?

24       THE COURT:  Sure.

25       MR. JACOBS:  Eric, do you have a list?

1          MR. LUBIN:  Yes, I do.

2          THE COURT:  Is Mr. Tambussi going to object to any?

3          MR. TAMBUSSI:  I don't know.

4          MR. JACOBS:  Well --

02:37   5          THE COURT:  You can move for them by consent if you

6     want to.

7          MR. JACOBS:  Well, I want go over them with him

8     first.

9          THE COURT:  How many do you have?

02:38  10          MR. JACOBS:  Looks like about 12 or 15.

11          THE COURT:  Go ahead.  What are the numbers?

12          MR. JACOBS:  All right.  Well these are -- okay.

13     These are from the Lloyd deposition testimony which was read

14     in as part of the record.  P-25 is a Commerce 10Q, June 30,

02:38  15     2007.  He was questioned about that.

16          MR. TAMBUSSI:  No objection, Judge.

17          THE COURT:  Twenty-five is received in evidence.

18     (PLAINTIFF EXHIBIT 25 WAS RECEIVED IN EVIDENCE)

19          MR. JACOBS:  Are you writing this down?  Okay.  P-20

02:38  20     is the December 31st.  We're still on Lloyd, December 31, 2007

21     10Q.

22          THE COURT:  Any objection?

23          MR. TAMBUSSI:  No objection.

24          THE COURT:  P-20 is received in evidence.

02:38  25     (PLAINTIFF EXHIBIT 20 WAS RECEIVED IN EVIDENCE)

1          MR. JACOBS:  P-51 is the December 14, 2006 Bono memo.

2          MR. TAMBUSSI:  Objection.

3          THE COURT:  I didn't hear you, Mr. Tambussi.

4          MR. TAMBUSSI:  Judge, objection.  I'm sorry.  Number

02:39   5  one, Judge, that's an attorney-client privilege document that

6  the Bank has not waived the privilege on.  Number two, there's

7  we identified the objections in the Pretrial Order.  We've

8  also indicated that there's a relevance objection on it.  What

9  Mr. Bono's interpretations of the findings are not relevant

02:39  10  here particularly since -- in fact they can't be authenticated

11  by Mr. Bono because he's not going to be here.

12          THE COURT:  May I see the document?

13          MR. JACOBS:  Yes.  Mr. Bono was general counsel and

14  he circulated this memo to all members of the Board and of

02:39  15  Bancorp and NA and to Mr. Hill.

16          THE COURT:  What do you say is the relevance of it?

17          MR. JACOBS:  The relevance of it, it's documentary

18  evidence from the records of Commerce Bank that there have

19  been prior examinations by the Federal Reserve and the OCC of

02:40  20  insider transactions.  Disclosures and examinations with

21  positive findings.  Positive in the sense that they complied

22  with the laws and regulations governing insider transactions.

23          MR. TAMBUSSI:  Well, it's duplicative testimony

24  that's already in the record.

02:40  25          THE COURT:  We had this testimony.

1          MR. JACOBS:  Well there's a difference between

2     testimony and documentary evidence.  You know documentary

3     evidence the jury can have in the jury room.  And it confirms

4     what the witnesses have said.  Witnesses can say anything.

02:40   5     This is seven year old documentation that is so.

6          THE COURT:  I think you asked him specifically as to

7     this document what it says.  But anyway.  What's the

8     attorney/client privilege?

9          MR. TAMBUSSI:  Well, we didn't waive the privilege.

02:40  10     Mr. Bono, the privilege continues with the Bank.  Mr. Hill

11     doesn't get to carry that privilege to this document.  We

12     never waived the privilege as to this document.

13          MR. JACOBS:  Judge, at a trial I don't think the Bank

14     can keep us from using exhibits based on a attorney/client

02:40  15     privilege especially in a document that's been disclosed to us

16     and in discovery and the document sent to Mr. Hill.

17          MR. TAMBUSSI:  We didn't disclose that document.  We

18     didn't produce that document.  They had that document.  Mr.

19     Hill had that document.

02:41  20          MR. JACOBS:  Okay.  Well if Mr. Hill had it, I think

21     Mr. Hill can use.  It was addressed to him.

22          THE COURT:  Then you don't -- attorney-client

23     privilege extends to a trial, unless it's been waived.

24     According to one of the exception clauses.

02:41  25          MR. JACOBS:  Well, I think an exception is that it's

1  circulated to Mr. Hill, among others.

2          THE COURT:  Well --

3          MR. JACOBS:  We also used it in testimony of Lloyd

4  without objection.

02:41   5          THE COURT:  This is advice by an attorney to the

6  Board.  Correct?

7          MR. JACOBS:  No, I wouldn't call it advice.  He's

8  just telling them historical information.  He's just

9  summarizing four prior examinations.  There's nothing advising

02:41  10  them of anything.

11          MR. TAMBUSSI:  Judge, <u>Commodities Futures Trading</u>

12  <u>Commission versus Weintraub</u>, 471 U.S., 343, 1985 clearly makes

13  this a document that there's attorney/client privilege.  That

14  privilege extends to -- it's held by TD Bank as its successor

02:42  15  to Commerce.  Mr. Bono is not going to be here.

16          THE COURT:  I'm not taking issue with any of that.

17  Mr. Jacobs' point now is that there are portions position this

18  document that have nothing to do with legal advice or seeking

19  legal advice.  They're stating facts, merely stating facts.

02:42  20          MR. TAMBUSSI:  I disagree with that.

21          THE COURT:  I don't know.  This is the first time

22  I've seen this, folks.

23          MR. TAMBUSSI:  I'm just trying to put some statements

24  on the record, Judge.  The fact of the matter is that Mr. Bono

02:42  25  makes certain interpretations based on his review which is

1    attorney work product.  It's a work product that belongs to TD

2    Bank.  Whole the U.S. holding is a successor to Commerce

3    Bancorp.

4         THE COURT:  Well, this is a report by the attorney to

5    the Board as to pending investigations.  Clearly some of this

6    clearly is work product.  So it's clearly is reporting to the

7    Bank the attorney's opinions about certain things.  Lawsuit,

8    things of that nature.

9         MR. JACOBS:  Those aren't the parts that I used,

10   Judge.  When Mr. Hill testifies, he is entitled to say that

11   there had been prior examinations.

12        THE COURT:  Sure.

13        MR. JACOBS:  This is a summary of them and they had

14   counsel representing the Bank in these prior examinations and

15   here is a documentary example of these examinations having

16   been conducted and the Bank having done well.

17        THE COURT:  I take issue with your last part of your

18   statement.  I think he can testify as to anything he has

19   personal knowledge of.  He can't testify as to something for

20   which attorney/privilege has not been waived.

21        MR. JACOBS:  Well, Judge, how does the

22   attorney/client privilege apply to the historical summary of

23   prior examinations and the results?  That's not anything

24   approaching advice.  The attorney/privilege applies to

25   communications which are --

1              THE COURT:  For the purpose of seeking or giving

2    legal advice.

3              MR. JACOBS:  This is --

4              THE COURT:  If the attorney is reporting to the Board

02:44    5    what his or her advice is on certain pending matters, that's

6    attorney/client privilege classic.

7              MR. JACOBS:  These aren't pending matters.  These go

8    back several years as of the date that's written.

9              THE COURT:  Some of them seem to be from my review of

02:45   10    them.

11              MR. JACOBS:  There's a summary in investigations --

12    I'm sorry.  Of examinations.

13              THE COURT:  All you want is the paragraph on prior

14    examinations.

02:45   15              MR. JACOBS:  That's what I'm looking for.

16              THE COURT:  He can testify because obviously those

17    are things --

18              MR. JACOBS:  He can, Judge, but --

19              THE COURT:  He can't testify to what counsel told him

02:45   20    about it.

21              MR. JACOBS:  But, Judge --

22              THE COURT:  I don't know why he would need to.  He

23    has personal knowledge as Chairman of the Board.  02, 03, 04

24    and 06, OCC and FRS did examinations and the Bank came out

02:45   25    fine on whatever the result was.  He has personal knowledge, I

1    assume.

2         MR. JACOBS:  Well, Judge, personal knowledge is one

3    species of evidence.  A document confirming that what he is

4    saying is accurate, it's another species of evidence.  We have

02:46    5    a right to present our case, you know, in a meaningful way and

6    part of it is a document which is a helpful summary of prior

7    examinations.

8         THE COURT:  I'm going to sustain the objection.  I do

9    find that portions of that document are covered by the

02:46   10    privilege.  It has not -- you haven't demonstrated it's been

11    waived.  So the objection is sustained as to P-51.

12         MR. JACOBS:  The next one is P-73 which are the

13    May 17, 2005 proxy statements.  That's P-73A.

14         THE COURT:  Any objection?

02:46   15         MR. TAMBUSSI:  No objection.

16         THE COURT:  P-73 is received in evidence.

17    (PLAINTIFF EXHIBIT 73 WAS RECEIVED IN EVIDENCE)

18         MR. JACOBS:  P-50 is the July 9, 2002 Vernon Hill

19    memo regarding withdrawing from site development business with

02:46   20    Commerce.

21         MR. TAMBUSSI:  No objection.

22         THE COURT:  That will be received in evidence P-50.

23    (PLAINTIFF EXHIBIT 50 WAS RECEIVED IN EVIDENCE)

24         MR. JACOBS:  P-73 B and C.  By the way, I'm now on

02:47   25    Pauls.  P-73 B and C are proxy statements.

```
 1              MR. TAMBUSSI:  P-73 was --

 2              MR. JACOBS:  No, I did A.  A was Lloyd.

 3              THE COURT:  You didn't say A.  You said P-73.  You

 4    want all of 73.

 5              MR. JACOBS:  I thought I said A, but be that as it

 6    may.  Yes between Lloyd and Pauls they discuss A B and C.

 7              MR. TAMBUSSI:  No objection.

 8              THE COURT:  All of P-73A, A, B and C are admitted

 9    into evidence.

10    (PLAINTIFF EXHIBITS 73 A, B C WERE RECEIVED IN EVIDENCE)

11              MR. JACOBS:  P-52 is --

12              THE COURT:  SEC files?

13              MR. JACOBS:  Yes.  P-52, yeah.  Okay.  The next four

14    entries are all -- I see.  I'm sorry.  P-52 different dates.

15    I'm sorry.  There are 8K's dated June 29, 2007, June 11, 2007,

16    July 24, 2007, October 20, 2007, and January 28, 2008.

17              MR. TAMBUSSI:  No objection.

18              THE COURT:  All right.

19              MR. JACOBS:  We're now to --

20              THE COURT:  Excuse me one second.  The list we got

21    has and the P-52?  Plaintiff's 52?

22              MR. JACOBS:  Yes.

23              THE COURT:  That's the SEC filing from 1993 to

24    through 2007, but that's not what you're proffering.  You just

25    have 2007, 2008 now.  Correct?
```

1          MR. JACOBS:  Five of them.

2          THE COURT:  Okay.  Those five are admitted in

3    evidence.

4    (PLAINTIFF EXHIBIT 52 WAS RECEIVED IN EVIDENCE)

02:48    5          MR. JACOBS:  From the DiFlorio video testimony.  P-2

6    is the February 14, 2007 memo.

7          MR. TAMBUSSI:  Judge, can I -- I just want to look at

8    that document for a minute.

9          Can I show you the document, Judge?

02:49    10              (Hands up document)

11          MR. TAMBUSSI:  Judge, the objection to P-2 is a

12   relevance objection.  This talks about -- it's a February 14,

13   2007, email, memo, I'm sorry, from Dennis DiFlorio to Mr.

14   Bershad who is chairman of the Nominating Governance Committee

02:49    15   and talks about the rates charged by InterArch to the bank, we

16   really didn't have significant testimony, barely any on that.

17   And this document particularly refers to the negotiation of

18   the price reduction for InterArch for which we've had no

19   testimony.

02:50    20          MR. JACOBS:  We've had testimony about this memo.

21   Mr. DiFlorio said he authored it, he stands by it, he fully

22   identified it.  I don't know what more you need to

23   authenticate a document.  He said --

24          THE COURT:  The objection is not authenticity, the

02:50    25   objection is relevance.

1       MR. JACOBS:  The relevance is a big part of the

2  defense here is, according to the bank, they can't provide the

3  necessary application for regulatory approval in part because

4  of Commerce's dealing with InterArch.  Here is a witness who

02:50      5  said he supported InterArch.

6       THE COURT:  We are not talking about that.  We're

7  arguing about the price negotiation.  What's the relevance of

8  that?

9       MR. JACOBS:  It's part of the reason he supported

02:50     10  InterArch, that InterArch was good for the bank.  I asked did

11  they deliver a good product at a good price in a timely way.

12  As to timely, he said most of the time.  Now, he wrote it, he

13  stands by it, it explains why he went to Washington, to try to

14  convince them to change the Consent Order so that the bank

02:51     15  could continue its dealings with InterArch, he said they were

16  a big part of the development of the brand, and it explains

17  why the Commerce Board felt it was good to continue dealing

18  with InterArch.  And dealings with InterArch are cited by the

19  defense as reasons they can't certify it and here you have a

02:51     20  human being, member of the Board, saying dealings were

21  beneficial.

22       THE COURT:  Anything else you want to say?

23       MR. TAMBUSSI:  No.

24       THE COURT:  I'm going to overrule the objection, it

02:51     25  has some minimal relevance showing some witness believed that

1    the services were valuable and were given a good price.  So

2    that will be admitted into evidence.

3         (PLAINTIFF EXHIBIT P-2 WAS RECEIVED IN EVIDENCE)

4         MR. JACOBS:  P-74 is the conference call, there's

02:51    5    been testimony from this most recent witness regarding the

6    conference call, there was testimony from DiFlorio regarding

7    the conference call, and there will be testimony from Mr. Hill

8    regarding the conference call.

9         MR. TAMBUSSI:  Judge, with regard to that conference

02:52    10   call, there are references to a couple portions of the

11   conference call not in its entirety of the conference call.

12   That testimony is already in evidence and in fact those

13   portions have been read into evidence.  I don't know why the

14   entirety of the conference call should be put in evidence,

02:52    15   that wasn't the evidence that was admitted and put before the

16   jury.

17        MR. JACOBS:  These are statements by the defendant.

18   These are statements by a party opponent.

19        THE COURT:  I don't know what they are.  What is

02:52    20   this?  Who was on the conference call?

21        MR. JACOBS:  Bharat Masrani, Ed Clark, Bob Fleese,

22   and a couple other people.

23        MR. TAMBUSSI:  A lot of other people.

24        MR. JACOBS:  And there are multiple expressions,

02:52    25   multiple expressions by Masrani, by Ed Clark as to the

```
    1   strength, the vitality, viability of Commerce Bank, which they

    2   are just starting to acquire, and they express confidence that

    3   they will be able to continue their branch approval process

    4   and they say things directly contradicting the defense concept

02:53    5   that branch approvals were impaired or impeded.  This is all

    6   them talking.  For me to just select out the ten or 15 or 20

    7   things takes it all out of context.  I can make pretextual

    8   objections to this pile of stuff Mr. Tambussi moved yesterday

    9   and ask for all sorts of redactions for things that didn't

02:53   10   pertain to Mr. Hill.

   11        MR. TAMBUSSI:  May I approach, Judge, with the

   12   document?

   13             (Hands up document.)

   14        THE COURT:  Yes.

02:53   15        What is this.

   16        MR. TAMBUSSI:  This is the document, Judge, marked

   17   P-74, which is a TD Bank Financial Group conference call of

   18   Tuesday, October 2, 2007.  The document reflects there were

   19   corporate participants from TD and Commerce Bank and a whole

02:54   20   host of conference call participants, which were analysts from

   21   the financial world.  There is a lot of information provided

   22   in this, Judge, a lot of information that has zero relevance

   23   to this case.  A lot of information.  It has the ability to

   24   confuse the jury with issues that aren't before it.

02:54   25        THE COURT:  Well, like what, for instance?  I haven't
```

1    had a chance to read this.

2             MR. TAMBUSSI:  Well, my understanding of the proffer

3    of this document, Judge, is that it talks about -- the proffer

4    is for the fact that it had something to do with branch

02:54    5    openings.  And we heard the testimony with the Consent Order

6    was surgical and primarily limited to one person.  Here it is

7    talking to -- Mr. Clark is saying, number one, in introduction

8    talking about the success in Canada, talking about TD Bank

9    North investor, growth, how that was transforming itself.  It

02:55   10    talks about other deals that TD Bank North engaged in.  It

11    talks about the TD Canada Trust, which is another branch of TD

12    Bank.  Ms. Colleen Johnson of TD Bank Financial Group talks

13    about TD Bank's financial strength, talks about the earnings

14    of TD Bank, TD Bank North.  Mr. Masrani talks again, in

02:55   15    addition to Commerce, talks about what the TD Bank North

16    management team philosophy was.  They answer specific

17    questions, Judge, about restructuring on securities at

18    Commerce Bank, which is not part of this case.  They talk

19    about the loan portfolio, which is not part of this case.

02:56   20             Would you like me to keep continuing, Judge.

21             THE COURT:  No, I get the idea.

22             MR. JACOBS:  Judge, may I speak as the movant of the

23    exhibit?

24             THE COURT:  Sure.

02:56   25             MR. JACOBS:  The regulation 359.4 requires that a

1   payor bank such as TD step forward and say either we do or we

2   don't have information that a disqualifying act was committed

3   by the IAP which materially damaged the bank, that's another

4   element of it, you know, what effect did -- whatever they're

02:56   5   thinking Mr. Hill had done.

6        If you look the statements in the Commerce call, this

7   one by Mr. Clark, for example, "Commerce's performance has

8   been truly phenomenal."

9        THE COURT:  That's fine.  There's no argument with

02:57  10   that.

11        MR. JACOBS:  What is the argument?  How do I redact

12   this stuff out?

13        THE COURT:  You have all the other stuff about TD

14   Bank in there that has nothing to do with this case.

02:57  15        MR. JACOBS:  How is that harmful to the defense?

16        THE COURT:  I don't know.

17        MR. TAMBUSSI:  So the record is also clear, at the

18   very beginning there's a forward looking information

19   statement, again in October of 2007 TD Bank had not yet

02:57  20   acquired Commerce Bank so at the time the statement is made

21   they weren't even parties.

22        THE COURT:  Mr. Jacobs, I want you to go through and

23   isolate those things that are relevant to your claim in this

24   case and talk to Mr. Tambussi about those and perhaps you can

02:57  25   come to some agreement as to what portions of this the jury is

1    going to see.

2           MR. JACOBS:  All right, Judge, we'll pick through it.

3       75 is a set of charts and graphs used in the DiFlorio

4    testimony.

02:58   5           MR. TAMBUSSI:  Judge, these charts and graphs don't

6    show financial performance at the time of the investigation or

7    at the time that Mr. Hill was in fact terminated from his

8    employment.  And the relevance here is that we're showing

9    historical growth but not growth during the period of time

02:58   10   that the investigation commenced through the end of the graph

11   period, so for that reason we don't think that the graphs are

12   relevant.

13          THE COURT:  They have some relevance, and I'm sure

14   you'll take great pains to demonstrate and show the jury the

02:58   15   point that you're making.  I'm going to overrule the

16   objection.

17       (PLAINTIFF EXHIBIT P-75 WAS RECEIVED IN EVIDENCE)

18          MR. JACOBS:  P-39 is the February 2010 answer to

19   interrogatory number 24 that Mr. Fisher testified about

02:59   20   yesterday.

21          THE COURT:  P-39.

22          MR. TAMBUSSI:  Judge, if we're going to have an

23   interrogatory answer of that nature, and certainly we believe

24   that there needs to be a redaction or proposed redaction

02:59   25   because if it's simply the entire interrogatory answers,

          1    there's a whole lot of other --

          2          MR. JACOBS:  No, it's not, it's number 24.

          3          THE COURT:  He just wants the one.

          4          MR. JACOBS:  Number 24.

02:59     5          THE COURT:  He just wants number 24.

          6          MR. TAMBUSSI:  The document that we have, which has

          7    been identified, shows more than 24.

          8          MS. LEMING:  And what was shown to the jury on the

          9    screen was the full set of interrogatories and then zoomed in

02:59    10    on that one rog.  I just want to make sure what goes back to

         11    the jury is just that one interrogatory.

         12          MR. JACOBS:  I'm only moving number 24.

         13          THE COURT:  You're only moving 24.  Interrogatory

         14    answer 24 will be received in evidence.

02:59    15          (PLAINTIFF EXHIBIT P-39 WAS RECEIVED IN EVIDENCE)

         16          MR. JACOBS:  Lastly, Judge, I think the Fisher

         17    certification of February 1st was moved yesterday, but we're

         18    waiting on some objection to unsealing on 71, is that right?

         19          THE COURT:  We have to wait to hear.

03:00    20          MR. JACOBS:  So I'm moving it now.

         21          THE COURT:  All right.

         22          MR. JACOBS:  When 4:00 tomorrow rolls around, if

         23    there's no objection, you'll admit it?

         24          MR. TAMBUSSI:  5:00, Judge.

03:00    25          THE COURT:  5:00.

            1           MR. JACOBS:  5:00.

            2           THE COURT:  We'll know on Monday.

            3           MR. JACOBS:  Okay.  Judge, we will submit some

            4    redactions or something on 74 to Mr. Tambussi sometime

03:00       5    tomorrow.

            6           THE COURT:  We'll talk about it Monday if we have to.

            7    That was the -- was it the FDIC that objected or the Federal

            8    Reserve?

            9           MS. LEMING:  It was the FDIC, your Honor.

03:00      10           THE COURT:  Okay.  Anything else?

           11           MR. JACOBS:  That's it, Judge.

           12           MR. TAMBUSSI:  Do we get a fall hour for lunch?

           13           THE COURT:  How about 1:30, can you do that?

           14           MR. TAMBUSSI:  Yes.

03:01      15           THE COURT:  Thank you.

           16           (Luncheon recess.)

           17                (Afternoon Session)

           18                  (Open Court)

           19           DEPUTY CLERK:  All rise.

04:02      20           THE COURT:  How is everybody?  Are we ready?  Ready?

           21           MR. JACOBS:  Yes.  Judge, what time do you recess?

           22    Do you recess the normal time today?

           23           THE COURT:  4:30.

           24           MR. JACOBS:  Okay.

04:02      25           THE COURT:  Is that okay?

──── HILL - DIRECT - JACOBS ────

**1**        MR. JACOBS:  Yeah.

**2**        THE COURT:  I don't imagine we'll be done with the

**3**   witness at 4:30.

**4**        MR. JACOBS:  I don't think so.

04:02   **5**        THE COURT:  Are you going to be showing anything on

**6**   the screen with this witness?

**7**        MR. JACOBS:  Not immediately but, yes.

**8**        DEPUTY CLERK:  All rise.

**9**             (Jury Enters the Courtroom.)

04:03   **10**        THE COURT:  Thank you.  Have a seat, everybody.

**11**       Your next witness, please.

**12**        MR. JACOBS:  Judge, I would like to call Mr. Hill to

**13**   the stand.

**14**        THE COURT:  Mr. Hill, come on up here.

04:04   **15**       Good afternoon.

**16**       Would you raise your right hand.

**17**   (**VERNON W. HILL, II,** HAVING BEEN DULY SWORN AS A WITNESS,

**18**   TESTIFIED AS FOLLOWS:)

**19**   (DIRECT EXAMINATION OF VERNON W. HILL, II, BY MR. JACOBS)

04:04   **20**        THE COURT:  Your full name?

**21**        THE WITNESS:  Vernon W. Hill, II.

**22**        THE COURT:  H-I-L-L?

**23**        THE WITNESS:  Correct.

**24**        THE COURT:  Thank you, Mr. Hill.  Have a seat, speak

04:04   **25**   into the microphone.

─────HILL - DIRECT - JACOBS─────

1    BY MR. JACOBS:

2    Q.   Mr. Hill, firstly, how old a gentleman are you?

3    A.   67.

4    Q.   Married?

04:04   5    A.   I am.

6    Q.   To?

7    A.   Children, yes.

8    Q.   No, I said to whom are you married.

9    A.   Shirley Hill.

04:04   10   Q.   And for how many years are you married to Shirley?

11   A.   40 years this December.

12   Q.   Now, Mr. Hill, were you the founder of Commerce Bank?

13   A.   Yes, sir, I was.

14   Q.   How does one found a bank?  Tell me about it.

04:04   15   A.   I worked in small banks while I was going to school at

16   Wharton.

17   Q.   What is Wharton?

18   A.   Wharton is the business school at Penn.  So I went to

19   Wharton and worked in banks part-time while I was going to

04:05   20   school at Wharton.  And when I got out, I went into real

21   estate development business, McDonald's was my first client.

22   I always wanted to do a bank, so in '72 I gathered a group of

23   folks together, we raised $1.5 million, we applied to the

24   state got a bank charter.

04:05   25   Q.   Mr. Hill, how old were you?

───── HILL - DIRECT - JACOBS ─────

**1**   A.   26 then, I think.

**2**   Q.   26 years old?

**3**   A.   Yes.  The bank opened in June of '73, I was --

**4**   Q.   Where was it?

04:05   **5**   A.   Marlton.  As a lot of people know, there was one other

**6**   office at the Marlton Circle.

**7**   Q.   What was it called?

**8**   A.   Commerce Bank.

**9**   Q.   Who made up the name?

04:05   **10**   A.   My wife and I.

**11**   Q.   Okay.  So what happened after that, you opened more

**12**   branches?

**13**   A.   The bank started, we opened with one office, a staff of

**14**   nine, and it was a very small bank.  And over the years I was

04:06   **15**   part-time at it, and over the more years became more full-time

**16**   at it.  And we grew the bank slowly, we added more stores.  We

**17**   called the branches stores.  And we learned to develop a

**18**   different banking model, one that said convenience and service

**19**   is the most important thing a bank can deliver.  And we grew

04:06   **20**   that model to 2007 our branch count was 400 and something.

**21**   Q.   Remember Mr. DiFlorio who testified on video a couple

**22**   days back?

**23**   A.   Yes.

**24**   Q.   Did he in fact come on board in 1988?

04:06   **25**   A.   I think that's right.

*United States District Court*
*Camden, New Jersey*

HILL - DIRECT - JACOBS

1  Q.  In 1988 about how many branches were there?

2  A.  25, I think.

3  Q.  Okay.  Now, according to Mr. DiFlorio a couple of days

4  ago, when he left 20 years later, there were about 450

04:06  5  branches, do you remember that?

6  A.  Yes, that's true.

7  Q.  All right.  So what would that difference be?  You're the

8  banker.

9  A.  I don't know.

04:07  10  Q.  425 difference?

11  A.  Yes.

12  Q.  Okay.  In a 25 year period?

13  A.  Yes.

14  Q.  I'm sorry, a 20 year period.

04:07  15  A.  A 20 year period, that's right.

16  Q.  So that would be about how many branches per year?

17  A.  The amount was going up each year, but generally we were

18  opening 20 to 30 new stores each year.

19  Q.  Now, what was it that you did to make Commerce Bank

04:07  20  different than your competitors?

21  A.  We saw ourselves as a nonbank.  We saw ourselves as a

22  growth retailer that devised this seven-day a week convenience

23  and service model.  We tried to be as nonbank as we could make

24  a bank.  So whatever the large banks did at the time, we tried

04:08  25  to do it in a better way.

HILL - DIRECT - JACOBS

1  Q.  Tell me some of the things.  We've heard mention of pens,

2  dog biscuits, dog bowls, late hours, Sundays.

3  A.  Those are all things that we did, but it was all built

4  around this model that the customer cared about convenience

04:08  5  and service and we were going to do whatever we could to

6  deliver the best in service and convenience, a seven-day a

7  week branch bank, and we had coin counting machines, we loved

8  dogs, all of this was to build a retailing brand.

9  Q.  Was Commerce different than other banks?

04:08  10  A.  Definitely.

11  Q.  Now, tell me about the Commerce look, what was it in the

12  '70s?

13  A.  When we started, in the first few years we were trying to

14  find our brand and look and we began to see ourselves as a

04:08  15  retailing company not a bank.  And I believe that great

16  retailers have great brands and the brands are about how you

17  service, how you deliver, and the look is very important.

18  Q.  Now, let's move over to your wife Shirley for a moment.

19  In the mid '70s did she start a business?

04:09  20  A.  Yes, she did.

21  Q.  What did she call it?

22  A.  InterArch.

23  Q.  And what did InterArch do?

24  A.  It did architecture and design.

04:09  25  Q.  Now, is Shirley about your age?

HILL - DIRECT - JACOBS

1    A.   I'm not allowed to say that.

2    Q.   I said about.

3    A.   Yes, she's about.

4    Q.   Okay.  This business she started in the mid '70s, tell me

5    about it, what did it do?

6    A.   Her firm --

7    Q.   Who did it employ and what did it do, that's what I mean.

8    A.   Architects.  Designers.  Brand people.  And one of the

9    things that was great about Commerce we integrated the parts

10   together, the building, the marketing, the branding, the look,

11   the service, and her firm not only did each part of that but

12   put all the parts together.  Great brands make all the parts

13   work together.

14   Q.   When did Shirley's company InterArch begin working for

15   Commerce Bank?

16   A.   '77 or eight or something like that.

17   Q.   And did Shirley's company InterArch work for Commerce

18   Bank through the '70s?

19   A.   Yeah, she worked from that period until 2007.

20   Q.   Through the '80's?

21   A.   '90's.

22   Q.   Through the '90's?

23   A.   Yes.

24   Q.   Right up to 2007?

25   A.   Correct.

*United States District Court*
*Camden, New Jersey*

1    Q.   All right.  And give us an idea of the things that

2    Shirley's company did to help develop the Commerce brand?

3    A.   The building.  The branding.  The marketing.  The

4    experience.  As I said, if you think about, there was a lot

04:10    5    written about Commerce as the apple of banking.  If you think

6    about us in that context of apple, they put all the parts

7    together and delivered a completely different experience and

8    that's what we did at Commerce.

9    Q.   Was there any other architectural and/or design firm able

04:11    10   to provide all the services to Commerce that InterArch did?

11   A.   Not that I'm aware of.

12   Q.   Now, did the Board of Directors of Commerce approve all

13   of the financial dealings between Commerce and InterArch?

14   A.   Yes.

04:11    15        MR. TAMBUSSI:  Objection.  Leading questions.

16   Perhaps maybe --

17        THE COURT:  They are leading.  Just rephrase them.

18        MR. JACOBS:  All right.

19   BY MR. JACOBS:

04:11    20   Q.   Who was in charge of the financial arrangements between

21   Commerce on the one hand and InterArch on the other?

22   A.   Certainly in the last ten years or plus she would make an

23   annual proposal to the bank.  The staff of the bank would

24   review the proposal, make a recommendation to the Board, and

04:11    25   the Board of Directors of the bank would approve it without me

─── HILL - DIRECT - JACOBS ───

1   being involved.

2   Q.   What was the level of satisfaction during those years of

3   the InterArch services?

4   A.   We never heard any issues.  We were -- she was an

5   essential part of making our model work and grow.

6   Q.   I'm going to show you an exhibit in evidence, which is

7   Plaintiff's Exhibit 2.

8        MR. JACOBS:  If we can get that on the screen.  If

9   you can please make it a bit bigger.

10  BY MR. JACOBS:

11  Q.   Do you see the date on this?  Happened to be Valentine's

12  Day 2007.

13  A.   Yes.

14  Q.   And do you recognize the name Jack Bershad?

15  A.   Yes.

16  Q.   What position did Mr. Bershad have in the bank?

17  A.   He was a Director Of The Bank and Chairman Of The

18  Governance Committee.

19  Q.   Do you recognize the name of Mr. DiFlorio there?

20  A.   Yes, I do.

21  Q.   And was he in fact President of Commerce Bank, N.A., back

22  then?

23  A.   I think so.

24  Q.   Okay.  Is the reference InterArch services?

25  A.   Yes.

─────── HILL - DIRECT - JACOBS ───────

1   Q.   Now, look at that second paragraph:  "InterArch continues

2   to provide outstanding creative support and design services

3   that is so tightly woven into brands positioning, truly

4   competitive advantage."

04:13   5        Was it?

6   A.   Absolutely.

7   Q.   Now, as of this date, 2007, about how many years was

8   InterArch doing Commerce work?

9   A.   20, 30 some years.

04:13   10   Q.   This next paragraph reads in part:  "InterArch, as a

11   result of John's negotiations, has proposed to again maintain

12   their existing hourly rates.  Goes on to say:  "They haven't

13   raised them in the last five years and they're expecting a 5

14   percent across the board discount."

04:14   15        So the question is did InterArch get any special deals

16   or preferences because you were married to Shirley?

17   A.   No, I would say the reverse is true.

18   Q.   The third paragraph -- I'm sorry.  The fourth paragraph

19   recites that "in the previous year InterArch --

04:14   20        I'm sorry.  "In the previous year InterArch did not

21   bill --

22        I'm sorry.  "In the previous year InterArch did not

23   bill for Shirley's personal services."

24        Is that right?

04:14   25   A.   Yes, it is.

--- HILL - DIRECT - JACOBS ---

1    Q.   Now, were things like that savings for --

2    A.   Of course.

3    Q.   For --

4    A.   Of course.

04:14    5    Q.   Now, Mr. Hill, did the bank periodically do any research

6    or have anybody do any research to make sure that the

7    financial arrangements with InterArch were competitive?

8    A.   They did.

9    Q.   All right.

04:15    10        MR. JACOBS:   Now, Judge, may I get on the screen for

11   the witness' consumption, because it's not in evidence yet,

12   but not the jury, number 8.

13        THE COURT:   Sure.  It just went up on the screen.

14        MR. TAMBUSSI:   There's an objection here, Judge, on

04:15    15   relevance grounds.

16        THE COURT:   We are not showing it to the jury yet.

17        MR. JACOBS:   We are not.  This IS the DiFlorio memo.

18        THE COURT:   Okay.  Can we put P-8 on the witness'

19   screen?

04:15    20        MR. TAMBUSSI:   We can't show the document on one

21   monitor, we can show it on all monitors or not.

22        THE COURT:   Do you have the paper?

23        MR. JACOBS:   Yeah.  May I just hand him a copy?

24        THE COURT:   You may.

04:16    25   BY MR. JACOBS:

HILL - DIRECT - JACOBS

1  Q.  Mr. Hill, I'm going to hand you a paper copy of

2  Plaintiff's Exhibit P-8.

3       MR. TAMBUSSI:  Judge, there's an objection to

4  relevance of this document.

5       THE COURT:  It's not moved into evidence yet, I don't

6  know what the purpose of this question is yet.

7  BY MR. JACOBS:

8  Q.  Do you recognize it?

9  A.  Give me a second here.

10      Yeah, this is an outside report reviewing the InterArch

11 services for the bank.

12 Q.  What year was it done?

13 A.  August of 2004.

14 Q.  And when you say it's an outside report, what exactly

15 does that mean?

16 A.  The bank hired an outside consultant to review the

17 relationships with the firm as to their scope and fees.

18 Q.  The relationship with the InterArch firm?

19 A.  Yes.

20 Q.  Okay.  And what was the name of that outside firm?

21 A.  Smart & Associates.

22 Q.  Smart & Associates?

23 A.  Yes.

24 Q.  All right.  And did they file this report?

25 A.  They filed it with the bank.

───────────── HILL - DIRECT - JACOBS ─────────────

1  Q.   Okay.  Have you read this report before today?

2  A.   I have, it's been a while.

3  Q.   And what is the general finding of this outside agency

4  Smart & Associates?

04:17   5        MR. TAMBUSSI:  Objection.

6        THE COURT:  Sidebar.

7        (Sidebar discussion.)

8        THE COURT:  I presume the answer is that Commerce is

9  getting a good deal from Shirley's company, is that where

04:18   10  you're going?

11        MR. JACOBS:  Competitive and better.

12        THE COURT:  What's the objection?

13        MR. TAMBUSSI:  It's P-8 is a 2004 document, a review

14  of InterArch's relationship as of 2004.  First of all, there's

04:18   15  no relevance to what's bearing on this case, number one.

16  Number two, it goes into duplicate testimony that everybody

17  was pleased with InterArch and her prior services.  Now,

18  frankly, this is a whole sideline, which would be a trial

19  within a trial, as to whether this report was done in a way

04:18   20  that was proper, in a way that showed competitive service,

21  whether or not people wanted to challenge this report, so on

22  and so forth.  We don't even need to get into the InterArch

23  stuff because we settled the InterArch.

24        THE COURT:  We settled the InterArch but InterArch is

04:19   25  an issue in this case because it's part of the OCC's

─── HILL - DIRECT - JACOBS ───

1    investigation and all that and it's part of what the bank

2    responded to when it decided it couldn't make this

3    certification.  I am concerned about 2004, though, the

4    timeline here doesn't work so well.

04:19    5         MR. JACOBS:  You can't do these things every day.

6    The question was did the bank periodically assess the

7    relationship between InterArch and the bank.  It was done in

8    2004.  It was done at other times also.

9         THE COURT:  What were the other times?

04:19   10         MR. JACOBS:  I'll ask the witness, I don't know what

11    the other times were.  But here is one example.  He is going

12    to testify, I believe, that the bank kept an eye on the

13    *bona fides* of all the dealings between the bank on the one

14    hand and InterArch on the other.

04:20   15         MR. TAMBUSSI:  Not by this report.

16         THE COURT:  If we go down this road, do you

17    understand the door you're opening?

18         MR. JACOBS:  I do, Judge, and it doesn't concern me

19    as long the bank is relying on the relationship between

04:20   20    Commerce and InterArch as a reason that they can't file a

21    golden parachute application.  I have to show the jury that

22    the reliance is misplaced, that the relationship between the

23    two was a, you know, above the table, you know, arms length

24    set of transactions.

04:20   25         MR. TAMBUSSI:  Judge, the bank's issue with InterArch

─────── HILL - DIRECT - JACOBS ───────

1    was the *DiMaria* identification, which has nothing to do with

2    this report.  The OCC's issue with InterArch was the insider

3    related party transaction, this doesn't bear on that either.

4    And the pricing was never an issue or the satisfaction with

04:21    5    Mrs. Hill's work has never been an issue.

6         MR. JACOBS:  The 2007 Order specifically names

7    InterArch and says they can only maintain contracts until the

8    end of that year.  Afterward, if they want to have any further

9    dealings, they have to accomplish it one of three ways under

04:21    10   Article I, Paragraph 4, they can pursuant to an approved

11   policy or they could do it on a transaction by transaction

12   basis approved by the OCC or, under Article II, Paragraph 1,

13   they can do inclusion of a transaction plan.

14        Now, it's an issue in this case, you know, was the

04:21    15   dealing -- were the dealings with InterArch proper or not

16   proper.  Now, our side of the story is although the OCC had

17   their suspicions, they were proper and in fact tested from

18   time to time.  Now, in the April 23, 2012, Pollock letter, in

19   the February 1, 2013, Fisher certification, and I believe in

04:22    20   the April 15, 2013, Fisher certification, mention is made of

21   the relationship with InterArch, the long-term dealing with

22   InterArch.  Now, our side of the story is, yeah, it was

23   long-term, we made no secret of it, but there was absolutely

24   nothing wrong with it, it was open and above board and we, in

04:22    25   fact, periodically tested it.

─────────── HILL - DIRECT - JACOBS ───────────

1          MR. TAMBUSSI:  DiFlorio said that.  Buckelew said

2    that.

3          THE COURT:  There's no reason he can't say it, too.

4          MR. TAMBUSSI:  He can say it but the report doesn't

5    go into evidence, this report talks about qualifications, it

6    talks hourly fees, it talks about project fees, it talks about

7    the cost benefits.

8          MR. JACOBS:  This report tests the InterArch charges

9    against other firms.

10         MR. TAMBUSSI:  No, it does not.

11         MR. JACOBS:  And says they are competitively priced.

12   On cross-examination that can be brought out.

13         MR. TAMBUSSI:  It has to have a basis to begin with.

14         THE COURT:  If your objection is on 403 grounds, I'm

15   going to overrule it, I don't think the danger of delay or all

16   that stuff substantially outweighs the relevance to this

17   evidence and you can cross-examine him on the *bona fides* of

18   this report in that you can show it doesn't say what he claims

19   it says.  I'm going to permit it and overrule the objection.

20         MR. JACOBS:  Thank you.

21         MR. TAMBUSSI:  Thank you.

22         (Sidebar ends.)

23   BY MR. JACOBS:

24   Q.  Mr. Hill, while we were over there, did you have a chance

25   to look at this document, P-8?

HILL - DIRECT - JACOBS

1    A.   Yes.

2    Q.   Okay.  And is this an example of the bank periodically

3    assessing the relationship?

4    A.   Yeah, I think it happened every year.

04:23   5    Q.   Every year.

6         Now, using this as an example, what are the findings of

7    this outside group assessing the relationship between the bank

8    and InterArch?

9    A.   I'll read a part of the conclusion.  InterArch has been a

04:24   10   close partner of Commerce Bancorp and has been instrumental in

11   the execution of its retail brand and growth, its hourly rates

12   are well below those of the competitors identified by Smart

13   and equal to or lower than those that would be contracted in

14   an arms length transaction.

04:24   15        MR. JACOBS:  Judge, did you admit this already or

16   I'll move it now.

17        THE COURT:  Are you moving it?

18        MR. JACOBS:  Yes.

19        THE COURT:  The objection is noted and it's overruled

04:24   20   and its moved into evidence.

21        MR. JACOBS:  Thank you, your Honor.

22   (PLAINTIFF EXHIBIT P-8 WAS RECEIVED IN EVIDENCE)

23   BY MR. JACOBS:

24   Q.   Now, were the dealings between Commerce Bank and

04:25   25   InterArch disclosed in SEC filings?

————— HILL - DIRECT - JACOBS —————

1   A.   Absolutely.

2         MR. TAMBUSSI:  Objection.

3         THE COURT:  Leading.

4   BY MR. JACOBS:

5   Q.   Were they disclosed?

6   A.   Yes.

7   Q.   Okay.  How were they disclosed?

8   A.   We were aware that there might be a perception issue with

9   my wife doing work for the bank so we spent a lot of time and

10   effort to explain this relationship to the stock market and it

11   was disclosed in every public filing where it was appropriate

12   to be disclosed, that would be our 10Qs, probably our 10Ks,

13   our annual report, and many other things.

14   Q.   As examples?

15         MR. JACOBS:  Judge, this is in evidence, this is 73A,

16   page -- well, face page first, I guess.  Yeah, 73A face page,

17   Plaintiff Exhibit 73A.

18         MR. TAMBUSSI:  Judge, you may recall that there's no

19   73A, 73 was a group of documents.

20         MR. JACOBS:  Well, that's not correct, Judge, I moved

21   73A, B, and C, we thrashed this out right before lunch and

22   they have been used in prior testimony.

23         THE COURT:  Do you need to waste the jury's time with

24   this?  Show him the document, will you?

25         MR. JACOBS:  I'm trying to.  Oh, here it is.  Okay.

─ HILL - DIRECT - JACOBS ─

1    BY MR. JACOBS:

2    Q.   Can you read it?  Is it big enough?

3    A.   Yes.

4    Q.   What is it?

5    A.   This is the annual statement you send to the shareholders

6    before the annual stockholders meeting.

7    Q.   And which meeting is this?

8    A.   This is 2005.

9    Q.   Okay.  And can you see the date of the statement in the

10   lower left-hand corner?

11   A.   No, I'm not sure I can.

12   Q.   Okay.  It's not important.

13        MR. JACOBS:  Can we get up on the screen Page 24,

14   second to last paragraph in particular.  That looks like --

15        THE COURT:  Do you want the next to last paragraph

16   blown up?

17        MR. JACOBS:  Yes, I do, Judge.  I think that is the

18   correct page.

19        THE COURT:  I think it is, too.  We're getting there.

20        MR. TAMBUSSI:  It's easier just to have documents,

21   Judge.

22        THE COURT:  We are on the right page.  Next to the

23   last paragraph.

24        MR. JACOBS:  Next to the last paragraph.

25        THE COURT:  "Bancorp has obtained architectural

HILL - DIRECT - JACOBS

1   design and facilities management services."

2           MR. JACOBS:  Can you make that a little bit bigger so

3   the jurors can see it?

4   BY MR. JACOBS:

04:30   5   Q.   Mr. Hill, I'm going to read this and tell me if I got it

6   right.  "Bancorp has obtained architectural design and

7   facilities management services for over 25 for a business

8   owned by the spouse of Mr. Hill.  Bancorp spent 6.5 million

9   dollars in 2004 for such services and related costs.

04:30   10  Management believes these disbursements were substantially

11  equivalent to those that would have been paid to unaffiliated

12  companies for similar services.  The Board of Directors

13  believes this arrangement has been an important factor in the

14  success of the Commerce brand."

04:30   15          Did I read that correctly?

16  A.   Yes, you did.

17  Q.   Do you agree with that statement?

18  A.   Yes, I do.

19  Q.   Is that the nature of statements you're referring to

04:30   20  earlier in public disclosures?

21  A.   Yes, it is.

22  Q.   Now, was it you personally who did the contracting with

23  InterArch on behalf of the bank?

24  A.   No, it was not.

04:30   25  Q.   Who were the people charged with those responsibilities?

─────── HILL - DIRECT - JACOBS ───────

1   A.   Well, it changed over all the years, but in the last,

2   let's say, eight or ten years the area that she dealt with was

3   headed by Dennis DiFlorio and our CFO Doug Pauls would have

4   also been involved.

5   Q.   Okay.  Now, have you heard mention in this case of an

6   indemnification issue?

7   A.   I have.

8   Q.   Okay.  Without me walking you through it, what happened?

9   A.   The *DiMaria* suit relates to construction of a new

10  building by Commerce in '93 or '94, there were some

11  construction problems on the building, the bank removed the

12  contractor from the building to complete it.  The contractor

13  couldn't sue the bank under the terms of his agreement with

14  the bank so he sued InterArch as the architect.

15  Q.   What did Dennis DiFlorio have to do with removing the

16  contractor?

17  A.   Dennis DiFlorio was the bank person in charge of the

18  whole job and was involved in overseeing with his staff the

19  contracting of the building and he was the one that fired the

20  contractor from the building.

21  Q.   Did he testify at that trial?

22  A.   Yes, he did.

23  Q.   Is that what he said?

24  A.   He did.

25  Q.   All right.  Now, what happened to InterArch in that

*United States District Court*
*Camden, New Jersey*

—————— HILL - DIRECT - JACOBS ——————

1   trial?

2   A.   They got sued on some wild legal theory.  And after they

3   lost on appeal, InterArch's lawyer made a demand on the bank

4   to indemnify them under the terms of the architectural

04:32   5   agreement.  As I remember, the Board of the bank formed a

6   separate committee, hired separate outside lawyers and, after

7   several months, reviewed the whole matter and decided to

8   reimburse InterArch.

9   Q.   You said outside lawyers, how many law firms were hired

04:33  10   to review this indemnification issue?

11  A.   At least two.

12  Q.   Can you remember the names of the law firms?

13  A.   Yes, one of them was Blank Rome and the other one was a

14  Newark firm whose name I forget at the moment.

04:33  15          MR. JACOBS:  Can I tell him the name, Judge.

16          THE COURT:  You want to testify?

17          MR. JACOBS:  No, I want to help him with the name.

18          THE WITNESS:  I forget the name.

19          THE COURT:  No, you can't testify, Mr. Jacobs.

04:33  20          MR. JACOBS:  All right.

21  BY MR. JACOBS:

22  Q.   And what was the opinion or what were the opinions of two

23  law firms?

24  A.   The Board, on the recommendation of the separate

04:33  25  committee and on the recommendation from their first lawyer,

───── HILL - DIRECT - JACOBS ─────

1    approved the reimbursement to the firm, to InterArch.

2    Q.   Do you recall what year that was?

3    A.   2002 maybe.

4    Q.   Now, and so was InterArch indemnified by Commerce?

04:34    5    A.   Yes, they were.

6    Q.   Now, fast forward to February 2008, okay, have you read

7    the Special Litigation Committee report?

8    A.   Yes, I have.

9    Q.   Do you have it in mind, can you remember it without me

04:34    10   showing you?

11   A.   I think so.

12   Q.   In that Special Litigation Committee report did -- let me

13   back up.

14        What was the Special Litigation Committee?

04:34    15   A.   The Special Litigation Committee was formed by the Board

16   to review claims and shareholder suits that were filed, I

17   believe, in '06 or '07.

18   Q.   Okay.  And what else?  What else did the Special

19   Litigation Committee review?

04:35    20   A.   Well, I think they were formed for that and then they

21   began to look at whatever issues the OCC had.

22   Q.   Now, before we get to the specifics of the

23   indemnification issue, who was on the Special Litigation

24   Committee?

04:35    25   A.   Independent members of the Board, John Lloyd, Joe

─── HILL - DIRECT - JACOBS ───

1   Vassalluzzo, and Nick Giordano.

2   Q.   Why do you refer to them as independent?

3   A.   They're no relationship to me.

4   Q.   And was the Special Litigation Committee assisted by

04:35   5   counsel, by lawyers?

6   A.   Yes, they hired an outside firm.

7   Q.   Do you recall the name of that outside firm?

8   A.   I don't.

9   Q.   When you say outside firm, was it a bank firm?

04:35   10   A.   No, it was a firm the bank had never used.

11   Q.   Let me go back to where I was then.  Do you remember what

12   the Special Litigation Committee recommended regarding that

13   indemnification?

14   A.   Yes, I do.

04:36   15   Q.   What did they recommend?

16   A.   The committee recommended that the bank should sue

17   Mrs. Hill's firm to recover this money.  In effect they were

18   suing themselves to reverse the decision they had made to pay

19   her.

04:36   20   Q.   Six years before?

21   A.   I believe so.

22   Q.   Okay.  Did they in fact sue -- did the bank follow the

23   recommendation of the Special Litigation Committee?

24   A.   Yes, they did.

04:36   25   Q.   Did they sue your wife's company?

HILL - DIRECT - JACOBS

1   A.   Yes, they did.

2   Q.   In the state court or federal court?

3   A.   State court.

4   Q.   And what was the result of that lawsuit, did the bank win

5   or lose?

6   A.   The bank lost.

7   Q.   Okay.  Do you remember the holding of the New Jersey

8   Superior Court and Supreme Court?

9          MR. TAMBUSSI:  Objection, Judge.  How can Mr. Hill

10  opine on the holding of the New Jersey Supreme -- first of

11  all, there's no decision by the New Jersey Supreme Court.

12         MR. JACOBS:  Yes, there is, it affirms the Appellate

13  Division.

14         THE COURT:  How would this witness know that?

15         MR. JACOBS:  He read them.

16         THE COURT:  He read the opinions?

17         MR. JACOBS:  Yes, he did.

18         THE COURT:  Okay.

19  BY MR. JACOBS:

20  Q.   Having read the opinions of the Appellate Division of the

21  New Jersey Superior Court and the affirmance of the Supreme

22  Court, what did they say?

23  A.   They said the bank acted within its authority in the

24  original indemnification.

25  Q.   Now, did you play any role in that decision making

—— HILL - DIRECT - JACOBS ——

1    process whether your wife's company should in fact be

2    indemnified?

3    A.   Absolutely none.

4         MR. TAMBUSSI:  Judge, at some point in time maybe the

04:37    5    objection on the leading question will take hold and that

6    the --

7         MR. JACOBS:  Judge, a leading question is one that

8    suggests an answer, I asked did he play a role.

9         THE COURT:  You're asking for a yes or no answer.

04:38   10   Let's keep going.

11        MR. JACOBS:  Okay.

12   BY MR. JACOBS:

13   Q.   Mr. Hill, aside from your interests in the bank -- by the

14   way, I didn't ask you, what was your position in 2007 with the

04:38   15   bank?

16   A.   Chairman and Chief Executive.

17   Q.   Of what, though?

18   A.   Commerce Bancorp and Commerce Bank.

19   Q.   Both?

04:38   20   A.   Both.

21   Q.   All right.  Commerce Bancorp, Inc., and Commerce Bank,

22   N.A.?

23   A.   Correct.

24   Q.   Now, aside from your interests and positions with the

04:38   25   bank, do you have any real estate interests?

HILL - DIRECT - JACOBS

 1   A.   Yes, I do.

 2   Q.   Will you explain them?

 3   A.   I've been -- as soon as I got out of school, out of

 4   college, I went into the real estate development business and

 5   we formed a company that develops sites for change around

 6   America.  McDonald's was our first client.  And the company

 7   still exists and it develops sites in this area but other

 8   markets around America.

 9   Q.   What's the name of the company?

10   A.   Site Development.

11   Q.   Are you involved in any similar real estate company?

12   A.   No.

13   Q.   Now, how long were you involved with Site Development?

14   A.   I think I started Site Development in '68.

15   Q.   Did Site Development do business with Commerce Bank after

16   you founded Commerce Bank in '73?

17   A.   Yeah.  And I should make it clear when I use the word

18   Site Development, that's the name for a group, there are lots

19   of related names.  But Site Development started locating sites

20   for the bank in the '70's, in the early -- no, I'm sorry, '81

21   or two I would guess.

22   Q.   Although it may be self-explanatory, what do you mean

23   when you say locating sites for the bank?

24   A.   When you billed new stores, you have to find a site, the

25   client has to approve the site, you have to get it zoned, you

HILL - DIRECT - JACOBS

1    either have to get an agreement of sale or a lease on it.  And

2    we didn't build but we did all those parts to develop plans,

3    find sites, and gets them zoned.

4    Q.   Who else was involved in these real estate companies or

5    this real estate company aside from you?

6    A.   Well, there are a number of people that were with it over

7    this long period of time, but the main and chief executive of

8    the company is John Silvestri.

9    Q.   Any relative of yours?

10   A.   My son worked there for a while and is my brother worked

11   there for a while.

12   Q.   Now, explain to us exactly what this real estate company

13   would do to find an appropriate site, how do you go about it?

14   A.   The bank would say or our clients would say, the bank was

15   one of many clients, we want to develop in Manhattan was a

16   good example and we'd say we want to build X number of stores

17   in Manhattan over certain period of time.  They would go off

18   to the market, they would check all the sites, they would make

19   a development plan, and they would begin to find sites, which

20   the staff of the bank would approve.  And once the bank

21   approved the site, you sign an agreement of sale or you sign a

22   lease, we'd go get it zoned and then someone else would build

23   it.

24   Q.   And who would actually buy the land, your company, the

25   bank?

──────── HILL - DIRECT - JACOBS ────────

1   A.   Well, the bank's deals out of 400 plus deals were about

2   half leases and half buys.  Site Development did a few of the

3   deals where they leased it back to the bank.  Most of these

4   were what we call multi deals.  They typical way to look at it

04:41   5   was a shopping center, we would build a shopping center and

6   the bank would put a freestanding bank out in front.

7   Q.   And, under that example, what would the relationship be

8   between your real estate company and the bank?

9   A.   The real estate company would lease the ground to the

04:42   10   bank.

11   Q.   Okay.  Now, how many years was this arrangement in place?

12   A.   30 some.

13   Q.   Was this disclosed?

14   A.   Absolutely.

04:42   15   Q.   How?

16   A.   The same way you showed me on the disclosures with

17   InterArch.

18   Q.   Let's look at an example which is -- if we get right back

19   to it, 73, it's the A tab, the 2005 proxy notice, and it's

04:42   20   Page 24 again, and this time it's the fourth from the bottom.

21   A.   Yes.

22   Q.   Okay.  It says:  "Bancorp leases the land on which it has

23   constructed 17 branch offices from limited partnerships in

24   which Mr. Hill's a partner, in which a corporation owned by

04:43   25   Mr. Hill as a partner or from the Hill family trust under

─────────── HILL - DIRECT - JACOBS ───────────

1   separate operating lease agreements with purchase options."

2        Is that the type of disclosure that was made?

3   A.   Yes, sir.

4   Q.   Okay.  And this last sentence:  "These leases expire

5   periodically beginning 2005 but are renewable through 2042.

6   Mr. Hill has agreed not to participate in any future real

7   estate leasing transactions involving Bancorp and its

8   subsidiaries."

9        Did you agree to do that?

10  A.   Yes, I did.

11  Q.   When did you agree to do that?

12  A.   2002.

13  Q.   And why did you agree to do that?

14  A.   As the bank grew and the world changed, we had to evolve,

15  too.  And there was no legal reason I had to change the

16  arrangements but I thought at that time the way the world was

17  evolving that this is something that didn't make sense going

18  forward.

19  Q.   And did you -- well, let's just look at this next

20  paragraph before we get off this.  This paragraph reads:

21  "Management believes that the rental paid for each of the

22  foregoing leases is and was comparable to the rental which

23  would have been paid to nonaffiliated parties in similar

24  commercial transactions for similar locations assuming that

25  such locations were available."

HILL - DIRECT - JACOBS

1          Is that an accurate statements?

2    A.   Yes, it is.

3    Q.   Now --

4    A.   And the reason we know it's accurate is every time we

04:44   5    would do one of these lease deals, we'd get an independence

6    appraisal of the rents.

7    Q.   You're getting ahead of me.  So tell me about that

8    process.

9    A.   So remember these deals only happened before '02.

04:45   10   Q.   Yes.

11   A.   But there was a whole related party procedure we had to

12   go through, we had to submit it to the Board to be approved,

13   we had to get it appraised, and all that was approved by the

14   Board independent of me.

04:45   15   Q.   So -- I'm sorry.  The Board would do what?

16   A.   They would approve each one of these deals.

17   Q.   No, you mentioned appraisals.

18   A.   They would get an appraisal, also.

19   Q.   What does that tell you about the proper lease amount?

04:45   20   A.   The appraisal was to check whether it was a fair market

21   rent.

22   Q.   All right.  Now, in this same document, if we go up a

23   couple of paragraphs, do you see a different type of

24   disclosure regarding Mr. DiFrancesco at his law firm?

04:45   25   A.   Yes, I do.

—— HILL - DIRECT - JACOBS ——

1    Q.   Okay.  Why did the bank make these types of disclosures

2    that it dealt with Mr. DiFrancesco, a Director, and his law

3    firm?

4    A.   These are the rules you follow when you have related

04:46    5    party transactions.

6    Q.   All right.  Tell me about related party transactions.

7    Whether it's Mr. DiFrancesco, a Director, and his law firm or

8    whether it's a real estate company in which you have an

9    interest, are they permitted or not permitted?

04:46    10   A.   They are.

11   Q.   Who permits them?

12   A.   The OCC regulations specifically permit related party

13   transactions.

14   Q.   How do you know -- how many years have you been in

04:46    15   banking?

16   A.   40 almost.

17   Q.   How many years have you been dealing with the OCC?

18   A.   I think we in OCC back from about '75 on.  Whatever that

19   is.  Forty is getting close, too.

04:46    20   Q.   Okay.  So please clarify this for us.  In your 35 or

21   40 years experience as a banker, and how ever many years

22   dealing with the OCC, what is your understanding about whether

23   you or Mr. DiFrancesco or anybody else can deal with the Bank

24   as related party or as an insider?

04:47    25   A.   There's no doubt that the Rules rules allow banks and all

─────── HILL - DIRECT - JACOBS ───────

1    banks do deal with no related parties.  The arrangement would

2    have to be an arms length basis and they have to be shown to

3    be at fair market value and in some instances they have to be

4    disclosed.

04:47    5    Q.   And have you read anything from the OCC on the topic in

6    your --

7    A.   Yeah.  Last night I read the OCC insider manual about it

8    which says just what I said.

9    Q.   All right.  Now, you made mention of withdrawing from

04:47    10    real estate transactions.  I'd like to show you plaintiff's

11    exhibit number 50.

12         MR. JACOBS:  Can you make that a bit bigger, if

13    that's possible?  Thank you.

14    Q.   Did you prepare this memo?

04:48    15    A.   I did.

16    Q.   To whom did you direct it?

17    A.   The Board of Directors.

18    Q.   And what is the date?

19    A.   July 9th, 02.

04:48    20    Q.   And what is the reference on the memo?

21    A.   Site development.

22    Q.   Without me reading or quoting anything, tell me what it's

23    all about.

24    A.   Can I see the bottom part of it, please?

04:48    25    Q.   Yes.

——— HILL - DIRECT - JACOBS ———

1    A.   Yeah.  It's a report to me from the Board saying that I

2    was going to withdraw as of this date from any relationship

3    with site development in transactions with the Bank.

4    Q.   You said from the Board to you.  Is that what you meant?

04:49   5    A.   From me to the Board.

6    Q.   Okay.  And did you explain why?

7    A.   Yeah.  I think it says it at the bottom.  Despite this

8    clearly mutually beneficial relationship today's corporate

9    governance environment and the increasing size and visibility

04:49   10   of Commerce requires the Bank to re-examine our related party

11   transactions if only for perception.

12   Q.   All right.  Did anybody force you to do that?

13   A.   Nobody.

14   Q.   Why did you do it?  Put that in English that paragraph.

04:49   15   A.   The world is going through a change.  As the Bank grew,

16   we, we had to evolve.  The corporate governance standards

17   worked.  Going through a change.  And this is part of when

18   you're returning a growth firm, you have to evolve.

19   Q.   Can we go to the second page of this document.  Top?

04:50   20   A.   Yes, sir.

21   Q.   There we are.  Okay.  It reads:  To avoid any perception

22   issues, I, therefore, propose to sever my relationship with

23   that portion of the site development group that does business

24   with Commerce as of July 30, 2002 as follows.  And then

04:50   25   there's some numbers following that.  Is that what you did?

———— HILL - DIRECT - JACOBS ————

1   A.   I did.

2   Q.   Did you follow through on all this?

3   A.   I did.

4   Q.   Okay.  Now was there any kind of investigation of insider

5   activities or related parties or anything going on at this

6   point?

7   A.   No, other than the normal examines.

8   Q.   What are normal examines?

9   A.   Banks are, in this case, governed by the OCC and they

10   were -- we're basically under a full-time examination plan.

11   They actually have bank examiners stationed inside the bank.

12   So there's an annual and frankly ongoing review of everything

13   a bank does.

14   Q.   Now, Mr. Hill, I want to go back and try to explain a

15   little bit more clearly what your real estate company would do

16   when it acquired, and I think your example was a whole

17   shopping center or shopping center property.

18        How do you decide or who decides whether a bank will be

19   there and where it will be?

20   A.   Well, when site development develops a site, they design

21   a plan in many cases where with a shopping center in the back

22   what we call free-standing pad sites out front and they would

23   design what they thought was best for the shopping center and

24   they would offer them obviously if there was a bank site

25   available, or on the plan, they would offer it to us first.

HILL - DIRECT - JACOBS

1    Q.   Now, I based upon what you know and read, as a banker in

2    your view, were those insider or related party dealings

3    appropriate or not?

4    A.   Yes, they were.

04:52    5    Q.   Were these types of dealings, insider or related party,

6    were they periodically examined by the Federal Bank

7    regulators?

8    A.   Yes, we were examined, as I said on an ongoing basis by

9    the OTC and the Fed and certainly in the last five or 10 years

04:52    10   reviewing these related party deals would be part of their

11   examine.

12   Q.   You said by the OCC and the Fed?

13   A.   Correct.

14   Q.   You mean the Federal Reserve?

04:53    15   A.   Federal Reserve.  Sorry.

16   Q.   Okay.  And with what frequency, did those two bank

17   regulatory agencies review these type of insider or related

18   party transactions?

19   A.   I would say every year to 18 months.

04:53    20   Q.   And would that include things like the Bank dealing with

21   InterArch, would that include things like your real estate

22   companies leasing to the Bank?

23   A.   Correct.

24   Q.   Okay.  Now, can you tell me whether there were such

04:53    25   examinations by the OCC and Federal Reserve of what I'm going

—— HILL - DIRECT - JACOBS ——

1    to call insider transactions in 2002, 2003, 2004 and 2006?

2    A.   Yes, I can.  And there were.

3    Q.   Can you tell me what the results were?

4    A.   You want me to go through each one?

04:53    5    Q.   No. Just tell me generally what were the results.  Did

6    the Bank pass or fail?

7    A.   They passed.  We always get in these examine reports ways

8    we can enhance your controls.  But so of the comments I have

9    here, the insider transactions review revealed insider loans

04:54   10    and leases were in compliance with arms length models.

11    Insider transactions properly complied with the regulation O

12    which is the regulation that governs this type of stuff.

13    Satisfactory compliance with the spirit and the intent of the

14    law and the reporting requirements for insider dealing.

04:54   15    Q.   Mr. Hill, can these insider or related party transactions

16    be beneficial to the Bank?

17    A.   Of course.  And the special litigation committee found

18    that they were.

19          MR. JACOBS:  May we see number nine, Plaintiff's

04:55   20    exhibit number nine, cover page, please.  Make it a little

21    bigger?  Thank you.

22    Q.   Do you recall the month and the year that the special

23    litigation committee was commissioned to start its work?

24    A.   Beginning of 07 I think.

04:55   25    Q.   Okay.  And from the cover can you tell when it issued its

HILL - DIRECT - JACOBS

1    report?

2    A.   Early 2008.

3    Q.   Is that approximately a year?

4    A.   Correct.

04:55    5    Q.   Okay.  Now, did the special litigation committee study

6    these insider or related party leases?

7    A.   Yes, they did.

8    Q.   And what was the conclusion of the special litigation

9    committee?

04:55    10   A.   That the lease rates were significantly below the market

11   and were good for the Bank.

12   Q.   And how did they figure out that the lease rates were

13   significantly below did market?

14   A.   I wasn't involved in the committee but from reading the

04:56    15   report they went out and got each site appraised.

16   Q.   Now, what about the real estate review committee.

17   A.   I'm sorry.  The real estate review committee made that

18   conclusion and it was adopted by the special litigation

19   committee.

04:56    20   Q.   Are you familiar with the June 28, 2007 OCC Consent

21   Order?

22   A.   Yes, I am.

23   Q.   Okay.  This is 19.  Plaintiff's Exhibit 19.  Let's get

24   the cover page first.  Do you recognize it?

04:57    25   A.   Yes, sir.

1   Q.   Now, let me ask you to direct your attention to the sixth

2   page of this Consent Order.  Have you read this order before?

3   A.   Yes.

4   Q.   Okay.  Well actually to make it make sense, we should

5   look at the fifth page first.  Do you see where it says

6   Article II, existing insider and insider related party

7   relationships?

8   A.   I do.

9   Q.   Okay.  Now, let's turn the page to page six.  It looks

10   like sub-paragraph four or paragraph four.  Paragraph four.

11   Does that deal with leases?

12   A.   It does.

13   Q.   All right.  Now, without us reading all this verbatim.

14   Under this order entered by the OCC, what is the Bank ordered

15   to do regarding these insider leases?

16   A.   It's ordered to review each lease and determine whether

17   it's a plus or minus for part of the Bank and then the

18   determine whether they wanted to end the lease, extend the

19   lease.  Whatever.

20   Q.   And as far as you know, is that what the real estate

21   review committee did?

22   A.   I believe so.

23   Q.   Now, were companies in which you had an interest on the

24   other side of these leases?

25   A.   Yes.

—— HILL - DIRECT - JACOBS ——

1  Q.   Landlords?

2  A.   Yes.

3  Q.   How many lease do you say there were?

4  A.   Seventeen I think.

5  Q.   Seventeen.  Did you hear Mr. Fisher say there were 60 or

6  70 in his sworn deposition testimony?

7  A.   I did hear it.

8  Q.   Okay.  How many are there actually?

9  A.   Seventeen.

10  Q.   Okay.  Now, of those 17, after the Consent Order is

11  entered saying that they must be reviewed and they can be

12  terminated and all this stuff, and after all these appraisals

13  and investigation, how many of these leases did Commerce Bank

14  choose to walk away from?

15  A.   None.

16  Q.   Why?

17  A.   The committee, I assume, found that the lease rates were

18  fair.

19  Q.   Were they?

20  A.   I think the committee concluded they were one third a

21  little less than the market price.

22  Q.   As a real estate person, is that right or wrong?

23  A.   Is what right?

24  Q.   That they were one third less than the market price?

25  A.   Probably more.

──────── HILL - DIRECT - JACOBS ────────

1   Q.   More being more than a third?

2   A.   Yeah, more than a third off the market price.

3   Q.   Did you or your real estate companies in these lease

4   transactions do anything to materially damage the Bank?

5   A.   No.

6   Q.   In your opinion as a landlord, did these leases

7   materially damage the tenants?

8   A.   The Bank?

9   Q.   Yeah.

10  A.   Absolutely no.  Absolutely not.

11  Q.   From what you know of more than 30 years of Commerce Bank

12  and InterArch transactions, was there anything in any of those

13  transactions that you can identify as materially adversely

14  affecting the or damaging the Bank?

15  A.   No.  Just the reverse is true.  My wife's firm

16  involvement in the Bank was a key factor of the success of the

17  Bank and it gets every report ever done.

18  Q.   Do you think Commerce could have developed as quickly as

19  it did and as well as it did without InterArch?

20  A.   Not at the same pace.

21  Q.   Okay.  Mr. Hill, the next thing I want to ask you about

22  is your contractual relationship with Commerce Bancorp.  Was

23  there one?

24  A.   Yes.

25          MR. JACOBS:  May we have 22, the face page first.

─────── HILL - DIRECT - JACOBS ───────

1              THE COURT:  Any objection to P-22.

2              MR. TAMBUSSI:  No objection.

3              MR. JACOBS:  Judge, I think it's in.

4              THE COURT:  No, it's not in.

05:01    5              MR. TAMBUSSI:  No objection.

6              THE COURT:  Twenty-two will be admitted into

7    evidence.  You may show it.

8    (PLAINTIFF EXHIBIT 22 WAS RECEIVED IN EVIDENCE)

9    Q.   Have you read your own employment contract?

05:02   10   A.   Yes, sir, I have.

11   Q.   Okay.  Now, on the cover and maybe we can make that a

12   little bit bigger?

13        It says amended or restated employment agreement.

14   Commerce Bank Commerce Bancorp, Inc. And Vernon W. Hill.  You

05:02   15   see the date January 1, 2006?

16   A.   Yes.

17   Q.   When was it actually signed, and to answer that we'd have

18   to take you to the last page, 22.

19   A.   Okay.

05:02   20   Q.   It will be up in a moment.

21              (Brief pause)

22   Q.   Make it a little bigger?

23   A.   Yeah.  Looks like March 14, 2006.

24   Q.   Is that your signature?

05:02   25   A.   It's either March or May.  I can't tell you.  Yes, that

*United States District Court*
*Camden, New Jersey*

1   is my signature.

2   Q.   And who else signed it?  Who signed on behalf of Commerce

3   Bancorp?

4   A.   Doug Pauls.

05:03  5   Q.   And what's the signature in the middle?

6   A.   I have no clue.

7   Q.   Okay.  Now, Mr. Hill, I'm going to ask you first about

8   the term of this contract.  And can we go to page two of 22.

9   When we get there, I'm going to direct your attention to

05:03  10   paragraph one, sub-paragraph 1.1.

11           MR. JACOBS:  Can we make that a little bigger?  Okay.

12   Q.   What was the term of the contract?

13   A.   Five years.

14   Q.   Mr. Hill, if we start counting forward from January 1

05:04  15   forward, January 1, 2006 I'd say.  2006, 2007, 2008, 2009,

16   2010.  Does that make five years?

17   A.   Correct.

18   Q.   So when would it end?

19   A.   December 2010.

05:04  20   Q.   December 31st?

21   A.   Correct.

22   Q.   Okay.  Now, next question.  Was there a compensation

23   section to this contract?

24   A.   Yes.

05:04  25   Q.   Now when this contract was signed in early 2006, how many

1  years had there been a Commerce Bank?

2  A.   Thirty-three.

3  Q.   And Commerce Bank had grown from one branch to about how

4  many in 2006?

05:04  5  A.   Four hundred about.

6  Q.   Okay.  And you said you were originally a part-time

7  banker.  How many of these years were you a full-time banker?

8  A.   Well, probably all except the first five.

9  Q.   Did you get compensation from Commerce Bancorp?

05:05  10  A.   Of course.

11  Q.   Will we find it in paragraph three?

12  A.   I guess so.  Show me three.

13  Q.   Yes, I will.  Please, the bottom half of three.  Looking

14  for page three of 22.  There we go.  Topic heading

05:05  15  compensation.  It's the bottom half.  Did you see that

16  definition compensation means the sum of the highest annual

17  rate of base salary and highest cash bonus paid to you during

18  the most recent 24 months?

19  A.   Correct.

05:06  20  Q.   Okay.  And 3.2, what was the base salary?

21  A.   One million dollars.

22  Q.   Per year?

23  A.   Per year.

24  Q.   Okay.  Now, there's a reference in 3.1 to bonus.  If we

05:06  25  go to the next page, four of 22.  We there?  Okay.

─────── HILL - DIRECT - JACOBS ───────

1    Do these paragraphs that we're looking at in the top of

2  the page, enlarge that a little.  Deal with your base salary

3  in other forms of compensation?

4  A.   Yes.

05:07  5  Q.   Now, bonus is mentioned a couple of times.  Did you get

6  an annual bonus?

7  A.   Yes, I did.

8  Q.   Now, in 2006 did you get an annual bonus?

9  A.   I did.

05:07  10  Q.   What was that?

11  A.   I believe it was one million five hundred thousand.

12  Q.   Was that in addition to the one million dollar salary?

13  A.   Yes, it was.

14  Q.   And that total would be two and a half million dollars?

05:07  15  A.   Correct.

16  Q.   In 2007, was your salary still one million dollars?

17  A.   Yes, it was.

18  Q.   In 2007 had you received any bonus by the middle of the

19  year?

05:07  20  A.   No.

21    MR. JACOBS:  Can we go to page seven of 22 of this

22  contract?  And can we enlarge the bottom of the page so we can

23  see paragraph seven on page seven a little better?

24    Judge, you don't mind if I sit down and question.  Do

05:08  25  you so I --

─── HILL - DIRECT - JACOBS ───

1       THE COURT:  Please do.

2       MR. JACOBS:  I'm having a hard time reading this.

3  Q.  Okay.  Now, you see this paragraph seven?

4  A.  I do.

05:08  5  Q.  And that bold face termination without cause by Commerce?

6  A.  Yes.

7  Q.  What's it all about?

8  A.  If you get fired without cause, it defines what happens

9  and what compensation you're entitled to.

05:08  10  Q.  Okay.  Well, let's figure it out.  In 7.2, without cause

11  is defined.  What is it, how did you understand it?

12  A.  If you were terminated without cause.  You're terminated

13  without cause.  In other words, you hadn't breached the

14  agreement.

05:09  15  Q.  Paragraph 7.3 deals with what happens if you're

16  terminated without cause, what happens?

17  A.  You're entitled to a lump sum and it's the sum of in

18  7.3B1 the sum of Hill's full compensation that would be

19  remaining until the end of the then term, had Hill continued

05:09  20  to be employed by Commerce.

21  Q.  And what are the components of that full compensation?

22  A.  Bonus and salary.  Base salary and bonus.

23  Q.  Okay.  Now, let's go forward to page 14 of 22 and try to

24  get the bottom half of the paragraph -- of the page, Paragraph

05:10  25  11.  Okay.

HILL - DIRECT - JACOBS

1        Let me direct your attention to the bold face, other

2    rights for termination without cause or for good reason.  Are

3    you with me?

4    A.   Yes, I am.

05:10    5    Q.   Okay.  Let's look at sub-paragraph 11.1 B.  Talks about

6    options.  What's the point?

7    A.   All the options you have outstanding that haven't matured

8    to vest.  In other words, it's not time for them to vest.  It

9    moves the vesting date up to the date of the without cause.

05:10   10    Q.   Did you have such option?

11    A.   I did.

12    Q.   Do you recall how many?

13    A.   I don't know the amount of options but I know the net

14    value.

05:10   15    Q.   Okay.  Now, let's go to -- I'm sorry.  On this same page,

16    11.3 at the bottom.  You see that paragraph says no mitigation

17    by Hill?

18    A.   Yes, sir.

19    Q.   What was that about?

05:11   20    A.   I am not required to take any action to reduce the

21    payments due under this agreement.

22    Q.   Let's go to the next page.  Paragraph -- this is page 15

23    of 22.  Hold on one second, please.  Page 15 of 22.  Look at

24    paragraph 13 right in the center.

05:12   25    A.   Yeah.

─── HILL - DIRECT - JACOBS ───

1   Q.   What does that deal with?

2   A.   I'm entitled to interest on the unpaid amount at the

3   prime rate of the Bank, plus two percentage points.

4   Q.   Okay.  Could you explain that a little bit.  How you do

5   that?

6   A.   It's interest on the unpaid money.  If the Bank does not

7   pay the amount due, interest accrues.

8   Q.   All right.  Mr. Hill, have you computed the salary and

9   bonus and stock option and interest figures that we just

10  reviewed?

11  A.   Yes, I have.

12          THE COURT:  I thought you had a stipulation on the

13  stock.

14          MR. JACOBS:  On one nor those we do.  On one.  We'll

15  use that stipulated figure.

16          THE COURT:  You don't have a choice, do you?

17          MR. JACOBS:  No.  We agreed to it.

18          THE COURT:  Okay.

19          MR. JACOBS:  Okay.

20          THE COURT:  Thank you.

21  Q.   I'd like to write them down and you can tell us how you

22  calculate each one.

23          MR. JACOBS:  Judge, can I move this over to write

24  them down?

25          THE COURT:  Yes.

─────── HILL - DIRECT - JACOBS ───────

1          MR. TAMBUSSI:  May we move over to watch?

2          THE COURT:  Sure.

3          MR. JACOBS:  This right here?

4          THE COURT:  You can get closer if you want.

05:14   5   A.  I can't really see it.

6   Q.  I'm going to write big.  So -- all right.  Can you tell

7   me how you computed, firstly, the outstanding salary and bonus

8   figure to the end of the term?

9   A.  I didn't bring the exact accounting of how we did it but

05:15  10   I have the amounts of the salary and bonus we believe is

11   9,690,000.

12   Q.  Nine million?

13   A.  690.

14   Q.  Six hundred and ninety?

05:15  15   A.  585.

16   Q.  585?  Is that both salary and bonus?

17   A.  Yes, it is.

18   Q.  To the end of the five-year term?

19   A.  Correct.

05:15  20   Q.  Okay.  How about the 2007 pro rata bonus?

21   A.  I believe that's included, too.

22   Q.  Okay.  How about the stipulated agreed upon option

23   figure?

24   A.  Yes, that's a fixed number.  3,024,750.

05:15  25   Q.  Okay.  Now, how do you do the interest?

HILL - DIRECT - JACOBS

1    A.   It's interest on the unpaid amount at prime, plus two

2    beginning one month.  I'm supposed to be paid one month after

3    I left the Bank.  So the interest begins one month after I

4    left it.

5    Q.   Okay.  Now what is prime?

6    A.   Prime is the rate that banks set to charge the most

7    credit worthy borrowers.

8    Q.   And in your contract, what are you saying you add two

9    percentage points to it?

10   A.   Correct.

11   Q.   Does prime change from time-to-time?

12   A.   It changes a lot.

13   Q.   Okay.  So, do you have to do the arithmetic for each

14   change?

15   A.   Yes, you do.

16   Q.   Okay.  Doing all that arithmetic, what does the interest

17   add up to today?

18   A.   4,522,141.

19   Q.   All right.  Did you add all these figures?

20   A.   17,227,476.

21   Q.   Now, did you calculate the per deem per day interest?

22   A.   Yes.  The interest is running at per deem.  I don't have

23   the exact amount, but it's about $1800 a day.

24   Q.   Now, have you accurately computed these figures?

25   A.   Yes, I think so.

*United States District Court*
*Camden, New Jersey*

─ HILL - DIRECT - JACOBS ─

1   Q.   Has any of that been paid to you since the middle of

2   2007?

3   A.   None.

4   Q.   Now, I made mention of the middle of 2007.  And have you

5   heard enough times references to that one day, June 28, 2007?

6   A.   I have.

7   Q.   All right.  Now, Mr. Hill, here's what I want you to

8   explain to the jury.  Did you leave the Bank June 28, 2007?

9   A.   Yes, I did.

10  Q.   How did you leave Commerce Bank NA?

11  A.   Uh, I was terminated without cause.  Maybe I have it

12  backwards.  I was fired from one and I resigned from the

13  other.

14  Q.   Okay.  When you say fired, do you mean terminated without

15  cause?

16  A.   I do.

17  Q.   Your contract we were looking at, P-9 on the face page

18  says Commerce Bank Commerce Bancorp, Inc.?

19  A.   Yes, it does.

20  Q.   Right.  As to the other one, Commerce Bank NA, how did

21  you leave?

22  A.   I resigned.

23  Q.   All right.  Now, why did you resign?

24  A.   This was my Bank.  I built it from scratch, from nine

25  people to 14,000 people.  We built a great --

HILL - DIRECT - JACOBS

1    Q.   How many?

2    A.   Fourteen thousand.  We built a great Bank that served our

3    clients and created great value for our shareholders.  The OCC

4    had begun a witch hunt in December of 06 trying to reverse all

05:19    5    the prior findings they had made on related party transactions

6    and it was obvious to me that the best thing for the Bank to

7    get this resolved was for me to leave.

8    Q.   And did you?

9    A.   I did.

05:19   10    Q.   Did you want to?

11    A.   No.

12         MR. JACOBS:  Judge, do you want to take an afternoon

13    break?

14         THE COURT:  Great time.  Thank you.  Ladies and

05:20   15    gentlemen, we'll take 15 minutes.  Please don't discuss the

16    case nor do any research.  We'll see you back.

17         THE DEPUTY COURT CLERK:  All rise.

18         (Jury leaves the courtroom)

19              (Recess)

05:20   20              (Open Court)

21         THE DEPUTY COURT CLERK:  All rise.

22         THE COURT:  Ready?

23    (Mr. Hill resumes the witness stand) everybody ready.

24         THE COURT:  Ready. Everybody ready?

05:35   25         MR. TAMBUSSI:  Judge, can I move the easel so I can

───── HILL - DIRECT - JACOBS ─────

1    see the witness again?

2            MR. JACOBS:  Can we move it?  There's a couple more

3    questions.

4            THE COURT:  Mr. Hill, come on back up here.  Let's

5    get the jury out.

6            THE DEPUTY COURT CLERK:  All rise.

7                    (Jury present)

8            THE COURT:  All right.  Thanks have a seat and we'll

9    continue with the direct examination of the witness.

10           MR. JACOBS:  Thank you, Judge.

11   By Mr. Jacobs:

12   Q.   Mr. Hill, I have a couple more questions drawn from your

13   employment contract about these computations which I moved

14   down here?

15           MR. JACOBS:  Can we get page 15 of 22 of P-22,

16   Plaintiff's Exhibit 22 on the screen?  Okay.  Can we make it a

17   bit bigger?  Thank you.  Okay.  Top half, please.  Okay.

18   That's fine.  Thank you.

19   Q.   Mr. Hill, I want to direct your attention to paragraph

20   12.2.  You see source of payment and timing 12.2 time?

21   A.   Yes.

22   Q.   All right.  Do you see the language, all payments due

23   Hill under Sections 5.2, 6.3 and 7.3?

24   A.   I do.

25   Q.   All right.  Is 7.3 the termination without cause section?

─────── HILL - DIRECT - JACOBS ───────

1    A.   I believe so.

2    Q.   And what is this does that say about this?

3    A.   It says all payments due under this contract are due

4    30 days following the termination of employment.

05:37    5    Q.   Okay.  And did you follow that provision in the

6    computations that you did up there?

7    A.   I did.

8    Q.   Okay.  Now further down on the page.  Just get the bottom

9    half.  Paragraph 14.  Specifically 14.1.  You see the bold

05:38    10   face reimbursement of enforcement expenses?

11   A.   I do.

12   Q.   Okay.  Now, what is this all about, the preamble and

13   14.1?

14   A.   Hill should be entitled to full reimbursement from

05:38    15   Commerce for all costs and expenses including reasonable

16   lawyer fees, costs and interest incurred by Hill in enforcing

17   his rights under this agreement.

18   Q.   What is 14.1 about?

19   A.   Under this agreement, the following exists.  One, 14.1.

05:38    20   Upon failure to pay Commerce fails to pay or provide Hill with

21   any of the amounts due him under this agreement.

22   Q.   Okay.  Now, Mr. Hill, has Commerce failed to pay?

23   A.   Absolutely.

24   Q.   Or TD I should say.

05:38    25   A.   Correct.

───────────── HILL - DIRECT - JACOBS ─────────────

1    Q.   Now without giving me dollars and cents, have you, in

2    fact, incurred enforcement fees?

3    A.   I have.

4    Q.   Including the counsel fees?

05:39    5    A.   Of course.

6    Q.   Okay.  All right.  Let me get off that exhibit.

7            MR. TAMBUSSI:  He says he's off the exhibit.

8            MR. JACOBS:  Yes, I am.

9            THE COURT:  Are you done with that calculation.

05:39    10           MR. JACOBS:  Yes, I am, Judge.

11           MR. TAMBUSSI:  Thank you.

12   Q.   Now, Mr. Hill, the next thing I want to discuss with you

13   is this topic of regulatory approval.  Okay?

14   A.   Yes.

05:39    15   Q.   Have you heard about it during the trial?

16   A.   I have.

17   Q.   All right.  Now, in your view under your contract, which

18   keeping in mind the 30 day payment provision.  Whose

19   obligation, in your view, was it to apply for any necessary

05:40    20   regulatory approvals?

21   A.   100 percent the Bank's.

22   Q.   Now, has that always been your view?

23   A.   It has.

24   Q.   Mr. Hill, you --

05:40    25           MR. JACOBS:  May we have plaintiff's exhibit P-27.

─── HILL - DIRECT - JACOBS ───

1    This was offered into evidence yesterday by counsel.   P-27

2    first page.   Okay.   Can we get that a bit bigger?

3    Q.   Do you recall this exhibit from -- I don't want to lose

4    the overhead there, the letterhead.   Okay.

05:40    5        Do you recall this exhibit from I believe it was

6    yesterday.

7    A.   Yes.

8    Q.   This --

9    A.   Yes.

05:41    10   Q.   You see the date there, July 13, 2007?

11   A.   Yes, I do.

12   Q.   Is that approximately 15 days after June 28, 2007?

13   A.   Right.

14   Q.   And you see this law firm letterhead Skaddens Arps so on?

05:41    15   A.   Yes, I do.

16   Q.   Who are those guys?

17   A.   Lawyers representing me.

18   Q.   And do they really have offices all these places around

19   the world?

05:41    20   A.   I guess so.

21   Q.   Have you seen this letter before today?

22   A.   Yes, I have.

23   Q.   Did you know about it back then?

24   A.   I did.

05:41    25   Q.   All right.   Who is it written to?

—— HILL - DIRECT - JACOBS ——

**1**   A.   Bill Tambussi.

**2**   Q.   Okay.  Now, you see in the very beginning of the letter

**3**   right after the salutation Dear Mr. Tambussi?  You see that

**4**   sentencing thanking him for his letter of July 3?

05:41   **5**   A.   Yes.

**6**   Q.   We're going to get to that in a minute.  Okay?  Do you

**7**   remember Mr. Tambussi's letter of July 3?

**8**   A.   I do.

**9**   Q.   All right.  Now, let's -- this is a formidable letter.

05:42   **10**   Let's move to the fourth page and this letter is divided into

**11**   topic headings.  You see this topic heading and employment

**12**   agreement?

**13**   A.   Yes, sir.

**14**   Q.   This topic heading employment agreement.  Count down one

05:42   **15**   two, to the third paragraph.  All right?

**16**   A.   The third paragraph.  Based on the July 3rd letter.

**17**   Q.   Exactly.  Now is this written by a lawyer who's working

**18**   for you at the time?

**19**   A.   Yes, it is.

05:42   **20**   Q.   And we already covered this.  You told me this is 15 days

**21**   after June 28.  Right?

**22**   A.   Yes.

**23**   Q.   Right.  Do you see this language in this letter based on

**24**   the July 3 letter.  Is that the Mr. Tambussi pretty letter?

05:42   **25**   A.   I believe so.

—— HILL - DIRECT - JACOBS ——

1  Q.   It appears that the company's position.  Do you know who

2  that means, the company's?

3  A.   The Bank.

4  Q.   That is the lump sum severance payment of $11,250.00

5  false within the requirement office part 359?  You know what

6  that is a reference, to that part 359?

7  A.   Of course.

8  Q.   What?

9  A.   It's their position that this payment requires approval

10  from the Federal Reserve.

11  Q.   All right.  Look at this next sentence with me, please,

12  therefore, we request that the company.  Is that the Bank?

13  A.   Yes.  Either the Bank or the Bancorp.

14  Q.   Promptly seek any necessary approvals, including but not

15  limited to approvals from the Federal Reserve and the FDIC so

16  that the company can comply with its contractual obligation

17  under Section 7.3B and 12.2 of the employment agreement to

18  make such payment to Mr. Hill within 30 days of the date of

19  his termination of employment.  Did I read that correctly?

20  A.   Yes.

21  Q.   Was that your position stated by your lawyer?

22  A.   Yes, it was.

23  Q.   Back 15 days after the June 28, 2007?

24  A.   Yes, sir.

25  BY MR. JACOBS:

──── HILL - DIRECT - JACOBS ────

**1**   Q.   Now, let's back up to Plaintiff's Exhibit 26.  The first

**2**   page.  Now, is that the July 3, 2007 letter of Mr. Tambussi

**3**   that we have spoken about?

**4**   A.   Yes, sir.

)5:44   **5**   Q.   It's addressed to a Mr. Bennett.

**6**   A.   Right.

**7**   Q.   Now, explain this to us.  Is Mr. Bennett -- or was

**8**   Mr. Bennett at that point representing you?

**9**   A.   Yes, he was.

)5:45   **10**   Q.   Was he a member of the same law firm?

**11**   A.   Skadden Arps.

**12**   Q.   Yes.

**13**   A.   Yes.

**14**   Q.   Now, back then, in July of 2007, did you see this letter

)5:45   **15**   from Mr. Tambussi, also?

**16**   A.   Yes, I did.

**17**   Q.   Now, this letter to Mr. Bennett from Mr. Tambussi, in its

**18**   first sentence, does it state that Mr. Tambussi's law firm

**19**   represents Commerce?

)5:45   **20**   A.   It does.

**21**   Q.   Now, is it about your termination and your employment

**22**   contract?

**23**   A.   It is.

**24**   Q.   In this letter, in the second full paragraph, do you see

)5:45   **25**   the termination without cause language?

*United States District Court*
*Camden, New Jersey*

─────────── HILL - DIRECT - JACOBS ───────────

1   A.   I do.

2   Q.   Can we make that letter bigger?

3        Does it refer to your January 1, 2006, employment

4   agreement?

5   A.   Yes, it does.

6   Q.   Now, in subparagraph A, does it refer to a separation

7   payment?

8   A.   It does.

9   Q.   How much?

10  A.   11,250,000.

11  Q.   Do you know whether that figure is accurate?

12  A.   I don't.

13  Q.   All right.  Now, you see this date, this sentence saying

14  had you continued to be employed by Commerce Bank until

15  December 31, 2011?

16  A.   Yes.

17  Q.   Is that when your contract would have ended?

18  A.   That's what he says.

19  Q.   Is that correct or incorrect?

20  A.   2010, I think.

21  Q.   Now, if we go to the second page of the letter, in the

22  next to last paragraph of this July 3, 2007, letter.  Now, can

23  we make that a bit bigger, do you think, that next to last

24  paragraph?  Okay.  Thank you.

25       What is that paragraph written by a Commerce Bank

─── HILL - DIRECT - JACOBS ───

1    lawyer about?

2    A.    Please be advised paragraph?

3    Q.    Yes.

4    A.    Please be advised that Commerce Bancorp has received an

5    opinion from the Federal Reserve board that any separation

6    payment will be governed by the applicable golden parachute

7    regulations.  As such, Commerce will not make payment of the

8    separation paid until all necessary findings under the

9    applicable regs are made and Commerce Bancorp is so authorized

10   by the Federal Reserve.

11   Q.    Is there anything in that letter telling you to go make

12   the application?

13   A.    No.

14   Q.    Now, is this letter, July 3rd, about five days after your

15   termination and resignation?

16   A.    Yes.

17   Q.    Now, let's talk about this application process.  Are you

18   generally familiar with this regulation, 359.4?

19   A.    I have become so, yes.

20   Q.    Okay.  Do you know the general language of it?

21   A.    Yes, I do.

22   Q.    When Commerce Bank was sold to Toronto Dominion Bank, who

23   got all --

24        MR. TAMBUSSI:  Objection.  It's not Toronto Dominion.

25        MR. JACOBS:  TD, NA, pardon me.

—————————— HILL - DIRECT - JACOBS ——————————

1    BY MR. JACOBS:

2    Q.   When Commerce Bank was sold to TD, NA, who got all of the

3    existing books and records and accounts and checks and

4    documents and payroll records and tax returns and leases and

05:49   5    everything else -- that Commerce --

6    A.   Liabilities and assets and everything.

7    Q.   Right.

8    A.   When the merger was completed, it went to the buyer.

9    Q.   TD, NA?

05:49   10   A.   TD Bank, right.

11   Q.   Now, did you hear references by Mr. Fisher about the

12   provision of millions of pages of documents to the OCC?

13   A.   I heard that.

14   Q.   Now, once you resigned from Commerce Bank, NA, and was

05:49   15   discharged without cause from Commerce Bancorp, Inc., did you

16   have all of the books and records and accounts and leases and

17   tax returns and all other documents of Commerce Bank?

18   A.   I had almost none.

19   Q.   Who did have them all?

05:50   20   A.   The bank.

21   Q.   Did you think that you could meaningfully state to the

22   OCC that you would you review all the information relevant to

23   this issue and having reviewed it all, did not have a

24   reasonable basis to believe that you had done anything

05:50   25   disqualifying yourself from payment?

*United States District Court*
*Camden, New Jersey*

─── HILL - DIRECT - JACOBS ───

**1**  A.   I think then and now that only Commerce Bank or Commerce

**2**  Bancorp could make whatever representations that were

**3**  required.

**4**  Q.   Do you think in an application, a hypothetical

**5**  application, you could do a self-assessment of your

**6**  performance in Commerce Bank?

**7**  A.   Not that would work.

**8**  Q.   In your opinion, after 35 or 40 years in banking, did you

**9**  think that anybody would pay any attention to an application

**10**  filed by you, rather than the payor bank?

**11**  A.   It's obvious then and it's obvious now that the

**12**  application must be made by a bank.

**13**  Q.   The next exhibit I want you to look at with me is in

**14**  evidence.  It's Plaintiff's Exhibit 35.  We'll get it on the

**15**  screen.  Perhaps make it a little bit bigger.

**16**      Do you see this is an August 6th, 2007 letter to both

**17**  the FDIC and the Federal Reserve on the letterhead of Sullivan

**18**  & Cromwell?

**19**  A.   Yes.

**20**  Q.   Now, August 6, 2007, is about how long after the Skadden

**21**  Arps July 13th letter demanding that the bank --

**22**  A.   A little bit less than a month.

**23**  Q.   Now, let's just show you the first page, second

**24**  paragraph.  We will blow that up a little bit.  Do you see

**25**  this letter written by a bank attorney saying in the center of

1   the second paragraph that Commerce Bank has been designated in

2   troubled condition and that your benefits are subject to the

3   golden parachute regulation; do you see all that?

4   A.   I see it, yes.

05:53   5   Q.   Now, Mr. Hill, this letter -- remember Mr. Fisher looking

6   at this letter yesterday?

7   A.   Yes.

8   Q.   Now, this letter which comes a little after a month --

9   little less than a month after your lawyer asked the bank to

05:53   10   go and make an application.  Can you find anything in this

11   letter which requests approval under the golden parachute reg

12   to pay you?

13   A.   No.

14   Q.   On the date this letter was written, which is August 6,

05:53   15   2007, did you have the employment contract we have been

16   talking about, P-22?

17   A.   Yes.

18   Q.   Was it in existence?

19   A.   Of course.

05:53   20   Q.   As far as you knew, did the bank have a copy?

21   A.   Of course.

22   Q.   On this date, August 6th, 2007, had the bank already

23   terminated you without cause?

24   A.   Yes.

05:54   25   Q.   Triggering the article 7.3 payments to you?

─────────── HILL - DIRECT - JACOBS ───────────

**1**   A.   Correct.

**2**   Q.   On this date, were the contract provisions regarding your

**3**   salary, your bonus, the stock options and the interest, were

**4**   they any different than you just explained them in the last

05:54   **5**   hour?

**6**   A.   They haven't changed from the day I left.

**7**   Q.   Have you ever seen a letter, Mr. Hill, ever, by this

**8**   Sullivan & Cromwell firm, Mr. Tambussi's firm, any law firm on

**9**   behalf of the bank, to the FDIC and/or Federal Reserve saying,

05:55   **10**   here is a copy of Mr. Hill's contract; we want approval to

**11**   pay?

**12**   A.   No, I have not.

**13**   Q.   Was everything calculable back then, just as it is now?

**14**   A.   Of course.

05:55   **15**       MR. TAMBUSSI:   Judge, at some point in time, leading

**16**   questions have to stop.   It's direct examination.

**17**   Respectfully, Judge, you ruled on this and it just hasn't

**18**   stopped.

**19**       THE COURT:   Some of your questions are leading,

05:55   **20**   Mr. Jacobs.

**21**       MR. JACOBS:   All right, Judge.   I will try to be more

**22**   precise.   I apologize.

**23**   BY MR. JACOBS:

**24**   Q.   Now, let me go back to June 28, 2007.   Plaintiff's

05:55   **25**   Exhibit 24 is in evidence.   Is that the resignation you spoke

HILL - DIRECT - JACOBS

1    of before the break?

2    A.   Yes.

3    Q.   Okay.  And does it refer to your employment contract?

4    A.   It does.

05:56    5    Q.   All right.  So now -- so we all understand this, from

6    which bank were you resigning?

7    A.   Well, my contract was with Bancorp, and for the jury,

8    Commerce Bancorp owns the two banks.  So my employment

9    agreement was with the Bancorp and I was resigning from the

05:56    10   banks.

11   Q.   Now, take a look at Plaintiff's Exhibit 23.  Have you

12   seen these minutes before today?

13   A.   Yes, I have.

14   Q.   Okay.  And does this comport with what you recall

05:57    15   about --

16   A.   It does.

17   Q.   Now, in between this date, August 28, 2007, and the

18   balance of the year, the rest of 2007, what, if anything, were

19   you doing, you and your lawyer, to try to get paid?

05:57    20   A.   Lawyers were negotiating with the bank lawyers.  I was

21   calling the chairman of the board of the bank, because it

22   wasn't only this money, they owed my wife's firm money, too.

23   So there were calls, but it was mainly handled by the legal

24   firms.

05:57    25   Q.   Now, I want to draw your attention to, firstly,

HILL - DIRECT - JACOBS

1   Plaintiff's Exhibit 19.  Have you read this June 28th consent

2   order before?

3   A.   Yes, I have.

4   Q.   Are you familiar with your term -- with its terms?

05:58   5   A.   Yes, I am.

6   Q.   Now, can you tell me, aside from the couple of things we

7   discussed regarding the review of leases, does this consent

8   order do anything to you or any transaction in which you have

9   participated in the previous 30 years?

05:58   10         MR. TAMBUSSI:  Objection, Judge.

11         THE COURT:  I don't understand the question.  Do you

12   understand the question, Mr. Hill?

13         THE WITNESS:  I think so.

14         THE COURT:  Do you want him to try it again?

05:59   15         THE WITNESS:  No, I got it.

16         It doesn't refer to -- it doesn't refer to me.  It

17   does order the bank to go back and review the leases that were

18   in affect and do this cost benefit analysis.  Other than that,

19   there's no reference to me in the agreement.

05:59   20   BY MR. JACOBS:

21   Q.   Does it reverse anything that you did?

22   A.   No.

23   Q.   Is there a mention in this order, that you can find, of

24   branch application completion or misstatements or anything?

05:59   25   A.   No.

──────────── HILL - DIRECT - JACOBS ────────────

1    Q.   Now, can you tell me what all needs to be done when

2    Commerce Bank is trying to get a new branch opened?

3    A.   Sure.  When you want to do a new branch site, once you

4    acquire the site, in other words, identify the site and begin

06:00    5    to get the zoning, you have to apply to the OCC to get the

6    branch approved.  Every branch has to be approved by the OCC.

7    It's not an easy step.  There are multiple steps you have to

8    get through.  And that was done 400 plus times for Commerce

9    over all the years.  Obviously, I didn't handle that.  It was

06:00    10    done by executive, inside the bank.

11    Q.   Okay.  I just want to make sure I cover this.  Is there

12    anything about that in this June 28, 2007 order?

13    A.   Not that I can see.

14    Q.   All right.  Now, who is Dave Wojcik?

06:00    15    A.   Dave was head of our risk and compliance group and it was

16    his job to deal with the OCC, including branch applications.

17    Q.   Have you heard, in testimony, about a memo that you

18    authored in -- sometime before this June 28, 2007?

19    A.   Yes, I have.

06:01    20    Q.   All right.  Why don't you tell us about that.

21    A.   Because I remember --

22    Q.   What did you say and why did you say it?

23    A.   As I remember, it was an internal document to my legal

24    team negotiating with the OCC about what this consent order

06:01    25    should say.  I think and -- I was making various comments

HILL - DIRECT - JACOBS

1  about what the order -- what we wanted the order to say.

2  There is a comment in there about these alleged incomplete

3  branch applications, and I made a comment that in a few

4  isolated cases they may have not have been complete. I think

06:01  5  I used the word "unsafe," but, of course, that was an error.

6  There was nothing unsafe about it. And I believe these

7  applications went back to '02.

8  Q. Well, tell us more. When you said whatever you said,

9  this may be true in some isolated cases, what exactly were you

06:01  10  talking about?

11  A. At the time the OCC was concerned that there were several

12  branch applications that had been completed and approved on

13  the wrong form and on these there had been related party

14  leases involved, and that because we did it on the wrong form,

06:02  15  or maybe we didn't do it on the wrong form, that these related

16  party issues were not disclosed.

17  Q. In that memo, were you talking about something that you

18  personally did?

19  A. No, I had nothing to do with the branch apps.

06:02  20        MR. TAMBUSSI: I'm sorry, I didn't hear that last

21  answer.

22        THE WITNESS: I have nothing to do with the branch

23  applications.

24        MR. TAMBUSSI: Thank you.

06:02  25  BY MR. JACOBS:

─────────── HILL - DIRECT - JACOBS ───────────

1    Q.  Whose job was that?

2    A.  Dave Wojcik's, W-O-J-C-I-K.

3    Q.  For how many years?

4    A.  10 or 12, I think.

06:02    5           THE COURT:  Take your time.

6           MR. JACOBS:  I'll be okay in a minute.

7           THE COURT:  Do you need water?

8           MR. JACOBS:  I think the water set me off.  All

9    right.  I'm back to normal.  Okay.  Thank you.  Judge, I

06:03    10   forgot where I was.

11          THE COURT:  Mr. Wojcik, 10 or 12 years, did the

12   branch applications.

13          MR. JACOBS:  Thank you.  Let's pick up from there.

14   BY MR. JACOBS:

06:03    15   Q.  Mr. Wojcik was in charge of this for how long?

16   A.  10 or 12 years, at least.

17   Q.  Okay.  And what 10 or 12 years would they be?

18   A.  Well, these applications, I think they were looking at

19   were in '02 or '03.  So 1990, about, he started.  And he was a

06:04    20   former OCC examiner.

21   Q.  Mr. Wojcik was?

22   A.  Yes.

23   Q.  Officer of the Comptroller of Currency?

24   A.  Yes, the same.

06:04    25          MR. JACOBS:  Can we get Plaintiff's Exhibit 9 face

—— HILL - DIRECT - JACOBS ——

1    page up, please?

2    BY MR. JACOBS:

3    Q.   Now, we're back to the special litigation committee

4    report.

06:04    5         Now, was -- you've told us you read this.  Did the

6    special litigation committee of disinterested directors and

7    outside law firms, did they look at this?

8    A.   They did.

9    Q.   Now, can you tell me the history of the applications as

06:04    10    it's recited in the special litigation committee report?

11         MR. TAMBUSSI:  Judge, does he want him to read the

12    report?  Is that what we're being asked here?

13         THE COURT:  I'm not sure -- where are we going with

14    this?

06:05    15         MR. JACOBS:  The three versions of -- how this

16    problem developed, the three versions of the OCC branch

17    application, '88 to '98, April of '98.

18         THE COURT:  He says he doesn't know anything about

19    branch applications.  Mr. Wojcik did them all.

06:05    20         MR. JACOBS:  It's under the report.  The report is in

21    evidence.

22         THE COURT:  So you want him to read the report?

23         MR. JACOBS:  No.  I just want him to summarize the

24    findings of the SLC on this topic.

06:05    25         THE COURT:  I understand that, where we're going, but

1    kind of a cumbersome way to go there, but go ahead.

2    BY MR. JACOBS:

3    Q.   Were there three versions of the branch application?

4    A.   The special litigation committee talks about three types

5    of forms that the OCC and various dates and submission methods

6    and were we on the online version, the non online version and

7    if we were using the wrong form.  Of course, as I said, I

8    wasn't personally involved.  There seemed to be some confusion

9    between the OCC and Commerce about exactly which form to use,

10   even though they had been approving branches on the old form

11   for a long time.

12   Q.   Was the form changed?

13   A.   Yes.

14   Q.   Were there any changes in the disclosure of related

15   parties or on what we call insider?

16   A.   I only really know what the special litigation committee

17   report says about it.  But there was some change in disclosure

18   on the various forms.

19   Q.   Did you discuss any of those things with Dave Wojcik?

20   A.   Oh, I'm sure I did.  Absolutely.

21   Q.   Do you recall what you told him?

22   A.   I recall what he told me.  He told me at great length

23   that we had submitted on the right form and our applications

24   were right.

25   Q.   Why do you think this whole branch application issue was

──── HILL - DIRECT - JACOBS ────

1    dropped from the June 28, 2007 --

2          THE COURT REPORTER:  I'm sorry, I didn't hear the end

3    of your question.

4          THE COURT:  Ask your question again.  Why do you

5    think that these were dropped?

6          MR. JACOBS:  Yes.

7          THE COURT:  How would he know that?

8          MR. JACOBS:  I'll withdraw the question.

9    BY MR. JACOBS:

10   Q.  In your view, knowing however much or little you knew

11   about the branch application process, were you doing anything

12   wrong in that process?

13   A.  I was not.

14   Q.  Do you think Mr. Wojcik was?

15   A.  I did not.

16   Q.  As far as you know, did the OCC ever take any action on

17   that topic?

18   A.  Not that I'm aware of.

19   Q.  As far as you know, did the SLC, special litigation

20   committee, ever take any action on that topic?

21   A.  No, they did not.

22   Q.  Mr. Hill, at some point was -- did someone -- let me

23   rephrase the question.  Were the funds due you under your

24   contract ever placed into escrow?

25   A.  No.

─── HILL - DIRECT - JACOBS ───

1   Q.   Why?

2   A.   They proposed an escrow agreement which was not

3   acceptable to me.

4          MR. JACOBS:  May I show -- Judge, may I show it to

06:08   5   the witness?

6          THE COURT:  Is there a marking on it?

7          MS. LEMING:  I don't think it's in evidence.

8          MR. JACOBS:  It is, but ours is not.

9          MS. LEMING:  It's D-51.

06:09   10          MR. JACOBS:  51 or 61?

11          MS. LEMING:  D-51.

12          MR. JACOBS:  Oh, I see the problem.  We have it as

13   Plaintiff 61.

14          MS. LEMING:  It's the same document, but D-51 was

06:09   15   moved yesterday, so it's in.

16          MR. JACOBS:  Well, I'll take either one.  Yours is

17   D-51?

18          MS. LEMING:  D-51.

19          MR. JACOBS:  Judge, D-51 and Plaintiff's Exhibit 51,

06:09   20   same document, so I'll take either one.  There it is.  Can we

21   make it a bit bigger, do you think?

22   BY MR. JACOBS:

23   Q.   Is this, in fact, the escrow proposal you were thinking

24   about?

06:09   25   A.   I'm not sure if we got this proposal.

——— HILL - DIRECT - JACOBS ———

1   Q.   Well, did you --

2   A.   Generally, this is what they proposed one lawyer to

3   another lawyer.  I don't remember seeing this.

4   Q.   Was part of the proposal paragraph No. 6?

5   A.   Yes, it was.

6   Q.   Tell us what paragraph 6 says.

7   A.   There will be no time limit on the escrow or the Fed's or

8   FDIC's approval.

9   Q.   And what did you think of that?  Was that agreeable to

10  you?

11  A.   It was not.

12  Q.   Tell us why.

13  A.   No one could ever agree to an escrow that has no time

14  limit.

15  Q.   These were -- how did you understand these words, "no

16  time limit"?

17  A.   They speak for themselves.

18  Q.   Okay.  Is that why you would not agree?

19  A.   One of the reasons.

20  Q.   What were the other reasons?

21  A.   The same time our lawyers were trying to collect moneys

22  that the bank owed my wife's firm which they refused to pay.

23        MR. TAMBUSSI:  Objection, objection, objection.

24  Judge, the issue of InterArch and whether or not there were

25  any moneys owed there has nothing to do with Mr. Hill's case.

──────── HILL - DIRECT - JACOBS ────────

1    The InterArch claims have long been resolved.

2              MR. JACOBS:  Judge, that's true, they have.  But in

3    opening statement, Mr. Tambussi mentioned it specifically.

4              THE COURT:  Mentioned what specifically?

5              MR. JACOBS:  I'm sorry?

6              THE COURT:  Mentioned what specifically?

7              MR. JACOBS:  Mr. Hill's refusal to agree to the

8    escrow proposal.

9              THE COURT:  Right.

10             MR. JACOBS:  And we want him to explain why.

11             THE COURT:  And he's just concurred that he refused

12   and he gave us the reasons.

13             MR. JACOBS:  Yes, but Mr. Tambussi is objecting to

14   one of the reasons.

15             THE COURT:  I'm going to overrule the objection.  The

16   jury heard it.  Let's move on.

17             MR. JACOBS:  Okay.  Thank you.

18   BY MR. JACOBS:

19   Q.   Now, staying on this topic of the funds due you and the

20   regulatory approval process, I want to show you Exhibit -- I

21   want to get to Exhibit 39, just Interrogatory 24.

22        Have you seen these before, Interrogatories answered in

23   this case by Mr. Fisher on behalf of Commerce and TD Bank?

24   A.   I can't recall if I have.

25   Q.   Specifically this one, No. 24, which we discussed with

─────────────── HILL - DIRECT - JACOBS ───────────────

1   Mr. Fisher yesterday.  Do you recall this claim?

2   A.   Yes, I do.

3   Q.   And focussing on that last sentence, what did Commerce do

4   to get you paid?  That last sentence:  Commerce has sought

06:13   5   necessary approvals from the appropriate regulatory

6   authorities.

7        Have you ever seen anything in writing where Commerce

8   sought to do that as of February of 2010?

9   A.   We now know again that that wasn't true then.

06:13   10   Q.   All right.  Thank you.  I want to take you to Plaintiff's

11   Exhibit 59.  Could we make it a little bit bigger?  And I want

12   to focus in on the date here.  Do you see the date?

13   A.   I do.

14   Q.   Now, is this letter on the currency of the -- Comptroller

06:14   15   of the Currency?

16   A.   Yes, it is.

17   Q.   And to whom it is addressed?

18   A.   Board of directors.

19   Q.   Now, on this date, in December of 2006, what was your

06:14   20   position?

21   A.   Chairman of the board.

22   Q.   So did you get this?

23   A.   I did.

24   Q.   Did you read it?

06:14   25   A.   Of course.

─── HILL - DIRECT - JACOBS ───

1   Q.   Did you understand it?

2   A.   Not really.

3   Q.   Now, it's just over a page.  What is this letter about?

4   What's it advising the board?  What's it saying?

06:14   5   A.   It says they are -- they are conducting investigation

6   into the affairs of Commerce Bank.  The scope includes

7   transactions related to bank officers and directors, their

8   relatives and laws and business associates and transactions

9   related to bank premises.

06:15   10   Q.   Okay.  Now, after you got this letter -- oh, by the way,

11   are there attachments to this letter?

12   A.   I think so.

13   Q.   Can we move on through so we can see all the attachments?

14   Okay.  You see this in boldface, request letter?

06:15   15   A.   Yes, I do.

16   Q.   What do they in the next one, two, three, four, five,

17   six, seven -- seven or eight pages, what are they requesting

18   be produced?

19   A.   Minutes of the board meeting of January 15th, 2002, the

06:16   20   agreements between InterArch and the Bancorp, the DeMaria

21   litigation.

22   Q.   Is that the same DeMaria litigation that we discussed a

23   couple hours ago?

24   A.   The very same.

06:16   25   Q.   Okay.  What else?

*United States District Court*
*Camden, New Jersey*

──────── HILL - DIRECT - JACOBS ────────

1   A.   No. 4 has to do with a branch location in Devon that was

2   done by a prior bank that we had bought, also named Commerce,

3   and it had to do with the bank buying the property back.   I

4   think the bank owned the land.   We bought the building back,

06:16   5   as I recall.

6   Q.   Go to the next page.   What sort of things is the OC

7   looking to collect as part of this investigation?

8   A.   Lease information.   This is all about land buying.

9   Q.   And the next page?

06:17   10   A.   This is about real estate.

11   Q.   And the next page?

12   A.   Construction, leases.

13   Q.   Then the next page, No. 5, you get to an appendix.

14   A.   Yes.

06:17   15   Q.   Is that definitions?

16   A.   Yes, it is.

17   Q.   Okay.   Now, you were chairman of the board, right?

18   A.   I was.

19   Q.   And CEO?

06:17   20   A.   I was.

21   Q.   What did you do about all this?

22   A.   I don't remember exactly what I do.   I'm sure I gave it

23   to our general counsel who wrote the memo shortly thereafter

24   that went to the board.   I'm sure I told all the board members

06:17   25   about it.   And I probably engaged outside law firms to consult

—— HILL - DIRECT - JACOBS ——

1    on it.

2    Q.   Now, with this December 5, 2006 letter, did it become

3    public?

4    A.   I'm not sure.

06:18    5    Q.   Well, how do these things work?

6    A.   They ask for information, we gave it to them.

7    Q.   And did Commerce Bank do that?

8    A.   Of course.

9    Q.   Are these the millions of pages that Mr. Fisher referred

06:18    10   to?

11   A.   Well, this is the start of it.

12   Q.   And how long did this continue?

13   A.   Six months.

14   Q.   All right.  Now -- and during those six months, what was

06:18    15   going on?

16   A.   With them?

17   Q.   Yeah.

18   A.   I have no clue.

19   Q.   What happened in April of 2007?  Did the OCC -- D-19.

06:19    20   Did the OCC communicate with the bank in April of 2007?

21   A.   Yeah, I think that letter was up to that date.  After we

22   got this December letter, we had a number of new branch

23   applications pending and we were asking them what they were

24   doing, are they going to approve it, I think we're getting

06:19    25   stalled, and I think that letter -- that resulted in the

1    letter saying they weren't going to approve new applications

2    until this matter was resolved.

3    Q.   Was that April 27, 2007?

4    A.   I believe so.

06:19    5    Q.   Now, Mr. Hill, what kind of problems did this present for

6    you as the chair of the board and the CEO?

7    A.   Well, of course, it was a problem.  We had to respond.

8    We had to spend time and it took a tremendous amount of

9    management time on this.

06:19    10    Q.   What were you thinking about this investigation and who

11    they were looking at?

12    A.   Well, it's obviously, they were looking at related-party

13    transactions, and that's me.  What was I thinking?  All these

14    transactions had been examined many times, had been disclosed

06:20    15    in many public filings, had been disclosed in every OCC report

16    where it was appropriate to disclose it and there was nothing

17    new.  So we were perplexed about what this was about.

18    Q.   When you got the April 27th letter or e-mail about not

19    approving new branches, what was your reaction?

06:20    20    A.   I can't recall.

21    Q.   How about the board, generally?

22    A.   Well, we were all concerned about it.  We were all

23    concerned about it.  No one really felt there was a concern

24    for the bank because we knew there was nothing new.  It's all

06:20    25    been disclosed, examined, reviewed by all the things that we

HILL - DIRECT - JACOBS

1  do.  So obviously, we were concerned.  We didn't really think

2  there was any long-term concern.

3  Q.  Did you change your mind about that?

4  A.  Well, they went on a witch hunt to try to find something

5  that the bank had done wrong and they couldn't find anything

6  as all the reports -- subsequent, including the special

7  litigation committee has shown.  And they kept asking for more

8  information, more information.

9  Q.  Explain how we get from a point here, in April of 2007

10  when they threaten no branch approvals to June 28, 2007, when

11  you resign and are terminated without cause.  What goes on in

12  those 60 days?

13  A.  They keep asking for more information.  Our branches

14  aren't being approved.  That's about it.

15  Q.  Did you -- did you begin to become concerned?

16  A.  Oh, I was concerned, absolutely.

17  Q.  Now, in that 60-day period, what options did you

18  consider?

19  A.  Well, the first option, the obvious option is just

20  supplying information to them and whatever concerns they had

21  we would solve and go forward.

22  Q.  Did you try to do that?

23  A.  Yes, we did.

24  Q.  Did it work?

25  A.  No.

─── HILL - DIRECT - JACOBS ───

1   Q.   What's the next option?

2   A.   We could fight them in court, we could get the lawyers

3   involved.  We could fight them that way.

4   Q.   And what are the consequences of doing that with a

06:22   5   federal regulatory agency?

6   A.   As I explained to one of our people one time, the U.S.

7   government has tanks.  We don't.  So it's strictly a one-sided

8   fight.

9   Q.   What got you to the point of resigning?

06:22   10   A.   It was a combination of this.  They were just being

11   completely unreasonable.  But frankly, I had been a CEO for 34

12   years and I was getting tired of it.

13   Q.   We looked at the June 28, 2007, resolution of the board

14   of directors stating you were terminated without cause.  You

06:23   15   recall that?

16   A.   I do.

17   Q.   Now, as an eyewitness to the unfolding events, did anyone

18   back then ever suggest terminating you with cause for doing

19   something bad?

06:23   20   A.   No.

21   Q.   Were you ever threatened with that?

22   A.   No.

23   Q.   Now, if we focus in on -- well, actually, I need to ask

24   you another question.  I'm sorry.  Tell us your understanding

06:24   25   as a banker of this troubled condition status.

1    A.   Yeah, I researched this troubled bank condition and this

2    359 reg.  It was a law introduced in '92 or '3, something like

3    that.  And it was for banks that had failed.  The government

4    was concerned that banks had financial problems or had failed

06:24    5    were paying out payments to people and were endangering the

6    FDIC insurance fund.  In fact, when you look at regs, it talks

7    about risks to the FDIC insurance fund.

8    Q.   In the middle of 2007, was Commerce Bancorp, or Commerce

9    NA in any way financially troubled?

06:24   10    A.   Absolutely not.

11    Q.   How were they doing in the middle of 2007?

12    A.   Fine.

13    Q.   How were they doing at the end of 2006?

14    A.   Great.

06:25   15    Q.   How were they doing at the end of 2007?

16    A.   Yeah, great.

17    Q.   How were you measuring great?

18    A.   Well, you measure it lots of ways.  Couple ways we

19    measure it was the stock price.  It was trading at a very high

06:25   20    multiple and during 2007 it actually went up.

21    Q.   Let me stop you there.  What does that mean?

22    A.   Price earnings ratio.  One of the ways we measure stock

23    prices is you take the amount a company makes per share, you

24    divide it by the price and you get a price earnings ratio.

06:25   25    The higher the price earnings ratio, the higher the stock is

─────────HILL - DIRECT - JACOBS─────────

1    valued in the market.

2    Q.   I'd like you to focus on this time period that I just

3    defined, late -- you know, like December 2006 to the end of

4    2007.  And I want you to take a close look for us and explain

5    to us the financial condition of Commerce Bank in that

6    one-year period.

7    A.   Well, the financial condition means a couple things.  The

8    stock price is one area, but the others, the other side is the

9    capital, the earnings, the growth of the bank.  And they

10   were -- they all were strong.  And, in fact, during this

11   period, actually in March of '07 in the middle of this,

12   Moody's upgraded the credit rating on the bank to an A1 rating

13   which is the highest rating you could have.

14   Q.   You've got to explain that for us.

15   A.   Moody.

16   Q.   Who or what is Moody?

17   A.   Moody's and S & P, you've all heard about credit rating

18   agencies.  They rate governments, they rate companies, they

19   rate banks and they write reports on the financial strength of

20   these companies.  And they had been rating our bank for a long

21   time, and in March of '07, they upgraded the credit rating of

22   Commerce Bank and they talk about in this ratings review all

23   the positive things.

24   Q.   March of '07, about four months after this letter --

25   A.   And that information was in the market at the time.  In

─────── HILL - DIRECT - JACOBS ───────

1   other words, we had disclosed the investigation, I believe.

2   Q.   About when did you disclose the investigation?

3   A.   I'm not sure.

4   Q.   The letter that we just looked at was dated December 5,

5   2006.  Was it after that?

6   A.   Yes.

7   Q.   Was it after the first of the year?

8   A.   I think so.

9   Q.   Was it before the Moody's report?

10   A.   I believe so.

11   Q.   Now, go back to the Moody's report.  The Moody's report

12   did what?  It upgraded Commerce --

13   A.   It upgraded our credit rating from an A to the A1.  A1 is

14   the highest credit rating you could have with that.

15   Q.   So was that after this OCC investigation started and

16   before you resigned?

17   A.   Correct.

18   Q.   All right.  Now, you began speaking about the stock price

19   as an indication of the strength of the bank.  Do you recall

20   that?

21   A.   Yes.

22   Q.   Same time frame, December '06, December '07 --

23   A.   I went back and researched some of the stock price

24   numbers.  January 31st, 2007, the stock was trading on the New

25   York Stock Exchange for 33.78 a share.

─── HILL - DIRECT - JACOBS ───

1   Q.   Wait a minute.  I want to write this down.

2   A.   January 31st, 33.78.

3   Q.   Wait a minute.  January 1st, '07 I think he said.

4          MR. JACOBS:  May I?

5          THE COURT:  Sure.

6   BY MR. JACOBS:

7   Q.   I actually wanted to start with December of '06.  Is that

8   possible?

9   A.   January 31st of '06 I have 33.44.

10  Q.   January 31st, '06.  What was the stock price?

11  A.   33.44.

12  Q.   Okay.  Go forward.

13  A.   You want each quarter or just the end of the year?

14  Q.   Each quarter.

15  A.   March 31st, 36.65.

16         June 30th, 35.67.

17         December 30th --

18  Q.   Aren't you skipping a quarter?

19  A.   I gave you -- yeah, I didn't -- I'm sorry, I didn't write

20  down September.  Go to December 31st.  35.27.  So that's in

21  '06.

22  Q.   Okay.  Now, let's just pause for a moment.  Did the OCC

23  letter come in the beginning of December?

24  A.   No.  The letter didn't come in until the end of -- maybe.

25  I'm not sure when we disclosed it.

*United States District Court*
*Camden, New Jersey*

─────────────── HILL - DIRECT - JACOBS ───────────────

**1**  Q.   The letter itself, where is that D-19?

**2**  A.   But the question is not when we got it, it's when we made

**3**  a public disclosure.

**4**  Q.   Hang on a minute.  I want to nail this date down.  Can we

06:30  **5**  get back up this letter in evidence, which is Plaintiff 59 --

**6**  yeah, Plaintiff 59.  I want to make sure we have the correct

**7**  date there.

**8**       Is this the OCC letter notifying you of an

**9**  investigation on -- what's the date?

06:31  **10**  A.   Yes.  December 5th, '06.

**11**  Q.   Okay.  So I'm just going to put an OCC up here.  Right?

**12**  A.   Okay.

**13**  Q.   Where do we go next?

**14**  A.   Then we're in '07.

06:31  **15**  Q.   Well, I know that.  But where in '07?

**16**  A.   January 31st, '07.

**17**  Q.   Okay.  Stock price?

**18**  A.   33.78.  March 33.38.

**19**  Q.   Exactly the same?

06:31  **20**  A.   No, the first one is 33.78.

**21**  Q.   Right.

**22**  A.   And March is 33.38.  And then in June, 36.99.  And then

**23**  in October 30th, after the Toronto Dominion deal was

**24**  announced, the stock was trading at 40.75.

06:32  **25**  Q.   Now, these figures you gave us, are they, you know,

──────── HILL - DIRECT - JACOBS ────────

1   published figures?

2   A.   They are.

3   Q.   Okay.  Now, if we look at the date of the investigation,

4   the close date we have is December 31st, 2006, the

06:32   5   investigation letter.  Do we see 35.27?

6   A.   35.67 is June 30th.

7   Q.   Okay.  And then December 31st?

8   A.   35.27, right, you got it right.

9   Q.   Then, if we fast forward to two days after you're

06:32   10   discharged without cause and your resignation, June 30th,

11   2007 --

12   A.   Right.  36.99.

13   Q.   Okay.  Now, is this, in your experience, anything unusual

14   about price fluctuation for Commerce Bank?

06:33   15   A.   No, this is your normal stock fluctuations.  And I would

16   say mid-2007 is when we were all beginning the feeling that

17   the big crash was coming and the bank stocks in general were

18   not doing well.

19   Q.   Now, Mr. Hill, tell me why the stock elevated in October,

06:33   20   the stock price elevated.

21   A.   That reflected the sale of the bank to Toronto Dominion.

22   Q.   And why would that happen?

23   A.   Because the price was higher.  Toronto Dominion's price

24   was $42 and a half.

06:34   25   Q.   Okay.  Well, that's what I want you to explain to the

─────── HILL - DIRECT - JACOBS ───────

1  jury.

2  A.  So the merger was announced that a price of $42 and a

3  half per share.  But since the deal didn't close for some

4  months, the market assigned some risk to it not happening.  So

06:34  5  the stock went up to 40.75 and that gap was the market risk of

6  the deal not going through.  But the acquisition price was $42

7  and a half.

8  Q.  Okay.  Well, here's what I'm trying to get you to explain

9  to us.  You say that TD price per share was 42.50?

06:34  10  A.  The price they were paying for Commerce was $42 and a

11  half.

12  Q.  Gotcha.  Now, here's what I want to know.  That day, what

13  was a share of Commerce stock selling for?

14  A.  Give me a minute.

06:35  15      You know, I don't know that number.  Ask me on Monday

16  and I'll have it for you.

17  Q.  Okay.  Was it more or less than 42.50?

18  A.  Oh, less.  Absolutely.

19  Q.  Right.  You just don't know how much less?

06:35  20  A.  Correct.

21  Q.  Okay.  And why was that?  Why were they paying 42.50?

22  A.  Because the bank was paying over the market price for

23  Commerce.

24  Q.  But why?  What was so good about Commerce?

06:35  25  A.  Well, we know what they said.

HILL - DIRECT - JACOBS

1  Q.   What did they say?

2  A.   Well, in their conference call and press release, they

3  said, among other things, they say the following things:  "The

4  addition of Commerce creates a truly impressive branch

06:35   5  footprint.  We will have great market share in New Jersey and

6  growing presence in New York City.  These are great markets,

7  places where low risk deposit driven franchises can continue

8  to grow rapidly."  We have taken a clear -- this the CO of

9  Toronto-Dominion talking.  "We have taken clear decisive

06:36   10  action on a unique growth opportunity by acquiring a

11  well-establish organic growth leader.  Let me be clear there's

12  no opportunity where you can by an organic growth engine much

13  less one of this size and quality.  What are the qualities of

14  Commerce that makes it such an attractive target?  Well,

06:36   15  simply put, it is the TD Canada Trust of the United States."

16  Q.   Why would they pay more per share than it was selling

17  for?

18       MR. TAMBUSSI:  Objection.  How would this witness

19  know that answer, Judge?

06:36   20       MR. JACOBS:  From 40 years of banking.

21       THE COURT:  Doesn't mean me knows what was in the

22  minds of the people that bought the bank.  Establish a

23  foundation that he has a reason to know why they paid.

24       MR. JACOBS:  Well, I think the answer to that

06:37   25  question is he does, Judge?

HILL - DIRECT - JACOBS

1          THE COURT:  Establish the foundation as to what it

2   is.  And, under 701, you need a rational basis for your

3   opinion.

4   BY MR. JACOBS:

06:37   5   Q.  Mr. Hill, based on your years of banking, have you a

6   thought on why TD, N.A., would pay over market price for

7   Commerce Bank?

8          MR. TAMBUSSI:  Objection.

9          THE COURT:  Sustained.

06:37   10         MR. JACOBS:  All right.

11  BY MR. JACOBS:

12  Q.  All right.  Let me go on to something else then.

13         In that conference call that you were quoting from, do

14  you recall a reference to 40 consecutive months of same store

06:37   15  double digit increases?

16  A.  Give me a minute here.

17  Q.  Yes.  I can help you.

18  A.  Go ahead, tell me.  Well, let me read this as a partial

19  answer.  "So where does the value of Commerce come from?

06:38   20  Commerce's performance has been are truly phenomenal.  The

21  average U.S. bank only has 50 to 70 million in deposits per

22  branch where Commerce has over 100 million per store and are

23  growing faster, indeed, at about three times the industry

24  average.  The value in this transaction cannot be adequately

06:38   25  accounted for by using a multiple of forward earnings, the

*United States District Court*
*Camden, New Jersey*

HILL - DIRECT - JACOBS

1    real value of this transaction is derived from the embedded

2    high organic growth which exists within the Commerce current

3    branch network.

4    Q.   Thank you.

06:39  5        Let me direct you back to something Mr. DiFlorio said

6    in this conference call, which he testified about on video

7    yesterday:  "At a time when most U.S. banks are flat or

8    experiencing low growth, we've been on a bit of a tear here,

9    we're coming on 40 consecutive quarters of double digit same

06:39  10   stores sales growth, which is a retailers dream."

11       What does that mean?

12   A.   Comparable store growth, whether it's in the retailing

13   business or in the banking business, it's how much the sales

14   in a retail business grow per store on a year to year basis.

06:39  15   Do sales per store go from 10,000 12,000, that's a 20 percent

16   growth.  In banking we measure it in deposit growth per branch

17   and Commerce reported that number at every quarter.

18   Q.   Now, in that quotation I just read, Mr. DiFlorio referred

19   to double digit same store sales growth, what does that mean?

06:40  20   A.   It's the percentage of our average store deposit growth,

21   it generally ran about 18 to 20 percent per store, that's an

22   astronomically high growth number.

23   Q.   What does 40 consecutive quarters mean?

24   A.   I guess it means 40 consecutive quarters we had double

06:40  25   digit deposit growth per store.

HILL - DIRECT - JACOBS

1   Q.   Is 40 consecutive quarters ten years?

2   A.   I guess it is.

3   Q.   All right.  Now, I want to talk to you about materially

4   adverse effect to a bank.  You know the phrase?

06:40   5   A.   I do.

6   Q.   Where does it appear?

7   A.   It's in the Federal Reserve golden parachute 359 reg.

8   Q.   Okay.  Now, 40 consecutive quarters, ten years, of double

9   digit same store sales growth, is that the truth, is that what

06:41   10   Commerce experienced?

11   A.   I believe so.

12   Q.   Do you think Commerce, you were there, do you think

13   Commerce was materially adversely effected by anything you

14   did?

06:41   15   A.   No, I don't.

16   Q.   You think it was materially adversely effected by

17   anything anybody did?

18   A.   No, I don't.

19   Q.   How well did Commerce do during your tenure there from

06:41   20   1973 to 2007?

21   A.   Well, rather than me give you a number, Forbes publishes

22   every year a report called a 20/20/20 club, these are public

23   firms where the CEO has been the CEO for 20 plus years and the

24   company has had a 20 plus compounded shareholder return.  This

06:41   25   one I have dated May '07, there were seven firms on this list

HILL - DIRECT - JACOBS

1    that met that criteria, we were number four, in other words,

2    we were the fourth highest performing company.

3    Q.   We being whom?

4    A.   Commerce Bank.  Just as an aside, we had compounded our

06:42    5    stock return at 23 percent a year compounded over my entire

6    term.  Warren Buffett was one notch ahead of us at 27 percent.

7    Q.   Who is Warren Buffett?

8    A.   I think we all know who Warren Buffett is.

9    Q.   Margaritaville Buffett?

06:42    10    A.   No, it's not the Buffett.

11    Q.   You were how close to him?

12    A.   One notch down.

13    Q.   So what did you do to materially adverse effect your

14    bank?  What did you do?  Sounds like it was doing okay.

06:43    15    A.   I did everything to help the bank.

16         MR. JACOBS:  Judge, you want me to go onto another

17    topic?  I'm about to get into some charts and stuff.

18         THE COURT:  Why don't we break for the week, it's a

19    good time.

06:43    20         MR. JACOBS:  Okay.

21         THE COURT:  Ladies and gentlemen, that's it for the

22    week.  Let me bring you up to date on some scheduling issues

23    before you leave.

24         THE WITNESS:  Can I get down?

06:43    25         THE COURT:  Yes.

─────────────── HILL - DIRECT - JACOBS ───────────────

1        Monday, May 20th we're going to begin 1:30 that day.

2   And Wednesday, May 22 we will not have court at all.  I'll

3   remind you of those things next week.

4        Have a great weekend.  To those of you who are mothers,

5   have a happy Mother's Day.  If you're not a mother but have a

6   mother, honor your mother on Sunday, please.  Please don't

7   discuss the case with anyone, don't do any research.  See you

8   back here Monday morning 9:15.

9             DEPUTY CLERK:  All rise.

10            (Jury leaves the courtroom.)

11            THE COURT:  Mr. Tambussi?

12            MR. TAMBUSSI:  Judge, Mr. Hill clearly has been

13   reviewing some and using some documents in his testimony, I

14   have not had the opportunity to see these documents, a number

15   of these documents that he's referenced have not been produced

16   in initial disclosure pursuant to Rule 26 or otherwise.  What

17   I would like to do today before he leaves is mark that entire

18   file so it's available in it's exact condition as it is today

19   for when I get an opportunity to cross him.

20            THE COURT:  You may inspect and it mark it before you

21   leave.

22            MR. JACOBS:  We have no problem, he can even look at

23   Mr. Hill's personal notes.

24            MR. TAMBUSSI:  I'd like to do that.

25            THE COURT:  Anything else, folks?

*United States District Court*
*Camden, New Jersey*

─── HILL - DIRECT - JACOBS ───

1          MR. TAMBUSSI:  That's it.

2          MR. JACOBS:  Judge, I want to make several last

3   efforts over these three days to find that witness.  If I

4   can't get him here Monday, I am going to ask to take him out

06:45   5   of order.

6          THE COURT:  You're going to ask to take him out of

7   order.

8          MR. JACOBS:  Yeah.

9          THE COURT:  When is your case going to end?

06:45  10          MR. JACOBS:  I think probably Monday.

11          THE COURT:  Well, I think Mr. Tambussi might have a

12   few questions for Mr. Hill.

13          MR. JACOBS:  I'm sure he will.

14          THE COURT:  I think that will take us into Tuesday.

06:45  15          MR. JACOBS:  Okay.  If I don't have to ask, I won't.

16          THE COURT:  We'll see how it goes.  Are you seeking

17   the assistance of the Court to enforce your subpoena?

18          MR. JACOBS:  No, I don't want to do that to the guy.

19          THE COURT:  What makes think he's going to show up at

06:45  20   all then?

21          MR. JACOBS:  I think he's on honorable person.  I've

22   met with him.  I think it's just a little misunderstanding

23   about the date.

24          THE COURT:  Anything else?

06:45  25          MR. TAMBUSSI:  Judge, we're going to do our best

─────── HILL - DIRECT - JACOBS ───────

1    to -- we're going to provide Mr. Jacobs with --

2          MR. JACOBS:  Oh, yeah, I forgot that.  I don't have a

3    witness list yet.

4          MR. TAMBUSSI:  Well, wait, I didn't even get a chance

5    to speak.

6          I told Mr. Jacobs that based on where he ended today,

7    we would provide him with a witness list for next week.  He

8    knows who the witnesses are, he just don't know the order.  A

9    number of those people are coming from out of town, we need to

10   get an idea how long Mr. Jacobs is going to continue on Monday

11   so we can schedule these people.

12         MR. JACOBS:  Here are my answers, Judge.  I expect to

13   be done with Mr. Hill Monday morning, that's answer number

14   one.  Answer number two is last Friday I handed my witness

15   list in its entirety in the exact order I presented the

16   witnesses to Mr. Tambussi asking that he reciprocate this week

17   and he said he would.  Now this week is almost gone, if I

18   don't get it today, I would like it tomorrow.  What's fair is

19   fair.

20         MR. TAMBUSSI:  There's no objection to that, Judge.

21         THE COURT:  What rule is that?

22         MR. JACOBS:  It's an agreement between counsel.

23         THE COURT:  What's fair is fair, what number is that?

24         MR. JACOBS:  That would never be in rule book, Judge.

25         THE COURT:  He said he's going to give you the list.

────── HILL - DIRECT - JACOBS ──────

1        MR. JACOBS:  He doesn't say when.

2        THE COURT:  This week.

3        MR. JACOBS:  This week could be Saturday night at

4   midnight.

5        MR. TAMBUSSI:  It will be between now and tomorrow

6   because I thought Mr. Hill would be finished today, I lined

7   some people up for Monday and I have to make some adjustments.

8        THE COURT:  All right.  Have a great weekend.

9        (Proceedings Concluded)

10

| 11 | VERNON W. HILL, II, | 1 | 119 | 17 |
| 12 | DIRECT EXAMINATION OF VERNON | 1 | 119 | 19 |
| 13 | W. HILL, II, BY MR. JACOBS | | | |

14

15

| 16 | PLAINTIFF EXHIBIT 25 WAS | 1 | 102 | 18 |
| 17 | RECEIVED IN EVIDENCE | | | |
| 18 | PLAINTIFF EXHIBIT 20 WAS | 1 | 102 | 25 |
| 19 | RECEIVED IN EVIDENCE | | | |
| 20 | PLAINTIFF EXHIBIT 73 WAS | 1 | 108 | 17 |
| 21 | RECEIVED IN EVIDENCE | | | |
| 22 | PLAINTIFF EXHIBIT 50 WAS | 1 | 108 | 23 |
| 23 | RECEIVED IN EVIDENCE | | | |
| 24 | PLAINTIFF EXHIBITS 73 A, B C | 1 | 109 | 10 |
| 25 | WERE RECEIVED IN EVIDENCE | | | |

*06:47*

─────HILL - DIRECT - JACOBS ─────

```
 1    PLAINTIFF EXHIBIT 52 WAS        1        110      4

 2    RECEIVED IN EVIDENCE

 3    PLAINTIFF EXHIBIT P-2 WAS       1        112      3

 4    RECEIVED IN EVIDENCE

 5    PLAINTIFF EXHIBIT P-75 WAS      1        116      17

 6    RECEIVED IN EVIDENCE

 7    PLAINTIFF EXHIBIT P-39 WAS      1        117      15

 8    RECEIVED IN EVIDENCE

 9    PLAINTIFF EXHIBIT P-8 WAS       1        134      22

10    RECEIVED IN EVIDENCE

11    PLAINTIFF EXHIBIT 22 WAS        1        159      8

12    RECEIVED IN EVIDENCE

13

14

15

16

17

18

19

20

21

22

23

24

25
```

## $

**$11,250.00** [1] - 175:4
**$1800** [1] - 167:23
**$372,000.00** [1] - 92:25
**$42** [4] - 206:24, 207:2, 207:6, 207:10

**'**

**'02** [3] - 148:9, 186:7, 187:19
**'03** [1] - 187:19
**'06** [7] - 140:17, 203:22, 204:7, 204:9, 204:10, 204:21, 205:10
**'07** [10] - 140:17, 202:11, 202:21, 202:24, 203:22, 204:3, 205:14, 205:15, 205:16, 211:25
**'68** [1] - 144:14
**'70s** [4] - 123:12, 123:19, 124:4, 124:18
**'72** [1] - 120:22
**'73** [2] - 121:3, 144:16
**'75** [1] - 149:18
**'77** [1] - 124:16
**'81** [1] - 144:20
**'88** [1] - 188:17
**'90's** [1] - 124:21
**'92** [1] - 201:2
**'93** [1] - 138:10
**'94** [1] - 138:10
**'98** [2] - 188:17

## /

**/S** [1] - 1:25

## 0

**02** [2] - 107:23, 150:19
**03** [1] - 107:23
**04** [1] - 107:23
**06** [2] - 107:24, 169:4
**07** [1] - 154:24
**08101** [1] - 1:9
**09-3685** [1] - 1:5

## 1

**1** [35] - 2:1, 2:2, 2:4, 2:5, 2:6, 2:7, 2:8, 2:9, 2:10, 2:11, 2:12, 2:13, 2:14, 19:7, 52:22, 75:20, 132:12, 132:19, 159:15, 160:14, 160:15, 177:3, 216:11, 216:12, 216:16, 216:18, 216:20, 216:22, 216:24, 217:1, 217:3, 217:5, 217:7, 217:9, 217:11
**1.1** [1] - 160:10
**1.3** [2] - 89:9, 89:20
**1.5** [1] - 120:23
**1.9** [2] - 91:18, 92:16
**10** [7] - 2:8, 153:9, 187:4, 187:11, 187:16, 187:17, 216:24
**10,000** [1] - 210:15
**100** [3] - 76:7, 172:21, 209:22
**102** [4] - 2:4, 2:5, 216:16, 216:18
**108** [4] - 2:6, 2:7, 216:20, 216:22
**109** [2] - 2:8, 216:24
**10K** [2] - 81:6, 88:1
**10Ks** [1] - 135:12
**10Q** [4] - 80:14, 88:1, 102:14, 102:21
**10Qs** [1] - 135:12
**11** [6] - 75:6, 75:15, 80:23, 81:13, 109:15, 163:25
**11,250,000** [1] - 177:10
**11.1** [1] - 164:5
**11.3** [1] - 164:16
**110** [2] - 2:9, 217:1
**112** [2] - 2:10, 217:3
**116** [2] - 2:11, 217:5
**117** [2] - 2:12, 217:7
**119** [4] - 2:1, 2:2, 216:11, 216:12
**12** [14] - 6:24, 20:2, 21:6, 21:18, 31:20, 73:11, 74:7, 79:16, 85:23, 102:10, 187:4, 187:11, 187:16, 187:17
**12,000** [1] - 210:15
**12.2** [3] - 170:20, 175:17
**12:13** [2] - 58:7, 58:8

**12:15** [1] - 58:5
**12:30** [1] - 58:4
**12th** [1] - 5:19
**13** [3] - 87:2, 164:24, 173:10
**134** [2] - 2:13, 217:9
**13th** [1] - 180:21
**14** [12] - 32:15, 41:5, 42:16, 72:10, 87:2, 88:10, 103:1, 110:6, 110:12, 159:23, 163:23, 171:9
**14,000** [1] - 168:25
**14.1** [4] - 171:9, 171:13, 171:18, 171:19
**15** [20] - 2:12, 42:17, 43:12, 58:9, 72:10, 88:10, 90:17, 90:21, 92:9, 102:10, 113:6, 132:20, 164:22, 164:23, 169:15, 170:15, 173:12, 174:20, 175:23, 217:7
**15-minute** [1] - 57:20
**159** [2] - 2:14, 217:11
**15th** [1] - 195:19
**16** [4] - 44:24, 55:15, 80:2, 90:18
**17** [30] - 2:1, 2:6, 2:11, 17:2, 17:8, 59:7, 59:17, 75:9, 77:1, 77:2, 77:3, 77:4, 77:14, 77:16, 78:1, 78:4, 88:13, 88:17, 89:4, 89:20, 98:11, 99:2, 100:21, 108:13, 146:23, 157:10, 216:11, 216:20, 217:5
**17,227,476** [1] - 167:20
**17th** [1] - 76:23
**18** [7] - 2:4, 76:24, 84:6, 85:7, 153:19, 210:21, 216:16
**1818** [1] - 31:21
**1873** [1] - 29:8
**1876** [1] - 29:8
**19** [9] - 2:2, 57:6, 69:20, 69:23, 92:11, 155:23, 184:1, 216:12
**1953** [1] - 28:19
**1958** [1] - 28:19
**1973** [1] - 211:20
**1985** [1] - 105:12
**1988** [1] - 55:24, 121:24, 122:1
**1990** [1] - 187:19
**1993** [1] - 109:23
**1996** [1] - 12:6

**1998** [4] - 55:25, 56:7, 56:16, 56:20
**1:30** [2] - 118:13, 213:1
**1A** [2] - 52:21, 65:18
**1st** [2] - 117:17, 204:3

## 2

**2** [18] - 38:24, 40:25, 46:21, 65:18, 67:19, 67:21, 67:23, 73:4, 75:21, 78:9, 78:16, 78:19, 79:5, 79:8, 79:17, 113:18, 126:7
**20** [28] - 2:5, 28:1, 36:6, 36:11, 36:18, 51:24, 52:17, 53:3, 82:16, 82:17, 83:8, 96:18, 97:3, 102:25, 109:16, 113:6, 122:4, 122:14, 122:15, 122:18, 127:9, 210:15, 210:21, 211:23, 211:24, 216:18
**20/20/20** [1] - 211:22
**2002** [17] - 56:23, 85:24, 86:9, 86:18, 87:9, 90:2, 90:9, 91:5, 91:8, 92:12, 93:9, 108:18, 140:3, 147:12, 151:24, 154:1, 195:19
**2003** [3] - 56:23, 87:9, 154:1
**2004** [10] - 56:23, 87:9, 92:23, 129:13, 130:13, 130:14, 131:3, 131:8, 137:9, 154:1
**2005** [9] - 56:24, 87:9, 88:13, 88:18, 90:2, 108:13, 136:8, 146:19, 147:5
**2006** [23] - 56:21, 56:24, 87:2, 87:9, 87:13, 90:18, 92:3, 103:1, 154:1, 159:15, 159:23, 160:15, 160:25, 161:4, 162:8, 177:3, 194:19, 197:2, 201:13, 202:3, 203:5, 206:4
**2007** [105] - 4:18, 8:3, 22:3, 24:8, 24:15, 27:19, 28:6, 29:1, 32:20, 33:17, 34:22, 35:1, 35:3, 36:23,

**37:5, 37:12, 38:24,** 40:25, 41:3, 42:9, 44:16, 45:10, 48:2, 51:23, 67:25, 69:24, 72:18, 77:22, 78:16, 79:4, 79:17, 80:3, 80:14, 81:7, 81:18, 81:19, 81:22, 82:16, 82:17, 82:22, 83:8, 84:6, 85:7, 86:23, 92:9, 96:18, 97:3, 102:15, 102:20, 109:15, 109:16, 109:24, 109:25, 110:6, 110:13, 113:18, 115:19, 121:20, 124:19, 124:24, 126:12, 127:7, 132:6, 143:14, 155:20, 160:15, 162:16, 162:18, 166:20, 168:2, 168:4, 168:5, 168:8, 173:10, 173:12, 175:23, 176:2, 176:14, 177:22, 180:16, 180:20, 181:15, 181:22, 182:24, 183:17, 183:18, 185:12, 185:18, 190:1, 197:19, 197:20, 198:3, 199:9, 199:10, 200:13, 201:8, 201:11, 201:15, 201:20, 202:4, 203:24, 206:11, 211:20
**2008** [24] - 17:3, 17:8, 22:24, 44:16, 45:2, 45:9, 55:17, 59:7, 59:17, 62:4, 75:9, 76:23, 77:4, 78:4, 92:5, 98:11, 99:2, 99:13, 100:21, 109:16, 109:25, 140:6, 155:2, 160:15
**2009** [1] - 160:15
**2010** [10] - 9:24, 56:15, 94:10, 94:14, 94:18, 116:18, 160:16, 160:19, 177:20, 194:8
**2011** [1] - 177:15
**2012** [38] - 5:21, 6:12, 6:16, 8:17, 9:17, 9:21, 12:16, 13:16, 14:3, 14:16, 16:22, 19:7, 32:10, 34:8, 34:10, 34:13, 34:16, 34:19, 39:4, 47:17,

49:4, 55:16, 56:12,
56:14, 56:19, 62:1,
62:15, 72:14, 85:10,
87:4, 87:18, 87:24,
90:11, 93:10, 94:1,
94:22, 99:12, 132:18
**2013** [4] - 1:10, 4:5,
132:19, 132:20
**2042** [1] - 147:5
**20th** [2] - 85:7, 213:1
**21** [7] - 28:1, 28:25,
29:1, 31:8, 36:7,
36:11, 36:20
**22** [28] - 2:13, 2:14,
28:1, 32:12, 32:16,
36:7, 36:11, 36:18,
36:21, 47:25, 54:5,
69:6, 93:4, 158:25,
159:8, 159:18, 160:8,
161:14, 161:25,
162:21, 163:23,
164:23, 170:15,
170:16, 213:2, 217:9,
217:11
**23** [46] - 2:7, 6:16,
8:16, 12:16, 13:16,
14:3, 14:16, 16:22,
17:15, 32:10, 34:8,
34:10, 34:13, 34:16,
34:19, 37:1, 39:4,
47:17, 49:4, 56:11,
56:14, 56:19, 60:6,
60:7, 60:10, 62:1,
62:14, 72:14, 78:13,
78:14, 85:10, 87:3,
87:18, 87:24, 90:11,
93:10, 94:1, 94:22,
97:22, 98:10, 99:2,
99:12, 132:18,
183:11, 212:5, 216:22
**23rd** [8] - 5:20, 5:21,
5:22, 6:13, 11:17,
13:9, 53:9, 55:16
**24** [17] - 12:9, 88:20,
109:16, 116:19,
117:2, 117:4, 117:5,
117:7, 117:12,
117:13, 117:14,
136:13, 146:20,
161:18, 182:25,
193:21, 193:25
**25** [9] - 2:4, 2:5, 46:5,
102:18, 122:2,
122:12, 137:7,
216:16, 216:18
**26** [10] - 45:19, 46:4,
46:5, 47:4, 62:10,
82:22, 121:1, 121:2,
176:1, 213:16
**27** [8] - 27:19, 62:10,

69:24, 88:19, 88:21,
88:22, 198:3, 212:6
**27th** [1] - 198:18
**28** [34] - 1:24, 4:18,
28:6, 29:1, 32:20,
32:22, 33:16, 34:22,
35:3, 36:23, 37:5,
37:12, 41:2, 42:9,
45:2, 45:10, 46:14,
48:2, 78:16, 86:23,
109:16, 155:20,
168:5, 168:8, 173:12,
174:21, 175:23,
182:24, 183:17,
185:12, 185:18,
190:1, 199:10, 200:13
**28th** [2] - 54:7, 184:1
**29** [1] - 109:15
**2A** [2] - 65:15, 65:16

---

## 3

**3** [14] - 2:10, 65:8,
65:14, 65:16, 65:18,
77:22, 174:4, 174:7,
174:24, 176:2,
177:22, 201:2, 217:3
**3,024,750** [1] -
166:24
**3.1** [1] - 161:24
**3.2** [1] - 161:20
**30** [15] - 10:6, 47:7,
66:6, 80:14, 86:18,
102:14, 122:18,
127:9, 146:12,
151:24, 158:11,
171:4, 172:18,
175:18, 184:9
**30th** [5] - 204:16,
204:17, 205:23,
206:6, 206:10
**31** [5] - 81:7, 81:19,
81:22, 102:20, 177:15
**31st** [12] - 48:24,
102:20, 160:20,
203:24, 204:2, 204:9,
204:10, 204:15,
204:20, 205:16,
206:4, 206:7
**33** [14] - 11:4, 12:2,
16:5, 16:15, 19:2,
30:8, 44:5, 49:13,
59:5, 67:16, 71:23,
76:6, 85:10, 95:7
**33.38** [2] - 205:18,
205:22
**33.44** [2] - 204:9,
204:11
**33.78** [4] - 203:25,

204:2, 205:18, 205:20
**34** [4] - 10:6, 90:18,
91:1, 200:11
**343** [1] - 105:12
**35** [3] - 149:20,
180:8, 180:14
**35.27** [3] - 204:20,
206:5, 206:8
**35.4** [1] - 95:21
**35.67** [2] - 204:16,
206:6
**359** [14] - 6:24, 7:12,
7:20, 22:14, 23:3,
35:9, 74:10, 100:19,
175:5, 175:6, 201:2,
211:7
**359.4** [7] - 20:3, 21:7,
73:11, 74:8, 76:9,
114:25, 178:18
**359.4A4** [1] - 21:18
**36.65** [1] - 204:15
**36.99** [2] - 205:22,
206:12
**37** [1] - 38:22
**38** [2] - 82:14
**39** [1] - 193:21
**3rd** [4] - 76:23,
77:12, 174:16, 178:14

---

## 4

**4** [10] - 2:9, 17:3,
73:1, 79:3, 79:8,
132:10, 196:1, 217:1
**4(a)(4** [1] - 75:17
**4,522,141** [1] -
167:18
**40** [11] - 120:11,
149:16, 149:21,
180:8, 208:20,
209:14, 210:9,
210:23, 210:24,
211:1, 211:8
**40.75** [2] - 205:24,
207:5
**400** [3] - 121:20,
146:1, 185:8
**403** [1] - 133:14
**42.50** [3] - 207:9,
207:17, 207:21
**425** [1] - 122:10
**45** [1] - 91:1
**450** [2] - 101:7, 122:4
**471** [1] - 105:12
**49** [1] - 92:10
**4:00** [1] - 117:22
**4:30** [2] - 118:23,
119:3

---

## 5

**5** [12] - 17:21, 67:11,
79:5, 79:16, 80:3,
94:10, 94:14, 94:18,
127:13, 196:13,
197:2, 203:4
**5.2** [1] - 170:23
**50** [5] - 2:7, 108:23,
150:11, 209:21,
216:22
**51** [2] - 191:10,
191:19
**52** [4] - 2:9, 109:21,
110:4, 217:1
**53** [1] - 81:10
**55** [4] - 15:24, 15:25,
67:19, 73:2
**57** [1] - 92:10
**585** [2] - 166:15,
166:16
**59** [3] - 194:11,
205:5, 205:6
**5:00** [3] - 117:24,
117:25, 118:1
**5th** [2] - 5:17, 205:10

---

## 6

**6** [5] - 80:2, 180:20,
181:14, 192:4, 192:6
**6.3** [1] - 170:23
**6.5** [1] - 137:8
**60** [3] - 71:10, 157:5,
199:12
**60-day** [1] - 199:17
**61** [2] - 191:10,
191:13
**65** [2] - 47:13, 62:11
**67** [1] - 120:3
**690** [1] - 166:13
**6th** [2] - 180:16,
181:22

---

## 7

**7.2** [1] - 163:10
**7.3** [4] - 163:15,
170:23, 170:25,
181:25
**7.3B** [1] - 175:17
**7.3B1** [1] - 163:18
**70** [2] - 157:6, 209:21
**70's** [1] - 144:20
**701** [1] - 209:2
**71** [1] - 117:18
**73** [9] - 2:6, 2:8,
108:17, 109:4,

109:10, 135:19,
146:19, 216:20,
216:24
**73A** [2] - 135:15,
135:16, 135:17,
135:19, 135:21
**74** [1] - 118:4
**75** [1] - 116:3
**753** [1] - 1:24

---

## 8

**8** [9] - 2:14, 4:5,
51:23, 79:4, 80:21,
99:13, 101:15,
128:12, 217:11
**8.3** [1] - 92:20
**8.5** [1] - 69:3
**80's** [1] - 124:20
**8400** [1] - 92:20
**8K's** [1] - 109:15

---

## 9

**9** [9] - 1:10, 39:15,
72:10, 82:9, 84:5,
85:24, 86:9, 108:18,
187:25
**9,690,000** [1] -
166:11
**90's** [1] - 124:22
**9:15** [1] - 213:8
**9th** [1] - 150:19

---

## A

**A1** [3] - 202:12,
203:13
**A4** [2] - 20:3, 21:7
**ability** [4] - 6:25,
11:18, 42:3, 113:23
**able** [9] - 23:4, 26:25,
68:20, 70:24, 73:7,
73:19, 74:4, 113:3,
125:9
**absolute** [1] - 82:5
**absolutely** [13] -
93:22, 127:6, 132:23,
135:1, 143:3, 146:14,
158:10, 171:23,
189:20, 199:16,
201:10, 207:18
**acceptable** [2] -
33:17, 191:3
**accepting** [1] - 56:23
**accomplish** [1] -
132:9
**according** [5] -

41:23, 76:12, 104:24,
111:2, 122:3
    **accounted** [1] -
209:25
    **accounting** [1] -
166:9
    **accounts** [2] - 179:3,
179:16
    **accrues** [1] - 165:7
    **accuracy** [2] - 54:16,
54:20
    **accurate** [11] - 21:12,
40:10, 40:21, 42:10,
42:11, 43:5, 43:23,
108:4, 148:1, 148:4,
177:11
    **accurately** [1] -
167:24
    **ACK** [1] - 15:13
    **acknowledges** [1] -
77:23
    **acknowledgment** [1]
- 99:6
    **acquaintance** [1] -
98:21
    **acquire** [3] - 69:3,
113:2, 185:4
    **acquired** [2] -
115:20, 152:16
    **acquiring** [2] - 32:4,
208:10
    **acquisition** [4] -
31:23, 33:22, 34:5,
207:6
    **act** [4] - 22:16, 70:24,
75:21, 115:2
    **acted** [1] - 142:23
    **acting** [1] - 33:14
    **action** [7] - 50:12,
55:21, 57:12, 164:20,
190:16, 190:20,
208:10
    **ACTION** [1] - 1:4
    **actions** [1] - 22:20
    **activities** [3] - 22:17,
42:2, 152:5
    **activity** [2] - 65:21,
66:16
    **actual** [3] - 31:21,
33:21, 37:10
    **ad** [1] - 47:1
    **add** [4] - 46:20,
167:8, 167:17, 167:19
    **added** [1] - 121:16
    **addition** [5] - 38:4,
92:22, 114:15,
162:12, 208:4
    **address** [1] - 86:19
    **addressed** [3] -
104:21, 176:5, 194:17

    **addresses** [1] -
71:14
    **adequately** [1] -
209:24
    **adjudication** [3] -
62:23, 63:2, 64:18
    **adjustments** [1] -
216:7
    **admit** [2] - 117:23,
134:15
    **admits** [4] - 61:8,
63:14, 98:3, 100:1
    **admitted** [8] - 50:19,
59:11, 75:10, 109:8,
110:2, 112:2, 112:15,
159:6
    **admitting** [1] - 64:3
    **adopted** [1] - 155:18
    **advantage** [1] -
127:4
    **adverse** [3] - 75:22,
211:4, 212:13
    **adversely** [3] -
158:13, 211:13,
211:16
    **advice** [7] - 105:5,
105:7, 105:18,
105:19, 106:24,
107:2, 107:5
    **advised** [7] - 9:19,
26:24, 82:20, 82:22,
84:12, 178:2, 178:4
    **advising** [2] - 105:9,
195:4
    **advocates** [2] -
23:24, 23:25
    **affairs** [1] - 195:6
    **Affairs** [1] - 10:8
    **affect** [1] - 184:18
    **affecting** [1] - 158:14
    **affiliated** [4] - 6:25,
22:16, 89:15, 91:23
    **affirmance** [1] -
142:21
    **affirms** [1] - 142:12
    **affix** [1] - 99:12
    **affixed** [1] - 14:23
    **Afternoon** [1] -
118:17
    **afternoon** [2] -
119:15, 169:12
    **age** [1] - 123:25
    **agencies** [5] - 12:12,
15:2, 15:3, 153:17,
202:18
    **agency** [4] - 38:5,
57:12, 130:3, 200:5
    **aggregate** [1] - 91:17
    **ago** [7] - 7:17, 20:9,
94:4, 94:5, 100:25,

122:4, 195:23
    **agree** [14] - 18:3,
18:16, 40:25, 41:1,
48:16, 64:20, 99:1,
137:17, 147:9,
147:11, 147:13,
192:13, 192:18, 193:7
    **agreeable** [1] - 192:9
    **agreed** [6] - 18:5,
64:9, 78:20, 147:6,
165:17, 166:22
    **agreeing** [2] - 29:20,
71:10
    **Agreement** [2] -
4:24, 78:22
    **agreement** [23] -
18:6, 29:24, 52:13,
80:23, 115:25,
138:13, 139:5, 145:1,
145:21, 159:13,
163:14, 164:21,
171:17, 171:19,
171:21, 174:12,
174:14, 175:17,
177:4, 183:9, 184:19,
191:2, 215:22
    **agreements** [7] -
46:8, 46:9, 47:1, 89:7,
91:16, 147:1, 195:20
    **ahead** [5] - 102:11,
148:7, 189:1, 209:18,
212:6
    **Alexander** [1] - 52:7
    **alleged** [1] - 186:2
    **allocation** [1] - 46:8
    **allow** [1] - 149:25
    **allowed** [1] - 124:1
    **allowing** [1] - 5:12
    **almost** [5] - 10:6,
92:3, 149:16, 179:18,
215:17
    **alternatives** [1] -
48:25
    **amended** [1] -
159:13
    **America** [2] - 144:6,
144:8
    **amount** [13] - 18:13,
18:22, 67:13, 81:13,
122:17, 148:19,
164:13, 165:2, 165:7,
167:1, 167:23, 198:8,
201:23
    **amounts** [5] - 81:1,
81:14, 82:5, 166:10,
171:21
    **analysis** [2] - 100:12,
184:18
    **analysts** [1] - 113:20
    **AND** [1] - 1:14

    **Andre** [1] - 40:14
    **announced** [2] -
205:24, 207:2
    **annual** [10] - 89:9,
89:21, 125:23,
135:13, 136:5, 136:6,
152:12, 161:16,
162:6, 162:8
    **annually** [2] - 92:16,
92:25
    **Annuity** [1] - 41:6
    **answer** [17] - 13:13,
44:22, 94:6, 114:16,
116:18, 116:23,
117:14, 130:8, 143:8,
143:9, 159:17,
186:21, 208:19,
208:24, 209:19,
215:13, 215:14
    **answered** [1] -
193:22
    **answers** [4] - 25:11,
25:13, 116:25, 215:12
    **anticipated** [1] -
67:13
    **anytime** [1] - 28:8
    **anyway** [2] - 69:17,
104:7
    **apologize** [1] -
182:22
    **apparent** [2] - 31:21,
33:21
    **appeal** [1] - 139:3
    **appear** [3] - 12:9,
32:7, 211:6
    **Appellate** [2] -
142:12, 142:20
    **appended** [3] - 8:16,
60:5, 61:20
    **appendix** [1] -
196:13
    **apple** [2] - 125:5,
125:6
    **apples** [1] - 69:11
    **applicable** [3] -
78:23, 178:6, 178:9
    **application** [44] -
11:15, 11:22, 12:3,
13:20, 19:6, 19:17,
20:3, 21:7, 23:4,
24:13, 50:22, 51:9,
53:13, 53:21, 55:22,
55:25, 56:15, 56:16,
56:20, 57:13, 71:20,
77:4, 84:1, 85:8, 88:6,
94:8, 94:13, 94:17,
97:6, 101:1, 111:3,
131:21, 178:12,
178:17, 180:4, 180:5,
180:9, 180:12,

181:10, 184:24,
188:17, 189:3,
189:25, 190:11
    **applications** [19] -
11:9, 54:1, 70:12,
70:25, 71:6, 101:5,
101:8, 185:16, 186:3,
186:7, 186:12,
186:23, 187:12,
187:18, 188:9,
188:19, 189:23,
197:23, 198:1
    **applied** [1] - 120:23
    **applies** [1] - 106:24
    **apply** [9] - 11:19,
83:12, 85:3, 95:25,
96:19, 96:24, 106:22,
172:19, 185:5
    **applying** [1] - 35:23
    **appointed** [1] - 45:22
    **appraisal** [3] - 148:6,
148:18, 148:20
    **appraisals** [2] -
148:17, 157:12
    **appraised** [2] -
148:13, 155:15
    **approach** [1] -
113:11
    **approaching** [1] -
106:24
    **appropriate** [8] -
31:19, 43:16, 84:15,
135:11, 145:13,
153:3, 194:5, 198:16
    **approval** [37] - 13:5,
13:7, 13:8, 13:9,
13:15, 35:24, 59:22,
76:15, 76:18, 77:5,
77:15, 77:17, 77:24,
78:2, 79:25, 80:12,
80:24, 81:3, 81:14,
81:15, 82:6, 82:7,
83:12, 85:8, 88:7,
96:4, 96:20, 97:1,
111:3, 113:3, 172:13,
175:9, 181:11,
182:10, 192:8, 193:20
    **approvals** [12] -
40:6, 46:13, 84:16,
85:1, 85:3, 86:20,
113:5, 172:20,
175:14, 175:15,
194:5, 199:10
    **approve** [8] - 71:6,
125:12, 125:25,
144:25, 145:20,
148:16, 197:24, 198:1
    **approved** [15] -
65:23, 66:25, 83:3,
84:14, 97:11, 132:10,

132:12, 140:1,
145:21, 148:12,
148:13, 185:6,
186:12, 199:14
**approving** [2] -
189:10, 198:19
**apps** [1] - 186:19
**April** [53] - 5:19,
5:20, 5:22, 6:13, 6:16,
8:16, 11:17, 12:16,
13:9, 13:16, 14:3,
14:16, 16:22, 32:10,
34:8, 34:10, 34:13,
34:16, 34:19, 39:4,
47:17, 49:4, 53:9,
55:16, 55:25, 56:7,
56:11, 56:14, 56:16,
56:19, 56:20, 62:1,
62:14, 69:24, 72:14,
85:10, 87:3, 87:18,
87:24, 90:11, 93:10,
94:1, 94:22, 99:12,
132:18, 132:20,
188:17, 197:19,
197:20, 198:3,
198:18, 199:9
**architect** [1] - 138:14
**architects** [1] - 124:8
**architectural** [5] -
49:15, 125:9, 136:25,
137:6, 139:4
**architecture** [1] -
123:24
**area** [4] - 46:24,
138:2, 144:7, 202:8
**areas** [1] - 46:24
**argue** [1] - 75:12
**arguing** [1] - 111:7
**argument** [2] -
115:9, 115:11
**arising** [4] - 38:7,
38:14, 44:10, 70:14
**arithmetic** [4] -
89:19, 92:16, 167:13,
167:16
**arms** [4] - 131:23,
134:14, 150:2, 154:10
**Arps** [3] - 173:14,
176:11, 180:21
**arrangement** [3] -
137:13, 146:11, 150:1
**arrangements** [3] -
125:20, 128:7, 147:16
**arrive** [2] - 42:4,
42:15
**Article** [6] - 17:22,
65:18, 67:11, 132:10,
132:12, 156:6
**article** [3] - 18:1,
48:11, 181:25

**AS** [2] - 119:17,
119:18
**aside** [6] - 6:16,
143:13, 143:24,
145:5, 184:6, 212:4
**assertion** [1] - 51:4
**assertions** [2] -
50:21, 51:8
**assess** [1] - 131:6
**assessing** [2] -
134:3, 134:7
**assessment** [1] -
180:5
**assets** [2] - 95:3,
179:6
**assigned** [1] - 207:4
**assistance** [1] -
214:17
**assisted** [1] - 141:4
**Associates** [3] -
129:21, 129:22, 130:4
**associates** [5] -
38:8, 38:15, 44:11,
49:19, 195:8
**assume** [2] - 108:1,
157:17
**assuming** [4] -
54:16, 54:20, 62:17,
147:24
**astronomically** [1] -
210:22
**attachment** [1] -
50:16
**attachments** [5] -
16:18, 16:20, 16:21,
195:11, 195:13
**attention** [10] - 24:4,
46:18, 63:9, 64:24,
156:1, 160:9, 164:1,
170:19, 180:9, 183:25
**attestation** [1] -
100:18
**attorney** [12] - 14:2,
14:7, 14:16, 16:23,
51:17, 103:5, 104:22,
105:5, 106:1, 106:4,
107:4, 180:25
**attorney's** [1] - 106:7
**attorney-client** [2] -
103:5, 104:22
**attorney/client** [8] -
51:12, 51:14, 51:21,
104:8, 104:14,
105:13, 106:22, 107:6
**attorney/privilege**
[2] - 106:20, 106:24
**attorneys** [3] - 80:6,
82:21, 84:9
**ATTORNEYS** [2] -
1:15, 1:18

**attractive** [1] -
208:14
**attributed** [3] - 41:9,
41:13, 98:4
**August** [6] - 129:13,
129:16, 180:20,
181:14, 181:22,
183:17
**authenticate** [1] -
110:23
**authenticated** [1] -
103:10
**authenticity** [1] -
110:24
**author** [2] - 35:6,
52:4
**authored** [7] - 6:3,
6:4, 6:17, 18:11,
47:17, 110:21, 185:18
**authorities** [2] -
43:17, 194:6
**authority** [1] -
142:23
**authorization** [1] -
83:4
**authorized** [1] -
178:9
**authorizing** [3] -
83:3, 84:14, 88:6
**available** [4] - 87:19,
147:25, 152:25,
213:18
**average** [3] - 209:21,
209:24, 210:20
**avoid** [3] - 63:19,
86:16, 151:21
**aware** [31] - 21:19,
21:20, 22:15, 23:1,
24:16, 27:10, 35:13,
36:3, 36:5, 38:5,
45:21, 45:23, 50:15,
55:23, 56:10, 56:18,
56:25, 61:6, 73:8,
73:20, 74:5, 75:18,
77:20, 82:8, 85:19,
86:22, 87:1, 96:15,
125:11, 135:8, 190:18

**B**

**B8** [1] - 53:8
**background** [1] -
10:2
**backwards** [2] -
82:10, 168:12
**bad** [1] - 200:19
**balance** [1] - 183:18
**Bancorp** [38] - 39:11,
42:18, 78:10, 80:17,

81:6, 82:17, 86:10,
88:17, 89:3, 90:13,
91:3, 92:11, 92:22,
103:15, 106:3,
134:10, 136:25,
137:6, 137:8, 143:18,
143:21, 146:22,
147:7, 158:22,
159:14, 160:3, 161:9,
168:18, 175:13,
178:4, 178:9, 179:15,
180:2, 183:7, 183:8,
183:9, 195:20, 201:8
**BANCORP** [1] - 1:6
**Band** [1] - 36:22
**Bank** [180] - 4:4,
8:22, 9:18, 9:23, 10:4,
12:2, 12:10, 18:4,
18:5, 18:6, 19:6,
19:16, 21:16, 23:10,
23:15, 23:20, 23:22,
23:24, 24:8, 24:12,
24:13, 25:6, 25:23,
26:5, 26:6, 26:7,
26:12, 27:9, 28:9,
28:12, 29:13, 29:21,
33:14, 33:19, 35:1,
35:23, 36:19, 36:21,
37:24, 38:9, 42:5,
43:10, 43:11, 44:12,
44:17, 44:18, 44:21,
45:1, 45:22, 47:10,
47:14, 48:17, 48:21,
49:6, 49:14, 50:12,
56:20, 60:19, 66:6,
68:23, 69:3, 79:11,
80:9, 82:13, 83:11,
85:15, 85:18, 85:25,
86:25, 87:21, 87:25,
88:4, 91:4, 91:11,
92:12, 94:25, 95:2,
95:9, 96:17, 98:1,
99:4, 99:22, 100:6,
100:7, 100:18,
100:22, 101:7, 103:6,
103:18, 104:10,
104:13, 105:14,
106:2, 106:7, 106:14,
106:16, 107:24,
113:1, 113:17,
113:19, 114:8,
114:10, 114:12,
114:14, 114:15,
114:18, 115:14,
115:19, 115:20,
120:12, 121:8,
122:19, 124:15,
124:18, 126:17,
126:21, 134:24,
143:18, 143:21,
144:15, 144:16,

149:23, 151:3,
151:10, 151:15,
153:6, 153:20,
153:22, 154:6,
154:16, 155:11,
156:14, 156:17,
157:13, 158:4, 158:8,
158:11, 158:14,
158:16, 158:17,
159:14, 161:1, 161:3,
165:3, 165:6, 167:3,
168:8, 168:10,
168:18, 168:20,
168:24, 169:2, 169:6,
175:3, 175:12,
175:13, 177:14,
177:25, 178:22,
179:2, 179:10,
179:14, 179:17,
180:1, 180:6, 181:1,
185:2, 193:23, 195:6,
197:2, 202:5, 202:22,
206:14, 209:7, 212:4
**bank** [148] - 10:4,
10:19, 12:12, 14:19,
17:4, 37:12, 50:21,
50:22, 51:3, 51:5,
51:8, 53:12, 53:20,
54:8, 59:7, 60:2,
61:13, 62:11, 63:12,
63:13, 64:22, 66:10,
68:14, 70:6, 70:7,
70:12, 70:19, 73:7,
73:19, 74:3, 75:18,
76:9, 76:12, 76:17,
76:18, 76:19, 77:4,
77:12, 77:23, 78:1,
92:6, 110:15, 111:2,
111:10, 111:14,
115:1, 115:3, 120:14,
120:22, 120:24,
121:3, 121:13,
121:14, 121:16,
121:19, 122:24,
123:7, 123:15,
125:23, 125:25,
126:16, 128:5,
129:11, 129:16,
129:25, 131:1, 131:6,
131:7, 131:12,
131:13, 131:19,
134:2, 134:7, 135:9,
137:23, 138:11,
138:13, 138:14,
138:17, 139:3, 139:5,
141:9, 141:10,
141:16, 141:22,
142:4, 142:6, 142:23,
143:13, 143:15,
143:25, 144:20,
144:23, 145:14,

145:20, 145:25,
146:3, 146:6, 146:8,
146:10, 147:14,
149:1, 152:11,
152:13, 152:18,
152:24, 153:16,
179:20, 180:10,
180:12, 180:21,
180:25, 181:9,
181:20, 181:22,
182:9, 183:6, 183:20,
183:21, 184:17,
185:10, 192:22,
195:7, 195:9, 196:2,
196:3, 196:4, 197:20,
198:24, 199:5, 201:1,
202:9, 202:12,
202:20, 203:19,
206:17, 206:21,
207:22, 208:22,
209:21, 211:4,
212:14, 212:15

**Bank's** [10] - 20:1,
21:5, 68:2, 95:11,
99:14, 99:25, 100:3,
100:4, 114:13, 172:21

**bank's** [3] - 15:1,
131:25, 146:1

**banker** [6] - 122:8,
149:21, 153:1, 161:7,
200:25

**banking** [9] - 36:24,
121:18, 125:5,
149:15, 180:8,
208:20, 209:5,
210:13, 210:16

**Banks** [1] - 152:9

**banks** [14] - 6:25,
120:15, 120:19,
122:24, 123:9,
149:25, 150:1, 167:6,
183:8, 183:10, 201:3,
201:4, 202:19, 210:7

**BARBONE** [3] - 1:14,
1:15, 58:25

**Barbone** [1] - 58:24

**barely** [1] - 110:16

**bargain** [1] - 58:8

**Barone** [1] - 27:17

**base** [6] - 39:25,
40:1, 161:17, 161:20,
162:2, 163:22

**based** [11] - 50:13,
57:12, 59:21, 67:23,
104:14, 105:25,
153:1, 174:16,
174:23, 209:5, 215:6

**basis** [11] - 73:10,
73:22, 74:6, 75:20,
132:12, 133:13,

150:2, 153:8, 179:24,
209:2, 210:14

**bear** [3] - 36:22,
86:2, 132:3

**bearing** [1] - 130:15

**bears** [1] - 32:13

**became** [2] - 9:16,
121:15

**become** [3] - 178:19,
197:2, 199:15

**BEEN** [1] - 119:17

**began** [3] - 123:14,
140:21, 203:18

**begin** [1] - 74:1,
124:14, 133:13,
145:19, 185:4,
199:15, 213:1

**beginning** [8] -
63:10, 115:18, 147:5,
154:24, 167:2, 174:2,
204:23, 206:16

**begins** [1] - 167:3

**begun** [1] - 169:4

**behalf** [5] - 12:12,
137:23, 160:2, 182:9,
193:23

**behind** [3] - 80:2,
80:21, 90:18

**beings** [1] - 22:8

**believes** [7] - 24:5,
34:23, 89:13, 91:20,
137:10, 137:13,
147:21

**belongs** [1] - 106:1

**below** [5] - 41:12,
41:17, 134:12,
155:10, 155:13

**beneficial** [3] -
111:21, 151:8, 154:16

**benefit** [2] - 95:14,
184:18

**benefits** [2] - 133:7,
181:2

**benefitted** [1] - 49:17

**Bennett** [5] - 48:22,
176:5, 176:7, 176:8,
176:17

**Bershad** [3] -
110:14, 126:14,
126:16

**best** [5] - 66:15,
123:6, 152:23, 169:6,
214:25

**better** [3] - 122:25,
130:11, 162:23

**between** [29] - 3:19,
6:11, 17:2, 18:6, 18:7,
22:3, 24:8, 29:21,
35:1, 36:19, 36:21,
36:22, 59:8, 104:1,

109:6, 125:13,
125:20, 131:7,
131:13, 131:19,
131:22, 134:7,
134:24, 146:8,
183:17, 189:9,
195:20, 215:22, 216:5

**beyond** [1] - 47:22

**Bharat** [10] - 39:7,
39:12, 40:13, 40:14,
71:23, 72:5, 72:11,
72:17, 85:20, 112:21

**big** [5] - 111:1,
111:16, 136:2, 166:6,
206:17

**bigger** [22] - 16:1,
45:6, 48:9, 49:11,
65:15, 67:21, 78:15,
82:19, 126:9, 137:2,
150:12, 154:21,
159:12, 159:22,
160:11, 170:17,
173:2, 177:2, 177:23,
180:15, 191:21,
194:11

**Bill** [1] - 174:1

**bill** [2] - 127:21,
127:23

**billed** [1] - 144:24

**billion** [1] - 69:3

**biscuits** [1] - 123:2

**bit** [19] - 12:19,
15:25, 19:22, 79:4,
126:9, 137:2, 150:12,
152:15, 159:12,
165:4, 170:17, 173:2,
177:23, 180:15,
180:22, 180:24,
191:21, 194:11, 210:8

**Blank** [1] - 139:13

**blessed** [1] - 71:12

**blow** [1] - 180:24

**blown** [1] - 136:16

**Board** [110] - 20:1,
21:5, 21:14, 21:16,
21:21, 21:22, 22:2,
22:7, 22:11, 22:13,
23:1, 23:7, 23:10,
23:13, 23:15, 24:5,
24:12, 24:13, 24:14,
24:21, 24:23, 24:24,
25:1, 25:2, 25:3, 25:6,
25:18, 25:21, 25:24,
26:7, 26:8, 26:17,
27:5, 33:15, 34:23,
35:8, 35:11, 35:13,
35:15, 36:5, 45:1,
59:16, 67:24, 69:25,
78:10, 78:20, 79:11,
79:12, 79:17, 79:24,

80:3, 80:4, 80:9,
82:13, 82:16, 82:20,
82:22, 82:24, 83:3,
83:4, 83:11, 83:15,
83:16, 83:19, 84:1,
84:6, 84:8, 84:11,
84:14, 85:5, 85:6,
85:14, 85:17, 85:25,
86:9, 94:3, 95:17,
95:23, 96:3, 96:8,
96:16, 97:5, 97:8,
97:11, 103:14, 105:6,
106:5, 107:4, 107:23,
111:17, 111:20,
125:12, 125:24,
125:25, 137:12,
139:5, 139:24,
140:15, 140:25,
148:12, 148:14,
148:15, 150:17,
151:1, 151:4, 151:5

**board** [15] - 121:24,
127:14, 132:24,
178:5, 183:21,
194:18, 194:21,
195:4, 195:19,
196:17, 196:24,
198:6, 198:21, 200:13

**Bob** [9] - 39:7, 39:9,
40:3, 40:4, 41:21,
71:23, 72:5, 72:17,
112:21

**body** [1] - 64:14

**boiler** [2] - 97:23,
97:24

**boils** [1] - 67:9

**bold** [4] - 46:6,
163:5, 164:1, 171:9

**boldface** [1] - 195:14

**bona** [2] - 131:13,
133:17

**Bono** [8] - 87:2, 93:8,
103:1, 103:11,
103:13, 104:10,
105:15, 105:24

**Bono's** [1] - 103:9

**bonus** [14] - 161:17,
161:24, 162:5, 162:6,
162:8, 162:18,
163:22, 165:9, 166:7,
166:10, 166:16,
166:20, 182:3

**book** [6] - 16:5,
16:15, 38:22, 69:10,
75:5, 215:24

**books** [2] - 179:3,
179:16

**borrowers** [1] -
167:7

**bottom** [13] - 28:18,

41:8, 42:16, 67:21,
146:20, 150:24,
151:7, 161:13,
161:15, 162:22,
163:24, 164:16, 171:8

**bought** [3] - 196:2,
196:4, 208:22

**bowls** [1] - 123:2

**branch** [57] - 31:23,
32:4, 33:23, 34:5,
40:6, 40:8, 51:9,
53:13, 53:21, 53:25,
54:9, 55:22, 55:25,
56:15, 57:12, 70:12,
70:15, 70:19, 70:24,
71:6, 71:20, 72:9,
89:4, 89:20, 101:7,
101:8, 113:3, 113:5,
114:4, 114:11,
121:20, 123:7,
146:23, 161:3,
184:24, 185:2, 185:3,
185:6, 185:16, 186:3,
186:12, 186:19,
186:22, 187:12,
188:16, 188:19,
189:3, 189:25,
190:11, 196:1,
197:22, 199:10,
208:4, 209:22, 210:3,
210:16

**branches** [20] - 38:9,
40:6, 40:15, 42:6,
44:12, 49:14, 50:1,
57:6, 68:10, 68:21,
71:17, 121:12,
121:17, 122:1, 122:5,
122:16, 189:10,
198:19, 199:13

**brand** [7] - 111:16,
123:8, 123:14, 124:8,
125:2, 134:11, 137:14

**branding** [2] -
124:10, 125:3

**brands** [4] - 123:16,
124:12, 127:3

**breach** [4] - 22:17,
22:20, 36:4, 75:22

**breached** [1] -
163:13

**breaches** [3] - 59:11,
61:10, 63:15

**break** [9] - 3:14,
57:20, 58:5, 93:25,
101:16, 169:13,
183:1, 212:18

**brief** [1] - 159:21

**briefed** [3] - 79:18,
80:5, 84:8

**briefer** [1] - 5:24

bring [2] - 166:9,
212:22
  brings [1] - 55:15
  brother [1] - 145:10
  brought [4] - 35:2,
68:10, 96:12, 133:12
  BROWN [1] - 1:16
  Brown [1] - 97:17
  Buckelew [1] - 133:1
  Buffett [5] - 212:6,
212:7, 212:8, 212:9,
212:10
  build [6] - 40:6,
123:8, 145:2, 145:16,
145:22, 146:5
  building [11] - 32:4,
40:7, 42:6, 124:10,
125:3, 138:10,
138:11, 138:12,
138:19, 138:20, 196:4
  built [4] - 123:3,
168:24, 168:25, 169:2
  bunch [2] - 48:24,
76:19
  business [25] - 38:8,
38:15, 39:23, 44:11,
49:18, 50:13, 68:2,
68:11, 68:22, 86:18,
86:24, 95:11, 108:19,
120:18, 120:21,
123:19, 124:4, 137:7,
144:4, 144:15,
151:23, 195:8,
210:13, 210:14
  buy [1] - 145:24
  buyer [1] - 179:8
  buying [2] - 196:3,
196:8
  buys [1] - 146:2
  BY [32] - 1:14, 1:17,
2:2, 119:19, 120:1,
125:19, 126:10,
128:25, 129:7,
133:23, 134:23,
135:4, 136:1, 137:4,
139:21, 142:19,
143:12, 175:25,
179:1, 182:23,
184:20, 186:25,
187:14, 188:2, 189:2,
190:9, 191:22,
193:18, 204:6, 209:4,
209:11, 216:13

**C**

  C.F.R [3] - 6:24,
73:11, 74:8
  calculable [1] -

182:13
  calculate [2] -
165:22, 167:21
  calculation [1] -
172:9
  CAM [3] - 46:8, 47:1,
47:21
  Camden [1] - 1:9
  Canada [3] - 114:8,
114:11, 208:15
  cannot [21] - 20:2,
21:5, 22:15, 23:9,
23:11, 23:12, 23:13,
23:14, 24:5, 31:2,
34:23, 35:8, 59:7,
59:21, 66:24, 76:9,
76:13, 76:20, 95:23,
96:3, 209:24
  capacity [1] - 40:5
  capital [1] - 202:9
  Capital [1] - 41:6
  captioned [2] - 28:5,
60:17
  care [3] - 12:10,
20:11, 20:12
  cared [1] - 123:4
  Carl [2] - 1:25, 20:7
  carry [1] - 104:11
  case [33] - 8:11,
8:23, 10:21, 10:24,
11:21, 12:8, 13:19,
23:24, 24:1, 51:11,
57:21, 58:23, 65:9,
69:16, 75:12, 99:11,
101:18, 108:5,
113:23, 114:18,
114:19, 115:14,
115:24, 130:15,
130:25, 132:14,
138:5, 152:9, 169:16,
192:25, 193:23,
213:7, 214:9
  cases [7] - 10:19,
50:24, 53:15, 54:18,
152:21, 186:4, 186:9
  cash [1] - 161:17
  catch [1] - 15:23
  cease [8] - 24:7,
27:18, 31:20, 34:25,
35:10, 37:15, 37:21,
41:3
  Cease [4] - 51:24,
53:25, 54:21, 67:25
  center [11] - 40:3,
41:12, 46:19, 146:5,
152:17, 152:21,
152:23, 164:24,
180:25
  centered [1] - 43:19
  cents [5] - 68:15,

68:17, 68:24, 68:25,
172:1
  CEO [11] - 26:7,
39:10, 42:18, 43:10,
60:18, 101:7, 196:19,
198:6, 200:11, 211:23
  certain [8] - 5:12,
46:7, 46:25, 91:4,
105:25, 106:7, 107:5,
145:17
  certainly [8] - 18:16,
39:3, 53:3, 58:25,
69:19, 116:23,
125:22, 153:9
  certification [35] -
20:2, 21:6, 21:18,
22:12, 22:13, 22:15,
23:11, 23:17, 24:6,
24:14, 25:22, 25:24,
26:10, 26:21, 26:25,
27:7, 34:24, 35:8,
37:13, 37:16, 37:24,
59:22, 76:9, 76:13,
77:21, 94:3, 95:18,
95:21, 95:24, 96:4,
96:14, 117:17, 131:3,
132:19, 132:20
  Certified [1] - 1:24
  certified [1] - 74:4
  certify [5] - 73:7,
73:19, 74:10, 74:25,
111:19
  cetera [1] - 74:8
  CFO [2] - 26:7, 138:3
  CFR [3] - 20:3, 21:6,
21:18
  chain [1] - 101:11
  chair [2] - 43:10,
198:6
  chairman [2] -
110:14, 143:16,
183:21, 194:21,
196:17
  Chairman [3] -
60:18, 107:23, 126:17
  challenge [1] -
130:21
  chance [3] - 114:1,
133:24, 215:4
  change [13] - 15:11,
15:12, 25:11, 25:13,
111:14, 144:5,
147:15, 151:15,
151:17, 167:11,
167:14, 189:17, 199:3
  changed [7] - 56:7,
56:15, 85:2, 138:1,
147:14, 182:6, 189:12
  changes [3] - 15:6,
167:12, 189:14

charge [5] - 57:15,
125:20, 138:17,
167:6, 187:15
  charged [2] - 110:15,
137:25
  charges [4] - 46:9,
47:1, 47:22, 133:8
  charter [1] - 120:24
  charts [3] - 116:3,
116:5, 212:17
  cheaper [2] - 65:6,
65:11
  check [3] - 18:19,
145:18, 148:20
  checking [1] - 86:4
  checks [1] - 179:3
  chief [1] - 145:7
  Chief [2] - 60:18,
143:16
  children [1] - 120:7
  choice [1] - 165:16
  choose [1] - 157:14
  Circle [1] - 121:6
  circulated [2] -
103:14, 105:1
  circumstances [5] -
11:18, 73:7, 73:19,
74:3, 97:25
  cited [1] - 111:18
  City [1] - 208:6
  CIVIL [1] - 1:4
  civil [2] - 11:21,
13:19
  claim [7] - 44:17,
44:19, 48:18, 53:20,
70:4, 115:23, 194:1
  claims [7] - 80:7,
82:25, 84:11, 84:14,
133:18, 140:16, 193:1
  clarification [1] -
25:4
  clarify [1] - 149:20
  clarifying [1] - 11:17
  Clark [10] - 43:9,
43:10, 71:24, 72:5,
72:11, 72:17, 112:21,
112:25, 114:7, 115:7
  clark [1] - 43:22
  classic [1] - 107:6
  clause [1] - 98:2
  clauses [1] - 104:24
  clear [8] - 42:21,
82:19, 94:12, 115:17,
144:17, 208:8, 208:9,
208:11
  clearly [9] - 23:19,
42:23, 105:12, 106:5,
106:6, 151:8, 152:15,
213:12
  CLERK [12] - 3:1,

3:21, 57:23, 57:25,
59:1, 101:20, 118:19,
119:8, 169:17,
169:21, 170:6, 213:9
  client [7] - 20:9,
24:1, 103:5, 104:22,
120:21, 144:6, 144:25
  clients [3] - 145:14,
145:15, 169:3
  close [22] - 38:8,
38:15, 44:11, 44:20,
49:18, 58:3, 81:15,
82:6, 83:5, 83:20,
84:16, 84:24, 86:18,
87:7, 98:6, 100:2,
134:10, 149:19,
202:4, 206:4, 207:3,
212:11
  closely [1] - 42:25
  closer [2] - 16:11,
166:4
  club [1] - 211:22
  clue [2] - 160:6,
197:18
  CO [1] - 208:8
  Cohen [2] - 1:8,
79:18
  coin [1] - 123:7
  collect [2] - 192:21,
196:7
  collective [2] - 22:7,
22:11
  Colleen [1] - 114:12
  college [1] - 144:4
  combination [1] -
200:10
  comfortable [2] -
43:18, 43:25
  coming [4] - 10:4,
206:17, 210:9, 215:9
  comma [1] - 73:1
  commemorating [1]
- 80:10
  commenced [1] -
116:10
  comment [2] - 186:2,
186:3
  comments [3] -
52:13, 154:8, 185:25
  Commerce [163] -
24:8, 25:3, 25:8,
25:19, 25:23, 26:18,
27:6, 28:12, 29:13,
35:1, 39:11, 39:22,
42:18, 44:16, 44:18,
44:21, 45:1, 45:22,
50:12, 50:14, 50:20,
56:20, 59:16, 59:21,
60:19, 66:6, 68:2,
68:9, 68:10, 68:23,

69:3, 69:25, 72:16,
78:10, 79:11, 80:17,
81:6, 82:16, 82:23,
83:16, 85:25, 86:10,
86:18, 86:25, 88:17,
90:13, 94:25, 95:2,
95:11, 96:17, 97:12,
102:14, 103:18,
105:15, 106:2,
108:20, 111:17,
113:1, 113:19,
114:15, 114:18,
115:6, 115:20,
120:12, 121:8,
122:19, 123:9,
123:11, 124:9,
124:15, 124:17,
125:2, 125:5, 125:8,
125:10, 125:12,
125:13, 125:21,
126:21, 127:8, 130:8,
131:20, 134:10,
134:24, 137:14,
138:10, 140:4,
143:18, 143:21,
144:15, 144:16,
151:10, 151:24,
157:13, 158:11,
158:18, 158:22,
159:14, 160:2, 161:1,
161:3, 161:9, 163:5,
163:20, 168:10,
168:18, 168:20,
171:15, 171:20,
171:22, 176:19,
177:14, 177:25,
178:4, 178:7, 178:9,
178:22, 179:2, 179:5,
179:14, 179:15,
179:17, 180:1, 180:6,
181:1, 183:8, 185:2,
185:8, 189:9, 193:23,
194:3, 194:4, 194:7,
195:6, 196:2, 197:7,
201:8, 202:5, 202:22,
203:12, 206:14,
207:10, 207:13,
207:23, 207:24,
208:4, 208:14, 209:7,
209:19, 209:22,
210:2, 210:17,
211:10, 211:12,
211:13, 211:19, 212:4
   **COMMERCE** [1] -
1:6
   **Commerce's** [5] -
68:3, 95:11, 111:4,
115:7, 209:20
   **commercial** [3] -
89:16, 91:23, 147:24
   **Commission** [1] -

105:12
   **commissioned** [1] -
154:23
   **committed** [3] -
22:19, 75:21, 115:2
   **Committee** [17] -
50:3, 50:6, 55:17,
57:4, 62:2, 62:7,
110:14, 126:18,
140:7, 140:12,
140:14, 140:15,
140:19, 140:24,
141:4, 141:12, 141:23
   **committee** [36] -
10:18, 10:23, 44:25,
45:21, 47:8, 47:9,
47:11, 47:12, 47:19,
47:20, 92:4, 99:14,
99:15, 100:5, 100:14,
139:6, 139:25,
141:16, 154:17,
154:23, 155:5, 155:9,
155:14, 155:16,
155:17, 155:19,
156:21, 157:17,
157:20, 188:3, 188:6,
188:10, 189:4,
189:16, 190:20, 199:7
   **committee's** [1] -
99:20
   **Commodities** [1] -
105:11
   **communicate** [1] -
197:20
   **communications** [4]
- 12:11, 12:15, 13:5,
106:25
   **companies** [9] -
90:3, 91:11, 137:12,
145:4, 153:22,
156:23, 158:3,
202:18, 202:20
   **company** [27] -
26:20, 49:24, 86:24,
123:15, 124:14,
124:17, 125:2, 130:9,
141:25, 143:1, 144:5,
144:6, 144:9, 144:11,
145:5, 145:8, 145:12,
145:24, 146:8, 146:9,
149:8, 152:15,
175:12, 175:16,
201:23, 211:24, 212:2
   **company's** [3] -
81:3, 175:1, 175:2
   **comparable** [4] -
89:14, 91:22, 147:22,
210:12
   **compare** [1] - 69:11
   **compensation** [9] -

79:6, 160:22, 161:9,
161:15, 161:16,
162:3, 163:9, 163:18,
163:21
   **competitive** [4] -
127:4, 128:7, 130:11,
130:20
   **competitively** [1] -
133:11
   **competitors** [2] -
122:20, 134:12
   **complete** [2] -
138:12, 186:4
   **completed** [2] -
179:8, 186:12
   **completely** [2] -
125:7, 200:11
   **completeness** [6] -
17:1, 31:17, 33:13,
48:10, 50:17, 65:9
   **completion** [1] -
184:24
   **compliance** [5] -
42:24, 43:7, 154:10,
154:13, 185:15
   **complied** [2] -
103:21, 154:11
   **comply** [3] - 61:11,
87:11, 175:16
   **components** [1] -
163:21
   **comport** [1] - 183:14
   **compounded** [3] -
211:24, 212:4, 212:5
   **Comptroller** [16] -
10:3, 33:18, 33:20,
60:25, 61:1, 61:8,
63:13, 63:16, 63:20,
63:24, 63:25, 64:7,
64:8, 64:10, 187:23,
194:14
   **comptroller** [5] -
31:20, 98:3, 98:6,
98:7
   **computations** [2] -
170:13, 171:6
   **computed** [3] -
165:8, 166:7, 167:24
   **concede** [1] - 64:25
   **concept** [1] - 113:4
   **concern** [4] - 93:5,
131:18, 198:23, 199:2
   **concerned** [8] -
131:3, 186:11,
198:22, 198:23,
199:1, 199:15,
199:16, 201:4
   **concerns** [1] -
199:20
   **conclude** [1] - 63:21

   **Concluded** [1] -
216:9
   **concluded** [8] -
14:15, 14:17, 20:24,
47:9, 47:12, 55:21,
57:5, 157:20
   **concludes** [2] - 98:8,
101:14
   **conclusion** [5] -
14:18, 100:3, 134:9,
155:8, 155:18
   **conclusions** [1] -
29:22
   **concurred** [1] -
193:11
   **condition** [6] - 181:2,
200:25, 201:1, 202:5,
202:7, 213:18
   **conditions** [2] -
65:23, 78:21
   **conduct** [8] - 30:10,
30:12, 30:15, 30:19,
73:11, 74:7, 74:12,
74:15
   **conducted** [3] -
19:24, 21:3, 106:16
   **conducting** [3] -
30:1, 30:7, 195:5
   **conducts** [1] - 30:21
   **conference** [20] -
38:24, 38:25, 39:16,
41:9, 42:8, 43:12,
112:4, 112:6, 112:7,
112:8, 112:9, 112:11,
112:14, 112:20,
113:17, 113:20,
208:2, 209:13, 210:6
   **confidence** [1] -
113:2
   **confidential** [1] -
87:10
   **confirm** [3] - 16:18,
29:9, 32:14
   **confirming** [1] -
108:3
   **confirms** [1] - 104:3
   **confiscate** [1] -
20:14
   **conflicts** [7] - 31:21,
32:3, 33:21, 38:7,
38:14, 44:9, 70:14
   **confuse** [1] - 113:24
   **confusion** [1] - 189:8
   **conjunction** [2] -
19:25, 21:3
   **connection** [3] -
38:8, 44:11, 61:12
   **CONNERY** [1] - 1:16
   **Connery** [1] - 97:18
   **consecutive** [6] -

209:14, 210:9,
210:23, 210:24,
211:1, 211:8
   **Consent** [47] - 4:14,
4:21, 4:23, 4:24, 5:1,
5:6, 17:2, 17:8, 22:18,
22:21, 22:22, 29:2,
29:12, 29:16, 31:13,
32:13, 32:21, 33:16,
33:20, 36:16, 36:21,
36:22, 41:25, 45:10,
48:3, 52:22, 52:23,
53:3, 53:4, 59:8,
60:21, 63:20, 71:11,
78:4, 78:17, 86:23,
93:4, 97:22, 98:13,
99:2, 100:16, 100:21,
111:14, 114:5,
155:20, 156:2, 157:10
   **consent** [13] - 29:2,
29:12, 31:9, 31:12,
33:16, 33:17, 33:18,
36:20, 42:21, 102:5,
184:1, 184:7, 185:24
   **consented** [1] -
33:19
   **consequence** [1] -
19:7
   **consequences** [1] -
200:4
   **conserve** [1] - 93:24
   **consider** [2] - 11:8,
199:18
   **consideration** [3] -
19:25, 21:4, 99:23
   **considered** [2] -
24:13, 26:8
   **constructed** [3] -
49:14, 89:4, 146:23
   **construction** [6] -
31:23, 33:22, 34:5,
138:9, 138:11, 196:12
   **consult** [1] - 196:25
   **consultant** [1] -
129:16
   **consumption** [1] -
128:11
   **contain** [2] - 76:7,
94:4
   **contained** [1] - 94:1
   **contains** [1] - 81:11
   **context** [2] - 113:7,
125:6
   **continue** [17] - 29:8,
42:4, 42:16, 42:25,
48:22, 48:23, 59:2,
62:22, 83:2, 111:15,
111:17, 113:3, 170:9,
197:12, 208:7, 215:10
   **continued** [4] -

56:20, 72:6, 163:19, 177:14

**continues** [3] - 41:16, 104:10, 127:1

**continuing** [4] - 40:7, 40:15, 42:14, 114:20

**contract** [23] - 6:19, 46:12, 79:13, 79:25, 159:9, 160:8, 160:12, 160:23, 160:25, 162:22, 167:8, 168:17, 170:13, 171:3, 172:17, 176:22, 177:17, 181:15, 182:2, 182:10, 183:3, 183:7, 190:24

**contracted** [1] - 134:13

**contracting** [2] - 137:22, 138:19

**contractor** [4] - 138:12, 138:16, 138:20

**contracts** [2] - 7:1, 132:7

**contractual** [5] - 25:20, 26:20, 80:11, 158:22, 175:16

**contradicting** [1] - 113:4

**contradictory** [1] - 100:22

**contrary** [1] - 54:12

**contributed** [2] - 68:2, 95:11

**controlled** [1] - 65:19

**controls** [1] - 154:8

**convenience** [4] - 121:18, 122:22, 123:4, 123:6

**conversations** [1] - 13:1

**convert** [1] - 39:25

**convince** [1] - 111:14

**COO** [1] - 26:7

**cooperate** [1] - 43:1

**copied** [1] - 12:23

**copy** [6] - 16:16, 99:13, 128:23, 129:1, 181:20, 182:10

**Core** [1] - 69:10

**corner** [1] - 136:10

**corporate** [4] - 61:11, 113:19, 151:8, 151:16

**corporation** [4] -

89:6, 91:15, 92:14, 146:24

**correct** [31] - 1:24, 4:1, 17:10, 17:12, 18:20, 26:21, 28:6, 52:2, 53:9, 105:6, 109:25, 119:23, 124:25, 135:20, 136:18, 143:23, 153:13, 153:23, 155:4, 160:17, 160:21, 161:19, 162:15, 166:19, 167:10, 171:25, 177:19, 182:1, 203:17, 205:6, 207:20

**corrected** [2] - 15:15, 15:16

**corrective** [1] - 55:21

**correctly** [10] - 17:5, 18:9, 20:4, 21:8, 24:9, 40:8, 59:13, 60:4, 137:15, 175:19

**correspondence** [4] - 5:11, 5:12, 6:14

**cost** [4] - 48:21, 68:23, 133:7, 184:18

**costs** [3] - 137:9, 171:15, 171:16

**counsel** [30] - 6:4, 14:19, 20:6, 23:2, 23:6, 25:23, 25:25, 26:4, 26:6, 26:14, 26:24, 27:12, 36:3, 38:17, 49:22, 51:16, 80:5, 84:8, 97:17, 97:18, 103:13, 106:14, 107:19, 141:5, 172:4, 173:1, 196:23, 215:22

**count** [3] - 76:22, 121:20, 174:14

**countermands** [1] - 85:6

**counting** [2] - 123:7, 160:14

**couple** [20] - 5:24, 6:1, 7:10, 15:13, 28:9, 47:21, 75:16, 98:17, 112:10, 122:2, 121:21, 122:3, 148:23, 162:5, 170:2, 170:12, 184:6, 195:23, 201:18, 202:7

**course** [17] - 39:12, 88:11, 97:25, 128:2, 128:4, 154:17, 161:10, 172:5, 175:7, 181:19, 181:21, 182:14, 186:5, 189:7,

194:25, 197:8, 198:7

**COURT** [204] - 1:1, 3:2, 3:6, 3:8, 3:12, 3:15, 3:23, 4:2, 4:6, 4:8, 15:19, 15:22, 16:8, 16:12, 17:18, 17:20, 20:6, 20:9, 20:19, 20:22, 21:1, 44:3, 45:5, 57:20, 58:1, 58:5, 58:8, 58:12, 58:17, 58:20, 58:23, 59:2, 60:12, 73:3, 73:24, 74:2, 86:7, 101:16, 101:20, 101:24, 102:2, 102:5, 102:9, 102:11, 102:17, 102:22, 102:24, 103:3, 103:12, 103:16, 103:25, 104:6, 104:22, 105:2, 105:5, 105:16, 105:21, 106:4, 106:12, 106:17, 107:1, 107:4, 107:9, 107:13, 107:16, 107:19, 107:22, 108:8, 108:14, 108:16, 108:22, 109:3, 109:8, 109:12, 109:18, 109:20, 109:23, 110:2, 110:24, 111:6, 111:22, 111:24, 112:19, 113:14, 113:25, 114:21, 114:24, 115:9, 115:13, 115:16, 115:22, 116:13, 116:21, 117:3, 117:5, 117:13, 117:19, 117:21, 117:25, 118:2, 118:6, 118:10, 118:13, 118:15, 118:20, 118:23, 118:25, 119:2, 119:5, 119:10, 119:14, 119:20, 119:22, 119:24, 125:17, 128:13, 128:16, 128:18, 128:22, 128:24, 129:5, 130:6, 130:8, 130:12, 130:24, 131:9, 131:16, 133:3, 133:14, 134:17, 134:19, 135:3, 135:23, 136:15, 136:19, 136:22, 136:25, 139:16, 139:19, 142:14, 142:16, 142:18,

143:9, 159:1, 159:4, 159:6, 163:1, 165:12, 165:16, 165:18, 165:20, 165:25, 166:2, 166:4, 169:14, 169:17, 169:21, 169:22, 169:24, 170:4, 170:6, 170:8, 172:9, 182:19, 184:11, 184:14, 187:5, 187:7, 187:11, 188:13, 188:18, 188:22, 188:25, 190:2, 190:4, 190:7, 191:6, 193:4, 193:6, 193:9, 193:11, 193:15, 204:5, 208:21, 209:1, 209:9, 212:18, 212:21, 212:25, 213:11, 213:20, 213:25, 214:6, 214:9, 214:11, 214:14, 214:16, 214:19, 214:24, 215:21, 215:23, 215:25, 216:2, 216:8

**Court** [8] - 118:18, 142:8, 142:11, 142:21, 142:22, 169:20, 214:17

**court** [6] - 8:10, 142:2, 142:3, 200:2, 213:2

**Courthouse** [1] - 1:8

**courtroom** [4] - 20:17, 101:21, 169:18, 213:10

**Courtroom** [3] - 3:22, 57:24, 119:9

**cover** [9] - 46:20, 88:18, 90:18, 90:25, 154:20, 154:25, 155:24, 159:11, 185:11

**covered** [2] - 108:9, 174:20

**crash** [1] - 206:17

**created** [1] - 169:3

**creates** [1] - 208:4

**creative** [1] - 127:2

**credit** [7] - 87:13, 167:7, 202:12, 202:17, 202:21, 203:13, 203:14

**Critchley** [1] - 52:8

**criteria** [1] - 212:1

**Cromwell** [4] - 83:19, 84:15, 180:18, 182:8

**cross** [3] - 133:12, 133:17, 213:19

**cross-examination** [1] - 133:12

**cross-examine** [1] - 133:17

**crux** [1] - 46:14

**crystal** [1] - 94:12

**cumbersome** [1] - 189:1

**Currency** [4] - 10:3, 60:25, 187:23, 194:15

**currency** [1] - 194:14

**current** [1] - 210:2

**customer** [1] - 123:4

**cut** [1] - 97:23

**D**

**D-19** [2] - 197:19, 205:1

**D-5** [1] - 44:2

**D-51** [6] - 191:9, 191:11, 191:14, 191:17, 191:18, 191:19

**D-55** [10] - 19:3, 19:4, 34:18, 34:19, 49:9, 67:19, 73:2, 85:12, 95:6

**D.C** [2] - 82:22, 84:13

**damage** [2] - 158:4, 158:7

**damaged** [1] - 115:3

**damaging** [1] - 158:14

**danger** [1] - 133:15

**data** [3] - 87:25, 88:3, 95:14

**date** [46] - 4:16, 4:17, 4:23, 7:6, 7:18, 8:2, 22:23, 29:1, 32:14, 32:18, 32:20, 36:23, 40:24, 51:21, 76:22, 78:17, 81:20, 81:21, 82:7, 107:8, 126:11, 127:7, 136:9, 150:18, 151:2, 159:15, 164:9, 173:10, 175:18, 177:13, 181:14, 181:22, 182:2, 183:17, 194:12, 194:19, 197:21, 205:4, 205:7, 205:9, 206:3, 206:4, 212:22, 214:23

**dated** [8] - 5:18, 17:2, 28:6, 33:16, 45:1, 109:15, 203:4, 211:25

**dates** [4] - 5:25,

6:11, 109:14, 189:5
**Dave** [4] - 185:14,
185:15, 187:2, 189:19
**days** [16] - 20:9,
51:24, 52:17, 53:3,
71:10, 121:22, 122:3,
171:4, 173:12,
174:20, 175:18,
175:23, 178:14,
199:12, 206:9, 214:3
**deal** [11] - 82:23,
130:9, 149:23, 150:1,
156:11, 162:2, 165:1,
185:16, 205:23,
207:3, 207:6
**dealing** [9] - 67:12,
111:4, 111:17,
132:15, 132:21,
149:17, 149:22,
153:20, 154:14
**dealings** [10] -
111:15, 111:18,
111:20, 125:13,
131:13, 132:9,
132:15, 134:24,
153:2, 153:5
**deals** [12] - 100:12,
114:10, 127:15,
146:1, 146:3, 146:4,
148:5, 148:9, 148:16,
153:10, 163:15
**dealt** [2] - 138:2,
149:2
**Dear** [1] - 174:3
**December** [30] -
48:24, 81:7, 81:18,
81:19, 81:22, 84:6,
85:7, 87:2, 102:20,
103:1, 120:11,
160:19, 160:20,
169:4, 177:15,
194:19, 197:2,
197:22, 202:3, 203:4,
203:22, 204:7,
204:17, 204:20,
204:23, 205:10,
206:4, 206:7
**decide** [3] - 10:24,
48:22, 152:18
**decided** [8] - 21:17,
23:16, 26:9, 49:6,
85:7, 98:8, 131:2,
139:7
**decides** [1] - 152:18
**decision** [9] - 11:20,
13:19, 24:22, 26:12,
35:16, 141:18,
142:11, 142:25
**decisions** [1] - 8:13
**decisive** [1] - 208:9

**declined** [1] - 47:22
**deem** [2] - 167:21,
167:22
**defendant** [2] -
12:12, 112:17
**Defendant** [1] - 1:7
**DEFENDANT** [1] -
1:18
**defense** [5] - 15:20,
111:2, 111:19, 113:4,
115:15
**deficiencies** [2] -
68:1, 95:10
**define** [2] - 9:2,
23:25
**defined** [4] - 43:19,
44:1, 163:11, 202:3
**defines** [1] - 163:8
**definitely** [1] -
123:10
**definition** [1] -
161:16
**definitions** [1] -
196:15
**delay** [1] - 133:15
**deliver** [4] - 111:1,
121:19, 123:6, 123:17
**delivered** [1] - 125:7
**demand** [2] - 79:19,
139:3
**demanding** [1] -
180:21
**DeMaria** [2] - 195:20,
195:22
**demonstrate** [1] -
116:14
**demonstrated** [1] -
108:10
**denied** [1] - 59:12
**denies** [4] - 61:9,
63:14, 98:4, 100:1
**Dennis** [4] - 110:13,
138:3, 138:15, 138:17
**denying** [1] - 64:3
**departure** [3] -
41:10, 41:14, 41:17
**deposit** [5] - 39:25,
208:7, 210:16,
210:20, 210:25
**deposition** [6] - 3:9,
3:24, 4:10, 6:23,
102:13, 157:6
**deposits** [2] - 68:10,
209:21
**DEPUTY** [12] - 3:1,
3:21, 57:23, 57:25,
59:1, 101:20, 118:19,
119:8, 169:17,
169:21, 170:6, 213:9
**derived** [1] - 210:1

**describe** [1] - 41:24
**described** [1] - 41:24
**describes** [3] - 30:1,
38:13, 75:17
**description** [1] -
10:11
**design** [8] - 49:15,
123:24, 125:9, 127:2,
137:1, 137:6, 152:20,
152:23
**designated** [1] -
181:1
**designed** [1] - 50:1
**designers** [1] - 124:8
**desired** [1] - 63:20
**Desist** [4] - 51:25,
53:25, 54:21, 67:25
**desist** [8] - 24:8,
27:19, 31:20, 34:25,
35:10, 37:15, 37:21,
41:3
**desk** [1] - 99:13
**despite** [1] - 151:7
**detailed** [1] - 52:12
**determination** [4] -
21:22, 25:21, 26:23,
76:16
**determine** [2] -
156:16, 156:18
**determined** [3] -
23:11, 24:14, 26:20
**develop** [4] - 121:17,
125:2, 145:2, 145:15
**developed** [2] -
158:18, 188:16
**development** [17] -
38:9, 44:12, 61:13,
61:24, 64:22, 86:19,
86:20, 99:4, 108:19,
111:16, 120:21,
144:4, 145:19,
150:21, 151:3,
151:23, 152:20
**Development** [8] -
86:17, 144:10,
144:13, 144:14,
144:15, 144:18,
144:19, 146:2
**develops** [3] - 144:5,
144:7, 152:20
**devised** [1] - 122:22
**Devon** [1] - 196:1
**DG** [1] - 43:10
**difference** [5] - 76:3,
76:4, 104:1, 122:7,
122:10
**different** [11] - 26:16,
48:1, 69:14, 69:15,
109:14, 121:18,
122:20, 123:9, 125:7,

148:23, 182:4
**difficulties** [5] - 68:3,
68:6, 68:12, 68:16,
95:12
**difficulty** [2] - 68:14,
68:22
**DiFlorio** [15] - 110:5,
110:13, 110:21,
112:6, 116:3, 121:21,
122:3, 126:19,
128:17, 133:1, 138:3,
138:15, 138:17,
210:5, 210:18
**DiFrancesco** [4] -
148:24, 149:2, 149:7,
149:23
**digit** [5] - 209:15,
210:9, 210:19,
210:25, 211:9
**diligence** [2] - 40:16,
43:15
**DiMaria** [2] - 132:1,
138:9
**direct** [13] - 13:20,
24:4, 24:12, 46:18,
63:9, 150:16, 156:1,
160:9, 164:1, 170:9,
170:19, 182:16, 210:5
**DIRECT** [3] - 2:2,
119:19, 216:12
**directed** [5] - 13:23,
38:6, 44:9, 52:7,
82:23
**direction** [1] - 42:22
**directly** [3] - 32:15,
82:23, 113:4
**Director** [6] - 80:4,
83:18, 84:2, 126:17,
149:2, 149:7
**directors** [5] - 70:6,
188:6, 194:18, 195:7,
200:14
**Directors** [47] - 20:1,
21:5, 21:14, 21:16,
21:17, 21:21, 21:22,
22:2, 22:7, 22:11,
23:15, 25:6, 25:18,
26:18, 27:5, 33:15,
45:1, 46:1, 46:2,
59:16, 69:25, 78:10,
78:20, 79:11, 79:12,
79:17, 79:24, 80:3,
80:10, 82:16, 83:11,
83:16, 84:7, 85:5,
85:15, 85:17, 85:25,
86:9, 95:17, 96:3,
96:8, 96:16, 97:12,
125:12, 125:25,
137:12, 150:17
**disagree** [1] - 105:20

**disbursements** [1] -
137:10
**discharged** [3] -
81:8, 179:15, 206:10
**disclose** [3] -
104:17, 198:16, 203:2
**disclosed** [18] -
89:25, 90:13, 90:14,
92:10, 104:15,
134:25, 135:5, 135:7,
135:11, 135:12,
146:13, 150:4,
186:16, 198:14,
198:15, 198:25,
203:1, 204:25
**disclosure** [9] - 57:6,
92:1, 93:13, 147:2,
148:24, 189:14,
189:17, 205:3, 213:16
**disclosures** [6] -
87:21, 90:5, 103:20,
137:20, 146:16, 149:1
**discount** [1] - 127:14
**discovery** [1] -
104:16
**discretion** [1] - 31:4
**discuss** [10] - 57:21,
85:20, 96:9, 96:18,
101:18, 109:6,
169:15, 172:12,
189:19, 213:7
**discussed** [15] -
12:17, 21:17, 23:16,
26:19, 35:15, 36:2,
59:18, 67:11, 82:13,
96:9, 96:12, 97:17,
184:7, 193:25, 195:22
**discussing** [6] -
16:16, 23:19, 60:5,
79:5, 79:13, 79:24
**discussion** [7] -
25:20, 35:11, 35:13,
52:20, 57:6, 57:7,
130:7
**discussions** [5] -
23:6, 26:4, 26:23,
27:12, 80:11
**disinterested** [4] -
46:1, 46:2, 46:3,
188:6
**disposal** [1] - 100:13
**disqualifying** [2] -
115:2, 179:25
**disregard** [1] - 59:7
**DISTRICT** [3] - 1:1,
1:1, 1:11
**divide** [1] - 201:24
**divided** [1] - 174:10
**Division** [2] - 142:13,
142:20

document [64] -
5:14, 6:13, 8:1, 8:6,
8:12, 8:15, 12:8, 28:3,
28:17, 29:5, 37:1,
38:18, 38:21, 39:15,
40:25, 42:1, 42:21,
45:12, 45:14, 45:16,
45:19, 87:20, 87:24,
90:2, 97:21, 103:5,
103:12, 104:7,
104:11, 104:12,
104:15, 104:16,
104:17, 104:18,
104:19, 105:13,
105:18, 108:3, 108:6,
108:9, 110:8, 110:9,
110:10, 110:17,
110:23, 113:12,
113:13, 113:16,
113:18, 114:3, 117:6,
128:20, 129:4,
130:13, 133:25,
135:24, 148:22,
151:19, 185:23,
191:14, 191:20
documentary [8] -
27:15, 79:23, 82:12,
83:11, 103:17, 104:2,
106:15
documentation [1] -
104:5
documents [26] -
4:9, 4:22, 7:24, 34:22,
35:3, 36:6, 42:24,
43:7, 46:14, 52:18,
73:9, 73:21, 74:5,
75:19, 79:10, 87:20,
93:8, 93:20, 135:19,
136:20, 179:4,
179:12, 179:17,
213:13, 213:14,
213:15
dog [2] - 123:2
dogs [1] - 123:8
dollar [3] - 18:19,
47:21, 162:12
dollars [20] - 18:4,
18:18, 68:15, 68:17,
68:24, 68:25, 69:3,
80:23, 81:13, 89:9,
89:21, 91:18, 92:16,
92:18, 92:20, 137:9,
161:21, 162:14,
162:16, 172:1
Dominion [5] -
178:22, 178:24,
205:23, 206:21, 208:9
Dominion's [1] -
206:23
done [19] - 66:4,

100:7, 101:11,
106:16, 115:5, 119:2,
129:12, 130:19,
131:7, 131:8, 158:17,
172:9, 179:24, 185:1,
185:8, 185:10, 196:2,
199:5, 215:13
door [1] - 131:17
double [6] - 74:15,
209:15, 210:9,
210:19, 210:24, 211:8
doubt [1] - 149:25
Doug [2] - 138:3,
160:4
down [15] - 49:12,
67:9, 102:19, 131:16,
162:24, 165:21,
165:24, 170:14,
171:8, 174:14, 204:1,
204:20, 205:4,
212:12, 212:24
draft [4] - 14:5,
52:18, 52:20, 53:4
drafted [6] - 14:7,
14:17, 23:20, 23:21,
23:22, 59:25
draw [1] - 183:25
drawing [1] - 64:24
drawn [1] - 170:12
dream [1] - 210:10
drew [1] - 34:21
driven [1] - 208:7
dropped [2] - 190:1,
190:5
due [11] - 40:16,
43:15, 46:7, 164:21,
165:7, 170:22, 171:3,
171:21, 190:23,
193:19
duly [1] - 33:14
DULY [1] - 119:17
duplicate [1] -
130:16
duplicative [1] -
103:23
during [11] - 50:20,
92:11, 92:23, 116:9,
126:2, 161:17,
172:15, 197:14,
201:20, 202:10,
211:19
duties [3] - 59:11,
61:10, 63:16
duty [1] - 36:5

E

e-mail [1] - 198:18
e-mails [2] - 20:10,

20:11
early [4] - 77:12,
144:20, 155:2, 160:25
earnings [8] - 69:7,
95:3, 114:13, 201:22,
201:24, 201:25,
202:9, 209:25
easel [1] - 169:25
easier [1] - 136:20
easy [1] - 185:7
Ed [9] - 43:9, 43:10,
43:13, 71:24, 72:5,
72:11, 72:17, 112:21,
112:25
Edward [2] - 4:3,
12:10
EDWIN [1] - 1:14
effect [6] - 12:6,
75:22, 115:4, 141:17,
211:4, 212:13
effected [2] - 211:13,
211:16
effective [1] - 48:23
effort [1] - 135:10
efforts [2] - 66:15,
214:3
eight [4] - 81:6,
124:16, 138:2, 195:17
either [13] - 33:8,
47:16, 50:7, 56:12,
60:8, 62:14, 115:1,
132:3, 145:1, 159:25,
175:13, 191:16,
191:20
elected [1] - 33:14
element [2] - 65:23,
115:4
elevated [2] -
206:19, 206:20
email [4] - 14:14,
14:16, 69:24, 110:13
embedded [1] -
210:1
employ [1] - 124:7
employed [2] -
163:20, 177:14
employee [3] - 9:19,
26:5, 65:4
employer [1] - 8:21
employment [17] -
7:1, 79:13, 80:22,
116:8, 159:9, 159:13,
170:13, 171:4,
174:11, 174:14,
175:17, 175:19,
176:21, 177:3,
181:15, 183:3, 183:8
Employment [1] -
78:22
encompassing [1] -

25:8
encounters [1] -
11:5
end [16] - 81:18,
84:23, 116:10, 132:8,
156:18, 160:18,
163:19, 166:8,
166:18, 190:2,
201:13, 201:15,
202:3, 204:13,
204:24, 214:9
endangering [1] -
201:5
ended [5] - 81:7,
81:19, 81:22, 177:17,
215:6
ends [1] - 133:22
enforce [1] - 214:17
enforcement [2] -
171:10, 172:2
enforcing [1] -
171:16
engage [7] - 65:20,
66:16, 66:24, 74:11,
74:15, 74:20, 74:21
engaged [16] - 9:16,
50:21, 51:5, 51:8,
53:12, 53:20, 54:8,
59:10, 61:9, 63:14,
73:11, 74:7, 75:7,
100:2, 114:10, 196:25
engaging [1] - 51:3
engine [1] - 208:12
English [1] - 151:14
enhance [1] - 154:8
enlarge [4] - 17:22,
19:21, 162:2, 162:22
enrichment [1] -
70:19
ensure [3] - 31:21,
33:21, 66:15
Enter [1] - 4:24
enter [3] - 5:1, 63:20,
63:21
entered [7] - 32:1,
59:8, 90:9, 92:11,
92:23, 156:14, 157:11
Enters [2] - 3:22,
119:9
entire [3] - 116:25,
212:5, 213:17
entirety [3] - 112:11,
112:14, 215:15
entitled [6] - 81:12,
106:10, 163:9,
163:17, 165:2, 171:14
entitlement [1] -
80:23
entitlements [4] -
6:20, 26:20, 46:12,

80:11
entity [3] - 22:11,
49:16, 65:20
entries [1] - 109:14
entry [6] - 24:7,
34:25, 37:14, 41:2,
51:24, 67:25
enumerated [1] -
67:24
environment [1] -
151:9
equal [1] - 134:13
equivalent [1] -
137:11
Eric [1] - 101:25
error [2] - 55:8,
186:5
errors [2] - 47:21,
71:20
escrow [6] - 190:24,
191:2, 191:23, 192:7,
192:13, 193:8
especially [1] -
104:15
espoused [1] - 84:17
ESQUIRE [4] - 1:14,
1:15, 1:17, 1:17
essential [5] -
126:5
establish [4] - 94:23,
208:11, 208:22, 209:1
estate [55] - 38:9,
39:23, 44:12, 46:14,
46:25, 47:8, 47:11,
47:20, 47:21, 49:16,
54:13, 56:9, 56:17,
61:12, 61:13, 61:23,
61:24, 62:3, 64:21,
65:20, 66:9, 66:16,
66:24, 71:16, 71:19,
86:19, 86:20, 86:24,
90:14, 93:6, 99:3,
99:15, 100:5, 120:21,
143:25, 144:4,
144:11, 145:4, 145:5,
145:12, 146:8, 146:9,
147:7, 149:8, 150:10,
152:15, 153:21,
155:16, 155:17,
156:20, 157:22,
158:3, 196:10
et [1] - 74:8
evaluation [1] -
48:22
event [2] - 11:20,
80:22
events [1] - 200:17
evidence [49] -
15:19, 17:18, 27:15,
45:4, 57:11, 60:11,
73:9, 73:21, 74:5,

75:19, 78:14, 79:24, 82:13, 83:11, 83:23, 83:25, 86:3, 100:22, 102:17, 102:24, 103:18, 104:2, 104:3, 108:3, 108:4, 108:16, 108:22, 109:9, 110:3, 112:2, 112:12, 112:13, 112:14, 112:15, 117:14, 126:6, 128:11, 129:5, 133:5, 133:17, 134:20, 135:15, 159:7, 173:1, 180:14, 182:25, 188:21, 191:7, 205:5

**EVIDENCE** [33] - 2:4, 2:5, 2:6, 2:7, 2:8, 2:9, 2:10, 2:11, 2:12, 2:13, 2:14, 102:18, 102:25, 108:17, 108:23, 109:10, 110:4, 112:3, 116:17, 117:15, 134:22, 159:8, 216:17, 216:19, 216:21, 216:23, 216:25, 217:2, 217:4, 217:6, 217:8, 217:10, 217:12

**evolve** [3] - 147:14, 151:16, 151:18

**evolving** [1] - 147:17

**exact** [6] - 6:11, 7:6, 166:9, 167:23, 213:18, 215:15

**exactly** [14] - 7:18, 22:6, 22:10, 35:6, 51:2, 62:22, 77:10, 129:14, 145:12, 174:17, 186:9, 189:9, 196:22, 205:19

**examination** [5] - 48:17, 133:12, 152:10, 170:9, 182:16

**EXAMINATION** [3] - 2:2, 119:19, 216:12

**examinations** [15] - 87:7, 87:8, 87:15, 103:19, 103:20, 105:9, 106:11, 106:14, 106:15, 106:23, 107:12, 107:14, 107:24, 108:7, 153:25

**examine** [4] - 133:17, 151:10, 153:11, 154:7

**examined** [6] - 62:2, 92:5, 153:6, 153:8, 198:14, 198:25

**examiner** [3] - 10:4, 63:13, 187:20

**examiners** [1] - 152:11

**examines** [2] - 152:7, 152:8

**examining** [1] - 49:5

**example** [14] - 79:16, 79:23, 80:2, 82:12, 83:10, 106:15, 115:7, 131:11, 134:2, 134:6, 145:16, 146:7, 146:18, 152:16

**examples** [3] - 79:12, 80:9, 135:14

**except** [1] - 161:8

**Exception** [2] - 65:15, 65:16

**exception** [2] - 104:24, 104:25

**excerpted** [1] - 88:19

**Exchange** [1] - 203:25

**excluding** [1] - 26:6

**excuse** [4] - 4:14, 39:19, 78:13, 109:20

**executed** [2] - 15:8, 33:15

**execution** [1] - 134:11

**Executive** [2] - 60:18, 143:16

**executive** [4] - 26:6, 57:16, 145:7, 185:10

**exhibit** [17] - 15:20, 16:5, 16:15, 38:22, 45:4, 97:3, 99:2, 114:23, 126:6, 150:11, 154:20, 172:6, 172:7, 172:25, 173:3, 173:5, 180:13

**Exhibit** [22] - 71:23, 75:6, 75:15, 78:14, 82:14, 85:23, 98:10, 126:7, 129:2, 135:17, 155:23, 170:16, 176:1, 180:14, 182:25, 183:11, 184:1, 187:25, 191:19, 193:20, 193:21, 194:11

**EXHIBIT** [30] - 2:4, 2:5, 2:6, 2:7, 2:9, 2:10, 2:11, 2:12, 2:13, 2:14, 102:18, 102:25, 108:17, 108:23, 110:4, 112:3, 116:17, 117:15, 134:22, 159:8, 216:16, 216:18, 216:20,

216:22, 217:1, 217:3, 217:5, 217:7, 217:9, 217:11

**exhibits** [6] - 27:18, 27:25, 93:24, 94:21, 101:23, 104:14

**EXHIBITS** [3] - 2:8, 109:10, 216:24

**existence** [4] - 67:24, 78:5, 99:6, 181:18

**existing** [4] - 48:11, 127:12, 156:6, 179:3

**exists** [3] - 144:7, 171:19, 210:2

**expanding** [1] - 40:15

**expect** [1] - 215:12

**expected** [1] - 12:10

**expecting** [1] - 127:13

**expenses** [3] - 81:2, 171:10, 171:15

**experience** [5] - 100:25, 125:4, 125:7, 149:21, 206:13

**experienced** [1] - 211:10

**experiencing** [1] - 210:8

**expert** [3] - 11:9, 98:18, 101:4

**expire** [1] - 147:4

**explain** [18] - 13:2, 51:2, 83:15, 83:17, 135:10, 144:2, 145:12, 151:6, 152:14, 165:4, 168:8, 176:7, 193:10, 199:9, 202:4, 202:14, 206:25, 207:8

**explained** [5] - 34:14, 50:9, 99:8, 182:4, 200:6

**explains** [2] - 111:13, 111:16

**explanation** [1] - 37:9

**explanatory** [1] - 144:22

**express** [1] - 113:2

**expressions** [2] - 112:24, 112:25

**extend** [1] - 156:18

**extends** [2] - 104:23, 105:14

**extensive** [1] - 43:15

**extraction** [1] - 80:20

**extremely** [5] - 50:24, 51:10, 53:14,

54:17, 69:16

**eye** [1] - 131:12

**eyeballing** [1] - 3:16

**eyewitness** [1] - 200:17

## F

**face** [13] - 44:24, 46:6, 80:21, 81:10, 100:22, 135:16, 158:25, 163:5, 164:1, 168:17, 171:10, 187:25

**facilities** [2] - 137:1, 137:7

**fact** [26] - 14:15, 27:4, 27:5, 35:23, 37:11, 37:14, 37:22, 64:17, 68:9, 68:20, 82:5, 103:10, 105:24, 112:12, 114:4, 116:7, 121:24, 126:21, 132:17, 132:25, 141:22, 143:1, 172:2, 191:23, 201:6, 202:10

**factor** [2] - 137:13, 158:16

**facts** [12] - 10:24, 20:1, 21:5, 27:4, 29:20, 29:23, 29:24, 93:20, 97:25, 99:11, 105:19

**factually** [1] - 21:12

**fail** [1] - 154:6

**failed** [3] - 171:22, 201:3, 201:4

**failing** [1] - 61:10

**fails** [1] - 171:20

**failure** [1] - 171:20

**fair** [11] - 12:22, 46:6, 46:24, 99:18, 148:20, 150:3, 157:18, 215:18, 215:19, 215:23

**fairly** [1] - 39:25

**faith** [7] - 20:2, 21:6, 73:8, 73:20, 74:4, 96:3, 100:12

**faithfully** [1] - 53:11

**False** [13] - 39:7, 39:9, 40:3, 40:4, 40:11, 41:21, 41:23, 42:8, 42:17, 71:24, 72:5, 72:11, 72:17

**fall** [1] - 118:12

**false** [7] - 50:22, 51:9, 53:13, 53:21, 54:9, 75:11, 175:5

**familiar** [4] - 39:16, 155:20, 178:18, 184:4

**family** [5] - 89:7, 91:16, 92:15, 92:24, 146:25

**far** [10] - 6:18, 43:4, 43:22, 50:11, 68:4, 82:25, 156:20, 181:20, 190:16, 190:19

**fast** [2] - 140:6, 206:9

**faster** [5] - 58:11, 58:12, 65:6, 65:10, 209:23

**favor** [1] - 47:13

**favorable** [3] - 62:21, 99:22, 100:6

**FDIC** [16] - 12:23, 13:1, 13:3, 50:12, 77:5, 82:24, 83:4, 84:12, 94:14, 118:7, 118:9, 175:15, 180:17, 182:9, 201:6, 201:7

**FDIC's** [1] - 192:8

**fear** [1] - 47:23

**February** [17] - 45:2, 45:9, 55:17, 62:4, 65:1, 92:5, 94:10, 94:14, 94:18, 99:13, 110:6, 110:12, 116:18, 117:17, 132:19, 140:6, 194:8

**Fed** [11] - 12:21, 13:3, 13:21, 32:10, 32:21, 36:20, 49:4, 76:16, 153:9, 153:12

**Fed's** [1] - 192:7

**federal** [2] - 142:2, 200:5

**Federal** [30] - 18:11, 19:25, 21:4, 28:12, 38:5, 44:8, 50:11, 76:8, 76:11, 77:5, 77:8, 82:24, 83:4, 84:12, 90:12, 94:2, 94:13, 103:19, 118:7, 153:6, 153:14, 153:15, 153:25, 175:10, 175:15, 178:5, 178:10, 180:17, 182:9, 211:7

**fees** [6] - 129:17, 133:6, 171:16, 172:2, 172:4

**felt** [2] - 111:17, 198:23

**female** [4] - 14:2, 14:7, 14:15, 16:23

**few** [6] - 38:2, 41:24, 123:13, 146:2, 186:3, 214:12

**fides** [2] - 131:13, 133:17

**fiduciary** [5] - 22:17, 36:5, 59:11, 61:10, 63:15

**fifth** [2] - 91:3, 156:5

**fight** [3] - 200:2, 200:3, 200:8

**figure** [9] - 52:16, 52:19, 92:25, 155:12, 163:10, 165:15, 166:8, 166:23, 177:11

**figures** [5] - 165:9, 167:19, 167:24, 205:25, 206:1

**file** [6] - 19:16, 80:17, 94:3, 129:24, 131:20, 213:18

**filed** [7] - 81:25, 94:9, 94:13, 129:25, 140:16, 180:10

**files** [1] - 109:12

**filing** [2] - 109:23, 135:11

**filings** [3] - 90:12, 134:25, 198:15

**filling** [1] - 101:8

**final** [7] - 32:14, 59:6, 67:20, 67:23, 70:22, 78:19, 95:8

**finally** [2] - 39:25, 41:14

**financial** [24] - 61:14, 65:21, 66:17, 68:3, 68:6, 68:12, 68:14, 68:15, 68:22, 81:3, 81:11, 94:24, 95:12, 95:14, 113:21, 114:13, 116:6, 125:13, 125:20, 128:7, 201:4, 202:5, 202:7, 202:19

**Financial** [3] - 38:23, 113:17, 114:12

**financially** [2] - 49:17, 201:9

**findings** [9] - 46:24, 59:9, 100:19, 103:9, 103:21, 134:6, 169:5, 178:8, 188:24

**fine** [9] - 58:6, 73:5, 82:15, 96:25, 100:6, 107:25, 115:9, 170:18, 201:12

**finger** [1] - 77:16

**fining** [1] - 30:24

**finished** [1] - 216:6

**fired** [4] - 138:19, 163:8, 168:12, 168:14

**firm** [28] - 50:13, 124:6, 124:11, 125:9, 129:17, 129:18, 129:20, 139:14, 140:1, 141:6, 141:7, 141:9, 141:10, 141:17, 148:24, 149:3, 149:7, 151:18, 158:15, 173:14, 176:10, 176:18, 182:8, 183:22, 192:22

**firms** [9] - 133:9, 139:9, 139:12, 139:23, 183:24, 188:7, 196:25, 211:23, 211:25

**first** [48] - 7:13, 7:20, 9:10, 9:16, 16:17, 19:5, 19:12, 19:19, 19:23, 21:2, 29:11, 29:15, 30:4, 30:6, 31:16, 33:12, 41:25, 51:14, 52:12, 52:21, 59:15, 60:24, 70:3, 86:15, 98:17, 102:8, 105:21, 120:21, 123:13, 130:14, 135:16, 139:25, 142:10, 144:6, 152:25, 155:24, 156:5, 158:25, 160:7, 161:8, 173:2, 176:1, 176:18, 180:23, 199:19, 203:7, 205:20

**firstly** [3] - 120:2, 166:7, 183:25

**fiscal** [2] - 81:6, 81:22

**Fisher** [10] - 116:19, 117:16, 132:19, 132:20, 157:5, 179:11, 181:5, 193:23, 194:1, 197:9

**five** [20] - 17:24, 28:18, 47:7, 69:10, 82:17, 86:22, 89:1, 102:17, 110:1, 110:2, 127:13, 153:9, 160:13, 160:16, 161:8, 162:11, 166:18, 178:14, 195:16

**five-year** [1] - 166:18

**fix** [2] - 20:19, 20:20

**fixed** [1] - 166:24

**flabbergasted** [1] - 101:1

**flat** [1] - 210:7

**Fleese** [1] - 112:21

**fluctuation** [1] - 206:14

**fluctuations** [1] - 206:15

**focus** [8] - 13:3, 32:3, 61:23, 93:5, 99:2, 194:12, 200:23, 202:2

**focused** [1] - 38:14

**focuses** [2] - 34:4, 42:2

**focussing** [1] - 194:3

**folks** [4] - 3:23, 105:22, 120:23, 213:25

**follow** [5] - 68:21, 141:22, 149:4, 152:2, 171:5

**followed** [1] - 83:16

**following** [6] - 38:3, 38:4, 52:12, 64:2, 91:20, 151:25, 171:4, 171:19, 208:3

**follows** [1] - 151:24

**FOLLOWS** [1] - 119:18

**food** [1] - 101:11

**footprint** [1] - 208:5

**FOR** [3] - 1:1, 1:15, 1:18

**Forbes** [1] - 211:21

**force** [1] - 151:12

**foregoing** [3] - 89:14, 91:21, 147:22

**forget** [3] - 26:5, 139:14, 139:18

**forgot** [2] - 187:10, 215:2

**form** [17] - 18:4, 18:12, 18:19, 55:25, 56:7, 56:15, 56:21, 56:24, 97:24, 186:13, 186:14, 186:15, 189:7, 189:9, 189:10, 189:12, 189:23

**formed** [4] - 139:5, 140:15, 140:20, 144:5

**former** [4] - 60:17, 63:13, 65:4, 187:20

**formidable** [1] - 174:9

**forms** [4] - 57:13, 162:3, 189:5, 189:18

**forth** [3] - 73:11, 74:7, 130:22

**forty** [1] - 149:19

**forward** [14] - 40:17, 40:19, 76:22, 115:1, 115:18, 140:6,

147:18, 160:14, 160:15, 163:23, 199:21, 204:12, 206:9, 209:25

**foundation** [2] - 208:23, 209:1

**founded** [1] - 144:16

**founder** [1] - 120:12

**four** [22] - 18:1, 18:4, 18:18, 18:19, 28:18, 46:24, 47:7, 48:10, 48:12, 48:13, 89:1, 105:9, 109:13, 156:10, 161:5, 161:25, 195:16, 202:24, 212:1

**fourteen** [1] - 169:2

**fourth** [5] - 92:10, 127:18, 146:20, 174:10, 212:2

**fragment** [1] - 49:3

**frame** [1] - 203:22

**franchises** [1] - 208:7

**frankly** [3] - 130:18, 152:12, 200:11

**fraudulent** [1] - 75:21

**free** [1] - 152:22

**free-standing** [1] - 152:22

**freestanding** [1] - 146:6

**frequency** [1] - 153:16

**Friday** [1] - 215:14

**Friedlander** [1] - 1:25

**front** [10] - 20:11, 20:14, 32:24, 38:21, 40:24, 94:23, 95:15, 100:4, 146:6, 152:22

**FRS** [2] - 87:8, 107:24

**full** [24] - 7:12, 19:5, 19:21, 27:22, 33:12, 34:17, 34:19, 44:7, 46:23, 49:10, 57:6, 59:6, 70:4, 93:13, 96:7, 117:9, 119:20, 121:15, 152:10, 161:7, 163:18, 163:21, 171:14, 176:24

**full-time** [3] - 121:15, 152:10, 161:7

**fully** [3] - 38:5, 78:21, 110:21

**fund** [2] - 201:6, 201:7

**funds** [2] - 190:23, 193:19

**furnished** [1] - 50:1

**future** [6] - 31:24, 33:23, 65:20, 66:16, 67:3, 147:6

**Futures** [1] - 105:11

**futuro** [5] - 32:1, 34:2, 66:1, 66:21, 71:14

**G**

**gain** [1] - 61:14

**gap** [1] - 207:5

**gathered** [1] - 120:22

**general** [5] - 103:13, 130:3, 178:20, 196:23, 206:17

**generally** [6] - 122:17, 154:5, 178:18, 192:2, 198:21, 210:21

**generated** [1] - 100:22

**gentleman** [1] - 120:2

**gentlemen** [3] - 57:21, 169:15, 212:21

**Gerry** [1] - 1:9

**Giordano** [2] - 83:18, 141:1

**given** [4] - 23:3, 66:25, 100:19, 112:1

**glad** [1] - 96:12

**Golden** [3] - 98:18, 101:1, 101:5

**golden** [17] - 7:22, 10:16, 10:19, 10:21, 10:25, 11:5, 11:9, 11:14, 12:3, 12:5, 77:9, 77:24, 131:21, 178:6, 181:3, 181:11, 211:7

**gotcha** [1] - 207:12

**governance** [3] - 61:11, 151:9, 151:16

**Governance** [2] - 110:14, 126:18

**governed** [2] - 152:9, 178:6

**governing** [3] - 7:22, 87:11, 103:22

**government** [3] - 3:8, 200:7, 201:3

**Government** [1] - 10:8

**governments** [1] - 202:18

**governs** [2] - 6:25, 154:12
**granted** [3] - 81:4, 81:15, 82:6
**graph** [1] - 116:10
**graphs** [3] - 116:3, 116:5, 116:11
**great** [18] - 39:25, 116:14, 123:15, 123:16, 124:9, 124:12, 168:25, 169:2, 169:3, 169:14, 189:22, 201:14, 201:16, 201:17, 208:5, 208:6, 213:4, 216:8
**greater** [2] - 18:13, 18:22
**grew** [4] - 121:16, 121:19, 147:14, 151:15
**ground** [1] - 146:9
**grounds** [2] - 128:15, 133:14
**group** [9] - 22:7, 65:22, 66:17, 120:22, 134:7, 135:19, 144:18, 151:23, 185:15
**Group** [4] - 38:23, 86:17, 113:17, 114:12
**grow** [3] - 126:5, 208:8, 210:14
**growing** [2] - 208:6, 209:23
**grown** [1] - 161:3
**growth** [27] - 39:24, 40:15, 42:23, 68:13, 72:6, 94:24, 114:9, 116:9, 122:22, 134:11, 151:18, 202:9, 208:10, 208:11, 208:12, 210:2, 210:8, 210:10, 210:12, 210:16, 210:19, 210:20, 210:22, 210:25, 211:9
**guess** [8] - 28:19, 53:6, 135:16, 144:21, 161:12, 173:20, 210:24, 211:2
**guidance** [1] - 87:12
**guilty** [1] - 36:24
**guy** [1] - 214:18
**guys** [1] - 173:16

# H

**half** [20] - 3:17, 3:18,

3:19, 9:25, 16:1, 16:2, 65:15, 69:6, 146:2, 161:13, 161:15, 162:14, 163:24, 170:17, 171:9, 206:24, 207:3, 207:7, 207:11
**halfway** [1] - 58:3
**hand** [7] - 14:13, 119:16, 125:21, 128:23, 129:1, 131:14, 136:10
**handed** [2] - 14:12, 215:14
**handle** [1] - 185:9
**handled** [1] - 183:23
**Hands** [1] - 113:13
**hands** [1] - 110:10
**hang** [1] - 205:4
**happy** [1] - 213:5
**hard** [1] - 163:2
**harmful** [1] - 115:15
**HAVING** [2] - 1:11, 185:15
**head** [4] - 10:8, 10:9, 38:23, 185:15
**headed** [1] - 138:3
**heading** [14] - 46:6, 47:6, 48:11, 78:16, 78:19, 79:5, 79:17, 80:3, 80:21, 82:17, 84:7, 161:14, 174:11, 174:14
**headings** [1] - 174:11
**healthy** [1] - 95:2
**hear** [10] - 20:13, 69:9, 101:17, 103:3, 117:19, 157:5, 157:7, 179:11, 186:20, 190:2
**heard** [16] - 12:13, 26:5, 45:24, 85:6, 94:16, 100:25, 114:5, 123:1, 126:4, 138:5, 168:5, 172:15, 179:13, 185:17, 193:16, 202:17
**hearing** [1] - 63:1
**hearings** [1] - 65:5
**held** [1] - 105:14
**help** [6] - 17:22, 39:24, 125:2, 159:17, 209:17, 212:15
**helpful** [1] - 108:6
**herein** [1] - 33:19
**high** [6] - 69:16, 69:18, 69:19, 201:19, 210:2, 210:22
**higher** [3] - 201:25, 206:23
**highest** [5] - 161:16,

161:17, 202:13, 203:14, 212:2
**HILL** [8] - 1:3, 2:1, 2:2, 119:17, 119:19, 119:22, 216:11, 216:13
**Hill** [151] - 8:2, 8:5, 8:7, 8:16, 11:18, 11:21, 13:6, 13:16, 13:21, 17:2, 17:3, 18:13, 18:23, 24:13, 27:8, 28:22, 29:9, 29:10, 35:24, 37:18, 37:21, 37:22, 37:25, 41:10, 41:15, 49:16, 49:18, 49:24, 50:13, 50:19, 50:23, 51:10, 51:19, 52:5, 53:19, 54:17, 54:25, 57:12, 57:15, 58:4, 59:9, 59:10, 59:11, 59:23, 60:17, 61:2, 64:3, 64:12, 65:10, 66:4, 66:9, 66:24, 67:14, 70:15, 71:11, 73:10, 74:7, 74:11, 76:15, 77:6, 80:6, 81:7, 81:12, 82:21, 83:5, 83:20, 84:10, 85:8, 85:24, 86:9, 86:23, 89:5, 89:6, 90:3, 91:9, 91:14, 91:15, 92:13, 92:14, 92:24, 93:14, 94:9, 94:13, 94:17, 103:15, 104:10, 104:16, 104:19, 104:20, 104:21, 105:1, 106:10, 108:18, 112:7, 113:10, 115:5, 116:7, 119:12, 119:14, 119:21, 119:24, 120:2, 120:9, 120:12, 120:25, 128:5, 129:1, 133:24, 137:5, 137:8, 142:9, 143:13, 146:25, 147:6, 152:14, 154:15, 158:21, 159:14, 160:7, 160:14, 163:19, 164:17, 165:8, 168:7, 169:23, 170:4, 170:12, 170:19, 170:23, 171:14, 171:16, 171:20, 171:22, 172:12, 172:24, 175:18, 181:5, 182:7, 184:12, 190:22, 198:5, 206:19, 209:5, 213:12, 214:12,

215:13, 216:6
**Hill's** [31] - 6:19, 12:4, 12:22, 25:20, 26:19, 38:7, 41:10, 41:17, 44:10, 46:12, 68:1, 78:21, 79:5, 79:13, 79:19, 79:24, 80:7, 80:11, 80:22, 82:25, 84:10, 84:13, 95:10, 132:5, 141:17, 146:24, 163:18, 182:10, 192:25, 193:7, 213:23
**hired** [4] - 129:16, 139:6, 139:9, 141:6
**historical** [7] - 27:4, 27:5, 82:5, 87:25, 88:3, 94:24, 105:8, 106:22, 116:9
**historically** [6] - 40:10, 40:21, 42:9, 42:11, 43:4, 43:23
**history** [3] - 12:1, 46:13, 188:9
**hold** [3] - 58:15, 143:5, 164:23
**holding** [3] - 106:2, 142:7, 142:10
**honor** [2] - 78:21, 213:6
**Honor** [2] - 118:9, 134:21
**HONORABLE** [1] - 1:11
**honorable** [1] - 214:21
**hoping** [1] - 58:18
**host** [1] - 113:20
**hour** [8] - 3:17, 3:18, 3:19, 94:3, 94:5, 101:17, 118:12, 182:5
**hourly** [3] - 127:12, 133:6, 134:11
**hours** [4] - 3:19, 98:10, 123:2, 195:23
**human** [2] - 22:8, 25:17, 111:20
**hundred** [6] - 47:21, 92:17, 94:4, 161:5, 162:11, 166:14
**hunt** [2] - 169:4, 199:4
**hypothetical** [1] - 180:4

# I

**IAP** [2] - 75:21, 115:3
**idea** [4] - 95:2,

114:21, 125:1, 215:10
**identification** [1] - 132:1
**identified** [5] - 42:18, 103:7, 110:22, 117:7, 134:12
**identify** [3] - 48:21, 158:13, 185:4
**ignore** [2] - 100:7, 100:15
**ignored** [1] - 100:9
**II** [12] - 1:3, 2:1, 2:2, 59:9, 61:2, 119:17, 119:19, 119:21, 132:12, 156:6, 216:11, 216:13
**imagine** [1] - 119:2
**immediately** [2] - 64:2, 119:7
**impact** [3] - 40:18, 68:24, 69:1
**impaired** [1] - 113:5
**impeded** [1] - 113:5
**impediment** [3] - 72:3, 72:6, 72:19
**implication** [1] - 42:22
**important** [4] - 121:19, 123:17, 136:12, 137:13
**impose** [5] - 30:25, 31:4, 31:5, 33:2, 35:20
**imposes** [1] - 33:10
**impressive** [1] - 208:4
**IN** [33] - 2:4, 2:5, 2:6, 2:7, 2:8, 2:9, 2:10, 2:11, 2:12, 2:13, 2:14, 102:18, 102:25, 108:17, 108:23, 109:10, 110:4, 112:3, 116:17, 117:15, 134:22, 159:8, 216:17, 216:19, 216:21, 216:23, 216:25, 217:2, 217:4, 217:6, 217:8, 217:10, 217:12
**inaccurate** [1] - 70:11
**Inc** [9] - 42:18, 49:15, 49:23, 78:10, 82:17, 143:21, 159:14, 168:18, 179:15
**inch** [1] - 41:17
**inches** [1] - 81:21
**include** [5] - 10:13, 10:19, 77:20, 153:20, 153:21

**included** [1] - 166:21
**includes** [1] - 195:6
**including** [11] - 12:2, 22:20, 48:25, 55:18, 70:5, 100:14, 171:15, 172:4, 175:14, 185:16, 199:6
**inclusion** [1] - 132:13
**incoming** [1] - 20:10
**incomplete** [2] - 70:11, 186:2
**incorporate** [1] - 38:3
**incorporated** [2] - 33:19, 54:21
**incorrect** [2] - 17:11, 177:19
**increases** [1] - 209:15
**increasing** [2] - 95:3, 151:9
**incurred** [2] - 171:16, 172:2
**indeed** [2] - 16:18, 209:23
**indemnification** [5] - 138:6, 139:10, 140:23, 141:13, 142:24
**indemnified** [2] - 140:4, 143:2
**indemnify** [1] - 139:4
**independence** [1] - 148:5
**independent** [8] - 44:13, 46:2, 46:3, 64:14, 93:19, 140:25, 141:2, 148:14
**indicate** [5] - 73:9, 73:21, 74:6, 75:20, 76:1
**indicated** [1] - 103:8
**indicates** [3] - 31:19, 98:2, 98:7
**indicating** [1] - 87:20
**indication** [1] - 203:19
**individual** [1] - 43:19
**industry** [1] - 209:23
**inferred** [2] - 68:1, 95:10
**information** [42] - 5:13, 22:6, 22:10, 23:5, 26:2, 26:14, 26:16, 31:18, 38:16, 49:21, 50:23, 51:9, 53:13, 54:9, 73:9, 73:21, 74:5, 74:11, 74:14, 74:19, 74:21,

75:1, 75:11, 75:19, 76:1, 94:1, 94:23, 105:8, 113:21, 113:22, 113:23, 115:2, 115:18, 179:22, 196:8, 197:6, 199:8, 199:13, 199:20, 202:25
**ingredient** [1] - 95:21
**inhibited** [1] - 42:3
**inhibitions** [1] - 42:23
**initial** [1] - 213:16
**initiate** [1] - 61:1
**initiated** [1] - 61:5
**inquire** [2] - 21:21, 21:24
**inside** [2] - 152:11, 185:10
**insider** [34] - 42:2, 46:7, 46:25, 48:11, 48:18, 49:5, 54:12, 56:1, 56:8, 56:17, 87:8, 87:11, 103:20, 103:22, 132:2, 149:24, 150:7, 152:4, 153:2, 153:5, 153:17, 154:1, 154:9, 154:11, 154:14, 154:15, 155:6, 156:6, 156:15, 189:15
**insiders** [1] - 46:15
**inspect** [1] - 213:20
**instance** [1] - 113:25
**instances** [3] - 10:20, 80:12, 150:3
**instead** [1] - 15:13
**institution** [4] - 6:25, 22:16, 65:21, 66:17
**instructed** [1] - 23:2
**instrumental** [1] - 134:10
**insurance** [2] - 201:6, 201:7
**insured** [2] - 65:21, 66:17
**integrated** [1] - 124:9
**intends** [1] - 61:1
**intent** [2] - 78:20, 154:13
**InterArch** [67] - 49:15, 49:23, 50:13, 80:6, 82:21, 84:10, 84:16, 90:15, 110:15, 110:18, 111:4, 111:5, 111:10, 111:15, 111:18, 123:22, 123:23, 124:14,

124:17, 125:10, 125:13, 125:21, 126:3, 126:24, 127:1, 127:8, 127:10, 127:15, 127:19, 127:20, 127:22, 128:7, 129:10, 129:18, 130:17, 130:22, 130:23, 130:24, 131:7, 131:14, 131:20, 131:25, 132:2, 132:7, 132:15, 132:21, 132:22, 133:8, 134:8, 134:9, 134:25, 137:23, 138:14, 138:25, 139:8, 140:1, 140:4, 146:17, 153:21, 158:12, 158:19, 192:24, 193:1, 195:20
**InterArch's** [3] - 84:11, 130:14, 139:3
**interest** [24] - 17:24, 31:22, 33:21, 38:7, 38:14, 39:18, 39:20, 44:10, 49:19, 70:14, 149:9, 156:23, 165:2, 165:6, 165:7, 165:9, 166:25, 167:1, 167:3, 167:16, 167:21, 167:22, 171:16, 182:3
**interests** [3] - 143:13, 143:24, 143:25
**internal** [1] - 185:23
**interpretations** [2] - 103:9, 105:25
**interrogatories** [1] - 117:9
**Interrogatories** [1] - 193:22
**interrogatory** [5] - 116:19, 116:23, 116:25, 117:11, 117:13
**Interrogatory** [1] - 193:21
**introduced** [1] - 201:2
**introduction** [1] - 114:7
**investigate** [1] - 32:25
**investigated** [6] - 44:17, 44:18, 44:21, 50:2, 65:1, 87:22
**investigation** [38] - 19:24, 21:3, 23:3, 24:7, 30:2, 30:7,

30:16, 30:19, 30:21, 31:18, 33:1, 34:24, 35:10, 35:23, 37:11, 37:14, 37:23, 38:13, 43:1, 44:13, 55:21, 70:5, 70:23, 71:4, 116:6, 116:10, 131:1, 152:4, 157:13, 195:5, 196:7, 198:10, 203:1, 203:2, 203:15, 205:9, 206:3, 206:5
**investigations** [6] - 30:10, 30:12, 38:6, 44:9, 106:5, 107:11
**investigative** [1] - 44:25
**investor** [1] - 114:9
**involved** [18] - 8:23, 9:8, 9:11, 9:13, 12:3, 66:10, 68:20, 97:18, 126:1, 138:4, 138:18, 144:11, 144:13, 145:4, 155:14, 186:14, 189:8, 200:3
**involvement** [3] - 48:19, 70:15, 158:16
**involving** [7] - 22:16, 31:22, 33:22, 61:13, 64:22, 99:4, 147:7
**IS** [1] - 128:17
**isolate** [1] - 115:23
**isolated** [6] - 50:24, 51:11, 53:14, 54:18, 186:4, 186:9
**issuance** [7] - 29:2, 29:12, 31:10, 31:13, 33:16, 33:20, 36:20
**issue** [22] - 26:9, 31:20, 43:19, 44:1, 46:14, 71:16, 86:16, 105:16, 106:17, 130:25, 131:25, 132:2, 132:4, 132:5, 132:14, 135:8, 138:6, 139:10, 140:23, 179:23, 189:25, 192:24
**issued** [2] - 55:17, 154:25
**issues** [13] - 8:11, 40:14, 40:17, 80:6, 82:24, 84:10, 84:13, 113:24, 126:4, 140:21, 151:22, 186:16, 212:22
**itself** [7] - 15:18, 16:4, 16:14, 32:22, 100:22, 114:9, 205:1
**IV** [2] - 17:22, 67:11

**J**

**Jack** [1] - 126:14
**Jacobs** [7] - 115:22, 139:19, 170:11, 182:20, 215:1, 215:6, 215:10
**JACOBS** [245] - 1:14, 1:14, 2:2, 3:11, 3:13, 3:16, 3:18, 4:1, 4:3, 4:7, 5:17, 15:20, 15:23, 15:25, 16:10, 17:17, 17:19, 17:21, 19:4, 19:20, 20:18, 20:21, 20:25, 24:3, 34:18, 39:19, 44:2, 44:4, 45:3, 45:6, 46:5, 46:22, 47:5, 48:7, 49:9, 57:18, 58:2, 58:7, 58:11, 58:16, 58:18, 58:22, 59:4, 60:11, 60:13, 65:14, 66:12, 67:19, 69:21, 73:2, 73:4, 78:13, 82:14, 82:19, 85:12, 86:2, 86:4, 101:14, 101:22, 101:25, 102:4, 102:7, 102:10, 102:12, 102:19, 103:1, 103:13, 103:17, 104:1, 104:13, 104:20, 104:25, 105:3, 105:7, 106:9, 106:13, 106:21, 107:3, 107:7, 107:11, 107:15, 107:18, 107:21, 108:2, 108:12, 108:18, 108:24, 109:2, 109:5, 109:11, 109:13, 109:19, 109:22, 110:1, 110:5, 110:20, 111:1, 111:9, 112:4, 112:17, 112:21, 112:24, 114:22, 114:25, 115:11, 115:15, 116:2, 116:18, 117:2, 117:4, 117:12, 117:16, 117:20, 117:22, 118:1, 118:3, 118:11, 118:21, 118:24, 119:1, 119:4, 119:7, 119:12, 119:19, 120:1, 125:18, 125:19, 126:8, 126:10, 128:10, 128:17, 128:23, 128:25, 129:7, 130:11, 131:5,

131:10, 131:18, 132:6, 133:8, 133:11, 133:20, 133:23, 134:15, 134:18, 134:21, 134:23, 135:4, 135:15, 135:20, 135:25, 136:1, 136:13, 136:17, 136:24, 137:2, 137:4, 139:15, 139:17, 139:20, 139:21, 142:12, 142:15, 142:17, 142:19, 143:7, 143:11, 143:12, 150:12, 154:19, 158:25, 159:3, 160:11, 162:21, 163:2, 165:14, 165:17, 165:19, 165:23, 166:3, 169:12, 170:2, 170:10, 170:15, 172:8, 172:10, 172:25, 175:25, 178:25, 179:1, 182:21, 182:23, 184:20, 186:25, 187:6, 187:8, 187:13, 187:14, 187:25, 188:2, 188:15, 188:20, 188:23, 189:2, 190:6, 190:8, 190:9, 191:4, 191:8, 191:10, 191:12, 191:16, 191:19, 191:22, 193:2, 193:5, 193:7, 193:10, 193:13, 193:17, 193:18, 204:4, 204:6, 208:20, 208:24, 209:4, 209:10, 209:11, 212:16, 212:20, 213:22, 214:2, 214:8, 214:10, 214:13, 214:15, 214:18, 214:21, 215:2, 215:12, 215:22, 215:24, 216:1, 216:3, 216:13
  **Jacobs'** [1] - 105:17
  **January** [12] - 109:16, 159:15, 160:14, 160:15, 177:3, 195:19, 203:24, 204:2, 204:3, 204:9, 204:10, 205:16
  **jeopardizing** [1] - 47:23
  **JERSEY** [1] - 1:1

**Jersey** [6] - 1:9, 142:7, 142:10, 142:11, 142:21, 208:5
**job** [6] - 10:11, 30:10, 30:12, 138:18, 185:16, 187:1
**Joe** [1] - 140:25
**John** [3] - 1:9, 140:25, 145:8
**John's** [1] - 127:11
**Johnson** [1] - 114:12
**joined** [1] - 27:9
**joint** [5] - 45:4, 61:12, 61:24, 64:21, 99:3
  **Joint** [1] - 12:7
  **JR** [1] - 1:14
  **Judge** [95] - 3:11, 3:13, 4:1, 4:3, 8:13, 15:17, 16:6, 16:10, 17:17, 19:7, 19:15, 19:20, 20:18, 34:18, 39:19, 44:4, 45:3, 48:7, 57:18, 58:2, 60:11, 73:2, 78:13, 78:14, 86:3, 101:14, 101:22, 102:16, 103:5, 104:13, 105:24, 106:10, 106:21, 107:18, 107:21, 108:2, 110:7, 110:9, 110:11, 112:9, 113:11, 113:16, 113:22, 114:3, 114:17, 114:20, 114:22, 116:2, 116:5, 116:22, 117:16, 117:24, 118:3, 118:11, 118:21, 119:12, 128:10, 128:14, 129:3, 131:18, 134:15, 135:15, 135:18, 135:20, 136:17, 136:21, 139:15, 142:9, 143:4, 143:7, 159:3, 162:24, 165:23, 169:12, 169:25, 170:10, 172:10, 182:15, 182:17, 182:21, 184:10, 187:9, 188:11, 191:4, 191:19, 192:24, 193:2, 208:19, 208:25, 213:12, 214:2, 214:25, 215:12, 215:20, 215:24
  **judge** [6] - 64:15,

86:2, 103:4, 105:11, 131:25, 212:16
  **JUDGE** [1] - 1:11
  **judgment** [2] - 63:3, 63:5
  **July** [21] - 76:23, 77:12, 77:22, 79:4, 85:24, 86:9, 86:18, 108:18, 109:16, 150:19, 151:24, 173:10, 174:4, 174:7, 174:16, 174:24, 176:2, 176:14, 177:22, 178:14, 180:21
  **June** [49] - 4:18, 6:13, 8:3, 24:8, 24:15, 27:19, 28:6, 29:1, 32:20, 32:22, 33:16, 34:22, 35:1, 35:2, 36:23, 37:5, 37:12, 41:2, 42:9, 45:10, 46:14, 48:2, 51:23, 54:7, 78:16, 80:14, 86:23, 102:14, 109:15, 121:3, 155:20, 168:5, 168:8, 173:12, 174:21, 175:23, 182:24, 184:1, 185:12, 185:18, 190:1, 199:10, 200:13, 204:16, 205:22, 206:6, 206:10
  **JUROR** [2] - 16:7, 16:13
  **jurors** [3] - 20:15, 101:22, 137:3
  **jury** [23] - 17:20, 20:11, 20:14, 58:14, 101:21, 104:3, 112:16, 113:24, 115:25, 116:14, 117:8, 117:11, 128:12, 128:16, 131:21, 168:8, 169:18, 170:5, 170:7, 183:7, 193:16, 207:1
  **Jury** [4] - 3:22, 57:24, 119:9, 213:10
  **jury's** [1] - 135:23

**K**

  **Karen** [1] - 1:25
  **keep** [5] - 49:6, 104:14, 114:20, 143:10, 199:13
  **keeping** [2] - 28:25, 172:18

**kept** [3] - 56:23, 131:12, 199:7
**key** [2] - 63:12, 158:16
**kind** [11] - 16:5, 16:15, 33:2, 35:20, 70:9, 85:23, 86:8, 88:25, 152:4, 189:1, 198:5
**kindly** [1] - 45:19
**knowing** [5] - 25:10, 25:13, 77:15, 96:7, 190:10
**knowledge** [5] - 43:6, 106:19, 107:23, 107:25, 108:2
**known** [2] - 67:24, 87:13
**knows** [2] - 208:21, 215:8
**Kugler** [3] - 8:13, 19:7, 19:15
**KUGLER** [1] - 1:11

**L**

**ladies** [3] - 57:20, 169:14, 212:21
**land** [9] - 89:3, 91:4, 91:11, 92:12, 92:23, 145:24, 146:22, 196:4, 196:8
**landlord** [1] - 158:6
**landlords** [1] - 157:1
**language** [12] - 40:1, 60:24, 61:7, 62:23, 64:20, 89:3, 89:12, 95:9, 170:22, 174:23, 176:25, 178:20
**large** [2] - 39:25, 122:24
**last** [30] - 7:6, 7:7, 7:13, 7:17, 7:19, 32:15, 39:21, 73:4, 73:5, 95:7, 106:17, 125:22, 127:13, 136:14, 136:15, 136:23, 136:24, 138:1, 147:4, 150:7, 153:9, 159:18, 177:22, 177:23, 182:4, 186:20, 194:3, 194:4, 214:2, 215:14
**lastly** [1] - 117:16
**late** [2] - 123:2, 202:3
**law** [16] - 11:5, 70:18, 139:9, 139:12, 139:23, 148:24, 149:2, 149:7, 154:14,

173:14, 176:10, 176:18, 182:8, 188:7, 196:25, 201:2
**lawfully** [2] - 76:17, 76:18
**laws** [3] - 78:23, 103:22, 195:8
**lawsuit** [4] - 9:6, 9:8, 106:7, 142:4
**lawyer** [41] - 9:18, 9:20, 21:10, 23:20, 23:22, 26:12, 27:1, 34:7, 38:18, 44:6, 47:17, 50:18, 51:7, 53:1, 53:8, 53:11, 55:16, 57:2, 59:25, 60:2, 61:19, 62:6, 68:7, 72:13, 72:22, 76:6, 76:12, 85:13, 87:19, 95:9, 97:14, 139:3, 139:25, 171:16, 174:17, 175:21, 178:1, 181:9, 183:19, 192:2, 192:3
**lawyer's** [1] - 96:2
**lawyers** [16] - 9:8, 12:8, 14:20, 20:15, 23:24, 24:1, 52:7, 84:18, 139:6, 139:9, 141:5, 173:17, 183:20, 192:21, 200:2
**lays** [3] - 29:20, 29:23, 29:24
**leader** [1] - 208:11
**leading** [8] - 37:11, 125:15, 125:17, 135:3, 143:5, 143:7, 182:15, 182:19
**learn** [1] - 65:4
**learned** [1] - 121:17
**lease** [23] - 46:8, 46:9, 47:1, 48:22, 48:23, 89:7, 92:20, 99:16, 145:1, 145:22, 146:9, 147:1, 148:5, 148:19, 155:10, 155:12, 156:16, 156:18, 156:19, 157:3, 157:17, 158:3, 196:8
**leased** [3] - 49:17, 91:11, 146:3
**leases** [42] - 47:9, 47:12, 47:23, 48:18, 48:21, 48:25, 49:5, 61:12, 61:23, 62:10, 64:21, 86:20, 89:3, 89:14, 89:20, 90:8, 91:4, 91:13, 91:22, 92:5, 92:11, 92:15,

92:23, 99:3, 99:21, 146:2, 146:22, 147:4, 147:22, 154:10, 155:6, 156:11, 156:15, 156:24, 157:13, 158:6, 179:4, 179:16, 184:7, 184:17, 186:14, 196:12
**leasing** [2] - 147:7, 153:22
**least** [10] - 3:17, 3:18, 11:19, 12:23, 35:12, 41:21, 77:12, 88:9, 139:11, 187:16
**leave** [9] - 16:2, 60:7, 101:23, 168:8, 168:10, 168:21, 169:7, 212:23, 213:21
**Leaves** [1] - 57:24
**leaves** [4] - 101:21, 169:18, 213:10, 213:17
**left** [9] - 73:1, 73:23, 85:22, 93:24, 122:4, 136:10, 167:3, 167:4, 182:6
**left-hand** [1] - 136:10
**legal** [12] - 80:5, 83:19, 83:25, 84:2, 84:8, 105:18, 105:19, 107:2, 139:2, 147:15, 183:23, 185:23
**LEMING** [8] - 1:17, 117:8, 118:9, 191:7, 191:9, 191:11, 191:14, 191:18
**length** [5] - 131:23, 134:14, 150:2, 154:10, 189:22
**lengthy** [1] - 3:13
**lent** [2] - 38:5, 44:8
**less** [9] - 56:8, 157:21, 157:24, 180:22, 181:9, 207:17, 207:18, 207:19, 208:13
**letter** [150] - 5:17, 6:16, 8:17, 11:17, 12:16, 13:9, 14:3, 14:16, 15:11, 15:18, 16:4, 16:14, 16:16, 16:18, 16:22, 18:11, 18:15, 19:3, 19:5, 19:13, 19:19, 19:23, 21:2, 32:10, 34:8, 34:10, 34:13, 34:19, 35:5, 37:24, 38:3, 38:12, 38:23, 39:4, 44:6, 47:17, 49:4,

49:12, 50:16, 50:18, 51:6, 53:2, 53:9, 53:11, 55:16, 56:12, 56:14, 56:19, 57:2, 57:9, 60:5, 61:19, 61:22, 62:1, 62:6, 62:15, 68:7, 70:3, 70:9, 71:9, 72:14, 72:22, 74:14, 74:19, 75:25, 76:5, 76:6, 76:7, 76:11, 76:23, 77:8, 77:23, 79:5, 85:10, 85:13, 85:14, 87:4, 87:19, 90:11, 93:11, 93:17, 93:25, 94:22, 95:6, 95:7, 95:15, 95:17, 95:23, 96:2, 96:7, 96:10, 97:11, 97:16, 97:17, 99:12, 99:24, 99:25, 100:8, 100:20, 132:18, 173:21, 174:2, 174:4, 174:7, 174:9, 174:10, 174:16, 174:23, 174:24, 176:2, 176:14, 176:17, 176:24, 177:2, 177:21, 177:22, 178:11, 178:14, 180:16, 180:21, 180:25, 181:5, 181:6, 181:8, 181:11, 181:14, 182:7, 194:14, 195:3, 195:10, 195:11, 195:14, 197:2, 197:21, 197:22, 197:25, 198:1, 198:18, 202:24, 203:4, 204:23, 204:24, 205:1, 205:5, 205:8, 206:5
**letterhead** [5] - 29:3, 60:14, 173:4, 173:14, 180:17
**letters** [6] - 5:24, 6:3, 6:6, 12:16, 12:20, 12:24
**letting** [1] - 64:4
**level** [1] - 126:2
**liabilities** [1] - 179:6
**liaison** [2] - 10:12, 15:2
**licensing** [1] - 56:5
**lie** [1] - 72:7
**life** [1] - 12:1
**lift** [1] - 77:16
**light** [3] - 19:24, 21:3, 41:14

**likely** [1] - 75:22
**limit** [3] - 192:7, 192:14, 192:16
**limited** [11] - 42:2, 51:11, 53:14, 54:17, 70:5, 89:4, 91:13, 92:12, 114:6, 146:23, 175:15
**limits** [1] - 41:16
**Line** [1] - 73:1
**line** [2] - 28:22, 32:15
**lined** [1] - 216:6
**Lisa** [1] - 1:25
**list** [8] - 4:12, 101:25, 109:20, 211:25, 215:3, 215:7, 215:15, 215:25
**listen** [1] - 10:24
**lists** [2] - 87:15
**litigate** [1] - 63:21
**Litigation** [15] - 50:3, 50:6, 55:17, 57:4, 62:2, 62:7, 140:7, 140:12, 140:14, 140:15, 140:19, 140:23, 141:4, 141:12, 141:23
**litigation** [27] - 18:7, 44:25, 45:21, 47:8, 47:11, 47:19, 63:19, 92:4, 99:7, 99:14, 99:20, 100:5, 100:14, 154:17, 154:23, 155:5, 155:8, 155:18, 188:3, 188:6, 188:10, 189:4, 189:16, 190:19, 195:21, 195:22, 199:7
**LLC** [1] - 1:15
**Lloyd** [6] - 102:13, 102:20, 105:3, 109:2, 109:6, 140:25
**LLP** [1] - 1:16
**loan** [2] - 40:1, 114:19
**loans** [1] - 154:9
**locating** [2] - 144:19, 144:23
**location** [1] - 196:1
**locations** [4] - 89:16, 91:24, 147:24, 147:25
**long-term** [3] - 132:21, 132:23, 199:2
**look** [52] - 16:4, 16:14, 16:20, 28:18, 29:11, 33:12, 36:12, 36:13, 36:15, 54:2, 54:3, 60:6, 60:7, 68:19, 75:2, 75:5, 80:20, 80:21, 81:22,

82:17, 85:23, 86:8, 86:14, 87:6, 88:3, 90:18, 92:8, 100:13, 110:7, 115:6, 123:11, 123:14, 123:17, 124:10, 127:1, 133:25, 140:21, 146:4, 146:18, 147:19, 156:5, 164:5, 164:23, 175:11, 180:13, 183:11, 188:7, 201:6, 202:4, 206:3, 213:22
**looked** [7] - 16:21, 48:1, 56:6, 88:1, 97:3, 200:13, 203:4
**looking** [28] - 12:7, 18:1, 27:20, 31:8, 31:16, 32:14, 48:9, 49:13, 53:8, 59:5, 69:23, 69:25, 71:5, 75:16, 81:20, 81:21, 82:10, 91:1, 107:15, 115:18, 161:13, 162:1, 168:17, 181:5, 187:18, 196:7, 198:11, 198:12
**looks** [5] - 80:3, 102:10, 136:14, 156:9, 159:23
**lose** [2] - 142:5, 173:3
**lost** [2] - 139:3, 142:6
**LOUIS** [1] - 1:15
**loved** [1] - 123:7
**low** [2] - 208:7, 210:8
**lower** [3] - 101:11, 134:13, 136:10
**LUBIN** [1] - 102:1
**luck** [1] - 54:5
**lump** [4] - 81:2, 81:12, 163:17, 175:4
**lunch** [6] - 58:6, 93:25, 101:16, 101:18, 118:12, 135:21
**Luncheon** [1] - 118:16

**M**

**machines** [1] - 123:7
**mail** [1] - 198:18
**mails** [2] - 20:10, 20:11
**main** [1] - 145:7
**maintain** [3] - 39:23, 127:11, 132:7

**manageable** [1] - 40:17
**management** [10] - 68:2, 89:13, 91:20, 95:10, 114:16, 137:1, 137:7, 137:10, 147:21, 198:9
**mandated** [3] - 47:9, 47:12, 47:20
**Manhattan** [2] - 145:15, 145:17
**manual** [1] - 150:7
**marathon** [1] - 58:13
**March** [15] - 4:5, 5:17, 6:12, 9:17, 9:21, 19:7, 101:15, 159:23, 159:25, 202:11, 202:21, 202:24, 204:15, 205:18, 205:22
**Marcus** [1] - 1:25
**Margaritaville** [1] - 212:9
**Mario** [2] - 41:6, 41:13
**mark** [2] - 213:17, 213:20
**marked** [3] - 60:8, 86:5, 113:16
**market** [21] - 46:6, 46:24, 47:13, 62:11, 91:17, 135:10, 145:18, 148:20, 150:3, 155:10, 155:13, 157:21, 157:24, 158:2, 202:1, 202:25, 207:4, 207:5, 207:22, 208:5, 209:6
**marketing** [2] - 124:10, 125:3
**Markets** [1] - 41:6
**markets** [2] - 144:8, 208:6
**marking** [1] - 191:6
**Marlton** [2] - 121:5, 121:6
**married** [4] - 120:4, 120:8, 120:10, 127:16
**Masrani** [11] - 39:7, 39:12, 40:13, 40:22, 71:23, 72:5, 72:17, 85:20, 112:21, 112:25, 114:14
**material** [2] - 75:22, 100:12
**materially** [16] - 50:22, 51:9, 53:13, 53:21, 54:9, 68:2, 75:11, 95:11, 115:3, 158:4, 158:7, 158:13,

211:3, 211:13,
211:16, 212:13
**materials** [1] - 75:19
**matter** [7] - 27:4,
32:7, 52:23, 82:5,
105:24, 139:7, 198:2
**Matter** [1] - 60:17
**matters** [3] - 70:10,
107:5, 107:7
**matured** [1] - 164:7
**McDonald's** [2] -
120:21, 144:6
**mean** [24] - 8:13,
13:8, 13:10, 14:12,
21:24, 29:24, 35:7,
35:22, 38:12, 62:20,
63:2, 63:3, 63:12,
100:13, 124:7,
129:15, 144:22,
153:14, 168:14,
201:21, 208:21,
210:11, 210:19,
210:23
**meaning** [2] - 6:1,
37:10
**meaningful** [2] -
40:18, 108:5
**meaningfully** [1] -
179:21
**means** [16] - 21:20,
22:1, 35:8, 38:13,
46:3, 51:2, 62:25,
63:19, 95:24, 96:17,
98:9, 98:18, 161:16,
175:2, 202:7, 210:24
**meant** [2] - 9:14,
151:4
**measure** [4] -
201:18, 201:19,
201:22, 210:16
**measuring** [1] -
201:17
**meeting** [24] - 21:14,
21:16, 21:21, 22:4,
24:22, 25:18, 26:8,
26:19, 26:23, 27:6,
78:11, 79:12, 80:3,
80:10, 82:16, 82:20,
84:7, 84:12, 85:5,
88:12, 90:17, 136:6,
136:7, 195:19
**meetings** [4] - 22:3,
79:11, 98:23, 98:24
**member** [6] - 24:21,
26:6, 65:21, 66:17,
111:20, 176:10
**members** [8] - 24:24,
25:1, 25:2, 25:3,
92:24, 103:14,
140:25, 196:24

**memo** [26] - 51:12,
51:15, 51:22, 52:4,
53:7, 55:3, 85:24,
86:9, 87:2, 87:6, 90:2,
91:8, 93:9, 103:1,
103:14, 108:19,
110:6, 110:13,
110:20, 128:17,
150:14, 150:20,
185:17, 186:17,
196:23
**memoranda** [3] -
28:5, 36:19, 41:11
**Memoranda** [1] - 5:8
**memorandum** [5] -
28:5, 28:14, 36:19,
41:15, 41:18
**memory** [1] - 4:13
**Mendonka** [2] - 41:6,
41:13
**mention** [9] - 53:25,
62:14, 72:23, 123:1,
132:20, 138:5, 150:9,
168:4, 184:23
**mentioned** [5] -
148:17, 162:5, 193:3,
193:4, 193:6
**merely** [1] - 105:19
**merger** [2] - 179:8,
207:2
**merits** [3] - 62:24,
63:3, 64:18
**met** [2] - 212:1,
214:22
**methods** [1] - 189:5
**microphone** [1] -
119:25
**mid** [4] - 22:3, 90:9,
123:19, 124:4
**mid-2007** [1] -
206:16
**middle** [7] - 160:5,
162:18, 168:1, 168:4,
201:8, 201:11, 202:11
**midnight** [1] - 216:4
**midway** [1] - 57:18
**might** [5] - 14:18,
15:11, 101:10, 135:8,
214:11
**Mike** [1] - 52:8
**million** [20] - 17:3,
18:4, 18:18, 18:19,
80:23, 81:13, 89:9,
89:20, 91:18, 92:16,
120:23, 137:8,
161:21, 162:11,
162:12, 162:14,
162:16, 166:12,
209:21, 209:22
**millions** [2] - 179:12,

197:9
**mind** [6] - 28:25,
85:3, 140:9, 162:24,
172:18, 199:3
**minded** [1] - 99:18
**minds** [1] - 208:22
**minimal** [1] - 111:25
**minimum** [2] - 24:6,
34:24
**minor** [2] - 47:21,
87:13
**minus** [1] - 156:17
**minute** [9] - 39:19,
110:8, 174:6, 187:6,
204:1, 204:3, 205:4,
207:14, 209:16
**minutes** [25] - 22:2,
23:7, 23:10, 23:13,
24:12, 24:16, 24:17,
24:19, 24:23, 25:6,
35:15, 58:9, 59:15,
59:20, 78:11, 79:4,
79:11, 80:10, 84:7,
85:5, 100:25, 169:15,
183:12, 195:19
**misplaced** [1] -
131:22
**missing** [1] - 73:24
**misstatements** [1] -
184:24
**mistake** [1] - 74:18
**mistakes** [1] - 55:10
**misunderstanding**
[2] - 93:23, 214:22
**Mitchell** [1] - 1:8
**mitigation** [1] -
164:16
**model** [8] - 68:11,
68:21, 68:22, 121:18,
121:20, 122:23,
123:4, 126:5
**models** [1] - 154:10
**moment** [11] - 17:16,
46:18, 54:16, 54:20,
69:21, 82:9, 86:2,
123:18, 139:14,
159:20, 204:22
**Monday** [11] - 58:17,
118:2, 118:6, 207:15,
213:1, 213:8, 214:4,
214:10, 215:10,
215:13, 216:7
**money** [8] - 18:13,
18:22, 67:13, 68:23,
141:17, 165:6, 183:22
**moneys** [2] - 192:21,
192:25
**monitor** [1] - 128:21
**monitors** [1] -
128:21

**month** [10] - 84:5,
84:24, 92:20, 154:22,
167:2, 167:3, 180:22,
181:8, 181:9
**months** [20] - 41:1,
41:2, 41:25, 42:9,
45:9, 76:24, 77:3,
77:15, 77:16, 78:1,
81:25, 139:7, 153:19,
161:18, 197:13,
197:14, 202:24,
207:4, 209:14
**moody** [1] - 202:15
**Moody** [1] - 202:16
**Moody's** [4] -
202:12, 203:9, 203:11
**moody's** [1] - 202:17
**morning** [6] - 3:2,
3:10, 3:23, 99:1,
213:8, 215:13
**most** [7] - 111:12,
112:5, 121:19, 146:3,
161:18, 167:6, 210:7
**mother** [2] - 213:5,
213:6
**Mother's** [1] - 213:5
**mothers** [1] - 213:4
**motion** [3] - 3:4,
83:3, 84:14
**motivation** [1] -
65:12
**MOU** [1] - 32:20
**movant** [1] - 114:22
**move** [12] - 16:10,
66:12, 102:5, 123:18,
134:16, 165:23,
166:1, 169:25, 170:2,
174:10, 193:16,
195:13
**moved** [7] - 113:8,
117:17, 129:5,
134:20, 135:20,
170:13, 191:15
**moves** [1] - 164:9
**moving** [4] - 117:12,
117:13, 117:20,
134:17
**MR** [324] - 2:2, 3:5,
3:7, 3:11, 3:13, 3:16,
3:17, 3:18, 4:1, 4:3,
4:7, 15:17, 15:20,
15:23, 15:24, 15:25,
16:6, 16:10, 17:17,
17:19, 17:21, 19:4,
19:20, 20:18, 20:21,
20:25, 24:3, 34:18,
39:19, 44:2, 44:4,
45:3, 45:6, 46:5,
46:20, 46:22, 47:5,
48:7, 49:9, 57:18,

58:2, 58:7, 58:11,
58:16, 58:18, 58:22,
58:25, 59:4, 60:11,
60:13, 65:14, 66:12,
67:19, 69:21, 73:2,
73:4, 73:23, 78:13,
82:14, 82:19, 85:12,
86:2, 86:3, 86:4,
101:14, 101:22,
101:25, 102:1, 102:3,
102:4, 102:7, 102:10,
102:12, 102:16,
102:19, 102:23,
103:1, 103:2, 103:4,
103:13, 103:17,
103:23, 104:1, 104:9,
104:13, 104:17,
104:20, 104:25,
105:3, 105:7, 105:11,
105:20, 105:23,
106:9, 106:13,
106:21, 107:3, 107:7,
107:11, 107:15,
107:18, 107:21,
108:2, 108:12,
108:15, 108:18,
108:21, 108:24,
109:1, 109:2, 109:5,
109:7, 109:11,
109:13, 109:17,
109:19, 109:22,
110:1, 110:5, 110:7,
110:11, 110:20,
111:1, 111:9, 111:23,
112:4, 112:9, 112:17,
112:21, 112:23,
112:24, 113:11,
113:16, 114:2,
114:22, 114:25,
115:11, 115:15,
115:17, 116:2, 116:5,
116:18, 116:22,
117:2, 117:4, 117:6,
117:12, 117:16,
117:20, 117:22,
117:24, 118:1, 118:3,
118:11, 118:12,
118:14, 118:21,
118:24, 119:1, 119:4,
119:7, 119:12,
119:19, 120:1,
125:15, 125:18,
125:19, 126:8,
126:10, 128:10,
128:14, 128:17,
128:20, 128:23,
128:25, 129:3, 129:7,
130:5, 130:11,
130:13, 131:5,
131:10, 131:15,
131:18, 131:25,

132:6, 133:1, 133:4,
133:8, 133:10,
133:11, 133:13,
133:20, 133:21,
133:23, 134:15,
134:18, 134:21,
134:23, 135:2, 135:4,
135:15, 135:18,
135:20, 135:25,
136:1, 136:13,
136:17, 136:20,
136:24, 137:2, 137:4,
139:15, 139:17,
139:20, 139:21,
142:9, 142:12,
142:15, 142:17,
142:19, 143:4, 143:7,
143:11, 143:12,
150:12, 154:19,
158:25, 159:2, 159:3,
159:5, 160:11,
162:21, 163:2,
165:14, 165:17,
165:19, 165:23,
166:1, 166:3, 169:12,
169:25, 170:2,
170:10, 170:15,
172:7, 172:8, 172:10,
172:11, 172:25,
175:25, 178:24,
178:25, 179:1,
182:15, 182:21,
182:23, 184:10,
184:20, 186:20,
186:24, 186:25,
187:6, 187:8, 187:13,
187:14, 187:25,
188:2, 188:11,
188:15, 188:20,
188:23, 189:2, 190:6,
190:8, 190:9, 191:4,
191:8, 191:10,
191:12, 191:16,
191:19, 191:22,
192:23, 193:2, 193:5,
193:7, 193:10,
193:13, 193:17,
193:18, 204:4, 204:6,
208:18, 208:20,
208:24, 209:4, 209:8,
209:10, 209:11,
212:16, 212:20,
213:12, 213:22,
213:24, 214:1, 214:2,
214:8, 214:10,
214:13, 214:15,
214:18, 214:21,
214:25, 215:2, 215:4,
215:12, 215:20,
215:22, 215:24,
216:1, 216:3, 216:5,

216:13
**MS** [7] - 117:8,
118:9, 191:7, 191:9,
191:11, 191:14,
191:18
**multi** [1] - 146:4
**multiple** [9] - 69:6,
69:13, 69:15, 112:24,
112:25, 185:7,
201:20, 209:25
**must** [2] - 157:11,
180:12
**mutually** [1] - 151:8

# N

**N.A** [5] - 4:4, 60:19,
126:21, 143:22, 209:6
**NA** [3] - 103:15,
168:10, 168:20,
178:25, 179:2, 179:9,
179:14, 201:9
**nail** [1] - 205:4
**name** [20] - 15:13,
15:15, 15:16, 41:6,
41:21, 42:11, 57:16,
71:24, 119:20, 121:9,
126:14, 126:19,
129:20, 139:14,
139:15, 139:17,
139:18, 141:7, 144:9,
144:18
**named** [1] - 196:2
**names** [5] - 25:10,
26:18, 28:12, 39:6,
59:17, 96:18, 132:6,
139:12, 144:19
**NAMI** [1] - 16:6
**Nami** [1] - 1:25
**narrowly** [2] - 43:18,
44:1
**nature** [3] - 106:8,
116:23, 137:19
**necessary** [22] -
22:12, 23:11, 23:17,
24:14, 26:10, 27:7,
31:19, 37:13, 59:22,
75:17, 76:13, 94:3,
95:18, 95:21, 95:24,
96:4, 96:13, 111:3,
172:19, 175:14,
178:8, 194:5
**need** [15] - 13:12,
16:7, 17:21, 44:4,
58:20, 75:12, 80:12,
107:22, 110:22,
130:22, 135:23,
187:7, 200:23, 209:2,
215:9

**needed** [2] - 42:5,
77:15
**needs** [3] - 77:23,
116:24, 185:1
**negative** [1] - 74:16
**negotiate** [2] - 58:8,
84:15
**negotiating** [2] -
183:20, 185:24
**negotiation** [3] -
47:22, 110:17, 111:7
**negotiations** [3] -
80:5, 84:9, 127:11
**net** [1] - 164:13
**network** [1] - 210:3
**never** [22] - 7:12,
26:5, 27:15, 27:16,
28:10, 35:11, 35:15,
45:14, 53:4, 53:18,
54:21, 96:8, 96:9,
96:12, 97:11, 99:6,
104:12, 126:4, 132:4,
132:5, 141:10, 215:24
**NEW** [1] - 1:1
**new** [15] - 38:9,
39:23, 44:12, 68:9,
68:10, 122:18, 138:9,
144:24, 185:2, 185:3,
197:22, 198:1,
198:17, 198:19,
198:24
**New** [8] - 1:9, 142:7,
142:10, 142:11,
142:21, 203:24,
208:5, 208:6
**Newark** [1] - 139:14
**Next** [1] - 136:22
**next** [36] - 4:3, 38:2,
49:13, 50:17, 50:18,
58:4, 70:9, 77:14,
77:16, 78:1, 89:12,
108:12, 109:13,
119:11, 127:10,
136:15, 136:24,
147:19, 158:21,
160:22, 161:25,
164:22, 172:12,
175:11, 177:22,
177:23, 180:13,
195:16, 196:6, 196:9,
196:11, 196:13,
200:1, 205:13, 213:3,
215:7
**Nick** [1] - 141:1
**night** [2] - 150:7,
216:3
**nine** [6] - 82:10,
121:14, 154:19,
154:20, 166:12,
168:24

**nineteen** [1] - 92:17
**ninety** [1] - 166:14
**nobody** [8] - 13:23,
27:11, 27:13, 50:9,
57:7, 99:12, 99:16,
151:13
**Nominating** [1] -
110:14
**non** [4] - 87:10,
89:15, 91:23, 189:6
**non-affiliated** [2] -
89:15, 91:23
**non-public** [1] -
87:10
**nonaffiliated** [1] -
147:23
**nonbank** [2] -
122:21, 122:23
**none** [6] - 88:4, 88:7,
143:3, 157:15, 168:3,
179:18
**nonlawyer** [1] - 9:18
**normal** [2] - 118:22,
152:7, 152:8, 187:9,
206:15
**North** [4] - 114:9,
114:10, 114:14,
114:15
**notch** [2] - 212:6,
212:12
**noted** [1] - 134:19
**notes** [2] - 81:11,
213:23
**nothing** [12] - 85:2,
105:9, 105:18,
115:14, 132:1,
132:24, 186:6,
186:19, 186:22,
192:25, 198:16,
198:24
**notice** [1] - 146:19
**notify** [1] - 3:8
**notifying** [1] - 205:8
**November** [20] -
17:2, 17:8, 22:24,
37:2, 59:7, 59:17,
66:3, 75:9, 76:23,
77:4, 78:4, 82:16,
82:17, 83:8, 85:7,
96:18, 97:3, 98:11,
99:2, 100:21
**number** [44] - 4:22,
12:9, 15:23, 19:2,
32:12, 32:15, 36:18,
38:21, 46:21, 48:7,
50:24, 51:11, 52:21,
53:14, 54:17, 82:9,
103:4, 103:6, 114:7,
116:19, 117:2, 117:4,
117:5, 117:12,

**nineteen** [1] - 92:17

128:12, 130:15,
130:16, 145:6,
145:16, 150:11,
154:19, 154:20,
166:24, 197:22,
207:15, 210:17,
210:22, 211:21,
212:1, 213:14, 215:9,
215:13, 215:14,
215:23
**NUMBER** [1] - 1:4
**numbers** [6] - 28:19,
36:6, 89:25, 102:11,
151:25, 203:24

# O

**O-C-K** [1] - 15:14
**oath** [2] - 23:9, 37:9
**object** [1] - 102:2
**objected** [1] - 118:7
**objecting** [1] -
193:13
**objection** [46] -
15:21, 102:16,
102:22, 102:23,
103:2, 103:4, 103:8,
105:4, 108:8, 108:11,
108:14, 108:15,
108:21, 109:7,
109:17, 110:11,
110:12, 110:24,
110:25, 111:24,
116:16, 117:18,
117:23, 125:15,
128:14, 129:3, 130:5,
130:12, 133:14,
133:19, 134:19,
135:2, 142:9, 143:5,
159:1, 159:2, 159:5,
178:24, 184:10,
192:23, 193:15,
208:18, 209:8, 215:20
**objections** [2] -
103:7, 113:8
**obligation** [3] - 17:3,
172:19, 175:16
**obtained** [3] - 31:18,
136:25, 137:6
**obvious** [4] - 169:6,
180:11, 199:19
**obviously** [11] -
40:16, 43:14, 43:16,
53:1, 53:2, 61:17,
107:16, 152:24,
185:9, 198:12, 199:1
**OC** [2] - 48:3, 196:6
**OCC** [121] - 4:15,
5:11, 5:12, 5:18, 5:24,
6:8, 6:16, 8:17, 10:13,

10:15, 10:17, 11:4, 11:17, 11:19, 12:2, 12:20, 12:21, 17:2, 19:24, 21:3, 23:3, 24:8, 24:15, 29:3, 30:1, 30:2, 30:7, 30:8, 30:15, 30:19, 30:21, 32:13, 32:22, 32:25, 33:9, 35:1, 36:4, 36:7, 36:21, 36:22, 38:5, 40:7, 41:3, 43:1, 44:8, 44:20, 47:9, 47:12, 47:20, 50:11, 50:21, 51:4, 51:24, 52:10, 52:16, 52:17, 52:18, 53:18, 53:23, 53:25, 55:25, 56:3, 56:23, 57:11, 59:8, 60:14, 65:4, 69:24, 70:12, 70:23, 71:4, 71:8, 71:10, 75:7, 77:5, 78:17, 82:23, 87:8, 94:8, 100:19, 101:1, 101:5, 103:19, 107:24, 132:12, 132:16, 140:21, 149:12, 149:17, 149:18, 149:22, 150:5, 150:7, 152:9, 153:12, 153:25, 155:20, 156:14, 169:3, 179:12, 179:22, 185:5, 185:6, 185:16, 185:24, 186:11, 187:20, 188:16, 189:5, 189:9, 190:16, 197:19, 197:20, 198:15, 203:15, 204:22, 205:8, 205:11

**OCC's** [6] - 51:8, 59:9, 71:9, 93:5, 130:25, 132:2

**occasion** [1] - 12:6

**occasionally** [1] - 10:19

**occur** [3] - 31:23, 33:23, 93:17

**occurred** [3] - 27:10, 50:20, 101:10

**October** [11] - 9:24, 38:24, 40:25, 72:18, 80:2, 82:22, 109:16, 113:18, 115:19, 205:23, 206:19

**OF** [4] - 1:1, 2:2, 119:19, 216:12

**offer** [3] - 41:18, 152:24, 152:25

**offered** [1] - 173:1

**office** [3] - 121:6, 121:13, 175:5

**Officer** [2] - 60:18, 187:23

**officers** [2] - 70:6, 195:7

**offices** [8] - 31:23, 32:4, 33:23, 34:5, 89:4, 89:20, 146:23, 173:18

**official** [1] - 6:14

**offset** [5] - 18:5, 18:13, 18:20, 18:22, 67:12

**old** [5] - 104:5, 120:2, 120:25, 121:2, 189:10

**omission** [1] - 75:21

**once** [5] - 48:1, 85:13, 145:20, 179:14, 185:3

**one** [108] - 3:13, 9:12, 10:17, 10:20, 11:2, 11:5, 11:11, 11:12, 11:24, 12:20, 12:21, 13:1, 15:11, 16:8, 16:10, 20:13, 22:24, 22:25, 26:7, 26:11, 27:21, 35:12, 37:7, 39:19, 49:7, 66:9, 67:20, 85:2, 86:2, 88:25, 91:13, 93:23, 97:22, 98:22, 98:24, 100:4, 103:5, 104:24, 108:2, 108:12, 109:20, 114:6, 114:7, 115:7, 117:3, 117:10, 117:11, 120:14, 121:5, 121:13, 121:18, 124:8, 125:21, 128:20, 131:11, 131:11, 131:13, 132:9, 138:19, 139:13, 143:7, 145:15, 148:5, 148:16, 154:4, 157:20, 157:24, 158:23, 160:10, 161:3, 161:21, 162:11, 162:12, 162:16, 164:23, 165:14, 165:22, 167:2, 167:3, 168:5, 168:12, 168:20, 171:19, 174:14, 191:16, 191:20, 192:2, 192:13, 192:19, 193:14, 193:25, 195:16,

198:23, 200:6, 200:7, 201:22, 202:6, 202:8, 205:20, 208:13, 211:25, 212:6, 212:12, 215:14

**One** [1] - 1:9

**one-sided** [1] - 200:7

**one-year** [1] - 202:6

**ones** [1] - 97:22

**ongoing** [3] - 43:1, 152:12, 153:8

**online** [2] - 189:6

**open** [9] - 16:5, 16:15, 44:20, 83:17, 98:6, 99:25, 118:18, 132:24, 169:20

**opened** [4] - 121:3, 121:11, 121:13, 185:2

**opening** [5] - 68:9, 68:21, 122:18, 131:17, 193:3

**openings** [2] - 72:9, 114:5

**operating** [5] - 89:7, 91:4, 92:11, 92:23, 147:1

**operations** [1] - 40:18

**operative** [1] - 69:24

**opine** [1] - 142:10

**opinion** [12] - 19:7, 19:10, 19:16, 77:8, 83:19, 83:21, 84:2, 139:22, 158:6, 178:5, 180:8, 209:3

**opinions** [5] - 83:25, 106:7, 139:22, 142:16, 142:20

**opponent** [1] - 112:18

**opportunity** [5] - 96:8, 208:10, 208:12, 213:14, 213:19

**opposite** [2] - 64:17, 75:25

**option** [6] - 164:10, 165:9, 166:22, 199:19, 200:1

**options** [7] - 89:8, 147:1, 164:6, 164:7, 164:13, 182:3, 199:17

**oral** [1] - 26:17

**orally** [1] - 45:16

**oranges** [1] - 69:11

**Order** [75] - 4:14, 4:17, 4:21, 4:23, 4:24, 5:1, 5:6, 12:7, 12:15, 17:2, 17:8, 22:18, 22:21, 22:22, 29:2, 29:12, 29:16, 31:13,

32:13, 32:21, 33:16, 33:20, 36:16, 36:21, 36:22, 41:25, 45:10, 48:3, 51:25, 52:17, 52:22, 52:23, 53:3, 53:4, 53:18, 53:25, 54:8, 54:21, 59:8, 59:17, 59:21, 60:5, 60:14, 60:21, 63:8, 63:21, 63:22, 66:1, 66:3, 66:8, 66:23, 67:25, 71:11, 72:1, 72:6, 72:8, 72:18, 77:4, 78:4, 78:17, 86:23, 93:4, 97:22, 98:13, 99:3, 100:16, 100:21, 103:7, 111:14, 114:5, 132:6, 155:21, 156:2, 157:10

**order** [45] - 24:8, 24:15, 27:19, 27:25, 31:7, 31:10, 31:20, 32:1, 32:22, 32:24, 33:5, 33:6, 33:8, 34:11, 34:14, 34:16, 34:25, 35:3, 35:10, 35:18, 35:19, 37:2, 37:5, 37:12, 37:15, 37:21, 37:23, 41:3, 42:9, 48:17, 75:9, 156:2, 156:14, 184:2, 184:8, 184:17, 184:23, 185:12, 185:24, 186:1, 214:5, 214:7, 215:8, 215:15

**ordered** [2] - 156:14, 156:16

**organic** [3] - 208:11, 208:12, 210:2

**original** [1] - 142:24

**originally** [1] - 161:6

**OTC** [1] - 153:9

**otherwise** [3] - 20:3, 21:7, 213:16

**ourselves** [3] - 122:21, 123:14

**outside** [14] - 6:4, 129:10, 129:14, 129:16, 129:20, 130:3, 134:7, 139:6, 139:9, 141:6, 141:7, 141:9, 188:7, 196:25

**outstanding** [3] - 127:2, 164:7, 166:7

**outweighs** [1] - 133:16

**overhead** [1] - 173:4

**overrode** [1] - 84:1

**overrule** [5] - 111:24, 116:15, 133:15,

133:19, 193:15

**overruled** [1] - 134:19

**overseas** [2] - 58:15, 58:20

**overseeing** [1] - 138:18

**owed** [3] - 183:22, 192:22, 192:25

**own** [3] - 99:14, 100:4, 159:9

**owned** [9] - 49:16, 49:24, 89:6, 91:15, 92:14, 92:24, 137:8, 146:24, 196:4

**owns** [1] - 183:8

**P**

**P-19** [2] - 48:7, 48:8

**P-2** [5] - 2:10, 110:5, 110:11, 112:3, 217:3

**P-20** [2] - 102:19, 102:24

**P-22** [3] - 159:1, 170:15, 181:16

**P-25** [1] - 102:14

**P-27** [2] - 172:25, 173:1

**P-39** [5] - 2:12, 116:18, 116:21, 117:15, 217:7

**P-50** [2] - 108:18, 108:22

**P-51** [2] - 103:1, 108:11

**P-52** [4] - 109:11, 109:13, 109:14, 109:21

**P-53** [4] - 17:17, 17:21, 60:11, 60:13

**P-73** [6] - 108:12, 108:16, 108:24, 108:25, 109:1, 109:3

**P-73A** [2] - 108:13, 109:8

**P-74** [2] - 112:4, 113:17

**P-75** [3] - 2:11, 116:17, 217:5

**P-8** [7] - 2:13, 128:18, 129:2, 130:13, 133:25, 134:22, 217:9

**P-9** [2] - 45:3, 168:17

**pace** [1] - 158:20

**packet** [1] - 87:25

**pad** [1] - 152:22

**Page** [17] - 17:21,

17:24, 52:22, 65:8,
65:14, 65:15, 65:16,
65:18, 67:11, 67:19,
67:21, 67:23, 73:4,
79:5, 136:13, 146:20
   **page** [102] - 19:3,
19:21, 29:11, 29:15,
30:4, 31:16, 32:12,
32:14, 32:16, 33:12,
34:17, 34:18, 34:19,
37:4, 39:15, 40:4,
40:24, 41:5, 41:13,
42:16, 42:17, 43:12,
44:2, 44:7, 45:19,
46:4, 46:17, 46:20,
46:21, 46:22, 47:4,
47:7, 48:2, 48:3, 48:8,
48:10, 48:12, 49:9,
49:13, 52:21, 53:7,
63:8, 70:3, 70:22,
80:4, 80:21, 81:10,
82:18, 86:14, 87:6,
88:18, 88:19, 88:20,
88:22, 90:18, 91:1,
92:10, 95:8, 135:16,
136:18, 136:22,
151:19, 154:20,
155:24, 156:2, 156:5,
156:9, 158:25,
159:18, 160:8,
161:14, 161:25,
162:2, 162:21,
162:22, 162:23,
163:23, 163:24,
164:15, 164:22,
164:23, 168:17,
170:15, 171:8, 173:2,
174:10, 176:2,
177:21, 180:23,
188:1, 195:3, 196:6,
196:9, 196:11, 196:13
   **pages** [8] - 28:17,
28:20, 29:7, 47:7,
92:9, 179:12, 195:17,
197:9
   **Pages** [2] - 62:10,
72:10
   **paid** [17] - 18:5, 69:3,
69:5, 89:13, 89:15,
91:21, 91:23, 137:11,
147:21, 147:23,
161:17, 167:2, 168:1,
178:8, 183:19, 194:4,
208:23
   **pains** [1] - 116:14
   **paper** [2] - 128:22,
129:1
   **parachute** [17] -
7:22, 10:16, 10:20,
10:21, 10:25, 11:5,

11:9, 11:14, 12:3,
12:5, 77:9, 77:24,
131:21, 178:6, 181:3,
181:11, 211:7
   **Parachute** [3] -
98:18, 101:1, 101:5
   **Paragraph** [3] -
132:10, 132:12,
163:24
   **paragraph** [74] -
19:5, 19:22, 27:22,
30:5, 31:17, 33:12,
34:17, 34:19, 37:5,
39:20, 44:7, 46:19,
46:23, 48:10, 48:12,
48:13, 49:10, 59:6,
60:24, 61:7, 62:22,
67:20, 67:23, 70:4,
70:9, 70:22, 73:5,
89:1, 89:12, 91:3,
92:10, 95:7, 95:8,
107:13, 127:1,
127:10, 127:18,
136:14, 136:15,
136:23, 136:24,
147:20, 151:14,
156:10, 160:10,
161:11, 162:23,
163:3, 163:15,
163:24, 164:5,
164:16, 164:22,
164:24, 170:19,
171:9, 174:15,
174:16, 176:24,
177:22, 177:24,
177:25, 178:2,
180:24, 181:1, 192:4,
192:6
   **paragraphs** [2] -
148:23, 162:1
   **paraphrasing** [2] -
22:15, 22:20
   **pardon** [1] - 178:25
   **part** [34] - 13:11,
24:15, 30:10, 30:12,
35:9, 67:23, 100:11,
100:19, 102:14,
106:17, 108:6, 111:1,
111:3, 111:9, 111:16,
114:18, 114:19,
120:19, 121:15,
124:11, 126:5,
127:10, 130:25,
131:1, 134:9, 150:24,
151:17, 153:10,
156:17, 161:6, 175:5,
175:6, 192:4, 196:7
   **Part** [4] - 6:24, 7:12,
22:13, 22:14
   **part-time** [3] -

120:19, 121:15, 161:6
   **partial** [1] - 209:18
   **partially** [1] - 92:24
   **participants** [2] -
113:19, 113:20
   **participate** [1] -
147:6
   **participated** [2] -
10:18, 184:9
   **particular** [2] - 98:4,
136:14
   **particularly** [3] -
98:13, 103:10, 110:17
   **parties** [11] - 6:25,
49:18, 56:1, 89:15,
91:5, 91:23, 115:21,
147:23, 150:1, 152:5,
189:15
   **partner** [9] - 89:5,
89:6, 91:14, 91:15,
92:13, 92:14, 134:10,
146:24, 146:25
   **partnerships** [5] -
89:5, 91:14, 92:13,
92:24, 146:23
   **parts** [6] - 106:9,
124:9, 124:12, 125:6,
145:2
   **party** [26] - 22:16,
46:7, 46:25, 48:12,
48:19, 66:15, 93:6,
112:18, 132:3,
148:11, 149:5, 149:6,
149:12, 149:24,
151:10, 153:2, 153:5,
153:10, 153:18,
154:15, 155:6, 156:6,
169:5, 186:13,
186:16, 198:12
   **pass** [1] - 154:6
   **passed** [3] - 27:6,
96:19, 154:7
   **passing** [1] - 83:12
   **past** [4] - 39:24,
41:24, 88:18, 90:25
   **pasted** [1] - 97:23
   **Pauls** [4] - 108:25,
109:6, 138:3, 160:4
   **pause** [3] - 68:6,
159:21, 204:22
   **pay** [39] - 6:25,
11:21, 13:6, 13:7,
13:8, 13:16, 17:3,
18:3, 18:13, 18:22,
27:7, 35:24, 37:18,
37:24, 59:23, 76:15,
76:17, 76:18, 76:20,
77:6, 79:13, 83:12,
83:13, 85:8, 94:9,
94:13, 94:17, 141:18,

165:7, 171:20,
171:22, 180:9,
181:12, 182:11,
192:22, 208:16, 209:6
   **paying** [5] - 67:14,
201:5, 207:10,
207:21, 207:22
   **payment** [29] - 6:19,
10:25, 11:14, 11:19,
11:22, 13:21, 18:12,
25:20, 26:19, 77:9,
79:25, 80:7, 81:2,
81:13, 83:22, 84:11,
84:14, 88:6, 95:25,
97:1, 170:20, 172:18,
175:4, 175:9, 175:18,
177:7, 178:6, 178:7,
179:25
   **payments** [10] - 7:22,
12:22, 79:19, 83:5,
83:20, 164:21,
170:22, 171:3,
181:25, 201:5
   **payor** [2] - 115:1,
180:10
   **payroll** [1] - 179:4
   **penalize** [1] - 71:19
   **penalties** [1] - 35:20
   **penalty** [5] - 30:25,
31:4, 31:5, 33:3,
33:10
   **pending** [5] - 70:24,
106:5, 107:5, 107:7,
197:23
   **Penn** [1] - 120:18
   **pens** [1] - 123:1
   **penultimate** [1] -
70:22
   **people** [22] - 29:14,
39:22, 52:8, 55:10,
56:5, 65:5, 72:17,
112:22, 112:23,
121:5, 124:8, 130:21,
137:25, 145:6,
168:25, 200:6, 201:5,
208:22, 215:9,
215:11, 216:7
   **per** [19] - 92:20,
122:16, 161:22,
161:23, 167:21,
167:22, 201:23,
207:3, 207:9, 208:16,
209:21, 209:22,
210:14, 210:15,
210:16, 210:21,
210:25
   **percent** [10] - 47:13,
62:11, 76:7, 94:5,
127:14, 172:21,
210:15, 210:21,

212:5, 212:6
   **percentage** [3] -
165:3, 167:9, 210:20
   **perception** [4] -
86:16, 135:8, 151:11,
151:21
   **performance** [5] -
94:24, 115:7, 116:6,
180:6, 209:20
   **performing** [1] -
212:2
   **perhaps** [3] - 115:24,
125:16, 180:15
   **period** [13] - 54:13,
116:9, 116:11,
122:12, 122:14,
122:15, 124:19,
145:7, 145:17,
199:17, 202:2, 202:6,
202:11
   **periodically** [6] -
128:5, 131:6, 132:25,
134:2, 147:5, 153:6
   **permission** [1] - 94:9
   **permit** [2] - 133:19,
149:12
   **permits** [1] - 149:11
   **permitted** [3] -
20:16, 149:9
   **perplexed** [1] -
198:17
   **person** [7] - 4:4,
72:16, 99:18, 114:6,
138:17, 157:22,
214:21
   **person's** [1] - 55:7
   **personal** [6] -
106:19, 107:23,
107:25, 108:2,
127:23, 213:23
   **personally** [2] -
137:22, 186:18, 189:8
   **personnel** [1] - 29:13
   **pertain** [1] - 113:10
   **phenomenal** [2] -
115:8, 209:20
   **philosophy** [1] -
114:16
   **phone** [3] - 12:21,
13:11, 13:12
   **photocopies** [1] -
79:10
   **phrase** [2] - 26:16,
211:4
   **pick** [3] - 72:25,
116:2, 187:13
   **picture** [1] - 100:14
   **pile** [1] - 113:8
   **pinpoint** [1] - 56:1
   **place** [4] - 39:23,

60:9, 72:9, 146:11
  **placed** [1] - 190:24
  **places** [2] - 173:18, 208:7
  **plainly** [2] - 95:23, 96:3
  **Plaintiff** [5] - 1:4, 135:17, 191:13, 205:5, 205:6
  **PLAINTIFF** [34] - 1:15, 2:4, 2:5, 2:6, 2:7, 2:8, 2:9, 2:10, 2:11, 2:12, 2:13, 2:14, 102:18, 102:25, 108:17, 108:23, 109:10, 110:4, 112:3, 116:17, 117:15, 134:22, 159:8, 216:16, 216:18, 216:20, 216:22, 216:24, 217:1, 217:3, 217:5, 217:7, 217:9, 217:11
  **Plaintiff's** [16] - 78:14, 82:14, 109:21, 126:7, 129:2, 154:19, 155:23, 170:16, 176:1, 180:14, 182:24, 183:11, 184:1, 187:25, 191:19, 194:10
  **plaintiff's** [2] - 150:10, 172:25
  **plan** [9] - 40:8, 42:4, 42:15, 68:13, 132:13, 145:19, 152:10, 152:21, 152:25
  **plans** [1] - 145:2
  **plate** [2] - 97:23, 97:24
  **play** [2] - 142:25, 143:8
  **Plaza** [1] - 1:9
  **pleased** [1] - 130:17
  **plus** [8] - 125:22, 146:1, 156:17, 165:3, 167:1, 185:8, 211:23, 211:24
  **point** [14] - 15:17, 42:3, 57:19, 94:20, 105:17, 116:15, 143:4, 152:6, 164:6, 176:8, 182:15, 190:22, 199:9, 200:9
  **pointed** [3] - 60:4, 62:9, 94:16
  **points** [2] - 165:3, 167:9
  **policy** [1] - 132:11
  **Pollock** [7] - 4:4,

12:7, 12:10, 27:17, 101:15, 132:18
  **portfolio** [1] - 114:19
  **portion** [2] - 86:17, 151:23
  **portions** [5] - 105:17, 108:9, 112:10, 112:13, 115:25
  **position** [8] - 10:7, 105:17, 126:16, 143:14, 175:1, 175:9, 175:21, 194:20
  **positioning** [1] - 127:3
  **positions** [1] - 143:24
  **positive** [3] - 103:21, 202:23
  **possess** [1] - 75:18
  **possession** [3] - 73:8, 73:20, 74:4
  **possible** [5] - 15:25, 17:23, 48:8, 150:13, 204:8
  **possibly** [1] - 57:7
  **potential** [5] - 38:6, 38:14, 44:9, 70:14, 70:18
  **potentially** [1] - 70:11
  **practice** [2] - 98:18
  **practices** [22] - 31:22, 32:4, 33:22, 34:4, 36:4, 36:8, 36:10, 36:25, 50:20, 50:22, 51:4, 51:5, 51:8, 53:12, 53:21, 54:8, 59:10, 61:10, 63:15, 70:19, 75:8, 100:2
  **preamble** [1] - 171:12
  **precise** [1] - 182:22
  **precisely** [1] - 75:4
  **predates** [2] - 52:16, 53:3
  **preferences** [1] - 127:16
  **premises** [4] - 70:7, 91:4, 92:12, 195:9
  **prepare** [3] - 4:9, 12:9, 150:14
  **Prepare** [1] - 84:24
  **prepared** [19] - 14:21, 16:23, 21:10, 34:8, 36:3, 38:18, 39:4, 44:6, 50:18, 55:16, 57:2, 61:19, 62:6, 72:14, 72:22,

85:13, 87:19, 95:9, 97:14
  **presence** [1] - 208:6
  **present** [6] - 5:12, 85:14, 85:17, 108:5, 170:7, 198:5
  **presented** [3] - 39:21, 96:8, 215:15
  **President** [2] - 60:18, 126:21
  **president** [3] - 39:10, 42:18
  **press** [1] - 208:2
  **presume** [7] - 14:8, 14:9, 17:12, 17:13, 17:14, 130:8
  **pretextual** [1] - 113:7
  **Pretrial** [3] - 12:7, 12:15, 103:7
  **pretty** [1] - 174:24
  **prevents** [4] - 35:23, 37:12, 37:16, 37:24
  **previous** [5] - 67:4, 127:19, 127:20, 127:22, 184:9
  **previously** [1] - 36:17
  **price** [29] - 69:5, 95:3, 110:18, 111:7, 111:11, 112:1, 117:21, 157:24, 158:2, 201:19, 201:22, 201:24, 201:25, 202:8, 203:18, 203:23, 204:10, 205:17, 206:14, 206:20, 206:23, 207:2, 207:6, 207:9, 207:10, 207:22, 209:6
  **priced** [1] - 133:11
  **prices** [1] - 201:23
  **pricing** [1] - 132:4
  **primarily** [3] - 38:6, 44:9, 114:6
  **prime** [5] - 165:3, 167:1, 167:5, 167:6, 167:11
  **principles** [1] - 61:11
  **privilege** [16] - 51:15, 51:21, 103:5, 103:6, 104:8, 104:9, 104:10, 104:11, 104:12, 104:15, 104:23, 105:13, 105:14, 106:22, 107:6, 108:10
  **privileged** [1] - 51:12
  **pro** [1] - 166:20
  **problem** [9] - 10:19, 20:12, 20:19, 20:20,

57:8, 188:16, 191:12, 198:7, 213:22
  **problems** [3] - 138:11, 198:5, 201:4
  **procedure** [1] - 148:11
  **proceeding** [2] - 61:1, 61:5
  **proceedings** [1] - 216:9
  **process** [7] - 113:3, 143:1, 148:8, 178:17, 190:11, 190:12, 193:20
  **produce** [2] - 97:8, 104:18
  **produced** [2] - 195:18, 213:15
  **product** [4] - 106:1, 106:6, 111:11
  **professional** [1] - 12:1
  **proffer** [2] - 114:2, 114:3
  **proffering** [1] - 109:24
  **prohibit** [1] - 67:6
  **prohibited** [3] - 68:9, 74:11, 74:15
  **project** [1] - 133:6
  **projects** [2] - 38:9, 44:12
  **promise** [1] - 37:6
  **prompting** [1] - 19:16
  **promptly** [1] - 175:14
  **proper** [5] - 130:20, 132:15, 132:16, 132:17, 148:19
  **properly** [2] - 42:4, 154:11
  **property** [5] - 46:8, 47:1, 48:24, 152:17, 196:3
  **propitious** [4] - 47:10, 62:11, 62:18, 92:6
  **Proposal** [2] - 52:10, 52:17
  **proposal** [6] - 125:23, 125:24, 191:23, 191:25, 192:4, 193:8
  **propose** [2] - 86:16, 151:22
  **proposed** [5] - 52:13, 116:24, 127:11, 191:2, 192:2
  **proved** [1] - 101:4

  **provide** [20] - 20:2, 21:6, 21:18, 23:11, 23:16, 48:21, 59:22, 76:9, 83:19, 87:25, 95:18, 95:24, 96:4, 96:13, 111:2, 125:10, 127:2, 171:20, 215:1, 215:7
  **provided** [3] - 14:10, 49:22, 113:21
  **provides** [1] - 29:20
  **providing** [1] - 75:10
  **provision** [3] - 171:5, 172:18, 179:12
  **provisions** [1] - 182:2
  **proxy** [9] - 88:12, 88:17, 90:17, 92:3, 92:8, 93:9, 108:13, 108:25, 146:19
  **public** [8] - 87:10, 135:11, 137:20, 197:3, 198:15, 205:3, 211:22
  **published** [1] - 206:1
  **publishes** [1] - 211:21
  **punish** [1] - 37:22
  **punishes** [1] - 33:9
  **punishment** [1] - 33:2
  **punitive** [1] - 50:12
  **purchase** [5] - 48:24, 89:8, 147:1
  **purchases** [4] - 61:12, 61:23, 64:21, 99:3
  **purports** [2] - 38:24, 44:24
  **purpose** [4] - 48:1, 64:24, 107:1, 129:6
  **purposes** [1] - 63:6
  **pursuant** [5] - 17:1, 18:6, 31:20, 132:10, 213:16
  **pursue** [1] - 47:22
  **put** [18] - 8:1, 8:5, 8:15, 15:17, 38:21, 86:5, 92:25, 99:13, 105:23, 112:14, 112:15, 124:12, 125:6, 128:18, 146:6, 151:14, 205:11, 208:15
  **putting** [1] - 93:18

## Q

  **qualifications** [1] -

133:5
**qualities** [1] - 208:13
**quality** [1] - 208:13
**quarter** [4] - 204:13, 204:14, 204:18, 210:17
**quarters** [5] - 210:9, 210:23, 210:24, 211:1, 211:8
**questioned** [1] - 102:15
**questions** [17] - 8:1, 8:4, 8:7, 8:15, 24:11, 25:6, 34:1, 38:2, 56:1, 98:17, 114:17, 125:15, 170:3, 170:12, 182:16, 182:19, 214:12
**quickly** [2] - 69:22, 158:18
**quite** [1] - 43:15
**quotation** [1] - 210:18
**Quote** [1] - 83:2
**quote** [43] - 18:3, 19:23, 21:2, 24:4, 31:18, 33:14, 34:22, 40:13, 41:9, 41:13, 41:23, 42:21, 43:13, 44:20, 81:1, 81:12, 81:15, 82:5, 82:7, 82:20, 83:2, 83:5, 83:18, 83:20, 84:8, 84:16, 84:24, 84:25, 86:15, 86:18, 87:7, 87:8, 89:3, 89:13, 91:3, 92:11, 98:6, 99:25, 100:3
**quoted** [4] - 43:13, 53:9, 53:11, 71:23
**quoting** [3] - 42:17, 150:22, 209:13

---

**R**

---

**radio** [1] - 43:15
**raise** [1] - 119:16
**raised** [2] - 120:23, 127:13
**ran** [1] - 210:21
**rapidly** [2] - 95:3, 208:8
**rata** [1] - 166:20
**rate** [7] - 91:17, 161:17, 165:3, 167:6, 202:18, 202:19
**rates** [6] - 110:15, 127:12, 134:11, 155:10, 155:12,

157:17
**rather** [4] - 43:18, 44:1, 180:10, 211:21
**rating** [8] - 202:12, 202:13, 202:17, 202:20, 202:21, 203:13, 203:14
**ratings** [1] - 202:22
**ratio** [3] - 201:22, 201:24, 201:25
**rational** [1] - 209:2
**re** [1] - 151:10
**re-examine** [1] - 151:10
**reaction** [1] - 198:19
**read** [94] - 3:9, 3:25, 4:9, 4:13, 4:14, 5:2, 5:3, 5:9, 5:11, 7:11, 7:12, 7:20, 8:1, 8:10, 15:4, 16:25, 17:5, 17:7, 18:9, 19:10, 19:11, 20:4, 21:8, 24:9, 29:15, 29:16, 29:17, 31:11, 31:17, 31:24, 33:7, 33:13, 34:11, 36:13, 36:16, 38:10, 38:25, 39:3, 40:19, 41:19, 41:22, 41:25, 42:6, 43:2, 43:19, 45:14, 48:4, 48:12, 48:13, 49:19, 50:25, 52:13, 53:1, 53:16, 58:11, 58:12, 59:13, 61:3, 61:15, 61:17, 68:4, 73:12, 73:18, 75:16, 83:6, 95:20, 99:14, 99:20, 102:13, 112:13, 114:1, 130:1, 134:9, 136:2, 137:5, 137:15, 140:6, 142:15, 142:16, 142:20, 150:5, 150:7, 153:1, 156:2, 159:9, 175:19, 184:1, 188:5, 188:11, 188:22, 194:24, 209:18, 210:18
**reading** [11] - 30:3, 63:12, 75:23, 79:21, 83:2, 91:3, 101:14, 150:22, 155:14, 156:13, 163:2
**readings** [1] - 59:3
**reads** [8] - 39:21, 65:19, 67:23, 79:17, 82:20, 127:10, 147:20, 151:21
**ready** [5] - 3:3, 58:1, 118:20, 169:22, 169:23, 169:24

**real** [56] - 38:9, 39:23, 44:12, 46:14, 46:25, 47:8, 47:11, 47:20, 47:21, 49:16, 54:13, 56:8, 56:17, 61:12, 61:23, 61:24, 62:3, 64:21, 65:20, 66:8, 66:16, 66:24, 71:16, 71:19, 86:19, 86:20, 86:24, 90:13, 93:6, 99:3, 99:15, 100:5, 120:20, 143:25, 144:4, 144:11, 145:4, 145:5, 145:12, 146:8, 146:9, 147:6, 149:8, 150:10, 152:15, 153:21, 155:16, 155:17, 156:20, 157:22, 158:3, 196:10, 210:1
**realize** [1] - 9:6
**realized** [1] - 56:24
**really** [10] - 42:2, 43:14, 43:15, 110:16, 166:5, 173:18, 189:16, 195:2, 198:23, 199:1
**reason** [8] - 111:9, 116:11, 131:20, 133:3, 147:15, 148:4, 164:2, 208:23
**reasonable** [6] - 73:10, 73:22, 74:6, 75:20, 171:15, 179:24
**reasonably** [2] - 24:5, 34:23
**reasons** [8] - 67:24, 76:8, 76:19, 111:19, 192:19, 192:20, 193:12, 193:14
**recalling** [1] - 96:21
**recapping** [1] - 8:11
**received** [8] - 40:6, 102:17, 102:24, 108:16, 108:22, 117:14, 162:18, 178:4
**RECEIVED** [33] - 2:4, 2:5, 2:6, 2:7, 2:8, 2:9, 2:10, 2:11, 2:12, 2:13, 2:14, 102:18, 102:25, 108:17, 108:23, 109:10, 110:4, 112:3, 116:17, 117:15, 134:22, 159:8, 216:17, 216:19, 216:21, 216:23, 216:25, 217:2, 217:4, 217:6, 217:8, 217:10, 217:12
**recent** [3] - 5:11,

112:5, 161:18
**recently** [3] - 6:12, 40:6, 84:17
**recess** [5] - 20:21, 118:16, 118:21, 118:22, 169:19
**recipient** [1] - 76:12
**reciprocate** [1] - 215:16
**recited** [1] - 188:10
**recites** [2] - 46:23, 127:19
**recognize** [16] - 22:7, 28:11, 29:3, 39:6, 41:5, 41:21, 55:7, 67:12, 92:1, 95:20, 126:14, 126:19, 129:8, 155:24
**recollection** [2] - 9:16, 9:22
**recommend** [1] - 141:15
**recommendation** [5] - 10:25, 125:24, 139:24, 139:25, 141:23
**recommended** [2] - 141:12, 141:16
**record** [9] - 13:11, 17:1, 31:17, 33:13, 63:16, 102:14, 103:24, 105:24, 115:17
**records** [4] - 103:18, 179:3, 179:4, 179:16
**recover** [1] - 141:17
**redact** [1] - 115:11
**redaction** [2] - 116:24
**redactions** [2] - 113:9, 118:4
**reduce** [1] - 164:20
**reduction** [2] - 67:13, 110:18
**redundantly** [1] - 70:10
**refer** [7] - 11:22, 141:2, 177:3, 177:6, 183:3, 184:16
**reference** [15] - 33:19, 37:4, 51:3, 52:10, 52:21, 54:7, 62:6, 77:7, 80:22, 126:24, 150:20, 161:24, 175:6, 184:19, 209:14
**referenced** [2] - 50:17, 213:15
**references** [3] - 112:10, 168:5, 179:11

**referred** [7] - 8:15, 53:1, 53:2, 61:20, 69:16, 197:9, 210:18
**referring** [12] - 4:23, 4:25, 22:25, 37:1, 37:2, 47:6, 63:17, 68:7, 87:12, 137:19
**refers** [5] - 27:18, 52:22, 54:12, 88:12, 110:17
**refine** [1] - 12:19
**reflected** [1] - 206:21
**reflecting** [2] - 23:10, 23:15
**reflects** [1] - 113:18
**refusal** [1] - 193:7
**refused** [2] - 192:22, 193:11
**reg** [5] - 74:25, 75:2, 181:11, 201:2, 211:7
**regard** [2] - 72:9, 112:9
**regarding** [15] - 32:4, 34:4, 44:13, 59:9, 71:16, 94:24, 108:19, 112:5, 112:6, 112:8, 141:12, 148:24, 156:15, 182:2, 184:7
**regards** [1] - 29:24
**regs** [2] - 178:9, 201:6
**regulation** [9] - 11:6, 75:15, 95:20, 100:11, 114:25, 154:11, 154:12, 178:18, 181:3
**regulations** [7] - 77:9, 78:23, 87:11, 96:21, 103:22, 149:12, 178:7
**regulator** [3] - 29:21, 100:1, 100:3
**Regulator's** [1] - 29:21
**regulators** [5] - 10:12, 41:16, 42:4, 42:14, 153:7
**regulatory** [37] - 4:4, 12:11, 15:2, 26:21, 35:24, 39:22, 43:16, 46:13, 57:11, 59:22, 77:5, 77:15, 77:17, 77:24, 79:25, 80:12, 80:24, 81:3, 81:14, 83:12, 84:16, 85:1, 85:3, 85:8, 87:12, 88:6, 96:4, 96:19, 96:24, 111:3, 153:17, 172:13, 172:20, 193:20, 194:5, 200:5
**Regulatory** [2] -

10:8, 10:9
**reimburse** [1] -
139:8
**reimbursement** [3] -
140:1, 171:10, 171:14
**related** [43] - 20:1,
21:4, 35:3, 42:23,
46:7, 48:11, 48:19,
56:1, 56:8, 56:17,
65:20, 66:15, 66:16,
70:6, 70:7, 81:1, 91:5,
93:5, 132:3, 137:9,
144:19, 148:11,
149:4, 149:6, 149:12,
149:24, 150:1,
151:10, 152:5, 153:2,
153:5, 153:10,
153:17, 154:15,
155:6, 156:6, 169:5,
186:13, 186:15,
189:14, 195:7, 195:9,
198:12
**related-party** [1] -
198:12
**relates** [1] - 138:9
**Relations** [2] - 10:8,
10:9
**relationship** [21] -
38:7, 38:15, 44:10,
50:7, 86:17, 86:24,
129:18, 130:14,
131:7, 131:19,
131:22, 132:21,
134:3, 134:7, 135:10,
141:3, 146:7, 151:2,
151:8, 151:22, 158:22
**relationships** [3] -
48:12, 129:17, 156:7
**relative** [1] - 145:9
**relatives** [7] - 38:8,
38:15, 44:11, 49:18,
66:9, 70:15, 195:8
**relayed** [1] - 27:12
**release** [1] - 208:2
**releases** [2] - 84:15,
84:24
**relevance** [15] -
103:8, 103:16,
103:17, 110:12,
110:25, 111:1, 111:7,
111:25, 113:22,
116:8, 116:13,
128:15, 129:4,
130:15, 133:16
**relevant** [4] - 103:9,
115:23, 116:12,
179:22
**reliance** [1] - 131:22
**relied** [1] - 98:10
**relying** [4] - 51:11,

94:2, 100:21, 131:19
**remaining** [1] -
163:19
**remember** [27] -
5:25, 6:11, 7:6, 8:2,
8:6, 10:20, 62:12,
71:23, 72:3, 72:10,
75:4, 91:7, 101:2,
121:21, 122:5, 139:5,
139:12, 140:9,
141:11, 142:7, 148:9,
174:7, 181:5, 185:21,
185:23, 192:3, 196:22
**remind** [1] - 213:3
**remove** [1] - 101:23
**removed** [1] - 138:11
**removing** [1] -
138:15
**renewable** [1] -
147:5
**rent** [1] - 148:21
**rental** [8] - 89:13,
89:14, 89:21, 91:17,
91:21, 91:22, 147:21,
147:22
**rents** [4] - 46:7,
46:25, 89:9, 148:6
**rephrase** [3] - 21:15,
125:17, 190:23
**report** [47] - 11:17,
40:13, 44:25, 55:18,
62:7, 62:10, 67:7,
88:1, 92:4, 99:7,
99:14, 99:20, 100:5,
100:15, 106:4,
129:10, 129:14,
129:24, 130:1,
130:10, 130:21,
131:15, 132:2, 133:4,
133:5, 133:8, 133:18,
133:13, 140:7,
140:12, 151:1, 155:1,
155:15, 158:17,
188:4, 188:10,
188:20, 188:22,
188:22, 189:17,
198:15, 203:9,
203:11, 211:22
**reported** [7] - 62:3,
65:23, 66:25, 81:2,
81:15, 82:6, 210:17
**REPORTER** [1] -
190:2
**reporting** [3] - 106:6,
107:4, 154:14
**reports** [4] - 87:10,
154:7, 199:6, 202:19
**represent** [2] -
91:16, 100:18
**representations** [2] -

70:11, 180:2
**representative** [1] -
15:1
**representing** [4] -
24:1, 106:14, 173:17,
176:8
**represents** [1] -
176:19
**request** [8] - 11:19,
13:5, 13:8, 13:9,
13:15, 83:3, 175:12,
195:14
**requested** [4] - 13:7,
43:8, 83:18, 84:2
**requesting** [1] -
195:17
**requests** [1] - 181:11
**require** [1] - 72:8
**required** [10] - 1:24,
12:8, 20:2, 21:6, 35:9,
42:25, 48:17, 56:17,
164:20, 180:3
**requirement** [2] -
18:18, 175:5
**requirements** [3] -
66:18, 78:22, 154:14
**requires** [4] - 22:14,
114:25, 151:10, 175:9
**requisite** [4] - 24:6,
25:22, 26:21, 34:23
**research** [6] - 57:21,
101:19, 128:5, 128:6,
169:16, 213:7
**researched** [2] -
201:1, 203:23
**Reserve** [27] - 18:12,
19:25, 21:4, 28:12,
50:11, 76:8, 76:11,
77:5, 77:8, 82:24,
83:4, 84:12, 90:12,
94:2, 94:14, 103:19,
118:8, 153:14,
153:15, 153:25,
175:10, 175:15,
178:5, 178:10,
180:17, 182:9, 211:7
**Reserves** [3] - 38:5,
44:8, 44:20
**resign** [2] - 168:23,
199:11
**resignation** [3] -
178:15, 182:25,
206:10
**resigned** [5] - 81:8,
168:12, 168:22,
179:14, 203:16
**resigning** [3] - 183:6,
183:9, 200:9
**resolution** [10] -
27:6, 59:20, 83:12,

83:16, 84:1, 84:24,
96:19, 97:5, 97:8,
200:13
**resolutions** [3] -
59:16, 80:10, 88:4
**resolved** [4] - 52:24,
169:7, 193:1, 198:2
**resolving** [1] - 18:7
**respect** [3] - 40:5,
40:14, 70:24
**respectfully** [1] -
182:17
**respective** [1] -
12:11
**respond** [2] - 11:20,
198:7
**responded** [2] - 3:4,
131:2
**Respondent** [2] -
100:1, 100:2
**respondent** [16] -
18:3, 18:6, 18:7,
22:19, 61:2, 61:8,
61:9, 61:14, 63:14,
64:3, 65:19, 66:14,
66:15, 98:3
**responds** [1] - 40:4
**response** [8] - 8:8,
50:20, 51:7, 53:13,
54:15, 54:16, 54:25,
55:8
**Response** [3] -
50:23, 51:10, 55:5
**responses** [1] -
75:10
**responsibilities** [2] -
10:16, 137:25
**rest** [1] - 183:18
**restated** [1] - 159:13
**restrictions** [1] -
39:22
**restructuring** [1] -
114:17
**result** [8] - 24:6,
32:25, 34:24, 35:9,
81:14, 107:25,
127:11, 142:4
**resulted** [3] - 61:14,
87:10, 197:25
**results** [4] - 81:3,
106:23, 154:3, 154:5
**resumes** [1] - 169:23
**retail** [2] - 134:11,
210:14
**retailer** [1] - 122:22
**retailers** [2] - 123:16,
210:10
**retailing** [2] - 123:8,
123:15, 210:12
**return** [2] - 211:24,

212:5
**returning** [1] -
151:18
**returns** [3] - 58:18,
179:4, 179:17
**revealed** [1] - 154:9
**reverse** [5] - 127:17,
141:18, 158:15,
169:4, 184:21
**reverses** [1] - 66:8
**reversing** [1] - 97:9
**review** [30] - 7:2,
22:2, 23:7, 24:17,
28:8, 29:5, 33:6, 47:9,
47:11, 47:20, 93:19,
105:25, 107:9,
125:24, 129:16,
130:13, 139:10,
140:16, 140:19,
152:12, 153:17,
154:9, 155:16,
155:17, 156:16,
156:21, 179:22,
184:7, 184:17, 202:22
**reviewed** [19] - 6:22,
6:24, 7:3, 7:5, 7:10,
10:18, 36:6, 36:12,
48:3, 57:5, 82:4,
87:23, 139:7, 157:11,
165:10, 179:23,
198:25
**reviewing** [4] - 35:2,
129:10, 153:10,
213:13
**reviews** [1] - 7:11
**Richard** [1] - 52:7
**ride** [1] - 40:8
**rights** [3] - 25:21,
164:2, 171:17
**rise** [12] - 3:1, 3:21,
57:23, 57:25, 59:1,
101:20, 118:19,
119:8, 169:17,
169:21, 170:6, 213:9
**risk** [4] - 185:15,
207:4, 207:5, 208:7
**risks** [1] - 201:7
**road** [1] - 131:16
**ROBERT** [1] - 1:11
**Rodgin** [1] - 79:18
**rog** [1] - 117:10
**role** [4] - 10:22,
10:23, 142:25, 143:8
**rolls** [1] - 117:22
**Rome** [1] - 139:13
**room** [1] - 104:3
**rule** [3] - 12:5,
215:21, 215:24
**Rule** [2] - 76:9,
213:16

ruled [1] - 182:17
**Rules** [1] - 149:25
**rules** [3] - 78:23, 149:4, 149:25
**running** [2] - 42:5, 167:22

# S

**safety** [1] - 42:22
**salary** [12] - 161:17, 161:20, 162:2, 162:12, 162:16, 163:22, 165:8, 166:7, 166:10, 166:16, 182:3
**sale** [3] - 145:1, 145:21, 206:21
**sales** [5] - 210:10, 210:13, 210:15, 210:19, 211:9
**salutation** [1] - 174:3
**satisfaction** [2] - 126:2, 132:4
**satisfactory** [1] - 154:13
**satisfying** [1] - 66:18
**Saturday** [1] - 216:3
**savings** [1] - 128:1
**saw** [5] - 27:15, 35:15, 90:2, 122:21
**schedule** [1] - 215:11
**scheduling** [1] - 212:22
**school** [4] - 120:15, 120:18, 120:20, 144:3
**scope** [2] - 129:17, 195:6
**scratch** [1] - 168:24
**screen** [11] - 15:18, 86:6, 117:9, 119:6, 126:8, 128:10, 128:13, 128:19, 136:13, 170:16, 180:15
**screwed** [1] - 41:12
**searching** [1] - 27:17
**seat** [4] - 3:23, 119:10, 119:24, 170:8
**SEC** [5] - 80:18, 90:12, 109:12, 109:23, 134:25
**second** [35] - 19:3, 19:21, 24:4, 27:22, 31:16, 33:12, 34:17, 34:18, 34:19, 34:21, 39:20, 44:7, 46:23, 49:10, 53:7, 59:6, 61:7, 70:4, 70:22,

73:1, 87:6, 98:2, 99:1, 109:20, 127:1, 129:9, 136:14, 151:19, 164:23, 176:24, 177:21, 180:23, 181:1
**secret** [1] - 132:23
**Section** [5] - 1:24, 7:20, 20:3, 21:7, 175:17
**section** [2] - 160:23, 170:25
**Sections** [1] - 170:23
**securities** [1] - 114:17
**see** [108] - 14:10, 20:6, 21:20, 22:3, 28:20, 28:22, 29:1, 32:13, 32:18, 38:22, 40:1, 41:8, 41:13, 41:18, 42:1, 45:7, 45:12, 46:6, 47:2, 47:6, 52:4, 52:21, 52:22, 53:23, 57:22, 60:24, 61:7, 61:23, 62:23, 70:4, 70:7, 74:18, 76:3, 76:4, 78:16, 78:19, 78:24, 79:3, 79:6, 79:21, 80:22, 81:1, 81:5, 81:23, 84:23, 85:24, 85:25, 86:8, 86:10, 86:15, 87:7, 87:13, 88:11, 88:13, 89:3, 89:9, 89:12, 90:5, 90:13, 92:8, 93:8, 101:19, 103:12, 109:14, 116:1, 123:14, 126:11, 136:9, 137:3, 148:23, 150:24, 154:19, 156:5, 159:15, 161:15, 162:23, 163:3, 164:16, 166:5, 169:16, 170:1, 170:20, 170:22, 171:9, 173:10, 173:14, 174:2, 174:3, 174:11, 174:23, 176:14, 176:24, 177:13, 180:16, 180:24, 181:3, 181:4, 185:13, 191:12, 194:12, 195:13, 195:14, 206:5, 213:7, 213:14, 214:16
**seeing** [1] - 192:3
**seek** [1] - 175:14
**seeking** [3] - 105:18, 107:1, 214:16
**seem** [2] - 46:13,

107:9
**select** [1] - 113:6
**selected** [1] - 14:25
**self** [2] - 144:22, 180:5
**self-assessment** [1] - 180:5
**self-explanatory** [1] - 144:22
**selling** [2] - 207:13, 208:16
**seminars** [1] - 98:22
**send** [3] - 14:2, 58:20, 136:5
**sense** [5] - 73:14, 73:15, 103:21, 147:17, 156:4
**sent** [4] - 6:8, 14:13, 14:16, 104:16
**sentence** [42] - 16:25, 17:10, 19:5, 19:12, 19:19, 19:23, 21:2, 21:12, 23:19, 24:4, 24:11, 27:18, 27:20, 27:22, 34:21, 34:22, 35:2, 35:7, 35:22, 37:5, 37:10, 38:3, 38:4, 44:7, 44:13, 44:14, 49:3, 49:14, 50:17, 50:18, 52:12, 59:6, 59:25, 78:19, 86:15, 94:12, 147:4, 175:11, 176:18, 177:13, 194:3, 194:4
**sentencing** [1] - 174:4
**separate** [5] - 89:7, 139:6, 139:24, 147:1
**separation** [9] - 79:19, 80:7, 82:25, 83:5, 84:10, 84:13, 177:6, 178:5, 178:8
**September** [2] - 79:16, 204:20
**series** [1] - 93:8
**served** [1] - 169:2
**service** [7] - 121:18, 122:23, 123:5, 123:6, 123:17, 124:11, 130:20
**services** [13] - 49:15, 112:1, 125:10, 126:3, 126:24, 127:2, 127:23, 129:11, 130:17, 137:1, 137:7, 137:9, 137:12
**Session** [1] - 118:17
**set** [11] - 23:13, 24:12, 73:11, 74:7,

79:4, 84:6, 116:3, 117:9, 131:24, 167:6, 187:8
**settle** [1] - 65:5
**settled** [3] - 65:10, 130:23, 130:24
**settlement** [2] - 63:6, 84:15
**seven** [14] - 45:9, 57:7, 80:14, 84:8, 104:5, 122:22, 123:6, 162:21, 162:23, 163:3, 195:17, 211:25
**seven-day** [2] - 122:22, 123:6
**Seventeen** [1] - 157:4
**seventeen** [2] - 157:5, 157:9
**sever** [2] - 86:16, 151:22
**several** [5] - 8:7, 107:8, 139:7, 186:11, 214:2
**severance** [3] - 81:2, 81:12, 175:4
**severed** [1] - 86:23
**shall** [3] - 18:3, 65:20, 66:14
**share** [7] - 201:23, 203:25, 207:3, 207:9, 207:13, 208:5, 208:16
**shareholder** [2] - 140:16, 211:24
**shareholders** [3] - 88:21, 136:5, 169:3
**shareholders'** [1] - 88:12
**shed** [1] - 41:14
**Shirley** [5] - 120:9, 120:10, 123:18, 123:25, 127:16
**Shirley's** [5] - 124:14, 124:17, 125:2, 127:23, 130:9
**shopping** [6] - 146:5, 152:17, 152:21, 152:23
**short** [2] - 14:20, 20:21
**shortly** [1] - 196:23
**show** [18] - 17:20, 110:9, 116:6, 116:14, 126:6, 128:20, 128:21, 131:21, 133:18, 135:24, 150:10, 159:7, 161:12, 180:23, 191:4, 193:20, 214:19
**showed** [4] - 72:19,

91:8, 130:20, 146:16
**showing** [6] - 83:10, 111:25, 116:8, 119:5, 128:16, 140:10
**shown** [5] - 93:8, 94:20, 117:8, 150:2, 199:7
**shows** [1] - 117:7
**side** [4] - 132:16, 132:22, 156:24, 202:8
**sidebar** [3] - 20:6, 20:8, 130:6
**Sidebar** [3] - 20:24, 130:7, 133:22
**sided** [1] - 200:7
**sideline** [1] - 130:18
**sides** [1] - 72:16
**sign** [8] - 11:16, 14:25, 36:2, 61:19, 97:16, 97:19, 145:21
**signals** [1] - 20:10
**signatory** [1] - 61:22
**signature** [13] - 14:23, 28:17, 28:20, 28:22, 29:7, 29:9, 29:10, 32:15, 38:19, 99:12, 159:24, 160:1, 160:5
**signatures** [2] - 29:13, 93:18
**signed** [62] - 5:18, 6:5, 6:6, 6:15, 11:22, 14:24, 15:4, 16:23, 18:15, 19:11, 19:12, 32:9, 34:7, 34:10, 34:13, 35:5, 35:6, 36:1, 36:3, 38:4, 38:12, 38:18, 44:6, 47:16, 49:2, 49:4, 49:12, 50:19, 53:2, 53:5, 55:15, 56:11, 56:14, 57:1, 60:6, 62:1, 72:13, 76:6, 76:7, 85:13, 87:3, 87:18, 87:24, 90:11, 93:10, 93:17, 94:1, 94:22, 95:15, 96:2, 96:7, 97:14, 99:23, 99:25, 100:8, 100:17, 100:20, 159:17, 160:2, 160:25
**significance** [1] - 98:4
**significant** [1] - 110:16
**significantly** [2] - 155:10, 155:13
**signing** [3] - 39:3, 52:23, 97:17
**Silvestri** [1] - 145:8

**similar** [8] - 10:23, 89:16, 91:23, 91:24, 137:12, 144:11, 147:23, 147:24

**similarly** [1] - 89:16

**simple** [3] - 55:12, 89:19, 92:17

**simply** [7] - 18:18, 35:22, 67:7, 67:12, 97:23, 116:25, 208:15

**single** [4] - 43:19, 49:6, 67:3, 71:16

**sit** [2] - 23:9, 162:24

**Site** [8] - 86:17, 144:10, 144:13, 144:14, 144:15, 144:18, 144:19, 146:2

**site** [15] - 108:19, 144:24, 144:25, 145:13, 145:21, 150:21, 151:3, 151:23, 152:20, 152:24, 155:15, 185:3, 185:4

**sites** [9] - 59:9, 144:5, 144:7, 144:19, 144:23, 145:3, 145:18, 145:19, 152:22

**six** [12] - 28:20, 48:2, 48:3, 48:8, 48:10, 48:12, 141:20, 156:9, 166:14, 195:17, 197:13, 197:14

**sixth** [1] - 156:1

**size** [2] - 151:9, 208:13

**Skadden** [2] - 176:11, 180:20

**Skaddens** [1] - 173:14

**skip** [2] - 82:9, 88:9

**skipping** [1] - 204:18

**SLC** [6] - 46:23, 55:21, 65:1, 88:1, 188:24, 190:19

**slowly** [1] - 121:16

**small** [2] - 120:15, 121:14

**smart** [1] - 129:21

**Smart** [3] - 129:22, 130:4, 134:12

**sold** [4] - 69:10, 91:11, 178:22, 179:2

**solely** [1] - 63:5

**Solomon** [1] - 83:18

**solve** [1] - 199:21

**someone** [4] - 13:25, 41:14, 145:22, 190:22

**sometime** [3] - 6:11,

118:4, 185:18

**sometimes** [6] - 30:11, 30:12, 30:14, 30:22, 30:25, 65:5

**son** [1] - 145:10

**soon** [1] - 144:3

**sorry** [37] - 11:16, 16:8, 19:20, 19:21, 25:12, 31:8, 41:1, 45:20, 67:16, 67:20, 76:6, 79:7, 79:8, 79:21, 87:9, 90:20, 90:22, 94:21, 103:4, 107:12, 109:14, 109:15, 110:13, 122:14, 127:18, 127:20, 127:22, 144:20, 148:15, 153:15, 155:17, 164:15, 186:20, 190:2, 193:5, 200:24, 204:19

**sort** [3] - 8:11, 72:8, 196:6

**sorts** [1] - 113:9

**sought** [2] - 194:4, 194:8

**sound** [3] - 20:12, 20:13, 61:11

**soundness** [1] - 42:22

**sounds** [4] - 12:19, 13:13, 20:16, 212:14

**source** [5] - 22:6, 22:10, 26:2, 38:16, 170:20

**speaking** [1] - 203:18

**speaks** [4] - 34:1, 66:1, 66:21, 67:3

**Special** [15] - 50:3, 50:6, 55:17, 57:4, 62:2, 62:7, 140:7, 140:12, 140:14, 140:15, 140:18, 140:23, 141:4, 141:12, 141:23

**special** [24] - 44:25, 45:21, 47:8, 47:10, 47:19, 92:4, 99:7, 99:13, 99:20, 100:4, 100:14, 127:15, 154:17, 154:22, 155:5, 155:8, 155:18, 188:3, 188:6, 188:10, 189:4, 189:16, 190:19, 199:6

**species** [2] - 108:3, 108:4

**specific** [6] - 8:4,

56:1, 56:8, 70:10, 97:25, 114:16

**specifically** [13] - 22:18, 27:18, 52:22, 54:12, 62:9, 104:6, 132:6, 149:12, 171:9, 193:3, 193:4, 193:6, 193:25

**specificity** [1] - 56:16

**specifics** [1] - 140:22

**spectators** [1] - 20:16

**speculate** [1] - 83:21

**speculating** [2] - 84:21, 84:22

**speculation** [1] - 84:23

**spelled** [1] - 15:13

**spelling** [1] - 15:15, 15:16

**spend** [1] - 198:8

**spent** [2] - 135:9, 137:8

**spirit** [1] - 154:13

**spoken** [1] - 176:3

**spouse** [1] - 137:8

**sprint** [1] - 58:12

**staff** [4] - 121:13, 125:23, 138:18, 145:20

**stalled** [1] - 197:25

**stand** [2] - 119:13, 169:23

**standards** [2] - 69:19, 151:16

**standing** [1] - 152:22

**stands** [2] - 110:21, 111:13

**start** [11] - 24:24, 28:1, 28:19, 29:8, 85:23, 88:11, 123:19, 154:23, 160:14, 197:11, 204:7

**started** [8] - 3:12, 121:13, 123:13, 124:4, 144:14, 144:19, 187:19, 203:15

**starting** [1] - 113:2

**state** [5] - 120:24, 142:2, 142:3, 176:18, 179:21

**statement** [19] - 42:11, 53:19, 64:2, 75:17, 81:11, 87:7, 88:12, 88:17, 90:17, 91:20, 92:3, 92:8, 106:18, 115:19,

115:20, 136:5, 136:9, 137:17, 193:3

**statements** [9] - 93:9, 105:23, 108:13, 108:25, 112:17, 112:18, 115:6, 137:19, 148:1

**STATES** [2] - 1:1, 1:11

**states** [5] - 19:6, 44:8, 76:19, 89:8, 92:15

**States** [4] - 1:8, 60:25, 69:10, 208:15

**stating** [3] - 105:19, 200:14

**stationed** [1] - 152:11

**status** [4] - 79:19, 80:5, 84:9, 200:25

**stay** [1] - 37:6

**staying** [1] - 193:19

**step** [2] - 115:1, 185:7

**steps** [1] - 185:7

**still** [11] - 27:21, 64:20, 94:6, 99:1, 100:8, 100:16, 100:17, 100:20, 102:20, 144:7, 162:16

**stipulated** [2] - 165:15, 166:22

**Stipulation** [8] - 4:14, 4:24, 5:1, 5:4, 17:1, 59:8, 60:21, 63:20

**stipulation** [16] - 22:18, 22:22, 29:1, 29:11, 29:16, 31:9, 31:12, 32:21, 33:15, 33:17, 33:18, 34:1, 36:16, 36:20, 97:22, 165:12

**stock** [21] - 95:3, 135:10, 165:9, 165:13, 182:3, 201:19, 201:22, 201:25, 202:8, 203:18, 203:23, 203:24, 204:10, 205:17, 205:24, 206:15, 206:19, 206:20, 207:5, 207:13, 212:5

**Stock** [1] - 203:25

**stockholders** [1] - 136:6

**stocks** [1] - 206:17

**stop** [2] - 182:16, 201:21

**stopped** [1] - 182:18

**stopping** [1] - 57:18

**store** [10] - 209:14, 209:22, 210:12, 210:14, 210:15, 210:19, 210:20, 210:21, 210:25, 211:9

**stores** [6] - 121:16, 121:17, 122:18, 144:24, 145:16, 210:10

**story** [3] - 40:16, 132:16, 132:22

**strength** [4] - 113:1, 114:13, 202:19, 203:19

**strictly** [1] - 200:7

**strong** [1] - 202:10

**structure** [1] - 72:9

**study** [2] - 90:12, 155:5

**stuff** [11] - 71:5, 87:22, 88:2, 113:8, 115:12, 115:13, 130:23, 133:16, 154:12, 157:12, 212:17

**sub** [5] - 53:8, 65:18, 156:10, 160:10, 164:5

**sub-paragraph** [3] - 156:10, 160:10, 164:5

**sub-subparagraph** [2] - 53:8, 65:18

**subject** [12] - 13:19, 23:3, 32:7, 35:8, 77:9, 78:22, 80:23, 81:13, 84:15, 85:1, 96:21, 181:2

**submission** [1] - 189:5

**submit** [2] - 118:3, 148:12

**submitted** [1] - 189:23

**submitting** [6] - 19:6, 50:22, 51:9, 53:12, 53:21, 54:8

**subordinate** [1] - 101:10

**subparagraph** [6] - 53:8, 65:18, 66:12, 66:14, 75:17, 177:6

**subparagraphs** [1] - 63:9

**subpoena** [2] - 3:4, 214:17

**subpoenas** [1] - 3:6

**subsequent** [2] - 80:22, 199:6

**subsidiaries** [1] -

147:8
**substantial** [2] - 42:24, 43:7
**substantially** [2] - 133:16, 137:10
**success** [3] - 114:8, 137:14, 158:16
**successor** [2] - 105:14, 106:2
**sue** [4] - 138:13, 141:16, 141:22, 141:25
**sued** [2] - 138:14, 139:2
**suggest** [1] - 200:18
**suggested** [1] - 83:21
**suggests** [1] - 143:8
**suing** [1] - 141:18
**suit** [1] - 138:9
**suits** [1] - 140:16
**Sullivan** [2] - 180:17, 182:8
**sum** [10] - 18:4, 18:5, 81:1, 81:2, 81:12, 161:16, 163:17, 163:18, 175:4
**summaries** [1] - 8:10
**summarize** [1] - 188:23
**summarized** [1] - 45:16
**summarizing** [1] - 105:9
**summary** [6] - 8:10, 12:22, 106:13, 106:22, 107:11, 108:6
**Sunday** [1] - 213:6
**Sundays** [1] - 123:2
**Superior** [2] - 142:8, 142:21
**supplying** [1] - 199:20
**support** [3] - 20:3, 21:7, 127:2
**supported** [2] - 111:5, 111:9
**suppose** [1] - 42:13
**supposed** [4] - 74:9, 74:10, 167:2
**Supreme** [4] - 142:8, 142:10, 142:11, 142:21
**surely** [1] - 63:6
**surgical** [2] - 42:1, 114:6
**SUSAN** [1] - 1:17
**suspicions** [1] - 132:17
**sustain** [1] - 108:8

sustained [2] - 108:11, 209:9
**switch** [1] - 17:17
**sworn** [1] - 157:6
**SWORN** [1] - 119:17

## T

**Tab** [17] - 16:5, 16:15, 17:15, 44:24, 55:15, 59:5, 60:6, 60:7, 60:10, 67:16, 76:6, 78:9, 79:3, 79:16, 80:2, 90:17, 90:21
**tab** [23] - 28:25, 29:1, 31:8, 32:12, 37:1, 44:5, 47:25, 49:13, 54:4, 79:7, 80:14, 81:6, 82:9, 82:10, 84:5, 85:10, 87:2, 93:4, 95:6, 95:7, 97:22, 146:19
**table** [1] - 131:23
**talks** [16] - 110:12, 110:15, 114:3, 114:10, 114:11, 114:12, 114:13, 114:14, 114:15, 133:5, 133:6, 164:5, 189:4, 201:6
**tAMBUSSI** [1] - 214:1
**TAMBUSSI** [78] - 1:17, 3:5, 3:7, 3:17, 15:24, 46:20, 73:23, 86:3, 102:3, 102:16, 102:23, 103:2, 103:4, 103:23, 104:9, 104:17, 105:11, 105:20, 105:23, 108:15, 108:21, 109:1, 109:7, 109:17, 110:7, 110:11, 111:23, 112:9, 112:23, 113:11, 113:16, 114:2, 115:17, 116:5, 116:22, 117:6, 117:24, 118:12, 118:14, 125:15, 128:14, 128:20, 129:3, 130:5, 130:13, 131:15, 131:25, 133:1, 133:4, 133:10, 133:13, 133:21, 135:2, 135:18, 136:20, 142:9, 143:4, 159:2, 159:5, 166:1, 169:25, 172:7,

172:11, 178:24, 182:15, 184:10, 186:20, 186:24, 188:11, 192:23, 208:18, 209:8, 213:12, 213:24, 214:25, 215:4, 215:20, 216:5
**Tambussi** [19] - 5:14, 60:4, 79:18, 102:2, 103:3, 113:8, 115:24, 118:4, 174:1, 174:3, 174:24, 176:2, 176:15, 176:17, 193:3, 193:13, 213:11, 214:11, 215:16
**Tambussi's** [6] - 76:23, 77:23, 79:4, 174:7, 176:18, 182:8
**tangible** [3] - 79:23, 82:12, 83:10
**tanks** [1] - 200:7
**target** [1] - 208:14
**tax** [2] - 179:4, 179:17
**taxes** [2] - 46:8, 47:1
**TD** [61] - 4:4, 8:22, 9:18, 9:23, 10:4, 12:2, 12:10, 18:4, 18:5, 18:6, 18:13, 18:22, 19:6, 24:24, 25:1, 25:8, 25:10, 25:19, 26:4, 26:5, 26:6, 26:18, 27:6, 28:9, 38:23, 39:24, 43:10, 59:16, 59:21, 67:13, 69:3, 72:8, 72:17, 96:17, 97:12, 97:18, 105:14, 106:1, 113:17, 113:19, 114:8, 114:10, 114:11, 114:12, 114:13, 114:14, 114:15, 115:1, 115:13, 115:19, 171:24, 178:25, 179:2, 179:9, 179:10, 193:23, 207:9, 208:15, 209:6
**TD's** [1] - 10:12
**team** [2] - 114:16, 185:24
**tear** [1] - 210:8
**technically** [1] - 9:14
**temporarily** [1] - 88:9
**ten** [7] - 82:9, 82:10, 113:6, 125:22, 138:2, 211:1, 211:8

**tenants** [1] - 158:7
**tenure** [2] - 50:20, 211:19
**term** [13] - 9:13, 45:24, 48:23, 132:21, 132:23, 160:8, 160:12, 163:19, 166:8, 166:18, 184:4, 199:2, 212:6
**terminate** [2] - 48:23, 49:6
**terminated** [10] - 116:7, 157:12, 163:12, 163:16, 168:11, 168:14, 181:23, 199:11, 200:14
**terminating** [1] - 200:18
**termination** [9] - 48:25, 163:5, 164:2, 170:25, 171:4, 175:19, 176:21, 176:25, 178:15
**terms** [6] - 42:5, 43:1, 78:21, 138:13, 139:4, 184:4
**tested** [2] - 132:17, 132:25
**TESTIFIED** [1] - 119:18
**testified** [3] - 116:19, 121:21, 210:6
**testifies** [1] - 106:10
**testify** [9] - 12:11, 106:18, 106:19, 107:16, 107:19, 131:12, 138:21, 139:16, 139:19
**testimony** [25] - 3:25, 4:5, 75:13, 101:15, 101:17, 102:13, 103:23, 103:25, 104:2, 105:3, 110:5, 110:16, 110:19, 110:20, 112:5, 112:6, 112:7, 112:12, 114:5, 116:4, 130:16, 135:22, 157:6, 185:17, 213:13
**tests** [1] - 133:8
**text** [1] - 48:9
**thanking** [1] - 174:4
**THE** [214] - 1:1, 1:11, 3:2, 3:6, 3:8, 3:12, 3:15, 3:23, 4:2, 4:6, 4:8, 15:19, 15:22, 16:8, 16:12, 17:18, 17:20, 20:6, 20:9, 20:19, 20:22, 21:1,

44:3, 45:5, 57:20, 58:1, 58:5, 58:8, 58:12, 58:17, 58:20, 58:23, 59:2, 60:12, 73:3, 73:24, 74:1, 74:2, 74:3, 86:7, 101:16, 101:20, 101:24, 102:2, 102:5, 102:9, 102:11, 102:17, 102:22, 102:24, 103:3, 103:12, 103:16, 103:25, 104:6, 104:22, 105:2, 105:5, 105:16, 105:21, 106:4, 106:12, 106:17, 107:1, 107:4, 107:9, 107:13, 107:16, 107:19, 107:22, 108:8, 108:14, 108:16, 108:22, 109:3, 109:8, 109:12, 109:18, 109:20, 109:23, 110:2, 110:24, 111:6, 111:22, 111:24, 112:19, 113:14, 113:25, 114:21, 114:24, 115:9, 115:13, 115:16, 115:22, 116:13, 116:21, 117:3, 117:5, 117:19, 117:21, 117:25, 118:2, 118:6, 118:10, 118:13, 118:15, 118:20, 118:23, 118:25, 119:2, 119:5, 119:10, 119:14, 119:20, 119:21, 119:22, 119:23, 119:24, 125:17, 128:13, 128:16, 128:18, 128:22, 128:24, 129:5, 130:6, 130:8, 130:12, 130:24, 131:9, 131:16, 133:3, 133:14, 134:17, 134:19, 135:3, 135:23, 136:15, 136:19, 136:22, 136:25, 139:16, 139:18, 139:19, 142:14, 142:16, 142:18, 143:9, 159:1, 159:4, 159:6, 163:1, 165:12, 165:16, 165:18, 165:20, 165:25, 166:2, 166:4, 169:14, 169:17,

169:21, 169:22, 169:24, 170:4, 170:6, 170:8, 172:9, 182:19, 184:11, 184:13, 184:14, 184:15, 186:22, 187:5, 187:7, 187:11, 188:13, 188:18, 188:22, 188:25, 190:2, 190:4, 190:7, 191:6, 193:4, 193:6, 193:9, 193:11, 193:15, 204:5, 208:21, 209:1, 209:9, 212:18, 212:21, 212:24, 212:25, 213:11, 213:20, 213:25, 214:6, 214:9, 214:11, 214:14, 214:16, 214:19, 214:24, 215:21, 215:23, 215:25, 216:2, 216:8

**themselves** [2] - 141:18, 192:17

**theory** [2] - 84:17, 139:2

**thereafter** [1] - 196:23

**therefore** [6] - 45:14, 50:5, 55:20, 86:16, 151:22, 175:12

**thinking** [4] - 115:5, 191:23, 198:10, 198:13

**thinks** [2] - 76:19, 101:11

**third** [15] - 41:8, 49:17, 63:8, 67:20, 79:16, 79:23, 80:4, 82:18, 127:18, 157:20, 157:24, 158:1, 158:2, 174:15, 174:16

**thirty** [1] - 161:2

**Thirty** [1] - 34:16

**thirty-three** [1] - 161:2

**Thirty-three** [1] - 34:16

**thorough** [1] - 55:20

**thousand** [3] - 92:17, 162:11, 169:2

**thrashed** [1] - 135:21

**threaten** [1] - 199:10

**threatened** [1] - 200:21

**three** [29] - 6:2, 6:17, 12:2, 12:16, 27:25, 34:16, 36:6, 41:1, 41:2, 42:8, 46:24,

52:8, 65:22, 88:25, 92:22, 94:21, 132:9, 161:2, 161:11, 161:12, 161:13, 161:14, 188:15, 188:16, 189:3, 189:4, 195:16, 209:23, 214:3

**tightly** [1] - 127:3

**time-to-time** [1] - 167:11

**timeframe** [1] - 66:25

**timeline** [1] - 131:4

**timely** [2] - 111:11, 111:12

**timing** [1] - 170:20

**tired** [1] - 200:12

**Title** [1] - 1:24

**title** [3] - 8:6, 8:12, 39:10

**today** [15] - 9:4, 23:9, 26:17, 61:17, 72:20, 118:22, 130:1, 167:17, 173:21, 183:12, 213:17, 213:18, 215:6, 215:18, 216:6

**today's** [2] - 69:19, 151:8

**together** [5] - 120:23, 124:10, 124:12, 124:13, 125:7

**tomorrow** [4] - 117:22, 118:5, 215:18, 216:5

**took** [3] - 18:12, 57:12, 198:8

**top** [13] - 38:22, 38:23, 42:17, 43:13, 65:15, 81:12, 81:21, 86:14, 91:1, 151:19, 162:1, 170:17

**topic** [27] - 46:6, 47:6, 48:11, 55:18, 56:8, 78:9, 78:16, 78:19, 79:5, 79:17, 80:3, 80:21, 82:17, 84:7, 93:23, 99:7, 150:5, 161:14, 172:13, 174:11, 174:14, 188:24, 190:17, 190:20, 193:19, 212:17

**topics** [1] - 75:13

**Toronto** [6] - 178:22, 178:24, 205:23, 206:21, 206:23, 208:9

**Toronto-Dominion** [1] - 208:9

**total** [3] - 89:20, 92:15, 162:14

**totally** [2] - 43:18, 43:25

**town** [1] - 215:9

**toys** [2] - 20:12, 20:14

**traces** [1] - 25:25

**tract** [1] - 40:7

**Trading** [1] - 105:11

**trading** [3] - 201:19, 203:24, 205:24

**transaction** [14] - 43:14, 43:17, 65:22, 66:9, 67:4, 87:11, 132:3, 132:11, 132:13, 134:14, 184:8, 209:24, 210:1

**transactions** [49] - 46:15, 49:17, 54:13, 56:9, 56:17, 61:13, 61:24, 62:3, 64:22, 66:24, 70:5, 70:6, 70:16, 70:20, 71:16, 71:20, 87:9, 89:16, 90:14, 91:24, 93:6, 99:4, 99:16, 99:22, 100:6, 103:20, 103:22, 131:24, 147:7, 147:24, 149:5, 149:6, 149:13, 150:10, 151:3, 151:11, 153:18, 154:1, 154:9, 154:11, 154:15, 158:4, 158:12, 158:13, 169:5, 195:7, 195:8, 198:13, 198:14

**transcript** [4] - 38:25, 40:4, 41:9, 43:12

**transcripts** [1] - 3:9

**transforming** [1] - 114:9

**transition** [1] - 84:11

**translate** [1] - 69:12

**tremendous** [1] - 198:8

**trial** [7] - 104:13, 104:23, 130:18, 130:19, 138:21, 139:1, 172:15

**tried** [2] - 122:23, 122:24

**triggered** [4] - 24:7, 34:25, 35:10, 37:14

**triggering** [1] - 181:25

**troubled** [4] - 181:2, 200:25, 201:1, 201:9

**true** [11] - 1:24, 50:23, 51:10, 53:14,

54:17, 122:6, 127:17, 158:15, 186:9, 193:2, 194:9

**truly** [4] - 115:8, 127:3, 208:4, 209:20

**trust** [7] - 22:17, 22:20, 75:22, 89:7, 91:16, 92:15, 146:25

**Trust** [2] - 114:11, 208:15

**truth** [1] - 211:9

**try** [10] - 58:23, 82:7, 111:13, 152:14, 163:23, 182:21, 183:19, 184:14, 199:4, 199:22

**trying** [10] - 7:25, 37:9, 94:22, 105:23, 123:13, 135:25, 169:4, 185:2, 192:21, 207:8

**Tuesday** [4] - 38:24, 58:17, 113:18, 214:14

**turn** [12] - 17:15, 19:3, 20:10, 27:25, 28:17, 28:25, 32:12, 39:15, 41:5, 45:19, 46:4, 46:17, 48:2, 63:8, 67:16, 78:9, 81:6, 88:10, 88:18, 90:25, 92:9, 156:9

**turned** [3] - 16:7, 42:24, 43:7

**TV** [1] - 16:7

**Twenty** [1] - 102:17

**twenty** [1] - 159:6

**Twenty-five** [1] - 102:17

**twenty-two** [1] - 159:6

**two** [60] - 3:19, 6:1, 6:2, 6:17, 7:11, 7:17, 9:25, 10:20, 11:2, 11:5, 12:2, 12:16, 12:20, 13:1, 19:21, 20:9, 27:9, 34:19, 37:4, 37:5, 44:2, 44:7, 46:17, 48:11, 49:10, 49:13, 52:7, 79:10, 79:12, 81:21, 86:15, 87:12, 88:25, 92:4, 92:9, 94:4, 94:5, 95:8, 98:22, 98:24, 103:6, 130:16, 131:23, 139:11, 139:22, 144:21, 153:16, 159:6, 160:8, 162:14, 165:3, 167:1, 167:8, 174:15, 183:8, 195:16, 206:9, 215:14

**two-and-a-half** [1] - 9:25

**type** [4] - 147:2, 148:23, 153:17, 154:12

**types** [3] - 149:1, 153:5, 189:4

**typical** [2] - 30:15, 146:4

# U

**U.S** [7] - 10:12, 43:10, 105:12, 106:2, 200:6, 209:21, 210:7

**U.S.C** [1] - 1:24

**ultimately** [1] - 57:5

**unable** [3] - 21:17, 23:16, 50:6

**unaffiliated** [1] - 137:11

**unanimously** [1] - 78:20

**under** [36] - 7:1, 22:13, 23:9, 37:1, 37:9, 46:7, 46:9, 46:25, 57:6, 57:7, 74:10, 87:7, 87:15, 89:7, 100:18, 132:9, 132:12, 138:13, 139:4, 146:7, 146:25, 152:10, 156:14, 164:21, 170:23, 171:3, 171:17, 171:19, 171:21, 172:17, 175:17, 178:8, 181:11, 188:20, 190:23, 209:2

**understood** [5] - 12:13, 35:22, 36:1, 37:4, 40:5

**undo** [1] - 67:3

**undoes** [1] - 66:3

**unfolding** [1] - 200:17

**unheard** [2] - 69:6, 69:8

**unilateral** [2] - 63:24, 64:10

**unique** [1] - 208:10

**UNITED** [2] - 1:1, 1:11

**United** [3] - 1:8, 60:25, 208:15

**unjust** [1] - 70:19

**unless** [2] - 65:22, 104:23

**unpaid** [3] - 165:2, 165:6, 167:1

**unreasonable** [1] - 200:11

**unsafe** [25] - 22:16, 22:19, 31:22, 32:3, 33:21, 34:4, 36:4, 36:8, 36:24, 50:19, 50:21, 51:4, 51:5, 51:8, 53:12, 53:20, 54:8, 59:10, 61:9, 63:15, 70:18, 75:7, 100:2, 186:5, 186:6

**unsealing** [1] - 117:18

**unsound** [15] - 22:17, 22:19, 31:22, 32:3, 33:22, 34:4, 36:4, 36:10, 36:24, 59:10, 61:9, 63:15, 70:18, 75:7, 100:2

**unusual** [3] - 30:18, 30:19, 206:13

**up** [42] - 20:25, 41:11, 41:12, 45:3, 47:7, 54:15, 58:9, 60:8, 66:13, 71:10, 72:25, 96:12, 98:22, 98:24, 110:10, 113:13, 119:14, 121:9, 122:17, 124:24, 128:13, 136:13, 136:16, 140:13, 148:22, 159:20, 164:9, 167:17, 170:4, 171:6, 176:1, 180:24, 187:13, 188:1, 197:21, 201:20, 205:5, 205:17, 205:5, 212:22, 214:19, 216:7

**upgraded** [4] - 202:12, 202:21, 203:12, 203:13

**USC** [1] - 31:21

**utilizing** [1] - 49:14

---

## V

**Valentine's** [1] - 126:11

**valuable** [1] - 112:1

**value** [11] - 46:7, 46:25, 47:13, 62:12, 91:17, 150:3, 164:14, 169:3, 209:19, 209:24, 210:1

**valued** [1] - 202:1

**various** [6] - 25:10, 41:16, 70:19, 185:25, 189:5, 189:18

**Vassalluzzo** [1] -

141:1

**verbatim** [2] - 15:8, 156:13

**Vernon** [45] - 6:19, 8:2, 8:5, 8:7, 8:15, 11:18, 11:21, 12:4, 12:22, 13:6, 13:21, 24:13, 25:20, 26:19, 27:7, 28:22, 29:9, 29:10, 46:12, 52:4, 59:9, 60:17, 61:1, 70:15, 71:11, 79:19, 80:6, 80:7, 80:11, 81:12, 82:21, 82:24, 83:5, 83:13, 83:20, 84:9, 84:10, 84:13, 84:16, 85:8, 94:9, 94:13, 108:18, 119:21, 159:14

**VERNON** [7] - 1:3, 2:1, 2:2, 119:17, 119:19, 216:11, 216:12

**version** [2] - 189:6

**versions** [3] - 188:15, 188:16, 189:3

**versus** [1] - 105:12

**vest** [2] - 164:8

**vesting** [1] - 164:9

**viability** [1] - 113:1

**video** [3] - 110:5, 121:21, 210:6

**view** [6] - 40:17, 153:2, 172:17, 172:19, 172:22, 190:10

**violations** [2] - 70:18, 87:13

**visibility** [1] - 151:9

**vitality** [1] - 113:1

**vote** [2] - 96:9, 96:18

**voted** [2] - 96:9, 96:13

**vs** [1] - 1:5

---

## W

**W-O-J-C-I-K** [1] - 187:2

**wait** [5] - 101:22, 117:19, 204:1, 204:3, 215:4

**waiting** [1] - 117:18

**waive** [1] - 104:9

**waived** [5] - 103:6, 104:12, 104:23, 106:20, 108:11

**walk** [1] - 157:14

**walking** [1] - 138:8

**wants** [3] - 58:24, 117:3, 117:5

**warranted** [1] - 55:22

**Warren** [3] - 212:6, 212:7, 212:8

**WAS** [30] - 2:4, 2:5, 2:6, 2:7, 2:9, 2:10, 2:11, 2:12, 2:13, 2:14, 102:18, 102:25, 108:17, 108:23, 110:4, 112:3, 116:17, 117:15, 134:22, 159:8, 216:16, 216:18, 216:20, 216:22, 217:1, 217:3, 217:5, 217:7, 217:9, 217:11

**Washington** [4] - 10:18, 82:22, 84:13, 111:13

**waste** [1] - 135:23

**watch** [1] - 166:1

**water** [2] - 187:7, 187:8

**ways** [5] - 132:9, 154:7, 201:18, 201:22

**Wednesday** [1] - 213:2

**week** [24] - 7:3, 7:4, 7:5, 7:6, 7:7, 7:13, 7:17, 7:19, 122:22, 123:7, 212:18, 212:22, 213:3, 215:7, 215:16, 215:17, 216:2, 216:3

**weekend** [3] - 58:19, 213:4, 216:8

**weeks** [1] - 7:17

**Weintraub** [1] - 105:12

**well-establish** [1] - 208:11

**WERE** [5] - 2:8, 109:10, 216:25

**Wharton** [5] - 120:16, 120:17, 120:18, 120:19, 120:20

**whereas** [4] - 31:18, 60:24, 61:8, 98:2

**whole** [11] - 64:24, 100:14, 106:2, 113:19, 117:1, 130:18, 138:18, 139:7, 148:11, 152:16, 189:25

**wife** [4] - 49:16, 121:10, 123:18, 135:9

**wife's** [6] - 50:13, 141:25, 143:1,

158:15, 183:22, 192:22

**wild** [1] - 139:2

**William** [1] - 79:18

**WILLIAM** [1] - 1:17

**win** [1] - 142:4

**winds** [1] - 71:10

**witch** [2] - 169:4, 199:4

**withdraw** [3] - 49:2, 151:2, 190:8

**withdrawal** [1] - 93:9

**withdrawing** [4] - 3:6, 90:3, 108:19, 150:9

**withdrawn** [3] - 3:5, 90:6, 93:14

**withdrew** [1] - 91:9

**WITNESS** [10] - 74:1, 74:3, 119:17, 119:21, 119:23, 139:18, 184:13, 184:15, 186:22, 212:24

**witness** [28] - 4:3, 8:24, 8:25, 9:2, 9:4, 9:11, 9:13, 12:9, 27:4, 58:4, 58:15, 111:4, 111:25, 112:5, 119:3, 119:6, 119:11, 131:10, 142:14, 169:23, 170:1, 170:9, 191:5, 208:18, 214:3, 215:3, 215:7, 215:14

**witness'** [2] - 128:11, 128:18

**witnesses** [4] - 104:4, 215:8, 215:16

**Wocjik** [1] - 57:16

**Wojcik** [7] - 185:14, 187:11, 187:15, 187:21, 188:19, 189:19, 190:14

**Wojcik's** [1] - 187:2

**word** [11] - 43:24, 62:17, 69:18, 73:1, 73:23, 73:24, 98:5, 98:8, 98:13, 144:17, 186:5

**words** [8] - 86:15, 97:21, 163:13, 164:8, 185:4, 192:15, 203:1, 212:1

**world** [5] - 113:21, 147:14, 147:16, 151:15, 173:19

**worthy** [1] - 167:7

**woven** [1] - 127:3

**write** [8] - 18:19, 51:7, 165:21, 165:23, 166:6, 202:19, 204:1,

204:19

**writer** [1] - 70:9

**writing** [6] - 8:8, 13:16, 45:17, 102:19, 194:7

**written** [12] - 6:4, 19:15, 26:17, 53:11, 79:10, 107:8, 125:5, 173:25, 174:17, 177:25, 180:25, 181:14

**wrongdoing** [1] - 65:2

**wrote** [14] - 49:2, 50:23, 51:7, 51:10, 53:9, 55:24, 56:11, 56:19, 57:9, 68:7, 76:12, 94:21, 111:12, 196:23

---

## Y

**year** [38] - 41:15, 65:1, 81:6, 81:7, 81:19, 81:22, 92:18, 100:4, 104:5, 122:12, 122:14, 122:15, 122:16, 122:17, 122:18, 127:19, 127:20, 127:22, 129:12, 132:8, 134:4, 134:5, 140:2, 153:19, 154:22, 155:3, 161:22, 161:23, 162:19, 166:18, 183:18, 202:6, 203:7, 204:13, 210:14, 211:22, 212:5

**years** [54] - 9:25, 10:6, 11:4, 12:2, 27:9, 28:9, 30:8, 44:16, 56:3, 66:6, 86:22, 90:15, 92:4, 93:14, 107:8, 120:10, 120:11, 121:2, 121:14, 121:15, 122:4, 123:13, 125:22, 126:2, 127:7, 127:9, 127:13, 138:1, 138:2, 141:20, 146:11, 149:14, 149:17, 149:21, 153:9, 158:11, 160:13, 160:16, 161:1, 161:7, 180:8, 184:9, 185:9, 187:3, 187:11, 187:16, 187:17, 200:12, 208:20, 209:5, 211:1, 211:8, 211:23

**yesterday** [10] - 22:3,
113:8, 116:20,
117:17, 173:1, 173:6,
181:6, 191:15, 194:1,
210:7
**York** [2] - 203:25,
208:6
**yourself** [4] - 11:8,
14:5, 17:7, 179:25

## Z

**zero** [1] - 113:22
**zoned** [3] - 144:25,
145:3, 145:22
**zoning** [1] - 185:5
**zoomed** [1] - 117:9