**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

————————————————————————

VERNON W. HILL, II,

        Plaintiff,          CIVIL ACTION NUMBER:

        -vs-              09-3685

COMMERCE BANCORP, LLC,

        Defendant.
————————————————————————

      Mitchell H. Cohen United States Courthouse
      One John F. Gerry Plaza
      Camden, New Jersey 08101
      May  13, 2013

**B E F O R E**:      **THE HONORABLE ROBERT B. KUGLER**
                **UNITED STATES DISTRICT JUDGE**

**A P P E A R A N C E S**:

JACOBS AND BARBONE
BY:  EDWIN J. JACOBS, JR., ESQUIRE
     LOUIS M. BARBONE, ESQUIRE
ATTORNEYS FOR PLAINTIFF

BROWN & CONNERY, LLP
BY:  WILLIAM M. TAMBUSSI, ESQUIRE
     SUSAN LEMING, ESQUIRE
ATTORNEYS FOR DEFENDANT

Certified as true and correct as required by Title 28,
U.S.C., Section 753.
             /S/ Carl J. Nami

| | | | |
|---|---|---|---|
| VERNON HILL | 1 | 2 | 24 |
| CROSS EXAMINATION OF MR. HILL BY MR. TAMBUSSI: | 1 | 21 | 5 |
| REDIRECT EXAMINATION OF MR. HILL BY MR. JACOBS: | 1 | 112 | 1 |
| REDIRECT EXAMINATION OF MR. HILL BY MR. TAMBUSSI: | 1 | 134 | 24 |
| WILLIAM A. SCHWARTZ, JR. | 1 | 135 | 23 |
| DIRECT EXAMINATION OF MR. SCHWARTZ BY MR. JACOBS | 1 | 135 | 25 |
| CROSS EXAMINATION OF MR. SCHWARTZ BY MR. TAMBUSSI: | 1 | 140 | 3 |
| RICHARD MARSHALL ALEXANDER | 1 | 147 | 15 |
| DIRECT EXAMINATION OF RICHARD MARSHALL ALEXANDER BY MR. TAMBUSSI | 1 | 147 | 22 |
| CROSS EXAMINATION OF MR. ALEXANDER BY MR. JACOBS: | 1 | 206 | 12 |
| | | | |
| PLAINTIFF EXHIBIT 74 WAS RECEIVED IN EVIDENCE | 1 | 2 | 19 |
| PLAINTIFF EXHIBIT 63 WAS RECEIVED IN EVIDENCE | 1 | 8 | 1 |
| PLAINTIFF EXHIBIT 71 WAS RECEIVED IN EVIDENCE | 1 | 64 | 10 |
| luncheon Recess | 1 | 122 | 10 |
| brief Recess | 1 | 184 | 15 |
| sidebar discussion held off the record | 1 | 237 | 3 |
| discussion held off the record | 1 | 237 | 3 |

1              (open Court)

2         THE DEPUTY COURT CLERK:  All rise.

3         THE COURT:  Good morning.  Have a seat.

4         MR. BARONE:  Good morning, your Honor.

01:10     5         MR. JACOBS:  Good morning, your Honor.

6         MR. TAMBUSSI:  Good morning, your Honor.

7         MS. LEMING:  Good morning, your Honor.

8         THE COURT:  All right.  Ready?

9         MR. TAMBUSSI:  Yes, sir.

01:15    10         MR. JACOBS:  Yes, your Honor.

11         THE COURT:  Get the jury in, please.

12         MR. JACOBS:  Judge, before we bring them in, we

13    submitted a redacted version of P-74 which is the October 2,

14    2007 conference call to Mr. Tambussi on a Friday.  So I'd like

01:15    15    to remove that in its redacted form.

16         MR. TAMBUSSI:  No objection.

17         THE COURT:  Redacted.  So it will be received

18    evidence.

19    (PLAINTIFF EXHIBIT 74 WAS RECEIVED IN EVIDENCE)

01:16    20         MR. JACOBS:  Thank you, Judge.

21         THE COURT:  All right.  Mr. Hill, come on back up

22    here, please.

23         (Mr. Hill resumes the witness stand)

24    (**VERNON HILL**, HAVING PREVIOUSLY BEEN DULY SWORN AS A WITNESS

01:16    25    TESTIFIED AS FOLLOWS:)

1      (CONTINUED DIRECT EXAMINATION OF MR. HILL BY JACOBS)

2              THE WITNESS:  Good morning.

3              THE COURT:  Good morning.  How are you?

4              THE WITNESS:  Fine.

01:16    5              THE COURT: How was your weekend?

6              THE WITNESS:  Good.

7                   (Brief pause)

8              THE DEPUTY COURT CLERK:  All rise.

9                      (Jury present)

01:17   10              THE COURT:  Have a seat everybody.  We'll continue

11   with the questions you had on direct.

12              MR. JACOBS:  May I proceed Judge?

13              THE COURT:  You may.

14   Q.  Good morning Mr. Hill?

01:17   15   A.  Good morning.

16   Q.  Mr. Hill, I want to back up for a moment to Thursday when

17   you were explaining your interest calculations.  I believe I

18   neglected to ask you what type of interest you calculated.

19   A.  Yeah.  I went back and reviewed the agreement that calls

01:18   20   for interest on the unpaid amount.  It's simple interest which

21   means there's no interest calculated on the interest.

22   Q.  And did you use that simple interest calculation on each

23   one of the various prime rates plus two?

24   A.  Yes.  The agreement calls for rate to be the prime rate

01:18   25   plus two percent on the prime rate goes up and down during

1    this period of time.  But mostly went down.  So when we

2    calculated the interest, we calculated it prime plus two at

3    whatever the prime rate was on a simple interest basis.

4    Q.   Next topic.  The jury's heard a lot about the June 28,

5    2007 OCC cease and desist Consent Order.  And so have you,

6    right?

7    A.   Yes.

8    Q.   Right.  How many years have you been in banking?

9    A.   I started in 1973.

10   Q.   Are these types of orders common or uncommon?

11   A.   Fairly common.

12   Q.   To what extent in?

13   A.   Well, I went back and checked the OCC records and from

14   1990 on, there's five, five hundred plus.  And I also checked

15   almost every major Bank has one, two, three or four or five of

16   these outstanding now.

17   Q.   Next topic.  Do you recall Mr. Tambussi producing a bunch

18   of civil lawsuit complaints in Court for Mr. Fisher?

19   A.   Yes, I do.

20   Q.   Focus in on those filed in 2004, which Mr. Tambussi

21   described as relating to the Philadelphia Treasurer case.  Do

22   you recall those complaints?

23   A.   Yes, I do.

24   Q.   What happened to them all?

25   A.   They were dismissed for failing to show cause of, a cause

1    -- I believe they were dismissed with no finding against the

2    Bank and no payment.

3    Q.   Do you remember that Philadelphia Treasurer case?

4    A.   I do.

01:20    5    Q.   Did it involve any bankers?

6    A.   Yes.  There was three or four bankers.  Two from Commerce

7    one or two from Chase and a couple from Janney Montgomery.

8    Q.   Two from Commerce out of how many Commerce employees?

9    A.   Ten thousand about then.

01:20    10   Q.   And did the Bank support those two who were charged?

11   A.   We did.

12   Q.   All right.  Did the Bank pay for their legal feels, for

13   example?

14   A.   Yes, we did.  And I might say, counsel, that after I

01:20    15   left, I subsequently found out that approximately --

16           MR. TAMBUSSI:  Objection.  Objection.

17           MR. JACOBS:  Well, Judge, the responsiveness

18   objection is up to the propounder of the question.

19           THE COURT:  Hearsay.

01:20    20           MR. TAMBUSSI:  Hearsay.

21           THE COURT:  Hearsay is the objection.  Is this going

22   to be a hearsay answer?

23           MR. JACOBS:  Not having heard it, I don't know.

24           THE COURT:  Let's move to another question.

01:20    25           MR. JACOBS:  All right.

1    Q.   Other civil lawsuit complaints produced by Mr. Tambussi

2    for Mr. Fisher he said were filed in 2007 and thereabouts.

3    Are you familiar with them?

4    A.   Yes, I am.

01:21    5    Q.   Were civil complaints filed as a result of the OCC

6    investigation?

7    A.   Yes.

8    Q.   And how about as a result of the merger?

9    A.   Yes.  I don't remember all the facts after I left, but

01:21    10   there were several lawsuits filed early 2007 and then when the

11   merger of Commerce and Toronto Dominion were announced, I

12   believe those suits were merged into one.

13   Q.   And were you and other Directors mentioned in those

14   suits?

01:21    15   A.   All the Directors of the Bank were sued, of course.

16   Q.   You specifically?

17   A.   In the list, yes.

18   Q.   Now, Mr. Hill, do you recall, I asked Mr. Fisher if any

19   of the people who filed those suits actually got any money for

01:22    20   filing those suits and he didn't know?  Did they?

21   A.   Not that I know of.

22   Q.   Next topic.  P-63 is a letter which I'm going to show

23   you.

24        MR. JACOBS:  Judge, do we have the capability of

01:22    25   showing it direct just to the witness should I simply hand

8

| | | |
|---|---|---|
| | **1** | them a marked copy. |
| | **2** | THE COURT:  Electronically? |
| | **3** | MR. JACOBS:  Yes. |
| | **4** | THE COURT:  Apparently they don't have that software. |
| )1:22 | **5** | MR. JACOBS:  May I just approach a minute? |
| | **6** | THE COURT:  Sure. |
| | **7** | Q.  I'm going to going to show you a two page letter dated |
| | **8** | September 10, 2010 authored by one Andrew Sandler.  Take a |
| | **9** | look at it and tell me if you can recognize it. |
| )1:23 | **10** | A.  Yes, I do. |
| | **11** | Q.  What's it about or who is it about? |
| | **12** | A.  It's a demand from Skadden Arps who represented me for |
| | **13** | payment, demand from the Bank from Toronto Dominion I guess |
| | **14** | Commerce then that they pay me the monies owed under my |
| )1:23 | **15** | employment agreement. |
| | **16** | Q.  And it's signed by whom? |
| | **17** | A.  Andrew Sandler. |
| | **18** | Q.  And he was representing whom? |
| | **19** | A.  He was representing me. |
| )1:23 | **20** | MR. JACOBS:  Judge, may I now move it into evidence |
| | **21** | and display it. |
| | **22** | THE COURT:  Any objection. |
| | **23** | MR. TAMBUSSI:  No objection, your Honor. |
| | **24** | THE COURT:  All right, plaintiff's 63 is received in |
| )1:23 | **25** | evidence.  You may show it to the jury. |

```
 1   (PLAINTIFF EXHIBIT 63 WAS RECEIVED IN EVIDENCE)
 2   Q.   May have my copy back and you can look only the screen,
 3   Mr. Hill.  Thank you.
 4          MR. JACOBS:  Can we make the text of the letter
 5   bigger please, the two paragraphs?
 6   Q.   Now, Mr. Hill, does this letter refer to Mr. Tambussi's
 7   July 3, 2007 letter?
 8   A.   Yes, it does.
 9   Q.   And does it refer to your termination without cause?
10   A.   Yes, it does.
11          MR. JACOBS:  Judge, can I move this one a little
12   closer, too?
13          THE COURT:  Sure.  How is that, better?
14           (The jury yes.  Thank you)
15   Q.   Does it refer to the payments due you and when they are
16   due you?
17   A.   Yes, it does.  It says the payments are due one month
18   after I leave.
19   Q.   And on the second page, top paragraph.
20          MR. JACOBS:  Larger, please.
21   Q.   Does it quantify those payments as I'm looking
22   specifically at the figures of $11,250,000, $700,000 reference
23   to interest and so on?
24   A.   Yes, it does.
25   Q.   Okay.  Next topic.
```

1          MR. JACOBS:  Can we take that down, Judge.

2   Q.   Next topic.  P-53.

3          MR. JACOBS:  If we can draw that up, Judge?  That is

4   in evidence.

01:25   5   Q.   Purports to be an OCC order involving you.  Is it?

6   A.   Yes, it is.

7   Q.   Now, if we make the text a bit bigger.  Now, Mr. Hill,

8   the date of this order has been referred to as November 17,

9   2008.  Is that right?

01:26   10   A.   I guess so.

11   Q.   Do you recall the date that the SLC reported it?

12   A.   February 20, 0078.

13   Q.   Is that about nine months earlier?

14   A.   Yes, sir.

01:26   15   Q.   Now, Mr. Hill, did you and your lawyer negotiate this

16   order?

17   A.   Yes, we did.

18   Q.   And tell the jury what is the subject matter of this

19   order as stated on the first page in the second paragraph.

01:26   20   A.   I'm paraphrasing.  Real estate purchases, leases, joint

21   real estate development transactions involving myself and the

22   Bank.

23   Q.   Had that will topic been studied and reported upon by the

24   Special Litigation Committee?

01:27   25   A.   At great length.

1  Q.   And is that the report we just referred to nine months

2  earlier?

3  A.   Yes, sir.

4  Q.   Had the Special Litigation Committee made findings?

01:27  5  A.   Yes.

6  Q.   Are they the findings we've been talking about in Court

7  the last week or so?

8  A.   Yes, they are.

9  Q.   Okay.  And just generally, because the jury's heard it

01:27  10  all.  These leases in question, what was the basic finding by

11  the Special Litigation Committee?

12  A.   That these leases were financially advantageous to the

13  Bank.  I think the word they used was propitious.

14  Q.   Look at this second paragraph of this order and focus in

01:27  15  on the language without adjudication on the merits and solely

16  for purposes of this settlement.  How did you understand all

17  that?

18  A.   I took it to mean that there were no findings of facts.

19  That this was a settlement with the OCC to end the matter and

01:28  20  nobody admitted nor denied and it was done solely to settle

21  the matter.

22  Q.   How about this language which says the Comptroller finds

23  respondent neither admits nor denies.  How did you understand

24  all that.

01:28  25  A.   I understood all that as as boiler plate.

1    Q.   Now, if he we go to page 3 of this order.

2         MR. JACOBS:   If we can make that still a little bit

3    bigger?

4    Q.   Basically what requirements did you agree to follow in

01:28   5    the future?

6    A.   Well, first of all, when I signed this agreement, it was

7    important to me about what was not in this order.  There was

8    no finding, there was no finding of wrongdoing.  There was no

9    restriction on what I did going forward in banking.  This says

01:29  10    that if I am involved in a Bank going forward and we do

11    related party transactions with those banks, that those are

12    allowed and that they have to meet certain tests.  And the

13    reason I was happy to sign this is because requirements going

14    forward were basically what we've been doing with Commerce for

01:29  15    a long time.

16    Q.   You made mention of things not in the order.  Did this

17    order undo or revoke or vacate any of the prior real estate

18    transactions in which you were directly or indirectly

19    involved?

01:29  20    A.   None.

21    Q.   How about to those of your family members and associates?

22    A.   None.

23         MR. JACOBS:   Could we go to page five of the order?

24    Thank you.  Can we enlarge article four, please?  Thank you.

01:30  25    Q.   Mr. Hill, by this date, by mid November 2008, had you

*United States District Court*
*Camden, New Jersey*

1    filed a lawsuit to get yourself paid?

2    A.   Yes.

3    Q.   Now, this paragraph reads respondents:  You shall pay the

4    TD Bank sum of four million dollars in the form of an offset

01:30    5    to an agreed upon sum to be paid by TD Bank to respondent

6    pursuant to an agreement between TD Bank and respondent

7    resolving all litigation between them.  Is that what it says?

8    A.   Yes, sir.

9    Q.   And what was the purpose of that litigation?

01:30    10    A.   The context as I understood that clause that at that time

11    we were trying to resolve the payment of my funds from Toronto

12    Dominion Bank.  We had agreed on an amount.  This four million

13    was already reflected in the amount we agreed upon and this

14    was just a reflection of that.  It only applies if I agree to

01:31    15    a settlement with Toronto Dominion Bank which resolved all the

16    litigation.

17    Q.   Did it happen?

18    A.   It did not.

19    Q.   Did your lawsuit go on past this date?

01:31    20    A.   We're here today.

21    Q.   Next topic.  We've made reference during this trial to

22    450 Commerce Bank branches, give or take.  Where are they all?

23    A.   They're in nine states.  The majority as I'm sure the

24    jury knows, Commerce started as one office in Marlton and grew

01:31    25    to 450 in nine states.  The majority of our locations are in

1  the metropolitan Philadelphia and southern New Jersey area and

2  the metropolitan New York area.

3  Q.  Now, Mr. Hill, have you heard the phrase material adverse

4  effect used in this trial?

01:32  5  A.  I have.

6  Q.  Is Commerce Bank or was Commerce Bank I should say during

7  your tenure was it rated by the Federal regulatory

8  authorities?

9  A.  Yes.  You get a rating each year.

01:32  10  Q.  What kind of rating did Commerce Bank get?

11       MR. TAMBUSSI:  Judge, we covered this on Thursday,

12  this specific area.

13       MR. JACOBS:  Well, I may have asked a question about

14  it, Judge.  Now I'm moving into the chart which is P-75.

01:32  15       THE COURT:  You're moving into the what no the what?

16       MR. JACOBS:  I said I may have asked a question about

17  it, but now I'm moving into the charts the which are P-75 in

18  our exhibit book.  And this is simply an introduction to that.

19       THE COURT:  Well, these are in evidence.  The power

01:33  20  point presentation, 75?

21       MR. JACOBS:  Yes.

22       THE COURT:  It's already in evidence?

23       MR. JACOBS:  Well, I believe it is, Judge.  And I'm

24  about to ask questions about it.

01:33  25       THE COURT:  Okay.

1          MR. JACOBS:  Total of nine.

2          THE COURT:  All right.  Fine.

3          MR. JACOBS:  All right.

4    Q.   So the question is:  What kind of rating did Commerce

5    Bank get?

6    A.   Rating from whom?

7    Q.   From the Federal regulators?

8    A.   The Regulators rate banks what's called a camel rating.

9    It's one to five.  One being the best and five being the

10   worst.  Commerce was rated a number 2, maybe 95 percent since

11   then of the time.  So, it's obvious that we wouldn't have been

12   allowed to expand at this rate unless our regulator rates were

13   satisfactory.

14   Q.   All right.  Now, you just talked about expanding.  I'd

15   like to go to P-75.  And on the first page of P-75 -- well

16   that's the third page actually.  Go to the first page of P-75.

17   Okay.  And in the upper left-hand quadrant.

18          MR. JACOBS:  Can we focus in on that five year growth

19   chart?

20   A.   Yes.

21   Q.   Well I'm actually asking the tech guy.

22   A.   Oh, I'm sorry.

23   Q.   All right, there we are.  Would you kindly explain what

24   this chart depicts regarding the financial status of -- and

25   health of Commerce Bank?

1    A.   Well, these charts were in the 2006 annual report of

2    Commerce and they project -- and they project the growth over

3    the five years.  This particular chart we're looking at now

4    shows the growth in assets from 16 billion in 2002 to 45

01:35    5    billion at the end of 2006.  And the dotted line across the

6    top shows the compound annual asset growth rate of 29 percent

7    a year.  And along the bottom it shows the average annual

8    growth rates and assets, deposits and loans.

9    Q.   Now during those years, Mr. Hill, were real estate

01:35    10   companies in which you had an interest doing some business

11   with Commerce?

12   A.   Of course, I wasn't involved in the real estate after

13   2002.

14   Q.   Well, how about pre-existing?

01:35    15   A.   Yeah, of course.

16   Q.   All right.  And during those years was Shirley's company,

17   InterArch, doing business with Commerce?

18   A.   Yes.

19   Q.   Look at the bottom of the chart, average annual increase.

01:36    20   You already addressed assets.  Tell us about the deposits.

21   A.   Assets, deposits and loans all grew about the same rate,

22   29 or 30 percent.

23   Q.   Let's go to the bottom left chart, five year net income.

24   A.   Okay.

01:36    25   Q.   Explain that to us, please.

1    A.   All right.   This is the growth and the net income.

2    Beginning in 2002 we're at Commerce earned a hundred

3    45 million dollars to 2006 when its net profit was 299.   And

4    it shows the annual growth rate in the dotted line of

)1:36    5    21 percent a year compounded.

6    Q.   Was this all during your tenure?

7    A.   Yes, it was.

8    Q.   When you were the CEO?

9    A.   Yes.

)1:36    10    Q.   Okay.   Let's go to the upper right hand chart which says

11    total revenue.

12    A.   Yeah.   This is like the top line growth.   This is like

13    sales.   So, again, it shows sales revenue we call in banking

14    of eight hundred 30 million in 2002, growing to one billion

)1:37    15    866 in 2006 and shows a compound average growth rate of

16    23 percent.

17    Q.   And to a Bank, what are sales?

18    A.   Interest earned is the primary driver of that.

19    Q.   And lastly on this page, go to the bottom right.   Five

)1:37    20    year earnings per share.

21    A.   Yeah.   This shows you the earnings per share which is how

22    much the Bank earns divided by the number of shares

23    outstanding.   And this generally the number that drives the

24    stock price.   So it grew from 101, $1.01 in 02 to a dollar

)1:37    25    five five in 06.   And it shows a 12 percent average annual,

 1  compound growth rate.

 2  Q.   When we say a company stock such as Commerce Bank is

 3  trading at a multiple, a multiple of what?

 4  A.   Of this number.  So let's take the bottom number 202.  If

 5  the earning were $1.01 and the multiple was ten, the stock

 6  would be trading at $10.10.

 7  Q.   Did Commerce Bank stock trade at healthy multiples?

 8  A.   Very healthy.

 9  Q.   Do you recall the, plaintiff's exhibit P-74 conference

10  call among persons, including Bharat Masrani, Bob Felice, Ed

11  Clark and others?

12  A.   What's the date?

13  Q.   October 2, 2007?

14  A.   Yes, I do.

15  Q.   Do you recall the conference call?

16  A.   Yes, I do.

17  Q.   And did the TD persons Masrani and Clark, did they

18  mention this?

19  A.   Yeah, I have it here if you'd like me to read from it,

20  but my recollection generally is they talked about why they

21  bought Commerce and what they liked about Commerce and they

22  talked about it's long term compound growth rate and the model

23  that could provide even more growth.

24  Q.   Let's go to the next page of P-75.  And this is a single

25  chart with three entries on it.  That's it.  May we make that

1    a little bit bigger?

2         Explain this to us, Commerce Bank Growth Model.

3    A.   This is another chart showing the growth model of

4    Commerce, and this is a case that goes back to 1990 through

5    '07, 1990 through '07, so let me explain this.

6         In 1990, Commerce in assets of one billion with 27

7    stores and the market cap, which is the value of the company

8    in the stock market, was 24 million.  By 2000 that had grown

9    to assets of 8 billion 300 million with 150 stores and the

10   market had grown to 1 billion 500 million.  By 2007, assets

11   had grown to 45 billion 300 million with 428 stores.  And the

12   market cap, in other words that's the value of the company in

13   the stock mark, was $8,500,000,000.  The compound growth rate

14   of each type of chart, assets, deposits and loans, is shown on

15   the far right.

16   Q.   And what are those figures respectively?

17   A.   Assets grew at 9 percent, loans grew at 28 percent,

18   deposits grew at 30 percent annually compounded.

19   Q.   Mr. Hill, if we look at the 2002 number of stores, 150.

20   A.   2000.  You mean 2000.

21   Q.   Year 2000, number of stores, number of branchs, 150, and

22   if we look at the 2007 number of branchs, 428, and we subtract

23   the former from the latter, do we get 278?

24   A.   I think so.

25   Q.   And if we take the 8 effective years 2001, two, three,

1    four, five, six and seven, eight years, and if we divide that

2    into 278 branches would we get 34 and 3 quarters branchs per

3    year?

4    A.   Sounds right.

01:41    5    Q.   Is that a good average?

6    A.   Sounds right.

7    Q.   Is that a good average for growth?

8    A.   Yes.

9    Q.   Mr. Hill, did that all happen under your stewardship as

01:41    10   CEO?

11   A.   Yes, it did.

12   Q.   The third and last page of P-75 at the top says Commerce

13   Bank Deposits-Stock Price.  You want to explain that to us,

14   please?

01:42    15   A.   Right.  The bars along the bottom, which are blue, but

16   not on the side, show the deposits, in other words the amount

17   of money people have deposited with us, from March 1997

18   through December '07.  And roughly looking at the numbers,

19   deposits grew from roughly 4 billion to 45 billion.  So those

01:42    20   are the bars running across the bottom.  And that growth rate

21   was 29 percent a year compounded over each of these years.

22          The line bar with the boxes is the stock price.  And

23   this chart is meant to show how the stock price is driven by

24   the growth in deposits and it shows that the stock price in

01:43    25   March of '97 was 543 and the stock price in December of '07

1    was $42 and-a-half, and that is the compound growth rate of

2    23 percent.

3    Q.   Look at that stock price of 42.50, did you just say that

4    was December of '07?

01:43    5    A.   Yes.

6    Q.   Is it higher or lower than the stock price December 30,

7    '06?

8    A.   Yes, definitely higher.

9    Q.   Now, you see the annual growth figures for the ten-year

01:43    10   period?

11   A.   I do.

12   Q.   Deposits of 29 percent?

13   A.   Yup.

14   Q.   And stock price 23 percent?

01:43    15   A.   Yes, sir.

16   Q.   Are you proud of that?

17   A.   Absolutely.

18   Q.   All right.  Mr. Hill, any of these things that have been

19   investigated by the OCC, any of these things you've been

01:43    20   accused of doing, any civil suit and so on, can you find,

21   being as objective as you can, any material adverse effect on

22   the bank?

23   A.   .  I certainly can't find it, but more important the

24   market couldn't find it as reflected in the growth of the bank

01:44    25   and in the growth of the stock.

─────────── Hill - Cross - Tambussi ───────────

1        MR. JACOBS:  Those of all the questions I have of

2   Mr. Hill, Judge.

3        THE COURT:  Cross-examine, please.

4        MR. TAMBUSSI:  Thank you.

01:44   5   (CROSS EXAMINATION OF MR. HILL BY MR. TAMBUSSI:)

6   BY MR. TAMBUSSI:

7   Q.  Mr. Hill, this document that's on the screen now, do you

8   see it?

9   A.  Yes.

01:44   10  Q.  The 42.50 number, that came after -- that was the strike

11  price for the sale of the bank to TD Bank, right?

12  A.  Right.

13  Q.  All right, just so we're clear here, this is a document

14  that Mr. Jacobs wrote based on your information on Thursday.

01:44   15      MR. TAMBUSSI:  Can I move it closer to the jury,

16  Judge?

17      THE COURT:  Sure.

18  Q.  These numbers reflect the market?

19  A.  Yes.

01:44   20  Q.  Okay.  So the investigation of the OCC starts in December

21  of '06, correct?

22  A.  I believe so.

23  Q.  And the price was 35.27?

24  A.  33 -- I'm sorry, in December of '06?

01:45   25  Q.  Yes, sir.

Hill - Cross - Tambussi

1   A.   I think it was announced after the first of the year, so

2   the price at the end of January was 33.78.

3   Q.   Okay.  But the December 3, '06 number that you gave --

4   A.   35.27.

)1:45   5   Q.   35.27.

6   A.   Correct.

7   Q.   And then the investigation was announced, correct?

8   A.   Yes.

9   Q.   It was released to the shareholders in an SEC filing,

)1:45   10   correct?

11   A.   Correct.

12   Q.   And the stock went down?

13   A.   A very small amount.

14   Q.   Well, it went down from 35.27 to 33.78?

)1:45   15   A.   A very small amount.

16   Q.   Then in March after it's announced that there is not

17   going to be anymore branch openings, correct, the stock goes

18   down again, correct?

19   A.   A very install amount.

)1:45   20   Q.   But it when down?

21   A.   A very small amount.

22   Q.   And I didn't start to go back up again until your

23   resignation was announced, correct?

24   A.   I'm not sure about that.

)1:45   25   Q.   Well, your resignation was announced in the newspapers

—————————— Hill - Cross - Tambussi ——————————

1    and everywhere else on June 29, '07?

2    A.    The stock price on June 30th was 36.99.

3    Q.    Which is more than 33.78., correct?

4    A.    Um-hum.

)1:46    5    Q.    Yes, sir?

6    A.    What's your question?

7    Q.    I'm sorry, I just wanted you to say yes.

8    A.    I don't understand your question.  Repeat it.

9    Q.    36-99 is more than 33.78?

)1:46    10    A.    Yes, sir.

11    Q.    Thank you.  In fact, the stock then went up afterwards as

12    the sale to Toranto-Dominion, TD Bank, was announced, correct?

13    A.    Correct.

14    Q.    Thank you.  Just so I'm clear, you had nothing to do with

)1:46    15    the sale of Commerce Bank to TD Bank?

16    A.    I had everything to do with building the bank that they

17    bought, but nothing to do with the sale.

18    Q.    Thank you.  Okay.  Now, you've heard a lot of testimony

19    and you've testified yourself that the board of directors of

)1:47    20    Commerce Bank reviewed a lot of things, correct?

21    A.    I guess.

22    Q.    Well, do you recall stating that for the record here

23    before this jury between Thursday and today?

24    A.    I know the board of directors reviewed a lot of things.

)1:47    25    I can't remember what I said.

Hill - Cross - Tambussi

1    Q.   Okay.  And out of all the Directors, only three were
2    considered independent, correct?
3    A.   No, that's not true.
4    Q.   Well, didn't you testify that Lloyd Vassalluzzo and
01:47    5    Giordano, who formed the Special Litigation Committee, were
6    considered independent Directors?
7    A.   But I didn't say the other Directors were not.
8    Q.   Okay.  But you defined independent Directors, did you
9    not, as those who had no relationship to you, correct?
01:47    10   A.   No, I didn't.
11   Q.   You didn't say that?
12   A.   I did not.  Okay?  I said that those three did, but I
13   didn't say they are the only three we had.
14   Q.   But, my question to you is didn't you define before this
01:47    15   jury in your testimony on Thursday that Lloyd Vassalluzzo and
16   Giordano were independent because they had no relationship to
17   you?
18   A.   Correct.
19   Q.   Okay.  So now when we talk about the remaining Directors,
01:48    20   the folks that were on the board, Mr. Bershad, he was a member
21   of board of directors, correct?
22   A.   Yes, he was.
23   Q.   And he was a former partner at the Blank Rome law firm?
24   A.   Yes, he was.
01:48    25   Q.   And the Blank Rome law firm did millions of dollars in

Hill - Cross - Tambussi

1  legal work for the bank, correct?

2  A.   Just like yours, Bill.

3  Q.   Just like mine?

4  A.   Just like yours.

01:48   5  Q.   I'd like you to show me one time when my firm made

6  millions of dollars from the bank.

7  A.   Okay.  We'll get your bills out, Bill.

8  Q.   Okay.  All right, Mr. Di Francisco, he was a board

9  member?

01:48  10  A.   He was.

11  Q.   By the way, I was never one of your board members,

12  correct?

13  A.   No, you weren't.

14  Q.   Mr. Di Francisco's firm made at least hundreds of

01:48  15  thousands in legal fees from the bank?

16  A.   They collected fees, I don't know the amount.

17  Q.   Mr. Kerr, he was an early board member.  He's been on the

18  board for a number of years.

19  A.   Since the beginning.

01:49  20  Q.   Since the beginning.  An original investor.

21  A.   Correct.

22  Q.   Steven Lewis was a board member, correct?

23  A.   Correct.

24  Q.   He's partner of yours in business ventures, correct?

01:49  25  A.   Yes, he is.

Hill - Cross - Tambussi

1  Q.   Dan Ragone, Mr. Ragone --

2  A.   Yes.

3  Q.   -- a fine gentleman, he was an original board member too,

4  correct?

01:49  5  A.   No.

6  Q.   No?

7  A.   No.

8  Q.   Okay.  An early board member?

9  A.   I don't know the date.

01:49  10  Q.   Joseph Tarquini.

11  A.   Yes.

12  Q.   Original board member?

13  A.   Correct.

14  Q.   In fact, started the architecture for the bank.

01:49  15  A.   Correct.

16  Q.   So these were all people who were on your board, correct?

17  And they were paid, correct?

18  A.   Paid for what?

19  Q.   Well, they were paid fees, Director's fees, correct?

01:49  20  A.   Correct.

21  Q.   In fact, Mr. Bershad made 143,000 in directors' fees in

22  2007, correct?

23  A.   Whatever the report says, Bill.

24  Q.   Mr. Di Francisco, $144,500?

01:49  25  A.   I don't have the report.

──────── Hill - Cross - Tambussi ────────

1    Q.   Mr. Kerr, $161,000?

2    A.   Could be.

3    Q.   You don't have any reason to dispute these numbers, do

4    you?

01:49     5    A.   You'd have to show them to me.

6    Q.   Okay, we can do that.

7              MR. TAMBUSSI:  May I approach the witness, your

8    Honor.

9              THE COURT:  You may.

01:50    10              MR. TAMBUSSI:  I want to show the witness P-24.  It's

11    in evidence, Judge.

12              MR. JACOBS:  You got a page number?

13              MR. TAMBUSSI:  Page 80.

14              THE WITNESS:  I don't have a page 80.

01:51    15              MR. TAMBUSSI:  Well, let me show you my copy then,

16    Mr. Hill.  It will make it easier.

17              MR. JACOBS:  Here.  You want mine?

18              MR. TAMBUSSI:  Sure.

19              MR. JACOBS:  Just 80?

01:51    20              MR. TAMBUSSI:  Just 80.  No, no, it actually says 83

21    at the top.

22              MR. JACOBS:  You told him 80.

23              MR. TAMBUSSI:  Well, here it is.  Here's the page

24    number.

01:51    25              MR. JACOBS:  That's 78.

────────────── Hill - Cross - Tambussi ──────────────

         1          MR. TAMBUSSI:  Yeah, you gave me 78, I asked for 80.

         2          MR. JACOBS:  You want the bottom?

         3          MR. TAMBUSSI:  That's the one.

         4          May I approach, Judge?

01:51    5          THE COURT:  You may.

         6   BY MR. TAMBUSSI:

         7   Q.  Mr. Hill, I'm showing you page 80 of the document.  Do

         8   you see that document?

         9   A.  Yes, I do.

01:51   10   Q.  Do you recognize it as the Compensation Committee report?

        11   A.  This was for the year ended in 2007, right?

        12   Q.  That's correct, yes, sir.

        13   A.  I wasn't involved in this, but that's what it seems to

        14   be.

01:52   15   Q.  Okay.  But you were the chairman of the board of Commerce

        16   Bank in the beginning of 2007, correct?

        17   A.  Not when this was prepared.

        18   Q.  In the beginning of 2007 you were of the chairman of

        19   board?

01:52   20   A.  Definitely.

        21   Q.  Okay, all right.  So we know that Mr. Bershad made

        22   $140,000 in fees and total compensation of $375,104 as a

        23   Director, correct?

        24   A.  Directors receive fees, Directors all receive options,

01:52   25   and this chart reflects those.

─── Hill - Cross - Tambussi ───

1   Q.   And Mr. Bershad made $375,000 plus in 2007, correct?

2   A.   In fees and options.

3   Q.   Right.  Mr. Di Francisco, total compensation, $505,883,

4   correct?

01:52   5   A.   In fees and options.

6   Q.   Mr. Kerr, $617,664 in fees and options, correct.

7   A.   Correct.

8   Q.   Steve Lewis, your partner, $436,391 in fees and options

9   in 2007, correct?

01:53   10   A.   Yes.

11   Q.   Mr. Ragone, $392,455 in fees and options in 2007,

12   correct?

13   A.   Yes.

14   Q.   William Schwartz, $1,016,763 in fees and options correct?

01:53   15   A.   Yes.

16   Q.   Joseph Tarquini, $832,194 in fees and options in 2007,

17   correct?

18   A.   Yes.

19   Q.   In addition, Mr. Giordano, who was on the SLC, made

01:53   20   $236,864, correct?

21   A.   Yes.

22   Q.   Mr. Lloyd was on the Special Litigation Committee,

23   $589,246, correct?

24   A.   Yes.

01:53   25   Q.   And Mr. Vassalluzzo, was also on the Special Litigation

Hill - Cross - Tambussi

1   Committee, $693,629, correct?

2   A.   Yes.

3   Q.   Now, this is the body of people who reviewed all the

4   insider related party transactions, is that what you are

01:54   5   saying?

6   A.   Yes.

7   Q.   This is the body that reviewed all your deals with Site

8   Development, correct?

9   A.   The independent Real Estate Committee reviewed the deals.

01:54   10   Q.   Who was on the independent real estate committee, people

11   from this board?

12   A.   Yes.

13   Q.   And this was the body that reviewed all the deals with

14   the single purpose limited liability corporation set up,

01:54   15   correct?

16   A.   Yes.

17   Q.   And this is the body that reviewed all the deals with

18   InterArch, correct?

19   A.   Yes.

01:54   20   Q.   All the leases were approved by this board of directors,

21   correct?

22   A.   Yes.

23   Q.   It was not an independent board, was it?

24   A.   Absolutely 100 percent.

01:54   25   Q.   It was your board, wasn't it?

Hill - Cross - Tambussi

1   A.   No, no, it was an independent board as required by the

2   SEC and required by about the OCC.  You didn't show me the

3   parts that describe the independence of this board, you only

4   showed me one page.  Show me the whole -- show me the whole

01:55   5   thing.

6   Q.   Well, you can have the whole report.

7   A.   Well, show me of the whole thing.

8   Q.   Well, see, the way this works --

9   A.   These reports -- the boards are required by law to be

01:55   10   independent.

11   Q.   Well, each one of those people were handsomely

12   compensated --

13   A.   They are required by law to be independent.

14   Q.   Mr. Hill, I'm going to try one or time.  Each member of

01:55   15   this board was handsomely compensated by Commerce Bank,

16   correct?

17   A.   Directors of every public company in America receive fees

18   and options in most cases.

19   Q.   To this extent?

01:55   20   A.   Absolutely.

21   Q.   Now, we talked about a little bit about Mr. Bershad

22   having been a member of Blank Rome law firm, correct?

23   A.   Yes.

24   Q.   This is the same Blank Rome firm that provided the legal

01:55   25   opinion in the De Maria indemnification case?

—— Hill - Cross - Tambussi ——

1   A.   Which turned out to be right.

2   Q.   Is this the same Blank Rome law firm that rendered the

3   legal opinion in De Maria case?  Yes or no?

4   A.   Yes.

01:56    5   Q.   Is this the same law firm that wrote your employment

6   agreement?

7   A.   I don't know about that.

8   Q.   You don't know about that?

9   A.   No.

01:56    10   Q.   Didn't Mr. Weissman work on this report -- on this

11   employment agreement?

12   A.   I don't recall.

13   Q.   Let's talk about the Special Litigation report.  You read

14   this report?

01:56    15   A.   Yes, I have.

16   Q.   Can we put up the special litigation report at page five,

17   please.

18        On page five do you see on the report where it states

19   "as will be noted?"  Do you see that paragraph.  "As will be

01:56    20   noted, however?"

21   A.   No.

22   Q.   Sorry.  Page five of the report.  Investigative process

23   midway through says "as will be noted."  Do you see that?

24   A.   Yes.

01:57    25   Q.   Doesn't it read "As will be noted, however, the SLC did

─── Hill - Cross - Tambussi ───

1 not receive full cooperation from Mr. Hill or from certain

2 Blank Rome attorneys who previously represented the bank.

3 Lacking the subpoena power to compel testimony and also the

4 power to immunize witnesses, to obtain reluctant testimony the

01:57 5 SLC was limited in its ability to counter such

6 noncooperation."

7   Did I read that correctly?

8 A. Correct.

9 Q. You didn't cooperate with the Special Litigation

01:57 10 Committee, did you?

11 A. Why should I?  They refused to pay on my agreement.

12 Q. Did you -- the Special Litigation Committee?

13 A. The bank.

14 Q. Okay.  Did you read page 9 of the Special Litigation

01:57 15 Committee report?

16 A. Wait a minute, let's stay on this page for a minute.  I'd

17 just like to make one other comment.

18 Q. I'm sorry, Mr. Hill.  Thank you for your answer, but --

19 A. Oh, you don't want me to talk about the independence of

01:58 20 this committee that's set forth in the report, is that right,

21 Bill?

22 Q. No.

23 A. Ah.

24 Q. I want you to talk as much as you want, Mr. Hill, but I

01:58 25 just want you to answer my questions first.  Okay?  Then you

Hill - Cross - Tambussi

1    can talk as much as you want.  Okay?  Do you understand?  Do

2    you understand?

3    A.   Yeah.

4    Q.   Okay.  Do we have page 9 up?  Okay, in page 9 do you see

01:58    5    where it starts, "In addition to meeting with and interviewing

6    the preceding individuals, the SLC's investigation has

7    included the following."  See that part?

8    A.   Yes, I do.

9    Q.   Does it say "Requested information from Mr. Hill

01:58   10    regarding his use of bank vendors at his personal residence.

11    This request was made through Andrew L. Sandler, Esquire from

12    Skadden Arps Slate Meagher and Flam, LLP, counsel to Mr. Hill.

13    As described more fully below, Mr. Hill's counsel did not

14    provide any relevant information in response to this request

01:59   15    from the SLC."

16          Did I read that correctly?

17    A.   Yes, you did.

18    Q.   Did your attorneys refused to provide information to the

19    Special Litigation Committee report?

01:59   20    A.   Yes they did.

21    Q.   All right.  Now, with regard to the De Maria case that

22    was reviewed by the Special Litigation Committee report, you

23    testified on Thursday that the contractor couldn't sue the

24    bank under the terms of his agreement with the bank, so he

01:59   25    sued InterArch as the architect."  Do you remember saying

─── Hill - Cross - Tambussi ───

1  that?

2  A.   That's the way I recall it, yes.

3  Q.   You also said before this injury that InterArch got sued

4  on some wild legal theory.  Do you recall saying that?

02:00  5  A.   Yes, I do.

6  Q.   Do you recall saying -- well, wasn't the theory tortious

7  interference with a business relationship?

8  A.   That was the theory.

9  Q.   Okay.  You recognize that, do you?

02:00  10  A.   Certainly.

11  Q.   And you also testified that after InterArch lost on

12  appeal, InterArch's lawyer made a demand on the bank to

13  indemnify them on the terms of the architectural agreement.

14  Do you recall starting that before this jury.

02:00  15  A.   Yes, I do.

16  Q.   Wasn't InterArch's lawyer also Commerce Bank's lawyer?

17  A.   I think both firms used the lawyer.

18  Q.   In fact, didn't InterArch's lawyer do a lot of work more

19  Commerce Bank?

02:00  20  A.   He did some.

21  Q.   Now, your trial testimony continued last Thursday, As I

22  remember the board of the bank formed a separate committee,

23  hired outside lawyers and after several months reviewed the

24  whole matter and decided to reimburse InterArch.  Do you

02:00  25  recall saying that?

——————————— Hill - Cross - Tambussi ———————————

**1**   A.   Yes, I do.

**2**   Q.   And you stated that one of the lawyers was -- one of the

**3**   law firms was Blank Rome.  Correct?

**4**   A.   Correct.

02:00   **5**   Q.   And Blank Rome was actually doing all the bank's

**6**   corporate governance work, correct?

**7**   A.   They were doing a lot of work for us.

**8**   Q.   Now, did you read the Special Litigation Committee report

**9**   on the De Maria case?

02:01   **10**   A.   Yes, I did.

**11**   Q.   Did you read the part that said, "On October 231, 1994,

**12**   De Maria brought an arbitration action against the bank with

**13**   the American Arbitration Association for breach of contract.

**14**   The arbitrators awarded De Maria $205,270 for the interior

02:01   **15**   office and HVAC contracts $49,650 for damages suffered by De

**16**   Maria related to all other contractual topics, and $69,554.66

**17**   for counsel fees."  Do you recall that happening?

**18**   A.   Yes, I do.

**19**   Q.   So do you recall that the De Maria folks sued the bank?

02:02   **20**   A.   No, I don't.  That's not a suit.

**21**   Q.   Okay.  They moved before -- they moved a claim before the

**22**   bank that was handled in arbitration?

**23**   A.   There was no suit.

**24**   Q.   They moved a claim before the bank?

02:02   **25**   A.   Fine.

─────── Hill - Cross - Tambussi ───────

1    Q.    That was handled in arbitration, correct?

2    A.    Yes.

3    Q.    And they won, correct?

4    A.    Yes, yes.

02:02   5    Q.    And that was affirmed by the Law Division, the trial

6    court in New Jersey, correct?

7    A.    I don't know about that.

8    Q.    Well, did you read the Special Litigation Committee

9    report that said at Footnote 3, "The awards at arbitration

02:02  10    were confirmed in the Law Division and affirmed on appeal,"

11    and it cites the Law Division case, the Appellate Division

12    case, and the Supreme Court case?

13    A.    If that's what the report says, I'm sure it's true.

14    Q.    Now, with regard to the claim against InterArch, the jury

02:02  15    in the claim against InterArch awarded compensatory damages in

16    the amount of $750,000 against InterArch and additional

17    punitive damages, correct --

18    A.    Correct.

19    Q.    -- against Shirley Hill in the amount of $75,000 and

02:03  20    against Mr. Klum, a former employee, more $75 for interference

21    with contractual relationship between De Maria and the bank.

22         Is that what happened?

23    A.    Yes.

24    Q.    Now in posttrial motions the trial court supplemented

02:03  25    that award by awarding $155,388.75 in prejudgment interest,

——————————— Hill - Cross - Tambussi ———————————

1    correct?

2    A.   I don't recall that.

3    Q.   Well, it's all in the special litigation report?

4    A.   Well, then I guess it's true.

02:03  5   Q.   Do you recall reading in the Special Litigation Committee

6    report these words?  "To this point then, De Maria's claims

7    against the bank have been adjudicated and/or reviewed in five

8    separate tribunals from the AAA arbitrators to the New Jersey

9    Court System, to the Supreme Court of the United States and De

02:03  10  Maria's claims against InterArch, Shirley Hill and Raymond

11   Klum have been adjudicated in three separate tribunals, in the

12   New Jersey Court System from a jury trial to the Supreme Court

13   of New Jersey.  De Maria prevailed in every forum."

14        Do you recall reading those words?

02:04  15  A.   I don't.

16   Q.   Is it true?

17   A.   I really don't know.

18   Q.   You don't know?

19   A.   No.

02:04  20  Q.   Now, this lawyer that made the demand on the bank to

21   indemnify Shirley Hill, do you recall him being a gentleman by

22   the name of Oliver Frey, who has since passed?

23   A.   I do.

24   Q.   And you know that Mr. Frey wrote a letter to the bank,

02:04  25  correct?

──────── Hill - Cross - Tambussi ────────

**1**  A.   I do.

**2**  Q.   And that letter is referenced in the Special Litigation

**3**  Committee report, correct?

**4**  A.   Yes.

02:04  **5**  Q.   In fact, on page 16 of the Special Litigation Committee

**6**  report the letter's quoted, correct?

**7**  A.   I don't have the report.

**8**  Q.   Well, let me read it to you see if this refreshes your

**9**  recollection.  "In short, Frey is a bank lawyer asserting a

02:04  **10**  demand on behalf of the bank chairman's wife against the bank

**11**  and his entire legal effort is paid for by the bank."

**12**       Do you recall reading those words?

**13**  A.   Yes.

**14**  Q.   And they are all true, correct?

02:05  **15**  A.   I haven't -- the last sentence, his entire legal effort

**16**  is paid for by the bank, I don't know what that means.

**17**  Q.   It continues on, the Special Litigation Committee report.

**18**  "If his indemnification demand were refused or even resisted,

**19**  Frey makes it clear in advance that he's not in a position to

02:05  **20**  take any more aggressive action, such as filing a lawsuit.

**21**  Moreover, there was an inherent conflict of interest in Frey

**22**  representing the defendant seeking indemnification, but also

**23**  representing the bank in "many other matters because of the

**24**  divergent interest of the parties, namely the agent

02:05  **25**  InterArch's interest was to be indemnified while the

─────── Hill - Cross - Tambussi ───────

1   principal, the bank's interest, theoretically would have been

2   to avoid indemnification at all costs."

3         Do you remember sewing that?

4   A.   That's what it says.

02:06   5   Q.   Do you agree with it?

6   A.   No.

7   Q.   Do you see that it continues.  "It is not clear whether

8   anyone at the bank or Blank Rome, the bank's outside counsel,

9   for this matter ever asserted Mr. Frey's conflict."

02:06   10        Do you see those words?

11  A.   I see it.

12  Q.   Do you agree with that?  Was that ever asserted?

13  A.   I have no idea.  I was not involved in how the bank

14  responded.

02:06   15  Q.   I'm going to ask you to look at page 17 of the SLC

16  report.  Do you recall mentioning a dead gentleman by the name

17  of Mr. Wojic?

18  A.   Yes.

19  Q.   He's the guy you say made the mistakes on the branch

02:06   20  applications, right?

21  A.   Correct.

22  Q.   He's the person that worked directly for you, correct?

23  A.   He worked for me, yes.

24  Q.   He reported directly to you too, correct?

02:06   25  A.   I believe so.

————— Hill - Cross - Tambussi —————

1  Q.  You believe so or it is so?

2  A.  I think so.

3  Q.  You are not sure about that?

4  A.  He reported to me.

02:06  5  Q.  Now, did you know that Mr. Wojic reviewed the Blank Rome

6  memorandum?

7  A.  I was not involved in how the bank responded, it was

8  handled by a committee of the board.

9  Q.  Did you know that Mr. Wojic had reviewed the Blank Rome

02:07  10  memorandum?

11  A.  Maybe I knew after, but I was not involved in it.

12  Q.  By the way, do you have the power to fire Mr. Wojic?

13  A.  Probably.

14  Q.  Page 17 of the Special Litigation Committee report, the

02:07  15  report that you read, says "After reviewing the Blank Rome

16  memorandum, David Wojic, the company's senior executive with

17  responsibility for dealing with the OCC, expressed some

18  serious reservations about the proposed indemnification."

19       Do you recall reading those words?

02:07  20  A.  I do.

21  Q.  And this is a footnote, right?  You recall reading the

22  footnote?

23  A.  I see it.

24  Q.  Did you read it?

02:07  25  A.  I don't know.

——— Hill - Cross - Tambussi ———

1  Q.  All right.  Well then the footnote says, "In an e-mail to

2  Bershad," that's Mr. Bershad, a member of your board who at

3  that time was a member of Blank Rome, correct?

4  A.  Yes.

02:08  5  Q.  The law firm providing the legal opinion to get Shirley

6  Hill money, correct?

7  A.  To handle this matter, yes.

8  Q.  The footnote states, "In an e-mail to Bershad, Wojic

9  warned the bank what Commerce pays InterArch is already a big

02:08  10  number and its gets bigger every year.  I don't know how

11  indemnification would have to be disclosed, but I know that I

12  wouldn't want to give a union shareholder additional

13  ammunition to shoot at the Commerce-InterArch relationship.

14  Is indemnification something that might lead to a shareholder

02:08  15  suit over the relationship?  I don't know, but I see a lot of

16  risks to Commerce and to InterArch that don't seem worth

17  taking given the money that InterArch has made off of Commerce

18  in the past and what they will continue to make in the future.

19  I presume that InterArch has appropriate professional conduct

02:08  20  insurance to offset some, if not the brunt of this verdict."

21          Did I read it correctly so far?

22  A.  Yes.

23  Q.  It continues, Mr. Wojic continues.  "I believe that the

24  OCC would look at any indemnification of InterArch in a very

02:09  25  circumspect manner and will likely be very judgemental in

Hill - Cross - Tambussi

1    reviewing how the board handles the situation.  Even the

2    purest of relationships must continually prove itself as being

3    above reproach."

4          Did I read all that correctly?

02:09    5    A.   Yes, you did.

6    Q.   Did you ever read that?

7    A.   Not probably until the Special Litigation Committee

8    report.

9    Q.   It continues.  "Mr. Wojic further noted, to the extend

02:09    10    that the verdict in favor of De Maria withstands appeal and

11    InterArch's actions are reviewed as intention interference and

12    were apart from actions as agents in context of Commerce's

13    lost arbitration case, why should Commerce paid for their

14    actions?  Again, if I were an examiner reviewing the matter, I

02:10    15    would ask how the bank might react to such a claim from an

16    unrelated vendor.  Given that the bank already had to pay the

17    contractor via the lost arbitration action, given that

18    InterArch failed to give Commerce timely notice of its intent

19    to hold Commerce liable nor the jury finding against them, and

02:10    20    given the report prepared by Blank Rome's attorneys'

21    suggestion that the compensatory damages were dictated from a

22    finding that the actions of the claimants necessitated the

23    award of punitive damages, would we be quick to pay under

24    different circumstances?

02:10    25          Did I read that correctly?

—— Hill - Cross - Tambussi ——

1  A.   Yes, you did.

2  Q.   Did you ever read that?

3  A.   I answered that already.

4  Q.   Now, the Special Litigation Committee notes that Mr.

02:10   5  Wojic's memo, the former OCC employee, his memo was forwarded,

6  Jack Bershad says on page 18, forwarded Wojic's e-mail to

7  Larry Weissman, Blank Rome attorney, with the "note please

8  look at this and call me."  There is no further reference made

9  in any other e-mails or meeting minutes to the "serious

02:11  10  reservations" expressed by Wojic.  According to interviews

11  conducted by counsel to the SLC, Wojic's e-mail was never

12  disclosed to the audit committee composed of Frank C. Vidian,

13  Senior, Daniel J. Ragone, and Joseph T. Tarquini, which

14  ultimately recommended indemnification to the board."

02:11  15        Did I read that correctly?

16  A.   Yes, you did.

17  Q.   Did you know that?

18  A.   I was not involved in this process at all.

19  Q.   My question to you, sir, is did you know that it wasn't

02:11  20  transmitted to the audit committee?

21  A.   And my answer was I was not involved in this process at

22  all.

23  Q.   Did you ever read Footnote 7 to the Special Litigation

24  Committee report with regard to indemnification of InterArch?

02:12  25  A.   I can't read it, you have to blow it up.

—— Hill - Cross - Tambussi ——

1    Q.   Well, let me help you out.  It says, "Counsel to the SLC

2    does not believe that the fact that InterArch was paid the

3    indemnification monies was publicly disclosed with

4    specificity.  Rather, in Commerce's 2002 SEC filings there is

02:12    5    an $8.1 million figure disclosed as the total amount paid to

6    InterArch in 2002, which appears to include the InterArch

7    indemnification amount.  The SEC finally describes the 8.1

8    million dollars paid to InterArch in 2002 as 4.6 million in

9    architectural design fees and 3.5 million in project

02:12    10   management fees.  There is no mention of indemnification.  It

11   further appears that the 2002 total of $8.1 million is a very

12   substantial increase from the past years."

13        Did I read that correctly?

14   A.   Yes, you did.

02:13    15   Q.   Did you review the SEC filings before they were made?

16   A.   I reviewed the SEC filings, absolutely.

17   Q.   Are you aware that there is an issue so whether the

18   indemnification payment to Shirley Hill was ever properly

19   identified?

02:13    20   A.   No, I'm not aware there is an issue.

21   Q.   Whose fault would that be?

22   A.   I'm not sure there is any fault.

23   Q.   Now, the SLC -- you are not sure that there is any fault?

24   A.   Correct.

02:13    25   Q.   The SLC made a finding with regard to InterArch, correct?

Hill - Cross - Tambussi

1   A.   Yes.

2   Q.   And that finding was that the SLC determined that the

3   special committee and the board were not fully apprised by

4   counsel of the full arsenal of legal defenses available to

02:13   5   defeat the indemnification demand, some of which may have been

6   dispositive of the indemnification claim and consequently the

7   special committee and the board could not have known that had

8   the indemnification was proper.

9        Did I read all that correctly?

02:14   10   A.   I believe so.

11   Q.   Are you aware that the appellate court in the suit

12   brought by Commerce to recoup the money held that the

13   corporation could not go back and revisit a decision made by

14   its board of directors in the interest of finality six years

02:14   15   later?

16   A.   My recollection is the appellate court ruled that the

17   indemnification made by the bank was appropriate, that's what

18   I remember.

19   Q.   Did you read that decision?

02:14   20   A.   Sure.

21   Q.   All right.  Now did you read the SLC report with regard

22   to a place called Villa Calina?

23   A.   I have.

24   Q.   Villa Calina is that your house?

02:14   25   A.   Yes, it is.

Hill - Cross - Tambussi

1    Q.   It's in Moorestown?

2    A.   It is.

3    Q.   Now, you were requested to provide information to the

4    Special Litigation Committee report regarding contractors who

02:14    5    performed work at both at your house and for the bank,

6    correct?

7    A.   Not directly, but my lawyer was asked, yes.

8    Q.   And you through your lawyer refused to cooperate on that

9    count also, correct?

02:15   10    A.   Absolutely right.

11    Q.   Now, in all fairness to you, Mr. Hill, because I want to

12    be fair, despite your failure to cooperate the SLC did not

13    discover any evidence of wrongdoing or anything inappropriate

14    with regard to that, correct?

02:15   15    A.   That's what the report says.

16    Q.   Okay.  Now, but did you ever read Footnote 9 of that

17    report?

18    A.   Go ahead, read it.

19    Q.   Well, did you ever read it?

02:15   20    A.   I can't recall.

21    Q.   You don't recall.  Do you recall that the SLC went out to

22    try to interview all the contractors that did work for the

23    bank and also did work for your house, correct?

24    A.   I only read what's in the -- what's in the report.

02:15   25    Q.   Do you have any dispute about what was in the report

———————————— Hill - Cross - Tambussi ————————————

1    here?

2    A.   You'll have to give me the exact words.

3    Q.   Let's focus directly on Footnote 9 on page 25.  It

4    states, "John Rehl," R-E-H-L "of Costa and Rehl, Mechanical

02:16   5    Contractors, advised counsel to the SLC in an interview on

6    November 26, 2007, that he had done work both for the bank and

7    at Villa Calina since at least 2000.  Rehl typically priced

8    the work through a general contractor and he acted as a

9    subcontractor.  In his most recent work at Villa Calina,

02:16   10   InterArch acted as the general contractor.  Rehl stated the

11   Villa Calina work was "always slow pay" and that he sometimes

12   felt as if he was "financing" the project.  Once his interview

13   with the SLC was scheduled, however, several days later he was

14   paid in full by InterArch in an amount, (counsel for the SLC

02:16   15   believes the amount to be $60,000) which had been outstanding

16   for more than a year.  Counsel to the SLC believes that it is

17   fair to draw the inference that the two events were not

18   unrelated."

19        Did I read that correctly?

02:17   20   A.   Um-hum.

21   Q.   Do you recall reading it?

22   A.   Yes.

23   Q.   Did you owe Mr. Rehl $60,000 for over a year?

24   A.   I have no idea.

02:17   25   Q.   It's your house, correct?

—————— Hill - Cross - Tambussi ——————

1   A.   I have no idea.

2        MR. JACOBS:  Excuse me, Judge.  The footnote says

3   InterArch wrote the check, not Mr. Hill.

4        THE COURT:  That's correct.

02:17   5   BY MR. TAMBUSSI:

6   Q.   It's your house, right?

7   A.   I have no idea.

8   Q.   Now, you testified on Thursday that you had nothing to do

9   with branch applications, did I read that correctly?

02:17   10  A.   Correct.

11  Q.   How about site acquisitions, did you have anything to do

12  with site acquisitions?

13  A.   Yes, of course.

14  Q.   In fact, you had everything to do with site acquisitions?

02:17   15  A.   No, but I was certainly involved.

16  Q.   Did you say no?

17  A.   I said no to your question.  I was certainly involved,

18  absolutely.

19  Q.   You were involved in every aspect of site acquisition,

02:18   20  correct?

21  A.   No, but I was involved, of course.

22  Q.   Do you recall being quoted, "I did all the site

23  acquisitions, so I know every site, I know all the stories, I

24  know how we bought it, when we bought it and why we bought

02:18   25  it."  Is that a quote from you?

——————————— Hill - Cross - Tambussi ———————————

**1**  A.  Correct.  And that's true.

**2**  Q.  You also said that there were independent appraisals done

**3**  on different parcels, correct?

**4**  A.  I was referring to the related party deals, I believe.

02:18  **5**  Q.  And who paid the appraiser?

**6**  A.  Probably the bank I would guess.  I don't know, actually.

**7**  Q.  Commerce hired the appraiser to do the appraisal that was

**8**  supposedly independent, is that what you are saying?

**9**  A.  I believe so.

02:18  **10**  Q.  And how many appraisals a year were done by this

**11**  independent appraiser?

**12**  A.  I have no idea.

**13**  Q.  More than 30?

**14**  A.  I have no idea.

02:19  **15**  Q.  Well, if on average there were 33 and a third, other

**16**  whatever Mr. Jacobs said, branches coming up each year, did

**17**  each one of those have an independent appraiser?

**18**  A.  I don't believe so.

**19**  Q.  Did you use more than one independent appraiser?

02:19  **20**  A.  I don't recall.

**21**  Q.  Didn't the OCC find issue with the fact that you used a

**22**  single appraiser on each of these parcels?

**23**  A.  Not that I'm aware of.

**24**  Q.  Are you aware that the Real Estate Review Committee found

02:19  **25**  that in the case of a number of the leases on these different

Hill - Cross - Tambussi

1   parcels there were no agreements, no arm's length transactions

2   for the allocation of the CAM charges and taxes?

3   A.   Well, your question refers to the leases, not the

4   hundreds of real estate locations that the bank bought.  And

02:19   5   CAMs, CAMs are common area maintenance charges.  So, for

6   instance, when you have a shopping center you share between

7   the people in the shopping center the cost of grass cutting

8   and snow removal, and there is always discussions among

9   tennants about how the common area charges should be split.

02:20   10   Q.   Isn't it a fact that the Real Estate Review Committee

11   found that in the case of a number of these leases there were

12   no agreements for the allocation of CAM charges and fees?

13   A.   I'm not sure about that.

14   Q.   You are not sure about that?

02:20   15   A.   Correct.

16   Q.   Do you remember when Mr. DiFloria testified that you were

17   involve in all the aspects the real estate from cradle to

18   grave?

19   A.   I was certain never involved in allocation of common area

02:20   20   expenses, that was handled by the bank accounting department,

21   correct.

22   Q.   Under your oversight?

23   A.   It had no oversight from me.

24   Q.   None?

02:20   25   A.   None.

Hill - Cross - Tambussi

1   Q.   Now, isn't it a fact that on some of these leaseholds

2   Commerce paid all the of the development costs even though it

3   used only part of the land?

4   A.   No, I don't think it's true.

02:21   5   Q.   You don't think that's true?

6   A.   No, I don't.

7   Q.   So if the Real Estate Committee found otherwise, would

8   you dispute that?

9   A.   I would have to see it.

02:21   10   Q.   Did you review any of the work of the Real Estate

11   Committee?

12   A.   I don't think we never got the Real Estate Committee

13   report.

14   Q.   All right, this company call Site Development, you

02:21   15   testified on Thursday "when I used the word "Site Development"

16   you said that's the name for a group, there are a lots of

17   related names.  Do you recall saying that?

18   A.   I do.

19   Q.   Okay.  Now, Site Development, that's a single company,

02:21   20   correct?

21   A.   Yes.

22   Q.   In fact, you are the chairman of Site Development,

23   correct?

24   A.   Yeah.  Yes, I am, Site Development, Inc. is -- I'm not

02:21   25   sure if I am the chairman, tell you the true.  But it's not an

1    active firm.

2    Q.    It not an active firm?

3    A.    Correct.

4    Q.    Was it an active firm in 2007?

02:22    5    A.    None of these transactions went through Site Development,

6    no.  As you will recall, I was completely out of the

7    development side of the acquisitions from 2002 on.

8    Q.    Were you identified in the proxy statement that's been

9    marked into evidence as P-28 as the chairman of Site

02:22    10    Development, Inc. in 2007?

11    A.    If that's what it says.  I was not involved in preparing

12    the 2007 proxy.

13    Q.    Well, it was issue in April of to 2007.

14    A.    Of course.  Yes, I was.

02:22    15    Q.    Did you review it at all?

16    A.    Of course.

17    Q.    Did you review it for accuracy?

18    A.    I don't review every single line of a multi-hundred page

19    agreement.

02:22    20    Q.    How about the part that referred to you, did you review

21    that?

22    A.    You'll have to show it to me.

23    Q.    Well, let me just ask you if you understand this to be

24    true and then we'll pull it up.  In the proxy statement, which

02:23    25    has been marked at P-28, which was sent to the shareholders

Hill - Cross - Tambussi

1    dated April 12, 2007, it identifies you, Mr. Hill, as the

2    chairman of the board of Site Development, Inc., a shareholder

3    in South Jersey Dining, Inc., a shareholder in U. S.

4    Restaurants, Inc.  By the way, South Jersey Dining, U. S.

02:23    5    Restaurants, were either of those ones that you were in

6    partnership with Steven Lewis, a member of board?

7    A.    Yes, in both of those.

8    Q.    A partner in JD Properties, a cotrustee and beneficiary

9    of the Hill Family Trust, trustee of the Hill Family

02:23    10    Foundation and a principal equity holder of Galloway National

11    Golf Course.  Does that properly identify you in 2007?

12    A.    Yes, it does.

13    Q.    So, we can agree then that it was accurate that you were

14    described as the chairman of the board of Site Development in

02:24    15    2007?

16    A.    Correct.

17    Q.    All right.  Now, are you familiar with the term "single

18    purpose limited liability corporation" or "single purpose

19    LLC?"

02:24    20    A.    Yes, I am.

21    Q.    All right.  You understand it to be a business entity

22    limited to one specific project or real estate holding,

23    correct?

24    A.    That's one way to describe it.

02:24    25    Q.    Okay.  And you understand that each single purpose

Hill - Cross - Tambussi

1    limited liability corporation was separate from each and every

2    other single purpose limited liability corporation?

3    A.   Correct.

4    Q.   Now, for each real estate project that Site Development

02:24    5    was involved with Commerce, each one involved a different

6    single purpose limited liability corporation, correct?

7    A.   I think so.

8    Q.   And not everyone of the single purpose liability

9    corporations limited liability corporations had the same

02:25    10    ownership, correct?

11    A.   Correct.

12    Q.   In fact, some you were the 30 percent ownership and some

13    you were some other percentage, correct?

14    A.   These were all transactions before '02, right.

02:25    15    Q.   Well, let me just finish here now.  So in each one of

16    these there were different ownerships, correct?

17    A.   Yes.

18    Q.   You had different partners in each?

19    A.   Correct.

02:25    20    Q.   So they each were a separate transaction with the bank,

21    correct?

22    A.   Yes.

23    Q.   Separate paperwork, correct?

24    A.   All before '02.

02:25    25    Q.   Okay.  Now, some of your partners in these were John

Hill - Cross - Tambussi

1    Silvestri, correct?

2    A.   Correct.

3    Q.   Some were Jack Bershad, correct?

4    A.   Jack Bershad on, on one deal.

5    Q.   Okay.  Mr. Lewis, Steve Lewis, he was a partner in some

6    of these deals?

7    A.   Yes.

8    Q.   Others?  Other members of your board?

9    A.   I don't think any -- not that I recall at the moment.

10   Q.   Now, you were asked on Thursday how the bank went to go

11   about locating sites.  Do you recall that?

12   A.   Yes.

13   Q.   In fact, the question was "Although it may be

14   self-explanatory, what do you mean when you say locating sites

15   for the bank?"  Your answer was, "When you build new stores,

16   you have to find a site.  The client has to approve the site."

17        Now, in this case you were Site Development, correct?

18   A.   Say that again.

19   Q.   Sure.  You were referring to Site Development when you

20   used the word "you," correct?

21   A.   Read -- I'm sorry, read it back.

22   Q.   All right, let's start a little bit earlier in your

23   testimony.  You testified:  How long were you involved in site

24   development.  You said I think I started site development in

25   '68.  If site development did business with Commerce Bank

─── Hill - Cross - Tambussi ───

1    after you Commerce in '73.  Answer:  Yeah.  I should make it

2    clear that when I use site development, that's the name for a

3    group.  There's lots of related names.  Now the related names

4    would be each of one of these single purpose limited liability

02:27   5    corporations.  Correct?

6    A.   Among others.

7    Q.   Okay.  And typically the single purpose limited liability

8    corporations were identified by the location.  Correct?

9    A.   Some were.

02:27   10    Q.   For example, when you built a branch in English it was

11    English Creek LLC.  Correct?

12    A.   Some were.

13    Q.   Another one Bensalem LLC.  Correct?

14    A.   Correct.

02:27   15    Q.   Dunphreys LLC.  Correct?

16    A.   I don't recall all the names.

17    Q.   That's the typical practice.  Correct?

18    A.   It was sometimes done that way.

19    Q.   Was that the typical practice?

02:27   20    A.   No, it's not.

21    Q.   Was it?  All right.  Now, you were then asked although it

22    may be self-explanatory, remember we're talking about site

23    development here, what you mean when you say locating sites

24    for the Bank.  And your testimony was, when you build new

02:28   25    stores, you have to find a site, the client has to approve the

—— Hill - Cross - Tambussi ——

1   site.  You're referring to site development as you.  Correct?

2   A.   I still don't understand what you're saying.

3   Q.   All right.  Let's go it this way.  You continued.  When

4   you build new stores, you have to find a site.  The client has

02:28   5   to approve the site.  You have to get it zoned, you either

6   have to get an agreement of sale or lease on it, and we didn't

7   build sites but we did all those part to develop plans, find

8   sites and get them zoned.  When you're referring to you and in

9   that context, you're referring to site development.  Correct?

02:28   10   A.   I have no idea what you mean.

11   Q.   You agree with me that the client is the Bank?

12   A.   Correct.

13   Q.   You agree with me that the site development went out and

14   found sites.

02:28   15   A.   Absolutely.

16   Q.   And it was you who went out and found the site?

17   A.   Absolutely no.  Absolutely not.

18   Q.   You didn't -- did you hear Mr. DiFlorio tell you that you

19   were --

02:29   20   A.   I don't no --

21   Q.   I'm sorry.

22   A.   Go ahead.

23   Q.   You didn't hear Mr. DiFlorio testify that were the person

24   who knew of all the sites, that you found all the sites for

02:29   25   the Bank?

Hill - Cross - Tambussi

A.   Well, he doesn't understand the found.  I did not go out

and find sites.  Site development and the related group and

other people would go out and find sites in our general

direction and I would go out and look at a lot of sites and

02:29   approve the ones that we liked.  I did not go out and find the

sites.

Q.   You did not.

A.   Maybe a long time ago, but not certainly in recent years.

Q.   Okay.  All right.  Now, you indicated on P-71 that you

02:29   severed your relationship --

MR. TAMBUSSI:  Can we pop P-71 up?  Let's go to the

second page of P-71.

Q.   We're go to blow it up, Mr. Hill so you can see it.

All right.  Right up at the top the first sentence up

02:30   at the top.  You see that now?

A.   Page two?

Q.   Yes, sir.

A.   Yes.

Q.   You want to blow it up?

02:30   A.   Yes.

Q.   To avoid any perception the issue, I therefore propose to

sever my relationship with that portion, that portion of the

site development group that does business with Commerce as of

July 30, 2002.  Did I read that correctly?

02:30   A.   Yes.

Hill - Cross - Tambussi

1    Q.   Now if we go down to real estate leases?

2          MR. JACOBS:  This isn't the P-71.

3          MR. TAMBUSSI:  72.

4          MR. JACOBS:  Not 72 either.

02:30    5          MR. TAMBUSSI:  I'm sorry.  P-50.

6          MR. JACOBS:  Fifty.  That's what it is.

7    Q.   Okay.  Now if you go down to paragraph three on that

8    document.  Do you see that?

9    A.   Yes, I do.

02:31   10    Q.   It says real estate leases is the caption?

11    A.   Yes.

12    Q.   All right.  Now, under the part that says the change.

13    You see that part?

14    A.   Yep.

02:31   15    Q.   It says effective July 30, 2002, I will no longer

16    participate in lease transactions in which the Bank is a

17    tenant other than those already approved.  Did I read that

18    correctly?

19    A.   Correct.

02:31   20    Q.   All right.  Now, P-29 is the proxy -- I'm sorry.  P-28 is

21    the proxy statement of April 12, 2007.  And that identifies

22    you as the chairman of site development.  Correct?

23    A.   Correct.

24    Q.   And that was correct as of 2007?

02:31   25    A.   Correct.

Hill - Cross - Tambussi

1    Q.   All right.   Now you also recall, do you not, your

2    testimony that your ownership interests in any land on which

3    Commerce has constructed branches was fully disclosed.   Do you

4    recall testifying to that?

02:32    5    A.   Yes.

6    Q.   Now, you were shown a portion of 2005 proxy statement

7    sent to the shareholders in April 2005 on Thursday.   Correct?

8    A.   2005?

9    Q.   Yeah, the proxy statement from 2005?

02:32    10   A.   I think so, yes.

11   Q.   Okay.   And in that proxy statement, it identified the 17

12   leases.   Do you recall that?

13   A.   Yes.

14   Q.   All right.   With 1.3 million dollars in annual rent?

02:32    15   A.   Yes.

16   Q.   Correct?

17   A.   Yes.

18   Q.   That proxy statement was sent to the shareholders before

19   the OCC and the Federal Reserve announced their investigation

02:33    20   in 2006.   Correct?

21   A.   Yes.

22   Q.   17 leases.   Correct?

23   A.   Yes.

24   Q.   Full disclosure?

02:33    25   A.   Yes.

Hill - Cross - Tambussi

1      MR. TAMBUSSI:  Could we put up the 2007 proxy

2 statement, please?

3                    (Brief pause)

4 Q.  All right.  Now, you see the paragraph that says Bancorp

02:33   5 has?

6      MR. TAMBUSSI:  Can you blow that up, Chris, please?

7 A.  Blow up the whole page, please?

8 Q.  Sure.

9                    (Brief pause)

02:34  10      MR. TAMBUSSI:  Are you there, Chris?

11 Q.  You see the paragraph that says that Bancorp has 19

12 operating leases entered into during 2002 and prior?

13 A.  Yes.

14 Q.  For annual rents aggregating approximately 1.9 million

02:34  15 dollars?

16 A.  Yes, I do.

17 Q.  Is it just a coincidence Mr. Hill that two additional

18 lease were disclosed after the OCC and the Federal Reserve

19 announced their investigation?

02:34  20 A.  I have no idea what you mean.  If you would give me a

21 schedule of those two, I'd be happy to answer.

22 Q.  Well, these are leases.  Correct?

23 A.  And if you would provide me with a schedule.  I'd be

24 happy to explain it to you.

02:34  25 Q.  You would agree with me, would you not, that 19 is a more

─────────────── Hill - Cross - Tambussi ───────────────

**1** than 17?

**2** A.   I would not agree in this case.

**3**          THE COURT:  We're going to take a brake.

**4**          MR. TAMBUSSI:  Sure.  Thank you.

02:34 **5**          THE COURT:  Ladies and gentlemen, we're going to

**6** break for 15 minutes.  Please don't discuss this case nor do

**7** any research and we'll see you back.

**8**          THE DEPUTY COURT CLERK:  All rise.

**9**       (Jury leaves the courtroom)

02:35 **10**          THE COURT:  I don't know how much longer we're going

**11** to be with him.  What's the status with your other witness.

**12**          MR. JACOBS:  I found him.

**13**          THE COURT:  Oh.  Is he coming in today?

**14**          MR. JACOBS:  I have him on telephone standby.

02:35 **15**          THE WITNESS:  No.  He's right there.

**16**          MR. JACOBS:  And as I said, I have him in Court.

**17**          THE COURT:  What a miracle.  Anything else you want

**18** to talk about on the record?

**19**          MR. JACOBS:  I thought I was going to call the

02:35 **20** witness.  I'm just wondering if Mr. Tambussi has an estimate

**21** so I can tell the witness whether to stay.

**22**          MR. TAMBUSSI:  I don't know, Judge.  But it's going

**23** up to the lunch break at least.

**24**          MR. JACOBS:  I'll ask him to stay.

02:35 **25**          THE COURT:  Thank you.

Hill - Cross - Tambussi

1          MR. JACOBS:  Thank you.

2                 (Recess)

3                 (Open Court)

4          THE COURT:  Ready?

02:50      5          MR. TAMBUSSI:  Yes, sir of the.

6          THE COURT:  Let's get the jury out, please.  P-71

7    will be moved into evidence.  The FDIC is not going to move to

8    seal that document.  I will put their letter to me on the

9    docket.

02:50      10   (PLAINTIFF EXHIBIT 71 WAS RECEIVED IN EVIDENCE)

11                (Brief pause)

12         THE DEPUTY COURT CLERK:  All rise.

13                (Jury present)

14         THE COURT:  All right.  Have a seat.  And we'll

02:51      15   continue with the cross-examination.

16         MR. TAMBUSSI:  Thank you, your Honor.

17   By Mr. Tambussi:

18   Q.   Mr. Hill, we were looking at the proxy statements before

19   the break, and I want to pull up the proxy statement for 2005.

02:52      20   It's going to come up on the screen in front of you and if we

21   go to page, the second page of that exhibit?

22         Now, there's a paragraph that says the Bank obtained

23   architectural design in facility management services.  Do you

24   see that paragraph.

02:52      25   A.   I can't read this.  Can you blow it up, please?

Hill - Cross - Tambussi

**1**  Q.   And you agree with me that for the year 2004 the Bank

**2**  spent 6.5 million dollars with InterArch.  Correct?

**3**  A.   That's what it says.

**4**  Q.   And if we go to the proxy statement, the same paragraph

02:52   **5**  in the proxy statement for 2005?  2006.  I'm sorry.  Read that

**6**  for 2005.

**7**      The Bank paid InterArch 7.5 million dollars for

**8**  architectural design services.  Correct?

**9**  A.   And it goes on to say the Board believes this arrangement

02:53   **10**  has been an important factor in the success of the Commerce

**11**  brand.

**12**  Q.   And this is the same Board of Directors we talked about

**13**  at the outset.  Correct?

**14**  A.   The very same Board.

02:53   **15**  Q.   And then we go to the proxy statement for 2007?  That

**16**  same paragraph indicates that InterArch was paid the 9.2

**17**  million dollars.  Correct?

**18**      MR. TAMBUSSI:  Chris, will bring it up.

**19**  Q.   Is that correct?

02:53   **20**  A.   Yes.

**21**  Q.   So, for the years 2004, five and six, InterArch was paid

**22**  a total of 23.2 million dollars by the Bank.  Correct?

**23**  A.   Sounds right.

**24**  Q.   Isn't it a fact that at no time for any of the years

02:54   **25**  2004, 2005, 2006 nor even 2007 did Commerce seek architectural

Hill - Cross - Tambussi

1  design for facility management services through an open and

2  fair bidding process?

3  A.   I don't know that to be true.

4  Q.   You know it to be false?

02:54  5  A.   I don't know it to be true.

6  Q.   You know it to be false?

7  A.   I don't know it to be true.

8  Q.   At any one time from for years 2004 to 2007, did Commerce

9  go out and seek bids for architectural design and facility

02:54  10  management services?

11  A.   I don't know the answer to that.

12  Q.   You heard about this thing called the Smart Report.

13  A.   I have.

14  Q.   Do you remember that?

02:55  15  A.   Yes, I have.

16  Q.   In fact, you read about it and all that?

17  A.   I have.

18  Q.   Who paid the people to write the Smart Report?

19  A.   The Bank, of course.

02:55  20  Q.   The Bank?

21  A.   The Bank.

22  Q.   You know whether the Smart Report was reviewed by anybody

23  else what's called a peer review?

24  A.   I don't believe it was.

02:55  25  Q.   Do you know whether or not when comparing the prices

──── Hill - Cross - Tambussi ────

1   provided by InterArch, the Smart Report compared the InterArch

2   design services to multiple stores, as opposed to single

3   stores by other architectural service firms?

4   A.   You have to show me the report.

02:55   5   Q.   I'm asking you if you know?

6   A.   I don't know.

7   Q.   You would agree that it would be an apples to oranges

8   comparison.  Correct?

9   A.   I certainly do not agree.

02:55   10   Q.   All right.  In these proxy statements, you would indicate

11   -- you would agree with me, would you not, that they show

12   stock ownership?

13   A.   They do.

14   Q.   And I think your testimony was that you thought that your

02:56   15   actions in resigning were good for the Band and good for the

16   shareholders.  Did I get that correct?

17   A.   I think so.

18   Q.   Isn't it a fact in 2007 that you were the single largest

19   individual shareholder on the Board of Directors?

02:56   20   A.   I was.

21   Q.   And isn't it a fact that by the sale of Commerce to TD

22   Bank, you made about 400 million dollars?

23   A.   Well, that's what I made on the sale.

24   Q.   That's my question?

02:56   25   A.   Yeah, of course.

Hill - Cross - Tambussi

1    Q.   Okay.  In fact, you had over six million shares.

2    Correct?

3    A.   I don't know the amount.

4    Q.   You wouldn't dispute anything that's in the proxy

5    statement?

6    A.   If it says that.  I don't remember the amount.

7    Q.   Now, you've mentioned more than one occasion in this

8    trial that you believe that the OCC was on a witch hunt.

9    A.   That's what I said.

10   Q.   You said it more than once.  Correct?

11   A.   I don't know.

12   Q.   Well, in fact when you filed this suit initially in

13   January of 2008, you filed it in the District of Columbia, did

14   you not?

15   A.   Correct.

16   Q.   And when you filed it on January 14, 2008 in the District

17   of Columbia, you filed it before you entered your Consent

18   Order with the OCC.  Correct?

19   A.   Correct.

20   Q.   When you filed this complaint, you indicated that the OCC

21   did something wrong, did it not?

22   A.   You'll have to show me the complaint.  It's been a long

23   time ago.

24   Q.   We can do that.

25         MR. TAMBUSSI:  Chris, if you would?  It's the

02:56
02:57
02:57
02:57
02:57

──────── Hill - Cross - Tambussi ────────

1    Defendant's Exhibit 26.  You have that up, Chris?  Thank you.

2    If you turn to page 14 of the complaint.  You have page 14?

3    Q.   All right.  You see the bold print.  The OCC pressures

4    Commerce to terminate Mr. Hill?

02:58   5    A.   Yes.

6    Q.   Did you read this complaint before you filed it or had it

7    filed by your lawyers on your behalf?

8    A.   I'm sure I did.

9    Q.   Okay.  You would agree with me that these were your

02:58   10   allegations.  Right?

11   A.   Correct.

12   Q.   And in these allegations, set forth at paragraphs 46, 47,

13   48, 49 through the section, you allege that the OCC was the

14   one that was controlling the Bank's actions.  Correct?

02:58   15   A.   At that time.

16   Q.   Well, did it change?

17   A.   Of course it changed.

18   Q.   Did it change before or after you entered the Consent

19   Order with the OCC?

02:58   20   A.   I don't know the answer.  Obviously, it changed after

21   this time.

22   Q.   Well, did it change before or after you entered the

23   Consent Order?

24   A.   I don't know the answer to that one.

02:59   25   Q.   That's a different question.

Hill - Cross - Tambussi

1        MR. TAMBUSSI:  Judge --

2        THE COURT:  Please rephrase your question.

3  Q.  Did it change before or after you entered the Consent

4  Order with the OCC on November 17, 2008?

02:59    5  A.  I don't know.

6  Q.  All right.  Now, in these allegations in your initial

7  complaint, you indicate that the OCC in order to exert

8  pressure on Commerce to take certain actions against Mr. Hill,

9  threatened to release unsubstantiated findings of fact,

02:59  10  initiated administrative action against Commerce and refused

11  to approve branch applications which Commerce was entitled to

12  have approved.  Is that your allegation?

13  A.  Yes, it was then.

14  Q.  Did it change?

02:59  15  A.  That's what it was then.

16  Q.  Okay.  But did it change?

17  A.  Certainly.

18  Q.  Okay.  When?

19  A.  My allegation now is Toronto Dominion Bank has refused a

03:00  20  to apply for the approval they claim that they need.

21  Q.  To whom?

22  A.  To the Federal, to the FDIC.

23  Q.  The Federal Banking Regulators?

24  A.  The Federal Reserve Bank and the FDIC.

03:00  25  Q.  Some of these people who have the tanks?

Hill - Cross - Tambussi

1  A.   Yeah, those ones.

2  Q.   The ones that have the tanks?

3  A.   Yeah.  Exactly.

4  Q.   Is it your statement that you do not believe today that

03:00   5  the OCC threatened to release unsubstantiated findings of

6  fact?

7  A.   Absolutely.  Everything in that statement was true.

8  Q.   Okay.  All right.  Now these unsubstantiated findings of

9  fact.  Is that in the proposed consent order?  Is that what

03:00  10  you are's referring to?

11  A.   It must have been.

12  Q.   All right.  That's the ones you signed.  Correct?  And

13  you urge the Board to sign.  Correct?

14  A.   I didn't sign any order.

03:00  15  Q.   You didn't urge your Board to sign a proposed Consent

16  Order?

17  A.   I didn't sign any order and I wasn't there when the order

18  was signed.

19  Q.   You recall that there were a number of proposed Consent

03:00  20  Orders in June of 2007.  Correct?

21  A.   Correct.

22  Q.   And wasn't there a proposed Consent Order that did not

23  call for your removal and you urged the Board to sign?

24  A.   I discussed with outside counsel and my Board on multiple

03:01  25  times how we should respond.

Hill - Cross - Tambussi

1  Q.   And wasn't it your recommendation that the Board should

2  sign this consent order containing what you've described as

3  unsubstantiated allegations?

4  A.   I'm not sure what you're refer to.  You'll have to show

5  me.

6  Q.   All right.  Now, you also indicate --

7       MR. TAMBUSSI:   Paragraph 47 if we can go to that?

8  Q.   A key component of the OCC's leverage over Commerce was

9  its ability to delay branch applications until its

10 investigation was concluded.  This coercion was defective

11 because Commerce's business model, which I've been very

12 successful, was rapid growth by building new branches.  Did I

13 read that correctly?

14 A.   Correct.

15 Q.   Now, you would agree with me, would you not, that the

16 refusal of the OCC to approve new branch applications would

17 have a negative effect on the Bank?

18 A.   If it never ended.  If it always continued.  Of course,

19 it had an effect, but obviously it didn't effect on the sale

20 of the Bank for eight and a half billion dollars.

21 Q.   It didn't have a positive effect on the Bank in the

22 middle of 2007, did it.

23 A.   No.

24 Q.   All right.  Because the stock went down to the market?

25 A.   No, the stock didn't go down.

Hill - Cross - Tambussi

**1**   Q.   Oh.

**2**   A.   The stock went down a very minor amount within the normal

**3**   market fluctuation.

**4**   Q.   All right.  You're talking a matter of degree.

03:02   **5**   A.   You're talking a matter of degree.

**6**   Q.   Now you say in paragraph 48 in late June upon information

**7**   and belief in response to the OCC pressure and threats, the

**8**   OCC and Commerce and Commerce's Directors reached a deal for

**9**   agreement whereby Mr. Hill's employment would be terminated.

03:03   **10**   Did I read that correctly?

**11**   A.   Yes, you did.

**12**   Q.   Now is it your contention that the only reason that

**13**   Commerce reached this deal was because of the pressure by the

**14**   OCC?

03:03   **15**   A.   That was my belief at the time.  I'm not sure if that's

**16**   true now.

**17**   Q.   And ultimately this agreement was the June 2007 Consent

**18**   Order.  Correct?

**19**   A.   Correct.

03:03   **20**   Q.   Okay.  Now, this June 2000 Consent Order certainly

**21**   regulated the Bank going forward?

**22**   A.   Correct.

**23**   Q.   Correct?

**24**   A.   Correct.

03:03   **25**   Q.   And it certainly required the Bank to do certain things.

Hill - Cross - Tambussi

1  Correct?

2  A.   Correct.

3  Q.   And subject to certain conditions it required the Bank to

4  terminate its relationship with certain insider and related

03:03   5  parties.  Correct?

6  A.   With possible exceptions.

7  Q.   Okay.  Do you know one exception that it actually

8  occurred?

9  A.   Yeah, of course.  They continued -- I'm sorry.  Go ahead.

03:04   10  Q.   Please.  I'm asking -- I'm giving you the opportunity.

11  A.   Obviously they continued the related party leases.

12  Q.   Okay.  Did they continue the related party transactions

13  with InterArch?

14  A.   No, they did not.

03:04   15  Q.   Did they continue the related party transactions with

16  site development?

17  A.   Well, it depends what you mean by site development.

18  Q.   All right.  Site development had another name also,

19  didn't it?  The Principal Interstate Commercial Realty?

03:04   20  A.   I wasn't involved in that, but I understand they did

21  continue the relationship with them.

22  Q.   Okay.  Now that business had a gentleman by the name of

23  Mr. Silvestri as one of its principal owners.  Correct?

24  A.   Yes.

03:04   25  Q.   The same Mr. Silvestri that was involved in the site

Hill - Cross - Tambussi

1  development?

2  A.   Absolutely.  Correct.

3  Q.   And Mr. Silvestri also had other people involved in that

4  business, including your brother and your son.  Correct?

03:04   5  A.   Right.

6  Q.   One of your sons?  Just one?

7  A.   Just one.

8  Q.   Okay.  Now, are you aware, sir, that the Bank had to

9  negotiate different terms with Interstate Commercial Real

03:04   10  Estate in order for the relationship to continue?

11  A.   I am not aware of it.

12  Q.   So, you would agree with me, would you not, that the

13  relationship would have changed if, in fact, that negotiation

14  resulted in less money being paid to Interstate Commercial

03:05   15  Real Estate.

16  A.   I have no idea what the terms were.

17  Q.   Now, November 17, 2000.  Let me, before I get to that.

18       Do you understand that the phrase troubled condition as

19  it applies to banks?

03:05   20  A.   I think so.

21  Q.   All right.  Now you explained to the jury your research

22  on that last Thursday about how it dealt with banks in

23  financial difficulty.  Do you recall that?

24  A.   Yes, I do.

03:05   25  Q.   The fact there were thrift savings and loans that had a

Hill - Cross - Tambussi

1  number of financial difficulties some years prior.  Correct?

2  A.   Yes.

3  Q.   And there were different banking regulators that enacted

4  or imposed certain enactments, legislative enactments to

03:06   5  review banks and thrifts and savings and loans.  Correct?

6  A.   Correct.

7  Q.   And many of those legislative actions required or

8  reviewed the financial status of those institutions.  Correct?

9  A.   Correct.

03:06   10  Q.   But that's not the only way that the Bank considers, the

11  regulators consider a bank to be in a troubled condition, does

12  it?

13  A.   I'm not aware of all the ways they can consider it, but

14  that's generally the way I understand it.

03:06   15  Q.   All right.  You would agree with me, would you not, that

16  the Regulators consider the entry of a cease and desist order

17  as it relates to a bank's governance to place that bank in

18  troubled condition status, do you not?

19  A.   Not in every case.

03:06   20  Q.   All right.  How this case?

21  A.   They did in this chase.

22  Q.   Okay.  So, in this case, when the Regulators entered the

23  cease and desist order, Commerce Bank was designated as a Bank

24  in troubled condition.  Correct?

03:06   25  A.   Correct.

Hill - Cross - Tambussi

1    Q.   And as a Bank in troubled condition, the Golden Parachute

2    regulations applied.  Correct?

3    A.   That's what the bank says.

4    Q.   Well, do you know what the regulations say?

03:07   5    A.   I'm not making a legal decision on the regulations.

6    Q.   Exactly.  But you know that the Regulators indicated that

7    the Bank was one in trouble condition.  Correct?

8    A.   That's what the Bank says.

9    Q.   You don't believe the Regulators say that.

03:07   10    A.   I don't know the answer.

11    Q.   Do you believe that the Golden Parachute regulations do

12    not apply to the payments that you seek before this Court?

13          MR. JACOBS:  Objection.  Isn't that a legal question

14    which was committed to the Court pretrial?

03:07   15          THE COURT:  If he doesn't have an opinion, he can

16    tell us that.

17    A.   I'm not sure whether they apply or not.

18    Q.   Do you agree that if the Golden Parachute regulation does

19    apply to these payments, that certain steps have to be taken

03:07   20    before the payments are approved.  Correct?

21    A.   Correct.

22    Q.   And you understand that those steps are set forth not

23    only in the regulation itself, but in certain letters or

24    bulletins issued by the Federal Banking regulators.  Correct?

03:08   25    A.   I understand that.

Hill - Cross - Tambussi

1   Q.   And you've reviewed those regulations and you've reviewed

2   the bulletins and you've reviewed the letters.  Correct?

3   A.   I am certainly not an expert on applications for Golden

4   Parachutes.

03:08   5   Q.   Understood.  But you have reviewed those matters.

6   Correct?

7   A.   I've read the regulations.

8   Q.   In fact you told me that when you swore under oath in

9   your deposition in May of 2011.  Correct?

03:08   10   A.   I believe so.

11   Q.   Now, those regulations require that the regulators sign

12   off on any payments.  Correct?

13   A.   Not what it says.

14   Q.   All right.  Don't the Regulators have to approve the

03:08   15   payments before they're made?

16   A.   Yes.

17   Q.   Okay.  All right.  Now, you filed an amended complaint in

18   this case.  Right?

19   A.   Could be.

03:08   20        MR. TAMBUSSI:  Pull up the amended complaint, please?

21   Q.   All right.  Now this complaint, Mr. Hill, was filed on

22   August 21, 2009, was it not?  Do you see it up at the top?

23   A.   I don't see the date, but I'll take your word for it.

24   Q.   Well, I really don't want you to take my word for it.

03:09   25   Want you to look at the banner right at the very top.

─────── Hill - Cross - Tambussi ───────

1    A.   Yes, I see it.

2    Q.   All right.  Now do you agree with me it was filed in

3    August of 2009?

4    A.   Yes, I do.

03:09     5    Q.   Do you agree with me that that complaint was filed after

6    you entered into your November 17, 2008 Consent Order with the

7    comptroller of the currency?

8    A.   Yes, I do.

9    Q.   All right.  In this complaint on paragraph eight, if you

03:09    10    would.

11         MR. TAMBUSSI:  Pull up paragraph eight?

12    Q.   Paragraph 8 says the OCC never issued any finding that

13    Mr. Hill acted improperly nor has any other regulator.  Did I

14    read that he correctly?

03:10    15    A.   You did.

16    Q.   All right.  Now, let's pop up, if you would the consent

17    order, the November 17th, 2008 Consent Order.  First page.  I

18    believe that's P-54.

19         MR. JACOBS:  Three.

03:10    20         MR. TAMBUSSI:  Fifty-three.

21    Q.   All right.  Now this Consent Order specifically states in

22    the second whereas clause the words:  The Comptroller finds.

23    Did I read that correctly?

24    A.   You did.

03:10    25    Q.   All right.  Now let's go to, if we could, page nine of

─────── Hill - Cross - Tambussi ───────

1   this order under heading article six.  Waivers.  There?

2        Now, Mr. Hill, before I ask you any questions on this

3   point, you agree with me, did you not, that you signed this

4   agreement of your own free will?

03:11   5   A.   Yes, I did.

6   Q.   No coercion?

7   A.   Correct.

8   Q.   No one promised you anything?

9   A.   Correct.

03:11   10   Q.   No one threatened you with anything?

11   A.   Correct.

12   Q.   You decided as a person whose been to the University of

13   Pennsylvania Wharton School, in the Bank business for over

14   30 years had developed a hugely successful bank, that you were

03:11   15   voluntarily and of your own free will, going to enter into

16   this agreement in full.  Correct?

17   A.   Correct.

18   Q.   You read every word of this agreement, did you not?

19   A.   Correct.

03:11   20   Q.   You understood every word in this agreement before you

21   signed it?

22   A.   I think so.

23   Q.   In fact there were more than one draft of this agreement

24   before you signed it.  Correct?

03:11   25   A.   Probably.

Hill - Cross - Tambussi

1   Q.   You were represented by counsel when you signed this.

2   A.   Yes I was.

3   Q.   So, you would expect that we can read these words and

4   believe that you understood them.  Correct?

03:11   5   A.   Probably.

6   Q.   All right.  Now, do you see under article six, waivers?

7   A.   Yes.

8   Q.   Where says by executing this order, respondent waives.

9   Small paragraph B, lower please B.  All rights to hearings and

03:12   10   final agency decisions pursuant to 12 USC Section 1818 and 12C

11   FR part 19.  Did I read that correctly?

12   A.   Yes, you did.

13   Q.   You understand that when you signed this agreement, that

14   you waive all rights to have an adjudication on the merits?

03:12   15   A.   Correct.

16   Q.   Next paragraph.  Paragraph c.  By executing this order,

17   Respondent waives all rights to seek judicial review of this

18   order.  Did I read that correctly?

19   A.   Yes, you did.

03:12   20   Q.   You understand that by signing this agreement, you

21   reviewed -- you waived all rights to have some Judge look at

22   this order and review it to see if it's proper or not?

23   A.   Yes.

24   Q.   And in paragraph D, by executing this order, respondent

03:12   25   waives all rights in any way to contest the validity of this

Hill - Cross - Tambussi

1    order.  Did I read that correctly?

2    A.    You did.

3    Q.    And you understand that?

4    A.    Certainly.

03:13    5    Q.    You have no right to challenge any words in this order.

6    Correct?

7    A.    Challenge it with the OCC.  That's the way I read it.

8    Q.    Well, you couldn't challenge it with the Court either?

9    A.    You asked me how I understood.  That's the way I

03:13    10    understood it.

11    Q.    Well, if you understand in the paragraph before that, you

12    couldn't seek judicial review.  Correct?

13    A.    Correct.

14    Q.    All right.  So now let's go back to the first page.  You

03:13    15    would agree with me, would you not, that first sentence says,

16    second whereas paragraph.  Whereas the Comptroller finds and

17    the respondent neither, Respondent neither admits nor denies

18    that Respondent engaged in unsafe and unsound practices and

19    breaches of fiduciary duty by failing to comply with sound

03:13    20    corporate governance principles in connection with real estate

21    purchases, leases and joint real estate development

22    transactions involving the Bank which resulted in financial

23    gain to the respondent.  Did I read that correctly?

24    A.    Well you're only half done.

03:14    25    Q.    Did I read that phrase correctly?

————— Hill - Cross - Tambussi —————

1   A.   Your first half you read right.

2   Q.   You don't deny any of those words.  Correct?

3   A.   I deny -- I don't deny any of these words when you read

4   them as a whole, not as a part.

03:14   5   Q.   Did you ever say that to anyone?

6   A.   Say what?

7   Q.   Did you ever say to anyone at the OCC, look, I can't

8   agree to these words where you say the comptroller finds that

9   I engaged in unsafe and unsound practices and breach of

03:14   10   fiduciary duty, et cetera?

11        Did you ever say I can't agree to those words included

12   in this?

13   A.   I read this as a whole.  This entire whereas clause as a

14   whole.  You only want to read half of it.

03:14   15   Q.   Did you ever deny to the office of the comptroller of the

16   currency that you engaged in unsafe and unsound practices and

17   breach of fiduciary duty?

18   A.   Of course.

19   Q.   Okay.  Did you deny it at one time after you signed this

03:15   20   order?

21   A.   I didn't have to.  Why don't you read the full part of

22   it?

23   Q.   I have read the full part?

24   A.   Why don't you allow me to read it now.

03:15   25   Q.   Feel free, Mr. Hill.

——————— Hill - Cross - Tambussi ———————

**1**  A.   Okay.  Without adjudication on the merits and solely for

**2**  the purpose of this settlement.  And pursuant to Rule 408 of

**3**  the Federal Rules and equivalent State provisions and in the

**4**  interest of cooperation and to avoid the cost associated with

03:15    **5**  future investigative administrative judicial proceedings with

**6**  respect to this order, comptroller and the respondent desire

**7**  to enter into this stipulation and Consent Order and conclude

**8**  this matter.

**9**  Q.   Finished?

03:15  **10**  A.   Correct.

**11**  Q.   Okay.  And I agree that you had read it correctly, Mr.

**12**  Hill.  And you would agree with me, would you not, that you

**13**  waived your right to an adjudication on the merits?

**14**  A.   Both sides did.

03:16  **15**  Q.   Okay.  No question about it.  No question about it.  But

**16**  you didn't make any findings, did you?

**17**  A.   It's not my job to make findings.

**18**  Q.   You didn't made a word of finding.

**19**  A.   That's not my job to make findings.

03:16  **20**  Q.   It's the Regulator's to make findings.

**21**  A.   Correct.

**22**  Q.   Not the Special Litigation Committee or your Board of

**23**  Directors either.  Right?

**24**  A.   I couldn't answer that.

03:16  **25**  Q.   Well, it's the regulators who enforce the regulations,

Hill - Cross - Tambussi

1    correct?

2    A.   Correct.

3    Q.   Not the Special Litigation Committee.

4    A.   Correct.

03:16    5    Q.   Not your Board of Directors?

6    A.   Correct.

7    Q.   Because again, these are the guys with the tanks.  Right?

8    A.   Right.

9    Q.   The guys you didn't want to fight.

03:16    10   A.   They're the guys with the tanks.

11   Q.   The guys that you didn't want to fight.

12   A.   The guys with the tanks.

13   Q.   The guys that you didn't want to fight.

14   A.   The guys with the tanks.

03:16    15   Q.   Now, these guys with the tanks, it's your position that

16   the Bank should fight them, or to get you paid?

17   A.   My position is the Bank is obligated under the agreement

18   to take whatever steps are necessary to satisfy the terms of

19   the employment agreement.

03:17    20   Q.   You wouldn't expect the Bank to lie, would you?

21   A.   Absolutely not.

22   Q.   You wouldn't expect the Bank to make material

23   misrepresentations, would you?

24   A.   Absolutely not.

03:17    25   Q.   If the Bank has information documents that would give

Hill - Cross - Tambussi

1    rise to a reasonable belief that you may have committed one of

2    the prohibited acts in a regulation, you wouldn't expect the

3    Bank to certify --

4    A.   Which you have a material adverse, which you have a

5    material adverse effect on the Bank.

6    Q.   You wouldn't expect the Bank, to expect the Bank to

7    represent to the regulators otherwise, would you?

8    A.   Of course not.

9    Q.   Okay.  Now you heard Mr. DiFlorio testify about the

10   chaos?

11   A.   I did.

12   Q.   You heard Mr. Buckelew testify about the chaos at the

13   Bank and you heard them testify that neither of which had a

14   positive effect on the Bank.  Correct?

15   A.   Correct.

16   Q.   You would agree with me, would you not, that that is a

17   negative effect?

18   A.   Caused by me being fired without cause.

19   Q.   Was it -- Mr. Hill, did you review, actually re-review

20   the 2004 complaints?

21   A.   Sure.

22   Q.   That were moved into evidence?

23   A.   Of course.

24   Q.   You know that those complaints have allegations that you

25   committed misdeeds.  Correct?

─────── Hill - Cross - Tambussi ───────

1   A.   And I also know they're unproven allegations dismissed by

2   this court.

3   Q.   Okay.  They're allegations not adjudicated on the merits.

4   Correct?

03:18   5   A.   They were dismissed by the Court.

6   Q.   And weren't adjudicated on the merits.  Correct?

7   A.   You're playing with words.  They were dismissed by the

8   Court.

9   Q.   And you know that from reading those allegations in those

03:18   10  complaints, that the allegations themselves are not flattering

11  toward you.  Correct?

12  A.   Anyone in America can allege anything that they like.

13  Q.   Okay.  And you understand that you were picked up on a

14  wiretap in the Philadelphia Pay to Play location.  Correct?

03:18   15  A.   I understand I was on a phone call.

16  Q.   Did you ever hear that?

17  A.   No, I didn't.

18       MR. TAMBUSSI:  Why don't you play that, Chris.

19            (Brief pause)

03:19   20  A.   And what year was this?

21  Q.   2002?

22  A.   2002.

23  Q.   Yeah, same year that you ceased all of your involvement

24  with the properties with site development.  That portion of

03:19   25  site development.  I'm sorry.  Thank you.

─────────────── Hill - Cross - Tambussi ───────────────

1              (The call was then played to the jury)

2                   (Tape stopped)

3    Q.   Mr. Hill, that is your voice on that tape?

4    A.   That is.

03:23    5    Q.   That conversation that you had with Ron White.

6    A.   That is.

7    Q.   By the way, Mr. White passed away.  Correct?

8    A.   Correct.

9    Q.   Is he an elected official?

03:23   10    A.   Not that I'm aware of.

11    Q.   Cory Kemp, he was then I believe a chief financial

12    officer of sorts with the City of Philadelphia?

13    A.   I believe so.

14    Q.   And Street, you were referring to former Mayor John

03:23   15    Street?

16    A.   Correct.

17    Q.   You said the words I have to take care of this myself.

18    You were personally involved in this matter.  Correct?

19    A.   It was a normal business development call with people

03:24   20    asked me for things.  We discussed things and no different

21    than any other business development type call you'd have.

22    Q.   Do you know whether this information, this tape was

23    provided for the Federal Regulators in the investigation that

24    started in 2006?

03:24   25    A.   I have no you idea.

Hill - Cross - Tambussi

1    Q.   Did you read the allegations against the Bank in the

2    indictment, the Ron White indictment?

3    A.   No allegations in this indictment.  Why did you ask me if

4    there were allegations when you know there aren't?

03:24    5    Q.   Did you recall reading, did you not, Mr. Hill, references

6    to the Bank's chief executive officer?

7    A.   There is a minor reference to me, yes.

8    Q.   Just one reference?

9    A.   I don't know, Bill.  You seem to know.

03:24    10   Q.   Well, on May 11, 2011 00 March 11, 2011 we went through

11   all these references.  Correct?

12   A.   Correct.

13   Q.   More than one.  You recall that?

14   A.   No, I don't.

03:25    15   Q.   You don't dispute that those words were, whatever the

16   words are in that indictment, you don't contend that they're

17   not true.  Correct?

18   A.   So me?

19   Q.   Yeah, so you.

03:25    20   A.   Right.  Correct, I do not.

21   Q.   All right.  Now, ultimately, Mr. Holk and Mr. Umbrel,

22   your employees were terminated.  Correct?

23   A.   They were.

24   Q.   After they were convicted and both of those guys went to

03:25    25   jail.  Is that correct?

*United States District Court*
*Camden, New Jersey*

Hill - Cross - Tambussi

1   A.   As were employees of Chase and Janny Montgomery Scott.

2   Q.   Now Holk, the head of your Pennsylvania the number it is

3   Banking Group?

4   A.   Correct.

03:25   5   Q.   He reported directly to you.  Correct?

6   A.   No, he did not.

7   Q.   He did not?

8   A.   Did not.

9   Q.   Didn't you have to provide to you a Monday morning update

03:25   10  every Monday on whatever is happening in his --

11  A.   All of our management team provided a Monday morning

12  update that was shared with all our senior management group.

13  Q.   Including, correct?

14  A.   Of course me, too.

03:26   15  Q.   Now, after this Philadelphia Pay to Play litigation went

16  through the Bank after a series of governance changes.

17  Correct?

18  A.   Correct.

19  Q.   And it changed the way that you were doing business.

03:26   20  Correct?

21  A.   Well, actually the Bank put in a bunch of governance

22  changes when the story first hit the press.

23  Q.   So, it was the story that prompted the governance

24  changes.  Correct?

03:26   25  A.   It prompted us to look into the whole matter and decide

—— Hill - Cross - Tambussi ——

1    if we needed to evolve our governance changes in these areas.

2    Q.   And, ultimately, there were lawsuits filed as a

3    consequence.  These were the 2004 Galati complaints.  Correct?

4    A.   You mean the same lawsuits that were dismissed.

03:26    5    Q.   Yeah, exactly the ones that were dismissed.

6    A.   Exactly so.

7    Q.   And they were dismissed because the allegations that they

8    say should have been disclosed were not required to be

9    disclosed.  Correct?

03:26    10    A.   That's what you say.  I don't know that to be true.

11    Q.   Okay.  But to if one were to read the opinion, that's

12    what one could green.  Correct?

13    A.   It could glean whatever you want.

14    Q.   Okay.  You don't dispute it, do you?

03:27    15    A.   What I know is the lawsuits were dismissed.

16    Q.   Okay.  Now, when the OCC started this investigation in

17    2006, certain shareholders filed suit against the Bank.  Then

18    correct?

19    A.   Yes.

03:27    20    Q.   And in these complaints where they named all the

21    Directors, as we can see from the complaints and the jury will

22    get to see them because they're in evidence, there are

23    complaints, allegations in those complaints specific to you.

24    Correct?

03:27    25    A.   Yes, there are.

Hill - Cross - Tambussi

1    Q.   Breach of fiduciary duty?

2    A.   I don't know exactly what they say.

3    Q.   Fraud?

4    A.   I don't know what they say.

03:27    5    Q.   Misappropriation?  Don't know what they say?

6    A.   No.

7    Q.   And you know that those complaints were complaints were

8    later joined with other shareholders, other shareholders in

9    shareholder derivative suits, correct?

03:27    10   A.   As I recall, they were joined with suits that challenged

11   the merger of Commerce into Toronto Dominion.

12   Q.   And those suits were ultimately resolved as part of the

13   resolution, the culmination of the deal between Commerce Bank

14   and TD.  Correct?

03:28    15   A.   Correct.

16   Q.   And you testified, I think you were asked the question

17   whether or not any one shareholder received anything of value

18   or one dollar even from those shareholder lawsuits, correct?

19   A.   Yes.

03:28    20   Q.   But you didn't recall.

21   A.   My recollection is the plaintiffs received zero.

22   Q.   Okay.  But that's just your recollection.  You never

23   looked at the order to tell us what the actual relief was?

24   A.   I have looked at that order.  I don't remember exactly

03:28    25   what it says, but I remember that the plaintiffs received

Hill - Cross - Tambussi

1   zero.

2   Q.   Well, are you aware that the plaintiffs were

3   shareholders?

4   A.   Yeah.  Of course.

03:28   5   Q.   And are aware as part of the settlement, the compensation

6   to shareholders and the deal changed somewhat?

7   A.   I was not involved in that at all.

8   Q.   Well, wait a minute.  You're a shareholder.

9   A.   I was not involved in that.

03:29   10   Q.   Huge shareholder.  Right?

11   A.   I was totally not involved in that.

12   Q.   Okay.  But as a shareholder, you understand what the deal

13   was.  You made 400 million dollars.  Right?

14   A.   It had nothing to do with these suits.

03:29   15   Q.   I mean, but you made four hundred million dollars.

16   A.   Correct.

17   Q.   On this deal.  And you know that the suits were brought

18   on behalf of shareholders seeking relief for shareholders.

19   Correct?

03:29   20   A.   Yes.

21   Q.   If -- do you want us to believe you didn't know what that

22   relief was?

23   A.   I was not involved in the settlement of this suit.

24   Q.   I'm not asking whether you were involved.  I'm asking you

03:29   25   whether as a shareholder.

Hill - Cross - Tambussi

1    A.   Okay.

2    Q.   Were you aware of the benefits given to the shareholders

3    in the resolution of those suits?

4    A.   No, I'm not aware.

03:29    5    Q.   Even though you had over six million shares.

6    A.   Correct.

7    Q.   Even though you made over 400 million dollars?

8    A.   Correct.

9    Q.   All right.  Now, Mr. Hill -- I'm sorry.  Take your time.

03:30   10    Mr. Hill, you recall that after you left the Bank and your

11    monies came due under your contract, the terms of your

12    contract, after August 30, 2007, your lawyers were talking to

13    Bank lawyers about trying to get this resolved.  Correct?

14    A.   Settlement negotiations.

03:30   15    Q.   Okay.  There were --

16    A.   Is that where we're at?  Is that what you asked me?

17    Q.   Well, I'm just referring to --

18    A.   Are you asking me about settlement negotiations?

19    Q.   Mr. Hill, I'm just asking you questions before this jury

03:30   20    and if you could just let me finish phrasing my question.

21         Didn't you tell this jury last Thursday that your

22    lawyers and the Bank lawyers were working to resolve the issue

23    of your payment?

24    A.   Yes.

03:30   25    Q.   After August 30th?

Hill - Cross - Tambussi

1   A.   Yes, they were.

2   Q.   Okay.  Now those would be the lawyers from Skadden Arps?

3   A.   I believe so.

4   Q.   Okay.  And they were working with lawyers for the Bank?

03:31   5   Correct?

6   A.   I believe so.

7   Q.   And that those discussions continued September, October,

8   November, December of 2007.  Correct?

9   A.   I believe so.

03:31   10   Q.   And they continued into 2008, even though you filed suit

11   against the Bank and individual Directors for fifty some

12   million dollars.  Correct?

13   A.   Correct.

14   Q.   And you know that those negotiations between the Bank's

03:31   15   lawyers and your lawyers to get this resolved, also include

16   meetings with the regulators.  Correct?

17   A.   I didn't have any.

18   Q.   I didn't ask you if you did.  I'm asking you, sir,

19   please.  You knew that the negotiations with your lawyers and

03:31   20   the Bank lawyers included meetings with the regulators?

21   A.   I know my lawyer met with the OCC once.  I have no idea

22   what the Bank did.

23   Q.   Okay.  And you're not aware of any meetings that the Bank

24   lawyers and your lawyers had in conjunction with the

03:32   25   Regulators?

Hill - Cross - Tambussi

1    A.    They might have.

2    Q.    They might have.  You wouldn't dispute any e-mail traffic

3    between Mr. Sandler and Mr. Alexander, for example, about such

4    meetings?

)3:32    5    A.    You'd have to show me.

6    Q.    Okay.  All right.  Now, even though you filed suit, the

7    Bank continued to seek regulatory approval after the merger

8    completed.  Correct?

9          MR. JACOBS:  I object to the form of the question,

)3:32    10    Judge.  No application was filed.

11          MR. TAMBUSSI:  I didn't say --

12          THE COURT:  That's not what the question was.

13          MR. JACOBS:  Well, it suggests that it was.

14          THE COURT:  That's not what the question was.  If the

)3:32    15    witness doesn't understand the question, he has the right to

16    say so and it will be rephrased.  Do you understand the

17    question, Mr. Hill?

18    A.    Would you repeat it?

19    Q.    Sure.  You understand that your lawyers and the Bank

)3:32    20    lawyers continued to talk after the merger completed.

21    Correct?

22    A.    Yes.

23    Q.    And you understand that your lawyers and the Bank lawyers

24    met with regulators to get your payments after the merger

)3:32    25    completed?

—— Hill - Cross - Tambussi ——

1    A.   I don't know what they met with.  I don't know what

2    happened.

3    Q.   Okay.  You understand, do you not, that the Bank

4    continued to seek approval for your payments after the merger

03:33    5    completed?

6    A.   I know no such thing.

7    Q.   The lawyers never told you that?

8    A.   I know no such thing.

9    Q.   You never heard that from your lawyers?

03:33    10   A.   I know no such thing.

11   Q.   All right.  Now, you understand I think that was your

12   testimony, that you had become familiar with part 359 since

13   this case started, 3590.4.  Correct?

14   A.   Yes.

03:33    15   Q.   And you understand that under part 359.4, that gives both

16   the Bank and the insider or the institution affiliated party

17   the right to submit information in support of a Part 359

18   certification.

19   A.   They can submit, yes.

03:33    20   Q.   Okay.  So, even party can.  Correct?

21   A.   Submit.

22   Q.   That's what I said.

23   A.   Right.

24   Q.   Okay.  You agree with me they could be either party.

03:34    25   Right?

Hill - Cross - Tambussi

1   A.   I don't agree that either party could apply.

2   Q.   Okay.  Either party could submit information to the OCC

3   -- I'm sorry.  To the Federal banking regulators, the FDIC in

4   support of a Part 359 request?

03:34   5   A.   If you're asking me could either party apply, the answer,

6   my opinion is no.

7   Q.   All right.  I understand that, Mr. Hill.  That's really

8   not my question.

9   A.   Uh-huh.

03:34   10   Q.   All right.  Try one more time.  You understand that the

11   regulation permits either the Bank or the institution

12   affiliated party to submit information in support of a Part

13   359 request?

14   A.   You're playing with words, counsel.  Okay?  Anybody can

03:34   15   submit information to any government agency they want to.  Can

16   I submit an application to a -- can I apply to get paid?

17   Absolutely not in my opinion.

18   Q.   Okay.  The Rules don't prohibit you from applying.

19   Correct?

03:35   20   A.   The Rules don't allow me to provide the information to

21   apply.

22   Q.   Well, let's talk about the information.

23        MR. TAMBUSSI:  Chris, pop up --

24   Q.   You read Part 359, Mr. Hill?

03:35   25   A.   Yes.

Hill - Cross - Tambussi

1    Q.   It's on the screen in front of you.  Bottom part of 359.

2    Paragraph 359.4 4 Roman Numeral I.  Do you see that?

3    A.   4-4I you say?

4    Q.   Yes.

03:35   5    A.   Yes.

6    Q.   The IAP?  You see that?

7    A.   Yes.

8    Q.   Committed any fraudulent act or omission, breach of trust

9    or fiduciary duty or insider abuse.  You see that?

03:36   10   A.   Correct.  I do, yes.

11   Q.   Okay.  And it goes on and it includes the word material

12   adverse effect.  Correct?

13   A.   All of which tie into that have a material adverse effect

14   on the company.

03:36   15   Q.   Now, Mr. Hill, you can certify because you've told me

16   under oath, correct, that you have not committed any

17   fraudulent act that has had a material adverse effect on

18   Commerce.  Correct?

19   A.   Correct.

03:36   20   Q.   And you can certify because you told me under oath in

21   March of 2011 that you can certify to a regulatory agency that

22   you have not committed any fraudulent omission that has led to

23   a material adverse effect on Commerce.  Correct?

24   A.   Correct.

03:36   25   Q.   And you can certify because you told me under oath in

*United States District Court*
*Camden, New Jersey*

─── Hill - Cross - Tambussi ───

1    March of 2011 that you can certify that you've not committed

2    any breach of fiduciary duty that had a material adverse

3    effect.  Correct?

4    A.    Correct.

03:36    5    Q.    And you can certify that you have not committed any

6    insider abuse that has had a material adverse effect on

7    Commerce.  Correct?

8    A.    Correct.

9    Q.    And you've also testified under oath that you can certify

03:37   10    that you have not committed any Federal or State banking law

11    that has had or is likely to have a material adverse effect on

12    Commerce.  Correct?

13    A.    Correct.

14    Q.    Finally, you can certify you are not responsible for the

03:37   15    troubled condition of Commerce.  Those are your words in March

16    of 2011?

17    A.    Correct.

18    Q.    But you haven't submitted any certification.

19    A.    Because I cannot.

03:37   20    Q.    All right.  Now, is there anything that prevents you from

21    actually writing those words on a piece of paper?

22    A.    I already -- you already read them back to me, but, of

23    course, you're only reading part of the application process.

24    Q.    The question to you, sir, is there anything that prevents

03:37   25    you from writing those words on a piece of paper and

──────── Hill - Cross - Tambussi ────────

1   submitting them to the Federal regulators?

2   A.   I can submit anything I want, but that's not considered

3   an application.

4   Q.   But you haven't submitted anything.  Correct?

)3:37   5   A.   Because I cannot.

6   Q.   All right.  Now, you retained certain documents in your

7   possession after you left the Bank.  Correct?

8   A.   I did.

9   Q.   Documents that were relevant to your employment.

)3:38   10   Correct?

11   A.   Correct.

12   Q.   And some of those documents were Bank documents.

13   Correct?

14   A.   Correct.

)3:38   15   Q.   All right.  Now, you also indicated that you read certain

16   of the institution letters that were sent by Federal

17   regulators bulletins that were sent by Federal Regulators

18   regarding these Part 359, or Part 359 process.  Correct?

19   A.   Yes.

)3:38   20   Q.   You understood and you understood back in March of 2011,

21   you understand now, that senior executive officers and other

22   officers identified as having significant influence over major

23   corporate initiatives and policy decisions can logically be

24   expected to have a greater difficulty meeting the requirements

)3:38   25   of Part 359.4.  Correct?

─────── Hill - Cross - Tambussi ───────

1   A.   That's what it says.

2   Q.   Now, you made some damages calculations for Mr. Jacobs.

3   Do you recall that?

4   A.   Yes I do.

03:39   5   Q.   Did you actually do those calculations or did you have

6   somebody do them for you?

7   A.   I had my accountant do it.

8   Q.   You had your accountant?

9   A.   Um-hum.

03:39   10   Q.   So when you said we did the calculations, it was actually

11   your accountant and not you?

12   A.   Correct.

13   Q.   And did you check to see if any of those calculations

14   were the same as the information that you previously provided

03:39   15   to the Bank in your joint final pretrial order?

16   A.   I believe they're the same.  I haven't checked them down

17   to the last dime.

18   Q.   Did you really do the interest calculation or did you

19   have your accountant do it?

03:39   20   A.   My accountant, of course.

21   Q.   You know that there was an escrow agreement proposed in

22   June of 2007.  Correct?

23   A.   Correct.

24   Q.   And your trial testimony was that it wasn't acceptable to

03:40   25   you, and you gave one reason.  No one would ever agree to an

————— Hill - Cross - Tambussi —————

1   escrow agreement that has no time limit.

2   A.   That's what I said.

3   Q.   Do you remember that?

4   A.   Yeah.   True.

03:40   5   Q.   Isn't it a fact that you didn't want to agree to the

6   terms of the escrow agreement because you didn't want to have

7   to deal with the Regulators yourself?  You wanted to have the

8   Bank instead do it?

9   A.   I told you why I couldn't sign the escrow agreement and

03:40   10   couldn't agree to it.   It had an unlimited time period.

11   Q.   Didn't the escrow agreement call for you and the Bank

12   Regulators to resolve your differences and then you would get

13   your money?

14   A.   I don't believe so.

03:40   15   Q.   Ever see any of that?

16   A.   Yeah, of course.

17       MR. TAMBUSSI:  You want to pop it up, Chris, please?

18   Q.   You recall reading that?

19   A.   Yes, I do.

03:41   20   Q.   When you were shown by, to you by Mr. Jacobs last

21   Thursday?

22   A.   Yes, I do.

23   Q.   Okay.   Now, if this money had been placed in the escrow

24   account in June of 2007, you wouldn't have to sue the Bank at

03:41   25   all, would you?

Hill - Cross - Tambussi

1    A.   Who can tell?

2    Q.   Well, it would be with the --

3    A.   An agreement that gives you unlimited time to do whatever

4    you whatever you want?

03:41    5    Q.   Gives who unlimited time?

6    A.   You, the Bank.

7    Q.   Well, doesn't that agreement agree to put the money into

8    an independent third party escrow account so that you and the

9    banking regulators could resolve your differences?

03:42    10    A.   Doesn't say anything like that in there.  Where do you

11    think it says that?

12    Q.   Isn't it a fact, Mr. Hill, that if you put this money,

13    you agreed to allow this money to be placed in this escrow

14    account, that you yourself would have had to deal with the

03:42    15    regulators in getting this payment approved?

16    A.   It absolutely says nothing like that.

17    Q.   Now isn't it a fact that this agreement says that

18    Commerce is required to cooperate with any investigation the

19    Regulators may conduct to determine if the requirements in the

03:42    20    Golden Parachute regulations have been met?

21    A.   It does.

22    Q.   And isn't payment of these monies to you contingent upon

23    Golden Parachute application approval?

24    A.   It doesn't even say the Bank has to apply.

03:43    25    Q.   You understood -- do you have any understanding what this

Hill - Cross - Tambussi

1    agreement says?

2    A.   I understand it clearly.

3    Q.   Okay.  The Bank would place the money that it says it

4    owes you and you agree.

03:43    5    A.   I didn't agree.

6    Q.   The Bank would have to put the money under the contract

7    to which you were owed with a third party escrow agreement or

8    agent.  Correct?  You understand that part?

9    A.   That's what it says.

03:43    10   Q.   Okay.  And then that money would stay there until the

11   regulators and you reached an agreement that you're entitled

12   to the money?

13   A.   Doesn't say anything, any such thing, and nowhere does it

14   say the Bank has to apply.

03:43    15   Q.   You would agree with me, would you not, Mr. Hill, that

16   these monies were placed in the escrow agreement, you would

17   not have to bring suit against the Bank?

18   A.   I don't agree to any such thing.

19   Q.   If the money were placed in the third party escrow

03:44    20   agreement, you understood that they would accrue interest.

21   Correct?

22   A.   I don't -- it doesn't say that here.

23   Q.   Now, you've testified on more than one occasion that this

24   was your Bank.  Correct?

03:44    25   A.   I started it.

Hill - Cross - Tambussi

1    Q.   In fact, you said this was my Bank.  Correct?

2    A.   The phrase that we used.

3    Q.   Okay.  But isn't if a fact that it was a shareholders'

4    bank?

03:44   5    A.   Office course it was.

6    Q.   And your first obligation was to the shareholders, not

7    your friends and relatives?

8    A.   Of course.

9    Q.   Let me just see if I can bring this up together here.

03:44   10   A.   This is your stuff back that you gave me earlier.

11   Q.   We'll take care of it.  You testified that you didn't

12   want to fight the regulators in Court in June of 2007 because

13   the consequences were that the U.S. Government has tanks and

14   you don't, it's strictly a one-sided fight.  Correct?

03:45   15   A.   Correct.

16   Q.   And you testified that they were looking at related party

17   transactions and that's you.  Correct?

18   A.   Among.  I was not the only one.

19   Q.   You said, your testimony only direct examination on

03:45   20   Thursday you were asked the question:  What were you thinking

21   about this investigation and who were they looking at.  And

22   your answer was:  Well, obviously they were looking at related

23   party transactions, and that's me.

24         You recall saying that?

03:45   25   A.   I did.

─── Hill - Cross - Tambussi ───

1    Q.   All right.  So I just want to see if I got this straight

2    where we are here up until now.  You resigned and were

3    terminated from the Bank and the Bancorp.  Correct?

4    A.   As you well know.

03:45    5    Q.   And one of the reasons was because you said that the U.S.

6    government had tanks in the Bank and the bank did not.

7    Correct?

8    A.   I don't know why I was terminated without cause.  You'll

9    have to ask the Board about that.

03:46   10    Q.   You submitted that -- and we'll have Board members next

11   week.

12   A.   Great.

13   Q.   This week actually.  But you actually voluntarily turned

14   in your resignation.  Correct?

03:46   15   A.   I resigned from the Bank and was fired without cause from

16   the holding company.

17   Q.   Right.  So voluntarily resold signed from the Bank?

18   A.   Correct.

19   Q.   All right.  And you refused to agree to have the Bank

03:46   20   place the money in the escrow agreement.  Correct?

21   A.   I'm under no obligation to accept an escrow agreement.

22   Q.   Didn't say you were?

23   A.   No.

24   Q.   The fact of the matter is that you refused to put money

03:46   25   in the escrow account?

──────────── Hill - Cross - Tambussi ────────────

1   A.   Someone offered this and we didn't agree to it.

2   Q.   All right.  And you signed the November 2008 Consent

3   Order with the OCC waiving your rights to hearings,

4   adjudication on the merits and everything else.  Correct?

03:47   5   A.   They already said there was no adjudication on the

6   merits.  I didn't need to have a hearing.

7   Q.   You signed that 2008 Consent Order even though it said

8   the words the comptroller finds.  Correct?

9   A.   Only in the context we've discussed.

03:47   10   Q.   You sued the Bank January 14, 2008 because you didn't

11   think you got your money quick enough.  Correct?

12   A.   Well, I also sued the Bank because the Bank failed to pay

13   my wife's firm.  You forgot that part of the suit, I guess.

14   Q.   I didn't forget that suit at all because that suit's been

03:47   15   long resolved, Mr. Hill.

16   A.   It hasn't.

17   Q.   You also testified under oath that you can provide

18   certifications to the Regulators but you have not.  Correct?

19   A.   You asked me on deposition whether I could attest to

03:47   20   these things.  I was proud to say the answer was I could

21   attest.  Our position is and was that only the Bank can apply.

22   Q.   All right.  You blame Mr. DiFlorio for the firings in the

23   DeMaria case that led to those judgments.  Correct?

24        MR. JACOBS:  I object to the form of the question.

03:48   25   Mr. DiFlorio admitted it him it's not a matter of blaming.

*United States District Court*
*Camden, New Jersey*

─────────── Hill - Cross - Tambussi ───────────

```
         1          THE COURT:  That's not the question.  The question is

         2    this witnesses' thoughts about that.

         3    A.   I didn't blame him for anything.

         4          MR. JACOBS:  It's not a matter of blaming, it's a

03:48    5    matter opinion.

         6    A.   I didn't blame him for anything.  Ge admitted that's what

         7    --

         8    Q.   You blame Mr. Wochek for the branch application issues.

         9    Correct?

03:48   10    A.   He admitted that was his responsibility.

        11    Q.   You were quoted in the, at least one publication that

        12    you're responsible for off-site acquisitions.  Correct?

        13    A.   I was responsible for choosing the branch sites.  True.

        14    Q.   And you heard Mr. DiFlorio say that you were involved in

03:48   15    the branch application process from cradle to grave.  Correct?

        16    A.   He said what.

        17    Q.   You were involved with the branch application process

        18    from cradle to grave?

        19    A.   That is not what he said.  That's not true.  Read it back

03:48   20    to me.

        21    Q.   We'll let the jury's recollection --

        22    A.   Okay.  Well, why don't you tell me the truth, Bill,

        23    before you.

        24    Q.   I did.

03:49   25    A.   No, you didn't.
```

*United States District Court*
*Camden, New Jersey*

Hill - Cross - Tambussi

1    Q.   He didn't tell you that.

2    A.   He didn't say that.

3    Q.   He did say it, cradle to grave.

4    A.   A branch applications.

03:49    5    Q.   Yeah.  You acknowledge that there are a pile documents a

6    foot high.  Tape recording containing allegations with regard

7    to your conduct as the CEO and the COB of the Bank.  Correct?

8    A.   I don't admit to anything.  You can pile up any amount of

9    stuff that you like.

03:49    10   Q.   I didn't ask you to admit or deny the allegations

11   certificate, sir.  I just ask you to admit that there's a pile

12   of documents that contain allegations against you.  Correct.

13   A.   In all my years at Commerce, there's a pile of documents

14   about everything.

03:49    15   Q.   And in spite of all these facts, in spite of all these

16   allegations, your knowledge of Part 359.4 that you've

17   testified to before this jury, you want this jury to order

18   Commerce to pay you millions of dollars in monies that the

19   bank authorities have not approved.  Correct?

03:50    20   A.   I want the jury to enforce the terms of my employment

21   agreement.  Toronto -- I'm not through.  Toronto Dominion Bank

22   has an obligation to fulfill the contract and they have never

23   to this day applied.

24   Q.   You understand that Banks have heavily regulated, do you

03:50    25   not?

*United States District Court*
*Camden, New Jersey*

Hill - Cross - Tambussi

1   A.   You think.

2   Q.   No, I don't.  It's not what I think.

3   A.   Yes, they are heavily regulated.

4   Q.   And you understand that the day-to-day operation of the

03:50    5   banks, banks that are operating in the United States like TD

6   Bank, they have to respond to the regulators.  Correct?

7   A.   Certainly.

8   Q.   And you understand that as part of their day-to-day

9   operations, they have to report to banking regulators.

03:50   10   Correct?

11   A.   Of course.

12   Q.   And you understand that they're not permitted to make

13   material misrepresentations to Regulators.  Correct?

14   A.   Of course.

03:50   15   Q.   In fact, there are civil and criminal penalties for doing

16   so, correct?

17   A.   Of course.

18   Q.   Do you expect Toronto Dominion Bank, as you refer to them

19   TD Bank, which is the party in this case, to make material

03:50   20   misrepresentations to Federal banking regulators in order to

21   get you paid?

22   A.   Of course I don't.  I expect them to tell the truth.

23         MR. TAMBUSSI:  Nothing further, your Honor.

24         THE COURT:  Redirect?

03:51   25         MR. JACOBS:  Thank you, Judge.

*United States District Court*
*Camden, New Jersey*

─────── HILL - RE-DIRECT - JACOBS ───────

1    (REDIRECT EXAMINATION OF MR. HILL BY MR. JACOBS:)

2    Q.   All these things that you've been discussing with Mr.

3    Tambussi, the InterArch indemnification, the telephone

4    conversation with Ron White back in 2002, the shareholder

03:51   5    suits in 2004 that were dismissed, the shareholder suits in

6    2007 that were dismissed, all these things, were they known to

7    the Board of Directors on June 28 and November 20, 2007 when

8    they voted to honor your contract to pay you and to secure

9    regulatory approval?

03:51  10    A.   Yes, they were.

11    Q.   And on December 18 when they voted to in fact prepare

12    releases to pay you.

13    A.   Yes, they were.

14    Q.   Now, let's take a look at exhibit 51 which Mr. Tambussi

03:52  15    produced a little while ago.  Is this, in fact, an e-mail?

16    A.   Yes, it is.

17    Q.   Do you see the date?

18    A.   June 28, 2007.

19    Q.   And is it from somebody at the OCC?

03:52  20    A.   Someone from the Federal Reserve Board.

21    Q.   And have you read it before?

22    A.   I have.

23    Q.   Okay.  Does it have six numbered paragraphs?

24    A.   It does.

03:52  25    Q.   Can you find anything in this one page e-mail which

─── HILL - RE-DIRECT - JACOBS ───

1    shifts the burden to you to go fight it out with the Fed to

2    get approval, as Mr. Tambussi suggested?  Can you find

3    anything?

4    A.   Well, first of all, this is an unsigned agreement by me.

03:52    5    I was not a party.  There is nothing in it that requires me to

6    get to 359 approval.

7    Q.   Have you looked at all six paragraphs and have you looked

8    at the preamble?  Have you looked at the concluding sentence

9    so you can tell the jury whether there is anything in here

03:53   10    shifting the burden to apply to you?

11    A.   I've looked at every word.  There's nothing in this memo

12    that requires me to apply for approval.

13    Q.   Now, let's stick with this time frame.  I think you said

14    the date of this is June 28, 2007?

03:53   15    A.   Yes.

16    Q.   Is that the date of the Board of Directors meeting where

17    they accepted your resignation from Commerce Bank NA and

18    discharged you without cause from Commerce Bank Bancorp?

19    A.   Yes.

03:53   20    Q.   As of what date would you be discharged without cause?

21    A.   July 29th I think.

22    Q.   Okay.  So, on the day that this e-mail number 61, defense

23    51, defense exhibit 51 was written, what had happened on that

24    same day?

03:53   25    A.   I got fired.

─── HILL - RE-DIRECT - JACOBS ───

**1**  Q.   And you?

**2**  A.   Left.

**3**  Q.   Okay.  And from your final date of July 31, 2007 how much

**4**  time did the Bank have to pay you?

03:54  **5**  A.   One month.

**6**  Q.   One month.  Now is there any -- so that would be one

**7**  month from July 31st would that be August 30, 2007?

**8**  A.   Correct.

**9**  Q.   Is there a peep in this escrow agreement which in any way

03:54  **10**  extends that or changes that?

**11**  A.   There is not, and this is not an agreement.  This is a

**12**  memo from a lawyer to another.  There's nothing in this memo

**13**  that would change that at all.

**14**  Q.   Okay.  Now, you focused on paragraph six.  There will be

03:54  **15**  no time limit on the escrow or the Feds or FDIC's approval

**16**  process.  How could you turn that down?

**17**  A.   Gee, that sounds like a great deal.

**18**  Q.   On this date, Mr. Hill, is there any reason in the world

**19**  that the Bank could not have put the money into an escrow

03:54  **20**  account in its bank or another bank and collected interest for

**21**  the next six years?

**22**  A.   None.

**23**  Q.   Mr. Hill, during these settlement discussions that Mr.

**24**  Tambussi claimed ongoing among counsel through 2007 and into

03:55  **25**  2008, during that time period, let's say the second half of

─── HILL - RE-DIRECT - JACOBS ───

1  2007 and into the first couple months of 2008.  Are you with

2  me so far?

3  A.  Yep.

4  Q.  At any point, have you ever seen a writing from the Bank

03:55  5  or its lawyers saying we're trying to settle with Vernon.  In

6  the meantime, we want approval to pay him under his contract?

7  A.  None.

8  Q.  Can you think of anything stopping them from doing it

9  back then?

03:55  10  A.  Nothing.

11  Q.  Did you hear Mr. Fisher's testimony, the corporate

12  representative where Mr. Fisher plainly said repeatedly for

13  three years, March 13, 2008 to March 24, 2011 they didn't even

14  make a decision whether they had a reasonable basis to believe

03:56  15  you did anything?

16  A.  Yes, I did hear anything.

17       MR. TAMBUSSI:  Objection.  Leading.

18       THE COURT:  That is leading.  Rephrase your question

19  please.

03:56  20       MR. JACOBS:  I'll just move on, Judge.  Thank you.

21  Q.  Mr. Tambussi made reference to your suit for over 50

22  million dollars.  Was this really yours alone?

23  A.  InterArch and my wife's firm and mine combined.

24  Q.  And what was your wife's suing for, money?

03:56  25  A.  Yes.

———— HILL - RE-DIRECT - JACOBS ————

1   Q.   Why was she suing for money?

2   A.   Commerce for no reason held back approximately

3   four million dollars in funds due her and at the same time

4   were out stealing her staff.

5              MR. TAMBUSSI:  Judge, sidebar.

6           THE COURT:  Yes.

7                (Sidebar)

8              MR. TAMBUSSI:  Judge, the objection is on relevancy,

9   number one.  Number two, are we going to try two cases here?

10  Clearly difficult divergent from this case.  It has nothing to

11  do with Mr. Hill's claims.

12             MR. JACOBS:  Here's the relevance, Judge.  In

13  cross-examination counsel made specific reference to our suit

14  for 50 some odd million dollars.  The reality is it wasn't

15  just his suit for 50 some million dollars.  It was his wife's

16  suit also.  Part of it was premised on money due to her,

17  several million dollars.  The bulk was premised on piracy of

18  her entire upper management.  And I think the jury if they

19  just hear your suit for 50 million dollars, it's being misled.

20  It was Mr. Hill and Mrs. Hill's suit and she had a completely

21  different set of facts and a completely different economic

22  complaint, economic damages which were, in fact, more

23  substantial than his.

24             THE COURT:  I'm going to sustain the objection.

25             MR. TAMBUSSI:  Thank you.

*United States District Court*
*Camden, New Jersey*

─────────────── HILL - RE-DIRECT - JACOBS ───────────────

1      THE COURT:  And the answer to the question it was his

2   wife's suit too.  I don't want to hear any more on that.

3   We're getting into the details of his wife's claims.

4      MR. JACOBS:  That's really as far as I was going to

5   go, Judge.

6      THE COURT:  Not far as he's going.

7      MR. JACOBS:  Okay.  I'll go to another topic while

8   we're here.  Just so we don't have any more of these sidebar

9   objections.  All right.  My plan to ask Mr. Hill why he keeps

10  saying that it was the Bank's obligation to make this

11  application.  As part of list response, I know from many prior

12  conversations is the ruling from the Court which is referenced

13  in the first paragraph of the Pollock letter to the Federal

14  Reserve.  That April 23 letter 2012 specifically says the

15  reaction to the Judge's decision March 1 we're submitting

16  this, that and the other thing.

17      MR. TAMBUSSI:  Well --

18      THE COURT:  He understands my decision, my opinion

19  but he doesn't understand the other one that Mr. Tambussi was

20  asking about.

21      MR. JACOBS:  I think he understands them both.  You

22  first ruled that either party --

23      THE COURT:  That decision.

24      MR. JACOBS:  Oh, I didn't hear that.  Very good the

25  way you hid that.

**1**      MR. TAMBUSSI:  Judge, your opinion also said Mr. Hill

**2**  can apply.  Why he didn't apply.

**3**      MR. JACOBS:  But the contractual responsibility is

**4**  squarely held was the Bank.

02:59  **5**      THE COURT:  Well, we might as deal with this now.

**6**  How are going to deal with this of insistence that he couldn't

**7**  make this application and my opinion that he couldn't?

**8**      MR. JACOBS:  Judge, you held and here's how.  You

**9**  held that as a matter of law he could.  He's explained why as

02:59  **10**  a matter of fact which is not practical.

**11**      THE COURT:  Well, that's not the only thing he

**12**   explained.  He says he can't.

**13**      MR. JACOBS:  He doesn't have access to the

**14**  information.

02:59  **15**      THE COURT:  I'm not talking about the practical.  We

**16**  all understand the practical reasons why he says he has not

**17**  made the application.  He said more than that.

**18**      MR. JACOBS:  Well, look, I think you should tell the

**19**  jury exactly what you've, what you held so far.  In 2010 you

02:59  **20**  held squarely that under that under the Reg either party can

**21**  apply.  You held that.  And both parties are stick with that.

**22**  In 2012 you held squarely that in this case it is the

**23**  contractual obligation of the Bank to apply.

**24**      THE COURT:  There's no dispute they agree they have a

03:00  **25**  contractual obligation to make an application.

—— HILL - RE-DIRECT - JACOBS ——

1        MR. JACOBS:  Well, they all began agreeing after you

2  authored your March 1, 2012 opinion, and they a fought it

3  tooth and nail until then.

4        THE COURT:  And he still doesn't agree with my

03:00    5  earlier decision.  At least I got them to agree with me.

6        MR. JACOBS:  Okay.  Well he agrees with your later

7  decision.  Why are you asking?  One out of two is not bad.

8        THE COURT:  You're right.  That's right.  I mean they

9  agree they only got 36 --

03:00   10        MR. JACOBS:  That's right.  That's right.  He's

11  looked as a phenomenon.  You're absolutely right.  Harry

12  Truman said if I'm absolutely right 70 percent of the time

13  that's the best anybody can ever hope for.

14        THE COURT:  Absolutely true.

03:00   15        MR. JACOBS:  Harry said it more than 70 percent.

16        THE COURT:  No, I think I agree.

17        MR. JACOBS:  Yeah.

18        THE COURT:  All right.  Well, we don't need to make

19  the decision unless you want me to tell the jury now that I

03:01   20  made this ruling that he can make the application.  Wait until

21  the charge.  How do you want handle that?

22        MR. TAMBUSSI:  I think tell them now.

23        MR. JACOBS:  I think you have to tell them the whole

24  story, not just that he can make the application but in this

03:01   25  case you've ruled it's the Bank's responsibility.

─── HILL - RE-DIRECT - JACOBS ───

1          THE COURT:  The Bank has a contractual obligation to

2    make the application.

3          MR. JACOBS:  Tell them now.

4          MR. TAMBUSSI:  I agree.

03:01      5          THE COURT:  All right.  Okay.

6          MR. TAMBUSSI:  Just so we're off the topic because

7    Mr. Hill may try to sneak stuff in.

8          THE COURT:  We're not talking about Shirley Hill's

9    case anymore.  We're not asking any more questions about that,

03:01     10    I assume.  Right?

11          MR. JACOBS:  I wasn't going to.

12          THE COURT:  Okay.

13          MR. JACOBS:  Just because you said what you said.

14    But I just want the jury to know that she had a component in

03:01     15    the claim.

16          THE COURT:  I know.

17          MR. JACOBS:  And they know.  Tell the jury you made

18    two rulings.

19          THE COURT:  Okay.

03:01     20          MR. JACOBS:  Okay.

21          THE COURT:  Anything else?

22          MR. JACOBS:  That is it.

23          THE COURT:  Thank you.

24          (Sidebar Concluded)

03:02     25          MR. TAMBUSSI:  Will you tell the jury the objection

—— HILL - RE-DIRECT - JACOBS ——

1   is sustained?

2          THE COURT:  All right.  The objection has been

3   sustained.  Ladies and gentlemen, one last thing I want to

4   tell you before we break for lunch.  I have made two prior

03:02   5   rulings in the case I want to make you aware of.  First and I

6   found as a matter of law that both Mr. Hill and the Bank can

7   make this application to the regulators.

8          Second, I have found that under the contract the Bank

9   has a contractual obligation to make this application on

03:02   10   behalf of Mr. Hill.

11          All right, let's break to lunch for an hour.  Don't

12   discuss the case.  Don't do any research.  We'll see you back

13   at 1:30.

14              MR. JACOBS:  Thank you.

03:02   15              THE DEPUTY COURT CLERK:  All rise.

16          (Jury leaves the courtroom)

17              THE COURT:  Are you going to rest after?

18              MR. JACOBS:  After the next witness, yes.  Judge, now

19   that Mr. Hill is done with the cross-examination, as you see,

03:03   20   and here I'm doing a little direct, is it your practice that I

21   can now talk to him about the remaining redirect?

22              THE COURT:  There's he has recross-examination

23   coming.

24              MR. JACOBS:  That's why I'm asking the question.

03:03   25              THE COURT:  The answer is, no, you cannot not.

HILL - RE-DIRECT - JACOBS

1        MR. JACOBS:  Okay.

2        THE COURT:  Unless he wants to assert a privilege.

3        MR. JACOBS:  Which privilege, at this point, Judge?

4   Which privilege?

03:03    5        THE COURT:  No, any person testifying has a right to

6   assert a Fifth Amendment privilege.  If he seeks advice to

7   those areas, you can certainly talk to about that.

8        MR. JACOBS:  Okay.

9        ( The luncheon recess was then taken)

05:11   10             (Luncheon Recess)

11        THE DEPUTY CLERK:  All rise.

12        THE COURT:  Be seated, please.

13        Are we ready?

14        MR. TAMBUSSI:  Yes, sir.

05:11   15        MR. JACOBS:  Yes, sir.

16        THE COURT:  Let's get the jury back.

17        Mr. Hill, would you come back up here, please.

18        (Witness resumes the stand).

19        THE DEPUTY CLERK:  All rise.

05:11   20        (Jury enters courtroom).

21        THE COURT:  Have a seat and continue with the

22   redirect, please.

23   BY MR. JACOBS:

24   Q.  Mr. Hill, your attention was drawn by Mr. Tambussi to the

05:14   25   2004 shareholders suits based on that Philadelphia indictment

HILL - RE-DIRECT - JACOBS

1   of the treasurer.

2   A.   Yes.

3   Q.   And some bank employees.  Do you recall all that?

4   A.   I do.

05:14   5   Q.   Now, was that before or after your 2006 contract, 5-year

6   contract with Commerce Bank was signed?

7   A.   Before, that was before.

8   Q.   The entire thing?

9   A.   Correct.

05:14   10   Q.   Now that phone call that he played from 2002, did you

11   hear that phone call?

12   A.   Yes.

13   Q.   Was that with Ron White?

14   A.   I was.

05:14   15   Q.   Is he a lawyer?

16   A.   He was.

17   Q.   Did he have some connection with the bank?

18   A.   Yes, he did.

19   Q.   What was his connection with the bank?

05:15   20   A.   He did labor work for us and he was an advisory director

21   of our sub bank in Philadelphia.

22   Q.   In 2002?

23   A.   I believe so.

24   Q.   Now, Mr. Hill, 2002 is how many years ago?

05:15   25   A.   Nine -- 11 years.

HILL - RE-DIRECT - JACOBS

1    Q.    You got it the second time.

2    A.    11 years.

3    Q.    11 years ago.  In the intervening 11 years, has any

4    federal prosecutor charged you with doing anything wrong

05:15    5    because that phone call?

6    A.    No.

7    Q.    How about a federal regulator, how about the OCC, how the

8    Federal Reserve, how about the FDIC, any federal bank

9    regulator charge you win doing anything wrong because of that

05:15   10    phone call?

11    A.    They neither charged me or they did not charge the bank.

12    Q.    Next.  If we can look at page 9 of P-53, which is your

13    November 17, 2008 order.  I want to look at the waiver

14    section.  It's the bottom of the page.  Maybe we can make that

05:16   15    a little bit bigger.  Since you waived the right to an

16    issuance of any notice, was any notice, any complaint ever

17    filed against you?

18    A.    No.

19    Q.    Sense you waived your right to a hearing and a final

05:16   20    agency decision was there ever any hearing or final agency

21    decision?

22    A.    No.

23    Q.    Now, go back to page one.  Does any of that change what

24    page one of this document says?  And can we make the second

05:16   25    paragraph bigger?  That this is about -- in connect with real

─ HILL - RE-DIRECT - JACOBS ─

1    estate purchases, leases and joint real estate development

2    transactions, any of that waiver stuff change this?

3    A.   No.

4    Q.   Any of the waiver stuff change the rest of it --

05:16   5    A.   No.

6    Q.   -- about there being no adjudication on the merits and

7    solely for purposes of settling the matter?  Does that waiver

8    paragraph change any of this?

9    A.   No.

05:16   10   Q.   Next topic.  Near the end of his cross-examination Mr.

11   Tambussi said to you you built a hugely successful bank.  Is

12   Mr. Tambussi correct?

13   A.   I think so.

14   Q.   Next topic.  You were asked about payments to Interarch

05:17   15   over a period of three years, you were asked about open

16   bidding, and things like that.  Now, I'm going to ask you to

17   look at P-9, which is the SLC report, and my interests are on

18   page 44, 45 and 46.  On page 46, the bottom couple lines, have

19   you read this before?  46 we should be on.

05:17   20   A.   Yes, I have.

21   Q.   I'm sorry, I'm saying 46, what I mean to be saying is 44.

22   The bottom couple lines is my interest.

23   A.   Yes, sir.

24   Q.   Okay.  Which read -- can we just focus in on those couple

05:18   25   lines, do you think?  "It appears that InterArch was decidedly

─ HILL - RE-DIRECT - JACOBS ─

1    unique in that the tailored its services precisely not

2    company's needs."  Did I read that correctly?

3    A.   Yes, you did.

4    Q.   Based on 35 years of Commerce Bank dealing with

05:18    5    InterArch; is that true?

6    A.    Absolutely.

7    Q.   Was there any other company who would give you a

8    competitive bid which had tailored its services precisely to

9    the company's needs?

05:18    10            MR. TAMBUSSI:  Objection, leading again.

11            MR. JACOBS:  That's not leading, Judge.  I'm asking

12    him were there any other companies.

13            THE COURT:  Go ahead.

14            THE WITNESS:  Not that we were aware of.

05:18    15    BY MR. JACOBS:

16    Q.   Now, I drew your attention last week to P-8, which is the

17    Smart & Associates report on comparing InterArch fees to other

18    companies' fees.

19    A.   Yes, that's a report by the bank to compare the fees,

05:19    20    correct.

21    Q.   All right.  Page 45 of this report, which you have read,

22    I'm looking now at the conclusion section, that's page 45 near

23    the bottom.  And if we can make that a bit bigger, please.

24    Okay.  Have you read this" "For the foregoing reasons it is

05:19    25    difficult, and in many cases it is impossible, to assign a

─ HILL - RE-DIRECT - JACOBS ─

1  reliable value to each of discrete services that InterArch

2  performed for the company and to then compare those, these

3  values depending on the services at issue to either, one, the

4  fees charged by one of the two outside firms for similar

05:19  5  services or, two, the costs of recruiting and employing the

6  companies' in-house personnel, who now provide such services."

7  Remember reading that and is that basically correct?

8  A.   Yeah, it's correct.  Because not only was -- this firm

9  had tremendous value for each of the parts that they did and

05:20  10  with a wide array of services, but the way they put them

11  together to create the brand.

12  Q.   And lastly on page 46, the first full paragraph, if we

13  can focus in on that.  46, the first full paragraph --

14  A.   Yes.

05:20  15  Q.   -- starts with the word finally.  Now, without me reading

16  the entire paragraph, Mr. Hill, this Special Litigation

17  Committee, having read the report, they do a lot of

18  interviews?

19  A.   I gather.

05:21  20  Q.   Did they list the people they interviewed through the

21  body of this 50 page report?

22  A.   Yes, they did.

23  Q.   On this single issue, whether InterArch received the

24  appropriate amount of money, read this paragraph and tell the

05:21  25  jurors what was the conclusion of every single Commerce

HILL - RE-DIRECT - JACOBS

1    executive interviewed on the topic of whether InterArch was

2    worth its money?

3    A.    "Finally, while the SLC through counsel systematically

4    ask a number of relevant Commerce executives, employees

05:21   5    whether they believed InterArch was overpaid or provided full

6    value for its fees received, all persons questioned, with a

7    single exception, replied that Commerce received full value

8    for its fees paid to InterArch."

9    Q.    Keep going, because we want to know about the exception.

05:21   10   A.    "The exception.  A senior vice president of Commerce

11   created a detailed memo recounting events during his

12   employment at the bank, together with his views and opinions

13   concerning such events.  Counsel to the SLC has thoroughly

14   investigated the allegations in this memo that fall within its

05:22   15   jurisdiction.  So InterArch, counsel has determined that

16   despite making various criticisms about InterArch, the same

17   senior vice president subsequently wrote "I find InterArch's

18   overall fee structure to be extremely competitive as it

19   compares to similar services in the retail industry.  And in

05:22   20   summary, the InterArch 2007 proposal is fair and gives the

21   bank the best architectural services at a very competitive

22   price."

23   Q.    Okay.  Now, these figures that Mr. Tambussi recited to

24   you over a three-year period adding up to 22 and-a-half

05:23   25   million dollars, or something like that, in this three-year

HILL - RE-DIRECT - JACOBS

1  period do you know how many banks Commerce opened and

2  InterArch designed and outfitted and provided architectural

3  services for?

4  A.   I'm not sure how many locations, but we were opening

05:23   5  about a branch a week, so it was 150 to 200 new stores.  A lot

6  of them were in the Manhattan market.  And besides doing the

7  individual stores, we had to expand the back office to support

8  the size of the bank as the bank grew 6 fold from the end of

9  2001 through 2007.

05:23   10  Q.   And who did all the work?

11  A.   My wife's team.

12  Q.   Next topic.  Is it true that you did not, you and/or your

13  lawyer did not cooperate with the Special Litigation Committee

14  about these claims that you did something wrong using

05:24   15  contractors for your house?

16  A.   Correct.

17  Q.   Even without your cooperation, look at page 24 of the SLC

18  report, 24 and 25, and tell the jurors did the SLC interview

19  every single contractor?  On the bottom of page 24 through the

05:24   20  center of 25.

21  A.   "Counsel to the SLC interviewed numerous contractors who

22  performed work both for the bank and for the Hills' personal

23  home.  Every contractor interviewed, every contractor

24  interviewed confirmed that the work was not done for free and

05:24   25  that the client was never the bank or the company."

––––– HILL - RE-DIRECT - JACOBS –––––

1    Q.   Look at the next page, 25, final paragraph.  What does

2    the SLC conclude about wrongdoing?  Did they find any

3    wrongdoing by you even though you didn't cooperate?

4    A.   You are talking about the paragraph that starts with

05:25    5    "every contractor?"

6    Q.   Yes, I am.

7    A.   "Every contractor interviewed regarding these allegations

8    stressed that not only was the work not performed for below

9    market rate, but that work for the Hills was extraordinarily

05:25    10   difficult.  In fact, many of the contractors noted that the

11   completion of the project was impeded due to a large number of

12   change orders submitted during the process.  Still, every

13   contractor confirmed that they had been paid at least market

14   rate for their work and they were never asked to perform such

05:25    15   work for below market value.

16   Q.   Two lines down, the SLC, did they or didn't they find any

17   evidence of wrongdoing?

18   A.   "The SLC did not discover any evidence of wrongdoing to

19   substantiate the allegations that certain contractors which do

05:25    20   business with the company were directed do provide services

21   for the Hills at below market rate in consideration of the

22   ability to continue to do work for the company."

23   Q.   Next.  Mr. Hill, remember the questions Mr. Tambussi

24   asked you about the legal opinion from a law firm called Blank

05:26    25   Rome?

HILL - RE-DIRECT - JACOBS

1    A.   Yes.

2    Q.   Are they a Philadelphia law firm?

3    A.   They are.

4    Q.   And he was questioning whether they were a bank law firm

05:26    5    and they provided a legal opinion regarding the InterArch

6    indemnify.  Do you recall those questions?

7    A.   I do.

8    Q.   You told the jury a couple times you've read that

9    opinion, the Appellate Division opinion?

05:26    10   A.   Yes, I have.

11   Q.   Can you tell from reading -- may I present him with a

12   copy?

13          THE COURT:  Sure.

14   Q.   Can you tell from reading the Appellate Division opinion

05:26    15   whether the Appellate Division knew all about that opinion and

16   in fact discussed it?

17          MR. TAMBUSSI:  Judge, objection to the question.

18   First of all, is Mr. Hill going to read the opinion into the

19   record?

05:26    20          MR. JACOBS:  No, he's just refreshing his

21   recollection, he's read the opinion --

22          THE COURT:  When you said he needed to refresh his

23   recollection --

24          THE WITNESS:  I need to refresh my recollection.

05:27    25          MR. JACOBS:  He read it a long time ago, Judge.

 1          THE WITNESS:  Is that all right?

 2          MR. TAMBUSSI:  Now, the second part of this, Judge,

 3  is how did he know what the Appellate Division was thinking?

 4          MR. JACOBS:  It's printed there.

05:27   5          MR. TAMBUSSI:  No, no, that's the decision, that's

 6  not what the question was.

 7          THE COURT:  He can tell us his understanding of the

 8  written decision.

 9          MR. JACOBS:  After you've read it -- I'll be more

05:27  10  precise in the questioning.

11          THE COURT:  You want him to read the parts that you

12  highlighted or do you want him to read the whole thing?

13          MR. JACOBS:  No, just the parts I highlighted, Judge?

14  A.   Do you want me to read that now?

05:27  15  Q.   No, I just want you to answer the question.

16  A.   Well, what was it?

17  Q.   This Blank Rome legal opinion about the indemnification,

18  based on what you've read there was that known to and

19  discussed by the appellate court which validated the

05:27  20  indemnity?

21  A.   Yes.

22  Q.   Now, page 22 of this P-9, which is the SLC report, you

23  are looking at page 22, topic heading five, the second full

24  paragraph four lines down.  Did the SLC make a recommendation

05:28  25  that a court case be filed challenging this indemnification?

─ HILL - RE-DIRECT - JACOBS ─

1    A.   I believe they did, but it doesn't say it in the part

2    that you just raised.

3    Q.   Page 22, second full paragraph, four lines down.   "On

4    January 14, 2008."

5               THE COURT:   The question's whether he --

6               THE WITNESS:   I'm sorry.   I see it.   I'm sorry, your

7    Honor.

8               THE COURT:   The question is whether the committee

9    recommended it.   A suit was filed, there is no question about

10   it.

11              MR. JACOBS:   I said based on the findings of the SLC.

12              THE COURT:   Well, what's your question, because that

13   the not in the report.

14              MR. JACOBS:   All right.

15   BY MR. JACOBS:

16   Q.   Again, is that the opinion that resulted from this suit

17   that was filed?

18   A.   Correct.

19   Q.   Was the indemnification found to be proper under New

20   Jersey law?

21   A.   Yes, it was.

22              MR. TAMBUSSI:   Objection, your Honor.

23   BY MR. JACOBS:

24   Q.   Was the SLC assisted by independent lawyers?

25   A.   Yes.   From what I read, they hired an outside firm.

──── Hill - Recross - Tambussi ────

1   Q.   Last thing.  Mr. Tambussi asked you a couple of times

2   about getting $400 million for your stock when the bank was

3   acquired by TD Bank NA, or whatever.  Do you remember those

4   questions?

05:29   5   A.   I did.

6   Q.   Did that just fall out of the sky?  I mean, how did you

7   get that stock?  How does one acquire stock?

8   A.   Most of it came from the stock I originally bought when

9   the bank was started in 1973.

05:29   10   Q.   Did you pay for that stock?

11   A.   Of course I paid for it.  And I bought stock lots of

12   times along the way.  23 percent compounded return for

13   34 years produces a massive return.  All of the folks who

14   bought stock in the beginning and every step along the way

05:30   15   enjoyed the same gain.

16   Q.   Did you buy and pay for that stock?

17   A.   Absolutely.

18   Q.   Which 30 years later became worth this $400 million?

19   A.   Correct.

05:30   20        MR. JACOBS:  That's all I have.

21        MR. TAMBUSSI:  Mr. Hill, this stock -- Judge, if I

22   may?

23        THE COURT:  Please.

24   (REDIRECT EXAMINATION OF MR. HILL BY MR. TAMBUSSI:)

05:30   25   Q.   This stock, you were awarded stock options as part of

*United States District Court*
*Camden, New Jersey*

———— Hill - Recross - Tambussi ————

1    your compensation weren't you?

2    A.    Options were a very small percent of the total.

3    Q.    In fact, when you exercised those options you also

4    exercised those under what is called a cashless exercise,

05:30    5    correct?

6    A.    Correct.

7    Q.    You gave no cash for those?

8    A.    It's the method the bank used.

9         MR. TAMBUSSI:  Nothing further, Judge.

05:30    10         THE COURT:  Anything else on that?

11         MR. JACOBS:  There are no further questions based

12    open that, your Honor.

13         THE COURT:  Thank you, Mr. Hill.  You may step down.

14         Your next witness, please.

05:30    15         (Witness excused).

16         MR. JACOBS:  The next witness to whom I will ask

17    questions is William Schwartz.

18         THE COURT:  Mr. Schwartz, please come up here.  Come

19    up on here, Mr. Schwartz.  Would you come right over here,

05:31    20    please.  Good afternoon.  How are you?

21         THE WITNESS:  Good afternoon, sir.

22         THE COURT:  Would you raise your right hand.

23    (**WILLIAM A. SCHWARTZ, JR.,** HAVING BEEN DULY SWORN AS A WITNESS

24    TESTIFIED AS FOLLOWS:)

05:31    25    (DIRECT EXAMINATION OF MR. SCHWARTZ BY MR. JACOBS)

———— Schwartz - Direct - Jacobs ————

1         THE COURT:  Mr. Schwartz, if you will please have a

2    seat here and try to speak in that microphone so we can all

3    hear you.

4         THE WITNESS:  Thank you.

05:31    5         THE COURT:  Thank you.

6    BY MR. JACOBS:

7    Q.   Good afternoon, Mr. Schwartz.

8    A.   Good afternoon.

9    Q.   Mr. Schwartz, are you here because at some time past I

05:31   10   had a trial subpoena served upon you?

11   A.   Yes.

12   Q.   Mr. Schwartz, may I ask how old a gentleman you are?

13   A.   I have to give some thought to that.  73.

14   Q.   Were you at some time past associated with Commerce Bank?

05:32   15   A.   Yes.

16   Q.   What was your position?

17   A.   Director.

18   Q.   For how long?

19   A.   Approximately 20 years.  I did not look that up in

05:32   20   preparation for today, but approximately 20 years.

21   Q.   Was that Commerce Bank NA or Commerce BanCorp, Inc.?

22   A.   Both I think.

23   Q.   Did you know Vernon Hill?

24   A.   Yes.

05:32   25   Q.   Did you work with him?

————— Schwartz - Direct - Jacobs —————

**1**  A.   Yes.

**2**  Q.   Mr. Schwartz, after the acquisition of Commerce Bank by

**3**  TD some time between October 2, 2007, and March 13, 2008, who

**4**  did you go to work for?

05:32  **5**  A.   Banking wise?

**6**  Q.   Yes.

**7**  A.   Stayed on at Commerce Bank until the transaction was

**8**  executed on and then was invited to join the TD -- I think the

**9**  official corporate name was TD North.

05:33  **10**  Q.   Were any other Commerce Bank Directors invited?

**11**  A.   No.  No.

**12**  Q.   Assuming the transaction was concluded in March of 2008,

**13**  how long did you stay with TD?

**14**  A.   Approximately 2 years.

05:33  **15**  Q.   Would that take us through 2010 or so?

**16**  A.   Approximately.  I didn't look that up either in preparing

**17**  for this, but approximately.

**18**  Q.   Thank you.  Who is Bharat Masrani?

**19**  A.   He was the president and CEO of TD Bank North.

05:33  **20**  Q.   Did you know him during those 2 years?

**21**  A.   During those 2 years I did.

**22**  Q.   Did you speak with him?

**23**  A.   Often.

**24**  Q.   Did you work with him?

05:33  **25**  A.   Yes.

Schwartz - Direct - Jacobs

1  Q.   Did you ever have any discussions with him regarding

2  whatever payments were due to Vernon Hill under his contract?

3  A.   A few times.

4  Q.   I'd like you to tell the jury approximately when you had

5  the discussions, where you and he were and what he said.

6  A.   The two most frequent occasions that I remember were at

7  lunches.  We tried to have -- I, as a Director and he as the

8  CEO and president of the bank, would try to go -- he was based

9  I think at the time in Portland, Maine and I'm in New Jersey,

10 so we tried to go to lunch corporately -- it evolved into

11 semiannually by the time we put our schedules together.  And

12 we'd meet for lunch in New Jersey and that's when these

13 conversations took place.  Because there was an informality

14 that since I was the only one Director that had served on both

15 boards, there was a commonality of perhaps I knew the

16 situation better than a Director who had never been involved

17 in Commerce before.  And one of the occasions was at a seafood

18 restaurant on Route 70 or 73, I think it's 70, Blue H²O, and

19 the subject of the founder and former president of Commerce

20 Bank came up.

21 Q.   Who brought -- would that be Vernon Hill?

22 A.   Yes, I'm sorry, Vernon Hill.

23 Q.   Who brought Mr. Hill up, you or Mr. Bharat Masrani?

24 A.   I don't recall.

25 Q.   Tell the jury what Mr. Masrani said, if anything, about

*United States District Court*
*Camden, New Jersey*

— Schwartz - Direct - Jacobs —

1   paying Mr. Hill.

2   A.   That was the subject of the conversation, so -- we know

3   it was an outstanding issue that we hadn't paid Vernon Hill

4   and we -- I as a Commerce Director thought he was going to be

5   paid and it would long sense be history.  And we weren't being

6   kept informed on that issue, as a TD Director, to any great

7   extent.  And over the course of lunch I asked Barrett the

8   status of that, was Vernon going to be paid?  And his answer

9   was "We're going to stretch that out as long as we can."  That

10  was one -- that was one of the occasions we discussed it.

11  Q.   "We're going to stretch that out as long as we can?

12  A.   We are going stretch it out and cost Vernon some money on

13  this issue.

14  Q.   Okay.  And did that topic come up more than once or just

15  this one time at the seafood joint?

16  A.   It came up at least twice.  But, I mean, this wasn't the

17  subject of lunch, we didn't go to lunch to discuss Vernon

18  Hill.

19  Q.   I understand.  All right.  Is that your best recollection

20  so what Mr. Masrani said?

21  A.   At that lunch, yes.

22  Q.   And what was his position the day he said that?

23  A.   He was CEO of TD North, which was the United States

24  division or subsidiary of Toranto-Dominion Bank.

25          MR. JACOBS:  That's all I have the witness.  Thank

—— Schwartz - Cross - Tambussi ——

1    you.

2          THE COURT:  Cross-examine.

3    (CROSS EXAMINATION OF MR. SCHWARTZ BY MR. TAMBUSSI:)

4    BY MR. TAMBUSSI:

05:37    5    Q.  Good afternoon, Mr. Schwartz.

6    A.  Good afternoon.

7    Q.  I just want to make sure we're talking about the same

8    thing here.  You were the William Schwartz who was a Director

9    for Commerce Bank for, I think your testimony was, some

05:37   10    20 years?

11    A.  As best I recall.  Maybe it was 15 or 22, I don't

12    remember.

13    Q.  You were paid handsomely for your service as a Director?

14    A.  I didn't think so.

05:37   15    Q.  Well, you were paid in 2007 fees of $179,000, correct?

16    A.  I worked pretty hard for those things.  Every time I

17    turned around, I was called to the bank to meet with lawyers,

18    accountants and other people.  I was paid but I thought I

19    worked pretty hard for those numbers.

05:38   20    Q.  In fact, in 2007 your total compensation was over

21    $1 million as a Director, correct?

22    A.  I don't believe I was -- I don't know how that came out

23    in fees, perhaps it was stock that I cashed in, or something,

24    I didn't -- I didn't have that job to get paid a million

05:38   25    dollars a year.

— Schwartz - Cross - Tambussi —

**1** Q.   You are the same guy though, right?

**2** A.   Pardon me?

**3** Q.   You are the same guy that's reported here?

**4** A.   I don't have what you have in front of me.  If you want

05:38 **5** to make it available so how I got it.

**6** Q.   Absolutely?

**7** A.   I was paid.  I did my work to get paid.  I don't know

**8** where that number came from.  I'm not disputing it, but I

**9** wasn't written a check for 50,000 a week, or anything.

05:38 **10** Q.   Ultimately when you went to TD you were paid fees also,

**11** correct?

**12** A.   Paid what?

**13** Q.   Director's fees?

**14** A.   Paid Director's fees at both institutions the same as the

05:38 **15** other Directors.

**16** Q.   Director fees at TD bank were far, far less, correct?

**17** A.   I don't recall.  They weren't -- they weren't the same

**18** Director's fees at Commerce, but I don't recall.

**19** Q.   Well, if the 2007 report of the Compensation Committee

05:39 **20** lists you as having $179,000 in fees alone for 2007, you don't

**21** dispute that, correct?

**22** A.   I haven't looked it up.  I wish I had prepared for today,

**23** but I wouldn't dispute that.

**24** Q.   We can show it to you.  I can show it to you.

05:39 **25** A.   I don't dispute it.

—— Schwartz - Cross - Tambussi ——

**1**  Q.   Okay.  And for the two and-a-half years that you served,

**2**  almost 3 years that you served as a Director for TD Bank, your

**3**  total fees for 3 years was just a little over 130,000,

**4**  correct?

05:39  **5**  A.   I don't know if that was the total.  And you say it was

**6**  and it in the reports.  I never saw any of those reports

**7**  because the American board was virtually in the dark, I never

**8**  saw anything as far as that was concerned.

**9**  Q.   Well, you know that at Commerce you were getting paid an

05:40  **10**  annual fee of 35,000 plus 1,500 for each meeting, correct?

**11**  A.   Mr. Tambussi, I accept whatever you're saying but I never

**12**  committed any of this to memory.

**13**  Q.   Okay.  But your Board fee at TD was $7,500, correct?

**14**  A.   You can go down this path as often as you want, I didn't

05:40  **15**  commit any of this to memory nor does any of this effect my

**16**  testimony.

**17**  Q.   But you don't dispute it at all, do you?

**18**  A.   Pardon me?

**19**  Q.   You don't dispute anything that I've said?

05:40  **20**  A.   If the numbers are there, the numbers are there, I

**21**  didn't --

**22**  Q.   Did there come a time when Mr. Masrani told you that you

**23**  were no longer going to be on the TD Board?

**24**  A.   At the same meeting that I told him that I was

05:40  **25**  uncomfortable with being on a Board where we were of no value

Schwartz - Cross - Tambussi

1  to the bank, the public, or the regulators.

2  Q.   You told Mr. Masrani you weren't happy, you were leaving

3  the Board, correct?

4  A.   At the same meeting we were trying to figure out what

5  would happen, would he fire me or would I quit.

6  Q.   And when it happened, you no longer received any fees

7  from TD Bank, correct?

8  A.   Yes, of course that's correct.

9  Q.   In fact, when you left, you received TD Bank's equivalent

10  of stock options in the amount of almost $78,000, correct?

11  A.   I don't know, I never --

12  Q.   And you lost all that when Masrani terminated you from

13  the Board, correct?

14  A.   If you pull out all the records after that lunch

15  discussion and I told him how unhappy I was with an impotent

16  Board that was just there to satisfy regulators and doing

17  nothing, I went back to the office, he said let's think about

18  it, I went back to the office and dictated a resignation.  I

19  don't think he fired me, I think I quit.

20  Q.   Okay.  Just existed to satisfy regulators.  You

21  absolutely recognize that banks have to satisfy the

22  regulators, correct?

23  A.   Say that again, Mr. Tambussi.

24  Q.   You said the Board was just there to satisfy regulators.

25  Do you remember just saying that to the jury just seconds ago?

— Schwartz - Cross - Tambussi —

1    Didn't you just say that?

2    A.   That's what we were told by Mr. Masrani, that the

3    regulators required a U.S. Board to satisfy the regulators,

4    however, the U.S. Board had no power, no authority, no

5    nothing.  And I retained separate counsel to advise me what to

6    do and he said I was placing myself in a very difficult

7    position with TD and I wanted to resign and he wanted to get

8    rid of me.

9    Q.   You recognize that boards of directors have to satisfy

10   the regulators, correct?

11   A.   Say that again, please.

12   Q.   You understand that the actions the Board of Directors

13   take must satisfy the regulators, correct?

14   A.   Should and were meant to satisfy the regulators.

15   Q.   Okay.  You also understand that a bank's Board cannot

16   make material misrepresentations to the regulators, correct?

17   A.   This bank Board did nothing.

18   Q.   Well, why don't you try to answer my question.

19        You understand that a bank's Board of Directors cannot

20   make material misrepresentation to banking regulators,

21   correct?

22        MR. JACOBS:  Judge, this is beyond the scope of the

23   very limited direct examination.  I asked about a single lunch

24   meeting or two lunch meetings, I didn't ask anything about

25   bank Board decision making.

*United States District Court*
*Camden, New Jersey*

───── Schwartz - Cross - Tambussi ─────

**1**      THE COURT:  This is about the service on the Board,

**2**  is it not?

**3**      MR. TAMBUSSI:  Yes.

**4**      THE COURT:  I'm going to permit it.

05:43   **5**      MR. JACOBS:  All right.

**6**  BY MR. TAMBUSSI:

**7**  Q.   Do you understand -- I'll try one more time.

**8**      Do you understand that a bank's Board of Directors are

**9**  under an obligation to make no material misrepresentation to

05:43  **10**  the federal banking regulators?

**11**  A.   That's why I wished to resign, we were making

**12**  representations without facts on our hands.

**13**  Q.   You understand that a banking Board of Directors cannot

**14**  pay money unless it's approved by the federal banking

05:44  **15**  regulators, correct?

**16**      MR. JACOBS:  Judge, this is beyond the scope of my

**17**  very limited direct examination.

**18**      THE COURT:  I'll permit it.

**19**      THE WITNESS:  Say again, Mr. Tambussi.

05:44  **20**  BY MR. TAMBUSSI:

**21**  Q.   You understand that a bank Board of Directors cannot pay

**22**  moneys to any individual unless approved by the federal

**23**  banking regulators, correct?

**24**  A.   I thought that was compromised by a CEO that said we're

05:44  **25**  going to do everything we have to to not pay Mr. Hill.

*United States District Court*
*Camden, New Jersey*

Schwartz - Cross - Tambussi

1   Q.   Let's try one more time.

2   A.   So I thought it was immaterial what was going to go on.

3   Q.   You understand that in order to pay Mr. Hill, federal

4   banking regulators had to approve the payment, correct?

05:44   5   A.   I didn't know that, it was never discussed when I left

6   the Commerce Board -- I'm sorry, it was never discussed when

7   Vernon Hill left the Board.  Your look on your face says you

8   know that it was but I was at the Board meetings and that was

9   never discussed at any TD Board meetings.

05:45   10   Q.   Are you saying there was never a discussion amongst the

11   Board of Directors at Commerce that the federal banking

12   regulators had to approve the payment to Mr. Hill?

13   A.   Must have happened when I was in bathroom.  When Mr. Hill

14   left the Board, we Board members were under the impression

05:45   15   that his contract would be satisfied unless he had committed

16   some illegal act, which none of us Board members -- I, as a

17   Board member, knew of nothing illegal he committed so I, as a

18   Board member, thought the president of the bank would be paid

19   what he was owed.  And at TD I never heard another word about

05:45   20   that aspect, all I know is TD didn't want to pay him.

21            MR. TAMBUSSI:  Nothing further, Judge.

22            THE COURT:  Any redirect?

23            MR. JACOBS:  No redirect, Judge.  Thank you.

24            THE COURT:  Thank you, sir.  You may step down.

05:45   25            THE WITNESS:  Thank you.

──── ALEXANDER - DIRECT - TAMBUSSI ────

**1**              (Witness Excused.)

**2**              THE COURT:  Any other witnesses or evidence?

**3**              MR. JACOBS:  Judge, the plaintiff rests so witnesses.

**4**   And I'd like a little bit of time to see if there's any

05:45  **5**   documentary evidence we have failed to move, I think we're

**6**   okay but I want to double-check that.

**7**              THE COURT:  Can I see counsel for a second at the

**8**   bench?

**9**               (OFF-THE-RECORD DISCUSSION.)

05:47  **10**              THE COURT:  Call your witness, please.

**11**              MR. TAMBUSSI:  Thank you.  Your Honor, the defense

**12**   calls Richard Alexander.

**13**              THE COURT:  Mr. Alexander, please.

**14**          Good afternoon, sir.  Would you raise your right hand.

05:48  **15**   (**RICHARD MARSHALL ALEXANDER,** HAVING BEEN DULY SWORN AS A

**16**   WITNESS, TESTIFIED AS FOLLOWS:)

**17**              THE COURT:  Spell your last name.

**18**              THE WITNESS:  A-L-E-X-A-N-D-E-R.

**19**              THE COURT:  Mr. Alexander, would you please have a

05:48  **20**   seat and try to remember to speak into the microphone.  Thank

**21**   you.

**22**   (DIRECT EXAMINATION OF RICHARD MARSHALL ALEXANDER BY MR.

**23**   TAMBUSSI)

**24**              MR. TAMBUSSI:  Your Honor.

05:48  **25**   BY MR. TAMBUSSI:

————— ALEXANDER - DIRECT - TAMBUSSI —————

1  Q.   Good afternoon, Mr. Alexander.  How are you?

2  A.   Good afternoon.

3  Q.   Mr. Alexander, could you please introduce yourself to the

4  jury by telling them your name and also what you do?

5  A.   Yeah, my name is Richard Alexander, I'm a partner at the

6  law firm of Arnold & Porter in Washington, D.C.

7  Q.   Now, at some point in time -- well, let me ask you this.

8       As a partner in Arnold & Porter, do you have a

9  specialty or area of work?

10  A.   Yes, I'm a senior partner in the financial services area,

11  I'm formerly an attorney with the Office of the Comptroller of

12  the Currency, and I'm currently the managing partner of Arnold

13  & Porter.

14  Q.   You did work for the Office of the Comptroller of the

15  Currency?

16  A.   Yes, sir.

17  Q.   What did you do in that position?

18  A.   I was an enforcement attorney handling supervisory cases

19  from 1982 to 1985.

20  Q.   What does that mean?

21  A.   I handled problem and troubled banks.

22  Q.   Okay.  And in order to do that, did you have to

23  familiarize yourself with certain laws and regulations?

24  A.   Yes, sir.

25  Q.   Did you do that?

─── ALEXANDER - DIRECT - TAMBUSSI ───

1   A.   Yes, sir.

2   Q.   Okay.  So in order to become a lawyer who went to work

3   for the Office of the Comptroller of the Currency, you must

4   have gone to law school?

05:49   5   A.   Yes, I went to Syracuse Law School and did an honor's

6   thesis in financial regulations and then joined the OCC right

7   out of law school.

8   Q.   And you were at OCC for a period of time and then you

9   went where?

05:49   10   A.   I went to Arnold & Porter first as an associate.

11   Q.   Okay.  And you've been there ever since?

12   A.   Yes, sir.

13   Q.   All right.  Now, let me just get right to the point here

14   on some issues.  At some point in time were you retained with

05:50   15   regard to an investigation of Commerce Bank instituted by the

16   Office of the Comptroller of the Currency and the Federal

17   Reserve?

18   A.   Yes, in approximately December of 2006.

19   Q.   Okay.  And did you have an understanding of what that

05:50   20   investigation was all about?

21   A.   I had a preliminary understanding based on the

22   description of the Order Of Investigation, which is a document

23   that the OCC provided the company and the bank in December of

24   2006, and I came to learn more about the investigation as we

05:50   25   interacted with the regulators.

*United States District Court*
*Camden, New Jersey*

ALEXANDER - DIRECT - TAMBUSSI

1    Q.   Okay.  Now, do you know a gentleman by the name of

2    Alexander Bono?

3    A.   Yes, sir.

4    Q.   And who is Mr. Alexander Bono?

05:50    5    A.   He was the former general counsel of Commerce who I think

6    was a former partner from Blank Rome.

7    Q.   Okay.  And did you work with Mr. Bono?

8    A.   He's the one that called me to retain our firm in

9    connection with the investigation.

05:51    10    Q.   Okay.  Now, I'm going to take things a little bit out of

11    chronological order because I really want to get to the point

12    of the matter here and then we'll go back and fill it up.

13        Are you familiar with Part 359 of the Code Of Federal

14    Regulations as it relates to golden parachute payments?

05:51    15    A.   Yes.

16    Q.   Tell us what you know about that provision.

17    A.   Well, the regulations were established and promulgated by

18    the FDIC to deal with abuse in the system where individuals

19    would cause harm to financial institutions taking money out of

05:51    20    the bank and leaving the banks, who are oftentime were in

21    troubled condition, holding the financial obligations and the

22    government wanted to address that.

23    Q.   When you say taking money out of the banks, what do you

24    mean by that?

05:51    25    A.   It could be in the form of severance, it could be in the

*United States District Court*
*Camden, New Jersey*

ALEXANDER - DIRECT - TAMBUSSI

1  form of indemnification, legal defense funds, there's a whole

2  variety of payments covered by the regulations.

3  Q.  Okay.  Did you have any experience dealing with Part 359?

4  A.  Substantial.

05:52  5  Q.  Okay.  Could you describe that for the jury?

6  A.  I had advised both individuals who had sought relief

7  under Part 359 in connection with my representation of those

8  individuals, I also had represented financial services

9  companies who were confronted with indemnification or golden

05:52  10  parachute requests.

11  Q.  Financial services institutions, do you mean banks?

12  A.  Banks and bank's holding companies.

13  Q.  Banks and bank's holding companies.

14     Now, at some point in time did you have to review part

05:52  15  359 as it related to work at Commerce Bank?

16  A.  Yes, sir.

17  Q.  Can you tell the jury about that?

18  A.  Yes.  In connection with Mr. Hill's disaffiliation with

19  the company, he had left the company, there had been a

05:52  20  discussion among the Board about paying him what he was due

21  subject to whatever regulatory restrictions would apply with

22  respect to those matters and I was involved with another law

23  firm in analyzing those issues.

24  Q.  What was the other law firm?

05:53  25  A.  Sullivan & Cromwell.

───────── ALEXANDER - DIRECT - TAMBUSSI ─────────

1   Q.   Now, did you analyze it particularly from the standpoint

2   of the facts surrounding Mr. Hill?

3   A.   Yes.  If I can explain what we did.

4   Q.   Please.

05:53   5   A.   These are regulations that are not very clear, but

6   essentially what they say is that some payments can be

7   exempted from the regulations if they meet certain criteria,

8   other payments are subject to prior approval from the

9   regulatory authorities depending upon who chartered the bank.

05:53   10   So in the first instance there were a series of payments due

11   Mr. Hill under his contract and what we did, and I did this in

12   consultation with the former general counsel of the FDIC who

13   was then at Sullivan & Cromwell and was a world class expert

14   on this, we first went to the regulators and ascertained which

05:54   15   of the payments due Mr. Hill were exempt from the regulations

16   and that was done pretty promptly.

17   Q.   Okay.  Now, people have been using the word application

18   as it relates to the Part 359 approval process.  Is there such

19   an application that we can find in some form book?

05:54   20   A.   I don't think in the way you're asking about it.  It's a

21   request to be made to the regulators and the regulations

22   provide for the types of information that would be necessary

23   for an application to be complete and to be considered by the

24   regulatory agencies.

05:54   25   Q.   What do the regulators require?

ALEXANDER - DIRECT - TAMBUSSI

1   A.   A description of the payments to be made, a description

2   of the contractual basis or other basis upon which the

3   payments could be made, and a certification either by the

4   institution to be paid or what's called the institution

05:55   5   affiliated party, the IAP, seeking payments certifying certain

6   things had not taken place.

7   Q.   Now, I'm going to show you a summary that we've been

8   looking at.

9        MR. TAMBUSSI:  Chris, could you put the summary up,

05:55   10   please, Part 359?  Thank you.

11   BY MR. TAMBUSSI:

12   Q.   Mr. Alexander, we've summarized part of Section -- Part

13   359 of 12 C.F.R., are these the applicable parts that you

14   referenced in dealing with Mr. Hill's payments?

05:55   15   A.   Yes, sir.

16   Q.   Okay.

17   A.   I also referred to the provisions that exempted certain

18   of those payments for which we got approval and I think Mr.

19   Hill was paid promptly.

05:56   20   Q.   Okay.  So those are exempted provisions or those are

21   exempted payments?

22   A.   Those are not covered in what you're showing me.

23   Q.   Right.  And those involved the 401(k) plan, correct?

24   A.   Yes, sir.

05:56   25   Q.   The supplemental executive retirement plan?

ALEXANDER - DIRECT - TAMBUSSI

1  A.   Yes, sir.

2  Q.   The executive stock option plan?

3  A.   I think that word vested, yes, I recall.

4  Q.   The stock options that were vested?

05:56  5  A.   And typically things that go more to health and welfare

6  kinds of benefits, I recall.

7  Q.   And you worked with someone form Sullivan & Cromwell, was

8  that Mr. Kroener?

9  A.   Yes, Bill Kroener was the general counsel.  One of the

05:56  10  reasons we asked him to get involved was he was at the FDIC

11  when these regulations were promulgated and he was the author

12  of the regulations.

13  Q.   Okay.  Now, we talked about request for approval process

14  and you said there were a number of component parts, the first

05:57  15  of which was a definition of what was being sought, correct?

16  A.   Correct.  Because as lawyers, we're always trying to

17  figure out whether something is actually subject to the

18  regulations and so we needed to convince the regulators that

19  certain payments were covered, and Mr. Kroener sent a letter

05:57  20  in to the regulators kind of identifying the buckets of

21  payments.

22  Q.   Okay.

23  A.   And we heard back from the regulators which would be

24  permissible or exempt and which would be subject to the golden

05:57  25  parachute regs.

ALEXANDER - DIRECT - TAMBUSSI

1  Q.  Now, these regulators, these federal regulators, do they

2  move at warp speed in reviewing these matters?

3  A.  Only when they want to.

4  Q.  And the bank has no control over that, right?

)5:57  5  A.  No, sir.

6  Q.  And nor does an institution affiliated party, is that

7  correct?

8  A.  No, sir.

9  Q.  In this case who was the institution affiliated party?

)5:57  10  A.  Mr. Hill.

11  Q.  And Mr. Hill -- and I think you said either the bank or

12  Mr. Hill could make a request for approval here, correct?

13  A.  Yes, if you look at 12 C.F.R. 359.4(a)(4), an insured

14  depository institution, that's a bank, a depository

)5:58  15  institution holding company, that's a bank holding company, or

16  IAP making a request.  And the whole reason for this is that

17  there was a recognition that a bank might not always be in a

18  position to make a request so there was an attempt to give

19  that option available to the IAP.

)5:58  20  Q.  Okay.  Now, you were here for some of the testimony, were

21  you not?

22  A.  For a little bit this morning, yes, sir.

23  Q.  You saw a reference to an escrow agreement, do you recall

24  that?

)5:58  25  A.  Generally.

ALEXANDER - DIRECT - TAMBUSSI

1   Q.   Or an email regarding an escrow arrangement?

2   A.   Yes.

3          MR. TAMBUSSI:   Chris, could you put that up, please?

4   BY MR. TAMBUSSI:

05:58   5   Q.   Now, Mr. Alexander, that's an email, which is in

6   evidence, and it's addressed to a number of people, including

7   yourself, correct?

8   A.   Yes.

9   Q.   Do you recall receiving that email?

05:58   10   A.   Not specifically, but I have no reason to think I didn't

11   get it.

12   Q.   Do you recall having discussions with the regulators with

13   regard to golden parachute payments to Mr. Hill as soon as

14   June 28, 2007?

05:59   15   A.   Yes, it was something that was discussed at the Board

16   meeting and it was something that we knew needed to be

17   addressed so, yes, very early on in the process.

18   Q.   Never any doubt?

19   A.   No, sir.

05:59   20   Q.   Now, let's go back to the summary, please, Part 359.   Now

21   your representation of the bank continued passed the merger,

22   correct?

23   A.   Yes.

24          MR. JACOBS:   Judge, I object to the leading question.

05:59   25          THE COURT:   It is leading.   Rephrase your question,

ALEXANDER - DIRECT - TAMBUSSI

1   please.

2       MR. TAMBUSSI:  Okay.

3   BY MR. TAMBUSSI:

4   Q.   Can you focus on the second part of Part 359, which deals

5   with what the bank or the institution affiliated party must

6   certify to.  Do you see those sections?

7   A.   Yes, sir.

8   Q.   Reading those sections, did you make a determination, as

9   counsel for the bank, so whether or not the bank could make

10  that certification?

11  A.   Yes, I did.

12       MR. JACOBS:  Objection, Judge.  What relevance does

13  an advocate's determination have?  This is about what the

14  Board decides.

15       MR. TAMBUSSI:  Well, the Board's also relying on the

16  advice of counsel.

17       THE COURT:  That's the next step, the Board is

18  reacting to what advice it gets, just like Mr. Hill was

19  reacting to advise he got.

20       MR. JACOBS:  Except we have Board resolutions saying

21  what they did.

22       THE COURT:  Okay.  Overruled.

23       THE WITNESS:  Can you repeat the question, please?

24  BY MR. TAMBUSSI:

25  Q.   Sure.  After reading that part of Part 359, did you,

ALEXANDER - DIRECT - TAMBUSSI

1  based on your representation of the bank, come to some

2  conclusions?

3  A.   I believed that it would be impossible for the bank to

4  make the certifications required under Part 359.

06:00   5  Q.   Why?

6  A.   Because I had information developed during the course of

7  the investigation, which had been shared with the company,

8  which had been shared by the regulators, that led me to

9  believe that we had a reasonable basis to believe that a

06:01  10  certification could not be made.  There is no question that

11  the reason that we were in troubled condition, the bank was in

12  troubled condition was as a direct result of the leasing and

13  real estate activities that have been discussed today and that

14  is one of the principle requirements in the certification.

06:01  15  Q.   Did you communicate that conclusion to the Board of

16  Directors?

17  A.   I did, as well as co-counsel.

18  Q.   Okay.  And given these facts, is there any reason to

19  believe that the bank, at least while you were representing

06:01  20  them, was in a position to submit a Part 359 request for

21  approval?

22  A.   I can't give a yes or no answer because I didn't view it

23  as black and white in that regard because the Board directed

24  us to try to get Mr. Hill paid subject to all regulatory

06:02  25  requirements and that's what we set out to do.  I was always

────────── ALEXANDER - DIRECT - TAMBUSSI ──────────

1    of the view, given Mr. Hill's very strong views, that a

2    certification could be made, that he was free to make that

3    certification and that the bank could support the process if

4    he would make the certification.

06:02    5    Q.   Did you communicate that to the bank?

6    A.   Yes, sir.

7    Q.   Did you communicate that to the bank directors?

8    A.   Yes, sir.

9    Q.   And could you tell us, sir, what you've done -- what you

06:02    10   did from the time Mr. Hill left the bank until your services

11   were completed with the bank in order to get Mr. Hill paid?

12   A.   Well, I think it was very busy in June and I know by the

13   beginning of 2008 around the time of the lawsuit, I think the

14   activity lessened.  But I know from the period of June, end of

06:03    15   June 2007 through around the lawsuit there were active

16   discussions among me, co-counsel, Mr. Hill's counsel,

17   regulators in respect to this very issue.  I had meetings with

18   Mr. Hill's counsel, I had meetings with regulators, and I know

19   that there extensive communications between me and regulatory

06:03    20   authorities with respect to these issues.

21        I have a very clear recollection of this process going

22   on for quite some time.  One of the reasons I know that is on

23   the day that my dad died -- while I was on the phone talking

24   to Mr. Cohen and one of the bank's counsel in respect to this

06:03    25   very issue, I learned my dad had died on November 2, 2007, so

ALEXANDER - DIRECT - TAMBUSSI

1    I'm very confident through November 2, 2007, that this issue

2    remained very much part of what I was working on.

3    Q.   And through 2008 you continued to have some discussions

4    with Mr. Sandler, correct?

06:04    5    A.   Correct.  And with TD's litigation counsel who was in

6    discussions with Mr. Hill about a possible resolution.

7    Q.   Okay.  And Mr. Sandler, can you identify for the jury who

8    he was?

9    A.   He was Mr. Hill's then counsel.

06:04   10    Q.   Okay.  All right.  Now, Mr. Alexander, I want to go back

11    a little bit.  Now, you learned of this investigation back in

12    2006, and could you tell us what you did as bank's counsel

13    with regard to this investigation beginning in December of

14    2006?

06:04   15    A.   Well, I think the first thing was to try to ascertain

16    what it was that the government was trying to focus on, so

17    early on -- I think the holidays interrupted the process a

18    little bit, but I think very early on in about the first week

19    of January we met with senior staff at the OCC and with the

06:05   20    Fed to ascertain what the investigation was about.  And what

21    we were told, it was principally about the OCC and Fed's

22    concerns regarding corporate governance issues, alleged

23    insider transactions, alleged irregularities in respect to

24    specific branch transactions and other issues involving the

06:05   25    level of transactions involving the bank and its insiders.

ALEXANDER - DIRECT - TAMBUSSI

1  Q.   Okay.  And did you get an understanding from speaking

2  with the regulators so whether any individuals were the

3  primary focus of the investigation?

4  A.   From the first meeting, yes, sir.

06:05   5  Q.   And what was your understanding?

6  A.   One of the lawyers from the OCC at our first meeting

7  advised us that --

8          MR. JACOBS:  Objection, Judge, is that not hearsay.

9          THE COURT:  It's not being offered for the truth.

06:06   10         You may answer the question.

11         THE WITNESS:  One of the lawyers at the first meeting

12  that we had, his name is Kevin Lee, said to me you need to

13  communicate to your client that they need to do management

14  succession planning.

06:06   15  BY MR. TAMBUSSI:

16  Q.   What does that mean?

17  A.   Well, I took it to mean Mr. Hill was the focus of

18  investigation.

19  Q.   Did you communicate that to the Board?

06:06   20  A.   Yes, sir.

21  Q.   Okay.  So you recall seeing the notices of the

22  investigation, correct?

23  A.   Yes.

24         MR. TAMBUSSI:  Chris, could you just pop up the

06:06   25  December 5, 2006, letter from the OCC, please?  I believe

*163*

ALEXANDER - DIRECT - TAMBUSSI

1  that's P-59.  Just blow it up a little bit so Mr. Alexander

2  can read it.

3  BY MR. TAMBUSSI:

4  Q.   Do you recognize that document?

06:07  5  A.   Yes, this is the organic document that initiated the

6  investigation.

7  Q.   What does that mean, "organic document?"

8  A.   Well, the OCC supervises through examination and this is

9  not an examination, this is an investigation and so they

06:07  10  initiate an investigation through a different statutory means

11  and this letter was the underlying document initiating that

12  investigation.

13  Q.   Based on your experience, is this some sort of run of the

14  mill event?

06:07  15  A.   Very unusual.

16  Q.   Very unusual?

17  A.   Yes, sir.

18  Q.   Why is it very unusual?

19  A.   Because normally they use their examination process.  And

06:07  20  the reason that they would use an Order Of Investigation in my

21  experience would be two or threefold, one, the issues are

22  quite serious, two, they want to avail themselves of subpoena

23  authority because they didn't feel that the institution was

24  cooperating or, three, they wanted to have the ability to

06:07  25  reach third parties not otherwise in their examination

ALEXANDER - DIRECT - TAMBUSSI

1  jurisdiction.

2  Q.   What does that mean third party not within their

3  examination jurisdiction?

4  A.   It could be -- in this case it could be sellers of land,

5  lessors, development parties, things like that.

6  Q.   We will get to this a little bit in the rest of your

7  examination, but did you understand if the regulators

8  interviewed people outside of Commerce Bank?

9  A.   Yes, we came to learn that during the investigation.

10  Q.   And did that include some of the sellers of the lands --

11  A.   Yes.

12  Q.   -- that later became sites for Commerce Bank branches?

13  A.   Yes.

14  Q.   Now, there's also a document that's P-58, which is from

15  the Federal Reserve Board, and we'll show that to you and blow

16  it up a little bit so you can get the gist of it.

17  A.   Yeah, I'm familiar with this, and this would be the Fed's

18  version of the same document.  This was a concurrent

19  investigation by the Fed in respect to the holding company and

20  the OCC in respect to the bank.

21  Q.   Okay.  Again, were you -- was this just a normal run of

22  the mill event?

23  A.   Not in my experience.

24  Q.   The fact that it wasn't a run of the mill event, did it

25  trigger any bells or whistles in your mind about this

ALEXANDER - DIRECT - TAMBUSSI

1   investigation?

2   A.   That it was to be taken quite seriously.

3   Q.   And what did the regulators request that you do upon the

4   first notice of the investigation?

06:09   5   A.   I recall two or three things specifically.  One was that

6   we implement what's called a document hold, which is fairly

7   standard, they wanted to make sure that the integrity of the

8   bank's documents were maintained.  Secondly, they asked us to

9   get each of the directors to sign a tolling agreement, which

06:09   10   is a legal document assuring that during the pendency of the

11   investigation, no statute of limitations would expire.  And,

12   thirdly, they gave us some transactions and told us that they

13   were going to ask us to do some due diligence in respect to

14   those transactions.  Those are the three things that I recall

06:10   15   specifically.

16   Q.   Okay.  Did the bank endeavor to take steps to comply with

17   the requests for documents?

18   A.   Yes.

19   Q.   Did you have any role in that process?

06:10   20   A.   My colleagues.

21   Q.   Okay.  And they were under your supervision?

22   A.   Yes, sir.

23   Q.   What did they do?

24   A.   They would have worked with the general counsel, the

06:10   25   internal audit department, and others at the bank to ensure

──────── ALEXANDER - DIRECT - TAMBUSSI ────────

1    that we met the OCC and Fed's instructions.

2    Q.   Okay.  Now, I'm just going to try to get this minor point

3    out on the table.  Mr. Fisher testified that millions of

4    documents were produced to the government in this

5    investigation, is that accurate?

6    A.   I don't know if it was millions but there were

7    substantial documents.

8    Q.   Okay.  Now, do you recall having a meeting with the

9    federal regulators and in particular the OCC and Federal

10   Reserve Board in January, early January of '07?

11   A.   Yes, that's the preliminary meeting that I mentioned

12   before.

13   Q.   Okay.  Now, at that preliminary meeting, can you tell us

14   all which was discussed?

15   A.   The essence of the meeting, I can't recall all the

16   specifics, I remember who was there, was that the OCC had

17   concluded that it had concerns about governance issues at the

18   Bank, had concerns about, I recall the *DiMaria* indemnification

19   issue coming up, had concerns about the InterArch

20   relationship, and had concerns about the arms length nature of

21   some of the branch transactions that the bank had engaged in.

22   Q.   Arms length transactions, what do you mean by that?

23   A.   Whether those transactions were on terms and conditions

24   that would have been the same as if the bank had engaged in a

25   transaction with a member of the jury, some independent

─── ALEXANDER - DIRECT - TAMBUSSI ───

1    person.

2    Q.   Okay.  Did they particularly point out any specific

3    location or transaction that caught their attention?

4    A.   I recall in the first meeting Dumfries, Virginia, was one

06:12   5    transaction that was identified.

6    Q.   Okay.  Now, are you familiar with the concept of single

7    purpose limited liability corporations?

8    A.   Generally, yes.

9    Q.   Okay.  And do you have an understanding what they're

06:12   10   created to do or what for?

11   A.   As a general matter.

12   Q.   Okay.  What's your understanding?

13   A.   They're set up to establish a specific purpose.  For

14   example, in a real estate transaction, to hold an interest in

06:12   15   property by way of example.

16   Q.   Did you see any of those instances of single purpose

17   limited liability corporations set up as it relates to

18   Commerce and this investigation?

19   A.   Many times.

06:13   20   Q.   Okay.  And how are they typically described or named?

21   A.   If I understand your question, I think that they tended

22   to be named for the location in which the property was

23   located.

24   Q.   Okay.  Now, as those single purpose limited liability

06:13   25   corporations were set up with regard different properties

ALEXANDER - DIRECT - TAMBUSSI

1  involving Commerce, were they looked at by the regulators as a

2  whole or individually?

3  A.   I'm not sure.

4  Q.   Okay.  Now, at some point in time you came to believe

5  that the -- strike that.

6      At some point in time did the OCC indicate to you that

7  they were investigating specific transactions with single

8  purpose limited liability corporations?

9  A.   Yes.  But I have to put this in context because the

10  investigation was backward looking in, that they were looking

11  at prior transactions in which branches had been built, but

12  they were also beginning to look at pending branch

13  applications that had not yet been acted on but were very

14  important to the bank's strategic growth plans.

15  Q.   So what did you understand about the pending applications

16  after you left your first meeting with the regulators?

17  A.   That they were going to be subjected to additional

18  scrutiny going forward.

19  Q.   Did they tell you why?

20  A.   Because of the concerns they had about the prior

21  transactions.

22  Q.   Now, did there come a time when the regulators gave you a

23  more definitive response so what was going to happen with

24  pending branch approvals?

25  A.   Yes.

──────── ALEXANDER - DIRECT - TAMBUSSI ────────

1          MR. TAMBUSSI:  Can we show D-19, please, Chris?

2    BY MR. TAMBUSSI:

3    Q.   Mr. Alexander, in evidence marked D-19 is an April 27,

4    2007, letter from Lawrence Beard, Deputy Comptroller of

5    licensing to the Board of Directors of Commerce Bank, do you

6    recall seeing that document?

7    A.   Yes.

8    Q.   What did that document -- what was the purpose of that

9    document to your understanding as lawyer for the bank at that

10   period of time?

11   A.   This was a very significant development because we had

12   spent from January through April trying to work through a

13   protocol with the OCC so that new applications could go

14   forward as the investigation continued, but in effect what Mr.

15   Beard was saying was until they had more answers no

16   applications were going to be approved.

17   Q.   Based on your understanding of how the bank's growth

18   model was up until this point, what effect would this

19   letter -- did this letter have on the bank?

20   A.   It caused great concern at the senior management level

21   and at the Board level given that the company's strategic

22   direction was to grow through branches.

23   Q.   Did it have a positive effect on the bank?

24   A.   No, sir.

25   Q.   Did it have a negative effect on the bank?

ALEXANDER - DIRECT - TAMBUSSI

1   A.   Certainly that's what I was being told.

2   Q.   Now, in your investigation during this period of time

3   leading up to this point, did you interview people at the

4   bank?

06:16   5   A.   Interviewed them probably in an informal way not under

6   oath.

7   Q.   Did you have any opportunity to interview Mr. Hill?

8   A.   I spoke to Mr. Hill many times.

9   Q.   Now, at some point in time you were asked to look at

06:16   10   certain specific documents and I think you mentioned Dumfries

11   as one.

12   A.   Yes.

13   Q.   And did the bank regulators indicate to you anything with

14   regard to this Dumfries transaction in particular that you

06:17   15   recall?

16   A.   Yeah, I think Dumfries was identified as a transaction

17   that was representative of the OCC's concerns.  And I'm not

18   sure I remember all of the concerns, I do have some

19   recollection of some of the issues that were raised.

06:17   20        MR. TAMBUSSI:  Judge, may I approach the witness?

21        THE COURT:  You may.

22        MR. TAMBUSSI:  This is D-37.

23   BY MR. TAMBUSSI:

24   Q.   Mr. Alexander, I show you what's been marked D-37 for

06:17   25   identification, do you recognize that document?

ALEXANDER - DIRECT - TAMBUSSI

1    A.   I think this was one of the -- this is a development

2    agreement between Commerce Bank and Dumfries Equities, LLC,

3    and I believe this was one of the documents that my team

4    looked at in responding to questions that the OCC raised in

06:18    5    respect to the Dumfries branch.

6    Q.   And what was it that the OCC found problematic with the

7    Dumfries branch?

8    A.   They said -- I don't recall all the issues.  I think that

9    generally the OCC had some underlying governance concerns

06:18    10    about the way in which branch transactions had been vetted at

11    the bank, so I think that existed in respect to almost all the

12    transactions but with respect to Dumfries in particular, the

13    OCC had real concerns that the bank was paying a

14    disproportionate amount of the cost given its land needs in

06:18    15    the overall property.

16    Q.   So in this document, this document development before

17    you, there's a reference to a CVS Pharmacy, do you see that?

18    A.   Yes, sir.

19    Q.   Does that refresh your recollection or help you tell the

06:19    20    jury about what that meant with regard to the development

21    costs?

22    A.   Yes, I think it was my recollection that oftentimes as

23    part of the retail strategy, that Commerce would partner with

24    another attractive retail establishment and oftentimes it was

06:19    25    a CVS, it could have been other companies, and so the site was

ALEXANDER - DIRECT - TAMBUSSI

1   located where -- and the whole I had was to bring traffic.  So

2   the site in this case, because I've actually been to the site

3   now, was intended to accommodate not only a Commerce branch

4   but a CVS location with parking and things like that.

5   Q.   And what was it about the allocation of cost that

6   concerned the OCC, to your knowledge, based on your

7   discussions and your representation of the bank?

8   A.   And I may have this confused with some other transactions

9   but, as I recall, there were concerns that the bank was

10  bearing too much of the cost of certain irrigation, parking,

11  and other development costs given its relative parcel on the

12  property.

13  Q.   Was there a single purpose limited liability corporation

14  set up to or company set up to be the site owner here?

15  A.   Dumfries Equities.

16  Q.   That's identified in the development agreement?

17  A.   Yeah.

18       MR. JACOBS:  Object to the leading question, Judge.

19       THE COURT:  It is leading.  Please rephrase your

20  questions.

21  BY MR. TAMBUSSI:

22  Q.   Now, Mr. Alexander, in your discussions with the

23  regulators with regard to the additional properties, did you

24  ever have a discussion with regard to a branch application for

25  an English Creek location?

ALEXANDER - DIRECT - TAMBUSSI

1   A.   Yes.

2          MR. TAMBUSSI:  May I approach the witness, your

3   Honor?

4          THE COURT:  You may.

06:21   5   BY MR. TAMBUSSI:

6   Q.   Mr. Alexander, I'm showing you a document marked D-35 for

7   identification, what was it that the regulators told you about

8   the English Creek application, branch application that gave

9   concern?

06:21   10         MR. JACOBS:  Judge, I'm going to make the same

11   objection, that is hearsay.  I can't cross-examine the

12   regulator to see if this is just what he said.  I think it's

13   being admitted for the truth of the matter.

14         MR. TAMBUSSI:  It's not.  It's being --

06:21   15         THE COURT:  Overruled.

16         MR. TAMBUSSI:  Thank you.

17         THE WITNESS:  Well, once again, with respect too many

18   of these branch applications, I recall in respect to the

19   English Creek application concerns that were raised about the

06:21   20   governance and in particular the concern that while Mr. Hill

21   may not have approved the -- been involved in the decision to

22   approve, that is, voted on the transaction in the Board room,

23   that he was actively involved in the process, and that was one

24   issue I recall.  The second I recall, I think this may have

06:22   25   been the property where there was substantial excess parking,

ALEXANDER - DIRECT - TAMBUSSI

1    that the OCC believed the bank had borne the cost unfairly, I

2    think they sat in a meeting and told me it was a

3    skateboarder's dream, if I remember correctly, that was this

4    property, and this was -- once again, they were picking out

06:22    5    these transactions to try to demonstrate to us that there was

6    a pattern or practice in respect to these transactions.

7    BY MR. TAMBUSSI:

8    Q.    And did they go over additional transactions with you?

9    A.    They did.  I can't remember -- I'm remembering one called

06:23    10    Ben Salem.

11    Q.    And what do you recall about Ben Salem.

12    A.    The same kinds of issues.  And the reason I remember that

13    one in particular is because we met with them in the days

14    leading up to the execution of the Consent Order and they gave

06:23    15    us a little more granularity about some of the concerns they

16    had.

17    Q.    What did they tell you?

18    A.    They had discovered -- they had talked to third parties,

19    they had looked at other land records, I believe in respect to

06:23    20    Dumfries, at some point in time, I don't remember if we

21    learned then or later on, that they had questions about

22    whether Mr. Hill's name appeared on some documents suggesting

23    he had an ownership interest.  We subsequently learned from

24    Mr. Hill that that had been an administrative, purported

06:23    25    administrative snafu, but those kinds of -- there were

*United States District Court*
*Camden, New Jersey*

—— ALEXANDER - DIRECT - TAMBUSSI ——

1    constantly issues being raised in the OCC's mind and they were

2    really, really focusing with great rigor over these

3    transactions.

4         MR. TAMBUSSI:  Judge, may I approach the witness,

5    please?

6         THE COURT:  You may.

7    BY MR. TAMBUSSI:

8    Q.  Mr. Alexander, I'm showing you D-36, which is the file

9    for the Ben Salem branch and ask you if you recognize that

10   document?

11   A.  You know, I don't -- this is in the form of the kinds of

12   documents -- we looked at all of the branch applications in

13   connection with this process so I don't have a specific

14   recollection sitting here today, but this is in the form that

15   we saw in the bank's files where Mr. Hill would send a memo

16   to, I think it was a facilities guy.

17   Q.  Okay.  Now, in fairness, that memo -- in fairness to Mr.

18   Hill, that memo is dated 1999, correct?

19   A.  Correct.

20   Q.  And were you hear when there was testimony about Mr. Hill

21   divesting himself of a portion of Site Development, Inc.?

22   A.  I remember that independently, yes, of learning that.

23   Q.  Okay.  How did you learn about that?

24   A.  From Mr. Hill.

25   Q.  Okay.  And what was the, purpose to your understanding

ALEXANDER - DIRECT - TAMBUSSI

1    based on your investigation, based on your work and

2    representation of the bank, of the OCC using a 1999 document?

3    A.   Well, in part my recollection was that they were using

4    this to demonstrate that Mr. Hill was not abstaining from the

06:25    5    process with respect to the economics of these branch

6    transactions.

7    Q.   Did they show you other examples during the course of the

8    way?

9    A.   Many.

06:25    10   Q.   Now, once you got this information from the OCC, were you

11   reporting it back to the Board of Directors on a regular

12   basis?

13   A.   We had established what I think ended up being the

14   Special Litigation Committee but we had used the same

06:26    15   gentlemen for a different purpose, and I believe Mr. Lloyd,

16   Mr. Giordano and Mr. Vassalluzzo were in effect appointed to

17   work as a working committee and so in the first instance we

18   were reporting to them so what we were learning.

19   Q.   Okay.   Now, during this period of time between the time

06:26    20   you were retained and let's say June, were you meeting with

21   the regulators on a regular basis in Washington?

22   A.   I was talking to them several times a week, meeting with

23   them less frequently but talking to them constantly.

24   Q.   And were you coming back from Washington -- coming up

06:26    25   from Washington to Cherry Hill to attend Board meetings during

———— ALEXANDER - DIRECT - TAMBUSSI ————

1  that period of time?

2  A.    Many times.

3  Q.    And what was the purpose of you coming to the Board

4  meetings?

5  A.    Well, there were, I think, several things going on in the

6  period from January through June.  As I said, one was advising

7  them about where we were with the investigation, two, was

8  dealing with the branching, what I call the branching

9  protocol, which was a very significant issue because we were

10 just being put on hold and we were trying to figure out if

11 there was a way of moving that process along and, third, we

12 were trying to be proactive with the Board and with management

13 about taking steps to see if we could address some the OCC's

14 concerns changing insider transaction policies, enhancing

15 policies and procedures, tightening up some reporting issues,

16 doing everything we could so that we could demonstrate to the

17 OCC that the bank was being responsible.

18 Q.    Did that include making disclosures that were not

19 heretofore made?

20 A.    We learned some facts -- I believe there's a letter that

21 we submitted to the OCC in respect to Dumfries where we

22 acknowledged that there were certain policies and procedures

23 that should have been more robust.  That's the only thing I

24 can recall right now.

25 Q.    Now, during this period of time that you were coming back

ALEXANDER - DIRECT - TAMBUSSI

1  to deal with the Board of Directors from your meetings with

2  the regulators, how would you describe the meetings?

3  A.  Extraordinarily tense.

4  Q.  Can you elaborate on that?

06:28  5  A.  This was one of the most difficult cases that I had ever

6  been involved in and in part because Mr. Hill was the bank and

7  had done an extraordinary job at growing the bank and creating

8  all this value but Mr. Hill also was in the center of the

9  storm here in terms of what the regulators were saying.  And

06:29  10  from my perspective Commerce had grown up quite a bit as a

11  bank but it hadn't grown up its governance so there was a lot

12  of tension about how to move from here to there.

13  Q.  During this period of time, were bank financial resources

14  being dedicated to this investigation?

06:29  15  A.  Substantial.

16  Q.  And during this period of time, how would you describe

17  the dedication of senior management resources?

18  A.  The senior management team was very, very distracted by

19  this.

06:29  20  Q.  And when you went to the Board meetings, was there

21  substantial discussion by the Board on these issues?

22  A.  Yes.  And initially a lot of anger and resentment toward

23  to OCC that this was a witch hunt.

24  Q.  Did you hear that phrase back at that time?

06:29  25  A.  Yes, sir.

ALEXANDER - DIRECT - TAMBUSSI

1    Q.   And who used it primarily?

2    A.   I don't recall.

3    Q.   Now, at some point in time the OCC proposed a Consent

4    Order to the bank, correct?

06:30    5    A.   Yes, sir.

6             MR. JACOBS:  Objection, Judge.  It's a leading

7    question.

8             MR. TAMBUSSI:  Just giving reference of time, Judge.

9             MR. JACOBS:  I understand that.  It's still a leading

06:30    10    question.

11            THE COURT:  It was leading.  Keep going.

12    BY MR. TAMBUSSI:

13    Q.   The initial Consent Order provided to the bank by the

14    OCC, could you describe it?

06:30    15    A.   Yes, it was one of the most Draconian documents I had

16    ever seen.

17    Q.   What do you mean by that?

18    A.   It had two things about it that I recall specifically.

19    Operationally a Cease And Desist Order is intended to provide

06:30    20    a blueprint or, you know, roadmap for the bank's operations

21    going forward and it was clear to me and the other people at

22    the bank that operationally it was going to be very difficult

23    for the bank to operate as usual under the terms so that was

24    one thing I remember.  The second thing was that it had in the

06:31    25    beginning detailed allegations about breaches of fiduciary

──────── ALEXANDER - DIRECT - TAMBUSSI ────────

1    duty, unsafe and unsound practices that were very unusual in

2    my experiences and would have been very damaging to the bank.

3    Q.   And was that proposed Consent Order presented to the

4    Board of Directors?

5    A.   Yes.

6    Q.   And what was the response?

7    A.   It triggered a series of negotiations at the highest

8    levels of the OCC and the bank to try to soften the

9    operational restrictions and trying to obviate or mitigate

10   some of the Draconian language that would have been harmful to

11   the bank and customers and shareholders.

12   Q.   And did those negotiations involve any discussions with

13   regard to Mr. Hill?

14   A.   Very much.

15   Q.   And can you describe those for the jury, please?

16   A.   The OCC expressed a willingness to soften the language

17   and to regularize some to the operational issues if the Board

18   would address the OCC's concerns about the management of the

19   bank.

20   Q.   In laymen terms what does that mean?

21   A.   They wanted the Board to fire Mr. Hill.

22   Q.   Now, was the OCC -- how would you describe the OCC's

23   tenor, if you will, in these negotiations, was it pleasant?

24   A.   No, as I said, it was one of the most challenging cases

25   I've ever been involved in and I've been involved in some of

───────ALEXANDER - DIRECT - TAMBUSSI───────

1   the most significant banking cases in the last 30 years.

2           MR. TAMBUSSI:  Judge, what time did you want to take

3   a break?

4           THE COURT:  If this is a convenient time, we'll break

06:33   5   now.

6           MR. TAMBUSSI:  I can do that.

7           THE COURT:  Ladies and gentlemen, let's take out

8   15-minute break.  Please do not discuss the case or do any

9   research and we'll come get you in a little while.

06:33   10          DEPUTY CLERK:  All rise.

11              (Jury Leaves the Courtroom.)

12          THE COURT:  Do you want to make those motions now?

13          MR. TAMBUSSI:  We can, Judge.

14          THE COURT:  It's your motions not mine.

06:33   15        Sit down, everybody.

16        Do you want to break first?

17          MR. TAMBUSSI:  I'd really like to use the mens' room.

18          THE COURT:  See you back in five minutes?  Can you do

19   it in five minutes?

06:34   20          MR. TAMBUSSI:  Less than that, Judge.

21          THE COURT:  All right.  Five minutes, everybody.

22            (Brief Recess.)

23          THE COURT:  Are we ready to go the record?  Go ahead,

24   Mr. Tambussi.

06:39   25          MR. TAMBUSSI:  Judge, at this point in time Commerce

─── ALEXANDER - DIRECT - TAMBUSSI ───

1    moves to dismiss or seek judgment as a matter of law on

2    plaintiff's claim for breach of the implied covenant of good

3    faith and fair dealing.  Judge, we're prepare -- we have a

4    brief and we're prepared to e-file that, if you'd like.

06:39    5              Specifically, the judgment is required because you

6    can't duplicate the express contract language to the claims of

7    good faith and fair dealing to create a second remedy to add

8    additional damages.  And at this point in time, clearly there

9    is a breach of contract claim advanced, it's an express breach

06:40   10    of contract claim.  There is no doubt that there is evidence

11    in the record of that, but those very same proofs cannot be

12    relied upon to seek a second avenue for additional damages,

13    and for that reason we move to dismiss the claim for good

14    faith and fair dealing, implied covenant of good faith and

06:40   15    fair dealing.  The second --

16              THE COURT:  Let's go one at a time.  Mr. Jacobs.

17              MR. JACOBS:  The response, your Honor, is that they

18    are different.  The breach of contract is almost self

19    defining.  There was a contract for payment within 30 days,

06:40   20    payment was not made.  But under New Jersey law, there is an

21    imputation of a good faith requirement on all contracts and

22    that comes into play on what the bank did or did not do or

23    could have done regarding carrying out their obligation to get

24    the approvals necessary to stay out of reach.  So they are

06:41   25    actually two separate fact questions.

─────── ALEXANDER - DIRECT - TAMBUSSI ───────

1     THE COURT:  Yeah, but what about the quantum?  The

2     defendant's argument is that you can't get -- there is not a

3     separate quantum of damages for the implied covenant, you only

4     get one set of damages.

06:41   5     MR. JACOBS:  Well, I'm not quarreling with that, what

6     I'm saying is there are two ways to get to those damages.  One

7     is the breach of contract, the other is the breach of the

8     implied covenant of good faith and fair dealing.

9     MR. TAMBUSSI:  Nothing further, Judge.

06:41  10     THE COURT:  Well, let me take a look at your brief.

11     MR. TAMBUSSI:  We will have it e-filed, Judge.

12     The second motion is to dismiss the plaintiff's claim

13     for punitive damages as a matter of law.  I mean, clearly

14     under New Jersey courts when the essence is a breach of a

06:41  15     contract, punitive damages are not appropriate.  And we cite

16     cases like Kernick v. Lawton, and other cases like that.  Even

17     where the breach is malicious or unjustified, punitive damages

18     are not allowed on private contracts.

19     There is no evidence whatsoever that would permit the

06:42  20     jury to act on a claim for punitive damages in this breach of

21     contract case.  He can characterize it as willful and

22     wrongful, but under Sandler and Kernick, it simply is not a

23     claim that should go to the jury in this case.

24     MR. JACOBS:  The punitive damages would flow from a

06:42  25     jury finding that, for example, the last plaintiff's witness

───────ALEXANDER - DIRECT - TAMBUSSI───────

1    heard, Mr. Schwartz, was believed and that there was a

2    malicious intent to do anything and everything necessary to

3    frustrate performance on the contract, but more particularly

4    the good faith element.  If the jury squarely finds that there

06:43    5    was not good faith, there was in fact bad faith and that a

6    series of contradictory things were done, which I don't want

7    to recite right now with this witness on the stand, a series

8    of contradictory things were done which all put together

9    evidenced a clear intent to spitefully and maliciously deprive

06:43    10    Mr. Hill of his contractual benefits, not in good faith but in

11    consistent bad faith, then I think we have a supportable

12    claim.

13        MR. TAMBUSSI:  That's not the law, Judge.

14        THE COURT:  I will grant that motion.  Under New

06:43    15    Jersey law, punitive damages are not available in an action

16    for breach of contract.  Pierce v. Ortho Pharmaceutical Corp.,

17    84 New Jersey 58.  That's from 1980.  Buckley v. Trenton

18    Savings Fund Society, 111 New Jersey 355, that's a New Jersey

19    Supreme Court case from 1988.  The only time that New Jersey

06:44    20    courts have recognized a claim for punitive damages is if the

21    breach is also a tort for which punitive damages are

22    recoverable, such as for a breach of a fiduciary -- an

23    independent fiduciary duty.  There is no fiduciary duty here

24    that runs from the bank to Mr. Hill, it's simply a contractual

06:44    25    duty.  Sandler v. Lawn-A-Mat Chemical and Equipment

─────────────── ALEXANDER - DIRECT - TAMBUSSI ───────────────

1   <u>Corporation</u>, 358 A. 2d.  I can go on and on.  <u>Lightening Lube</u>

2   <u>v. Witco Corporation</u>, 4 F.3d 1153, which is a Third Circuit

3   decision from 1993.  So New Jersey is not recognizing a claim

4   for punitive damages in a contract action, that motion is

5   granted.

6           Anything else?

7           MR. TAMBUSSI:  Nothing at all, Judge.

8           THE COURT:  You want to spend a couple minutes on

9   your documents or you want to wait until the end of the day?

10          MR. JACOBS:  We have no additional documents we need

11  to move at this point.

12          THE COURT:  Okay.  We've got five more minutes.

13  Okay.  Well, I told them 15 minutes, so we'll give them until

14  3:15 exactly, 4 minutes.

15                      (Brief Recess)

16          THE DEPUTY CLERK:  All rise.

17          THE COURT:  Okay, let's get the jury out.

18          THE DEPUTY CLERK:  All rise.

19          (Jury enters courtroom).

20          THE COURT:  Let's all have a seat.  We'll continue,

21  please.

22          MR. TAMBUSSI:  Thank you, your Honor.

23  BY MR. TAMBUSSI:

24  Q.  Mr. Alexander, I show you a document that's been marked

25  into evidence as Defendant's Exhibit 20.  It's going to come

ALEXANDER - DIRECT - TAMBUSSI

1   up on your screen.  Chris, could you blow that up a little

2   bit, please?  Mr. Alexander, do you recall receiving that

3   letter from Richard Sterns?

4   A.   Yes.

5   Q.   Who is Richard Sterns?

6   A.   He was the then Director of the Enforcement and

7   Compliance Division at OCC.

8   Q.   Now, Mr. Sterns in that letter states, "As you

9   undoubtedly know from your own review, the bank has serious

10  and extensive insider problems emanating from the highest

11  levels of the bank.  The OCC believes that we must formally

12  and immediately address some of these issues prior to the

13  conclusion of the investigation."

14       Did I read that correctly?

15  A.   Yes, sir.

16  Q.   Is this the letter that Mr. Sterns sent to you with a

17  proposed consent order?

18  A.   Yes.

19  Q.   And he indicates that you know from your own review.

20  He's referring to you, correct?

21  A.   I believe so.

22  Q.   And what did you learn from your own review?

23  A.   Well, first of all, to be fair, I think some of this is

24  his own advocacy because there were certainly areas where we

25  did not agree with the OCC's position.  Nevertheless, there

ALEXANDER - DIRECT - TAMBUSSI

1    clearly were issues about governance, in particular whether

2    there had been -- he asserted lack of participation in some of

3    the transactions regarding insiders and their related

4    interests; there were concerns were about the pricing; there

06:52    5    were concerns about the disclosure.  And I think the other

6    concern that we shared with the OCC was that some of the

7    applications that had been filed with the OCC -- you know, I

8    had problems in terms of the disclosure.

9    Q.   Now, you mentioned governance a number of times.  Could

06:53    10   you explain to the jury what you mean by the word

11   "governance?"

12   A.   So, what I mean in governance is that appropriate

13   governance on transactions with an interested he party means

14   that the parties should not participate in any way in the --

06:53    15   in the transaction, and clearly that was not the case in

16   respect to Commerce.

17   Q.   How so?

18   A.   Well, by way of example, and I think this was both a

19   strength and a governance challenge, you know, Mr. Hill had

06:53    20   great and extensive knowledge about the real estate market and

21   what was a good location for the bank, and so it's appropriate

22   for him to provide his input.  But as governance matter,

23   particularly when he or his related parties had economic

24   interests in those transactions, he should not have been

06:54    25   participating in the governance decisions surrounding those

ALEXANDER - DIRECT - TAMBUSSI

1    transactions.

2    Q.   Did you find evidence of that?

3    A.   Yes.

4    Q.   Could you describe that for the jury.

5    A.   Mr. Hill would sit in meetings in which these

6    transactions were discussed and voted on.

7    Q.   And did you have any communications with the OCC about

8    this?

9    A.   Yes.

10   Q.   And did you communicate that later to board members?

11   A.   Yes.

12   Q.   Now, let me show to you a memo that we've marked into

13   evidence as D-52.  Mr. Alexander, do you recall ever seeing

14   this memo before?  You are a recipient on the document.

15   A.   Yeah.  I have no -- I know what it is.  I don't

16   specifically recall it in this format, but I know what it is.

17   Q.   Now, do you recall sending a proposed OCC consent order

18   to members of senior management and asking for their comments?

19   A.   Yes.

20   Q.   And do you understand this to be a memo received back

21   from Mr. Hill?

22   A.   Correct.

23   Q.   Let's go to the second page of that document and if we

24   can focus on lower case Roman numeral viii.  Can you blow that

25   up, Chris?  Can you read that to yourself for a moment, Mr.

ALEXANDER - DIRECT - TAMBUSSI

1  Alexander.

2  A.   Yes, I've read it.

3  Q.   You see that the allegation was that the bank engaged in

4  unsafe practices by submitting materially false branch

06:55  5  information.  Did I read that correctly?

6  A.   Yes.

7  Q.   Is that one of the factual proposals that the OCC set

8  forth in a proposed consent order?

9  A.   That was one.  If you recall, I said before that there

06:56  10  were two draconian elements of the consent order, one was the

11  operational restrictions, the second was a series of

12  allegations.  And my recollection was that one of the

13  allegations in the draft consent order, the first draft, was

14  that they included this language.  And in my book submitting a

06:56  15  false application to the Federal Government is a criminal

16  offense.

17  Q.   Now, Mr. Hill sent you a response, did he not?

18  A.   Yes, he did.

19  Q.   What was the response?

06:56  20  A.   "That is true only in an extremely limited number of

21  isolated cases."

22  Q.   Meaning that it occurred at least one time, right?

23          MR. JACOBS:  I object to the form of question, that

24  is clearly leading.

06:56  25          MR. TAMBUSSI:  Withdrawn.

*United States District Court*
*Camden, New Jersey*

ALEXANDER - DIRECT - TAMBUSSI

1   BY MR. TAMBUSSI:

2   Q.   How did you interpret that response, Mr. Alexander?

3   A.   It indicated to me that Mr. Hill believed that it might

4   have happen in a limited number of cases, but not to the

06:57   5   extent that the OCC was asserting.

6   Q.   Now, ultimately there was what was called a decision and

7   consent to the issuance of a consent order.  What's that in

8   the process, what does that mean?

9   A.   And I apologize for the legalese, but an order can only

06:57   10   be issued, unilaterally by the agency, so a stipulation is a

11   bilateral, or two party agreement, by which the bank and the

12   OCC agree that the order can be issued.  So it's really the

13   signing document.

14   Q.   Did such an order enter in this case?

06:57   15   A.   Yes.

16   Q.   And ultimately there was a consent order, correct?

17   A.   Correct.

18   Q.   Well, show P-19, please, Chris.

19          Now, Mr. Alexander, what does the issuance of a

06:58   20   consent order of this nature mean with regard to the

21   designation of a bank?

22   A.   For these purposes, although Commerce was healthy

23   financially, it was deemed to be in "troubled" condition.

24   Q.   What does that mean when a bank is placed in troubled

06:58   25   condition or designated as troubled condition?

ALEXANDER - DIRECT - TAMBUSSI

1   A.   It has a number of connotations.  It means, for example,

2   that it's not eligible for expedited processing of routine

3   corporate applications.  Any new management or directors are

4   subject to prior approval, and that the golden parachute

06:58   5   regulations would be applicable to any indemnification of

6   golden parachute payments.  There may be some others, but

7   those are three of the critical once.

8   Q.   Is that considered a positive event?

9   A.   No, sir.

06:59   10   Q.   Is it considered a negative event?

11   A.   Well, it imposes harsh regulatory restrictions and it's

12   viewed in the marketplace as putting you in a penalty box

13   where other banks are not.

14   Q.   Now, this consent order puts certain restrictions on the

06:59   15   bank, correct?

16        MR. JACOBS:  Objection, that's another leading

17   question, Judge,, either it does or it doesn't.  The witness

18   can explain.

19        THE COURT:  It is.

06:59   20   BY MR. TAMBUSSI:

21   Q.   Mr. Alexander, can you tell me what this consent order

22   did?

23   A.   I haven't looked at it in a long time, but my

24   recollection is that it dealt with a number of the areas that

06:59   25   had been the subject in the investigation, including asking

─ALEXANDER - DIRECT - TAMBUSSI─

1   the bank to conduct a review of certain lease transactions,

2   and I think one of the significant things in the document was

3   requiring the bank to submit a transition plan that was going

4   to require the bank to transition away from some of the

07:00   5   current, then current vendors that the OCC had questions

6   about.

7   Q.   Any particular vendors that come to mind?

8   A.   Well, there was a focus on -- there was a focus on Blank

9   Rome, there was a company called Markhim Chalmers; Interstate,

07:00   10   ICRE, which was the Silvestri company; there was I recall

11   about ten companies that were subject to this transition plan.

12   Q.   Now, the transition plan, did it have a time limit on it?

13   A.   I believe -- well, when you say time limit, they had

14   to -- I'd have to look at the document.  They had to submit it

07:00   15   within a certain amount of days and I believe the transition

16   required the bank to wean itself off these relationships by

17   the end of 2007, if I'm recalling.

18   Q.   Now, this document, it talks about what was required of

19   the bank.  Did it require the bank to undo any past activity?

07:01   20   A.   I'd have to look at the document, my recollection was

21   that there was a committee formed to take a look, to conduct a

22   review of prior lease transactions, and there may have been

23   some that had been identified.

24   Q.   All right.  Now, let me show you -- you mentioned

07:01   25   Interstate Commercial Real Estate, correct, a John Silvestri

ALEXANDER - DIRECT - TAMBUSSI

1  company?

2  A.   Yes, sir.

3  Q.   Now, were there any discussions that you were involved

4  with in your representation of the bank with Interstate

07:01  5  Commercial Real Estate?

6  A.   Extensive discussions with their counsel.

7  Q.   Could you explain that to the jury, please.

8  A.   Interstate was represented by a Washington law firm named

9  Venable, and there were a number of issues associated with --

07:02  10  that arose out of this investigation as it related to

11  Interstate, one was the production of documents, a second was

12  whether or not some of these transactions could have been

13  unwound given the contractual arrangements.  I think this was

14  also an issue under New Jersey law about whether commissions

07:02  15  that had been paid, whether it was appropriate to rebate them

16  back to the bank.  Those are the things I remember.

17  Q.   Do you recall having e-mail discussions with the person

18  from Venable, the lawyer from Venable?

19  A.   Extensive e-mails and meetings.  They are just up the

07:02  20  street from us.

21         MR. TAMBUSSI:  May I approach the witness, your

22  Honor.

23         THE COURT:  You may.

24  BY MR. TAMBUSSI:

07:02  25  Q.   Mr. Alexander, I'm going to show you what's been marked

ALEXANDER - DIRECT - TAMBUSSI

1  D-41 for identification.  Can you identify that document?

2  A.   Yes, I can.  This is an e-mail from me to Thomas Kelly,

3  who is a partner at Venable, and this is in October of 2007 in

4  which I am communicating to him a proposed form of agreement

07:03   5  that would implement the transition plans that I mentioned

6  arising out of the consent order.

7  Q.   And in your e-mail on the bottom of page one to Mr. Kelly

8  you refer to a number of properties, correct?

9  A.   Yes, 19 properties.

07:03   10  Q.   19 properties?

11  A.   Yes, sir.

12  Q.   And did these discussions involve any future action with

13  regard to any rates?

14  A.   Yes.

07:04   15  Q.   What was that?

16  A.   Going forward, as I recall, Interstate was agreeing to a

17  cap on its brokerage commission of 5 percent, except in

18  limited circumstances, and they were also agreeing under

19  certain circumstances to rebate the bank where it was lawful

07:04   20  to do so.

21       MR. TAMBUSSI:  Approach the witness, your Honor?

22       THE COURT:  You may.

23  BY MR. TAMBUSSI:

24  Q.   I'm going to show you what's been marked D-42 for

07:04   25  identification.  Can you identify that for the jury and

*United States District Court*
*Camden, New Jersey*

ALEXANDER - DIRECT - TAMBUSSI

1    explain what it is?

2    A.    So this exhibit appears to me to be two copies of the

3    same letter from Mr. Kelly, who I just mentioned, who is the

4    partner at Venable, to me with a copy to Mr. Silvestri in

07:05    5    which he is responding to Commerce's demand that certain

6    concessions be made by Interstate in respect to certain leases

7    and closed branch deals.

8    Q.    Did you ultimately reach an agreement with Mr. Kelly of

9    Venable with regard to this issue?

07:06   10    A.    I believe we did.

11    Q.    Okay.  Now, let me move to a different topic as it

12    relates to the consent order.  You recall looking at the April

13    letter from Mr. Beard with regard to branch applications.  How

14    are branch application, that issue, addressed with this

07:06   15    consent order at the end of June?

16    A.    One of the essential pieces of consideration that the

17    board was dealing with in deciding whether to agree to the

18    consent order was whether the OCC would undo kind of having

19    put the bank in the penalty box.  So, a commitment was made at

07:06   20    the highest levels of the OCC that a more -- a less onerous

21    protocol would be agreed to by which the bank would submit

22    information to the OCC and it would be begin processing

23    applications once again.

24    Q.    Once again after what?

07:07   25    A.    After they satisfied themselves that the information was

—————— ALEXANDER - DIRECT - TAMBUSSI ——————

1    complete.

2    Q.   Okay.  And at what point in time did this occur, before

3    or after Mr. Hill left?

4    A.   After Mr. Hill left.

07:07   5    Q.   And was that -- strike that.

6         Do you recall the meeting where Mr. Hill was

7    terminated and resigned?

8    A.   Yes.

9    Q.   Can y describe what you observed at that board meeting?

07:07   10   A.   It was a very difficult board meeting.  I think it was an

11   emotional board meeting.  Many of these Directors had been

12   together with Mr. Hill for a long time.  Mr. Hill was very

13   angry.  I specifically recall me asking him to leave the room

14   because I didn't think it was appropriate for us to have a

07:08   15   discussion about certain elements of this and he was very

16   upset with me.  I think that was the last time I spoke to him.

17   Q.   And ultimately did Mr. Hill resign from one bank and was

18   terminated from the other bank on that day?

19   A.   Yes.

07:08   20   Q.   Okay.  Now, at the outset of your testimony, which I took

21   out of order because that's really what we're focusing on here

22   today, we talked about the events that transpired between the

23   time of Mr. Hill's termination going forward.  I want to show

24   you a couple e-mails and see if you recognize those.

07:08   25        MR. TAMBUSSI:  If I may I approach, your Honor.

─── ALEXANDER - DIRECT - TAMBUSSI ───

1          THE COURT:  Yes.

2    BY MR. TAMBUSSI:

3    Q.   Mr. Alexander, I show you what's been marked D-16 for

4    identification.  Can you identify that series of e-mails?

5    A.   This is a set of e-mails between the OCC, Mr. Hill's

6    counsel Andrew Sandler, who is then at Skadden, and myself

7    that summarizes discussions we had been having and meetings

8    that had taken place in the November time period regarding

9    Mr. Hill and specifically payments to Mr. Hill that are the

10   subject of this dispute.

11   Q.   What was the purpose of these discussions with you, Mr.

12   Sandler and the regulators?

13   A.   Well, from our standpoint, from the company and bank's

14   standpoint we were trying, as I said before, to facilitate an

15   on going dialogue with the regulators and the e-mails are the

16   parties' back and forth describing what their respective

17   positions were in respect to the dispute at that time.

18   Q.   Is the bank trying to get Mr. Hill paid?

19   A.   Certainly we were trying to intercede with the regulators

20   to move the process along.

21   Q.   I show you what's been marked --

22          MR. TAMBUSSI:  May I approach the witness,  your

23   Honor?

24          THE COURT:  You may.

25   BY MR. TAMBUSSI:

─────────── ALEXANDER - DIRECT - TAMBUSSI ───────────

1    Q.   What's been marked P-64.  By the way, that e-mail that

2    you have in front of you, the one that you just looked at, I

3    believe it was D-16; is that correct?

4    A.   D-16.

07:11    5    Q.   What's the date of that?

6    A.   Well, there is three e-mails.  I'm sorry, two e-mails,

7    one is dated November 30th that refers to a meeting of

8    November 19, 2007, and one is a response to that November 30th

9    e-mail from the government dated December 30, 2007.

07:11    10   Q.   Let me show you P-64.  Can you identify that document?

11   A.   Yes.  This is an e-mail from Mr. Sandler, once again

12   Mr. Hill's lawyer, to myself and Mr. Cohen, who is the senior

13   partner at Sullivan & Cromwell, copying -- also copying Mr.

14   Sandler's partner discussing the status of this dispute.

07:11    15   Q.   What was the purpose of this e-mail traffic?  Part of the

16   ongoing discussion with the regulators and Mr. Hill's lawyers?

17           MR. JACOBS:  Object to the form of the question,

18   Judge.

19           THE COURT:  Leading.

07:12    20           MR. JACOBS:  Counsel asked it and then he answered

21   it.

22           THE COURT:  It was leading.

23   BY MR. TAMBUSSI:

24   Q.   What was the purpose of the e-mail, Mr. Alexander?

07:12    25   A.   Mr. Sandler was just giving his perspective about where

─────ALEXANDER - DIRECT - TAMBUSSI─────

1    things stood in respect to the matter.

2    Q.   Okay.  I want to show you --

3         MR. TAMBUSSI:  If I can approach, your Honor, please.

4         THE COURT:  You may.

07:12    5    Q.   D-17.  Can you identify this document by date and

6    subject?

7    A.   So this is an e-mail dated December 5, 2007, from Mr.

8    Sandler to the OCC lawyers handling the case -- Richard

9    Sterns; if you recall, he's the person who transmitted the

07:13   10    consent order -- to me and Mr. Cohen in which he's trying to

11    ascertain the OCC's position so its role with respect to the

12    application of the golden parachute rules.

13         MR. TAMBUSSI:  May I approach the witness, your

14    Honor?

07:13   15         THE COURT:  You may.

16    Q.   By the way, what is the date of that document?

17    A.   December 5, 2007.

18    Q.   I show you D-18.  Can you describe that document and also

19    identify the date, please?

07:13   20    A.   So, D-18 appears to be some additional e-mail chain

21    relating back to D-17 that I just referenced in which

22    Mr. Sterns communicates the OCC's position to Mr. Hill's

23    lawyers and Mr. Hill's lawyers thanks the OCC for

24    clarifications, in which he says they are entirely consistent

07:14   25    with our understanding from the meeting and it's helpful to

*United States District Court*
*Camden, New Jersey*

ALEXANDER - DIRECT - TAMBUSSI

1   have the OCC's position stated clearly to all of us.

2   Q.   When was that?

3   A.   That was December 7, 2007.

4        MR. TAMBUSSI:  Approach, your Honor?

5        THE COURT:  Yes.

6   BY MR. TAMBUSSI:

7   Q.   I show you what's been marked D-22, a set of e-mails in

8   August of 2008.  If you can identify those e-mails.

9   A.   So this appears to be a set of e-mails starting -- I have

10  to read up, I apologize, but from August 11, 2008, from myself

11  to Kevin Lee, who is the investigator handling the OCC

12  investigation, trying to ascertain the status of some document

13  issues.  And then three days later, an e-mail from him

14  inquiring about -- I'm having trouble reading this because

15  it's blacked out a little bit.  "Also as I mentioned during

16  our conversation, the Fed and the OCC need to know what entity

17  would make the payment under the proposed settlement with the

18  Hills, and if it is the Bank, whether funds would be or were

19  down-streamed to fund the payment.  As you know, this is an

20  important jurisdictional issue that needs to be resolved

21  quickly."  And then I respond that I will get back to him with

22  that information.  And that was on the 14th, eight minutes

23  later.

24  Q.   Fourteen over what.

25  A.   2008?

ALEXANDER - DIRECT - TAMBUSSI

1  Q.   2008.  What does that mean, jurisdictional issue?

2  A.   I think the issue here was that if I recall, was that the

3  employment agreement with the holding company.  And the OCC

4  was focusing on the extent any monies were being exchanged

07:16  5  whether they were coming from the holding company which would

6  be outside of the OCC's jurisdiction or from the Bank which

7  would be within the OCC's jurisdiction.

8  Q.   Okay.  So the regulators had to decide whose got to make

9  the decision?

07:16  10  A.   Correct.

11        MR. JACOBS:  Objection to the leading question,

12  Judge.

13        THE COURT:  Sustained.

14        MR. TAMBUSSI:  May I approach the witness, your

07:16  15  Honor?

16        THE COURT:  You may.

17        MR. TAMBUSSI:  D-25.

18  Q.   Mr. Alexander, I show you a document marked D-25 which is

19  dated August, which is dated August 19, 2008.  Are you

07:16  20  familiar with what that document is?

21  A.   Yes.  This is my e-mail back to Mr. Lee in which I had

22  followed up with the client and I'm advising the OCC that I

23  say the Hill litigation reserve currently is at the Bank level

24  and what that means is that there's money sitting at the Bank

07:17  25  for purposes of satisfying the judgment and then Mr. Lee turns

─────────────── ALEXANDER - DIRECT - TAMBUSSI ───────────────

1    and says thanks, but we need to know whether the holding

2    company funded the reserve directly or indirectly.

3    Q.   Okay.

4    A.   And that's dated August 19, 2008.

5    Q.   Okay.

6         MR. TAMBUSSI:  May I approach the witness, your

7    Honor?

8         THE COURT:  You may.

9    Q.   D-23.  December 5th, the 2008 e-mail.  Could you tell the

10   jury what this is?

11   A.   This is an e-mail from me to Mr. Stearns with a copy to a

12   Lynne Nunner who is a litigation partner at TD Bank's outside

13   New York law firm regarding Vernon Hill.  And what I'm saying

14   to Mr. Stearns is would you have time to speak with us about

15   the Hill settlement tomorrow at around noon.  Once again

16   that's December 5th, 2008.

17   Q.   So you were still involved in December 2008?

18   A.   That's consistent with what I said at the outset.

19   Q.   All right.  Now, going back to the end of 2007 before the

20   merger took place.  Did you give advice, specific advice to

21   the Board so whether or not they could submit a 359

22   certification?

23   A.   Yes.

24   Q.   What was that advice?

25   A.   That we couldn't make the certification.

ALEXANDER - DIRECT - TAMBUSSI

1    Q.   And the reason was what?

2    A.   Because we couldn't satisfy the standards set forth in

3    the Regulations.

4    Q.   Now, are you aware that the Board meeting minutes

5    authorizing the Bank's lawyers to discuss settlement with the

6    regulators?

7    A.   Yes.  And I don't think those were inconsistent with my

8    legal advice.

9    Q.   Tell me why.  Tell the jury why.

10   A.   Well, I think there's several reasons.  First, the Board

11   minutes, as I recall, say to resolve and get Hill his money,

12   subject to meeting all applicable regulatory requirements.

13   So, that was an important part of our job.  Secondly, and this

14   may sound harsh, but the fact is that these regulations were

15   intended to give the regulators the authority to not allow a

16   payment, even though it's contractually obligated.  And that's

17   why we were taking the steps to enable are Mr. Hill through

18   his counsel to do what it could do to advocate for their

19   client.  But we could only do what we could do.

20   Q.   Well, at some point in time in December of 2007 there's

21   Board meeting minutes that talk about authorizing the Bank's

22   lawyers, in particular Mr. Cohen to get a release, negotiate a

23   release with Mr. Hill.  Is that consistent with your legal

24   advice?

25   A.   Yes.

ALEXANDER - DIRECT - TAMBUSSI

1   Q.   How so?

2   A.   Because Mr. Cohen would not do anything that wouldn't

3   meet the regulatory requirements.  He had the same view I did

4   about what the regulations provided.

07:20   5   Q.   And was that communicated to the Board of Directors?

6   A.   I heard Mr. Cohen communicate that in my presence.  I

7   don't recall that specific meeting.

8   Q.   Okay.  All right.  Now, I want to show you what has been

9   marked in evidence as P-53, which is a Consent Order.

07:21   10        MR. TAMBUSSI:  That if I may, Judge, may I approach

11   the witness?

12        THE COURT:  You may.

13   A.   I have it.

14   Q.   It will come up.

07:21   15   A.   I have it on the screen.

16   Q.   You only have the first page.

17   A.   Okay.

18   Q.   I'm going to give you the rest of it.

19        Mr. Alexander, this is a stipulation and Consent Order

07:21   20   the jury has seen a number of times.  Are you familiar with

21   such orders?

22   A.   This order?

23   Q.   All right.  First of all, are you familiar with this

24   order?

07:21   25   A.   Yes.

—— ALEXANDER - DIRECT - TAMBUSSI ——

1   Q.   Are you familiar with orders like this?

2   A.   Yes.

3   Q.   Is there a typical run of the mill order?

4   A.   No.  And the reason I say that is certainly you know

07:22   5   things have changed obviously in the financial crisis but at

6   the time a monetary payment in the form of four million

7   dollars was a very substantial enforcement action, and also I

8   think given who the subject of the order was, it was -- this

9   was a pretty significant development.

07:22   10   Q.   Why do you say that?

11   A.   For the reasons I explained before about, Mr. Hill's

12   tenure with the Bank.

13   Q.   Okay.  Now, this Bank has two whereas clauses on the

14   first page.  Do you see those?

07:22   15   A.   Yes.

16   Q.   But in your experience dealing with these matters having

17   seen orders like this, is this boiler plate?

18        MR. JACOBS:  Judge, I object.  This witness had

19   nothing to do with this order.  He's giving now what is expert

07:22   20   testimony.  And he's never been offered as an expert.

21        THE COURT:  He's giving opinion testimony.  He's not

22   giving expert testimony.  He's got foundation and that he

23   worked with orders like this for a long time.  Go ahead.

24   A.   There are, there are aspects of this that are boiler

07:23   25   plate.  There are other parts that are not.

————— ALEXANDER - DIRECT - TAMBUSSI —————

1  Q.  Okay.  All right.  Tell me the difference between the

2  two, please.  Tell the jury, please.

3  A.  Well in my experience with this document means is that

4  Hill and his lawyers were given the choice of settling on

)7:23  5  terms reflected in this document or litigating the matter.

6  And that's what's reflected in the first whereas clause.  And

7  in the second whereas clause, what this says to me based on my

8  experience is that the parties continue to dispute the facts

9  the OCC felt it had a basis under the statute to proceed and

)7:23  10  bring the action against Mr. Hill.  And Mr. Hill was trying to

11  assert whatever defenses he could within the context of the

12  settlement.

13  Q.  Okay.  The language whereas the comptroller finds and

14  respondent neither admits nor denies that Respondent engage in

)7:24  15  unsafe and unsound practices of fiduciary duty by failing to

16  comply with sound corporate governance principles in

17  connection with real estate purchases, leases and joint real

18  estate development transactions involving the Bank which

19  resulted in financial gain to the respondent.  Do you see that

)7:24  20  language?

21  A.  Yes.

22  Q.  Recognizing that language, how does that language apply

23  to the Part 359 certification?

24  A.  Well, I think it is an example of why it is that I

)7:24  25  believe that the company couldn't give a certification.  This

────────── ALEXANDER - CROSS - JACOBS ──────────

1   is consistent with what the comptroller had been telling me

2   since January of 2007.

3   Q.   That report refers to real estate leases and the real

4   estate development transactions.  These single purpose limited

07:25   5   liability corporations?  Did each and every lease have to

6   stand on its own?

7   A.   That would be the OCC's position.

8   Q.   You have to look at them in the aggregate.  Correct?

9   A.   Correct.  That was their position.

07:25   10        MR. TAMBUSSI:  That's all I have, Judge.

11        THE COURT:  Cross examine.

12   (CROSS EXAMINATION OF MR. ALEXANDER BY MR. JACOBS:)

13   Q.   Good afternoon, Mr. Alexander.  How are you?

14   A.   Good afternoon.

07:25   15   Q.   We've not met before have we?

16   A.   No, sir.

17   Q.   Mr. Alexander, in the early part of your direct testimony

18   you helped us a little bit with why these Golden Parachute

19   regulations exist, and I wrote down what you said.  I think.

07:25   20   To prevent individuals who cause harm to a Bank from taking

21   away money.  Is that what you said?

22   A.   That's one of the reasons, yes, sir.

23   Q.   Okay.  To prevent individuals who cause harm to a Bank to

24   take away money.  Right?

07:26   25   A.   Yes, sir.

ALEXANDER - CROSS - JACOBS

1    Q.   All right.  What kind of harm?

2    A.   You're asking me what the legislative history was with

3    the statute.

4    Q.   No. I'm asking you about your experience.  Isn't it all

07:26    5    about banks that were in financial trouble because of

6    mismanagement by people who then wanted huge sums of severance

7    pay?

8    A.   No.  Because the OCC and the other regulators would have

9    otherwise other ways of putting banks in a bucket other than

07:26    10   in the use of the phrase trouble condition.  Trouble condition

11   does not only connotate financial, bad financial condition.

12   Q.   I'm not up to trouble condition yet.  I'm right now

13   asking you for a further explanation of what you meant when

14   you said the regulations exist to keep people who caused harm

07:26    15   to a bank from walking away with money.  You did say that,

16   didn't you?

17   A.   Words to that effect yes, sir.

18   Q.   Okay.  When was this passed, in the mid nineties?

19   A.   I think in 1991.

07:27    20   Q.   All right.  The early nineties?

21   A.   I believe in the -- FDIC Improvement Act of 1991.

22   Q.   Had there been some Bank failures?

23   A.   We had a Savings and Loan crisis.

24   Q.   And isn't that what prompted this?

07:27    25   A.   Among other things.

—— ALEXANDER - CROSS - JACOBS ——

1    Q.   All right.  So, Congress passed a law and the regulators

2    passed some regulations so that people who did damage to banks

3    didn't profit by it.

4    A.   I disagree with that characterization.  That's not what I

5    said.

6    Q.   Okay.  I know what you said.  I'm asking what you meant

7    by it?

8    A.   Congress passed a law that said in certain circumstances

9    they did not want people who were responsible for causing the

10   conditions at the Bank from getting a benefit at the expense

11   of the shareholders or the FDIC Insurance Fund, even if it

12   meant abrogating contractual obligations.

13   Q.   Who caused the conditions at the Bank?

14   A.   Yes.

15   Q.   All right.  How much do you know about the conditions at

16   Commerce Bank?

17   A.   I knew at the time an extensive amount.

18   Q.   You told us that it was financially healthy?

19   A.   Correct.

20   Q.   What period of time were you talking about that you said

21   it was financially healthy?

22   A.   Well, I had done some work for Commerce in the prior

23   couple years before so I had some experience with the company.

24   I had admired the company.  I had no reason to think it had

25   any financial problems.  It was strong from a capital

ALEXANDER - CROSS - JACOBS

1    standpoint and liquidity standpoint.

2    Q.   You even said that Mr. Hill did an extraordinary job

3    going the Bank April.  Creating value?

4    A.   Correct.

5    Q.   Creating what kind of value?

6    A.   A brand.

7    Q.   What else?

8    A.   Shareholder value.

9    Q.   Shareholder.  Shares of stock went up 23 percent a year

10   for ten years running, didn't they?

11   A.   I don't have that information.

12   Q.   All right.  So this was a Bank that from your own

13   personal observations for years was prospering.  Is that

14   correct?

15   A.   In certain ways, yes.

16   Q.   It was prospering in all ways, wasn't it?

17   A.   No, sir.

18   Q.   Deposits?  Branch growth.  Shareholder.  Value of shares?

19   Gross income.  Net income.  In what way was it not prospering?

20   A.   Its governance was not keeping up with its -- if I can

21   finish my answer, sir?

22   Q.   You can.

23   A.   It's governance was not keeping up with its financial

24   growth.

25   Q.   Its governance.

ALEXANDER - CROSS - JACOBS

1  A.   Yes.

2  Q.   We're back to governance.  Okay.  Let's stay with

3  governance for a minute.  Any evidence that Mr. Hill was

4  stealing?

07:29    5  A.   You'd have to define that word for me.

6  Q.   You don't understand what stealing is?

7  A.   No, sir.

8  Q.   Okay.  Any evidence that Mr. Hill was embezzling from the

9  Bank?

07:30   10  A.   No.

11  Q.   Any evidence that Mr. Hill was padding his expense

12  account to get money he wasn't entitled to?

13  A.   That's not something I looked at.

14  Q.   Okay.  This is all about governance, right?

07:30   15  A.   I did not say it was all about governance.

16  Q.   Okay.  The June 28, 2007 order.  Is it or is it not good

17  governance?

18  A.   That is an essential part of the order, but another

19  essential part of the document was the approach by management

07:30   20  to the regulatory issues confronting this institution.

21  Q.   So the order is about governance.

22  A.   That's one of the issues, yes, sir.

23  Q.   Okay.

24  A.   It's about process.  It's about policies and procedures

07:30   25  governing insider transactions.  It's about a transition plan,

—————— ALEXANDER - CROSS - JACOBS ——————

1    weaning the Bank off its pre-existing relationships.  And it's

2    about imposing on the Bank a legally enforceable document that

3    requires -- required the Board and the management to do the

4    things that they had promised in five straight examinations

07:31   5    before that examine.

6    Q.   What were the five straight examines?

7    A.   Going back to 2002 or three.  There were recommendations

8    from the OCC about enhancing policies and procedures in the

9    governance area.

07:31   10   Q.   Okay.  Bear with me just a moment.

11          MR. JACOBS:  Can I hand this to the witness, Judge?

12          THE COURT:  Sure.  You want to show Mr. Tambussi what

13   you're handing the witness?

14          MR. JACOBS:  P-51.

07:32   15   Q.   This document  s not in evidence.  So I'm going to hand

16   it to you.  And let me first ask you if you've seen it before.

17   It's three pages.

18   A.   I don't recall seeing this.

19   Q.   You see the date there?

07:32   20   A.   Yes, sir.

21   Q.   Does that coincide with the onset of this OCC

22   investigation?

23   A.   It would have been around the time when Mr. Bono called

24   me.  Correct.

07:32   25   Q.   Do you, in fact, see Mr. Bono's name there?

ALEXANDER - CROSS - JACOBS

1    A.   He appears to be the author of the memo.

2    Q.   And do you see it's directed to the Board of Directors of

3    both Commerce Bancorp, Inc. and Commerce Bank NA?

4    A.   Yes, sir.

07:33   5    Q.   And isn't it about this notice of investigation that you

6    told us about?

7    A.   Yes.

8    Q.   And doesn't it refer specifically to two letters you told

9    us about, both dated December 5, 2006 both by the OCC, one to

07:33   10   the Board, one to Vernon?

11   A.   Yes.

12   Q.   Okay.  Now, if you turn to the second page of Mr. Bono's

13   memo.  Are these the prior examinations you were referring to?

14   Prior OCC and Federal Reserve examinations in the years 2002,

07:33   15   2003, 2004 and 2006?

16   A.   Probably, yes.

17   Q.   Read what Mr. Bono says and tell me if you agree that in

18   each of those examines the insider transactions were found to

19   comply with governing regulations and regulatory guidance.

07:34   20   A.   Yeah, I generally agree with what he said, but it's not

21   what I testified to.

22   Q.   That's why I'm showing it to you.  You see Mr. Bono

23   general counsel is telling the Board of Directors about these

24   prior examinations?

07:34   25   A.   Yes.

*United States District Court*
*Camden, New Jersey*

ALEXANDER - CROSS - JACOBS

1   Q.   Insider transactions got a clean bill of health?

2   A.   Well, that certainly is the introduction.  But then he

3   goes on and what I was referring to if you look, for example,

4   in the third bullet point.  While you're transactions properly

5   complied with regulation O and regulatory guidelines, you

6   lacked adequate systems to govern payment for services

7   provided by insider and further improvement to the insider

8   program was sought.  That's the kind of thing I was talking

9   about where I said that the Company's governance was not

10  keeping up with its growth.

11  Q.   Mr. Bono says that, doesn't he?  Quote:  Matters

12  requiring attention close quote.

13  A.   You asked me what the basis of my statement.

14  Q.   Yeah?

15  A.   Mr. Bono says it.  Correct.

16  Q.   He says, Mr. Bono says two things.  In four prior

17  examinations the preceding years, the Bank had a clean bill of

18  health but the OCC or Federal Reserve said here are things

19  which require attention.

20  A.   Correct.

21  Q.   And if you look at the third page, there's a reference to

22  the tolling agreements requested for all Directors.

23  A.   I mentioned those before, yes, sir.

24  Q.   Is that right.  Okay.  And this is all coincident with

25  the OCC investigation?

*07:34*
*07:34*
*07:34*
*07:35*
*07:35*

1    A.   Yes.

2    Q.   Right?  All right.  Take that back from you.  Thank you.

3         Now, Mr. Alexander, you apparently based on your work

4    for your client -- by the way who was your client?

07:36   5    A.   The Company and the Bank.

6    Q.   What Company?

7    A.   Commerce Bancorp corn.

8    Q.   And the Bank being Commerce?

9    A.   Bank NA.

07:36   10   Q.   All right.  You apparently decided that it was impossible

11   for the Bank to make the certification and you so advised the

12   Bank.  Will you tell me when you did that?

13   A.   Specifically, no.

14   Q.   What year?

07:36   15   A.   2007.

16   Q.   What part of 2007?  First half or second half?

17   A.   It would have been in the context of the Part 359 issue.

18   So certainly in the context of a certification, it would have

19   been probably post June of 2007.

07:36   20   Q.   How much after June of 2007?

21   A.   I don't recall.

22   Q.   And who did you tell?

23   A.   I was working with the management of the Bank.  I was

24   working with the Board of the Bank.  I was working with

07:37   25   Sullivan and Cromwell as co-counsel.  This was at a time when

ALEXANDER - CROSS - JACOBS

1    there was a transition going on because I forgot when the TD

2    Bank was announced, the transaction was announced but our --

3    Q.   When was that announced?

4    A.   I just said I didn't know.  But our role was clearly

5    going to change through that transition and it did.

6    Q.   How did it change?

7    A.   We were substantially less involved.

8    Q.   If I tell you that there is proof in this record that the

9    TD transaction, the conference call announcement was

10   October 2nd of 2007, does that sound right?

11   A.   Yes.

12   Q.   And if I tell you that the deal was done March 13, 2008,

13   does that sound right?

14   A.   Yes.

15   Q.   Okay.  Now, you tell me, when did you get substantially

16   uninvolved?

17   A.   Well, what I said is that our role changed and in part it

18   was because of the deal and it was in part because another law

19   firm, Sullivan & Cromwell, was brought in to handled the deal

20   and some of these issues became deal issues, so we were

21   working with them.

22   Q.   Okay.  So you don't have a date when you closed your

23   file?

24   A.   No, I was continuing to work on the matter at least

25   through the end of 2008.

ALEXANDER - CROSS - JACOBS

1    Q.   Fine.  Now, so it sounds like you got involved in

2    December of 2006 and had some involvement through 2008?

3    A.   Yes.

4    Q.   And after 2008, were you any further involved?

07:38    5    A.   I'm not sure.  It's possible on an incidental basis.

6    Q.   All right.  I want to show you an exhibit in this case,

7    which is P-23.  When it comes up on the screen you'll see it's

8    a set of board of directors meeting minutes of Commerce

9    BanCorp dated June 28, 2007.  Now, Mr. Tambussi mentioned

07:39    10    those minutes to you.  I want you to take a look at them.

11    I'll be there in just a moment.  Here we go.  Maybe we can

12    make just the top half bigger for present purposes.

13    A.   Yeah, I can see them all.

14    Q.   Okay.  Well, I'm not sure the jury can also, so why don't

07:39    15    you -- that's good.  Okay.  Do you see what I just said,

16    Commerce BanCorp, Inc. board of directors meeting?

17    A.   Yes.

18    Q.   Have you ever seen these before today?

19    A.   I think so.

07:39    20    Q.   According to the second paragraph, you were there?  Or

21    you were attending by speaker.

22    A.   I believe I was present.

23    Q.   And in the first paragraph we see a long list of

24    Directors who were there, don't we?

07:40    25    A.   Correct.

ALEXANDER - CROSS - JACOBS

1   Q.   And second paragraph we see a long list of lawyers who

2   were there?

3   A.   Yes, sir.

4   Q.   Rodgin Cohen of Sullivan & Cromwell.  You referred to

5   them as had being involved also, right?

6   A.   Yes, sir.

7   Q.   Richard Alexander.  That's you.  Mr. Weissman, from Blank

8   Rome.  Mr. Tambussi from Brown and Connery, Mr. Critchley, and

9   then some -- some officers of the company.  Is that who all

10  was there?

11  A.   That's consistent with my recollection.

12  Q.   Do you remember the meeting?

13  A.   I remember the meeting.

14  Q.   Let look at topic heading two, termination of Hill.

15  A.   Can you make that bigger for me, please?

16  Q.   I can't, but this gentleman over there can.

17  A.   Okay.

18  Q.   Termination of Hill.  Messrs. Cohen, Alexander -- that

19  would be you, right?

20  A.   Yes, sir.

21  Q.   "Messrs. Cohen, Alexander, Norcross and Critchley

22  discussed with the board their meeting with the Federal

23  Reserve Board concerning the termination of Mr. Hill's

24  employment agreement and responded to board questions."

25          Now, in that sentence Cohen, that's a lawyer, right.

*United States District Court*
*Camden, New Jersey*

ALEXANDER - CROSS - JACOBS

1   A.   Yes, sir.

2   Q.   Alexander.  You are a lawyer?

3   A.   Yup.

4   Q.   And Mr. Critchley is a lawyer, right?

07:41   5   A.   Yes, sir.

6   Q.   That's three out of four, right?

7   A.   Yes.

8   Q.   And is this what happened, did you three lawyers and Mr.

9   Norcross discuss with the board the meeting you had with the

07:41   10   Federal Reserve Board concerning the termination of Mr. Hill's

11   agreement?

12   A.   I have absolutely no reason to think that those minutes

13   don't accurately reflect that discussion.

14   Q.   Well, my question is, is that what happened?  In other

07:41   15   words, do you remember it?

16   A.   I remember lots of things about that meeting and I don't

17   remember the part about discussing our meeting with the

18   Federal Reserve Board, but I certainly remember substantial

19   discussion about Mr. Hill's employment agreement.

07:42   20   Q.   Okay.  Well, let's be sure about what we're saying.  You

21   are not contesting any part of that sentence, are you, as

22   being historically accurate?

23   A.   I said I didn't have any specific recollection sitting

24   here today about the aspect of the sentence that relates to a

07:42   25   meeting with the Federal Reserve Board.

ALEXANDER - CROSS - JACOBS

1   Q.   Well, let's be more specific.  Was there in fact a

2   meeting when the Federal Reserve Board?

3   A.   There were several meetings with the Federal Reserve

4   Board during this period.

07:42   5   Q.   Was there one before the June 28, 2007, board of

6   directors meeting?

7   A.   There were several meetings with the Federal Board before

8   that meeting.

9   Q.   Okay.  Do you agree that the first sentence seems to

07:42   10   refer to one?  It says "meeting" not "meetings?"

11   A.   Yes, it does.

12   Q.   Okay.  So my question is based on this, was there a

13   meeting with the Federal Reserve Board before this June 28th

14   board of directors meeting?

07:43   15   A.   There were several board meetings before the June 28th

16   board meeting.

17   Q.   So this should actually say "meetings?"

18   A.   I -- I can't -- you are asking me to verify a sentence in

19   minutes that I didn't write and I'm telling you that I don't

07:43   20   specifically recall a specific meeting discussed in that

21   agreement.  In those minutes, I'm sorry.

22   Q.   Is it true that you responded to the board's questions?

23   A.   I have no reason to doubt what's in the minutes.

24   Q.   The minutes go on to say, "The board unanimously approved

07:43   25   the termination of Mr. Hill's employment without cause

ALEXANDER - CROSS - JACOBS

1   pursuant to the resolutions attached hereto as Exhibit B."

2   Did I read that right?

3   A.   Yes, sir.

4   Q.   Is that what happened?

5   A.   That's my recollection.

6   Q.   "The board unanimously agreed that it was their intent to

7   fully honor the terms and conditions of Mr. Hill's employment

8   agreement, subject, however, to the requirements of all

9   applicable laws, rules and regulations."

10          Did I read that right?

11  A.   Yes, sir.

12  Q.   Now, what is the last time you saw these minutes, if you

13  ever did?

14  A.   I don't recall when I saw them last.

15  Q.   Have you ever seen them?

16  A.   Yes.

17  Q.   Okay.

18  A.   I don't know that I've seen them in this form where

19  they've been -- you know, where there are portions redacted.

20  That's one of the reasons I'm struggling with your question.

21  Q.   Okay.  So I'll change the question then.  When is the

22  last time you saw the portions that appear on this piece of

23  paper?

24  A.   I might have seen them in refreshing my recollection in

25  connection with my testimony today.

ALEXANDER - CROSS - JACOBS

1   Q.   Now, at this meeting did you tell the board of directors

2   that in your legal opinion they could not file the necessary

3   certification to get approval under the applicable laws, rules

4   and regulations?

07:45   5   A.   I do not have a precise recollection of exactly what was

6   said at the meeting.  I know that either Mr. Cohen or myself

7   or Mr. Critchley, or all of us, discussed the fact that we

8   were going to have to comply with the golden parachute

9   regulations.

07:45   10   Q.   Is that what you told the board, that the bank would have

11   to comply with golden parachute regulations?

12   A.   I don't have any other specific recollection of what was

13   said.

14   Q.   You don't have any other specific --

07:45   15   A.   I don't have a specific recollection of what was said at

16   the meeting.

17   Q.   Okay.  Well, conspicuously absent from these minutes,

18   which I realize you did not prepare, but neither did I, is any

19   statement that you said, or Mr. Critchley said, or Mr. Cohen

07:45   20   said that you can't apply because you can't file a

21   certification.  Is there anything in there that I'm missing?

22   A.   Well, first of all, you mischaracterized what I would

23   have said to the board.

24   Q.   Tell me what you did say to the board.

07:46   25   A.   I said I didn't recall what I said to the board, but what

ALEXANDER - CROSS - JACOBS

1    I would have said to the board was not that we couldn't apply.

2    I said from the outset the application is not the issue, a

3    complete application requires a certification.  And what I

4    made clear, based on my knowledge and I think Mr. Cohen would

07:46    5    have agreed, that there were significant issues in the bank's

6    ability to itself certified to the 359 requirements.

7    Q.    Through whom does the bank express itself?

8    A.    I don't understand your question.

9    Q.    A bank is a legal entity, isn't it?

07:46    10   A.    Yes, sir.

11   Q.    If it wants to do something, let's say buy a trash can or

12   enter into a contract, through whom does it do that?

13   A.    It all depends on the issue.

14   Q.    Doesn't a bank acts through it's board of directors?

07:47    15   A.    For some things.

16   Q.    Doesn't the bank act through its board of directors for

17   things like this, golden parachute applications?

18   A.    In this case, yes.

19   Q.    So you are going to agree with me at this early stage of

07:47    20   the cross-examination that it is up to the bank directors to

21   make the decision on a golden parachute application, not some

22   Washington lawyer and not some New York lawyer.  It's up to

23   the bank board of directors, right or wrong?  Right or wrong?

24   A.    I don't --

07:47    25   Q.    Right or wrong?

ALEXANDER - CROSS - JACOBS

1    A.    I don't understand your question.

2    Q.    You give legal advice, you don't enforce it; is that

3    correct?

4    A.    I give legal advice.

07:47    5    Q.    You give legal advice.  It is up to the bank board of

6    directors to decide whether they can provide the necessary

7    golden parachute certification, right or wrong for the fourth

8    time?

9    A.    Well, I disagree.  I disagree with your characterization.

07:48    10    I think the board -- it's a mixed issue of fact and law here.

11    There are legal concepts encompassed in part 359 and there are

12    factual concepts.  Mr. Cohen, the New York lawyer -- and in

13    other parts of the country we refer to him differently, sir,

14    Mr. Cohen is the dean --

07:48    15    Q.    What do you call in other parts of the country?

16    A.    Excuse me.  Dean of the banking bar, probably the most

17    preeminent banking lawyer in the world, and myself, and I'll

18    let the people decide whether or not I've got the *bona fides*,

19    were in agreement that there were issues that were presented

07:48    20    based on the facts as we knew it and the allegations that were

21    being made by the government.  And I believe the board was

22    entitled to make its decision based on the input it received

23    from us.

24            And keep in mind that members of the Special

07:48    25    Litigation Committee participated in meetings with me with Mr.

──── ALEXANDER - CROSS - JACOBS ────

1    Cohen in which some of these facts as presented by the OCC

2    were discussed.  So they heard it directly not just from me.

3    Q.   Okay.  Do you remember my question?

4    A.   I've answered your question.

5    Q.   My question was isn't it up to the board of directors to

6    make this decision whether to file the necessary application

7    for regulatory approval?

8    A.   Well, I'm trying to answer the question to the best of my

9    ability, I don't think you like my answer.  The instructions

10   that the enterprise was conveying through the board was that

11   the board wanted to see Mr. Hill paid, but it wanted to make

12   sure that it complied with all applicable regulations.  And

13   that's my best answer.

14   Q.   And doesn't this resolution which I have in my left hand,

15   June 28, 2007, say that?

16   A.   Yes, it does.

17   Q.   In fact, it says both those things, they want him paid

18   under his contract, and they want to comply with all

19   applicable laws and regulations?

20   A.   Correct.

21   Q.   All right.  Now --

22   A.   Those two things may be at odds with each other.

23   Q.   Can you explain why there is no statement in here

24   reflecting your advice or Mr. Cohen's advice, who you refer to

25   as the dean, whose advice should certainly be respected, why

—ALEXANDER - CROSS - JACOBS—

1   there is nothing in these resolutions, can you explain, saying

2   that based on what you two lawyers know, you can't make the

3   necessary certification?

4   A.   I can only speculate.

07:50   5   Q.   You can only speculate.

6   A.   Okay.

7   Q.   Well, I'm not going to ask you to do that, of course.

8        You made mention of the Special Litigation Committee.

9   That committee didn't report until February of the next year,

07:50   10   isn't that correct.

11   A.   No, that's absolutely incorrect.

12   Q.   It is.  Let's look at P-9.  And I think all we'll use is

13   the face sheet.

14   A.   I have it in front of me.

07:51   15   Q.   You should, yes.  Thank you.  Is that in fact the face

16   sheet of the report of the Special Litigation Committee?

17   A.   I think, as I said when I was testifying earlier --

18   Q.   Well, I wonder if you could answer my question.  Is that

19   in fact the face sheet of the report of Special Litigation

07:51   20   Committee?

21   A.   I believe so.  I was not involved in the preparation of

22   the Special Litigation Committee.

23   Q.   I didn't suggest you were.  I'm just asking you is this

24   the face sheet of the report of the Special Litigation

07:51   25   Committee?

*United States District Court*
*Camden, New Jersey*

─ALEXANDER - CROSS - JACOBS ─

1  A.   I believe so.

2  Q.   All right.  And is it dated if the lower left hand corner

3  February 2008?

4  A.   Yes.

07:51   5  Q.   And is that approximately seven or eight months before

6  June 28, 2007?

7  A.   As a chronological matter, yes.

8  Q.   And isn't this when it reported?

9  A.   No, sir.

07:51   10  Q.   It reported earlier?

11  A.   As I testified earlier, a form of the Special Litigation

12  Committee having Mr. Giordano, Mr. Lloyd and Mr. Vassalluzzo,

13  was established in the first quarter of 2007 in connection

14  with the OCC investigation.  Those were the principal people

07:52   15  that I was reporting to at the board.  It appears that that

16  group's responsibility morphed into a broader jurisdiction.  I

17  was not involved in that process.  So I knew them at the time

18  as a special committee with those same three members.

19  Q.   That committee, the Special Litigation Committee, these

07:52   20  three members, they were charged with the responsibility of

21  investigating everything anybody claimed that Vernon Hill had

22  done wrong, plus all the lawsuits that were filed in 2007 as a

23  result of, A, the OCC investigation, and, B, the merger; isn't

24  that right?

07:52   25  A.   That was not their charge when I was dealing with them.

─ALEXANDER - CROSS - JACOBS ─

1    Q.   Did it become their charge?

2    A.   I'm not sure.

3    Q.   By August 21, 2007?

4    A.   I don't know.

07:53   5    Q.   You don't know?

6    A.   I was interviewed by the special committee, so that was

7    generally my understanding.

8    Q.   You were one of about 40 people interviewed by that

9    committee, weren't you?

07:53   10   A.   I don't know.

11   Q.   Have you ever read the report?

12   A.   Yes.

13   Q.   Okay.  How long ago?

14   A.   In preparing for my testimony.

07:53   15   Q.   Well, when did you prepare for your testimony?

16   A.   Recently.

17   Q.   Well, how recently?

18   A.   In the last couple weeks.

19   Q.   In the last two weeks?

07:53   20   A.   Last couple weeks, I don't know if it was two.

21   Q.   Could have been three?

22   A.   Um-hum.

23   Q.   Okay.  So today is May 13, 2013, the first time you read

24   this Special Litigation Committee report is some time between

07:53   25   the last week in April and today?

ALEXANDER - CROSS - JACOBS

1   A.   No.  I don't recall if I had seen it before.

2   Q.   Oh, you don't know?

3   A.   Right.  I know that I was interviewed by the special

4   committee.

07:54   5   Q.   But you don't know whether you read it before some time

6   in the last three weeks?

7   A.   Correct.

8   Q.   But you did in fact read it within the last three weeks?

9   A.   Yes.

07:54   10   Q.   Okay.  Now the next thing I want to ask you about is

11   P-38.  If you don't mind looking at that.  Now, what you

12   should be looking at is another set of board of directors

13   meeting minutes, November 20, 2007.  Is that what you are

14   looking at?

07:54   15   A.   Yes.

16   Q.   And let's focus in on this top here, top part.

17   A.   Yeah, I see that I wasn't there.

18   Q.   You are getting ahead of me.  Let's just enlarge this top

19   part, okay?  I'm only addressing who was there.  Have you ever

07:54   20   seen these before today?

21   A.   I don't recall.

22   Q.   In looking at them, do you see that a whole slough of

23   directors, Bershad, Buckelew, Di Francisco, Giordano, Kerr,

24   Lewis, Lloyd, Schwartz, Ragone, Vassalluzzo and Norcross shows

07:55   25   up in progress.  See all that?

ALEXANDER - CROSS - JACOBS

1    A.   Yes, sir.

2    Q.   And then we get to lawyers.  You see the next paragraph

3    that Mr. Tambussi was there?

4    A.   Yes, sir.

07:55    5    Q.   And this gentleman from Sullivan & Cromwell in New York,

6    Rodgin Cohen, who you refer to as the dean, was there?

7    A.   The dean of the banking bar, just to be clear.

8    Q.   Okay.  And David Marstan and Michael Griffinger of

9    Gibbons.  Is that yet another law firm?

07:55    10   A.   Yes.  And this is consistent with what I told you before

11   about our role changing, evolving.

12   Q.   I didn't claim it's not, I'm just asking who is there,

13   then we'll get to who is not.  So lawyers Mr. Tambussi, Mr.

14   Cohen, Mr. Marstan and Mr. Griffinger were there, right?

07:56    15   A.   That's what the minutes say.

16   Q.   But you weren't?

17   A.   Not that I recall, not that the document suggests.

18   Q.   Okay.  You don't remember it and the document doesn't say

19   you were there?

07:56    20   A.   Correct.

21   Q.   So you weren't there.  Right?

22   A.   Correct.

23   Q.   Okay.  Now, you said earlier that your role was changing.

24   Let's hear a little bit more detail.  Explain your answer.

07:56    25   Does that mean you are not as active in the case as you were

ALEXANDER - CROSS - JACOBS

1  and other lawyers are taking your place?  What does that mean?

2  A.  Essentially what you said, that there were other -- that

3  there were a bunch of things going on.  I had been primarily

4  responsible for the regulatory investigation and the

5  negotiations relating to the consent order, and those matters

6  had resolved themselves.  There was some continuing issues in

7  respect to the investigation, and that was our role.  And

8  there was also issues of costs and efficiency.  So we didn't

9  have a role, as I said, in the Special Litigation Committee

10 thereafter, I think that's what the Gibbons firm was doing, if

11 I recall.  So that's what I mean by our role was evolving.

12 Q.  It was you actually devolving, you were getting less

13 involved?

14 A.  Yes, sir.

15 Q.  All right.  Weren't totally out, but you weren't totally

16 in anymore?

17 A.  I was involved in the issues that I think I had unique

18 knowledge about.

19 Q.  Now, if we look at these board of directors meetings, now

20 that we know who was there and who wasn't.  Let's go to the

21 third page, topic heading five.  There we go.  Let's get that

22 top paragraph bigger.

23      Now, do you see what these minutes say "The board was

24 also briefed by legal counsel?"  Now, that would not be you,

25 right, because you weren't there?

07:56
07:57
07:57
07:57
07:58

— ALEXANDER - CROSS - JACOBS —

1    A.   That would be my assumption, yeah.

2    Q.   "On the status of the negotiations with the attorneys for

3    Vernon Hill and InterArch on the issues of Vernon Hill's

4    separation payment claims and InterArch's transition."  Right?

07:58    5    A.   Yeah.  The only reason -- I'm trying to be very, very

6    precise with you, sir.  But Mr. Tambussi showed me before some

7    e-mails that reflected I was having discussions with

8    Mr. Hill's lawyers at the time, so it's possible that I was

9    involved in some of the discussions with the Fed that are

07:58   10    referenced in these minutes, but I don't think I was at this

11    meeting.  That make sense?

12    Q.   Thank you for your clarification.  Right.

13         So, it is clear to you that lawyers other than you

14    were addressing the board about negotiations with Vernon's

07:58   15    attorneys regarding his separation payments, right?

16    A.   That's what the minutes say.

17    Q.   Well, if you had four months earlier told the board that

18    they couldn't make the necessary certification to get Vernon

19    paid, what are they talking about four months later?

07:59   20    A.   I don't know what was discussed in this board meeting.

21    Q.   "The board was advised of the meeting had with the

22    attorneys for Vernon Hill and InterArch on October 26, 2007,

23    in Washington, D.C."  Were you at that meeting?

24    A.   I'm not sure.  It's possible.

07:59   25    Q.   Well, do you have a recollection of it?

— ALEXANDER - CROSS - JACOBS —

1    A.    Not sitting here today.

2    Q.    Has this statement that it was October 26, 2007, does

3    that refresh your recollection?

4    A.    No.

07:59    5    Q.    So you have no recollection of being at such a meeting in

6    your home town?

7    A.    I have a recollection of meeting lots of times with

8    Mr. Hill's lawyers, I believe InterArch was represented by

9    Gibson Dunn, and I don't recall ever meeting with them.  I

08:00    10    know there was another Washington lawyer, but it was not

11    someone that I recall meeting on behalf of Mrs. Hill.

12    Q.    The third sentence says, "The board was advised that the

13    OCC directed Commerce to deal directly with the Federal

14    Reserve Board and the FDIC on the issue of Vernon's Hill's

08:00    15    separation payment claims."

16         Do I read that right?

17    A.    That's what it says.

18    Q.    Well, if you had already decided four months earlier and

19    told the board that they could not file the necessary

08:00    20    certification, what were these other lawyer talking about with

21    the board?  They ever tell you?  You were working with them.

22    A.    Well, I think in this case the sentence from my

23    perspective says that these were payments as a jurisdictional

24    matter that would have to be made at the company level, so the

08:00    25    OCC didn't have primary jurisdiction over the issue, and the

*United States District Court*
*Camden. New Jersey*

ALEXANDER - CROSS - JACOBS

1   FDIC is the agency responsible for the administration of the

2   golden parachute regs.

3   Q.   I thought it was the Federal Reserve with the concurrent

4   of the FDIC?

08:01   5   A.   I'm sorry.

6   Q.   I said I thought it was the Federal Reserve with the

7   concurrence of the FDIC?

8   A.   I think my testimony just was that the FDIC is the agency

9   with the overall responsibility, it is its regulation, it's

08:01   10   found in its part, and that's why this makes sense to me.

11   Q.   It makes sense to you that in late November, 2007 these

12   other lawyers are explaining to the board that they have to go

13   talk to the Federal Reserve or the FDIC to get approval for

14   Vernon to be paid.   That make sense to you?

08:01   15   A.   Yes.

16   Q.   After you've determined four months earlier that it's a

17   waste of time?

18   A.   That is not what I have said.   I have said that the bank

19   was not in a position to make the certification.

08:01   20   Q.   Tell me the day the board of directors --

21           MR. TAMBUSSI:   Judge --

22           THE COURT:   Let him finish his answer.

23           MR. JACOBS:   I'm sorry, I thought he was.

24   Q.   Go ahead.

08:02   25   A.   I've said that several times.   I did not say that

1   Mr. Hill was not able to make the certification, which is

2   expressly provided for in the regulations, nor did I say that

3   there obviously was a desire on the part of the government to

4   try to bring a resolution of this matter.  So I think smart

08:02   5   lawyers were sitting around trying to see, because this was a

6   huge distraction for TD, for Mr. Hill, for the company,

7   everybody was trying to put this in good faith behind them.

8   Q.   Okay.  Now, these minutes that I'm reading you, before

9   you testified today have you ever read them?

08:02   10   A.   I said I didn't remember seeing them.

11   Q.   They go on to say "The board approved a motion."  You

12   know what that means, don't you?

13   A.   Yes, sir.

14   Q.   "Authorizing a request to be made to the Federal Reserve

08:03   15   Board and FDIC for authorization of any separation payments to

16   Vernon Hill."

17        Did I read that right?

18   A.   That's what the document says.

19   Q.   And you actually know the lawyers who were there in

08:03   20   attendance, you know Mr. Tambussi, you know Mr. Cohen.  Do you

21   know Mr. Marstan?

22   A.   I met him when he interviewed me.

23   Q.   And Mr. Griffinger?

24   A.   I meet him when he interviewed me, I didn't know --

08:03   25   Q.   Four lawyers, four lawyers present when the board

ALEXANDER - CROSS - JACOBS

1   approved the motion authorizing a request to be made to the

2   regulators to pay Vernon, right?

3   A.   Right. That's what it says.

4   Q.   That's what it says.  Now, but you say that four months

08:03   5   earlier you expressed your opinion, your opinion to someone

6   that based on what you studied, the board could not make the

7   necessary certification, right?

8   A.   I think, once again, sir, you've mischaracterized my

9   testimony in the following respect:  You asked me many times

08:04   10   do I remember when I gave that advice.  I said I did not.

11   Q.   Okay.

12   A.   I certainly know that I gave that advice and I don't

13   think that advice changed.  I believe -- I continued to

14   maintain that the bank, based on what I know today, is not in

08:04   15   a position to give the certification.

16   Q.   Tell me the day that you presented whatever it is you

17   know and whatever it is you thought to the board of directors

18   of Commerce Bank so they could vote upon it?

19   A.   I don't have the foggiest idea what day I gave that

08:04   20   advice.

21   Q.   Did you ever?

22   A.   I think I've testified many times today that I

23   communicated that to the management, the Special Litigation

24   Committee, and to the board.

08:04   25   Q.   So they knew what your opinion was, right?

*United States District Court*
*Camden, New Jersey*

1    A.   I assume they understood it, yes.

2    Q.   It seemed like people capable of understanding whatever

3    you were telling them, right?

4    A.   I can't put myself in their -- in their mindset.

08:05   5    Q.   But assuming they were capable of understanding what you

6    were telling them, they would then go out and have their own

7    discussions as board members and take their own vote in the

8    presence of four other lawyers other than you, right?  Four

9    other lawyers.

08:05   10   A.   I wasn't at the meeting, I don't know what you are asking

11   me.  Sorry.

12   Q.   I'm asking you didn't they resolve to pay Vernon and go

13   get regulatory approval in the face of, in the presence of

14   four other lawyers, not you, but four other lawyers, including

08:05   15   Mr. Tambussi, the dean of all banking in America, Mr. Marstan

16   and Mr. Griffinger?

17   A.   That's what the minutes suggest.

18   Q.   Right.

19        MR. JACOBS:  You want to stop now, Judge?

08:06   20        THE COURT:  Sounds good.

21        Ladies and gentlemen, that's it for today.  We'll see

22   you tomorrow morning.

23        MR. JACOBS:  Can we ask you a question before we go,

24   though?

08:06   25        THE COURT:  With the jury here.

ALEXANDER - CROSS - JACOBS

1          MR. JACOBS:  It involves the jury.

2          THE COURT:  Sidebar.

3             (Sidebar discussion held off the record)

4          THE COURT:  Thank you, ladies and gentlemen.  Have a

08:07   5   good evening.  See you tomorrow morning at 9:15 to be here to

6   order your lunch.  Don't discuss the case with anyone.

7          THE DEPUTY CLERK:  All rise.

8          (Jury leaves courtroom).

9          MR. TAMBUSSI:  Judge, can I just confer with Mr.

08:07   10  Alexander on timing before everyone else leaves the courtroom?

11         THE COURT:  Sure.

12         (Short pause.)

13         THE COURT:  See you tomorrow morning, everybody.

14  9:30 AM.

08:08   15         MR. JACOBS:  Yes, thank you.

16         (Adjournment.)

17

18

19

20

21

22

23

24

25

## $

**$1,016,763** [1] - 30:14
**$1.01** [2] - 17:24, 18:5
**$10.10** [1] - 18:6
**$11,250,000** [1] - 9:22
**$140,000** [1] - 29:22
**$144,500** [1] - 27:24
**$155,388.75** [1] - 38:25
**$161,000** [1] - 28:1
**$179,000** [2] - 141:15, 142:20
**$205,270** [1] - 37:14
**$236,864** [1] - 30:20
**$375,000** [1] - 30:1
**$375,104** [1] - 29:22
**$392,455** [1] - 30:11
**$400** [2] - 135:2, 135:18
**$42** [1] - 21:1
**$436,391** [1] - 30:8
**$49,650** [1] - 37:15
**$505,883** [1] - 30:3
**$589,246** [1] - 30:23
**$60,000** [2] - 49:15, 49:23
**$617,664** [1] - 30:6
**$69,554.66** [1] - 37:16
**$693,629** [1] - 31:1
**$7,500** [1] - 143:13
**$700,000** [1] - 9:22
**$75** [1] - 38:20
**$75,000** [1] - 38:19
**$750,000** [1] - 38:16
**$78,000** [1] - 144:10
**$8,500,000,000** [1] - 19:13
**$832,194** [1] - 30:16

## '

**'02** [2] - 56:14, 56:24
**'06** [4] - 21:7, 22:21, 22:24, 23:3
**'07** [7] - 19:5, 20:18, 20:25, 21:4, 24:1, 166:10
**'68** [1] - 57:25
**'73** [1] - 58:1
**'97** [1] - 20:25

## /

**/S** [1] - 1:25

## 0

**00** [1] - 90:10
**0078** [1] - 10:12
**02** [1] - 17:24
**06** [1] - 17:25
**08101** [1] - 1:9
**09-3685** [1] - 1:5

## 1

**1** [23] - 2:1, 2:2, 2:3, 2:4, 2:5, 2:5, 2:6, 2:7, 2:8, 2:9, 2:11, 2:12, 2:13, 2:14, 2:15, 2:15, 2:16, 19:10, 118:15, 120:2, 141:21
**1,500** [1] - 143:10
**1.3** [1] - 62:14
**1.9** [1] - 63:14
**10** [3] - 2:13, 2:14, 8:8
**100** [1] - 31:24
**101** [1] - 17:24
**11** [7] - 90:10, 124:25, 125:2, 125:3, 200:10
**111** [1] - 184:18
**112** [1] - 2:3
**1153** [1] - 185:2
**12** [7] - 2:9, 17:25, 55:1, 61:21, 82:10, 154:13, 156:13
**122** [1] - 2:14
**13** [5] - 1:10, 116:13, 138:3, 216:12, 228:23
**130,000** [1] - 143:3
**134** [1] - 2:4
**135** [2] - 2:5, 2:5
**14** [5] - 69:16, 70:2, 109:10, 134:4
**140** [1] - 2:6
**143,000** [1] - 27:21
**147** [2] - 2:7, 2:8
**14th** [1] - 200:22
**15** [5] - 2:7, 2:15, 64:6, 141:11, 185:13
**15-minute** [1] - 181:8
**150** [4] - 19:9, 19:19, 19:21, 130:5
**16** [2] - 16:4, 40:5
**17** [10] - 10:8, 41:15,

42:14, 62:11, 62:22, 64:1, 71:4, 76:17, 80:6, 125:13
**17th** [1] - 80:17
**18** [2] - 45:6, 113:11
**1818** [1] - 82:10
**184** [1] - 2:15
**19** [9] - 2:11, 63:11, 63:25, 82:11, 194:9, 194:10, 198:8, 201:19, 202:4
**1973** [2] - 5:9, 135:9
**1980** [1] - 184:17
**1982** [1] - 149:19
**1985** [1] - 149:19
**1988** [1] - 184:19
**1990** [4] - 5:14, 19:4, 19:5, 19:6
**1991** [2] - 208:19, 208:21
**1993** [1] - 185:3
**1994** [1] - 37:11
**1997** [1] - 20:17
**1999** [2] - 175:18, 176:2
**1:30** [1] - 122:13

## 2

**2** [11] - 2:1, 2:11, 3:13, 15:10, 18:13, 138:3, 138:14, 138:20, 138:21, 160:25, 161:1
**20** [7] - 10:12, 113:7, 137:19, 137:20, 141:10, 185:25, 229:13
**200** [1] - 130:5
**2000** [7] - 19:8, 19:20, 19:21, 49:7, 74:20, 76:17
**2001** [2] - 19:25, 130:9
**2002** [21] - 16:4, 16:13, 17:2, 17:14, 19:19, 46:4, 46:6, 46:8, 46:11, 54:7, 60:24, 61:15, 63:12, 88:21, 88:22, 113:4, 124:10, 124:22, 124:24, 212:7, 213:14
**2003** [1] - 213:15
**2004** [10] - 5:20, 66:1, 66:21, 66:25, 67:8, 87:20, 92:3, 113:5, 123:25, 213:15
**2005** [8] - 62:6, 62:7, 62:8, 62:9, 65:19,

66:5, 66:6, 66:25
**2006** [18] - 16:1, 16:5, 17:3, 17:15, 62:20, 66:5, 66:25, 89:24, 92:17, 124:5, 150:18, 150:24, 161:12, 161:14, 162:25, 213:9, 213:15, 217:2
**2007** [86] - 3:14, 5:5, 7:2, 7:10, 9:7, 18:13, 19:10, 19:22, 27:22, 29:11, 29:16, 29:18, 30:1, 30:9, 30:11, 30:16, 49:6, 54:4, 54:10, 54:12, 54:13, 55:1, 55:11, 55:15, 61:21, 61:24, 63:1, 66:15, 66:25, 67:8, 68:18, 72:20, 73:22, 74:17, 95:12, 96:8, 103:22, 104:24, 107:12, 113:6, 113:7, 113:18, 114:14, 115:3, 115:7, 115:24, 116:1, 129:20, 130:9, 138:3, 141:15, 141:20, 142:19, 142:20, 157:14, 160:15, 160:25, 161:1, 169:4, 192:17, 194:3, 198:8, 198:9, 199:7, 199:17, 200:3, 202:19, 203:20, 207:2, 211:16, 215:15, 215:16, 215:19, 215:20, 216:10, 217:9, 220:5, 225:15, 227:6, 227:13, 227:22, 228:3, 229:13, 232:22, 233:2, 234:11
**2008** [34] - 10:9, 12:25, 69:13, 69:16, 71:4, 80:6, 80:17, 96:10, 109:2, 109:7, 109:10, 115:25, 116:1, 116:13, 125:13, 134:4, 138:3, 138:12, 160:13, 161:3, 200:8, 200:10, 200:25, 201:1, 201:19, 202:4, 202:9, 202:16, 202:17, 216:12, 216:25, 217:2, 217:4, 227:3
**2009** [2] - 79:22, 80:3
**2010** [3] - 8:8, 119:19, 138:15
**2011** [8] - 79:9,

90:10, 100:21, 101:1, 101:16, 102:20, 116:13
**2012** [3] - 118:14, 119:22, 120:2
**2013** [2] - 1:10, 228:23
**202** [1] - 18:4
**206** [1] - 2:9
**21** [4] - 2:2, 17:5, 79:22, 228:3
**22** [6] - 2:8, 129:24, 133:22, 133:23, 134:3, 141:11
**23** [7] - 2:5, 17:16, 21:2, 21:14, 118:14, 135:12, 210:9
**23.2** [1] - 66:22
**231** [1] - 37:11
**237** [2] - 2:15, 2:16
**24** [7] - 2:1, 2:4, 19:8, 116:13, 130:17, 130:18, 130:19
**25** [5] - 2:5, 49:3, 130:18, 130:20, 131:1
**26** [4] - 49:6, 70:1, 232:22, 233:2
**27** [2] - 19:6, 169:3
**278** [2] - 19:23, 20:2
**28** [12] - 1:24, 5:4, 19:17, 113:7, 113:18, 114:14, 157:14, 211:16, 217:9, 220:5, 225:15, 227:6
**28th** [2] - 220:13, 220:15
**29** [5] - 16:6, 16:22, 20:21, 21:12, 24:1
**299** [1] - 17:3
**29th** [1] - 114:21
**2d** [1] - 185:1
**2nd** [1] - 216:10

## 3

**3** [10] - 2:6, 2:15, 2:16, 9:7, 12:1, 20:2, 23:3, 38:9, 143:2, 143:3
**3.5** [1] - 46:9
**30** [15] - 16:22, 17:14, 19:18, 21:6, 51:13, 56:12, 60:24, 61:15, 81:14, 95:12, 115:7, 135:18, 181:1, 182:19, 198:9
**300** [2] - 19:9, 19:11
**30th** [4] - 24:2, 95:25, 198:7, 198:8

**31** [1] - 115:3
**31st** [1] - 115:7
**33** [2] - 22:24, 51:15
**33.78** [4] - 23:2, 23:14, 24:3, 24:9
**34** [2] - 20:2, 135:13
**35** [1] - 127:4
**35,000** [1] - 143:10
**35.27** [4] - 22:23, 23:4, 23:5, 23:14
**355** [1] - 184:18
**358** [1] - 185:1
**359** [26] - 98:12, 98:17, 99:4, 99:13, 99:24, 100:1, 102:18, 114:6, 151:13, 152:3, 152:7, 152:15, 153:18, 154:10, 154:13, 157:20, 158:4, 158:25, 159:4, 159:20, 202:21, 206:23, 215:17, 223:6, 224:11
**359.4** [4] - 98:15, 100:2, 102:25, 111:16
**359.4(a)(4** [1] - 156:13
**3590.4** [1] - 98:13
**36** [1] - 120:9
**36-99** [1] - 24:9
**36.99** [1] - 24:2
**3:15** [1] - 185:14

## 4

**4** [4] - 20:19, 100:2, 185:2, 185:14
**4-I** [1] - 100:3
**4.6** [1] - 46:8
**40** [1] - 228:8
**400** [3] - 68:22, 94:13, 95:7
**401(k** [1] - 154:23
**408** [1] - 85:2
**42.50** [2] - 21:3, 22:10
**428** [2] - 19:11, 19:22
**44** [2] - 126:18, 126:21
**45** [7] - 16:4, 17:3, 19:11, 20:19, 126:18, 127:21, 127:22
**450** [2] - 13:22, 13:25
**46** [7] - 70:12, 126:18, 126:19, 126:21, 128:12, 128:13
**47** [2] - 70:12, 73:7
**48** [2] - 70:13, 74:6

**49** [1] - 70:13

## 5

**5** [6] - 2:2, 162:25, 194:17, 199:7, 199:17, 213:9
**5-year** [1] - 124:5
**50** [5] - 116:21, 117:14, 117:15, 117:19, 128:21
**50,000** [1] - 142:9
**500** [1] - 19:10
**52** [1] - 113:14, 114:23
**543** [1] - 20:25
**58** [1] - 184:17
**5th** [2] - 202:9, 202:16

## 6

**6** [1] - 130:8
**6.5** [1] - 66:2
**61** [1] - 114:22
**63** [3] - 2:12, 8:24, 9:1
**64** [1] - 2:13

## 7

**7** [2] - 45:23, 200:3
**7.5** [1] - 66:7
**70** [4] - 120:12, 120:15, 139:18
**71** [2] - 2:13, 65:10
**72** [2] - 61:3, 61:4
**73** [2] - 137:13, 139:18
**74** [2] - 2:11, 3:19
**75** [1] - 14:20
**753** [1] - 1:24
**78** [2] - 28:25, 29:1

## 8

**8** [4] - 2:12, 19:9, 19:25, 80:12
**8.1** [3] - 46:5, 46:7, 46:11
**80** [7] - 28:13, 28:14, 28:19, 28:20, 28:22, 29:1, 29:7
**83** [1] - 28:20
**84** [1] - 184:17
**866** [1] - 17:15

## 9

**9** [7] - 19:17, 34:14, 35:4, 48:16, 49:3, 125:12
**9.2** [1] - 66:16
**95** [1] - 15:10
**9:15** [1] - 238:5
**9:30** [1] - 238:14

## A

**A-L-E-X-A-N-D-E-R** [1] - 148:18
**AAA** [1] - 39:8
**ability** [6] - 34:5, 73:9, 131:22, 163:24, 223:6, 225:9
**able** [1] - 235:1
**abrogating** [1] - 209:12
**absent** [1] - 222:17
**absolutely** [24] - 21:17, 31:24, 32:20, 46:16, 48:10, 50:18, 59:15, 59:17, 72:7, 76:2, 86:21, 86:24, 99:17, 105:16, 120:11, 120:12, 120:14, 127:6, 135:17, 142:6, 144:21, 219:12, 226:11
**abstaining** [1] - 176:4
**abuse** [3] - 100:9, 101:6, 151:18
**accept** [2] - 108:21, 143:11
**acceptable** [1] - 103:24
**accepted** [1] - 114:17
**access** [1] - 119:13
**accommodate** [1] - 172:3
**according** [2] - 45:10, 217:20
**account** [6] - 104:24, 105:8, 105:14, 108:25, 115:20, 211:12
**accountant** [5] - 103:7, 103:8, 103:11, 103:19, 103:20
**accountants** [1] - 141:18
**accounting** [1] -

52:20
**accrue** [1] - 106:20
**accuracy** [1] - 54:17
**accurate** [3] - 55:13, 166:5, 219:22
**accurately** [1] - 219:13
**accused** [1] - 21:20
**acknowledge** [1] - 111:5
**acknowledged** [1] - 177:22
**acquire** [1] - 135:7
**acquired** [1] - 135:3
**acquisition** [2] - 50:19, 138:2
**acquisitions** [6] - 50:11, 50:12, 50:14, 50:23, 54:7, 110:12
**Act** [1] - 208:21
**act** [5] - 100:8, 100:17, 147:16, 183:20, 223:16
**acted** [4] - 49:8, 49:10, 80:13, 168:13
**ACTION** [1] - 1:4
**action** [9] - 37:12, 40:20, 44:17, 71:10, 184:15, 185:4, 194:12, 205:7, 206:10
**actions** [9] - 44:11, 44:12, 44:14, 44:22, 68:15, 70:14, 71:8, 77:7, 145:12
**active** [5] - 54:1, 54:2, 54:4, 160:15, 230:25
**actively** [1] - 173:23
**activities** [1] - 159:13
**activity** [2] - 160:14, 192:19
**acts** [2] - 87:2, 223:14
**actual** [1] - 93:23
**add** [1] - 182:7
**adding** [1] - 129:24
**addition** [2] - 30:19, 35:5
**additional** [10] - 38:16, 43:12, 63:17, 168:17, 172:23, 174:8, 182:8, 182:12, 185:10, 199:20
**address** [4] - 151:22, 177:13, 180:18, 186:12
**addressed** [4] - 16:20, 157:6, 157:17, 195:14

**addressing** [2] - 229:19, 232:14
**adequate** [1] - 214:6
**Adjournment** [1] - 238:16
**adjudicated** [4] - 39:7, 39:11, 88:3, 88:6
**adjudication** [7] - 11:15, 82:14, 85:1, 85:13, 109:4, 109:5, 126:6
**administration** [1] - 234:1
**administrative** [4] - 71:10, 85:5, 174:24, 174:25
**admired** [1] - 209:24
**admit** [3] - 111:8, 111:10, 111:11
**admits** [3] - 11:23, 83:17, 206:14
**admitted** [5] - 11:20, 109:25, 110:6, 110:10, 173:13
**advance** [1] - 40:19
**advanced** [1] - 182:9
**advantageous** [1] - 11:12
**adverse** [11] - 14:3, 21:21, 87:4, 87:5, 100:12, 100:13, 100:17, 100:23, 101:2, 101:6, 101:11
**advice** [18] - 123:6, 158:16, 158:18, 202:20, 202:24, 203:8, 203:24, 224:2, 224:4, 224:5, 225:24, 225:25, 236:10, 236:12, 236:13, 236:20
**advise** [2] - 145:5, 158:19
**advised** [6] - 49:5, 152:6, 162:7, 215:11, 232:21, 233:12
**advising** [2] - 177:6, 201:22
**advisory** [1] - 124:20
**advocacy** [1] - 186:24
**advocate** [1] - 203:18
**advocate's** [1] - 158:13
**affiliated** [6] - 98:16, 99:12, 154:5, 156:6, 156:9, 158:5
**affirmed** [2] - 38:5,

38:10

**afternoon** [11] -
136:20, 136:21,
137:7, 137:8, 141:5,
141:6, 148:14, 149:1,
149:2, 207:13, 207:14

**afterwards** [1] -
24:11

**agencies** [1] -
153:24

**agency** [8] - 82:10,
99:15, 100:21,
125:20, 190:10,
234:1, 234:8

**agent** [2] - 40:24,
106:8

**agents** [1] - 44:12

**aggregate** [1] - 207:8

**aggregating** [1] -
63:14

**aggressive** [1] -
40:20

**ago** [8] - 60:8, 69:23,
113:15, 124:24,
125:3, 132:25,
144:25, 228:13

**agree** [52] - 12:4,
13:14, 41:5, 41:12,
55:13, 59:11, 59:13,
63:25, 64:2, 66:1,
68:7, 68:9, 68:11,
70:9, 73:15, 76:12,
77:15, 78:18, 80:2,
80:5, 81:3, 83:15,
84:8, 84:11, 85:11,
85:12, 87:16, 98:24,
99:1, 103:25, 104:5,
104:10, 105:7, 106:4,
106:5, 106:15,
106:18, 108:19,
109:1, 119:24, 120:4,
120:5, 120:9, 120:16,
121:4, 186:25,
190:12, 195:17,
213:17, 213:20,
220:9, 223:19

**agreed** [7] - 13:5,
13:12, 13:13, 105:13,
195:21, 221:6, 223:5

**agreeing** [3] - 120:1,
194:16, 194:18

**agreement** [56] -
4:19, 4:24, 8:15, 12:6,
13:6, 33:6, 33:11,
34:11, 35:24, 36:13,
54:19, 59:6, 74:9,
74:17, 81:4, 81:16,
81:18, 81:20, 81:23,
82:13, 82:20, 86:17,
86:19, 103:21, 104:1,

104:6, 104:9, 104:11,
105:3, 105:7, 105:17,
106:1, 106:7, 106:11,
106:16, 106:20,
108:20, 108:21,
111:21, 114:4, 115:9,
115:11, 156:23,
165:9, 171:2, 172:16,
190:11, 194:4, 195:8,
201:3, 218:24,
219:11, 219:19,
220:21, 221:8, 224:19

**agreements** [3] -
52:1, 52:12, 214:22

**agrees** [1] - 120:6

**ahead** [8] - 48:18,
59:22, 75:9, 127:13,
181:23, 205:23,
229:18, 234:24

**Alexander** [38] -
97:3, 148:12, 148:13,
148:19, 149:1, 149:3,
149:5, 151:2, 151:4,
154:12, 157:5,
161:10, 163:1, 169:3,
170:24, 172:22,
173:6, 175:8, 185:24,
186:2, 188:13, 189:1,
190:2, 190:19,
191:21, 193:25,
197:3, 198:24,
201:18, 204:19,
207:13, 207:17,
215:3, 218:7, 218:18,
218:21, 219:2, 238:10

**ALEXANDER** [6] -
2:7, 2:8, 2:10, 148:15,
148:22, 207:12

**allegation** [3] -
71:12, 71:19, 189:3

**allegations** [25] -
70:10, 70:12, 71:6,
73:3, 87:24, 88:1,
88:3, 88:9, 88:10,
90:1, 90:3, 90:4, 92:7,
92:23, 111:6, 111:10,
111:12, 111:16,
129:14, 131:7,
131:19, 179:25,
182:12, 189:13,
224:20

**allege** [2] - 70:13,
88:12

**alleged** [2] - 161:22,
161:23

**allocation** [4] - 52:2,
52:12, 52:19, 172:5

**allow** [4] - 84:24,
99:20, 105:13, 203:15

**allowed** [3] - 12:12,

15:12, 183:18

**almost** [5] - 5:15,
143:2, 144:10,
171:11, 182:18

**alone** [2] - 116:22,
142:20

**AM** [1] - 238:14

**amended** [2] - 79:17,
79:20

**Amendment** [1] -
123:6

**America** [3] - 32:17,
88:12, 237:15

**American** [2] - 37:13,
143:7

**ammunition** [1] -
43:13

**amount** [24] - 4:20,
13:12, 13:13, 20:16,
23:13, 23:15, 23:19,
23:21, 26:16, 38:16,
38:19, 46:5, 46:7,
49:14, 49:15, 69:3,
69:6, 74:2, 111:8,
128:24, 144:10,
171:14, 192:15,
209:17

**analyze** [1] - 153:1

**analyzing** [1] -
152:23

**AND** [1] - 1:14

**and-a-half** [3] - 21:1,
129:24, 143:1

**Andrew** [4] - 8:8,
8:17, 35:11, 197:6

**anger** [1] - 178:22

**angry** [1] - 196:13

**announced** [12] -
7:11, 23:1, 23:7,
23:16, 23:23, 23:25,
24:12, 62:19, 63:19,
216:2, 216:3

**announcement** [1] -
216:9

**annual** [10] - 16:1,
16:6, 16:7, 16:19,
17:4, 17:25, 21:9,
62:14, 63:14, 143:10

**annually** [1] - 19:18

**answer** [28] - 6:22,
34:18, 34:25, 45:21,
57:15, 63:21, 67:11,
70:20, 70:24, 78:10,
85:24, 99:5, 107:22,
109:20, 118:1,
122:25, 133:15,
140:8, 145:18,
159:22, 162:10,
210:21, 225:8, 225:9,
225:13, 226:18,

230:24, 234:22

**Answer** [1] - 58:1

**answered** [3] - 45:3,
198:20, 225:4

**answers** [1] - 169:15

**apart** [1] - 44:12

**apologize** [2] -
190:9, 200:10

**appeal** [3] - 36:12,
38:10, 44:10

**appear** [1] - 221:22

**appeared** [1] -
174:22

**Appellate** [5] - 38:11,
132:9, 132:14,
132:15, 133:3

**appellate** [3] - 47:11,
47:16, 133:19

**apples** [1] - 68:7

**applicable** [7] -
154:13, 191:5,
203:12, 221:9, 222:3,
225:12, 225:19

**application** [31] -
97:10, 99:16, 101:23,
102:3, 105:23, 110:8,
110:15, 110:17,
118:11, 119:7,
119:17, 119:25,
120:20, 120:24,
121:2, 122:7, 122:9,
153:17, 153:19,
153:23, 172:24,
173:8, 173:19,
189:15, 195:14,
199:12, 223:2, 223:3,
223:21, 225:6

**applications** [18] -
41:20, 50:9, 71:11,
73:9, 73:16, 79:3,
111:4, 168:13,
168:15, 169:13,
169:16, 173:18,
175:12, 187:7, 191:3,
195:13, 195:23,
223:17

**applied** [2] - 78:2,
111:23

**applies** [2] - 13:14,
76:19

**apply** [21] - 71:20,
78:12, 78:17, 78:19,
99:1, 99:5, 99:16,
99:21, 105:24,
106:14, 109:21,
114:10, 114:12,
119:2, 119:21,
119:23, 152:21,
206:22, 222:20, 223:1

**applying** [1] - 99:18

**appointed** [1] -
176:16

**appraisal** [1] - 51:7

**appraisals** [2] - 51:2,
51:10

**appraiser** [6] - 51:5,
51:7, 51:11, 51:17,
51:19, 51:22

**apprised** [1] - 47:3

**approach** [17] - 8:5,
28:7, 29:4, 170:20,
173:2, 175:4, 193:21,
194:21, 196:25,
197:22, 199:3,
199:13, 200:4,
201:14, 202:6,
204:10, 211:19

**appropriate** [8] -
43:19, 47:17, 128:24,
183:15, 187:12,
187:21, 193:15,
196:14

**approval** [21] -
71:20, 97:7, 98:4,
105:23, 113:9, 114:2,
114:6, 114:12,
115:15, 116:6, 153:8,
153:18, 154:18,
155:13, 156:12,
159:21, 191:4, 222:3,
225:7, 234:13, 237:13

**approvals** [2] -
168:24, 182:24

**approve** [10] - 57:16,
58:25, 59:5, 60:5,
71:11, 73:16, 79:14,
147:4, 147:12, 173:22

**approved** [11] -
31:20, 61:17, 71:12,
78:20, 105:15,
111:19, 146:14,
146:22, 169:16,
173:21, 220:24,
235:11, 236:1

**April** [10] - 54:13,
55:1, 61:21, 62:7,
118:14, 169:3,
169:12, 195:12,
210:3, 228:25

**arbitration** [6] -
37:12, 37:22, 38:1,
38:9, 44:13, 44:17

**Arbitration** [1] -
37:13

**arbitrators** [2] -
37:14, 39:8

**architect** [1] - 35:25

**architectural** [9] -
36:13, 46:9, 65:23,
66:8, 66:25, 67:9,

68:3, 129:21, 130:2

**architecture** [1] - 27:14

**are's** [1] - 72:10

**area** [9] - 14:1, 14:2, 14:12, 52:5, 52:9, 52:19, 149:9, 149:10, 212:9

**areas** [4] - 92:1, 123:7, 186:24, 191:24

**argument** [1] - 183:2

**arising** [1] - 194:6

**arm's** [1] - 52:1

**arms** [2] - 166:20, 166:22

**Arnold** [4] - 149:6, 149:8, 149:12, 150:10

**arose** [1] - 193:10

**Arps** [3] - 8:12, 35:12, 96:2

**arrangement** [2] - 66:9, 157:1

**arrangements** [1] - 193:13

**array** [1] - 128:10

**arsenal** [1] - 47:4

**article** [3] - 12:24, 81:1, 82:6

**AS** [6] - 3:24, 3:25, 136:23, 136:24, 148:15, 148:16

**ascertain** [4] - 161:15, 161:20, 199:11, 200:12

**ascertained** [1] - 153:14

**aspect** [3] - 50:19, 147:20, 219:24

**aspects** [2] - 52:17, 205:24

**assert** [3] - 123:2, 123:6, 206:11

**asserted** [3] - 41:9, 41:12, 187:2

**asserting** [2] - 40:9, 190:5

**asset** [1] - 16:6

**assets** [9] - 16:4, 16:8, 16:20, 16:21, 19:6, 19:9, 19:10, 19:14, 19:17

**assign** [1] - 127:25

**assisted** [1] - 134:24

**associate** [1] - 150:10

**associated** [3] - 85:4, 137:14, 193:9

**associates** [1] - 12:21

**Associates** [1] -

127:17

**Association** [1] - 37:13

**assume** [2] - 121:10, 237:1

**assuming** [2] - 138:12, 237:5

**assumption** [1] - 232:1

**assuring** [1] - 165:10

**attached** [1] - 221:1

**attempt** [1] - 156:18

**attend** [1] - 176:25

**attendance** [1] - 235:20

**attending** [1] - 217:21

**attention** [5] - 123:24, 127:16, 167:3, 214:12, 214:19

**attest** [2] - 109:19, 109:21

**attorney** [3] - 45:7, 149:11, 149:18

**ATTORNEYS** [2] - 1:15, 1:18

**attorneys** [5] - 34:2, 35:18, 232:2, 232:15, 232:22

**attorneys'** [1] - 44:20

**attractive** [1] - 171:24

**audit** [3] - 45:12, 45:20, 165:25

**August** [11] - 79:22, 80:3, 95:12, 95:25, 115:7, 200:8, 200:10, 201:19, 202:4, 228:3

**author** [2] - 155:11, 213:1

**authored** [2] - 8:8, 120:2

**authorities** [4] - 14:8, 111:19, 153:9, 160:20

**authority** [3] - 145:4, 163:23, 203:15

**authorization** [1] - 235:15

**authorizing** [4] - 203:5, 203:21, 235:14, 236:1

**avail** [1] - 163:22

**available** [4] - 47:4, 142:5, 156:19, 184:15

**avenue** [1] - 182:12

**average** [7] - 16:7, 16:19, 17:15, 17:25, 20:5, 20:7, 51:15

**avoid** [3] - 41:2,

60:21, 85:4

**award** [2] - 38:25, 44:23

**awarded** [3] - 37:14, 38:15, 135:25

**awarding** [1] - 38:25

**awards** [1] - 38:9

**aware** [17] - 46:17, 46:20, 47:11, 51:23, 51:24, 76:8, 76:11, 77:13, 89:10, 94:2, 94:5, 95:2, 95:4, 96:23, 122:5, 127:14, 203:4

**B**

**backward** [1] - 168:10

**bad** [4] - 120:7, 184:5, 184:11, 208:11

**Bancorp** [9] - 63:4, 63:11, 108:3, 114:18, 137:21, 213:3, 215:7, 217:9, 217:16

**BANCORP** [1] - 1:6

**Band** [1] - 68:15

**bank** [167] - 21:22, 21:24, 22:11, 24:16, 26:1, 26:6, 26:15, 27:14, 34:2, 34:13, 35:10, 35:24, 36:12, 36:22, 37:12, 37:19, 37:22, 37:24, 38:21, 39:7, 39:20, 39:24, 40:9, 40:10, 40:11, 40:16, 40:23, 41:8, 41:13, 42:7, 43:9, 44:15, 44:16, 47:17, 48:5, 48:23, 49:6, 51:6, 52:4, 52:20, 56:20, 57:10, 57:15, 77:11, 77:17, 78:3, 81:14, 107:4, 108:6, 111:19, 115:20, 124:3, 124:17, 124:19, 124:21, 125:8, 125:11, 126:11, 127:19, 129:12, 129:21, 130:8, 130:22, 130:25, 132:4, 135:2, 135:9, 136:8, 139:8, 141:17, 142:16, 144:1, 145:17, 145:25, 146:21, 147:18, 150:23, 151:20, 153:9, 156:4, 156:11, 156:14, 156:15, 156:17,

157:21, 158:5, 158:9, 159:1, 159:3, 159:11, 159:19, 160:3, 160:5, 160:7, 160:10, 160:11, 161:25, 164:20, 165:16, 165:25, 166:21, 166:24, 169:9, 169:19, 169:23, 169:25, 170:4, 170:13, 171:11, 171:13, 172:7, 172:9, 174:1, 176:2, 177:7, 178:6, 178:7, 178:11, 178:13, 179:4, 179:13, 179:22, 179:23, 180:2, 180:8, 180:11, 180:19, 182:22, 184:24, 186:9, 186:11, 187:21, 189:3, 190:11, 190:21, 190:24, 191:15, 192:1, 192:3, 192:4, 192:16, 192:19, 193:4, 193:16, 194:19, 195:19, 195:21, 196:17, 196:18, 197:18, 208:15, 222:10, 223:7, 223:9, 223:14, 223:16, 223:20, 223:23, 224:5, 234:18, 236:14

**Bank** [182] - 5:15, 6:2, 6:10, 6:12, 7:15, 8:13, 10:22, 11:13, 12:10, 13:4, 13:5, 13:6, 13:12, 13:15, 13:22, 14:6, 14:10, 15:5, 15:25, 17:17, 17:22, 18:2, 18:7, 19:2, 20:13, 22:11, 24:12, 24:15, 24:20, 29:16, 32:15, 36:19, 57:25, 58:24, 59:11, 59:25, 61:16, 65:22, 66:1, 66:7, 66:22, 67:19, 67:20, 67:21, 68:22, 71:19, 71:24, 73:17, 73:20, 73:21, 74:21, 74:25, 75:3, 76:8, 77:10, 77:23, 78:1, 78:7, 78:8, 81:13, 83:22, 86:16, 86:17, 86:20, 86:22, 86:25, 87:3, 87:5, 87:6, 87:13, 87:14, 90:1, 91:16, 91:21, 92:17, 93:13, 95:10, 95:13, 95:22, 96:4,

96:11, 96:20, 96:22, 96:23, 97:7, 97:19, 97:23, 98:3, 98:16, 99:11, 102:7, 102:12, 103:15, 104:8, 104:11, 104:24, 105:6, 105:24, 106:3, 106:6, 106:14, 106:17, 106:24, 107:1, 108:3, 108:6, 108:15, 108:17, 108:19, 109:10, 109:12, 109:21, 111:7, 111:21, 112:6, 112:18, 112:19, 114:17, 114:18, 115:4, 115:19, 116:4, 119:4, 119:23, 121:1, 122:6, 122:8, 124:6, 127:4, 135:3, 137:14, 137:21, 138:2, 138:7, 138:10, 138:19, 139:20, 140:24, 141:9, 143:2, 144:7, 150:15, 152:15, 164:8, 164:12, 166:18, 169:5, 171:2, 200:18, 201:6, 201:23, 201:24, 205:12, 205:13, 206:18, 207:20, 207:23, 208:22, 209:10, 209:13, 209:16, 210:3, 210:12, 211:9, 212:1, 212:2, 213:3, 214:17, 215:5, 215:8, 215:9, 215:11, 215:12, 215:23, 215:24, 216:2, 236:18

**Bank's** [10] - 36:16, 70:14, 90:6, 96:14, 118:10, 120:25, 144:9, 202:12, 203:5, 203:21

**bank's** [18] - 37:5, 41:1, 41:8, 77:17, 145:15, 145:19, 146:8, 152:12, 152:13, 160:24, 161:12, 165:8, 168:14, 169:17, 175:15, 179:20, 197:13, 223:5

**bankers** [2] - 6:5, 6:6

**Banking** [3] - 71:23, 78:24, 91:3

**banking** [22] - 5:8, 12:9, 17:13, 77:3, 99:3, 101:10, 105:9,

112:9, 112:20, 138:5, 145:20, 146:10, 146:13, 146:14, 146:23, 147:4, 147:11, 181:1, 224:16, 224:17, 230:7, 237:15

**banks** [19] - 12:11, 15:8, 76:19, 76:22, 77:5, 112:5, 130:1, 144:21, 149:21, 151:20, 151:23, 152:11, 152:12, 152:13, 191:13, 208:5, 208:9, 209:2

**Banks** [1] - 111:24

**banner** [1] - 79:25

**bar** [3] - 20:22, 224:16, 230:7

**BARBONE** [2] - 1:14, 1:15

**BARONE** [1] - 3:4

**Barrett** [1] - 140:7

**bars** [2] - 20:15, 20:20

**based** [23] - 22:14, 123:25, 127:4, 133:18, 134:11, 136:11, 139:8, 150:21, 159:1, 163:13, 169:17, 172:6, 176:1, 206:7, 215:3, 220:12, 223:4, 224:20, 224:22, 226:2, 236:6, 236:14

**basic** [1] - 11:10

**basis** [10] - 5:3, 116:14, 154:2, 159:9, 176:12, 176:21, 206:9, 214:13, 217:5

**bathroom** [1] - 147:13

**bear** [1] - 212:10

**Beard** [2] - 169:4, 169:15

**beard** [1] - 195:13

**bearing** [1] - 172:10

**became** [3] - 135:18, 164:12, 216:20

**become** [2] - 98:12, 150:2, 228:1

**BEEN** [3] - 3:24, 136:23, 148:15

**began** [1] - 120:1

**begin** [1] - 195:22

**beginning** [10] - 17:2, 26:19, 26:20, 29:16, 29:18, 135:14, 160:13, 161:13, 168:12, 179:25

**behalf** [5] - 40:10, 70:7, 94:18, 122:10, 233:11

**behind** [1] - 235:7

**belief** [3] - 74:7, 74:15, 87:1

**believes** [4] - 49:15, 49:16, 66:9, 186:11

**bells** [1] - 164:25

**below** [4] - 35:13, 131:8, 131:15, 131:21

**Ben** [3] - 174:10, 174:11, 175:9

**bench** [1] - 148:8

**beneficiary** [1] - 55:8

**benefit** [1] - 209:10

**benefits** [3] - 95:2, 155:6, 184:10

**Bensalem** [1] - 58:13

**Bershad** [12] - 25:20, 27:21, 29:21, 30:1, 32:21, 43:2, 43:8, 45:6, 57:3, 57:4, 229:23

**best** [7] - 15:9, 120:13, 129:21, 140:19, 141:11, 225:8, 225:13

**better** [2] - 9:13, 139:16

**between** [16] - 13:6, 13:7, 24:23, 38:21, 52:6, 93:13, 96:14, 97:3, 138:3, 160:19, 171:2, 176:19, 196:22, 197:5, 206:1, 228:24

**beyond** [2] - 145:22, 146:16

**Bharat** [3] - 18:10, 138:18, 139:23

**bid** [1] - 127:8

**bidding** [2] - 67:2, 126:16

**bids** [1] - 67:9

**big** [1] - 43:9

**bigger** [11] - 9:5, 10:7, 12:3, 19:1, 43:10, 125:15, 125:25, 127:23, 217:12, 218:15, 231:22

**bilateral** [1] - 190:11

**bill** [2] - 214:1, 214:17

**Bill** [7] - 26:2, 26:7, 27:23, 34:21, 90:9, 110:22, 155:9

**billion** [1] - 16:4, 16:5, 17:14, 19:6,

19:9, 19:10, 19:11, 20:19, 73:20

**bills** [1] - 26:7

**bit** [20] - 10:7, 12:2, 19:1, 32:21, 57:22, 125:15, 127:23, 148:4, 151:10, 156:22, 161:11, 161:18, 163:1, 164:6, 164:16, 178:10, 186:2, 200:15, 207:18, 230:24

**black** [1] - 159:23

**blacked** [1] - 200:15

**blame** [4] - 109:22, 110:3, 110:6, 110:8

**blaming** [1] - 109:25, 110:4

**Blank** [20] - 25:23, 25:25, 32:22, 32:24, 33:2, 34:2, 37:3, 37:5, 41:8, 42:5, 42:9, 42:15, 43:3, 44:20, 45:7, 131:24, 133:17, 151:6, 192:8, 218:7

**blow** [10] - 45:25, 60:13, 60:19, 63:6, 63:7, 65:25, 163:1, 164:15, 186:1, 188:24

**Blue** [1] - 139:18

**blue** [1] - 20:15

**blueprint** [1] - 179:20

**Board** [87] - 66:9, 66:12, 66:14, 68:19, 72:13, 72:15, 72:23, 72:24, 73:1, 85:22, 86:5, 108:9, 108:10, 113:7, 113:20, 114:16, 143:13, 143:23, 143:25, 144:3, 144:13, 144:16, 144:24, 145:3, 145:4, 145:12, 145:15, 145:17, 145:19, 145:25, 146:1, 146:8, 146:13, 146:21, 147:6, 147:7, 147:8, 147:9, 147:11, 147:14, 147:16, 147:17, 147:18, 152:20, 157:15, 158:14, 158:17, 158:20, 159:15, 159:23, 162:19, 164:15, 166:10, 169:5, 169:21, 173:22, 176:11, 176:25, 177:3, 177:12, 178:1,

178:20, 178:21, 180:4, 180:17, 180:21, 202:21, 203:4, 203:10, 203:21, 204:5, 212:3, 213:2, 213:10, 213:23, 215:24, 218:23, 219:10, 219:18, 219:25, 220:2, 220:4, 220:7, 220:13, 233:14, 235:15

**board** [85] - 24:19, 24:24, 25:20, 25:21, 26:8, 26:11, 26:17, 26:18, 26:22, 27:3, 27:8, 27:12, 27:16, 29:15, 29:19, 31:11, 31:20, 31:23, 31:25, 32:1, 32:3, 32:15, 36:22, 42:8, 43:2, 44:1, 45:14, 47:3, 47:7, 47:14, 55:2, 55:6, 55:14, 57:8, 143:7, 188:10, 195:17, 196:9, 196:10, 196:11, 217:8, 217:16, 218:22, 218:24, 219:9, 220:5, 220:14, 220:15, 220:16, 220:24, 221:6, 222:1, 222:10, 222:23, 222:24, 222:25, 223:1, 223:14, 223:16, 223:23, 224:5, 224:10, 224:21, 225:5, 225:10, 225:11, 227:15, 229:12, 231:19, 231:23, 232:14, 232:17, 232:20, 232:21, 233:12, 233:19, 233:21, 234:12, 234:20, 235:11, 235:25, 236:6, 236:17, 236:24, 237:7

**board's** [1] - 220:22

**Board's** [3] - 158:15

**boards** [3] - 32:9, 139:15, 145:9

**Bob** [1] - 18:10

**body** [5] - 31:3, 31:7, 31:13, 31:17, 128:21

**boiler** [3] - 11:25, 205:17, 205:24

**bold** [1] - 70:3

**bona** [1] - 224:18

**Bono** [9] - 151:2,

151:4, 151:7, 212:23, 213:17, 213:22, 214:11, 214:15, 214:16

**Bono's** [2] - 212:25, 213:12

**book** [3] - 14:18, 153:19, 189:14

**borne** [1] - 174:1

**bottom** [15] - 16:7, 16:19, 16:23, 17:19, 18:4, 20:15, 20:20, 29:2, 100:1, 125:14, 126:18, 126:22, 127:23, 130:19, 194:7

**bought** [9] - 18:21, 24:17, 50:24, 52:4, 135:8, 135:11, 135:14, 135:18

**box** [2] - 191:12, 195:19

**boxes** [1] - 20:22

**brake** [1] - 64:3

**branch** [32] - 23:17, 41:19, 50:9, 58:10, 71:11, 73:9, 73:16, 110:8, 110:13, 110:15, 110:17, 111:4, 130:5, 161:24, 166:21, 168:12, 168:24, 171:5, 171:7, 171:10, 172:3, 172:24, 173:8, 173:18, 175:9, 175:12, 176:5, 189:4, 195:7, 195:13, 195:14, 210:18

**branches** [8] - 13:22, 20:2, 51:16, 62:3, 73:12, 164:12, 168:11, 169:22

**branching** [2] - 177:8

**branchs** [3] - 19:21, 19:22, 20:2

**brand** [3] - 66:11, 128:11, 210:6

**breach** [18] - 37:13, 84:9, 84:17, 93:1, 100:8, 101:2, 182:2, 182:9, 182:18, 183:7, 183:14, 183:17, 183:20, 184:16, 184:21, 184:22

**breaches** [2] - 83:19, 179:25

**break** [9] - 64:6, 64:23, 65:19, 122:4, 122:11, 181:3, 181:4, 181:8, 181:16

**Brief** [1] - 181:22

**brief** [9] - 2:15, 4:7, 63:3, 63:9, 65:11, 88:19, 182:4, 183:10, 185:15
**briefed** [1] - 231:24
**bring** [3] - 3:12, 66:18, 106:17, 107:9, 172:1, 206:10, 235:4
**broader** [1] - 227:16
**brokerage** [1] - 194:17
**brother** [1] - 76:4
**brought** [6] - 37:12, 47:12, 94:17, 139:21, 139:23, 216:19
**Brown** [1] - 218:8
**BROWN** [1] - 1:16
**brunt** [1] - 43:20
**Buckelew** [2] - 87:12, 229:23
**bucket** [1] - 208:9
**buckets** [1] - 155:20
**Buckley** [1] - 184:17
**build** [4] - 57:15, 58:24, 59:4, 59:7
**building** [2] - 24:16, 73:12
**built** [3] - 58:10, 126:11, 168:11
**bulk** [1] - 117:17
**bullet** [1] - 214:4
**bulletins** [3] - 78:24, 79:2, 102:17
**bunch** [3] - 5:17, 91:21, 231:3
**burden** [2] - 114:1, 114:10
**business** [15] - 16:10, 16:17, 26:24, 36:7, 55:21, 57:25, 60:23, 73:11, 75:22, 76:4, 81:13, 89:19, 89:21, 91:19, 131:20
**busy** [1] - 160:12
**buy** [2] - 135:16, 223:11
**BY** [51] - 1:14, 1:17, 2:2, 2:3, 2:4, 2:6, 2:7, 2:8, 2:10, 4:1, 22:5, 22:6, 29:6, 50:5, 113:1, 123:23, 127:15, 134:15, 134:23, 135:24, 136:25, 137:6, 141:3, 141:4, 146:6, 146:20, 148:22, 148:25, 154:11, 157:4, 158:3, 158:24, 162:15, 163:3, 169:2, 170:23, 172:21, 173:5, 174:7,

175:7, 179:12, 185:23, 190:1, 191:20, 193:24, 194:23, 197:2, 197:25, 198:23, 200:6, 207:12

## C

**C.F.R** [2] - 154:13, 156:13
**calculated** [4] - 4:18, 4:21, 5:2
**calculation** [2] - 4:22, 103:18
**calculations** [5] - 4:17, 103:2, 103:5, 103:10, 103:13
**Calina** [3] - 47:22, 47:24, 49:7, 49:9, 49:11
**CAM** [2] - 52:2, 52:12
**Camden** [1] - 1:9
**camel** [1] - 15:8
**CAMs** [2] - 52:5
**cannot** [8] - 101:19, 102:5, 122:25, 145:15, 145:19, 146:13, 146:21, 182:11
**cap** [3] - 19:7, 19:12, 194:17
**capability** [1] - 7:24
**capable** [2] - 237:2, 237:5
**capital** [1] - 209:25
**caption** [1] - 61:10
**care** [2] - 89:17, 107:11
**Carl** [1] - 1:25
**carrying** [1] - 182:23
**case** [46] - 5:21, 6:3, 19:4, 32:25, 33:3, 35:21, 37:9, 38:11, 38:12, 44:13, 51:25, 52:11, 57:17, 64:2, 64:6, 77:19, 77:20, 77:22, 79:18, 98:13, 109:23, 112:19, 117:10, 119:22, 120:25, 121:9, 122:5, 122:12, 133:25, 156:9, 164:4, 172:2, 181:8, 183:21, 183:23, 184:19, 187:15, 188:24, 190:14, 199:8, 217:6, 223:18, 230:25, 233:22, 238:6

**cases** [11] - 32:18, 117:9, 127:25, 149:18, 178:5, 180:24, 181:1, 183:16, 189:21, 190:4
**cash** [1] - 136:7
**cashed** [1] - 141:23
**cashless** [1] - 136:4
**caught** [1] - 167:3
**caused** [4] - 87:18, 169:20, 208:14, 209:13
**causing** [1] - 209:9
**cease** [3] - 5:5, 77:16, 77:23
**Cease** [1] - 179:19
**ceased** [1] - 88:23
**center** [4] - 52:6, 52:7, 130:20, 178:8
**CEO** [7] - 17:8, 20:10, 111:7, 138:19, 139:8, 140:23, 146:24
**certain** [31] - 12:12, 34:1, 52:19, 71:8, 74:25, 75:3, 75:4, 77:4, 78:19, 78:23, 92:17, 102:6, 102:15, 131:19, 149:23, 153:7, 154:5, 154:17, 155:19, 170:10, 172:10, 177:22, 191:14, 192:1, 192:15, 194:19, 195:5, 195:6, 196:15, 209:8, 210:15
**certainly** [22] - 21:23, 36:10, 50:15, 50:17, 60:8, 68:9, 71:17, 74:20, 74:25, 79:3, 83:4, 112:7, 123:7, 170:1, 186:24, 197:19, 205:4, 214:2, 215:18, 219:18, 225:25, 236:12
**certificate** [1] - 111:11
**certification** [26] - 98:18, 101:18, 154:3, 158:10, 159:10, 159:14, 160:2, 160:3, 160:4, 202:22, 202:25, 206:23, 206:25, 215:11, 215:18, 222:3, 222:21, 223:3, 224:7, 226:3, 232:18, 233:20, 234:19, 235:1, 236:7, 236:15
**certifications** [2] - 109:18, 159:4

**certified** [1] - 223:6
**Certified** [1] - 1:24
**certify** [10] - 87:3, 100:15, 100:20, 100:21, 100:25, 101:1, 101:5, 101:9, 101:14, 158:6
**certifying** [1] - 154:5
**cetera** [1] - 84:10
**chain** [1] - 199:20
**chairman** [8] - 29:15, 29:18, 53:22, 53:25, 54:9, 55:2, 55:14, 61:22
**chairman's** [1] - 40:10
**challenge** [4] - 83:5, 83:7, 83:8, 187:19
**challenged** [1] - 93:10
**challenging** [2] - 133:25, 180:24
**Chalmers** [1] - 192:9
**change** [16] - 61:12, 70:16, 70:18, 70:22, 71:3, 71:14, 71:16, 115:13, 125:23, 126:2, 126:4, 126:8, 131:12, 216:5, 216:6, 221:21
**changed** [8] - 70:17, 70:20, 76:13, 91:19, 94:6, 205:5, 216:17, 236:13
**changes** [5] - 91:16, 91:22, 91:24, 92:1, 115:10
**changing** [3] - 177:14, 230:11, 230:23
**chaos** [2] - 87:10, 87:12
**characterization** [2] - 209:4, 224:9
**characterize** [1] - 183:21
**charge** [5] - 120:21, 125:9, 125:11, 227:25, 228:1
**charged** [5] - 6:10, 125:4, 125:11, 128:4, 227:20
**charges** [4] - 52:2, 52:5, 52:9, 52:12
**chart** [12] - 14:14, 15:19, 15:24, 16:3, 16:19, 16:23, 17:10, 18:25, 19:3, 19:14, 20:23, 29:25
**chartered** [1] - 153:9

**charts** [2] - 14:17, 16:1
**chase** [1] - 77:21
**Chase** [2] - 6:7, 91:1
**check** [4] - 50:3, 103:13, 142:9, 148:6
**checked** [3] - 5:13, 5:14, 103:16
**Chemical** [1] - 184:25
**Cherry** [1] - 176:25
**chief** [2] - 89:11, 90:6
**choice** [1] - 206:4
**choosing** [1] - 110:13
**Chris** [15] - 63:6, 63:10, 66:18, 69:25, 70:1, 88:18, 99:23, 104:17, 154:9, 157:3, 162:24, 169:1, 186:1, 188:25, 190:18
**chronological** [2] - 151:11, 227:7
**Circuit** [1] - 185:2
**circumspect** [1] - 43:25
**circumstances** [4] - 44:24, 194:18, 194:19, 209:8
**cite** [1] - 183:15
**cites** [1] - 38:11
**City** [1] - 89:12
**CIVIL** [1] - 1:4
**civil** [5] - 5:18, 7:1, 7:5, 21:20, 112:15
**claim** [19] - 37:21, 37:24, 38:14, 38:15, 44:15, 47:6, 71:20, 121:15, 182:2, 182:9, 182:10, 182:13, 183:12, 183:20, 183:23, 184:12, 184:20, 185:3, 230:12
**claimants** [1] - 44:22
**claimed** [2] - 115:24, 227:21
**claims** [8] - 39:6, 39:10, 117:11, 118:3, 130:14, 182:6, 232:4, 233:15
**clarification** [1] - 232:12
**clarifications** [1] - 199:24
**Clark** [2] - 18:11, 18:17
**class** [1] - 153:13
**clause** [5] - 13:10, 80:22, 84:13, 206:6,

206:7
clauses [1] - 205:13
clean [2] - 214:1,
214:17
clear [12] - 22:13,
24:14, 40:19, 41:7,
58:2, 153:5, 160:21,
179:21, 184:9, 223:4,
230:7, 232:13
clearly [9] - 106:2,
117:10, 182:8,
183:13, 187:1,
187:15, 189:24,
200:1, 216:4
CLERK [11] - 3:2,
4:8, 64:8, 65:12,
122:15, 123:11,
123:19, 181:10,
185:16, 185:18, 238:7
client [10] - 57:16,
58:25, 59:4, 59:11,
130:25, 162:13,
201:22, 203:19, 215:4
close [1] - 214:12
closed [2] - 195:7,
216:22
closer [2] - 9:12,
22:15
co [3] - 159:17,
160:16, 215:25
co-counsel [3] -
159:17, 160:16,
215:25
COB [1] - 111:7
Code [1] - 151:13
coercion [2] - 73:10,
81:6
Cohen [20] - 1:8,
160:24, 198:12,
199:10, 203:22,
204:2, 204:6, 218:4,
218:18, 218:21,
218:25, 222:6,
222:19, 223:4,
224:12, 224:14,
225:1, 230:6, 230:14,
235:20
Cohen's [1] - 225:24
coincide [1] - 212:21
coincidence [1] -
63:17
coincident [1] -
214:24
colleagues [1] -
165:20
collected [2] - 26:16,
115:20
Columbia [2] -
69:13, 69:17
combined [1] -

116:23
coming [9] - 51:16,
64:13, 122:23,
166:19, 176:24,
177:3, 177:25, 201:5
comment [1] - 34:17
comments [1] -
188:18
Commerce [118] -
6:6, 6:8, 7:11, 8:14,
12:14, 13:22, 13:24,
14:6, 14:10, 15:4,
15:10, 15:25, 16:2,
16:11, 16:17, 17:2,
18:2, 18:7, 18:21,
19:2, 19:4, 19:6,
20:12, 24:15, 24:20,
29:15, 32:15, 36:16,
36:19, 43:9, 43:13,
43:16, 43:17, 44:13,
44:18, 44:19, 47:12,
51:7, 53:2, 56:5,
57:25, 58:1, 60:23,
62:3, 66:10, 66:25,
67:8, 68:21, 70:4,
71:8, 71:10, 71:11,
73:8, 74:8, 74:13,
77:23, 93:11, 93:13,
100:18, 100:23,
101:7, 101:12,
101:15, 105:18,
111:13, 111:18,
114:17, 114:18,
117:2, 124:6, 127:4,
128:25, 129:4, 129:7,
129:10, 130:1,
137:14, 137:21,
138:2, 138:7, 138:10,
139:17, 139:19,
140:4, 141:9, 142:18,
143:9, 147:6, 147:11,
150:15, 151:5,
152:15, 164:8,
164:12, 167:18,
168:1, 169:5, 171:2,
171:23, 172:3,
178:10, 181:25,
187:16, 190:22,
209:16, 209:22,
213:3, 215:7, 215:8,
217:8, 217:16,
233:13, 236:18
COMMERCE [1] -
1:6
Commerce's [5] -
44:12, 46:4, 73:11,
74:8, 195:5
Commerce-
InterArch [1] - 43:13
Commercial [5] -

75:19, 76:9, 76:14,
192:25, 193:5
commission [1] -
194:17
commissions [1] -
193:14
commit [1] - 143:15
commitment [1] -
195:19
committed [12] -
78:14, 87:1, 87:25,
100:8, 100:16,
100:22, 101:1, 101:5,
101:10, 143:12,
147:15, 147:17
committee [17] -
31:10, 34:20, 36:22,
42:8, 45:12, 45:20,
47:3, 47:7, 134:8,
176:17, 192:21,
226:9, 227:18,
227:19, 228:6, 228:9,
229:4
Committee [46] -
10:24, 11:4, 11:11,
25:5, 29:10, 30:22,
31:1, 31:9, 34:10,
34:12, 34:15, 35:19,
35:22, 37:8, 38:8,
39:5, 40:3, 40:5,
40:17, 42:14, 44:7,
45:4, 45:24, 48:4,
51:24, 52:10, 53:7,
53:11, 53:12, 85:22,
86:3, 128:17, 130:13,
142:19, 176:14,
224:25, 226:8,
226:16, 226:20,
226:22, 226:25,
227:12, 227:19,
228:24, 231:9, 236:24
common [5] - 5:10,
5:11, 52:5, 52:9,
52:19
commonality [1] -
139:15
communicate [7] -
159:15, 160:5, 160:7,
162:13, 162:19,
188:10, 204:6
communicated [2] -
204:5, 236:23
communicates [1] -
199:22
communicating [1] -
194:4
communications [2]
- 160:19, 188:7
companies [7] -
16:10, 127:12, 152:9,

152:12, 152:13,
171:25, 192:11
companies' [2] -
127:18, 128:6
company [35] -
16:16, 18:2, 19:7,
19:12, 32:17, 53:14,
53:19, 100:14,
108:16, 127:7, 128:2,
130:25, 131:20,
131:22, 150:23,
152:19, 156:15,
159:7, 164:19,
172:14, 192:9,
192:10, 193:1,
197:13, 201:3, 201:5,
202:2, 206:25,
209:23, 209:24,
218:9, 233:24, 235:6
Company [2] -
215:5, 215:6
company's [4] -
42:16, 127:2, 127:9,
169:21
Company's [1] -
214:9
compare [2] -
127:19, 128:2
compared [1] - 68:1
compares [1] -
129:19
comparing [2] -
67:25, 127:17
comparison [1] -
68:8
compel [1] - 34:3
compensated [2] -
32:12, 32:15
Compensation [2] -
29:10, 142:19
compensation [5] -
29:22, 30:3, 94:5,
136:1, 141:20
compensatory [2] -
38:15, 44:21
competitive [3] -
127:8, 129:18, 129:21
complaint [12] -
69:20, 69:22, 70:2,
70:6, 71:7, 79:17,
79:20, 79:21, 80:5,
80:9, 117:22, 125:16
complaints [14] -
5:18, 5:22, 7:1, 7:5,
87:20, 87:24, 88:10,
92:3, 92:20, 92:21,
92:23, 93:7
complete [3] -
153:23, 196:1, 223:3
completed [5] - 97:8,

97:20, 97:25, 98:5,
160:11
completely [3] -
54:6, 117:20, 117:21
completion [1] -
131:11
Compliance [1] -
186:7
complied [2] - 214:5,
225:12
comply [7] - 83:19,
165:16, 206:16,
213:19, 222:8,
222:11, 225:18
component [3] -
73:8, 121:14, 155:14
composed [1] -
45:12
compound [6] -
16:6, 17:15, 18:1,
18:22, 19:13, 21:1
compounded [4] -
17:5, 19:18, 20:21,
135:12
compromised [1] -
146:24
Comptroller [8] -
11:22, 80:22, 83:16,
149:11, 149:14,
150:3, 150:16, 169:4
comptroller [7] -
80:7, 84:8, 84:15,
85:6, 109:8, 206:13,
207:1
concept [1] - 167:6
concepts [2] -
224:11, 224:12
concern [4] - 169:20,
173:9, 173:20, 187:6
concerned [2] -
143:8, 172:6
concerning [3] -
129:13, 218:23,
219:10
concerns [17] -
161:22, 166:17,
166:18, 166:19,
166:20, 168:20,
170:17, 170:18,
171:9, 171:13, 172:9,
173:19, 174:15,
177:14, 180:18,
187:4, 187:5
concessions [1] -
195:6
conclude [2] - 85:7,
131:2
Concluded [1] -
121:24
concluded [3] -

73:10, 138:12, 166:17

**concluding** [1] - 114:8

**conclusion** [4] - 127:22, 128:25, 159:15, 186:13

**conclusions** [1] - 159:2

**concurrence** [1] - 234:7

**concurrent** [2] - 164:18, 234:3

**condition** [17] - 76:18, 77:11, 77:18, 77:24, 78:1, 78:7, 101:15, 151:21, 159:11, 159:12, 190:23, 190:25, 208:10, 208:11, 208:12

**conditions** [6] - 75:3, 166:23, 209:10, 209:13, 209:15, 221:7

**conduct** [5] - 43:19, 105:19, 111:7, 192:1, 192:21

**conducted** [1] - 45:11

**confer** [1] - 238:9

**conference** [4] - 3:14, 18:9, 18:15, 216:9

**confident** [1] - 161:1

**confirmed** [3] - 38:10, 130:24, 131:13

**conflict** [2] - 40:21, 41:9

**confronted** [1] - 152:9

**confronting** [1] - 211:20

**confused** [1] - 172:8

**Congress** [2] - 209:1, 209:8

**conjunction** [1] - 96:24

**connect** [1] - 125:25

**connection** [10] - 83:20, 124:17, 124:19, 151:9, 152:7, 152:18, 175:13, 206:17, 221:25, 227:13

**Connery** [1] - 218:8

**CONNERY** [1] - 1:16

**connotate** [1] - 208:11

**connotations** [1] - 191:1

**consent** [20] - 72:9,

73:2, 80:16, 186:17, 188:17, 189:8, 189:10, 189:13, 190:7, 190:16, 190:20, 191:14, 191:21, 194:6, 195:12, 195:15, 195:18, 199:10, 231:5

**Consent** [22] - 5:5, 69:17, 70:18, 70:23, 71:3, 72:15, 72:19, 72:22, 74:17, 74:20, 80:6, 80:17, 80:21, 85:7, 109:2, 109:7, 174:14, 179:3, 179:13, 180:3, 204:9, 204:19

**consequence** [1] - 92:3

**consequences** [1] - 107:13

**consequently** [1] - 47:6

**consider** [3] - 77:11, 77:13, 77:16

**consideration** [2] - 131:21, 195:16

**considered** [6] - 25:2, 25:6, 102:2, 153:23, 191:8, 191:10

**considers** [1] - 77:10

**consistent** [7] - 184:11, 199:24, 202:18, 203:23, 207:1, 218:11, 230:10

**conspicuously** [1] - 222:17

**constantly** [2] - 175:1, 176:23

**constructed** [1] - 62:3

**consultation** [1] - 153:12

**contain** [1] - 111:12

**containing** [2] - 73:2, 111:6

**contend** [1] - 90:16

**contention** [1] - 74:12

**contest** [1] - 82:25

**contesting** [1] - 219:21

**context** [8] - 13:10, 44:12, 59:9, 109:9, 168:9, 206:11, 215:17, 215:18

**contingent** [1] - 105:22

**continually** [1] - 44:2

**continue** [11] - 4:10,

43:18, 65:15, 75:12, 75:15, 75:21, 76:10, 123:21, 131:22, 185:20, 206:8

**continued** [14] - 36:21, 59:3, 73:18, 75:9, 75:11, 96:7, 96:10, 97:7, 97:20, 98:4, 157:21, 161:3, 169:14, 236:13

**CONTINUED** [1] - 4:1

**continues** [5] - 40:17, 41:7, 43:23, 44:9

**continuing** [2] - 216:24, 231:6

**contract** [26] - 37:13, 95:11, 95:12, 106:6, 111:22, 113:8, 116:6, 122:8, 124:5, 124:6, 139:2, 147:15, 153:11, 182:6, 182:9, 182:10, 182:18, 182:19, 183:7, 183:15, 183:21, 184:3, 184:16, 184:4, 223:12, 225:18

**contractor** [10] - 35:23, 44:17, 49:8, 49:10, 130:19, 130:23, 131:5, 131:7, 131:13

**Contractors** [1] - 49:5

**contractors** [6] - 48:4, 48:22, 130:15, 130:21, 131:10, 131:19

**contracts** [3] - 37:15, 182:21, 183:18

**contractual** [12] - 37:16, 38:21, 119:3, 119:23, 119:25, 121:1, 122:9, 154:2, 184:10, 184:24, 193:13, 209:12

**contractually** [1] - 203:16

**contradictory** [2] - 184:6, 184:8

**control** [1] - 156:4

**controlling** [1] - 70:14

**convenient** [1] - 181:4

**conversation** [4] - 89:5, 113:4, 140:2, 200:16

**conversations** [2] -

118:12, 139:13

**conveying** [1] - 225:10

**convicted** [1] - 90:24

**convince** [1] - 155:18

**cooperate** [6] - 34:9, 48:8, 48:12, 105:18, 130:13, 131:3

**cooperating** [1] - 163:24

**cooperation** [3] - 34:1, 85:4, 130:17

**copies** [1] - 195:2

**copy** [6] - 8:1, 9:2, 28:15, 132:12, 195:4, 202:11

**copying** [2] - 198:13

**corn** [1] - 215:7

**corner** [1] - 227:2

**Corp** [1] - 184:16

**corporate** [8] - 37:6, 83:20, 102:23, 116:11, 138:9, 161:22, 191:3, 206:16

**corporately** [1] - 139:10

**corporation** [7] - 31:14, 47:13, 55:18, 56:1, 56:2, 56:6, 172:13

**Corporation** [2] - 185:1, 185:2

**corporations** [9] - 56:9, 58:5, 58:8, 167:7, 167:17, 167:25, 168:8, 207:5

**correct** [358] - 1:24, 22:21, 23:6, 23:7, 23:10, 23:11, 23:17, 23:18, 23:23, 24:3, 24:12, 24:13, 24:20, 25:2, 25:9, 25:18, 25:21, 26:1, 26:12, 26:21, 26:22, 26:23, 26:24, 27:4, 27:13, 27:15, 27:16, 27:17, 27:19, 27:20, 27:22, 29:12, 29:16, 29:23, 30:1, 30:4, 30:6, 30:7, 30:9, 30:12, 30:14, 30:17, 30:20, 30:23, 31:1, 31:8, 31:15, 31:18, 31:21, 32:16, 32:22, 34:8, 37:3, 37:4, 37:6, 38:1, 38:3, 38:6, 38:17, 38:18, 39:1, 39:25, 40:3, 40:6, 40:14, 41:21, 41:22, 41:24, 43:3,

43:6, 46:24, 46:25, 48:6, 48:9, 48:14, 48:23, 49:25, 50:4, 50:10, 50:20, 51:1, 51:3, 52:15, 52:21, 53:20, 53:23, 54:3, 55:16, 55:23, 56:3, 56:6, 56:10, 56:11, 56:13, 56:16, 56:19, 56:21, 56:23, 57:1, 57:2, 57:3, 57:17, 57:20, 58:5, 58:8, 58:11, 58:13, 58:14, 58:15, 58:17, 59:1, 59:9, 59:12, 61:19, 61:22, 61:23, 61:24, 61:25, 62:7, 62:16, 62:20, 62:22, 63:22, 66:2, 66:8, 66:13, 66:17, 66:19, 66:22, 68:8, 68:16, 69:2, 69:10, 69:15, 69:18, 69:19, 70:11, 70:14, 72:12, 72:13, 72:20, 72:21, 73:14, 74:18, 74:19, 74:22, 74:23, 75:1, 75:2, 75:5, 75:23, 76:2, 76:4, 77:1, 77:5, 77:6, 77:8, 77:9, 77:24, 77:25, 78:2, 78:7, 78:20, 78:21, 78:24, 79:2, 79:6, 79:9, 79:12, 81:7, 81:9, 81:11, 81:16, 81:17, 81:19, 81:24, 82:4, 82:15, 83:6, 83:12, 83:13, 84:2, 85:10, 85:21, 86:1, 86:2, 86:4, 86:6, 87:14, 87:15, 87:25, 88:4, 88:6, 88:11, 88:14, 89:7, 89:8, 89:16, 89:18, 90:11, 90:12, 90:17, 90:20, 90:22, 90:25, 91:4, 91:5, 91:13, 91:17, 91:18, 91:20, 91:24, 92:3, 92:9, 92:12, 92:18, 92:24, 93:9, 93:14, 93:15, 93:18, 94:16, 94:19, 95:6, 95:8, 95:13, 96:5, 96:8, 96:12, 96:13, 96:16, 97:8, 97:21, 98:13, 98:20, 99:19, 100:10, 100:12, 100:16, 100:18, 100:19, 100:23, 100:24, 101:3, 101:4, 101:7, 101:8, 101:12,

101:13, 101:17,
102:4, 102:7, 102:10,
102:11, 102:13,
102:14, 102:18,
102:25, 103:12,
103:22, 103:23,
106:8, 106:21,
106:24, 107:1,
107:14, 107:15,
107:17, 108:3, 108:7,
108:14, 108:18,
108:20, 109:4, 109:8,
109:11, 109:18,
109:23, 110:9,
110:12, 110:15,
111:7, 111:12,
111:19, 112:6,
112:10, 112:13,
112:16, 115:8, 124:9,
126:12, 127:20,
128:7, 128:8, 130:16,
134:18, 135:19,
136:5, 136:6, 141:15,
141:21, 142:11,
142:16, 142:21,
143:4, 143:10,
143:13, 144:3, 144:7,
144:8, 144:10,
144:13, 144:22,
145:10, 145:13,
145:16, 145:21,
146:15, 146:23,
147:4, 154:23,
155:15, 155:16,
156:7, 156:12, 157:7,
157:22, 161:4, 161:5,
162:22, 175:18,
175:19, 179:4,
186:20, 188:22,
190:16, 190:17,
191:15, 192:25,
194:8, 198:3, 201:10,
207:8, 207:9, 209:19,
210:4, 210:14,
212:24, 214:15,
214:20, 217:25,
224:3, 225:20,
226:10, 229:7,
230:20, 230:22
  **correctly** [26] - 34:7,
35:16, 43:21, 44:4,
44:25, 45:15, 46:13,
47:9, 49:19, 50:9,
60:24, 61:18, 73:13,
74:10, 80:14, 80:23,
82:11, 82:18, 83:1,
83:23, 83:25, 85:11,
127:2, 174:3, 186:14,
189:5
  **Cory** [1] - 89:11
  **cost** [7] - 52:7, 85:4,

140:12, 171:14,
172:5, 172:10, 174:1
  **Costa** [1] - 49:4
  **costs** [6] - 41:2,
53:2, 128:5, 171:21,
172:11, 231:8
  **cotrustee** [1] - 55:8
  **counsel** [42] - 6:14,
35:12, 35:13, 37:17,
41:8, 45:11, 47:4,
49:5, 49:14, 49:16,
72:24, 82:1, 99:14,
115:24, 117:13,
129:3, 129:13,
129:15, 130:21,
145:5, 148:7, 151:5,
153:12, 155:9, 158:9,
158:16, 159:17,
160:16, 160:18,
160:24, 161:5, 161:9,
161:12, 165:24,
193:6, 197:6, 198:20,
203:18, 213:23,
215:25, 231:24
  **Counsel** [1] - 46:1
  **count** [1] - 48:9
  **counter** [1] - 34:5
  **country** [2] - 224:13,
224:15
  **couple** [12] - 6:7,
116:1, 126:18,
126:22, 126:24,
132:8, 135:1, 185:8,
196:24, 209:23,
228:18, 228:20
  **Course** [1] - 55:11
  **course** [32] - 7:15,
16:12, 16:15, 50:13,
50:21, 54:14, 54:16,
67:19, 68:25, 70:17,
73:18, 75:9, 84:18,
87:8, 87:23, 91:14,
94:4, 101:23, 103:20,
104:16, 107:5, 107:8,
112:11, 112:14,
112:17, 112:22,
135:11, 140:7, 144:8,
159:6, 176:7, 226:7
  **court** [7] - 38:6,
38:24, 47:11, 47:16,
88:2, 133:19, 133:25
  **Court** [18] - 3:1, 5:18,
11:6, 38:12, 39:9,
39:12, 64:16, 65:3,
78:12, 78:14, 83:8,
88:5, 88:8, 107:12,
118:12, 184:19
  **COURT** [158] - 1:1,
3:2, 3:3, 3:8, 3:11,
3:17, 3:21, 4:3, 4:5,

4:8, 4:10, 4:13, 6:19,
6:21, 6:24, 8:2, 8:4,
8:6, 8:22, 8:24, 9:13,
14:15, 14:19, 14:22,
14:25, 15:2, 22:3,
22:17, 28:9, 29:5,
50:4, 64:3, 64:5, 64:8,
64:10, 64:13, 64:17,
64:25, 65:4, 65:6,
65:12, 65:14, 71:2,
78:15, 97:12, 97:14,
110:1, 112:24,
116:18, 117:6,
117:24, 118:1, 118:6,
118:18, 118:23,
119:5, 119:11,
119:15, 119:24,
120:4, 120:8, 120:14,
120:16, 120:18,
121:1, 121:5, 121:8,
121:12, 121:16,
121:19, 121:21,
121:23, 122:2,
122:15, 122:17,
122:22, 122:25,
123:2, 123:5, 123:12,
123:16, 123:21,
127:13, 132:13,
132:22, 133:7,
133:11, 134:5, 134:8,
134:12, 135:23,
136:10, 136:13,
136:20, 136:22,
137:1, 137:5, 141:2,
146:1, 146:4, 146:18,
147:22, 147:24,
148:2, 148:7, 148:10,
148:13, 148:17,
148:19, 157:25,
158:17, 158:22,
162:9, 170:21,
172:19, 173:4,
173:15, 175:6,
179:11, 181:4, 181:7,
181:12, 181:14,
181:18, 181:21,
181:23, 182:16,
183:1, 183:10,
184:14, 185:8,
185:12, 185:17,
185:20, 191:19,
193:23, 194:22,
197:1, 197:24,
198:19, 198:22,
199:4, 199:15, 200:5,
201:13, 201:16,
202:8, 204:12,
205:21, 207:11,
212:12, 234:22,
237:20, 237:25,
238:2, 238:4, 238:11,

238:13
  **Courthouse** [1] - 1:8
  **Courtroom** [1] -
181:11
  **courtroom** [3] - 64:9,
122:16, 238:10
  **courtroom)** [3] -
123:20, 185:19, 238:8
  **courts** [2] - 183:14,
184:20
  **covenant** [4] - 182:2,
182:14, 183:3, 183:8
  **covered** [4] - 14:11,
152:2, 154:22, 155:19
  **cradle** [4] - 52:17,
110:15, 110:18, 111:3
  **create** [2] - 128:11,
182:7
  **created** [2] - 129:11,
167:10
  **creating** [3] - 178:7,
210:3, 210:5
  **Creek** [4] - 58:11,
172:25, 173:8, 173:19
  **criminal** [2] - 112:15,
189:15
  **crisis** [2] - 205:5,
208:23
  **Critchley** [5] - 218:8,
218:21, 219:4, 222:7,
222:19
  **criteria** [1] - 153:7
  **critical** [1] - 191:7
  **criticisms** [1] -
129:16
  **Cromwell** [8] -
152:25, 153:13,
155:7, 198:13,
215:25, 216:19,
218:4, 230:5
  **cross** [2] - 22:3,
65:15, 117:13,
122:19, 126:10,
141:2, 173:11,
207:11, 223:20
  **CROSS** [6] - 2:2, 2:6,
2:9, 22:5, 141:3,
207:12
  **cross-examination**
[5] - 65:15, 117:13,
122:19, 126:10,
223:20
  **cross-examine** [3] -
22:3, 141:2, 173:11
  **culmination** [1] -
93:13
  **currency** [2] - 80:7,
84:16
  **Currency** [4] -
149:12, 149:15,

150:3, 150:16
  **current** [2] - 192:5
  **customers** [1] -
180:11
  **cutting** [1] - 52:7
  **CVS** [3] - 171:17,
171:25, 172:4

**D**

  **D-16** [3] - 197:3,
198:3, 198:4
  **D-17** [2] - 199:5,
199:21
  **D-18** [2] - 199:18,
199:20
  **D-19** [2] - 169:1,
169:3
  **D-22** [1] - 200:7
  **D-23** [1] - 202:9
  **D-25** [2] - 201:17,
201:18
  **D-35** [1] - 173:6
  **D-36** [1] - 175:8
  **D-37** [2] - 170:22,
170:24
  **D-41** [1] - 194:1
  **D-42** [1] - 194:24
  **D-52** [1] - 188:13
  **D.C** [2] - 149:6,
232:23
  **dad** [2] - 160:23,
160:25
  **damage** [1] - 209:2
  **damages** [21] -
37:15, 38:15, 38:17,
44:21, 44:23, 103:2,
117:22, 182:8,
182:12, 183:3, 183:4,
183:6, 183:13,
183:15, 183:17,
183:20, 183:24,
184:15, 184:20,
184:21, 185:4
  **damaging** [1] - 180:2
  **Dan** [1] - 27:1
  **Daniel** [1] - 45:13
  **dark** [1] - 143:7
  **date** [19] - 10:8,
10:11, 12:25, 13:19,
18:12, 27:9, 79:23,
113:17, 114:14,
114:16, 114:20,
115:3, 115:18, 198:5,
199:5, 199:16,
199:19, 212:19,
216:22
  **dated** [12] - 8:7, 55:1,
175:18, 198:7, 198:9,

199:7, 201:19, 202:4, 213:9, 217:9, 227:2
**David** [1] - 42:16, 230:8
**day-to-day** [2] - 112:4, 112:8
**days** [5] - 49:13, 174:13, 182:19, 192:15, 200:13
**De** [13] - 32:25, 33:3, 35:21, 37:9, 37:12, 37:14, 37:15, 37:19, 38:21, 39:6, 39:9, 39:13, 44:10
**dead** [1] - 41:16
**deal** [19] - 57:4, 74:8, 74:13, 93:13, 94:6, 94:12, 94:17, 104:7, 105:14, 115:17, 119:5, 119:6, 151:18, 178:1, 216:12, 216:18, 216:19, 216:20, 233:13
**dealing** [13] - 42:17, 127:4, 152:3, 154:14, 177:8, 182:3, 182:7, 182:14, 182:15, 183:8, 195:17, 205:16, 227:25
**deals** [8] - 31:7, 31:9, 31:13, 31:17, 51:4, 57:6, 158:4, 195:7
**dealt** [2] - 76:22, 191:24
**dean** [6] - 224:14, 224:16, 225:25, 230:6, 230:7, 237:15
**December** [23] - 20:18, 20:25, 21:4, 21:6, 22:20, 22:24, 23:3, 96:8, 113:11, 150:18, 150:23, 161:13, 162:25, 198:9, 199:7, 199:17, 200:3, 202:9, 202:16, 202:17, 203:20, 213:9, 217:2
**decide** [4] - 91:25, 201:8, 224:6, 224:18
**decided** [4] - 36:24, 81:12, 215:10, 233:18
**decidedly** [1] - 126:25
**decides** [1] - 158:14
**deciding** [1] - 195:17
**decision** [22] - 47:13, 47:19, 78:5, 116:14, 118:15, 118:18, 118:23, 120:5, 120:7, 120:19, 125:20,

125:21, 133:5, 133:8, 145:25, 173:21, 185:3, 190:6, 201:9, 223:21, 224:22, 225:6
**decisions** [3] - 82:10, 102:23, 187:25
**dedicated** [1] - 178:14
**dedication** [1] - 178:17
**deemed** [1] - 190:23
**defeat** [1] - 47:5
**defective** [1] - 73:10
**Defendant** [1] - 1:7
**defendant** [1] - 40:22
**DEFENDANT** [1] - 1:18
**Defendant's** [2] - 70:1, 185:25
**defendant's** [1] - 183:2
**defense** [4] - 114:22, 114:23, 148:11, 152:1
**defenses** [2] - 47:4, 206:11
**define** [2] - 25:14, 211:5
**defined** [1] - 25:8
**defining** [1] - 182:19
**definitely** [2] - 21:8, 29:20
**definition** [1] - 155:15
**definitive** [1] - 168:23
**degree** [2] - 74:4, 74:5
**delay** [1] - 73:9
**demand** [8] - 8:12, 8:13, 36:12, 39:20, 40:10, 40:18, 47:5, 195:5
**DeMaria** [1] - 109:23
**demonstrate** [3] - 174:5, 176:4, 177:16
**denied** [1] - 11:20
**denies** [3] - 11:23, 83:17, 206:14
**deny** [6] - 84:2, 84:3, 84:15, 84:19, 111:10
**department** [2] - 52:20, 165:25
**depicts** [1] - 15:24
**deposited** [1] - 20:17
**deposition** [2] - 79:9, 109:19
**depository** [2] - 156:14
**deposits** [10] - 16:8, 16:20, 16:21, 19:14,

19:18, 20:16, 20:19, 20:24, 21:12, 210:18
**Deposits** [1] - 20:13
**Deposits-Stock** [1] - 20:13
**deprive** [1] - 184:9
**DEPUTY** [11] - 3:2, 4:8, 64:8, 65:12, 122:15, 123:11, 123:19, 181:10, 185:16, 185:18, 238:7
**Deputy** [1] - 169:4
**derivative** [1] - 93:9
**describe** [11] - 32:3, 55:24, 152:5, 178:2, 178:16, 179:14, 180:15, 180:22, 188:4, 196:9, 199:18
**described** [5] - 5:21, 35:13, 55:14, 73:2, 167:20
**describes** [1] - 46:7
**describing** [1] - 197:16
**description** [3] - 150:22, 154:1
**design** [6] - 46:9, 65:23, 66:8, 67:1, 67:9, 68:2
**designated** [2] - 77:23, 190:25
**designation** [1] - 190:21
**designed** [1] - 130:2
**desire** [2] - 85:6, 235:3
**Desist** [1] - 179:19
**desist** [3] - 5:5, 77:16, 77:23
**despite** [2] - 48:12, 129:16
**detail** [1] - 230:24
**detailed** [2] - 129:11, 179:25
**details** [1] - 118:3
**determination** [2] - 158:8, 158:13
**determine** [1] - 105:19
**determined** [3] - 47:2, 129:15, 234:16
**develop** [1] - 59:7
**developed** [2] - 81:14, 159:6
**Development** [14] - 31:8, 53:14, 53:15, 53:19, 53:22, 53:24, 54:5, 54:10, 55:2, 55:14, 56:4, 57:17, 57:19, 175:21

**development** [34] - 10:21, 53:2, 54:7, 57:24, 57:25, 58:2, 58:23, 59:1, 59:9, 59:13, 60:2, 60:23, 61:22, 75:16, 75:17, 75:18, 76:1, 83:21, 88:24, 88:25, 89:19, 89:21, 126:1, 164:5, 169:11, 171:1, 171:16, 171:20, 172:11, 172:16, 205:9, 206:18, 207:4
**devolving** [1] - 231:12
**Di** [5] - 26:8, 26:14, 27:24, 30:3, 229:23
**dialogue** [1] - 197:15
**dictated** [2] - 44:21, 144:18
**died** [2] - 160:23, 160:25
**difference** [1] - 206:1
**differences** [2] - 104:12, 105:9
**different** [17] - 44:24, 51:3, 51:25, 56:5, 56:16, 56:18, 70:25, 76:9, 77:3, 89:20, 117:21, 163:10, 167:25, 176:15, 182:18, 195:11
**differently** [1] - 224:13
**difficult** [7] - 117:10, 127:25, 131:10, 145:6, 178:5, 179:22, 196:10
**difficulties** [1] - 77:1
**difficulty** [2] - 76:23, 102:24
**DiFloria** [1] - 52:16
**DiFlorio** [6] - 59:18, 59:23, 87:9, 109:22, 109:25, 110:14
**diligence** [1] - 165:13
**DiMaria** [1] - 166:18
**dime** [1] - 103:17
**Dining** [2] - 55:3, 55:4
**direct** [8] - 4:11, 7:25, 107:19, 122:20, 145:23, 146:17, 159:12, 207:17
**DIRECT** [5] - 2:5, 2:8, 4:1, 136:25, 148:22
**directed** [4] - 131:20, 159:23, 213:2, 233:13

**direction** [2] - 60:4, 169:22
**directly** [9] - 12:18, 41:22, 41:24, 48:7, 49:3, 91:5, 202:2, 225:2, 233:13
**Director** [13] - 29:23, 137:17, 139:7, 139:14, 139:16, 140:4, 140:6, 141:8, 141:13, 141:21, 142:16, 143:2, 186:6
**director** [1] - 124:20
**Director's** [4] - 27:19, 142:13, 142:14, 142:18
**Directors** [37] - 7:13, 7:15, 25:1, 25:6, 25:7, 25:8, 25:19, 29:24, 66:12, 68:19, 74:8, 85:23, 86:5, 92:21, 96:11, 113:7, 114:16, 138:10, 142:15, 145:12, 145:19, 146:8, 146:13, 146:21, 147:11, 159:16, 169:5, 176:11, 178:1, 180:4, 196:11, 204:5, 213:2, 213:23, 214:22, 217:24
**directors** [26] - 24:19, 24:24, 25:21, 31:20, 32:17, 47:14, 145:9, 160:7, 165:9, 191:3, 217:8, 217:16, 220:6, 220:14, 222:1, 223:14, 223:16, 223:20, 223:23, 224:6, 225:5, 229:12, 229:23, 231:19, 234:20, 236:17
**directors'** [1] - 27:21
**disaffiliation** [1] - 152:18
**disagree** [3] - 209:4, 224:9
**discharged** [2] - 114:18, 114:20
**disclosed** [8] - 43:11, 45:12, 46:3, 46:5, 62:3, 63:18, 92:8, 92:9
**disclosure** [3] - 62:24, 187:5, 187:8
**disclosures** [1] - 177:18
**discover** [2] - 48:13, 131:18
**discovered** [1] -

174:18
**discrete** [1] - 128:1
**discuss** [2] - 64:6, 122:12, 140:17, 181:8, 203:5, 219:9, 238:6
**discussed** [18] - 72:24, 89:20, 109:9, 132:16, 133:19, 140:10, 147:5, 147:6, 147:9, 157:15, 159:13, 166:14, 188:6, 218:22, 220:20, 222:7, 225:2, 232:20
**discussing** [3] - 113:2, 198:14, 219:17
**discussion** [12] - 2:15, 2:16, 144:15, 147:10, 152:20, 172:24, 178:21, 196:15, 198:16, 219:13, 219:19, 238:3
**DISCUSSION** [1] - 148:9
**discussions** [21] - 52:8, 96:7, 115:23, 139:1, 139:5, 157:12, 160:16, 161:3, 161:6, 172:7, 172:22, 180:12, 193:3, 193:6, 193:17, 194:12, 197:7, 197:11, 232:7, 232:9, 237:7
**dismiss** [3] - 182:1, 182:13, 183:12
**dismissed** [11] - 5:25, 6:1, 88:1, 88:5, 88:7, 92:4, 92:5, 92:7, 92:15, 113:5, 113:6
**display** [1] - 8:21
**dispositive** [1] - 47:6
**disproportionate** [1] - 171:14
**dispute** [17] - 28:3, 48:25, 53:8, 69:4, 90:15, 92:14, 97:2, 119:24, 142:21, 142:23, 142:25, 143:17, 143:19, 197:10, 197:17, 198:14, 206:8
**disputing** [1] - 142:8
**distracted** [1] - 178:18
**distraction** [1] - 235:6
**DISTRICT** [3] - 1:1, 1:1, 1:11
**District** [2] - 69:13,

69:16
**divergent** [2] - 40:24, 117:10
**divesting** [1] - 175:21
**divide** [1] - 20:1
**divided** [1] - 17:22
**division** [1] - 140:24
**Division** [9] - 38:5, 38:10, 38:11, 132:9, 132:14, 132:15, 133:3, 186:7
**docket** [1] - 65:9
**document** [49] - 22:7, 22:13, 29:7, 29:8, 61:8, 65:8, 125:24, 150:22, 163:4, 163:5, 163:7, 163:11, 164:14, 164:18, 165:6, 165:9, 165:16, 169:8, 169:9, 170:25, 171:16, 173:6, 175:10, 176:2, 185:24, 188:14, 188:23, 190:13, 192:2, 192:14, 192:18, 192:20, 194:1, 198:10, 199:5, 199:16, 199:18, 200:12, 201:18, 201:20, 206:3, 206:5, 211:19, 212:2, 212:15, 230:17, 230:18, 235:18
**documentary** [1] - 148:5
**documents** [20] - 86:25, 102:6, 102:9, 102:12, 111:5, 111:12, 111:13, 165:8, 165:17, 166:4, 166:7, 170:10, 171:3, 174:22, 175:12, 179:15, 185:9, 185:10, 193:11
**dollar** [2] - 17:24, 93:18
**dollars** [27] - 13:4, 17:3, 25:25, 26:6, 46:8, 62:14, 63:15, 66:2, 66:7, 66:17, 66:22, 68:22, 73:20, 94:13, 94:15, 95:7, 96:12, 111:18, 116:22, 117:3, 117:14, 117:15, 117:17, 117:19, 129:25, 141:25, 205:7
**Dominion** [10] - 7:11,

8:13, 13:12, 13:15, 24:12, 71:19, 93:11, 111:21, 112:18, 140:24
**done** [17] - 11:20, 49:6, 51:2, 51:10, 58:18, 83:24, 122:19, 130:24, 153:16, 160:9, 178:7, 182:23, 184:6, 184:8, 209:22, 216:12, 227:22
**dotted** [2] - 16:5, 17:4
**double** [1] - 148:6
**double-check** [1] - 148:6
**doubt** [3] - 157:18, 182:10, 220:23
**down** [23] - 4:25, 5:1, 10:1, 23:12, 23:14, 23:18, 23:20, 61:1, 61:7, 73:24, 73:25, 74:2, 103:16, 115:16, 131:16, 133:24, 134:3, 136:13, 143:14, 147:24, 181:15, 200:19, 207:19
**down-streamed** [1] - 200:19
**draconian** [1] - 189:10
**Draconian** [2] - 179:15, 180:10
**draft** [3] - 81:23, 189:13
**draw** [2] - 10:3, 49:17
**drawn** [1] - 123:24
**dream** [1] - 174:3
**drew** [1] - 127:16
**driven** [1] - 20:23
**driver** [1] - 17:18
**drives** [1] - 17:23
**due** [12] - 9:15, 9:16, 9:17, 95:11, 117:3, 117:16, 131:11, 139:2, 152:20, 153:10, 153:15, 165:13
**DULY** [3] - 3:24, 136:23, 148:15
**Dumfries** [1] - 167:4, 170:10, 170:14, 170:16, 171:2, 171:5, 171:7, 171:12, 172:15, 174:20, 177:21
**Dunn** [1] - 233:9
**Dunphreys** [1] -

58:15
**duplicate** [1] - 182:6
**during** [25] - 4:25, 13:21, 14:6, 16:9, 16:16, 17:6, 63:12, 115:23, 115:25, 129:11, 131:12, 138:20, 138:21, 159:6, 164:9, 165:10, 170:2, 176:7, 176:19, 176:25, 177:25, 178:13, 178:16, 200:15, 220:4
**duty** [11] - 83:19, 84:10, 84:17, 93:1, 100:9, 101:2, 180:1, 184:23, 184:25, 206:15

# E

**e-file** [1] - 182:4
**e-filed** [1] - 183:11
**e-mail** [22] - 43:1, 43:8, 45:6, 45:11, 97:2, 113:15, 113:25, 114:22, 193:17, 194:2, 194:7, 198:1, 198:9, 198:11, 198:15, 198:24, 199:7, 199:20, 200:13, 201:21, 202:9, 202:11
**e-mails** [12] - 45:9, 193:19, 196:24, 197:4, 197:5, 197:15, 198:6, 200:7, 200:8, 200:9, 232:7
**early** [7] - 7:10, 26:17, 27:8, 157:17, 161:17, 161:18, 166:10, 207:17, 208:20, 223:19
**earned** [2] - 17:2, 17:18
**earning** [1] - 18:5
**earnings** [2] - 17:20, 17:21
**earns** [1] - 17:22
**easier** [1] - 28:16
**economic** [3] - 117:21, 117:22, 187:23
**economics** [1] - 176:5
**Ed** [1] - 18:10
**EDWIN** [1] - 1:14
**effect** [23] - 14:4, 21:21, 73:17, 73:19,

73:21, 87:5, 87:14, 87:17, 100:12, 100:13, 100:17, 100:23, 101:3, 101:6, 101:11, 143:15, 169:14, 169:18, 169:23, 169:25, 176:16, 208:17
**effective** [2] - 19:25, 61:15
**efficiency** [1] - 231:8
**effort** [2] - 40:11, 40:15
**eight** [7] - 17:14, 20:1, 73:20, 80:9, 80:11, 200:22, 227:5
**either** [18] - 55:5, 59:5, 61:4, 83:8, 85:23, 98:24, 99:1, 99:2, 99:5, 99:11, 118:22, 119:20, 128:3, 138:16, 154:3, 156:11, 191:17, 222:6
**elaborate** [1] - 178:4
**elected** [1] - 89:9
**electronically** [1] - 8:2
**element** [1] - 184:4
**elements** [2] - 189:10, 196:15
**eligible** [1] - 191:2
**email** [3] - 157:1, 157:5, 157:9
**emanating** [1] - 186:10
**embezzling** [1] - 211:8
**emotional** [1] - 196:11
**employee** [2] - 38:20, 45:5
**employees** [5] - 6:8, 90:22, 91:1, 124:3, 129:4
**employing** [1] - 128:5
**employment** [13] - 8:15, 33:5, 33:11, 74:9, 86:19, 102:9, 111:20, 129:12, 201:3, 218:24, 219:19, 220:25, 221:7
**enable** [1] - 203:17
**enacted** [1] - 77:3
**enactments** [2] - 77:4
**encompassed** [1] - 224:11
**end** [11] - 11:19, 16:5, 23:2, 126:10,

130:8, 160:14, 185:9, 192:17, 195:15, 202:19, 216:25
**endeavor** [1] - 165:16
**ended** [3] - 29:11, 73:18, 176:13
**enforce** [3] - 85:25, 111:20, 224:2
**enforceable** [1] - 212:2
**Enforcement** [1] - 186:6
**enforcement** [2] - 149:18, 205:7
**engage** [1] - 206:14
**engaged** [6] - 83:18, 84:9, 84:16, 166:21, 166:24, 189:3
**English** [5] - 58:10, 58:11, 172:25, 173:8, 173:19
**enhancing** [2] - 177:14, 212:8
**enjoyed** [1] - 135:15
**enlarge** [1] - 12:24, 229:18
**ensure** [1] - 165:25
**enter** [4] - 81:15, 85:7, 190:14, 223:12
**entered** [7] - 63:12, 69:17, 70:18, 70:22, 71:3, 77:22, 80:6
**enterprise** [1] - 225:10
**enters** [2] - 123:20, 185:19
**entire** [6] - 40:11, 40:15, 84:13, 117:18, 124:8, 128:16
**entirely** [1] - 199:24
**entitled** [4] - 71:11, 106:11, 211:12, 224:22
**entity** [3] - 55:21, 200:16, 223:9
**entries** [1] - 18:25
**entry** [1] - 77:16
**Equipment** [1] - 184:25
**Equities** [2] - 171:2, 172:15
**equity** [1] - 55:10
**equivalent** [2] - 85:3, 144:9
**escrow** [19] - 103:21, 104:1, 104:6, 104:9, 104:11, 104:23, 105:8, 105:13, 106:7, 106:16, 106:19,

108:20, 108:21, 108:25, 115:9, 115:15, 115:19, 156:23, 157:1
**Esquire** [1] - 35:11
**ESQUIRE** [4] - 1:14, 1:15, 1:17, 1:17
**essence** [2] - 166:15, 183:14
**essential** [3] - 195:16, 211:18, 211:19
**essentially** [2] - 153:6, 231:2
**establish** [1] - 167:13
**established** [3] - 151:17, 176:13, 227:13
**establishment** [1] - 171:24
**Estate** [10] - 31:9, 51:24, 52:10, 53:7, 53:10, 53:12, 76:10, 76:15, 192:25, 193:5
**estate** [23] - 10:20, 10:21, 12:17, 16:9, 16:12, 31:10, 52:4, 52:17, 55:22, 56:4, 61:1, 61:10, 83:20, 83:21, 126:1, 159:13, 167:14, 187:20, 206:17, 206:18, 207:3, 207:4
**estimate** [1] - 64:20
**et** [1] - 84:10
**evening** [1] - 238:5
**event** [5] - 163:14, 164:22, 164:24, 191:8, 191:10
**events** [4] - 49:17, 129:11, 129:13, 196:22
**everywhere** [1] - 24:1
**evidence** [28] - 3:18, 8:20, 8:25, 10:4, 14:19, 14:22, 28:11, 48:13, 54:9, 65:7, 87:22, 92:22, 131:17, 131:18, 148:2, 148:5, 157:6, 169:3, 182:10, 183:19, 185:25, 188:2, 188:13, 204:9, 211:3, 211:8, 211:11, 212:15
**EVIDENCE** [6] - 2:12, 2:13, 2:14, 3:19, 9:1, 65:10
**evidenced** [1] -

184:9
**evolve** [1] - 92:1
**evolved** [1] - 139:10
**evolving** [2] - 230:11, 231:11
**exact** [1] - 49:2
**exactly** [9] - 72:3, 78:6, 92:5, 92:6, 93:2, 93:24, 119:19, 185:14, 222:5
**examination** [15] - 65:15, 107:19, 117:13, 122:19, 122:22, 126:10, 145:23, 146:17, 163:8, 163:9, 163:19, 163:25, 164:3, 164:7, 223:20
**EXAMINATION** [15] - 2:2, 2:3, 2:4, 2:5, 2:6, 2:8, 2:9, 4:1, 22:5, 113:1, 135:24, 136:25, 141:3, 148:22, 207:12
**examinations** [5] - 212:4, 213:13, 213:14, 213:24, 214:17
**examine** [5] - 22:3, 141:2, 173:11, 207:11, 212:5
**examiner** [1] - 44:14
**examines** [2] - 212:6, 213:18
**example** [10] - 6:13, 58:10, 97:3, 167:14, 167:15, 183:25, 187:18, 191:1, 206:24, 214:3
**examples** [2] - 176:7
**except** [2] - 158:20, 194:17
**exception** [4] - 75:7, 129:7, 129:9, 129:10
**exceptions** [1] - 75:6
**excess** [1] - 173:25
**exchanged** [1] - 201:4
**excuse** [2] - 50:2, 224:16
**Excused** [1] - 148:1
**excused)** [1] - 136:15
**executed** [1] - 138:8
**executing** [3] - 82:8, 82:16, 82:24
**execution** [1] - 174:14
**executive** [6] - 42:16, 90:6, 102:21,

129:1, 154:25, 155:2
**executives** [1] - 129:4
**exempt** [2] - 153:15, 155:24
**exempted** [4] - 153:7, 154:17, 154:20, 154:21
**exercise** [1] - 136:4
**exercised** [2] - 136:3, 136:4
**exert** [1] - 71:7
**exhibit** [7] - 14:18, 18:9, 65:21, 113:14, 114:23, 195:2, 217:6
**Exhibit** [3] - 70:1, 185:25, 221:1
**EXHIBIT** [6] - 2:11, 2:12, 2:13, 3:19, 9:1, 65:10
**exist** [2] - 207:19, 208:14
**existed** [2] - 144:20, 171:11
**existing** [3] - 16:14, 212:1
**expand** [2] - 15:12, 130:7
**expanding** [1] - 15:14
**expect** [8] - 82:3, 86:20, 86:22, 87:2, 87:6, 112:18, 112:22
**expected** [1] - 102:24
**expedited** [1] - 191:2
**expense** [2] - 209:10, 211:11
**expenses** [1] - 52:20
**experience** [9] - 152:3, 163:13, 163:21, 164:23, 205:16, 206:3, 206:8, 208:4, 209:23
**experiences** [1] - 180:2
**expert** [5] - 79:3, 153:13, 205:19, 205:20, 205:22
**expire** [1] - 165:11
**explain** [14] - 15:23, 16:25, 19:2, 19:5, 20:13, 63:24, 153:3, 187:10, 191:18, 193:7, 195:1, 225:23, 226:1, 230:24
**explained** [4] - 76:21, 119:9, 119:12, 205:11
**explaining** [2] - 4:17,

234:12
**explanation** [1] - 208:13
**explanatory** [2] - 57:14, 58:22
**express** [3] - 182:6, 182:9, 223:7
**expressed** [4] - 42:17, 45:10, 180:16, 236:5
**expressly** [1] - 235:2
**extend** [1] - 44:9
**extends** [1] - 115:10
**extensive** [6] - 160:19, 186:10, 187:20, 193:6, 193:19, 209:17
**extent** [5] - 5:12, 32:19, 140:7, 190:5, 201:4
**extraordinarily** [2] - 131:9, 178:3
**extraordinary** [2] - 178:7, 210:2
**extremely** [2] - 129:18, 189:20

---

# F

**F.3d** [1] - 185:2
**face** [6] - 147:7, 226:13, 226:15, 226:19, 226:24, 237:13
**facilitate** [1] - 197:14
**facilities** [1] - 175:16
**facility** [3] - 65:23, 67:1, 67:9
**fact** [54] - 24:11, 27:14, 27:21, 36:18, 40:5, 46:2, 50:14, 51:21, 52:10, 53:1, 53:22, 56:12, 57:13, 66:24, 67:16, 68:18, 68:21, 69:1, 69:12, 71:9, 72:6, 72:9, 76:13, 76:25, 79:8, 81:23, 104:5, 105:12, 105:17, 107:1, 107:3, 108:24, 112:15, 113:11, 113:15, 117:22, 119:10, 131:10, 132:16, 136:3, 141:20, 144:9, 164:24, 182:25, 184:5, 203:14, 212:25, 220:1, 222:7, 224:10, 225:17, 226:15, 226:19, 229:8

factor [1] - 66:10
facts [11] - 7:9,
11:18, 111:15,
117:21, 146:12,
153:2, 159:18,
177:20, 206:8,
224:20, 225:1
factual [2] - 189:7,
224:12
failed [3] - 44:18,
109:12, 148:5
failing [3] - 5:25,
83:19, 206:15
failure [1] - 48:12
failures [1] - 208:22
fair [10] - 48:12,
49:17, 67:2, 129:20,
182:3, 182:7, 182:14,
182:15, 183:8, 186:23
fairly [2] - 5:11,
165:6
fairness [3] - 48:11,
175:17
faith [12] - 182:3,
182:7, 182:14,
182:21, 183:8, 184:4,
184:5, 184:10,
184:11, 235:7
fall [2] - 129:14,
135:6
false [4] - 67:4, 67:6,
189:4, 189:15
familiar [10] - 7:3,
55:17, 98:12, 151:13,
164:17, 167:6,
201:20, 204:20,
204:23, 205:1
familiarize [1] -
149:23
Family [2] - 55:9
family [1] - 12:21
far [9] - 19:15, 43:21,
116:2, 118:4, 118:6,
119:19, 142:16, 143:8
fault [3] - 46:21,
46:22, 46:23
favor [1] - 44:10
FDIC [17] - 65:7,
71:22, 71:24, 99:3,
125:8, 151:18,
153:12, 155:10,
208:21, 209:11,
233:14, 234:1, 234:4,
234:7, 234:8, 234:13,
235:15
FDIC's [1] - 115:15
February [3] - 10:12,
226:9, 227:3
Fed [5] - 114:1,
161:20, 164:19,

200:16, 232:9
Fed's [3] - 161:21,
164:17, 166:1
federal [10] - 125:4,
125:7, 125:8, 146:10,
146:14, 146:22,
147:3, 147:11, 156:1,
166:9
Federal [39] - 14:7,
15:7, 62:19, 63:18,
71:22, 71:23, 71:24,
78:24, 85:3, 89:23,
99:3, 101:10, 102:1,
102:16, 102:17,
112:20, 113:20,
118:13, 125:8,
150:16, 151:13,
164:15, 166:9,
189:15, 213:14,
214:18, 218:22,
219:10, 219:18,
219:25, 220:2, 220:3,
220:7, 220:13,
233:13, 234:3, 234:6,
234:13, 235:14
Feds [1] - 115:15
fee [3] - 129:18,
143:10, 143:13
fees [35] - 26:15,
26:16, 27:19, 27:21,
29:22, 29:24, 30:2,
30:5, 30:6, 30:8,
30:11, 30:14, 30:16,
32:17, 37:17, 46:9,
46:10, 52:12, 127:17,
127:18, 127:19,
128:4, 129:6, 129:8,
141:15, 141:23,
142:10, 142:13,
142:14, 142:16,
142:18, 142:20,
143:3, 144:6
Felice [1] - 18:10
felt [2] - 49:12, 206:9
few [1] - 139:3
fides [1] - 224:18
fiduciary [11] -
83:19, 84:10, 84:17,
93:1, 100:9, 101:2,
179:25, 184:22,
184:23, 206:15
Fifth [1] - 123:6
fifty [1] - 61:6, 80:20,
96:11
fifty-three [1] - 80:20
fight [7] - 86:9,
86:11, 86:13, 86:16,
107:12, 107:14, 114:1
figure [4] - 46:5,
144:4, 155:17, 177:10

figures [4] - 9:22,
19:16, 21:9, 129:23
file [7] - 175:8, 182:4,
216:23, 222:2,
222:20, 225:6, 233:19
filed [29] - 7:2, 7:2,
7:5, 7:10, 7:19, 13:1,
69:12, 69:13, 69:16,
69:17, 69:20, 70:6,
70:7, 79:17, 79:21,
80:2, 80:5, 92:2,
92:17, 96:10, 97:6,
97:10, 125:17,
133:25, 134:9,
134:17, 183:11,
187:7, 227:22
files [1] - 175:15
filing [3] - 7:20, 23:9,
40:20
filings [3] - 46:4,
46:15, 46:16
fill [1] - 151:12
final [6] - 82:10,
103:15, 115:3,
125:19, 125:20, 131:1
finality [1] - 47:14
finally [4] - 46:7,
101:14, 128:15, 129:3
financial [20] - 15:24,
76:23, 77:1, 77:8,
83:22, 89:11, 149:10,
150:6, 151:19,
151:21, 152:8,
152:11, 178:13,
205:5, 206:19, 208:5,
208:11, 209:25,
210:23
financially [4] -
11:12, 190:23,
209:18, 209:21
financing [1] - 49:12
findings [11] - 11:4,
11:6, 11:18, 71:9,
72:5, 72:8, 85:16,
85:17, 85:19, 85:20,
134:11
fine [5] - 4:4, 15:2,
27:3, 37:25, 217:1
finish [4] - 56:15,
95:20, 210:21, 234:22
finished [1] - 85:9
fire [3] - 42:12,
144:5, 180:21
fired [4] - 87:18,
108:15, 114:25,
144:19
firings [1] - 109:22
firm [28] - 25:23,
25:25, 26:5, 26:14,
32:22, 32:24, 33:2,

33:5, 43:5, 54:1, 54:2,
54:4, 109:13, 116:23,
128:8, 131:24, 132:2,
132:4, 134:25, 149:6,
151:8, 152:23,
152:24, 193:8,
202:13, 216:19,
230:9, 231:10
firms [4] - 36:17,
37:3, 68:3, 128:4
first [47] - 10:19,
12:6, 15:15, 15:16,
23:1, 34:25, 60:14,
80:17, 83:14, 83:15,
84:1, 91:22, 107:6,
114:4, 116:1, 118:13,
118:22, 122:5,
128:12, 128:13,
132:18, 150:10,
153:10, 153:14,
155:14, 161:15,
161:18, 162:4, 162:6,
162:11, 165:4, 167:4,
168:16, 176:17,
181:16, 186:23,
189:13, 203:10,
204:16, 204:23,
205:14, 206:6,
212:16, 215:16,
217:23, 220:9,
222:22, 227:13,
228:23
Fisher [5] - 5:18, 7:2,
7:18, 116:12, 166:3
Fisher's [1] - 116:11
five [26] - 5:14, 5:15,
12:23, 15:9, 15:18,
16:3, 16:23, 17:19,
17:25, 20:1, 33:16,
33:18, 33:22, 39:7,
66:21, 133:23,
181:18, 181:19,
181:21, 185:12,
212:4, 212:6, 231:21
Flam [1] - 35:12
flattering [1] - 88:10
flow [1] - 183:24
fluctuation [1] - 74:3
focus [14] - 5:20,
11:14, 15:18, 49:3,
126:24, 128:13,
158:4, 161:16, 162:3,
162:17, 188:24,
192:8, 229:16
focused [1] - 115:14
focusing [3] - 175:2,
196:21, 201:4
foggiest [1] - 236:19
fold [1] - 130:8
folks [3] - 25:20,

37:19, 135:13
follow [1] - 12:4
followed [1] - 201:22
following [2] - 35:7,
236:9
FOLLOWS [3] - 3:25,
136:24, 148:16
foot [1] - 111:6
footnote [5] - 42:21,
42:22, 43:1, 43:8,
50:2
Footnote [4] - 38:9,
45:23, 48:16, 49:3
FOR [3] - 1:1, 1:15,
1:18
foregoing [1] -
127:24
forget [1] - 109:14
forgot [3] - 109:13,
216:1
form [16] - 3:15,
13:4, 97:9, 109:24,
151:25, 152:1,
153:19, 155:7,
175:11, 175:14,
189:23, 194:4,
198:17, 205:6,
221:18, 227:11
formally [1] - 186:11
format [1] - 188:16
formed [3] - 25:5,
36:22, 192:21
former [19] - 19:23,
25:23, 38:20, 45:5,
89:14, 139:19, 151:5,
151:6, 153:12
formerly [1] - 149:11
forth [6] - 34:20,
70:12, 78:22, 189:8,
197:16, 203:2
forum [1] - 39:13
forward [9] - 12:9,
12:10, 12:14, 74:21,
168:18, 169:14,
179:21, 194:16,
196:23
forwarded [2] - 45:5,
45:6
fought [1] - 120:2
foundation [1] -
205:22
Foundation [1] -
55:10
founder [1] - 139:19
four [24] - 5:15, 6:6,
12:24, 13:4, 13:12,
20:1, 94:15, 117:3,
133:24, 134:3, 205:6,
214:16, 219:6,
232:17, 232:19,

233:18, 234:16, 235:25, 236:4, 237:8, 237:14

**fourteen** [1] - 200:24
**fourth** [1] - 224:7
**FR** [1] - 82:11
**frame** [1] - 114:13
**Francisco** [4] - 26:8, 27:24, 30:3, 229:23
**Francisco's** [1] - 26:14
**Frank** [1] - 45:12
**fraud** [1] - 93:3
**fraudulent** [3] - 100:8, 100:17, 100:22
**free** [5] - 81:4, 81:15, 84:25, 130:24, 160:2
**frequent** [1] - 139:6
**frequently** [1] - 176:23
**Frey** [5] - 39:22, 39:24, 40:9, 40:19, 40:21
**Frey's** [1] - 41:9
**Friday** [1] - 3:14
**friends** [1] - 107:7
**front** [5] - 65:20, 100:1, 142:4, 198:2, 226:14
**frustrate** [1] - 184:3
**fulfill** [1] - 111:22
**full** [13] - 34:1, 47:4, 49:14, 62:24, 81:16, 84:21, 84:23, 128:12, 128:13, 129:5, 129:7, 133:23, 134:3
**fully** [4] - 35:13, 47:3, 62:3, 221:7
**fund** [1] - 200:19
**Fund** [2] - 184:18, 209:11
**funded** [1] - 202:2
**funds** [4] - 13:11, 117:3, 152:1, 200:18
**future** [4] - 12:5, 43:18, 85:5, 194:12

**G**

**gain** [3] - 83:23, 135:15, 206:19
**Galati** [1] - 92:3
**Galloway** [1] - 55:10
**gather** [1] - 110:6
**ge** [1] - 110:6
**gee** [1] - 115:17
**general** [9] - 49:8, 49:10, 60:3, 151:5, 153:12, 155:9,

165:24, 167:11, 213:23
**generally** [9] - 11:9, 17:23, 18:20, 77:14, 156:25, 167:8, 171:9, 213:20, 228:7
**gentleman** [8] - 27:3, 39:21, 41:16, 75:22, 137:12, 151:1, 218:16, 230:5
**gentlemen** [6] - 64:5, 122:3, 176:15, 181:7, 237:21, 238:4
**Gerry** [1] - 1:9
**Gibbons** [2] - 230:9, 231:10
**Gibson** [1] - 233:9
**Giordano** [6] - 25:5, 25:16, 30:19, 176:16, 227:12, 229:23
**gist** [1] - 164:16
**given** [13] - 43:17, 44:16, 44:17, 44:20, 95:2, 159:18, 160:1, 169:21, 171:14, 172:11, 193:13, 205:8, 206:4
**glean** [1] - 92:13
**golden** [13] - 151:14, 152:9, 155:24, 157:13, 191:4, 191:6, 199:12, 222:8, 222:11, 223:17, 223:21, 224:7, 234:2
**Golden** [7] - 78:1, 78:11, 78:18, 79:3, 105:20, 105:23, 207:18
**Golf** [1] - 55:11
**govern** [1] - 214:6
**governance** [32] - 37:6, 77:17, 83:20, 91:16, 91:21, 91:23, 92:1, 161:22, 166:17, 171:9, 173:20, 178:11, 187:1, 187:9, 187:11, 187:12, 187:13, 187:19, 187:22, 187:25, 206:16, 210:20, 210:23, 210:25, 211:2, 211:3, 211:14, 211:15, 211:17, 211:21, 212:9, 214:9
**governing** [2] - 211:25, 213:19
**Government** [2] - 107:13, 189:15
**government** [8] - 99:15, 108:6, 151:22,

161:16, 166:4, 198:9, 224:21, 235:3
**grant** [1] - 184:14
**granted** [1] - 185:5
**granularity** [1] - 174:15
**grass** [1] - 52:7
**grave** [4] - 52:18, 110:15, 110:18, 111:3
**great** [7] - 10:25, 108:12, 115:17, 140:6, 169:20, 175:2, 187:20
**greater** [1] - 102:24
**green** [1] - 92:12
**grew** [8] - 13:24, 16:21, 17:24, 19:17, 19:18, 20:19, 130:8
**Griffinger** [4] - 230:8, 230:14, 235:23, 237:16
**gross** [1] - 210:19
**Group** [1] - 91:3
**group** [5] - 53:16, 58:3, 60:2, 60:23, 91:12
**group's** [1] - 227:16
**grow** [1] - 169:22
**growing** [2] - 17:14, 178:7
**grown** [5] - 19:8, 19:10, 19:11, 178:10, 178:11
**growth** [27] - 15:18, 16:2, 16:4, 16:6, 16:8, 17:1, 17:4, 17:12, 17:15, 18:1, 18:22, 18:23, 19:3, 19:13, 20:7, 20:20, 20:24, 21:1, 21:9, 21:24, 21:25, 73:12, 168:14, 169:17, 210:18, 210:24, 214:10
**Growth** [1] - 19:2
**guess** [6] - 8:13, 10:10, 24:21, 39:4, 51:6, 109:13
**guidance** [1] - 213:19
**guidelines** [1] - 214:5
**guy** [5] - 15:21, 41:19, 142:1, 142:3, 175:16
**guys** [6] - 86:7, 86:9, 86:10, 86:11, 86:12, 86:13, 86:14, 86:15, 90:24

**H**

**half** [11] - 21:1, 73:20, 83:24, 84:1, 84:14, 115:25, 129:24, 143:1, 215:16, 217:12
**hand** [9] - 7:25, 15:17, 17:10, 136:22, 148:14, 212:11, 212:15, 225:14, 227:2
**handing** [1] - 212:13
**handle** [2] - 43:7, 120:21
**handled** [6] - 37:22, 38:1, 42:8, 52:20, 149:21, 216:19
**handles** [1] - 44:1
**handling** [3] - 149:18, 199:8, 200:11
**hands** [1] - 146:12
**handsomely** [2] - 32:11, 32:15, 141:13
**happy** [4] - 12:13, 63:21, 63:24, 144:2
**hard** [2] - 141:16, 141:19
**harm** [5] - 151:19, 207:20, 207:23, 208:1, 208:14
**harmful** [1] - 180:10
**Harry** [2] - 120:11, 120:15
**harsh** [2] - 191:11, 203:14
**HAVING** [3] - 3:24, 136:23, 148:15
**head** [1] - 91:2
**heading** [4] - 81:1, 133:23, 218:14, 231:21
**health** [4] - 15:25, 155:5, 214:1, 214:18
**healthy** [5] - 18:7, 18:8, 190:22, 209:18, 209:21
**hear** [13] - 59:18, 59:23, 88:16, 116:11, 116:16, 117:19, 118:2, 118:24, 124:11, 137:3, 175:20, 178:24, 230:24
**heard** [16] - 5:4, 6:23, 11:9, 14:3, 24:18, 67:12, 87:9, 87:12, 87:13, 98:9, 110:14, 147:19, 155:23, 184:1, 204:6,

225:2
**hearing** [3] - 109:6, 125:19, 125:20
**hearings** [2] - 82:9, 109:3
**hearsay** [6] - 6:19, 6:20, 6:21, 6:22, 162:8, 173:11
**heavily** [2] - 111:24, 112:3
**held** [12] - 2:15, 2:16, 47:12, 117:2, 119:4, 119:8, 119:9, 119:19, 119:20, 119:21, 119:22, 238:3
**help** [2] - 46:1, 171:19
**helped** [1] - 207:18
**helpful** [1] - 199:25
**hereto** [1] - 221:1
**heretofore** [1] - 177:19
**hid** [1] - 118:25
**high** [1] - 111:6
**higher** [2] - 21:6, 21:8
**highest** [3] - 180:7, 186:10, 195:20
**highlighted** [2] - 133:12, 133:13
**HILL** [10] - 1:3, 2:1, 2:2, 2:3, 2:4, 3:24, 4:1, 22:5, 113:1, 135:24
**hill** [41] - 19:19, 20:9, 21:18, 22:2, 22:7, 28:16, 29:7, 32:14, 34:1, 34:18, 34:24, 35:9, 35:12, 48:11, 50:3, 55:1, 123:17, 124:24, 128:16, 131:23, 132:18, 135:21, 136:13, 139:23, 140:1, 184:10, 184:24, 187:19, 188:5, 188:21, 189:17, 190:3, 196:3, 196:4, 196:6, 196:12, 196:17, 197:9, 197:18
**Hill** [114] - 3:21, 3:23, 4:14, 4:16, 7:18, 9:3, 9:6, 10:7, 10:15, 12:25, 14:3, 16:9, 38:19, 39:10, 39:21, 43:6, 46:18, 55:9, 60:13, 63:17, 65:18, 70:4, 71:8, 79:21, 80:13, 81:2, 84:25, 85:12, 87:19, 89:3,

90:5, 95:9, 95:10, 95:19, 97:17, 99:7, 99:24, 100:15, 105:12, 106:15, 109:15, 115:18, 115:23, 117:20, 118:9, 119:1, 121:7, 122:6, 122:10, 122:19, 123:24, 137:23, 139:2, 139:21, 139:22, 140:3, 140:18, 146:25, 147:3, 147:7, 147:12, 147:13, 153:2, 153:11, 153:15, 154:19, 156:10, 156:11, 156:12, 157:13, 158:18, 159:24, 160:10, 160:11, 161:6, 162:17, 170:7, 170:8, 173:20, 174:24, 175:15, 175:18, 175:20, 175:24, 176:4, 176:25, 178:6, 178:8, 180:13, 180:21, 201:23, 202:13, 202:15, 203:11, 203:17, 203:23, 206:4, 206:10, 210:2, 211:3, 211:8, 211:11, 218:14, 218:18, 225:11, 227:21, 232:3, 232:22, 233:11, 235:1, 235:6, 235:16

**hill's** [7] - 35:13, 196:23, 197:5, 198:12, 198:16, 199:22, 199:23

**Hill's** [21] - 74:9, 117:11, 117:20, 121:8, 152:18, 154:14, 160:1, 160:16, 160:18, 161:9, 174:22, 205:11, 218:23, 219:10, 219:19, 220:25, 221:7, 232:3, 232:8, 233:8, 233:14

**Hills** [3] - 131:9, 131:21, 200:18

**Hills'** [1] - 130:22

**himself** [1] - 175:21

**hired** [3] - 36:23, 51:7, 134:25

**historically** [1] - 219:22

**history** [2] - 140:5,

208:2

**hit** [1] - 91:22

**hold** [4] - 44:19, 165:6, 167:14, 177:10

**holder** [1] - 55:10

**holding** [11] - 55:22, 108:16, 151:21, 152:12, 152:13, 156:15, 164:19, 201:3, 201:5, 202:1

**holidays** [1] - 161:17

**Holk** [2] - 90:21, 91:2

**home** [2] - 130:23, 233:6

**Honor** [26] - 3:4, 3:5, 3:6, 3:7, 3:10, 8:23, 28:8, 65:16, 112:23, 134:7, 134:22, 136:12, 148:11, 148:24, 173:3, 182:17, 185:22, 193:22, 194:21, 196:25, 197:23, 199:3, 199:14, 200:4, 201:15, 202:7

**honor** [2] - 113:8, 221:7

**honor's** [1] - 150:5

**HONORABLE** [1] - 1:11

**hope** [1] - 120:13

**hour** [1] - 122:11

**house** [7] - 47:24, 48:5, 48:23, 49:25, 50:6, 128:6, 130:15

**huge** [3] - 94:10, 208:6, 235:6

**hugely** [2] - 81:14, 126:11

**hum** [4] - 24:4, 49:20, 103:9, 228:22

**hundred** [5] - 5:14, 17:2, 17:14, 54:18, 94:15

**hundreds** [2] - 26:14, 52:4

**hunt** [2] - 69:8, 178:23

**HVAC** [1] - 37:15

**H²O** [1] - 139:18

**I**

**IAP** [4] - 100:6, 154:5, 156:16, 156:19

**ICRE** [1] - 192:10

**idea** [12] - 41:13, 49:24, 50:1, 50:7, 51:12, 51:14, 59:10,

63:20, 76:16, 89:25, 96:21, 236:19

**identification** [5] - 170:25, 173:7, 194:1, 194:25, 197:4

**identified** [9] - 46:19, 54:8, 58:8, 62:11, 102:22, 167:5, 170:16, 172:16, 192:23

**identifies** [2] - 55:1, 61:21

**identify** [9] - 55:11, 161:7, 194:1, 194:25, 197:4, 198:10, 199:5, 199:19, 200:8

**identifying** [1] - 155:20

**II** [1] - 1:3

**illegal** [2] - 147:16, 147:17

**immaterial** [1] - 147:2

**immediately** [1] - 186:12

**immunize** [1] - 34:4

**impeded** [1] - 131:11

**implement** [2] - 165:6, 194:5

**implied** [4] - 182:2, 182:14, 183:3, 183:8

**important** [6] - 12:7, 21:23, 66:10, 168:14, 200:20, 203:13

**imposed** [1] - 77:4

**imposes** [1] - 191:11

**imposing** [1] - 212:2

**impossible** [3] - 127:25, 159:3, 215:10

**impotent** [1] - 144:15

**impression** [1] - 147:14

**improperly** [1] - 80:13

**Improvement** [1] - 208:21

**improvement** [1] - 214:7

**imputation** [1] - 182:21

**IN** [6] - 2:12, 2:13, 2:14, 3:19, 9:1, 65:10

**in-house** [1] - 128:6

**inappropriate** [1] - 48:13

**Inc** [9] - 53:24, 54:10, 54:25, 55:3, 55:4, 137:21, 175:21, 213:3, 217:16

**incidental** [1] - 217:5

**include** [4] - 46:6, 96:15, 164:10, 177:18

**included** [4] - 35:7, 84:11, 96:20, 189:14

**includes** [1] - 100:11

**including** [6] - 18:10, 76:4, 91:13, 157:6, 191:25, 237:14

**income** [4] - 16:23, 17:1, 210:19

**inconsistent** [1] - 203:7

**incorrect** [1] - 226:11

**increase** [2] - 16:19, 46:12

**indemnification** [26] - 32:25, 40:18, 40:22, 41:2, 42:18, 43:11, 43:14, 43:24, 45:14, 45:24, 46:3, 46:7, 46:10, 46:18, 47:5, 47:6, 47:8, 47:17, 113:3, 133:17, 133:25, 134:19, 152:1, 152:9, 166:18, 191:5

**indemnified** [1] - 40:25

**indemnify** [3] - 36:13, 39:21, 132:6

**indemnity** [1] - 133:20

**independence** [2] - 32:3, 34:19

**independent** [19] - 25:2, 25:6, 25:8, 25:16, 31:9, 31:10, 31:23, 32:1, 32:10, 32:13, 51:2, 51:8, 51:11, 51:17, 51:19, 105:8, 134:24, 166:25, 184:23

**independently** [1] - 175:22

**indicate** [5] - 68:10, 71:7, 73:6, 168:6, 170:13

**indicated** [5] - 60:9, 69:20, 78:6, 102:15, 190:3

**indicates** [2] - 66:16, 186:19

**indictment** [5] - 90:2, 90:3, 90:16, 123:25

**indirectly** [2] - 12:18, 202:2

**individual** [4] - 68:19, 96:11, 130:7, 146:22

**individually** [1] - 168:2

**individuals** [7] - 35:6, 151:18, 152:6, 152:8, 162:2, 207:20, 207:23

**industry** [1] - 129:19

**inference** [1] - 49:17

**influence** [1] - 102:22

**informal** [1] - 170:5

**informality** [1] - 139:13

**information** [24] - 22:14, 35:9, 35:14, 35:18, 48:3, 74:6, 86:25, 89:22, 98:17, 99:2, 99:12, 99:15, 99:20, 99:22, 103:14, 119:14, 153:22, 159:6, 176:10, 189:5, 195:22, 195:25, 200:22, 210:11

**informed** [1] - 140:6

**inherent** [1] - 40:21

**initial** [2] - 71:6, 179:13

**initiate** [1] - 163:10

**initiated** [2] - 71:10, 163:5

**initiating** [1] - 163:11

**initiatives** [1] - 102:23

**injury** [1] - 36:3

**input** [2] - 187:22, 224:22

**inquiring** [1] - 200:14

**insider** [13] - 31:4, 75:4, 98:16, 100:9, 101:6, 161:23, 177:14, 186:10, 211:25, 213:18, 214:1, 214:7

**insiders** [2] - 161:25, 187:3

**insistence** [1] - 119:6

**install** [1] - 23:19

**instance** [3] - 52:6, 163:10, 176:17

**instances** [1] - 167:16

**instead** [1] - 104:8

**instituted** [1] - 150:15

**institution** [12] - 98:16, 99:11, 102:16, 154:4, 156:6, 156:9, 156:14, 156:15,

158:5, 163:23, 211:20
**institutions** [4] - 77:8, 142:14, 151:19, 152:11
**instructions** [2] - 166:1, 225:9
**Insurance** [1] - 209:11
**insurance** [1] - 43:20
**insured** [1] - 156:13
**integrity** [1] - 165:7
**intended** [3] - 172:3, 179:19, 203:15
**intent** [4] - 44:18, 184:2, 184:9, 221:6
**intention** [1] - 44:11
**interacted** [1] - 150:25
**Interarch** [53] - 16:17, 31:18, 35:25, 36:3, 36:11, 36:24, 38:14, 38:15, 38:16, 39:10, 43:9, 43:13, 43:16, 43:17, 43:19, 43:24, 44:18, 45:24, 46:2, 46:6, 46:8, 46:25, 49:10, 49:14, 50:3, 66:2, 66:7, 66:16, 66:21, 68:1, 75:13, 113:3, 116:23, 126:14, 126:25, 127:5, 127:17, 128:1, 128:23, 129:1, 129:5, 129:8, 129:15, 129:16, 129:20, 130:2, 132:5, 166:19, 232:3, 232:22, 233:8
**InterArch's** [7] - 36:12, 36:16, 36:18, 40:25, 44:11, 129:17, 232:4
**intercede** [1] - 197:19
**interest** [25] - 4:17, 4:18, 4:20, 4:21, 4:22, 5:2, 5:3, 9:23, 16:10, 17:18, 38:25, 40:21, 40:24, 40:25, 41:1, 47:14, 85:4, 103:18, 106:20, 115:20, 126:22, 167:14, 174:23
**interested** [1] - 187:13
**interests** [4] - 62:2, 126:17, 187:4, 187:24
**interference** [3] - 36:7, 38:20, 44:11
**interior** [1] - 37:14
**internal** [1] - 165:25

**interpret** [1] - 190:2
**interrupted** [1] - 161:17
**interstate** [1] - 193:8
**Interstate** [9] - 75:19, 76:9, 76:14, 192:9, 192:25, 193:4, 193:11, 194:16, 195:6
**intervening** [1] - 125:3
**interview** [6] - 48:22, 49:5, 49:12, 130:18, 170:3, 170:7
**interviewed** [13] - 128:20, 129:1, 130:21, 130:23, 130:24, 131:7, 164:8, 170:5, 228:6, 228:8, 229:3, 235:22, 235:24
**interviewing** [1] - 35:5
**interviews** [2] - 45:10, 128:18
**introduce** [1] - 149:3
**introduction** [2] - 14:18, 214:2
**investigated** [2] - 21:19, 129:14
**investigating** [2] - 168:7, 227:21
**investigation** [50] - 7:6, 22:20, 23:7, 35:6, 62:19, 63:19, 73:10, 89:23, 92:16, 105:18, 107:21, 150:15, 150:20, 150:24, 151:9, 159:7, 161:11, 161:13, 161:20, 162:3, 162:18, 162:22, 163:6, 163:9, 163:10, 163:12, 164:9, 164:19, 165:1, 165:4, 165:11, 166:5, 167:18, 168:10, 169:14, 170:2, 176:1, 177:7, 178:14, 186:13, 191:25, 193:10, 200:12, 212:22, 213:5, 214:25, 227:14, 227:23, 231:4, 231:7
**Investigation** [2] - 150:22, 163:20
**investigative** [2] - 33:22, 85:5
**investigator** [1] - 200:11
**investor** [1] - 26:20
**invited** [2] - 138:8, 138:10

**involve** [4] - 6:5, 52:17, 180:12, 194:12
**involved** [49] - 12:10, 12:19, 16:12, 29:13, 41:13, 42:7, 42:11, 45:18, 45:21, 50:15, 50:17, 50:19, 50:21, 52:19, 54:11, 56:5, 57:23, 75:20, 75:25, 76:3, 89:18, 94:7, 94:9, 94:11, 94:23, 94:24, 110:14, 110:17, 139:16, 152:22, 154:23, 155:10, 173:21, 173:23, 178:6, 180:25, 193:3, 202:17, 216:7, 217:1, 217:4, 218:5, 226:21, 227:17, 231:13, 231:17, 232:9
**involvement** [1] - 88:23, 217:2
**involves** [1] - 238:1
**involving** [7] - 10:5, 10:21, 83:22, 161:24, 161:25, 168:1, 206:18
**irregularities** [1] - 161:23
**irrigation** [1] - 172:10
**isolated** [1] - 189:21
**issuance** [3] - 125:16, 190:7, 190:19
**issue** [29] - 46:17, 46:20, 51:21, 54:13, 60:21, 95:22, 128:3, 128:23, 140:3, 140:6, 140:13, 160:17, 160:25, 161:1, 166:19, 173:24, 177:9, 193:14, 195:9, 195:14, 200:20, 201:1, 201:2, 215:17, 223:2, 223:13, 224:10, 233:14, 233:25
**issued** [4] - 78:24, 80:12, 190:10, 190:12
**issues** [29] - 110:8, 150:14, 152:23, 160:20, 161:22, 161:24, 163:21, 166:17, 170:19, 171:8, 174:12, 175:1, 177:15, 178:21, 180:17, 186:12, 187:1, 193:9, 200:13, 211:20, 211:22, 216:20, 223:5,

224:19, 231:6, 231:8, 231:17, 232:3
**itself** [5] - 44:2, 78:23, 192:16, 223:6, 223:7

**J**

**Jack** [3] - 45:6, 57:3, 57:4
**Jacobs** [5] - 22:14, 51:16, 103:2, 104:20, 182:16
**JACOBS** [135] - 1:14, 1:14, 2:3, 2:6, 2:10, 3:5, 3:10, 3:12, 3:20, 4:1, 4:12, 6:17, 6:23, 6:25, 7:24, 8:3, 8:5, 8:20, 9:4, 9:11, 9:20, 10:1, 10:3, 12:2, 12:23, 14:13, 14:16, 14:21, 14:23, 15:1, 15:3, 15:18, 22:1, 28:12, 28:17, 28:19, 28:22, 28:25, 29:2, 50:2, 61:2, 61:4, 61:6, 64:12, 64:14, 64:16, 64:19, 64:24, 65:1, 78:13, 80:19, 97:9, 97:13, 109:24, 110:4, 112:25, 113:1, 116:20, 117:12, 118:4, 118:7, 118:21, 118:24, 119:3, 119:8, 119:13, 119:18, 120:1, 120:6, 120:10, 120:15, 120:17, 120:23, 121:3, 121:11, 121:13, 121:17, 121:20, 121:22, 122:14, 122:18, 122:24, 123:1, 123:3, 123:8, 123:15, 123:23, 127:11, 127:15, 132:20, 132:25, 133:4, 133:9, 133:13, 134:11, 134:14, 134:15, 134:23, 135:20, 136:11, 136:16, 136:25, 137:6, 140:25, 145:22, 146:5, 146:16, 147:23, 148:3, 157:24, 158:12, 158:20, 162:8, 172:18, 173:10, 179:6, 179:9, 182:17, 183:5, 183:24, 185:10,

189:23, 191:16, 198:17, 198:20, 201:11, 205:18, 207:12, 212:11, 212:14, 234:23, 237:19, 237:23, 238:1, 238:15
**jail** [1] - 90:25
**Janney** [1] - 6:7
**Janny** [1] - 91:1
**January** [11] - 23:2, 69:13, 69:16, 109:10, 134:4, 161:19, 166:10, 169:12, 177:6, 207:2
**JD** [1] - 55:8
**JERSEY** [1] - 1:1
**Jersey** [20] - 1:9, 14:1, 38:6, 39:8, 39:12, 39:13, 55:3, 55:4, 134:20, 139:9, 139:12, 182:20, 183:14, 184:15, 184:17, 184:18, 184:19, 185:3, 193:14
**job** [6] - 85:17, 85:19, 141:24, 178:7, 203:13, 210:2
**John** [5] - 1:9, 49:4, 56:25, 89:14, 192:25
**join** [1] - 138:8
**joined** [3] - 93:8, 93:10, 150:6
**joint** [6] - 10:20, 83:21, 103:15, 126:1, 140:15, 206:17
**Joseph** [3] - 27:10, 30:16, 45:13
**JR** [3] - 1:14, 2:5, 136:23
**Judge** [59] - 3:12, 3:20, 4:12, 6:17, 7:24, 9:11, 10:1, 10:3, 14:11, 14:14, 14:23, 22:2, 22:16, 28:11, 29:4, 50:2, 64:22, 71:1, 82:21, 97:10, 112:25, 116:20, 117:5, 117:12, 118:5, 122:18, 123:3, 127:11, 132:25, 133:2, 133:13, 135:21, 136:9, 147:21, 147:23, 148:3, 158:12, 162:8, 170:20, 172:18, 173:10, 175:4, 179:6, 179:8, 181:2, 181:13, 181:20, 183:9, 183:11, 184:13,

185:7, 191:17,
198:18, 201:12,
204:10, 207:10,
212:11, 237:19, 238:9
  **JUDGE** [1] - 1:11
  **judge** [12] - 8:20,
117:8, 119:1, 119:8,
132:17, 145:22,
146:16, 157:24,
181:25, 182:3,
205:18, 234:21
  **Judge's** [1] - 118:15
  **judgemental** [1] -
43:25
  **judgment** [3] - 182:1,
182:5, 201:25
  **judgments** [1] -
109:23
  **judicial** [3] - 82:17,
83:12, 85:5
  **July** [6] - 9:7, 60:24,
61:15, 114:21, 115:3,
115:7
  **June** [29] - 5:4, 24:1,
24:2, 72:20, 74:6,
74:17, 74:20, 103:22,
104:24, 107:12,
113:7, 113:18,
114:14, 157:14,
160:12, 160:14,
160:15, 176:20,
177:6, 195:15,
211:16, 215:19,
215:20, 217:9, 220:5,
220:13, 220:15,
225:15, 227:6
  **jurisdiction** [7] -
129:15, 164:1, 164:3,
201:6, 201:7, 227:16,
233:25
  **jurisdictional** [3] -
200:20, 201:1, 233:23
  **jurors** [2] - 128:25,
130:18
  **jury** [63] - 3:11, 4:9,
8:25, 9:14, 10:18,
13:24, 22:15, 24:23,
25:15, 36:14, 38:14,
39:12, 44:19, 64:9,
65:6, 65:13, 76:21,
89:1, 92:21, 95:19,
95:21, 111:17,
111:20, 114:9,
117:18, 119:19,
120:19, 121:14,
121:17, 121:25,
122:16, 123:16,
123:20, 132:8, 139:4,
139:25, 144:25,
149:4, 152:5, 152:17,

161:7, 166:25,
171:20, 180:15,
183:20, 183:23,
183:25, 184:4,
185:17, 185:19,
187:10, 188:4, 193:7,
194:25, 202:10,
203:9, 204:20, 206:2,
217:14, 237:25,
238:1, 238:8
  **Jury** [3] - 181:11
  **jury's** [3] - 5:4, 11:9,
110:21

## K

  **keep** [4] - 129:9,
179:11, 208:14,
224:24
  **keeping** [3] - 210:20,
210:23, 214:10
  **keeps** [1] - 118:9
  **Kelly** [4] - 194:2,
194:7, 195:3, 195:8
  **Kemp** [1] - 89:11
  **kept** [1] - 140:6
  **Kernick** [2] - 183:16,
183:22
  **Kerr** [4] - 26:17,
28:1, 30:6, 229:23
  **Kevin** [2] - 162:12,
200:11
  **key** [1] - 73:8
  **kind** [7] - 14:10,
15:4, 155:20, 195:18,
208:1, 210:5, 214:8
  **kindly** [1] - 15:23
  **kinds** [4] - 155:6,
174:12, 174:25,
175:11
  **Klum** [2] - 38:20,
39:11
  **knowledge** [5] -
111:16, 172:6,
187:20, 223:4, 231:18
  **known** [3] - 47:7,
113:6, 133:18
  **knows** [1] - 13:24
  **Kroener** [3] - 155:8,
155:9, 155:19
  **KUGLER** [1] - 1:11

## L

  **labor** [1] - 124:20
  **lack** [1] - 187:2
  **lacked** [1] - 214:6
  **lacking** [1] - 34:3
  **ladies** [1] - 64:5,

122:3, 181:7, 237:21,
238:4
  **land** [5] - 53:3, 62:2,
164:4, 171:14, 174:19
  **lands** [1] - 164:10
  **language** [10] -
11:15, 11:22, 180:10,
180:16, 182:6,
189:14, 206:13,
206:20, 206:22
  **large** [1] - 131:11
  **larger** [1] - 9:20
  **largest** [1] - 68:18
  **Larry** [1] - 45:7
  **last** [24] - 11:7,
20:12, 36:21, 40:15,
76:22, 95:21, 103:17,
104:20, 122:3,
127:16, 135:1,
148:17, 181:1,
183:25, 196:16,
221:12, 221:14,
221:22, 228:18,
228:19, 228:20,
228:25, 229:6, 229:8
  **lastly** [2] - 17:19,
128:12
  **late** [2] - 74:6, 234:11
  **latter** [1] - 19:23
  **law** [34] - 25:23,
25:25, 32:9, 32:13,
32:22, 33:2, 33:5,
37:3, 43:5, 101:10,
119:9, 122:6, 131:24,
132:2, 132:4, 134:20,
149:6, 150:4, 150:7,
152:22, 152:24,
182:1, 182:20,
183:13, 184:13,
184:15, 193:8,
193:14, 202:13,
209:1, 209:8, 216:18,
224:10, 230:9
  **Law** [4] - 38:5, 38:10,
38:11, 150:5
  **lawful** [1] - 194:19
  **Lawn** [1] - 184:25
  **Lawn-A-Mat** [1] -
184:25
  **Lawrence** [1] - 169:4
  **laws** [4] - 149:23,
221:9, 222:3, 225:19
  **lawsuit** [7] - 5:18,
7:1, 13:1, 13:19,
40:20, 160:13, 160:15
  **lawsuits** [6] - 7:10,
92:2, 92:4, 92:15,
93:18, 227:22
  **Lawton** [1] - 183:16
  **lawyer** [27] - 10:15,

36:12, 36:16, 36:17,
36:18, 39:20, 40:9,
48:7, 48:8, 96:21,
115:12, 124:15,
130:13, 150:2, 169:9,
193:18, 198:12,
218:25, 219:2, 219:4,
223:22, 224:12,
224:17, 233:10,
233:20
  **lawyers** [52] - 36:23,
37:2, 70:7, 95:12,
95:13, 95:22, 96:2,
96:4, 96:15, 96:19,
96:20, 96:24, 97:19,
97:20, 97:23, 98:7,
98:9, 116:5, 134:24,
141:17, 155:16,
162:6, 162:11,
198:16, 199:8,
199:23, 203:5,
203:22, 206:4, 218:1,
219:8, 226:2, 230:2,
230:13, 231:1, 232:8,
232:13, 233:8,
234:12, 235:5,
235:19, 235:25,
237:8, 237:9, 237:14
  **laymen** [1] - 180:20
  **lead** [1] - 43:14
  **leading** [18] - 116:17,
116:18, 127:10,
127:11, 157:24,
157:25, 170:3,
172:18, 172:19,
174:14, 179:6, 179:9,
179:11, 189:24,
191:16, 198:19,
198:22, 201:11
  **learn** [4] - 150:24,
164:9, 175:23, 186:22
  **learned** [5] - 160:25,
161:11, 174:21,
174:23, 177:20
  **learning** [2] - 175:22,
176:18
  **lease** [6] - 59:6,
61:16, 63:18, 192:1,
192:22, 207:5
  **leaseholds** [1] - 53:1
  **leases** [19] - 10:20,
11:10, 11:12, 31:20,
51:25, 52:3, 52:11,
61:1, 61:10, 62:12,
62:22, 63:12, 63:22,
75:11, 83:21, 126:1,
195:6, 206:17, 207:3
  **leasing** [1] - 159:12
  **least** [10] - 26:14,
49:7, 64:23, 110:11,

120:5, 131:13,
140:16, 159:19,
189:22, 216:24
  **leave** [2] - 9:18,
196:13
  **leaves** [4] - 64:9,
122:16, 238:8, 238:10
  **Leaves** [1] - 181:11
  **leaving** [1] - 144:2,
151:20
  **led** [3] - 100:22,
109:23, 159:8
  **Lee** [3] - 162:12,
200:11, 201:21,
201:25
  **left** [18] - 6:15, 7:9,
15:17, 16:23, 95:10,
102:7, 115:2, 144:9,
147:5, 147:7, 147:14,
152:19, 160:10,
168:16, 196:3, 196:4,
225:14, 227:2
  **left-hand** [1] - 15:17
  **legal** [26] - 6:12,
26:1, 26:15, 32:24,
33:3, 36:4, 40:11,
40:15, 43:5, 47:4,
78:5, 78:13, 131:24,
132:5, 133:17, 152:1,
165:10, 203:8,
203:23, 222:2, 223:9,
224:2, 224:4, 224:5,
224:11, 231:24
  **legalese** [1] - 190:9
  **legally** [1] - 212:2
  **legislative** [3] - 77:4,
77:7, 208:2
  **LEMING** [2] - 1:17,
3:7
  **length** [4] - 10:25,
52:1, 166:20, 166:22
  **less** [7] - 76:14,
142:16, 176:23,
181:20, 195:20,
216:7, 231:12
  **lessened** [1] -
160:14
  **lessors** [1] - 164:5
  **letter** [22] - 7:22, 8:7,
9:4, 9:6, 9:7, 39:24,
40:2, 65:8, 118:13,
118:14, 155:19,
162:25, 163:11,
169:4, 169:19,
177:20, 186:3, 186:8,
186:16, 195:3, 195:13
  **letter's** [1] - 40:6
  **letters** [4] - 78:23,
79:2, 102:16, 213:8
  **level** [5] - 161:25,

169:20, 169:21, 201:23, 233:24

**levels** [3] - 180:8, 186:11, 195:20

**leverage** [1] - 73:8

**Lewis** [1] - 26:22, 30:8, 55:6, 57:5, 229:24

**liability** [15] - 31:14, 55:18, 56:1, 56:2, 56:6, 56:8, 56:9, 58:4, 58:7, 167:7, 167:17, 167:24, 168:8, 172:13, 207:5

**liable** [1] - 44:19

**licensing** [1] - 169:5

**lie** [1] - 86:20

**Lightening** [1] - 185:1

**likely** [2] - 43:25, 101:11

**limit** [4] - 104:1, 115:15, 192:12, 192:13

**limitations** [1] - 165:11

**limited** [21] - 31:14, 34:5, 55:18, 55:22, 56:1, 56:2, 56:6, 56:9, 58:4, 58:7, 145:23, 146:17, 167:7, 167:17, 167:24, 168:8, 172:13, 189:20, 190:4, 194:18, 207:4

**line** [5] - 16:5, 17:4, 17:12, 20:22, 54:18

**lines** [6] - 126:18, 126:22, 126:25, 131:16, 133:24, 134:3

**liquidity** [1] - 210:1

**list** [5] - 7:17, 118:11, 128:20, 217:23, 218:1

**lists** [1] - 142:20

**litigating** [1] - 206:5

**Litigation** [39] - 10:24, 11:4, 11:11, 25:5, 30:22, 30:25, 33:13, 34:9, 34:12, 34:14, 35:19, 35:22, 37:8, 38:8, 39:5, 40:2, 40:5, 40:17, 42:14, 44:7, 45:4, 45:23, 48:4, 85:22, 86:3, 128:16, 130:13, 176:14, 224:25, 226:8, 226:16, 226:19, 226:22, 226:24, 227:11, 227:19, 228:24,

231:9, 236:23

**litigation** [9] - 13:7, 13:9, 13:16, 33:16, 39:3, 91:15, 161:5, 201:23, 202:12

**LLC** [6] - 1:6, 55:19, 58:11, 58:13, 58:15, 171:2

**Lloyd** [6] - 25:4, 25:15, 30:22, 176:15, 227:12, 229:24

**LLP** [2] - 1:16, 35:12

**Loan** [1] - 208:23

**loans** [6] - 16:8, 16:21, 19:14, 19:17, 76:25, 77:5

**located** [2] - 167:23, 172:1

**locating** [3] - 57:11, 57:14, 58:23

**location** [7] - 58:8, 88:14, 167:3, 167:22, 172:4, 172:25, 187:21

**locations** [3] - 13:25, 52:4, 130:4

**logically** [1] - 102:23

**look** [39] - 8:9, 9:2, 11:14, 16:19, 19:19, 19:22, 21:3, 41:15, 43:24, 45:8, 60:4, 79:25, 82:21, 84:7, 91:25, 113:14, 119:18, 125:12, 125:13, 126:17, 130:17, 131:1, 137:19, 138:16, 147:7, 156:13, 168:12, 170:9, 183:10, 192:14, 192:20, 192:21, 207:8, 214:3, 214:21, 217:10, 218:14, 226:12, 231:19

**looked** [15] - 93:23, 93:24, 114:7, 114:8, 114:11, 120:11, 142:22, 168:1, 171:4, 174:19, 175:12, 191:23, 198:2, 211:13

**looking** [17] - 9:21, 16:3, 20:18, 65:18, 107:16, 107:21, 107:22, 127:22, 133:23, 154:8, 168:10, 195:12, 229:11, 229:12, 229:14, 229:22

**lost** [4] - 36:11, 44:13, 44:17, 144:12

**LOUIS** [1] - 1:15

**lower** [4] - 21:6, 82:9, 188:24, 227:2

**Lube** [1] - 185:1

**lunch** [13] - 64:23, 122:4, 122:11, 139:10, 139:12, 140:7, 140:17, 140:21, 144:14, 145:23, 145:24, 238:6

**luncheon** [3] - 2:14, 123:9, 123:10

**lunches** [1] - 139:7

**Lynne** [1] - 202:12

**M**

**mail** [22] - 43:1, 43:8, 45:6, 45:11, 97:2, 113:15, 113:25, 114:22, 193:17, 194:2, 194:7, 198:1, 198:9, 198:11, 198:15, 198:24, 199:7, 199:20, 200:13, 201:21, 202:9, 202:11

**mails** [12] - 45:9, 193:19, 196:24, 197:4, 197:5, 197:15, 198:6, 200:7, 200:8, 200:9, 232:7

**Maine** [1] - 139:9

**maintain** [1] - 236:14

**maintained** [1] - 165:8

**maintenance** [1] - 52:5

**major** [2] - 5:15, 102:22

**majority** [2] - 13:23, 13:25

**malicious** [2] - 183:17, 184:2

**maliciously** [1] - 184:9

**management** [19] - 46:10, 65:23, 67:1, 67:10, 91:11, 91:12, 117:18, 162:13, 169:20, 177:12, 178:17, 178:18, 180:18, 188:18, 191:3, 211:19, 212:3, 215:23, 236:23

**managing** [1] - 149:12

**Manhattan** [1] - 130:6

**manner** [1] - 43:25

**March** [15] - 20:17, 20:25, 23:16, 90:10, 100:21, 101:1, 101:15, 102:20, 116:13, 118:15, 120:2, 138:3, 138:12, 216:12

**Maria** [11] - 32:25, 33:3, 35:21, 37:9, 37:12, 37:14, 37:16, 37:19, 38:21, 39:13, 44:10

**Maria's** [2] - 39:6, 39:10

**mark** [1] - 19:13

**marked** [16] - 8:1, 54:9, 54:25, 169:3, 170:24, 173:6, 185:24, 188:12, 193:25, 194:24, 197:3, 197:21, 198:1, 200:7, 201:18, 204:9

**market** [14] - 19:7, 19:8, 19:10, 19:12, 21:24, 22:18, 73:24, 74:3, 130:6, 131:9, 131:13, 131:15, 131:21, 187:20

**marketplace** [1] - 191:12

**Markhim** [1] - 192:9

**Marlton** [1] - 13:24

**MARSHALL** [4] - 2:7, 2:8, 148:15, 148:22

**Marstan** [4] - 230:8, 230:14, 235:21, 237:15

**Masrani** [10] - 18:10, 18:17, 138:18, 139:23, 139:25, 140:20, 143:22, 144:2, 144:12, 145:2

**massive** [1] - 135:13

**Mat** [1] - 184:25

**material** [17] - 14:3, 21:21, 86:22, 87:4, 87:5, 100:11, 100:13, 100:17, 100:23, 101:2, 101:6, 101:11, 112:13, 112:19, 145:16, 145:20, 146:9

**materially** [1] - 189:4

**matter** [32] - 10:18, 11:19, 11:21, 36:24, 41:9, 43:7, 44:14, 74:4, 74:5, 85:8, 89:18, 91:25, 108:24, 109:25, 110:4, 110:5, 119:9, 119:10, 122:6, 126:7, 151:12,

167:11, 173:13, 182:1, 183:13, 187:22, 199:1, 206:5, 216:24, 227:7, 233:24, 235:4

**matters** [7] - 40:23, 79:5, 152:22, 156:2, 205:16, 214:11, 231:5

**Mayor** [1] - 89:14

**Meagher** [1] - 35:12

**mean** [33] - 11:18, 19:20, 57:14, 58:23, 59:10, 63:20, 75:17, 92:4, 94:15, 120:8, 126:21, 135:6, 140:16, 149:20, 151:24, 152:11, 162:16, 162:17, 163:7, 164:2, 166:22, 179:17, 180:20, 183:13, 187:10, 187:12, 190:8, 190:20, 190:24, 201:1, 230:25, 231:1, 231:11

**meaning** [1] - 189:22

**means** [8] - 4:21, 40:16, 163:10, 187:13, 191:1, 201:24, 206:3, 235:12

**meant** [6] - 20:23, 145:14, 171:20, 208:13, 209:6, 209:12

**meantime** [1] - 116:6

**Mechanical** [1] - 49:4

**meet** [6] - 12:12, 139:12, 141:17, 153:7, 204:3, 235:24

**meeting** [61] - 35:5, 45:9, 102:24, 114:16, 143:10, 143:24, 144:4, 145:24, 157:16, 162:4, 162:6, 162:11, 166:8, 166:11, 166:13, 166:15, 167:4, 168:16, 174:2, 176:20, 176:22, 196:6, 196:9, 196:10, 196:11, 198:7, 199:25, 203:4, 203:12, 203:21, 204:7, 217:8, 217:16, 218:12, 218:13, 218:22, 219:9, 219:16, 219:17, 219:25, 220:2, 220:6, 220:8, 220:10, 220:13, 220:14,

220:16, 220:20,
222:1, 222:6, 222:16,
229:13, 232:11,
232:20, 232:21,
232:23, 233:5, 233:7,
233:9, 233:11, 237:10
  **meetings** [24] -
96:16, 96:20, 96:23,
97:4, 145:24, 147:8,
147:9, 160:17,
160:18, 176:25,
177:4, 178:1, 178:2,
178:20, 188:5,
193:19, 197:7, 220:3,
220:7, 220:10,
220:15, 220:17,
224:25, 231:19
  **member** [15] - 25:20,
26:9, 26:17, 26:22,
27:3, 27:8, 27:12,
32:14, 32:22, 43:2,
43:3, 55:6, 147:17,
147:18, 166:25
  **members** [12] -
12:21, 26:11, 57:8,
108:10, 147:14,
147:16, 188:10,
188:18, 224:24,
227:18, 227:20, 237:7
  **memo** [15] - 45:5,
114:11, 115:12,
129:11, 129:14,
175:15, 175:17,
175:18, 188:12,
188:14, 188:20,
213:1, 213:13
  **memorandum** [3] -
42:6, 42:10, 42:16
  **memory** [2] - 143:12,
143:15
  **mens'** [1] - 181:17
  **mention** [4] - 12:16,
18:18, 46:10, 226:8
  **mentioned** [11] -
7:13, 69:7, 166:11,
170:10, 187:9,
192:24, 194:5, 195:3,
200:15, 214:23, 217:9
  **mentioning** [1] -
41:16
  **merged** [1] - 7:12
  **merger** [10] - 7:8,
7:11, 93:11, 97:7,
97:20, 97:24, 98:4,
157:21, 202:20,
227:23
  **merits** [9] - 11:15,
82:14, 85:1, 85:13,
88:3, 88:6, 109:4,
109:6, 126:6

  **Messrs** [2] - 218:18,
218:21
  **met** [9] - 96:21,
97:24, 98:1, 105:20,
161:19, 166:1,
174:13, 207:15,
235:22
  **method** [1] - 136:8
  **metropolitan** [2] -
14:1, 14:2
  **Michael** [1] - 230:8
  **microphone** [2] -
137:2, 148:20
  **mid** [2] - 12:25,
208:18
  **middle** [1] - 73:22
  **midway** [1] - 33:23
  **might** [9] - 6:14,
43:14, 44:15, 97:1,
97:2, 119:5, 156:17,
190:3, 221:24
  **mill** [4] - 163:14,
164:22, 164:24, 205:3
  **million** [38] - 13:4,
13:12, 17:3, 17:14,
19:8, 19:9, 19:10,
19:11, 46:5, 46:8,
46:9, 46:11, 62:14,
63:14, 66:2, 66:7,
66:17, 66:22, 68:22,
69:1, 94:13, 94:15,
95:5, 95:7, 96:12,
116:22, 117:3,
117:14, 117:15,
117:17, 117:19,
129:25, 135:2,
135:18, 141:21,
141:24, 205:6
  **millions** [5] - 25:25,
26:6, 111:18, 166:3,
166:6
  **mind** [5] - 164:25,
175:1, 192:7, 224:24,
229:11
  **mindset** [1] - 237:4
  **mine** [4] - 26:3,
28:17, 116:23, 181:14
  **minor** [3] - 74:2,
90:7, 166:2
  **minute** [5] - 8:5,
34:16, 94:8, 211:3
  **minutes** [29] - 45:9,
64:6, 181:18, 181:19,
181:21, 185:8,
185:12, 185:13,
185:14, 200:22,
203:4, 203:11,
203:21, 217:8,
217:10, 219:12,
220:19, 220:21,

220:23, 220:24,
221:12, 222:17,
229:13, 230:15,
231:23, 232:10,
232:16, 235:8, 237:17
  **miracle** [1] - 64:17
  **misappropriation**
- 93:5
  **mischaracterized** [1]
- 222:22, 236:8
  **misdeeds** [1] - 87:25
  **misled** [1] - 117:19
  **mismanagement** [1]
- 208:6
  **misrepresentation**
[2] - 145:20, 146:9
  **misrepresentations**
[4] - 86:23, 112:13,
112:20, 145:16
  **missing** [1] - 222:21
  **mistakes** [1] - 41:19
  **Mitchell** [1] - 1:8
  **mitigate** [1] - 180:9
  **mixed** [1] - 224:10
  **model** [4] - 18:22,
19:3, 73:11, 169:18
  **Model** [1] - 19:2
  **moment** [5] - 4:16,
57:9, 188:25, 212:10,
217:11
  **Monday** [3] - 91:9,
91:10, 91:11
  **monetary** [1] - 205:6
  **money** [35] - 7:19,
20:17, 43:6, 43:17,
47:12, 76:14, 104:13,
104:23, 105:7,
105:12, 105:13,
106:3, 106:6, 106:10,
106:12, 106:19,
108:20, 108:24,
109:11, 115:19,
116:24, 117:1,
117:16, 128:24,
129:2, 140:12,
146:14, 151:19,
151:23, 201:24,
203:11, 207:21,
207:24, 208:15,
211:12
  **moneys** [1] - 146:22
  **monies** [7] - 8:14,
46:3, 95:11, 105:22,
106:16, 111:18, 201:4
  **Montgomery** [2] -
6:7, 91:1
  **month** [4] - 9:17,
115:5, 115:6, 115:7
  **months** [10] - 10:13,
11:1, 36:23, 116:1,

227:5, 232:17,
232:19, 233:18,
234:16, 236:4
  **Moorestown** [1] -
48:1
  **moreover** [1] - 40:21
  **morning** [15] - 3:3,
3:4, 3:5, 3:6, 3:7, 4:2,
4:3, 4:14, 4:15, 91:9,
91:11, 156:22,
237:22, 238:5, 238:13
  **morphed** [1] -
227:16
  **most** [9] - 32:18,
49:9, 135:8, 139:6,
178:5, 179:15,
180:24, 181:1, 224:16
  **mostly** [1] - 5:1
  **motion** [5] - 183:12,
184:14, 185:4,
235:11, 236:1
  **motions** [3] - 38:24,
181:12, 181:14
  **move** [13] - 6:24,
8:20, 9:11, 22:15,
65:7, 116:20, 148:5,
156:2, 178:12,
182:13, 185:11,
195:11, 197:20
  **moved** [5] - 37:21,
37:24, 65:7, 87:22
  **moves** [1] - 182:1
  **moving** [4] - 14:14,
14:15, 14:17, 177:11
  **MR** [284] - 2:2, 2:2,
2:3, 2:3, 2:4, 2:4, 2:5,
2:6, 2:6, 2:7, 2:8, 2:9,
2:10, 3:4, 3:5, 3:6,
3:9, 3:10, 3:12, 3:16,
3:20, 4:1, 4:12, 6:16,
6:17, 6:20, 6:23, 6:25,
7:24, 8:3, 8:5, 8:20,
8:23, 9:4, 9:11, 9:20,
10:1, 10:3, 12:2,
12:23, 14:11, 14:13,
14:16, 14:21, 14:23,
15:1, 15:3, 15:18,
22:1, 22:4, 22:5, 22:6,
22:15, 28:7, 28:10,
28:12, 28:13, 28:15,
28:17, 28:18, 28:19,
28:20, 28:22, 28:23,
28:25, 29:1, 29:2,
29:3, 29:6, 50:2, 50:5,
60:11, 61:2, 61:3,
61:4, 61:5, 61:6, 63:1,
63:6, 63:10, 64:4,
64:12, 64:14, 64:16,
64:19, 64:22, 64:24,
65:1, 65:5, 65:16,

66:18, 69:25, 71:1,
73:7, 78:13, 79:20,
80:11, 80:19, 80:20,
88:18, 97:9, 97:11,
97:13, 99:23, 104:17,
109:24, 110:4,
112:23, 112:25,
113:1, 116:17,
116:20, 117:5, 117:8,
117:12, 117:25,
118:4, 118:7, 118:17,
118:21, 118:24,
119:1, 119:3, 119:8,
119:13, 119:18,
120:1, 120:6, 120:10,
120:15, 120:17,
120:22, 120:23,
121:3, 121:4, 121:6,
121:11, 121:13,
121:17, 121:20,
121:22, 121:25,
122:14, 122:18,
122:24, 123:1, 123:3,
123:8, 123:14,
123:15, 123:23,
127:10, 127:11,
127:15, 132:17,
132:20, 132:25,
133:2, 133:4, 133:5,
133:9, 133:13,
134:11, 134:14,
134:15, 134:22,
134:23, 135:20,
135:21, 135:24,
136:9, 136:11,
136:16, 136:25,
137:6, 140:25, 141:3,
141:4, 145:22, 146:3,
146:5, 146:6, 146:16,
146:20, 147:21,
147:23, 148:3,
148:11, 148:22,
148:24, 148:25,
154:9, 154:11, 157:3,
157:4, 157:24, 158:2,
158:3, 158:12,
158:15, 158:20,
158:24, 162:8,
162:15, 162:24,
163:3, 169:1, 169:2,
170:20, 170:22,
170:23, 172:18,
172:21, 173:2, 173:5,
173:10, 173:14,
173:16, 174:7, 175:4,
175:7, 179:6, 179:8,
179:9, 179:12, 181:2,
181:6, 181:13,
181:17, 181:20,
181:25, 182:17,
183:5, 183:9, 183:11,

183:24, 184:13, 185:7, 185:10, 185:22, 185:23, 189:23, 189:25, 190:1, 191:16, 191:20, 193:21, 193:24, 194:21, 194:23, 196:25, 197:2, 197:22, 197:25, 198:17, 198:20, 198:23, 199:3, 199:13, 200:4, 200:6, 201:11, 201:14, 201:17, 202:6, 204:10, 205:18, 207:10, 207:12, 212:11, 212:14, 234:21, 234:23, 237:19, 237:23, 238:1, 238:9, 238:15

**MS** [1] - 3:7
**multi** [1] - 54:18
**multi-hundred** [1] - 54:18
**multiple** [5] - 18:3, 18:5, 68:2, 72:24
**multiples** [1] - 18:7
**must** [7] - 44:2, 72:11, 145:13, 147:13, 150:3, 158:5, 186:11

## N

**NA** [5] - 114:17, 135:3, 137:21, 213:3, 215:9
**nail** [1] - 120:3
**name** [14] - 39:22, 41:16, 53:16, 58:2, 75:18, 75:22, 138:9, 148:17, 149:4, 149:5, 151:1, 162:12, 174:22, 212:25
**named** [4] - 92:20, 167:20, 167:22, 193:8
**namely** [1] - 40:24
**names** [4] - 53:17, 58:3, 58:16
**Nami** [1] - 1:25
**National** [1] - 55:10
**nature** [2] - 166:20, 190:20
**near** [2] - 126:10, 127:22
**necessary** [11] - 86:18, 153:22, 182:24, 184:2, 222:2,

224:6, 225:6, 226:3, 232:18, 233:19, 236:7
**necessitated** [1] - 44:22
**need** [9] - 71:20, 109:6, 120:18, 132:24, 162:12, 162:13, 185:10, 200:16, 202:1
**needed** [4] - 92:1, 132:22, 155:18, 157:16
**needs** [4] - 127:2, 127:9, 171:14, 200:20
**negative** [4] - 73:17, 87:17, 169:25, 191:10
**neglected** [1] - 4:18
**negotiate** [3] - 10:15, 76:9, 203:22
**negotiation** [1] - 76:13
**negotiations** [10] - 95:14, 95:18, 96:14, 96:19, 180:7, 180:12, 180:23, 231:5, 232:2, 232:14
**net** [4] - 16:23, 17:1, 17:3, 210:19
**never** [24] - 26:11, 45:11, 52:19, 53:12, 73:18, 80:12, 93:22, 98:7, 98:9, 111:22, 130:25, 131:14, 139:16, 143:6, 143:7, 143:11, 144:11, 147:5, 147:6, 147:9, 147:10, 147:19, 157:18, 205:20
**nevertheless** [1] - 186:25
**new** [8] - 57:15, 58:24, 59:4, 73:12, 73:16, 130:5, 169:13, 191:3
**NEW** [1] - 1:1
**New** [23] - 1:9, 14:1, 14:2, 38:6, 39:8, 39:12, 39:13, 134:19, 139:9, 139:12, 182:20, 183:14, 184:14, 184:17, 184:18, 184:19, 185:3, 193:14, 202:13, 223:22, 224:12, 230:5
**newspapers** [1] - 23:25
**next** [23] - 5:4, 5:17, 7:22, 9:25, 10:2, 13:21, 18:24, 82:16,

108:10, 115:21, 122:18, 125:12, 126:10, 126:14, 130:12, 131:1, 131:23, 136:14, 136:16, 158:17, 226:9, 229:10, 230:2
**nine** [7] - 10:13, 11:1, 13:23, 13:25, 15:1, 80:25, 124:25
**nineties** [2] - 208:18, 208:20
**nobody** [1] - 11:20
**noncooperation** [1] - 34:6
**none** [8] - 12:20, 12:22, 52:24, 52:25, 54:5, 115:22, 116:7, 147:16
**noon** [1] - 202:15
**Norcross** [3] - 218:21, 219:9, 229:24
**normal** [3] - 74:2, 89:19, 164:21
**normally** [1] - 163:19
**North** [3] - 138:9, 138:19, 140:23
**note** [1] - 45:7
**noted** [6] - 33:19, 33:20, 33:23, 33:25, 44:9, 131:10
**notes** [1] - 45:4
**nothing** [21] - 24:14, 24:17, 50:8, 94:14, 105:16, 112:23, 114:5, 114:11, 115:12, 116:10, 117:10, 136:9, 144:17, 145:5, 145:17, 147:17, 147:21, 183:9, 185:7, 205:19, 226:1
**notice** [5] - 44:18, 125:16, 165:4, 213:5
**notices** [1] - 162:21
**November** [19] - 10:8, 12:25, 49:6, 71:4, 76:17, 80:6, 80:17, 96:8, 109:2, 113:7, 125:13, 160:25, 161:1, 197:8, 198:7, 198:8, 229:13, 234:11
**nowhere** [1] - 106:13
**NUMBER** [1] - 1:4
**number** [36] - 15:10, 17:22, 17:23, 18:4, 19:19, 19:21, 19:22, 22:10, 23:3, 26:18, 28:12, 28:24, 43:10,

51:25, 52:11, 72:19, 77:1, 91:2, 114:22, 117:9, 129:4, 131:11, 142:8, 155:14, 157:6, 187:9, 189:20, 190:4, 191:1, 191:24, 193:9, 194:8, 204:20
**numbered** [1] - 113:23
**numbers** [6] - 20:18, 22:18, 28:3, 141:19, 143:20
**numeral** [1] - 188:24
**Numeral** [1] - 100:2
**numerous** [1] - 130:21
**Nunner** [1] - 202:12

## O

**oath** [7] - 79:8, 100:16, 100:20, 100:25, 101:9, 109:17, 170:6
**object** [7] - 97:9, 109:24, 157:24, 172:18, 189:23, 198:17, 205:18
**objection** [22] - 3:16, 6:16, 6:18, 6:21, 8:22, 8:23, 78:13, 116:17, 117:8, 117:24, 121:25, 122:2, 127:10, 132:17, 134:22, 158:12, 162:8, 173:11, 179:6, 191:16, 201:11
**objections** [1] - 118:9
**objective** [1] - 21:21
**obligated** [2] - 86:17, 203:16
**obligation** [10] - 107:6, 108:21, 111:22, 118:10, 119:23, 119:25, 121:1, 122:9, 146:9, 182:23
**obligations** [2] - 151:21, 209:12
**observations** [1] - 210:13
**observed** [1] - 196:9
**obtain** [1] - 34:4
**obtained** [1] - 65:22
**obviate** [1] - 180:9
**obvious** [1] - 15:11
**obviously** [6] - 70:20, 73:19, 75:11,

107:22, 205:5, 235:3
**OCC** [99] - 5:5, 5:13, 7:5, 10:5, 11:19, 21:19, 22:20, 32:2, 42:17, 43:24, 45:5, 51:21, 62:19, 63:18, 69:8, 69:18, 69:20, 70:3, 70:13, 70:19, 71:4, 71:7, 72:5, 73:16, 74:7, 74:8, 74:14, 80:12, 83:7, 84:7, 92:16, 96:21, 99:2, 109:3, 113:19, 125:7, 150:6, 150:8, 150:23, 161:19, 161:21, 162:6, 162:25, 163:8, 164:20, 166:1, 166:9, 166:16, 168:6, 169:13, 171:4, 171:6, 171:9, 171:13, 172:6, 174:1, 176:2, 176:10, 177:17, 177:21, 178:23, 179:3, 179:14, 180:8, 180:16, 180:22, 186:7, 186:11, 187:6, 187:7, 188:7, 188:17, 189:7, 190:5, 190:12, 192:5, 195:18, 195:20, 195:22, 197:5, 199:8, 199:23, 200:11, 200:16, 201:3, 201:22, 206:9, 208:8, 212:8, 212:21, 213:9, 213:14, 214:18, 214:25, 225:1, 227:14, 227:23, 233:13, 233:25
**OCC's** [13] - 73:8, 170:17, 175:1, 177:13, 180:18, 180:22, 186:25, 199:11, 199:22, 200:1, 201:6, 201:7, 207:7
**occasion** [2] - 69:7, 106:23
**occasions** [3] - 139:6, 139:17, 140:10
**occur** [1] - 196:2
**occurred** [2] - 75:8, 189:22
**October** [9] - 3:13, 18:13, 37:11, 96:7, 138:3, 194:3, 216:10, 232:22, 233:2
**odd** [1] - 117:14
**odds** [1] - 225:22

**OF** [16] - 1:1, 2:2, 2:3, 2:4, 2:5, 2:6, 2:8, 2:9, 4:1, 22:5, 113:1, 135:24, 136:25, 141:3, 148:22, 207:12
**OFF** [1] - 148:9
**off-site** [1] - 110:12
**OFF-THE-RECORD** [1] - 148:9
**offense** [1] - 189:16
**offered** [3] - 109:1, 162:9, 205:20
**office** [7] - 13:24, 37:15, 84:15, 107:5, 130:7, 144:17, 144:18
**Office** [4] - 149:11, 149:14, 150:3, 150:16
**officer** [2] - 89:12, 90:6
**officers** [3] - 102:21, 102:22, 218:9
**official** [2] - 89:9, 138:9
**offset** [2] - 13:4, 43:20
**often** [2] - 138:23, 143:14
**oftentime** [1] - 151:20
**oftentimes** [2] - 171:22, 171:24
**old** [1] - 137:12
**Oliver** [1] - 39:22
**omission** [2] - 100:8, 100:22
**once** [13] - 49:12, 69:10, 96:21, 140:14, 173:17, 174:4, 176:10, 191:7, 195:23, 195:24, 198:11, 202:15, 236:8
**one** [124] - 4:23, 5:15, 6:7, 7:12, 8:8, 9:11, 9:17, 13:24, 15:9, 17:14, 19:6, 26:5, 26:11, 29:3, 32:4, 32:11, 32:14, 34:17, 37:2, 51:17, 51:19, 55:22, 55:24, 56:5, 56:15, 57:4, 58:4, 58:13, 67:8, 69:7, 70:14, 70:24, 75:7, 75:23, 76:6, 76:7, 78:7, 81:8, 81:10, 81:23, 84:19, 87:1, 90:8, 90:13, 92:11, 92:12, 93:17, 93:18, 99:10, 103:25, 106:23, 107:14, 107:18, 108:5,

110:11, 113:25, 115:5, 115:6, 117:9, 118:19, 120:7, 122:3, 125:23, 125:24, 128:3, 128:4, 135:7, 139:14, 139:17, 140:10, 140:15, 146:7, 147:1, 151:8, 155:9, 159:14, 160:22, 160:24, 162:6, 162:11, 163:21, 165:5, 167:4, 170:11, 171:1, 171:3, 173:23, 174:9, 174:13, 177:6, 178:5, 179:15, 179:24, 180:24, 182:16, 183:4, 183:6, 189:7, 189:9, 189:10, 189:12, 189:22, 192:2, 193:11, 194:7, 195:16, 196:17, 198:2, 198:7, 198:8, 207:22, 211:22, 213:9, 213:10, 220:5, 220:10, 221:20, 228:8
**One** [1] - 1:9
**one-sided** [1] - 107:14
**onerous** [1] - 195:20
**ones** [6] - 55:5, 60:5, 72:1, 72:2, 72:12, 92:5
**ongoing** [2] - 115:24, 198:16
**onset** [1] - 212:21
**open** [5] - 3:1, 65:3, 67:1, 126:15, 136:12
**opened** [1] - 130:1
**opening** [1] - 130:4
**openings** [1] - 23:17
**operate** [1] - 179:23
**operating** [2] - 63:12, 112:5
**operation** [1] - 112:4
**operational** [3] - 180:9, 180:17, 189:11
**operationally** [2] - 179:19, 179:22
**operations** [2] - 112:9, 179:20
**opinion** [27] - 32:25, 33:3, 43:5, 78:15, 92:11, 99:6, 99:17, 110:5, 118:18, 119:1, 119:7, 120:2, 131:24, 132:5, 132:9, 132:14, 132:15, 132:18, 132:21, 133:17, 134:16, 205:21,

222:2, 236:5, 236:25
**opinions** [1] - 129:12
**opportunity** [2] - 75:10, 170:7
**opposed** [1] - 68:2
**option** [2] - 155:2, 156:19
**options** [14] - 29:24, 30:2, 30:5, 30:6, 30:8, 30:11, 30:14, 30:16, 32:18, 135:25, 136:2, 136:3, 144:10, 155:4
**oranges** [1] - 68:7
**Order** [24] - 5:5, 69:18, 70:19, 70:23, 71:4, 72:16, 72:22, 74:18, 74:20, 80:6, 80:17, 80:21, 85:7, 109:3, 109:7, 150:22, 163:20, 174:14, 179:4, 179:19, 179:19, 180:3, 204:9, 204:19
**order** [70] - 10:5, 10:8, 10:16, 10:19, 11:14, 12:1, 12:7, 12:16, 12:17, 12:23, 71:7, 72:9, 72:14, 72:17, 73:2, 76:10, 77:16, 77:23, 80:17, 81:1, 82:8, 82:16, 82:18, 82:22, 82:24, 83:1, 83:5, 84:20, 85:6, 93:23, 93:24, 103:15, 111:17, 112:20, 125:13, 147:3, 149:22, 150:2, 151:11, 160:11, 186:17, 188:17, 189:8, 189:10, 189:13, 190:7, 190:9, 190:12, 190:14, 190:16, 190:20, 191:14, 191:21, 194:6, 195:12, 195:15, 195:18, 196:21, 199:10, 204:22, 204:24, 205:3, 205:8, 205:19, 211:16, 211:18, 211:21, 231:5, 238:6
**Orders** [1] - 72:20
**orders** [6] - 5:10, 131:12, 204:21, 205:1, 205:17, 205:23
**organic** [2] - 163:5, 163:7
**original** [3] - 26:20, 27:3, 27:12
**originally** [1] - 135:8

**Ortho** [1] - 184:16
**otherwise** [4] - 53:7, 87:7, 163:25, 208:9
**outfitted** [1] - 130:2
**outset** [4] - 66:13, 196:20, 202:18, 223:2
**outside** [8] - 36:23, 41:8, 72:24, 128:4, 134:25, 164:8, 201:6, 202:12
**outstanding** [4] - 5:16, 17:23, 49:15, 140:3
**overall** [3] - 129:18, 171:15, 234:9
**overpaid** [1] - 129:5
**overruled** [2] - 158:22, 173:15
**oversight** [2] - 52:22, 52:23
**owe** [1] - 49:23
**owed** [3] - 8:14, 106:7, 147:19
**owes** [1] - 106:4
**own** [10] - 81:4, 81:15, 186:9, 186:19, 186:22, 186:24, 207:6, 210:12, 237:6, 237:7
**owner** [1] - 172:14
**owners** [1] - 75:23
**ownership** [5] - 56:10, 56:12, 62:2, 68:12, 174:23
**ownerships** [1] - 56:16

**P**

**P-19** [1] - 190:18
**P-23** [1] - 217:7
**P-24** [1] - 28:10
**P-28** [3] - 54:9, 54:25, 61:20
**P-29** [1] - 61:20
**P-38** [1] - 229:11
**P-50** [1] - 61:5
**P-51** [1] - 212:14
**P-53** [3] - 10:2, 125:12, 204:9
**P-54** [1] - 80:18
**P-58** [1] - 164:14
**P-59** [1] - 163:1
**P-63** [1] - 7:22
**P-64** [2] - 198:1, 198:10
**P-71** [5] - 60:9, 60:11, 60:12, 61:2, 65:6

**P-74** [2] - 3:13, 18:9
**P-75** [7] - 14:14, 14:17, 15:15, 15:16, 18:24, 20:12
**P-8** [1] - 127:16
**P-9** [3] - 126:17, 133:22, 226:12
**padding** [1] - 211:11
**page** [64] - 8:7, 9:19, 10:19, 12:1, 12:23, 15:15, 15:16, 17:19, 18:24, 20:12, 28:12, 28:13, 28:14, 28:23, 29:7, 32:4, 33:16, 33:18, 33:22, 34:14, 34:16, 35:4, 40:5, 41:15, 42:14, 45:6, 49:3, 54:18, 60:12, 60:16, 63:7, 65:21, 70:2, 80:17, 80:25, 83:14, 113:25, 125:12, 125:14, 125:23, 125:24, 126:18, 127:21, 127:22, 128:12, 128:21, 130:17, 130:19, 131:1, 133:22, 133:23, 134:3, 188:23, 194:7, 204:16, 205:14, 213:12, 214:21, 231:21
**pages** [1] - 212:17
**paid** [49] - 13:1, 13:5, 27:17, 27:18, 27:19, 40:11, 40:16, 44:13, 46:2, 46:5, 46:8, 49:14, 51:5, 53:2, 66:7, 66:16, 66:21, 67:18, 76:14, 86:16, 99:16, 112:21, 129:8, 131:13, 135:11, 140:3, 140:5, 140:8, 141:13, 141:15, 141:18, 141:24, 142:7, 142:10, 142:12, 142:14, 143:9, 147:18, 154:4, 154:19, 159:24, 160:11, 193:15, 197:18, 225:11, 225:17, 232:19, 234:14
**paper** [3] - 101:21, 101:25, 221:23
**paperwork** [1] - 56:23
**Parachute** [6] - 78:1, 78:11, 78:18, 105:20, 105:23, 207:18

**parachute** [13] -
151:14, 152:10,
155:25, 157:13,
191:4, 191:6, 199:12,
222:8, 222:11,
223:17, 223:21,
224:7, 234:2
**Parachutes** [1] -
79:4
**paragraph** [41] -
9:19, 10:19, 11:14,
13:3, 33:19, 61:7,
63:4, 63:11, 65:22,
65:24, 66:4, 66:16,
73:7, 74:6, 80:9,
80:11, 80:12, 82:9,
82:16, 82:24, 83:11,
83:16, 100:2, 115:14,
118:13, 125:25,
126:8, 128:12,
128:13, 128:16,
128:24, 131:1, 131:4,
133:24, 134:3,
217:20, 217:23,
218:1, 230:2, 231:22
**paragraphs** [4] - 9:5,
70:12, 113:23, 114:7
**paraphrasing** [1] -
10:20
**parcel** [1] - 172:11
**parcels** [3] - 51:3,
51:22, 52:1
**pardon** [2] - 142:2,
143:18
**parking** [3] - 172:4,
172:10, 173:25
**Part** [21] - 98:17,
99:4, 99:12, 99:24,
102:18, 102:25,
111:16, 151:13,
152:3, 152:7, 153:18,
154:10, 154:12,
157:20, 158:4,
158:25, 159:4,
159:20, 206:23,
215:17
**part** [48] - 35:7,
37:11, 53:3, 54:20,
59:7, 61:12, 61:13,
82:11, 84:4, 84:21,
84:23, 93:12, 94:5,
98:12, 98:15, 100:1,
101:23, 106:8,
109:13, 112:8,
117:16, 118:11,
133:2, 134:1, 135:25,
152:14, 154:12,
158:4, 158:25, 161:2,
171:23, 176:3, 178:6,
198:15, 203:13,

207:17, 211:18,
211:19, 215:16,
216:17, 216:18,
219:17, 219:21,
224:11, 229:16,
229:19, 234:10, 235:3
**participate** [2] -
61:16, 187:14
**participated** [1] -
224:25
**participating** [1] -
187:25
**participation** [1] -
187:2
**particular** [9] - 16:3,
166:9, 170:14,
171:12, 173:20,
174:13, 187:1, 192:7,
203:22
**particularly** [4] -
153:1, 167:2, 184:3,
187:23
**parties** [9] - 40:24,
75:5, 119:21, 163:25,
164:5, 174:18,
187:14, 187:23, 206:8
**parties'** [1] - 197:16
**partner** [16] - 25:23,
26:24, 30:8, 55:8,
57:5, 149:5, 149:8,
149:10, 149:12,
151:6, 171:23, 194:3,
195:4, 198:13,
198:14, 202:12
**partners** [2] - 56:18,
56:25
**partnership** [1] -
55:6
**parts** [9] - 32:3,
128:9, 133:11,
133:13, 154:13,
155:14, 205:25,
224:13, 224:15
**party** [29] - 12:11,
31:4, 51:4, 75:11,
75:12, 75:15, 98:16,
98:20, 98:24, 99:1,
99:2, 99:5, 99:12,
105:8, 106:7, 106:19,
107:16, 107:23,
112:19, 114:5,
118:22, 119:20,
154:5, 156:6, 156:9,
158:5, 164:2, 187:13,
190:11
**passed** [7] - 39:22,
89:7, 157:21, 208:18,
209:1, 209:2, 209:8
**past** [6] - 13:19,
43:18, 46:12, 137:9,

137:14, 192:19
**path** [1] - 143:14
**pattern** [1] - 174:6
**pause** [6] - 4:7, 63:3,
63:9, 65:11, 88:19,
238:12
**pay** [23] - 6:12, 8:14,
13:3, 34:11, 44:16,
44:23, 49:11, 109:12,
111:18, 113:8,
113:12, 115:4, 116:6,
135:10, 135:16,
146:14, 146:21,
146:25, 147:3,
147:20, 208:7, 236:2,
237:12
**Pay** [2] - 88:14, 91:15
**paying** [3] - 140:1,
152:20, 171:13
**payment** [18] - 6:2,
8:13, 13:11, 46:18,
95:23, 105:15,
105:22, 147:4,
147:12, 182:19,
182:20, 200:17,
200:19, 203:16,
205:6, 214:6, 232:4,
233:15
**payments** [32] - 9:15,
9:17, 9:21, 78:12,
78:19, 78:20, 79:12,
79:15, 97:24, 98:4,
126:14, 139:2,
151:14, 152:2, 153:6,
153:8, 153:10,
153:15, 154:1, 154:3,
154:5, 154:14,
154:18, 154:21,
155:19, 155:21,
157:13, 191:6, 197:9,
232:15, 233:23,
235:15
**pays** [1] - 43:9
**peep** [1] - 115:9
**peer** [1] - 67:23
**penalties** [1] -
112:15
**penalty** [2] - 191:12,
195:19
**pendency** [1] -
165:10
**pending** [3] - 168:12,
168:15, 168:24
**Pennsylvania** [2] -
81:13, 91:2
**people** [27] - 7:19,
20:17, 27:16, 31:3,
31:10, 32:11, 52:7,
60:3, 67:18, 71:25,
76:3, 89:19, 128:20,

141:18, 153:17,
157:6, 164:8, 170:3,
179:21, 208:6,
208:14, 209:2, 209:9,
224:18, 227:14,
228:8, 237:2
**per** [3] - 17:20,
17:21, 20:2
**percent** [22] - 4:25,
15:10, 16:6, 16:22,
17:5, 17:16, 17:25,
19:17, 19:18, 20:21,
21:2, 21:12, 21:14,
31:24, 56:12, 120:12,
120:15, 135:12,
136:2, 194:17, 210:9
**percentage** [1] -
56:13
**perception** [1] -
60:21
**perform** [1] - 131:14
**performance** [1] -
184:3
**performed** [4] - 48:5,
128:2, 130:22, 131:8
**perhaps** [2] - 139:15,
141:23
**period** [20] - 5:1,
21:10, 104:10,
115:25, 126:15,
129:24, 130:1, 150:8,
160:14, 169:10,
170:2, 176:19, 177:1,
177:6, 177:25,
178:13, 178:16,
197:8, 209:20, 220:4
**permissible** [1] -
155:24
**permit** [3] - 146:4,
146:18, 183:19
**permits** [1] - 99:11
**permitted** [1] -
112:12
**person** [7] - 41:22,
59:23, 81:12, 123:5,
167:1, 193:17, 199:9
**personal** [3] - 35:10,
130:22, 210:13
**personally** [1] -
89:18
**personnel** [1] - 128:6
**persons** [3] - 18:10,
18:17, 129:6
**perspective** [3] -
178:10, 198:25,
233:23
**Pharmaceutical** [1] -
184:16
**Pharmacy** [1] -
171:17

**phenomenon** [1] -
120:11
**Philadelphia** [9] -
5:21, 6:3, 14:1, 88:14,
89:12, 91:15, 123:25,
124:21, 132:2
**phone** [6] - 88:15,
124:10, 124:11,
125:5, 125:10, 160:23
**phrase** [6] - 14:3,
76:18, 83:25, 107:2,
178:24, 208:10
**phrasing** [1] - 95:20
**picked** [1] - 88:13
**picking** [1] - 174:4
**piece** [3] - 101:21,
101:25, 221:22
**pieces** [1] - 195:16
**Pierce** [1] - 184:16
**pile** [4] - 111:5,
111:8, 111:11, 111:13
**piracy** [1] - 117:17
**place** [9] - 47:22,
77:17, 106:3, 108:20,
139:13, 154:6, 197:8,
202:20, 231:1
**placed** [5] - 104:23,
105:13, 106:16,
106:19, 190:24
**placing** [1] - 145:6
**plainly** [1] - 116:12
**plaintiff** [1] - 148:3
**Plaintiff** [1] - 1:4
**PLAINTIFF** [7] -
1:15, 2:11, 2:12, 2:13,
3:19, 9:1, 65:10
**plaintiff's** [5] - 8:24,
18:9, 182:2, 183:12,
183:25
**plaintiffs** [3] - 93:21,
93:25, 94:2
**plan** [8] - 118:9,
154:23, 154:25,
155:2, 192:3, 192:11,
192:12, 211:25
**planning** [1] - 162:14
**plans** [3] - 59:7,
168:14, 194:5
**plate** [3] - 11:25,
205:17, 205:25
**Play** [2] - 88:14,
91:15
**play** [2] - 88:18,
182:22
**played** [2] - 89:1,
124:10
**playing** [2] - 88:7,
99:14
**Plaza** [1] - 1:9
**pleasant** [1] - 180:23

**plus** [7] - 4:23, 4:25, 5:2, 5:14, 30:1, 143:10, 227:22
**point** [25] - 14:20, 39:6, 81:3, 116:4, 123:3, 149:7, 150:13, 150:14, 151:11, 152:14, 166:2, 167:2, 168:4, 168:6, 169:18, 170:3, 170:9, 174:20, 179:3, 181:25, 182:8, 185:11, 196:2, 203:20, 214:4
**policies** [5] - 177:14, 177:15, 177:22, 211:24, 212:8
**policy** [1] - 102:23
**Pollock** [1] - 118:13
**pop** [5] - 60:11, 80:16, 99:23, 104:17, 162:24
**Porter** [4] - 149:6, 149:8, 149:13, 150:10
**portion** [5] - 60:22, 62:6, 88:24, 175:21
**portions** [2] - 221:19, 221:22
**Portland** [1] - 139:9
**position** [18] - 40:19, 86:15, 86:17, 109:21, 137:16, 140:22, 145:7, 149:17, 156:18, 159:20, 186:25, 199:11, 199:22, 200:1, 207:7, 207:9, 234:19, 236:15
**positions** [1] - 197:17
**positive** [4] - 73:21, 87:14, 169:23, 191:8
**possession** [1] - 102:7
**possible** [5] - 75:6, 161:6, 217:5, 232:8, 232:24
**post** [1] - 215:19
**posttrial** [1] - 38:24
**power** [5] - 14:19, 34:3, 34:4, 42:12, 145:4
**practical** [3] - 119:10, 119:15, 119:16
**practice** [4] - 58:17, 58:19, 122:20, 174:6
**practices** [6] - 83:18, 84:9, 84:16, 180:1, 189:4, 206:15
**pre** [2] - 16:14, 212:1
**pre-existing** [2] -

16:14, 212:1
**preamble** [1] - 114:8
**preceding** [2] - 35:6, 214:17
**precise** [3] - 133:10, 222:5, 232:6
**precisely** [2] - 127:1, 127:8
**preeminent** [1] - 224:17
**prejudgment** [1] - 38:25
**preliminary** [3] - 150:21, 166:11, 166:13
**premised** [2] - 117:16, 117:17
**preparation** [2] - 137:20, 226:21
**prepare** [4] - 113:11, 182:3, 222:18, 228:15
**prepared** [4] - 29:17, 44:20, 142:22, 182:4
**preparing** [3] - 54:11, 138:16, 228:14
**presence** [3] - 204:6, 237:8, 237:13
**present** [6] - 4:9, 65:13, 132:11, 217:12, 217:22, 235:25
**presentation** [1] - 14:20
**presented** [4] - 180:3, 224:19, 225:1, 236:16
**president** [6] - 129:12, 129:17, 138:19, 139:8, 139:19, 147:18
**press** [1] - 91:22
**pressure** [3] - 71:8, 74:7, 74:13
**pressures** [1] - 70:3
**presume** [1] - 43:19
**pretrial** [2] - 78:14, 103:15
**pretty** [4] - 141:16, 141:19, 153:16, 205:9
**prevailed** [1] - 39:13
**prevent** [2] - 207:20, 207:23
**prevents** [2] - 101:20, 101:24
**previously** [2] - 34:2, 103:14
**PREVIOUSLY** [1] - 3:24
**Price** [1] - 20:13
**price** [13] - 17:24,

20:22, 20:23, 20:24, 20:25, 21:3, 21:6, 21:14, 22:11, 22:23, 23:2, 24:2, 129:22
**priced** [1] - 49:7
**prices** [1] - 67:25
**pricing** [1] - 187:4
**primarily** [2] - 179:1, 231:3
**primary** [3] - 17:18, 162:3, 233:25
**prime** [5] - 4:23, 4:24, 4:25, 5:2, 5:3
**Principal** [1] - 75:19
**principal** [4] - 41:1, 55:10, 75:23, 227:14
**principally** [1] - 161:21
**principle** [1] - 159:14
**principles** [2] - 83:20, 206:16
**print** [1] - 70:3
**printed** [1] - 133:4
**private** [1] - 183:18
**privilege** [4] - 123:2, 123:3, 123:4, 123:6
**proactive** [1] - 177:12
**problem** [1] - 149:21
**problematic** [1] - 171:6
**problems** [3] - 186:10, 187:8, 209:25
**procedures** [4] - 177:15, 177:22, 211:24, 212:8
**proceed** [2] - 4:12, 206:9
**proceedings** [1] - 85:5
**process** [26] - 33:22, 45:18, 45:21, 67:2, 101:23, 102:18, 110:15, 110:17, 115:16, 131:12, 153:18, 155:13, 157:17, 160:3, 160:21, 161:17, 163:19, 165:19, 173:23, 175:13, 176:5, 177:11, 190:8, 197:20, 211:24, 227:17
**processing** [2] - 191:2, 195:22
**produced** [3] - 7:1, 113:15, 166:4
**produces** [1] - 135:13
**producing** [1] - 5:17

**production** [1] - 193:11
**professional** [1] - 43:19
**profit** [2] - 17:3, 209:3
**program** [1] - 214:8
**progress** [1] - 229:25
**prohibit** [1] - 99:18
**prohibited** [1] - 87:2
**project** [7] - 16:2, 46:9, 49:12, 55:22, 56:4, 131:11
**promised** [2] - 81:8, 212:4
**prompted** [3] - 91:23, 91:25, 208:24
**promptly** [2] - 153:16, 154:19
**promulgated** [2] - 151:17, 155:11
**proof** [1] - 216:8
**proofs** [1] - 182:11
**proper** [3] - 47:8, 82:22, 134:19
**properly** [3] - 46:18, 55:11, 214:4
**Properties** [1] - 55:8
**properties** [6] - 88:24, 167:25, 172:23, 194:8, 194:9, 194:10
**property** [6] - 167:15, 167:22, 171:15, 172:12, 173:25, 174:4
**propitious** [1] - 11:13
**proposal** [1] - 129:20
**proposals** [1] - 189:7
**propose** [1] - 60:21
**proposed** [13] - 42:18, 72:9, 72:15, 72:19, 72:22, 103:21, 179:3, 180:3, 186:17, 188:17, 189:8, 194:4, 200:17
**propounder** [1] - 6:18
**prosecutor** [1] - 125:4
**prospering** [3] - 210:13, 210:16, 210:19
**protocol** [3] - 169:13, 177:9, 195:21
**proud** [2] - 21:16, 109:20
**prove** [1] - 44:2

**provide** [14] - 18:23, 35:14, 35:18, 48:3, 63:23, 91:9, 99:20, 109:17, 128:6, 131:20, 153:22, 179:19, 187:22, 224:6
**provided** [13] - 32:24, 68:1, 89:23, 91:11, 103:14, 129:5, 130:2, 132:5, 150:23, 179:13, 204:4, 214:7, 235:2
**providing** [1] - 43:5
**provision** [1] - 151:16
**provisions** [3] - 85:3, 154:17, 154:20
**proxy** [17] - 54:8, 54:12, 54:24, 61:20, 61:21, 62:6, 62:9, 62:11, 62:18, 63:1, 65:18, 65:19, 66:4, 66:5, 66:15, 68:10, 69:4
**public** [2] - 32:17, 144:1
**publication** [1] - 110:11
**publicly** [1] - 46:3
**pull** [5] - 54:24, 65:19, 79:20, 80:11, 144:14
**punitive** [11] - 38:17, 44:23, 183:13, 183:15, 183:17, 183:20, 183:24, 184:15, 184:20, 184:21, 185:4
**purchases** [4] - 10:20, 83:21, 126:1, 206:17
**purest** [1] - 44:2
**purported** [1] - 174:24
**purports** [1] - 10:5
**purpose** [25] - 13:9, 31:14, 55:18, 55:25, 56:2, 56:6, 56:8, 58:4, 58:7, 85:2, 167:7, 167:13, 167:16, 167:24, 168:8, 169:8, 172:13, 175:25, 176:15, 177:3, 197:11, 198:15, 198:24, 207:4
**purposes** [5] - 11:16, 126:7, 190:22, 201:25, 217:12
**pursuant** [4] - 13:6, 82:10, 85:2, 221:1

put [19] - 33:16, 63:1, 65:8, 91:21, 105:7, 105:12, 106:6, 108:24, 115:19, 128:10, 139:11, 154:9, 157:3, 168:9, 177:10, 184:8, 195:19, 235:7, 237:4
puts [1] - 191:14
putting [2] - 191:12, 208:9

## Q

quadrant [1] - 15:17
quantify [1] - 9:21
quantum [2] - 183:1, 183:3
quarreling [1] - 183:5
quarter [1] - 227:13
quarters [1] - 20:2
question's [1] - 134:5
questioned [1] - 129:6
questioning [2] - 132:4, 133:10
questions [19] - 4:11, 14:24, 22:1, 34:25, 81:2, 95:19, 121:9, 131:23, 132:6, 135:4, 136:11, 136:17, 171:4, 172:20, 174:21, 182:25, 192:5, 218:24, 220:22
quick [2] - 44:23, 109:11
quickly [1] - 200:21
quit [2] - 144:5, 144:19
quite [4] - 160:22, 163:22, 165:2, 178:10
quote [3] - 50:25, 214:11, 214:12
quoted [3] - 40:6, 50:22, 110:11

## R

Ragone [5] - 27:1, 30:11, 45:13, 229:24
raise [2] - 136:22, 148:14
raised [5] - 134:2, 170:19, 171:4, 173:19, 175:1
rapid [1] - 73:12

rate [18] - 4:24, 4:25, 5:3, 15:8, 15:12, 16:6, 16:21, 17:4, 17:15, 18:1, 18:22, 19:13, 20:20, 21:1, 131:9, 131:14, 131:21
rated [2] - 14:7, 15:10
rates [4] - 4:23, 15:12, 16:8, 194:13
rather [1] - 46:4
rating [5] - 14:9, 14:10, 15:4, 15:6, 15:8
Raymond [1] - 39:10
re [1] - 87:19
re-review [1] - 87:19
reach [3] - 163:25, 182:24, 195:8
reached [3] - 74:8, 74:13, 106:11
react [1] - 44:15
reacting [2] - 158:18, 158:19
reaction [1] - 118:15
read [99] - 18:19, 33:13, 33:25, 34:7, 34:14, 35:16, 37:8, 37:11, 38:8, 40:8, 42:15, 42:24, 43:21, 44:4, 44:6, 44:25, 45:2, 45:15, 45:23, 45:25, 46:13, 47:9, 47:19, 47:21, 48:16, 48:18, 48:19, 48:24, 49:19, 50:9, 57:21, 60:24, 61:17, 65:25, 66:5, 67:16, 70:6, 73:13, 74:10, 79:7, 80:14, 80:23, 81:18, 82:3, 82:11, 82:18, 83:1, 83:7, 83:23, 83:25, 84:1, 84:3, 84:13, 84:14, 84:21, 84:23, 84:24, 85:11, 90:1, 92:11, 99:24, 101:22, 102:15, 110:19, 113:21, 126:19, 126:24, 127:2, 127:21, 127:24, 128:17, 128:24, 132:8, 132:21, 132:25, 133:9, 133:11, 133:12, 133:14, 133:18, 134:25, 163:2, 184:18, 188:25, 189:2, 189:5, 200:10, 213:17, 221:2,

221:10, 228:11, 228:23, 229:5, 229:8, 233:16, 235:19, 235:17
reading [18] - 39:5, 39:14, 40:12, 42:19, 42:21, 49:21, 88:9, 90:5, 101:23, 104:18, 128:7, 128:15, 132:11, 132:14, 158:8, 158:25, 200:14, 235:8
reads [1] - 13:3
ready [4] - 3:8, 65:4, 123:13, 181:23
Real [10] - 31:9, 51:24, 52:10, 53:7, 53:10, 53:12, 76:9, 76:15, 192:25, 193:5
real [24] - 10:20, 10:21, 12:17, 16:9, 16:12, 31:10, 52:4, 52:17, 55:22, 56:4, 61:1, 61:10, 83:20, 83:21, 125:25, 126:1, 159:13, 167:14, 171:13, 187:20, 206:17, 207:3
reality [1] - 117:14
realize [1] - 222:18
really [12] - 39:17, 79:24, 99:7, 103:18, 116:22, 118:4, 151:11, 175:2, 181:17, 190:12, 196:21
Realty [1] - 75:19
reason [19] - 12:13, 28:3, 74:12, 103:25, 115:18, 117:2, 156:16, 157:10, 159:11, 159:18, 163:20, 174:12, 182:13, 203:1, 205:4, 209:24, 219:12, 220:23, 232:5
reasonable [3] - 87:1, 116:14, 159:9
reasons [2] - 108:5, 119:16, 127:24, 155:10, 160:22, 203:10, 205:11, 207:22, 221:20
rebate [2] - 193:15, 194:19
recalling [1] - 192:17
receive [4] - 29:24, 32:17, 34:1
RECEIVED [6] - 2:12, 2:13, 2:14, 3:19, 9:1, 65:10

received [12] - 3:17, 8:24, 93:17, 93:21, 93:25, 128:23, 129:6, 129:7, 144:6, 144:9, 188:20, 224:22
receiving [2] - 157:9, 186:2
recent [2] - 49:9, 60:8
recently [2] - 228:16, 228:17
Recess [5] - 2:14, 2:15, 123:10, 181:22, 185:15
recess [2] - 65:2, 123:9
recipient [1] - 188:14
recite [1] - 184:7
recited [1] - 129:23
recognition [1] - 156:17
recognize [9] - 8:9, 29:10, 36:9, 144:21, 145:9, 163:4, 170:25, 175:9, 196:24
recognized [1] - 184:20
recognizing [2] - 185:3, 206:22
recollection [30] - 18:20, 40:9, 47:16, 93:21, 93:22, 110:21, 132:21, 132:23, 132:24, 140:19, 160:21, 170:19, 171:19, 171:22, 175:14, 176:3, 189:12, 191:24, 192:20, 218:11, 219:23, 221:5, 221:24, 222:5, 222:12, 222:15, 232:25, 233:3, 233:5, 233:7
recommendation [2] - 73:1, 133:24
recommendations [1] - 212:7
recommended [2] - 45:14, 134:9
record [9] - 2:16, 2:17, 24:22, 64:18, 132:19, 181:23, 182:11, 216:8, 238:3
RECORD [1] - 148:9
recording [1] - 111:6
records [5] - 5:13, 144:14, 174:19
recounting [1] - 129:11

recoup [1] - 47:12
recoverable [1] - 184:22
recross [1] - 122:22
recross-examination [1] - 122:22
recruiting [1] - 128:5
redacted [4] - 3:13, 3:15, 3:17, 221:19
REDIRECT [4] - 2:3, 2:4, 113:1, 135:24
redirect [5] - 112:24, 122:21, 123:22, 147:22, 147:23
refer [5] - 9:6, 9:9, 9:15, 73:4, 112:18, 194:8, 213:8, 220:10, 224:13, 225:24, 230:6
reference [11] - 9:22, 13:21, 45:8, 90:7, 90:8, 116:21, 117:13, 156:23, 171:17, 179:8, 214:21
referenced [5] - 40:2, 118:12, 154:14, 199:21, 232:10
references [2] - 90:5, 90:11
referred [5] - 10:8, 11:1, 54:20, 154:17, 218:4
referring [11] - 51:4, 57:19, 59:1, 59:8, 59:9, 72:10, 89:14, 95:17, 186:20, 213:13, 214:3
refers [3] - 52:3, 198:7, 207:3
reflect [2] - 22:18, 219:13
reflected [5] - 13:13, 21:24, 206:5, 206:6, 232:7
reflecting [1] - 225:24
reflection [1] - 13:14
reflects [1] - 29:25
refresh [4] - 132:22, 132:24, 171:19, 233:3
refreshes [1] - 40:8
refreshing [2] - 132:20, 221:24
refusal [1] - 73:16
refused [8] - 34:11, 35:18, 40:18, 48:8, 71:10, 71:19, 108:19, 108:24
Reg [1] - 119:20
regard [21] - 35:21,

38:14, 45:24, 46:25, 47:21, 48:14, 111:6, 150:15, 157:13, 159:23, 161:13, 167:25, 170:14, 171:20, 172:23, 172:24, 180:13, 190:20, 194:13, 195:9, 195:13

**regarding** [14] - 15:24, 35:10, 48:4, 102:18, 131:7, 132:5, 139:1, 157:1, 161:22, 182:23, 187:3, 197:8, 202:13, 232:15

**regs** [2] - 155:25, 234:2

**regular** [2] - 176:11, 176:21

**regularize** [1] - 180:17

**regulated** [3] - 74:21, 111:24, 112:3

**regulation** [6] - 78:18, 78:23, 87:2, 99:11, 214:5, 234:9

**Regulations** [2] - 151:14, 203:3

**regulations** [34] - 78:2, 78:4, 78:5, 78:11, 79:1, 79:7, 79:11, 85:25, 105:20, 149:23, 150:6, 151:17, 152:2, 153:5, 153:7, 153:15, 153:21, 155:11, 155:12, 155:18, 191:5, 203:14, 204:4, 207:19, 208:14, 209:2, 213:19, 221:9, 222:4, 222:9, 222:11, 225:12, 225:19, 235:2

**regulator** [5] - 15:12, 80:13, 125:7, 125:9, 173:12

**Regulator's** [1] - 85:20

**regulators** [74] - 15:7, 77:3, 77:11, 78:24, 79:11, 85:25, 87:7, 96:16, 96:20, 97:24, 99:3, 102:1, 102:17, 105:9, 105:15, 106:11, 107:12, 112:6, 112:9, 112:20, 122:7, 144:1, 144:16, 144:20, 144:22, 144:24, 145:3, 145:10, 145:13, 145:14,

145:16, 145:20, 146:10, 146:15, 146:23, 147:4, 147:12, 150:25, 153:14, 153:21, 153:25, 155:18, 155:20, 155:23, 156:1, 157:12, 159:8, 160:17, 160:18, 162:2, 164:7, 165:3, 166:9, 168:1, 168:16, 168:22, 170:13, 172:23, 173:7, 176:21, 178:2, 178:9, 197:12, 197:15, 197:19, 198:16, 201:8, 203:6, 203:15, 208:8, 209:1, 236:2

**Regulators** [15] - 15:8, 71:23, 77:16, 77:22, 78:6, 78:9, 79:14, 89:23, 96:25, 102:17, 104:7, 104:12, 105:19, 109:18, 112:13

**regulatory** [18] - 14:7, 97:7, 100:21, 113:9, 152:21, 153:9, 153:24, 159:24, 160:19, 191:11, 203:12, 204:3, 211:20, 213:19, 214:5, 225:7, 231:4, 237:13

**Rehl** [5] - 49:4, 49:7, 49:10, 49:23

**REHL** [1] - 49:4

**reimburse** [1] - 36:24

**related** [18] - 12:11, 31:4, 37:16, 51:4, 53:17, 58:3, 60:2, 75:4, 75:11, 75:12, 75:15, 107:16, 107:22, 152:15, 187:3, 187:23, 193:10

**relates** [6] - 77:17, 151:14, 153:18, 167:17, 195:12, 219:24

**relating** [3] - 5:21, 199:21, 231:5

**relationship** [13] - 25:9, 25:16, 36:7, 38:21, 43:13, 43:15, 60:10, 60:22, 75:4, 75:21, 76:10, 76:13, 166:20

**relationships** [3] - 44:2, 192:16, 212:1

**relative** [1] - 172:11

**relatives** [1] - 107:7

**release** [4] - 71:9, 72:5, 203:22, 203:23

**released** [1] - 23:9

**releases** [1] - 113:12

**relevance** [2] - 117:12, 158:12

**relevancy** [1] - 117:8

**relevant** [3] - 35:14, 102:9, 129:4

**reliable** [1] - 128:1

**relied** [1] - 182:12

**relief** [4] - 93:23, 94:18, 94:22, 152:6

**reluctant** [1] - 34:4

**relying** [1] - 158:15

**remained** [1] - 161:2

**remaining** [2] - 25:19, 122:21

**remedy** [1] - 182:7

**remember** [40] - 6:3, 7:9, 24:25, 35:25, 36:22, 41:3, 47:18, 52:16, 58:22, 67:14, 69:6, 93:24, 93:25, 104:3, 128:7, 131:23, 135:3, 139:6, 141:12, 144:25, 148:20, 166:16, 170:18, 174:3, 174:9, 174:12, 174:20, 175:22, 179:24, 193:16, 218:12, 218:13, 219:15, 219:16, 219:17, 219:18, 225:3, 230:18, 235:10, 236:10

**remembering** [1] - 174:9

**removal** [2] - 52:8, 72:23

**remove** [1] - 3:15

**rendered** [1] - 33:2

**rent** [1] - 62:14

**rents** [1] - 63:14

**repeat** [3] - 24:8, 97:18, 158:23

**repeatedly** [1] - 116:12

**rephrase** [4] - 71:2, 116:18, 157:25, 172:19

**rephrased** [1] - 97:16

**replied** [1] - 129:7

**report** [57] - 11:1, 16:1, 27:23, 27:25, 29:10, 32:6, 33:10, 33:13, 33:14, 33:16,

33:18, 33:22, 34:15, 34:20, 35:19, 35:22, 37:8, 38:9, 38:13, 39:3, 39:6, 40:3, 40:6, 40:7, 40:17, 41:16, 42:14, 42:15, 44:8, 44:20, 45:24, 47:21, 48:4, 48:15, 48:17, 48:24, 48:25, 53:13, 68:4, 112:9, 126:17, 127:17, 127:19, 127:21, 128:17, 128:11, 130:18, 133:22, 134:13, 142:19, 207:3, 226:9, 226:16, 226:19, 226:24, 228:11, 228:24

**Report** [4] - 67:12, 67:18, 67:22, 68:1

**reported** [8] - 10:11, 10:23, 41:24, 42:4, 91:5, 142:3, 227:8, 227:10

**reporting** [4] - 176:11, 176:18, 177:15, 227:15

**reports** [3] - 32:9, 143:6

**represent** [1] - 87:7

**representation** [6] - 152:7, 157:21, 159:1, 172:7, 176:2, 193:4

**representations** [1] - 146:12

**representative** [2] - 116:12, 170:17

**represented** [6] - 8:12, 34:2, 82:1, 152:8, 193:8, 233:8

**representing** [5] - 8:18, 8:19, 40:22, 40:23, 159:19

**reproach** [1] - 44:3

**request** [13] - 35:11, 35:14, 99:4, 99:13, 153:21, 155:13, 156:12, 156:16, 156:18, 159:20, 165:3, 235:14, 236:1

**requested** [2] - 48:3, 214:22

**Requested** [1] - 35:9

**requests** [2] - 152:10, 165:17

**require** [5] - 79:11, 153:25, 192:4, 192:19, 214:19

**required** [16] - 1:24, 32:1, 32:2, 32:9,

32:13, 74:25, 75:3, 77:7, 92:8, 105:18, 145:3, 159:4, 182:5, 192:16, 192:18, 212:3

**requirement** [1] - 182:21

**requirements** [10] - 12:4, 12:13, 102:24, 105:19, 159:14, 159:25, 203:12, 204:3, 221:8, 223:6

**requires** [4] - 114:5, 114:12, 212:3, 223:3

**requiring** [2] - 192:3, 214:12

**research** [4] - 64:7, 76:21, 122:12, 181:9

**resentment** [1] - 178:22

**reservations** [2] - 42:18, 45:10

**reserve** [2] - 201:23, 202:2

**Reserve** [23] - 62:19, 63:18, 71:24, 113:20, 118:14, 125:8, 150:17, 164:15, 166:10, 213:14, 214:18, 218:23, 219:10, 219:18, 219:25, 220:2, 220:3, 220:13, 233:14, 234:3, 234:6, 234:13, 235:14

**residence** [1] - 35:10

**resign** [3] - 145:7, 146:11, 196:17

**resignation** [5] - 23:23, 23:25, 108:14, 114:17, 144:18

**resigned** [3] - 108:2, 108:15, 196:7

**resigning** [1] - 68:15

**resisted** [1] - 40:18

**resold** [1] - 108:17

**resolution** [5] - 93:13, 95:3, 161:6, 225:14, 235:4

**resolutions** [3] - 158:20, 221:1, 226:1

**resolve** [6] - 13:11, 95:22, 104:12, 105:9, 203:11, 237:12

**resolved** [7] - 13:15, 93:12, 95:13, 96:15, 109:15, 200:20, 231:6

**resolving** [1] - 13:7

**resources** [2] - 178:13, 178:17

**respect** [25] - 85:6,

152:22, 160:17, 160:20, 160:24, 161:23, 164:19, 164:20, 165:13, 171:5, 171:11, 171:12, 173:17, 173:18, 174:6, 174:19, 176:5, 177:21, 187:16, 195:6, 197:17, 199:1, 199:11, 231:7, 236:9
**respected** [1] - 225:25
**respective** [1] - 197:16
**respectively** [1] - 19:16
**respond** [3] - 72:25, 112:6, 200:21
**responded** [4] - 41:14, 42:7, 218:24, 220:22
**respondent** [10] - 11:23, 13:5, 13:6, 82:8, 82:24, 83:17, 83:23, 85:6, 206:14, 206:19
**Respondent** [4] - 82:17, 83:17, 83:18, 206:14
**respondents** [1] - 13:3
**responding** [2] - 171:4, 195:5
**response** [10] - 35:14, 74:7, 118:11, 168:23, 180:6, 182:17, 189:17, 189:19, 190:2, 198:8
**responsibility** [7] - 42:17, 110:10, 119:3, 120:25, 227:16, 227:20, 234:9
**responsible** [7] - 101:14, 110:12, 110:13, 177:17, 209:9, 231:4, 234:1
**responsiveness** [1] - 6:17
**rest** [4] - 122:17, 126:4, 164:6, 204:18
**restaurant** [1] - 139:18
**Restaurants** [2] - 55:4, 55:5
**restriction** [1] - 12:9
**restrictions** [5] - 152:21, 180:9, 189:11, 191:11, 191:14

**rests** [1] - 148:3
**result** [4] - 7:5, 7:8, 159:12, 227:23
**resulted** [4] - 76:14, 83:22, 134:16, 206:19
**resumes** [2] - 3:23, 123:18
**retail** [3] - 129:19, 171:23, 171:24
**retain** [1] - 151:8
**retained** [4] - 102:6, 145:5, 150:14, 176:20
**retirement** [1] - 154:25
**return** [2] - 135:12, 135:13
**revenue** [2] - 17:11, 17:13
**Review** [2] - 51:24, 52:10
**review** [19] - 46:15, 53:10, 54:15, 54:17, 54:18, 54:20, 67:23, 77:5, 82:17, 82:22, 83:12, 87:19, 152:14, 186:9, 186:19, 186:22, 192:1, 192:22
**reviewed** [22] - 4:19, 24:20, 24:24, 31:3, 31:7, 31:9, 31:13, 31:17, 35:22, 36:23, 39:7, 42:5, 42:9, 44:11, 46:16, 67:22, 77:8, 79:1, 79:2, 79:5, 82:21
**reviewing** [4] - 42:15, 44:1, 44:14, 156:2
**revisit** [1] - 47:13
**revoke** [1] - 12:17
**Richard** [6] - 148:12, 149:5, 186:3, 186:5, 199:8, 218:7
**RICHARD** [4] - 2:7, 2:8, 148:15, 148:22
**rid** [1] - 145:8
**rights** [6] - 82:9, 82:14, 82:17, 82:21, 82:25, 109:3
**rigor** [1] - 175:2
**rise** [12] - 3:2, 4:8, 64:8, 65:12, 87:1, 122:15, 123:11, 123:19, 181:10, 185:16, 185:18, 238:7
**risks** [1] - 43:16
**roadmap** [1] - 179:20
**ROBERT** [1] - 1:11
**robust** [1] - 177:23
**Rodgin** [2] - 218:4,

230:6
**role** [9] - 165:19, 199:11, 216:4, 216:17, 230:11, 230:23, 231:7, 231:9, 231:11
**Roman** [2] - 100:2, 188:24
**Rome** [19] - 25:23, 25:25, 32:22, 32:24, 33:2, 34:2, 37:3, 37:5, 41:8, 42:5, 42:9, 42:15, 43:3, 45:7, 131:25, 133:17, 151:6, 192:9, 218:8
**Rome's** [1] - 44:20
**Ron** [4] - 89:5, 90:2, 113:4, 124:13
**room** [3] - 173:22, 181:17, 196:13
**roughly** [2] - 20:18, 20:19
**Route** [1] - 139:18
**routine** [1] - 191:2
**Rule** [1] - 85:2
**ruled** [2] - 47:16, 118:22, 120:25
**rules** [3] - 199:12, 221:9, 222:3
**Rules** [3] - 85:3, 99:18, 99:20
**ruling** [2] - 118:12, 120:20
**rulings** [2] - 121:18, 122:5
**run** [4] - 163:13, 164:21, 164:24, 205:3
**running** [2] - 20:20, 210:10
**runs** [1] - 184:24

**S**

**sale** [8] - 22:11, 24:12, 24:15, 24:17, 59:6, 68:21, 68:23, 73:19
**Salem** [3] - 174:10, 174:11, 175:9
**sales** [3] - 17:13, 17:17
**Sandler** [13] - 8:8, 8:17, 35:11, 97:3, 161:4, 161:7, 183:22, 184:25, 197:6, 197:12, 198:11, 198:25, 199:8
**Sandler's** [1] - 198:14

**sat** [1] - 174:2
**satisfactory** [1] - 15:13
**satisfied** [2] - 147:15, 195:25
**satisfy** [10] - 86:18, 144:16, 144:20, 144:21, 144:24, 145:3, 145:9, 145:13, 145:14, 203:2
**satisfying** [1] - 201:25
**savings** [2] - 76:25, 77:5
**Savings** [3] - 184:18, 208:23
**saw** [7] - 143:6, 143:8, 156:23, 175:15, 221:12, 221:14, 221:22
**schedule** [2] - 63:21, 63:23
**scheduled** [1] - 49:13
**schedules** [1] - 139:11
**school** [2] - 150:4, 150:7
**School** [2] - 81:13, 150:5
**Schwartz** [13] - 30:14, 136:17, 136:18, 136:19, 137:1, 137:7, 137:9, 137:12, 138:2, 141:5, 141:8, 184:1, 229:24
**SCHWARTZ** [6] - 2:5, 2:6, 2:7, 136:23, 136:25, 141:3
**scope** [2] - 145:22, 146:16
**Scott** [1] - 91:1
**screen** [7] - 9:2, 22:7, 65:20, 100:1, 186:1, 204:15, 217:7
**scrutiny** [1] - 168:18
**seafood** [2] - 139:17, 140:15
**seal** [1] - 65:8
**seat** [7] - 3:3, 4:10, 65:14, 123:21, 137:2, 148:20, 185:20
**seated** [1] - 123:12
**SEC** [6] - 23:9, 32:2, 46:4, 46:7, 46:15, 46:16
**second** [30] - 9:19, 10:19, 11:14, 60:12, 65:21, 80:22, 83:16, 115:25, 122:8, 125:1,

125:24, 133:2, 133:23, 134:3, 148:7, 158:4, 173:24, 179:24, 182:7, 182:12, 182:15, 183:12, 188:23, 189:11, 193:11, 206:7, 213:12, 215:16, 217:20, 218:1
**secondly** [2] - 165:8, 203:13
**seconds** [1] - 144:25
**section** [3] - 70:13, 125:14, 127:22
**Section** [3] - 1:24, 82:10, 154:12
**sections** [2] - 158:6, 158:8
**secure** [1] - 113:8
**see** [74] - 21:9, 22:8, 29:8, 32:8, 33:18, 33:19, 33:23, 35:4, 35:7, 40:8, 41:7, 41:10, 41:11, 42:23, 43:15, 53:9, 60:13, 60:15, 61:8, 61:13, 63:4, 63:11, 64:7, 65:24, 70:3, 79:22, 79:23, 80:1, 82:6, 82:22, 92:21, 92:22, 100:2, 100:6, 100:9, 103:13, 104:15, 107:9, 108:1, 113:17, 122:12, 122:19, 134:6, 148:4, 148:7, 158:6, 167:16, 171:17, 173:12, 177:13, 181:18, 189:3, 196:24, 205:14, 206:19, 212:19, 212:25, 213:2, 213:22, 217:7, 217:13, 217:15, 217:23, 218:1, 225:11, 229:17, 229:22, 229:25, 230:2, 231:23, 235:5, 237:21, 238:5, 238:13
**seeing** [5] - 162:21, 169:6, 188:13, 212:18, 235:10
**seek** [9] - 66:25, 67:9, 78:12, 82:17, 83:12, 97:7, 98:4, 182:1, 182:12
**seeking** [3] - 40:22, 94:18, 154:5
**seeks** [1] - 123:6
**seem** [2] - 43:16, 90:9

**self** [3] - 57:14, 58:22, 182:18

**self-explanatory** [2] - 57:14, 58:22

**sellers** [2] - 164:4, 164:10

**semiannually** [1] - 139:11

**send** [1] - 175:15

**sending** [1] - 188:17

**senior** [12] - 42:16, 91:12, 102:21, 129:10, 129:17, 149:10, 161:19, 169:20, 178:17, 178:18, 188:18, 198:12

**Senior** [1] - 45:13

**sense** [6] - 125:19, 140:5, 232:11, 234:10, 234:11, 234:14

**sent** [8] - 54:25, 62:7, 62:18, 102:16, 102:17, 155:19, 186:16, 189:17

**sentence** [11] - 40:15, 60:14, 83:15, 114:8, 218:25, 219:21, 219:24, 220:9, 220:18, 233:12, 233:22

**separate** [9] - 36:22, 39:8, 39:11, 56:1, 56:20, 56:23, 145:5, 182:25, 183:3

**separation** [4] - 232:4, 232:15, 233:15, 235:15

**September** [2] - 8:8, 96:7

**series** [7] - 91:16, 153:10, 180:7, 184:6, 184:7, 189:11, 197:4

**serious** [4] - 42:18, 45:9, 163:22, 186:9

**seriously** [1] - 165:2

**served** [4] - 137:10, 139:14, 143:1, 143:2

**service** [3] - 68:3, 141:13, 146:1

**services** [21] - 65:23, 66:8, 67:1, 67:10, 68:2, 127:1, 127:8, 128:1, 128:3, 128:5, 128:6, 128:10, 129:19, 129:21, 130:3, 131:20, 149:10, 152:8, 152:11, 160:10, 214:6

**set** [19] - 31:14, 34:20, 70:12, 78:22, 117:21, 159:25, 167:13, 167:17, 167:25, 172:14, 183:4, 189:7, 197:5, 200:7, 200:9, 203:2, 217:8, 229:12

**settle** [2] - 11:20, 116:5

**settlement** [13] - 11:16, 11:19, 13:15, 85:2, 94:5, 94:23, 95:14, 95:18, 115:23, 200:17, 202:15, 203:5, 206:12

**settling** [2] - 126:7, 206:4

**seven** [2] - 20:1, 227:5

**sever** [1] - 60:22

**several** [11] - 7:10, 36:23, 49:13, 117:17, 176:22, 177:5, 203:10, 220:3, 220:7, 220:15, 234:25

**severance** [2] - 151:25, 208:6

**severed** [1] - 60:10

**sewing** [1] - 41:3

**shall** [1] - 19:14, 62:6, 104:20

**share** [3] - 17:20, 17:21, 52:6

**shared** [4] - 91:12, 159:7, 159:8, 187:6

**shareholder** [17] - 43:12, 43:14, 55:2, 55:3, 68:19, 93:9, 93:17, 93:18, 94:8, 94:10, 94:12, 94:25, 113:4, 113:5, 210:8, 210:9, 210:18

**shareholders** [17] - 23:9, 54:25, 62:7, 62:18, 68:16, 92:17, 93:8, 94:3, 94:6, 94:18, 95:2, 107:6, 123:25, 180:11, 209:11

**shareholders'** [1] - 107:3

**shares** [5] - 17:22, 69:1, 95:5, 210:9, 210:18

**sheet** [4] - 226:13, 226:16, 226:19, 226:24

**shifting** [1] - 114:10

**shifts** [1] - 114:1

**Shirley** [6] - 38:19,

39:10, 39:21, 43:5, 46:18, 121:8

**Shirley's** [1] - 16:16

**shoot** [1] - 43:13

**shopping** [2] - 52:6, 52:7

**short** [1] - 40:9

**Short** [1] - 238:12

**show** [44] - 5:25, 7:22, 8:7, 8:25, 20:16, 20:23, 26:5, 28:5, 28:10, 28:15, 32:2, 32:4, 32:7, 54:22, 68:4, 68:11, 69:22, 73:4, 97:5, 142:24, 154:7, 164:15, 169:1, 170:24, 176:7, 185:24, 188:12, 190:18, 192:24, 193:25, 194:24, 196:23, 197:3, 197:21, 198:10, 199:2, 199:18, 200:7, 201:18, 204:8, 212:12, 217:6

**showed** [2] - 32:4, 232:6

**showing** [7] - 7:25, 19:3, 29:7, 154:22, 173:6, 175:8, 213:22

**shown** [3] - 19:14, 62:6, 104:20

**shows** [10] - 16:4, 16:6, 16:7, 17:4, 17:13, 17:15, 17:21, 17:25, 20:24, 229:24

**side** [2] - 20:16, 54:7

**sidebar** [6] - 2:15, 117:5, 117:7, 118:8, 238:2, 238:3

**Sidebar** [1] - 121:24

**sided** [1] - 107:14

**sides** [1] - 85:14

**sign** [10] - 12:13, 72:13, 72:14, 72:15, 72:17, 72:23, 73:2, 79:11, 104:9, 165:9

**signed** [4] - 8:16, 12:6, 72:12, 72:18, 81:3, 81:21, 81:24, 82:1, 82:13, 84:19, 108:17, 109:2, 109:7, 124:6

**significant** [7] - 102:22, 169:11, 177:9, 181:1, 192:2, 205:9, 223:5

**signing** [2] - 82:20, 190:13

**Silvestri** [7] - 57:1,

75:23, 75:25, 76:3, 192:10, 192:25, 195:4

**similar** [2] - 128:4, 129:19

**simple** [3] - 4:20, 4:22, 5:3

**simply** [4] - 7:25, 14:18, 183:22, 184:24

**single** [26] - 18:24, 31:14, 51:22, 53:19, 54:18, 55:17, 55:18, 55:25, 56:2, 56:6, 56:8, 58:4, 58:7, 68:2, 68:18, 128:23, 128:25, 129:7, 130:19, 145:23, 167:6, 167:16, 167:24, 168:7, 172:13, 207:4

**sit** [2] - 181:15, 188:5

**Site** [1] - 31:7, 53:14, 53:15, 53:19, 53:22, 53:24, 54:5, 54:9, 55:2, 55:14, 56:4, 57:17, 57:19, 75:18, 175:21

**site** [34] - 50:11, 50:12, 50:14, 50:19, 50:22, 50:23, 57:16, 57:23, 57:24, 57:25, 58:2, 58:22, 58:25, 59:1, 59:4, 59:5, 59:9, 59:13, 59:16, 60:2, 60:23, 61:22, 75:16, 75:17, 75:25, 88:24, 88:25, 110:12, 171:25, 172:2, 172:14

**sites** [14] - 57:11, 57:14, 58:23, 59:7, 59:8, 59:14, 59:24, 60:2, 60:3, 60:4, 60:6, 110:13, 164:12

**sitting** [5] - 175:14, 201:24, 219:23, 233:1, 235:5

**situation** [2] - 44:1, 139:16

**six** [11] - 20:1, 47:14, 66:21, 69:1, 81:1, 82:6, 95:5, 113:23, 114:7, 115:14, 115:21

**size** [1] - 130:8

**Skadden** [4] - 8:12, 35:12, 96:2, 197:6

**skateboarder's** [1] - 174:3

**sky** [1] - 135:6

**Slate** [1] - 35:12

**SLC** [31] - 10:11, 30:19, 33:25, 34:5,

35:15, 41:15, 45:11, 46:1, 46:23, 46:25, 47:2, 47:21, 48:12, 48:21, 49:5, 49:13, 49:14, 49:16, 126:17, 129:3, 129:13, 130:17, 130:18, 130:21, 131:2, 131:16, 131:18, 133:22, 133:24, 134:11, 134:24

**SLC's** [1] - 35:6

**slough** [1] - 229:22

**slow** [1] - 49:11

**small** [5] - 23:13, 23:15, 23:21, 82:9, 136:2

**smart** [1] - 235:4

**Smart** [5] - 67:12, 67:18, 67:22, 68:1, 127:17

**snafu** [1] - 174:25

**sneak** [1] - 121:7

**snow** [1] - 52:8

**Society** [1] - 184:18

**soften** [2] - 180:8, 180:16

**software** [1] - 8:4

**solely** [4] - 11:15, 11:20, 85:1, 126:7

**someone** [5] - 109:1, 113:20, 155:7, 233:11, 236:5

**sometimes** [2] - 49:11, 58:18

**somewhat** [1] - 94:6

**son** [1] - 76:4

**sons** [1] - 76:6

**soon** [1] - 157:13

**sorry** [24] - 15:22, 22:24, 24:7, 33:22, 34:18, 57:21, 59:21, 61:5, 61:20, 66:5, 75:9, 88:25, 95:9, 99:3, 126:21, 134:6, 139:22, 147:6, 198:6, 220:21, 234:5, 234:23, 237:11

**sort** [1] - 163:13

**sorts** [1] - 89:12

**sought** [3] - 152:6, 155:15, 214:8

**sound** [5] - 83:19, 203:14, 206:16, 216:10, 216:13

**sounds** [6] - 20:4, 20:6, 66:23, 115:17, 217:1, 237:20

**South** [2] - 55:3, 55:4

**southern** [1] - 14:1

**speaker** [1] - 217:21
**speaking** [1] - 162:1
**special** [7] - 33:16, 39:3, 47:3, 47:7, 227:18, 228:6, 229:3
**Special** [39] - 10:24, 11:4, 11:11, 25:5, 30:22, 30:25, 33:13, 34:9, 34:12, 34:14, 35:19, 35:22, 37:8, 38:8, 39:5, 40:2, 40:5, 40:17, 42:14, 44:7, 45:4, 45:23, 48:4, 85:22, 86:3, 128:16, 130:13, 176:14, 224:24, 226:8, 226:16, 226:19, 226:22, 226:24, 227:11, 227:19, 228:24, 231:9, 236:23
**specialty** [1] - 149:9
**specific** [18] - 14:12, 55:22, 92:23, 117:13, 161:24, 167:2, 167:13, 168:7, 170:10, 175:13, 202:20, 204:7, 219:23, 220:1, 220:20, 222:12, 222:14, 222:15
**specifically** [15] - 7:16, 9:22, 80:21, 118:14, 157:10, 165:5, 165:15, 179:18, 182:5, 188:16, 196:13, 197:9, 213:8, 215:13, 220:20
**specificity** [1] - 46:4
**specifics** [1] - 166:16
**speculate** [2] - 226:4, 226:5
**speed** [1] - 156:2
**Spell** [1] - 148:17
**spend** [1] - 185:8
**spent** [2] - 66:2, 169:12
**spite** [2] - 111:15
**spitefully** [1] - 184:9
**split** [1] - 52:9
**squarely** [4] - 119:4, 119:20, 119:22, 184:4
**staff** [2] - 117:4, 161:19
**stage** [1] - 223:19
**stand** [3] - 3:23, 184:7, 207:6
**stand)** [1] - 123:18
**standard** [1] - 165:7

**standards** [1] - 203:2
**standby** [1] - 64:14
**standpoint** [5] - 153:1, 197:13, 197:14, 210:1
**start** [2] - 23:22, 57:22
**started** [9] - 5:9, 13:24, 27:14, 57:24, 89:24, 92:16, 98:13, 106:25, 135:9
**starting** [2] - 36:14, 200:9
**starts** [4] - 22:20, 35:5, 128:15, 131:4
**State** [2] - 85:3, 101:10
**statement** [19] - 54:8, 54:24, 61:21, 62:6, 62:9, 62:11, 62:18, 63:2, 65:19, 66:4, 66:5, 66:15, 69:5, 72:4, 72:7, 214:13, 222:19, 225:23, 233:2
**statements** [2] - 65:18, 68:10
**STATES** [2] - 1:1, 1:11
**states** [7] - 13:23, 13:25, 33:18, 43:8, 49:4, 80:21, 186:8
**States** [4] - 1:8, 39:9, 112:5, 140:23
**stating** [1] - 24:22
**status** [8] - 15:24, 64:11, 77:8, 77:18, 140:8, 198:14, 200:12, 232:2
**statute** [3] - 165:11, 206:9, 208:3
**statutory** [1] - 163:10
**stay** [7] - 34:16, 64:21, 64:24, 106:10, 138:13, 182:24, 211:2
**stayed** [1] - 138:7
**stealing** [3] - 117:4, 211:4, 211:6
**Stearns** [2] - 202:11, 202:14
**step** [4] - 135:14, 136:13, 147:24, 158:17
**steps** [6] - 78:19, 78:22, 86:18, 165:16, 177:13, 203:17
**Sterns** [6] - 186:3, 186:5, 186:8, 186:16, 199:9, 199:22
**Steve** [2] - 30:8, 57:5

**Steven** [2] - 26:22, 55:6
**stewardship** [1] - 20:9
**stick** [2] - 114:13, 119:21
**still** [6] - 12:2, 59:2, 120:4, 131:12, 179:9, 202:17
**stipulation** [3] - 85:7, 190:10, 204:19
**stock** [38] - 17:24, 18:2, 18:5, 18:7, 19:8, 19:13, 20:22, 20:23, 20:24, 20:25, 21:3, 21:6, 21:14, 21:25, 23:12, 23:17, 24:2, 24:11, 68:12, 73:24, 73:25, 74:2, 135:2, 135:7, 135:8, 135:10, 135:11, 135:14, 135:16, 135:21, 135:25, 141:23, 144:10, 155:2, 155:4, 210:9
**Stock** [1] - 20:13
**stood** [1] - 199:1
**stop** [1] - 237:19
**stopped** [1] - 89:2
**stopping** [1] - 116:8
**stores** [12] - 19:7, 19:9, 19:11, 19:19, 19:21, 57:15, 58:25, 59:4, 68:2, 68:3, 130:5, 130:7
**stories** [1] - 50:23
**storm** [1] - 178:9
**story** [3] - 91:22, 91:23, 120:24
**straight** [3] - 108:1, 212:4, 212:6
**strategic** [2] - 168:14, 169:21
**strategy** [1] - 171:23
**streamed** [1] - 200:19
**Street** [2] - 89:14, 89:15
**street** [1] - 193:20
**strength** [1] - 187:19
**stressed** [1] - 131:8
**stretch** [3] - 140:9, 140:11, 140:12
**strictly** [1] - 107:14
**strike** [3] - 22:10, 168:5, 196:5
**strong** [2] - 160:1, 209:25
**structure** [1] - 129:18

**struggling** [1] - 221:20
**studied** [2] - 10:23, 236:6
**stuff** [5] - 107:10, 111:9, 121:7, 126:2, 126:4
**sub** [1] - 124:21
**subcontractor** [1] - 49:9
**subject** [18] - 10:18, 75:3, 139:19, 140:2, 140:17, 152:21, 153:8, 155:17, 155:24, 159:24, 191:4, 191:25, 192:11, 197:10, 199:6, 203:12, 205:8, 221:8
**subjected** [1] - 168:17
**submit** [13] - 98:17, 98:19, 98:21, 99:2, 99:12, 99:15, 99:16, 102:2, 159:20, 192:3, 192:14, 195:21, 202:21
**submitted** [6] - 3:13, 101:18, 102:4, 108:10, 131:12, 177:21
**submitting** [4] - 102:1, 118:15, 189:4, 189:14
**subpoena** [3] - 34:3, 137:10, 163:22
**subsequently** [3] - 6:15, 129:17, 174:23
**subsidiary** [1] - 140:24
**substantial** [9] - 46:12, 117:23, 152:4, 166:7, 173:25, 178:15, 178:21, 205:7, 219:18
**substantially** [2] - 216:7, 216:15
**substantiate** [1] - 131:19
**subtract** [1] - 19:22
**success** [1] - 66:10
**successful** [3] - 73:12, 81:14, 126:11
**succession** [1] - 162:14
**sue** [2] - 35:23, 104:24
**sued** [6] - 7:15, 35:25, 36:3, 37:19, 109:10, 109:12

**suffered** [1] - 37:15
**suggest** [2] - 226:23, 237:17
**suggested** [1] - 114:2
**suggesting** [1] - 174:22
**suggestion** [1] - 44:21
**suggests** [2] - 97:13, 230:17
**suing** [2] - 116:24, 117:1
**suit** [22] - 21:20, 37:20, 37:23, 43:15, 47:11, 69:12, 92:17, 94:23, 96:10, 97:6, 106:17, 109:13, 109:14, 116:21, 117:13, 117:15, 117:16, 117:19, 117:20, 118:2, 134:9, 134:16
**suit's** [1] - 109:14
**suits** [13] - 7:12, 7:14, 7:19, 7:20, 93:9, 93:10, 93:12, 94:14, 94:17, 95:3, 113:5, 123:25
**Sullivan** [8] - 152:25, 153:13, 155:7, 198:13, 215:25, 216:19, 218:4, 230:5
**sum** [2] - 13:4, 13:5
**summarized** [1] - 154:12
**summarizes** [1] - 197:7
**summary** [4] - 129:20, 154:7, 154:9, 157:20
**sums** [1] - 208:6
**supervises** [1] - 163:8
**supervision** [1] - 165:21
**supervisory** [1] - 149:18
**supplemental** [1] - 154:25
**supplemented** [1] - 38:24
**support** [6] - 6:10, 98:17, 99:4, 99:12, 130:7, 160:3
**supportable** [1] - 184:11
**supposedly** [1] - 51:8
**Supreme** [4] - 38:12,

39:9, 39:12, 184:19
**surrounding** [2] -
153:2, 187:25
**SUSAN** [1] - 1:17
**sustain** [1] - 117:24
**sustained** [3] -
122:1, 122:3, 201:13
**swore** [1] - 79:8
**SWORN** [3] - 3:24,
136:23, 148:15
**Syracuse** [1] - 150:5
**system** [1] - 151:18
**System** [2] - 39:9,
39:12
**systematically** [1] -
129:3
**systems** [1] - 214:6

# T

**table** [1] - 166:3
**tailored** [2] - 127:1,
127:8
**talks** [1] - 192:18
**Tambussi** [30] - 3:14,
5:17, 5:20, 7:1, 64:20,
65:17, 113:3, 113:14,
114:2, 115:24,
116:21, 118:19,
123:24, 126:11,
126:12, 129:23,
131:23, 135:1,
143:11, 144:23,
146:19, 181:24,
212:12, 217:9, 218:8,
230:3, 230:13, 232:6,
235:20, 237:15
**TAMBUSSI** [139] -
1:17, 2:2, 2:4, 2:7,
2:9, 3:6, 3:9, 3:16,
6:16, 6:20, 8:23,
14:11, 22:4, 22:5,
22:6, 22:15, 28:7,
28:10, 28:13, 28:15,
28:18, 28:20, 28:23,
29:1, 29:3, 29:6, 50:5,
60:11, 61:3, 61:5,
63:1, 63:6, 63:10,
64:4, 64:22, 65:5,
65:16, 66:18, 69:25,
71:1, 73:7, 79:20,
80:11, 80:20, 88:18,
97:11, 99:23, 104:17,
112:23, 116:17,
117:5, 117:8, 117:25,
118:17, 119:1,
120:22, 121:4, 121:6,
121:25, 123:14,
127:10, 132:17,
133:2, 133:5, 134:22,

135:21, 135:24,
136:9, 141:3, 141:4,
146:3, 146:6, 146:20,
147:21, 148:11,
148:23, 148:24,
154:5, 154:9,
154:11, 157:3, 157:4,
158:2, 158:3, 158:15,
158:24, 162:15,
162:24, 163:3, 169:1,
169:2, 170:20,
170:22, 170:23,
172:21, 173:2, 173:5,
173:14, 173:16,
174:7, 175:4, 175:7,
179:8, 179:12, 181:2,
181:6, 181:13,
181:17, 181:20,
181:25, 183:9,
183:11, 184:13,
185:7, 185:22,
185:23, 189:25,
190:1, 191:20,
193:21, 193:24,
194:21, 194:23,
196:25, 197:2,
197:22, 197:25,
198:23, 199:3,
199:13, 200:4, 200:6,
201:14, 201:17,
202:6, 204:10,
207:10, 234:21, 238:9
**Tambussi's** [1] - 9:6
**tanks** [9] - 71:25,
72:2, 86:7, 86:10,
86:12, 86:14, 86:15,
107:13, 108:6
**tape** [4] - 89:2, 89:3,
89:22, 111:6
**Tarquini** [3] - 27:10,
30:16, 45:13
**taxes** [1] - 52:2
**TD** [34] - 13:4, 13:5,
13:6, 18:17, 22:11,
24:12, 24:15, 68:21,
93:14, 112:5, 112:19,
135:3, 138:3, 138:8,
138:9, 138:13,
138:19, 140:6,
140:23, 142:10,
142:16, 143:2,
143:13, 143:23,
144:7, 144:9, 145:7,
147:9, 147:19,
147:20, 202:12,
216:1, 216:9, 235:6
**TD's** [1] - 161:5
**team** [4] - 91:11,
130:11, 171:3, 178:18
**tech** [1] - 15:21

**telephone** [2] -
64:14, 113:3
**ten** [5] - 6:9, 18:5,
21:9, 192:11, 210:10
**ten-year** [1] - 21:9
**tenant** [1] - 61:17
**tended** [1] - 167:21
**tennants** [1] - 52:9
**tenor** [1] - 180:23
**tense** [1] - 178:3
**tension** [1] - 178:12
**tenure** [3] - 14:7,
17:6, 205:12
**term** [2] - 18:22,
55:17
**terminate** [2] - 70:4,
75:4
**terminated** [7] -
74:9, 90:22, 108:3,
108:8, 144:12, 196:7,
196:18
**termination** [7] - 9:9,
196:23, 218:14,
218:18, 218:23,
219:10, 220:25
**terms** [15] - 35:24,
36:13, 76:9, 76:16,
86:18, 95:11, 104:6,
111:20, 166:23,
178:9, 179:23,
180:20, 187:8, 206:5,
221:7
**TESTIFIED** [3] -
3:25, 136:24, 148:16
**testified** [19] - 24:19,
35:23, 36:11, 50:8,
52:16, 53:15, 57:23,
93:16, 101:9, 106:23,
107:11, 107:16,
109:17, 111:17,
166:3, 213:21,
227:11, 235:9, 236:22
**testify** [5] - 25:4,
59:23, 87:9, 87:12,
87:13
**testifying** [3] - 62:4,
123:5, 226:17
**testimony** [27] -
24:18, 25:15, 34:3,
34:4, 36:21, 57:23,
58:24, 62:2, 68:14,
98:12, 103:24,
107:19, 116:11,
141:9, 143:16,
156:20, 175:20,
196:20, 205:20,
205:21, 205:22,
207:17, 221:25,
228:14, 228:15,
234:8, 236:9

**tests** [1] - 12:12
**text** [2] - 9:4, 10:7
**THE** [182] - 1:1, 1:11,
3:2, 3:3, 3:8, 3:11,
3:17, 3:21, 4:2, 4:3,
4:4, 4:5, 4:6, 4:8,
4:10, 4:13, 6:19, 6:21,
6:24, 8:2, 8:4, 8:6,
8:22, 8:24, 9:13,
14:15, 14:19, 14:22,
14:25, 15:2, 22:3,
22:17, 28:9, 28:14,
29:5, 50:4, 64:3, 64:5,
64:8, 64:10, 64:13,
64:15, 64:17, 64:25,
65:4, 65:6, 65:12,
65:14, 71:2, 78:15,
97:12, 97:14, 110:1,
112:24, 116:18,
117:6, 117:24, 118:1,
118:6, 118:18,
118:23, 119:5,
119:11, 119:15,
119:24, 120:4, 120:8,
120:14, 120:16,
120:18, 121:1, 121:5,
121:8, 121:12,
121:16, 121:19,
121:21, 121:23,
122:2, 122:15,
122:17, 122:22,
122:25, 123:2, 123:5,
123:11, 123:12,
123:16, 123:19,
123:21, 127:13,
127:14, 132:13,
132:22, 132:24,
133:1, 133:7, 133:11,
134:5, 134:6, 134:8,
134:12, 135:23,
136:10, 136:13,
136:18, 136:21,
136:22, 137:1, 137:4,
137:5, 141:2, 146:1,
146:4, 146:18,
146:19, 147:22,
147:24, 147:25,
148:2, 148:7, 148:9,
148:10, 148:13,
148:17, 148:18,
148:19, 157:25,
158:17, 158:22,
158:23, 162:9,
162:11, 170:21,
172:19, 173:4,
173:15, 173:17,
175:6, 179:11, 181:4,
181:7, 181:12,
181:14, 181:18,
181:21, 181:23,
182:16, 183:1,

183:10, 184:14,
185:8, 185:12,
185:16, 185:17,
185:18, 185:20,
191:19, 193:23,
194:22, 197:1,
197:24, 198:19,
198:22, 199:4,
199:15, 200:5,
201:13, 201:16,
202:8, 204:12,
205:21, 207:11,
212:12, 234:22,
237:20, 237:25,
238:2, 238:4, 238:7,
238:11, 238:13
**themselves** [4] -
88:10, 163:22,
195:25, 231:6
**theoretically** [1] -
41:1
**theory** [3] - 36:4,
36:6, 36:8
**thereabouts** [1] - 7:2
**thereafter** [1] -
231:10
**therefore** [1] - 60:21
**thesis** [1] - 150:6
**they've** [1] - 221:19
**thinking** [2] - 107:20,
133:3
**Third** [1] - 185:2
**third** [14] - 15:16,
20:12, 51:15, 105:8,
106:7, 106:19,
163:25, 164:2,
174:18, 177:11,
214:4, 214:21,
231:21, 233:12
**thirdly** [1] - 165:12
**Thomas** [1] - 194:2
**thoroughly** [1] -
129:13
**thoughts** [1] - 110:2
**thousand** [1] - 6:9
**thousands** [1] -
26:15
**threatened** [3] -
71:9, 72:5, 81:10
**threats** [1] - 74:7
**three** [30] - 5:15, 6:6,
18:25, 19:25, 25:1,
25:12, 25:13, 39:11,
61:7, 80:19, 80:20,
116:13, 126:15,
129:24, 129:25,
163:24, 165:5,
165:14, 191:7, 198:6,
200:13, 212:7,
212:17, 219:6, 219:8,

227:18, 227:20, 228:21, 229:6, 229:8

**three-year** [2] - 129:24, 129:25

**threefold** [1] - 163:21

**thrift** [1] - 76:25

**thrifts** [1] - 77:5

**Thursday** [15] - 4:16, 14:11, 22:14, 24:23, 25:15, 35:23, 36:21, 50:8, 53:15, 57:10, 62:7, 76:22, 95:21, 104:21, 107:20

**tie** [1] - 100:13

**tightening** [1] - 177:15

**timely** [1] - 44:18

**timing** [1] - 238:10

**Title** [1] - 1:24

**today** [20] - 13:20, 24:23, 64:13, 72:4, 137:20, 142:22, 159:13, 175:14, 196:22, 217:18, 219:24, 221:25, 228:23, 228:25, 229:20, 233:1, 235:9, 236:14, 236:22, 237:21

**together** [6] - 107:9, 128:11, 129:12, 139:11, 184:8, 196:12

**tolling** [2] - 165:9, 214:22

**tomorrow** [4] - 202:15, 237:22, 238:5, 238:13

**took** [5] - 11:18, 139:13, 162:17, 196:20, 202:20

**tooth** [1] - 120:3

**top** [14] - 9:19, 16:6, 17:12, 20:12, 28:21, 60:14, 60:15, 79:22, 79:25, 217:12, 229:16, 229:18, 231:22

**topic** [18] - 5:4, 5:17, 7:22, 9:25, 10:2, 10:23, 13:21, 118:7, 121:6, 126:10, 126:14, 129:1, 130:12, 133:23, 140:14, 195:11, 218:14, 231:21

**topics** [1] - 37:16

**Toronto** [2] - 24:12, 140:24

[2] - 24:12, 140:24

**Toronto** [9] - 7:11, 8:13, 13:11, 13:15, 71:19, 93:11, 111:21, 112:18

**tort** [1] - 184:21

**tortious** [1] - 36:6

**total** [11] - 15:1, 17:11, 29:22, 30:3, 46:5, 46:11, 66:22, 136:2, 141:20, 143:3, 143:5

**totally** [3] - 94:11, 231:15

**toward** [2] - 88:11, 178:22

**town** [1] - 233:6

**trade** [1] - 18:7

**trading** [2] - 18:3, 18:6

**traffic** [3] - 97:2, 172:1, 198:15

**transaction** [14] - 56:20, 138:7, 138:12, 166:25, 167:3, 167:5, 167:14, 170:14, 170:16, 173:22, 177:14, 187:15, 216:2, 216:9

**transactions** [47] - 10:21, 12:11, 12:18, 31:4, 52:1, 54:5, 56:14, 61:16, 75:12, 75:15, 83:22, 107:17, 107:23, 126:2, 161:23, 161:24, 161:25, 165:12, 165:14, 166:21, 166:22, 166:23, 168:7, 168:11, 168:21, 171:10, 171:12, 172:8, 174:5, 174:6, 174:8, 175:3, 176:6, 187:3, 187:13, 187:24, 188:1, 188:6, 192:1, 192:22, 193:12, 206:18, 207:4, 211:25, 213:18, 214:1, 214:4

**transition** [10] - 192:3, 192:4, 192:11, 192:12, 192:15, 194:5, 211:25, 216:1, 216:5, 232:4

**transmitted** [2] - 45:20, 199:9

**transpired** [1] - 196:22

**trash** [1] - 223:11

**Treasurer** [2] - 5:21,

6:3

**treasurer** [1] - 124:1

**tremendous** [1] - 128:9

**Trenton** [1] - 184:17

**trial** [9] - 13:21, 14:4, 36:21, 38:5, 38:24, 39:12, 69:8, 103:24, 137:10

**tribunals** [2] - 39:8, 39:11

**tried** [2] - 139:7, 139:10

**trigger** [1] - 164:25

**triggered** [1] - 180:7

**trouble** [6] - 78:7, 200:14, 208:5, 208:10, 208:12

**troubled** [13] - 76:18, 77:11, 77:18, 77:24, 78:1, 101:15, 149:21, 151:21, 159:11, 159:12, 190:23, 190:24, 190:25

**true** [26] - 1:24, 25:3, 38:13, 39:4, 39:16, 40:14, 51:1, 53:4, 53:5, 53:25, 54:24, 67:3, 67:5, 67:7, 72:7, 74:16, 90:17, 92:10, 104:4, 110:13, 110:19, 120:14, 127:5, 130:12, 189:20, 220:22

**Truman** [1] - 120:12

**trust** [1] - 100:8

**Trust** [1] - 55:9

**trustee** [1] - 55:9

**truth** [4] - 110:22, 112:22, 162:9, 173:13

**try** [17] - 32:14, 48:22, 99:10, 117:9, 121:7, 137:2, 139:8, 145:18, 146:7, 147:1, 148:20, 159:24, 161:15, 166:2, 174:5, 180:8, 235:4

**trying** [20] - 13:11, 95:13, 116:5, 144:4, 155:16, 161:16, 169:12, 177:10, 177:12, 180:9, 197:14, 197:18, 197:19, 199:10, 200:12, 206:10, 225:8, 232:5, 235:5, 235:7

**turn** [3] - 70:2, 115:16, 213:12

**turned** [3] - 33:1,

108:13, 141:17

**turns** [1] - 201:25

**twice** [1] - 140:16

**two** [46] - 4:23, 4:25, 5:2, 5:15, 6:6, 6:7, 6:8, 6:10, 8:7, 9:5, 19:25, 49:17, 60:16, 63:17, 63:21, 117:9, 120:7, 121:18, 122:4, 128:4, 128:5, 131:16, 139:6, 143:1, 145:24, 163:21, 163:22, 165:5, 177:7, 179:18, 182:25, 183:6, 189:10, 190:11, 195:2, 198:6, 205:13, 206:2, 213:8, 214:16, 218:14, 225:22, 226:2, 228:19, 228:20

**type** [3] - 4:18, 19:14, 89:21

**types** [2] - 5:10, 153:22

**typical** [3] - 58:17, 58:19, 205:3

**typically** [4] - 49:7, 58:7, 155:5, 167:20

## U

**U.S** [4] - 107:13, 108:5, 145:3, 145:4

**U.S.C** [1] - 1:24

**ultimately** [10] - 45:14, 74:17, 90:21, 92:2, 93:12, 142:10, 190:6, 190:16, 195:8, 196:17

**um-hum** [4] - 24:4, 49:20, 103:9, 228:22

**Umbrel** [1] - 90:21

**unanimously** [2] - 220:24, 221:6

**uncomfortable** [1] - 143:25

**uncommon** [1] - 5:10

**under** [44] - 8:14, 20:9, 35:24, 44:23, 52:22, 61:12, 79:8, 81:1, 82:6, 86:17, 95:11, 98:15, 100:16, 100:20, 100:25, 101:9, 106:6, 108:21, 109:17, 116:6, 119:20, 122:8, 134:19, 136:4, 139:2, 146:9, 147:14, 152:7, 153:11, 159:4, 165:21, 170:5,

179:23, 182:20, 183:14, 183:22, 184:14, 193:14, 194:18, 200:17, 206:9, 222:3, 225:18

**underlying** [2] - 163:11, 171:9

**understood** [12] - 11:25, 13:10, 79:5, 81:20, 82:4, 83:9, 83:10, 102:20, 105:25, 106:20, 237:1

**undo** [3] - 12:17, 192:19, 195:18

**undoubtedly** [1] - 186:9

**unfairly** [1] - 174:1

**unhappy** [1] - 144:15

**unilaterally** [1] - 190:10

**uninvolved** [1] - 216:16

**union** [1] - 43:12

**unique** [2] - 127:1, 231:11

**UNITED** [2] - 1:1, 1:11

**United** [4] - 1:8, 39:9, 112:5, 140:23

**University** [1] - 81:12

**unjustified** [1] - 183:17

**unless** [6] - 15:12, 120:19, 123:2, 146:14, 146:22, 147:15

**unlimited** [3] - 104:10, 105:3, 105:5

**unpaid** [1] - 4:20

**unproven** [1] - 88:1

**unrelated** [2] - 44:16, 49:18

**unsafe** [6] - 83:18, 84:9, 84:16, 180:1, 189:4, 206:15

**unsigned** [1] - 114:4

**unsound** [5] - 83:18, 84:9, 84:16, 180:1, 206:15

**unsubstantiated** [4] - 71:9, 72:5, 72:8, 73:3

**unusual** [4] - 163:15, 163:16, 163:18, 180:1

**unwound** [1] - 193:13

**up** [86] - 3:21, 4:16, 4:25, 6:18, 10:3, 23:22, 24:11, 31:14, 33:16, 35:4, 45:25,

51:16, 54:24, 60:11, 60:13, 60:14, 60:19, 63:1, 63:6, 63:7, 64:23, 65:19, 65:20, 65:25, 66:18, 70:1, 79:20, 79:22, 80:11, 80:16, 88:13, 99:23, 104:17, 107:9, 108:2, 111:8, 123:17, 129:24, 136:18, 136:19, 137:19, 138:16, 139:20, 139:23, 140:14, 140:16, 142:22, 151:12, 154:9, 157:3, 162:24, 163:1, 164:16, 166:19, 167:13, 167:17, 167:25, 169:18, 170:3, 172:14, 174:14, 176:13, 176:24, 177:15, 178:10, 178:11, 186:1, 188:25, 193:19, 200:10, 201:22, 204:14, 208:12, 210:9, 210:20, 210:23, 214:10, 217:7, 223:20, 223:22, 224:5, 225:5, 229:25

**update** [2] - 91:9, 91:12

**upper** [3] - 15:17, 17:10, 117:18

**upset** [1] - 196:16

**urge** [2] - 72:13, 72:15

**urged** [1] - 72:23

**USC** [1] - 82:10

**usual** [1] - 179:23

## V

**vacate** [1] - 12:17

**validated** [1] - 133:19

**validity** [1] - 82:25

**value** [14] - 19:7, 19:12, 93:17, 128:1, 128:9, 129:6, 129:7, 131:15, 143:25, 178:8, 210:3, 210:5, 210:8, 210:18

**values** [1] - 128:3

**variety** [1] - 152:2

**various** [2] - 4:23, 129:16

**Vassalluzzo** [6] - 25:4, 25:15, 30:25,

176:16, 227:12, 229:24

**Venable** [6] - 193:9, 193:18, 194:3, 195:4, 195:9

**vendor** [1] - 44:16

**vendors** [3] - 35:10, 192:5, 192:7

**ventures** [1] - 26:24

**verdict** [2] - 43:20, 44:10

**verify** [1] - 220:18

**VERNON** [3] - 1:3, 2:1, 3:24

**Vernon** [21] - 116:5, 137:23, 139:2, 139:21, 139:22, 140:3, 140:8, 140:12, 140:17, 147:7, 202:13, 213:10, 227:21, 232:3, 232:18, 232:22, 234:14, 235:16, 236:2, 237:12

**Vernon's** [2] - 232:14, 233:14

**version** [2] - 3:13, 164:18

**vested** [2] - 155:3, 155:4

**vetted** [1] - 171:10

**via** [1] - 44:17

**vice** [2] - 129:10, 129:17

**Vidian** [1] - 45:12

**view** [3] - 159:22, 160:1, 204:3

**viewed** [1] - 191:12

**views** [2] - 129:12, 160:1

**viii** [1] - 188:24

**Villa** [4] - 47:22, 49:7, 49:9, 49:11

**villa** [1] - 47:24

**Virginia** [1] - 167:4

**virtually** [1] - 143:7

**voice** [1] - 89:3

**voluntarily** [3] - 81:15, 108:13, 108:17

**vote** [2] - 236:18, 237:7

**voted** [4] - 113:8, 113:11, 173:22, 188:6

**vs** [1] - 1:5

## W

**wait** [4] - 34:16, 94:8, 120:20, 185:9

**waive** [1] - 82:14

**waived** [4] - 82:21, 85:13, 125:15, 125:19

**waiver** [4] - 125:13, 126:2, 126:4, 126:7

**waivers** [2] - 81:1, 82:6

**waives** [3] - 82:8, 82:17, 82:25

**waiving** [1] - 109:3

**walking** [1] - 208:15

**wants** [2] - 123:2, 223:11

**warned** [1] - 43:9

**warp** [1] - 156:2

**WAS** [6] - 2:11, 2:12, 2:13, 3:19, 9:1, 65:10

**Washington** [8] - 149:6, 176:21, 176:24, 176:25, 193:8, 223:22, 232:23, 233:10

**waste** [1] - 234:17

**ways** [5] - 77:13, 183:6, 208:9, 210:15, 210:16

**wean** [1] - 192:16

**weaning** [1] - 212:1

**week** [9] - 11:7, 108:11, 108:13, 127:16, 130:5, 142:9, 161:18, 176:22, 228:25

**weekend** [1] - 4:5

**weeks** [5] - 228:18, 228:19, 228:20, 229:6, 229:8

**Weissman** [3] - 33:10, 45:7, 218:7

**welfare** [1] - 155:5

**Wharton** [1] - 81:13

**whatsoever** [1] - 183:19

**whereas** [5] - 80:22, 83:16, 84:13, 205:13, 206:6, 206:7, 206:13

**whereby** [1] - 74:9

**whistles** [1] - 164:25

**white** [1] - 159:23

**White** [5] - 89:5, 89:7, 90:2, 113:4, 124:13

**whole** [17] - 32:4, 32:6, 32:7, 36:24, 63:7, 84:4, 84:13, 84:14, 91:25, 120:23, 133:12, 152:1, 156:16, 168:2, 172:1, 229:22

**wide** [1] - 128:10

**wife** [1] - 40:10

**wife's** [7] - 109:13, 116:23, 116:24, 117:15, 118:2, 118:3, 130:11

**wild** [1] - 36:4

**willful** [1] - 183:21

**William** [3] - 30:14, 136:17, 141:8

**WILLIAM** [3] - 1:17, 2:5, 136:23

**willingness** [1] - 180:16

**win** [1] - 125:9

**wiretap** [1] - 88:14

**wise** [1] - 138:5

**wish** [1] - 142:22

**wished** [1] - 146:11

**witch** [1] - 69:8, 178:23

**Witco** [1] - 185:2

**withdrawn** [1] - 189:25

**withstands** [1] - 44:10

**Witness** [1] - 148:1

**witness** [31] - 3:23, 7:25, 28:7, 28:10, 64:11, 64:20, 64:21, 97:15, 122:18, 123:18, 136:14, 136:15, 136:16, 140:25, 148:10, 170:20, 173:2, 175:4, 183:25, 184:7, 191:17, 193:21, 194:21, 197:22, 199:13, 201:14, 202:6, 204:11, 205:18, 212:11, 212:13

**WITNESS** [20] - 3:24, 4:2, 4:4, 4:6, 28:14, 64:15, 127:14, 132:24, 133:1, 134:6, 136:21, 136:23, 137:4, 146:19, 147:25, 148:16, 148:18, 158:23, 162:11, 173:17

**witnesses** [3] - 34:4, 148:2, 148:3

**witnesses'** [1] - 110:2

**Wochek** [1] - 110:8

**Wojic** [5] - 41:17, 42:5, 42:9, 42:12, 42:16, 43:8, 43:23, 44:9, 45:10

**Wojic's** [3] - 45:5,

45:6, 45:11

**won** [1] - 38:3

**wonder** [1] - 226:18

**wondering** [1] - 64:20

**word** [16] - 11:13, 53:15, 57:20, 79:23, 79:24, 81:18, 81:20, 85:18, 100:11, 114:11, 128:15, 147:19, 153:17, 155:3, 187:10, 211:5

**words** [26] - 19:12, 20:16, 39:6, 39:14, 40:12, 41:10, 42:19, 49:2, 80:22, 82:3, 83:5, 84:2, 84:3, 84:8, 84:11, 88:7, 89:7, 90:15, 90:16, 99:14, 101:15, 101:21, 101:25, 109:8, 208:17, 219:15

**works** [2] - 32:8

**world** [3] - 115:18, 153:13, 224:17

**worst** [1] - 15:10

**worth** [3] - 43:16, 129:2, 135:18

**write** [2] - 67:18, 220:19

**writing** [3] - 101:21, 101:25, 116:4

**written** [3] - 114:23, 133:8, 142:9

**wrongdoing** [6] - 12:8, 48:13, 131:2, 131:3, 131:17, 131:18

**wrongful** [1] - 183:22

**wrote** [6] - 22:14, 33:5, 39:24, 50:3, 129:17, 207:19

## Y

**year** [26] - 14:9, 15:18, 16:7, 16:23, 17:5, 17:20, 19:21, 20:3, 20:21, 21:9, 23:1, 29:11, 43:10, 49:16, 49:23, 51:10, 51:16, 66:1, 88:20, 88:23, 129:24, 129:25, 141:25, 210:9, 215:14, 226:9

**years** [43] - 5:8, 16:3, 16:9, 16:16, 19:25, 20:1, 20:21, 26:18, 46:12, 47:14, 60:8, 66:21, 66:24, 67:8,

77:1, 81:14, 111:13, 115:21, 116:13, 124:24, 124:25, 125:2, 125:3, 126:15, 127:4, 135:13, 135:18, 137:19, 137:20, 138:14, 138:20, 138:21, 141:10, 143:1, 143:2, 143:3, 181:1, 209:23, 210:10, 210:13, 213:14, 214:17

**York** [5] - 14:2, 202:13, 223:22, 224:12, 230:5

**yourself** [8] - 13:1, 24:19, 104:7, 105:14, 149:3, 149:23, 157:7, 188:25

**yup** [2] - 21:13, 219:3

## Z

**zero** [2] - 93:21, 94:1
**zoned** [2] - 59:5, 59:8